UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>MICHAEL AVENATTI,<br><br>       Defendant. | 19 Cr. 374 |

**DEFENDANT MICHAEL AVENATTI'S NOTICE OF MOTION FOR
TRANSFER OF CASE TO THE CENTRAL DISTRICT OF CALIFORNIA**

PLEASE TAKE NOTICE THAT upon the accompanying Memorandum of Law, defendant Michael Avenatti, pursuant to Rule 21 of the Federal Rules of Criminal procedure and the other authority cited in his Memorandum, moves this honorable Court for an order transferring the case to the Central District of California.

PLEASE TAKE FURTHER NOTICE that the government's response is due on Sept. 11 2019, and no reply has been ordered, nor has a hearing been set.

H. Dean Steward
107 Avenida Miramar #C
San Clemente, CA 92672
Telephone:  (949) 481-4900
Facsimile:  (949) 496-6753
Email:  deansteward7777@gmail.com

*Attorney for Defendant Michael Avenatti*

1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 22, 2019, I caused a true and correct copy of the foregoing

to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to

receive electronic notes.


<u>/s/ H. Dean Steward</u>
H. Dean Steward

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

MICHAEL AVENATTI,

Defendant.

19 Cr. 374

**DEFENDANT MICHAEL AVENATTI'S MEMORANDUM OF LAW IN
SUPPORT OF HIS MOTION TO TRANSFER**

H. Dean Steward
107 Avenida Miramar #C
San Clemente, CA 92672
Telephone: (949) 481-4900
Facsimile: (949) 496-6753
Email: deansteward7777@gmail.com

*Attorney for Defendant Michael Avenatti*

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   THE CHARGES ................................................................................................... 2

III.  ARGUMENT ......................................................................................................... 2

    A.   The Government Could Have Brought this Case in California ........................... 3

    B.   All of the Platt Factors Weigh in Favor of Transfer .......................................... 4

        1.   Location of the Defendants ........................................................................ 4

        2.   Location of Potential Witnesses ................................................................ 4

        3.   Location of the Events at Issue .................................................................. 6

        4.   Location of the Documents and Records .................................................... 6

        5.   Disruption of Defendant's Business ........................................................... 7

        6.   Expense of the Parties ................................................................................ 7

        7.   Location of Counsel .................................................................................... 8

        8.   Relative Accessibility of Place of Trial ..................................................... 8

        9.   Docket Conditions of the District Courts Involved .................................... 8

       10.  Special Elements ........................................................................................ 9

IV.  CONCLUSION ................................................................................................... 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Platt v. Minn. Mining & Mfg. Co.*,
  376 U.S. 240 (1964)..................................................................................1, 3, 4

*United States v. Abdallah*,
  840 F. Supp. 2d 584 (E.D.N.Y. 2012) ...........................................................3

*United States v. Aronoff*,
  463 F. Supp. 454 (S.D.N.Y. 1978) ...............................................................4, 7

*United States v. Bergstein*,
  2018 WL 2417845 (S.D.N.Y. 2018)...............................................................3

*United States v. Clark*,
  360 F. Supp. 936 (S.D.N.Y. 1973) .................................................................4

*United States v. Gotti*,
  593 F. Supp. 2d 1260 (M.D. Fla. 2008)..........................................................9

*United States v. Hanley*,
  1995 WL 60019 (S.D.N.Y. Feb. 10, 1995)......................................................4

*United States v. Kim*,
  246 F.3d 186 (2d Cir. 2001)...........................................................................3

*United States v. Maldonado-Rivera*,
  922 F.2d 934 (2d Cir. 1990)...........................................................................3

*United States v. McDonald*,
  740 F. Supp. 757 (D. Alaska 1990) ................................................................8

*United States v. Olen*,
  183 F. Supp. 212 (S.D.N.Y. 1960) .................................................................7

*United States v. Rutigliano*,
  790 F.3d 383 (2d Cir. 2015)...........................................................................3

*United v. Russell*,
  582 F. Supp. 660 (1984) ...............................................................................5, 7

*United States v. Spy Factory, Inc.*,
  951 F. Supp. 450 (S.D.N.Y. 1997) .................................................................6

*United States v. Stephenson,*
   895 F.2d 867 (2d Cir. 1990)...................................................................................3

**Other Authorities**

Fed R. Crim. Proc. Rule 8(a) ...................................................................................1

Fed R. Crim. Proc. Rule 13 ......................................................................................1

Fed R. Crim. Proc. Rule 21 ...............................................................................1, 3, 8

Defendant Michael Avenatti, through counsel, and pursuant to Fed. R. Crim. P. 21, respectfully submits this memorandum of law in support of his motion to transfer the present matter to the Central District of California.

## I.    <u>INTRODUCTION</u>

This motion seeks the Rule 21 transfer of a pending case in the Southern District of New York to the Central District of California so that it may be consolidated and tried together under Rule 13 with a pending case there that alleges the same basic conduct.  The cases are "of the same or similar character" and, as alleged, "constitute parts of a common scheme or plan" under Rule 8(a).  The United States Attorney for the Central District of California has acknowledged that if a motion to transfer is granted, the government would be prepared to try the charges pending in the SDNY case in a consolidated proceeding.  *See United States v. Avenatti*, No. 19-061-JVS, Dkt. 44 at 25 (attached hereto at Exhibit 1).  Thus, a transfer of this case is in the interest of judicial economy.  It would result in a single trial, with one judge, and one set of prosecutors, and would avoid conflicting schedules (especially given that Mr. Avenatti is now charged in three cases).

Thus, this motion cannot be compared to the typical Rule 21 motion, wherein a defendant, charged in a single case, seeks to transfer the single case to a location more convenient to the defendant.  In such a case, the transfer does not necessarily save resources.  In this case, the transfer makes sense for all parties and the system as a whole.  Beyond that, an analysis of the factors set forth in *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964) heavily favor transfer.  Accordingly, the Court should transfer this case to the Central District of California.

1

## II.     THE CHARGES

On April 10, 2019, Mr. Avenatti was indicted in the Central District of California in a 36-count indictment for allegedly misappropriating the funds of five of his clients through fraudulent means.  *See United States v. Avenatti*, Case No. 19-061-JVS (C.D. Cal.) (Selna, J.) ("C.D. Cal. Action"), Dkt. 16. (attached as Exhibit 2).  Then, one month later, Mr. Avenatti was indicted in this case, which alleges that Mr. Avenatti misappropriated the funds of a sixth client, Ms. Daniels, through fraudulent means.  Dkt. 1.  *Even a cursory review of the indictments in the two cases reveals that the conduct charged in the S.D.N.Y. indictment is of the same exact species charged in the C.D. Cal. indictment*.  Both indictments allege that Mr. Avenatti received funds related to the settlement of cases on behalf of clients, did not timely remit the full share of the settlement amount owed to his clients, and then lulled clients into believing that the settlement funds had not yet been received.  There is no principled reason that these cases—which both include claims for wire fraud, which both allege misconduct by Mr. Avenatti in the Central District of California, and which will undoubtedly share many of the same issues, documents, and witnesses—should be tried in different federal districts.  And if this case is not transferred, Mr. Avenatti will have to defend himself in largely identical actions brought on opposite ends of the United States while paying for his and his attorneys' living and travel expenses.

Mr. Avenatti thus brings this motion to transfer this case to the courtroom of Judge Selna in the Central District of California.

## III.     ARGUMENT

Fed. R. Crim. P. 21(b) provides for the transfer of a criminal proceeding to other districts "for the convenience of the parties and witnesses and in the interest of justice."  Disposition of a

Rule 21(b) motion is vested in the sound discretion of the district court. *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990). The test to be applied to a Rule 21(b) motion to transfer was set out in *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964). In *Platt*, the Supreme Court articulated factors that the courts must consider when determining whether to transfer a case. *Id.* These factors include: 1) the location of the defendant; 2) location of possible witnesses; 3) location of the events at issue; 4) location of documents and records; 5) disruption of defendant's business; 6) expense to the parties; 7) location of counsel; 8) relative accessibility of place of trial; 9) docket condition of the district courts involved; and 10) any other special elements that might affect transfer. *Id.* "It remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990).

### A.  The Government Could Have Brought this Case in California

Venue for wire fraud offenses is proper "in any district in which the offense began, continued, or concluded." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (citing 18 U.S.C. 3237(a)). Also, wire fraud is a continuing offense. *See United States v. Rutigliano*, 790 F.3d 383, 396 (2d Cir. 2015). That means venue for wire fraud can be proper in more than one location. *United States v. Bergstein*, 2018 WL 2417845 at *7 (S.D.N.Y. 2018).

Here, venue is proper in either the Southern District of New York or the Central District of California. The indictment alleges that Mr. Avenatti, a California resident, wired funds that originated from New York into a California-based trust account of a California law firm and then used those funds for various California businesses and clients. *See* Dkt. 1. Accordingly, venue plainly lies in the Central District of California. *See United States v. Abdallah*, 840 F. Supp. 2d 584, 606 (E.D.N.Y. 2012) (holding that "venue lies for the wire fraud in the districts that are at

either end of the call regardless of whether defendant is in the district or whether defendant initiated the call.").

**B.  All of the *Platt* Factors Weigh in Favor of Transfer**

After determining that the action could have been brought in the Central District of California, the next consideration is whether transfer would be convenient for parties and witnesses and in the interest of justice.  Here, all of the factors weigh in favor of transfer.

1.  <u>Location of the Defendants</u>

The first factor looks at location and inconvenience of parties.  Although the original factor in *Pratt* referred to the location of a "corporate defendant," subsequent cases apply this factor equally to individual defendants.  *See United States v. Clark*, 360 F. Supp. 936, 941 (S.D.N.Y. 1973).

A defendant should normally be tried where he lives.  *See, e.g.*, *United States v. Hanley*, 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) ("Therefore, as a matter of policy, a defendant should ordinarily be tried, whenever possible, where he resides."); *United States v. Aronoff*, 463 F. Supp. 454, 457 (S.D.N.Y. 1978) ("It can be a hardship for a defendant to face trial far away from home and from 'appropriate facilities for defense.'"  (quoting *United States v. Johnson*, 323 U.S. 273, 275 (1944)).

Mr. Avenatti lives in the Central District of California.  As such, this factor weighs heavily in favor of transfer.

2.  <u>Location of Potential Witnesses</u>

When the location of both government and defense witnesses are considered, this factor also strongly favors transfer.

4

The largest number of witnesses for both the government and defense reside in California. *See United v. Russell*, 582 F. Supp. 660, 662 (1984) (holding that because the "great majority" of witnesses will not come from the New York Metropolitan area, the second factor weighs in favor of transfer).

Upon review of the evidence, it appears that there are only likely two witnesses who reside in New York—Ms. Clifford's literary agent and publisher—one or both of whom are alleged to have initiated the wire transfer. Ms. Clifford lives in Texas.

The vast majority of the witnesses reside in California. The government's principal allegations center on Mr. Avenatti's alleged diversion of client funds into an "Avenatti & Associates – Attorney Client Trust." That account was maintained by a California company and was kept within a bank located in the Central District of California. The government contends that the client funds were allegedly given to various California residents and businesses, including Eagan Avenatti, a California limited liability partnership, a coffee business owned by Mr. Avenatti located in Washington State, and a client that Mr. Avenatti represented in a Los Angeles-based lawsuit. The witnesses who will testify to/against these allegations likely also all reside in the Central District of California.

Moreover, since the government brings a fraud charge against Mr. Avenatti, the location of character witnesses is critical. *Id.* ("Since this case involved allegations of fraud, the *mens rea* of the defendants and their general character will be of some consequent….The availability and convenience of [character] witnesses, while not a controlling factor, is one that should be given considerable weight."). Mr. Avenatti submits that nearly all of his character witnesses— witnesses that have worked with Mr. Avenatti—are all located in the Central District of California.

3.   Location of the Events at Issue

The allegations in the indictment stem from Mr. Avenatti's purported scheme to divert client funds into a California-based trust account of a California law firm.  The indictment further alleges that Mr. Avenatti used these funds for various California businesses and clients. This factor thus weights heavily in favor of venue in California.  Although Ms. Clifford's literary agent and publicist reside in New York and the money may have also originated there, Mr. Avenatti, his firm, his bank account, and the other relevant witnesses are all based out of California and were in California during the majority of events giving rise to the indictment. Accordingly, this factor also strongly weighs in favor of transfer.

4.   Location of the Documents and Records

The vast majority of the relevant documents are located in California—namely, in the possession of a receiver federally appointed to oversee Eagan Avenatti as well as the U.S. Attorney's Office in the Central District of California.  Indeed, the government seized Mr. Avenatti's documents that are critical to this action.  *See United States v. Avenatti*, Case No. SA-CR-19-61-JVS (C.D. Cal.).  And despite Mr. Avenatti's multiple requests to obtain these documents, the government has refused to provide them.  *See id.* at Dkt. 50.[1]

Even if the Southern District were to later obtain these documents, that would still not weigh against transfer.  *See United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 458 (S.D.N.Y. 1997) ("[W]here the government had seized documents from one location and transferred them to, and consolidated them at, the place of trial, the fact that the documents were to be found there could not properly lie in favor of the Government's opposition to the change of venue.").

---

[1] Mr. Avenatti has moved to compel these documents from the government.  *Id.*  The hearing is set for August 26, 2019. *Id.*

5.   <u>Disruption of Defendant's Business</u>

Mr. Avenatti is a member of the California State Bar, primarily based in California, who represents several clients in civil matters within the Central District of California.  An extended trial in New York would impair Mr. Avenatti's ability to work as he would be unable to attend hearings and meet with his California clients.  Transfer to the Central District of California would allow Mr. Avenatti to represent his California clients during trial—something he will not be able to do if the trial occurs in New York.  *See United States v. Olen*, 183 F. Supp. 212, 219 (S.D.N.Y. 1960) (transfer allowed defendants to use evenings and weekends to maintain accounting practice); *Russell*, 582 F. Supp. at 663 (holding that the fifth factor weighs in favor of transfer because disruption of business was "quite clear" and a transfer would make it "possible for [Defendants] to carry on their business at least to a limited extent…."); *Aronoff*, 462 F. Supp. at 458 ("To a failing business that depends so much on personal involvement, even a few hours each weekday plus weekends could make a substantial difference.").

6.   <u>Expense of the Parties</u>

Mr. Avenatti currently incurs significant financial expense in defending against multiple criminal allegations in California and New York.  This requires Mr. Avenatti and his attorneys, who also reside in Southern California, to travel across the country on a consistent basis.  This financial burden is made worse because it is difficult for him to conduct business when he spends most of his time in a different state or traveling.  The considerable financial burden Mr. Avenatti faces by litigating this matter in New York at the same time as the C.D. Cal. Action thus supports transfer.

7

7.  Location of Counsel

Mr. Avenatti is represented by the undersigned, H. Dean Steward, whose office is in San Clemente, CA.  Mr. Steward also represents Mr. Avenatti in the action in the Central District of California.  This factor weighs heavily in favor of transfer as well.

8.  Relative Accessibility of Place of Trial

In determining Rule 21(b) transfer motions, courts consider factors such as the relative number of flights, the percentage of direct and connecting flights, and travel times to bring the parties and witnesses to the place of trial.  *See United States v. McDonald*, 740 F. Supp. 757, 763–64 (D. Alaska 1990).  Most of the witnesses are located in California.  Also, Mr. Avenatti and his lawyers currently must travel from New York to California on a regular basis to defend against similar charges in different jurisdictions.  The financial burden on witnesses and Mr. Avenatti to travel from California to New York is substantial.  Hundreds of hours of travel time for these witnesses would be saved, and thousands of dollars in transportation and lodging costs could be saved by both the government and the defense if the Court allows the transfer.

9.  Docket Conditions of the District Courts Involved

This Court and Judge Selna in the Central District of California both have well-managed dockets and the ability to hear this matter.  But there already existed a criminal action against Mr. Avenatti for virtually identical alleged conduct in the Central District of California when this indictment was filed.  Because the allegations in these two cases allegedly stem from similar fraudulent conduct, the cases are likely to be tried together if this case is transferred to the Central District of California, saving judicial resources in the process.  Accordingly, when this factor is viewed through the lens of the federal criminal docket writ large, this factor favors transfer as well.

10. <u>Special Elements</u>

The C.D. Cal. Action constitutes a special element that strongly supports transfer. *United States v. Gotti* is illustrative. 593 F. Supp. 2d 1260 (M.D. Fla. 2008). In *Gotti*, a Florida indictment charged the same RICO conspiracy against which [John] Gotti defended himself three times in New York. *Id.* at 1269. The Court found the Florida indictment troubling because it feared the United States sought to uproot the New York indictments and re-pot the whole operation in Florida, "hoping for more favorable conditions and a more favorable result and dismissing as inconsequential the resulting expense and dislocation visited upon Gotti." *Id.* The Court noted:

> The singular notoriety of this defendant, his apparently acknowledged history of complicity in the malignancies of organized crime … and perhaps the cumulative frustration of law enforcement contribute to the temptation to extend to Florida the "quest" to convict Gotti. Nonetheless, standing before an Article III judge of the United States in a United States District Court governed by the Constitution and laws of the United States, Gotti is merely another defendant, presumed innocent …and unreservedly entitled to the protection of the principles codified in Rule 21(b), which features no exclusion for defendant, even a conspicuous one, charged with participation in organized crime.

*Id.* at 1270. Thus, because "the RICO conspiracy charged in the Florida indictment [was] unmistakably the same RICO conspiracy charged in New York, the court found a "special element" that by itself justified transfer. *Id.* at 1269–71.

Similar to the Florida and New York indictments in *Gotti*, the S.D.N.Y. indictment against Avenatti is virtually identical to certain counts in the C.D. Cal. indictment. Both cases deal with alleged allegations of financial mismanagement stemming from misappropriating client funds through fraudulent means. And both cases allege Mr. Avenatti used the funds to benefit himself or his businesses.

9

Mr. Avenatti is a high-profile figure who has drawn the wrath of the Executive Branch and is receiving special negative treatment.  Faced with the fact that the government has intentionally loaded up the docket with multiple indictments to prosecute Mr. Avenatti in different jurisdictions for similar conduct, the prudent course is to transfer this case to the Central District of California.

## IV.    CONCLUSION

Mr. Avenatti's motion to transfer should be granted.


Respectfully submitted,


By:    /s/ H. Dean Steward
       H. Dean Steward
       107 Avenida Miramar #C
       San Clemente, CA 92672
       Telephone:  (949) 481-4900
       Facsimile:  (949) 496-6753
       Email:  deansteward7777@gmail.com

       *Attorneys for Defendant Michael Avenatti*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notes.


/s/ H. Dean Steward
H. Dean Steward

EXHIBIT 1

EXHIBIT 1

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6683
    Facsimile: (213) 894-6269
    Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar. No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>MICHAEL JOHN AVENATTI,<br><br>       Defendant. | SA CR No. 19-061-JVS<br><br>JOINT REPORT<br><br>Hearing Date: July 8, 2019<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>          Hon. James V. Selna |

     Pursuant to the Court's June 19, 2019, Minute Order (CR 43),
plaintiff United States of America, by and through its counsel of
record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Julian L. André and

///

///

Brett A. Sagel, and defendant MICHAEL JOHN AVENATTI, by and through his counsel of record, H. Dean Steward, hereby files their Joint Report.

Dated: July 1, 2019                    Respectfully submitted,

                                       NICOLA T. HANNA
                                       United States Attorney

                                       BRANDON D. FOX
                                       Assistant United States Attorney
                                       Chief, Criminal Division

                                       _/s/ Julian L. André_
                                       JULIAN L. ANDRÉ
                                       BRETT A. SAGEL
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

Dated: July 1, 2019                    _/s/ via email authorization_
                                       H. DEAN STEWARD

                                       Attorney for Defendant
                                       MICHAEL JOHN AVENATTI

**TABLE OF CONTENTS**

I.   THE COURT'S JUNE 19, 2019, MINUTE ORDER.........................1

II.  GOVERNMENT'S DISCOVERY DISCLOSURES TO DATE.....................2

     A.   USAO's Statement.........................................2

          1.   Documents and Interview Reports.....................2

          2.   Digital Search Warrant Evidence.....................3

     B.   Defendant's Statement....................................4

III. OUTSTANDING DISCOVERY ISSUES..................................7

     A.   USAO's Statement.........................................7

          1.   Non-Search Warrant Evidence.........................7

          2.   Digital Search Warrant Evidence.....................8

          3.   Hard-Copy Search Warrant Evidence..................11

          4.   Reciprocal Discovery from Defendant................12

     B.   Defendant's Statement...................................12

          1.   Non-Search Warrant Evidence........................12

          2.   Digital Search Warrant Evidence....................12

          3.   Hard-Copy Search Warrant Evidence..................15

          4.   Reciprocal Discovery from Defendant................15

IV.  PROPOSED TRIAL SCHEDULE......................................15

     A.   USAO's Proposed Trial Schedule..........................15

     B.   Defendant's Proposed Trial Schedule.....................16

          1.   Significant Discovery Has Yet to Be Produced.......16

          2.   The Government May Supersede the Indictment........17

          3.   Other Cases Pending Against the Defendant Will
               Delay this Case....................................17

          4.   The Existing Trial Schedule of Defense Counsel.....18

V.   LOGISTICAL ISSUES............................................19

     A.   The SDNY Extortion Case.................................19

            1.    Defendant's Statement...............................19

            2.    Government's Statement.............................20

       B.   The SDNY Fraud Case....................................21

            1.    Defendant's Statement.............................21

            2.    USAO's Statement..................................21

VI.   ESTIMATED LENGTH OF TRIAL......................................22

       A.   USAO's Estimate........................................22

       B.   Defendant's Estimate...................................22

VII.  NEED FOR A TIME-QUALIFIED JURY................................22

       A.   USAO's Position........................................22

       B.   Defendant's Position...................................22

VIII.      ADDITIONAL ISSUES TO ADDRESS AT STATUS CONFERENCE.......22

       A.   Defendant's Position...................................22

       B.   USAO's Position........................................23

**JOINT REPORT**

**I.    THE COURT'S JUNE 19, 2019, MINUTE ORDER**

On June 19, 2019, the Court issued a minute order (CR 43) requiring the United States Attorney's Office for the Central District of California (the "USAO") and defendant MICHAEL JOHN AVENATTI ("defendant") to file a joint report addressing the following:

1.    Government discovery disclosures to date.

2.    Remaining government discovery disclosures and a timetable for completion.

3.    A proposed schedule, including at least:

a.    Trial date.

b.    Final pretrial conference date.

c.    Government witness list disclosure date.

d.    Government exhibit disclosure date.

e.    Expert witness disclosure date.

f.    Last date for filing and hearing motions, including motions *in limine*.

g.    Date for disclosure of Jencks Act materials and witness statements.

h.    Dates(s) for interim status conference(s).

4.    Any logistical or other potential problems affecting the proposed schedule.

5.    Anticipated length of trial.

6.    Use of a jury pool pre-screened for time.

7.    Any other matters the parties wish to discuss at the status conference.

The parties' respective positions regarding these issues are set forth below.

## II.  GOVERNMENT'S DISCOVERY DISCLOSURES TO DATE

### A.  USAO's Statement

#### 1.  Documents and Interview Reports

To date, the USAO has made the following discovery disclosures to defendant:

1.  On May 22, 2019, the USAO produced approximately 113,000 pages of discovery materials, including, but not limited, the following materials:

a.  Financial records, including bank records reflecting the financial transactions set forth in the indictment;

b.  Documents obtained from third-parties, including various business records, and emails and text messages reflecting communications between defendant and the victim-clients identified in the indictment, employees of defendant's coffee company Global Baristas U.S. LLC ("GBUS"), and other third-parties;

c.  Internal Revenue Service ("IRS") tax records; and

d.  Transcripts of defendant's prior testimony in various legal proceedings.

2.  On June 5, 2019, the USAO produced approximately 9,000 pages of additional discovery materials, primarily consisting of additional documents obtained from third-parties, including emails and other records obtained from defendant's former certified public accountant ("CPA").

3.  On June 28, 2019, the USAO produced approximately 16,000 pages of additional discovery materials, including additional documents obtained from third-parties, and memoranda summarizing

interviews with most of the potential government witnesses, including the victim-clients identified in the Indictment. The USAO has voluntarily produced these witness statements at an early date in an effort to ensure that defendant is prepared to proceed to trial as soon as possible.

To date, the USAO has produced, subject to the Court's May 20, 2019, Protective Order (CR 36), a total of approximately 138,903 pages of discovery materials.

### 2. Digital Search Warrant Evidence

During the course of its investigation, the Internal Revenue Service – Criminal Investigation ("IRS-CI") obtained a number of digital devices from various sources, including pursuant to judicially-authorized search warrants.

On June 10, 2019, the USAO's Privilege Review Team Assistant United States Attorney ("PRTAUSA") produced to defendant, subject to the Court's May 20, 2019, Protective Order (CR 36), complete forensic copies of the accessible[1] digital devices that were: (1) seized from defendant's residence; (2) seized during defendant's arrest; and (3) obtained from former employees of GBUS.[2]

---

[1] As discussed further below, the USAO and another U.S. Attorney's Office has possession of approximately four digital devices seized from defendant or his residence, which are currently inaccessible because they are password-protected. The government will continue to attempt to gain access to these devices, but cannot provide a forensic image of the devices to defendant until they have been accessed. To date, defendant has declined to provide the password(s) for these devices, which would expedite providing him with the contents of the devices.

[2] The PRTAUSA also produced to defendant a copy of the cell-phone extraction report for Client 3's cellphone, as well as approximately 103 emails involving defendant that were extracted from Client 3's computer. Because Client 3 executed a limited waiver of the attorney-client privilege, these documents have already been provided to the investigation team and will not be subject to a further privilege review.

As discussed further below, the USAO has not provided defendant with forensic copies of the following digital devices: (1) the computer server belonging to defendant's former law firm, Eagan Avenatti LLP ("EA LLP"); (2) devices seized from the residence of EA LLP's former office manager ("EA Employee 1"), which belong to EA LLP; (3) devices seized from another law firm with which defendant had a business relationship ("Law Firm 1"); and (4) the inaccessible digital devices seized from defendant and defendant's residence.

To date, defendant has produced no discovery.

**B.    Defendant's Statement**

The government's production to date has been woefully inadequate.  While it may appear from the page counts and alleged descriptions referenced above that the government has produced significant amounts of information, on a percentage basis, the information produced to date is far less than five percent (5%) of what is required.

After charging Defendant with 36 counts in a lengthy "speaking" indictment months ago, which purportedly followed a three-year investigation, the government now refuses to produce millions of pages of documents and huge amounts of electronic data (likely well over 20 terabytes) that Defendant needs to defend himself—including potential *Brady* and *Giglio* material.  The government has had this information in its possession for months—perhaps years--and yet still has not produced it (while continuing to grandstand and argue for an early trial date).  The government's refusal to produce this information is even more egregious and inexplicable considering that Defendant had unlimited access to nearly all of this information until the morning of his arrest on March 25, 2019, yet the government

4

now refuses to return even a copy to Defendant, while continuing to access the same data in its own preparation for trial. Simply put, there is no reason why Defendant should not be afforded access to this vast amount of information in connection with preparing his defense, not to mention the fact that he requires this information in order to meet his obligations as a practicing attorney who continues to represent clients.[3]

The government has taken this course of action despite repeated requests for this information from defense counsel and *this Court's clear directives at the last status conference, during which the Court directed the government to promptly return seized items to the Defendant and also expressed skepticism as to why a "privilege review" would have to be done before returning/producing the items to Defendant (an attorney) when the documents were previously in his possession or control.*

As this Court is aware, the indictment charges the Defendant with conduct relating to multiple clients of Defendant, as well as conduct concerning business interests of the Defendant. Despite this, the government has essentially refused to provide Defendant with the entirety of his business files that existed prior to the date of his arrest on March 25, including emails, time records, accounting records, pleadings reflecting work done for clients, documents demonstrating client consent, correspondence with clients, etc. To be clear, the government has refused to provide the following, among other things:

---

[3] In prior communications, the government has been overt in its attempts to interfere with Defendant's attempts to continue to make a living through the practice of law.

        a.    *Defendant's correspondence and emails with his clients, including the clients referenced in the indictment.*

        b.    *Defendant's client files, including for those clients referenced in the indictment.*

        c.    *Defendant's accounting, tax and cost records, including for those clients referenced in the indictment.*

        d.    *Defendant's time records, including for those clients referenced in the indictment.*

        e.    *Defendant's settlement communications and documentation, including for those clients referenced in the indictment.*

        f.    *Defendant's emails relating to the charges in the indictment.*

        g.    *Defendant's emails with his tax professionals and others relating to his taxes.*

The government's excuse that some of this information belongs to "Eagan Avenatti, LLP" is without merit and is a red herring. Defendant founded EA in 2007 with two other partners. He was the Managing Partner of EA at all relevant times (since 2011) and remains in that role to this day. He presently owns 100% of the law firm and has owned a controlling interest in the firm since 2011. Finally, at all relevant times, all clients of EA were clients of Defendant. Indeed, at all relevant times, no client could become a client of EA without Defendant's knowledge and consent.

Without the return and/or production of the information, it is literally impossible for the Defendant to mount a defense in this case, let alone continue to represent his clients or properly transition those clients to other attorneys.

### III. OUTSTANDING DISCOVERY ISSUES

#### A. USAO's Statement

##### 1. Non-Search Warrant Evidence

The vast majority of documentary evidence and interview reports relating to the charges in the indictment case have already been produced to defendant. The USAO, however, is still processing additional documents and records it obtained from third-parties, as well as additional interview reports. The USAO and IRS-CI are also still conducting additional witness interviews and collecting evidence from additional sources. The USAO will produce any newly obtained documents and records on a rolling basis going forward. The USAO does not believe that this evidence will be particularly voluminous.

Additionally, the USAO is scanning additional hard-copy records, including two boxes of records obtained from the IRS Revenue Officer who handled the GBUS payroll tax collection action between October 2016 and March 2018, and three boxes of records obtained from defendant's CPA. The USAO offered to make these records available for defendant's counsel to review at the USAO or IRS-CI's offices, but defense counsel indicated that he would prefer that the USAO just produce the scanned copies. Due to the nature of the hard-copy records and how they were stored, the USAO anticipates it could take approximately one month to finish scanning these documents.

Finally, the USAO is in possession of approximately two boxes of mail relating to GBUS. The USAO has advised defense counsel that it will not be scanning these documents because they are unlikely to contain any relevant information. The USAO will, however, make them

1  available for defense counsel to review at the USAO or IRS-CI's
2  offices at a mutually convenient time.

          2.   Digital Search Warrant Evidence

               a.   *The USAO's Review of the Digital Devices*

5       During the course of its investigation, IRS-CI obtained the
6  following digital devices or forensic copies thereof:  (1) the
7  computer server belonging to EA LLP; (2) digital devices seized
8  during defendant's arrest on March 25, 2019; (3) digital devices
9  seized from defendant's residence; (4) digital devices seized from
10 the residence of EA Employee 1; (5) digital devices seized from Law
11 Firm 1; and (6) digital devices obtained from former GBUS employees.
12 The USAO and IRS-CI obtained warrants to search each of these devices
13 for evidence relating to the investigation and defendant's
14 prosecution.  Undersigned government counsel understands that the
15 devices contain a total of approximately 20 TB of data.

16      The USAO and IRS-CI is reviewing the contents of each of these
17 devices, pursuant to the privilege review and other search protocols
18 set forth in the search warrants.  The USAO's Privilege Review Team,
19 which is overseeing the initial scope review and subsequent privilege
20 review, has made substantial progress and expects to complete the
21 privilege review within the next three months.[4]  The USAO will
22 produce any non-privileged documents falling within the scope of the
23 search warrants to the defense on a rolling basis.

---

        [4]  Because the victim-clients named in the Indictment and the
court-appointed bankruptcy trustee for GBUS have already executed
limited waivers of the attorney-client privilege, the USAO believes
privilege disputes, if any, would be quite limited.

### b. Production of Forensic Copies of the Digital Devices to Defendant

At this time, the USAO has not provided defendant with forensic copies of the following digital devices: (1) the EA LLP computer server; (2) digital devices seized from the residence of EA Employee 1; and (3) digital devices seized from Law Firm 1.

With respect to the EA LLP computer server and the digital devices seized from EA Employee 1's residence (collectively, the "EA Devices"), the USAO understands that the EA Devices belong to EA LLP, which is currently controlled by a court-appointed receiver (the "EA Receiver"), and are not defendant's personal property. The USAO also understands that the EA devices likely contain substantial amounts of attorney-client privileged information relating to third-parties, which defendant is not entitled to access. Accordingly, on May 24, 2019, the USAO informed defendant that it did not believe it would be appropriate for the USAO to provide defendant with complete forensic copies of the EA Devices without obtaining consent from the EA Receiver.[5] The EA Receiver has advised the USAO that it will not consent to the USAO producing complete forensic copies of the EA Devices to defendant.

With respect to the digital devices seized from Law Firm 1, the USAO understands that these devices belong solely to Law Firm 1 and are likely to contain substantial amounts of attorney-client

---

[5] To the extent defendant needs to access any of the materials on the EA Devices in order to represent his remaining legal clients, the USAO has advised defendant that he should address this issue with the EA Receiver or seek relief from the Honorable Karen E. Scott, United States Magistrate Judge, or the Honorable Virginia A. Phillips, United States District Judge, who are overseeing the receivership in In re Eagan Avenatti LLP, No. CV 18-1644-VAP (C.D. Cal.).

privileged and confidential information relating to Law Firm 1's clients. Accordingly, on May 24, 2019, the USAO informed defendant that it did not believe it would be appropriate for the USAO to provide defendant with complete forensic copies of these digital devices without obtaining consent from Law Firm 1. Counsel for Law Firm 1 has advised the USAO that Law Firm 1 will not consent to the USAO producing complete forensic copies of Law Firm 1's digital devices to defendant.

Although the USAO has not produced forensic copies of the digital devices referenced above to defendant, on May 24, 2019, and again during a meet-and-confer on June 26, 2019, the USAO offered to discuss alternative procedures designed to ensure that defendant can access any materials on the EA Devices that may be relevant to his defense. For example, the USAO requested that defendant's counsel consider whether providing defendant with the results of a broader search for potentially relevant materials on the EA Devices, having defendant and his counsel work with the Privilege Review Team to identify and produce relevant materials on the EA Devices directly to defendant, or allowing defendant's counsel to review the complete forensic copy of the EA Devices at IRS-CI's offices would be sufficient to address defendant's concerns.

To the extent defendant does not believe any alternative procedures would be sufficient to address defendant's concerns and that defendant should be provided with complete forensic copies of the EA Devices or Law Firm 1's devices, the USAO requests that the Court set an expedited briefing schedule so that this issue can be resolved as soon as possible. The USAO would also request that any

such briefing schedule provide an opportunity for the EA Receiver and Law Firm 1 to be heard regarding defendant's request.

### c. Inaccessible Digital Devices

IRS-CI is currently in possession of an Apple desktop computer seized from defendant's residence, which is password protected and has not yet been accessed. The USAO understands that the United States Attorney's Office for the Southern District of New York (the "SDNY USAO") is also in possession of an iPhone, an iPad, and an Apple laptop computer, which are password protected and have not yet been accessed. The USAO will produce to defendant forensic copies of these devices if and when the USAO is able to access the devices. The government, including the SDNY USAO, has advised defendant that if defendant wishes to immediately obtain forensic copies of these digital devices or access materials on these devices defendant will need to provide the government with the passwords for these devices so that the government can create forensic images of the devices. To date, defendant has not provided the USAO or the SDNY USAO with the passwords for any of the inaccessible devices.

### 3. Hard-Copy Search Warrant Evidence

During the execution of search warrants at defendant's residence, EA Employee 1's residence, and Law Firm 1, IRS-CI seized approximately 15 to 20 boxes of hard copy materials. These records are currently being reviewed by the Privilege Review Team to ensure that they do not contain any privileged materials. The USAO will produce scanned copies of these documents to defendant as soon as they are available, likely within the next three weeks.

4.   Reciprocal Discovery from Defendant

The USAO has requested that defendant produce reciprocal discovery under Federal Rule of Criminal Procedure 16.   Although defendant has indicated, including through posting numerous messages on Twitter.com, that he is in possession of various documents he intends to use in his defense, including two documents purportedly signed by "Client 1" in the indictment, defendant has not yet produced any reciprocal discovery to the USAO.   The USAO therefore requests that the Court order defendant to produce any known reciprocal discovery within two weeks of the status conference, and set a final deadline for defendant to produce reciprocal discovery approximately two months before trial.

B.   Defendant's Statement

1.   Non-Search Warrant Evidence

The Defendant requests that the Court order the government to produce all information referenced above under "Non-Search Warrant Evidence" within two weeks of the status conference.

2.   Digital Search Warrant Evidence

As stated above, the government has refused, without an adequate basis, to return and/or produce significant amounts of critical data and information to the Defendant, without justification.   This includes: (1) the computer server belonging to EA LLP; (2) digital devices seized during defendant's arrest on March 25, 2019; (3) digital devices seized from defendant's residence; (4) digital devices seized from the residence of EA Employee 1; (5) digital devices obtained from former GBUS employees.   According to the government, these devices contain a total of approximately 20 TB of data.   More importantly, this information constitutes nearly all of

the business files of Defendants for the last decade, including close
to 100 percent of the information relating to the work performed by
Defendant for the clients referenced in the indictment.  Defendant
cannot defend this case without full and complete access to this
information.

To be clear, there can be no privilege issues relating to
producing any of this information to Defendant because Defendant is
an attorney who was--and in some cases still is, as his
representation of those clients is ongoing-- entitled to full access
to this information at all relevant times.    Moreover, even if
Defendant has since been discharged, Defendant would still be
entitled to keep a copy of the information for his records and use,
including in connection with defending any civil claim by any client.

> a.  *Production of Forensic Copies of the Digital*
> *Devices to Defendant*

With respect to the EA LLP computer server and the digital
devices seized from EA Employee 1's residence (collectively, the "EA
Devices"), the government's position lacks all merit.  Defendant
founded EA in 2007 with two other founding partners.  He was the
Managing Partner of EA at all relevant times (since 2011) and remains
the Managing Partner to this day.  He presently owns 100% of the law
firm and has owned a controlling interest in the firm since 2011.
Further, at all relevant times, all clients of EA were clients of
Defendant.  Indeed, at all relevant times, no client could become a
client of EA without Defendant's knowledge and consent.

In addition, up until his arrest on March 25, 2019, Defendant
had virtually unlimited access to the information he now demands be
returned/produced.  Accordingly, there can be no legitimate argument

13

that he should not be afforded access now, especially seeing as he has a constitutionally guaranteed right to prepare a defense.

*Moreover, the EA Receiver is not an attorney, cannot service or represent clients, has no right to access attorney-client information on the servers or in EA's files, and has no ownership interest in the firm. More importantly, the Defendant needs full and complete access to the totality of this information immediately.* Indeed, it is quite frankly shocking that the Receiver and the government, both of whom have limited, if any, right to this information, presently enjoy unfettered access while denying Defendant access so he can prepare a defense to these serious criminal charges.

Further, the alleged "alternative" production methods proposed by the government are unworkable and unrealistic, and would result in this case being delayed for years because of the amount of data involved. Defendant should not have to telegraph his defense by revealing which documents he is interested in reviewing, nor should the Defendant and his counsel be required to review over 20 terabytes of data at the offices of the government.

The government must be required to produce complete forensic copies of the EA Devices to Defendant within thirty (30) days of the status conference. Following this production and the review of the discovery produced to date, Defendant will further meet and confer with the government as to Law Firm 1's devices.

b.   *Inaccessible Digital Devices*

The warrants permitting the government to access the four inaccessible devices expired long ago. And Defendant is under no obligation to now provide the passwords in exchange for a forensic image of the devices or their return. Defendant requests the return

14

of the four devices within three (3) court days of the status conference so that he may prepare his defense.

### 3. Hard-Copy Search Warrant Evidence

The entirety of the documents seized from defendant's residence and EA Employee 1's residence should be produced immediately as no possible privilege issues exist as to this information for the reasons previously discussed.  The government has been in possession of this information for 14 weeks and it should have been produced long ago as Defendant needs this information for his defense.

As for the materials seized from Law Firm 1, Defense counsel will further meet and confer with the government following review of the documents to be produced.

### 4. Reciprocal Discovery from Defendant

Defendant maintains that it is entirely premature for any order of reciprocal discovery, especially considering the lack of timely discovery provided by the government.

## IV. PROPOSED TRIAL SCHEDULE

### A. USAO's Proposed Trial Schedule

The USAO proposes the following trial schedule and other relevant dates:

1. Trial Date – January 28, 2020.

2. Final Pretrial Conference – January 7-11, 2020 (any date that week convenient for the Court).

3. Government Witness List Disclosure – December 30, 2019 (i.e., approximately one month before trial).

4. Government Exhibit Disclosure – January 21, 2020 (i.e., approximately one week before trial).

15

5.    <u>Expert Witness Disclosures</u> – November 4, 2019 (<u>i.e.</u>, approximately two weeks before pretrial motions are to be filed).

6.    <u>Proposed Pretrial Motions Schedule</u>

a.    <u>Motions Due</u> – November 18, 2019.

b.    <u>Oppositions Due</u> – December 2, 2019.

c.    <u>Replies Due</u> – December 9, 2019.

d.    <u>Motions Hearing</u> – December 23, 2019 (or any date during the week of December 16-20, 2019, that is convenient for the Court).

7.    <u>Disclosure of Jencks Act Materials and Witness Statements</u> – December 30, 2019 (<u>i.e.</u>, approximately one month before trial).[6]

8.    <u>Interim Status Conferences</u> – August 5, 2019; September 9, 2019; October 7, 2019; and November 4, 2019.[7]

The USAO believes that this schedule is appropriate and will provide defendant and his counsel sufficient time to prepare for trial.

**B.    Defendant's Proposed Trial Schedule**

Defendant maintains that it is far too premature for the Court to set a trial date in this matter, let alone in January, for the following reasons:

1.    <u>Significant Discovery Has Yet to Be Produced</u>

As set forth above, the government has yet to produce well over 95% of the information and data necessary for the defense in this

---

[6] The USAO will agree to produce summaries of any additional witness statements it obtains during trial preparations on a rolling basis thereafter.

[7] The interim status conferences will provide the parties an opportunity to address any issues and/or foreseeable issues with the Court. If the parties agree in advance of one or more of the status conferences that such a hearing is unnecessary, the parties will inform the Court in advance to vacate the hearing(s).

case, including over 20 terabytes of data.  Until this information

and data are produced and reviewed, together with the yet to be

produced 302s, it is impossible for the defense to adequately

determine the total amount of time necessary to prepare for trial,

the likely motions and experts required, etc.

### 2.   The Government May Supersede the Indictment

The Defense has recently learned that the government is

eliciting testimony and evidence concerning Defendant before the

Grand Jury.  Defendant's counsel has inquired as to whether this will

result in further charges and the government has refused to answer.

Obviously, any further charges would result in further discovery and

the need for more time for proper defense preparation.  Defendant

should be permitted to know the entirety of the charges against him

before committing to a trial date.

### 3.   Other Cases Pending Against the Defendant Will Delay this Case

As the Court is aware and as discussed more fully below, rather

than charge the Defendant in one case, in one jurisdiction, the

Department of Justice made the decision to charge him in three

separate cases on two coasts.  As a result of this strategic

decision, significant delay will result.  This delay is not the fault

of the defense – it stems directly from the government's approach to

charging the Defendant.  Accordingly, the Defendant should not be

prejudiced in his ability to adequately prepare a defense.

As further discussed below, the Defendant is already scheduled

to be tried in New York on November 12, 2019, in the Southern

District of New York in United States v. Avenatti, No. 1:19-CR-373

(the "SDNY Extortion Case" or "Nike Case"), a trial that is expected

to last two weeks at a minimum. Defendant is represented in that case by separate counsel, whom he is presently assisting in preparing his defense.

It is anticipated that the government will soon be asking the court in the Southern District of New York to set a trial in the third case - United States v. Avenatti, No. 1:19-CR-374 (the "SDNY Fraud Case") for trial immediately following the Nike Case. A status conference is scheduled in New York for July 23, 2019.  As noted below, the Defendant will be moving to transfer and likely consolidate the SDNY Fraud Case with this matter.

4.   The Existing Trial Schedule of Defense Counsel

Even leaving aside a possible trial date in the SDNY Fraud Case, defense counsel's trial schedule does not permit a trial in this case in January as demanded by the government.  Presently, that 2019 schedule is as follows:


► **September 17-** *U.S. v. Noori* SA-CR-17-112-DMG (client is very ill- unclear whether he will be well enough for trial in September, which may result in delay)- 2 week bank fraud trial in Los Angles

► **October 22-** *U.S. v. Michaels et. al.* SA-CR-16-76-JVS (client is Jonathan Brightman)- 3-4 week multiple defendant telemarketing fraud trial - Santa Ana

► **November 26-** *U.S. v. Le* SA-CR-18-119-AG - 3 week multiple defendant health care fraud trial- Santa Ana

► **December 3-** *U.S. v. Garcia* (District of Nevada - Las Vegas; conflicts with *U.S. v. Le therefore* likely be continued to January or February, 2020) - 2-3 week multiple defendant mortgage fraud trial.

In addition, following the trial in the *Garcia* matter in Las Vegas in January or February 2020, Defendant's counsel would need at least sixty (60) days to prepare for the trial in this matter, at a minimum, assuming that all of the discovery demanded above is produced immediately (thus allowing for immediate review).

As a result of the above and the need for clarity as to which charges Defendant will face and the content of the discovery, Defendant requests a further status conference on November 8, 2019.

## V.    LOGISTICAL ISSUES

### A.    The SDNY Extortion Case

Defendant is charged in a four-count indictment in the Southern District of New York with offenses relating to an alleged scheme to extort Nike Inc.  United States v. Avenatti, No. 1:19-CR-373 (the "SDNY Extortion Case").  The SDNY extortion case is set for trial on November 12, 2019.  Defendant is represented by separate counsel in the SDNY Extortion Case.

#### 1.    Defendant's Statement

The Nike case will result in significant delay of this case. Defendant is actively involved in preparing for the trial in the Nike matter, including by regularly meeting with his counsel (located in Miami), reviewing discovery, and researching various issues.  He is highly involved on a daily basis as the case is set for trial in November.  The government is seeking a loss amount of over one billion dollars in connection with the Nike case, which is far greater than the amount here, and may result in significant incarceration if Defendant is found guilty.  Accordingly, until that case is tried to completion, Defendant will be unable to assist in the defense in this case in any meaningful way.  There can be little

19

question that this will result in significant delay. Again, this results not from any strategic choice by the Defendant, but rather from the choices made by the government.

The government has been investigating this case and seizing and otherwise obtaining massive amounts of data for three years, yet wants to push defendant to trial in 10 months. This is based in part on a general assertion from the government that it will get the discovery it wants to produce, but only that discovery, to the defendant in the next several months. It is apparent that the government is attempting to exert pressure on and disadvantage the Defendant, by failing to produce massive amounts of discovery in a timely manner in this case, proceeding to trial in the Nike case, moving forward on the other case in the SDNY, and pushing to have this case proceed to trial shortly after the Nike case. This is fundamentally unfair, and prejudicial.

> 2. <u>Government's Statement</u>

The USAO does not believe that the SDNY Extortion Case should delay the trial in this case. The SDNY Extortion Case is being handled by separate defense attorneys, is based on separate conduct, primarily involves different evidence and witnesses, and presents separate legal issues. The trial in the SDNY Extortion Case should therefore have no impact on defendant's ability to proceed to trial in this case in a timely manner (other than defendant's presence in SDNY during his trial). Accordingly, the USAO has proposed that this case proceed to trial as soon after the SDNY Extortion Case as possible.

1    **B.   The SDNY Fraud Case**

2         Defendant is also charged in a two-count indictment with wire

3    fraud and aggravated identity in the Southern District of New York in

4    <u>United States v. Avenatti</u>, No. 1:19-CR-374 (the "SDNY Fraud Case").

5    A trial date has not yet been set for the SDNY Fraud Case.   A status

6    conference is currently scheduled for July 23, 2019.   Defendant is

7    represented by Mr. Steward in the SDNY Fraud Case.

8         1.   <u>Defendant's Statement</u>

9         Defendant anticipates filing a motion to transfer venue and/or

10   consolidate as it relates to the SDNY Fraud Case because Defendant

11   believes the case should have been charged in this district.

12   Depending on the outcome of those motions, this case may involve more

13   charges.   In the alternative, Defendant will request that the SDNY

14   Fraud Case be tried after the Nike case as it involves fewer

15   witnesses, far less discovery, and can be tried to conclusion long

16   before this case will be ready for trial.

17        2.   <u>USAO's Statement</u>

18        The resolution of defendant's anticipated motion to transfer the

19   SDNY Fraud Case to this district should have no impact on the trial

20   date in this case.   If such a motion is granted, the government would

21   be prepared to try the charges pending in the SDNY Fraud Case either

22   in a consolidated proceeding with the current charges or immediately

23   after the trial in this case. If such a motion is denied, the USAO

24   believes that this case should proceed to trial prior to the SDNY

25   Fraud Case because this case involves broader alleged criminal

26   conduct and multiple victims, including five of defendant's former

27   clients, who suffered total financial losses of approximately $9

28

million, and the IRS, which is owed at least $3.2 million in unpaid taxes.

## VI. ESTIMATED LENGTH OF TRIAL

### A. USAO's Estimate

The USAO estimates that the trial, including any defense case, can be completed in three to four weeks.

### B. Defendant's Estimate

Defendant estimates that the trial, including the defense case, can be completed in six weeks. This estimate is a rough estimate and is largely dependent on the remaining discovery to be produced, as well as the outcome in the motions to transfer venue/consolidate.

## VII. NEED FOR A TIME-QUALIFIED JURY

### A. USAO's Position

The USAO believes that a time-qualified jury is likely necessary.

### B. Defendant's Position

Defendant objects to the request for a time-qualified jury. In counsel's experience, time qualified jurors tend to favor the prosecution.

## VIII. ADDITIONAL ISSUES TO ADDRESS AT STATUS CONFERENCE

### A. Defendant's Position

Defendant anticipates raising two additional issues at the Status Conference: (1) a deadline by which the government must supersede the indictment and (2) the immediate production of any purported waivers of the attorney-client privilege by any of the clients of Defendant.

**B.  USAO's Position**

The parties met-and-conferred telephonically regarding the instant Joint Report on June 26, 2019.  Defendant's portion of the Joint Report, which the USAO did not receive until approximately 3:30 pm on July 1, 2019 (the day it was due to be filed), raises a number of issues or arguments regarding discovery and other matters for the very first time.  Defendant has also taken positions in the Joint Report that are inconsistent with the positions defendant's counsel took during the June 26 meet-and-confer.  Because there is insufficient time to respond to these issues prior to filing the Joint Report, the government will be prepared to address all of the issues raised in the Joint Report at the July 8, 2019, status conference.

With respect to the specific additional issues defendant identifies above, the USAO cannot comment on grand jury proceedings under Federal Rule of Criminal Procedure 6(e) and believes any deadline regarding the potential filing of a superseding indictment would be inappropriate at this time.  As for the attorney-client privilege waivers, defendant is raising this issue for the first time in this Joint Report.  Although redacted copies of such waivers were attached as exhibits to the search warrant applications and therefore have already been produced to defendant, the government will gladly reproduce the waivers to defendant on July 2, 2019.

# EXHIBIT 2

# EXHIBIT 2

COPY

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 10 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2018 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL JOHN AVENATTI,<br><br>        Defendant. | SA CR No. 19  **SACR19-00061**<br>              JVS<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1343: Wire Fraud;<br>26 U.S.C. § 7202: Willful Failure<br>to Collect and Pay Over Withheld<br>Taxes; 26 U.S.C. § 7212(a):<br>Endeavoring to Obstruct the<br>Administration of the Internal<br>Revenue Code; 26 U.S.C. § 7203:<br>Willful Failure to File Tax<br>Return; 18 U.S.C. § 1344(1): Bank<br>Fraud; 18 U.S.C. § 1028A(a)(1):<br>Aggravated Identity Theft; 18<br>U.S.C. § 152(3): False Declaration<br>in Bankruptcy; 18 U.S.C. § 152(2):<br>False Testimony Under Oath in<br>Bankruptcy; 18 U.S.C. § 2(b):<br>Causing an Act to Be Done;<br>18 U.S.C. §§ 981(a)(1)(C), 982,<br>1028 and 28 U.S.C. § 2461(c):<br>Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH TEN

[18 U.S.C. § 1343]

**A.    INTRODUCTORY ALLEGATIONS**

1.    At all relevant times:

a.    Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was a resident of Orange and Los Angeles Counties, within the Central District of California.

b.    Defendant AVENATTI was an attorney licensed to practice law in the State of California.  Defendant AVENATTI provided legal services to clients in exchange for attorneys' fees.

c.    Defendant AVENATTI practiced law through Eagan Avenatti LLP ("EA LLP") and Avenatti & Associates, APC ("A&A").  EA LLP and A&A's principal offices were located in Newport Beach and Los Angeles, California.

d.    A&A was a professional corporation organized in California.  Defendant AVENATTI was A&A's Chief Executive Officer ("CEO"), Secretary, Chief Financial Officer, and sole director. Defendant AVENATTI owned 100 percent of A&A.

e.    EA LLP was a limited liability partnership organized in California.  Defendant AVENATTI was EA LLP's managing member and managing partner.  Through A&A, defendant AVENATTI owned at least 75 percent of EA LLP.

f.    Defendant AVENATTI was also the effective owner and controlled a number of other entities, including:

i.    Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California;

ii.    Global Baristas, LLC ("GB LLC"), which wholly owned GBUS;

2

1     iii. GB Autosport, LLC ("GB Auto"), which managed

2 defendant AVENATTI's car racing team; and

3     iv. Passport 420, LLC ("Passport 420"), which held

4 title to a private airplane defendant AVENATTI used.

5     g. Defendant AVENATTI was a signatory on and exercised

6 control over the following bank accounts, which were all maintained

7 in Orange and Los Angeles Counties, within the Central District of

8 California:

9     i. California Bank & Trust ("CB&T") attorney trust

10 account ending in x8541 in the name of "The State Bar of California,

11 Eagan Avenatti LLP, Attorney Client Trust Fund" ("EA Trust Account

12 8541").

13     ii. CB&T attorney trust account ending in x3714 in

14 the name of "The State Bar of California, Eagan Avenatti LLP,

15 Attorney Client Trust Account" ("EA Trust Account 3714").

16     iii. CB&T attorney trust account ending in x4613 in

17 the name of "State Bar of California, Eagan Avenatti LLP, Attorney

18 Client Trust Account" ("EA Trust Account 4613").

19     iv. CB&T attorney trust account ending in x8671 in

20 the name of "The State Bar of California, Eagan Avenatti LLP,

21 Attorney Client Trust Account" ("EA Trust Account 8671").

22     v. CB&T account ending in x2851 in the name of

23 "Eagan Avenatti LLP" ("EA Account 2851").

24     vi. CB&T account ending in x8461 in the name of

25 "Eagan Avenatti LLP, Operating Account" ("EA Account 8461").

26     vii. CB&T account ending in x0313 in the name of

27 "Eagan Avenatti LLP, Debtor-in-Possession Case 8:17-BK-11961-CB,

28 General Account" ("EA DIP Account 0313").

viii.   CB&T account ending in x0661 in the name of "Avenatti & Assoc. A Professional Corp." ("A&A Account 0661").

ix.   City National Bank ("CNB") attorney trust account ending in x5566 in the name of "Michael J. Avenatti, Attorney Client Trust Account" ("Avenatti Trust Account 5566").

x.   CNB attorney trust account ending in x4705 in the name of "Michael J. Avenatti, Esq., Attorney Client Trust Account" ("Avenatti Trust Account 4705").

xi.   CB&T account ending in x2240 in the name of "Global Baristas US LLC, Operating Account" ("GBUS Operating Account 2240").

xii.  CB&T account ending in x3730 in the name of "Global Baristas LLC" ("GB LLC Account 3730").

h.   Defendant AVENATTI was a signatory on and exercised control over a KeyBank account ending in x6193 in the name of "Global Baristas US LLC" ("GBUS KeyBank Account 6193"), which was maintained in Seattle, Washington.

i.   As a member of the State Bar of California, defendant AVENATTI was obligated to comply with the California Rules of Professional Conduct.  Defendant AVENATTI was required, among other things, to promptly notify a client of the receipt of any funds the client was entitled to receive, and to promptly pay or deliver to the client or such payees as designated by the client any such funds that defendant AVENATTI held in trust for the client upon the client's request.

j.   Money transmitted through the Fedwire Funds Transfer System (the "Fedwire system") was routed from its origin to its destination through Texas and New Jersey.

        k.   A "Special Needs Trust" was a specialized trust that
allowed for a disabled person to maintain his or her eligibility for
public assistance benefits, despite having assets that would
otherwise make the person ineligible for those benefits.

        2.   "Client 1" was an individual who resided in Los Angeles
County, within the Central District of California.  Beginning as
early as in or about 2012 and continuing until in or about March
2019, defendant AVENATTI and EA LLP had a formal attorney-client
relationship with Client 1.  Specifically, defendant AVENATTI and EA
LLP agreed to represent Client 1 in connection with a lawsuit against
the County of Los Angeles and others, alleging violations of Client
1's constitutional rights that led to severe emotional distress and
severe physical injuries, including paraplegia (the "L.A. County
Lawsuit").

        3.   "Client 2" was an individual who resided in Los Angeles
County, within the Central District of California.  Beginning as
early as in or about December 2016 and continuing until in or about
March 2019, defendant AVENATTI and EA LLP had a formal attorney-
client relationship with Client 2.  Specifically, defendant AVENATTI
and EA LLP agreed to represent Client 2 in connection with potential
litigation against an individual with whom Client 2 had a personal
relationship ("Individual 1").

        4.   "Client 3" was an individual who resided in Orange County,
within the Central District of California.  Beginning as early as in
or about July 2014 and continuing until in or about November 2018,
defendant AVENATTI and EA LLP had a formal attorney-client
relationship with Client 3.  Specifically, defendant AVENATTI and EA

LLP agreed to represent Client 3 in connection with an intellectual property dispute against a Colorado-based company ("Company 1").

5.    "Client 4" and "Client 5" were both individuals who resided in Los Angeles County, within the Central District of California. Beginning as early as in or about August 2017 and continuing until in or about August 2018, defendant AVENATTI had a formal attorney-client relationship with both Client 4 and Client 5.  Specifically, defendant AVENATTI agreed to represent both Client 4 and Client 5 in connection with their separation and divestment from one of the companies in which Client 4 and Client 5 owned shares ("Company 2").

**B.    THE SCHEME TO DEFRAUD**

6.    Beginning as early as in or about January 2015 and continuing through at least in or about March 2019, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant AVENATTI, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim-clients to whom defendant AVENATTI had agreed to provide legal services, including, but not limited to, Client 1, Client 2, Client 3, Client 4, and Client 5, as to material matters, and to obtain money and property from such victim-clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts that defendant AVENATTI had a duty to disclose.

**C.    THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD**

7.    The fraudulent scheme operated, in substance, in the following manner:

a.    Defendant AVENATTI would negotiate a settlement on behalf of a client that would require the payment of funds to the client.

b.    Defendant AVENATTI would misrepresent, conceal, and falsely describe to the client the true terms of the settlement and/or the disposition the settlement proceeds.

c.    Defendant AVENATTI would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts defendant AVENATTI controlled.

d.    Defendant AVENATTI would embezzle and misappropriate settlement proceeds to which he was not entitled.

e.    Defendant AVENATTI would lull the client to prevent the client from discovering the embezzlement and misappropriation by, among other things, falsely denying the settlement proceeds had been paid, sending funds to the client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the client had been delayed for legitimate reasons and would occur at a later time.

### Embezzlement of Client 1's Funds

f.    On or about January 21, 2015, defendant AVENATTI negotiated a settlement of the L.A. County Lawsuit on behalf of Client 1.  Under the terms of the negotiated settlement agreement, the County of Los Angeles agreed to pay $4,000,000 to Client 1 in exchange for Client 1 dismissing the L.A. County Lawsuit.  Client 1 was entitled to receive the $4,000,000 settlement payment, less EA LLP's attorneys' fees, costs, and expenses.

g.     In or around January 2015, defendant AVENATTI told Client 1 that the County of Los Angeles had agreed to a settlement. Defendant AVENATTI falsely represented to Client 1 that the settlement agreement had to remain confidential, the County of Los Angeles could not pay the settlement to Client 1 in one lump-sum, and the settlement proceeds could not be paid until the County of Los Angeles approved a Special Needs Trust for Client 1.  In truth and in fact, as defendant AVENATTI then well knew, the settlement agreement did not contain a confidentiality provision, the County of Los Angeles had agreed to make a lump-sum $4,000,000 settlement payment to Client 1, and the settlement payment from the County of Los Angeles was not conditioned on the approval of a Special Needs Trust for Client 1.

h.     On or about January 26, 2015, defendant AVENATTI caused the approximately $4,000,000 settlement payment to be deposited into EA Trust Account 8541 to be held in trust for Client 1.  Knowing that the full settlement amount had been paid by the County of Los Angeles, defendant AVENATTI concealed and failed to disclose to Client 1 that EA LLP had received the $4,000,000 settlement payment.  Further, defendant AVENATTI and EA LLP retained and did not transfer Client 1's portion of the settlement payment to Client 1.

i.     Between on or about January 26, 2015, and on or about March 30, 2015, defendant AVENATTI caused approximately $3,125,000 of the $4,000,000 settlement payment to be transferred from EA Trust Account 8541 to EA Account 2851.  Thereafter, defendant AVENATTI caused substantial portions of the settlement proceeds to be transferred from EA Account 2851 to A&A Account 0661, and then

8

further transferred to other bank accounts defendant AVENATTI
controlled, including defendant AVENATTI's personal bank account and
bank accounts associated with GBUS and GB Auto, or used to pay
defendant AVENATTI's personal expenses. By no later than July 6,
2015, defendant AVENATTI had drained all of the settlement proceeds
out of EA Trust Account 8541. Defendant AVENATTI concealed and
failed to disclose to Client 1 that the entire $4,000,000 settlement
payment had been expended and that substantial portions of the
settlement proceeds had been used for defendant AVENATTI's own
purposes.

j. In order to lull Client 1 and prevent Client 1 from
discovering that defendant AVENATTI had embezzled Client 1's portion
of the $4,000,000 settlement payment, defendant AVENATTI committed
and caused to be committed the following acts:

i. Starting as early as in or about July 2015 and
continuing to in or about March 2019, defendant AVENATTI caused at
least 69 payments, each ranging from approximately $1,000 to
approximately $1,900 and together totaling at least approximately
$124,000, to be made to Client 1. During this same time period,
defendant AVENATTI also caused payments to be made to various
assisted living facilities to pay for rent on Client 1's behalf.
Defendant AVENATTI falsely represented to Client 1 that the payments
made to Client 1 and to the assisted living facilities where Client 1
resided were "advances" on the settlement payment from the County of
Los Angeles, which defendant AVENATTI falsely represented had not yet
been received.

ii. In or about 2017, after Client 1 told defendant
AVENATTI that Client 1 wanted to purchase his own residence,

defendant AVENATTI agreed to help Client 1 find a real estate broker and purchase a house. Defendant AVENATTI represented and promised to Client 1 that Client 1 would be able to use the settlement proceeds to fund the purchase of a house. After Client 1 was in escrow on the purchase of a house, however, defendant AVENATTI falsely told Client 1 that Client 1 could not purchase the house after all because the County of Los Angeles still had not approved the Special Needs Trust and therefore could not make the settlement payment to Client 1. Client 1 was unable to close escrow and did not purchase the house.

iii. On or about November 26, 2018, defendant AVENATTI told Client 1 that defendant AVENATTI would respond on Client 1's behalf to a request that Client 1 provide the United States Social Security Administration ("SSA") information it requested to evaluate Client 1's continued eligibility for Supplemental Security Income ("SSI") benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from defendant AVENATTI. Knowing full well that the requested information could lead to inquiries that could reveal that defendant AVENATTI had embezzled Client 1's portion of the settlement proceeds, defendant AVENATTI failed to provide the requested information to SSA, which resulted in Client 1's SSI benefits being discontinued in or about February 2019.

k. On or about March 22, 2019, defendant AVENATTI was questioned regarding the alleged embezzlement of the Client 1 Settlement Proceeds during a public judgment-debtor examination conducted in federal court in Los Angeles, California. Shortly thereafter, in order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion

of the $4,000,000 settlement, defendant AVENATTI falsely told Client 1 that the County of Los Angeles had finally approved the Special Needs Trust for Client 1 and that Client 1 would begin receiving settlement payments from the County of Los Angeles through the Special Needs Trust.

l.     In order to further lull Client 1 and to attempt to establish a defense against any claims Client 1 could bring against defendant AVENATTI, on or about March 23, 2019, and on or about March 24, 2019, defendant AVENATTI caused Client 1 to sign a document defendant AVENATTI claimed was necessary to effectuate the settlement agreement and finalize the Special Needs Trust that defendant AVENATTI claimed was required before Client 1 could begin receiving payments due under the settlement, and a document stating that Client 1 was satisfied with defendant AVENATTI's representation of Client 1.

### Embezzlement of Client 2's Funds

m.     On or about January 7, 2017, defendant AVENATTI negotiated a settlement on behalf of Client 2 with Individual 1. Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.  Client 2 was entitled to receive the initial $2,750,000 settlement payment, less EA LLP's attorneys' fees (i.e., 33 percent of the total $3,000,000 settlement amount), costs, and expenses.

n.     In order to conceal the true details of the settlement agreement from Client 2, defendant AVENATTI did not provide a copy of

the settlement agreement to Client 2.  Rather, in or about January

2017, defendant AVENATTI falsely represented to Client 2 that

Individual 1 would make an initial lump-sum payment, the entirety of

which would be used to pay EA LLP's attorney fees (i.e., 33 percent

of the total settlement amount) and costs, and then approximately 96

monthly payments over the course of the next eight years by which the

remaining settlement funds would be paid to Client 2.  In truth and

in fact, as defendant AVENATTI then well knew, the actual settlement

agreement required Individual 1 to make the initial $2,750,000

settlement payment, which far exceeded the money owed to EA LLP for

attorneys' fees, by on or about January 28, 2017, and Individual 1

was not required to make any monthly payments to Client 2 thereafter.

o.   On or about January 25, 2017, defendant AVENATTI

caused the initial $2,750,000 settlement payment from Individual 1 to

be transferred to EA Trust Account 8671 to be held in trust for

Client 2.  Defendant AVENATTI concealed and failed to disclose to

Client 2 that EA LLP had received the initial $2,750,000 settlement

payment.  Further, defendant AVENATTI and EA LLP retained and did not

transfer Client 2's portion of the $2,750,000 settlement payment to

Client 2.

p.   On or about January 26, 2017, defendant AVENATTI

caused $2,500,000 of the $2,750,000 settlement payment to be

transferred to an attorney trust account for another law firm ("Law

Firm 1").  That same day, defendant AVENATTI caused Law Firm 1 to

transfer the entire $2,500,000 to Honda Aircraft Company, LLC, to

purchase a private airplane for defendant AVENATTI's company,

Passport 420.  Defendant AVENATTI also caused the remaining $250,000

of the $2,750,000 settlement payment to be transferred first to EA

12

Account 2851 and then to A&A Account 0661. Defendant AVENATTI

concealed and failed to disclose to Client 2 that defendant AVENATTI

had used the settlement proceeds in this manner.

q. In order to lull Client 2 and prevent Client 2 from

discovering that defendant AVENATTI had embezzled Client 2's portion

of the initial $2,750,000 settlement payment, defendant AVENATTI

committed and caused to be committed the following acts:

i. Between on or about March 15, 2017, and on or

about June 18, 2018, defendant AVENATTI caused approximately 11

payments totaling approximately $194,000 to be deposited into Client

2's bank account. Defendant AVENATTI falsely represented to Client 2

that these payments constituted the monthly settlement payments that

were purportedly due from Individual 1. For example, on or about

February 20, 2018, defendant AVENATTI caused a $16,000 cashier's

check drawn on EA Account 4613 to be deposited into Client 2's bank

account, which falsely identified Individual 1 as the "remitter."

ii. Between in or about June 2018 and in or about

March 2019, after defendant AVENATTI stopped making the purported

monthly payments to Client 2, defendant AVENATTI falsely represented

to Client 2 that Individual 1 was not complying with the settlement

agreement and falsely told Client 2 that defendant AVENATTI was

working on obtaining the missing monthly settlement payments

purportedly due to Client 2 from Individual 1.

iii. On or about March 24, 2019, at a meeting with

Client 2 at defendant AVENATTI's residence in Los Angeles,

California, defendant AVENATTI falsely represented to Client 2 that

Client 2 would soon be receiving a payment from Individual 1 to make

13

1   up for the purportedly missing monthly settlement payments from

2   Individual 1 for July 2018 through March 2019.

3                    **Embezzlement of Client 3's Funds**

4            r.   Between on or about December 22, 2017, and on or about

5   December 28, 2017, defendant AVENATTI negotiated a settlement

6   agreement with Company 1 on behalf of Client 3.  The settlement

7   agreement required Company 1 to make an initial payment of $1,600,000

8   by January 10, 2018, and three additional payments of $100,000 by

9   January 10 of 2019, 2020, and 2021, respectively, for a total of

10  $1,900,000.  Client 3 was entitled to receive the initial $1,600,000

11  settlement payment, less EA LLP's attorneys' fees of $760,000 (i.e.,

12  40 percent of the total $1,900,000 settlement amount), costs, and

13  expenses.

14           s.   On or about December 28, 2017, at a meeting with

15  Client 3 at EA LLP's offices in Newport Beach, California, to discuss

16  the proposed settlement agreement with Company 1, defendant AVENATTI

17  provided an altered copy of the settlement agreement to Client 3 for

18  Client 3's review, which copy falsely represented the payment

19  schedule as $1,600,000 due by March 10, 2018, and $100,000 due by

20  March 10 of each of the three subsequent years.  That same day,

21  defendant AVENATTI emailed the attorney for Company 1 the signature

22  page for the actual settlement agreement, bearing Client 3's

23  signature.

24           t.   On or about December 29, 2017, defendant AVENATTI

25  received a complete copy of the fully executed settlement agreement

26  with Client 3's and Company 1's signatures from Company 1's attorney,

27  which included the payment schedule that had actually been negotiated

28  by defendant AVENATTI but had been concealed from Client 3, namely,

                                  14

1    an initial $1,600,000 payment due by January 10, 2018, and additional
2    payments of $100,000 due by January 10 of each of the three
3    subsequent years.
4           u.    On or about January 2, 2018, defendant AVENATTI
5    emailed instructions to Company 1's attorney to wire the initial
6    $1,600,000 settlement payment to Avenatti Trust Account 5566.
7           v.    On or about January 5, 2018, as instructed by
8    defendant AVENATTI, Company 1 wired the initial $1,600,000 settlement
9    payment to Avenatti Trust Account 5566 to be held in trust for Client
10   3.  Defendant AVENATTI concealed and failed to disclose to Client 3
11   that defendant AVENATTI had received the initial $1,600,000
12   settlement payment from Company 1.  Further, defendant AVENATTI
13   retained Client 3's portion of the $1,600,000 settlement payment and
14   did not transfer Client 3's portion of the $1,600,000 settlement
15   payment to Client 3.
16          w.    Between on or about January 5, 2018, and on or about
17   March 14, 2018, defendant AVENATTI caused approximately $1,599,400 of
18   the initial $1,600,000 settlement payment to be used for his own
19   purposes, including to pay for expenses relating to GBUS.  Defendant
20   AVENATTI concealed and failed to disclose to Client 3 that defendant
21   AVENATTI used the settlement proceeds for his own purposes.
22          x.    In order to lull Client 3 and prevent Client 3 from
23   discovering that defendant AVENATTI had embezzled Client 3's portion
24   of the initial $1,600,000 settlement payment, defendant AVENATTI
25   committed and caused to be committed the following acts:
26          i.    Between on or about March 10, 2018, and in or
27   about November 2018, defendant AVENATTI falsely represented to Client
28   3 that Company 1 had not made the initial $1,600,000 settlement

15

payment, and that defendant AVENATTI was working on obtaining the purportedly missing $1,600,000 settlement payment from Company 1.

ii. Between in or about April 2018 and in or about November 2018, defendant AVENATTI caused multiple payments totaling approximately $130,000 to be paid to Client 3 and/or Client 3's spouse, which payments defendant AVENATTI falsely claimed represented "advances" on Client 3's portion of the $1,600,000 settlement payment from Company 1, so that Client 3 could meet certain financial obligations while Client 3 was purportedly "waiting" for his portion of the $1,600,000 settlement payment from Company 1.

**Embezzlement of Client 4's Funds**

y. On or about September 17, 2017, defendant AVENATTI negotiated a "Common Stock Repurchase Agreement" with Company 2 on behalf of Client 4 and Client 5. Under the terms of Client 4's Common Stock Repurchase Agreement, Company 2 agreed to repurchase from Client 4 361,565 shares of Company 2 for approximately $27,478,940, and thereafter an additional 107,188 shares of Company 2 for approximately $8,146,288, which resulted in a total repurchase amount of approximately $35,625,228.

z. On or about September 18, 2017, Company 2 wired approximately $27,414,668 to Avenatti Trust Account 4705. Approximately $2,787,651 of this amount constituted defendant AVENATTI's and/or EA LLP's attorneys' fees (i.e., 7.5 percent of the total $35,625,228 repurchase amount), costs, and expenses. Between on or about September 21, 2017, and on or about October 3, 2017, defendant AVENATTI caused the remainder of the initial $27,414,668 payment to be transferred to bank accounts associated with Client 4.

1          aa.  On or about March 13, 2018, after Company 2 informed
2  Client 4 and Client 5 that Company 2 was ready to repurchase the
3  remaining 107,188 shares of Company 2 from Client 4 as contemplated
4  in the Common Stock Purchase Agreement, defendant AVENATTI told
5  Client 5 that Company 2 should wire the remaining $8,146,288 payment
6  due to Client 4 to Avenatti Trust Account 4705, and that defendant
7  AVENATTI would then wire the $8,146,288 payment from Avenatti Trust
8  Account 4705 to Client 4.

9          bb.  On or about March 14, 2018, following defendant
10  AVENATTI's instructions, Company 2 transferred approximately
11  $8,146,288 to Avenatti Trust Account 4705 to be held in trust for
12  Client 4.  Defendant AVENATTI retained and did not transfer the
13  $8,146,288 payment to Client 4 as defendant AVENATTI had promised to
14  do.

15          cc.  Between on or about March 15, 2018, and on or about
16  May 4, 2018, defendant AVENATTI caused approximately $4,000,000 out
17  of the $8,146,288 payment from Company 2 due to Client 4 to be used
18  for defendant AVENATTI's own purposes, including the following:

19               i.  On or about March 15, 2018, defendant AVENATTI
20  caused approximately $3,000,000 of Client 4's funds to be transferred
21  to EA Trust Account 4613.  Later that same day, defendant AVENATTI
22  then caused approximately $2,828,423 to be transferred from EA Trust
23  Account 4613 to an attorney trust account for SulmeyerKupetz, a law
24  firm representing A&A and defendant AVENATTI in bankruptcy
25  proceedings involving EA LLP, so that SulmeyerKupetz could use the
26  money to pay some of EA LLP's creditors in the bankruptcy
27  proceedings, including the Internal Revenue Service.

28

1           ii.  Between on or about March 20, 2018, and on or

2 about May 1, 2018, defendant AVENATTI caused a total of approximately

3 $780,000 of Client 4's funds to be paid to EA Trust Account 4613,

4 which defendant AVENATTI then used for his own purposes, including

5 transferring the funds to bank accounts associated with defendant

6 AVENATTI's other companies, namely, GBUS, GB LLC, A&A, and Passport

7 420.

8           iii. Between on or about March 20, 2018, and May 1,

9 2018, defendant AVENATTI caused a total of approximately $260,000 of

10 Client 4's funds to be paid to EA DIP Account 0313.

11           iv.  In order to lull Client 1 and prevent Client 1

12 from discovering that defendant AVENATTI had embezzled Client 1's

13 portion of the $4,000,000 settlement payment from the County of Los

14 Angeles, on or about April 9, 2018, defendant AVENATTI used Client

15 4's funds, which had been transferred from Avenatti Trust Account

16 4705 to EA DIP Account 0313 and then to EA Trust Account 4613, to

17 make an approximately $1,900 payment to Client 1.

18           v.   In order to lull Client 2 and prevent Client 2

19 from discovering that defendant AVENATTI had embezzled Client 2's

20 portion of the $2,750,000 settlement payment from Individual 1, on or

21 about April 17, 2018, defendant AVENATTI used Client 4's funds, which

22 had been transferred from Avenatti Trust Account 4705 to EA Trust

23 Account 4613, to make an approximately $34,000 payment to Client 2.

24          dd.  Between on or about March 14, 2018, and on or about

25 May 3, 2018, defendant AVENATTI failed to disclose to Client 4 and

26 Client 5 that defendant AVENATTI had used approximately $4,000,000 of

27 Client 4's funds for defendant AVENATTI's own purposes.

28

1          ee.  In order to lull Client 4 and Client 5 and prevent

2    them from discovering that defendant AVENATTI had embezzled

3    approximately $4,000,000 from the approximately $8,146,288 payment

4    defendant AVENATTI received from Company 2, between on or about

5    March 14, 2018, and on or about May 3, 2018, defendant AVENATTI

6    falsely represented and promised Client 4 and Client 5 that defendant

7    AVENATTI would transfer Client 4's funds to Client 4 at a later date,

8    and that defendant AVENATTI needed to go to the bank to fill out

9    paperwork to effectuate the wire transfers.  In truth and in fact, as

10   defendant AVENATTI then well knew, he had already caused

11   approximately $4,000,000 of Client 4's funds to be transferred or

12   paid to other bank accounts defendant AVENATTI controlled, and then

13   used for defendant AVENATTI's own purposes.

14         ff.  In order to lull Client 4 and Client 5 and prevent

15   them from discovering that he had embezzled approximately $4,000,000

16   of Client 4's funds, on or about May 4, 2018, defendant AVENATTI

17   caused two wire transfers in the amounts of $4,000,000 and $146,288

18   to be sent from Avenatti Trust Account 4705 to a bank account

19   associated with Client 4.  Defendant AVENATTI retained and failed to

20   transfer to Client 4 the remainder of the $8,146,288 payment that

21   Company 2 had transferred on or about March 14, 2018, to Avenatti

22   Trust Account 4705 for the benefit of Client 4.

23         gg.  Between on or about May 4, 2018, and on or about

24   June 4, 2018, defendant AVENATTI and another attorney with whom

25   defendant AVENATTI worked ("Attorney 1") falsely represented to

26   Client 4 and Client 5 that the entire $8,146,288 payment from Company

27   2 had been transferred to Client 4 in three separate wire transfers.

28   For example, in response to a request from Client 5 that defendant

                                    19

1  AVENATTI provide the wire transfer information for the remaining
2  $4,000,000 of Client 4's funds, on or about May 11, 2018, defendant
3  AVENATTI emailed Attorney 1 a wire transfer confirmation document
4  purporting to reflect a second $4,000,000 wire transfer to Client 4.
5  In truth and in fact, as defendant AVENATTI then well knew, defendant
6  AVENATTI had never transferred the remaining $4,000,000 to Client 4,
7  defendant AVENATTI had already used the remaining $4,000,000 for his
8  own purposes, and the wire transfer confirmation document that
9  defendant AVENATTI provided on or about May 11, 2018, related to the
10 first $4,000,000 wire transfer from Avenatti Trust Account 4705 that
11 Client 4 had already received on May 4, 2018.

12 **D.   THE USE OF THE WIRES**

13      8.   On or about the following dates, within the Central
14 District of California, and elsewhere, defendant AVENATTI, for the
15 purpose of executing the above-described scheme to defraud,
16 transmitted and caused to be transmitted by means of wire and radio
17 communications in interstate commerce the following items:

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| ONE | 1/30/2015 | Wire transfer of approximately $250,000 sent from A&A Account 0661 through the Fedwire system to GBUS's Homestreet bank account in Seattle, Washington. |
| TWO | 2/10/2015 | Wire transfer of approximately $50,000 from A&A Account 0661 through the Fedwire system to defendant AVENATTI's personal Bank of America bank account. |
| THREE | 1/26/2017 | Wire transfer of approximately $2,500,000 from EA Trust Account 8671 through the Fedwire system to Law Firm 1's JP Morgan Chase Bank, N.A. ("Chase") IOLTA trust account. |

| COUNT | DATE | ITEM WIRED |
|-------|------|------------|
| FOUR | 1/5/2018 | Wire transfer of approximately $1,600,000 sent from Company 1's Silicon Valley Bank account through the Fedwire system to Avenatti Trust Account 5566. |
| FIVE | 1/10/2018 | Wire transfer of approximately $60,000 sent from Avenatti CNB Trust Account 5566 through the Fedwire system to EA Trust Account 3714. |
| SIX | 3/15/2018 | Wire transfer of approximately $3,000,000 from Avenatti Trust Account 4705 through the Fedwire system to EA CB&T Trust Account 4613. |
| SEVEN | 3/15/2018 | Wire transfer of approximately $2,828,423 from EA CB&T Trust Account 4613 through the Fedwire system to an attorney trust account for SulmeyerKupetz at CNB. |
| EIGHT | 3/20/2018 | Wire transfer of approximately $200,000 from Avenatti CNB Trust Account 4705 through the Fedwire system to EA Trust Account 4613. |
| NINE | 6/18/2018 | Wire transfer of approximately $16,000 from EA Trust Account 4613 through the Fedwire system to Client 2's Chase bank account. |
| TEN | 7/13/2018 | Wire transfer of approximately $1,900 from EA Trust Account 4613 through the Fedwire system to Client 1's Bank of America bank account. |

COUNTS ELEVEN THROUGH EIGHTEEN

[26 U.S.C. § 7202; 18 U.S.C. § 2(b)]

**A.    INTRODUCTORY ALLEGATIONS**

**Background**

9.    The Grand Jury re-alleges and incorporates by reference paragraph 1 through 7 of this Indictment as though fully set forth herein.

10.    At all relevant times:

a.    GBUS was a limited liability company organized in Washington, which operated Tully's stores in Washington and California.  Until in or around November 2017, GBUS's corporate office was in Seattle, Washington.

b.    GB LLC was a limited liability company organized in Washington.  Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was the sole managing member of GB LLC.

c.    GB Auto was a limited liability company organized in Washington.  Defendant AVENATTI was the sole manager of GB Auto.

d.    Doppio, Inc. ("Doppio") was a for-profit corporation incorporated in Washington.  Defendant AVENATTI was the sole governor of Doppio.

e.    Defendant AVENATTI was the effective owner of GBUS. In or around June 2013, defendant AVENATTI's company GB LLC acquired TC Global Inc., which previously operated Tully's, at a bankruptcy auction for approximately $9.15 million, namely, $6.95 million in cash and $2.2 million in assumed liabilities.  On or about June 25, 2013, defendant AVENATTI caused a wire transfer in the amount of $7,000,000 from EA Trust Account 8541 to a bank account for Foster Pepper PLLC, the law firm representing GB LLC in Tully's bankruptcy

auction.  A&A owned 100 percent of Doppio, which in turn owned at least 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

  f. Defendant AVENATTI served as GBUS's CEO, for which he was paid a yearly salary of approximately $250,000.  As GBUS's CEO, defendant AVENATTI exercised control over every aspect of GBUS's business affairs, including approving payments GBUS made and controlling GBUS's bank accounts.  Defendant AVENATTI managed and exercised control over GBUS's business affairs from Orange and Los Angeles Counties, within the Central District of California, and elsewhere.

  g. The Internal Revenue Service ("IRS") was an agency of the United States within the Department of Treasury of the United States and was responsible for enforcing and administering the tax laws of the United States.

 11. Beginning in or about February 2015 and continuing until at least in or about July 2018, GBUS maintained multiple bank accounts at CB&T in Orange County, California, including GBUS's payroll account ending in x2976 ("GBUS Payroll Account 2976") and GBUS Operating Account 2240.  Defendant AVENATTI and an EA LLP employee ("EA Employee 1") were the only signatories on GBUS Payroll Account 2976 and GBUS Operating Account 2240.

 12. In addition to defendant AVENATTI's yearly salary as GBUS's CEO, between as early as in or about September 2015 and continuing until at least in or about December 2017, defendant AVENATTI caused GBUS to make substantial payments for defendant AVENATTI's personal benefit and the benefit of other entities defendant AVENATTI

controlled, while, at the same time, failing to pay over to the IRS payroll taxes withheld from GBUS employees' paychecks.  For example:

a.  Between on or about September 1, 2015, and on or about December 31, 2017, defendant AVENATTI caused a net of approximately $2.5 million to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with A&A and EA LLP.

b.  On or about March 30, 2016, defendant AVENATTI caused GBUS to transfer $200,000 to the G.P. Family Trust as payment for two months of rent for defendant AVENATTI's residence in Newport Beach, California.

c.  In order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment from the County of Los Angeles, on or about April 7, 2016, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to EA Account 2851, to make an approximately $1,900 payment to Client 1.

d.  In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1, defendant AVENATTI caused GBUS funds to be used to make payments to Client 2, including the following:

i.  On or about April 14, 2017, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to A&A Account 0661, to make an approximately $16,000 payment to Client 2.

ii.  On or about May 15, 2017, defendant AVENATTI used GBUS funds, which had been transferred from GBUS Account 2240 to A&A Account 0661, to make an approximately $16,000 payment to Client 2.

**Federal Payroll Taxes**

13. At all relevant times:

a. Title 26 of the United States Code imposed four types of tax with respect to wages paid to employees: (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

b. Federal income tax was imposed upon employees based upon the amount of wages they received.

c. Social Security tax and Medicare tax were imposed by the Federal Insurance Contributions Act (collectively referred to as "FICA taxes"). FICA taxes were imposed separately on employees and on employers.

d. Federal unemployment tax was imposed under the Federal Unemployment Tax Act ("FUTA"). FUTA taxes were imposed solely on employers.

**GBUS's Obligation to Collect, Truthfully Account For, and Pay Over to the IRS Federal Payroll Taxes**

14. At all relevant times:

a. GBUS was required to withhold employee income taxes and FICA taxes from the wages paid to its employees, and to pay over the withheld amounts to the IRS. The employee income taxes and FICA taxes that GBUS was required to withhold and pay over to the IRS were commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

b. GBUS was required to make deposits of payroll taxes, including trust fund taxes, to the IRS on a periodic basis. In addition, GBUS was required to file, following the end of each

25

calendar quarter, an Employer's Quarterly Federal Tax Return (Form 941), setting forth for the quarter the total amount of wages and other compensation subject to withholding paid by GBUS, the total amount of income tax withheld, the amount of Social Security and Medicare taxes (*i.e.*, FICA taxes) due, and the total federal tax deposits.

   c. Defendant AVENATTI was a "responsible person" for GBUS, that is, defendant AVENATTI had the corporate responsibility to collect, truthfully account for, and pay over to the IRS GBUS's payroll taxes.

  15. Beginning in or about June 2013 and continuing until at least in or about October 2017, GBUS withheld tax payments from its employees' paychecks, including federal income taxes and FICA taxes.

  16. Beginning in or about September 2015 and continuing until at least in or about October 2017, GBUS failed to pay over to the IRS payroll taxes due and owing, including federal income taxes and FICA taxes GBUS withheld from its employees' paychecks. In total, between in or around September 2015 and in or around October 2017, GBUS failed to pay over to the IRS at least approximately $3,207,144 in federal payroll taxes, including at least approximately $2,390,048 in trust fund taxes that GBUS withheld from its employees' paychecks.

  17. Beginning in or about January 2016 and continuing until at least in or about October 2017, GBUS failed to timely file its quarterly employment tax returns (Forms 941) with the IRS for the fourth quarter of 2015 through the third quarter of 2017, inclusive.

**B.** **FAILURE TO ACCOUNT FOR AND PAY OVER PAYROLL TAXES**

  18. Beginning in or about October 2015 and continuing until at least on or about October 31, 2017, in Orange County, within the

Central District of California, and elsewhere, defendant AVENATTI, a responsible person of GBUS, willfully failed and willfully caused GBUS to fail to pay over to the United States, namely, the IRS, all of the federal income taxes and FICA taxes (i.e., trust fund taxes) that GBUS withheld from GBUS employees' total taxable wages, which were due and owing to the United States by the dates set forth below and in the amounts set forth below, for each of the following calendar year quarters:

| COUNT | QUARTER AND YEAR | QUARTERLY DUE DATE | APPROXIMATE TRUST FUND TAXES DUE AND OWING |
|-------|------------------|--------------------|--------------------------------------------|
| ELEVEN | Fourth Quarter of 2015 | 1/31/2016 | $292,724 |
| TWELVE | First Quarter of 2016 | 4/30/2016 | $382,100 |
| THIRTEEN | Second Quarter of 2016 | 7/31/2016 | $297,791 |
| FOURTEEN | Third Quarter of 2016 | 10/31/2016 | $333,969 |
| FIFTEEN | Fourth Quarter of 2016 | 1/31/2017 | $277,681 |
| SIXTEEN | First Quarter of 2017 | 4/30/2017 | $309,702 |
| SEVENTEEN | Second Quarter of 2017 | 7/31/2017 | $345,094 |
| EIGHTEEN | Third Quarter of 2017 | 10/31/2017 | $150,989 |

COUNT NINETEEN

[26 U.S.C. § 7212(a)]

**A.  INTRODUCTORY ALLEGATIONS**

19.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 10 through 17 of this Indictment as though fully set forth herein.

20.  In or about September 2016, the IRS initiated a collection action relating to GBUS's failure to file its quarterly employment tax returns (Forms 941) and pay over to the IRS payroll taxes that were due and owing, including federal income taxes and FICA taxes that GBUS had withheld (collectively, "trust fund taxes") from GBUS employees' paychecks.

21.  On or about October 7, 2016, an IRS Revenue Officer ("IRS RO-1") spoke with defendant MICHAEL JOHN AVENATTI ("AVENATTI") and other GBUS employees regarding the IRS's collection action and advised them that since approximately September 2015 GBUS had not paid over to the IRS any federal payroll taxes.

22.  On or about June 26, 2017, IRS RO-1 filed a notice of federal tax lien against GBUS in King County in the State of Washington.  The federal tax lien indicated that GBUS owed the IRS approximately $4,998,227 in unpaid federal payroll taxes.  A copy of the federal tax lien notice was also mailed to GBUS.

23.  Between in or about August 2017 and in or about January 2018, IRS RO-1 issued levy notices to a number of financial institutions and companies associated with GBUS.  The levy notices indicated that GBUS owed the IRS as much as approximately $5,210,769. Each levy notice required the recipient of the levy notice to turn over to the United States Treasury GBUS's property and rights to

property, such as money, credits, and bank deposits, that the
recipient of the levy had or was already obligated to pay to GBUS.
Banks, savings and loans, and credit unions were obligated to hold
any funds subject to the levy notices for 21 days before sending
payment to the United States Treasury.  Copies of the levy notices
issued by IRS RO-1 were mailed to GBUS.

24.  Beginning as early as in or about August 2017, defendant
AVENATTI knew that the IRS had issued levies to certain financial
institutions at which GBUS maintained bank accounts.

**B.   THE ATTEMPT TO OBSTRUCT AND IMPEDE THE ADMINISTRATION OF THE
INTERNAL REVENUE LAWS**

25.  Beginning on or about October 7, 2016, and continuing until
at least in or around September 2018, in Orange and Los Angeles
Counties, within the Central District of California, and elsewhere,
defendant AVENATTI corruptly obstructed and impeded, and corruptly
endeavored to obstruct and impede, the due administration of the
internal revenue laws of the United States.

26.  The attempt to obstruct and impede the due administration
of the internal revenue laws of the United States operated, in
substance, in the following manner:

a.   On or about October 7, 2016, defendant AVENATTI made
false statements to IRS RO-1 in connection with the IRS's collection
action, including that:  (i) defendant AVENATTI was not personally
involved in GBUS's finances; and (ii) defendant AVENATTI was unaware
that since approximately September 2015 GBUS had failed to pay over
to the IRS any federal payroll taxes.  In truth and in fact, as
defendant AVENATTI then well knew, (i) defendant AVENATTI was
personally involved in GBUS's finances in that he had authority to

approve payments on behalf of GBUS and had control over GBUS's bank
accounts; and (ii) defendant AVENATTI was aware that since
approximately September 2015 GBUS had failed to pay over to the IRS
any federal payroll taxes because, among other reasons, on or about
November 5, 2015, GBUS's controller had sent defendant AVENATTI an
email explaining to defendant AVENATTI the "implications" of GBUS not
paying to the IRS its payroll taxes in a timely manner, and, between
in or about September 2015 and in or about October 2016, defendant
AVENATTI had refused to authorize GBUS to pay over to the IRS the
federal payroll taxes that GBUS had withheld from its employees'
paychecks.

      b.   In order to further obstruct and impede the IRS's
collection action and the IRS's efforts to collect the payroll taxes
that GBUS owed to the IRS, defendant AVENATTI directed GBUS employees
to stop depositing cash receipts from the Tully's stores into GBUS
KeyBank Account 6193, which defendant AVENATTI knew was already
subject to IRS levy notices, and instructed GBUS employees to instead
deposit all cash receipts from Tully's stores into a little-used Bank
of America account for a separate entity defendant AVENATTI
controlled, GB Auto. Defendant AVENATTI did so by, among other acts,
the following:

      i.   In or about September 2017, defendant AVENATTI
directed and instructed a GBUS employee ("GBUS Employee 1") to tell
the Tully's stores that the stores could no longer make cash deposits
into GBUS KeyBank Account 6193 and should hold all of the stores'
cash deposits.

      ii.   On or about September 7, 2017, defendant
AVENATTI sent GBUS Employee 1 a text message containing the bank

account information for the GB Auto account at Bank of America (the "GB Auto Account"), in order to cause the cash deposits from the Tully's stores to be made into the GB Auto Account.

iii. On or about September 18, 2017, after receiving a text message from GBUS Employee 1 asking if the Tully's stores were able to deposit at KeyBank yet, defendant AVENATTI responded via text message "Not yet but hopefully in next two days.  Can you collect deposits tmrw and deposit pls?"

iv. On or about September 28, 2017, defendant AVENATTI sent a text message to GBUS Employee 1 and another GBUS employee ("GBUS Employee 2"), asking, "When are we depositing again?" and, later that same day, another text message, stating, "It is important that these deposits be made regularly.  Thanks."

v. Between on or about September 7, 2017, and in or about December 2017, GBUS Employee 1, acting at defendant AVENATTI's direction, made approximately 27 cash deposits totaling approximately $859,784 into the GB Auto Account.  After approximately 24 of the cash deposits, GBUS Employee 1 sent defendant AVENATTI a text message attaching a photograph of the deposit slip.

c. In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI caused GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts ("merchant accounts"), which defendant AVENATTI knew were already subject to IRS levy notices.  Defendant AVENATTI did so by, among other acts, the following:

31

1           i.   On or about September 28, 2017, defendant

2    AVENATTI received an email from GBUS Employee 2, which stated, among

3    other things, "9.25.17 tsys – $22,135.19 IRS levy."

4           ii.  On or about September 29, 2017, defendant

5    AVENATTI received an email from GBUS Employee 2 titled "Levies,"

6    which stated that "IRS took as [sic] additional $23,763.02 from tsys

7    yesterday."

8           iii. On or about September 29, 2017, defendant

9    AVENATTI directed a TSYS representative ("TSYS Rep. 1") to change the

10   company name associated with the merchant accounts from "Global

11   Baristas US LLC" to "Global Baristas, LLC" and to change the EIN from

12   GBUS's EIN to GB LLC's EIN.

13          iv.  On or about October 2, 2017, defendant AVENATTI

14   sent TSYS Rep. 1 an email regarding changes to the merchant accounts

15   and said "we need this done ASAP."

16          v.   On or about October 3, 2017, defendant AVENATTI

17   entered into a new Merchant Transaction Processing Agreement with

18   TSYS on behalf of GB LLC.

19          vi.  On or about October 3, 2017, defendant AVENATTI

20   and EA Employee 1 opened a new bank account, GB LLC Account 3730, for

21   GB LLC at CB&T in Orange County, California.  Later that day, EA LLP

22   Employee 1 emailed TSYS Rep. 1 the bank account and routing number

23   for GB CB&T Account 3730, which was to be the new bank account into

24   which the proceeds of the credit card transactions were to be

25   deposited.

26          d.   In order to further obstruct and impede the IRS's

27   collection action and the IRS's efforts to collect the payroll taxes

28   that GBUS owed to the IRS, in or about December 2017, after TSYS

                                    32

closed GBUS and GB LLC's merchant accounts, defendant AVENATTI caused
GBUS to open new merchant accounts with Chase for the Tully's stores
under the name GB LLC and directed Chase to deposit all credit card
receipts in to GB LLC Account 3730.

      e.   In order to further obstruct and impede the IRS's
efforts to collect the payroll taxes that GBUS owed to the IRS,
defendant AVENATTI changed the name of the contracting party on
various contracts with The Boeing Company ("Boeing"), which had
agreed to allow GBUS to operate Tully's stores at Boeing facilities
in Washington.  Defendant AVENATTI did so by, among other acts, the
following:

      i.   In or about November 2016, approximately one
month after defendant AVENATTI learned of the IRS's collection
action, defendant AVENATTI caused the contracting party's name on a
contract with Boeing to be changed from "Global Baristas US LLC" to
"GB Hospitality LLC," even though, as defendant AVENATTI then well
knew, GBUS operated the Tully's stores at the Boeing facilities and
"GB Hospitality LLC" had never been registered with any government
agency and had never operated.

      ii.   In or about September 2017 and in or about
October 2017, after IRS RO-1 had issued levy notices to Boeing and
numerous financial institutions at which GBUS maintained accounts,
defendant AVENATTI, having agreed on behalf of GBUS to sell Boeing
two Tully's coffee kiosks and other Tully's equipment in exchange for
a payment from Boeing of approximately $155,010 and forgiveness of
certain debts, directed a Boeing attorney to change the seller's name
from "GB Hospitality, LLC" to "Global Baristas, LLC" on the two bills
of sales relating to the transaction.  Defendant AVENATTI further

instructed Boeing to transfer the approximately $155,010 payment to
EA Trust Account 8671, rather than to GBUS's bank account. Defendant
AVENATTI then transferred the approximately $155,010 payment from EA
Trust Account 8671 to A&A Account 0661, from which defendant AVENATTI
used a substantial portion of the proceeds of the sale for defendant
AVENATTI's personal purposes, including to: (1) transfer
approximately $15,000 to a personal bank account; (2) pay
approximately $13,073 for rent at defendant AVENATTI's residential
apartment in Los Angeles, California; and (3) pay approximately
$8,459 that defendant AVENATTI owed to Neiman Marcus.

        f.    After learning of the IRS's collection action,
defendant AVENATTI used GBUS funds that should and could have been
used to pay over to the IRS federal incomes taxes and FICA taxes that
had been withheld from GBUS employees' paychecks for his own personal
benefit and the benefit of other entities defendant AVENATTI
controlled, including, but not limited to, the following:

        i.    Between in or about October 2016 and in or about
December 2017, defendant AVENATTI caused a net of approximately $1.6
million to be transferred from GBUS's and GB LLC's bank accounts to
bank accounts associated with defendant AVENATTI's other companies,
namely, A&A and EA LLP.

        ii.   In order to lull Client 1 and prevent Client 1
from discovering that defendant AVENATTI had embezzled Client 1's
portion of the $4,000,000 settlement payment from the County of Los
Angeles, defendant AVENATTI used GBUS funds, including credit card
receipts from Tully's stores that Chase deposited into GB LLC Account
3730, to make the following additional payments to Client 1:

34

          (I)  On or about January 19, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or KeyBank Account 6193 to EA Trust Account 3714, to make an approximately $1,900 payment to Client 1.

          (II) On or about February 15, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 4613, to make an approximately $1,900 payment to Client 1.

          iii. In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1, defendant AVENATTI used GBUS funds, including credit card receipts from Tully's stores that Chase deposited into GB LLC Account 3730, to make the following additional payments to Client 2:

          (I)  On or about January 16, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 3714, to make an approximately $16,000 payment to Client 2.

          (II) On or about February 20, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 4613, to make an approximately $16,000 payment to Client 2.

COUNTS TWENTY THROUGH TWENTY-THREE

[26 U.S.C. § 7203]

**A.   INTRODUCTORY ALLEGATIONS**

27.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, and 26 of this Indictment as though fully set forth herein.

28.  On or about October 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed his U.S. Individual Income Tax Return (Form 1040) for the 2009 calendar year, which claimed defendant AVENATTI had total income of $1,939,942 and that defendant AVENATTI owed the IRS approximately $569,630 in taxes for the 2009 calendar year.  Defendant AVENATTI, however, did not pay the remaining tax due for the 2009 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

29.  On or about October 11, 2011, defendant AVENATTI filed his U.S. Individual Income Tax Return (Form 1040) for the 2010 calendar year, which claimed defendant AVENATTI had total income of $1,154,800 and that defendant AVENATTI owed the IRS approximately $281,786 in taxes for the 2010 calendar year.  Defendant AVENATTI, however, did not pay the remaining taxes due to the IRS for the 2010 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

30.  The 2010 Form 1040 was the last U.S. Individual Income Tax Return defendant AVENATTI filed with the IRS.

**B.   THE WILLFUL FAILURES TO FILE TAX RETURNS**

31.  During the calendar years set forth below, defendant AVENATTI, who resided in Orange and Los Angeles Counties, within the

36

Central District of California, had and received gross income in excess of the amounts ("threshold gross income amounts") set forth below.  By reason of such gross income, defendant AVENATTI was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an income tax return to the IRS Center, at Fresno, California, to a person assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make an income tax return.

| COUNT | CALENDAR YEAR | THRESHHOLD GROSS INCOME AMOUNT | DUE DATE |
|-------|---------------|--------------------------------|----------|
| TWENTY | 2014 | $20,300 | October 15, 2015, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-ONE | 2015 | $20,600 | October 17, 2016, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-TWO | 2016 | $20,700 | April 15, 2017 |
| TWENTY-THREE | 2017 | $20,800 | April 16, 2018 |

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

[26 U.S.C. § 7203]

**A.  INTRODUCTORY ALLEGATIONS**

32.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, and 28 through 30 of this Indictment as though fully set forth herein.

33.  On or about March 17, 2014, EA LLP filed its 2011 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant MICHAEL JOHN AVENATTI ("AVENATTI") signed the return on or about March 12, 2014, as the general partner or member manager.  The return listed A&A as the designated Tax Matters Partner ("TMP") before the IRS, and defendant AVENATTI as the TMP representative.

34.  On or about October 8, 2014, EA LLP filed its 2012 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant AVENATTI signed the return on or about October 1, 2014, as the general partner or member manager.  The return listed A&A as the designated TMP before the IRS.

35.  The 2012 Form 1065 for EA LLP was the last U.S. Return of Partnership Income for EA LLP filed with the IRS.

**B.  THE WILLFUL FAILURES TO FILE TAX RETURNS**

36.  During the calendar years set forth below, defendant AVENATTI conducted a business as a partnership under the name of EA LLP, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make, for and on behalf of the partnership, a partnership return of income to the IRS Center, at Ogden, Utah, to a person

38

assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of the partnership's gross income and the deductions and credits allowed by law.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make a partnership return.

| COUNT | CALENDAR YEAR | DUE DATE |
|-------|---------------|----------|
| TWENTY-FOUR | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-FIVE | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-SIX | 2017 | March 15, 2018. |

COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE

[26 U.S.C. § 7203]

**A.    INTRODUCTORY ALLEGATIONS**

37.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, 28 through 30, and 33 through 35 of this Indictment as though fully set forth herein.

38.   On or about September 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed a 2009 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 calendar year.  The return listed defendant AVENATTI as the President of A&A.

39.   On or about September 30, 2011, defendant AVENATTI filed a 2010 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 calendar year.  The return listed defendant AVENATTI as the President of A&A.

40.   The 2010 Form 1120S for A&A was the last U.S. Income Tax Return for an S Corporation (Form 1120S) that defendant AVENATTI filed for A&A with the IRS.

**B.    THE WILLFUL FAILURE TO FILE TAX RETURN**

41.   During the calendar years set forth below, defendant AVENATTI was the President and CEO of A&A, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an

40

income tax return, for and on behalf of the corporation, to the IRS Center, at Ogden, Utah, to a person assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of the corporation's gross income and the deductions and credits allowed by law.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make an income tax return at the time required by law.

| COUNT | CALENDAR YEAR | DUE DATE |
|---|---|---|
| TWENTY-SEVEN | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-EIGHT | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-NINE | 2017 | March 15, 2018. |

COUNTS THIRTY AND THIRTY-ONE

[18 U.S.C. §§ 1344(1), 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

42.  The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, and 38 through 40 of this Indictment as though fully set forth herein.

43.  Between in or about January 2014 and in or about April 2016, defendant MICHAEL JOHN AVENATTI ("AVENATTI") operated and controlled GB LLC and EA LLP from EA LLP's offices in Newport Beach, California.

44.  At all times relevant to this Indictment, The Peoples Bank was a financial institution located in Biloxi, Mississippi, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation.

**B.   THE SCHEME TO DEFRAUD**

45.  Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

46.  The fraudulent scheme operated, in substance, in the following manner:

   a.   Between in or about January 2014 and in or about December 2014, defendant AVENATTI sought and obtained the following three loans from The Peoples Bank on behalf of the following companies that defendant AVENATTI controlled:

42

1          i.   In or about January 2014, defendant AVENATTI

2  sought and obtained a $850,000 loan to GB LLC (the "January 2014 GB

3  LLC Loan");

4          ii.  In or about March 2014, defendant AVENATTI sought

5  and obtained a $2,750,000 loan to EA LLP (the "March 2014 EA LLP

6  Loan"), from which defendant AVENATTI used approximately $884,166 to

7  pay off the January 2014 GB LLC Loan; and

8          iii. In or about December 2014, defendant AVENATTI

9  sought and obtained a $500,000 loan to EA LLP (the "December 2014 EA

10  LLP Loan").

11       b.   In order to obtain the March 2014 EA LLP Loan and the

12  December 2014 EA LLP Loan from The Peoples Bank, defendant AVENATTI

13  omitted and concealed material facts, and provided The Peoples Bank

14  with materially false financial information, including, but not

15  limited to, false and fraudulent individual and partnership tax

16  returns, and false and fraudulent balance sheets and financial

17  statements, as described below.

18       c.   In support of the application for the March 2014 EA

19  LLP Loan, defendant AVENATTI submitted to The Peoples Bank a 2011

20  U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2011

21  Form 1040") stating that defendant AVENATTI had an adjusted gross

22  income for the 2011 calendar year of approximately $4,562,881, and

23  had a tax due and owing to the IRS for the 2011 calendar year of

24  approximately $1,506,707.  In truth and in fact, as defendant

25  AVENATTI then well knew, defendant AVENATTI had not filed the Peoples

26  Bank 2011 Form 1040 with the IRS, had not filed any 2011 U.S.

27  Individual Income Tax Return with the IRS, and had not paid to the

28

IRS the $1,506,707 defendant AVENATTI purportedly owed for the 2011 calendar year.

d.    In support of the application for the March 2014 EA LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to The Peoples Bank a personal financial statement as of March 11, 2014, in which defendant AVENATTI failed to disclose to The Peoples Bank that defendant AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, for the 2009 and 2010 calendar years.

e.    In support of the application for the March 2014 EA LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to The Peoples Bank a Balance Sheet for January 2014 through March 10, 2014 for EA LLP, which stated, among other things, that EA LLP had approximately $508,299 in its operating account, EA Account 8461, as of March 10, 2014.  In truth and in fact, as defendant AVENATTI then well knew, the balance in EA Account 8461 as of March 10, 2014, was approximately $43,013.

f.    In support of the application for the March 2014 EA LLP Loan, on or about March 13, 2014, defendant AVENATTI submitted to The Peoples Bank a 2012 U.S. Partnership Return (Form 1065) for EA LLP (the "Peoples Bank 2012 Form 1065"), which stated that in the 2012 calendar year EA LLP had total income of approximately $11,426,021, and ordinary business income of approximately $5,819,458.  In truth and in fact, as defendant AVENATTI then well knew, the Peoples Bank 2012 Form 1065, had not been filed with the IRS.  Rather, in or about October 2014, defendant AVENATTI caused a different 2012 U.S. Partnership Return (Form 1065) to be filed with

the IRS (the "IRS 2012 Form 1065"), which differed materially from
the Peoples Bank 2012 EA 1065 in the following ways:

   i. The Peoples Bank 2012 Form 1065 stated that in
the 2012 calendar year EA LLP had total income of approximately
$11,426,021, whereas the IRS 2012 Form 1065 stated that in the 2012
calendar year EA LLP had gross receipts and total income of
approximately $6,212,605.

   ii. The Peoples Bank 2012 Form 1065 stated that in
the 2012 calendar year EA LLP had ordinary business income of
approximately $5,819,458, whereas the IRS 2012 Form 1065 stated that
EA LLP had an ordinary business loss of approximately $2,128,849.

   g. In reliance on the false and fraudulent information
defendant AVENATTI submitted to The Peoples Bank in support of the
March 2014 EA LLP Loan, on or about March 14, 2014, The Peoples Bank
approved the March 2014 EA LLP Loan and transferred approximately
$1,824,584 to EA Account 8461.

   h. In support of the application for the December 2014 EA
LLP Loan, on or about November 16, 2014, defendant AVENATTI submitted
to The Peoples Bank a Balance Sheet for January 2014 through
September 2014 for EA LLP, which stated, among other things, that EA
LLP had approximately $712,729 in EA Account 8461 as of September 30,
2014.  In truth and in fact, as defendant AVENATTI then well knew,
the balance in EA Account 8461 as of September 30, 2014, was
approximately $27,710.

   i. In support of the application for the December 2014 EA
LLP Loan, on or about November 22, 2014, defendant AVENATTI submitted
to The Peoples Bank a personal financial statement as of November 1,
2014, in which defendant AVENATTI failed to disclose to The Peoples

Bank that defendant AVENATTI still owed the IRS approximately $850,438 in unpaid personal income taxes, plus interest and penalties, for the 2009 and 2010 calendar years.

j. In support of the application for the December 2014 EA LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted to The Peoples Bank a 2012 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2012 Form 1040"), stating that defendant AVENATTI had total income for the 2012 calendar year of approximately $5,423,099, and had paid to the IRS $1,600,000 in estimated tax payments. In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2012 Form 1040 with the IRS, had not filed any 2012 U.S. Individual Income Tax Return with the IRS, and had not made any payments to the IRS towards his 2012 individual tax liability.

k. In support of the application for the December 2014 EA LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted to The Peoples Bank a 2013 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2013 Form 1040"), stating that defendant AVENATTI had total income for the 2013 calendar year of approximately $4,082,803, and had paid to the IRS approximately $1,250,000 in estimated tax payments and approximately $103,511 in withholdings. In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2013 Form 1040 with the IRS, had not filed any 2013 U.S. Individual Income Tax Return with the IRS, had not made any estimated tax payments to the IRS towards his 2013 individual tax liability, and did not have any tax withholdings during the 2013 calendar year.

l.   In order to obtain the December 2014 EA LLP Loan, on or about December 12, 2014, defendant AVENATTI, on behalf of EA LLP, signed a commercial pledge agreement whereby EA LLP agreed to "Assignment of the First $500,000 Plus Interest of Settlement Proceeds in the Meridian related cases, said attorney's fees to be $10.8 million plus out of pocket costs for class counsel [EA LLP]." On or about March 31, 2015, after EA LLP received a $3,034,514 wire transfer from the trustee of the Meridian settlement, defendant AVENATTI concealed and did not disclose, and caused EA LLP to conceal and not disclose, the receipt of the funds to The Peoples Bank, and did not distribute and caused EA LLP not to distribute the first $500,000 to The Peoples Bank as defendant AVENATTI on behalf of EA LLP had agreed to do.

m.   In reliance on the false and fraudulent information defendant AVENATTI submitted to The Peoples Bank in support of the March 2014 EA LLP Loan and the December 2014 EA LLP Loan, on or about December 12, 2014, The Peoples Bank approved the December 2014 EA LLP Loan and transferred approximately $494,500 to EA Account 8461.

## C.   EXECUTIONS OF THE SCHEME TO DEFRAUD

47.   On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, executed the fraudulent scheme by committing and willfully causing others to commit the following acts:

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY | 3/14/2014 | Receipt of March 2014 EA LLP Loan proceeds in the amount of approximately $1,824,584. |

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY-ONE | 12/12/2014 | Receipt of December 2014 EA LLP Loan proceeds in the amount of approximately $494,500. |

## COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

48.   The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, 38 through 40, and 43 through 46 of this Indictment as though fully set forth herein.

49.   On or about December 1, 2014, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant AVENATTI knew belonged to another person, namely, the name and preparer tax identification number ("PTIN") of M.H., during and in relation to the offense of Bank Fraud, a felony violation of Title 18, United States Code, Section 1344(1), as charged in Count Thirty-One of this Indictment.

COUNT THIRTY-THREE

[18 U.S.C. §§ 152(3), 2(b)]

A.   **INTRODUCTORY ALLEGATIONS**

50.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 of this Indictment as though fully set forth herein.

51.  In or about February 2016, J.F., a former partner at EA LLP, filed an arbitration claim against EA LLP and defendant MICHAEL JOHN AVENATTI ("AVENATTI").  In or about February 2017, the arbitration panel ordered the depositions of defendant AVENATTI and EA Employee 1 to take place on March 3, 2017.

52.  On or about March 1, 2017, a creditor of EA LLP, filed an involuntary Chapter 11 bankruptcy petition against EA LLP in the Middle District of Florida.  By law, the filing of the bankruptcy petition created an automatic stay under Section 362 of Title 11 of the arbitration between J.F. and EA LLP and defendant AVENATTI.

53.  On or about March 8, 2017, in response to an emergency motion filed by J.F. for relief from the automatic stay, the Bankruptcy Court in the Middle District of Florida ordered that unless EA LLP consented to the bankruptcy by March 10, 2017, the Court would grant relief from the automatic stay and thereby allow the arbitration to proceed.

54.  On or about March 10, 2017, EA LLP consented to an order for relief under Chapter 11 of Title 11 and, as a result, EA LLP became a debtor in possession in bankruptcy.

55.  On or about April 11, 2017, defendant AVENATTI certified and declared under penalty of perjury as the managing partner of EA LLP that the United States Trustee Financial Requirements Checklist,

50

Certifications, and any Attachments Thereto, were true and correct to the best of his knowledge and belief. Defendant AVENATTI on behalf of EA LLP further certified that he had "read and underst[ood] the United States Trustee Chapter 11 'Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees'" and "agree[d] to perform in accordance with said guidelines and requirements." Specifically, defendant AVENATTI certified as the managing partner of EA LLP that he understood, among other things, that EA LLP was required to: (a) close all pre-petition bank accounts controlled by the debtor, EA LLP; (b) immediately open new debtor-in-possession ("DIP") operating, payroll, and tax accounts; and (c) deposit all business revenues into the DIP operating account.

56. On or about April 20, 2017, the EA LLP Chapter 11 bankruptcy was transferred from the Middle District of Florida to the Central District of California as In re: Eagan Avenatti LLP, bearing case number 8:17-bk-11961-CB. In the bankruptcy case, EA LLP was the debtor in possession, and all property and assets in which the debtor had any ownership or interest at the time of the filing of the bankruptcy petition as well as any interest in property that the debtor acquired after the commencement of the bankruptcy case was the "bankruptcy estate," and was under the management and control of the debtor in possession.

57. On or about May 12, 2017, the Office of the United States Trustee in the Central District of California provided defendant AVENATTI the Guidelines and Requirements for Chapter 11 Debtors in Possession (the "Guidelines and Requirements"), which required EA LLP to close all existing bank accounts and open new DIP general,

payroll, and tax bank accounts, and to file a declaration regarding
EA LLP's compliance with the Guidelines and Requirements.

58.  On or about May 30, 2017, defendant AVENATTI signed under
penalty of perjury as the managing partner of EA LLP a "Declaration
of Debtor Regarding Compliance with the United States Trustee
Guidelines and Requirements for Chapter 11 Debtors in Possession,"
which included the following information:

a.  Defendant AVENATTI, on behalf of EA LLP, confirmed
that EA LLP had closed all pre-petition bank accounts, and provided
the account information for EA LLP's three new DIP bank accounts.

b.  Defendant AVENATTI, on behalf of EA LLP, provided the
United States Trustee with evidence that EA LLP had closed EA LLP's
prior general account and opened three new DIP bank accounts.

c.  In response to the requirement that EA LLP list the
last two years for which EA LLP filed federal and state tax returns,
defendant AVENATTI, on behalf of EA LLP, stated that neither "[t]he
Debtor nor its accountant has copies of its 2014 and 2015 federal or
state income tax returns.  The Debtor will seek to obtain copies of
them from the IRS and the State of California."

59.  Pursuant to the Guidelines and Requirements, EA LLP had
additional and ongoing requirements during the course of the
bankruptcy, including the following:

a.  Before any insiders, including the owners, partners,
officers, directors, and shareholders of EA LLP and relatives of
insiders, could receive compensation from the bankruptcy estate, EA
LLP was required to provide notice to the creditors and the United
States Trustee.  No such compensation could be paid to any insiders
until 15 days after service of the notice and (i) no objection had

been received by the Bankruptcy Court; or (ii) if an objection had
been received, the Bankruptcy Court had resolved the objection.

       b.   EA LLP was required to file Monthly Operating Reports
("MOR") to include, among other things, "information regarding bank
accounts over which the debtor ha[d] possession, custody, control,
access or signatory authority, even if the account [was] not in the
debtor's name and whether or not the account contain[ed] only post-
petition income." EA LLP was "required to report all of [its]
financial information in the MOR."

    60. From on or about May 25, 2017, through on or about February
15, 2018, defendant AVENATTI signed under penalty of perjury and
filed MORs for EA LLP for eleven months, namely, March 2017 through
January 2018, inclusive, which included the following information:

       a.   The first page of each MOR stated that "All receipts
must be deposited into the general account," and required EA LLP to
itemize: (i) the beginning balance of the general account for the
month at issue; (ii) all receipts EA LLP obtained during the month;
(iii) all of the disbursements EA LLP made during the month,
including transfers to other DIP accounts; and (iv) the ending
balance of the general account for the month at issue.

       b.   Each MOR required EA LLP to include all receipts and
expenditures during the monthly reporting period, as well as the
cumulative post-petition amounts. On all eleven MORs that defendant
AVENATTI signed under penalty of perjury on behalf of EA LLP,
defendant AVENATTI claimed zero payroll was made to insiders.
Immediately above the penalty of perjury declaration, each MOR sought
answers to several questions, including whether EA LLP provided
compensation or remuneration to any officers, directors, principals,

1    or other insiders without appropriate authorization during the

2    reporting period.  On all eleven MORs that defendant AVENATTI signed

3    under penalty of perjury on behalf of EA LLP, defendant AVENATTI

4    answered "no" to the question whether any compensation or

5    remuneration was made to any officers, directors, principals, or

6    other insiders.

7    **B.   FALSE DECLARATION**

8         61.  On or about June 19, 2017, in Orange County, within the

9    Central District of California, defendant AVENATTI knowingly and

10   fraudulently made and willfully caused to be made a materially false

11   declaration and statement under penalty of perjury within the meaning

12   of Title 28, United States Code, Section 1746, in and in relation to

13   a case under Title 11 of the United States Code, namely, In re: Eagan

14   Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court

15   for the Central District of California, by submitting and declaring

16   under penalty of perjury to be true and complete the Monthly

17   Operating Report for EA LLP for the period May 1, 2017, through

18   May 30, 2017 (the "May 2017 MOR"), in which defendant AVENATTI, as

19   the Managing Partner for EA LLP, falsely stated that EA LLP's

20   "Receipts During Current Period; Accounts Receivable – Post Filing"

21   were $409,953.70, whereas, in truth and in fact, as defendant

22   AVENATTI then well knew, EA LLP's receipts during the May 2017 MOR

23   period, accounts receivable – post filing were greater than

24   $409,953.70.

25

26

27

28

COUNT THIRTY-FOUR

[18 U.S.C. § 152(3), 2(b)]

62. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

63. On or about October 16, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period September 1, 2017, through September 30, 2017 ("September 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $829,635.28, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the September 2017 MOR period, accounts receivable – post filing were greater than $829,635.28.

COUNT THIRTY-FIVE

[18 U.S.C. § 152(3), 2(b)]

64. The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

65. On or about February 15, 2018, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period January 1, 2018, through January 31, 2018 ("January 2018 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $232,221.11, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the January 2018 MOR period, accounts receivable – post filing were greater than $232,221.11.

COUNT THIRTY-SIX

[18 U.S.C. § 152(2)]

66.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

67.  On or about June 12, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made a false oath as to a material matter in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, in that defendant AVENATTI testified under oath at the Section 341(a) debtor's examination and stated "no" when asked whether the debtor, EA LLP, received any counsel fees from the Super Bowl NFL litigation.  In truth and in fact, as defendant AVENATTI well knew at the time he made the false oath, defendant AVENATTI and EA LLP had received fees from the Super Bowl NFL litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

68.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Ten, Thirty, Thirty-One, or Thirty-Three through Thirty-Six of this Indictment.

69.    Defendant shall forfeit to the United States of America the following:

a.    all right, title, and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, or property traceable to such proceeds; and

b.    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

70.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 1028, and 28 U.S.C. §2461(c)]

71.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028, and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offense set forth in Count Thirty-Two of this Indictment.

72.  Defendant, if so convicted, shall forfeit to the United States of America the following:

a.  All right, title and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, and any property traceable thereto;

b.  Any personal property used or intended to be used to commit the offense; and

c.  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

73.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

60

court; (d) has been substantially diminished in value; or (e) has

been commingled with other property that cannot be divided without

difficulty.

A TRUE BILL

_____
Foreperson

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

JULIAN L. ANDRÉ
Assistant United States Attorney
Major Frauds Section

BRETT A. SAGEL
Assistant United States Attorney
Santa Ana Branch Office

61