**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

August 21, 2020

**BY EMAIL & ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:   **United States v. Michael Avenatti**
       **19 Cr. 374 (JMF)**

Dear Judge Furman:

     Michael Avenatti's Fifth and Sixth Amendment rights compel the Court to keep under seal Mr. Avenatti's CJA 23 Form and his accompanying affidavit in support of a motion for court-appointed counsel.  Sealing the documents is necessary to safeguard Mr. Avenatti's privilege against self-incrimination because there is a real and appreciable risk that the government will use Mr. Avenatti's sworn statements about his financial condition against him.  Not only do the government's instant charges and theory of the case turn on the details of Mr. Avenatti's income, debts, and financial obligations, but also the same prosecutors litigating this case have, in an earlier prosecution, introduced Mr. Avenatti's finances against him to prove motive and a culpable intent; that case remains open, pending sentencing.  Further, keeping the documents sealed will result in no prejudice to the government or the public's interest in ensuring that public funds for court-appointed counsel are being properly spent. There is no dispute over Mr. Avenatti's eligibility to be represented by the Federal Defenders of New York, Inc., and the Court has implemented its own safeguards to ensure the propriety of such representation.  Against this backdrop, Mr. Avenatti's sworn statements about his financial condition—statements he was compelled to make in order to obtain counsel under the Sixth Amendment—should remain sealed.

**Background**

  **A. Mr. Avenatti's income, debts, and financial motives are central to the Indictment and underlying factual allegations.**

  The government has accused Mr. Avenatti of committing wire fraud and aggravated identity theft through a scheme to fraudulently appropriate a former client's advance profits from a book deal that Mr. Avenatti helped broker. The government claims Mr. Avenatti received money from his former client's book publisher on behalf of his former client without her authorization, deposited the funds into his own account, and then used the funds "for his own purposes"—i.e., to satisfy various personal and professional debts, and to subsidize his day-to-day expenses. See Indictment, United States v. Avenatti, No. 19 Cr. 374 (JMF), Dkt. No. 1, at ¶1-2 (S.D.N.Y. May 22, 2019) (hereinafter "Avenatti II"). Specifically, Mr. Avenatti is alleged to have appropriated the money "to pay employees of his law firm and a coffee business he owned, to make payments to individuals with whom [he] had personal relationships, to make a luxury car payment, and to pay for hotels, airfare, meals, car services, and dry cleaning." Id. at ¶2; ¶¶17 and 23 (detailing the alleged expenditures).

  **B. The same prosecutors litigating this case have used and offered proof of Mr. Avenatti's income, debts, and financial obligations against him in a prior prosecution.**

  Earlier this year, the same prosecutors litigating this case against Mr. Avenatti took him to trial over allegations that he attempted to extort Nike, Inc., by demanding money from them in exchange for his client's silence on alleged corporate malfeasance. See Avenatti I, 19 Cr. 373 (PGG) (S.D.N.Y.). Before trial, Mr. Avenatti moved to preclude the government from using evidence of his financial condition and spending against him on two grounds: that his finances were irrelevant to the allegations because his motive was not at issue and that, even if relevant, evidence of his financial condition should be excluded under Fed. R. Evid. 403. Avenatti I, Dkt. No. 89.

  In opposing Mr. Avenatti's motion, the government alleged a direct link between his "motive to commit the charged offenses" and "evidence regarding his financial needs at the time of his conduct." Avenatti I, Dkt. No. 108 at 6. In particular, the government argued that Mr. Avenatti's charged conduct was motivated by his "significant debt … in excess of $15 million." Id. at 7. The government claimed these debts were owed to various sources—including another individual involved in the

purported extortion, "multiple of the defendant's former clients, one or more of his former law partners, and both of his former spouses"—and resulted from "unpaid civil judgments, defaulted personal loans, and child and spousal support in arrears." Id. According to the government, proof of these debts (through witness testimony and documentary evidence) would provide the best explanation of why Mr. Avenatti engaged in the charged conduct, and would therefore be highly relevant to counter his argument that he did not commit the crime. Id. at 8. This was true, the government contended, even though Mr. Avenatti's motive was technically not an element of the charged offenses because his indebtedness demonstrated his "need and motive to quickly generate substantial sums of money, at the time when he engaged in the charged conduct." Id. at 11.

At trial in Avenatti I, the government delivered on its intent to use Mr. Avenatti's lack of income and indebtedness against him. The government called Mr. Avenatti's former office manager to testify against him and to establish his alleged desperate financial outlook and lack of assets in the spring of 2019. The government also introduced into evidence proof of Mr. Avenatti's outstanding adverse civil judgments, which exceeded $11 million—approximately the amount of money he sought from Nike. Avenatti I, Exhibit GX S-4. And during summations, the government referred back to Mr. Avenatti's adverse civil judgments, making his poor financial straits the centerpiece of its closing argument:

> And that is why we are here today. Because Michael Avenatti, facing a mountain of debts, saw a light at the end of the tunnel. He saw a way to walk out from under those debts…. And so Avenatti took what Gary Franklin told him and he used it. He used it to shake down Nike, to line his own pockets to try to pay off his debts. [Avenatti I, Trial Tr. Feb. 11, 2020, p. 2127:13-22.]
>
> …
>
> But you know why he did it here. You know why he made these demands. It starts with the amount of money. The $12 million up front is a lot of money to anyone, but in this case it was really important to Michael Avenatti. He needed the money right away…. [T]his wasn't about Franklin for Avenatti. This was about getting out from under this debt. About a get-rich-quick scheme to clear $11 million in debt. [Id. at pp. 2164-66.]

3

### C. The Court granted Mr. Avenatti's motion for the appointment of counsel without objection from the government.

On July 29, 2020 Mr. Avenatti filed an ex parte motion for court-appointed counsel. Dkt. No. 65. In the publicly-filed version of Mr. Avenatti's motion, the government was noted as having "take[n] no position on Defendant's request." Id. at 4. On August 7, 2020 the parties appeared before the Court telephonically for a status conference, and for a decision on whether the Federal Defenders of New York, Inc. would be appointed to represent Mr. Avenatti. The Court granted Mr. Avenatti's motion without objection, and simultaneously implemented preventive measures designed to address any future changes in Mr. Avenatti's financial ability. Mr. Avenatti is required to update the Court on his financial condition at least every four months, and the Federal Defenders must keep track of the hours spent on representing Mr. Avenatti should his financial circumstances change and he becomes able to reimburse the Court.

**Argument**

Mr. Avenatti was required to make sworn statements about his financial condition to obtain the effective assistance of counsel as guaranteed by the Sixth Amendment. His Fifth Amendment right against self-incrimination prevents those very same statements from being weaponized against him, especially in a case that may turn on his income, debts, and overall financial motivations. Having already emphasized Mr. Avenatti's financial ruin in a previous prosecution, and without a basis for challenging Mr. Avenatti's eligibility for court-appointed counsel, the government cannot justify the disclosure of Mr. Avenatti's sworn financial statements. In the absence of any compelling countervailing interests that could justify even a limited or conditional disclosure of Mr. Avenatti's sworn statements about his finances, his Fifth and Sixth Amendment rights weigh heavily in favor of keeping them under seal.

### A. Legal Standard

#### i. Using a defendant's testimony to secure court-appointed counsel against him violates his Fifth Amendment privilege against self-incrimination.

In Simmons v. United States, 390 U.S. 377, 394 (1968), the Supreme Court held

that a defendant's testimony at a suppression hearing to establish standing to object to a search cannot be used against him at trial to establish guilt. This rule was necessary to avoid forcing defendants to choose between the Fourth Amendment right to be free from unreasonable searches and the Fifth Amendment right against self-incrimination. Id. ("In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

The Supreme Court has not explicitly ruled on whether statements made by a defendant to establish eligibility for appointed counsel are admissible at trial as proof of guilt. United States v. Kahan, 415 U.S. 239, 242-43 (1974). But several circuits have followed the reasoning of Simmons to protect defendants' sworn financial statements from disclosure and categorically preclude their use against defendants at trial to avoid a conflict between the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination. See, e.g., United States v. Anderson, 567 F.2d 839, 840-41 (8th Cir. 1977) (financial data provided to show indigency "should be sealed and not made available for the purpose of tax prosecution" because "[t]o hold otherwise would force [the defendant] to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination. Such a choice is constitutionally impermissible") (citing United States v. Branker, 418 F.2d 378, 380-81 (2d Cir. 1969)); see also United States v. Aguirre, 605 F.3d 351, 358 (6th Cir. 2010); United States v. Hardwell, 80 F.3d 1471, 1483 (10th Cir. 1996).

The consensus is clear: in order for a defendant to "enjoy his constitutional rights to counsel … without running the risk that thereby he may be incriminating himself with respect to the charges against him," the government "should not be permitted" to use as part of its direct case any testimony given by a defendant to secure court-appointed counsel. Branker, 418 F.2d at 380-81.

> **ii. Sealing a defendant's sworn financial statements to obtain court-appointed counsel is necessary to protect his Fifth Amendment rights, and avoid a conflict with the Sixth Amendment, whenever his financial status is relevant to the government's underlying charges.**

Courts take two different approaches to protect a defendant's Fifth Amendment interest in his sworn statements about his financial inability to afford counsel. If a defendant's financial condition is irrelevant to the underlying charges, then sealing his financial affidavits is likely too extreme a remedy because he is only able to assert a

5

speculative risk of self-incrimination. See, e.g., Seattle Times v. United States District Court, 845 F.2 1513, 1520 (9th Cir. 1988) (holding that unsealing financial affidavits in a product tampering case would not result in real and appreciable hazards of self-incrimination). Absent a link between the government's allegations and a defendant's finances, sealing his financial affidavits is unnecessary because there is no real and appreciable hazard that his statements will be used against him. Id. at 1518-19 ("To claim the [Fifth Amendment] privilege, the accused must be faced with substantial hazards of self-incrimination that are real and appreciable and not merely imaginary and unsubstantial.") (citations omitted). Under these circumstances, granting a defendant use immunity and precluding the government from using as part of its direct case the defendant's testimony is appropriate. See United States v. Harris, 707 F.2d 653, 662-63 (2d Cir. 1983).

In contrast, if a defendant's financial status is directly relevant to the charges against him, then sealing his financial affidavits is necessary to protect him from the substantial risk of self-incrimination. United States v. Hickey, 997 F. Supp. 1206, 1208-09 (N.D. Cal. 1998), subsequently dismissed, 185 F.3d 1064 (9th Cir. 1999); see also Anderson, 567 F.2d at 840-41 (citing Branker, 418 F.2d at 380). The risk is not just that a defendant's sworn statements would necessarily support a criminal conviction, but also that they would "furnish a link in the chain of evidence needed to prosecute the [defendant] for a federal crime." United States v. Hyde, 208 F. 2d 1052, 1055 (N.D. Cal. 2002) (quoting United States v. Neff, 615 F.2d 1235, 1239 (9th Cir. 1980), cert. denied, 447 U.S. 925 (1980)). Confronted with such a "real and appreciable" hazard of self-incrimination, the best way to ensure that a defendant's financial affidavit does not provide a lead or clue to possibly incriminating evidence is to seal the documents. Id. at 1056; see also Hardwell, 80 F.3d at 1483-84; United States v. Davis, 958 F.2d 47, 49 n.4 (4th Cir. 1992); United States v. Gravatt, 868 F.2d 585, 590 (3d Cir. 1989); Anderson, 567 F.2d at 840.

The circumstances of this prosecution support keeping Mr. Avenatti's sworn statements about his financial inability under seal. Not only is there a clear link between Mr. Avenatti's finances and the indictment, but the government has also aggressively sought to use Mr. Avenatti's financial condition against him in a previous (and still pending) prosecution in this district. Further, because the government has not disputed Mr. Avenatti's eligibility for court-appointed counsel, and given the protective measures the Court has imposed to ensure that public funds are being spent properly on Mr. Avenatti's defense, there are no countervailing interests competing with his Fifth and Sixth Amendment rights that could otherwise justify disclosure.

6

## B. Discussion

### i. Sealing Mr. Avenatti's CJA 23 Form and accompanying financial affidavit is necessary because there is a real and appreciable risk that the government will use his sworn statements against him.

Because there is a real and substantial hazard that any disclosure of Mr. Avenatti's sworn financial statements to the government would be used against him in violation of the Fifth Amendment, his statements should remain sealed.

Hyde is illustrative. There, the defendant was charged with mail fraud, health care fraud, and money laundering violations resulting in a forfeiture amount of over $1.2 million. 208 F. Supp. 2d at 1053. At some point, the defendant requested the Court appoint counsel to represent him and submitted a financial affidavit in support of his motion. Id. At the defendant's request, the court provisionally sealed the financial affidavit and questioned the defendant about his finances during an ex parte proceeding. Id. Before questioning the defendant, the court received from the government "suggested areas of inquiry" into his finances based on information the government had obtained from the Securities and Exchange Commission (SEC). Id. Satisfied with the information provided by the defendant, the court appointed a federal public defender. Id. Shortly thereafter, the defendant sought to keep his financial affidavit under seal, which the government opposed. Id.

The defendant argued that sealing was necessary to preserve his Fifth Amendment right against self-incrimination because his financial affidavit contained information "which the Government may use, or which could lead to evidence, against him in the underlying case." 208 F. Supp. 2d at 1053. In pertinent part, the government responded that sealing obstructed the truth-seeking function of the court by eliminating the possibility of adversarial proceedings to determine whether the defendant was truthful about his assets or had committed perjury. Id. at 1053-54. The government also contended that any Fifth Amendment concerns were premature and unavailing because it had not yet attempted to use any of the compelled information. Id.[1]

---

[1] The government also argued that sealing was against the public's interest in open proceedings. Hyde, 208 F. Supp. 2d at 1053. To the extent this is at issue here, the United States Attorney's Office for the Southern District of New York, as the agency prosecuting Mr. Avenatti, lacks third-party standing to assert any right on behalf of the

7

The court rejected both of these arguments. First, while the court recognized the general benefit of the full adversarial process, it expressly "note[d] that courts retain the authority (and so exercised that authority here) to conduct an <u>ex parte</u> examination" of the defendant and his sworn financial statements. <u>Hyde</u>, 208 F. Supp. 2d at 1054. And in conducting an <u>ex parte</u> examination, courts could mitigate any prejudice to the government by receiving its suggestions for specific areas of inquiry based on, for example, independent SEC investigations of the defendant. <u>Id.</u> Concerns about the court's truth-seeking function could be similarly ameliorated by waiting to obtain the defendant's financial affidavit until after trial, at which point the government could investigate possible perjury without creating a clear conflict with the defendant's Fifth Amendment rights. <u>Id.</u> The court also highlighted that "the interest in protecting the public fisc is protected inasmuch as appointment of counsel can be conditioned on a defendant's obligation to repay defense costs should it be later determined he or she is in fact able to pay." <u>Id.</u>

Second, and more crucially, the court dismissed outright the government's attempt to limit the defendant's Fifth Amendment concerns to the government's use of his statements as direct evidence. The court observed that a defendant faces substantial hazards of self-incrimination that are "real and appreciable" (and therefore sufficient to trigger Fifth Amendment protection) when the information would simply "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." <u>Hyde</u>, 208 F. Supp. 2d at 1054-55 (quoting <u>Neff</u>, 615 F.2d at 1239). The defendant's Fifth Amendment protections did not turn on whether the information could itself support a criminal conviction. <u>Id.</u> at 1056. Rather, he clearly had a Fifth Amendment interest in his financial affidavit because it was relevant to allegations and charges that directly concerned the status of his finances, including his "current finances, assets, sources of money, [and] ownership of his residence." <u>Id.</u> at 1057. Since the government might have been able to use his financial affidavit to obtain "probative evidence of his allegedly fraudulent conduct and money laundering," the defendant's concerns about self-incrimination were not imaginary or unsubstantial, and sealing was appropriate. <u>Id.</u> at 1056.

Even more so than the defendant in <u>Hyde</u>, Mr. Avenatti's circumstances reveal a substantial risk of self-incrimination should his CJA 23 Form and financial affidavit be

---

public to access Mr. Avenatti's sworn financial statements. <u>See</u> <u>United States v. Hickey</u>, 185 F.3d 1064 (9th Cir. 1999).

8

unsealed.   In accusing Mr. Avenatti of unlawfully appropriating a former client's funds to satisfy various debts, the government has alleged a direct, nefarious connection between discrete sources of Mr. Avenatti's income and outstanding financial obligations, inextricably intertwining Mr. Avenatti's finances with his alleged misconduct.   Mr. Avenatti's sworn statements are therefore replete with information that could provide leads for probative evidence, including an explanation for any alleged culpable motive or intent.   Indeed, as detailed above, the same prosecutors litigating this case have already (and aggressively) used Mr. Avenatti's financial condition against him in Avenatti I.   Because the government has tethered its theory of the case and Mr. Avenatti's alleged culpability to his finances, there is too great a risk that unsealing Mr. Avenatti's compelled statements about his financial condition would assist the government and cause Mr. Avenatti to incriminate himself in violation of the Fifth Amendment.

Further, because the Court has already taken measures (endorsed in Hyde) to balance Mr. Avenatti's Fifth and Sixth Amendment rights with the Court's responsibility to ensure that public funds are being spent appropriately, there is no need for adversarial proceedings concerning Mr. Avenatti's financial inability.   By requiring Mr. Avenatti to provide sworn updates on his financial condition every four months and the Federal Defenders to keep track of the hours spent on Mr. Avenatti's defense, the Court is affirmatively holding Mr. Avenatti accountable to the truthfulness of his representations under penalty of perjury and simultaneously minding the public fisc.   In light of these safeguards, Mr. Avenatti's sworn statements about his finances should remain sealed.

### ii. Sealing Mr. Avenatti's CJA 23 Form and accompanying financial affidavit is particularly appropriate in the absence of any countervailing concerns about the appropriateness of court-appointed representation.

Notwithstanding the steps taken by the Court to ensure the propriety of appointing the Federal Defenders to represent Mr. Avenatti, there is no credible basis for challenging Mr. Avenatti's financial eligibility in the first instance.   The government was given at least two opportunities to object to Mr. Avenatti's motion for the appointment of counsel and failed to do so.   The government has also failed to proffer any information suggesting Mr. Avenatti has the means to pay for representation.   This makes sense.   In Avenatti I, the government averred through various testimony and

documentary evidence that Mr. Avenatti is millions of dollars in debt—proof positive that he lacks the resources to afford counsel and qualifies for public representation. With no meaningful dispute over Mr. Avenatti's financial inability, there is no countervailing interest to compete with Mr. Avenatti's extraordinarily compelling Fifth Amendment concerns. Taken together, these two aspects of Mr. Avenatti's case distinguish him from the Second Circuit's decision United States v. Harris, which endorsed the district court's refusal to consider a defendant's sworn statements about his financial inability ex parte and under seal. 707 F.2d at 662-63.

In Harris, the defendant challenged the district court's termination of court-appointed counsel after he refused to submit additional proof of financial inability unless the proceedings were held in camera and without the government's participation. In upholding the district court's decision, the Second Circuit explained that "the speculative possibility of inadequate protection of defendant's fifth amendment rights is outweighed by the need to determine facts through adversarial proceedings." Id. at 663. Crucial to the Second Circuit's decision was the significant factual dispute over the defendant's financial means, ability to afford counsel, and truthfulness of representations he made on his CJA 23 Form. This dispute was driven by the government, which "rebutted Harris's claim of inability to afford counsel by inference and circumstantial evidence," including affidavits "rais[ing] serious questions as to whether Harris's original CJA 23 affidavit … understated his income by 50%, denied ownership of automobiles when he owned at least one, and failed to disclose other income in the 12-month period preceding submission of the affidavit." Id. at 661. Because the government had offered a substantial basis to believe that the defendant had made material misrepresentations and misstatements in his original CJA 23, sealing and reviewing in camera his additional claims of inability to pay was inappropriate.

Mr. Avenatti's situation stands in stark contrast to that of the defendant in Harris. As discussed above, the risk of self-incrimination should Mr. Avenatti's sworn statements be unsealed is not speculative; it is a near certainty. And unlike the defendant in Harris, whose credibility and truthfulness was called into question by extrinsic evidence introduced by the government, there is no basis whatsoever to disbelieve the accuracy of Mr. Avenatti's CJA 23 Form or his accompanying affidavit. To the contrary, the government's representations about Mr. Avenatti's significant debt in Avenatti I support his indigence, and the government has otherwise failed to offer any other basis upon which the Court could determine Mr. Avenatti's financial ability to afford counsel. Because Harris is eminently distinguishable from Mr. Avenatti's circumstances, it is not particularly useful to the Court's resolution of this issue.

**Conclusion**

For the foregoing reasons, and for those that may become apparent at any hearing or oral argument the Court orders, Mr. Avenatti's CJA 23 Form and accompanying affidavit should remain sealed.   The defense respectfully requests leave to file a reply letter within one week of any response in opposition the government may submit.

Respectfully Submitted,

/s/
Robert M. Baum
Tamara L. Giwa
Andrew J. Dalack
Assistant Federal Defenders

Counsel for Michael Avenatti

Cc:   Government Counsel