UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                        :

UNITED STATES OF AMERICA,          :       19 Cr. 374 (JMF)

                                          :

       -v-                       :

                                          :

MICHAEL AVENATTI,                 :

                                          :

                  Defendant.      :

                                          :
------------------------------------------------------------X


## DEFENDANT MICHAEL AVENATTI'S PRE-TRIAL MOTIONS


                                       **DAVID E. PATTON, ESQ.**
                                         Federal Defenders of New York, Inc.
                                         Attorney for Defendant
                                         **MICHAEL AVENATTI**
                                         52 Duane Street, 10th Floor
                                         New York, NY 10007
                                         (212) 417-8700

                                    Of Counsel:       **Robert M. Baum, Esq.**
                                                  **Andrew J. Dalack, Esq.**
                                                  **Tamara L. Giwa, Esq.**
                                                  Assistant Federal Defenders
                                                  (212) 417-8760

TO:    **AUDREY STRAUSS, ESQ.**
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, NY 10007

        Attn:    **Matthew Podolsky, Esq.**
                  **Robert Sobelman, Esq.**
                  Assistant United States Attorneys
                  Southern District of New York

# TABLE OF CONTENTS

OVERVIEW ..................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 5

   I.   Stephanie Clifford's relationship with former President Donald J. Trump. ................ 5

  II.   Ms. Clifford retains Michael Avenatti as her attorney and executes a written agreement. ..................... 6

 III.   Mr. Avenatti's extensive work on behalf of Ms. Clifford. .......................................... 7

 IV.   Mr. Avenatti solicits, negotiates, and finalizes Ms. Clifford's book deal. ................... 8

  V.   Mr. Avenatti terminates representation of Ms. Clifford in February 2019, three months before his indictment. ................................................................................. 9

 VI.   Post-indictment developments. ................................................................................. 10

ARGUMENT .................................................................................................................. 11

   I.   The government must produce the complete and original version of Ms. Clifford's WhatsApp communications with Mr. Avenatti or be precluded from introducing the chats in its case-in-chief. ................................................................ 13

      A.   The government has not produced an authentic and complete version of the WhatsApp chats between Mr. Avenatti and Ms. Clifford. ................................ 14

      B.   The government's failure to create a forensic copy of Ms. Clifford's phone, and of the WhatsApp chats in particular, after it took possession of Ms. Clifford's phone violates Fed. R. Crim. P. 16 and Brady. ................................ 15

  II.   The warrant authorizing a far-reaching search of Mr. Avenatti's iCloud account is defective because it improperly delegated the privilege review to the Department of Justice. ....................... 18

      A.   The attorney-client privilege is sacrosanct and must be zealously guarded by the attorney. ............. 19

      B.   The work-product doctrine protects an attorney's legal representation from unnecessary intrusion by opposing parties and their counsel. ..................................... 20

      C.   The relationship between the attorney-client privilege, work-product doctrine, and the Sixth Amendment's guarantee to all criminal defendants of the effective assistance of counsel. .............. 21

      D.   The warrant to search Mr. Avenatti's iCloud account is defective on its face because it improperly delegated to the Department of Justice, an interested party and Mr. Avenatti's adversary, the purely judicial function of reviewing the iCloud materials for privileged materials, including communications, documents, and other data concerning Mr. Avenatti's discussions with his own defense counsel about this case, the Nike case, and the CDCA prosecution. ................................. 22

          1.   The warrant improperly assigned judicial functions to the DOJ's "filter team." .......... 22

          2.   The warrant should not have been sought or authorized ex parte, without any opportunity for Mr. Avenatti or other interested parties to intervene or object. .............. 25

 III.   The Court should compel the government to promptly disclose all statements in its possession, custody, or control made by Stephanie Clifford, Judy Regnier, and Luke Janklow related to Ms. Clifford's book deal and/or her relationship with Mr. Avenatti. ................ 26

      A.   Due process requires the government's prompt disclosure of evidence that is favorable to the accused and material to guilt or punishment, regardless of its admissibility. ................. 28

      B.   The Court should compel the government to promptly disclose all Brady and Giglio material relevant to the complainant. ............................................... 30

CONCLUSION ............................................................................................................... 31

By and through undersigned counsel, Michael Avenatti respectfully moves the Court to:

1. Preclude the government from introducing at trial Mr. Avenatti's alleged WhatsApp communications with Stephanie Clifford, or hold an evidentiary hearing into the government's failure to produce the original, electronically stored version of the WhatsApp chats (U.S. Cons. amends. V and VI; Fed. R. Evid. 106, 1002);

2. Suppress all fruits of the government's search of Mr. Avenatti's iCloud account conducted pursuant to a search warrant that improperly delegated to the Department of Justice the responsibility of determining whether Mr. Avenatti's communications or documents stored in his iCloud account are protected by the attorney-client privilege or work-product doctrine (U.S. Cons. amend. IV; In re The City of New York, 607 F.3d 923, 947 (2d Cir. 2010) (observing that evaluating privilege claim is always a judicial function)); and

3. Compel the government to promptly produce all prior statements in its possession, custody, or control (or that could be through due diligence) attributable to Stephanie Clifford, Judy Regnier, and Luke Janklow (U.S. Cons. amend. V; Brady v. Maryland, 373 U.S. 83, 87 (1963) and Giglio v. United States, 405 U.S. 150, 154 (1972)).

## OVERVIEW

Michael Avenatti is accused of embezzling Stephanie Clifford's[1] advances from her book deal, which Mr. Avenatti negotiated as Ms. Clifford's personal attorney. The government accuses Mr. Avenatti of accepting money from Ms. Clifford's book publisher without her authorization, and then of lying to Ms. Clifford about the transactions. As proof, the government purports to rely heavily on various WhatsApp communications between Mr. Avenatti and Ms. Clifford.

However, the government has not produced a complete and original version of Ms. Clifford's various communications with Mr. Avenatti. Instead, to the defense's best knowledge, the government has only produced (1) photographs of some of Ms. Clifford's WhatsApp communications with Mr. Avenatti—i.e., photographs of Ms. Clifford's cell phone screen taken by an agent from the United States Attorney's Office (Exhibit B)—and, (2) typewritten text from Ms. Clifford's current attorney, Clark Brewster, purporting to represent all of the WhatsApp

---

[1] Also known by her adult film stage name, Stormy Daniels.

1

communications, which Mr. Brewster e-mailed the United States Attorney's Office on March 25, 2019 (Exhibit C). Neither production consists of the actual WhatsApp communications with corresponding metadata between Mr. Avenatti and Ms. Clifford, even though the best practice—pursuant to industry standards and Mr. Avenatti's rights under the Fifth and Sixth Amendments, Federal Rules of Evidence, and Federal Rules of Criminal Procedure—would have been to obtain such originals by creating a forensic copy of Ms. Clifford's cell phone and then extracting all of the messages. <u>See</u> Declaration of Don Vilfer (Exhibit D) at ¶8.  Further, the government has likewise not produced all SMS text messages and emails between Ms. Clifford and Mr. Avenatti, including those relating to the book deal.

"Typically in an investigation involving digital evidence, the digital data is acquired using industry-accepted and proven digital forensic tools that preserve the data in an identical format that can later be verified as being the same as the original data stored on the device." <u>See</u> Ex. D at ¶3. "In the case of mobile devices, Cellebrite is the most commonly used tool used to acquire [digital] evidence in a forensically sound manner that will allow for later authentication." <u>Id.</u> Use of digital forensic tools like Cellebrite "allow for the examiner to not only acquire the files, such as the databases text messages are stored in, but also to recover and document the metadata about the files such as the date created and modified." <u>Id.</u> "The tool will also calculate the hash value, often called a digital fingerprint, of the evidence so it can be verified as being the same as what was on the original device, allowing for authentication." <u>Id.</u> Crucially, because applications like Cellebrite are forensic tools, "they are comprehensive, often recovering deleted messages and all other available communications and information about activity on the device." <u>Id.</u>

Against this backdrop, the portable document format (PDF) files provided by the government that purportedly reflect some of Ms. Clifford's WhatsApp chats with Mr. Avenatti "fall far short of being acceptable as evidence of digital data." Ex. D at ¶4. As Don Vilfer, former FBI

Supervisory Special Agent, last in charge of the White-Collar Crime and Computer Crimes unit, explains:

> The pdf files depict photos taken of the screen of a phone and offer none of the authenticating information found through the use of forensic tools. With the simple photos of the screen, there is no way to know if the messages are actually associated with the participants or numbers shown. It is very easy to fabricate a series of messages and then change contact information so it appears the messages were with a different person in the contact database. Even if the messages were not fabricated, the selection of what is displayed for a photo of the screen could have been carefully chosen to exclude parts of a conversation or entire conversations. Even prior to the creation of the photos, the user could have deleted select messages to change the context of messages remaining.

Ex. D at ¶4. The text-only attachment provided by Mr. Brewster cannot be used to corroborate or authenticate the PDF files as it "is equally problematic." Id. at ¶6. Paper evidence of electronic files, like the one provided by Mr. Brewster, "is insufficient and generally not accepted by courts" because it can be "easily edited" and impossible to "authenticate[] as genuine." Id. Crucially, although Mr. Brewster's PDF contains chats not reflected in the government's photographs of Ms. Clifford's phone, it is "clearly incomplete" because, on its face, the document lacks "all of the content of conversations between Mr. Avenatti and Clifford." Id. at ¶7.

Without a complete and forensically collected set of the actual WhatsApp communications exchanged between Ms. Clifford and Mr. Avenatti, the government should not be permitted to introduce its PDF files in its case-in-chief. The government's failure to preserve and produce all of the WhatsApp communications prejudices Mr. Avenatti's defense, undermining his ability to put the allegedly incriminating exchanges in context and to meaningfully rebut the government's theory of the case. See U.S. Cons. amends. V and VI. The Court should, at a minimum, hold an evidentiary hearing to assess why the government failed to forensically copy Ms. Clifford's cell phone while it was in their possession and whether the government took any steps to ensure that it had a full and accurate version of the devices' messages and data.

The Court should also suppress any evidence the government obtained through a search of Mr. Avenatti's iCloud account. While Mr. Avenatti was a practicing attorney, and as set forth in his accompanying affidavit (Exhibit E), he stored vast amounts of documents and communications on his iCloud account that are protected by the attorney-client privilege and work-product doctrine (both in the context of Mr. Avenatti's private practice of law and as a defendant in various criminal and civil cases, including this one). However, in issuing a search warrant for Mr. Avenatti's iCloud account on August 13, 2019, Judge Paul G. Gardephe, upon the government's application, authorized the Department of Justice to utilize its own undefined "filter team" and unspecified protocol "in order to address potential privileges." iCloud Search Warrant (Exhibit F). The issuing court's delegation of the privilege review to the DOJ violated Mr. Avenatti's rights under the Fourth, Fifth, and Sixth Amendments, irreparably tainting the warrant's legitimacy and the lawfulness of the search.

"[W]hen a dispute arises as to whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege or work-product doctrine, the resolution of that dispute is a judicial function," which cannot be assigned to the executive branch. In re Search Warrant Issued June 13, 2019, 942 F.3d 159, 176 (4th Cir. 2019). See also, e.g., NLRB v. Interbake Foods, LLC, 637 F.3d 492, 498, 500 (4th Cir. 2011) (a court "cannot delegate" an in camera review of documents to an agency, but must itself decide a claim of privilege). "Put simply, a court is not entitled to delegate its judicial power and related functions to the executive branch, especially when the executive branch is an interested party in the pending dispute." In re Search Warrant, 942 F.3d at 176-77 (citing, inter alia, NLRB v. Detroit Newspapers, 185 F.3d 602, 606 (6th Cir. 1999) (concluding that "district court had the obligation … to determine whether the subpoenaed documents were protected by some privilege, and had no discretion to delegate that duty")). Given the issuing court's failure to conduct its own privilege review of Mr. Avenatti's iCloud account, and

its improper delegation of the responsibility to the DOJ, the iCloud warrant is defective on its face and the entirety of the search must be suppressed.[2]

Lastly, the Court should compel the government to promptly disclose prior statements about Mr. Avenatti and his representation of Ms. Clifford that are attributable to Ms. Clifford, Judy Regnier (Mr. Avenatti's former office manager), and Luke Janklow (Ms. Clifford's book agent). In its correspondence with undersigned counsel, the government has represented that it construes all of these materials as falling under the Jencks Act, 18 U.S.C. § 3500, and will not produce them on an expedited timeline. However, given the scope of the allegations and these three individuals' pivotal roles in the government's case, Mr. Avenatti respectfully submits that their prior statements about Mr. Avenatti and/or Ms. Clifford's book deal likely contain information that is helpful to Mr. Avenatti's defense, material to guilt or innocence, and useful to impeaching the witnesses' motivations and credibility. See Brady and Giglio. As a result, the Court should compel the government to disclose these materials without delay, or review them in camera to ensure the government's compliance with the Court's recent order relating to Fed. R. Crim. P. 5(f). See Dkt. No. 95.

## STATEMENT OF FACTS

### I.    Stephanie Clifford's relationship with former President Donald J. Trump.

According to Ms. Clifford, in approximately 2006, she and Donald Trump shared a one-night sexual liaison. Mr. Trump was married at the time with a four-month-old son at home. A decade later, in October 2016, then-candidate Trump's personal lawyer, Michael Cohen, arranged a

---

[2] The warrants for Mr. Avenatti's other electronic devices that were seized by the government appear to suffer from the same infirmity and contain a clause improperly delegating the privilege review to a DOJ "filter team." To the extent the Court grants Mr. Avenatti's motion to suppress the returns from the search of his iCloud account on the ground that the warrant is defective, the defense would seek to enforce that ruling as to the other identically-worded device warrants.

payment of approximately $130,000 to Ms. Clifford in exchange for her agreement to stay silent about her affair with Mr. Trump. Mr. Cohen feared that news of Mr. Trump's affair with Ms. Clifford would derail Mr. Trump's presidential ambitions. See Information, U.S. v. Cohen, No. 18-CR-602-WHP, Dkt. No. 2 at 14-17. (S.D.N.Y. Aug. 21, 2018). The plan worked; Ms. Clifford did not speak to the press prior to the 2016 presidential election, and Mr. Trump was elected the 45th President of the United States of America.

## II. Ms. Clifford retains Michael Avenatti as her attorney and executes a written agreement.

As of early 2018, Mr. Avenatti was a practicing civil trial lawyer in California who had obtained numerous multi-million dollar judgments for his clients through various verdicts and settlements in courts throughout the United States. Many of Mr. Avenatti's cases received extensive local and national press coverage. More importantly, some of Mr. Avenatti's cases achieved meaningful positive change for the greater good. For example, in 2017, Mr. Avenatti obtained a $454 million judgment in compensatory and punitive damages on behalf of 400 hospitals and health centers in California against Kimberly-Clark Corp. (and its spinoff medical technology firm Halyard Health) after a federal jury found that the companies misled California buyers about the impermeability of their MicroCool surgical gowns. Hospital gowns didn't protect as promised, jury says in $454-million fraud verdict, Associated Press (Apr. 10, 2017 4:20 PM PT), available at: https://lat.ms/3nwEXp0. As a result of the verdict, potentially defective personal protective equipment was removed from the United States National Stockpile in 2017. See CDC "Quarantines" Its Own Equipment, 60 Minutes (Aug. 6, 2017), available at: https://cbsn.ws/2PIJ3y4.

In February 2018, Mr. Avenatti was retained by Stephanie Clifford (a/k/a Stormy Daniels) to represent her in connection with various matters relating to her previous liaison with the 45th President of the United States. Mr. Avenatti and Ms. Clifford memorialized their agreement in writing by way of an "Attorney-Client Fee Contract," which Ms. Clifford signed. See Exhibit A

(hereinafter "the Agreement"). The Agreement expressly provided that Ms. Clifford was required to, among other things, "cooperate" with Mr. Avenatti and "pay bills for reasonably incurred costs on time." Ex. A at 1. The Agreement further stated that:

> For legal services rendered, Attorney will receive (a) an one-time payment of $100.00 and (b) Attorneys' standard hourly fees and out-of-pocket costs if a legal defense fund is established to benefit Clients and has sufficient funds to pay such fees and costs. In addition, in the event Attorney assists Clients **in finalizing any book or media opportunity that results in Clients being paid**, Attorney and Client agree that **Attorney shall be entitled to a reasonable percentage to be agreed upon between Clients and Attorney**.

Ex. A at 1 (emphasis added). Ms. Clifford signed the Agreement, dated February 27, 2018.

### III.   Mr. Avenatti's extensive work on behalf of Ms. Clifford.

After his agreement with Ms. Clifford was finalized and signed, Mr. Avenatti executed an extensive legal and media strategy to further Ms. Clifford's goals vis-à-vis her relationship with Mr. Trump and the publicity surrounding the campaign-finance scandal. Mr. Avenatti zealously represented Ms. Clifford in various forums, including the court of public opinion, and helped arrange for Ms. Clifford to appear on 60 Minutes in March 2018. This interview was one of the most watched interviews in United States history, and brought in the largest audience for 60 Minutes since its interview of then newly-elected President Barack Obama and former First Lady Michelle Obama in November 2008. Mr. Avenatti also helped Ms. Clifford obtain a Fall 2018 Vogue photoshoot with renowned photographer Annie Leibovitz. According to the article accompanying the photoshoot, Ms. Clifford "clearly trusts and relies on Avenatti, but she also treats him like a lovable, well-meaning stepbrother who forgot to take his Ritalin." Amy Chozick, Stormy Daniels Isn't Backing Down, Vogue (Aug. 28, 2018), available at: https://bit.ly/32WIZxt. By any measure, Ms. Clifford and Mr. Avenatti were working very closely together for Ms. Clifford's benefit. Indeed, by the time the Vogue article and photoshoot were published, Stormy Daniels had transcended adult film stardom and became a household name.

On the legal front, Mr. Avenatti filed two lawsuits on Ms. Clifford's behalf against Mr. Trump. First, on March 6, 2018, Mr. Avenatti filed an action in California state court seeking to have the non-disclosure agreement Ms. Clifford purportedly signed at Michael Cohen's behest declared unenforceable. This action followed efforts by Mr. Trump and Mr. Cohen to obtain a restraining order in arbitration to prevent Ms. Clifford from publicly discussing the affair and corresponding hush money. The case was ultimately removed to the United States District Court for the Central District of California. See Clifford v. Trump, et al., No. 18-CV-2217-SJP (C.D. Cal.). Eventually, Mr. Trump and Mr. Cohen were forced to abandon their efforts to enforce the non-disclosure agreement against Ms. Clifford, which resulted in an Order from the Honorable S. James Otero on March 7, 2019 acknowledging that Ms. Clifford got "exactly what she asked for" with respect to the non-enforcement of the NDA. Dkt. No. 109. Ms. Clifford was later awarded attorneys' fees from the case that Mr. Avenatti had successfully brought on her behalf.

Second, in the Summer of 2018, Mr. Avenatti also filed a defamation suit against Mr. Trump over his calling Ms. Clifford a liar on Twitter. See Clifford v. Trump, No.18-CV-6893-SJO (C.D. Cal.) (transferred from S.D.N.Y.). That action was dismissed because the district court, applying the Texas anti-SLAPP law, determined that Mr. Trump's tweet was protected by the First Amendment. Consequently, the court ordered Ms. Clifford to pay certain of Mr. Trump's attorneys' fees in defending the matter. On July 31, 2020, the Ninth Circuit Court of Appeals affirmed the district court's dismissal.

**IV.    Mr. Avenatti solicits, negotiates, and finalizes Ms. Clifford's book deal.**

Included among the benefits Mr. Avenatti obtained for Ms. Clifford was a book deal between Ms. Clifford and Saint Martin's Press. The deal Mr. Avenatti negotiated with Saint Martin's Press contemplated Ms. Clifford's receipt of an $800,000 advance over multiple installments, and the hiring of a ghostwriter to assist Ms. Clifford in actually writing the manuscript. Mr. Avenatti

participated in countless communications and meetings relating to the book's publication, before and after Ms. Clifford ultimately signed a contract with Saint Martin's Press. These efforts spanned hundreds of hours and several months, and required Mr. Avenatti to often act as a mediator between Ms. Clifford and the book publisher. Ms. Clifford's book was ultimately published in October 2018 and, after briefly appearing on the New York Times Bestseller List as a result of pre-orders, suffered from underwhelming sales.

###### V.    Mr. Avenatti terminates representation of Ms. Clifford in February 2019, three months before his indictment.

On February 19, 2019, Mr. Avenatti transmitted to Ms. Clifford a letter via email terminating his representation of her effective immediately. Exhibit G. In his letter, Mr. Avenatti cited to various disagreements and Ms. Clifford's "lack of communication and responsiveness to time sensitive matters." Id. But five weeks later, and upon Mr. Avenatti's arrest in the Nike case (United States v. Michael Avenatti, 19 Cr. 373 (PGG) (SDNY)), Ms. Clifford publicly claimed that she had been the one who "terminate[d] Michael's services" because he was "extremely dishonest[]":



Three months later, on May 22, 2019, Mr. Avenatti was indicted in connection with his representation of Ms. Clifford and her book deal, specifically accused of embezzling Ms. Clifford's book advances from Saint Martin's Press. Dkt. No. 1. Although the government acknowledged that the plain language of Mr. Avenatti's contract with Ms. Clifford entitled him to compensation for his work on Ms. Clifford's book deal, the government alleges—based entirely on Ms. Clifford's word— that Mr. Avenatti "subsequently told [Ms. Clifford], in substance and in part that he would not accept payment or remuneration from [her] for any work related to [her] book." Dkt. No. 1 at ¶9.

Also crucial to the government's allegations are various WhatsApp communications between Mr. Avenatti and Ms. Clifford—communications that the government alleges illustrate Mr. Avenatti's intent to defraud Ms. Clifford and misappropriate her book-deal advances. <u>See, e.g.</u>, Dkt. No. 1 at ¶¶13, 19, 24, 25.

> **VI.     Post-indictment developments.**

Despite the importance of Ms. Clifford's credibility to the charges, the defense has not received the balance of Ms. Clifford's prior statements in the government's control or that it could possess through due diligence—statements about Mr. Avenatti and/or the book deal that could be favorable to the defense or material to Ms. Clifford's bias or motive to lie. Further, and despite the purported significance of Mr. Avenatti's WhatsApp communications with Ms. Clifford, the government has also not produced the actual WhatsApp chats and their corresponding metadata. Rather, the government has produced two PDF documents: one is a compilation of pictures of Ms. Clifford's cell phone screen that were ostensibly taken by an agent from the United States Attorney's Office (Ex. B), and a text-only printout purportedly of the WhatsApp chats, which was provided by Ms. Clifford's attorney (Ex. C). Crucially, the government has not produced anything memorializing how or when a special agent took pictures of Ms. Clifford's cell phone, and acknowledges that it never conducted a forensic extraction of Ms. Clifford's electronic devices to obtain the complete versions of her WhatsApp chats and any other electronic communications with Mr. Avenatti.

Subsequent to the indictment, on August 13, 2019, the Honorable Paul G. Gardephe approved the government's <u>ex parte</u> application for a warrant to search Mr. Avenatti's iCloud account, in which Mr. Avenatti stored client communications and attorney work product. <u>See</u> Ex. C, Ex. D. Special Agent DeLeassa Penland's affidavit, which was appended to the search warrant, sought numerous items associated with Mr. Avenatti's iCloud account, including all message content, all images and videos, address book information, all records and other stored information,

transactional records, device backups, and any preserved or backup copies of the requested materials. Ex. C at 3-4. Penland's affidavit concluded with a statement that:

> Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege (to the extent not waived). When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

Id. at 7. Penland provided no other details about the privilege-review procedures or the composition of the so-called "filter team"; rather, by the very terms of the search warrant, it appears the DOJ conducted its own "privilege review" of the iCloud materials without any oversight or input from Judge Gardephe or a magistrate.

## ARGUMENT

Mr. Avenatti's due process rights, along with the strictures of Federal Rule of Criminal Procedure 16 and the Federal Rules of Evidence, preclude the government from offering against him at trial any photographs or text-only PDF files purporting to be his WhatsApp communications with Ms. Clifford, which are inauthentic and do not capture the entire correspondence. Instead, the government should be compelled to disclose a complete forensic copy of Ms. Clifford's cell phone, including the native version of the WhatsApp chats at issue and all other communications with and about Mr. Avenatti. Without access to the original, electronically stored version of the WhatsApp messages, Mr. Avenatti cannot: (a) verify the authenticity of the chats cited in the indictment or put them into their proper context; (b) adequately defend himself against the allegedly inculpatory messages; or (c) meaningfully investigate whether Ms. Clifford altered the WhatsApp chats before allowing a special agent to photograph her phone. Unless the government can produce a forensic copy of the WhatsApp chats (with all corresponding hash values and metadata, see Ex. D at ¶3), the communications should be excluded.

Separately, the Court should suppress evidence obtained directly or indirectly from the government's search of Mr. Avenatti's iCloud account, or hold an evidentiary hearing. The warrant authorizing the government's wide-ranging examination of Mr. Avenatti's iCloud account improperly delegated to the Department of Justice—an interested party—the responsibility of identifying and (presumably) walling off from the prosecution team materials protected by the attorney-client privilege and work-product doctrine. See U.S. Cons. amends. IV and VI; In re Search Warrant Issued June 13, 2019, 942 F.3d 159 (4th Cir. 2019). Worse, the warrant was apparently approved ex parte (without any opportunity for Mr. Avenatti or other interested parties to object) even though Mr. Avenatti was represented by counsel and actively defending against the Nike case. The warrant also failed to set forth the actual procedures to be used by the "filter team" to prevent disclosure of privileged materials. Because the iCloud search warrant improperly delegated to the DOJ the purely judicial function of conducting a privilege review—and was otherwise issued in a manner that denied Mr. Avenatti and other interested parties an opportunity to challenge the warrant's scope and seek judicial protection of privileged materials—the warrant is defective, the search was unreasonable, and the fruits therefrom are inadmissible.

Lastly, this case is all about Ms. Clifford's credibility and her communications with several key players, including Mr. Avenatti, Judy Regnier (Mr. Avenatti's former paralegal and office manager), and Luke Janklow (Ms. Clifford's retained book agent). This is especially true because of the plain language of Mr. Avenatti's contract that Ms. Clifford signed. Ex. A at 1. But to date, the government has declined to produce all of the statements in its possession attributable to Ms. Clifford, Ms. Regnier,[3] and Mr. Janklow, insisting that disclosure is premature and governed solely by

---

[3] The defense is concerned that certain evidence and materials (including prior statements by Ms. Regnier) once in the possession of the government may have been spoliated during the pendency of this case. The defense has asked the government to confirm that no spoliation occurred but is still

18 U.S.C. § 3500. The problem with this position is that it sidesteps the government's obligations under <u>Brady</u> and <u>Giglio</u> to promptly disclose information that is material to guilt, favorable to Mr. Avenatti, or that tends to impeach its witnesses' credibility.

With respect to Ms. Regnier and Mr. Janklow, their prior statements about Mr. Avenatti's practice, relationship with Ms. Clifford, and work on Ms. Clifford's book deal are material to Mr. Avenatti's defense and potentially favorable. At the very least, the Court should inspect these materials <u>in camera</u> following an <u>ex parte</u> conference with the defense about our theory of the case to determine the materials' immediate discoverability. And with respect to the balance of Ms. Clifford's prior statements with others and law enforcement <u>about</u> Mr. Avenatti and the book, those are clearly <u>Brady</u> and <u>Giglio</u> materials that are not bound by the §3500 timeline. Indeed, absent Ms. Clifford's claim that Mr. Avenatti told her he would not seek compensation for his work on her book deal, there is no criminal case, just a contractual dispute. Accordingly, the balance of Ms. Clifford's statements about Mr. Avenatti and her book deal are immediately discoverable—these communications likely contain information material to Mr. Avenatti's guilt or innocence, impeaching as to Ms. Clifford's credibility, and/or necessary to developing defense theories or identifying additional witnesses concerning Ms. Clifford's bias and motive to lie.

I.      **The government must produce the complete and original version of Ms. Clifford's WhatsApp communications with Mr. Avenatti or be precluded from introducing the chats in its case-in-chief.**

The indictment relies heavily on WhatsApp chats between Ms. Clifford and Mr. Avenatti that purportedly illustrate his intent to lie to Ms. Clifford and misappropriate cash advances owed to her by Saint Martin's Press. However, the government has not produced the actual and complete WhatsApp messages exchanged between Mr. Avenatti and Ms. Clifford. Instead, the government has

---

awaiting the government's response. If certain materials have spoliated or been lost or destroyed, the defense intends to raise the issue with the Court and seek appropriate relief.

produced photographs that a special agent took of Ms. Clifford's phone, and a text-only printout of the chats that Ms. Clifford provided the government via her attorney, Clark Brewster. The government's failure to produce the original, electronically stored version of the chats triggers two primary concerns.

### A. The government has not produced an authentic and complete version of the WhatsApp chats between Mr. Avenatti and Ms. Clifford.

First, neither document is an authenticatable version of the WhatsApp communications and both "fall far short of being acceptable as evidence of digital data." Ex. D at ¶4. Indeed, the photographed images of the chats (Exhibit B) do not reflect all of the messages contained in the text-only printout provided by Mr. Brewster (Exhibit C), which itself is incomplete because it omits certain embedded content. Ex. D at ¶¶6, 7. These discrepancies suggest that Ms. Clifford (or someone else with access to her phone) manipulated the chats before the special agent photographed them, or that the special agent (deliberately or negligently) failed to photograph all of the messages. The government may have also allowed Ms. Clifford and/or her counsel to cherry pick which communications she would disclose. Both scenarios are irreconcilable with Mr. Avenatti's due process right to disclosure of all information material to his guilt or innocence (Brady) and with the Federal Rules of Evidence. They are equally inconsistent with a thorough investigation designed as a search for the truth.

Under Brady, the prosecution must disclose evidence that is "favorable to the accused" or "material" to the issue of guilt or punishment; failure to do so violates a defendant's constitutional right to due process. 373 U.S. at 86-87. Here, there is no dispute that the WhatsApp messages are "material" to the issue of Mr. Avenatti's guilt; the indictment relies in large part on specific messages from specific dates and times to substantiate the fraud charges. But without a forensic copy of the digital data at issue, it is impossible to authenticate and verify the chats cited in the government's indictment, and ensure that they are a true and complete reflection of Mr. Avenatti and Ms.

Clifford's exchanges. Accordingly, under <u>Brady</u>, the government has a duty to produce all of Mr. Avenatti's communications with Ms. Clifford (<u>i.e.</u>, evidence material to the issue of guilt) in their entirety and forensically-collected format. Its failure to do so violates due process and deprives Mr. Avenatti of a meaningful opportunity to defend against the government's evidence and theory of the case.

Separately, the government's deficient disclosures violate Fed. R. Evid. 106 and 1002. Under Fed. R. Evid. 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." This "rule of completeness" cannot be satisfied in this case without the government's production of <u>all</u> of the WhatsApp messages exchanged between Mr. Avenatti and Ms. Clifford. Relatedly, under Fed. R. Evid. 1002, "[a]n original writing, recording or photograph is required in order to prove its content," but the government has not provided the original communications (or forensic copies). <u>See</u> <u>also</u> <u>Gordon v. United States</u>, 344 U.S. 414, 421 (1953) ("The elementary wisdom of the best evidence rule rests on the fact that the [original] document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description…."). Accordingly, the government cannot offer its PDFs to establish the content of and to authenticate any WhatsApp communications, and the files are inadmissible.

**B. The government's failure to create a forensic copy of Ms. Clifford's phone, and of the WhatsApp chats in particular, after it took possession of Ms. Clifford's phone violates Fed. R. Crim. P. 16 and <u>Brady</u>.**

Second, the government's acknowledgement that a special agent took photographs of Ms. Clifford's cell phone screen, which comprise the chats reflected in Exhibit B, makes clear that the government possessed (at some point) Ms. Clifford's phone, and yet did not forensically extract its contents or take steps to preserve the entirety of the communications between Ms. Clifford and Mr.

Avenatti. But under Fed. R. Crim. P. 16(a)(1)(E), Mr. Avenatti has an unconditional right to inspect and to copy data within the government's possession, custody, or control and that the government intends to use in its case-in-chief. Because Ms. Clifford's phone was at one point in the government's possession, custody, or control, and because it clearly intends to use data allegedly from the phone in its case-in-chief, the government had an affirmative duty under Rule 16 to obtain and preserve the raw contents of Ms. Clifford's device, particularly the WhatsApp chats and other messages.[4] Now, two years later, it is unclear whether the originals of the WhatsApp chats and other messages still exist in their original, unaltered context. Consequently, and at a minimum, the Court should hold an evidentiary hearing to determine the time, place, and manner of the government's acquisition of the images contained in Exhibit B and assess the steps taken, if any, to preserve the original version of the communications and the data on Ms. Clifford's phone. Crucially, if Ms. Clifford declined to have her phone forensically imaged, and the government honored that preference, then that information (including the basis for Ms. Clifford's refusal) should have been long ago disclosed to the defense pursuant to Brady.

The government's failure to forensically image Ms. Clifford's cell phone also means that the government did not obtain or preserve Ms. Clifford's electronic or written communications with third parties about Mr. Avenatti and the book deal—communications that are a likely source of Brady and Giglio material. The government should have followed basic electronic discovery procedures as described by former FBI Supervisory Special Agent Donald Vilfer and made a complete forensic copy of Ms. Clifford's device—a prerequisite to preserving all relevant and discoverable electronically stored information on her phone. In not imaging Ms. Clifford's phone,

---

[4] The government also arguably had an obligation to forensically copy Ms. Clifford's phone when it was in their possession to preserve and eventually disclose all of Mr. Avenatti's relevant statements contained on it, as set forth at Fed. R. Crim. P. 16(a)(1)(B).

however, the government has likely deprived Mr. Avenatti of valuable evidence. Indeed, Mr. Avenatti can only speculate as to what has been lost. Perhaps Ms. Clifford sent electronic messages (e-mails, social media chats, SMS texts, etc.) to other friends and confidants lauding Mr. Avenatti's representation of her generally and in the context of the book deal. Or perhaps Ms. Clifford expressed to others biases against Mr. Avenatti for reasons unrelated to his legal representation—biases that could reveal a motive to lie about their alleged oral agreement regarding the book deal and her knowledge about the advance payments at issue.

Unfortunately, Mr. Avenatti will likely never be able to determine if these communications ever existed because of how the government chose to handle Ms. Clifford's cell phone when it was in their possession. Rather than take the minimum steps necessary to preserve all relevant evidence on Ms. Clifford's phone, including a complete set of the WhatsApp communications cited in the indictment, the government buried its head in the sand and instead allowed Ms. Clifford—an interested party—to determine what information she would share with the special agent. Such spurious investigative tactics cast doubt on the government's effort to meaningfully determine what actually transpired between Mr. Avenatti and Ms. Clifford, suggesting that the government simply accepted her claims at face value and allowed her to determine the methods and boundaries of their "investigation." Absent the government's ability to at least produce the full and original version of the WhatsApp chats, the most appropriate remedy is to preclude the government from introducing the messages in its case-in-chief; in the alternative, the Court should hold an evidentiary hearing to determine what exactly transpired when the government took control of Ms. Clifford's cell phone and why it was not forensically copied.

II.    **The warrant authorizing a far-reaching search of Mr. Avenatti's iCloud account is defective because it improperly delegated the privilege review to the Department of Justice.**

In August 2019, Mr. Avenatti had already been charged and represented by counsel, both in this case and the Nike case. Nevertheless, the government sought and obtained ex parte from Judge Paul G. Gardephe a warrant to conduct an exhaustive search of Mr. Avenatti's iCloud account, a space where he stored attorney-client privileged materials and attorney work product. These materials not only covered Mr. Avenatti's representation of clients as a practicing attorney, but also Mr. Avenatti's communications with his own counsel as their client. In particular, the communications between Mr. Avenatti and the attorneys he had retained to represent him included legal advice concerning various civil and criminal matters, including the Nike case, this case, and his prosecution in the Central District of California. However, because the government's warrant application was heard and granted ex parte, neither Mr. Avenatti nor any other interested parties had an opportunity to contest the scope of the warrant's reach or to flag any privilege concerns.

Further, at the invitation of the government, the issuing court permitted the DOJ to conduct its own privilege review of the materials through a "filter team" that purportedly relied on nondescript "established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege." However, because evaluating a privilege claim is always a judicial function (see In re The City of New York, 607 F.3d 923, 947 (2d Cir. 2010)), the warrant issued by Judge Gardephe improperly delegated the privilege review to the DOJ, thereby rendering the warrant defective on its face. Accordingly, the Court should suppress all evidence the government obtained (directly or indirectly) through its examination of Mr. Avenatti's iCloud account as the fruit of an unlawful and unreasonable search. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

**A. The attorney-client privilege is sacrosanct and must be zealously guarded by the attorney.**

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); see also In re Grand Jury Subpoenas, 454 F.3d 511, 519 (6th Cir. 2006) (explaining that "[t]he privilege protecting confidential communications between an attorney and his client dates back to the Tudor dynasty"). The attorney-client privilege empowers a client—as the privilege holder—"to refuse to disclose and to prevent any other person from disclosing confidential communications between him and his attorney." See Black's Law Dictionary 129 (6th ed. 1990).

The purpose of the attorney-client privilege is to ensure "full and frank communication" between a client and his lawyer and "thereby promote broader public interests in the observance of law and administration of justice." See Upjohn Co., 449 U.S. at 389. As the Supreme Court has consistently emphasized, the attorney-client privilege exists because "sound legal advice or advocacy serves public ends and … such advice or advocacy depends upon the lawyer's being fully informed by the client." Id. Accordingly, in proceedings such as these, lawyers are obliged to protect the attorney-client privilege to the maximum possible extent on behalf of their clients. See Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 556 (2d Cir. 1967) (recognizing that lawyer has a duty to invoke claim of privilege on his client's behalf); Model Rules of Prof'l Conduct r. 1.6(a), (c) (Am. Bar Ass'n 1983) (explaining that lawyer owes duty of confidentiality to client and must prevent unauthorized disclosure of confidential information). See also, e.g., Fisher v. United States, 425 U.S. 391, 402 n.8 (1976) ("[I]t is universally accepted that the attorney-client privilege may be raised by the attorney[.]"); In re Grand Jury Proceedings, 727 F.2d 1352, 1354-55 (4th Cir. 1984) (emphasizing that a lawyer "is entitled to raise [a claim of] privilege on behalf of his … client").

### B. The work-product doctrine protects an attorney's legal representation from unnecessary intrusion by opposing parties and their counsel.

Even though the work-product doctrine is not as established in history as the attorney-client privilege, it is no less important. The Supreme Court explicitly recognized and explained the work-product doctrine more than 70 years ago in Hickman v. Taylor, 329 U.S. 495, 510-11 (1947). There, the Court underscored that a lawyer must be able to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Id. at 510.  Elaborating on that principle, the Court emphasized that "[p]roper preparation of a client's case demands that [a lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." Id. at 511. Indeed, in a stern warning, the Court cautioned that absent strong protection for work product, "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial," all to the detriment of clients and "the cause of justice." Id.

The Supreme Court has explicitly approved what it called "a qualified privilege," to be held by lawyer and client alike, "for certain materials prepared by an attorney 'acting for his client in anticipation of litigation.'" See United States v. Nobles, 422 U.S. 225, 237-38 (1975) (quoting Hickman, 329 U.S. at 508). That privilege is the work-product doctrine, which has now been incorporated into the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 26(b)(3), and the Federal Rules of Criminal Procedure, see Fed. R. Crim. P. 16(a)(2), (b)(2). "The Work-product privilege, while properly construed more narrowly than attorney-client privilege, nevertheless operates for a similar purpose: that is, that people should be free to make requests of their attorneys without fear, and that their attorneys should be free to conduct research and prepare litigation strategies without fear that these preparations will be subject to review by outside parties." In re Grand Jury Subpoenas, 454 F.3d at 520 (emphasis added). Thus, there are two types of attorney work product that are within the ambit of the doctrine: (1) fact work product, which is "a transaction of the factual

20

events involved," and (2) opinion work product, which "represents the actual thoughts and impressions of the attorney."  See In re Grand Jury Subpoena, 870 F.3d 312, 316 (4th Cir. 2017) (internal quotation marks omitted).

**C.  The relationship between the attorney-client privilege, work-product doctrine, and the Sixth Amendment's guarantee to all criminal defendants of the effective assistance of counsel.**

Critically, the attorney-client privilege and the work-product doctrine jointly support the Sixth Amendment's guarantee of effective assistance of counsel. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence."); Strickland v. Washington, 466 U.S. 668, 686 (1984) (analyzing Sixth Amendment right to the effective assistance of counsel). As the Fourth Circuit has held in assessing the interplay between the attorney-client privilege and the Sixth Amendment, "[t]he essence of the Sixth Amendment right to effective assistance of counsel is, indeed, privacy of communication with counsel." United States v. Brugman, 655 F.2d 540, 546 (4th Cir. 1981). See also, DeMassa v. Nunez, 770 F.2d 1505, 1507 (9th Cir. 1985) (describing Sixth Amendment as a "source" for the expectation of privacy in attorney-client communications); 1 Geoffrey C. Hazard, Jr. et al., The Law of Lawyering § 10.14, 10-91 (4th ed. Supp. 2019) (explaining that "[t]he attorney-client privilege has ties to the Sixth Amendment").  Absent privacy of communications and the "full and frank" discussions that flow therefrom, a lawyer could be deprived of the information necessary to prepare and present his client's defense and, as a result, a client, such as Mr. Avenatti, could be deprived of due process and his right to a proper defense. See Upjohn Co., 449 U.S. at 389.

In a similar vein, the work-product doctrine fulfills an essential and important role in ensuring the Sixth Amendment right to effective assistance of counsel. The Supreme Court has recognized that the work-product doctrine is vital to "assur[e] the proper functioning of the criminal justice system," in that it "provid[es] a privileged area within which [a lawyer] can analyze and

prepare his client's case." See Nobles, 422 U.S. at 238; see also In re Grand Jury Subpoenas, 454 F.3d at 520. Without that "privileged area," a lawyer's ability to plan and present his client's defense will be impaired. See Nobles, 422 U.S. at 238; see also Hickman, 329 U.S. at 511.

**D. The warrant to search Mr. Avenatti's iCloud account is defective on its face because it improperly delegated to the Department of Justice, an interested party and Mr. Avenatti's adversary, the purely judicial function of reviewing the iCloud materials for privileged materials, including communications, documents, and other data concerning Mr. Avenatti's discussions with his own defense counsel about this case, the Nike case, and the CDCA prosecution.**

The government searched Mr. Avenatti's iCloud account, which undeniably contained materials protected by the attorney-client privilege and work-product doctrine, pursuant to a warrant that it obtained ex parte and that improperly delegated the privilege review to an undefined DOJ "filter team" to use undefined "protocols" to be solely determined by the DOJ. But privilege reviews are always a judicial function that cannot be delegated to the executive branch, particularly when, as here, they are an interested party. Accordingly, the warrant is defective on its face and the fruits of the government's search of Mr. Avenatti's iCloud must be suppressed. U.S. Cons. amends. IV, V, VI.

**1. The warrant improperly assigned judicial functions to the DOJ's "filter team."**

Determining whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege or work-product doctrine is a non-delegable judicial function. See NLRB v. Interbake Foods, LLC, 637 F.3d 492, 498 (4th Cir. 2011) (concluding that, in deciding whether to enforce an administrative subpoena seeking potentially privileged documents, a court "cannot delegate" an in camera review of documents to an agency, but must itself decide a claim of privilege); see also In re The City of New York, 607 F.3d 923, 947 (2d Cir. 2010) (observing that evaluating privilege claim is always a judicial function). Indeed, the Constitution vests "[t]he judicial Power" solely in the federal courts, see U.S. Const. art. III, § 1, which includes "the duty of interpreting and applying" the law, see Massachusetts v. Mellon, 262 U.S. 447, 488 (1923). Put

simply, a court is not entitled to delegate its judicial power and related functions to the executive branch, especially when, as here, the executive branch is an interested party in the pending dispute. See Interbake Foods, 637 F.3d at 501 (affirming refusal "to delegate" to an administrative law judge the judiciary's "responsibility to decide the issue of privilege"); NLRB v. Detroit Newspapers, 185 F.3d 602, 606 (6th Cir. 1999) (concluding that "district court had the obligation … to determine whether the subpoenaed documents were protected by some privilege, and had no discretion to delegate that duty").

Here, the privilege assessment provisions of the warrant to search Mr. Avenatti's iCloud account (Ex. F at 7) directly contravened this non-delegation principle. The warrant authorized an undefined division of the DOJ—the "filter team"—to sift through the returns of the iCloud search and make decisions on whether the attorney-client privilege and the work-product doctrine applied to a trove of digital data, some of which likely included Mr. Avenatti's privileged communications with his own counsel about various pending legal matters, including this case. This was a clear violation of Mr. Avenatti's Fifth and Sixth Amendment rights and would never have happened had the issuing court been responsible for making privilege determinations. Because courts cannot simply delegate their responsibility to decide privilege issues to another government branch, the iCloud search warrant is clearly defective. See, e.g., Interbake Foods, 637 F.3d at 498, 500-01 (recognizing that courts must decide privilege disputes); see also In re The City of New York, 607 F.3d at 947 (observing that evaluating privilege claim is a judicial function).

To make matters worse, the privilege assessment provisions of the warrant are silent on the specifics of the "filter team" and its privilege-review protocol, and instead left those issues for the DOJ's sole determination. Based on the face of the warrant, Mr. Avenatti does not know whether the privilege review was delegated to non-lawyer members of the "filter team," like litigation support staff, computer forensic agents, or other personnel, nor can he evaluate the adequacy of the

measures purportedly used to wall off the "filter team" from the prosecution team and its case

agents. Indeed, the Third Circuit has strongly criticized a privilege-review protocol that authorized

non-lawyer federal agents to make privilege determinations. See In re Search of Elec. Commc'ns,

802 F.3d 516, 530 & n.54 (3d Cir. 2015).

    In addition to the separation of powers issues triggered by the improper delegation of

judicial functions to the "filter team," there are other legal issues. The "filter team"—even if

comprised entirely of trained lawyers—will undoubtedly make errors in privilege determinations and

in transmitting seized materials to an investigation or prosecution team, errors that Mr. Avenatti

cannot possibly redress. Indeed, the Sixth Circuit recognized several years ago that filter teams

present "reasonably foreseeable risks to privilege" and "have been implicated ... in leaks of

confidential information to prosecutors." See In re Grand Jury Subpoenas, 454 F.3d at 523

(explaining that a filter team might "have an interest in preserving privilege, but it also possesses a

conflicting interest in pursuing the investigation, and … some [filter] team attorneys will make

mistakes or violate their ethical obligations. It is thus logical to suppose that [filter] teams pose a

serious risk to holders of privilege").

    As the Sixth Circuit also emphasized, filter team errors can arise from differences of opinion

regarding privilege. Id. In explaining that problem, the court elaborated that a filter team's members

"might have a more restrictive view of privilege" than the subject of the search, given their

prosecutorial interests generally and in pursuing the underlying investigations. Id. That "more

restrictive view of privilege" could cause privileged documents to be misclassified and erroneously

provided to an investigation or prosecution team. Id. For example, in United States v. Noriega, 764

F. Supp. 1480 (S.D. Fla. 1991), the government's filter team missed a document obviously protected

by the attorney-client privilege and turned over tapes of attorney-client conversations to members of

the investigating team. "This Noriega incident points to an obvious flaw in the [filter] team

24

procedure: the government's fox is left in charge of the henhouse, and may err by neglect or malice, as well as by honest differences of opinion." In re Grand Jury Subpoenas, 454 F.3d at 523 (emphasis added).

Here, the warrant authorized a protocol designed to do just that and place the government's fox in charge of Mr. Avenatti's and his law firm's henhouse, all but guaranteeing that documents protected by the attorney-client privilege and work product doctrine would be reviewed and erroneously provided to the prosecution. Because the court that issued the warrant should have never delegated this privilege review to the DOJ, the warrant is defective and the fruits of it inadmissible.

## 2. **The warrant should not have been sought or authorized ex parte, without any opportunity for Mr. Avenatti or other interested parties to intervene or object.**

The government obtained a warrant to search Mr. Avenatti's iCloud account and permission to have its own "filter team" conduct a privilege review ex parte and without any notice to Mr. Avenatti or any other privilege holder (i.e. client of Mr. Avenatti's). This is despite the fact that Mr. Avenatti was already charged in both this case and the Nike prosecution, and represented by counsel in both matters. The defense acknowledges that the government, in the normal course, routinely obtains search warrants in criminal cases ex parte, primarily to maintain the integrity of its investigations. But in this case, the government knew that its warrant application implicated a large amount of privileged communications, and that it would have suffered no prejudice had it afforded Mr. Avenatti, or other privilege holders, the opportunity to weigh in on the scope of the search and the manner of review by any filter team. In failing to provide such an opportunity, however, the government also deprived Judge Gardephe of information from Mr. Avenatti concerning the voluminous amount of privileged material contained in his iCloud account and the myriad of clients impacted.

Indeed, the issuing court should have declined to hear the government's warrant application ex parte and should have insisted on adversarial proceedings on whether to authorize the "filter team" and the propriety of its vague privilege-review procedures. See, e.g., RSZ Holdings Avv v. PDVSA Petroleo S.A., 506 F.3d 350, 356 (4th Cir. 2007) (emphasizing that ex parte proceedings are "greatly disfavored"); In re Ingram, 915 F. Supp. 2d 761, 763-64 (E.D. La. 2012) (assessing briefing from parties on propriety of filter team). Through contested proceedings, Judge Gardephe could have been fully informed of the materials contained within the iCloud account, including the fact that it stored digital data relevant to Mr. Avenatti's private practice and his own conversations with counsel representing him in various civil and criminal matters. Proceeding in this manner would have had no prejudice to the government, and would have helped ensure that the court undertook its own privilege review of the iCloud account with as much information as possible to all but guarantee the protection of privileged materials. Additionally, in summarily granting the warrant and approving the "filter team" and its nondescript protocol, there is no record that the issuing court weighed any of the important legal principles that protect attorney-client relationships, particularly Mr. Avenatti's relationships with the attorneys representing him in ongoing criminal matters across two federal judicial districts and his role in representing thousands of clients as an attorney. This omission exacerbates the issuing court's error in delegating the privilege review, a purely judicial function, to the DOJ.

Accordingly, the Court should suppress the returns from the government's search of Mr. Avenatti's iCloud account, or hold an evidentiary hearing.

### III. The Court should compel the government to promptly disclose all statements in its possession, custody, or control made by Stephanie Clifford, Judy Regnier, and Luke Janklow related to Ms. Clifford's book deal and/or her relationship with Mr. Avenatti.

The government and the defense have discussed the disclosure of Brady and Giglio materials, including prior statements made by the complaining witness Stephanie Clifford. Although

the government has stated that it is in compliance with its <u>Brady</u> obligations, to the best of undersigned counsel's knowledge, the government has not yet made any <u>Brady</u> disclosures. The defense also understands that the government intends to turn over <u>Giglio</u> material at approximately the same time it intends to disclose Jencks Act material. The government has otherwise resisted defense efforts to obtain <u>Giglio</u> material on an earlier timeline.

      The government's position creates two distinct problems. First, its failure to have made any <u>Brady</u> disclosures to this point, despite the nature of the case and the centrality of the complainant's credibility, suggests that its view of what constitutes <u>Brady</u> is unreasonably conservative. Second, its intention of withholding <u>Giglio</u> until around the same time it intends to disclose Jencks Act materials ignores what the law makes clear: that <u>Giglio</u> is <u>Brady</u> and that both always trump the Jencks Act. Accordingly, the Court should compel the government to promptly disclose to the defense:

1. All of Ms. Clifford's statements about Mr. Avenatti in its possession, custody, or control;
2. All of Ms. Clifford's statements about her book deal in its possession, custody, or control;
3. All of Ms. Clifford's statements accusing anyone else of taking money from her that are in its possession, custody, or control;
4. Any evidence of Ms. Clifford's bias against Mr. Avenatti;
5. All of Ms. Regnier's statements about Mr. Avenatti's representation of Ms. Clifford in the government's possession, custody, or control;
6. All of Ms. Regnier's statements about Mr. Avenatti's efforts regarding Ms. Clifford's book deal;
7. All of Ms. Regnier's statements about Mr. Avenatti and his law firm's alleged financial condition in its possession, custody, or control;
8. Any evidence of Ms. Regnier's bias against Mr. Avenatti in its possession, custody, or control; and
9. All of Mr. Janklow's statements about Ms. Clifford's book deal, Ms. Clifford, or Mr. Avenatti in its possession, custody, or control.

Of course, this list is not exhaustive and is not meant to supplant the government's scrupulous review of its file and of information relating to this case in the possession of any other competent law enforcement entity. However, as discussed below, the government's withholding of a trove of information about the complainant and her dealings with Mr. Avenatti that is favorable to

Mr. Avenatti or material to his defense is inconsistent with its obligations under Brady, Giglio, and due process.

### A. Due process requires the government's prompt disclosure of evidence that is favorable to the accused and material to guilt or punishment, regardless of its admissibility.

Under Brady v. Maryland, 373 U.S. 83 (1963), the government must disclose to a criminal defendant any evidence in the government's possession that is "favorable to an accused" and "material either to guilt or punishment. Id. at 87. "Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Maury, 695 F.3d 227, 249 (3d Cir. 2012) (citations omitted).

The prosecution must also disclose evidence that goes to the credibility of crucial prosecution witnesses. Giglio v. United States, 405 U.S. 150, 154 (1972). "Giglio material" is a subset of Brady insofar as it addresses situations in which certain evidence about a witness's credibility or motivation to testify exists, and where "the reliability of a given witness may well be determinative of guilt or innocence." Id. Admissibility is also not a prerequisite to disclosure under Brady or Giglio, since "inadmissible evidence may be material if it could … [lead] to the discovery of admissible evidence." Johnson v. Folino, 705 F.3d 117, 129-30 (3d Cir. 2013) (collecting cases). Lastly, although Brady and its progeny establish a prosecutorial obligation rather than a general rule of pre-trial discovery, the Supreme Court (as does Congress)[5] favors a liberal policy of disclosure of exculpatory material, and "[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure." Kyles v. Whitley, 514 U.S. 419, 439 (1995).

Despite these seemingly bright line rules, however, one prominent battleground is the requirement that the prosecution disclose Brady and Giglio information "in time for its effective use

---

[5] See Fed. R. Crim. P. 5(f), order entered at Dkt. No. 95.

at trial." In re United States (Coppa), 267 F.3d 132, 135 (2d Cir. 2001). Sometimes narrowly

interpreted by courts and prosecutors as simply guaranteeing an opportunity to cross examine (see

United States v. Moore, 867 F. Supp. 2d 150, 152 (D.D.C. 2012) (listing cases)), timeliness from a

defense attorney's perspective means access to Brady and Giglio information sufficiently in advance

of trial to seek additional favorable information, to shape trial theories, and to add meat to opening

statements. Belated disclosures, as the Second Circuit explained in Leka v. Portunondo, may "throw

existing strategies and [trial] preparation into disarray … when a trial already has been prepared for

on the basis of the best opportunities and choices then available." 257 F.3d 89, 101 (2d Cir. 2001).

See also United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009) ("it would eviscerate the

purpose of the Brady rule and encourage gamesmanship were we to allow the government to

postpone disclosures to the last minute, during trial"); United States v. Gil, 297 F.3d 93, 103, 106 (2d

Cir. 2002) (exculpatory and impeaching document deemed suppressed within meaning of Brady

where given to the defendant on the Friday before a Monday trial buried in reams of paper labeled

"3500 material"). Consequently, some judges have ruled that "'timeliness' with respect to Brady

disclosure means immediate disclosure upon discovery." United States v. Binday, 908 F. Supp. 2d

485, 498 (S.D.N.Y. 2012) (McMahon, C.J.).

     Related to the timeliness issue is the canard that impeachment material is a species of Brady

subject to less stringent disclosure requirements. Prosecutors will often announce that they will

disclose Giglio material at the same time as their required disclosures under the Jencks Act (as the

prosecutors in this case have done). The law is clear, however, that Giglio **is** Brady. United States v.

Bagley, 473 U.S. 667, 676 (1985) ("This Court has rejected any such distinction between

impeachment evidence and exculpatory evidence."). As such, Brady and Giglio always beat the

Jencks Act, and if information is both Jencks material and Brady, "it must be disclosed on the earlier

Brady timeline." Moore, 867 F. Supp. 2d at 151-52; United States v. Rittweger, 524 F.3d 171, 181 n.4

(2d Cir. 2008) ("Complying with the Jencks Act, of course, does not shield the government from its independent obligation to timely produce exculpatory material under <u>Brady</u>—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500.").

### B. The Court should compel the government to promptly disclose all <u>Brady</u> and <u>Giglio</u> material relevant to the complainant.

This case boils down to the complainant's credibility: given the government's apparent theory of the case, it cannot prove all of the elements of the identity theft and wire fraud charges without the complainant's testimony, particularly her claim that Mr. Avenatti orally modified the scope of their negotiated, signed legal contract. It would also strain credulity if the government denied possessing a trove of information about the complainant and her prior statements about Mr. Avenatti, the book deal, and her overall relationship with him.

The Court should order the government to make such disclosures promptly. Allowing the government to withhold crucial information concerning the most key witnesses to its case until a few weeks before trial unconstitutionally hamstrings Mr. Avenatti's defense preparation. If for example Ms. Clifford has given conflicting stories about her understanding of the book deal, the dates of various payments, or the scope of her attorney-client arrangement with Mr. Avenatti, then the defense should know about it immediately. And if Ms. Clifford has exhibited a bias toward Mr. Avenatti, or some other reason to be upset at him besides his alleged mishandling of her book deal advances, the defense should also be so informed immediately. All of this information is crucial to preparing a defense to the government's theory of the case and effective cross examinations of the government's witnesses. It is also vital to the defense's identification and adequate preparation of potential witnesses for any defense case.

## CONCLUSION

For the foregoing reasons, and for any that are apparent at any evidentiary hearing or oral argument, the Court should grant the defense's motions to preclude, suppress, and compel evidence.

Dated:  May 1, 2021
        New York, NY

Respectfully Submitted,

_____/s/_____
Robert M. Baum, Esq.
Andrew J. Dalack, Esq.
Tamara L. Giwa, Esq.
Assistant Federal Defenders

Counsel for Michael Avenatti