UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - v. -

MICHAEL AVENATTI,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19 Cr. 374 (JMF)


## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS


AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Matthew Podolsky
Robert B. Sobelman
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ..................................................................................................................1

   A.  The Indictment..........................................................................................................1

   B.  The Defendant's Prior Pretrial Motions ..................................................................3

ARGUMENT .......................................................................................................................4

   I.  The Defendant's Motion to Preclude Text Message Evidence Should Be Denied ..................4

      A.  Relevant Facts ..................................................................................................4

      B.  Applicable Law ................................................................................................6

         1. Rule 16.…………………………………………………………………………6

         2. Rule 901.…………………………………………………………….…....7

      C.  Discussion ........................................................................................................8

   II.  The Defendant's Motion to Suppress Returns from the Defendant's iCloud Account Should Be Denied ...............................................................................................................13

      A.  Relevant Facts ..............................................................................................13

      B.  Applicable Law ............................................................................................16

      C.  Discussion ....................................................................................................19

         1. The Defendant Waived Any Objection to the Government's Use of a Filter Team…..19

         2. The Search Warrant Was Not Defective on its Face……………………….…….20

         3. The Defendant Has Failed to Identify Any Error or Prejudice in the Government's Use of a Filter Team…………………………………………………………23

         4. The Government Relied on the Warrant In Good Faith……………………………24

         5. The Remedy Sought Is Overbroad…………………………………...………….25

   III.  The Defendant's Motion For Early Disclosure of *Giglio* and Jencks Act Material Should Be Denied …………………………………………………………………………27

      A.  Relevant Facts ..............................................................................................27

      B.  Applicable Law ............................................................................................28

      C.  Discussion ....................................................................................................31

CONCLUSION...................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

*Andresen v. Maryland*, 427 U.S. 463 (1976) .................................................................. 17

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................................ 8

*Chacko v. United States*, No. 96 Cr. 519 (JGK), 2000 WL 1808662 (S.D.N.Y. Dec. 11, 2000) ... 9

*Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420  (7th Cir. 1993) ............................... 7

*Deputla v. Rosen*, No. 20 Civ. 2371 (JPC) (BCM), 2020 WL 6135793 (S.D.N.Y. Oct. 16, 2020) .................................................................................................................................... 12

*Heller v. New York*, 413 U.S. 483 (1973) ....................................................................... 22

*Herring v. United States*, 555 U.S. 135 (2009) .............................................................. 18

*Hudson v. Michigan*, 547 U.S. 586 (2006) ..................................................................... 18

*In re E.D.T. ex rel. Adamah v. Tayson*, No. 09 Civ. 5477 (FB), 2010 WL 2265308 (E.D.N.Y. May 28, 2010) ............................................................................................................... 12

*In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006) ................................... 20, 21

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)  ......... 21, 24

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) ........................................................................................................................ 22

*In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ....................................................................... 17, 21, 23

*In the Matter of Search Warrants Executed on April 9, 2018*, No. 18 Misc. 3161 (KMW) (S.D.N.Y. Apr. 16, 2018) .............................................................................................. 17

*In re United States*, 834 F.2d 283, 284-87 (2d Cir. 1987)  ........................................... 30

*Kastigar v. United States*, 406 U.S. 441 (1972) ............................................................ 26

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................................. 6

*Maryland v. King*, 569 U.S. 435 (2013) ................................................................... 16, 17

*Nat'l City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980) .................... 23

*Pennsylvania v. Mimms*, 434 U.S. 106 (1977).............................................................. 16

*Puckett v. United States*, 556 U.S. 129 (2009).............................................................. 20

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................... 16

*United States ex rel. Lucas v. Regan*, 503 F.2d 1 (2d Cir. 1974)................................. 30

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ............................................ 22

*United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 13514090 (S.D.N.Y. Feb. 9, 2015) ............................................................................................................................. 7

*United States v. Arnold*, 696 F. App'x 903 (10th Cir. 2017) ...................................................... 12

*United States v. Avenatti*, No. 19 Cr. 374 (DAB), 2019 WL 4640232 (S.D.N.Y. Sept. 24, 2019) .................................................................................................................................... ..3

*United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ................................................................................................................ ….17, 21, 24

*United States v. Bout*, 651 F. App'x 62 (2d Cir. 2016) .................................................................. 7

*United States v. Brennerman*, 818 F. App'x 25 (2d Cir. 2020) ................................................. 8, 9

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ............................................................. 17

*United States v. Budovsky*, No. 13 Cir. 368 (DLC), 2016 WL 386133 (S.D.N.Y. Jan. 28, 2016) .....................................................................................................................................25

*United States v. Canter*, 338 F. Supp. 2d 460 (S.D.N.Y. 2004) ............................................... 31

*United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015)… ................................................................................................................................... 17, 21

*United States v. Cohen*, 366 F. Supp. 2d 612 (S.D.N.Y. 2019) ................................................. 22

*United States v. Conyers*, No. S13 15 Cr. 537 (VEC), 2016 WL 7189850 (S.D.N.Y. Dec. 9, 2016) ......................................................................................................................... 32

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ........................................................... 31, 32

*United States v. Correia*, 468 F. Supp. 3d 618 (S.D.N.Y. 2020) ............................................... 24

*United States v. Dames*, 380 F. Supp. 2d 270 (S.D.N.Y. 2005) ............................................... 11

*United States v. Davis*, 918 F.3d 397, 401 (4th Cir. 2019) ........................................................ 12

*United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009)…… ................................................................................................................................... 29, 30

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001) ................................................................ 7

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) ............................................... 23

*United States v. Fernandez*, No. 17 Cr. 167 (JMF), 2017 WL 6372783 (S.D.N.Y. Dec. 12, 2017) ......................................................................................................................... 32

*United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977) ............................................................... 7

*United States v. Gagliardi*, 506 F.3d 140 (2d Cir. 2007) ........................................................... 11

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) ............................................................... 18

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ................................................... 9

*United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ..... 29

*United States v. Hutcher*, 622 F.2d 1083 (2d Cir. 1980) ...................................................... 8, 9, 10

*United States v. Kenyatta*, No. 16 Cr. 273 (DLC), 2017 WL 972114 (S.D.N.Y. Mar. 9, 2017) .. 29

iii

*United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011)...... 28

*United States v. Leon*, 468 U.S. 897 (1984)................................................................. 18, 19, 24

*United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016)..
................................................................................................................................. 26

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992)........................................................ 19, 24

*United States v. Morgan*, 690 F. Supp. 2d 274 (S.D.N.Y. 2010) ................................................ 31

*United States v. Neill*, 952 F. Supp. 835 (D.D.C. 1997). ................................................... 24

*United States v. Olano*, 507 U.S. 725 (1993)................................................................. 20

*United States v. Patel*, No 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017)......
............................................................................................................................ 25, 26, 27

*United States v. Pena*, 227 F.3d 23 (2d Cir. 2000) ........................................................ 9

*United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974) ............................................... 30

*United States v. Pluta*, 176 F.3d 43 (2d Cir. 1999)........................................................ 7

*United States v. Purcell*, 967 F.3d 159 (2d Cir. 2020)..................................................... 18

*United States v. Ramirez*, 658 F. App'x 949 (11th Cir. 2016)............................................ 12

*United States v. Ramirez*, No. 91 Cr. 493 (KMW), 1991 WL 177239 (S.D.N.Y. Aug. 30, 1991)...
............................................................................................................................ 32, 33

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)............................................... 28, 29

*United States v. Rueb*, No. 00 Cr. 91 (RWS), 2001 WL 96177 (S.D.N.Y. Feb. 5, 2001) ........... 32

*United States v. Ruggiero*, 928 F.2d 1289 (2d Cir. 1991) ............................................... 7

*United States v. Sanchez*, No. S1 10 Cr. 277 (RCC), 2003 WL 1900851 (S.D.N.Y. Apr. 17,
2003) ................................................................................................................. 11

*United States v. Schulte*, No. S2 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019)
............................................................................................................................ 25, 26

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991)............................................. 26

*United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027 (D. Nev. 2006)...................... 26

*United States v. Sebastian*, 497 F.2d 1267 (2d Cir. 1974)............................................... 30

*United States v. Solomonyan*, 451 F. Supp. 2d 626 (S.D.N.Y. 2006)................................. 10

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ............................................ 26

*United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007) ......................................... 6

*United States v. Tadros*, 310 F.3d 999 (7th Cir. 2002)................................................... 9

*United States v. Teman*, 465 F. Supp. 3d 277 (S.D.N.Y. 2020) ....................................... 9

*United States v. Thomas*, No. 14 Cr. 31 (RNC), 2015 WL 237337 (D. Conn. Jan. 17, 2015) ..... 10

*United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013). .................................................................................................................................................. 29

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)................................................ 29, 32

*United States v. Triumph Cap. Grp.*, 211 F.R.D. 31 (D. Conn. 2002) ....................................... 25

*United States v. Volpe*, 42 F. Supp. 2d 204 (E.D.N.Y. 1999)....................................................... 6

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)....................................................... 26, 27

*United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ... 29, 31

*United States v. Winters*, No. 06 Cr. 54 (SWK), 2006 WL 2789864 (S.D.N.Y. Sept. 27, 2006).. .............................................................................................................................................. 18, 21

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003).............................................................. 21, 24

*United States v. Zolin*, 491 U.S. 554 (1989) ................................................................................ 22

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) .................................................................... 22, 23

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's pretrial motions to (1) preclude the Government from offering evidence of text messages between him and the victim of his crime; (2) suppress the fruits of a search of his iCloud account pursuant to a warrant issued by the Honorable Paul G. Gardephe, United States District Judge for the Southern District of New York; and (3) compel the Government to turn over witness statements of the defendant's choosing some seven months prior to trial, notwithstanding a directly contrary agreement entered into by the defendant and so-ordered by the Court (Dkt. No. 115 ("Def.'s Mot.")). Like the defendant's prior two pretrial motions, the defendant's latest motions are without merit. Indeed, the defendant's latest motions alternatively ignore and invent facts, and are devoid of legal support in any case. The motions should be denied.

## BACKGROUND

### A.  The Indictment

On May 22, 2019, a grand jury sitting in this District charged the defendant with wire fraud and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A, 1343, and 2. The charges stem from the defendant's efforts to deceive a Manhattan-based literary agent and Manhattan-based publisher, through the use of wires sent to Manhattan, in order to intercept payments intended for the defendant's client ("Victim-1"). As alleged more fully in the Indictment, from August 2018 through February 2019, the defendant, an attorney, engaged in a scheme to defraud Victim-1, who was one of his clients at that time, by diverting money owed to Victim-1 to the defendant's control and use. (Indictment ¶ 1.) After assisting Victim-1 in securing a book contract with a publisher in Manhattan, the defendant stole a significant portion of Victim-1's advance on that contract by sending a fraudulent and unauthorized letter purporting to contain

Victim-1's signature to Victim-1's literary agent. (*Id*.) That letter instructed the agent to send payments not to Victim-1 but instead to a bank account controlled by the defendant. (*Id*.)

Specifically, prior to Victim-1's literary agent wiring the second of four installment payments due to Victim-1 as part of the book advance, the defendant sent a letter to Victim-1's literary agent, purportedly signed by Victim-1, that instructed the literary agent to send all future payments to a client trust account in Victim-1's name and controlled by the defendant. (*Id*. ¶ 15.) The literary agent initiated a wire transfer from Manhattan of $148,750 to the account, which the defendant promptly began spending on his own personal and business expenses, including on airfare, hotels, car services, restaurants and meal delivery, online retailers, payroll for his law firm and another business he owned, and insurance. (*Id*. ¶¶ 16-17.) When Victim-1 began inquiring of the defendant as to why Victim-1 had not received the second installment, the defendant lied to Victim-1, telling Victim-1 that he was still attempting to obtain the payment from Victim-1's publisher. (*Id*. ¶¶ 19-20.) Approximately one month after diverting the payment, the defendant used funds recently received from another source to pay $148,750 to Victim-1, so that Victim-1 would not realize that the defendant had previously taken and used Victim-1's money. (*Id*. ¶ 21.)

Approximately one week later, pursuant to the defendant's earlier fraudulent instructions, the literary agent sent from Manhattan another payment of $148,750 of Victim-1's book advance to the client account controlled by the defendant. (*Id*. ¶ 22.) The defendant promptly began spending the money on his own personal expenses, including to make payments to individuals with whom the defendant had a personal relationship, to make a monthly lease payment on a luxury automobile, and to pay for airfare, dry cleaning, hotels, restaurants and meals, payroll, and insurance costs. (*Id*. ¶ 23.) Moreover, to conceal his scheme, and despite repeated requests from

Victim-1 to the defendant, as Victim-1's lawyer, for assistance in obtaining the book payment that

Victim-1 believed was missing, the defendant falsely led Victim-1 to believe that Victim-1's

publisher was refusing to make the payment to the literary agent, when, as the defendant knew,

the publisher had made the payment to the literary agent, who had then sent the money to the

defendant pursuant to the defendant's fraudulent instructions. (*Id*. ¶¶ 24-25.)

## B. The Defendant's Prior Pretrial Motions

On August 29, 2019, the defendant filed a motion seeking to transfer this case to the Central

District of California under Federal Rule of Criminal Procedure 21. (Dkt. No. 19.) On

September 24, 2019, the late Honorable Deborah A. Batts, United States District Judge for the

Southern District of New York, denied the defendant's motion. *See United States v. Avenatti*,

No. 19 Cr. 374 (DAB), 2019 WL 4640232 (S.D.N.Y. Sept. 24, 2019).

On June 11, 2020, the defendant filed a second motion seeking to transfer this case to the

Central District of California. (Dkt. No. 56.) On August 7, 2020, this Court denied the defendant's

motion. (Dkt. No. 73.)

Also on August 7, 2020, new counsel was appointed to represent the defendant. (Dkt.

No. 73.) At a conference held that day, new counsel for the defendant—entering the case more

than fourteen months after indictment, and following two prior rounds of pretrial motions—asked

for "an opportunity to determine whether there should be any motions going forward." (Aug. 7,

2020 Tr. 19:18-19 (Dkt. No. 87).) The Court responded:

> I'm obviously not going to preclude [counsel] from making an
> effort. But as I think he is probably aware, he would have an uphill
> climb to persuade me that at this point Mr. Avenatti should be
> granted leave to file any motions.
>
> He's had an opportunity to do that. He had one before Judge Batts.

3

> He was given an opportunity to renew his motion to transfer and has
> had plenty of time since then to raise other issues. Given that, he
> would certainly have to persuade me that a late motion would be
> appropriate.

(*Id.* at 21:10-19.) Although the Court did subsequently grant the defendant's request for a motion schedule for potential further pretrial motions (Dkt. No. 105), at no time did the defendant seek leave to file the present motions, nor has he provided any explanation for why these motions—the purported basis for which was apparent well before the first venue transfer motion was filed— should be heard now. In any case, for the reasons set forth below, these newest motions are without merit.

## **ARGUMENT**

I.   **The Defendant's Motion to Preclude Text Message Evidence Should Be Denied**

A.   **Relevant Facts**

On March 11, 2019, Victim-1 was interviewed by the Government. During that interview, Victim-1 provided limited consent for the Government to screenshot in her presence certain portions of Victim-1's WhatsApp text messages with the defendant, and an Investigative Analyst with the United States Attorney's Office did so.[1] Those approximately 45 screenshots were produced to the defendant in discovery and are attached to his motion as Exhibit B.

On March 25, 2019, Victim-1, through counsel, voluntarily provided to the Government an export of all of the WhatsApp text messages with the defendant that were stored on Victim-1's

---

[1]   The defendant repeatedly asserts that Victim-1's cellphone was in the possession, custody, and control of the Government. (*See, e.g.*, Def.'s Mot. 15-16 & n.4.) The Government is unaware of any basis the defendant has for making such a claim, and, as described above, it is not accurate.

cellphone, which covered the time period of February 28, 2018 through February 15, 2019.[2] The Government understands that the text message records provided to the Government were generated automatically using an electronic feature that compiles the entirety of a WhatsApp conversation into a printable and shareable electronic file. Those approximately 60 pages of text messages were produced to the defendant in discovery and are attached to his motion as Exhibit C.

At no time has the Government had possession of any other contents of Victim-1's cellphone or had the legal authority to forensically extract or copy any other data from Victim-1's cellphone.

However, as further detailed below (*see infra* Part II.A), the Government obtained pursuant to a court-authorized warrant contents of the defendant's iCloud account, which includes thousands of records of WhatsApp calls and text messages between the defendant and Victim-1. The defendant has received those records in discovery (and presumably has access to his own iCloud account), and yet has neither mentioned his possession of these records nor pointed to any differences between the version contained in his iCloud account and those produced by Victim-1 despite baselessly alleging that Victim-1 or law enforcement agents may have "manipulated the chats" (Def.'s Mot. 14). Instead, as addressed below, the defendant has moved to suppress the contents of his iCloud account.

A copy of the defendant's WhatsApp text messages with Victim-1 also likely resides on

---

[2]     The defendant makes repeated reference to the fact that the responsive text messages were produced to the Government by counsel for Victim-1, with the apparent suggestion that there is something untoward about an individual's attorney producing records. (*See, e.g.*, Def.'s Mot. 1-2, 3, 14.) It is, of course, customary and entirely appropriate for the subject of a voluntary request for records or a subpoena to engage the assistance of an attorney to comply with such process.

the defendant's cellphone. On March 24, 2019, and April 9, 2019, the Government obtained search

warrants to seize and review the contents of, among other things, the defendant's cellphone for

evidence of, among other things, the offenses later charged in this case. To date, the Government

has been unable to access the data on the defendant's cellphone because the Government does not

have the password to that device. The Government has invited the defendant to provide the

password for the cellphone, the contents of which the Government would promptly produce in

discovery, but the defendant has thus far declined to do so.

### B.   Applicable Law

#### 1.   Rule 16

Rule 16 of the Federal Rules of Criminal Procedure "created only a narrow right of pretrial

discovery from the government." *United States v. Stein*, 488 F. Supp. 2d 350, 365 (S.D.N.Y. 2007).

In particular, the Rule requires the Government to disclose to the defendant "any relevant written

or recorded statement by the defendant . . . within the government's possession, custody, or

control," Fed. R. Crim. P. 16(a)(1)(B), as well as any documents within the Government's

possession, custody, or control if the items are material to preparing the defense, if the Government

intends to use them in its case-in-chief at trial, or if the items were obtained from or belong to the

defendant. Fed. R. Crim. P. 16(a)(1)(E).

By its terms, the relevant portion of Rule 16 applies only to items "within the government's

possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Rule 16 has been construed

"narrowly" by courts to apply only to materials to which "the prosecutors in the particular case"

have "access." *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999); *cf. Kyles v.*

*Whitley*, 514 U.S. 419, 437 (1995) (government's discovery and disclosure obligations extend only

to information in the custody of the prosecutor); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420 1427 (7th Cir. 1993) ("the fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean that the document is in its possession, custody, or control; in fact it means the opposite").

## 2.    Rule 901

Rule 901(a) of the Federal Rules of Evidence provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "Rule 901's requirements are satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 13514090, at *3 (S.D.N.Y. Feb. 9, 2015) (quoting *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991)). "It 'does not erect a particularly high hurdle[,]' and may be satisfied by 'circumstantial evidence.'" *Id.* (quoting *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001)).

Furthermore, "[t]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (quotation marks and citation omitted). Notably, for this reason, "pure speculation" of tampering is insufficient to undermine authenticity. *United States v. Bout*, 651 F. App'x 62, 64 (2d Cir. 2016); *United States v. Fuentes*, 563 F.2d 527, 532-33 (2d Cir. 1977).

## C. Discussion

The defendant seeks to preclude admission of screenshots and printouts of his WhatsApp messages with Victim-1 on two bases: first, the defendant contends, in substance, that the Government must obtain and produce a "forensic image" of a cellphone on which the messages were sent or received; and second, the defendant argues that these records cannot be authenticated.[3] (Def.'s Mot. 13-17.) The defendant offers no law in support of these claims and, in fact, they are inconsistent with governing rule, statute, and caselaw.

*First*, the defendant argues that "the government should be compelled to disclose a complete forensic copy of [Victim-1's] cellphone." (Def.'s Mot. 11.) Of course, the Government cannot be compelled to produce what does not exist and it does not possess, nor does Rule 16, *Brady v. Maryland*, 373 U.S. 83 (1963), or any other source of law require it to do so. *See, e.g.*, *United States v. Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020) (rejecting *Brady* and Jencks Act claim regarding materials allegedly in victim's possession because "government's discovery and

---

[3] The defendant also asserts that the Government was in possession of Victim-1's cellphone, and by virtue of that possession was under an obligation to create a forensic image of Victim-1's entire cellphone. (Def.'s Mot. 15-17 & n.4.) As noted above, *supra* n.1, the defendant does not offer a basis for his factual claims and they are simply wrong. Nor does the defendant offer support for the notion that any time a government official is in temporary possession of an individual's cellphone, the Government is obligated, without permission, to access the contents of that cellphone and create an entire forensic duplicate of that individual's data. In fact, the Second Circuit has explicitly rejected the argument "that the prosecution did possess . . . materials because they must for some time have actually been in the hands of the prosecution's investigators." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject, however, a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about."). Indeed, it is unclear how the Government could be permitted to take the steps the defendant seeks, let alone be required to do so, inasmuch as the defendant suggests that the Government conduct warrantless searches of a victim or witness's cellphone for his benefit.

disclosure obligations extend only to information and documents in the government's possession"); *Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and never possessed or inspected." (quotation marks and citation omitted)); *United States v. Teman*, 465 F. Supp. 3d 277, 337 (S.D.N.Y. 2020) ("The Government's *Brady* obligation does not extend to evidence that it does not know of or that it does not have within its possession.); *Chacko v. United States*, No. 96 Cr. 519 (JGK), 2000 WL 1808662, at *5 (S.D.N.Y. Dec. 11, 2000) ("the Government had no obligation under *Brady* to produce a document it did not possess" (citing *United States v. Pena*, 227 F.3d 23, 27 n.3 (2d Cir. 2000))).[4]

The defendant nonetheless suggests generally that the Government ought to be required to obtain a forensic image of Victim-1's cellphone. (Def.'s Mot. 15-17 & n.4.) The defendant offers no legal support for this view, and the law, as described above, is to the contrary. *See, e.g.*, *Brennerman*, 818 F. App'x at 29; *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) ("*Brady* prohibits suppression of evidence, it does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel."); *Hutcher*, 622 F.2d at 1088; *Teman*, 465 F. Supp. 3d at 337; *United States v. Giffen*, 379

---

[4] In any event, the defendant offers no basis whatsoever to suppose that there exists exculpatory evidence on Victim-1's cellphone or that a "forensic" version of his WhatsApp messages with Victim-1 would be in some fashion exculpatory. On this count, it is noteworthy first that the defendant has identified nothing the records from his iCloud account of his WhatsApp messages with Victim-1 that undermines the authenticity of the records Victim-1 produced, or is otherwise exculpatory. Second, the defendant, who purports to want to confirm the extent of the text exchanges between himself and Victim-1, has declined for two years to provide the Government with the password to his cellphone, which the Government obtained pursuant to a search warrant and presumably contains the same text messages, but which the Government has thus far been unable to access due to the password protection on the cellphone.

F. Supp. 2d 337, 343 (S.D.N.Y. 2004) ("the Government must produce only those documents to which it has access" and "is not required to conduct a separate investigation for the purpose of responding to a defendant's discovery requests"). The defendant's proposed rule is also unworkable. It would not only mandate that the Government seek to invade the privacy of victims and witnesses, but would undoubtedly discourage victims or witnesses from coming forward. This rule would require the collection of vast sums of irrelevant, private information to be held by the Government and turned over to defendants. Moreover, it is entirely unclear what the scope of such a rule would be and what obligations would be imposed on the Government. In short, the Government sought evidence germane to its investigation and turned over all evidence governed by Rule 16 to the defense. Nothing more is required.[5]

*Second*, the defendant contends that screenshots or printouts of WhatsApp messages cannot be authenticated. (Def.'s Mot. 14.) As an initial matter, this argument is premature. The potential preclusion or admission of any particular exhibit at trial is an issue that is appropriate for disposition, at the earliest, on a motion *in limine*. The Government anticipates that such motions will not be due for several more months, as the trial is more than six months away. Accordingly, the defendant's motion to preclude should be denied, without prejudice, as premature. *See, e.g.*, *United States v. Thomas*, No. 14 Cr. 31 (RNC), 2015 WL 237337, at *1 (D. Conn. Jan. 17, 2015)

---

[5]       The defendant suggests, without any factual basis, that Victim-1's cellphone may contain "written communications with third parties about Mr. Avenatti and the book deal," which he claims "are a likely source of *Brady* and *Giglio* material." (Def.'s Mot. 16.) As explained below, the Government will produce *Giglio* material related to Victim-1 and other witnesses in advance of trial. The defendant has set forth no legal basis to require the Government to obtain certain hypothetical contents of Victim-1's cellphone in order to comply with its obligations, which are limited to what is in the Government's possession. *See Kyles*, 514 U.S. at 437; *Hutcher*, 622 F.2d at 1088.

("reserving a ruling" on "question of authenticity" of text messages because it "turns on the admissibility and substance of evidence that is not yet in the record"); *United States v. Solomonyan*, 451 F. Supp. 2d 626, 646 (S.D.N.Y. 2006) (denying pretrial motion to preclude evidence at trial as "premature because the government has not yet decided what evidence they will seek to introduce"); *United States v. Dames*, 380 F. Supp. 2d 270, 277 (S.D.N.Y. 2005) (denying pretrial motion to preclude evidence at trial as "premature"); *United States v. Sanchez*, No. S1 10 Cr. 277 (RCC), 2003 WL 1900851, at *4 (S.D.N.Y. Apr. 17, 2003) (denying pretrial motion to preclude evidence at trial as "premature," and explaining that "[t]he Court will address [the defendant's] evidentiary requests when and if they arise at or just prior to trial").

In any case, the defendant's argument that materials cannot be authenticated without a forensic image is wrong and should be rejected.[6] Aside from generalized references to *Brady* and the Federal Rules of Evidence, the defendant offers no support for his claim. Indeed, the law is directly to the contrary. In *United States v. Gagliardi*, the Court of Appeals considered the argument that, because "transcripts of instant-message chats . . . were largely cut from [the defendant's] electronic communications and then pasted into word processing files, they were not originals and could have been subject to editing by the government," and "could even have been completely fabricated." 506 F.3d 140, 151 (2d Cir. 2007). The Court concluded that, based on testimony from an informant and an agent that the exhibits were accurate records of the defendant's conversations, "a reasonable juror could have found that the exhibits did represent those

---

[6]     The defendant also omits that, to the extent the messages were also saved on his iCloud account and responsive to the Government's warrant, the authenticity of the WhatsApp messages at issue can be corroborated by the contents of the defendant's own iCloud account.

conversations, notwithstanding that the e-mails and online chats were editable," and therefore the transcripts were properly authenticated. *Id.* Much as in *Gagliardi*, screenshots and photographs of text message exchanges are routinely admitted. *See, e.g.*, *United States v. Davis*, 918 F.3d 397, 401-02 (4th Cir. 2019) (photographs of text messages taken by officer properly authenticated by testimony of officer); *United States v. Arnold*, 696 F. App'x 903, 906 (10th Cir. 2017) (compilation of screenshots of text messages properly authenticated by testimony of witness involved in text message exchange that compilation reflected at least some of the text messages exchanged with the defendant); *United States v. Ramirez*, 658 F. App'x 949, 952 (11th Cir. 2016) (photographs of text messages properly authenticated by witness who took the photographs and officer who received the photographs).

Moreover, the authentication of text messages by the testimony of an individual with knowledge is a routine and widely accepted method of authenticating electronic communications. *See, e.g.*, *Arnold*, 696 F. App'x at 907 (affirming admission of text messages authenticated by victim's testimony); *Deputla v. Rosen*, No. 20 Civ. 2371 (JPC) (BCM), 2020 WL 6135793, at *1 n.1 (S.D.N.Y. Oct. 16, 2020) (Authentication of "text messages, and other electronic communications recently sent or received, . . . is ordinarily not a difficult task, but it does require a *specific* attestation, by a person with personal knowledge of the communications, that they are authentic (*i.e.*, that they were actually sent to or received from the indicated person(s)) and that any printout or other version submitted to the court is a true copy of the original electronic messages."); *In re E.D.T. ex rel. Adamah v. Tayson*, No. 09 Civ. 5477 (FB), 2010 WL 2265308, at *4 n.4 (E.D.N.Y. May 28, 2010) (reaffirming "earlier ruling to admit the text messages into evidence" because, "[e]ven if they were not independently authenticated by the service provider

or by a forensic specialist," testimony by one of the parties to the text messages "was sufficient to establish their authenticity"). The Government is aware of no precedent supporting the notion that a forensic analysis is somehow required in order to authenticate electronic communications, and the defendant cites none.

## II.     The Defendant's Motion to Suppress Returns from the Defendant's iCloud Account Should Be Denied

### A.     Relevant Facts

On March 25, 2019, the defendant was arrested on a complaint alleging extortion charges for which he was later indicted, tried, and convicted in *United States v. Avenatti*, 19 Cr. 373 (PGG) (the "Extortion Case"). At the time of the defendant's arrest, law enforcement agents executed a search warrant for electronic devices in his possession, including an Apple iPhone, an Apple iPad, and an Apple MacBook Pro. In light of the possibility that the defendant's devices contained potentially privileged communications, the Government engaged a filter team (the "Filter Team") of Assistant United States Attorneys, who were not and never would be members of the prosecution team, to filter the contents of those devices and remove any potentially privileged materials from that which was to be provided to the prosecutors and law enforcement agents (the "Prosecution Team") handling the Extortion Case and the ongoing investigation that led to this case (the "Fraud Case").

The Filter Team engaged with the defendant's counsel in the Extortion Case prior to providing any materials from the defendant's devices to the Prosecution Team, and, as a courtesy, offered to provide them with an advance copy of any materials that the Filter Team had determined was not potentially privileged, and a reasonable period of time to review those materials in order to provide input on whether any such materials might be subject to a valid claim of privilege. In

13

short, the defendant's counsel was permitted an opportunity to participate in the filter process and to review search warrant returns before the Prosecution Team, and did so. The defendant made no objection to this process and sought no judicial relief, and instead took advantage of the benefits afforded to review potentially privileged materials and object prior to provision of the materials to the Prosecution Team.

On August 13, 2019, the Honorable Paul G. Gardephe, United States District Judge for the Southern District of New York, issued a search warrant (the "Search Warrant") for the defendant's Apple iCloud account (the "iCloud Account"). The Search Warrant contained the following provision:

> Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege (to the extent not waived). When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

(Def.'s Mot. Ex. F, Attachment A at 5.)

Upon receipt of the contents of the iCloud Account, consistent with the protocol that had been established with defense counsel in the Extortion Case regarding the review of the defendant's devices, the Filter Team conducted its review for potentially privileged communications.

On November 23, 2019, the Filter Team provided to the defendant's counsel in the Extortion Case communications from the iCloud Account for the February and March 2019 time period, with proposed redactions of materials determined to be potentially privileged by the Filter Team. Again, the defendant made no objection to this process and sought no judicial relief. Instead,

14

on December 6, 2019, after the defendant's counsel in the Extortion Case confirmed to the Filter

Team that no additional redactions were necessary, and so the Filter Team provided a redacted

version of that set of communications to the Prosecution Team.

Moreover, on December 5, 2019, the Filter Team, at the direction of the defendant's

counsel in the Extortion Case, provided to the defendant's counsel in the Fraud Case

communications from the iCloud Account for the August 2018 through January 2019 time period,

with proposed redactions of materials determined to be potentially privileged by the Filter Team.

After some back-and-forth, on January 7, 2020, counsel for the defendant in the Fraud Case wrote

to the Government objecting to the release of any of the communications to the Prosecution Team

because, they claimed, it had not undergone "a full review by the taint team" and the defendant's

counsel did not have the opportunity "to provide a list of the communications that are privileged."

That same day, a member of the Filter Team responded:

> As I indicated in our conversation earlier today and in my email
> below, the USAO filter team has in fact conducted a full privilege
> review of each of the communications that we are proposing to
> release. Through that review, we have identified and agreed to
> withhold certain communications that we determined may be
> potentially privileged. Moreover, Mr. Warren, co-counsel
> Mr. Srebnick and you have had well over a month to review the
> communications, including those our filter team has identified as
> potentially privileged, and to provide a list of any additional
> communications not flagged by our filter review that you intend to
> assert are potentially privileged. And I note that you received all of
> these communications as Rule 16 discovery in September 2019.
> Yet, to date, you have not identified a single communication as
> potentially privileged, nor have you responded to our request for a
> list of clients or provided contact information for his spouse to help
> facilitate our review. In fact, I have not received any communication
> from you or Mr. Warren since your emails below, dated December 5
> and 6, 2019.

The Prosecution Team obtained these communications pursuant to a court-ordered search warrant authorizing them to view the communications after review by a filter team, which has occurred and, indeed, was complete over a month ago. I will therefore be releasing to the prosecution team the iCloud communications that the USAO Filter Team designated as non-privileged for the time period in the search warrant relating to the extortion charges, August 1, 2018 to January 31, 2019 (having already released February 1 to March 25, 2019, after Mr. Srebnick's review). I will do so at 5 p.m. on Thursday, January 9, 2020. If you would like to identify any additional communications not flagged by the filter team as potentially privileged or discuss any other matter related to our privilege review, please feel free to contact me directly before that time.

Counsel for the defendant never responded to the above-quoted email, and on January 9, 2020, the communications were released to the Prosecution Team, subject to the redactions made by the Filter Team. Between that date and the filing of the defendant's motion more than 15 months later, counsel for the defendant in the Fraud Case (or the Extortion Case) have never suggested at any time that the Filter Team's protocol was somehow improper nor have they identified a single potentially privileged communication that was provided to the Prosecution Team.[7]

### B.    Applicable Law

"The touchstone of . . . analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). To be reasonable, "the government interest must outweigh the degree to

---

[7]    The defendant claims to not know the identities of who led the Filter Team or participated in its review. The defendant fails to acknowledge that his counsel in both this case and the Extortion case were in regular contact with the leader of the Filter Team—an Assistant United States Attorney—throughout the undertaking of the filter process. Prior to filing this motion, the defendant never inquired whether other attorneys or staff were involved in the Filter Team process.

which the search [or seizure] invades an individual's legitimate expectations of privacy." *Maryland v. King*, 569 U.S. 435, 461 (2013); *see also Mimms*, 434 U.S. at 109 ("Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975))).

The Fourth Amendment accepts the reality that "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). But it also requires that "responsible officials, including judicial officials, . . . take care to assure that [such searches] are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.* There is thus no one-size-fits-all rule that applies to every conceivable scenario, because "'what is reasonable [under the Fourth Amendment] depends on the context within which a search takes place.'" *King*, 569 U.S. at 461-62 (citation omitted).

"The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." *In re Search Warrants Executed on April 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *8 (S.D.N.Y. Oct. 9, 2020), and *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015)); *see also In the Matter of Search Warrants Executed on April 9, 2018*, No. 18 Misc. 3161 (KMW), Dkt. No. 38 at 8 (S.D.N.Y. Apr. 16, 2018) (stating that there was no question that the privilege review conducted by the government's filter team of covert email warrants, including of the then-President's attorney's email account, was "as fair as one done by a

special master"); *United States v. Winters*, No. 06 Cr. 54 (SWK), 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006) (proposed use of "'wall Assistant' adequately protects the defendant's asserted privilege").

"Even when a search warrant is constitutionally defective, [the Second Circuit] bear[s] in mind that '[s]uppression of evidence . . . has always been [a] last resort, not [a] first impulse.'" *United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "'To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). Thus, evidence seized pursuant to a defective warrant will not be suppressed if it was 'obtained in objectively reasonable reliance' on the invalid warrant." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). "'[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' in most cases, 'there is no police illegality and thus nothing to deter.'" *Id.* (quoting *Leon*, 468 U.S. at 920-21). "In such cases, '[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *Id.* (quoting *Leon*, 468 U.S. at 921)). "'[T]he exclusion of evidence is inappropriate when the government acts 'in objectively reasonable reliance' on a search warrant, even when the warrant is subsequently invalidated.'" *Id.* (quoting *United States v. Ganias*, 824 F.3d 199, 221 (2d Cir. 2016) (en banc)).

"The Supreme Court in *Leon* identified four circumstances in which the good-faith exception does not apply, thereby rendering the exclusion of evidence appropriate: '(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned

his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'" *Id.* at 179-80 (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

### C.   Discussion

#### 1.   The Defendant Waived Any Objection to the Government's Use of a Filter Team

The defendant argues that the Search Warrant is defective on its face and that the Filter Team's protocol was improper. In support of these claims, the defendant asserts that he "does not know whether the privilege review was delegated to non-lawyer members of the 'filter team,' like litigation support staff, computer forensic agents, or other personnel, nor can he evaluate the adequacy of the measures purportedly used to wall off the 'filter team' from the prosecution team and its case agents." (Def.'s Mot. 23-24.) The defendant further states that "[t]he 'filter team'— even if comprised entirely of trained lawyers—will undoubtedly make errors in privilege determinations and in transmitting seized materials to an investigation or prosecution team, errors that [the defendant] cannot possibly redress." (*Id.* at 24.)

The defendant entirely omits that, contrary to his claims, he knew precisely the Government's filter process and *was* able to redress any errors. As detailed above, two separate sets of attorneys for the defendant interacted directly with the Government's Filter Team and were afforded the opportunity to review documents before they were passed to the Prosecution Team. Rather than object to this process or seek judicial relief at the time—which would have allowed the Government to address any putative deficiencies (including by obtaining a new warrant if any of the defendant's claims had merit, which they do not) prior to the Prosecution Team receiving

19

the Search Warrant returns—the defendant and his counsel took advantage of the Government's offer, not required by law or the provisions of the Search Warrant, to participate in the Filter Process, preview documents that might be transferred to the Prosecution Team, and make objections.

The defendant's strategic participation in the filter process, only to raise the issue prior to trial in an effort to suppress all fruits of the Search Warrant, is nothing short of "'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009). The defendant should not be permitted now to challenge a process in which he participated and to which he consented for strategic gain, and his claims should be deemed waived. *Cf. United States v. Olano*, 507 U.S. 725, 733 (1993) (no error where the defendant waives a right); *see also Puckett*, 556 U.S. at 134-35 (defendant may not sandbag district court by forfeiting claim and raising it later on appeal).

### 2.    The Search Warrant Was Not Defective on its Face

The defendant claims that "because evaluating a privilege claim is always a judicial function, the warrant issued by Judge Gardephe improperly delegated the privilege review" to the Government's Filter Team (Def.'s Mot. 18), and that Judge Gardephe "should have declined to hear the government's warrant application *ex parte* and should have insisted on adversarial proceedings[.]" (Def.'s Mot. 26). The defendant is wrong. Filter teams are reasonable under the Fourth Amendment, and it was entirely proper for Judge Gardephe to consider the warrant application on an *ex parte* basis.

*First*, the defendant's assertion that there is anything unlawful about the use of a filter team

is incorrect. Indeed, "the filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients." *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2; *see also In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006) (noting that where "the potentially-privileged documents are already in the government's possession . . . the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege"); *United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."). The use of a filter team is thus reasonable and lawful, as courts in this Circuit have repeatedly held. *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2; *see also, e.g.*, *Blakstad*, 2020 WL 5992347, at *8; *Ceglia*, 2015 WL 1499194, at *1; *Winters*, 2006 WL 2789864, at *2.

In support of his contention that a warrant that references a filter process is facially invalid, the defendant relies on the Fourth Circuit's opinion in *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019). As Judge Oetken recently explained:

> Although the Fourth Circuit in that case held that the magistrate judge's authorization of the filter team and protocols were improper under the circumstances, it did not hold that the Government's use of a filter team is categorically inappropriate. In any event, that decision is not binding on this Court, and to the extent it suggests that the use of a filter team by a federal prosecuting office may violate the constitutional separation of powers, this Court respectfully disagrees.

*In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *2 n.3. And whatever the Fourth Circuit's opinion might stand for, it certainly is not that the use of a filter team violates the Fourth Amendment or that a warrant referencing a filter team is facially invalid and evidence

gathered pursuant to such a warrant should be suppressed. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d at 183 (reversing district court's decision not to enjoin review of search warrant returns by filter team). Indeed, the defendant here has pointed to no violation of the Fourth Amendment, and there was none.

*Second*, the defendant's bald assertion that the warrant application should have been subjected to adversarial proceedings is wrong. The Fourth Amendment provides the relevant framework for "stri[king] the balance between privacy and public need." *Zurcher v. Stanford Daily*, 436 U.S. 547, 559 (1978). Determinations about the reasonableness of a warrant, and the reasonableness of a particular mode of executing that warrant, are routinely made through *ex parte* proceedings. *See, e.g.*, *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) ("[H]istorically the process of issuing search warrants involves an *ex parte* application by the government and *in camera* consideration by the judge or magistrate."); *United States v. Cohen*, 366 F. Supp. 2d 612, 632 (S.D.N.Y. 2019) ("History and experience indicate that proceedings to obtain search warrants traditionally involve *in camera* determinations of *ex parte* applications."); *see also United States v. Abuhamra*, 389 F.3d 309, 322 n.8 (2d Cir. 2004) ("the criminal law does permit *ex parte* submissions in support of arrest and search warrants"). And relatedly, the Supreme Court has endorsed procedures by which lower courts may make final privilege determinations on an *ex parte* basis. *See United States v. Zolin*, 491 U.S. 554, 572 (1989) (*in camera* proceeding to determine the applicability of the crime-fraud exception); *Heller v. New York*, 413 U.S. 483, 493 (1973) (holding that a target was not entitled to "an adversary hearing prior to a seizure").

Accordingly, the defendant's claim that, in substance, for *him*, the Government should be

required to proceed by subpoena rather than search warrant finds no support in the law. Indeed, Judge Oetken recently rejected just such a claim, noting that "lawyers are not immune from searches in criminal investigations" and "a law office search 'is nevertheless proper if there is reasonable cause to believe that the specific items sought are located on the property to be searched.'" *In re Search Warrants Executed on April 28, 2021*, 2021 WL 2188150, at *1 (quoting *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980)); *see also Zurcher*, 436 U.S. at 559, 566-67 (rejecting claim that Fourth Amendment requires resort to subpoenas or prior notice and hearing where search warrant implicates other constitutional protections and observing that "[t]he Fourth Amendment has itself struck the balance between privacy and public need, and there is no occasion or justification for a court to revise the Amendment and strike a new balance by denying the search warrant in the circumstances present here and by insisting that the investigation proceed by subpoena *duces tecum*, whether on the theory that the latter is a less intrusive alternative or otherwise").

### 3. The Defendant Has Failed to Identify Any Error or Prejudice in the Government's Use of a Filter Team

The defendant advances generalized arguments about his rights under the Fourth, Fifth, and Sixth Amendments, but articulates no actual error or prejudice from the Filter Team's review in this case. Indeed, the defendant has failed to point to even one potentially privileged communication that was provided to the Prosecution Team. This lack of identified error or prejudice is fatal to the defendant's claim that the Filter Team's process was in some way infirm.

To the extent the defendant attempts to assert a violation of his Sixth Amendment right, he can make no such showing. Indeed, even if he could point to communications that were improperly provided to the Prosecution Team—and he cannot—"the mere fact that the government obtained

privileged information does not mean it violated [a defendant's] Sixth Amendment rights." *United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011). Rather, the Sixth Amendment is violated only if privileged information is intentionally obtained and used to the defendant's detriment at trial. *See United States v. Neill*, 952 F. Supp. 835, 840 (D.D.C. 1997). There is not and cannot be any such claim here.

### 4.  The Government Relied on the Warrant In Good Faith

Even if the Court finds that permitting the use of a filter team was erroneous in some manner, because the law enforcement agents who executed the search warrant reasonably relied in good faith on the warrant, the evidence should not be suppressed. It is well-settled that, with certain limited exceptions not applicable here, where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the Fourth Amendment exclusionary rule does not apply. *Leon*, 468 U.S. at 922.

None of the limited circumstances where the good faith exception does not apply is implicated here. *See Moore*, 968 F.2d at 222 (citing *Leon*, 468 U.S. at 923). Rather, the law enforcement agents executing the Search Warrant relied reasonably on Judge Gardephe's authorization.

*First*, the non-controlling decision on which the defendant principally relies—*In re Search Warrant Issued June 13, 2019*, 943 F.3d at 159—was issued *after* the Search Warrant was issued.

*Second*, the use of filter teams was and remains a widely accepted, standard practice in the Second Circuit. *See, e.g.*, *Yousef*, 327 F.3d at 168 ("the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."); *Blakstad*, 2020 WL 5992347,

24

at *8 ("the use of a filter team protected against any privileged information from being produced to the particular lawyers prosecuting this case"); *United States v. Correia*, 468 F. Supp. 3d 618, 621 (S.D.N.Y. 2020) ("The Government utilized a filter team to review the contents of the package to determine whether they included privileged material."); *United States v. Budovsky*, No. 13 Cr. 368 (DLC), 2016 WL 386133, at *9 n.24 (S.D.N.Y. Jan. 28, 2016) ("The Government . . . used a 'filter team' so that prosecutors did not have access to communications between [the defendant] and his counsel."); *United States v. Triumph Cap. Grp.*, 211 F.R.D. 31, 43 (D. Conn. 2002) ("The use of a taint team is a proper, fair and acceptable method of protective privileged communications when a search involves property of an attorney."). As set forth above, there is no basis for concluding that the warrant was deficient in any way, much less deficient in a way such that the executing agents could not have presumed it to be valid. *See, e.g.*, *United States v. Schulte*, No. S2 17 Cr. 548 (PAC), 2019 WL 5287994, at *3 (S.D.N.Y. Oct. 18, 2019) ("Although the use of the wall team may not be the method preferred by the Defendant, it does not evidence the sort of bad faith, or flagrant disregard of the warrant's limits that would justify wholesale suppression.").

*Third*, the Government relied upon the consent and involvement of defense counsel in the iterative Filter Team process. This fact alone demonstrates the Government's good faith. *Cf. United States v. Patel*, No 16 Cr. 798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (noting government use of filter review team as evidence of good faith) .

### 5. The Remedy Sought Is Overbroad

Even if there were anything improper with respect to the Government's use of a filter team (which there is not), the remedy would be far narrower than the broad suppression sought by the

defendant. Indeed, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial,' not to order wholesale suppression." *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (quoting *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1047 (D. Nev. 2006)); *see also Schulte*, 2019 WL 5287994, at *2 (same); *Patel*, 2017 WL 3394607, at *6 (same). Although the defendant has not identified any privileged communication that was purportedly released improperly by the Filter Team to the Prosecution Team, any such communication would presumably not be of a constitutional dimension since the timeframe of the communications at issue substantially predated the defendant's indictment in this case. Where, as is the case here, the unspecified attorney-client communications are not constitutionally protected, the privilege is a mere evidentiary one, and evidence derived from the privileged information need not be suppressed under the fruit-of-the-poisonous-tree doctrine. *See United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding that "suppression of any evidence derived from the privileged conversations" was not required since "the privilege is a testimonial or evidentiary one, and not constitutionally-based"); *see also United States v. Warshak*, 631 F.3d 266, 294 (6th Cir. 2010) (applying *Squillacote* to the attorney-client privilege and holding that "evidence derived from a violation of the attorney-client privilege is not fruit of the poisonous tree").[8]

---

[8]    In dicta in *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991), the Second Circuit suggested, citing *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972), that "[t]he government must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." That rule, however, does not apply here, where the allegedly privileged communication was neither compelled nor in violation of the defendant's constitutional rights. As the Sixth Circuit has observed, the "*Kastigar* analysis is not triggered by the existence of evidence protected by a privilege, but instead by the government's effort to compel a witness to testify over the witness's claim of privilege." *Warshak*, 631 F.3d at 293.

Thus, "no court [has] applied the fruit-of-the-poisonous-tree doctrine to derivative evidence obtained as a result of improper access to materials covered by a non-constitutional privilege," *Warshak*, 631 F.3d at 294, and unsurprisingly the defendant has not cited a single case where a court ordered blanket suppression or invalidation of subsequent search warrants following the seizure or use of privileged material. *Cf. Patel*, 2017 WL 3394607, at *6 (noting that the parties had not "identified any instances where a court authorized blanket suppression or invalidation of a search warrant following seizure of privileged material").

## III.     The Defendant's Motion For Early Disclosure of *Giglio* and Jencks Act Material Should Be Denied

### A.     Relevant Facts

The parties have repeatedly agreed upon, and the Court has repeatedly adopted, a comprehensive, fair, and reasonable timeline for mutual pretrial disclosures, including with respect to 18 U.S.C. § 3500 material.

On October 8, 2019, the late Honorable Deborah A. Batts, United States District Judge for the Southern District of New York, scheduled the trial in this case for April 21, 2020. On March 5, 2020, the parties jointly submitted a proposed schedule with respect to the exchange of certain material and information prior to and during trial, including the production of § 3500 material. (Dkt. No. 44.) Specifically, the parties agreed that the Government would produce § 3500 material one week before trial.[9] (*Id*. at 1.) This Court adopted the parties' proposed schedule. (Dkt. No. 45.)

On March 23, 2020, the parties jointly proposed that the trial be adjourned to July 14, 2020,

---

[9]     The Government and the defendant agreed upon and abided by a similar schedule for mutual pretrial disclosures in connection with the trial in the Extortion Case.

in light of the onset of the COVID-19 pandemic. (Dkt. No. 48.) In that submission, the parties again jointly submitted a proposed schedule with respect to pretrial disclosures, including the production of § 3500 material. (*Id.* at 2.) As with the prior proposal, the parties agreed that the Government would produce § 3500 material one week before trial. (*Id.*) This Court again adopted the parties' proposed schedule. (Dkt. No. 49.)

On May 15, 2020, the parties jointly proposed that the trial be adjourned to October 2020 or as soon thereafter as the Court's calendar would permit. (Dkt. No. 50.) In that request, the parties reaffirmed their commitment to the jointly agreed pretrial disclosure schedule, and informed the Court that they would "amend [it] . . . to correspond to any new trial date the Court may set, and submit that schedule for the Court's endorsement." (*Id.* at 1.) After the Court adjourned the trial to October 13, 2020, the parties again jointly submitted a proposed schedule for pretrial disclosures, including the production of § 3500 material one week before trial. (Dkt. Nos. 54, 54-1 at 2-3.) This Court again adopted the parties' proposed schedule. (Dkt. No. 55 at 2-3.)

On January 8, 2021, this Court adjourned the trial to January 10, 2022. (Dkt. No. 103.) The Government has informed the defendant that it remains committed to the parties' previously agreed-upon schedule for pretrial disclosures, provided that the defendant also abide by that same schedule. The defendant has declined to stand by his prior agreement, and now seeks an order from the Court in direct contravention of his previous agreement with the Government.

## B.   Applicable Law

It is the standard practice in this District that *Giglio* material is produced shortly in advance of trial, together with § 3500 material, a practice that has been widely held to be sufficient to satisfy the requirement that *Giglio* be produced "in sufficient time that the defendant will have a

reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (noting, and approving over defense objection, Government's agreement to produce *Giglio* material at same time as *Jencks* Act disclosures); *United States v. Trippe*, 171 F. Supp. 2d 230, 238 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as *Jencks* Act material[.]"). Immediate disclosure of such material is not warranted simply because the defendant prefers it. *See, e.g.*, *United States v. Kenyatta*, No. 16 Cr. 273 (DLC), 2017 WL 972114, at *3 (S.D.N.Y. Mar. 9, 2017) (denying motion to compel production of *Giglio* material because the Government "asserts . . . that it will provide any *Giglio* and Jencks material before the start of trial pursuant to its customary schedule for such productions, and in sufficient time for defense counsel to prepare to cross examine its witnesses"); *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *23 (S.D.N.Y. Jan. 18, 2017) (denying defendant's motion for immediate disclosure of *Giglio* material as defendant "fails to articulate any persuasive reason why immediate disclosure is required in this case, and the Court otherwise sees no basis to deviate so substantially from the typical practice"); *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013) (denying request for early production of Jencks Act material); *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *6 (S.D.N.Y. Jan. 6, 2010) (declining to order immediate disclosure of *Giglio* material, because the Government stated it would provide both *Giglio* and Jencks Act material "shortly before trial"); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis

in the law.").

The Jencks Act provides that "[i]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). In addition, Rule 16 exempts from production, prior to trial, the materials sought: "[T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2). In light of these provisions, requests for discovery of Jencks Act materials in advance of trial are uniformly denied in this District. Indeed, there is no legal basis for a court to order the disclosure of statements of Government witnesses before their direct testimony at trial. *See In re United States*, 834 F.2d 283, 284-87 (2d Cir. 1987) (issuing a writ of mandamus reversing District Court's order directing the Government "to produce all oral statement made by the defendants and coconspirators that the Government planned to offer at trial as admissions of a defendant" under Fed. R. Evid. 801); *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974); *United States v. Sebastian*, 497 F.2d 1267, 1268-69 (2d Cir. 1974); *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir.

1974).[10]

### C.     Discussion

As an initial matter, the Government takes seriously its disclosure obligations, including those arising under Rule 16, *Brady* and its progeny, and *Giglio* and its progeny, and has complied and will continue to comply fully with those obligations. The Government intends to do so irrespective of whether the defendant specifically requests such material, or how he characterizes that material.

The defendant asserts that *Giglio* material must be produced immediately. This argument is foreclosed by the law of this Circuit. As noted above, controlling law provides that impeachment or so-called *Giglio* material need only be produced "in time for its effective use at trial," *United States v. Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting authorities), which the Second Circuit and the judges of this District have repeatedly construed as shortly before the witness is expected to actually testify, generally several days before trial, *see, e.g.*, *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001); *Wey*, 2017 WL 237651, at *23 ("[I]t is a widely recognized customary practice in this District that *Giglio* material is turned over at the same time as material under the [Jencks] Act . . . . Both types of material are typically produced a week or two before the start of trial, depending on the complexity of the case.") (quotation marks and citations omitted); *United States v. Canter*, 338 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2004) (denying request for order compelling disclosure of *Brady*, *Giglio* and Jencks Act material 30 days prior to

---

[10]     The defendant's motion failed to acknowledge that he already has possession of all *Giglio* and Jencks Act materials that were produced in advance of the trial in the Extortion Case for Judy Regnier, who testified at that trial.

trial); *Trippe*, 171 F. Supp. 2d at 237 ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify"); *United States v. Rueb*, No. 00 Cr. 91 (RWS), 2001 WL 96177, at *6-7 (S.D.N.Y. Feb. 5, 2001) (Government directed to provide *Giglio* material at least one day before calling the relevant witness to testify).

Notably, the defendant makes no effort to explain why in the circumstances of this case it would be necessary to disclose impeachment material to make effective use of it some seven months prior to the start of trial, which would be far out of line with what has occurred in even the most complex cases tried in this district, let alone a straightforward fraud case such as this one. In fact, the defendant has effectively conceded that there is no reason he needs this material more than a week prior to the start of trial, inasmuch he previously agreed, on multiple occasions, to such a schedule, which was repeatedly adopted by the Court.

The defendant's request also goes far beyond the scope of potential impeachment material, requesting that the Court order early production of swaths of Jencks Act material. (*See* Def.'s Mot. 27.) "[I]n fact, the Court cannot order early disclosure of statements subject to production under the Jencks Act." *United States v. Fernandez*, No. 17 Cr. 167 (JMF), 2017 WL 6372783, at *1 (S.D.N.Y. Dec. 12, 2017) (citing 18 U.S.C. § 3500; *Coppa*, 267 F.3d at 145 n.10); *see also, e.g.*, *United States v. Conyers*, No. S13 15 Cr. 537 (VEC), 2016 WL 7189850, at *8 (S.D.N.Y. Dec. 9, 2016) (denying motion for early disclosure because "the Jencks Act precludes the Court from compelling disclosure of such materials before the relevant witness testifies at trial"); *United States v. Ramirez*, No. 91 Cr. 493 (KMW), 1991 WL 177239, at *1 (S.D.N.Y. Aug. 30, 1991) (denying motion for production of Jencks Act material because "the court has no authority to order

the government to do so"). As explained above, the Government is prepared to stand by the parties'
prior agreement regarding mutual pretrial disclosures, provided that the defendant fulfills his
obligations pursuant to that agreement. In any event, any deadline for production of Jencks Act
material in advance of trial must be set through discussion between the parties, not a defense
motion.

## **CONCLUSION**

For the reasons set forth above, the defendant's motions should be denied.

Dated: New York, New York
June 1, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:    _Robert B. Sobelman_
       _____
       Matthew Podolsky
       Robert B. Sobelman
       Assistant United States Attorneys
       Tel.: (212) 637-1947/2616

33