UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                      :
UNITED STATES OF AMERICA,                                             :
                                                                      :
            -v-                                                       :
                                                                      :            19-CR-374-1 (JMF)
MICHAEL AVENATTI,                                                     :
                                                                      :            <u>OPINION AND ORDER</u>
                           Defendant.                                 :
                                                                      :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

The Sixth Amendment to the Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The Supreme Court has interpreted this guarantee to require the appointment of counsel, at public expense, to represent indigent defendants in most criminal cases.  *See Alabama v. Shelton*, 535 U.S. 654 (2002); *Gideon v. Wainwright*, 372 U.S. 335 (1963).  The Criminal Justice Act ("CJA"), enacted by Congress in 1964, governs such appointments in federal criminal cases.  *See* 18 U.S.C. § 3006A.  To the extent relevant here, it mandates the appointment of counsel for any person charged with a felony if the court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel."  *Id.* § 3006A(b).  The Act itself does not prescribe what form the court's required "inquiry" must take.  In practice, however, it usually involves the defendant's submission of an affidavit describing his or her financial circumstances.  To that end, the Administrative Office of the United States Courts has created a standard form for the purpose, commonly known as CJA Form 23.

The questions presented here are whether or when the CJA Form 23 or similar documents may be sealed and whether or when they must be made available to the public — questions that

are surprisingly unsettled despite the more than half century of experience with the CJA.  They

arise in connection with the prosecution of Michael Avenatti, a formerly high-profile and

seemingly successful lawyer, for an alleged scheme to defraud a former client.  In August 2020,

the Court appointed counsel for Avenatti pursuant to the CJA based on affidavits he had filed

attesting to his inability to afford counsel.  The Court temporarily granted Avenatti's request to

file the affidavits under seal — and did the same with respect to affidavits he has since filed

attesting to his continuing eligibility (together with the initial affidavits, the "Financial

Affidavits") — but directed him to show cause why they should remain sealed.  He argues that

sealing is necessary to protect his Fifth Amendment privilege against self-incrimination because

the Government could use his statements in the affidavits against him.  A member of the press,

having intervened, argues that the affidavits must be disclosed because they qualify as judicial

documents to which the public, under the common law and the First Amendment, has a right of

access and that Avenatti's Fifth Amendment interests do not outweigh the public's rights.

        For the reasons that follow, the Court holds that Avenatti's Financial Affidavits are

indeed judicial documents subject to the common law and First Amendment rights of public

access.  Additionally, in light of Second Circuit precedent emphasizing that determinations

regarding the appointment of counsel pursuant to the CJA should be made in traditional, open

adversary proceedings and holding that a defendant's Fifth Amendment interests are adequately

protected by a prohibition on the use of the defendant's statements as part of the prosecution's

case-in-chief, the Court concludes that there are no countervailing factors or higher values

sufficient to outweigh the public's right to access the documents.  Accordingly, and for the

reasons that follow, the Court holds that Avenatti's Financial Affidavits must be unsealed

(subject to the possibility of narrowly tailored redactions to serve other interests).

## BACKGROUND

The Court begins with a brief discussion of the relevant background, starting with the CJA and the role of the documents at issue here and then turning to the history of this case.

### A. The Criminal Justice Act

Congress enacted the CJA to effectuate the Sixth Amendment right to counsel "[i]n all criminal prosecutions," U.S. Const. amend. VI, which the Supreme Court has construed to mean that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial," *Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972). The Act "establishes the broad institutional framework for appointing counsel for a criminal defendant who is financially unable to obtain representation." *United States v. Parker*, 439 F.3d 81, 91 (2d Cir. 2006). It provides that "[e]ach United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). In accordance with the Act, this District has a Plan for Furnishing Representation Pursuant to the Criminal Justice Act (the "CJA Plan"), the operative version of which was adopted in 2019. *See* U.S. DIST. CT., S. DIST. OF N.Y., REVISED PLAN FOR FURNISHING REPRESENTATION PURSUANT TO THE CRIMINAL JUSTICE ACT (2019), https://www.nysd.uscourts.gov/sites/default/files/2019-11/1-2019-plan-final-october.pdf ("CJA Plan").

To the extent relevant here, the CJA mandates the appointment of counsel "for any person" charged with a felony offense who is "financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a); *see id.* § 3006A(c) (providing for the appointment of counsel if, "at any stage of the proceedings, . . . the court finds that the person is financially

unable to pay counsel whom he had retained").  The Court may appoint counsel in this manner, however, only "if [it is] satisfied after appropriate inquiry that the [defendant] is financially unable to obtain counsel."  *Id.* § 3006A(b).  It is the defendant's burden to establish financial eligibility.  *See United States v. O'Neil*, 118 F.3d 65, 74 (2d Cir. 1997).  The court's inquiry is usually based, at least in part, on information "provided by the person seeking the appointment of counsel either: 1) by affidavit sworn to before a district judge, magistrate judge, court clerk, deputy clerk, or notary public; or 2) under oath in open court before a district judge or magistrate judge."  CJA Plan 5; *see Parker*, 439 F.3d at 93 ("Courts have utilized a broad range of considerations in conducting an 'appropriate inquiry' into financial eligibility under 18 U.S.C. § 3006A. . . .  In many cases, the court's inquiry may properly be limited to review of financial information supplied on the standard form financial affidavit." (internal quotation marks omitted)).  Indeed, the CJA Plan provides that, "[w]henever possible," a defendant "shall" complete and use a standard financial affidavit created by the Administrative Office of the United States Courts — known as CJA Form 23, a blank copy of which is attached as Exhibit A.  CJA Plan 5.  "CJA Form 23, a standard financial affidavit, requires comprehensive financial data, including employment income of the defendant and his or her spouse; all other income, cash, and property; identification of the defendant's dependents; and all obligations, debts, and monthly bills."  *Parker*, 439 F.3d at 86 (internal quotation marks omitted).

Notably, the CJA explicitly provides that a defendant may seek certain services — namely, "investigative, expert, or other services necessary for adequate representation" — by way of "an ex parte application" and provides that a court's determination of an application for such services is to be made "after appropriate inquiry in an ex parte proceeding."  18 U.S.C. § 3006A(e)(1).  Another subsection of the Act provides that "the amounts paid . . . for services in

any case shall be made available to the public . . . upon the court's approval of the payment," but it permits a court to delay or limit such disclosure if necessary to protect, among other things, "any person's 5th amendment right against self-incrimination," "the defendant's 6th amendment rights to effective assistance of counsel," "the defendant's attorney-client privilege" or "the work product privilege of the defendant's counsel."  *Id.* § 3006A(d)(4).  By contrast, the CJA is conspicuously silent on how a court should handle documents demonstrating a defendant's financial eligibility for appointed counsel in the first instance — that is, whether and when such documents (including but not limited to the CJA Form 23) should be sealed or disclosed and whether and whether or how they may be used.  This District's CJA Plan, however, provides that "[t]he Government may not use as part of its direct case, other than a prosecution for perjury or false statements, any information provided by a defendant in connection with his or her request for the appointment of counsel pursuant to this Plan."  CJA Plan 6.

Meanwhile, the Judicial Conference of the United States (in its Guide to Judiciary Policy and its current Policy on Privacy and Public Access to Electronic Case Files) and the Advisory Committee on the Criminal Rules (in the Advisory Committee note to Rule 49.1 of the Federal Rules of Criminal Procedure) have gone further, stating that "financial affidavits filed in seeking representation pursuant to" the CJA and "ex parte requests for authorization of investigative, expert or other services pursuant to" the CJA "shall not be included in the public case file and should not be made available to the public at the courthouse or via remote electronic access." Fed. R. Crim. P. 49.1 note; 10 Jud. Conf. of the U.S, Guide to Judiciary Policy § 340; Jud. Conf. of the U.S., *Judicial Conference Policy on Privacy and Public Access to Electronic Case Files* (March 2008), https://www.uscourts.gov/rules-policies/judiciary-policies/privacy-policy-electronic-case-files.  Neither explains the rationale for that direction, but the Advisory

Committee note cites March 2004 Guidance from the Judicial Conference Committee on Court Administration and Case Management ("CACM").  The CACM Guidance, in turn, provides no explanation of why "financial affidavits filed in seeking representation pursuant to" the CJA made its list of documents to be withheld from the public or how the list was compiled, noting only that "because of the security and law enforcement issues unique to criminal case file information, some specific criminal case file documents will not be available to the public remotely or at the courthouse."  JUD. CONF. COMM. ON CT. ADMIN. & CASE MGMT., GUIDANCE FOR IMPLEMENTATION OF THE JUDICIAL CONFERENCE POLICY ON PRIVACY AND PUBLIC ACCESS TO ELECTRONIC CRIMINAL CASE FILES 3, 5 (2004), https://www.uscourts.gov/sites/default/files/implement031604.pdf.

## B.  Relevant Factual Background

Until 2019, Avenatti was a high-profile attorney who, at least publicly, seemed to be quite financially successful.  As he describes it in a submission unrelated to the treatment of his Financial Affidavits, as of early 2018, he "was a practicing civil trial lawyer in California who had obtained numerous multi-million dollar judgments for his clients through various verdicts and settlements in courts throughout the United States.  Many of Mr. Avenatti's cases received extensive local and national press coverage."  ECF No. 115, at 6.  In February 2018, Avenatti was hired to represent Stephanie Clifford, an adult entertainer more commonly known by her stage name, Stormy Daniels, "in connection with various matters relating to her previous liaison with the 45th President of the United States," Donald J. Trump.  *Id.* at 6.  As part of what he describes as "an extensive legal and media strategy," Avenatti "represented Ms. Clifford in various forums, including the court of public opinion."  *Id.* at 7.  As a result, it is fair to say that by late 2018, Avenatti, like Ms. Clifford, had become "a household name."  *Id.*

Avenatti's life took a dramatic turn in early 2019.  First, in March 2019, he was arrested and charged in this District with bank and wire fraud related to an alleged scheme to extort Nike ("*Avenatti I*").  *See* Sealed Compl., *United States v. Avenatti*, No. 19-CR-373 (PGG) (S.D.N.Y. March 24, 2019), ECF No. 1.  Then, in April 2019, he was indicted in the Central District of California on charges stemming from an alleged scheme to defraud and embezzle several of his clients.  Indictment, *United States v. Avenatti*, No. 8:19-CR-61 (JVS) (C.D. Cal. Apr. 19, 2019), ECF No. 16.  Finally, in May 2019, he was indicted in this case with a scheme to defraud Ms. Clifford.  *See* ECF No. 1 ("Indictment").  In February 2020, after a trial before Judge Gardephe, a jury found Avenatti guilty of transmission of interstate communications with intent to extort (Count One), attempted extortion (Count Two), and honest services wire fraud (Count Three) in *Avenatti I*.  *See* Verdict, *Avenatti I*, No. 19-CR-373 (PGG) (S.D.N.Y. Feb. 14, 2020), ECF No. 265.  On July 8, 2021, Judge Gardephe sentenced him to twenty-four months' imprisonment on Count One and thirty months' imprisonment on Counts Two and Three, with all terms to be served concurrently.  Judgment, *Avenatti I*, No. 19-CR-373 (PGG) (S.D.N.Y. July 15, 20201, ECF No. 339.  The California case, meanwhile, was severed into two sets of charges.  Trial on one set of the charges began July 13, 2021.  Minutes, *United States v. Avenatti*, No. 8:19-CR-61 (JVS) (C.D. Cal. July 13, 2021), ECF No. 553.  The second trial is scheduled to begin October 12, 2021.  *See* Order, *United States v. Avenatti*, No. 8:19-CR-61 (JVS) (C.D. Cal. Nov. 13, 2020), ECF No. 386.

In this case, trial was originally scheduled to begin on April 21, 2020, ECF Nos. 23, 36, but due to the COVID-19 pandemic it was adjourned to January 10, 2022, ECF No. 103.  On July 27, 2020, the attorneys who had been retained to represent Avenatti moved to withdraw, *see* ECF No. 61, and shortly thereafter, he applied for an order pursuant to the CJA appointing the

Federal Defenders of New York to be his counsel going forward, ECF No. 66.  To demonstrate his eligibility for appointment of counsel, Avenatti filed a CJA Form 23 and an attached declaration (together, the "Initial Financial Affidavit").  By letter dated July 31, 2020, his then-counsel moved for the Initial Financial Affidavit to be kept under seal until the conclusion of these proceedings and the criminal proceedings pending against Avenatti in the Central District of California.  *See* ECF No. 68.  In support of that request, counsel explained only that the judge presiding over the California case had granted a request two days earlier to seal the same documents.  *See id.*  "A contrary ruling in this case," counsel contended, "would frustrate [the California] Order and prejudice Mr. Avenatti."  *Id.*  The Court granted the request.  *Id.*

On August 7, 2020, during a conference conducted on the record by telephone, the Court granted counsel's motion to withdraw.  ECF No. 87 ("Aug. 7, 2020 Tr."), at 13; *see also* ECF No. 73.  Based on a review of the Initial Financial Affidavit, the Court found that Avenatti was eligible for the appointment of counsel and, on that basis, appointed Federal Defenders to be his new counsel.  *See* Aug. 7, 2020 Tr. 15; ECF No. 73.  In doing so, however, the Court noted Avenatti's acknowledgement in the Initial Financial Affidavit that he had "certain assets" with an "undetermined" value "that might yield funds in the future such as contingency lawsuits and the like."  Aug. 7, 2020 Tr. 15.  That raised "the possibility, however remote," that Avenatti's financial circumstances could change such that he would no longer be eligible for appointed counsel.  *Id.* at 16.  To ensure that it would be aware of any such change, the Court ordered Avenatti to submit an affidavit every four months "regarding his financial circumstances and noting with specificity any change in those circumstances since the prior affidavit."  *Id.*  The Court also directed counsel from Federal Defenders to keep track of their hours to ensure that, if there was a basis to do so, it could order Avenatti to reimburse the taxpayers for legal fees.  *Id.*;

*see* 18 U.S.C. § 3006A(f) ("Whenever the . . . court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . to the court for deposit in the Treasury as a reimbursement to the appropriation . . . .").

Additionally, the Court ordered Avenatti to show cause in writing why the Initial Financial Affidavit (and, by implication, any of the affidavits to be filed every four months thereafter) should not be unsealed.  Aug. 7, 2020 Tr. 10-12; ECF No. 73.  The Court noted that, "upon reflection," it had decided that "the question of whether [the Initial Financial Affidavit] should be public in this case warrants further briefing."  Aug. 7, 2020 Tr. 10.  The Court acknowledged that the documents may "contain private information or information that Mr. Avenatti may not want to share with the public.  But at the same time, there is obviously some public interest in ensuring that taxpayer dollars are spent appropriately," particularly "given that not long ago, Mr. Avenatti certainly had sufficient funds to afford plenty of lawyers."  *Id.* at 10-11.  The Court noted also that the mere fact that the California judge had agreed to seal a similar document — the sole basis for Avenatti's July 31, 2020 application to seal — was not sufficient reason to maintain the Initial Financial Affidavit under seal, particularly because the law on public access in the Second and Ninth Circuits might differ.  *Id.* at 11.  In response to the Court's Order, Avenatti filed a letter brief arguing that the Initial Financial Affidavit should remain under seal.  ECF No. 80 ("Def.'s Mem.").  Thereafter, the Court received submissions from Inner City Press, a media outlet that intervened to seek disclosure of the Financial Affidavits, ECF Nos. 85, 90, 99; a letter from the Government, ECF No. 86 ("Gov't Opp'n"); and additional submissions from Avenatti, ECF Nos. 89 ("Def.'s Reply"), 91 ("Def.'s Sur-Reply").  Since that

time, in compliance with the Court's directives, Avenatti has filed supplemental affidavits every four months, all of which — like the Initial Financial Affidavit itself — remain under seal.

## DISCUSSION

Avenatti contends that his Financial Affidavits should remain under seal in their entirety. His primary argument is that sealing the documents is necessary to safeguard his Fifth Amendment privilege against self-incrimination because "there is a real and appreciable risk" that the Government will use his sworn statements against him." Def.'s Mem. 1. But he also disputes the proposition, advanced primarily by Inner City Press, ECF No. 85, at 2-3; ECF No. 99, at 2-3,[1] that the documents are judicial documents subject to a right of public access in the first instance. *See* Def.'s Reply 1 n.1; Def.'s Sur-Reply 1.[2] In the alternative, Avenatti asks the Court to delay disclosure of his Financial Affidavits until after the Government has presented its case-in-chief at trial and to give him an opportunity to propose redactions to the documents. *See* Def.'s Reply 4-5. The Court will begin with an overview of the well-established legal principles that govern whether and when the public has either a First Amendment or common law right to access documents in criminal cases before explaining why, in light of those principles, disclosure of Avenatti's Financial Affidavits (subject to the possibility of narrowly tailored redactions) is required.

---

[1]     References to page numbers in the submissions by Inner City Press are to the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

[2]     The Defendant initially argued that the Government lacked standing "to assert any right on behalf of the public to access Mr. Avenatti's sworn financial statements." Def.'s Mem. 7 n.1 (citing *United States v. Hickey*, 185 F.3d 1064 (9th Cir. 1999)). Subsequently, however, the Court granted leave to Inner City Press to be heard on the Defendant's motion, ECF No. 85, which indisputably does have standing to assert such rights.

**A.  Applicable Legal Principles Regarding Public Access to Judicial Documents**

It is well established that the First Amendment provides a qualified right of access to criminal proceedings, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (plurality op.), including pretrial proceedings, *Press-Enter. Co. v. Superior Ct.* ("*Press-Enter. II*"), 478 U.S. 1, 10 (1986), and to certain documents filed in connection with criminal proceedings, *see United States v. Biaggi* (*In re N.Y. Times Co.*), 828 F.2d 110, 114 (2d Cir. 1987); *see also Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004) ("[O]ur precedents establish[] the public's and the press's qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.").  Separate and apart from the First Amendment, the common law provides a "right of public access to judicial documents." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  The common law right arises from "the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice."  *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1048 (2d Cir. 1995).

In light of the common law presumption in favor of public access, "the Second Circuit has established a three-part test for determining whether documents may be placed under seal." *Coscarelli v. ESquared Hosp. LLC*, No. 18-CV-5943 (JMF), 2020 WL 6802516, at *1 (S.D.N.Y. Nov. 19, 2020).  First, a court must determine whether "the documents at issue are indeed 'judicial documents'" to which the "presumption of access attaches."  *Lugosch*, 435 F.3d at 119. The Second Circuit has defined a "judicial document" as one that is "relevant to the performance of the judicial function and useful in the judicial process," *United States v. Amodeo* ("*Amodeo I*"), 44 F.3d 141, 145 (2d Cir. 1995).  "A document is . . . relevant to the performance of the

judicial function if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (internal quotation marks omitted).  Second, the court "must determine the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Lugosch*, 435 F.3d at 119 (internal quotation marks omitted).  "The weight of the common law presumption is strongest for 'matters that directly affect an adjudication . . . .'" *United States v. Correia*, No. 19-CR-725-3 (JPO), 2020 WL 6683097, at *1 (S.D.N.Y. Nov. 12, 2020) (quoting *Lugosch*, 435 F.3d at 119). "Finally, . . . the court must balance competing considerations," including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure," against the presumption. *Lugosch*, 435 F.3d at 120 (internal quotation marks omitted).

Separate and apart from whether the common law presumption of access mandates disclosure of a document, the Court must determine "whether a First Amendment presumption of access also exists," because the constitutional presumption "gives rise to a higher burden on the party seeking to prevent disclosure than does the common law presumption." *Id.* at 124, 126.  In determining whether a First Amendment right of access attaches to a particular filing, courts should consider (1) whether the filing at issue has "historically been open to the press and general public" and (2) whether "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. II*, 478 U.S. at 8.  A court should also ask "whether the documents at issue 'are derived from or are a necessary corollary of the capacity to

attend the relevant proceedings.'"  *Newsday LLC v. County of Nassau*, 730 F.3d 156, 164 (2d

Cir. 2013) (quoting *Lugosch,* 435 F.3d at 120).  Applying these tests, "[t]he Second Circuit has

recognized a qualified First Amendment right of access to a wide variety of judicial documents

associated with criminal proceedings, including pretrial suppression hearings, suppression

motion papers, voir dire, and more."  *Correia*, 2020 WL 6683097, at *2.  "Indeed, the Second

Circuit has consistently affirmed that the right of access applies to 'judicial documents' in

criminal cases."  *United States v. Smith*, 985 F. Supp. 2d 506, 517 (S.D.N.Y. 2013) (citing

cases).  If the "more stringent First Amendment framework applies, continued sealing of the

documents may be justified only with specific, on-the-record findings that sealing is necessary to

preserve higher values and only if the sealing order is narrowly tailored to achieve that aim."

*Lugosch*, 435 F.3d at 124 (*citing In re N.Y. Times*, 828 F.2d at 116).

## A.  The Rights of Public Access Apply to Avenatti's Financial Affidavits

As an initial matter, there is no question that the Financial Affidavits are judicial

documents subject to the common law presumption of public access.  As discussed above, the

Second Circuit has broadly defined a "judicial document" for purposes of the common law as a

document that is "relevant to the performance of the judicial function" — meaning "it would

reasonably have the *tendency* to influence a district court's ruling on a motion" —  "and useful in

the judicial process."  *Brown*, 929 F.3d at 49 (internal quotation marks omitted).  CJA Form 23s

generally — and, *a fortiori*, the Financial Affidavits specifically — "fit comfortably within the

Second Circuit's capacious definition," *Correia*, 2020 WL 6683097, at *1: They are relevant,

indeed critical, to the "appropriate inquiry" a court is statutorily mandated to conduct when

tasked with determining if a criminal defendant is financially eligible for appointment of counsel

at public expense.  18 U.S.C. § 3006A(b); *see Parker*, 439 F.3d at 93-96 (discussing the role of

13

CJA Form 23s in connection with fulfilling the CJA's mandate to conduct "appropriate inquiry" regarding the eligibility for appointment of counsel); 7 Jud. Conf. of the U.S, Guide to Judiciary Policy § 210.40.20(a) ("The determination of eligibility for representation under the CJA is a *judicial function* to be performed by the court or U.S. magistrate judge after making appropriate inquiries concerning the person's financial condition." (emphasis added)); *see also, e.g.*, *United States v. Hadden*, No. 20-CR-468 (RMB), 2020 WL 7640672, at *2 (S.D.N.Y. Dec. 23, 2020) (rejecting a request to seal financial statements submitted in connection with an application for CJA counsel "because the documents are both useful and relevant to the judicial process and the application for appointed counsel").

So too, the Court concludes that there is a qualified First Amendment right of access to the Financial Affidavits. Significantly, the Second Circuit addressed a similar issue in *United States v. Suarez*, 880 F.2d 626 (2d Cir. 1989), holding that there is a First Amendment right to access to "CJA forms on which judicial officers have approved payments to attorneys or to others who provided expert or other services to appellants, such as investigators, interpreters and computer experts," *id.* at 629-30. Citing "recent decisions . . . dealing with the public's right of access to courtroom proceedings in criminal cases and to papers filed in connection with them," the court held that "the principles" of these cases applied to the CJA forms at issue given that they "were submitted to the federal district judge in charge of the criminal case . . . and the submission was obviously in connection with the criminal proceeding." *Id.* at 630-31. The court acknowledged that "there is no long tradition of accessibility to CJA forms," but it noted "that is because the CJA itself is, in terms of tradition, a fairly recent development." *Id.* at 631 (internal quotation marks omitted). Moreover, the court reasoned, "[t]he lack of tradition with respect to the CJA forms does not detract from the public's strong interest in how its funds are being spent

in the administration of criminal justice and what amounts of public funds are paid to particular private attorneys or firms." *Id.* (internal quotation marks omitted).  The court concluded: "Because there is no persuasive reason to ignore the presumption of openness that applies to documents submitted in connection with a criminal proceeding, . . . the public has a qualified First Amendment right of access to the CJA forms after payment has been approved." *Id.*

*Suarez* all but compels the conclusion that the Financial Affidavits at issue here are judicial documents subject to the First Amendment right of public access.  *See Correia*, 2020 WL 6683097, at *2 ("The Court sees no reason why the declarations at issue depart from judicial documents associated with criminal pretrial proceedings as to which the Second Circuit has previously recognized the First Amendment right of access." (citing *Suarez*, 880 F.2d at 631)). In fact, if anything, there is a stronger argument for granting First Amendment status to the CJA Form 23 and similar documents than there was for granting it to the forms at issue in *Suarez*. Whereas the forms at issue in *Suarez* provided only "barebones data" regarding "who was paid, how much and for what services," 880 F.2d at 631 (internal quotation marks omitted), the CJA Form 23 plays a critical role in the determination of an applicant's substantive right to appointed counsel under both the CJA and the Sixth Amendment — a right that is fundamental to the fairness of many criminal trials and the criminal justice system as a whole.  In addition, an applicant's statements on the CJA Form 23 are subject to the penalties of perjury, the court's inquiry is generally made in the context of the adversarial process, and the decision to deny or terminate appointed counsel can be appealed.  *See, e.g.*, *United States v. Harris*, 707 F.2d 653, 658, 660-62 (2d Cir. 1983); *see also United States v. Coniam*, 574 F. Supp. 615, 617 (D. Conn. 1983) (noting the "role of the government" and the "adversarial process" in "[e]nsur[ing] the propriety of [a] defendant's receipt of services of counsel under the CJA").

In short, here, as in *Suarez*, "there is no persuasive reason to ignore the presumption of openness that applies to documents submitted in connection with a criminal proceeding."  880 F.2d at 631.  Put differently, "public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enter. II*, 478 U.S. at 8-9.  Much like the right to a public trial generally, the right to public access here ensures that "the public may see [a defendant] is fairly dealt with and not unjustly" denied an important substantive right.  *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (internal quotation marks omitted).  Further, knowledge that the form is subject to public scrutiny serves to "keep [a defendant's] triers keenly alive to a sense of their responsibility and to the importance of their functions" — that is, it helps ensure "that judge and prosecutor carry out their duties responsibly" — and it "discourages perjury."  *Id.* (internal quotation marks omitted).  Critically, these values inhere even where there is no reason to believe that an applicant has lied, and the prosecution does not question the applicant's eligibility for the appointment of counsel.  That is, "the sure knowledge that *anyone* is free" to access a CJA Form 23 "gives assurance that established procedures are being followed and that deviations will become known."  *Press-Enter. Co. v. Superior Ct.* ("*Press-Enter. I*"), 464 U.S. 501, 508 (1984).  While public scrutiny "will more likely bring to light any errors that do occur, it is the openness of the [document] itself, regardless of [what is actually in the document or whether anyone accesses it], that imparts 'the appearance of fairness so essential to public confidence in the system' as a whole."  *United States v. Gupta*, 699 F.3d 682, 689 (2d Cir. 2012) (quoting *Press-Enter. I*, 464 U.S. at 508).

Notably, Avenatti barely disputes that the Financial Affidavits are subject to both the First Amendment right of public access and the common law presumption in favor of public access.  Indeed, he relegates the issue to a footnote in his reply, *see* Def.'s Reply 2 n.1, and to

one sentence in his sur-reply, *see* Def.'s Sur-Reply 1, neither of which is sufficient to raise the

issue, *see, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently

argued in the briefs are considered waived . . . ."); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327

F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (stating that an argument "relegated to a footnote . . . does not

suffice to raise [an] issue" and citing cases).  In any event, his argument is easily rejected, as he

relies solely on the majority opinion in *United States v. Connolly* (*In re Boston Herald, Inc.*), 321

F.3d 174 (1st Cir. 2003).  The *Boston Herald* majority did indeed hold (in what appears to be the

only court of appeals decision squarely addressing the issue) "that neither the First Amendment

nor the common law provides a right of access to financial documents submitted with an initial

application to demonstrate a defendant's eligibility for CJA assistance."  *Id.* at 191.  But that

holding is obviously not binding here and, if the Court were writing on a blank slate, it would

conclude that Judge Lipez, writing in dissent, had the better of the argument.  *See id.* at 191-206

(Lipez, J., dissenting).  In any event, the Court does not write on a blank slate, but is bound by

both *Suarez* and the Second Circuit's broad definition of "judicial documents" for purposes of

the common law right.  As Judge Lipez's dissent confirms, it is difficult, if not impossible, to

reconcile the *Boston Herald* majority's analysis and conclusion with these precedents.  *See id.* at

200-01 & n.13 (Lipez, J., dissenting) (relying on *Suarez*).

In sum, the Financial Affidavits are subject to a right of public access under both the First

Amendment and the common law.  That said, this "right of access . . . is a qualified one; it is not

absolute."  *Suarez*, 880 F.2d at 631.  Thus, the Financial Affidavits "may be kept under seal if

'countervailing factors' in the common law framework or 'higher values' in the First

Amendment framework so demand." *Lugosch*, 435 F.3d at 124.  That is the primary basis on which Avenatti resists disclosure.  To these arguments, the Court thus turns.[3]

### B.  There Are No Countervailing Factors or Higher Values that Justify Sealing

Avenatti proffers only one countervailing factor or higher value in an effort to justify sealing of the Financial Affidavit: his Fifth Amendment privilege against self-incrimination. Avenatti argues that he "was compelled to make" the statements in the Financial Affidavit "to obtain counsel under the Sixth Amendment."  Def.'s Mem. 1.  "His Fifth Amendment right against self-incrimination," Avenatti continues, "prevents those very same statements from being weaponized against him."  *Id.* at 4; *see* Def.'s Mem. 4-9; Def.'s Reply 2-4.

The courts of appeals have taken varying approaches to the question of whether and when CJA Form 23s can or should be sealed, *see United States v. Hilsen*, No. 03-CR-919 (RWS), 2004 WL 2284388, at *8-9 & nn.7-9 (S.D.N.Y. Oct. 12, 2004) (citing and discussing cases), but at least one — the Eighth Circuit — has adopted the theory pressed by Avenatti in explicitly approving the sealing of CJA Form 23s, *see United States v. Anderson*, 567 F.2d 839, 840-41

---

[3]     Strictly speaking, the second step of the common law analysis is to "determine the weight" of the presumption in favor of public access, which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Lugosch*, 435 F.3d at 119 (internal quotation marks omitted).  In *Correia*, Judge Oetken concluded that similar documents (namely, declarations submitted by counsel explaining a defendant's non-payment as the reason for a motion to withdraw) were subject to only a "moderate presumption of access" because they "related to the court's supervision or management of counsel, authority ancillary to the court's core role in adjudicating a case, and closer in nature to filings associated with discovery or in limine proceedings than to dispositive motions or trial documents."  2020 WL 6683097, at *1 (cleaned up).  By contrast, in *Boston Herald*, Judge Lipez took the position that "the CJA Form 23 information unmistakably falls on the 'strong presumption' end of the Article III continuum" because it is of "the utmost importance to the court" and, "[i]n many cases, . . . may be the only evidence submitted in the eligibility proceeding."  321 F.3d at 198 (Lipez, J., dissenting).  The Court need not and does not wade into this debate because, whatever weight the presumption has here, there are — for the reasons discussed below — no countervailing interests that would justify sealing.

(8th Cir. 1977) (per curiam); *see also United States v. Gravatt*, 868 F.2d 585, 590-91 (3d Cir. 1989) (holding that, where a defendant refuses to complete a CJA Form 23, a district court has "discretion" either to require the applicant to submit the information for *in camera* review, following which "the financial data should be sealed," or, if the district court "deems an adversary hearing . . . to be appropriate," to "grant use immunity to the defendant's testimony at that hearing" (internal quotation marks omitted)).[4]  As the Eighth Circuit put it, to require a defendant seeking appointed counsel to disclose the financial information requested by the CJA Form 23 "would force [him] to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination.  Such a choice is constitutionally impermissible."  *Anderson*, 567 F.2d at 840-41 (citing *United States v. Branker*, 418 F.2d 378, 380 (2d Cir. 1969), and *Simmons v. United States*, 390 U.S. 377 (1968)).

    The problem for Avenatti is that the Second Circuit has explicitly rejected the Eighth Circuit's decision in *Anderson* and adopted a different approach to the balancing of a defendant's

---

[4]     Avenatti asserts that the Third, Fourth, Fifth, and Ninth Circuits have also held that defendants' financial affidavits "should be sealed and reviewed by courts *in camera*," Def.'s Reply 2; *see also* Def.'s Mem. 4-6, but that is not accurate.  In the Third Circuit case cited by Avenatti, *Gravatt*, the court (as noted above) held that district courts *could* seal such documents, not that they "should" do so.  868 F.2d at 590-91.  In the Fourth Circuit case, *United States v. Davis*, 958 F.2d 47, 49 n.4 (4th Cir. 1992) (per curiam), *abrogation on other grounds recognized in United States v. Ductan*, 800 F.3d 642, 652 n.5 (4th Cir. 2015) (per curiam), the court merely observed that the district court had "avoided any serious Fifth Amendment challenge by conducting an *ex parte* examination" of the defendant and sealing his answers; it did not opine on the propriety of sealing.  In *Seattle Times Co. v. United States District Court for the Western District of Washington*, 845 F.2d 1513, 1519 (9th Cir. 1988), the Ninth Circuit actually *reversed* a district court's decision to seal a financial affidavit.  (Although not cited by Avenatti, the Ninth Circuit's decision in *United States v. Ellsworth*, 547 F.2d 1096, 1097-98 (9th Cir. 1976), upheld the denial of an application for CJA counsel where the defendant had refused to complete the CJA Form 23 despite having been assured that it would "be sealed after review."  But like the *Davis* Court, it did not address the propriety of sealing.)  Avenatti, meanwhile, does not actually cite a decision from the Fifth Circuit.  Judge Sweet's decision in *Hilsen* provides a helpful survey of the differing approaches among the circuits.  *See* 2004 WL 2284388, at *4, *9 & nn.6-9.

Fifth Amendment and Sixth Amendment rights in connection with the appointment of CJA counsel.  In *Harris*, the district court had appointed counsel to represent John L. Harris based on his CJA Form 23.  *See* 707 F.2d at 654-55.  A few months later, however, the prosecution moved for a determination that Harris "was not financially unable to obtain counsel and hence [wa]s not entitled" to appointed counsel under the CJA.  *Id.* at 655 (internal quotation marks omitted).  Harris disputed the prosecution's conclusions but refused to submit additional evidence when the district court denied his request to do so "at an in camera, ex parte proceeding."  *Id.*  Thereafter, the district court terminated Harris's appointment of counsel.  *See id.*  In an interlocutory appeal, he argued that "further inquiry should have been appropriately conducted through an ex parte, sealed in camera hearing."  *Id.* at 662.  The Second Circuit acknowledged that *Anderson* provided "some support" for this argument, but it rejected the Eighth Circuit's approach for several reasons.  *Harris*, 707 F.2d at 662.  First, citing 18 U.S.C. § 3006A(e)(1), the court noted that the CJA "specifically provides for ex parte applications for services other than counsel, while there is no such requirement for proceedings involving the appointment or termination of counsel."  *Id.* (citation omitted).[5]  "[S]ince Congress obviously knew how to provide for an ex parte proceeding when it seemed appropriate," the court observed, "the failure to do so in the context of appointment of counsel seems significant."  *Id.*  Second, the court reasoned that "our legal system is rooted in the idea that facts are best determined in adversary proceedings; secret, ex parte hearings are manifestly conceptually incompatible with our system of criminal jurisprudence."  *Id.* (internal quotation marks omitted).

---

[5]     As the *Harris* court explained, "ex parte proceedings for services other than counsel are provided for to ensure that a defense would not be 'prematurely' or 'ill-advisedly' disclosed" — "considerations" that "are not relevant to proceedings concerning the appointment or termination of counsel."  *Id.* (quoting *Criminal Justice Act of 1963: Hearings on S.63 and S.1057 Before the Senate Comm. on the Judiciary*, 88th Cong., 1st Sess. 173 (1963)).

Finally, the court observed that there "are numerous situations where a defendant must face the unappealing choice . . . of testifying in open court or losing a constitutional claim." *Id.* (internal quotation marks omitted).  Quoting from the Supreme Court's decision in *Simmons* and its own earlier decision in *Branker* — the same two cases cited by the Eighth Circuit in *Anderson* — the Second Circuit continued:

> However, "intolerable tension[s]" between constitutional rights have been alleviated by applying the rule that a defendant's testimony at a pretrial hearing will not be admissible at trial on the issue of guilt unless he fails to object.  See *Simmons v. United States*, supra, 390 U.S. at 394; see also Note, *Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings,* 76 Colum. L. Rev. 674, 678-81 (1976).  We have held that "the government should not be permitted to use as part of its direct case any testimony given by a defendant at a hearing where he is seeking *forma pauperis* relief or the assignment of counsel on the ground of his financial inability to . . . afford counsel," *United States v. Branker,* 418 F.2d 378, 380 (2d Cir. 1969), and that holding is directly applicable to the case before us.

*Harris*, 707 F.2d at 662-63.[6]  The court found no merit to Harris's contention that the "*Simmons* and *Branker* rule . . . affords inadequate protection." *Id.* at 663.  "Harris's claim of fifth amendment violation by use of his testimony at a later time," the court explained, "is speculative at this point.  See *United States v. Peister*, 631 F.2d [658, 662 (2d Cir. 1980)].  Moreover, we believe that the speculative possibility of inadequate protection of defendant's fifth amendment rights is outweighed by the need to determine facts through adversarial proceedings." *Id.*

In short, the Second Circuit in *Harris* held that applications for appointment of counsel pursuant to the CJA should be addressed in traditional, open "adversarial proceedings" and "that constraints on the subsequent use of a defendant's testimony submitted in support of an application for appointed counsel" — that is, "use immunity" — "will strike an appropriate

---

[6]     Needless to say, the Second Circuit's reading of *Simmons* and *Branker* casts some doubt on the soundness of the Eighth Circuit's decision in *Anderson*.  But because this Court is bound by the Second Circuit's decisions, whether *Anderson* is sound or not is irrelevant.

balance between a defendant's Fifth and Sixth Amendment rights where those rights are
arguably in conflict." *Hilsen*, 2004 WL 2284388, at *4. Following *Harris*, "courts in this circuit
have almost uniformly denied requests to file a CJA affidavit *ex parte*, including where the
defendants were charged with fraud." *United States v. Kolfage*, — F. Supp. 3d —, No. 20-CR-
412 (AT), 2021 WL 1792052, at *6 (S.D.N.Y. May 5, 2021) (discussing cases in denying the
"analogous" request of a defendant charged with fraud to file financial data under seal in seeking
the release of seized assets to hire counsel); *see, e.g.*, *Hilsen*, 2004 WL 2284388, at *1 (denying
leave to file the CJA Form 23 under seal despite the defendant's argument that it would disclose
facts "directly related, if not identical, to the facts the government must establish at trial");
*Coniam*, 574 F. Supp. at 616-17 & n.2 (explaining, in rejecting a request to seal the defendant's
CJA Form 23 in a prosecution for securities fraud and mail fraud, that "[e]x parte proceedings
are not consistent with traditional adversarial proceedings.  The evidence in a preliminary
hearing on qualification can be excluded.  The conflict between the Fifth and Sixth Amendments
is not unreconcilable."); *United States v. Hennessey*, 575 F. Supp. 119, 120 (N.D.N.Y. 1983)
(Miner, J.) (describing a tax prosecution in which the defendant submitted a CJA Form 23 after
the court had deemed his asserted Fifth Amendment privilege "premature" and ordered that the
prosecution "would be prohibited from using as part of its direct case any information supplied
by [the] defendant demonstrating inability to obtain counsel"), *aff'd,* 751 F.2d 372 (2d Cir. 1984)
(unpublished table decision); *see also Correia*, 2020 WL 6683097, at *1-2 (denying a motion to
seal a lawyer's declaration, submitted in support of a motion to withdraw, explaining that the
defendant had not paid his fees and would likely qualify for appointed counsel).  *But see United
States v. McPartland*, No. 17-CR-587 (JMA), 2021 WL 722496, at *4 & n.1 (E.D.N.Y. Feb. 23,

2021) (relying in part on *Boston Herald* in holding that the defendants' "CJA-related applications" could remain under seal, without citing either *Suarez* or *Harris*).

Avenatti attempts to distinguish *Harris* and its progeny on two grounds, but his arguments are unpersuasive. First, he contends that, unlike the defendants in these cases, "whose Fifth Amendment concerns were deemed premature or insubstantial, there can be no question that disclosing [his] sworn financial statements to the government would render his right against self-incrimination null and void." Def.'s Reply 3-4; *see* Def.'s Mem. 10 (arguing that, in contrast to *Harris*, "the risk of self-incrimination should Mr. Avenatti's sworn statements be unsealed is not speculative; it is a near certainty"). "[T]he government," Avenatti asserts, "allege[s] a direct, nefarious connection between discrete sources of [his] income and outstanding financial obligations, inextricably intertwining [his] finances with his alleged misconduct. [His] sworn statements are therefore replete with information that could provide leads for probative evidence . . . ." Def.'s Mem. 9. As evidence that these risks are not speculative, Avenatti points to the trial before Judge Gardephe in *Avenatti I*, in which "the same prosecutors litigating this case" used his "lack of income and indebtedness against him" by arguing that they "demonstrated his need and motive to quickly generate substantial sums of money, at the time when he engaged in the charged conduct." *Id.* at 2-3 (internal quotation marks omitted). In short, Avenatti argues that, unlike the defendants in *Harris* and its progeny, he faces a "'real and appreciable' hazard of self-incrimination" that justifies sealing the Financial Affidavits altogether. *Id.* at 6 (quoting *United States v. Hyde*, 208 F. Supp. 2d 1052, 1056 (N.D. Cal. 2002).

Admittedly, Avenatti's argument does find some support in a handful of decisions by district courts in other circuits. *See Hilsen*, 2004 WL 2284388, at *8-10 (noting that some courts

have approved *ex parte* proceedings where "the conflict between a defendant's Fifth and Sixth Amendment rights is deemed to be immediate and real" and citing cases).  But it cannot be squared with *Harris*, which "did not limit its discussion of the proper balance to strike between assertions of Fifth Amendment privilege made in conjunction with applications for appointed counsel pursuant to the Sixth Amendment to the particular facts before it."  *Hilsen*, 2004 WL 2284388, at *10.  Yes, the Second Circuit observed that "Harris's claim of fifth amendment violation by use of his testimony at a later time is speculative at this point."  *Harris*, 707 F.2d at 663.  In support of that proposition, however, the *Harris* Court cited the Tenth Circuit's decision in *Peister*, which rejected a defendant's refusal to complete a financial affidavit on Fifth Amendment grounds.  *See Peister*, 631 F.3d at 661-62.  Critically, though, the Tenth Circuit's decision was *not* based on the nature of the information or relationship between that information and the charges in the case; it was based on the fact that, *until trial*, "any conflict with the Fifth Amendment right" was "speculative and prospective only."  *Id.* at 662; *cf. United States v. Allen*, 864 F.3d 63, 86 (2d Cir. 2017) ("[T]he Fifth Amendment is a personal *trial* right — one violated only at the time of 'use' rather than at the time of 'compulsion.'").  As the *Peister* Court put it: "The time for protection will come when, if ever, the government attempts to use the information against the defendant at trial.  We are not willing to assume that the government will make such use, or if it does, that a court will allow it to do so."  631 F.2d at 662.  Harris's claim, in other words, was "speculative" because it was pressed before trial, not because the defendant's financial status lacked a sufficient nexus to the charges against him.  It follows that the Second Circuit's solution for the tension between a defendant's Fifth and Sixth Amendment rights — use immunity — applies to all cases and is not dependent on the nature of the charges against the defendant.

24

In any event, assuming for the sake of argument that sealing *could* be justified where a defendant showed a "real and appreciable" risk of self-incrimination, Def.'s Mem. 6, it would not be justified here.  As noted, in arguing otherwise, Avenatti relies heavily on the fact that "the same prosecutors . . . already (and aggressively) used [his] financial condition against him in *Avenatti I*."  *Id.* at 9.  But far from supporting Avenatti's argument, that fact undermines it.  That is, as Avenatti himself concedes, the Government *already has* ample evidence that he "is millions of dollars in debt."  *Id.* at 9-10; *see* Gov't Opp'n 3 ("[T]he Government has already conducted a thorough financial investigation of the defendant and already has access to significant information about his finances relevant to the charged conduct.").  Thus, it is pure speculation to suggest, as Avenatti does, *see* Def.'s Reply 4, that the information in the Financial Affidavits will lead the Government to "new" evidence, let alone evidence that the Government would endeavor to use at trial.  *See, e.g.*, *Hilsen*, 2004 WL 2284388, at *10 (characterizing the defendant's claim "that the government may be able to develop leads from information contained in his CJA 23" as "mere speculation"); *see also Coniam*, 574 F. Supp. at 617 (similar).  And even if it did, there is a good chance that the evidence would be inadmissible, either on relevance grounds (given that the Indictment charges a scheme between July 2018 and February 2019, *see* Indictment ¶¶ 32, 34, and the Financial Affidavits only contain information regarding Avenatti's financial circumstances in July 2020 or later) or on cumulativeness grounds.  *See* Fed. R. Evid. 401-403.  In short, Avenatti's assertion of a Fifth Amendment risk is indeed "both premature and speculative."  *Hilsen*, 2004 WL 2284388, at *11.  It is thus not weighty enough to override the common law presumption of public access, let alone the public's First Amendment right.

Avenatti's second argument for distinguishing *Harris* and its progeny is that here, unlike in those cases, "there is no credible basis for challenging [his] financial eligibility."  Def.'s Mem.

9; *see* Def.'s Reply 3-4.  That is, whereas the prosecution disputed the defendant's eligibility for counsel in *Harris*, here "the government has been pellucid that there is no basis to question [Avenatti's] financial inability; accordingly, there is no dispute to resolve and no adversarial proceeding to protect."  Def.'s Reply 3-4.  But that argument misunderstands the nature of the common law and First Amendment rights — and overlooks that these rights belong to the *public*.  Put simply, the "supposition that a bona fide public interest in CJA eligibility only materializes if and when" the prosecution contests a defendant's application "is difficult to harmonize with the principles underlying the common law presumption of access to judicial documents" and the First Amendment right.  *Bos. Herald*, 321 F.3d at 196 (Lipez, J., dissenting).  Or to put it differently: Much as the public's right to attend a trial for a witness's testimony does not rise or fall on whether the prosecution chooses to cross-examine the witness, the public's right to a CJA Form 23 does not rise or fall on whether the prosecution elects to contest it.

In any event, Avenatti overstates the Government's position.  The Government does not concede that Avenatti qualifies for appointed counsel.  Instead, it "take[s] no position, based on the information available to it, on the request."  Gov't Opp'n 3.  That is hardly surprising given that, to date, the Government has been kept in the dark with respect to what is in Avenatti's Financial Affidavits.  As the Government notes, "[a]bsent knowledge of what is contained in the defendant's CJA form and accompanying affidavit, the Government is unable to advise the Court on its view of the accuracy of that information, or whether efforts to recoup fees would be appropriate."  *Id.*  Leaving the Government in such darkness is hard to justify given its right to be heard on the question of whether a defendant is eligible for appointment of counsel pursuant to the CJA.  *See United States v. Herbawi*, 913 F. Supp. 170, 173 (W.D.N.Y. 1996); *see also United States v. Jenkins*, No. 5:11-CR-602 (GTS), 2012 WL 12952829, at *3 n.1 (N.D.N.Y. Oct.

9, 2012) ("[T]he government always has the right, and indeed is charged with the responsibility, of bringing to the Court's attention any possible misuse or waste of public funds." (internal quotation marks omitted)).  More fundamentally, it cannot be reconciled with the Second Circuit's admonition that "our legal system is rooted in the idea that facts are best determined in adversary proceedings" and that "secret, ex parte hearings are manifestly conceptually incompatible with our system of criminal jurisprudence."  *Harris*, 707 F.2d at 662 (internal quotation marks omitted); *see also Hilsen*, 2004 WL 2284388, at *8 ("[T]he *ex parte* approach . . . is incompatible with [*Harris*'s] emphasis on adversarial proceedings . . . .").

In sum, Avenatti's proffered justifications for sealing his Financial Affidavits — that it is necessary to protect his Fifth Amendment and Sixth Amendment rights — fall short.  That is, *Harris* and its progeny already provide Avenatti with the protection to which he is entitled: use immunity.  It follows that Avenatti's Fifth Amendment interests are not sufficiently weighty "countervailing factors" to override the common law presumption in favor of public access.  *Lugosch*, 435 F.3d at 124.  Nor do they make sealing "necessary to preserve higher values."  *Id.*[7]

---

[7] Needless to say, the guidance of the Judicial Conference, the Advisory Committee on the Criminal Rules, and CACM — that financial affidavits to obtain CJA counsel should *never* be made available to the public — does not provide a basis for this Court to seal the Financial Affidavits, particularly given the First Amendment foundation of the public's right of access. Notably, their categorical guidance is hard to square even with those decisions that have allowed for the sealing of financial affidavits, which have generally required a showing that "the conflict between a defendant's Fifth and Sixth Amendment rights is . . . immediate and real." *Hilsen*, 2004 WL 2284388, at *9 (citing cases).  Even more notably, their guidance appears to have played a role in leading at least one district court in this Circuit astray.  *See McPartland*, 2021 WL 722496, at *4 & n.1 (emphasizing the Judicial Conference and Advisory Committee guidance in holding that the defendants' "CJA-related applications and submissions" could remain under seal).  In the Court's view, it would be appropriate for the Judicial Conference, the Advisory Committee, and CACM to revisit the issue and, if not change their guidance, at least alert courts that the common law or First Amendment may require public disclosure.

**C.  Avenatti's Alternative Requests for Delayed Release and Redaction**

That does not end the matter because Avenatti asks, in the alternative, for the Court to "delay disclosure of the documents until after the government rests and/or until the defense has had an opportunity to offer redactions for the Court's consideration."  Def.'s Reply 5.  The former request is easily rejected.  As the Second Circuit has held, the presumption — "under both the common law and the First Amendment" — is for "*immediate* public access to" judicial documents.  *Lugosch*, 435 F.3d at 126 (emphasis added).  Given that, and the protections afforded by *Harris* and its progeny, there is no basis to delay public access any longer.  By contrast, the Court grants Avenatti's request to keep the Financial Affidavits under seal so that he may propose for the Court's consideration redactions consistent with this Opinion and Order. *See, e.g.*, *Hadden*, 2020 WL 7640672, at *2 n.2 ("The Court will provide the defense the opportunity to redact personal information such as social security numbers, names of minor children, dates of birth, financial account numbers, and home addresses."); *see also Suarez*, 880 F.2d at 633 ("It may be . . . that some modest redaction before disclosure of a particular CJA form will be justified . . . .").  To be clear, however, any such redactions would have to be justified by an interest other than the Fifth Amendment — with respect to which use immunity provides all the protection to which Avenatti is entitled — and narrowly tailored to that interest.[8]

**CONCLUSION**

As is true for any criminal defendant, Avenatti's Fifth and Sixth Amendment rights are undoubtedly of paramount importance.  Given the protections already available under Second

---

[8]     In light of the fact that the Financial Affidavits will remain under seal pending the Court's consideration of any proposed redactions, Avenatti's request for a two-week stay of any order to unseal in order to consider an interlocutory appeal, *see* Def.'s Reply 2 n.2; Def.'s Sur-Reply 1 n.1, is denied as unripe.  In the event that Avenatti believes such a stay would still be warranted, he may renew the request in conjunction with any request for redaction.

Circuit law, however, the Court concludes that these rights are insufficient to override the

public's rights — under both the First Amendment and the common law — to access the

Financial Affidavits that Avenatti filed in this case to secure counsel at public expense.  More

specifically, the Court holds that:

- Avenatti's Financial Affidavits are "judicial documents" subject to the common law presumption in favor of public access and to the qualified First Amendment right of public access;

- that Avenatti's Fifth Amendment privilege against self-incrimination does not rebut the common law presumption or override the qualified First Amendment right because, under *Harris* and its progeny, Avenatti is adequately protected by the rule that his statements cannot be used against him in the Government's case-in-chief; and

- that Avenatti may propose limited redactions to protect other interests, but otherwise the public is entitled to immediate disclosure of the Financial Affidavits.

Avenatti shall propose any redactions to the Financial Affidavits, not inconsistent with this

Opinion and Order, no later than **August 10, 2021**.  Avenatti shall do so in accordance with the

procedures set forth in Paragraph 10 of the Court's Individual Rules and Practices for Criminal

Cases, available at https://nysd.uscourts.gov/hon-jesse-m-furman.  As relevant here, those

procedures require Avenatti to file a letter-motion seeking leave for any proposed redactions

(other than redactions of two narrow categories of information for which Court permission is not

required) that explains both the purpose of the proposed redactions and how they are narrowly

tailored to serve an interest that outweighs the common law presumption and First Amendment

right of public access.  In the event that Avenatti does not seek leave for any redactions by the

deadline, he shall promptly file all of the Financial Affidavits on ECF.

SO ORDERED.

Dated: July 27, 2021
       New York, New York

JESSE M. FURMAN
United States District Judge

29

# EXHIBIT A

CJA-23
(Rev 3/21)

# FINANCIAL AFFIDAVIT
### IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT, OR OTHER SERVICES WITHOUT PAYMENT OF FEE

**IN THE UNITED STATES**  ☐ DISTRICT COURT    ☐ COURT OF APPEALS    ☐ OTHER *(Specify Below)*

| | |
|---|---|
| FOR | LOCATION NUMBER |
| AT | |

IN THE CASE OF

_____ V. _____

PERSON REPRESENTED *(Show your full name)*

CHARGE/OFFENSE *(Describe if applicable & check box→)*    ☐ Felony
☐ Misdemeanor

1 ☐ Defendant - Adult
2 ☐ Defendant - Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Supervised Release Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other *(Specify)* _____

**DOCKET NUMBERS**

Magistrate Judge

District Court

Court of Appeals

---

## ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

| | | |
|---|---|---|
| **INCOME & ASSETS** | **EMPLOYMENT** | Do you have a job?  ☐ Yes   ☐ No<br><br>**IF YES,** how much do you earn per month? _____<br><br>Will you still have a job after this arrest?   ☐ Yes   ☐ No   ☐ Unknown |
| | **PROPERTY** | Do you own any of the following, and if so, what is it worth?<br><br>**APPROXIMATE VALUE**   **DESCRIPTION & AMOUNT OWED**<br>Home   $_____   _____<br>Car/Truck/Vehicle $_____   _____<br>Boat   $_____   _____<br>Stocks/bonds   $_____   _____<br>Other property  $_____   _____ |
| | **CASH & BANK ACCOUNTS** | Do you have any cash, or money in savings or checking accounts?  ☐ Yes   ☐ No<br><br>**IF YES,** give the total approximate amount after monthly expenses  $_____ |
| **OBLIGATIONS, EXPENSES, & DEBTS** | | How many people do you financially support? _____<br><br>**BILLS & DEBTS**  **MONTHLY EXPENSE**  **TOTAL DEBT** |

| BILLS & DEBTS | MONTHLY EXPENSE | TOTAL DEBT |
|---|---|---|
| Housing | $_____ | $_____ |
| Groceries | $_____ | $_____ |
| Medical expenses | $_____ | $_____ |
| Utilities | $_____ | $_____ |
| Credit cards | $_____ | $_____ |
| Car/Truck/Vehicle | $_____ | $_____ |
| Childcare | $_____ | $_____ |
| Child support | $_____ | $_____ |
| Insurance | $_____ | $_____ |
| Loans | $_____ | $_____ |
| Fines | $_____ | $_____ |
| Other | $_____ | $_____ |

I certify under penalty of perjury that the foregoing is true and correct.

_____   _____
SIGNATURE OF DEFENDANT     Date
(OR PERSON SEEKING REPRESENTATION)