Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

December 23, 2021

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE: United States v. Michael Avenatti**
**19 Cr. 374 (JMF)**

Dear Judge Furman:

We write regarding the trial date in the above-captioned case, which is currently scheduled for January 24, 2022, and respectfully request a 120-day adjournment. The Government opposes this application.

On December 14, 2021, the Government served Michael Avenatti with a subpoena commanding his production of a trove of documents and materials in his possession, custody, and control "if, as, and when" he elects to testify at trial. See "If, as, and when" Subpoena, Exhibit A. The subpoena identifies vast categories of documents that go to the heart to the allegations in this case, as well as defenses available to Mr. Avenatti. Many, if not all, of the electronic communications, documents, notes, calendar entries, data compilations and other materials responsive to the Government's subpoena are embedded among nearly 20 terabytes worth of data from his law firm's servers that was first produced to Mr. Avenatti in connection with his prosecution in the Central District of California in mid-September of this year.

Given the Government's subpoena, there can be no reasonable dispute that the information on the servers is material to this case and to Mr. Avenatti's defense. Further, there is a strong likelihood that Mr. Avenatti will testify in his own defense. Because the defense cannot possibly identify all of the materials relevant to Mr. Avenatti's defense or responsive to the Government's subpoena in time for a January 24, 2022 trial date, a substantial adjournment is warranted. Mr. Avenatti's motion is also supported by the escalating threat to public health posed by the Omicron variant of COVID-19, which is ravaging New York City and threatens, inter alia, the Court's ability to safely convene 100 to 150 prospective jurors to

complete the jury questionnaire and participate in voir dire, and Mr. Avenatti's right to a petit jury drawn from a fair cross section of the community.

**Mr. Avenatti's Efforts To Obtain A Forensic Copy Of His Law Firm's Servers And Information Relating To His Representation of Stephanie Clifford**

At all times relevant for the purposes of this case, Mr. Avenatti owned 100% of the equity of Eagan Avenatti, LLP ("EA"), a law firm he co-founded in Southern California in 2007. Mr. Avenatti served as the firm's managing partner and generated nearly all of the firm's business. John Drum, a financial expert retained by the Government, who has been paid over $600,000 to date, estimates that the firm received approximately $263.2 million during the years 2011-2018 and stated as recently as September 4, 2019 that Mr. Avenatti's law firm "is a profitable business with large Net Flows …." (emphasis added).

Like most modern law firms, EA's records, client files, e-mails and financial information were maintained electronically on computer servers. The EA servers include client and law firm data totaling approximately 19.86 terabytes.[1]

On the morning of March 25, 2019, Mr. Avenatti was arrested pursuant to a criminal complaint filed in the Central District of California, 19-cr-61 (JVS) (C.D. Ca.), and a separate criminal complaint out of this district, 19-cr-373 (PGG) (S.D.N.Y.). A search warrant was simultaneously executed at the home of Ms. Judy Regnier, Mr. Avenatti's longtime office manager and lead paralegal. Ms. Regnier informed the co-lead prosecutor in C.D. Ca. and an IRS/CID agent that the servers for the law firm were located and maintained in an e-storage facility. Mr. Avenatti's ability to access his servers was immediately cut-off.

On April 3, 2019, the Government obtained the servers from Mr. Brian Weiss, a receiver previously appointed to manage EA, and later made a complete forensic copy of them. On the morning of April 11, 2019, the Government docketed an Indictment in California. 9-ER-2111-2171.[2] That same day, Mr. Avenatti's

[1] 19.86 terabytes of data could hold double the amount of information contained in the printed collection of the Library of Congress. See, e.g., Schwartz v. United States, 828 F. App'x 628, 634 n. 3 (11th Cir. 2020) (citing United States v. Salyer, Cr. No. S-10-0061-LKK, 2011 WL 1466887, at *1 n.2 (E.D. Cal. Apr. 18, 2011) (quotation omitted)), report and recommendation adopted, Cr. No. S-10-061-LKK, 2011 WL 1811211 (E.D. Cal. May 12, 2011).

[2] References to "ER" are to the excerpts of record filed at docket number 24 in U.S. v. Avenatti, Case No. 21-50225 (9th Cir. Nov. 30, 2021).

counsel wrote the prosecutors assigned to the case and informed them that the defense needed urgent access to the information from the servers in order to defend Mr. Avenatti. 2-ER-266. The attorneys for the Government committed to defense counsel during a subsequent conversation that all relevant documents from the servers would be promptly produced to Mr. Avenatti during discovery. The prosecutors confirmed this agreement in writing the next day: "To the extent the servers contain evidence relevant to the prosecution of Mr. Avenatti, as we mentioned yesterday, such materials will be produced to the defense during the discovery process." Id. (emphasis added). In the weeks that followed, however, no such information was produced.

On May 15, 2019, the District Court in C.D. Ca. conducted a status conference, during which the court inquired about the Government's discovery production, including materials seized from Mr. Avenatti and his law firm. 9-ER-2104-2105. After the Government informed the court that a privilege review process was being utilized, the court directed: "To the extent that his files don't involve materials to which he is arguably not entitled to access, I think the Government ought to move forward promptly and provide mirror images. There's no need to do a privilege review in terms of giving him back his own files." Id. The Government responded, "Your Honor, we would agree with that." 9-ER-2106.[3]

Following the status conference, Mr. H. Dean Steward, Mr. Avenatti's counsel, sent the Government a letter demanding that it comply with Rule 16, Brady, and Giglio. Among other items, Mr. Avenatti specifically requested "all documents, information, materials, electronic information, etc., obtained from Brian Weiss and/or Eagan Avenatti, LLP or any corresponding search including but not limited to forensic copies of all electronic files, computers, servers, drives, USB keys, cell phones and iPads." 2-ER-269. The word "servers" was mentioned ten times in the letter, as were the words "computers" and "drives." 2-ER-269-273.

On May 22, 2019, the Indictment in this case was filed. See Dkt. No. 1. That same day, having not received any response to his May 15 letter, Mr. Steward sent another letter to the Government addressing the importance of obtaining a copy of the servers and the prejudice to the defense in not having received the withheld materials. 2-ER-275-277.

---

[3] Under California law, defendant was individually entitled at all times to a copy of the materials and information relating to his prior representation of his clients. See, e.g., Cal. R. Prof. Cond. 1.16(e)(1), comment [6]; State Bar of Calif., Opn. No. 1994-134. Moreover, the privilege review process never precluded the prosecution team from gaining access to any and all information relating to the clients referenced in the Indictments.

On May 24, 2019, the IRS/CID agent who questioned Ms. Regnier submitted a search warrant application in California to search the entirety of the EA servers that were already in the Government's possession. 3-ER-280-566; 4-ER-567-703; 3-ER-286-290. The application was granted that afternoon, permitting the Government broad access to seize and search for a myriad of documents and materials, including financial and accounting information. 4-ER-732-754.

Later that day, the prosecutors in California provided a response to defense counsel's letters. 4-ER-763-765. The Government promised, "We will produce any relevant evidence seized from the EA LLP server once the Government completes the review protocols set forth in the search warrant." 4-ER-759-760. Weeks passed by and no information from the servers was produced.

In early June 2019, Mr. Steward entered his formal appearance in this case. See, e.g., Dkt. No 8. Within weeks, on June 25, 2019, Mr. Steward sent the California prosecutors a letter itemizing the Government's failures to produce "all data – emails, pleadings, settlement agreements, accounting information, etc. from the servers and computers relating to Mr. Avenatti's law firm." 4-ER-765-766.

On July 1, 2019, the parties submitted a joint report to the District Court in California. 9-ER-2074-2100. Mr. Avenatti challenged the inadequacies of the Government's discovery productions: "The Government's production to date has been woefully inadequate … the information produced to date is far less than five percent (5%) of what is required…. [T]he Government now refuses to produce millions of pages of documents and huge amounts of electronic data (likely well over 20 terabytes) that Mr. Avenatti needs to defend himself-including potentially Brady and Giglio material." 9-ER-2081.

The district court in C.D. Ca. held another status conference on July 8, 2019. The Government represented that, "At this point we have been primarily focused on the server, because that's the largest device. It's what Mr. Avenatti and his counsel have indicated is most important to them." 9-ER-2056 (emphasis added). The Government added, "[T]he way that we have processed the data is that the initial review and processing of the data is being conducted by the DOJ Cyber Crime Lab." 9-ER-2058. The court subsequently issued an Order directing the Government to submit "a report re privilege review and a timetable to produce documents to Mr. Avenatti including how the documents will be produced." 9-ER-2073.

On July 28, 2019, in an effort to gain access to the servers, Mr. Avenatti filed a Motion to Compel Discovery in California. 8-ER-1977-1985.

The motion requested "immediate and unfettered access to the [EA] servers." 8-ER-1979. Mr. Avenatti specifically requested access to various materials including, "(2) client files", "(3) time records" and "(7) accounting information relating to the clients at issue, including documents showing client costs and expenses, and associated fees." Id.

On August 12, 2019, the Government filed its opposition. Under a heading entitled, "The USAO Has Complied With and Will Continue to Comply with its Obligations Under *Brady* and *Giglio*" the Government stated, "the USAO is aware of its obligations under Brady and Giglio. The USAO has already made, and will continue to make timely disclosures of any such materials to [Mr. Avenatti], including any such documents that are located on and seized from the EA Devices." 8-ER-1794. In addition, the Government procured the support of Mr. Weiss, the receiver, in opposing Mr. Avenatti's efforts to gain access to the servers. On August 29, 2019, the court denied Mr. Avenatti's motion.

In September 2019, Mr. Avenatti and his counsel were permitted minimal access to certain emails and client pleadings stored on the servers by visiting the IRS-CI's Los Angeles office, but were not permitted any access to any other files, data or software programs on the servers (i.e., financial data showing costs expended for clients such as Ms. Clifford). On September 13, 2019, Mr. Steward specifically requested that the Government provide the emails and documents from the servers relating to Mr. Avenatti's representation of Ms. Clifford. On September 20, 2019, the Government refused to produce the materials relating to Ms. Clifford from the servers.

Between September 2019 and July 2021, Mr. Avenatti repeatedly requested access to the servers and that the Government produce all Brady and Rule 16 material contained therein.

**The Court in C.D. Ca. Grants A Mistrial Because The Government Violated Brady In Failing To Produce Relevant And Material Information From The Servers**

In his final pretrial status report filed on June 25, 2021, Mr. Avenatti alerted the court that "the Government has not produced information and documents to the defense that constitute *Brady* material. Included among the materials the Government has not produced are … financial information relating to the accounting applicable to the client matters at issue in counts 1-10." 6-ER-1198. In fact, Mr. Avenatti issued a warning, which turned out to be prescient: "If these issues are not addressed in detail now, before trial, they will emerge in to middle of trial or immediately post-trial and create a host of problems (not to mention a

possible mistrial)." 6-ER-1199 (emphasis added).

During the trial, Mr. Avenatti continued to raise the Government's discovery failures and the resulting prejudice. On August 15, 2021, approximately four weeks into trial and as a result of the Government's failure to produce Brady information from the servers, Mr. Avenatti filed a Notice of Motion and Motion to Dismiss or, in the Alternative, Motion for Mistrial, due to the Government's (1) Failure to Produce Information as Required by Rule 16, Brady, and Giglio, and (2) Contempt of the District Court's January 25, 2021 Order. 5-ER-990-1034 ("The Mistrial Motion").

Mr. Avenatti re-called DOJ Senior Digital Investigative Analyst Joseph Varani to the stand. Mr. Varani works at Main Justice at the DOJ Computer Crime Lab. Mr. Varani testified that he previously analyzed the forensic images of the computer servers seized from EA. 12-ER-2826-2827.

The court held a hearing on Mr. Avenatti's Mistrial Motion on Friday, August 20, 2021. 5-ER-865-866. The court ordered the Government to cooperate with the defense over the weekend to search for financial information on the servers relevant to the five clients at issue in California. Over the weekend, Mr. Avenatti again requested a complete forensic copy of the servers over the Government's objection. The Court again denied the request.

During the late afternoon of Monday, August 23, 2021, Mr. Avenatti was provided with approximately 6 GB of data from the servers. All of this information was obtained from the forensic copies of the EA servers that have been in the possession of Main Justice since the Spring of 2019. None of these electronic files were previously produced to Mr. Avenatti prior to August 23, 2021.

On August 24, 2021, the court heard oral argument on Mr. Avenatti's Motion but made no inquiry of the prosecutors' conduct. Before concluding that the Government had committed a Brady violation by suppressing the data from the servers, however, the court performed a three-part analysis. 13-ER-2917-2918. First, the court found that "the Tabs data and other accounting data that was not produced would have been favorable to the accused." 13-ER-2917. Second, the court determined that the materials were not produced. Id. Finally, the court found that Mr. Avenatti suffered substantial prejudice due to the Government's suppression of evidence. The court granted Mr. Avenatti's request for a mistrial and permitted Mr. Avenatti to brief the issue as to whether the Government should be permitted a re-trial. Id.[4]

---

[4] This issue was subsequently briefed and argued, with the District Court determining retrial was permitted. Following Mr. Avenatti's appeal to the Ninth Circuit, the District Court divested itself of jurisdiction, finding that defendant's

**Mr. Avenatti Is Finally Provided A Copy Of The Server Data On September 16, 2021**

On September 16, 2021, after waiting approximately 30 months and following an order from the District Court, Mr. Avenatti was finally provided a forensic copy of the servers, totaling approximately 19.86 terabytes. In order to assist Mr. Avenatti in his review, the Government was also ordered to provide a forensic index to all of the files located on the servers but has yet to provide the complete index as of this filing.[5]

The sheer volume of the data on the servers[6] coupled with the form of production – a forensic copy that is not easily reviewed, renders the process of reviewing the data on the servers a herculean task. The email data alone totals over one million emails plus attachments. Mr. Avenatti has retained a highly qualified computer expert to assist with this effort and it continues as of this filing. However, a preliminary review shows that information highly relevant to Mr. Avenatti's defense and responsive to the Government's "If, as, and when" subpoena are included on the servers, including (i) email communications: (a) between Mr. Avenatti and Ms. Clifford, (b) between Mr. Avenatti and the book agent and publisher, (c) between Mr. Avenatti and Ms. Clifford's business manager, and (d) between Mr. Avenatti and others relating to his work for Ms. Clifford on the book and otherwise; (ii) financial data relating to Mr. Avenatti's representation of Ms. Clifford, including costs and expenses incurred on her behalf and payments of cash made to her, all of which Mr. Avenatti was entitled to be reimbursed; and (iii) documents relating to Mr. Avenatti's work on the book deal and representation of Ms. Clifford under their fee agreement. Virtually none of this information has been previously produced by the Government.

In order to respond to the Government's subpoena and adequately glean from the servers all information necessary to prepare for trial, the defense requires an adjournment of 120 days.

---

double jeopardy claim and appeal were not frivolous and that there is a "substantial question as to with what the term goading means" in the context of the record in this case, especially considering the court's previous determination that the government had committed, during the trial, a "*Brady* violation with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm." 2-ER-31. That appeal is pending as of the date of this filing.

[5] On December 7, 2021, the government informed the defendant that there are approximately 1.2 million files from the servers left to index.

[6] 19.86 terabytes equals approximately 80 laptop computers, each holding 250GB of data.

**The Rapid Spread Of The Highly Contagious Omicron Variant Of COVID-19 Further Supports An Adjournment Of The Trial Date**

For the fifth time in a week on December 22, 2021, New York smashed its single-day COVID-19 case record with an astounding 28,924 new infections. New state data also shows the stark rate of vaccine efficacy decline when it comes to new infections for certain age groups. For example, during the week of November 29, 2021, days before New York reported its first Omicron case, data showed a 77.4% vaccine effectiveness ate for those aged 18 to 49. In the most recent week assessed, those numbers dropped to 66.4%, and are likely to continue to plummet.[7] By all accounts, the situation is only going to get worse in the coming weeks, just in time for when 100 to 150 jurors are to be summoned to the Southern District of New York to fill out a written questionnaire and submit to voir dire for a case involving an alleged fraud with a net loss amount of approximately $149,000.

Proceeding to trial now while COVID is surging also poses an unnecessary threat to Mr. Avenatti's right to a petit jury drawn from a fair cross section of the community. Given the Omnicron variant's demonstrated ability to spread quickly even amongst the vaccinated, prospective jurors who are unvaccinated or are particularly susceptible to severe illness or hospitalization as a result of COVID, including certain communities of color,[8] are more likely to opt out of jury service or ignore the summons altogether out of fear of contracting the virus.

Trial during this surge also compromises Mr. Avenatti's rights to trial by an impartial jury and to be free of coercive verdicts. "Due process implies a tribunal both impartial and mentally competent to afford a hearing."[9] It would be hard for jurors to devote their full attention to the testimony and evidence while they worry about their safety and that of loved ones. Nor can they be expected to remain neutral in these circumstances, free of any resentment toward Mr. Avenatti. The likelihood that a jury will blame Mr. Avenatti for requiring them to sit in a trial while Omicron rages and poses an acute risk to their health is hardly remote.[10] It

---

[7] See Jennifer Millman, NY Breaks COVID Case Record by 30%; Vax Efficacy Plunging vs. Omicron Infection, NBC New York (Dec. 22, 2021, Updated Dec. 23, 2021 at 5:08 a.m.), available at: https://www.nbcnewyork.com/news/coronavirus/ny-breaks-single-day-covid-case-record-for-5th-time-in-week-new-state-data-shows-stark-drop-in-vax-efficacy-vs-infection-not-hospitalization/3464284/.

[8] See Center for Disease Control and Prevention, Health Equity Considerations and Racial and Ethnic Minority Groups, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last visited Feb. 15, 2021).

[9] Jordan v. Massachusetts, 225 U.S. 167, 172 (1912).

[10] Of course, the public health risk is not limited to even those willing attendees in the courthouse. As public health officials and experts have explained repeatedly, the

creates "a real risk that jurors will resent being asked to serve on a jury during a [surge in a] global pandemic."[11]

Further, private discussions with venire members who have confidential concerns—a mainstay of jury selection in this district—either will not be possible because of social distancing requirements compelled by a highly infectious variant, or will require the Court, counsel, the defendant, the court reporter, and a venire member to move to a separate courtroom. This will pose particular challenges in this case due to the high-profile nature of the parties and the need for individualized voir dire.

Finally, when the jury retires for deliberations, they will likely return a quick verdict to terminate the proceedings. Other than avoiding service through voir dire or non-compliance with a summons, which should both be expected as jurors seek to avoid exposure to Omnicron, the speed of the verdict will be the one way that jurors can control the duration of their viral exposure. In deciding whether a verdict is coerced, "the real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations."[12] In the midst of an unprecedented COVID surge, nearly any amount of time is "an unreasonable length of time."

Against this backdrop, there is no overriding or compelling reason to proceed with the January 24, 2022 trial date and place prospective jurors and the parties at risk, particularly in light of the defense's need to conduct a full review of data from the servers.

Respectfully Submitted,

/s/
Robert M. Baum, Esq.
Tamara L. Giwa, Esq.
Andrew J. Dalack, Esq.

Counsel for Michael Avenatti

Cc: AUSA Robert Sobelman
AUSA Matthew Podolsky

---

dynamic of community spread means that anyone with whom jurors, witnesses, lawyers, court personnel and staff means that anyone with whom the persons come in contact with are at risk, as are those with whom they come in contact ad infinitum.

[11] Josh Dubin, Covid-19's Next Victim? The Rights of the Accused, The Champion, Vol. XLIV No. 4, (May 2020), https://www.nacdl.org/Article/May2020-COVID19sNextVictimTheRightsoftheAccused.

[12] United States v. Kimmel, 777 F.2d 290, 295 n.5 (5th Cir. 1985).