M1DsAVEc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        19 CR 374 (JMF)

5  MICHAEL AVENATTI,

6              Defendant.

7  ------------------------------x

8                                       New York, N.Y.
                                        January 13, 2021
9                                       9:30 a.m.

10
   Before:
11
                        HON. JESSE M. FURMAN,
12
                                        District Judge
13

14                        APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  ROBERT SOBELMAN
17      MATTHEW D. PODOLSKY
        ANDREW ROHRBACH
18      Assistant United States Attorneys

19 FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
20 BY:  ROBERT M. BAUM
        ANDREW J. DALACK
21      TAMARA L. GIWA

22

23

24

25

M1DsAVEc

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4              MR. PODOLSKY:  Good morning, your Honor.

5              Andrew Rohrbach, Robert Sobelman, and Matthew Podolsky

6    for the government.

7              THE COURT:  Good morning.

8              MR. BAUM:  Good morning, your Honor.

9              Robert Baum on behalf of Mr. Avenatti, who is on the

10   phone for this conference, and joined by co-counsel Andrew

11   Dalack and Tamara Giwa.

12             THE COURT:  Good morning to you all.

13             Mr. Avenatti, are you on?

14             THE DEFENDANT:  Good morning, and I appreciate the

15   court allowing me to participate by phone.

16             THE COURT:  No worries.  Safe travels when you make

17   your way here.

18             I have found that it is most effective if counsel

19   remain seated since we're masked and speak directly into the

20   microphone.  Particularly since Mr. Avenatti is listening in by

21   phone, it is all the more important to make sure you speak

22   directly into the microphone.

23             Just housekeeping matter with respect to

24   Mr. Avenatti's absence.  There was no request for him to

25   participate in the jury questionnaire portion by phone.  I'm

M1DsAVEc

```
 1    not sure we even have the means to do that.  I assume he is
 2    waiving his presence after this proceeding when we go across
 3    the street.
 4              That is correct, Mr. Baum?
 5              MR. BAUM:  That is correct, your Honor.
 6              THE COURT:  Can you make sure you speak into the
 7    microphone.
 8              MR. BAUM:  That is correct, your Honor.
 9              THE COURT:  All right.  Thank you.
10              Can I confirm with the government that you have
11    delivered the jury questionnaires?
12              MR. ROEBER:  Yes, your Honor, we have delivered the
13    questionnaires.
14              THE COURT:  Terrific.  I think what my plan is --
15    actually, I have a bunch that I would like to cover this
16    morning.  I am hoping we will get a heads-up from the jury
17    department when they are ready for us.  If so, I think what we
18    will do is basically reconvene downstairs at the exit on Pearl
19    Street and walk over across the street together.
20              And just a reminder, as discussed, it is the
21    government's responsibility to retrieve the completed
22    questionnaires at the end of this morning's proceeding and to
23    make electronic scanned copies for both sides and for me.  I
24    assume that will be done later today and as expeditiously as
25    possible.
```

M1DsAVEc

1        I would think that the file names should correspond to

2   the juror numbers, but I'm happy to leave that to you all to

3   discuss with one another and figure out if there is a preferred

4   way of handling that.

5        I'll direct the government to return the original

6   copies of the questionnaires to me, to my staff, no later than

7   the final pretrial conference on Tuesday.

8        There are two motions that are fully briefed and under

9   advisement.  The government's motion, motions in limine, and

10  the government's motion to preclude the testimony of

11  Mr. Vilfer.  Time permitting, I am prepared to address all of

12  them now.  Let's just see how far we get.  If we get cut off,

13  one option would be to reconvene here after my remarks across

14  the street are done, or I can pick up where we leave off at the

15  final pretrial conference on Tuesday.  Having said that, let's

16  try to do what we can.

17       Let me start with the motion to preclude the testimony

18  of Mr. Vilfer.  I'm not sure that it is outcome determinative,

19  but it does seem to me whether the government intends to offer

20  evidence of the WhatsApp communications from the defendant's

21  iCloud account, as opposed to the screenshots and/or PDF

22  obtained from victim one, is highly material to the motion.  I

23  think the reply comes pretty close to clearly stating that the

24  government intends to offer the evidence from the iCloud

25  account, but it's a little bit less clear than I would have

M1DsAVEc

1    thought or liked.

2          I just wanted to unambiguously ask the government, is

3    that the plan?

4          How do you plan to present the WhatsApp messages?

5          MR. ROHRBACH:  That is the plan, your Honor.  We

6    intend to present the WhatsApp messages evidence from the

7    iCloud account rather than from victim one's cell phone.

8          THE COURT:  OK.  In other words, you don't plan to

9    introduce the screenshots or the PDF at all?

10          MR. ROHRBACH:  That's correct, your Honor.

11          THE COURT:  All right.  In light of that, the motion

12    is granted, on the grounds that Mr. Vilfer's testimony is

13    irrelevant, putting aside whether it would have been admissible

14    otherwise, it is simply not relevant given the source of the

15    evidence that the government plans to offer.  See Daubert v.

16    Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993)

17    (noting that expert testimony must be "sufficiently tied to the

18    facts of the case" in order to "aid the jury in resolving a

19    factual dispute" to satisfy the fit requirement).

20          MR. DALACK:  Your Honor, at the risk, I understand

21    your Honor just ruled.  I was hoping we would have an

22    opportunity to address that particular point with the

23    government's decision to introduce the messages from the iCloud

24    account as opposed to the photographs that were taken of the

25    complainant's telephone.

M1DsAVEc

1          Also, we raised in our opposition to that motion to

2    preclude additional argument about why Mr. Vilfer's testimony

3    would, nevertheless, be relevant and satisfy the strictures of

4    702, notwithstanding the introduction of the communications

5    from the iCloud.

6          I wish to make sure the record is complete on those

7    points.

8          THE COURT:  The record is complete, and I'll continue

9    with my ruling.

10          To the extent that the evidence has any probative

11    value, it is substantially outweighed by the dangers of unfair

12    prejudice, confusion, waste of time, substantially for the

13    reasons stated by the government in its initial letter motion

14    and in reply.  Accordingly, the motion is granted.

15          I will say, even if the government were planning to

16    introduce the charts and PDF, I think I would still grant the

17    motion.  Number one, the testimony doesn't fit the facts of the

18    case.  There has been no suggestion, given at any stage, let

19    alone that the messages are inauthentic and doesn't account for

20    the fact that the defendant has always had or long had access

21    to forensic copies of the messages in his own iCloud account.

22    For that reason, it fails to the fit test.  Moreover, I agree

23    with the government that the proposed testimony runs afoul of

24    the well-established propositions supported by the case, many

25    cases cited by the government in its reply, including

M1DsAVEc

1    United States v. Saldarriaga, 204 F.3d 50, 52-53 (2d Cir.

2    2000).  The government has no duty to employ in the course of

3    a single investigation all of the many weapons at its disposal,

4    and the failure to utilize some particular technique or

5    techniques does not tend to show the defendant not guilty with

6    the crime he has been charged.  Cases on which defendant

7    relies -- including Kyles, Bowden, and Lindsey -- are

8    inapposite for the reasons stated by the government and by,

9    among others, Judge Nathan in the Maxwell case.  All those

10   cases arose in a very different context, namely the Brady

11   context and on habeas -- and all involved very different facts.

12   Were there any doubt on that score, it is resolved by the

13   Second Circuit's decision in Watson v. Greene, 640 F.3d 501

14   (2d Cir. 2011), which observed -- in footnote 11 on page five12

15   -- that "Kyles provides no guidance about what evidence must be

16   admitted at trial or what lines of questioning must be

17   permitted to ensure a meaningful opportunity to cross-examine

18   adverse witnesses."

19        In short, the testimony is not relevant or helpful

20   with respect to anything the jury will be asked to do or can

21   consider and thus is inadmissible.  In addition, as I stated,

22   it fails the Rule 403 balancing test, substantially for the

23   reasons stated on pages four and five of the government's reply

24   letter brief.  The bottom line is, I think it would -- not

25   think, it would create a side show, giving rise to a mini-trial

M1DsAVEc

regarding best practices and requiring testimony and

instructions about what the government can and cannot do,

including Fourth Amendment limitations on seizing and mirroring

a civilian's electronic devices, and so on.  It would also be

contrary to the instructions that I will give to the jury that

the government is not on trial here and has no duty to imply

any particular investigative techniques.

The bottom line is that any minimal relevance and

probative value to the evidence is substantially outweighed by

the dangers of unfair prejudice to the government, confusion of

the issues, misleading the jury, and waste of time.

Accordingly, the government's motion is granted.

Turning to the motions in limine, let me quickly

address the four motions that are not seriously in dispute.

Starting with the fourth motion to preclude evidence and

argument that victims of defendant's alleged scheme are to

blame for having acted negligently or gullibly.  That motion is

granted.  Insofar as the government's motion sought relief with

respect to not only victim one, but to others (including, for

example, victim one's literary agent and publisher), I agree

that the defendant's opposition doesn't entirely moot the

issue, but nor does he oppose the broader relief.  For that

reason, it is granted as unopposed.  And in any event, it is

amicably justified for the reasons stated in the government's

opening brief.  Accordingly, that motion is granted.

M1DsAVEc

1          I do have one question, by the way, which is there any

2    reason to continue referring to her as victim one?  Her name is

3    in the record, which including in the very questionnaire today.

4    It just seems like the game is up at this point.

5          MR. ROHRBACH:  If I may have a moment to confer with

6    my colleagues, your Honor?

7          (Counsel confer)

8          Your Honor, if the court would like to use her name,

9    that's fine with the government.  We don't take issue with

10   that.

11         THE COURT:  I will make my decision on the fly and

12   keep you in suspense.

13         A fifth motion is to provide argument that the

14   defendant lacked the intent to defraud because he intended to

15   repay the victim.  As the parties agree, the issue is moot

16   given that agreement.

17         The sixth motion is to preclude evidence or argument

18   concerning the potential punishment or consequences of

19   conviction.  That motion is granted.  It is not enough for the

20   defense to promise, as it does, that it won't make reference to

21   the "specific consequences or punishments" that Mr. Avenatti

22   may face.  That is the opposition brief at ECF number 187 at

23   23.  To state in the opening or closing that Mr. Avenatti's

24   "liberty is at stake," as the defense proposes to do, is to

25   make a not-so-thinly-veiled reference to the prospect of

M1DsAVEc

incarceration, which is altogether improper.  Mr. Avenatti is

certainly free to say something to the effect, that the case is

important to him or that his fate or future is in the jury's

hands.  I mean, something of that nature.  But anything that

adverts to possible punishments, including possibility of

incarceration, however obliquely, is improper and will not be

permitted.  Accordingly, the government's sixth motion in

limine is granted.

The seventh is to preclude evidence or argument

concerning the defendant's prior good acts or failure to commit

other bad acts.

Seems to be an agreement that, as a general matter,

the defendant may not offer evidence of prior good acts or

failure to commit other bad acts.  But beyond that, the record

is insufficient for me to rule on the issue because I don't

know what the defendant proposes to offer or whether he will

offer anything on this score and under what exception or

argument he would offer it.  He makes reference to a couple

different possibilities in his oppositions.  So I just don't

think I can give an advanced ruling on that.  Accordingly, the

motion is denied without prejudice to specific objections at

trial.

That said, I'm inclined to agree with the government's

suggestion at footnote seven of its reply, which is ECF number

197, that the defendant should be required to provide notice

M1DsAVEc

1    and confer with the government before offering any specific

2    purported acts, or anything of the sort that is covered by this

3    motion, to ensure that the government can raise the issue in a

4    timely fashion and in advance.

5           Any objection to that, Mr. Baum?

6           MR. BAUM:  Judge, there may be issues brought out in

7    cross-examination of witnesses.  If that's the case, I don't

8    see how -- I mean, I don't want to say there is no objection to

9    that.  The government may open the door and in direct

10   examination may intend to call Mr. Avenatti's office manager.

11   I don't know what degree they will inquire about Mr. Avenatti's

12   work.  There is also the issues yet to be determined about the

13   government going into the financial -- his financial resources

14   and his firm's financial resources.

15          So these may engender some discussion about

16   Mr. Avenatti's work in the past.  We have no intention on our

17   direct case, unless Mr. Avenatti testifies, to bring out these

18   issues.

19          THE COURT:  All right.  So, listen, I recognize that

20   and you're certainly allowed some latitude with respect to your

21   cross-examinations.  Let me make a couple things clear.

22          One, if the government opens the door, the government

23   opens the door, if you think they have opened the door.

24   However, I want you to bring that to my attention so I can give

25   you a ruling on whether I agree.

M1DsAVEc

1          Number two, I will say that you may not offer any

2    affirmative evidence as part of your case in chief of this sort

3    unless you confer with the government first, and if there is an

4    objection raised, raise it with me?

5          Number three, I would ask you to, I would say,

6    exercise the rule of reason.  If you can, and if you can

7    anticipate you intend to offer evidence of this sort on cross

8    or go into it on cross and you think that it might trigger an

9    objection and it would be helpful for me to address it in

10   advance outside the hearing of the jury, I think you should try

11   to raise it with the government.

12          Having said that, I recognize that it is not always

13   easy to anticipate the course of cross, and if there is a

14   question here or there, I'll deal with objections as they come

15   up.

16          Understood?

17          MR. BAUM:  That's satisfactory, Judge.

18          THE COURT:  I do want to be clear, however, this case

19   is not whether Mr. Avenatti is a good lawyer or a bad lawyer,

20   successful lawyer, unsuccessful lawyer.  With the caveat that

21   I'll rule on the pending motion about his financial condition.

22   That is not what this case is about.

23          This case is about whether he committed the crimes

24   charged in the indictment, and that's what the evidence will

25   focus on.  And if it is relevant to that, then it will come in.

M1DsAVEc

1    if it's not, we're not going to go down a sideshow about

2    whether he's a good person, a bad person, good lawyer or bad

3    lawyer, so on and so forth.  All right.

4            All right.  That leaves the first three issues raised

5    by the government in its motion in limine, one of which I had

6    told you to be prepared to focus on today, namely the

7    government's motion to admit evidence regarding the defendant's

8    failure to file income taxes for the relevant time period.

9            Let me start with that issue first.  That is to say

10   it's the third motion in limine.  First, bracketing the

11   advice-of-counsel issue for a moment, I'm inclined to think

12   that the government has the better of the argument, that

13   defendant's sole argument in response is to the government's

14   motion that there is nothing to indicate that, had he filed tax

15   returns for the years in question, he would have been required

16   to specify the sources of his income at the granular client

17   level.  That may be so.  I think that is so.

18           But if the government were seeking to introduce tax

19   returns that Mr. Avenatti did file, I would think that that

20   might well be an argument to keep them out.  In that situation,

21   the government would have to be able to show that the income

22   that is at issue was not included in whatever income the

23   defendant reported; absent the ability to do that, the tax

24   returns wouldn't be relevant or probative of the crimes

25   charged.

1          But that is not the situation here.  Here, the

2     defendant, as I understand it, did not file tax returns at all

3     and that fact does seem relevant and probative to me of whether

4     the proceeds at issue here were, in fact, legitimate proceeds.

5     That if the proceeds were lawful, legitimate proceeds to which

6     Mr. Avenatti was entitled, they would have presumably been

7     income and he would have been required to report them to the

8     IRS.  The fact that he did not do so tends to rebut any claim

9     that they were lawful and legitimate.  Of course, he may well

10    have had other reasons not to file tax returns.  And, again,

11    I'm bracketing the advice-of-counsel issue for the moment.  But

12    that strikes me as argument to be made to the jury and/or

13    fodder for cross-examination -- and ultimately I would think

14    goes to the weight and not admissibility.

15          In support of that analysis and conclusion, I would

16    cite several cases.  First is United States v. Atuana, 816

17    F.App'x 592, 595 (2d Cir. 2020)(which affirms a district court

18    decision to admit evidence that the defendant had failed to

19    file income tax statements for business entities he controlled,

20    which had been used as conduits in the fraudulent activity at

21    issue" and noted that "the district court reasonably concluded

22    that Atuana's failure to file any tax returns for his several

23    companies over the course of the conspiracy was probative of

24    whether the businesses were legitimate.")

25          Second is United States v. Mitchell, 613 F.3d 862, 866

M1DsAVEc

 1    (8th Cir. 2010)(which affirmed the district court's decision in

 2    the money laundering conspiracy case, to admit evidence of a

 3    failure to file tax returns as "relevant to show a plan to

 4    conceal the transactions" and noting that "failure to file tax

 5    returns is relevant to the existence of, and a defendant's

 6    participation in, a money laundering conspiracy.")

 7            Finally, United States v. Memoli, 2014 WL 5313707, at

 8    *9 (D.Conn., October 16, 2014)(which admitted evidence of the

 9    "defendant's failure to file federal income taxes" for two

10    years to "show consciousness under 404(b)(2)," accepting the

11    government's argument that "defendant's failure to file taxes,

12    and his accompanying failure to declare the extortion payments

13    he received ... as income, is relevant admissible evidence that

14    tends to show defendant's motive, intent, and knowledge that

15    those payments were derived from criminal activity and thus

16    needed to be concealed," and noting that "defendant did not

17    refute the government's argument" about relevance, for

18    instance, "by asserting that defendant had a legitimate reason

19    not to file tax returns, for example, because he did not have

20    any reportable income for those years."

21            So, again, bracketing the advice-of-counsel issue for

22    a moment, I am inclined to think that putting that issue aside,

23    that the government has the better of the argument.

24            Whoever is addressing this, what am I missing there?

25            MR. DALACK:  Thank you, Judge.

M1DsAVEc

1          I think the problem is, as your Honor pointed out, had

2     we been dealing with actual tax returns filed, there would have

3     been nothing in them for him to specify which client account

4     particular income came.

5          THE COURT:  Keep your voice up and speak into the

6     microphone.

7          MR. DALACK:  There would have been no requirement

8     compelling him to specify from which client any income came.

9     So the failure to file tax returns at all doesn't really speak

10    to anything about the sources of income that he obtained and

11    doesn't really allow the jury to infer anything about whether

12    the income at issue in this case was obtained fraudulently or

13    not, or whether he obtained it for some other purpose, perhaps,

14    to reimburse for costs, which I'm not a tax specialist or a tax

15    lawyer, but query whether any sort of reimbursement for costs

16    would have had to have been filed formally in the context of a

17    tax return.

18          So, on that score, whatever limited probative value

19    the failure to file tax returns has is substantially outweighed

20    by the risk of prejudice and confusing the issues.  This case

21    is not a tax fraud case.  It is not about whether Mr. Avenatti

22    properly or improperly declared income to the United States

23    government.  It is whether or not he had a culpable state of

24    mind when he transferred funds from the trust account to his

25    firm's account, and for whatever reason that was income for

M1DsAVEc

| 1 | reimbursement.  That is the crux of the case.  It is not about

2 | what happened afterwards or what happened with respect to the

3 | firm.

4 | I think it is also difficult here, and with the

5 | understanding that the court is interested in bracketing off

6 | the advice-of-counsel issue, I'll set that aside for a second.

7 | It is important to note as well, and I acknowledge that we

8 | didn't mention this specifically in our papers in opposition to

9 | the government's motion, but it is our understanding that in

10 | February of 2019, Mr. Avenatti's firm was put into a

11 | receivership.  So there is an actual factual impact.  He did

12 | not have filed tax returns for the year 2019.  He didn't have

13 | access to the information.  It was in receivership at that

14 | point.

15 | So on that additional ground, we think that when you

16 | look at the 403 balancing test, whatever minimal relevance the

17 | failure to file tax returns has is, again, substantially

18 | outweighed by the risk of prejudice to Mr. Avenatti.  The jury

19 | could infer his guilt as to the charges, which are pretty much

20 | divorced from the failure to file tax returns simply on the

21 | ground that, well, he didn't file tax returns, so he must have

22 | been up to something.  We don't think that that is a fair

23 | inference on balance given all of the information available.

24 | Then when you couple that with the fact that we can

25 | confidently say Mr. Avenatti was acting under the advice of

M1DsAVEc

1      counsel.  We are going to have a sort of mini-trial of sorts to

2      determine whether the advice-of-counsel defense and the

3      standards we set forth in our opposition can be met.  That

4      would be a waste of time and confuse the issues and be very

5      confusing to the jury.

6             For all those reasons, we think the government's

7      motion should be denied.

8             THE DEFENDANT:  Your Honor, this is Mr. Avenatti.

9             THE COURT:  Mr. Avenatti, your counsel is doing an

10     ample job on your behalf.  Please let them speak.

11            THE DEFENDANT:  I just needed to communicate with my

12     lawyer, if I had an opportunity.  That's all.

13            THE COURT:  Do you have a means to do that?

14            MR. DALACK:  I do, your Honor.  It might require me to

15     step out of the courtroom, if that's OK.

16            THE COURT:  All right.  Why don't you give Mr. Dalack

17     access to the jury room and a couple minutes, and I'll give him

18     an opportunity to confer with his client.

19            MR. DALACK:  Thank you, Judge.

20            (Recess)

21            Thank you, your Honor.  I would also be remiss if I

22     failed to make the observation that at the time that at least

23     the tax returns with respect to 2018 were due, it's undisputed

24     that Mr. Avenatti was under indictment at that time, and that

25     there was a Fifth Amendment concern that sort of dovetails with

M1DsAVEc

1    the advice-of-counsel issue.

2             THE COURT:  OK.  Understood.

3             Again, I think I would like to bracket the

4    advice-of-counsel issue and include in that the receivership

5    issue, because I think they are sort of a similar nature and

6    focus for a moment on the issue in the absence of those.

7             As I understand it, the defense that Mr. Avenatti is

8    presenting is that he was entitled by virtue of an agreement

9    with Ms. Clifford -- and I've made my decision on that score --

10   to keep a portion of the money that she was receiving as a book

11   advance.  If that is the case, it seems to me that it would be

12   reportable income and that the failure to file any tax returns

13   at all -- again, bracketing the receivership issue and Fifth

14   Amendment issues and advice-of-counsel -- that it would be

15   reportable income and that the absence or failure to file any

16   tax returns would, therefore, be relevant and probative for the

17   reasons I described.

18            I just don't see, I don't understand, it seems to me

19   that the fact that he wouldn't have had to itemize it had he

20   filed taxes is irrelevant to that issue.  It's the failure to

21   file that and the failure to report any income combined with

22   the fact that this would clearly qualify as income, that would

23   make it probative and relevant.

24            Am I missing something there?

25            MR. DALACK:  Your Honor, I don't think you're missing

M1DsAVEc

| | |
|---|---|
| 1 | something there.  I would push back.  And, again, tax law is |
| 2 | not my expertise, but this is not a tax fraud case.  Whether or |
| 3 | not the money that was kept from the book advance was kept for |
| 4 | the purposes of income as opposed to reimbursement, I think |
| 5 | could affect what would have been filed on any tax return with |
| 6 | respect to that money and how the firm handled it. |
| 7 | But I think what I'm struggling with, you know, |
| 8 | notwithstanding the court's desire to bracket off the other |
| 9 | issues, is that the other issues do heavily weigh in our favor |
| 10 | when it comes to the balancing test under 403. |
| 11 | THE COURT:  Since I bracket those, I don't want you to |
| 12 | go into them. |
| 13 | All right.  Let me say that bracketing those issues, I |
| 14 | think the evidence would clearly be admissible for the reasons |
| 15 | I described.  That is to say, strikes me that it is clearly |
| 16 | income, or at least an argument could be made and you're |
| 17 | entitled to argue otherwise to the jury, that it is relevant |
| 18 | and probative for the reasons I described and not substantially |
| 19 | outweighed by any danger of prejudice.  It's not especially |
| 20 | inflammatory relevant to the crimes charged, so on and so |
| 21 | forth. |
| 22 | Having said that, the Fifth Amendment issue, the |
| 23 | advice-of-counsel issue, and the receivership issue certainly |
| 24 | do change the picture somewhat.  And if those things are valid |
| 25 | and an argument for why he didn't file tax returns, then it may |

M1DsAVEc

| | |
|---|---|
| 1 | well tip the balance.  I don't quite understand why somebody |
| 2 | who is under indictment or a microscope of multiple |
| 3 | investigations would not file tax returns.  That seems to be |
| 4 | just digging a deeper hole and raising a separate issue that |
| 5 | the government could come after someone for. |
| 6 | So I don't quite understand the theory there or why |
| 7 | counsel would have given that advice.  Can you make a proffer |
| 8 | with respect to the advice of counsel here? |
| 9 | MR. DALACK:  It's hard to disentangle it with respect |
| 10 | to this case, because when I say that Mr. Avenatti was under |
| 11 | indictment, he was under indictment at the time of 2019 in at |
| 12 | least three separate cases, or at least two separate cases, |
| 13 | including the California case, which included tax charges. |
| 14 | Without, at this particular moment, getting into the |
| 15 | propriety of an advice-of-counsel defense, I can say that as a |
| 16 | reasonably experienced defense attorney myself, I would advise |
| 17 | myself, faces tax charges, not making any representations or |
| 18 | facing indictment, on Fifth Amendment grounds.  I think that |
| 19 | sort of resolves the issue here. |
| 20 | Perhaps had the government charged everything in one |
| 21 | indictment, we might be in a different position.  But it still |
| 22 | remains the case, at least with respect to the California |
| 23 | charges that were not the subject of the mistrial, he is still |
| 24 | facing tax fraud charges in that case.  So there wasn't |
| 25 | anything on its face that is improper about advising him to not |

M1DsAVEc

1    make any sworn representations about his finances, given the

2    position that the government has taken about those finances and

3    about the propriety of his firm's dealings.

4             THE COURT:  OK.  Can you make a proffer about who

5    advised him of that, when they advised him of that, and on what

6    grounds?

7             MR. DALACK:  I can make a proffer.  I do know who the

8    attorney is that advised him to not file the tax returns.  My

9    understanding is that it is Mr. Steward, James Steward, and he

10   advised him not to file tax returns on a number of different

11   grounds, but largely on Fifth Amendment grounds, your Honor.

12            THE COURT:  Is the government not entitled to

13   disclosure of the evidence that would support an

14   advice-of-counsel defense?

15            I recognize it is not the charged crime here, but to

16   the extent that I think it would otherwise be admissible, I

17   think the government is entitled to know the basis on which

18   you're arguing it's inadmissible and to challenge that, if they

19   think that there is no valid advice-of-counsel defense.

20            MR. DALACK:  I'm sorry.  Your Honor, I think I would

21   respectfully like an opportunity to write on that particular

22   issue with respect to what kind of affirmative disclosures we

23   would have to make in the first instance before advancing an

24   advice-of-counsel defense.  We think it touches on thorny

25   privilege issues.  I want an opportunity --

M1DsAVEc

1          THE COURT:  Mr. Dalack, if you're raising an

2    advice-of-counsel defense, you are waiving the privilege.

3    There is no privilege because you're relying on the advice of

4    counsel.

5          MR. DALACK:  Understood, your Honor.  I think the

6    issue is that it's disentangling whether or not we are

7    advancing advice-of-counsel charges as opposed to something --

8    we're not making, obviously, an advice-of-counsel defense with

9    respect to the charges in this case.  We are advancing and

10   saying that there is a viable advice-of-counsel defense as to a

11   particular piece of evidence that the government is seeking to

12   introduce.  I don't know if those trigger the same kinds of

13   affirmative disclosure obligations in the first instance.

14          I would like an opportunity to take a look at the law

15   on that issue and see to what extent the government would even

16   be entitled to that before we sort of cross that bridge in the

17   middle of trial.

18          Can I have one minute, your Honor?

19          THE COURT:  Yes.

20          (Counsel confer)

21          MR. DALACK:  Mr. Baum alerted me to another issue,

22   which is if, in fact, we had to go down this road and

23   affirmatively call Mr. Steward to the stand to inquire about

24   the propriety of his advice as to not to file tax returns, it

25   would necessarily open the door to a discussion of the

M1DsAVEc

1    California case.

2              THE COURT:  Let me stop you.  I'm inclined to think,

3    although I haven't heard from the government, that if there is

4    a valid advice-of-counsel defense here, that this isn't going

5    to come in because then the 403 balancing probably does tip the

6    other way for those reasons, among others.  It just becomes a

7    complete sideshow, and the dangers of unfair prejudice involved

8    with revealing that Mr. Avenatti faced multiple indictments and

9    so on and so forth are just, you know, quite clear.

10             Let me put it this way.  I think the government is

11   entitled to test your assertion, and if it doesn't think that

12   there is a valid defense to challenge it and if I need to hold

13   a hearing outside the presence of the jury to determine whether

14   it is valid to then determine whether the evidence comes in

15   without any discussion of that, I'm prepared to do that.

16             Just, at the end of the day, candidly, I'm not sure

17   this evidence is so powerful that the government wants to go

18   down that road and buy the risks that come along with it.  That

19   being said, I need to decide the issues that I need to decide.

20             Anyway, let me turn to the government and see your

21   thoughts on this, how you think we should proceed, what sort of

22   disclosure you would look for, how you want to address the

23   receivership issue and the Fifth Amendment issues.  I would

24   think the Fifth Amendment issues are tied up with the

25   advice-of-counsel issue, and in that sense, they are not really

M1DsAVEc

1   separable.

2           In any event, government?

3           MR. ROHRBACH:  The government agrees with that last

4   proposition, that the Fifth Amendment issue is tied up with the

5   advice-of-counsel issue.  We agree that the Fifth Amendment

6   issue is tied up with the advice-of-counsel issue.  On the

7   advice-of-counsel issue, our view is what the court expected.

8   If there is a valid advice-of-counsel defense here, I think the

9   government would walk away from this evidence rather than try

10  to introduce it and open the door to the sideshow that the

11  defense is discussing.

12          But the government should have an opportunity to test

13  whether that advice-of-counsel defense is real, whether

14  Mr. Avenatti, in fact, received the kind of advice that we're

15  talking about.  The defense's assertion of privilege here is an

16  attempt to use privilege as a sword to keep out the

17  government's evidence and a shield to protect them, protect the

18  actual content of advice on which Mr. Avenatti relied, which is

19  improper.

20          So the government's suggestion here is that the

21  defense provide discovery to the government about the basis for

22  the advice on which Mr. Avenatti allegedly relied upon review

23  of that evidence.  The government may decide not to proceed

24  with the tax evidence or we may ask for further relief or

25  opportunity to discuss it with the court again.

M1DsAVEc

1    THE COURT:  All right.

2    MR. DALACK:  I'm a little --

3    THE COURT:  My proposal is the following.  I'm

4    inclined to agree with that, but certainly prepared to give you

5    an opportunity, if you think that there is a basis to avoid

6    disclosure, to persuade me of that.

7    What I propose is that I set a deadline of Monday for

8    the defense to disclose whatever evidence it has or any

9    information that would support advice-of-counsel with respect

10    to this issue, and then that you be prepared to address it on

11    Tuesday either substantively or procedurally with respect to

12    how you propose we proceed, whether it needs to be briefed,

13    whether the government is walking away, so on and so forth.

14    To that end, I think you guys should confer before

15    that conference on Tuesday to see if you can reach some

16    agreements on that score.  In the meantime, if the defense

17    think that's there is a basis to withhold the information on

18    privileged grounds or otherwise, you can submit a letter brief

19    to me, and I will certainly consider it.  And if I agree, then

20    I'll deviate from what I just said.  If I disagree, that's the

21    plan.

22    Any objection?

23    MR. DALACK:  Well, I guess I'm having a difficult time

24    understanding exactly what more the government wants beyond the

25    proffer that we have made here today with respect to the advice

M1DsAVEc

1    of counsel.  We have named the attorney who we are saying gave

2    Mr. Avenatti that advice.  I'm not sure, beyond that

3    information, do they want details as to the exact advice given?

4              I guess I'm having a hard time understanding the scope

5    of what the government desires, and we feel we have made a

6    fulsome enough proffer to allow the issue to be resolved on

7    balancing grounds, assuming that Mr. Avenatti -- and we're

8    saying he was advised my Mr. Steward not to file tax returns

9    for a number of reasons, but primarily on Fifth Amendment

10   grounds, and given the pending charges out in another district.

11             THE COURT:  Well, I don't want to speak for the

12   government.  I think the best course here is for them to confer

13   with you and tell you what sorts of things they are looking

14   for.  At a minimum, I would think that if there were any

15   communications regarding this issue, part of the

16   advice-of-counsel defense requires a showing that the defendant

17   disclosed all relevant information to counsel and also what the

18   advice was.

19             If the advice was given in writing, they are entitled

20   to see what the advice was and when it was given.  If there is

21   a record of the dates on which that advice was given, I think

22   they are entitled to that.  I think they are entitled to more

23   than simply the name of the person and the bottom-line advice

24   given.  But I think the best course is to leave it to you to

25   confer later today and see if you can reach agreement on that.

M1DsAVEc

1    If you have any disagreements, you are certainly available to

2    try and resolve them.  And, again, if you want to persuade me

3    that you don't have to disclose anything beyond what you

4    already disclosed, certainly make an effort.

5              I would think there is a clear waiver, if you're

6    putting forward advice-of-counsel as a basis to avoid the

7    admission of evidence against your client.

8              All right.  Anything else on that score?

9              MR. ROHRBACH:  Just one thing from the government,

10   your Honor.  We ask the deadline be Monday at noon, since the

11   conference is Tuesday at noon.  I think we have more than just

12   Monday at midnight to Tuesday at noon to review and confer with

13   the defense.

14             THE COURT:  All right.  I'll set it as Monday and

15   three p.m.  How about that?

16             MR. DALACK:  I'm sorry.  That's Monday at three p.m.

17   for any disclosures to the government or our letter to the

18   court about both?

19             THE COURT:  Any disclosures, unless sometime before

20   then I grant you relief from having to do that.  It is

21   incumbent on you to get me a brief on that sooner rather than

22   later why you think there is a basis to it.  Otherwise, at

23   three p.m. on Monday, you are to disclose whatever evidence

24   supports the defense.

25             MR. DALACK:  I anticipate being in touch with one of

M1DsAVEc

1    the three of them over the weekend too.  There will be many

2    opportunities to discuss this.

3              THE COURT:  I would imagine.

4              All right.  I should note, I guess, on Tuesday we can

5    take it up, but to the extent that the evidence does ultimately

6    come in, I would also think that it is an appropriate issue to

7    have a limiting instruction on.  I think putting the cart

8    before the horse asking you that you should propose something

9    now.  Let's first figure out if it's coming in.  If it does

10   come in and the defense requests a limiting instruction, I

11   would be inclined to give one.  You should certainly give that

12   some thought.  Confer with one another and make a proposal if

13   and when it is appropriate.

14             All right.  Since I think we have some additional

15   time, let me turn to the other two issues on the table.

16   Actually, before I do that, can I also just clarify if this

17   evidence, the tax return evidence were to come in, how the

18   government -- what it would be?

19             Would it be through a witness, through stipulation?

20             MR. ROHRBACH:  We would confer with the defense about

21   a stipulation, but the government's plan otherwise is to call

22   someone from the Internal Revenue Service to give very brief

23   testimony just explaining the absence of tax filing for those

24   two years and relevant entity.  We think, extremely brief, from

25   the government's perspective, subject to cross and along the

M1DsAVEc

1   lines the defense has been talking about.

2           THE COURT:  That's why I asked, just because if there

3   are arguments to be made or cross-examination that may have

4   some bearing on the issues.

5           All right.  Let's turn to the first issue in the

6   motions in limine, namely the request to admit evidence

7   regarding the disposition of criminal proceeds.

8           Let me start with a question for the government.  What

9   is the evidence?

10          You say you don't want to introduce evidence of

11  Mr. Avenatti's spending habits generally, but you don't

12  actually give me any details on what the actual use of the

13  funds here was and how you propose to prove it up.

14          MR. ROHRBACH:  If I may have a minute to confer with

15  my colleagues, your Honor?

16          (Counsel confer)

17          Your Honor, the government would offer a law

18  enforcement witness who would explain a tracing analysis

19  showing where the funds went.  They went to various entities,

20  including Avenatti & Associates, as well as from there on to

21  other entities or other individuals.  And then the government

22  would also offer some brief testimony from the office

23  assistant, who would just describe what some of those entities

24  are, if they are not facially apparent from the bank records

25  that the law enforcement officer would be testifying about.

M1DsAVEc

1          So there might be, for instance, some of the money

2     went to pay payroll for Mr. Avenatti's other entities, and that

3     is something that the office assistant would be able to

4     elaborate on.

5          THE COURT:  OK.  As I understand it, there is no

6     intention to prove, sort of, that he paid for some expensive

7     coat or alcohol or dinners at some fancy restaurant.  I mean,

8     something that would sort of veer into the territory of living

9     a high-flying life.  I mean, it sounds like it is much more

10    just showing that it was converted to his own use.

11         MR. ROHRBACH:  It is much more like that, your Honor.

12    But one of the items of his own use is, I think, the thing that

13    is most in the vein of what your Honor is describing are

14    payments for a Ferrari.

15         THE COURT:  For a Ferrari?

16         MR. ROHRBACH:  Yes, your Honor.

17         THE COURT:  Is there a need to say that it is a

18    Ferrari as opposed to just paying for a car?

19         (Counsel confer)

20         MR. ROHRBACH:  Yes.  I think what we're struggling

21    with, your Honor, is the records show a payment to a Ferrari

22    financial entity.  So that is the way we are able to describe

23    where the payment went and show that it wasn't for the benefit

24    of victim one.

25         If the defense were to stipulate it went to a car

M1DsAVEc

<table>
<tr><td>1</td><td>dealership, we won't draw an objection.  If we just make that</td></tr>
<tr><td>2</td><td>point that it was for his car, that would be sufficient for the</td></tr>
<tr><td>3</td><td>government, and we could omit the word Ferrari.</td></tr>
<tr><td>4</td><td>THE COURT:  All right.</td></tr>
<tr><td>5</td><td>MR. DALACK:  If I may, Judge?</td></tr>
<tr><td>6</td><td>THE COURT:  Yes.</td></tr>
<tr><td>7</td><td>MR. DALACK:  First, the government is seeking to</td></tr>
<tr><td>8</td><td>introduce this information to show lavish lifestyle evidence</td></tr>
<tr><td>9</td><td>that we think is improper, not only going to show it with</td></tr>
<tr><td>10</td><td>respect to the Ferrari, also going to show it with respect to a</td></tr>
<tr><td>11</td><td>private jet.</td></tr>
<tr><td>12</td><td>I think the point that I would like to emphasize is,</td></tr>
<tr><td>13</td><td>according to the government's theory of the case and indeed</td></tr>
<tr><td>14</td><td>according to the case law, whatever wire fraud that allegedly</td></tr>
<tr><td>15</td><td>took place was complete the moment that the money was moved</td></tr>
<tr><td>16</td><td>from the trust account to Eagan Avenatti.  Whatever happened</td></tr>
<tr><td>17</td><td>afterwards is immaterial.</td></tr>
<tr><td>18</td><td>Just as it would be inappropriate for us to say, well,</td></tr>
<tr><td>19</td><td>Mr. Avenatti spent this money helping Syrian refugees as a</td></tr>
<tr><td>20</td><td>defense to the charges, it is similarly improper for the</td></tr>
<tr><td>21</td><td>government to say, look how he spent this money afterwards.  If</td></tr>
<tr><td>22</td><td>the money was obtained properly, it doesn't matter what</td></tr>
<tr><td>23</td><td>Mr. Avenatti spent it on.</td></tr>
<tr><td>24</td><td>THE COURT:  I got the argument.  You make that in your</td></tr>
<tr><td>25</td><td>briefs.  I totally get it.</td></tr>
</table>

M1DsAVEc

1          MR. ROHRBACH:  I do want to say, Mr. Dalack is right

2     there are payments made to a company that is responsible for

3     Mr. Avenatti's private jet, which we would like to introduce.

4     If there is a way we can do that without revealing the fact

5     that Mr. Avenatti had a private jet, we would be amenable to

6     do so.

7          THE COURT:  OK.  So let me rule on the motion before

8     me, which is generally with respect to this kind of evidence.

9          The motion is granted, as to say the government may

10    introduce evidence regarding the disposition of criminal

11    proceeds subject to specific objections to particular evidence,

12    and I'll get more into that in a moment.

13         As the government's brief opening brief notes,

14    evidence showing how a defendant spent the proceeds of his

15    crime is routinely admitted as relevant evidence to establish

16    the defendant's motive and intent for committing the crime.

17    See pages four and five of the government's brief, which is ECF

18    number 176, for relevant citations.  More specifically, I agree

19    with the government that the proffered evidence is (1) direct

20    evidence of the defendant's scheme to defraud; (2) proof that

21    he controlled the disposition of the fraud proceeds; and

22    (3) evidence of the defendant's motive and intent to commit the

23    charged crimes.

24         In arguing otherwise, the principal contention made in

25    the briefs, and repeated by Mr. Dalack a moment ago, is that

1    evidence of what Mr. Avenatti did with the money is not an

2    element of the crimes charged.  But that is certainly true, but

3    of course that is not the test for relevance under Rule 401.

4    See, for example, United States v. Quattrone, 441 F.3d 153, 188

5    (2d Cir. 2006)("So long as a chain of inferences leads the

6    trier of fact to conclude that the proffered submission effect

7    as the mix of material information, the evidence cannot be

8    excluded at the threshold relevance inquiry.")

9            United States v. Redcorn, 528 F.3d 727 (10th Cir.

10   2008), the sole case on which the defendant relies, does not

11   suggest otherwise.

12           For one thing, it is obviously from a different

13   circuit and, therefore, not binding.  But in any event, Redcorn

14   did not address the issue here, the relevance and admissibility

15   of evidence concerning the disposition of criminal proceeds.

16   Instead, the question in Redcorn was whether certain wire

17   transfers could be used to satisfy the elements of the crime.

18   The court held that they could not because, at the time of

19   those wire transfers, the crime had already been completed.

20   See page 739.  That is a totally different issue from the one

21   here of admissibility.

22           Finally, and not for nothing, the evidence in Redcorn

23   was unnecessary even to prove conversion to the defendant's use

24   because the funds at issue had already been converted by being

25   transferred into the defendant's accounts.  Here, because the

1  defendant was authorized or alleged authorized to receive the

2  funds on behalf of Ms. Clifford, the government has to show

3  more to prove that he converted them to his own use.  That more

4  is evidence that he spent the funds on himself.

5          Finally, assuming for the moment that none of the

6  specific expenditures are inflammatory or could give rise to

7  undue prejudice, that is to say assuming there is a narrow

8  scope of the evidence that the government seeks to offer, and

9  I'm inclined to keep it narrow, that is the government does not

10  seek to offer evidence of Mr. Avenatti's spending habits

11  generally, the Rule 403 balancing test would plainly not call

12  for wholesale exclusion.  That is the evidence is highly

13  probative of the crimes charged and given that it is not

14  particularly inflammatory, and certainly no more inflammatory

15  than the charges, the probative value is not substantially

16  outweighed by the Rule 403 dangers, that is as to the evidence

17  generally.

18          Having said that, I am not sure that is true with

19  respect to an expenditure on a Ferrari or expenditure on a

20  private jet.  It just isn't clear to me that the government

21  needs to prove those if it has other proof of expenditures that

22  are personal to Mr. Avenatti.  Those make the point, and there

23  is probably no need to get into expenditures that might simply

24  raise the specter of unfair prejudice in front of the jury.

25          I would like you guys to confer about what the

M1DsAVEc

1    expenditures are that the government proposes to prove.  I

2    would urge the government to consider, just excluding those on

3    the theory that you can make the arguments based solely on the

4    other expenditures, if for some reason the government concludes

5    that it can't, I would urge you to consider whether there is a

6    way to sanitize it to say that it is a car dealership or

7    transportation expenses related to Mr. Avenatti that would omit

8    the potentially inflammatory details that we're talking about,

9    a Ferrari and private jet.  But I will hear if there is a

10   dispute about it.  I'm prepared to hear about it, and you

11   should raise it on Tuesday.

12        Again, as a general matter, the government's evidence

13   is granted, but it is subject to rulings on the particulars if

14   there is any dispute between the parties.  On this issue, I'm

15   not sure that a limiting instruction would be necessary, but if

16   the defense requests one, I'll certainly consider it.  And you

17   should confer with one another in advance, in the event that

18   the defense does request one.

19        Since I haven't heard that they are ready for us

20   across the street, I will plow ahead and turn to the last issue

21   on the agenda, which is the second motion in limine, motion to

22   admit evidence regarding the defendant's and his law firm's

23   financial circumstances.

24        One question of clarification for the defense.  In

25   your opposition brief you quote from what I think is an

M1DsAVEc

1    analysis from a Mr. Drum that was prepared in connection with

2    the Central District of California case.  Am I correct in

3    inferring from that and from the brief more generally that you

4    have that analysis and that it was disclosed to you?

5        MR. DALACK:  We were referencing an analysis that was

6    on the record.  We do not have all the analyses from Mr. Drum,

7    your Honor.  That is part of the problem.  We have asked for

8    it.  We subpoenaed it.  It has not yet been received.  So

9    that's also an issue that remains from what I understand in

10   dispute in the Central District of California.

11       While I have the microphone for a second, your Honor,

12   I want to raise an issue that bars on the court's consideration

13   of this particular motion in limine.

14       THE COURT:  Slowly, and go ahead.

15       MR. DALACK:  Yes, Judge.

16       There is a Rule 16 issue here that's aside from the

17   servers for a moment and the information contained on the

18   servers and the information and analysis conducted by Mr. Drum.

19   For the first time ever, despite having represented on a number

20   of occasions that Rule 16 discovery was complete, the

21   government disclosed to us yesterday, or maybe two days ago,

22   Rule 16 material that they labeled as Rule 16 material from a

23   prospective government witness.  That's Sean Macias.  It is

24   about 303 pages of communications between Mr. Macias and

25   Mr. Avenatti that should have absolutely been disclosed by the

M1DsAVEc

1    Rule 16 deadline in this case.

2           In its discovery letter, the government dropped a

3    footnote to indicate that these materials were previously

4    disclosed to other counsel in connection with 19 CR 373.  That

5    is completely a red herring and inapposite.  Regardless,

6    whether the government disclosed it to other counsel in the

7    separate case has no bearing on the government's obligation to

8    disclose that information in this case, particularly because

9    one, it involves Mr. Avenatti's own written recorded statements

10   that are plainly discoverable under Rule 16, and two, because

11   it discloses records that are in the possession of the

12   government witness that we understand they intend to call on

13   this financial condition issue.

14          So as the court is aware, there are a number of

15   remedies available to the court to rectify a Rule 16 violation.

16   One of them is adjournment.  Another is to preclude the

17   evidence or preclude the testimony.  And we're going to ask for

18   both.  We want the court to consider this Rule 16 violation in

19   the context of the government's application to affirmatively

20   introduce evidence of Mr. Avenatti's condition and preclude

21   them from getting it in on that basis.  We want the court to

22   strike and prevent Mr. Macias from testifying because they did

23   not produce Rule 16 materials relevant to his testimony.

24          And third, your Honor, again, we would ask for an

25   adjournment in light of the belated Rule 16 discovery request

M1DsAVEc

1    and its impact on our investigation and our ability to prepare

2    adequately for Mr. Macias' anticipated testimony, which we

3    understand will focus primarily on Mr. Avenatti's financial

4    condition and that of his firm.

5        THE COURT:  Can you tell me what the 303 pages consist

6    of?

7        What is in the 303 pages?

8        MR. DALACK:  A lot of communications between

9    Mr. Avenatti and Mr. Macias concerning various aspects of

10   Mr. Avenatti's financial condition and his firm's financial

11   condition.  I'm still reviewing them, your Honor, and going

12   over them.  We received a voluminous set of 3500 material as

13   well that we're still digesting.

14       To receive that kind of a Rule 16 production on the

15   eve of trial, what appears to be a crucial government witness,

16   is completely uncalled for.

17       THE COURT:  All right.  Mr. Dalack, we are 11 days

18   prior to the beginning of the actual trial.  303 pages hardly

19   seems like an especially voluminous set of materials.  If they

20   are just communications between your client and another

21   witness, putting aside the fact that your client was involved

22   in them and presumably, therefore, aware of them, I just find

23   it unfathomable that you can't be prepared to go to trial in

24   11 days.

25       What am I missing?

M1DsAVEc

1          MR. DALACK:  It's not so much about the actual number

2     of the pages, but it is the content of them and the fact it

3     should have been disclosed to us months ago.

4          THE COURT:  And what is the content of them that

5     requires you to have more than 11 days to prepare before you

6     begin this trial?

7          That's what I'm asking you.  If you're asking an

8     adjournment, what is the basis for that request?

9          Because it seems like a transparent attempt to get

10    something that you have previously asked and been denied, and

11    it doesn't seem to be at all grounded in reality.

12         My question is:  What is there about these materials

13    that requires more than 11 days to prepare?

14         MR. DALACK:  There are individuals that are also

15    referenced in the communications.  Again, a substantial amount

16    of the Rule 16 discovery pertaining to Mr. Macias contains

17    communications between Mr. Macias and others about Mr. Avenatti

18    and also between Mr. Avenatti and Mr. Macias.  It will require

19    time for us to go through and figure out if we want to

20    interview any of those people, potentially call them as defense

21    witnesses to rebut what Mr. Macias might say, or to put on an

22    affirmative defense case.

23         I'm still going through it, Judge.  And respectfully,

24    it is not a transparent attempt to get adjournment for some

25    flimsy reason.  We are very concerned about it, particularly

M1DsAVEc

1    because it appears both based on the 3500 from Mr. Macias and

2    the Rule 16 discovery, that they are going to rely on him

3    heavily to advance their argument by a financial condition.

4           And we think that it further tips the scale in our

5    favor with respect to the court's taking one of a number of

6    remedies, either restricting the government's ability to

7    introduce evidence of financial condition, precluding

8    Mr. Macias from testifying, or granting adjournment.

9           THE COURT:  All right.  Mr. Podolsky, is this your

10   issue?

11          MR. PODOLSKY:  I'll address this, your Honor.

12          Honestly, I don't want to give this more air than it

13   needs, but just to provide the actual facts here.

14          As an initial matter, Mr. Macias is not going to be

15   offered to testify generally about the defendant's financial

16   condition or provide some form of analysis about it.  His

17   testimony will be significantly limited to a loan that the

18   defendant procured at a particularly relevant time in this

19   case.  It will be quite short testimony.

20          The second thing I'll say is that the defense is

21   right --

22          THE COURT:  Can I stop you there for a moment?

23          MR. PODOLSKY:  Yes.

24          THE COURT:  What is the loan and what relevance does

25   it have to the issue in this case?

M1DsAVEc

1          MR. PODOLSKY:  Yes, your Honor.

2          I think the evidence will show, this is clear from the

3    3500 and I think the defense is well aware that in order to

4    repay the first -- well, the second of the four book payments,

5    but the first payment that we allege Mr. Avenatti stole before

6    the victim detected it, Mr. Avenatti went to, quite

7    desperately, to find a loan.  Mr. Macias has direct testimony

8    to provide about the defendant's efforts to get a personal

9    loan, the proceeds of which went to repay essentially to

10   provide a cashier's check to Ms. Clifford that was represented

11   by the defendant to be the book proceeds.

12          So it is probative, directly relevant, and it is not

13   so much about the defendant's financial condition generally,

14   although certainly there will be implications about that, given

15   the need for a loan.  It is about a directly relevant fact in

16   the sequence of Mr. Avenatti's scheme.  That is what it is

17   about.

18          In preparing for trial, we noticed through

19   inadvertence that a set of e-mails and text messages involving

20   Mr. Macias that had been produced in the prior case, his 3500,

21   by the way, had been produced as well, the content of the

22   testimony has been made known to the defendant for years now.

23   We realize simply by inadvertence, I accept the representation

24   that it was maybe 300 pages, hadn't been transferred over to

25   production in this case as well.

M1DsAVEc

1          In less than 24 hours of realizing it, we produced

2     those materials.  The content of them, your Honor asked, is

3     mostly irrelevant e-mails and text messages.  Most of those

4     pages, frankly, are defendant messages that show pictures of

5     people at dinner, have no relevance to this case, and not going

6     to be an exhibit in this case.

7          I would say it took me about 30 minutes to go through

8     these pages when we realized we hadn't produced them, and we

9     have already marked as potential exhibits, which are being

10    produced today I think, probably five pages or less of these

11    exhibits that actually may be offered at trial.

12         So the bottom line is the defense has received 3500 in

13    this case, received the same 3500 two years ago.  The

14    defendant, I should say, not this defense counsel.  We have

15    produced the 300 largely relevant pages which, as I say, took

16    about 30 minutes to review.  We don't see any basis for

17    adjournment or any other relief here.  This, frankly, simply is

18    what it is like to prepare for trial, and the defense is well

19    aware of what the testimony will be and certainly prepared, has

20    plenty of time to prepare for it.

21         THE COURT:  And did Mr. Macias -- if that is how it is

22    pronounced -- did he testify in the Judge Gardephe trial?

23         MR. PODOLSKY:  He has not testified before in the

24    prior trial against Mr. Avenatti in this district.  My

25    understanding from speaking to him is he did not testify in the

M1DsAVEc

California trial against Mr. Avenatti either.  We did, though,

beyond our obligations and in an abundance of caution, provide

his 3500 in advance of the prior trial in this district so the

defendant did have it, despite the fact that he is not a

testifying witness in that case.

THE COURT:  All right.  Mr. Dalack?

MR. DALACK:  Yes.  I don't think the court should

credit the government's argument that because it previously

produced these materials to counsel in another case that it

should somehow cure the failure to produce.

THE COURT:  Mr. Dalack, it's not just a counsel in the

other case.  It is to the defendant.  The defendant is also a

relevant party here, and if it was disclosed in his own prior

case, he has had them.  On top of which, again, he was party to

these communications, so he surely knows what is in them.  So I

don't quite understand the argument.

MR. DALACK:  The significance, your Honor, is that at

the time, from what I understand, at the time that the

materials pertaining to Mr. Macias were disclosed to the

defense and, perhaps, Mr. Avenatti in the other case, he was

incarcerated in solitary confinement at the MCC on 10 South.

So I think that is also a circumstance that I want the court to

consider.

Again, it's frankly frustrating for the government to,

on the one hand, say, you know, this Rule 16 violation is no

M1DsAVEc

big deal because the defendant had it or should have had in it

in connection with the other case.  And it was the government's

decision to move on three separate indictments and to charge

him in three separate cases.  If the government wanted the

convenience of making one single production across numerous

charges, it could have proceeded differently.  They opted not

to, now we are at a disadvantage.

THE COURT:  All right.  It sure seems to me, based on

what both sides have said, that this is making a mountain out

of a molehill.  I firmly agree that the government should have

turned over what it doesn't dispute is Rule 16 material in a

more timely fashion, but I also know that it is not uncommon,

as lawyers prepare for trial, they discover that certain things

were inadvertently not turned over.  As long as they promptly

cure that and it doesn't cause prejudice, it is what it is.

I am certainly not persuaded, based on what I had

heard, there is any prejudice, certainly no prejudice that

would warrant a delay of trial.  11 days until you start trial.

This is a marginal issue in a trial.  303 pages is not a lot.

Even if you need to speak to witnesses based on those

communications, you have 11 days to do it.  There is absolutely

zero basis, as far as I can tell, to adjourn this trial on that

basis.

If the defense wants to make an application to

preclude the exhibits that the government has marked from this

M1DsAVEc

1    set of documents and if those haven't already been disclosed --

2    I think today is the deadline for the government to provide

3    that to the defense -- I'll certainly entertain that motion.

4    I'm skeptical because, again, I don't really see what the

5    prejudice is.  But if you want to make the motion, you're

6    entitled to make the motion and I will take it under

7    consideration.

8           With respect to the motion that is correctly before me

9    and fully submitted, namely the motion to admit evidence

10   regarding the defendant's and his law firm's financial

11   circumstances, that motion is granted subject to specific

12   objections to particular evidence at trial.  There are scores

13   of cases in this circuit holding that evidence of financial

14   motivation is relevant and admissible in fraud cases.  See, for

15   example, United States v. Moses, 2021 WL 4558137, at *2

16   (W.D.N.Y. October 6, 2021)(citing cases, as well as the cases

17   cited by the government on pages seven through nine of its

18   opening brief).

19          In his opposition, defendant contends that motive is

20   distinct from intent and not an element of the offenses.  That

21   is true, but a non sequitur.  Again, it ignores the broad

22   definition of relevance under Rule 401.

23          Second, the defendant contends that motive has no

24   bearing on the circumstances of this case, but that is not

25   true.  As the government argues at page four of its reply

M1DsAVEc

1    brief, this is ECF number 197, it is critical that the jury be

2    provided with the contempt of the defendant's motive in order

3    to properly assess his conduct and intent; absent such a

4    context, I think the jury would be left with a misleading

5    impression that there was little or no reason for the defendant

6    to commit the crimes charged.  The defendant is obviously free

7    to argue to the jury that his financial condition did not

8    provide a motive for the crimes here, but that argument does

9    not call for exclusion of the evidence.

10        Finally, defendant, once again, invokes the discovery

11   issues that arose in the Central District of California case,

12   and, obviously, the one that Mr. Dalack just raised here.  With

13   respect to that issue, that is Mr. Macias, I don't think that

14   that provides a basis to exclude this evidence generally.

15   Again, it may provide a basis to exclude the actual

16   communications that were just disclosed, and I'll reserve

17   judgment on that pending motion, if there is one, but it

18   certainly doesn't change my calculus, analysis, or conclusion

19   with respect to the government's first motion in limine.

20        With respect to the Central District of California

21   case, I do not think that those issues have any bearing here.

22   As I noted in my order with respect to the defendant's request

23   for adjournment at ECF number 213, the defendant has had the

24   servers, and at least to some extent the Drum analysis,

25   certainly the bottom line of it, for approximately four months.

M1DsAVEc

1    Given the nature of the charges in this case, the defendant's

2    own familiarity with the underlying evidence, and his own

3    familiarity with his own and his law firm's financial condition

4    and the tools available to him to review the servers and other

5    evidence that is ample time to make use of the evidence, and

6    there is simply no argument, no compelling argument to be made

7    about delayed disclosure in this case.

8           To the extent that defendant speculates in his brief

9    that there may be other materials in the Central District of

10   California U.S. Attorney's office, files that have not been

11   turned over, that argument is without merit here.

12          First, it is pure speculation.

13          Second, I am inclined to agree with the government,

14   but will not rule definitively on the issue that the Central

15   District of California U.S. Attorney's office is not part of

16   the prosecution team for purposes of this case or at least with

17   respect to purposes of this issue in this case.

18          Third, whether it is or not, the defendant

19   conspicuously does not allege any discovery violations in this

20   case, aside from the Mr. Macias issue just raised.

21          And, finally, with the exception, perhaps, of the

22   Mr. Macias issue, since that was based on a disclosure that was

23   just made, any such motion would be untimely under

24   Rule 12(b)(3)(e) and (c).  Accordingly, the motion is granted.

25   Again, that is subject to specific objections at trial.

M1DsAVEc

1    Moreover, I would encourage the parties to confer in an effort

2    to streamline the evidence, perhaps through stipulations, as

3    the government seems to invite in footnote two of its opening

4    brief.

5         Yes, Mr. Dalack.  Hold on.  I should warn you, I'm

6    told that we should begin to make our way across the street in

7    a couple minutes.  I'm nearing the conclusion of what I have to

8    cover, but just wanted to give you a heads-up, we will promptly

9    decamp to the other courthouse to proceed.

10        MR. DALACK:  Thank you, Judge.  I'll be very brief.

11   We have one other quick matter to cover, too.

12        The issue that we flagged is not just materials that

13   are in the possession of the Central District of California,

14   but the servers were in the possession of main justice.  And we

15   want to make --

16        THE COURT:  Mr. Dalack, I find this totally

17   uncompelling.  I understand that Mr. Avenatti got a mistrial in

18   the Central District of California case, and it is not for me

19   to opine whether that was right or wrong.  Judge Selna is an

20   excellent judge.  Not my case.

21        MR. DALACK:  Understood.

22        THE COURT:  Bottom line, there is no issue in this

23   case.  He had the servers four months at this point, and the

24   limited information that may be on them that is relevant to

25   this case is clearly accessible, presumably known to him.  It

M1DsAVEc

1    is a nonissue.  It is making something out of nothing, so I

2    don't want to hear about it again.

3    　　　　　MR. DALACK:  Yes, your Honor.

4    　　　　　There is two subpoenas that are currently pending to

5    the trustee for Eagan Avenatti, the bankruptcy trustee.  We

6    subpoenaed information from the trustee.  The government

7    subpoenaed information from the trustee.  I just wish to alert

8    the court to the fact that, late last night, we received an

9    e-mail, counsel for the government and I, from the attorney

10   representing the bankruptcy trustee in that case who

11   represented that it was likely unlikely that we would get any

12   return on the subpoena in time for the January 24 trial date.

13   　　　　　THE COURT:  OK.  Duly noted.

14   　　　　　On this last issue, once again, I am not inclined to

15   think that a limiting instruction is particularly necessary.

16   But, once again, if the defense has a request, disagrees, I am

17   certainly willing to consider it, and you should confer with

18   one another if that is the case.

19   　　　　　Before we decamp across the street, anything else to

20   discuss from either side, from the government?

21   　　　　　MR. ROHRBACH:  The government has three very brief

22   housekeeping matters, your Honor.

23   　　　　　THE COURT:  Can they wait until Tuesday?

24   　　　　　Do they need to be taken up today?

25   　　　　　MR. ROHRBACH:  They need to be dealt with, but they

M1DsAVEc

1    are extremely brief, your Honor.

2              THE COURT:  Go for it, but not too quickly that the

3    court reporter will get mad at me.

4              MR. ROHRBACH:  We will be extremely brief.

5              The first is just how the court would like the

6    electronic copies of the jury questionnaires today.  We are

7    producing them to the defense through a file sharing site

8    USAfx.  We can add someone from the court to that site as well

9    so the court could have access.

10             THE COURT:  I think we've gotten things through that

11   means ourselves.  Talk to my chambers about that.  I think that

12   would suffice.

13             MR. ROHRBACH:  OK.  Second, the filing deadline for

14   motions to quash the defense subpoenas to the office assistant

15   is five o'clock today.  We understand that the office assistant

16   is going to file a motion at five o'clock, and so the

17   government would ask permission to file any supplemental motion

18   by midnight today, since our motion may depend on what the

19   office assistant says.  We will, of course, make an effort not

20   to be redundant with any arguments the office assistant is

21   making.  We want to see what the office assistant says in her

22   motion before we file any additional briefing on the subject.

23             THE COURT:  I'll give you until 11 p.m. tonight.

24             Next.

25             MR. ROHRBACH:  Thank you, your Honor.

M1DsAVEc

1        Last issue is just that we are working to resolve the

2   issue about video testimony for office assistant one.  So we

3   wanted to flag for the court that the earlier the parties are

4   aware of which courtroom in which the trial will be held, the

5   faster we'll be able to make arrangements.  We would like to do

6   an in-person test well before trial to facilitate.

7        THE COURT:  That issue is an open issue.  I'll be

8   prepared to address it more on Tuesday.  Right now, we have

9   courtroom 318.  But I've been advised that it may not be

10  possible to have more than 15 jurors in courtroom 318.  I would

11  love to have more than 15 jurors, given what is going on in the

12  world at the moment.  I'm exploring whether there is another

13  courtroom available that would accommodate more.

14       I'm trying to nail that down, and I will be able to

15  speak to it on Tuesday, and certainly give you as much notice

16  as I can that I think would provide ample opportunity to run

17  whatever tests you need to test.  I definitely want you to test

18  it to make sure that it is working.

19       MR. ROHRBACH:  Thank you, your Honor.

20       Nothing further.

21       THE COURT:  Anything from the defense before we --

22       MS. GIWA:  Briefly on one issue related, in fact, to

23  the office assistant.  Yes, your Honor.

24       THE COURT:  Very quickly.

25       MS. GIWA:  As to the last point that the government

M1DsAVEc

1    raised, I share the concern about the technology.  So I would

2    just ask to be included in the test run that they have with the

3    witness.

4              THE COURT:  I think that was contemplated, but I

5    agree, you should be.

6              MS. GIWA:  I just wanted to confirm that.

7              Your Honor, the other issue is with respect to your

8    Honor's ruling about the Rule 15 issue.  Certainly, we

9    understand the court's ruling in allowing two-way video.  We

10   understand also that that ruling relied on Second Circuit

11   precedent.  We just want to clarify one issue.

12             In footnote three of your Honor's --

13             THE COURT:  This sounds like an issue that we can

14   table until Tuesday.  Any reason we need to take it up now?

15             MS. GIWA:  No, your Honor, although I think I can make

16   it briefly.

17             THE COURT:  I'm sorry.

18             MS. GIWA:  I think I can address it briefly.  I'm also

19   happy to wait until Tuesday.

20             THE COURT:  Let's wait until Tuesday.  I just want to

21   wrap up and get downstairs so we don't keep folks waiting

22   across the street.

23             But definitely raise it Tuesday.  I'm not precluding

24   you from bringing it up, I just don't want to do it now.

25             Next Tuesday we will be in courtroom 318 in this

M1DsAVEc

1    building at 11:15.  Again, I'll be able to speak at that time,

2    I hope I'll be able to speak at that time as to where trial

3    will be, but that's where we'll be.

4            One issue I do want to just flag for you to think

5    about between now and Tuesday, because I want to hear from you

6    about it on Tuesday, whether I can and should ask the jurors as

7    part of the oral voir dire whether they are fully vaccinated

8    and/or boosted.  I would be inclined to do so.

9            For one thing, if I were a lawyer, I think I would

10   want to know the answer to that question.  It might have

11   bearing on my peremptory challenges.  Putting that aside, if

12   the jury ends up being fully vaccinated, if I were on the jury,

13   I think I would want to know that and inclined to share that

14   information with them.

15           Third, depending on the court's protocols throughout

16   trial, it may affect or have bearing on seating and the jury

17   box and how much distance they need to maintain from each other

18   and so forth.

19           I'm reserving judgment on the question.  I'm thinking

20   about it myself.  I wanted to flag it as something you should

21   think about and be prepared to address on Tuesday.

22           With that, let's reconvene by the exit of Pearl Street

23   in the lower lobby, and I'll see you there in the next few

24   minutes.

25           Thank you very much.

M1DsAVEc

1          (Recess)

2          (Venire present)

3          THE COURT:  You may be seated, in case you're in

4     another room and couldn't hear me.

5          Good morning and happy new year, everyone.  Welcome to

6     the United States District Court for the Southern District of

7     New York.  My name is Jessie Furman.  I am a United States

8     District Judge here in this district, and I will be the judge

9     presiding over this matter.

10         Let me start by thanking you for being here.  Jury

11    service is one of the most important duties of citizenship and

12    our system of justice depends on citizens who are willing to

13    meet their civic responsibilities.  And so while I know that

14    this may not be the most convenient time for some of you to be

15    here, and this may not be the place you would most like to be,

16    your presence is important and we are grateful to all of you

17    for being here.

18         Your commitment is especially commendable in light of

19    the ongoing COVID-19 pandemic.  This court has been in

20    continuous operation for 232 years, through several wars, the

21    flu pandemic of 1918, the Great Depression, the attack of

22    September 11, 2001, just to name a few national crises.  As it

23    does through those events, the court has continued to operate

24    through the present pandemic, thanks to the tireless efforts of

25    the court staff, some of whom have helped you here this

M1DsAVEc

morning.  That is because the wheels of justice must continue
to turn.  Jury trials are an essential part of that wheel and
can happen only if people like you show up to do your civic
duty.  So I am profoundly grateful for your service during
these challenges times.

         Following the advice of medical expert, we have
adopted COVID protocols that have enabled us to safely conduct
trials throughout most of the pandemic.  Indeed, since
September 2020, so for about 15 months, the court has safely
operated and conducted more than 100 jury trials, including
several since the recent Omicron surge began.

         We have taken and will continue to take every
appropriate precaution to ensure your safety.  For example,
everyone entering the building must complete an electronic
questionnaire.  Our witnesses will testify from a plexiglass
partitioned witness box with a HEPA filter, and lawyers will
conduct examinations from a similarly equipped podium.
Everyone else, including me, is required to wear an N95, KN95,
or KN94 face mask, and to maintain social distancing at all
times.  We have re-outfitted large courtrooms to be used in
place of regular jury rooms, to allow for distancing during
your jury breaks and deliberations.  In short, we have
endeavored to think through every relevant detail, and other
COVID protocols have proven effective in dozens and dozens of
trials, again, over 100, during the last 15 months.

M1DsAVEc

1          We are here to begin the selection of a jury for a

2    criminal case entitled United States v. Michael Avenatti.  Our

3    purpose, as I am sure you know, is to make sure that we have a

4    jury of citizens who will decide the issues in this case both

5    fairly and impartially, and without any bias or prejudice in

6    favor of, or against, either side; and who will decide the case

7    based only on the evidence that is presented in the court

8    during the trial.

9          As of this moment, you are all potential jurors in

10   this case, and until you are relieved of your duties in

11   connection with this case, until you are excused formally from

12   jury duty, you must follow all of the rules of conduct for

13   jurors, many of which I will discuss with you in the next few

14   minutes.

15         The jury selection process is being conducted in two

16   phases.  Today, you will provide your sworn answers to

17   questions on a written questionnaire.  It is absolutely

18   essential that you answer all of the questions truthfully, and

19   that you answer them truthfully, accurately, and completely.

20   For one thing, you will be under oath when you answer the

21   questions.  That is, the answers you give on the questionnaire

22   will be given under penalty of perjury.  For another, your

23   questions will play -- I'm sorry.  Your answers will play an

24   important part in selecting the jury for this case and will

25   help make the process of picking the jury more efficient and

M1DsAVEc

1    fair.  The more careful and thorough you are in making sure

2    that all of your answers are truthful and complete, the faster

3    this process is likely to go, which is good for you and for

4    good for all the trial participants.

5           After you finish filling out the questionnaires today,

6    they will be collected so that they can be reviewed by the

7    parties and by me.  You will then be done for today.  Many of

8    you, however, will be asked to return for phase two of the jury

9    selection process, which will involve in-person questioning by

10   me beginning either next Thursday, January 20, or next Friday,

11   January 21, at 8:30 in the morning.  I will give you further

12   instructions and you'll receive further instructions about how

13   to find out if you are required to return next Thursday or

14   Friday and where you should go on those days.

15          The trial in this case is expected to take up to three

16   or possibly four weeks after jury selection is completed,

17   meaning that it should end no later than Friday, February 18,

18   and may well end before that.  In part, for your convenience,

19   I have chosen to follow a growing trend in this courthouse by

20   keeping shorter, more compact trial days.  Once we have

21   selected a jury, we will begin each morning at nine a.m. and we

22   will end each day by three p.m., with one and only one

23   half-hour break in the middle of the day.  I want to stress,

24   though, that this is the schedule only after we have picked and

25   seated a jury, which is to say that next Thursday or Friday, if

M1DsAVEc

1    you are asked to return, you should be prepared to be here for

2    the full day.

3            I will now give you some information about the nature

4    of the case, go over some of the important rules of conduct

5    that you must follow, and conclude with a few more words about

6    the questionnaire that you will fill out today.  Keep in mind

7    that everything I say is not evidence and that you may not use

8    it if you are ultimately called to be a juror in this case; it

9    is just meant to give you an idea of what the case is about to

10   help you complete the questionnaire truthfully and accurately.

11           As I mentioned, this is a criminal case.  The charges

12   against Michael Avenatti are set forth in an indictment.  An

13   indictment is a formal method of accusing a defendant of a

14   crime.  It is not evidence of any kind; it merely states what

15   crimes the government intends to prove that the defendant

16   committed.  It is the government's burden to establish a

17   defendant's guilt beyond a reasonable doubt.  I will instruct

18   the jury on what this burden of proof means after the evidence

19   at trial is presented.

20           Mr. Avenatti has pleaded not guilty to the charges in

21   the indictment.  That is, he has denied the charges made by the

22   government.  The accusations, and the defendant's denial of

23   these accusations, raise issues of fact that must be decided by

24   a jury on the basis of evidence that will be presented in

25   court.  Unless and until the government proves the defendant's

M1DsAVEc

guilt by competent evidence beyond a reasonable doubt, the

defendant is presumed to be innocent of the charges contained

in the indictment.

        Let me give you a brief summary of those charges so

that you have some sense of what it is about as we go through

jury selection.  As I told you a moment ago, however, nothing I

say is evidence.

        Mr. Avenatti is charged in the indictment with two

crimes -- referred to as counts.  Count One charges that

Mr. Avenatti devised a scheme to defraud his client, Stephanie

Clifford, who is also known as Stormy Daniels, by taking for

himself payments due to Ms. Clifford pursuant to a book

contract.  The government further alleges that Mr. Avenatti

falsely represented to Ms. Clifford that the payment has not

been made.  Count Two charges that Mr. Avenatti used

Ms. Clifford's identity -- specifically, her name and

signature -- without her permission, namely on a document in

which he allegedly falsely represented to Ms. Clifford's book

agent that Ms. Clifford had given authorization for the

payments to be sent by wire to an account controlled by

Mr. Avenatti.

        As I noted, Mr. Avenatti has pleaded not guilty to

both charges and denies these allegations.  Mr. Avenatti is

presumed innocent and that presumption of innocence continues

unless and until a jury determines that the government has

M1DsAVEc

proved every element of a crime charged beyond a reasonable
doubt.

During the course of trial, each side will present
evidence to support its claims.  The function of the jury is to
decide questions of fact.  You who are chosen as jurors will be
the only judges of the facts, and nothing that the court, that
is me, or the parties say or do may in any way intrude on your
role as the exclusive fact-finders based only on the evidence
presented.  When it comes to the law, as distinguished from the
facts, however, you must take your instructions from me, from
the court, and you are bound by these instructions.  You may
not substitute your own ideas of what the law is or what you
think it should be.  At the conclusion of the case, your job
will be to determine whether the government has proved the
defendant's guilt beyond a reasonable doubt.

Your decisions as a juror must also be made solely on
the basis of the evidence presented in court.  Because of this,
unless and until you are formally excused as a juror, you
should not attempt to gather any information on your own
relating to the case or anyone involved in it again until you
are formally excused.  After today, you may come back next
Thursday or Friday.  During that time, these instructions apply
to you and it is critical that you follow them.  So that
includes me, that is to say you must not attempt to gather any
information about me, about the defendant, about the lawyers in

M1DsAVEc

the case, about any other names that you hear about today,
about anything relating to this case.  Do not engage in any
outside reading about the case, do not use the Internet
(including Google, Facebook, Twitter, any other social media
website that you may use, any search engine you may use,) do
not use anything to learn about this case or anyone involved in
the case.  Put simply, do not try to obtain information from
any source outside of the confines of the courtroom.

          This case arises out of activities that may have been
covered by the media.  The trial itself may be covered by the
media and people may talk about it.  From this moment on, you
as jurors must not pay any attention to outside information or
commentary about this case, whether it is in the newspapers, on
TV or radio, or on the Internet.  If you see an article
somewhere, do not read it.  If you have the TV on and you
suddenly hear something about the case, turn it off.  All
right?  You must ignore even the comments and opinions of your
family and friends.  Nor may you discuss the case, or anyone or
anything having to do with it, with anyone else, including your
family members and your potential fellow jurors, until I have
discharged you as a juror or a potential juror in this case.

          This means that you must not speak to anyone directly
or by telephone, text message, the Internet, social networking
sites, social media sites, or any tool of technology about the
case or anyone or anything having to do with it.  You must not

M1DsAVEc

read or listen to anything about this case from any source.

You must not allow anyone to speak to you about this case.  If

you are approached by anyone to speak about it, politely tell

them that the judge has directed you not to do so, and do not

remain in the presence of anyone who may be discussing the

case.

The attorneys for both sides are here today, but I

will formally introduce them and Mr. Avenatti to you when we

return next week for the second phase of the selection

procedures.  They, members of their teams, and the witnesses,

everyone involved in this case, have been instructed not to

speak with you outside of the courtroom, even to offer a

friendly greeting.  So if you happen to see any of them outside

of whatever room you're currently in or outside of whatever

room you come back to next week, that is any room outside of

the trial courtroom, they will not and should not speak to you.

They will not hold the door open for you, they will not give

you a greeting, they will not smile at you.  Do not be offended

by this.  They will only be acting properly and following my

instructions.  The reason for all of these rules is quite

simple.  The parties are entitled to have you render a verdict

in this case on the basis of your independent evaluation of the

evidence presented in the courtroom -- and only that evidence.

Obviously, communicating with others about the case, including

your family, friends, or social networking contacts, before you

M1DsAVEc

1    deliberate with your fellow jurors at the end of the trial, or

2    exposing yourself to information about the case outside of the

3    courtroom, would compromise your service and fairness as a

4    juror.  I thank you in advance for taking these duties serious

5    and responsibilities seriously and for obeying my instructions

6    in every respect.

7          Finally, I have some instructions and other

8    information with respect to the questionnaire that you will be

9    completing today.

10          As I said a few minutes ago, the purpose of the

11   questionnaire is to provide information to me and to the

12   parties to assist us in determining whether you can be a fair

13   and impartial jurors in this case.  The questionnaire will ask

14   you to provide certain information -- information about your

15   personal background, your family, some of your beliefs and

16   attitudes about certain matters, how you are employed and so

17   forth.

18          You should understand that these questions are not

19   intended to pry into your lives, but to make sure that we

20   select fair and impartial jurors who can listen to the evidence

21   with an open mind and decide the issues in this case based only

22   on the sworn testimony given in the courtroom, on whatever

23   exhibits may be received in evidence, and on my instructions as

24   to the law.  The selection of such a jury is our sole goal at

25   this point.

M1DsAVEc

1          To help ensure the selection of a fair and impartial

2     jury, you must, as I said before and will say again, give true,

3     complete, and detailed answers to the questions as you will

4     shortly swear to do.  To repeat, you will be completing this

5     questionnaire under oath, under penalty of perjury, and you

6     must answer each and every question truthfully and completely,

7     and it is critical that you take the time and care you need to

8     do so.

9          Please read all of the instructions and introductory

10    information in the questionnaire carefully before you answer

11    any of the questions.  Read each question in full carefully

12    before you write your answer.  You are to write your juror

13    number -- which you should have received as you came into the

14    court this morning -- on the top of each page of the

15    questionnaire.  Again, whatever number you received, that is

16    the number you should write on each page of the questionnaire.

17    Where indicated for each question, please either circle yes or

18    no, or as required, furnish answers, explanations, or details

19    in the space provided.  Do not write on the back of any page --

20    if you need additional space to complete any answer, there are

21    additional pages at the end of the questionnaire that you may

22    use to finish an answer.

23          Please do not leave the room that you are in while you

24    are completing the questionnaire.  If you must use the

25    restroom, please raise your hand to alert a member of the jury

M1DsAVEc

1    department staff, then hand the questionnaire to the staff

2    member, wait for them to come, hand the questionnaire to that

3    staff member, follow their directions and retrieve your

4    questionnaire upon your return.  Please do not discuss the

5    questions or your answers with anyone, including your fellow

6    prospective jurors.

7          In a moment, I will ask you to stand so that my

8    deputy, Ms. Smallman, Alex Smallman, who is hiding behind the

9    screen right here, can administer the oath to you.  I will give

10   her the microphone to do so.  If you would prefer to affirm

11   rather than swear, you are free to do so.  She will ask you to

12   either swear or affirm, and whatever your preference may be,

13   you can do.  In either case, you will then be under oath.

14         With that, I'll ask you to please stand so that

15   Ms. Smallman can administer the oath.

16         (Venire sworn)

17         All right.  Thank you very much.

18         Because I cannot say it too many times, let me repeat,

19   you are now under oath and must answer all of the questions on

20   the questionnaire truthfully.  Take your time, make sure you

21   read each question in full before you answer it, and then

22   answer each question carefully.

23         Before I finish and leave, because I'm going to leave

24   to allow you the time to complete the questionnaire, let me,

25   once again, thank you on behalf of the parties and on behalf of

M1DsAVEc

1    the court for your service today.  In a minute, the parties,

2    the lawyers and I are going to step out and representatives of

3    the court will provide the questionnaires to you.  As I said

4    before, you are allowed to leave after your questionnaire has

5    been completed and turned in, and to the extent that you need

6    instructions, the jury department will give it to you.

7              The first page of the questionnaire has instructions

8    for how to find out if you are required to return for in-person

9    questioning either next Thursday, January 20, or next Friday,

10   January 21.  As it says on that sheet -- and you should keep

11   that sheet -- you are required to call a number after six p.m.

12   next Wednesday, January 19, for information on whether, when,

13   and where you are required to return.  Make sure that you

14   remember your juror number and keep that information page with

15   that phone number in a safe place so you know how to find out.

16   You are not excused until you find out whether you are called

17   upon to return or not, and if you are called upon to return,

18   you must return to continue your jury service.  You will need

19   both your juror numbers and that information sheet as this

20   process continues, so keep them in a safe place.

21             With that, the lawyers and I will now step out and

22   allow you to complete the questionnaire.  Again, please take

23   your time and make sure your answers are truthful and accurate.

24   I look forward to seeing some or many of you here next week.

25   In the meantime, I hope you and your family stay safe and

M1DsAVEc

1    healthy, and I wish you a wonderful day.

2            Thank you very much.

3            (Adjourned)