```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                v.                           19 Cr. 374 (JMF)

 5    MICHAEL AVENATTI,

 6                    Defendant.               Conference

 7    ------------------------------x

 8                                             New York, N.Y.
                                               January 18, 2022
 9                                             11:15 a.m.

10    Before:

11
                        HON. JESSE M. FURMAN,
12
                                               District Judge
13
                              APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    BY:  MATTHEW D. PODOLSKY
           ROBERT B. SOBELMAN
17         ANDREW ROHRBACH
           Assistant United States Attorneys
18
      ROBERT M. BAUM
19    ANDREW J. DALACK
      TAMARA L. GIWA
20         Attorneys for Defendant

21

22

23

24

25
```

1

2          (Case called)

3          THE DEPUTY CLERK:  Counsel, please state your name for

4    the record.

5          MR. SOBELMAN:  Robert Sobelman, Matthew Podolsky, and

6    Andrew Rohrbach, for the United States.  And we are joined at

7    counsel table by Special Agent DeLeassa Penland of the United

8    States Attorney's Office.

9          Good morning, your Honor.

10          THE COURT:  Good morning.

11          MS. GIWA:  Federal Defenders of New York by Tamara

12    Giwa, Andrew Dalack.  Your Honor, Mr. Baum just got a call from

13    the jail.  He's stuck outside.  He will be in a one minute.  We

14    are joined at counsel table of course by our client Mr.

15    Avenatti and by Juliet Vicari, a paralegal in our office.

16          THE COURT:  Good morning to all of you as well.  We

17    are here for a final pretrial conference.  I'm sorry we are

18    starting a couple of minutes late, in part because I received a

19    letter from defense counsel just before I was headed over, but

20    I'll get to that in due course.

21          We have a number of issues to address today.  I do

22    want to begin with a *Lafler/Frye* allocution, just confirming

23    whether the government made any plea offers to the defendant,

24    and if so, whether they communicated to the defendant any

25    objection from counsel?

1          MR. SOBELMAN:  No objection to proceeding in that

2     manner, and we're happy to make a record about the

3     communications, if your Honor wishes.

4          THE COURT:  All right.  Why don't you start with that.

5          Did you extend a plea offer to Mr. Avenatti.

6          MR. SOBELMAN:  We did not extend a formal plea offer

7     to the defendant.  We did have plea discussions after the last

8     trial that resulted in us sending some draft plea agreements

9     and having discussions about a potential resolution, but

10    ultimately the defendant declined to proceed in further

11    discussions and no formal offer was communicated.

12         THE COURT:  Okay.  When you say you sent a draft plea

13    agreement, it wasn't a plea offer, though, it was just pursuant

14    to open-ended discussions.  Is that accurate?

15         MR. SOBELMAN:  Correct, your Honor.  It was not

16    signed.  It could not be accepted.  It was for purpose of

17    discussion amongst the parties.

18         THE COURT:  Okay.  Notwithstanding that, is it the

19    government's position that Mr. Avenatti's sentencing exposure

20    if he proceeds to trial and is convicted on both counts would

21    it be greater than the exposure that he would have faced had

22    that made an offer and he accepted it?

23         MR. SOBELMAN:  Yes, your Honor.

24         THE COURT:  Very good.

25         Ms. Giwa or Mr. Dalack, any objection to -- well,

1  first of all, any objection to my inquiring of you and then of

2  Mr. Avenatti in turn?

3          MR. DALACK:  No objection, Judge.

4          THE COURT:  Can you just make sure you use the

5  microphone please.

6          MR. DALACK:  I'm sorry.

7          THE COURT:  Recognizing what the government just said,

8  that it wasn't a formal plea offer, first of all, is what the

9  government said accurate?

10         MR. DALACK:  I don't recall that this particular

11 defense team received a four-corner document that the

12 government is referring to, but we did have discussions about

13 the terms of that plea offer subsequent to our appointment in

14 the matter, so we were aware of it, yes, your Honor.

15         THE COURT:  Obviously I don't want to pry into the

16 particulars, but did you discuss these issues with

17 Mr. Avenatti, what his sentencing exposure would be if he went

18 to trial and he was convicted on all counts, and the question

19 of whether to plead or not plead?

20         MR. DALACK:  Can I have a moment, your Honor.

21         THE COURT:  Yes.

22         MR. DALACK:  Thank you.

23         (Counsel and the defendant conferred)

24         MR. DALACK:  Your Honor, can I represent that because

25 we never actually saw the offer that the government was

1    referring to, that I believe was transmitted to prior counsel,

2    we obviously could not review that particular document with

3    Mr. Avenatti, but I can represent that we discussed potential

4    resolutions to this case and various sentencing exposures with

5    our client.

6             THE COURT:  Again, I don't want to know in particular

7    what it was, but did you make a recommendation to Mr. Avenatti

8    as to whether he should accept or pursue a plea offer or

9    whether he should go to trial?

10            MR. DALACK:  Your Honor, I think I respectfully have

11    to decline to answer that question as to our recommendation.

12            THE COURT:  I am not asking what your recommendation

13    was, just whether you addressed the subject.

14            MR. DALACK:  We addressed the subject, yes, Judge.

15            THE COURT:  All right.

16            Mr. Avenatti, let me turn to you.

17            First, in the last 48 hours have you taken any

18    medicine, pills, drugs, or had any alcohol?

19            THE DEFENDANT:  I had a drink, your Honor.  No drugs.

20            THE COURT:  Okay.  And when did you have that drink?

21            THE DEFENDANT:  I think two or three days ago.

22            THE COURT:  All right.  But I presume it would not

23    impact your thinking right now.  Is that correct?

24            THE DEFENDANT:  Actually, your Honor, I did have a

25    drink last night, and that would not impact my thinking.

1              THE COURT:  Is your mind clear today?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Do you understand what is happening here

4    today?

5              THE DEFENDANT:  Yes.

6              THE COURT:  And did you hear my discussions with

7    counsel for the government and your lawyer.

8              THE DEFENDANT:  I did.

9              THE COURT:  Was your lawyer's description of your

10   discussions with your lawyers accurate?

11             THE DEFENDANT:  With one clarification, your Honor.

12             THE COURT:  All right.

13             THE DEFENDANT:  That is, I never received any plea

14   offer from the government, and therefore I've never discussed

15   the plea offer with any counsel.  My understanding is that when

16   these informal discussions occurred initially they were with a

17   prior counsel of mine, Mr. Warren, and it was while I was in

18   solitary confinement or lockdown at MCC.

19             THE COURT:  All right.  In any event, what Mr. Dalack

20   described that you've discussed with him, the decision of

21   whether to go to trial or not, is an accurate statement.  I

22   don't want to know the particulars of your conversations, just

23   that you did converse with him about those subjects.

24             THE DEFENDANT:  Yes.  But it was not about any offer,

25   because the government has never given me the opportunity to

```
 1   plead to any offer.
 2              THE COURT:  I understand.
 3              Is it correct that you have made the decision to go to
 4   trial?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Okay.  Thank you.
 7              Do both counsel agree that covers the necessary ground
 8   there?
 9              MR. SOBELMAN:  Yes, your Honor.
10              THE COURT:  Mr. Dalack?
11              MR. DALACK:  Yes, your Honor.
12              THE COURT:  All right.  With that, let's turn to
13   various motions.
14              First, last week I obviously resolved the outstanding
15   sort of primary motions in limine and the government's motion
16   to preclude or both sides' motions to preclude.
17              The government has filed a letter on the tax return
18   issue.  It's docket No. 257.  In light of that letter, the
19   motion to admit Mr. Avenatti's tax returns is denied as moot.
20              I am fully prepared to revisit the issue in the event
21   that the defense opens the door to the issue.  If the
22   government believes that the defense has opened the door, it
23   should promptly advise defense counsel and bring it to my
24   attention swiftly so that we can discuss whether and how to
25   proceed, and, if necessary, to resolve the advice of counsel
```

1   issue.

2          The one concern that I have on that score is if a

3   hearing is necessary I would assume that Mr. Steward may well

4   be an important witness at that hearing.  I don't know that he

5   is in California, but I presume he might be, and in any event

6   it just poses logistical challenges that you may want to think

7   about in advance and underscores the need to bring it to my

8   attention as quickly as possible.

9          Anything further to discuss on that?

10          MR. SOBELMAN:  No, your Honor.  We understand.

11          THE COURT:  Mr. Dalack?

12          MR. DALACK:  No, your Honor.

13          THE COURT:  All right.  Otherwise, anything that we

14   need to follow up or discuss with respect to the issues that I

15   resolved last week?

16          I think you were going to confer with respect to the

17   government's specific evidence with respect to financial

18   circumstances and bring to my attention if there were any

19   disputes to resolve as to specific items of evidence on that

20   score.

21          MR. SOBELMAN:  We had a brief discussion with defense

22   counsel about that.  We will continue discussing, but we are

23   not aware of any disputes to resolve at this time.

24          THE COURT:  All right.  Obviously you should continue

25   to confer and try to resolve things as swiftly as possible and

1    make sure you bring them to my attention so that I can resolve

2    them in a timely manner.

3              Mr. Dalack, anything else on that front?

4              MR. DALACK:  Not on that score, Judge.  Thank you.

5              THE COURT:  Anything else on any of the other issues

6    that we discussed and resolved last week?

7              From the government?

8              MR. SOBELMAN:  Not from the government.

9              THE COURT:  From the defense?

10             MR. DALACK:  Nor from the defense, Judge.

11             THE COURT:  Just a reminder, if there are defense

12   requests for limiting instructions with respect to any of those

13   items, that is something you should also confer with one

14   another about and then propose in a timely fashion.

15             All right.  There are a few motions that are now fully

16   submitted and ripe for resolution or may be ripe for

17   resolution, and then there's the defense letter that was filed

18   or submitted just before this proceeding.

19             I think ECF may be down, so it was e-mailed to me.  I

20   don't know if the government has received a copy.

21             You're nodding, so I take it you have.

22             MR. SOBELMAN:  Yes, your Honor, we have.

23             THE COURT:  All right.  So we will get to that in

24   short order.

25             First, the defense filed a motion to unseal the

1    letters that have been filed with respect to cross-examination

2    of Ms. Clifford and seeking the records, medical records of the

3    office assistant.

4         That motion is denied substantially for the reasons

5    stated by the government.  The defense motion cites no law in

6    support of its request.  There's no acknowledgment of the fact

7    that I had previously ruled on that issue by written order, let

8    alone any argument for reconsideration of that ruling.

9         Assuming that either of the witnesses testifies at

10   trial, which I assume they will, I believe that the letter

11   should then be made public, albeit perhaps with appropriate

12   redactions.  But unless and until they testify, my view is that

13   the privacy interest of the third-party witnesses outweigh the

14   public's interest in public access.  So they will remain under

15   seal for the time being, but assuming that they testify, that

16   is going to be a temporary measure.

17        Second, with respect to the motion to preclude

18   cross-examination of Ms. Clifford, I am going to address that

19   notwithstanding that the documents themselves are under seal

20   and would ask for some discretion from you to the extent that

21   discussion is invited.

22        First is the government's the motion to preclude

23   cross-examination.  Number one, the motion is denied with

24   respect to cross-examination of Ms. Clifford with respect to

25   her beliefs in the paranormal and the like, subject, of course

1    to particularized objections at trial.

2            That is the case substantially for the reasons stated

3    by the defense in its letter of January 13.  Put simply, I do

4    not think that the issue is analogous to cross-examination on

5    the issue of religious beliefs or the like.  The defense has

6    proffered various public statements that Ms. Clifford has made

7    that basically amount to her stating that she has seen visions

8    or the like, and I think that the jury could conclude that that

9    is probative of her ability to accurately perceive events and

10   to her credibility, and given her role in this case and the

11   fact that she is a key witness I think the defense is entitled

12   to cross-examine her on that for those purposes.  *See, e.g.*,

13   *United States v. Pryce*, 938 F.2d 1343 at 1345, (D.C. Cir.

14   1991), as well as the other cases that are cited by the defense

15   on page 3 of its letter.  So to that extent the government's

16   motion is denied.

17           By contrast, I'm inclined to grant the government's

18   motion with respect to Ms. Clifford's mental health history for

19   lack of a good-faith basis to inquire on that front.  The

20   defense in its January 13 letter argues that she has made

21   inconsistent statements with respect to whether she has

22   obtained mental health treatment.

23           I would be inclined to say that it is fair game if the

24   defense could actually point to any inconsistent statements,

25   but none of the statements listed in the defense's letter

1    strike me as actually being inconsistent.  Most pertain to the

2    treatment for physical ailments, and in that sense they are

3    immaterial or certainly not inconsistent with respect to the

4    representation made by counsel that there is no mental health

5    record for the period of time that had been subpoenaed.

6          The only statements that even come close are the

7    statements in paragraphs E and F of the defense letter, which

8    suggest that at some point in time Ms. Clifford may have

9    consulted with a therapist or more than one therapist, but

10   because there are no dates provided in those statements I don't

11   see them as inconsistent with the representation made by

12   counsel.

13         So the bottom line is unless the defense can proffer a

14   more solid basis to pursue that line of questioning, I do not

15   think there's a good-faith basis to find that there is any

16   inconsistency and for that reason would be inclined to preclude

17   cross there.

18         Mr. Dalack?

19         MR. DALACK:  Yes, your Honor.  With the understanding

20   that the Court is inclined to grant it, we would ask for leave

21   to be able to make that proffer as to the statements that we

22   believe are inconsistent so that the Court can determine the

23   issue on the fullest record possible.

24         THE COURT:  That is fine.  I guess the bottom line is

25   that the motion is granted on that score unless you can

1  persuade me that there is a good-faith basis and actually point

2  me to a statement that is inconsistent.

3          The two statements that you cited that came the

4  closest, as I said, I think one -- both of them come from

5  YouTube videos that I figured I might watch for myself until I

6  discovered that the YouTube video was something in the nature

7  of an hour and 40 minutes long.  I'm not going to go watch that

8  to see if you have a solid basis.  So if you think that there

9  is beyond what you have already quoted, you can bring it to my

10  attention.  I'm prepared to revisit the issue, recognizing

11  again that if you can actually point to inconsistent statements

12  I think it is probably fair game; but if you can't, you are not

13  going to be allowed to cross on that score.

14          MR. DALACK:  Understood, Judge.

15          At the moment my memory is escaping me but to the

16  extent that we failed to provide the Court with time stamps for

17  particular statements during videos, we will endeavor to do

18  that as well to save the court's time.

19          THE COURT:  Well, you don't need to with respect to

20  these.

21          MR. DALACK:  Yes.

22          THE COURT:  The bottom line is I'm granting the

23  government's motion, subject to reconsideration if you can

24  point me to actually inconsistent statements.  And if you do,

25  and if they are in videos, I would certainly recommend that you

1     provide time stamps so I don't need to watch lengthy YouTube

2     videos.  All right?

3               MR. DALACK:  Yes, Judge.

4               THE COURT:  All right.  Very good.

5               And then the third item is the motion for the office

6     assistant's medical records.  There are actually two motions

7     here.  One was filed by the government seeking a protective

8     order to withhold records that are in its possession.  The

9     other is the defense motion for a subpoena.

10              The defense reply of yesterday indicates that the

11    office assistant's counsel has represented that he -- I think

12    it's a he.  Give me a moment.  Yes.  That he would consent to

13    or agree to production for purposes of consulting an expert in

14    the first instance as long as the records were otherwise kept

15    confidential.  I guess my question is, does that moot the

16    dispute, at least temporarily?  What's the government's

17    position on that?  And have you confirmed that with

18    Mr. Ambrosio?

19              MR. SOBELMAN:  Yes, your Honor.  I spoke with

20    Mr. Ambrosio last night and got another e-mail from him this

21    morning.  I have been trying to connect with him again, but he

22    has duty day in magistrate court today so I think he is a

23    little tied up.

24              My understanding from the e-mail that I got this

25    morning is that the representation he made to defense counsel

1  related only to the medications listed in the medical records

2  that the government has.  So that he does not object to the

3  list of medications being provided to the defense for purposes

4  of their expert consultations, but that he's not agreeing to

5  wholesale turnover of any other medical records.

6         I think it is a -- the representation in the letter is

7  a little unclear to me, and I encouraged Mr. Ambrosio to submit

8  something to the Court in advance of this proceeding to clarify

9  his position, but I don't think he was able to do that in light

10  of his other commitments.

11         MR. BAUM:  May I be heard, your Honor.

12         THE COURT:  Yes.

13         MR. BAUM:  I personally spoke to Mr. Ambrosio, because

14  he contacted me on a number of occasions.  He's the person --

15         THE COURT:  Can I actually ask both counsel why don't

16  you just remain seated so you can speak more directly into the

17  microphone.

18         MR. BAUM:  He advised me that he had no objection to

19  us obtaining the records, because he believed the records would

20  provide us with the information we need to show to our expert

21  concerning the issue of memory loss.  Ms. Giwa was also present

22  during that conversation, which was on speakerphone.

23         He called me this morning to tell me that the

24  government has been putting pressure on him to file a letter,

25  that he has resisted that pressure.  He doesn't think a letter

1    needs to be filed.  He told me he read our motion; that it was

2    accurate in all respects.  That is exactly what he told me.

3    And he said he had no intention of filing the letter.  I

4    invited him to attend this morning.  As he told the government,

5    he told me he didn't know if he could make it.

6          The bottom line is this:  He gave me more information.

7    He said, pursuant to your subpoena, you will receive 27 pages

8    of medical documentation, including the medications.  That

9    doesn't sound like he was saying you are only entitled to the

10   medications.

11         He said the government has talked to him last night.

12   The government communicated with him this morning.  They were

13   pushing him to file a response; that he is satisfied with the

14   response that we filed.

15         The bottom line is this, Judge:  If Ms. Regnier's

16   attorney, who represents her, has no objection -- we've made

17   that representation, there is nothing to counter that

18   representation -- Ms. Regnier's attorney has no objection to

19   the subpoena, the government virtually has no standing here to

20   object to it.  And we ask that you grant it.

21         MR. SOBELMAN:  Your Honor, may I respond?

22         THE COURT:  You may.

23         MR. SOBELMAN:  Thank you.

24         First of all, the characterization -- sorry, your

25   Honor, the characterization of our putting pressure on

1  Mr. Ambrosio is false.  I don't know what Mr. Ambrosio said to

2  Mr. Baum or what he said to Mr. Ambrosio, but what we didn't

3  bring to Mr. Ambrosio's attention was the --

4            THE COURT:  I think -- I don't know if that is

5  Mr. Ambrosio.

6            MR. SOBELMAN:  Excellent.

7            MR. AMBROSIO:  Your Honor, Tom Ambrosio.  I'm Judy

8  Regnier's attorney.  I am on my duty day today.

9            THE COURT:  Do you want to step forward.  Why don't

10  you use the podium there, and you can use the microphone in the

11  podium.  Over here.

12            MR. AMBROSIO:  I'm sorry.

13            MR. SOBELMAN:  Your Honor, may I just make one

14  sentence before Mr. Ambrosio addresses this, which I'm grateful

15  he's here.

16            THE COURT:  Sure.

17            MR. SOBELMAN:  We only raised this issue in our

18  initial motion on January 10 because we had told Mr. Ambrosio

19  we were going to produce those medical records we did have with

20  our 3500 and *Giglio* material, and he wrote us to objecting and

21  asked us not to.  That's how this all was generated.  I'm glad

22  he's here though to clarify.

23            THE COURT:  Perhaps he's had a change of heart.

24            MR. SOBELMAN:  Perhaps.

25            THE COURT:  He's here and he can clarify.

1            So, Mr. Ambrosio, thank you for joining us.

2            Tell me what the situation is.

3            MR. AMBROSIO:  Judge, my understanding is -- and I

4   apologize.  I didn't hear the colloquy that went on before I

5   came here today, before I walked into the courtroom.

6            But I read motions concerning other subpoenas.  Here's

7   the issue with Ms. Regnier.  She was treated for cancer.  She

8   had medication for chemotherapy.  I have spoken to both sides.

9   I understand as a defense attorney, if she is a witness, the

10  defense has a right to cross-examine her if there's anything

11  that would affect her ability to recall.

12           I only have a certain amount of medical records.  The

13  government has them.  It's 17 pages.  It basically lists the

14  medications that she has.  I have spoken with defense counsel.

15  They want their doctor to be able to review it to see if any of

16  those medications might affect her credibility.

17           My concern, Judge, was when I saw the request for

18  subpoenas for all of her records, her therapist, which I don't

19  know whether they exist, because Ms. Regnier has only a very

20  limited amount of medical records.  She moved so she doesn't

21  have access to much of what may have been there.  I was

22  concerned that there would be privileged information in the

23  responses to your Honor might receive, and I just wanted the

24  right to object if there was privileged information going to

25  any side.  But as your order said, we don't know what's there

1    yet.

2           But in terms of what Ms. Regnier can provide, it's

3    basically drugs.  Frankly, your Honor, based upon my

4    interactions with Ms. Regnier, it's not going to be something

5    that is going to be -- it's not going to sway the jury that

6    those drugs affect her ability to recall.

7           THE COURT:  Okay.  So just to clarify, I take it that

8    you would have no objection to the defense receiving the 17

9    pages that have been turned over to government, with the

10   understanding that they would be used in the first instance to

11   consult an expert and would otherwise remain confidential

12   unless and until I said otherwise?

13          MR. AMBROSIO:  Yes.

14          THE COURT:  Okay.

15          So, Mr. Baum, I guess that clarifies things.  I am

16   certainly prepared to grant that, and that does strike me as

17   giving you most, if not all, of what you need.  Between that

18   and the government's previous letters and disclosures, and not

19   to mention the office assistant's -- I am going to use that

20   instead of the name -- prior testimony, I would think that you

21   have, you know, ample information to consult any expert and

22   also pursue any lines of cross, and I wouldn't think that you

23   need the rest of what you had sought in the subpoenas.  But

24   tell me your thoughts otherwise, obviously subject to

25   revisiting it if you consult an expert.

1          MR. BAUM:  Yes.  I think that you have accurately

2    recounted what we are seeking and what we hope to obtain from

3    it.  We'd like to get the 17 pages.  We've already spoken to a

4    potential expert who's waiting to review it.

5          I think somewhere in your discussion of the issues,

6    you mentioned, well, you know, we can turn over the 17 pages in

7    the first instance.  I think that if there is a need for

8    anything beyond that, we will notify the Court, we will notify

9    the government, and we'll notify Mr. Ambrosio.

10          THE COURT:  All right.

11          So that I think is an appropriate resolution.  Yes?

12          MR. SOBELMAN:  Yes, your Honor.  We can produce the 17

13    pages today.

14          THE COURT:  Great.  So please do that.

15          If either side thinks that an actual protective order

16    signed by me is appropriate, you're welcome to confer about it

17    and submit something.  But unless and until I say otherwise,

18    the records are to be used only for purposes of consulting an

19    expert and for no other reason.  If the defense seeks to use

20    them for any other purpose, they must first confer with counsel

21    for the office assistant, the government, and then seek an

22    order from me.

23          MR. BAUM:  Agreed, your Honor.

24          THE COURT:  All right.  So if you think there is a

25    need for a protective order memorializing that, you can submit

1   one to me, but I think that would probably suffice for present

2   purposes regardless.

3          So, with that understanding, the motion for a subpoena

4   is denied without prejudice to renewal in the event that the

5   defense decides that it wants to seek further relief, and the

6   government's motion to withhold those records is denied with

7   that understanding.

8          Anything else for Mr. Ambrosio before I let him go

9   back to his duty day?

10         MR. SOBELMAN:  Not from the government, your Honor.

11         THE COURT:  All right.  Good.  Thank you for being

12  here.

13         MR. AMBROSIO:  You're welcome, Judge.  Thank you.

14         THE COURT:  Thank you for performing your duty, and

15  you are excused.

16         Anything else on that front more generally?

17         MR. SOBELMAN:  Not from the government, your Honor.

18         THE COURT:  Mr. Baum?

19         MR. BAUM:  Nothing on this issue.  Thank you, Judge.

20         THE COURT:  All right.  Great.

21         Turning to other issues, first, I had cut Ms. Giwa off

22  last week and said that whatever she wanted to raise she could

23  raise today, but let me give her that opportunity, unless it's

24  already subsumed in something else.

25         MS. GIWA:  Thank you, your Honor.

 1              No, I don't think I need to address you at this point.

 2    I may follow up in writing, but for now I think we're okay.

 3    Thank you.

 4              THE COURT:  All right.  Great.

 5              Second -- well, I guess let's address the letter that

 6    defense counsel submitted just before this proceeding.  It

 7    raises, I think, four different issues.

 8              The first is whether the government has produced all

 9    3500, *Brady* and *Giglio* material.

10              The second pertains to the testimony of Mr. Macias,

11    Mr. Avenatti's prior counsel.

12              The third has to do with the servers.

13              And the fourth pertains to the subpoenas served on the

14    trustee.

15              I guess let's take them in turn.

16              I understand this letter to basically just be flagging

17    these issues and essentially raising them for general

18    discussion, slash, you know, discussion of how to resolve them,

19    if briefing is necessary, appropriate, etc.  But why don't we

20    at least take them in turn in the first instance and then we

21    can decide how to handle them.

22              With that, let me turn to the government to address

23    the first issue, which is 3500, *Brady*, and *Giglio*?

24              MR. SOBELMAN:  Yes, your Honor.

25              I think there are two items in this paragraph as I

1    read it.  The first is potential communication between the

2    special agent and the office assistant.  This was the subject

3    of a posttrial motion in the case before Judge Gardephe.  We

4    had extensive briefing on this.

5            I was told by the defense a few days ago they may

6    raise this again, and I pointed them to our briefing from that

7    other case and told them our position is the same, which is

8    there is a note in a piece of 3500 from the last trial in which

9    there's some reference to potentially the office assistant

10   sending a screen shot of a tweet that she had seen to a special

11   agent; that if that was sent it was never produced.

12           The defense before the last trial never raised it,

13   never asked about it.  Many months after they asked about it.

14   We looked for any e-mail or text message of that tweet which

15   was a tweet by a random person that the office assistant had

16   seen referencing her potential testimony in a generic way, and

17   we have no record of any communication on that.  So that still

18   remains the same.

19           We queried our e-mail, we looked through cell phones.

20   If it did exist, we have no recollection of receiving it, and

21   we don't have it.  So there's really nothing to say about that

22   that wasn't already said in our brief filed in the other case

23   on June 11, 2021.

24           THE COURT:  Okay.

25           MR. SOBELMAN:  That's the first issue.

1            With respect to the second, defense counsel helpfully

2    asked us I think yesterday for whether there were any

3    additional notes from an earlier conversation between Victim

4    1's counsel and our office.  We double checked and did find one

5    set of notes from an additional conversation which we are going

6    to produce today.  I think those two issues are dealt with.

7            THE COURT:  Okay.  I think there are two other things

8    in this paragraph --

9            MR. SOBELMAN:  Yes.

10            THE COURT:  -- that I see.  One is notes of the

11    government's interviews with the office manager beyond what

12    you've just described perhaps, including any that may be in the

13    possession of the prosecution team from the Central District of

14    California.  I have not ruled that they are part of the SDNY

15    prosecution team for purposes of this case, but they cite a

16    decision by Judge Gardephe finding that they are or were, at

17    least as to the office assistant.  That may be the case here

18    too.  I just don't know.

19            Can you speak to that issue?

20            MR. SOBELMAN:  Yes, your Honor.  We in advance of the

21    prior trial did ask the U.S. Attorney's Office for the Central

22    District of California pursuant to a specific law enforcement

23    request and as a courtesy to the defendant to provide us with

24    any notes or interviews they had, interview memoranda they had

25    from meeting with the office assistant, and we produced those

1    as 3500 before the prior case and produced them again now.

2         We have not renewed that request because our

3    understanding is that anything that would have been generated

4    between our last trial and now would have been produced before

5    the California trial happened this past summer.

6         So, if the Court directs us, we will renew that

7    request.  We don't think it's necessary because the defendant

8    would have that, those materials, but we are happy to make that

9    request if the Court thought it appropriate.

10         THE COURT:  Meaning the defendant would have them

11    because they were produced in the California trial?

12         MR. SOBELMAN:  That's what we understand.  We don't

13    have access to those materials.

14         THE COURT:  Okay.

15         And the last item in this paragraph is *Brady* or *Giglio*

16    information relating to finances of Mr. Avenatti and his firm.

17         MR. SOBELMAN:  We have produced everything that's in

18    our possession.  To the extent the defendant is seeking

19    materials in the possession of another office, we assume that

20    those materials were produced either before or after the trial

21    in California, but we have not made any request of them for

22    such materials, and we don't believe we have any obligation to

23    do so because we are a separate prosecution team.  And if

24    they're talking -- it is not clear from this letter, but

25    assuming they're talking about the Drum reports or the servers,

1    we dealt with that before your Honor in the adjournment request

2    and other papers.

3              THE COURT:  Okay.

4              Let me turn to defense counsel to discuss each of

5    these things.

6              So it sounds like with respect to the office assistant

7    and Ms. Clifford that the government is making a representation

8    that it has searched and either has produced or will shortly

9    produce anything that qualifies for production with the

10   possible exception of what would have been produced in

11   California.

12             I imagine it would be easy enough for the government

13   to obtain the 3500 for the office assistant from their

14   California counterparts if the defense doesn't have that from

15   that case.  Obviously it was produced to the defendant, but if

16   you want that, I'm happy to order the government to do that

17   since it seems like it would be relatively easy to do.

18             Then, as to the finances, I guess my view is that

19   unless and until you persuade me that you haven't received

20   something that is within the possession of this trial, the

21   prosecution team, that is to say that the Drum analysis or

22   anything that you haven't obtained from it counts for purposes

23   of this prosecution team, I would think that they have

24   represented that they have produced everything that would

25   qualify.

1          MR. DALACK:  With respect to your Honor's invitation

2    to compel from the California team all typewritten and

3    handwritten notes of their interviews with Ms. Regnier, we

4    would like the court to order that.  It's my understanding that

5    we have not received handwritten notes from the prosecution

6    team in California's interviews with Ms. Regnier, and our

7    position is that we are also missing some typewritten notes.

8    Your Honor --

9          THE COURT:  Can I interrupt you for a second?

10          MR. DALACK:  Yes, Judge.

11          THE COURT:  I mean, would they not have been turned

12    over as 3500 before the California trial?

13          MR. DALACK:  That is part of the problem is that they

14    in the course of the California trial, our understanding is

15    what whatever productions they made out there did not include

16    the handwritten notes.

17          MR. SOBELMAN:  Yes, your Honor.  That's correct.  That

18    office has a different practice than our practice here.  They

19    do not produce handwritten notes of memoranda.

20          Our understanding is unless there's some inconsistency

21    between the two -- we obviously don't know what they did

22    produced or what they didn't produce or how they went about

23    making that analysis, but that's our understanding of how they

24    comply with their obligations in that district.  I believe that

25    was raised with the court there and the court did not disturb

1    that determination.

2         THE COURT:  All right.  I think there is law that

3    supports that.  It has always struck me as dumb practice,

4    because if they're not inconsistent there's no harm in turning

5    them over; if they are inconsistent, then they have to be

6    turned over, so ergo they should be turned over.  But I am not

7    here to litigate the practices of the California U.S.

8    Attorney's Office.  So at a minimum I want you to get the 3500

9    that was produced with respect to the office assistant and turn

10   that over to counsel here to ensure that it's in their

11   possession.

12        You're welcome to share my views about their practices

13   on the handwritten notes and see if that persuades them to

14   provide those to you as well.  If it doesn't, then defense

15   counsel can raise to me and make the argument that they qualify

16   as part of the prosecution team here, in which case I would be

17   prepared to compel their production on the grounds that they're

18   3500.

19        But it may be easier to short circuit that and have

20   them provide it for the reasons that I've cited.  While you are

21   at it, I want you to make sure that they have not conducted any

22   additional interviews with the office assistant since the

23   trial, because if they have, that may well qualify as well.  We

24   ought to know that, and you can either make the decision to

25   turn that over and thereby moot any litigation over whether

1    you're required to, or the defense can raise it with me and

2    we'll adjudicate it in the appropriate fashion.

3         All right?

4         MR. SOBELMAN:  Yes, your Honor.  Our understanding is

5    they have not spoken or met with her, but we will confirm that.

6         THE COURT:  Okay.  Great.

7         Mr. Dalack?

8         MR. DALACK:  That was going to be my next point,

9    Judge, with respect to the California prosecution team about

10   interviews postdating July 2021, so thank you for flagging

11   that.

12        With respect to the issues pertaining to the finances

13   of Mr. Avenatti and his firm and other omissions that we

14   believe exist in the -- I guess with respect to -- I'm sorry,

15   Agent Penland's communications with Ms. Regnier, I just want to

16   note it's not clear to me how the government is aware of the

17   substance of the tweet that the office assistant purportedly

18   commented on by text to Agent Penland, but yet doesn't know the

19   context of that communication between, or the content of that

20   communication between Agent Penland and Ms. Regnier.  If it's

21   the case that that text message was deleted, that is a fact

22   that we think should be divulged and disclosed to us.  We want

23   the government to run that down.

24        We are not chasing a ghost here.  There is a

25   representation in the notes that the office assistant

1   communicated with Agent Penland by text message.  We don't have

2   that text message, so we want the government to run it down and

3   make a representation as to what exactly happened with that

4   communication.

5          MR. SOBELMAN:  Your Honor, we were very clear in our

6   prior briefing in the other case, and I'll recount it now.  I

7   was present.  I recall it.  She showed us a tweet on her phone

8   that, again, it was a random member of the public saying

9   something about you know how her testimony might be impactful

10  if she's called at trial.

11         She told us she was, you know, uncomfortable or

12  drawing it to our attention.  And I believe Special Agent

13  Penland said, Okay, please send that to me, and then made a

14  note.

15         None of us, as far as I can remember our

16  conversations, none of us in the room recall whether she

17  actually did send it or not.  We can't find a record of her

18  actually sending it to us.  There's nothing else for us to run

19  down.

20         If the Court wants more information, we would like

21  guidance on what else we can do.

22         MR. DALACK:  Can I make a suggestion, Judge?  To

23  whatever the extent the government has or has not taken Agent

24  Penland's phone and examined to it see what -- any information

25  that can be gleaned from it about the transmission of the text

1     or whether it was deleted, we would ask that the judge compel

2     the government to conduct that kind of a review.

3          MR. SOBELMAN:  Your Honor, Special Agent Penland has

4     had I think at least one new, if not two new phones since then.

5     The defendant in the other case didn't raise it until like a

6     year and a half after the trial.  So any message that might

7     have been on that phone is long gone by now.

8          But, again, no one has a recollection of receiving it.

9     As Judge Gardephe wrote about this, it is really a nonissue.

10    We have done the search we can do.  If we had it, we would

11    produce it.  If we could find it, we would, but we are at a

12    loss of anything else we can do on this issue or why it's

13    important.

14         MR. DALACK:  If I may just on one point.  I just have

15    to respectfully take issue with the government's, you know,

16    continued representation of what was or was not done in the

17    Nike-related matter before Judge Gardephe.

18         We are here now in this case with discrete 3500 and

19    *Giglio* obligations on the government in this case, and we're

20    asking about their compliance with those standards in this

21    case.  We are not concerned at this particular juncture with

22    what transpired in front of Judge Gardephe in 2019 or '20.

23         THE COURT:  All right.  I assume the government is

24    raising it just because it's been litigated and there's a

25    record in that case.  But I certainly agree that this is a

1   different case and may raise different issues.

2          That being said, I can't order the government to

3   produce something that doesn't exist, and it sounds like it may

4   not exist.  And beyond that, can you tell me why this is 3500

5   or *Giglio*.  It sounds like it's fairly, I mean immaterial if

6   not irrelevant to her testimony.

7          MR. DALACK:  The concern, Judge, and if I may

8   respectfully ask for leave to put this in a letter.  The issue

9   is that we're concerned that the content of that communication

10  and the circumstances surrounding Ms. Regnier's concerns about

11  that tweet go to certain motives that she may have with respect

12  to Mr. Avenatti.

13         I am reluctant to get in further on the public record

14  with respect to that because it might go towards certain

15  aspects of her cross-examination at trial.

16         THE COURT:  All right.  So the bottom lime is if you

17  think -- based on the record that has been developed today I

18  don't think there's any relief that I can or should order, but

19  if you think that there is and there's anything further to be

20  done, you're welcome to try to persuade me of that.

21         It also seems like you have sufficient information to

22  cross her on this and inquire about whatever tweet she may have

23  seen and see if you can elicit anything relevant in that

24  regard.  But be that as it may, if you think there's something

25  to file, you're welcome to file it.

1          MR. DALACK:  Thank you, Judge.

2          THE COURT:  I would just urge you to do it as quickly

3   as possible.

4          And then what about the financial information,

5   finances issue?

6          MR. DALACK:  You know, I'm aware of the Court's

7   perhaps exhaustion with our mentioning of the server issue, but

8   it's worth us raising that.  In addition to the servers, we're

9   concerned that the prosecution team in this case has not

10  disclosed all information that they have either come across in

11  the context of their dealings with the Central District of

12  California that bear on Mr. Avenatti's financial condition and

13  the firm's financial condition, and we are afraid of a

14  situation in which we get to trial, several of the government,

15  or at least two of the government's witnesses we anticipate

16  that the government will elicit through them certain

17  information about, you know, making allegations about

18  Mr. Avenatti's financial condition and that of his former firms

19  without the full picture, without us being able to use the full

20  picture in cross-examining them.

21          So I'm happy to take this issue up again in a more

22  formal letter brief, but I wanted to flag for the Court that it

23  is our position that we have not received all of the

24  information bearing on Avenatti's financial condition or for

25  the firm's financial condition that is in the possession of

1    this prosecution team.

2              THE COURT:  Okay.

3              Let me make one thing clear:  I am not exhausted with

4    that issue.  I'm exhausted with the request for an adjournment.

5              MR. DALACK:  Okay.  Thank you, Judge.

6              THE COURT:  And it was not a valid basis to either

7    seek an adjournment or oppose the government's motion to

8    introduce evidence of his finances.  That being said, if

9    there's something in the possession of the prosecution team to

10   which you are entitled then they are going to have to produce

11   it.

12             But right now I think what I said last week is that I

13   wasn't inclined to think that for purposes of this issue

14   that -- well, let me put it this way:  I don't think at this

15   point you have persuaded me that the California U.S. Attorney's

16   Office is part of this prosecution team for purposes of that

17   issue.

18             If you think that they are, and you can make the case

19   that they are, and that this prosecution team therefore needs

20   to disclose additional information regarding the finances,

21   you're welcome to try to do that.  But based on the record that

22   is before me, they are a different U.S. Attorney's Office.  It

23   does not sound like this U.S. Attorney's Office was involved in

24   retaining Mr. Drum or pursuing whatever analysis was done on

25   that score.  For that reason I wouldn't think that they qualify

1    as part of this team.

2              MR. DALACK:  Understood, Judge, we'll take it up in a

3    letter if appropriate.

4              THE COURT:  Okay.

5              Anything the government wishes to say on that?

6              MR. SOBELMAN:  No, your Honor.

7              THE COURT:  Let's move to the second issue, which is

8    the potential testimony of Sean Macias, if I am pronouncing

9    that correctly.  Is that the witness that we discussed last

10   week?

11             MR. PODOLSKY:  It is, your Honor.

12             THE COURT:  What's the government's response here?

13   There's no application here, just merely that the defense may

14   move to preclude.  Obviously they're entitled to do that, but

15   what's the government's view?

16             MR. PODOLSKY:  Let me just take the statements in the

17   paragraph here.

18             First, the defense asserts that the government only

19   recently disclosed their intention to call Sean Macias,

20   Mr. Avenatti's prior counsel, as a witness.

21             Just for the record, we disclosed that when we

22   discussed our witness list and 3500 pursuant to the schedule

23   set by the parties and adopted by the Court, so I am not quite

24   sure what the implication of this sentence is.  We discussed

25   this witness last week in fact.

1          THE COURT:  All right.  I assume it is just the

2    justification for them raising it now, not that they think that

3    you belatedly produced it.

4          MR. DALACK:  Well, it is that, your Honor.  But also,

5    as we spoke about last week, they only also produced Rule 16

6    material with respect are to Mr. Macias that, you know,

7    illuminated our understanding of what the government contends

8    is his utility at trial.  So it's in both of those, you know,

9    with respect to both of those issues that wanted to flag the

10   recent disclosure.

11         THE COURT:  All right.  Well, in any event, I don't

12   think -- perhaps that issue aside, there is no suggestion of

13   impropriety with respect to the disclosure that he may testify.

14   Certainly, if you think there is a valid basis to pursue relief

15   with respect to it, I am not going to preclude them since that

16   information was just disclosed last week.

17         On the substance, Mr. Podolsky.

18         MR. PODOLSKY:  Thank you, your Honor.  The best of my

19   understanding is that Mr. Macias represented Mr. Avenatti in

20   some specific instances, I believe although I could be

21   incorrect, concerning the domestic violence accusation in

22   California several years ago involving Mr. Avenatti.

23         That is not the subject matter of the testimony here.

24   There's no issue of attorney-client privilege.  There's no duty

25   of loyalty issue.  There's really nothing relevant here as to

1    Mr. Macias' testimony, which just concerns, as I mentioned last

2    week, relationship with Mr. Avenatti, some discussion

3    Mr. Avenatti had with Mr. Macias with no bearing on legal

4    advice, including the assistance in obtaining from Mr. Avenatti

5    a personal loan of direct relevance to this case.  Obviously,

6    the defense can make whatever application they want and we're

7    prepared to respond, but based on this paragraph I don't quite

8    understand what the concern is.

9            THE COURT:  All right.

10           MR. DALACK:  Your Honor, we take issue with the

11   government's representation of the scope of Mr. Macias'

12   representation of Mr. Avenatti, and we will write on this issue

13   both with respect to the attorney-client privilege and the duty

14   of loyalty.  And to the extent that it's necessary for us to

15   put in a declaration or some sort of affidavit, we'll take that

16   up in the papers.

17           THE COURT:  All right.  So once we finish going

18   through these issues, let's discuss timing of any further

19   applications, but the bottom line is there is no request for

20   relief at the moment, just a suggestion that it may be pursued.

21           The third is the server issue.

22           And let me turn to the government on this.  I suppose,

23   number one, to the extent that there is a request here that

24   further productions be made on a rolling basis, that seems

25   reasonable under the circumstances, but I will hear from you if

1    you think otherwise.

2           And then second is some sort of inability to access

3    critical information regarding Ms. Clifford, but I don't know

4    what that is about or why it's only coming out now.

5           MR. SOBELMAN:  Your Honor, with respect to the rolling

6    production, of course, as the defense obtains or identifies

7    materials that are producible, we would like them to produce

8    that as early as they can.

9           That being said, in a prior motion they filed, they

10   listed a whole bunch of materials that had been subject to

11   their review already from the servers.  To date we've received

12   zero documents in those categories.

13          The only Rule 16 production we have been provided, in

14   our view at least, has nothing do with this case.  It had to do

15   with Victim's 1's representation by another attorney in another

16   matter.  So we have still not received anything from the

17   servers that we had anticipated receiving that the defense put

18   in writing that they had reviewed.

19          THE COURT:  Okay.

20          MR. SOBELMAN:  So, with respect to the rolling

21   production, we don't have an objection in principle to a

22   rolling production, but we want it to be made in good faith.

23   To the extent the defense has already reviewed and identified

24   documents from the servers now a couple of weeks ago, we don't

25   understand why we haven't received that yet.

1          THE COURT:  All right.  Well --

2          MR. DALACK:  Your Honor, if I may.

3          THE COURT:  For starters I think today is the deadline

4     for the production of the defense exhibit list, so that may

5     have some bearing.  But, Mr. Dalack, go ahead.

6          MR. DALACK:  Your Honor, the documents we disclosed to

7     the government did come from the servers.  We are continuing

8     the review.  We are going to make another substantial

9     production today.  We'll continue to produce things to the

10    government as we find them on the servers.

11         I mean, I can represent that we're working pretty

12    tirelessly to make our way through as much of the information

13    as possible and especially reviewing any, you know, e-mail

14    communications from the servers that we think would be part of

15    the defense case in chief and that would be subject to

16    production under Rule 16 for any nonimpeachment purpose.

17         With respect to the issue about the financial

18    information on the servers that pertains to Mr. Avenatti's

19    former representation of Ms. Clifford, my understanding is that

20    this is a technical problem and that for whatever reason the

21    cost that we believe exists on the servers with respect to

22    Mr. Avenatti's former representation of Ms. Clifford is

23    inaccessible due to a technical matter that we're still trying

24    to run down.

25         We submit that it is possible that the government has

1    better tools and more sophisticated tools as its disposal to

2    obtain that information, and it is for that reason that it sort

3    of dovetails with our concern with the way in which the

4    government has kind of avoided the server issue all together,

5    notwithstanding the fact that they have been in the possession

6    of main justice for a couple of years now.

7         THE COURT:  Okay.  So let me take these things in

8    turn.

9         First, your request for permission to produce things

10   on a rolling basis is granted with the understanding that that

11   will be done in good faith.  Obviously you should comply with

12   your production requirements today, and then as you discover

13   anything new or additional, recognizing that the obligation is

14   a continuing one, you should promptly disclose that to the

15   government.

16        That is without prejudice to whatever application may

17   be made with respect to those things.  If something substantial

18   is produced it's belated and should have been produced sooner,

19   then I'm obviously prepared to visit or revisit the issue as

20   the case may be.

21        With respect to this technical issue, I guess my

22   follow-up question to you, Mr. Dalack, is you suggest that

23   someone is seeking relief before Judge Selna in California.

24   Can you tell me what that means and where that stands?

25        MR. DALACK:  One moment, your Honor.

1              (Counsel and defendant conferred)

2         MR. DALACK:  The application pertains to materials

3    from the server that are in the possession of the prosecution

4    team in the Central District of California that we would like

5    to produce to the government here in this case and that we've

6    asked for Judge Selna, that Mr. Avenatti in the context of that

7    prosecution in the Central District of California has asked

8    Judge Selna to potentially compel the government to produce

9    that to him so that we can turn it over to the government in

10   this case for its review.  Because it contains, we submit, cost

11   data related to Mr. Avenatti's representation of Ms. Clifford.

12        So, again, the issue is we just wanted to alert the

13   Court that we're trying to run this down on two coasts with

14   respect to the cost data issue and that, you know, much of this

15   could be fixed if the government would endeavor to search

16   through the servers.  And we're trying to make it a little bit

17   easier to do that by delivering to them exactly what is in the

18   possession of the prosecution team in California that contains,

19   we submit, the cost data.

20        MR. SOBELMAN:  First, your Honor, we reviewed the

21   motion that the defendant filed in California, and he objects

22   to the production -- assuming Judge Selna enters an order

23   directing the California prosecution to produce whatever it is

24   he's asking for to him, he actually objected to Judge Selna

25   simultaneously providing a copy to us.  So to the extent he's

1    saying that now that he wants us to get a copy, that's not

2    consistent with the papers that were submitted in California.

3           But to turn to the main issue, we don't have these

4    servers in our possession.  We don't have access to them.  We

5    don't have a legal means of reviewing them.

6           The prosecution team in California we understand

7    obtained a search warrant based on their case.  They set forth

8    whatever probable cause they set forth for whatever crimes

9    they've investigated and may be charged.

10          We don't have these items.  We don't have a legal

11   means to search them.  We are not the same prosecution team.

12   This is the same issue that's been coming up over and over.  I

13   don't see anything in this letter or anything defense counsel

14   said to suggest that we should be handling this in a different

15   way.

16          I also note the defense has the server.  We should not

17   be in a position where we're trying to solve a technical issue

18   with a forensic production made by a different office that the

19   defendant has had for months.

20          MR. DALACK:  If I may, just with respect to the

21   objection that I understand the government is referring to in

22   the papers out in the Central District of California, that was

23   raised in the context of Mr. Avenatti's ability to conduct a

24   privilege review in the first instance before disclosed to the

25   prosecution team.

1          Perhaps I didn't specify that step, but we would

2     obviously not object and want it to be disclosed to the SDNY

3     prosecutors, subject to a privilege review on our end for any,

4     you know, work product or attorney-client privilege that might

5     be found on that particular production.

6          I think that the issue in -- you know, it does keep

7     coming up again and again because of the fact that these

8     servers were in the possession of main justice for a number of

9     years.  It's our position that the government has just actively

10    avoided doing anything with them and taking the position that,

11    notwithstanding being in the possession of main justice, they

12    have had no obligation or reason to search it for anything,

13    Rule 16, *Brady* or *Giglio*.  We don't think that's a tenable

14    position.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1  M1IYAVEC2

2          THE COURT:  Okay.  And can you tell me why whatever

3  the technical issue is with respect to the financial

4  information or cross-data, why that's coming to light now if

5  you've had these in your possession since September?

6          MR. DALACK:  You know, I can't necessarily speak to

7  the specific details of the technical issue, but I can assure

8  the Court that we can provide some more detail on that if and

9  when we submit a formal letter motion seeking relief as to this

10  particular issue.

11          THE COURT:  Okay.  I'll wait and see if you file

12  anything.  Again, at the moment, I'm not persuaded, based on

13  the record that I have before me, that the servers are in the

14  possession of this prosecution team.  But if you persuade me

15  that that isn't the case, then perhaps there is some relief to

16  which you'd be entitled.

17          The caveat to all that is that you've had the server

18  since September.  Given that, I think that's ample time, and

19  you'd have to explain to me why the technical issue is either

20  only coming to light now, if you are seeking any relief with

21  respect to that, or if it's because you didn't review it until

22  this week, then that's really on you.  That's not a problem

23  with the government's productions.  Again, I'm not going to do

24  anything further for now.  If you think there's any relief to

25  be had, you're certainly welcome to make the case.

1          The final issue pertains to the trustee.  I think one

2    or both sides indicated last week that the trustee was not

3    likely to comply with the subpoena or be able to comply with

4    the subpoena.  But I don't know where that stands or what there

5    is to be done on this front.

6          Perhaps the government can shed some light on it based

7    on the letter, this letter.

8          MR. SOBELMAN:  The government served a trial subpoena

9    on the trustee for certain materials.  We understand the

10   defense has also served a subpoena.  We have no update since

11   the last conference, which is that counsel for the trustee said

12   that in light of the nature of the requests and the need to

13   seek relief from the bankruptcy court, they may or may not able

14   to comply with either subpoena in advance of trial.

15         To the extent the government receives anything

16   pursuant to the subpoena, it will promptly disclose those

17   materials to the defense.  I'm not sure exactly what the

18   defense is asking for, but we don't really see a role for this

19   Court at this time.

20         THE COURT:  All right.  Can you just shed some light

21   on the outside consultant being on your witness list, what

22   that's about.

23         MR. SOBELMAN:  Yes, your Honor.  So the materials that

24   we sought we understand have been or will be pulled from the

25   servers, forensic copies in the possession of the trustee by

1    this forensic person, and that if we do get the materials,

2    which we don't know if we will, we would call this person to

3    authenticate them.

4           THE COURT:  Okay.  So it's conditional on you getting

5    the materials.

6           MR. SOBELMAN:  Yes, your Honor.

7           THE COURT:  Mr. Dalack.

8           MR. DALACK:  I haven't seen the government's subpoena,

9    but I know what we subpoenaed.  And I can say that we

10   subpoenaed information that's co-extensive with what we believe

11   to be on the servers with respect to cost data for

12   Mr. Avenatti's formal representation of Ms. Clifford.

13          So I just want to sort of point out that the

14   government in subpoenaing the trustee -- and I can only surmise

15   that they're subpoenaing similar information -- they're

16   interested in it as well.  So it underscores the significance

17   and importance of this information.

18          At this particular point, I'm still waiting to hear an

19   update.  Mr. Sobelman and I are both copied on a message from

20   the attorney for the trustee.  We haven't heard back from him

21   yet since last week.  I'm happy to reach out today to see about

22   an update.

23          But as far as any changes to the representation I made

24   last week about the unlikelihood that the trustee will be able

25   to comply with the subpoenas, the dueling subpoenas, by the

1    24th, I think that still stands.  And we will -- we'll take up

2    any appropriate remedies by letter at the end of the week,

3    should that situation remain the same.

4            THE COURT:  All right.  Very good.  I guess the

5    question arises, now that we've exhausted the topics in this

6    letter, whether a deadline should be set for the defense to

7    seek any of the relief that we've discussed, either as to the

8    office assistants, 3500/Giglio, Mr. Meiselas, the servers, or

9    the trustee.

10           What's the government's position on that?  Obviously

11   even if I don't set a deadline, any motion would have to be

12   promptly filed.  And if it's not, that might be an independent

13   basis to deny it.  But I think the question is does it make

14   sense to set a more firm deadline than that.

15           MR. SOBELMAN:  It does, your Honor, for two reasons:

16   First, some of these things would take time to deal with,

17   for example, or inconvenience people.  We think it's unlikely,

18   but if the Court were to preclude Mr. Meiselas from testifying,

19   we would rather not have him travel from California in a

20   pandemic for example.

21           Second, we very much think it's in the Court's

22   interest and the parties' interest not to be briefing these

23   issues during the trial.  So if the defense has an argument to

24   make, we'd like them to make it soon so that we can respond and

25   the Court can resolve it in a timely fashion.

1          THE COURT:  Mr. Dalack, it seems right to me.  I guess

2    one option would be to let you guys discuss it immediately

3    after this conference and see if you can agree on an expedited

4    briefing schedule, but I can also try to set one now.

5          MR. DALACK:  I'd like to have the opportunity to

6    discuss that with the government in the first instance.

7          THE COURT:  Why don't you two discuss that, but I

8    think it is in everybody's interest to try and resolve these

9    things sooner rather than later, especially if they have any

10   bearing on openings, to resolve it before trial begins on

11   Monday.

12         MR. DALACK:  There's one last issue, your Honor, I

13   wanted to raise.  And that's just about the setup of the

14   courtroom, if I may.

15         THE COURT:  Okay.

16         MR. DALACK:  I had the occasion to try a case in this

17   courtroom in April before Judge Rakoff.  In anticipation of

18   that trial, we had raised for him sort of the complexities of

19   the setup of the courtroom with respect to the defense tables

20   and our ability to be able to converse more readily amongst

21   defense counsel with our paralegal.

22         We had raised this for Judge Rakoff, and he had

23   actually allowed the defense, in the interest of being able to

24   communicate amongst counsel with Mr. Avenatti and with the

25   defendant in that case and our paralegal, that we take the

1    front table and the government take the back two tables.

2          I'd like to propose a similar arrangement.  At this

3    point, there is no more of a compelling reason for the

4    government to have Agent Penland at the head of its table than

5    for us to have Mr. Avenatti at our able and able to communicate

6    effectively with all three of his counsel.

7          So for that reason, we submit that it would be

8    appropriate for a seat change, that we take the front table and

9    the government take the back two tables.

10          THE COURT:  I guess the question I have is:  Why would

11    that make it any easier?  If anything, the cumulative distance

12    among all counsel and Mr. Avenatti seems to me less based on

13    your current seating arrangement than it would be if you were

14    at the front table where one would be at the far right and the

15    other person would be all the way to the far left.  It seems

16    like it's easier to confer as a group where you're currently

17    seated.

18          MR. DALACK:  That might be true.  We're concerned

19    about optics.  And we don't want to be in a position where

20    we're standing up and passing notes across the table and

21    conferring in front of the jury at various points.  We'd like

22    to be able to be a little bit more subtle about it if we

23    communicate at counsels' table amongst ourselves.

24          It also creates an issue for our paralegal as well

25    who, at this particular point and depending on what the Court

1   envisions for a COVID-compliant setup in the courtroom, we

2   understand that if we don't get the front table, we won't have

3   ready access to our paralegal during trial who might be forced

4   to sit in the gallery.

5           MR. SOBELMAN:  Your Honor, our concern is not sort of

6   where we sit in the courtroom, but our experience in the trial

7   held two years ago -- and the record bears this out -- the

8   defendant was -- how should I put this? -- very active during

9   the trial.  And the Court had to admonish him on multiple

10  occasions to keep his voice down, to stop aggressively shaking

11  his head, to --

12          MR. DALACK:  I want to object to everything that

13  Mr. Sobelman is putting on the record about issues concerning

14  Mr. Avenatti's prior conduct that we take issue with and his

15  characterizations about aggressively shaking his head and

16  stuff.  I believe that's unnecessary, Judge.

17          MR. SOBELMAN:  Your Honor, this is in the public

18  record.

19          THE COURT:  And the jury is not here.

20          MR. SOBELMAN:  Judge Gardephe had to admonish the

21  defendant about it on multiple occasions.  We can't predict

22  what's going to happen in the future.  But that is a concern we

23  have about having him closer to the witness and potentially

24  closer to the jury.  So that's really a concern we have.

25              I think we defer to the Court on where you'd like us

1    to sit and whether there's a better way for the proceeding to

2    unfold rather than in the traditional sense.

3          THE COURT:  I will take it under advisement, perhaps

4    even speak to Judge Rakoff.  But I think right now, my

5    inclination is to keep things as they are for the reasons that

6    I stated.  I just don't see this as an insurmountable problem.

7    But I'll consider it a request.  And if I revisit it, I'll let

8    you know.

9          MR. DALACK:  Thank you, Judge.  The case number was 19

10    CR 354.

11          THE COURT:  I'm sure he would remember if he allowed

12    you to swap seats.  I'm not concerned about the case number.

13    Let me just say that I do not need to resolve whether the

14    representations regarding Mr. Avenatti's behavior in another

15    trial were accurate or not.  That's not my concern.

16          I do want to be clear that no one is to speak audibly

17    if they should not be speaking or heard by the jury.  No one is

18    to be making gesticulations with their head, arms, anything if

19    they're just sitting at counsel table during the testimony of a

20    witness or in front of the jury.  That's just not going to be

21    permitted, whether it's from a lawyer, Mr. Avenatti, or a

22    member from either team.  So let me make that clear.  I don't

23    want to see any of that.

24          Any other issues that you can think of?

25          MR. BAUM:  Judge, there is an issue, a personal issue,

1    regarding counsel.  If we may have a very brief sidebar off the

2    record.  The personal issue is a medical issue that I want to

3    alert the Court to because it needs to be taken into

4    consideration during the trial.

5            THE COURT:  All right.  Why don't you approach,

6    please.

7            (At the sidebar; discussion off the record)

8            THE COURT:  Legal issues to review, I did review, at

9    least briefly, the parties' request to charge.  Nothing jumped

10   out at me as requiring resolution at this time.  But I'm

11   inviting you to tell me if you think there is anything and, in

12   particular, beyond what we've already discussed, if there's

13   anything that would bear on your openings.  That's, as I said

14   before, something I think that we should resolve before the

15   openings.

16           The bottom line is now throughout trial, I've allowed

17   you to raise issues with me in a timely fashion, particularly

18   anything that would require consideration or briefing, so that

19   I can make rulings in a timely fashion and it won't disrupt

20   trial.  So anything further at this time?

21           MR. BAUM:  We do have two issues, two additional, very

22   brief issues, to raise.  One issue -- I think the jury alluded

23   to this and wanted to know the Court's position.  There is some

24   issue about whether or not the jury room would ask questions of

25   the prospective jurors as to whether or not they were

1    vaccinated.

2            THE COURT:  I'm going to get to jury selection in a

3    minute.  So hold that thought.

4            MR. BAUM:  Okay.  The other issue is also a jury

5    selection issue.  So we'll hold on.

6            THE COURT:  Anything else non-jury selection related

7    to raise at this time?

8            MR. DALACK:  Not with respect to the charge or

9    openings, no, Judge.

10           THE COURT:  All right.  From the government?

11           MR. SOBELMAN:  Your Honor, we just have one issue with

12   respect to the trial but not with respect to the jury charge.

13           THE COURT:  Okay.

14           MR. SOBELMAN:  In the other case that Mr. Avenatti had

15   in this courthouse, he had made a motion to dismiss on the

16   basis of vindictive and selective prosecution.  In advance of

17   that trial, we made a motion to preclude him from making any

18   types of claims like that before the jury.

19           We don't expect that the defendant intends to do that

20   here.  We just want to confirm on the record that we don't have

21   to be concerned that there's going to be some claim before the

22   jury that he was singled out or is being persecuted for his

23   political beliefs or something like that.

24           THE COURT:  Okay.

25           MR. SOBELMAN:  We raised this specifically because he

1    filed a recent lawsuit on the day the jury questionnaire was

2    administered.  We want to make sure that nothing from that

3    lawsuit or related to it, among other things, are going to make

4    an entry at this trial.

5              THE COURT:  Mr. Dalack.

6              MR. DALACK:  You know, it's hard for me to on the fly

7    respond to an argument that, frankly, I submit should have been

8    raised in the context of in limine practice.  So I don't

9    anticipate -- I can say confidently, Judge, that none of us on

10   the defense team anticipate making any improper arguments

11   before the Court or before the jury.

12             So if the government wants to enumerate or specify

13   what arguments it's concerned about us making on paper, we'll

14   respond to them accordingly.  I just want to note that the

15   issue that the government just flagged about the claim that

16   Mr. Avenatti filed, it's got nothing to do with this case or

17   with our representation.  So that's that.

18             THE COURT:  Okay.  If you can remain seated and speak

19   into the microphone, that would be helpful.

20             The bottom line is the issue has been flagged, as

21   Mr. Dalack has just said and I think conceded, the lawsuit that

22   Mr. Avenatti apparently filed last week, as far as I'm

23   concerned, doesn't have anything to do with this case at all.

24   So I would not anticipate that it would be mentioned at this

25   trial.

1          Relatedly, any vindictive prosecution or selective

2     prosecution claim is a legal issue for me to decide and not

3     something that is any business of the jury.  So I would not

4     expect to hear any argument or any evidence on that score

5     either.

6          So as far as I'm concerned, nothing of that sort

7     should come into this trial.  If the defense anticipates that

8     it intends to raise it, you better confer with the government

9     and raise it with me to ensure that it is proper.  But I fail

10     to see how it would be proper.  So I'll leave it at that for

11     now.

12          One other issue that I need to raise.  I got a call

13     this morning from a former retired New York state judge who I

14     guess is serving as a due process hearing officer with respect

15     to a matter unrelated to this, except for the following:  That

16     I gather one of the lawyers involved in that proceeding is

17     someone by the name of Craig Brewster.  And Mr. Brewster told

18     the hearing officer that he had been subpoenaed in this case

19     and, on that basis, has a conflict with respect to the

20     proceeding there.

21          I said I would inquire about it to find out what the

22     story was because I don't know whether Mr. Brewster is going to

23     testify or not, what the timing would be, so on and so forth.

24          So does anyone want to shed some light on that?

25          MR. SOBELMAN:  Your Honor, assuming your Honor's

1   talking about Clark Brewster, who represents victim 1, our

2   understanding from him is that he was subpoenaed by the

3   defense.

4          We anticipate he likely will file a motion to quash

5   that subpoena based on our conversations with him.  We're not

6   aware of this other proceeding, but that's the only insight we

7   can provide.

8          THE COURT:  Okay.  First of all, I was told that it

9   was victim 1's, Ms. Clifford's, counsel.  So I assume it is

10  Clark Brewster, but I think the name was wrong.  I also was

11  told that he either had filed or would be filing a motion to

12  quash, but I haven't seen that.  So that's consistent with what

13  the government has said.

14         Mr. Dalack or Mr. Baum, do you want to shed some light

15  on this?

16         MR. BAUM:  Yes, your Honor.  I would be happy to.

17  Obviously we subpoenaed him in good faith.  I can tell you,

18  although I'm reluctant to do so because it would be disclosing

19  part of the defense case, we anticipate he may be called as a

20  defense witness, if not called by the government.  And

21  apparently they have chosen not to call him.

22         We were aware through discovery that Clark Brewster

23  made a recorded phonecall that he had with Michael Avenatti in

24  which he questioned Michael Avenatti about the charges in this

25  case.

1          Michael Avenatti responded to some of those charges by

2     indicating that Mr. Brewster needed to speak with his client

3     for a particular reason which is part of our defense.

4          We may call him regarding that conversation or the

5     recording.  So clearly we are acting in good faith, and clearly

6     we believe he's relevant based on the conversation he had with

7     Michael Avenatti.

8          THE COURT:  All right.  There may be some hearsay

9     issues with respect to the recording, but I'm sure that will be

10    raised, if appropriate, in a timely fashion.

11         I guess if he's called by the defense, I promised the

12    hearing officer that I would let him know just what I could

13    tell him in terms of the scheduling issues.  It sounds like he

14    wouldn't testify next week in all likelihood.

15         MR. BAUM:  In all likelihood not.  And, Judge, we may

16    not call him.  You're correct.  We're considering the issues

17    that may be raised.  We believe there may be some hearsay

18    issues, but there are clearly non-hearsay issues -- I wouldn't

19    say "non-hearsay issues."  There's clearly relevant and

20    non-hearsay testimony to be elicited there.

21         But I can't tell you we've made a 100 percent

22    determination to call him.  But obviously the subpoena was

23    issued to him in good faith with a specific basis.

24         THE COURT:  Okay.  It sounds like there may be a

25    motion to quash, and I'll consider that if and when it's filed.

1          Does anyone know if he intends to or wants to be here

2    during the testimony of Ms. Clifford, if he still represents

3    her?

4          MR. SOBELMAN:  He does currently represent her.  I'm

5    not sure whether he's planning to be here during her testimony

6    or not.  I imagine he is, but we haven't actually talked about

7    that specific topic.

8          THE COURT:  All right.  And if he does, what's the

9    government's current thought on when she's likely to take the

10   stand?

11         MR. SOBELMAN:  It's very hard to know.  It depends, in

12   large part, on the length of cross-examinations of other

13   witnesses.  But I think the earliest possible day she could

14   take the stand is Tuesday.  But it could be Wednesday; it could

15   be Thursday.  It's difficult for us to say.

16         THE COURT:  All right.  Can you check with

17   Mr. Brewster if he intends to be here during her testimony and

18   just advise my chambers by email copying defense counsel so

19   that I can just report whatever I need to report back to the

20   hearing officer.

21         As far as I'm concerned, you all should do what you

22   need to do on this front, and I'll just report the facts, and

23   what he chooses to do in light of those facts is up to him.

24   But I did promise him I would get back to him.

25         Mr. Dalack.

1          MR. DALACK:  Yes.  We just wanted to note that, as

2     Mr. Baum indicated, the fact that we subpoenaed him might

3     create a sequestration issue, should he choose to be present

4     for Ms. Clifford's testimony, and we'll take that up with the

5     Court as appropriate.

6          THE COURT:  Understood, and you definitely should.  Of

7     course if there's a motion to quash, it may moot the issue.

8     But regardless, we definitely need to resolve that before he

9     would be present for the testimony of any other witness.

10         MR. DALACK:  Yes, your Honor.

11         THE COURT:  In terms of disclosures, I believe that --

12    I don't believe.  My chambers did receive the government's 3500

13    and exhibits this morning.  So thank you for that.

14         Just a reminder that under my rules, both sides should

15    submit Microsoft Word versions of your exhibit lists just prior

16    to trial or no later than the start of trial so I can keep

17    track of that.

18         I would like some heads-up of the witness list order.

19    I don't know if the government is in a position to share that

20    now, or we could just establish that basically 48 hours before

21    any given trial day that the government should disclose to the

22    defense and to me its anticipated ordering of witnesses,

23    recognizing that things may change in that 48-hour period, but

24    at least a good-faith basis of what the order is going to be.

25         MR. SOBELMAN:  Yes, your Honor.  We have an agreement

1    that's actually referenced in the amended scheduling order in

2    which I think we committed to letting the defense know by 5:00

3    p.m. the night before at the latest which witnesses we expect

4    and what order and which documents we expect to offer through

5    those witnesses.  We will do that, and we may be able to give

6    even more advance notice if we can.

7            THE COURT:  Thank you for reminding me of that.  I'm

8    looking at it now, and that would include presumably this

9    Friday being the business day before.  I should say it should

10   be the business day before, not just the day before.

11           MR. DALACK:  Thank you for clarifying that, Judge.

12           THE COURT:  Any additions?  Actually, let me postpone

13   that until later.

14           With respect to trial, trial practices and schedule,

15   first, do you still expect that it would be about two weeks,

16   give or take?  You probably heard I told the jury pool last

17   week that it could be up to three or four weeks.

18           I did so for two reasons:  One is I always tell the

19   jury it's going to be a little longer than I think it will be

20   because, in my experience, they are very happy when they

21   discover it's shorter than what they were led to believe and

22   very angry if they discover the opposite.

23           The second, frankly, is that I wanted to pad it in

24   case there are delays that arise from the COVID situation at

25   the moment.  If anyone participating can't enter the courthouse

1    or a witness can't, it just occurred to me that there might be

2    delays, and we should build in some time for that.  So that was

3    the reason for it.

4            Any change to your estimates of the trial length?

5            MR. SOBELMAN:  Our current estimate, based on the

6    Court's trial day, is that we are hopeful that we can rest the

7    first week.  Obviously that depends in part on the length of

8    cross-examinations.

9            THE COURT:  Yes.  Defense, it sounds like up to two

10   weeks still seems reasonable, barring any unexpected delays.

11           Any reason to think otherwise?

12           MR. DALACK:  No, Judge.

13           THE COURT:  As you know from I think my rules and what

14   I've said before, my schedule beginning Monday will be -- it's

15   usually 9:00 to 2:30 with one half-hour break.

16           In light of the fact that the jury room is located on

17   a different floor and it will take some time to get the jury

18   back and forth, I think a 45-minute break and going until 3:00

19   is probably more realistic.

20           So that's what you should plan on.  And subject to

21   what we discussed at the sidebar, you should understand that

22   that schedule will be pretty strictly enforced.  So you should

23   be prepared.

24           This Thursday and, if need be, Friday, we'll sit the

25   full day to select the jury as long as we need to.  So we won't

1  have the truncated schedule on those days.

2        You should familiarize yourselves, if you haven't

3  already, with my individual rules and practices for trial.  In

4  particular, I would just draw your attention to the rules and

5  practices regarding the handling of exhibits and objections.

6  To some extent those are covered by the scheduling order at ECF

7  number 160.  But regardless, you should certainly familiarize

8  yourself with it.

9        I do try to avoid having any sidebars whatsoever.

10  Particularly in the age of COVID, there's all the more reason

11  to avoid them.  So the bottom line is I rely on you to

12  anticipate issues that may come up that require discussion

13  outside the presence of the jury.

14        Those, in an ideal world, should be discussed before

15  the jury comes out in the morning or at the end of the day.

16  And that's part of the reason for the truncated schedule.  So

17  do your best to anticipate those issues.

18        To the extent that there are objections, I do not want

19  you making speeches in front of the jury.  That should be

20  either just, "Objection" or, if need be, "Objection," and a

21  single one or two words to articulate the basis for the

22  objection.

23        But if there's a need to discuss it or something

24  beyond that, I'm likely to take it up at the next break.  So,

25  again, do your best to anticipate issues in advance.

1        Each side must have its witnesses ready to go when

2   they're going to take the stand.  That is to say, when one

3   witness ends, the next witness better be here ready to take the

4   stand.  If not, I will deem that party to have rested, and we

5   will move on to the next phase of the case.  So the bottom line

6   is have your witnesses here when they are needed.

7        Let's talk about jury selection, which is a little

8   more complicated, given COVID issues and issues specific to

9   this case, given our use of the jury questionnaire, the

10  potential need for press access, and so forth.

11       Number one, I received the parties' strike lists

12  yesterday.  Per my prior order, the jurors on the joint strike

13  list, that is, I think, page 1 of ECF number 256, are excused

14  and will be excused without further review by me.

15       So those 41 jurors are no longer with us.  There are,

16  by my count, 69 jurors with no strikes.  There was, by the way,

17  I think one juror -- I want to say it was 121, but that's going

18  off my memory.

19       There was one juror who was on the joint strike list

20  who is also included on the defense list.  So that person is

21  double-counted and automatically excused.

22       I think, by my count, there are 69 jurors as to whom

23  neither side had an objection, I think 46 jurors as to whom the

24  defense had an objection, and 2 jurors as to whom the

25  government had an objection.

1          My inclination for purposes of efficiency would be to

2     begin with the 69 as to which there's no objection; call them

3     on Thursday; see if we can seat a jury just from that group;

4     and if not, proceed with the rest.  And I would resolve the

5     objections either in advance of that or on Friday, if need be.

6     But that just strikes me as the most efficient path here.

7          Any objection to that?

8          MR. SOBELMAN:  Your Honor, the government does object

9     to proceeding in that manner.  That allows the defense, without

10    essentially any review or oversight, to be able to tailor the

11    overall jury pool potentially in their favor and skew it.

12         We could suggest that the Court either resolve on the

13    papers the motions for excusal as to the ones we do not agree

14    on or, alternatively, voir dire those jurors to which both

15    sides did not agree to excuse.  And the defense can make a

16    motion for excusal at that time, and the Court can make a

17    decision based on follow-up questions about the issues that the

18    parties raised about those jurors.

19         THE COURT:  All right.  So let me press you on two

20    fronts:  Number one, I would certainly agree that if either

21    side understood that I was going to propose proceeding in the

22    manner that I just proposed, that there might be some

23    opportunity for manipulation, that is to say, someone whom you

24    would want to exercise a peremptory, you just make a for-cause

25    challenge as a way of perhaps accomplishing the same goal.

1        But I didn't actually tell anyone that until a moment

2   ago.  It strikes me that both sides have no reason to believe

3   that they would benefit in the way that you're describing.  And

4   I presume, therefore, made their challenges in good faith based

5   on jurors that they believed needed to be struck for cause.

6        Number two, I don't think either side is entitled to

7   any particular juror or jury for that matter but merely a fair

8   and impartial jury.  In that sense, I don't think the

9   government would be prejudiced if a jury is selected from the

10  69 jurors as to which there was no objection.

11       If we can't seat a jury from those 69, then we would

12  obviously proceed with the rest and I would need to resolve the

13  objections and decide if they were well-founded or not.

14       I guess those are the two things that I would press

15  you on, all of which lead me to think that my proposal is the

16  most efficient and is more efficient, clearly more efficient,

17  but it doesn't prejudice the government with respect to

18  anything that the government has any right to.

19       MR. SOBELMAN:  Your Honor, respectfully, we request

20  that the Court proceed on the numeric basis.  So take the first

21  however many jurors the Court wishes to question at a time,

22  whether it's 50, that do not have joint strikes, and question

23  those.  And then we can move on.

24       It doesn't mean that the Court will necessarily have

25  to question more.  But our view of the defense strikes is that

1    many of them are unfounded or simply require some additional

2    clarification.

3         It may be that at the end of the day, if the Court

4    follows up on some of these issues, we may agree to strike

5    them, and the process could move quickly.  We could use the

6    question that the defense flagged as the basis to initiate some

7    follow-up questions before a larger number of questions are

8    posed.  That's similar to what happened before Judge Gardephe

9    in the prior case with this defendant.

10         But we do think that if the Court simply removes from

11    the jury pool essentially all the 40 or 50 additional jurors

12    that the defense objected to, many of which we think are

13    unfounded, at least based on the questionnaire alone, that

14    unfairly allows them to skew the pool in a way that we think

15    could be prejudicial to the government.

16         It's not a random sample to take the additional 69.

17    It's a sample that the defense has already been able to weed

18    through.

19         THE COURT:  And what's your answer to my point that

20    unless they knew that I was going to proceed in that manner,

21    they have no incentive to -- in other words, you're suggesting

22    that they have exercised some of their strikes in bad faith

23    essentially.

24         MR. SOBELMAN:  No, not at all, your Honor.  We have no

25    doubt about their faith.  It's that we don't think they're

1    well-founded.  So we think that if the Court would review them,

2    it might agree with some of the strikes.  But many of them we

3    think the Court might not agree or the Court might think that

4    additional questioning is required in order to determine what

5    they meant.

6            We discussed several of the jurors with the defense.

7    And we said, look.  We agree that there is some concern about

8    this juror, but we don't think it rises to the level of

9    striking them merely based on the questionnaire.  We think it's

10   confusing, and we think a follow-up question is necessary.  And

11   by allowing them to essentially eliminate another third of the

12   entire jury pool in this case based on their unilateral

13   strike --

14           THE COURT:  Well, I'm not.  I'm not excusing them.

15   I'm summoning them for Friday, if I follow the proposal that I

16   made, which is to say behind the veil of ignorance, one would

17   assume that the jurors who have no objection from either side

18   are presumptively more likely to be qualified.

19           That is not to say that they will all be qualified or

20   that the ones that are objected to by only one side are not

21   qualified.  But just as a matter of efficiency, it just seems

22   like it make sense to begin with those, see if we can seat a

23   jury and, if we can't, then continue with those as to which

24   there is only a single strike.

25           MR. SOBELMAN:  Respectfully, your Honor, we think the

1    juror pool will be skewed unfairly.  For example, it appears,

2    from our view, that the defense would move to strike every

3    juror who had even heard of the defendant.

4         We don't think that's a valid basis to strike.  So we

5    are going to be left with people, for example, who may have

6    never read the news.  Now, there's wrong with not reading the

7    news.  But to have an entire jury made up of only people who

8    have not read the news in the last five years is not a

9    representative sample of the jury pool that we have in this

10   case.

11        THE COURT:  All right.  Defense.

12        MS. GIWA:  May I be heard on this?

13        THE COURT:  Yes.

14        MS. GIWA:  We certainly acted in good faith, as we

15   have on all of the matters on this case.  We had no intention

16   of skewing the jury pool in any way.

17        We spent a lot of time reviewing the questionnaires,

18   all of us.  We then articulated all of the reasons that we

19   thought certain jurors should be struck for cause.

20        We didn't merely state the question number as the

21   government did.  We actually wrote out the reason and tried to

22   use, as much as possible, the actual language of the juror just

23   to make a very clear record on that issue.

24        I would contest one thing that Mr. Sobelman said which

25   is that we sought to strike every person who has ever heard of

1    Mr. Avenatti.  That is not true at all.  The jurors who we

2    sought to strike were jurors who knew about his prior case, his

3    prior convictions, or people who made very explicit commentary

4    that indicated they would not be able to be fair and impartial

5    because of opinions and beliefs that they had about him.

6         After going through all of the questions, we then set

7    up a call with the government in order to discuss our

8    cross-challenges with the hopes that after a conversation, we

9    would have agreement as to more jurors.

10        That conversation didn't go anywhere, but that was not

11   for lack of trying on our part.  We are confident that upon

12   further inquiry by the Court, a significant number, if not all

13   of the jurors we identified, would in fact end up being struck

14   by your Honor.

15        It is inefficient to question those people when there

16   is a pool of people that we agree, at least on its face, at

17   least with regards to their responses to the questions, would

18   be eligible to serve on this jury.  So I just want to make

19   clear that we did not act in good faith, and quite the

20   opposite.  We spent a lot of time carefully considering all of

21   this.

22        One last point I would add is that we also sought to

23   strike people who made unfavorable comments about Ms. Daniels

24   or Ms. Clifford.  So we were not in any way trying to skew

25   anybody in favor of our client.

1          THE COURT:  I think you said you did not act in "good"

2     faith.  I think you meant "bad" faith.

3          MS. GIWA:  I'm sorry.  We did not act in bad faith.

4          THE COURT:  I'm going to reserve judgment on this.  I

5     think what I'll do is start to review the strikes from both

6     sides.  I'm not promising that I will go through every one, but

7     I will make at least a preliminary determination of whether

8     they're well-founded or not.

9          And on that basis, I think we'll proceed in one of two

10    ways:  One is the one that I've already described where I will

11    call the 69 jurors as to which there is no objection on

12    Thursday and, if we need to get there, the other 48 on Friday.

13         The other would be if I decide based on my sampling to

14    do this, I think what we would do is I'll basically call

15    probably half of the remaining 100 whatever on Thursday and try

16    to resolve the objections based on the questionnaire alone in

17    advance of Thursday and advise you basically of what the first

18    half would be.  In other words, it would just be purely on the

19    basis of numeric order, subject to my rulings on the

20    objections.

21         Any questions about that?  I'll let you know later

22    today after I've taken a look at them.

23         Mr. Podolsky.

24         MR. PODOLSKY:  Just one word, your Honor.  I thought

25    this might be useful.  In my past experience with

1   questionnaires, there's always a bit of a question that the

2   parties and the Court have to discuss, which is what is the

3   sort of rationale or decision-making in terms of whether a

4   potential juror makes it through the questionnaire process.

5        I thought it would just be useful to explain the

6   rationale that we tried to sort of apply consistently across

7   the questionnaires, which is if a juror registered some

8   familiarity with the facts or parties but nonetheless indicated

9   that they could follow the Court's directions to put that aside

10  and be fair and impartial, that indicated to us a juror who

11  could be fair and impartial and should be subject to voir dire

12  in the normal course.

13       I just thought it might be useful to the Court because

14  it may well be that part of the difference of the 40 is that

15  the defense and the government have taken a slightly different

16  approach for understanding whether a juror should be brought in

17  for voir dire.

18       THE COURT:  All right.  I understand that.  Ultimately

19  the issue is whether a juror can be fair and impartial in this

20  case.  And if I can make that determination based on the

21  questionnaire, then so be it.  And if I can't and I think a

22  followup is warranted or appropriate, then we'll follow up as

23  needed.

24       MR. BAUM:  Judge, on this issue, just a clarification.

25  Whichever system you choose -- and we've spoken as to what we

1  hoped the Court will choose.  But on this issue of calling the

2  jurors, in my experience, jurors are selected randomly from the

3  wheel and asked to take certain places in the jury box and in

4  the courtroom.

5          And my question for the Court is whether that

6  procedure will follow or whether the procedure will be merely

7  to seat jurors numerically.  We would object to that procedure

8  because we don't believe that would involve a random selection

9  of the jurors.

10          They've already been given a numerical value, and we

11  think the jurors should be selected by the wheel at random and

12  seated in the box in the order in which they're selected from

13  the wheel.

14          THE COURT:  I'll hear from the government.  I guess

15  the question I have for you before I do though is:  The number

16  they received was assigned to them at random.  And in that

17  sense, it's baked into the current list.  So sticking with the

18  order that -- the numbers that they've already received is a

19  form of randomness in itself.

20          So why complicate matters further and not just stick

21  to that order?

22          MR. BAUM:  The government, in objecting to the

23  procedure you initially articulated, talked about unfairness to

24  the government and prejudice to the government.

25          We think proceeding in this way would present

1    prejudice to the defense, and we want to point out that when

2    they talked about the fact that we could have selected the 40

3    jurors for cause merely to skew the panel, we want to point out

4    that by selecting those 40 jurors, we've signaled to the

5    government what peremptories we would probably take.

6         And if we now proceed in random order, they will

7    undoubtedly take the -- have the knowledge that these are

8    jurors we do not feel should sit for whatever reason and

9    exercise peremptories.  They would know virtually every

10   peremptory we would take if we went in the numerical order.

11   And that would skew vastly in their favor and prejudice the

12   defense.

13        THE COURT:  And how?  And how is that different than

14   any jury selection?  In any jury selection, you make an

15   application to excuse a juror for cause.  And if the judge

16   disagrees, the other side has some reason to think you might

17   exercise a peremptory as to that juror.

18        MR. BAUM:  But that occurs after the jury is already

19   selected and placed in the jury box, not with the

20   questionnaires, Judge.

21        THE COURT:  No.  It's based on voir dire.  It just

22   happens that in this case, the voir dire is split in two, and

23   one part is in writing and one part is oral.

24        MR. BAUM:  I understand that.  It's based on the voir

25   dire.  But the jurors would not be seated 1, 2, 3, 4, 5, 6, 7

1    and they know that we are planning to challenge 1, 2, 3, 4, 5,

2    and 7.

3           In the procedure that normally happens, they're

4    questioned, we raise a challenge for cause, but they're

5    randomly seated.  There are jurors to be called if we exercise

6    a for-cause or peremptory or replace those seats.

7           So they have absolute knowledge of this.  We

8    understood that when we made the cause challenges in good

9    faith, and we understood that they would have a unique

10   advantage in this sense.  And we believe that for this reason,

11   the jurors should be selected randomly to be distributed in the

12   jury box.

13          Now, they will still have that knowledge and still

14   could exercise that knowledge.  But at least it will not be

15   right in front of them which jurors we've challenged for cause.

16   There will be certainly members of that 69 group interspaced

17   with the challenges we've sought to exercise for cause.  And

18   that would turn out to be a fairer process.

19          THE COURT:  Government?

20          MR. SOBELMAN:  I'm honestly confused, your Honor.  I

21   think your Honor's point that both parties are always there

22   when the other party makes their for-cause challenges and this

23   has never been an issue in jury selection before.

24          Second, I'm not quite sure what scrambling the panel

25   would accomplish because we would still know who the jurors are

1    and be able to just match them up with the questionnaire and

2    the number they had before.  So I'm missing it a little bit.

3    We defer to the Court on the best way to proceed on this, but

4    I'm not sure I understand the defense's issue.

5           In addition of course, they know the for-cause

6    challenges we made.  And we're on equal footing with that

7    except that they get 10 challenges and we only get 6.

8           THE COURT:  Actually, I think it's 13 and 9.

9           MR. BAUM:  Judge, if we took the procedure which

10   your Honor has said would be the most efficient -- and we

11   totally agree.  If we don't do that procedure, we're liable to

12   spend twice as much time selecting jurors as we normally would.

13          But if we took the procedure which your Honor felt was

14   most efficient, none of these issues that I raised would come

15   into play.

16          THE COURT:  I certainly understand that.  So given

17   that and that they're intertwined, I'll take that under

18   advisement as well.  But my inclination is not to add further

19   complication and just to stick with the order that we have.

20   Number one, those numbers were already assigned randomly.  So

21   it's already random.

22          Number two, I don't quite understand the defense

23   objection because it seems like that's inherent in jury

24   selection in any case where a for-cause challenge is made and

25   it's denied by the Court.

1        Number three, randomizing further doesn't actually

2   solve the problem because a random selection could lead to a

3   list in which the defense strikes are all in the beginning and

4   the government would still know who they are and, in that

5   sense, would still be armed with the same information that they

6   currently have.

7        And number four, although certainly numerically

8   there's a distinction between the number of strikes that each

9   side made, as the government points out, the defense has that

10  advance knowledge as well.

11       That being said, I will reserve judgment and decide on

12  the basis of my reflection how we're going to proceed.  In any

13  event, my plan would be -- as I've said a few times, I

14  sincerely hope that we can seat a jury on Thursday, but I

15  confess.  I just don't know how long the process will take.  So

16  there is considerable uncertainty.

17       If we need to use Friday as well, I think what I'm

18  inclined to do is the following:  Basically qualify however

19  many jurors we get through on Thursday because I do intend to

20  have 6 alternates -- I think we need a total of 40 -- and then

21  have them come back.  Well, we'll get through however many we

22  get through.  We'll qualify however many we qualify.

23       If we don't qualify 40, then we'll have to continue on

24  Friday.  We can continue on Friday with whatever the balance is

25  that we don't get to on Thursday, plus any new jurors that we

1    need that weren't called to show up on Thursday.

2            In either case, what I would propose is that any juror

3    who has been qualified by the end of the day on Thursday is

4    directed to reappear on Monday morning; we qualify the

5    remainder of the 40 on Friday; they too are directed to appear

6    on Monday morning; and then on Monday morning, each side can --

7    we would begin with the exercise of peremptory challenges as to

8    those 40.  The jury would be those who were left over, and we

9    would proceed directly into trial.

10            Any objections or questions about that?  I mean, point

11   being I think it pays to have the full complement of 40 present

12   for you to exercise your peremptories, and it doesn't make

13   sense to exercise peremptories based on only a partial set of

14   qualified jurors, and that strikes me as the best way to

15   accomplish that.

16            MR. SOBELMAN:  We agree, your Honor.  Just one

17   question, which is if we do qualify 40 jurors on Thursday,

18   which we're hopeful we can, will we exercise our peremptories

19   then?

20            THE COURT:  If we have time, I would say yes.

21            MR. SOBELMAN:  Thank you, your Honor.

22            MR. DALACK:  Just by way of clarification, Judge, will

23   the jurors keep the numbers that were assigned to them at the

24   outset that were used in connection with their questionnaire?

25            THE COURT:  Yes.

1          MR. DALACK:  So those will not change?

2          THE COURT:  Those numbers will not change.  Whether

3  randomize their order or not, they will keep those numbers.

4  Otherwise, it will be mass confusion.

5          MR. DALACK:  Thank you.

6          THE COURT:  Until they're actually selected and

7  seated, at which point they will become jurors number 1 through

8  18.  But, yes, until then.

9          MR. DALACK:  Thank you.

10         THE COURT:  On Thursday, I think my understanding is

11 that they may be ready for us as early as 9:30.  But obviously

12 it will depend a little bit on how conscientious the jurors are

13 at appearing when they're directed.  So what I want you to do

14 is to be in this courtroom by 9:15 -- hang on.

15         (Pause)

16         THE COURT:  I need to double-check to make sure that

17 this courtroom is available on Thursday and, if not, I'll give

18 you different instructions.  But I guess unless and until I

19 tell you otherwise, I want you in this courtroom by 9:15 on

20 Thursday so that we can go down when they are ready for us and

21 as soon as they're ready for us.

22         Sorry.  Thanks for your patience.  I know we've been

23 at this for a while and it's eating into the lunchtime.  But if

24 you'll bear with me, hopefully we can get through the rest of

25 this.

1          Jury selection in the jury assembly room.  Judge Cote

2   innovated a new system last week or two weeks ago where she

3   picked a juror where in lieu of leaving the jurors in their

4   seats and having people wander with microphones, there are

5   three tables at the front of the room.

6          The prosecution would have one table, and my

7   understanding is four people could fit at it.  The defense

8   would have another table.  Again, four people can fit at it.

9   The third middle table would be set up with two microphones for

10  two jurors.

11         So we would begin with the first and second that I

12  call and basically conduct voir dire with respect to the first

13  juror.  When I'm done with that juror, I would turn to juror

14  number 2.

15         And while I'm doing that, the third juror would come

16  to the table and basically be there and be ready to go when I'm

17  done with the second juror.  And we'd continue in that fashion

18  until we get through all of them.

19         The advantages being, number one, it just I think

20  speeds things up because you don't have to find where the juror

21  is in the room.  Number two, it enables counsel and the parties

22  to really be able to see the jurors because they are seated

23  right next to you rather than potentially far back in the room.

24  And, relatedly, it allows me to really see the juror and engage

25  in a more meaningful colloquy.

1        Any objection to that?  It seems like a very good

2  innovation.

3        MR. SOBELMAN:  We agree, your Honor.

4        MR. DALACK:  No objection.  But just to try and -- and

5  I obviously don't know how the Court's oral voir dire is going

6  to look or the contents of it, but to avoid a similar situation

7  to what seems to be unfolding in the trial before Judge Nathan,

8  might it be appropriate for the parties to flag one or two

9  questions from the questionnaire.

10        THE COURT:  We'll get to that in a second.

11        MR. DALACK:  Okay.  Thank you.

12        THE COURT:  As I indicated, my plan is to pick 18

13  jurors, 12, and a maximum of 6 alternates.  Candidly, that's

14  probably more than we need in excess, but I'd rather err on the

15  side of excess, particularly given the times.

16        As you probably know, I'll conduct all voir dire.  My

17  plan is to use a questionnaire for oral voir dire but in the

18  fashion I typically do, namely, to basically hand out the

19  questionnaire to all the jurors; go through the questionnaire

20  in full with respect to the first juror and the first juror

21  only; and thereafter, ask each juror if they have a yes answer

22  to any of the questions that are on the questionnaire and

23  follow up as appropriate, if they do.

24        I'm going to have -- I think, if it hasn't been

25  docketed already, it will be docketed soon, particularly since

1    ECF may be out, but we'll give you copies in a moment.

2            What I have endeavored to do is number one -- let me

3    clarify that.  As you'll see in the questionnaire, there are

4    three questions that I would propose to pose to each juror

5    regardless, those being, number one, if they need to change

6    anything on their written questionnaire; number two, have they

7    heard or read or seen anything about this case or anyone

8    involved in it since they completed the questionnaire.  I am

9    going to ask those of every juror regardless.

10           The third, which we'll discuss, is the question of

11   whether to ask them about their vaccination status.  The other

12   questions are the questions that I would pose in the fashion

13   that I described, namely, just ask juror number one questions

14   four through whatever the last number is and then ask every

15   juror thereafter if they had yes answers to any of those

16   questions.

17           On that score, you'll see that a number of them are

18   questions that are already on the written questionnaire.  They

19   just strike me as important enough to reiterate them, not just

20   given the recent events in the other case that Mr. Dalack

21   mentioned but just generally things that I think we want to

22   make sure that the jurors understood and answered in a way that

23   is not problematic.  There are a couple additional questions

24   beyond that.  But, in essence, those are the ones that I have

25   sort of focused on in this questionnaire.

1          I'd ask you to look at it.  I think in the order that

2     I entered, I said that you have until 10:00 a.m. tomorrow to

3     give me any suggestions or objections.  If you think there are

4     additional questions that I didn't include that sort of are of

5     a similar nature, I'm certainly open to adding them.  But the

6     goal is to do this as efficiently as possible, given that we

7     already have plenty of data about the jurors.

8          Any questions about any of that?

9          MR. SOBELMAN:  No, your Honor.

10          MR. DALACK:  No, Judge.

11          THE COURT:  All right.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.

2          Relatedly, I need to know if there are any additional

3    names that may come up during trial.  There was a list in the

4    questionnaire last week.  I am going to repeat those in the

5    oral voir dire, but if any of that has changed, you should let

6    me know promptly, I guess no later than the objection letters

7    that you will file by tomorrow morning.

8          I also need to know if there are questions that relate

9    to the trial teams.  I will obviously ask each to identify or

10   to stand when I identify you during jury selection.  I want to

11   make sure that I have covered everyone who will be present or

12   should be on that list.

13         So if you can make sure that you look at that

14   question.  I think in particular I wasn't sure if there are any

15   additional names from the defense team.  So if you can make

16   sure that you review that and let me know if there are any

17   other names that need to be added, that would be helpful.  I

18   would like those people to all be present in the jury assembly

19   room on Thursday so that when I introduce the respective teams

20   you could stand.  I will ask you to lower your mask for a

21   moment just to make sure that everybody can see you.

22         I already mentioned there's room for only four people

23   for each side at the table, so that may mean that others are

24   elsewhere in the jury assembly room.  At that moment, though, I

25   will ask you to just approach because we will have some jurors

1    who are in the overflow courtroom watching on video, and I need

2    you at the front so that everybody can be seen by all the

3    jurors.  So, again, I will direct you as needed, but I just

4    want to make sure that you can anticipate that.

5                Any questions about any of that?

6                MR. SOBELMAN:  No, your Honor.

7                THE COURT:  All right.  My law clerk is providing at

8    least one copy to both sides.  If we have more than one copy,

9    we will give you more than one copy.  Regardless, it should be

10   docketed later today.

11               With respect to sidebars, I guess one question is

12   whether Mr. Avenatti wishes to attend sidebars if or when they

13   are held.

14               MR. DALACK:  Yes, your Honor.  He does intend to, and

15   to the extent that a particular sidebar, you know, he'll make a

16   case-by-case decision, but that is a general proposition, yes.

17               THE COURT:  Okay.  I think he has the right to.  I

18   just need to know for purposes of distancing and space.

19               I don't know if anyone here knows if the press has

20   actually expressed an interest in attending sidebars.  The

21   issue was previously litigated.  On ECF No. 120 I think my

22   ruling indicating that if there was a press request to attend

23   sidebars, I was prepared to allow one pool reporter to be at

24   sidebar.

25               I don't know the best way to confirm that there is

1  somebody who wishes to do that.  I don't know if the press is

2  present or not, but if anyone knows the answer to that

3  question --

4          MR. SOBELMAN:  The government hasn't been contacted

5  about that.

6          MR. BAUM:  The defense hasn't been contacted about

7  that matter either to our knowledge, Judge.

8          I just want to flag that with respect to particular

9  jurors that we noted, we just want to make sure that jurors who

10  ask for a sidebar also have the opportunity to raise the

11  objection to the presence of media in answering particular

12  questions or giving more details to the Court.

13          THE COURT:  Understood.  I think in my order I

14  indicated that I would advise jurors of that, and if they had

15  any concerns about whatever it is they want to raise that I

16  would ask the reporter to excuse him or herself.

17          All right.  I am announcing bottom line if there is

18  press and they wish to attend, I will allow no more than one

19  reporter to be present at sidebars, subject to the terms and

20  conditions that I previously ruled on in my order.

21          The issue is that there are some limits on the number

22  of people who can be at the sidebar, given social distancing

23  requirements, not to mention just, you know, even in normal

24  times there would be a limit.  The bottom line is I don't think

25  we can accommodate more than one counsel per side between me --

1    I will be on the bench, but the prospective juror, the court

2    reporter, the pool reporter, Mr. Avenatti, I just don't think

3    we can deal with more than one.  I will obviously allow counsel

4    to confer with your compatriots as needed, but you should

5    basically plan to just have one counsel per side at any

6    sidebars.

7            Give me one moment.

8            Let me state, if there is any press who wish to attend

9    in that fashion that I have described, they should contact the

10   district executive's office to let that be known and I will

11   make appropriate arrangements.

12           Any questions or anything to discuss about any of

13   that?

14           MR. SOBELMAN:  No, your Honor.

15           MR. DALACK:  No, your Honor.

16           I'm sorry, Judge.  Is it possible for the parties to

17   be notified as to the member of the press who has expressed

18   interest and will be authorized to participate at sidebar from

19   the press pool?

20           THE COURT:  Yes.  If there's only one person, I think

21   it will be that person.  If there's more than one, I will have

22   to select a pool reporter.  I'll either do that at random or

23   see if the reporters can identify someone, but in any case you

24   will certainly know.

25           MR. DALACK:  Thank you.

1          THE COURT:  All right.  Also, on the subject of press,

2    I believe the law is pretty clear that exhibits are judicial

3    documents once they are offered at trial.  I know in some

4    high-profile cases, the press is interested in documents.  They

5    are not maintained by the Court.  I don't really want to be in

6    the position of having to provide them to the press.

7          The bottom line is you should figure out some

8    appropriate arrangement to provide such things to the press as

9    they may request.  I'm mindful that you also want to try your

10   case and not be spending your time fulfilling press requests.

11   So maybe talk amongst yourselves and figure out if there is a

12   way to do that in the most efficient manner.

13         If you need anything from me or want me to bless it,

14   I'm happy to do so.  But the bottom line, the press should make

15   those requests to the parties, and you should honor them if

16   you're required to do so, which in most instances you will be.

17         Any questions about that?

18         MR. SOBELMAN:  No, your Honor.  We have a standard

19   practice with our press office that's able to provide admitted

20   and nonsealed exhibits upon request.

21         THE COURT:  All right.

22         Any questions from the defense?

23         MR. DALACK:  No, Judge.

24         THE COURT:  Going back to jury selection, as I said, I

25   think we will seek to have 40 jurors qualified, given that with

1     the extra strikes pursuant to Rule 24, the defense will have 13

2     peremptory challenges, the government will have 9.  I think

3     where I usually have only two alternates, I split up the

4     peremptories as to the regular jury and then peremptories as to

5     alternates.

6            I think what I would propose here -- I'm happy to hear

7     if you think otherwise, is that you exercise all your

8     peremptories.  The way I do it is you make a list.  You do it

9     simultaneously.  We exchange the lists.  You submit them to me.

10    I take up any applications with respect to them.  And then the

11    regular jury are the 12 remaining lowest numbered jurors, and

12    the alternates are the next 6 remaining jurors.

13           If there are no duplicate strikes, there will be only

14    18 left, and the regular jury would be the lowest numbered 12

15    and the alternates would be the next 6.  If there are

16    duplicates, then we will have more than 18, but the bottom line

17    is the lowest numbered 12 are the regular jury and the next 6

18    or the alternates.

19           Any questions or objections on that?

20           MR. SOBELMAN:  No objections, your Honor.  Just to

21    make sure we're clear, it's simultaneous and we exercise all

22    our peremptories at once?

23           THE COURT:  Correct.

24           MR. SOBELMAN:  Thank you, your Honor.

25           MR. BAUM:  Judge, on the number of peremptories, I may

 1    have misinterpreted what you said.  The defense has 10

 2    peremptories for the actual jury, and we have additional

 3    peremptories for alternates.  I thought you said the defense

 4    would have 13 peremptories?

 5              THE COURT:  I'm sorry.  You would have ten plus what?

 6              MR. BAUM:  We would have ten plus I think it's -- you

 7    were saying we would have three, one for each two alternates?

 8              THE COURT:  I think that's what Rule 24 provides.

 9              MR. BAUM:  Yes.  I just want to -- we are supposed to

10    use all 13 at the same time?

11              THE COURT:  That's what I am proposing.  But if you

12    have a problem with that, we can discuss alternative

13    arrangements.

14              MR. BAUM:  I think it is our position that we should

15    choose the jurors first and the alternates separate.

16              (Defense counsel conferred)

17              MR. BAUM:  We consent to the Court's proposal.

18              THE COURT:  All right.  Great.

19              All right.  We are almost at the end here.  I thank

20    everybody for their patience.

21              A couple of things on the sort of no-surprise

22    category.

23              Does either side intend to use demonstratives in your

24    opening?  I think it may be that order ECF 160 addresses that,

25    but regardless I certainly want to make sure that you advise

1    the other side, and if there's any objection it is brought to

2    my attention before openings.

3            MR. SOBELMAN:  We do not intend to use a demonstrative

4    in opening.

5            MR. DALACK:  We are not sure yet, but we'll be sure to

6    comply with the Court's order and give prompt notice to both

7    the Court and the government.

8            THE COURT:  The second is Rule 615 issues, namely,

9    sequestration of witnesses.  Obviously the defendant is

10   entitled to be here, even if he later testifies.  But beyond

11   that, I don't know if there is a case agent who intends to be

12   present and who may be testifying.  That may be allowed under

13   the rule, but otherwise I would think that no witnesses should

14   be in the courtroom.  And to the extent that Mr. Brewster is an

15   issue, we will address that in due course.

16           Any issues on that front?

17           MR. SOBELMAN:  No issues aside from Mr. Brewster.

18           THE COURT:  Okay.  Mr. Dalack.

19           MR. BAUM:  The same thing.  No, Judge.

20           THE COURT:  Let me be clear.  I also think that those

21   witnesses should not read transcripts of the trial or news

22   accounts of the trial, and you should instruct them accordingly

23   so that they are genuinely sequestered from the trial

24   proceedings.

25           In terms of technical issues, this is the trial

1    courtroom, as you know, and you should get in touch with the

2    district executive's office or, to the extent you need it, my

3    chambers as soon as possible to make whatever arrangements you

4    need for any technical needs.

5         If you need any orders from me, I think I've signed

6    some electronic device orders for both sides, but you should

7    make sure you get those to me in a timely fashion.

8         The bottom line is you better make sure you have what

9    you need and you get it set up and you test it.  In particular,

10   I would urge you, as discussed last week, to make sure that you

11   run a test of the two-way live testimony for the office

12   assistant.  I would like to avoid any problems, glitches, you

13   know, bugs there as possible.  As ordered, it should be set

14   up -- and I hope this is technically feasible -- so the witness

15   is able to see the jury, me, the defendant, and examining

16   counsel.

17        So it's going to require a little bit of advance

18   planning.  Hopefully you guys are on top of that and can take

19   care of whatever needs to be done.

20        MR. SOBELMAN:  Yes, your Honor.  We are doing a test

21   with the Court's IT staff and defense counsel this afternoon

22   with the witness as well.  So we will hope that that goes well.

23   If it does, we will be set.  If it doesn't, we will do another

24   test.

25        With respect to the device orders, we did submit some

1    proposed orders to your Honor.  I don't believe we've received

2    those back.

3            THE COURT:  I think you either have or will shortly.

4    I signed them this morning.

5            MR. SOBELMAN:  Got it.  Okay.  Thank you, your Honor.

6            THE COURT:  All right.  The bottom-line theme is I

7    don't want to waste the jury's time with any technical

8    problems.  So it is up to you to make sure you have your needs

9    met and met in advance and also to test things and test things

10   before the trial starts every day.

11           I have found unfortunately technology doesn't always

12   work, and sometimes it works one day and doesn't work the next.

13   So you really have to test throughout trial and try to

14   troubleshoot before the jury is in the box, because I don't

15   want to waste their time.  And I will have limited patience to

16   deal with those sort of problems.

17           Relatedly, you should have a backup plan.  If we have

18   a technical problem and I can't solve it very swiftly, you are

19   going to have to figure out a different way to proceed, and if

20   that means in a traditional style with paper exhibits, so be

21   it.  But just make sure you've given that some thought.

22           THE COURT:  I think that's it for my agenda.

23           Anything else from the government?

24           MR. SOBELMAN:  Your Honor, just to clarify, the order

25   that was issued not long ago said that the trial day on Monday

1    would start at 9:30.  I believe your Honor today said we are

2    starting at 9:00.  We just want to know what time to tell our

3    first witness to be here.

4              THE COURT:  I will start at 9:00.

5              MR. SOBELMAN:  Okay.

6              THE COURT:  To the extent that I have previously

7    ordered otherwise, consider that superseded and corrected.

8              So the trial day will start each day at 9.  My

9    anticipation is that we will take up any issues outside the

10   jury's presence between 9 and 9:15.  My goal will be to have

11   the jury in the box at 9:15 to start with testimony or jury

12   addresses as the case may be.

13             This coming Monday it will start with, first of all,

14   peremptory challenges if they're not done on Thursday; second,

15   preliminary instructions to the jurors, since I am not going to

16   swear them until Monday morning, you should be aware of that;

17   and, third, openings.  So in that sense your first witness

18   won't be testifying at 9:15, but you can plan accordingly.

19             MR. SOBELMAN:  Yes, your Honor.  Thank you.

20             THE COURT:  Anything else from the defendants?

21             MR. BAUM:  Yes, your Honor.  I raised this earlier

22   with the Court.  In reviewing the Court's individual questions

23   to jurors --

24             THE COURT:  Yes, sorry.  I meant to flag that.  The

25   vaccine question.

 1              MR. BAUM:  Yes.

 2              THE COURT:  Go ahead.

 3              MR. BAUM:  On this issue, Judge, we would strongly

 4    object.  We think asking individual jurors publicly about their

 5    vaccination status would hold them up to embarrassment, and we

 6    think even privately asking questions about vaccination status

 7    is unwarranted because it's not relevant to their

 8    qualifications as a juror, unless the Court is telling us that

 9    you plan to exclude jurors who aren't vaccinated.  It has no

10    relevance to their ability to be fair and impartial.

11              MR. SOBELMAN:  We have no objection to the Court

12    inquiring, but we also defer to the Court on this.  We don't

13    really have a position on whether it should or should not.

14              THE COURT:  All right.  Well, Mr. Baum, I guess the

15    question that I have is -- so Judge Cote did ask in her trial

16    two weeks ago with the parties' agreement.  So in that sense it

17    was obviously a different circumstance if you're objecting

18    here.  I will say that she found that there was no resistance

19    to answering the question, and indeed I think said that many of

20    the prospective jurors were enthusiastic about sharing that

21    they were fully boosted -- I think vaxxed to the max was one of

22    the answers she got -- and ended up having a fully vaccinated

23    jury, which I think enabled her to tell the jury that they were

24    all fully vaccinated and sort of put them at ease in that

25    regard.

1          It also may have a bearing -- I think right now our

2    rules require six feet of separation regardless of vaccination

3    status, but depending on omicron numbers, that may be relaxed,

4    in which case it may have some bearing on social distancing

5    either in the courtroom or in the jury room.  So that was part

6    of the theory in asking.

7          But I guess my question to you is, having heard all

8    that, does that change your view, or do you still object?

9          MR. BAUM:  Well, Judge, you know, there have been

10   studies about people who are unvaccinated.  I totally

11   understand people who said they're fully vaxxed are happy to

12   share.  I disagree that people who are unvaccinated are happy

13   to share it.  We'll find out.  But there are lots of issues.

14         Number one, I think it might be a HIPAA violation to

15   go into their medical status or their health status, which

16   would prohibit us from inquiring about that.

17         And, secondly --

18         THE COURT:  I don't think there's a HIPAA issue.  I

19   don't think HIPAA covers that at all.

20         What's your other argument?

21         MR. BAUM:  Well, our prime issue is it just doesn't go

22   to their qualifications to serve as fair and impartial jurors.

23   Although people may be happy to answer it, we don't ask

24   questions that don't go -- I mean, we can suggest a lot of

25   questions to the Court in addition that you haven't determined

1    to question --

2                THE COURT:  Mr. Baum --

3                MR. BAUM:  -- that doesn't go to their --

4                THE COURT:  -- that's not true.

5                In this case I asked on the questionnaire a whole set

6    of questions that have no bearing on for-cause challenges:

7    What magazines and numbers do you read?  What TV shows do you

8    watch?

9                Those are to allow the parties to meaningfully and

10   intelligently exercise their peremptory challenges.

11               Part of what I said last week is that I think I would

12   want to know if I were you for purposes of exercising

13   peremptory challenges, but if you're objecting me and you're

14   telling me that you don't want to know, I will take that under

15   advisement.

16               MR. BAUM:  We are objecting, Judge.

17               THE COURT:  All right.  Does the government have a

18   view, given that the defense is objecting?  I mean, there is an

19   argument for not buying an appellate issue.

20               MR. SOBELMAN:  Yes, your Honor.  We think it would be

21   appropriate for the Court to inquire, but we are not making

22   that request.

23               To the extent your Honor doesn't want to ask, decides

24   not to ask the question during voir dire, if the Court's

25   concern is what restrictions to put on the jury, social

1   distancing during their service, the Court could ask it after

2   the jury is selected and gain the information then.  It would

3   have no factor in the jury selection, but could still allow

4   Court to make whatever decision it wished to do regarding their

5   conduct.

6          THE COURT:  All right.  Fair enough.

7          Mr. Baum, anything you want to say on that score?

8          MR. BAUM:  No, your Honor.

9          THE COURT:  All right.  So I will take that under

10  advisement.

11         You don't need to include that objection in your

12  submission by tomorrow.  I will duly note it already, and I

13  will decide what to do and anticipate that I will file a final

14  version of the questionnaire that I use before the end of the

15  day tomorrow.  That will tell you what my ruling is on that.

16         I assume we are done and nothing further for today?

17         MR. SOBELMAN:  Nothing further from the government.

18  Thank you, your Honor.

19         THE COURT:  Mr. Baum?

20         MR. BAUM:  Nothing further from us.  Thank you, Judge.

21         THE COURT:  Thank you all for your patience.

22         Again, unless I tell you otherwise, please be in this

23  courtroom by 9:15 on Thursday, and we'll go down when they're

24  ready for us downstairs.

25         Thank you very much.

1          Have a good rest of your day.

2          We are adjourned.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25