UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA        :            19 Cr. 374 (JMF)

                                  :

      - v -                      :             <u>ORDER</u>

                                  :

MICHAEL AVENATTI,           :

                                  :

                     Defendant.   :

                                  :
--------------------------------------------------------x

JESSE M. FURMAN, United States District Judge:

      As discussed on the record today, the attached letters are hereby unsealed.

      SO ORDERED.

Dated: January 28, 2022
       New York, New York                   _____
                                    JESSE M. FURMAN
                             United States District Judge

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

November 18, 2021

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:  **United States v. Michael Avenatti,**
      **19 Cr. 374 (JMF)**

Dear Judge Furman:

We write to respectfully request that the Court authorize the issuance of a subpoena pursuant to Fed. R. Crim. P. 17(c)(1) compelling the complainant in the above-captioned case, Stephanie Clifford, to produce to the Court for an in camera inspection on or before December 10, 2021 the following items:

1. All documents relating to or reflecting any mental health or psychological examination, treatment, or counseling Ms. Clifford received from February 15, 2018 to the present;
2. All documents relating to or reflecting Ms. Clifford's use of any medication designed to treat any condition affecting her mental health or psychological state from February 15, 2018 to the present; and
3. The names, addresses, and phone numbers of all medical and mental health providers that Ms. Clifford consulted from February 15, 2018 to the present in connection with any mental health or psychological condition or symptom.

The defense respectfully submits that, upon receiving the aforementioned items and inspecting them in camera, the Court can then determine what materials should be disclosed to the defense before trial consistent with Mr. Avenatti's Sixth Amendment right to confront his accuser, and consistent with the strictures of Fed. R. Evid. 403, 601, 607, 608(b), and 611.

## A witness's mental or psychological condition can be relevant to her credibility and is therefore an appropriate ground for cross examination.

It is well-settled that "[e]vidence of a witness's psychological history may be admissible when it goes to her credibility." United States v. Sasso, 59 F.3d 341, 347 (2d Cir. 1995); see also Chnapkova v. Koh, 985 F.2d 79, 81 (2d Cir. 1993) ("Clinical history of mental illness is probative of the credibility of witness."). "In assessing the probative value of such evidence, the court should consider such factors as [1] the nature of the psychological problem… [2] the temporal recency or remoteness of the history… and [3] whether the witness suffered the problem at the time of the events to which she is to testify, so that it may have affected her 'ability to perceive or to recall events or to testify accurately…'" Sasso, 49 F.3d. at 347-48 (quoting United States v. Butt, 955 F.2d 77, 82 (1st Cir. 1992). With this standard in mind, "[a] paranoid and delusional condition, for example, is likely to be relevant" to a witness's credibility. United States v. Paredes, No. 99-CR-290 (PKL), 2001 WL 1478810, at *1 (S.D.N.Y. Nov. 20, 2001) (citing Chnapkova, 985 F.2d at 81) (affirming that the defendant was permitted to offer hospital records into evidence to impeach witness's credibility based on a history of paranoia and delusional conditions).

A couple of cases from this district illustrate the point. In United States v. Landry, No. 05-CR-376 (CSH), 2006 WL 17441 (S.D.N.Y. Jan. 4, 2006), the court denied the Government's request to preclude the defendant from introducing evidence, including during cross examination, of a government witness's psychological condition. After reviewing the witness's psychological history, which implicated the integrity of the witness's memory process, the court determined that it was probative of the witness's credibility and proper for the jury to consider. Id. at *8 (whether the witness's "mental condition as revealed by the psychological reports has any effect upon his credibility as a trial witness, and if so to what extent, are questions properly left to the jury").

Similarly, in United States v. Paredes, 2001 WL 1478810, the Government sought to call a witness to testify about events that occurred before and after the onset of her anxiety attacks. After reviewing all of the "available psychological records in camera," the court ordered their disclosure to the defense. Id. at *2. In doing so, the court determined that while "disclosure of this information may be embarrassing to" the witness, "the defendant's opportunity to cross-examine [her] regarding her psychological condition may prove important to assessing her credibility," particularly since she was a key Government witness and because her panic attacks and depression "existed during at least some of the events which she is expected to testify about" and "appear[ed] to continue to the present." Id. (citing United States v. Kohan, 806 F.2d 18, 23 (2d Cir. 1986) (noting that courts should

2

provide wide latitude when a Government witness is cross-examined by the defendant) (citing <u>United States v. Pedroza</u>, <u>750 F.2d 187, 195</u> (2d Cir. 1984)).

## <u>The Court should authorize a Rule 17(c) subpoena to compel Stephanie Clifford to disclose her mental health records for in camera review.</u>

Mr. Avenatti's situation is just as compelling as that of the defendants in <u>Paredes</u>, <u>Landry</u>, and <u>Chnapkova</u>. First, there is no doubt that Ms. Clifford's testimony is central to the Government's allegations. A core aspect of the Government's case is that Mr. Avenatti kept some of Ms. Clifford's book-deal proceeds after orally forfeiting any compensatory interest in the matter (an allegation that starkly contrasts with Mr. Avenatti's written contract with Ms. Clifford, which plainly entitled Mr. Avenatti to compensation for negotiating any book deal on Ms. Clifford's behalf). Ms. Clifford is the <u>only person</u> that the Government could call to prove that this purported modification to the written contract ever occurred. Ms. Clifford is also the <u>only person</u> that the Government could call to establish that Mr. Avenatti signed her name on a document without her permission to obtain some of the book-deal money on her behalf. Ms. Clifford's credibility and competence as a witness is therefore of paramount importance, and her ability to accurately recall the minute details of her communications with Mr. Avenatti is clearly appropriate for cross examination.

Second, the defense has a good faith basis to believe that any records of Ms. Clifford's psychological and mental health treatment from the start of her attorney-client relationship with Mr. Avenatti (February 15, 2018) through the present will likely reveal evidence of treatment for anxiety, depression, paranoia, and delusional thinking—<u>i.e.</u>, impeachment material that the jury must be allowed to consider in assessing Ms. Clifford's credibility and competence as a witness. Indeed, and as set forth in Mr. Avenatti's reply memorandum of law in support of his Rule 12 omnibus motion, since at least early 2019, when Mr. Avenatti terminated his representation of Ms. Clifford by letter, and continuing to the present, Ms. Clifford has made any number of bizarre, fantastical claims that call into serious question her mental state during her dealings with Mr. Avenatti and her overall truthfulness.

In particular, Ms. Clifford has claimed that: (1) she "sees dead people" and can communicate with them; (2) she recently helped someone locate a body through her psychic powers; (3) in early 2019, she was possessed by spirits after moving into a "haunted house" in New Orleans; (4) the spirit that came to live inside of her caused her to self-harm and to bleed profusely from the mouth, eyes and ears (but she did not seek any medical attention); (5) the same house caused her then-manager to physically attack Ms. Clifford and attempt to strangle her to death; (6) she can turn lights on and off through her thoughts alone; (7) she has x-ray vision

and can see inside homes and apartments; (8) her "energy" causes electronic devices to no longer work and the information on those devices to be deleted; (9) she is a "witch" who practices witchcraft and can rid people of spirits (a "service" for which she charges); and (10) she possesses supernatural powers that allow her to serve as a "medium" to the dead and conduct "paranormal investigations."[1]

In addition, and with respect to Ms. Clifford's paranoia, she has publicly (and dubiously) claimed that the FBI manipulated her criminal records in order to make her unemployable and to retaliate against her for going public about former President Trump's hush-money payment, appearing on CNN's "New Day" program on June 7, 2021, to accuse the FBI of planting 17 falsified criminal charges on her record.[2]

Against this backdrop, Mr. Avenatti's request that the Court obtain and review Ms. Clifford's psychological records in camera is not only supported by well-established Second Circuit precedent, but it is also a good-faith effort to obtain impeachment material that the jury should be allowed to consider in assessing Ms. Clifford's credibility and ability to accurately (and truthfully) recall the events at issue in this case. Accordingly, the Court should issue a Rule 17(c) subpoena directing Ms. Clifford to disclose, by December 10, 2021, all records regarding psychological and/or mental health treatment, from February 15, 2018 to the present, including the names and addresses of treating physicians and any psychotropic medications she has been prescribed.

Respectfully Submitted,

/s/

Robert M. Baum
Tamara L. Giwa
Andrew J. Dalack
Assistant Federal Defenders

Cc:     Government Counsel                    Counsel for Michael Avenatti

---

[1] Ms. Clifford has made these various claims during numerous audio and video interviews and on social media. See, e.g., G Crew Episode 33, available at: https://m.youtube.com/watch?v=gesklupndgU; BREWtally Speaking, available at: https://m.youtube.com/watch?v=VlR_19C63OM; That Witch Life (recording and transcript), available at: https://thatwitchlife.com/2021/03/08/episode-75-investigating-the-paranormal-with-stormy-daniels/.

[2] See Transcript, available at: http://www.cnn.com/TRANSCRIPTS/2106/07/nday.06.html.



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 24, 2021

**REQUEST TO FILE UNDER SEAL**

**BY EMAIL**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007
furman_nysdchambers@nysd.uscourts.gov

Re:   *United States v. Michael Avenatti*, 19 Cr. 374 (JMF)

Dear Judge Furman:

The Government respectfully submits this letter in response to the defendant's letter motion dated November 18, 2021 (Dkt. No. 164 ("Mot.")). Specifically, the defendant seeks the issuance of a trial subpoena requiring Victim-1 (as identified in the Indictment) to produce, "by December 10, 2021, all records regarding psychological and/or mental health treatment, from February 15, 2018 to the present, including the names and addresses of treating physicians and any psychotropic medications she has been prescribed." (Mot. 4.) The defendant claims that he has a "good faith basis" that Victim-1's records would "reveal evidence of treatment for anxiety, depression, paranoia, and delusional thinking," in light of Victim-1's apparent participation in a series of discussions of the "paranormal." (Mot. 3.) For the following reasons, the motion should be denied.

I.      **Applicable Law**

Under the Federal Rules of Criminal Procedure, "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed. R. Crim. P. 17(c)(1). "Rule 17(c) authorizes two types of subpoena: (1) pre-trial subpoenas to obtain admissible evidence and (2) subpoenas that are returnable at trial (trial subpoenas) to obtain impeachment material." *United States v. Donziger*, No. 19 Cr. 561 (LAP), 2021 WL 1865376, at *4 (S.D.N.Y. May 10, 2021) (quoting *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018)). "The test announced in *United States v. Nixon*, 418 U.S. 683 (1974), governs both varieties." *Id.* (citing *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 508682, at *3 (S.D.N.Y. Jan. 31, 2020)). Accordingly, the defendant bears the burden of satisfying the "strict standard" set forth by the Supreme Court in *Nixon*, 418 U.S. at 700, namely of "specifically identifying the materials sought and showing that they are relevant and admissible," *United States v. Brown*, No. 95 Cr. 168 (AGS), 1995 WL 387698, at *9 (S.D.N.Y.

Honorable Jesse M. Furman
United States District Judge
November 24, 2021
Page 2

June 30, 1995).  In short, the party seeking the documents "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *Nixon*, 418 U.S. at 700; *see also United States v. R. Enters., Inc.*, 498 U.S. 292, 296 (1991).

## II.    Discussion

The defendant's motion should be denied for at least four independent reasons.  First, the defendant has not shown that any potentially responsive materials, to the extent they exist, would not be subject to the psychotherapist-patient privilege.  Second, the defendant has failed to satisfy the *Nixon* standard.  Third, the defendant has failed to articulate a good faith basis to support his request.  Finally, the defendant's motion should be denied as moot in light of Victim-1's representation, through counsel, that no responsive records exist.

*First*, as Victim-1's counsel explains in the letter submitted herewith on Victim-1's behalf, the defendant has failed to address, much less establish, how the records sought would not be protected by the psychotherapist-patient privilege.  *See* Fed. R. Evid. 501.  Indeed, the psychotherapist-patient privilege is not just a bar on the use of confidential therapy records as evidence (rendering them inadmissible under *Nixon*), it also protects against their compelled disclosure.  *See Jaffee v. Redmond*, 518 U.S. 1, 15 (1996); *In re Sims*, 534 F.3d 117, 130 (2d Cir. 2008).

*Second*, the defendant has failed to meet his burden under the *Nixon* standard of identifying the materials sought with specificity and establishing that such materials would be admissible.[1] As to specificity, the defendant seeks, among other things, "[a]*ll documents* relating to or reflecting *any* mental health or psychological examination, treatment, or counseling" that Victim-1 may have had for nearly a four-year time period.  (Mot. 1 (emphases added).)  The defendant does not seek a specific document or set of documents.  He does not even limit his request to those documents relevant or sufficient to establish the existence of the mental health conditions he speculates that Victim-1 may suffer from.  The request is the very opposite of "specific"; rather, it is blatantly overbroad.

The defendant also fails to establish the admissibility of any—much less all—of the broad categories of documents he seeks.  It is difficult to imagine how any such documents, if they existed, could be properly admitted at trial as extrinsic evidence of Victim-1's mental health.  Rather, the defendant seems to want to use the documents as grist for a cross-examination in which he would attempt to portray Victim-1 as mentally ill, which is not sufficient to satisfy the *Nixon* standard.  *See, e.g.*, *Nixon*, 418 U.S. at 701 ("Generally the need for evidence to impeach witnesses

---

[1] For the purposes of this letter, the Government assumes *arguendo* that one or more of the mental health conditions listed in the defendant's motion might potentially be relevant to a jury's consideration of a witness's credibility.  However, the Government respectfully reserves the right to object to any such argument or evidence in a motion *in limine* or at trial.  *See, e.g.*, *United States v. Sasso*, 59 F.3d 341, 348 (2d Cir. 1995) (district court properly excluded evidence of witness's severe depression as not bearing on credibility).

Honorable Jesse M. Furman
United States District Judge
November 24, 2021
Page 3

is insufficient to require its production in advance of trial" (citations omitted)); *United States v. Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004) ("documents sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena"); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 1107526, at *2 (S.D.N.Y. Mar. 13, 2003); *United States v. Coriaty*, No. 99 Cr. 1251 (DAB), 2000 WL 1099920, at *7 (S.D.N.Y. Aug. 7, 2000); *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995); *United States v. Iozia*, 13 F.R.D. 335, 340 (S.D.N.Y. 1952) (Rule 17(c) cannot be used "to require in advance of trial, and in preparation for trial, a disclosure to the defendant of information which may tend to impeach persons the Government may or may not call as witnesses").

*Third*, the defendant claims through citation to two YouTube videos and two interviews the defendant gave regarding the "paranormal" that he has a "good faith basis" that Victim-1 possesses records that would "reveal evidence of treatment for anxiety, depression, paranoia, and delusional thinking." (Mot. 3-4 & n.1.)  Tellingly, the defendant does not claim that the videos or interviews to which he cites contain any discussion of Victim-1's mental health, such as any diagnosis or treatment for anxiety, depression, paranoia, or delusional thinking.  The defendant also does not allege, despite his prior relationship as Victim-1's attorney, that he is aware of any diagnosis or treatment for such conditions, based on his communications with Victim-1 or anyone else.  Rather, his purported "good faith basis" is entirely speculative.[2]

*Finally*, Victim-1, through counsel, informs the Court in the letter submitted herewith that, with respect to the categories of records the defendant seeks, "no such records exist."  This representation renders the defendant's motion moot.  It also underscores the lack of any good faith basis for seeking such records in the first instance.[3]

## III.   Sealing

After consultation with Victim-1, the Government requests that the defendant's motion, Victim-1's response, and this letter be filed and remain under seal at least until after Victim-1's testimony at trial, if any, concludes.  That procedure will protect Victim-1's "right to be treated with fairness and with respect for the victim's dignity and privacy," 18 U.S.C. § 3771(a)(8); *see also United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995) ("[t]he privacy interests of

---

[2] To the extent the defendant attempts to cast the types of discussions in which Victim-1 was engaged in the cited videos and transcripts as unusual and indicative of mental illness, it should be noted that such beliefs are common. *See, e.g.*, Anna P. Kambhampaty, *Many Americans Say They Believe in Ghosts. Do You?*, N.Y. Times, Oct. 28, 2021, https://www.nytimes.com/2021/10/28/style/do-you-believe-in-ghosts.html.

[3] To the extent the Court considers authorizing the requested subpoena, the defendant's request for the subpoena to be issued with a return date of December 10, 2021—more than a month before trial is scheduled to begin—should be rejected.  *See Donziger*, 2021 WL 1865376, at *4 ("[S]ubpoenas for impeachment material are returnable only after a witness takes the stand, not prior to trial or even on the first day of trial." (citing *Avenatti*, 2020 WL 805682, at *4-5)).

Honorable Jesse M. Furman
United States District Judge
November 24, 2021
Page 4

innocent third parties . . . should weigh heavily in a court's balancing equation" (quoting *Gardner v. Newsday, Inc.*, 895 F.2d 74, 79-80 (2d Cir. 1998))), and avoid potentially prejudicial pretrial publicity, *see, e.g.*, *United States v. DiSalvo*, 34 F.3d 1204, 1218 (3d Cir. 1994) (concluding that indictment was properly sealed to avoid publicity about codefendant and that the government did not have to justify sealing in relation to each defendant named in indictment); *United States v. Nojay*, 224 F. Supp. 3d 208, 213 (W.D.N.Y. 2016) (describing "avoiding prejudicial pretrial publicity with respect to a codefendant" as one of the justifications for sealing parts of a record in a criminal case).

The need for such measures is underscored by the reaction to the defendant's public filing of his motion.  As the Court is aware, on November 18, 2021, the defendant publicly filed his letter claiming that Victim-1's medical records would "reveal evidence of treatment for anxiety, depression, paranoia, and delusional thinking," in light of Victim-1's apparent participation in a series of discussions of the "paranormal." (Mot. 3.)  Shortly after the motion was filed, the Court "restricted viewing access for the motion to Court personnel only" because "the motion should almost certainly have been filed under seal given the Complainant's privacy interests."  (Dkt. No. 165 at 1 (citing 18 U.S.C. § 3771(a)(8) (providing that a crime victim has "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy")).)  However, certain social and other media sources published reports regarding the defendant's motion, and Victim-1 made several public comments in response to media sources publicizing the defendant's speculative request regarding her mental health.  The fact that the filing of the defendant's motion quickly provoked a media reaction, to which Victim-1 felt the need to respond due to the inappropriate and invasive nature of the public filing, highlights the need for sealing to avoid prejudicial pretrial publicity.  Further public litigation about this or any similar issue will only provoke more media coverage that risks tainting the jury pool and is unfairly prejudicial to Victim-1 and to the Government, particularly given the legally and factually baseless nature of the defendant's request.

Honorable Jesse M. Furman
United States District Judge
November 24, 2021
Page 5

## IV.     Conclusion

For the foregoing reasons, the defendant's motion should be denied and all submissions filed with respect to the motion should be sealed at least until after Victim-1's testimony at trial, if any, concludes.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By:     /s/_____
        Matthew D. Podolsky
        Robert B. Sobelman
        Assistant United States Attorneys
        (212) 637-1947/2616


cc:     Robert M. Baum, Esq. (by email)
        Andrew J. Dalack, Esq. (by email)
        Tamara L. Giwa, Esq. (by email)
        Clark O. Brewster, Esq. (by email)

Brewster & De Angelis
——— A D V O C A T E S ———

CLARK O. BREWSTER    Law Offices of
cbrewster@brewsterlaw.com   Brewster & De Angelis
Phone 918-742-2021   2617 East 21st Street
Facsimile 918-742-2197   Tulsa, OK 74114

November 22, 2021

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE:    United States v. Michael Avenatti**
**19 Cr. 374 (JMF)**

Dear Judge Furman,

This letter is an objection to Mr. Avenatti's request for a subpoena to compel Ms. Clifford to produce all documents and information regarding any mental health or psychological examinations she received from February 15, 2018, to the present. Notwithstanding that no such records exist, such personal health information is protected against disclosure under the psychotherapist-patient privilege, which is recognized in federal courts. *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996).

To support his request, Mr. Avenatti relies exclusively on the "well-settled" notion that a party may compel a witness to disclose her history of psychological treatment under the balancing test applied in *Chnapkova v. Koh*, 985 F.2d 79 (2d Cir. 1993), and in *United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995). Both cases preceded *Jaffee* and, therefore, did not discuss the psychotherapist-patient privilege. Instead, *Chnapkova* and *Sasso* relied exclusively on the balancing test set forth in Fed. R. Ev. 403, which considers the probative value and prejudicial effect of relevant evidence, and identified several factors that would be pertinent to that analysis. *See Sasso*, 59 F.3d at 347; *Chnapkova*, 985 F.2d at 81.

One year after *Sasso*, the United States Supreme Court decided *Jaffee*, which adopted the psychotherapist-physician privilege in federal courts. *Jaffee*, 518 U.S. at 15. That case made two holdings, both of which bar Mr. Avenatti's request. The first is, simply, "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Id.* The Court acknowledged the compelling public interest in protecting the privacy and confidentiality of the communications between a patient and her therapist, given that the promise of confidentiality is, as in the physician-patient relationship, "is completely dependent upon [the patients'] willingness and ability to talk freely." *Id.* at 11 (quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972)). If judicial intrusions into the psychotherapist-patient relationship were permitted, the Court concluded, "confidential conversations between psychotherapists and their patients would surely be chilled." *Id.* at 11-12.

*CLARK O. BREWSTER • JENNIFER L. DE ANGELIS • GUY A. FORTNEY • MONTGOMERY L. LAIR
KATIE A. MCDANIEL • MBILIKE M. MWAFULIRWA • **JOSEPH C. DE ANGELIS • RYAN R. NIGH

*Licensed in Oklahoma and Texas       **Licensed in Oklahoma and Colorado

Second, the Court rejected the use of balancing tests to overcome the privilege. *Id.* at 17. The Court acknowledged that for a privilege to be effective, the participants to a conversation must be able to predict with some degree of certainty whether particular conversations will be protected. *Id.* at 18 ("An uncertain privilege . . . is little better than no privilege at all.") (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)). The Court thereby concluded, "Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *Id.* at 17.

For one reason or another, the impact of *Jaffee* on the balancing test set forth in *Chnapkova* and *Sasso* were not recognized in the Second Circuit until 2008, two years after Mr. Avenatti's most recent cited case. *In re Sims*, 534 F.3d 117, 137 (2d Cir. 2008). There, the Second Circuit Court of Appeals rejected a district court's attempt to use *Chnapkova* to require the disclosure of psychiatric records. The Circuit Court noted that *Chnapkova* was decided before the psychotherapist-patient privilege was recognized. *Id.* Further, it held that the probative-value-focused balancing that *Chnapkova* required "was overtaken by the Supreme Court's 1996 decision in *Jaffee* that the psychotherapist-patient privilege is not subject to such a balancing test" and that such an approach to overcoming the privilege "is now foreclosed." *Id.* Following *Sims*, this Court has acknowledged the abrogation of the balancing test in *Chnapkova*, *See Francois v. Mazer*, No. 09 CIV. 3275 (KBF), 2012 WL 12549430, at *1 (S.D.N.Y. May 14, 2012) (recognizing abrogation).

Today, the law surrounding privileges under Fed. R. Ev. 501 — not the balancing test described in Fed. R. Ev. 403 — govern the disclosure of confidential communications between a patient and her psychotherapist. Mr. Avenatti does not allege that Ms. Clifford has waived that privilege, either expressly or by forfeiture. *See Sims*, 534 F.3d at 131-136 (discussing grounds for forfeiture). Considering that Mr. Avenatti has not asserted any legitimate ground for overcoming the psychotherapist-patient privilege, his request should be denied.

Respectfully submitted,

Clark O. Brewster
Counsel for Stephanie Clifford

Cc:     Government Counsel, Counsel for Michael Avenatti

Brewster & De Angelis
——— A D V O C A T E S ———

CLARK O. BREWSTER   Law Offices of
cbrewster@brewsterlaw.com   Brewster & De Angelis
Phone 918-742-2021   2617 East 21st Street
Facsimile 918-742-2197   Tulsa, OK 74114

November 22, 2021

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE:** **United States v. Michael Avenatti**
        **19 Cr. 374 (JMF)**

Dear Judge Furman,

This letter is an objection to Mr. Avenatti's request for a subpoena to compel Ms. Clifford to produce all documents and information regarding any mental health or psychological examinations she received from February 15, 2018, to the present. Notwithstanding that no such records exist, such personal health information is protected against disclosure under the psychotherapist-patient privilege, which is recognized in federal courts. *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996).

To support his request, Mr. Avenatti relies exclusively on the "well-settled" notion that a party may compel a witness to disclose her history of psychological treatment under the balancing test applied in *Chnapkova v. Koh*, 985 F.2d 79 (2d Cir. 1993), and in *United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995). Both cases preceded *Jaffee* and, therefore, did not discuss the psychotherapist-patient privilege. Instead, *Chnapkova* and *Sasso* relied exclusively on the balancing test set forth in Fed. R. Ev. 403, which considers the probative value and prejudicial effect of relevant evidence, and identified several factors that would be pertinent to that analysis. *See Sasso*, 59 F.3d at 347; *Chnapkova*, 985 F.2d at 81.

One year after *Sasso*, the United States Supreme Court decided *Jaffee*, which adopted the psychotherapist-physician privilege in federal courts. *Jaffee*, 518 U.S. at 15. That case made two holdings, both of which bar Mr. Avenatti's request. The first is, simply, "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Id.* The Court acknowledged the compelling public interest in protecting the privacy and confidentiality of the communications between a patient and her therapist, given that the promise of confidentiality is, as in the physician-patient relationship, "is completely dependent upon [the patients'] willingness and ability to talk freely." *Id.* at 11 (quoting Advisory Committee's Notes to Proposed Rules, 56 F.R.D. 183, 242 (1972)). If judicial intrusions into the psychotherapist-patient relationship were permitted, the Court concluded, "confidential conversations between psychotherapists and their patients would surely be chilled." *Id.* at 11-12.

*CLARK O. BREWSTER • JENNIFER L. DE ANGELIS • GUY A. FORTNEY • MONTGOMERY L. LAIR
KATIE A. MCDANIEL • MBILIKE M. MWAFULIRWA • **JOSEPH C. DE ANGELIS • RYAN R. NIGH

*Licensed in Oklahoma and Texas      **Licensed in Oklahoma and Colorado

Second, the Court rejected the use of balancing tests to overcome the privilege. *Id.* at 17. The Court acknowledged that for a privilege to be effective, the participants to a conversation must be able to predict with some degree of certainty whether particular conversations will be protected. *Id.* at 18 ("An uncertain privilege . . . is little better than no privilege at all.") (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)). The Court thereby concluded, "Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *Id.* at 17.

For one reason or another, the impact of *Jaffee* on the balancing test set forth in *Chnapkova* and *Sasso* were not recognized in the Second Circuit until 2008, two years after Mr. Avenatti's most recent cited case. *In re Sims*, 534 F.3d 117, 137 (2d Cir. 2008). There, the Second Circuit Court of Appeals rejected a district court's attempt to use *Chnapkova* to require the disclosure of psychiatric records. The Circuit Court noted that *Chnapkova* was decided before the psychotherapist-patient privilege was recognized. *Id.* Further, it held that the probative-value-focused balancing that *Chnapkova* required "was overtaken by the Supreme Court's 1996 decision in *Jaffee* that the psychotherapist-patient privilege is not subject to such a balancing test" and that such an approach to overcoming the privilege "is now foreclosed." *Id.* Following *Sims*, this Court has acknowledged the abrogation of the balancing test in *Chnapkova*, *See Francois v. Mazer*, No. 09 CIV. 3275 (KBF), 2012 WL 12549430, at *1 (S.D.N.Y. May 14, 2012) (recognizing abrogation).

Today, the law surrounding privileges under Fed. R. Ev. 501 — not the balancing test described in Fed. R. Ev. 403 — govern the disclosure of confidential communications between a patient and her psychotherapist. Mr. Avenatti does not allege that Ms. Clifford has waived that privilege, either expressly or by forfeiture. *See Sims*, 534 F.3d at 131-136 (discussing grounds for forfeiture). Considering that Mr. Avenatti has not asserted any legitimate ground for overcoming the psychotherapist-patient privilege, his request should be denied.

Respectfully submitted,

Clark O. Brewster
Counsel for Stephanie Clifford

Cc:     Government Counsel, Counsel for Michael Avenatti

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street–10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

November 30, 2021

**BY EMAIL**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:   **United States v. Michael Avenatti,**
       **19 Cr. 374 (JMF)**

Dear Judge Furman:

We write in further support of our motion to authorize a subpoena pursuant to Fed. R. Crim. P. 17(c)(1) compelling the complainant in the above-captioned case, Stephanie Clifford, to produce her mental health records to the Court for an <u>in camera</u> inspection. Mr. Avenatti's opening motion was made in good faith and was based on Ms. Clifford's own public statements, in which she knowingly and publicly acknowledged each of the facts set forth in our motion, and many of which flatly belie her contention that there are no records to produce. None of the facts alleged in support of this motion come from information known only by Mr. Avenatti as a result of his representation of Ms. Clifford, and his motion is otherwise based on valid case law and consistent with his constitutional right to cross-examine and confront his accuser. Lastly, no sealing is appropriate or permitted under well-settled law. Accordingly, the Court should grant Mr. Avenatti's motion, compel Ms. Clifford to produce the requested records for an <u>in camera</u> inspection, and unseal the papers filed in connection with this motion.

**<u>Mr. Avenatti has a legitimate and good faith basis for his request.</u>**

In its opposition to Mr. Avenatti's motion, the Government claims that the basis for his request is "entirely speculative" and that Ms. Clifford's beliefs about her supernatural experiences are "common." All of these observations miss the mark and reveal the Government's conscious avoidance of its complaining witness's lack of credibility.

As set forth in Mr. Avenatti's omnibus Rule 12 motion, he terminated his

attorney-client relationship with Ms. Clifford by letter in February 2019 and, a few weeks later, Ms. Clifford accused him of defrauding her after she was approached by the Government. These circumstances coincide with Ms. Clifford's claims that her life began to be overcome by spirits and demons, affecting her relationship with her business manager and romantic partner, Denver Nicks. According to Ms. Clifford, starting in 2019, she began experiencing "a series of unexplainable and frightening experiences" in her home. "Physical attacks from invisible assailants, poltergeist phenomenon, shadow figures, unexplainable sounds/voices and more prowled her [] home, invading Stormy's former life and relationship like a predatory animal. Those experiences started in March 2019 and escalated rapidly until they had made life as it had been for her an impossibility. . . . Stormy's then partner [Mr. Nicks] refused to believe what was transpiring in the home and questioned her sanity."[1]

Ms. Clifford has also claimed publicly on multiple occasions[2] over the past two years that in the Spring of 2019, again contemporaneous with her accusations against Mr. Avenatti, a demon even possessed her business manager, causing him to physically attack her to the point of breaking her collarbone:[3]

a. ". . .there was a portal in that house and this dark entity came through it. . . . You know, my [ex], it held him down twice. He attacked me one day. I saw him, his eyes turned black and he put his hands on me and he has not been the same since." (September 4, 2020.)[4]

b. "This house hated the guy that I was with. . . . And I stayed there and he turned on me. Like, I saw it happen. [Mr. Nicks] said he was held underwater in the bathtub, he came running upstairs, unprovoked, screamed at me, hit me so--, choked me so hard that he broke my collarbone, fractured it. And, I mean, you're gonna think I'm crazy. He looked at me and there was no color or white in his eyes." (January 7, 2021.)[5]

Ms. Clifford has also described during multiple audio and video recorded interviews many of her recent mental health and life experiences, all of which bear on her

---

[1] See https://spookybabesshow.com/meet-the-team/.

[2] Each of the below quotes are taken from the referenced audio/video recordings, which are available on the Internet and, in many cases, promoted by Ms. Clifford via her social media, which vitiates any need for confidentiality and undermines any privacy concerns.

[3] The defense has been unable to find any photographs or video evidence substantiating this accusation, but if it is true, then presumably there are medical records. At trial, the defense will show that Ms. Clifford has falsely accused any number of people of committing serious crimes against her over the last three years, including the FBI.

[4] https://creepinitrealshow.podbean.com/e/stormy-daniels-spooky-babes-paranormal-show-interview/

[5] https://www.youtube.com/watch?v=gesklupndgU

capacity and credibility as a witness and illustrate (presumably false) accusations against others. By way of example only:

a. "So, long story short, I began to think I *was* crazy. He, my ex, told me I was crazy. I, you know, I thought I was going insane. I think I did a little bit, actually." (September 4, 2020.)[6]

b. "I trusted [Mr. Nicks] so much because he's a logical-- he's a journalist, he's logical. And he kept telling me that I was crazy…he kept telling me that I was crazy and I needed psychiatric help." (April 12, 2021.)[7]

c. "And I was standing in the kitchen and I, like, blanked out, I guess? And I remember feeling, like, a woman's presence, but more strongly than normal. I could actually see her this time and she was crying over a child that, like, had passed. . . . She's, like, she was standing and I, just, she was sobbing and cutting her wrists like trying to, like, kill herself and I was there. Like, the room, like, morphed into, like, how it probably, like, how it used to look maybe? Like, not my furniture anymore? And, when I came to, I looked down and my whole arm was covered in blood. I don't remember opening the drawer, taking the knife out, and cutting myself. . . . [I] felt like I was crazy. And then, like I said, I'm sitting there, I'm cutting myself in my kitchen." (March 8, 2021.)[8]

d. "I didn't know I was a medium, but there was a woman there that was really sad and she kept cutting herself. I ended up, like, taking a knife to my arm, which, I don't remember doing it. Like, I was sober. And I just got really ill and I would, like, had days where I . . . just couldn't get up." (April 12, 2021.)[9]

e. "[A] couple of people…were like, 'Okay, the stress of all the political stuff is getting to you, girl. You're nuts. You need to get on medication.'" (May 2, 2021.)[10]

f. "When I first started doing it, like I said, I was just trying to find answers, because I thought I was going insane." (July 1, 2021.)[11]

[6] https://creepinitrealshow.podbean.com/e/stormy-daniels-spooky-babes-paranormal-show-interview/

[7] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/

[8] https://thatwitchlife.com/2021/03/08/episode-75-investigating-the-paranormal-with-stormy-daniels/

[9] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/

[10] https://www.youtube.com/watch?v=VlR_19C63OM

[11] https://www.iheart.com/podcast/256-night-dreams-talk-radio-31027514/episode/070121-stormy-daniels-on-the-84360703/

g. "<u>I really thought I was going crazy</u>." (July 1, 2021.)[12]

h. "That's what started me on this quest, is the house I was in had significant physical, mental, and emotional damage done to me." (September 2, 2020.)[13]

i. "My partner at the time was, like, 'you're nuts.' And he had moved out. He was like, wouldn't hear it." (July 22, 2021.)[14]

j. "[Mr. Nicks] broke my heart. He attacked me. This was somebody I was madly in love with. And then he said <u>I was crazy and I was inventing it</u>. And it's not true. And once he was gone, I was alone in this house. Like, I went to a dark place and I legit tried to die." (January 7, 2021.)[15]

k. "I developed almost a weird obsession for this house and I still have it. Not the house, but this fascination. Like, she has a name. . . like, I would pull up in an Uber and look at her and talk. It was so weird. But [Mr. Nicks] said I was crazy." (January 7, 2021.)[16]

l. "[Mr. Nicks] was saying that <u>I was crazy and I was imagining it. And a lot of people sort of agree with him</u>." (June 4, 2021.)[17]

m. "It escalated to the point where <u>I was having some severe health problems</u>. And I watched the television, I watched a documentary called 'Hell House' by Zak Bagans and I was like, 'Oh my gosh. This is all the same stuff, like <u>the same symptoms, unexplained, like, physical symptoms</u>.' And I was like, 'Well, you know what? I have to know what's going on. I need to prove to myself that I'm not just insane.'" (February 8, 2021.)[18]

[12] https://www.iheart.com/podcast/256-night-dreams-talk-radio-31027514/episode/070121-stormy-daniels-on-the-84360703/
[13] https://www.iheart.com/podcast/269-crazy-cat-paranormal-speak-63030943/episode/ccp-is-caught-in-the-storm-71021149/
[14] https://podcasts.apple.com/us/podcast/going-to-bed-with-stormy-daniels/id1509776802?i=1000529680332
[15] https://www.youtube.com/watch?v=gesklupndgU
[16] https://www.youtube.com/watch?v=gesklupndgU
[17] https://omny.fm/shows/darkness-radio/a-dark-stormy-night-w-stormy-daniels-justin-loupe
[18] https://podcasts.apple.com/us/podcast/stormy-daniels-is-not-afraid-february-8-2021/id1530639447?i=1000508279909

n. "[Mr. Nicks] just left and cut me off. I never spoke to him again. And then he, you know, called me crazy and told my friends, 'Oh, she's inventing ghost stories to try to get me back.'" (January 7, 2021.)[19]

o. "Some people try to convince me that I was crazy. <u>And I actually thought maybe I was</u>. . ." (July 22, 2021.)[20]

p. "And so I reached out to a bunch of paranormal investigators <u>because I was convinced that the guy I was in love with was possessed by a demon</u> and nobody got back to me, including one very famous paranormal investigator who's an expert in that. Probably thought I was crazy. Never responded." (January 7, 2021.)[21]

Ms. Clifford's public statements about her mental health and condition include claims that she has sought help from various medical and mental health providers during the time period at issue. Crucially, these video and audio admissions are directly contrary to the representations made to this Court by the Government and Ms. Clifford, through her counsel, that no records bearing on her mental condition exist and therefore the defense motion is moot. <u>See, e.g.</u>, Gov't Opposition Letter ("Finally, Victim-1, through counsel, informs the Court in the letter submitted herewith that, with respect to the categories of records the defendant seeks, 'no such records exist.' This representation renders the defendant's motion moot. It also underscores the lack of any good faith basis for seeking such records in the first instance."). For example, and in Ms. Clifford's own words:

a. "And I, at one point, I was like, I got like, <u>I was having memory loss and headaches, and they found a mass in my head</u>. I was bleeding from the eyes and the ears and the nose. <u>All documented</u>. . . ." (March 8, 2021.)[22]

b. "I started to have physical health problems. My hair was falling out . . . I was bleeding at one point. I had a tumor. They had, like, a mass." (April 12, 2021.)[23]

c. "I had <u>doctors' appointments</u> and I <u>had a brain scan and all these things</u>. . . ." (June 4, 2021.)[24]

---

[19] https://www.youtube.com/watch?v=gesklupndgU
[20] https://podcasts.apple.com/us/podcast/going-to-bed-with-stormy-daniels/id1509776802?i=1000529680332
[21] https://www.youtube.com/watch?v=gesklupndgU
[22] https://thatwitchlife.com/2021/03/08/episode-75-investigating-the-paranormal-with-stormy-daniels/
[23] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/
[24] https://omny.fm/shows/darkness-radio/a-dark-stormy-night-w-stormy-daniels-justin-loupe

d.  "[Interviewer]: You said you had a brain scan. Did they find any form of, even minimal form of, epilepsy at all?

Ms. Clifford: No. They actually thought I had meningitis at one point. They wanted to do a spinal tap. Because I was, like, forgetting stuff. And I can't remember the rest of the clues. But they're like, 'It might be this. It might be that.' They did find a mass. But I went in for one, like, treatment. And they wanted to test everything else to make sure it hadn't spread." (June 4, 2021.)[25]

e.  "I found that no therapist in the world is equipped to handle what I've gone through. . . . You know what I mean? Like, I'm the only person in the entire existence of the universe who had the experience I had, there's just not enough people. They, they, I mean, the therapist that I had I went to her, like, three or four times. She was wonderful. She was so cool. She was so sweet. It was just, it was beyond her. . .capabilities." (May 2, 2021.)[26]

f.  "[He] gives better advice than any of the therapists I've ever talked to." (May 2, 2021.)[27]

g.  "I went into this thinking this is going to go one of two ways. Either I'm going to prove my ex wrong, or I'm going to check myself into a hospital." (April 12, 2021.)[28]

Moreover, when Ms. Clifford made various statements regarding her mental condition and experiences, she did so with apparent knowledge that they would likely impact her various legal matters, including this case. Because of this, it is difficult, if not impossible, for Ms. Clifford to now disclaim or attempt to walk back these prior public statements. It is equally difficult for her or the Government to now make a legitimate claim of privacy or assert that there has been no waiver. By way of example only, and in Ms. Clifford's own words:

a.  "I'm pretty sure coming forward and saying that I talk to dead people are ruining my court cases, because there's your insanity, like, dismissal, you know?" (May 2, 2021.)[29]

---

[25] https://omny.fm/shows/darkness-radio/a-dark-stormy-night-w-stormy-daniels-justin-loupe
[26] https://www.youtube.com/watch?v=VlR_19C63OM
[27] https://www.youtube.com/watch?v=VlR_19C63OM
[28] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/
[29] https://www.youtube.com/watch?v=VlR_19C63OM

b. "People are gonna use, you know, use this to say I'm crazy or I'm not a credible witness, you know. All points indicate that I'm headed towards the Supreme Court and, you know, I'm sure my attorney is not happy with me by choosing to pursue this at this moment in time. I'm sure he would much rather have been like, 'Oh my God, Stormy, could you have not waited a year before you decided to tell everybody that you see dead people? Um, but, you know, I'm not really known for giving a fuck what anybody thinks." (January 30, 2021.)[30]

c. "I should keep my mouth shut, because me going around saying, 'I see dead people,' and 'I hear voices' can have a pretty terrible effect on these open court cases. Like, I was scheduled to go to the Supreme Court. I probably shouldn't be going around going, 'I hear voices,' you know what I mean?" (April 12, 2021.)[31]

d. 'Do you really think I need this attention? *I have open court cases.* The last thing I need to be going around saying [is], 'I see dead people.'" (July 1, 2021.)[32]

Against this backdrop, there is no merit to the Government's contention that the defense lacks a good faith basis to request that the Court issue a subpoena for Ms. Clifford's mental health records and to inspect them in camera. Ms. Clifford's own words, including numerous representations about experiencing psychiatric episodes and seeking medical attention, belie any notion that the defense is on some sort of unfounded and mean-spirited fishing expedition. And because much of the Government's case rests of Ms. Clifford's credibility and her recollection of disputed events, Mr. Avenatti's Fifth and Sixth Amendment rights demand that he be afforded as robust an opportunity as possible to confront and cross-examine Ms. Clifford, particularly with information impeaching her credibility, memory, and perception of reality.

**Mr. Avenatti's Fifth Amendment right to a fair trial and Sixth Amendment right to confront his accuser demand that he has the opportunity to conduct a robust cross-examination of Ms. Clifford.**

Much of Ms. Clifford's and the Government's opposition to Mr. Avenatti's motion turns on the idea that the case law he cited is essentially overruled by the

---

[30] https://www.youtube.com/watch?v=l_9oGmAzOAg

[31] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/

[32] https://www.iheart.com/podcast/256-night-dreams-talk-radio-31027514/episode/070121-stormy-daniels-on-the-84360703/

Supreme Court's decision in Jaffee v. Redmond, 518 U.S. 1 (1996). This argument fails for two reasons.

First, the Southern District of New York cases that Mr. Avenatti relied on to support his request for the Court's in camera inspection of Ms. Clifford's mental health records post-date Jaffee (which was decided in 1996), making abundantly clear that there is nothing about Jaffee that undermines the longstanding proposition that a testifying witness's mental condition in a criminal case is relevant to her credibility, particularly to the extent the mental condition reveals a paranoid delusion. See, e.g., United States v. Landry, No. 05-CR-376 (CSH), 2006 WL 17441, at *8 (S.D.N.Y. Jan. 4, 2006) (whether the witness's "mental condition as revealed by the psychological reports has any effect upon his credibility as a trial witness, and if so to what extent, are questions properly left to the jury"); United States v. Paredes, No. 99-CR-290 (PKL), 2001 WL 1478810, at *2 (S.D.N.Y. Nov. 20, 2001) ("[T]he defendant's opportunity to cross-examine [the witness] regarding her psychological condition may prove important to assessing her credibility," particularly since she was a key Government witness and because her panic attacks and depression "existed during at least some of the events which she is expected to testify about" and "appear[ed] to continue to the present.").

Second, Jaffee is significant only to the extent that it formally recognized the psychotherapist privilege at the federal level in a civil case. In likening the psychotherapist privilege to the spousal and attorney-client privileges, neither of which are absolute, Jaffee plainly does not stand for the proposition that anything said to a psychotherapist is protected always and forever. Infra. And more notably, the issue in Jaffee was not about whether a witness in a federal criminal case could be compelled to produce mental health records to the court for in camera inspection. Rather, following a traumatic incident in which she shot and killed a man, a police officer received extensive counseling from a licensed clinical social worker and was later sued by the family of the deceased. In the context of defending herself against that lawsuit, the Supreme Court determined that, under Fed. R. Evid. 501, the court could not compel disclosure of the police officer's statements to the clinical social worker to be used against her.

In this case, Ms. Clifford is not on trial; Mr. Avenatti is, and Ms. Clifford is a key witness against him whose credibility is seriously in question. Jaffee would be more useful to Ms. Clifford if she were defending herself against a lawsuit brought by Mr. Avenatti. But that is not the situation and Jaffee is inapposite to this case. The law cited by the defense in our opening motion clearly shows that any psychotherapist privilege recognized by Jaffee must give way to a criminal defendant's constitutional right to a fair trial and to confront his accuser. This is particularly true here given the importance of Ms. Clifford's testimony to the

Government's case, which it did not dispute in its opposition.

Indeed, evidentiary privileges that limit defendants' access to medical and counseling records strike at the heart of our adversarial system. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). Exclusion of "exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" Crane, 476 U.S. at 690-91 (quoting United States v. Cronic, 466 U.S. 648, 656 (1984)). "The ends of criminal justice [are] defeated" when criminal "judgments [are] founded on a partial or speculative presentation of the facts." Taylor v. Illinois, 484 U.S. 400, 409 (1988) (quoting United States v. Nixon, 418 U.S. 683, 709 (1974)).

With this in mind, the Supreme Court has held that at least some evidentiary privileges "cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." Nixon, 418 U.S. at 713 (executive privilege); see Pennsylvania v. Ritchie, 480 U.S. 39, 57-58 (1987) (privilege relating to child protective service records); Roviaro v. United States, 353 U.S. 53, 59, 65 (1957) (informer's privilege). See also In re Doe, 964 F.2d 1325 (2d Cir. 1992) (recognizing, pre-Jaffee, psychotherapist privilege but determining that it could be overcome). The "interest in preserving confidentiality," though "weighty … and entitled to great respect," must "yield to the demonstrated, specific need for evidence." Nixon, 418 U.S. at 712-13.

Material exculpatory information often comes only in the form of professional diagnoses or observations buried in health records. When that information undermines a witness's capacity for truthfulness—as is the case here—it is important for the defendant to be able to use it to impeach key prosecution witnesses. Such information carries even greater significance where, again as here, the case against the defendant turns on the complaining witness's perception of events and overall mental state. To be sure, evidentiary privileges serve important substantive values, and it is important to proceed with care when seeking to overcome such a privilege. But in camera review by a trial court (the instant relief sought by Mr. Avenatti) is a well-established, reliable procedure by which a defendant's constitutional rights can be vindicated while largely preserving the interests the (psychotherapist) privilege is designed to protect.[33]

---

[33] In its opposition to Mr. Avenatti's motion, the Government argued that the defense failed to clear the three hurdles set forth in Nixon to obtain a Rule 17(c) subpoena, i.e., relevancy, admissibility, and specificity. Gov't Opposition at 1-2. This argument fails. Mr. Avenatti has clearly set forth here and in his opening motion why the records he seeks are relevant to Ms. Clifford's motive and credibility, and they are plainly admissible as impeachment under the Fifth and Sixth Amendments and the Federal Rules of Evidence, as set forth in the cases Mr. Avenatti cited. The Government

**The Court should unseal the papers regarding this issue because Mr. Avenatti's application for a Rule 17(c) subpoena is a judicial document to which the public has a presumptive right of access that is not outweighed by any countervailing interests.**

Sealing the moving papers regarding this issue is improper for at least three reasons.

First, there is nothing about Mr. Avenatti's opening motion or reply that contains any information actually covered by a psychotherapist privilege. Rather, the defense's moving papers rely exclusively on Ms. Clifford's own public statements about her mental health and condition, which she has discussed at length on various, publicly-accessible podcasts and other social media fora.[34] Given that the cases cited by the defense in its opening motion identified the witnesses by name and expressly discussed the mental health diagnoses bearing on their credibility, the defense avers that its raising of this issue based solely on publicly-available information did not require the motion to be sealed or any other confidential treatment. In addition, much of the information cited by the defense in its opening motion was previously filed publicly in connection with Mr. Avenatti's reply memorandum in support of his Rule 12 motion. Crucially, neither the Government nor Ms. Clifford objected then.

Second, and since the filing of the opening motion, Ms. Clifford has publicly discussed the motion repeatedly on her social media (where she has over a million followers) and even re-posted a slightly-redacted version of the motion after it was sealed by the Court. Because the motion is largely already in the public sphere, and is also being actively discussed by Ms. Clifford, keeping the documents sealed advances no legitimate privacy interests.[35]

---

contends that Rule 17(c) subpoenas are not the proper vehicle to compel pre-trial disclosure of impeachment material. But that is not the relief Mr. Avenatti seeks. Rather, Mr. Avenatti seeks the Court's in camera review of any records to determine whether and when they should be disclosed to the defense in advance of Ms. Clifford's testimony, a course of action taken by other judges in this district. Finally, Mr. Avenatti cabined his request for records to a discrete time period and about specific mental and physical diagnoses, conditions, and treatments bearing on Ms. Clifford's cognition, memory, and perception of reality. Mr. Avenatti is not in a position to get more specific with respect to the individual records he seeks because he has no way of knowing such details, and the Government has not pointed to a single case where such granularity is required in this context.

[34] Indeed, Ms. Clifford continues to discuss this case openly and often in crude terms, using Twitter and other social media to denigrate defense counsel's efforts on Mr. Avenatti's behalf and to call for Mr. Avenatti to be raped in prison with lubricant laced with Tabasco hot sauce.

[35] Contrary to the Government's suggestion, it does not appear that there were any media articles about the motion until Ms. Clifford drew attention to it by posting the motion and repeatedly

Third, and with respect to the Government's arguments about prejudicial pre-trial publicity, such concerns do not outweigh the weighty presumption in favor of the public's access to these judicial documents.

The "notion that the public should have access to the proceedings and documents of courts is integral to our system of government." United States v. Erie Cty., 763 F.3d 235, 238-39 (2d Cir. 2014). This long-standing precept is embodied in two "related but distinct presumptions"—"a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." Newsday LLC v. Cty. of Nassau, 730 F.3d 156, 163 (2d Cir. 2013); accord Erie Cty., 763 F.3d at 239. Each presumption implicates a separate framework governing when it attaches and when it may be overcome. Ultimately, the "decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978).[36]

In the absence of any statutory presumption against the public filing of Mr. Avenatti's motion, the Court must first turn to whether a common law presumption applies to the materials. The common law right of access to court records has a "long history" that has been said to "predate even the Constitution itself." Erie Cty., 763 F.3d at 239 (citing United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 145 (2d Cir. 1995)). This "presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1048 (2d Cir. 1995); see also Erie Cty., 763 F.3d at 239) (explaining that the common law right of access stems from the need for the public to "have the ability to learn of, monitor, and respond to the actions of their representatives and representative institutions," including the courts).

In analyzing whether the common law right of access warrants the unsealing of court records, courts in this circuit first ask whether the document is a "judicial document" presumed to be accessible. Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). If the document is a judicial document to which the common law presumption of access applies, the court must then "determine the weight of that presumption." Id. at 119. Finally, a court must balance the weight of the presumption against countervailing considerations, such as the "privacy interests of those resisting disclosure." Amodeo II, 71 F.3d at 1040. Access to

---

tweeting about it.

[36] Because the common law presumption of access is sufficient to warrant the unsealing of Mr. Avenatti's moving papers, he does not address the First Amendment presumption.

judicial documents may only be denied when competing interests outweigh the presumption. <u>Erie Cty.</u>, 763 F.3d at 239.

In this case, Mr. Avenatti's motion is a judicial document to which the common law presumption of access applies, and there is no sufficiently weighty countervailing privacy interest to restrict its public filing. The threshold inquiry of whether a document is a "judicial document" turns on its "relevan[ce] to the performance of the judicial function and useful[ness] in the judicial process." <u>Lugosch</u>, 435 F.3d at 119 (cleaned up). Like search warrants (and their applications), Rule 17(c) subpoenas (and their applications) are unquestionably judicial documents because they themselves embody the performance of judicial functions. <u>See</u> <u>Joy v. North</u>, 692 F.2d 880, 892 (2d Cir. 1982) ("An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny."). Indeed, the Second Circuit has observed that a document is a judicial document "not only if the judge actually relied upon it, but also if 'the judge <u>should</u> have considered or relied upon [it], but did not." <u>Bernstein v. Bernstein Litowitz Berger & Grossman LLP</u>, 814 F.3d 132, 140, n.3 (2d Cir. 2016) (citing <u>Lugosch</u>, 435 F.3d at 119). Because a court necessarily relies upon an application for a Rule 17(c) subpoena in assessing whether there is a basis to issue the subpoena, they are certainly relevant to the performance of that judicial function. <u>Accord United States v. Pirk</u>, 282 F. Supp. 3d 585, 596 (W.D.N.Y. 2017) (collecting cases); <u>see</u> <u>also</u> <u>United States v. All Funds on Deposit at Wells Fargo Bank in S.F. in Account No. 7986104185, Held in the Name of Account Servs. Inc., & All Prop. Traceable Thereto</u> ("Wells Fargo Bank"), 643 F. Supp. 2d 577, 583 (S.D.N.Y. 2009) (explaining that affidavits in support of search or seizure warrants, which "are central to a court's probable cause determination," "clearly fall within the definition of 'judicial documents'" (cleaned up)).

Here, Mr. Avenatti's application for a Rule 17(c) subpoena triggers a weighty presumption of access because it directly affects the adjudication and determination of his constitutional rights to a fair trial, to mount a complete and effective defense, and to meaningfully confront his accuser. <u>Amodeo II</u>, 71 F.3d at 1049 (the strength of the public's right to access judicial documents is at its zenith when the documents play a role "in determining litigants' substantive rights"—that is, "conduct at the heart of Article III" that implicates "the need for public monitoring"). And contrary to the Government's assertion, this presumption is not outweighed by Ms. Clifford's privacy interests. Gov't Opposition at 4-5. In fact, it is incredible for the Government to have even argued as much since Mr. Avenatti's application is based entirely on Ms. Clifford's own widely-disseminated and publicly-available statements about her mental health and condition. This fact alone necessarily precludes Ms. Clifford and the Government from meaningfully arguing now that those same statements should be protected from public disclosure in the context of

this litigation. That Ms. Clifford continues to discuss this issue publicly is also of no consequence to sealing, and any pretrial publicity generated by Ms. Clifford's repeated commentary about Mr. Avenatti and/or this trial is a matter that the Government should take up with her directly, or through her counsel.

## **Conclusion**

For the reasons set forth herein and for any that become apparent at a subsequent hearing or oral argument, the Court should grant Mr. Avenatti's application for a Rule 17(c) subpoena, compel Ms. Clifford to produce the requested records for the Court's <u>in camera</u> inspection, and unseal the papers filed in connection with the motion.

Respectfully Submitted,


_____/s/_____
Robert M. Baum
Tamara L. Giwa
Andrew J. Dalack
Assistant Federal Defenders

Cc:    Government Counsel          Counsel for Michael Avenatti



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 11, 2022

**REQUEST TO FILE UNDER SEAL**

**BY EMAIL**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007
furman_nysdchambers@nysd.uscourts.gov

Re:    *United States v. Michael Avenatti*, 19 Cr. 374 (JMF)

Dear Judge Furman:

The Government respectfully submits this letter to move *in limine* to preclude cross-examination of Victim-1 regarding (a) her mental health treatment history and (b) beliefs she may or may not hold regarding the paranormal.  As explained below, there is no good-faith basis to inquire about Victim-1's mental health treatment history and, with respect to both topics, any potential probative value associated with these topics is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.[1]

I.    **Background**

On November 18, 2021, the defendant moved for the issuance of a subpoena compelling Victim-1 to produce various mental health records and information.  (Dkt. No. 164.)  On December 6, 2021, the Court granted the defendant's motion. (Dkt. No. 168.) On December 15, 2021, the Court disclosed that Victim-1, through counsel, had confirmed that no materials responsive to the subpoena exist.  (Dkt. No. 178.)

In the course of briefing the aforementioned motion, the defendant speculated that the materials he sought—which did not exist—"will likely reveal evidence of treatment for anxiety, depression, paranoia, and delusional thinking." (Dkt. No. 164 at 3.)  In support of his unfounded claim, he pointed principally to statements that Victim-1 made in connection with Victim-1's role

---

[1]    The Government requests that this letter motion, any response by the defendant, and the Court's ruling be filed under seal at least until Victim-1 testifies at trial, for substantially the same reasons that the Court sealed the parties' briefing concerning the issuance of a subpoena to Victim-1.  (*See* Dkt. No. 168 at 2; *see also* Gov't Opp'n to Def. Subpoena Mot. 3-4 (filed under seal on Nov. 24, 2021).)

Honorable Jesse M. Furman
United States District Judge
January 11, 2022
Page 2

on the paranormal investigations "reality television" show *Spooky Babes*. (*See id*. 3-4; Def. Reply 2-7 (filed under seal on Nov. 30, 2021).)  Victim-1, who is an adult film star, actor, director, author, exotic dancer, and stand-up comedian, is one of approximately half a dozen cast members on the show.  Victim-1's role on *Spooky Babes* and her paranormal-related statements post-date the events at issue in the case charged, which is the time period of March 2018 through February 2019.

## II.       Applicable Law

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

"Trial judges have broad discretion to limit the cross-examination of witnesses as appropriate to minimize the risk of harassment, undue prejudice, confusion of the issues to be presented to the jury, redundancy of the evidence, or unnecessary delays in the trial."  *United States v. Al-Farekh*, 956 F.3d 99, 114 (2d Cir. 2020).  Indeed, "district courts have an independent responsibility to [e]nsure that issues are clearly presented to the jury by, for example, imposing reasonable limitations on cross-examination."  *Id*. at 114-15 (internal quotation marks omitted).

## III.      Discussion

The defendant should be precluded from questioning Victim-1 on cross-examination concerning mental health treatment and conditions.  Although the Court concluded the defendant had a good-faith basis to seek Victim-1's mental health records (to the extent they existed), now that the defendant has learned that there are no such materials—that is, since at least February 15, 2018, Victim-1 has received no mental health treatment and has not been diagnosed with any mental health condition—there is no good-faith basis for the defendant to suggest on cross-examination of Victim-1 that she has received mental health treatment and/or has been diagnosed with any mental health condition (and the Government is aware of no such treatment or condition). Accordingly, the defendant should not be permitted to engage in such an inquiry unless and until the defendant provides the Court with the basis for such questions.  *See United States v. Scotti*, 47 F.3d 1237, 1248 (2d Cir. 1995) ("The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis.").

The defendant should also be precluded from questioning Victim-1 on cross-examination about her role on *Spooky Babes*, specific instances of paranormal investigations in which she has participated, or her beliefs regarding the paranormal.  There is no logical connection to be made between Victim-1's role on the television show *Spooky Babes* and any issue relevant to this case. Except for the basic fact that Victim-1 has a role on a paranormal investigations show, eliciting details about that show, specific experiences, or her beliefs and/or statements made during a television show, is far afield of any information that could permissibly inform a jury's perception of Victim-1's testimony.  Moreover, any potential relevance that such testimony might have would

Honorable Jesse M. Furman
United States District Judge
January 11, 2022
Page 3

be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time.

First, jurors who may have their own views—either positive or negative—about the existence of the paranormal may favor or disfavor Victim-1's testimony on that basis alone, introducing potentially unfair prejudice to both the Government and the defendant.  Any limited probative value regarding Victim-1's role on *Spooky Babes* and her beliefs about the paranormal, whatever they may be, is far outweighed by the effect of injecting a controversial and provocative issue about which many jurors may have strongly held views.  Indeed, just as it would be improper in this context to question a witness about their religious beliefs, *see* Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."), beliefs about the cause of global warming, and beliefs about whether unidentified flying objects ("UFOs") are aliens visiting from other planets, it similarly is improper to question a witness about his or her belief in the paranormal, as all these topics involve beliefs shared by large populations of Americans and rejected by other large populations of Americans.  *See, e.g.*, Dalia Fahmy, *Key Findings About Americans' Belief in God*, Pew Research Center, Apr. 25, 2018, https://www.pewresearch.org/fact-tank/2018/04/25/key-findings-about-americans-belief-in-god/ (56% of Americans "professing faith in God as described in the Bible and another 33% saying they believe in another type of higher power or spiritual force"); Dante Chinni, *Global Warming Perceptions By State: Most Americans Accept Human Fault*, Apr. 25, 2021, https://www.nbcnews.com/politics/meet-the-press/global-warming-perceptions-states-more-americans-accept-fault-n1265213 (57% of Americans "said they believed that 'human activities' were mostly responsible for 'global warming'"); Lydia Saad, *Do Americans Believe In UFOs?*, Aug. 20, 2021, Gallup, https://news.gallup.com/poll/350096/americans-believe-ufos.aspx ("Four in 10 Americans now think some UFOs that people have spotted have been alien spacecraft visiting Earth from other planets or galaxies."); Anna P. Kambhampaty, *Many Americans Say They Believe in Ghosts. Do You?*, N.Y. Times, Oct. 28, 2021, https://www.nytimes.com/2021/10/28/style/do-you-believe-in-ghosts.html (46% of Americans "believe in ghosts"); *Government Corruption, Fear for Loved Ones, Civil Unrest Top Fears in America*, Chapman University, Oct. 14, 2021, https://blogs.chapman.edu/wilkinson/2021/10/14/government-corruption-fear-for-loved-ones-civil-unrest-top/ ("Even more surprising is just how normal the paranormal has become.  Nearly 3/4 of Americans (72%) believed in at least one of these subjects:" "hauntings, ancient aliens, modern aliens, fortune telling, Bigfoot, Atlantis and telekinesis.").

Second, permitting such cross-examination would confuse the issues and mislead the jury. The jury would be left with the misimpression that an assessment of Victim-1's credibility requires the jury to resolve whether Victim-1's role on a paranormal investigations television show is merely entertainment, or reflects Victim-1's genuine beliefs.  Even if the jury could resolve that question, which they are unlikely to be able to do, and should not be asked to do, they then would have to evaluate whether Victim-1's role on a paranormal investigations show, beginning substantially after the facts at issue in this case, has any bearing on her testimony.  Of course, that may beg the question referenced above of whether the jurors themselves have personal beliefs in the existence of the paranormal.  Highlighting this controversial issue for the jury has no benefit

Honorable Jesse M. Furman
United States District Judge
January 11, 2022
Page 4

to the jury's role as a factfinder in this case and only raises the specter of judgments being reached on bases that are unrelated to the evidence that will establish the facts at trial.[2]

Third, the cross-examination of Victim-1 concerning her role on *Spooky Babes* and paranormal-related statements would be a complete waste of the jury's time. Setting aside the time spent on the cross-examination itself, which would be of little or no value (as explained above), the Government would need to engage in a lengthy and detailed redirect examination, and potentially offer additional witnesses and exhibits to explain, contextualize, and/or corroborate certain of Victim-1's testimony about *Spooky Babes* and paranormal-related statements. To be clear, it appears that the defendant wishes to embark on such an endeavor, as the Government was recently notified that another cast member of *Spooky Babes*—who has no knowledge regarding the facts at issue in this case and did not even meet Victim-1 until after the defendant's representation of Victim-1 ended—was recently served a trial subpoena by the defendant. If the Court permits such an inquiry, and certainly if it allows the defense to call collateral witnesses regarding *Spooky Babes*, the Government would likely need to call other cast members, producers, or crew members to testify; show exemplar clips of the show; call an expert or fact witness to explain the concept of "reality television"; and fact witnesses to testify as to Victim-1's normal abilities to perceive and recall events notwithstanding her beliefs, if any, in the paranormal. The Court should not permit the defendant to transform the trial into a sideshow examining *Spooky Babes*, the paranormal, and Victim-1's personal beliefs.

## IV.    Conclusion

For the foregoing reasons, the Court should preclude cross-examination of Victim-1 regarding (a) her mental health treatment history and (b) beliefs she may or may not hold regarding the paranormal.

---

[2]      To the extent Victim-1's role is mere entertainment, rather than a reflection of her genuine beliefs, her ability to act has no bearing on her character for truthfulness. Insofar as the defendant might argue to the contrary, that line of cross-examination should be precluded under Rule 403 for the reasons described herein. But in any event, any extrinsic evidence on that point is barred by Rule 608(b). *See* Fed. R. Evid. 608(b) ("Except for a criminal conviction . . . extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack . . . the witness's character for truthfulness."). However, to the extent the defendant wishes to pose otherwise permissible and appropriate questions regarding Victim-1's career as a performer, the defendant has the ability to do so without exploring her personal beliefs or her current role on *Spooky Babes*.

Honorable Jesse M. Furman
United States District Judge
January 11, 2022
Page 5

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/
      Matthew D. Podolsky
      Andrew A. Rohrbach
      Robert B. Sobelman
      Assistant United States Attorneys
      (212) 637-1947/2345/2616

cc:   Robert M. Baum, Esq. (by email)
      Andrew J. Dalack, Esq. (by email)
      Tamara L. Giwa, Esq. (by email)

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

January 13, 2022

**BY EMAIL**
**REQUEST TO FILE UNDER SEAL**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE:   **United States v. Michael Avenatti**
        **19 Cr. 374 (JMF)**

Dear Judge Furman:

        The Court should deny the Government's motion <u>in limine</u>[1] to preclude cross-examination regarding Stormy Daniels's mental health treatment history and her paranormal beliefs and activities.   The Government has misapprehended the substance and significance of Ms. Daniels's cross-examination, and these topics are admissible because they directly implicate her competency and credibility.   For the jury to understand fully the issues in this case, the jury must also understand Ms. Daniels's credibility and her ability to accurately and truthfully recall the events at issue in this case.   Indeed, the fact that Ms. Daniels has made inconsistent statements about mental health counseling and therapy resulting necessarily entitles defense counsel to impeach her with those prior inconsistent statements in order to show that Ms. Daniels is lying about <u>inter alia</u> her claim that Mr. Avenatti disavowed any pecuniary interest in her book deal through an oral, unrecorded, and un-memorialized conversation.   The Government correctly argues that the Court has wide discretion in this area, but "a trial judge abuses his discretion in curtailing

---

[1] The defense wishes to note that the Government filed its <u>in limine</u> motion to restrict our cross examination of Ms. Daniels after the Court's deadline for <u>in limine</u> motions without providing a sufficient justification for the delay and despite being aware of the issue since the beginning of December 2021 when the defense moved to subpoena Ms. Daniels's mental health records.

cross-examination of a government witness when the curtailment denies the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." United States v. White, 692 F.3d 235, 248 (2d. Cir. 2012), quoting United States v. Blanco, 861 F.2d 773, 781 (2d Cir. 1988).   Accordingly, the Government's motion lacks merit and should be denied

**Cross-examination of Ms. Daniels's paranormal beliefs and activities is permissible because these topics speak directly to her credibility and competency.**

Under Federal Rule of Evidence 601, a witness is competent to testify if she has the "ability to observe, to remember, to communicate, and to understand that the oath imposes a duty to tell the truth." United States v. Roman, 884 F. Supp. 126, 127 (S.D.N.Y. 1995); Fed. R. Evid. 601.   Under Federal Rule of Evidence 607, "Any party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607.   Specifically, cross-examination into a witness's credibility necessarily includes showing that a witness lacks the memory or perception to provide reliable testimony. See generally United States v. Sasso, 59 F.3d 341, 347-48 (2d Cir. 1995).   Competency and credibility are issues for the trier of fact. Roman, 884 F. Supp. at 127; see also Fed. R. Evid. Advisory Committee Note—1972 Proposed Rules ("The question [of credibility] is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence.").   In determining the credibility of a witness, the jury is not confined to the words used by a witness and should "take into consideration the whole nexus of sense impressions received from a witness." United States v. Campos, 255 F. Supp. 853, 856 (S.D.N.Y. 1966).

Thus, a party may introduce extrinsic evidence to impeach specific errors or falsehoods in a witness's direct testimony, particularly with respect to issues of credibility. United States v. Benedetto, 571 F.2d 1246, 1250, n.7 (2d Cir. 1978). This evidence should only be excluded subject to Rule 403 considerations, which says that relevant evidence may be excluded only if its "probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Cross-examining Ms. Daniels on her purported visions of dead people, ability to speak with dead people, and her alleged possession by spirits and demons is proper because these issues impugn her credibility.   Indeed, a witness who has experienced hallucinations or similar visions may be cross-examined about this history.   See United States v. Pryce, 938 F.2d 1343, 1345 (D.C. Cir. 1991) (precluding cross-examination of Government witness regarding witness's hallucinations violated confrontation clause and was relevant to witness's credibility); see also United States v. Moten, 564 F.2d 620, 628-29 (2d Cir. 1977) (noting that jury was allowed to review evidence about how witness indicated that "certain people were trying to kill him … by use of a 'laser light'" to assess his motivation and credibility; see e.g., United States v. Gent, No. 10-CR-90S, 2012 WL 1899159, at *11 (W.D.N.Y. May 23, 2012) (evidence about the defendant's belief in the paranormal was introduced at trial to create doubts about defendant's credibility).   Similarly, evidence that a witness has been under hypnosis or under a similar kind of influence weighs on her credibility.   Borawick v. Shay, 68 F.3d 597, 607-08 (2d Cir. 1995) (noting that admissibility of hypnosis may weigh on the credibility of a witness); see also United States v. Awkard, 597 F.2d 667, 679 (9th Cir. 1979) (finding no error in admitting evidence of hypnosis on the part of the witness and noting that "[t]he fact of hypnosis, if disclosed to the jury, may affect the credibility of the evidence").

The anticipated cross examination of Ms. Daniels does not contemplate questions about her proposed television project "Spooky Babes" as the Government suggests.   Rather, it concerns her professed experiences with the paranormal or supernatural which at best can be described as bizarre, illogical, and irrational. This includes the following public statements attributable to Ms. Daniels:

a.  "And I was standing in the kitchen and I, like, blanked out, I guess? And I remember feeling, like, a woman's presence, but more strongly than normal. I could actually see her this time and she was crying over a child that, like, had passed. . . . She's, like, she was standing and I, just, she was sobbing and cutting her wrists like trying to, like, kill herself and I was there. Like, the room, like, morphed into, like, how it probably, like, how it used to look maybe? Like, not my furniture anymore? And, when I came to, I looked down and my whole arm was covered in blood. I don't remember opening the drawer, taking the knife out, and cutting myself. . . . [I] felt like I was crazy.

And then, like I said, I'm sitting there, I'm cutting myself in my kitchen."
(March 8, 2021.)[2]

b. "<u>I didn't know I was a medium, but there was a woman there that was really sad</u> and she kept cutting herself. I ended up, like, taking a knife to my arm, which, I don't remember doing it. Like, I was sober."   (April 12, 2021.)[3]

c. "I developed almost a weird obsession for this house and I still have it. Not the house, but this fascination. <u>Like, she has a name. . . like, I would pull up in an Uber and look at her and talk</u>. It was so weird." (January 7, 2021.)[4]

    Precluding questioning of Ms. Daniels on cross-examination concerning her beliefs in paranormal activity would be against the interests of justice.   Ms. Daniels has made multiple bizarre and fantastical claims that call into question her credibility and her state of mind during the time she was dealing with Mr. Avenatti. Her paranormal activities—specifically her hallucinatory experiences seeing and speaking with dead people—bear directly on her ability to be a credible witness and must be allowed as impeachment material at trial.

    Additionally, cross examining Ms. Daniels on these statements will not cause unfair prejudice, confuse the issues, mislead the jury, or waste the jury's time.   As Ms. Daniels is the alleged victim in this case—and the Government's key witness—her testimony is significant and her credibility is at the core of the case. Her alleged (undocumented and unrecorded) conversations with Mr. Avenatti about the scope of their agreement regarding her book deal form the core of the Government's allegations of fraud and aggravated identity theft as set forth in the indictment.   Ms. Daniels will likely testify not just about conversations that she had with Mr. Avenatti via text message and email, but also about conversations that she had with Mr. Avenatti in person and over the phone.   Ms. Daniels's credibility and competence as a witness is therefore of paramount importance, and her ability to accurately recall the minute details of her communications with Mr. Avenatti is clearly appropriate for cross-examination.

---

[2] https://thatwitchlife.com/2021/03/08/episode-75-investigating-the-paranormal-with-stormy-daniels/

[3] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/.

[4] https://www.youtube.com/watch?v=gesklupndgU

The Government also inappropriately equates Ms. Daniels's paranormal activities and hallucinations to religious beliefs, which are not admissible to attack a witness's credibility.   Fed. R. Evid. 610; see Dkt. No. 236 at 3.   The purpose of this rule is to "guard against the prejudice which may result from disclosure of a witness's faith."   United States v. Kalaydijian, 784 F.2d 53, 56 (2d Cir. 1986) (internal citations omitted).   This rule does not protect against statements regarding the paranormal and supernatural activities that are at the heart of a witness's credibility, as is the case here.   Additionally, the Government improperly compares Ms. Daniels's communications with dead people to a belief in unidentified flying objects ("UFOs").   See Dkt. No. 236 at 3.   The Government's analogy is again misplaced.   Indeed, Ms. Daniels's beliefs and experiences reveal more than a belief   in the existence of UFOs, but rather equate with experiences in which a spaceship lands in her backyard and she communicates with the aliens that emerge.

Further, the Government's letter focuses primarily on Ms. Daniels's role on the television show Spooky Babes.   See Dkt. No. 236 at 2-4.   The focus of the cross-examination will not be on Spooky Babes or Ms. Daniels's role on the television show.   As explained above, the defense intends to use cross-examination about Ms. Daniels's specific paranormal activities to call into question her credibility to testify about key issues in this case, and her imagination and hallucinations directly affect her ability to accurately (and truthfully) recall what really transpired between her and Mr. Avenatti in their unrecorded, verbal communications.

Permitting cross examination regarding Ms. Daniel's paranormal experiences; talking to dead people; possession by spirits and demons; speaking with inanimate objects like a house and a doll, are appropriate areas of cross examination to allow the jury to assess the credibility of the witness. At least one other District Court agrees with this proposition.   In McCray v. Capra, 2017 WL 3836054 (W.D.N.Y. 2017), the Court analyzed a petitioner's claim that cross examination was limited.   It held that "County Court's refusal to permit [the defendant} to cross examine ... regarding various events at which the victim exhibited undisciplined behavior, while permitting questions regarding the victim hearing voices, wandering around outside in her pajamas, sensing dead people, and visualizing her deceased grandfather, demonstrated a sound exercise of discretion in controlling the scope of cross-examination." Id. at *15.

5

**Cross-examination of Ms. Daniels's mental health history should be admissible because Ms. Daniels has made inconsistent statements about her mental health history.**

It is a long-recognized principle that prior statements by a witness that conflict with that witness's testimony have significant impeachment value.   See Strickler v. Green, 527 U.S. 263, 282 (1999); see Fed. R. Evid. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to question the witness about it, or if justice so requires."). Specifically, "prior inconsistent statements may be used to impeach the credibility of a witness."   United States v. Hale, 422 U.S. 171, 176 (1975).

On November 18, 2021, the defense moved for the issuance of a subpoena compelling Ms. Daniels to produce her mental health records.   Dkt. No. 164.   On December 6, 2021, the Court granted the Defendant's motion.   Dkt. No. 168.   On December 15, 2021, Ms. Daniels, through counsel, represented to the Court that no materials responsive to the subpoena exist.   Dkt. No. 178.

But Ms. Daniels has made public statements directly contradicting the representations she has made to this Court.   She has previously claimed publicly that she has sought help from various medical and mental health providers during the time period at issue. If Ms. Daniels testifies that she has not received therapy or other mental health treatment, counsel seeks only to impeach that testimony with prior inconsistent statements.   By way of example only, Ms. Daniels has made the following claims:

    a.  "And I, at one point, I was like, I got like, I was having memory loss and headaches, and they found a mass in my head. I was bleeding from the eyes and the ears and the nose. All documented. . ." (March 8, 2021.)[5]

---

[5] https://thatwitchlife.com/2021/03/08/episode-75-investigating-the-paranormal-with-stormy-daniels/

b. "I started to have physical health problems. My hair was falling out . . . I was bleeding at one point. I had a tumor. They had, like, a mass." (April 12, 2021.)[6]

c. "I had doctors' appointments and I had a brain scan and all these things. . . ." (June 4, 2021.)[7]

d. "[Interviewer]: You said you had a brain scan. Did they find any form of, even minimal form of, epilepsy at all?

Ms. Clifford: No. They actually thought I had meningitis at one point. They wanted to do a spinal tap. Because I was, like, forgetting stuff. And I can't remember th19e rest of the clues. But they're like, 'It might be this. It might be that.' They did find a mass. But I went in for one, like, treatment. And they wanted to test everything else to make sure it hadn't spread." (June 4, 2021.)[8]

e. "I found that no therapist in the world is equipped to handle what I've gone through. . . . You know what I mean? Like, I'm the only person in the entire existence of the universe who had the experience I had, there's just not enough people. They, they, I mean, the therapist that I had I went to her, like, three or four times. She was wonderful. She was so cool. She was so sweet. It was just, it was beyond her. . .capabilities." (May 2, 2021.)[9]

f. "[He] gives better advice than any of the therapists I've ever talked to." (May 2, 2021.)[10]

g. "I went into this thinking this is going to go one of two ways. Either I'm going to prove my ex wrong, or I'm going to check myself into a hospital." (April 12, 2021.)[11]

---

[6] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/

[7] https://omny.fm/shows/darkness-radio/a-dark-stormy-night-w-stormy-daniels-justin-loupe

[8] https://omny.fm/shows/darkness-radio/a-dark-stormy-night-w-stormy-daniels-justin-loupe

[9] https://www.youtube.com/watch?v=VlR_19C63OM

[10] https://www.youtube.com/watch?v=VlR_19C63OM

[11] https://www.facebook.com/thekevinalanshow/videos/the-kevin-alan-show-stormy-daniels-and-justin-loupe-talk-spooky-babes/243718883845653/

The jury is entitled to determine if Ms. Daniels either lied in these interviews when she made these statements, or she lied to this Court.   The defense still contends that Ms. Daniels's mental health is relevant to her credibility, as stated in its request for a subpoena compelling Ms. Daniels to produce her mental health records.   <u>See</u> Dkt. Nos. 164, 167.   More importantly, at this juncture, these statements regarding Ms. Daniels's mental and physical health must be admissible as they raise serious questions regarding Ms. Daniels's ability to recall the events at issue in this case accurately and truthfully.   <u>See</u> Rule 608(b) (extrinsic evidence may be allowed on cross-examination if it is "probative of the character for truthfulness or untruthfulness of... the witness").

Separately, we also write to respectfully request that the Court authorize that the records and documents related to Judy Regnier's health, including a letter from her attorney, be filed on the docket without any redactions.   As discussed in Mr. Avenatti's letter to this Court on January 10, 2022, Ms. Regnier's mental and psychological conditions are appropriate grounds for cross-examination and bear directly on her credibility as a witness.   Especially considering that Ms. Regnier is a crucial witness in this case, all information in those documents will reveal information bearing on Ms. Regnier's memory, credibility, and accurate perception of reality during the relevant time period.   Thus, these records should be available on the public record, and at least to defense counsel so that we can prepare and offer any expert testimony bearing on the jury's understanding of how the treatment Ms. Regnier receives affects her memory and perception of reality.   The defense also respectfully requests leave to supplement this argument following the Government's letter regarding our motion to subpoena Ms. Regnier's records, and no later than 3:00 p.m. on Monday, January 17, 2022.

**Conclusion**

      For the reasons set forth herein, the Court should deny the Government's motion in limine to preclude cross-examination on Stephanie Daniels's mental health treatment history and beliefs she may or may not hold regarding the paranormal and allow the defense to cross-examine Ms. Daniels on these issues through impeachment material.

Respectfully Submitted,

_____
/s/
Robert M. Baum, Esq.
Andrew J. Dalack, Esq.
Tamara L. Giwa, Esq.
Assistant Federal Defenders

Cc:    Government Counsel               Counsel for Michael Avenatti

9
