January 30, 2022

**BY ECF – VIA FEDERAL DEFENDERS**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE:   United States v. Michael Avenatti**
       **19 Cr. 374 (JMF)**

Dear Judge Furman:

      I write in response to the Court's Orders at Dkts. 323 and 324 concerning defendant's ability to call certain witnesses in his case-in-chief, which was expected to begin tomorrow.[1] Two witnesses, Mr. Carlos Colorado[2] and Mr. John Barrale,[3] were previously subpoenaed to testify in the defense case and have since moved to quash their respective subpoenas.[4] The Government has joined these motions and has since filed a motion to preclude the testimony of three other witnesses, Mr. Jason Fischer, Mr. David Karlbey, and Mr. Justin Loupe. (Dkt. 322). In compliance with the Court's January 30, 2022 Order (Dkt. 323), defendant submits the instant opposition to the motions to quash as well as the Government's motion to preclude defense witnesses. For each of the reasons set forth below, defendant should be permitted to call each of the five witnesses as scheduled and mount his defense. Based on the following, defendant respectfully requests that the Court deny Carlos Colorado and John Barrale's Motions to Quash. Further, defendant respectfully requests that the Court deny the Government's motion to preclude the testimony of the three other defense witnesses.[5]

---

[1] If the Court precludes all six witnesses, five of whom were on defendant's witness list for Monday, it is likely that the defendant will not be able to proceed with any other witnesses until Tuesday.

[2] Mr. Colorado, a licensed attorney, was finally served with a subpoena on January 26, 2022 after evading service since January 19. Defendant will have a paralegal present in Court on Monday, January 31, to testify, if necessary, as to the efforts to serve Mr. Colorado and his repeated attempts at evading service.

[3] Until very recently, Mr. Barrale was cooperating with the defense (advisory counsel) and discussing the means by which he could testify.

[4] Each motion to quash has not been docketed at the time of this filing.

[5] Defendant is willing to permit Mr. Barrale to testify via video in light of his recent diagnosis.

## I.     Applicable Law

The constitutional right to present a defense derives from the Compulsory Process and Confrontation Clauses of the Sixth Amendment. The Compulsory Process Clause guarantees a defendant the right to subpoena witnesses and have them testify on her behalf. "[A] criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense, including the opportunity to call witnesses to aid in that defense." Scrimo v. Lee, 935 F.3d 103, 112 (2d. Cir. 2019). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973); citing, Webb v. Texas, 409 U.S. 95 (1972); Washington v. Texas, 388 U.S. 14 (1967); In Re Oliver, 333 U.S. 257 (1948). Indeed, the Supreme Court has repeatedly held that a defendant has a fundamental due process right to mount a defense and call witnesses on his behalf. See, e.g., Taylor v. Illinois, 484 U.S. 400, 409 (1988):

> As we noted just last Term, "[o]ur cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987). Few rights are more fundamental than that of an accused to present witnesses in his own defense, see, e. g., Chambers v. Mississippi, 410 U.S. 284, 302 (1973). Indeed, this right is an essential attribute of the adversary system itself.
>
> "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." United States v. Nixon, 418 U.S. 683, 709 (1974).
>
> The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words:
>
> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the

right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19 (1967).

Both the Government and defendant "have the right to call witnesses, and the power to compel witness testimony is essential to our system of justice." Barnett v. Norman, 782 F.3d 417, 422 (9th Cir. 2015); citing Blair v. United States, 250 U.S. 273, 281-82 (1919). The "interest in full disclosure and the fair administration of justice overrides concerns that testimony might be inconvenient, burdensome, or harmful to a witness's social or economic status." Id.; citing United States v. Calandra, 414 U.S. 338, 345 (1974).

A criminal defendant has the power to issue a subpoena pursuant to Federal Rule of Criminal Procedure 17. Rule 17 subpoenas act as a mechanism for securing testimony of a witness as well as documents at trial.

Relevance under the Federal Rules of Evidence "is a low threshold, easily satisfied." United States v. Gramins, 939 F.3d 429, 450 (2d Cir. 2019); see also, United States v. Certified Envtl. Servs., Inc. 753 F.3d 72, 90 (2d Cir. 2014) ("[T]he definition of relevance under FRE 401 is very broad."). Relevancy "simply requires that the evidence logically advance a material aspect of the party's case." United States v. Ruvalcaba-Garcia, 923 F.3d 1183, 1189 (9th Cir. 2019). The testimony sought by way of the instant subpoenas are not only relevant, as discussed herein, but the compelled testimony is admissible and crucial to Mr. Avenatti's ability to defend himself in this serious matter.

Critically, when weighing probative value against unfair prejudice under Rule 403, the Court must analyze the issue assuming "the evidence is believed, not the degree the Court finds it believable." Bowden. v. McKenna, 600 F.2d 282, 284-85 (1st Cir. 1979) (emphasis added)(citations omitted). "The court may not exclude relevant evidence – or [] assign it no probative value – on the ground that it does not find the evidence to be credible." United States v. Evans, 728 F.3d 953, 963 (9th Cir. 2013), citing, United States v. Candoli, 870 F.2d 496, 509 (9th Cir. 1989)(quotation omitted). Put simply, credibility and believability are for the jury, not the Court. Id. at fn. 13 (citations omitted).

Federal Rule of Evidence 608(a) allows for "a witness' credibility to be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form an opinion about that character." Fed. R. Evid. 608(a).

Pursuant to Federal Rule of Evidence 404(a)(2)(A), "subject to the limitations in Rule 412, a defendant may offer evidence of an alleged victim's pertinent trait . . ."

Federal Rule of Evidence 608(b) provides that other than a criminal conviction, extrinsic evidence is inadmissible to prove specific instances of witness conduct in order to attack the witnesses' truthfulness. However, in 2003, the Legislature amended this rule and stated: "by limiting the application of the Rule to proof of a witness' character for truthfulness, the

amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." See, Fed. R. Evid. 608, Notes on Advisory Committee on 2003 Amendment ;citing United States v. Tarantino, 846 F.2d 1384 (D.C. Cir. 1998) (admissibility of extrinsic evidence offered to contradict a witness is governed by Rules 402 and 403). The Rule was amended "to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness. Id., citing United States v. Abel, 469 U.S. 45 (1984).

II.     **Relevant Events During Trial**

Through its theory of prosecution and presentation of evidence, the Government has placed Ms. Daniels' credibility, bias and mental capacity at the center of this case. This is especially true considering the testimony the Government elicited on direct examination concerning Ms. Daniels' alleged communications with the defendant, the context of those communications, and Ms. Daniels' claims that (1) she never agreed that defendant could cause the payments to be sent to his trust account; (2) she knew nothing about the trust account; (3) defendant was never entitled to retain any portion of the book proceeds; and, (4) she had approximately three conversations with defendant wherein he informed her, contrary to their written agreement, that he would not take any of her book proceeds.The Government also elicited testimony on direct suggesting that Ms. Daniels' statements about wanting to see defendant harmed in prison were years ago and simply made out of anger at a discrete time. The Government also introduced Ms. Daniels' beliefs in the paranormal into the trial through its questioning of Ms. Daniels and suggested to the jury that her beliefs and claims were merely made-up for the benefit of Ms. Daniels' TV show.[6]

In addition, the Government introduced into evidence the fee agreement defendant had with Ms. Daniels (GX-3), the letter defendant provided to Ms. Daniels in November 2018 describing *some*, but not all, of the work defendant and his firms had done for Ms. Daniels as of that date, as well as some, but not all, of the costs defendant had advanced for Ms. Daniels (GX-2), and the letter of termination defendant sent to Ms. Daniels in February 2019 (GX-4). The Government has elicited testimony from at least two witnesses concerning these documents – Ms. Daniels and Ms. Regnier.

Importantly, by introducing the fee agreement and questioning witnesses about it, the Government has placed the issue of the type, amount, quality and quantity of work performed by defendant and his firms for the benefit of Ms. Daniels directly at issue. All of these facts go to the issue of whether defendant and his firms were entitled to a "reasonable fee" and, if so, the amount of this fee. This is true even if the agreement were found to be invalid. See, e.g., California Business and Professions Code §§ 6147 and 6148 (applicable to all licensed attorneys in California). These sections codify the general rule in California that "when legal services have

---

[6] The show has never aired, nor is there any evidence that any network has purchased the show to air. In any event, Ms. Daniels' alleged paranormal beliefs and experiences long pre-date any development of the show or taping in connection with the show.

been provided without a valid written fee agreement, the attorney may recover the reasonable value of the services she [or he] performed in the action pursuant to a common count for quantum meruit." Leighton v. Forster, 8 Cal. App. 5th 467, 490 (1st Dist. 2017); citing, Huskinson & Brown v. Wolf, 32 Cal. 4th 453, 460 (2004) (California Supreme Court determining that §§6147-6148 "both also specify that, where an agreement is voided, the attorney remains 'entitled to collect a reasonable fee.'"). See also, Flannery v. Prentice, 26 Cal. 4th 572, 589 (2001) (California Supreme Court stating: "[e]ven in circumstances where the Legislature has required a written fee agreement … it has provided that, while noncompliance renders the agreement voidable, the attorney nevertheless is 'entitled to collect a reasonable fee.'"). Indeed, the California Supreme Court has made clear that "'in the absence of an agreement upon the subject, [the client] must be deemed to have promised to pay [the attorney] the reasonable value of the services performed in his behalf and with his consent and knowledge.'" Id., quoting, Batcheller v. Whittier, 12 Cal.App. 262, 266-267 (1909) (In absence of an agreement and when there is "no meeting of the minds of the parties" regarding the subject's compensation, the client "must be deemed to have promised to pay the reasonable value of the services performed…"). In addition, "[T]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Mardirossian & Associates, Inc. v. Ersoff, 153 Cal. App. 4th (2d Dist. 2007). California Courts have then reviewed other factors such as the nature of the litigation, amount of work involved, the skill required, the attention given to the matter, the success of the attorney's efforts, the attorney's personal skill level, and his experience in the area of law. Id. Moreover, whether defendant was entitled to a reasonable fee under the law and/or believed he was entitled to a reasonable fee goes directly to whether the Government can show that defendant had the requisite intent necessary for a conviction.

Similarly, defendant and his firms' billing practices and the firms' general practice of charging between 25% and 45% in connection with the firm's representation of clients on a percentage of benefit or recovery basis is also highly relevant to defendant's state of mind and intent and the "reasonableness" of the monies retained from Ms. Daniels' book deal.

### III.    Defendant Should Be Permitted to Call Each Witness

Under the law and the facts as set forth in this letter, each witness should be permitted to testify.

1. Justin Loupe[7]

---

[7] The facts as alleged herein relating to Mr. Loupe are available publicly via interviews and social media posts, including but not limited to, the following: Darkness Radio, May 31, 2021: https://www.youtube.com/watch?v=vcXfk8zHjbw; Brewtally Speaking, May 2, 2021: https://www.youtube.com/watch?v=VlR_19C63OM; Midnight Paranormal Society, January 9, 2021: https://www.facebook.com/paranormalmps/videos/mps-show-presents-stormy-daniels-and-justin-loupe/221243772875190/

Mr. Loupe is Ms. Daniels' closest friend and has lived with her for nearly three years - since approximately 2019, contemporaneous with the time period she began making accusations against defendant. According to public interviews he and Ms. Daniels have given, no one has spent more time with Ms. Daniels since early 2019 than Mr. Loupe. Ms. Daniels has described how they are together 24/7. According to these same interviews, Mr. Loupe has witnessed Ms. Daniels' consistent memory loss and inability to remember facts and details during the last three years. Mr. Loupe has also witnessed first-hand Ms. Daniels' diminished mental capacity.

During the last three years, Mr. Loupe has likewise witnessed Ms. Daniels' bizarre claims and conduct surrounding her alleged ability to speak with the dead, communicate with objects, operate in a trance after which her memory is "wiped" and she cannot remember anything, and her claims of being possessed by the supernatural. Critically, Mr. Loupe claims to have witnessed this bizarre behavior and conduct including during 2019, the year BEFORE any alleged TV show was launched, thus refuting the Government's attempt to mislead the jury into believing that Ms. Daniels is simply playing a "character" on a TV show and does not really have delusional beliefs and mental infirmaries. Tr. 1004-1005.

Defendant also avers that Mr. Loupe has witnessed Ms. Daniels' make false allegations against Mr. Karbley, described *infra*.

Mr. Loupe's testimony is relevant under Rule 401 and Rule 404(a)(2)(A) to show Ms. Daniel's delusion, lack of mental capacity, contradictions, prior inconsistent statements, and propensity to make false criminal allegations against others.

2. Carlos Colorado

Mr. Colorado was an attorney at Eagan Avenatti, LLP from 2012 to March of 2019.[8] Mr. Colorado worked on <u>at least two</u> of the legal matters Mr. Avenatti and the firm was handling for Ms. Daniels during 2018 and 2019 – the Columbus lawsuit and another lawsuit filed against Ms. Daniels in Texas. During 2017 to 2019, Mr. Colorado was also familiar with the firm's billing practices for time and costs, and the firms' general practice of charging between 33% and 40% in connection with the firm's representation of clients on a percentage of benefit or recovery basis.[9] Contrary to the assertions of his counsel in Mr. Colorado's motion to quash, Mr. Colorado had far more involvement on the Daniels' matters than a mere few hours. Mr. Colorado also

---

[8] Portions of Mr. Colorado's testimony from the recent California trial are attached hereto as Exhibit A. Further evidence of Mr. Colorado's involvement with the Daniels' matters, as well as Mr. Colorado's knowledge and involvement with fee agreements at the firm, is attached as Exhibit B and is being filed under seal, in camera because such information is work product of the defense, reveals the defense strategy, and/or is attorney-client privileged.

[9] Many of the dental group cases referenced in Mr. Colorado's motion to quash were previously cases originated at defendant's firm during 2017-2019. While at defendant's firm, Mr. Colorado was involved in signing-up the clients on retainer agreements and negotiating with the clients and co-counsel as to fees and percentages.

witnessed the type, amount and quality of the work performed by others in the office on Ms. Daniels' legal matters.

Mr. Colorado's testimony is relevant under Rule 401 and critical to the defense because it goes to (1) the type, quantity and quality of the work performed for Ms. Daniels, (2) the billing practices of the firm and method by which time and costs were tracked,[10] and (3) the percentages the firm generally billed its clients, thus establishing that the money defendant and the firm kept from Ms. Daniels was a reasonable sum (approximately 18.6% of the $800,000 total) and far lower than what the firm typically charged its other clients.

3. David Karbley and John "JD" Barrale

Mr. Karbley was Ms. Daniels' tour bus driver during 2018 to 2021. According to the Government's handwritten notes from its first interview of Ms. Daniels on March 11, 2019, Ms. Daniels told the Government that she spoke with Mr. Karbley about the alleged nonpayment issues surrounding the book in 2018. See 3501-004. Defendant met Mr. Karbley in 2018 in the course of his representation of Ms. Daniels. Mr. Karbley also witnessed Ms. Daniels' near constant security during 2018-2019, which she demanded, and which defendant advanced huge sums of monies towards. Mr. Karbley also interacted regularly with Denver Nicks, who he understood to be serving as Ms. Daniels' manager. Mr. Karbley also has witnessed Ms. Daniels' delusional and bizarre behavior, including her inability to separate reality from fantasy (i.e., lack of mental capacity).

Mr. Barrale and his partner Keith Munyan were very close with Ms. Daniels during 2018-2019. Ms. Daniels had known Mr. Munyan for approximately 15 years as of that time. Mr. Munyan is the godfather to Ms. Daniels' daughter. See, e.g., Tr. 1133-34. Mr. Munyan, a photographer, was also consulted by Mr. Avenatti and Ms. Daniels in connection with the completion of the book and the publicity surrounding the book.

Ms. Daniels previously testified that everything in her book is true to the best of her knowledge. Tr. 1009. In her book, Ms. Daniels refers to Mr. Barrale and Mr. Munyan as her "gay dads" and states that they were "the family [she] chose in [her] twenties when [she] gave up on her biological parents." Full Disclosure, p. 4. On May 24, 2018, Ms. Daniels gave a speech upon receiving the key to the city in West Hollywood, California and said: "As a woman with two wonderful gay dads, Keith and JD, I feel especially at home here." Id. at 7. In connection with his representation of Ms. Daniels, defendant had extensive communications with Mr. Barrale and Mr. Munyan in 2018 and 2019, in person, via text and by telephone. He met with Ms. Daniels at their home at least three times. Portions of the 60 Minutes interview were also filmed at their home with defendant present.

Ms. Daniels testified last week that she spoke with Mr. Barrale and Mr. Munyan about

---

[10] Under the fee agreement, Ms. Daniels was responsible for paying all costs incurred in connection with her matters (paragraph 3) and defendant was entitled to 100% of the proceeds from the Crowd Justice effort for defendant and his firms' hourly fees and costs (paragraph 4).

her book deal on "many days." Tr. 1134. She also remembered being at their home when she received word of the completion of the book deal, a moment the Government first asked about on direct. Tr. 1132-33.

In 2018 and early 2019, Ms. Daniels gave Mr. Barrale and Mr. Munyan assets and money to hold during her divorce in order to hide it from her husband. After doing so, she then claimed that they had stolen the money. This is consistent with a theory of the defense as to her dealings with defendant – that she instructed defendant to have the money routed to his account to keep it hidden from her husband and then later claimed he had stolen it.

Mr. Barrale and Mr. Munyan witnessed much of the extensive work defendant performed for Ms. Daniels in 2018-2019. They are familiar with the quantity and quality of the work, type of work, and Ms. Daniels' satisfaction with that work. When Ms. Daniels first accused defendant of impropriety in dealing with her in November 2018, which the Government inquired about on direct, Mr. Barrale was quoted as saying, "What's happening to Michael Avenatti is wrong because he's so good to her. . . He's been the best thing that has ever happened to her." See Exhibit C. Mr. Barrale also has knowledge as to certain costs defendant advanced for Ms. Daniels.

Mr. Barrale also can testify as to the legal work defendant performed for Ms. Daniels in 2018 and 2019 relating to a dispute Ms. Daniels had with Mr. Barrale and Mr. Munyan over money. Defendant and his firms assisted Ms. Daniels in the dispute. Mr. Barrale can testify to the quantity and quality of the work that was done in connection with that matter, which bears directly on whether defendant was entitled to a reasonable fee and the amount of that fee.

Defendant further intends on calling Mr. Karbley and Mr. Barrale to show that Ms. Daniels has a reputation for untruthfulness and dishonesty, and that they are of the opinion that she is untruthful and dishonest. See FRE 608(a). Defendant expects both witnesses to offer testimony concerning Ms. Daniels' pertinent trait of falsely accusing people of financial crimes when she believes she has been wronged by them. See FRE 404(a)(2)(A). Further, Ms. Daniels testified Friday that to the best of her knowledge, she has never falsely accused someone of a crime. (Tr. 1044). Both witnesses have had business dealings with Ms. Daniels, who they knew for years, only to then be falsely and publicly accused of financial crimes when those relationships have soured. Ms. Daniels falsely accused Mr. Barrale and his partner Keith Munyan of stealing from Ms. Daniels and her daughter in late 2018 and early 2019, contemporaneous with her accusations against defendant. In the Fall of last year, Ms. Daniels began falsely accusing Mr. Karbley of extortion and stealing, among other crimes, after Mr. Karbley attempted to get her to pay him for his work.

The testimony of Mr. Karbley and Mr. Barrale is relevant under Rule 401 and Rule 404(a)(2)(A) to show the type, quantity and quality of the work defendant performed, the costs advanced by defendant, Ms. Daniels' ever evolving statements about the book deal and payments under the book deal, and Ms. Daniels lack of mental capacity, contradictions, prior inconsistent statements, and propensity to make false criminal allegations against others.

4. <u>Jason Fisher</u>

Mr. Fisher is the Director of Information Technology for the Federal Defenders of New York. He routinely extracts data from forensic copies of electronic devices and icloud returns, including text messages, WhatsApp messages and emails. In this case, Mr. Fisher has extracted certain data from the iCloud data produced by the Government.

Mr. Fisher is expected to testify as to various text messages, WhatsApp messages, and emails identified by the defendant after the close of the government's case. Included within this data is the text message at DX-AB. This message does not relate to a collateral matter in the case; it addresses an issue raised by the Government on direct examination of Mr. Macias, namely why Mr. Macias was finding money for defendant. Mr. Macias was given an opportunity under Fed. R. Crim. P. 613 to explain or deny the statement and he declined to do so. Accordingly, once authenticated, the text message is admissible in defendant's case-in-chief.

## IV.    Conclusion

For each of the reasons stated above, including the Compulsory Process and Confrontation Clauses of the Sixth Amendment, defendant respectfully requests that the motions be denied and that defendant be permitted to call each of the witnesses in his case-in-chief.

Respectfully Submitted,

/s/
Michael J. Avenatti
Defendant