Exhibit A

1

2

3

4              UNITED STATES DISTRICT COURT

5            CENTRAL DISTRICT OF CALIFORNIA

6                 SOUTHERN DIVISION

7                     - - -

8     THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

9

       UNITED STATES OF AMERICA,     )CERTIFIED TRANSCRIPT
10                     Plaintiff,  )
           vs.                      )
11                                  )  SACR-19-00061-JVS
       MICHAEL JOHN AVENATTI,       )
12                     Defendant.  ) TRIAL DAY 8, Vol. 1
       ------------------------------)
13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             Santa Ana, California

17              July 23, 2021

18

19                 SHARON A. SEFFENS, RPR
                   United States Courthouse
20                 411 West 4th Street, Suite 1-1053
                   Santa Ana, CA  92701
21                 (714) 543-0870

22

23

24

25

09:35  1    created or edited any document, correct?

09:35  2    A    Correct.  I don't know whether you specifically were at

09:35  3    the computer at the time.

09:35  4    Q    Sir, thank you for your candor.

09:35  5            THE COURT:  Redirect.

09:35  6            MR. WYMAN:  No, Your Honor.  Thank you.

09:35  7            THE COURT:  May the witness be excused?

09:35  8            MR. AVENATTI:  We would like to reserve the

09:35  9    opportunity to potentially recall him, Your Honor.

09:36  10            THE COURT:  Sir, you are excused for now but

09:36  11    you're on recall.  Thank you.

09:36  12            Would the government call its next witness,

09:36  13    please.

09:36  14            MR. WYMAN:  Thank you, Your Honor.

09:36  15            The United States calls Carlos Colorado.

09:36  16        CARLOS COLORADO, GOVERNMENT'S WITNESS, SWORN

09:36  17            THE CLERK:  If you will pull the microphone

09:36  18    towards you and state and spell your first and last name.

09:37  19            THE WITNESS:  Carlos Colorado, C-a-r-l-o-s,

09:37  20    C-o-l-o-r-a-d-o.

09:37  21            THE COURT:  Mr. Wyman.

09:37  22            MR. WYMAN:  Thank you, Your Honor.

09:37  23                    DIRECT EXAMINATION

09:37  24    BY MR. WYMAN:

09:37  25    Q    Good morning, Mr. Colorado.

33

| | | |
|---|---|---|
| 09:37 | 1 | A    Good morning. |
| 09:37 | 2 | Q    What do you do for a living? |
| 09:37 | 3 | A    I'm an attorney. |
| 09:37 | 4 | Q    What law firm do you currently work for? |
| 09:37 | 5 | A    I work for a law firm called the X-Law Group. |
| 09:37 | 6 | Q    Between 2012 and March 2019, where did you work? |
| 09:37 | 7 | A    At that time I worked at Eagan Avenatti, LLP. |
| 09:37 | 8 | Q    What kind of cases does Eagan Avenatti handle or did |
| 09:37 | 9 | Eagan Avenatti handle at that time? |
| 09:37 | 10 | A    Usually represented plaintiffs in complex litigation. |
| 09:37 | 11 | Q    Prior to joining Eagan Avenatti, did you interview with |
| 09:37 | 12 | any attorneys at the firm? |
| 09:37 | 13 | A    Yes, I did. |
| 09:37 | 14 | Q    Was the defendant Michael Avenatti one of those |
| 09:37 | 15 | attorneys you interviewed with? |
| 09:38 | 16 | A    He was. |
| 09:38 | 17 | Q    When you joined the firm, what was your title? |
| 09:38 | 18 | A    I was an associate. |
| 09:38 | 19 | Q    Generally speaking, what were your responsibilities as |
| 09:38 | 20 | an associate at Eagan Avenatti? |
| 09:38 | 21 | A    As an associate I was responsible for the day-to-day |
| 09:38 | 22 | handling of the cases that I was assigned to. |
| 09:38 | 23 | Q    So did you work on cases with other more senior |
| 09:38 | 24 | attorneys at the time? |
| 09:38 | 25 | A    Yes, I did. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:38  1  Q    Did you work on cases with the defendant?

09:38  2  A    I did.

09:38  3  Q    During your time at the firm, how would you describe

09:38  4  the defendant's role at Eagan Avenatti?

09:38  5  A    During the time that I was there, Mr. Avenatti was the

09:38  6  head of the office, the head of the firm, and he was

09:38  7  responsible as far as I could tell for you all the business

09:38  8  decisions and the final word on the legal aspects of the

09:39  9  cases we were handling.

09:39  10  Q    When you worked with the defendant on his cases, how

09:39  11  closely involved was he on the day-to-day operations of the

09:39  12  business?

09:39  13       MR. AVENATTI:  Objection, Your Honor.  Lacks

09:39  14  foundation.

09:39  15       THE COURT:  Overruled.

09:39  16       THE WITNESS:  Generally he would give us --

09:39  17  delegate the day-to-day handling of the sort of routine

09:39  18  aspects of litigation, but he was involved in -- he was

09:39  19  knowledgeable of the details.  We would debrief him on a

09:39  20  daily basis on what was happening.

09:39  21  BY MR. WYMAN:

09:39  22  Q    When you say we, are you referring to yourself and

09:40  23  other attorneys?

09:40  24  A    Correct.

09:40  25  Q    Would the defendant's level of involvement in a case

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:40  1    change as the case neared a resolution?
09:40  2              MR. AVENATTI:  Objection, Your Honor.  Foundation.
09:40  3              THE COURT:  Overruled.
09:40  4              THE WITNESS:  Yes.  Typically his involvement
09:40  5    would increase as cases neared resolution.
09:40  6    BY MR. WYMAN:
09:40  7    Q    And when I am saying resolution, what do you understand
09:40  8    that to mean?
09:40  9    A    When a case is resolved, generally that involves either
09:40  10   going to court and getting a verdict or reaching some kind
09:40  11   of settlement between the parties that ends the case.
09:40  12   Q    As the defendant became more involved as the cases
09:40  13   neared settlement or some resolution, would your role in
09:40  14   those cases change at all?
09:40  15   A    Sure.  As he became more involved, my role diminished.
09:41  16   Q    I want to turn now to a particular case handled by
09:41  17   Eagan Avenatti.  At some point during your time at that
09:41  18   firm, were you assigned to work on a case for a client named
09:41  19   Geoffrey Johnson?
09:41  20   A    Yes, I was.
09:41  21   Q    Did that case involve civil rights allegations against
09:41  22   the County of Los Angeles?
09:41  23   A    It did.
09:41  24   Q    And was this one of the defendant's cases that you
09:41  25   worked on?

09:41  1    A    Correct.

09:41  2    Q    Generally speaking, what was your role on that case?

09:41  3    A    As in other cases that I worked on but especially that

09:41  4    case because it was the first case that I was assigned when

09:41  5    I arrived at Eagan Avenatti, I was in charge of the

09:41  6    day-to-day handling of the case, meaning I drafted the

09:41  7    complaint; I drafted discovery that was served on the County

09:42  8    and the defendants and responded to discovery, engaged in

09:42  9    communications with opposing counsel about those day-to-day

09:42  10   aspects.

09:42  11   Q    Did you also communicate with the client, Geoffrey

09:42  12   Johnson?

09:42  13   A    At some point I did communicate with Mr. Johnson.

09:42  14   Q    Did you meet with him in person?

09:42  15   A    Not typically, but once or twice I did.

09:42  16   Q    Let me show you what is already in evidence as

09:42  17   Exhibit 1.  It will be on the screen.  And also if you would

09:42  18   like to review the entire document, it's in Volume 1 of the

09:42  19   binders behind you.

09:42  20   A    Okay.  Is the screen going to come up?  Thank you.

09:42  21   Q    Do you recognize this?

09:42  22   A    Yes.

09:43  23   Q    What is it?

09:43  24   A    It's what we call a retainer agreement, the contract

09:43  25   with the client and an attorney.

| | | |
|---|---|---|
| 09:43 | 1 | Q    And who is this retainer agreement with? |
| 09:43 | 2 | A    This is the retainer agreement between Eagan Avenatti |
| 09:43 | 3 | and Mr. Johnson. |
| 09:43 | 4 | MR. WYMAN:  If you could please pull up paragraph |
| 09:43 | 5 | four on page 1. |
| 09:43 | 6 | BY MR. WYMAN: |
| 09:43 | 7 | Q    What amount of attorney fees does this agreement call |
| 09:43 | 8 | for? |
| 09:43 | 9 | MR. AVENATTI:  Objection, Your Honor.  The |
| 09:43 | 10 | document speaks for itself.  Best evidence. |
| 09:43 | 11 | THE COURT:  Overruled. |
| 09:43 | 12 | THE WITNESS:  It states that the attorney will |
| 09:43 | 13 | receive a contingent fee of 40 percent. |
| 09:43 | 14 | BY MR. WYMAN: |
| 09:43 | 15 | Q    To your knowledge was there any other agreement between |
| 09:43 | 16 | Eagan Avenatti and Geoffrey Johnson regarding attorney's |
| 09:43 | 17 | fees? |
| 09:43 | 18 | A    Not to my knowledge. |
| 09:43 | 19 | Q    If you could please look in the binder behind you, |
| 09:44 | 20 | Volume 1, at what has been marked government's Exhibit 7. |
| 09:44 | 21 | A    (Witness complies.)  Yes. |
| 09:44 | 22 | Q    Do you recognize this document? |
| 09:44 | 23 | A    Yes, I do. |
| 09:44 | 24 | Q    Is this a fair and accurate copy of an e-mail exchange |
| 09:44 | 25 | that you were on with the defendant? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 10:00 | 1 | of that exhibit where the signatures are, do you see on the |
| 10:00 | 2 | signature block that your name is listed as an attorney for |
| 10:00 | 3 | plaintiff? |
| 10:00 | 4 | A    Yes. |
| 10:00 | 5 | Q    Is that your signature? |
| 10:00 | 6 | A    No. |
| 10:00 | 7 | Q    Do you know whose signature that is? |
| 10:00 | 8 | A    I'm not certain, but it looks like Mr. Avenatti's |
| 10:00 | 9 | signature. |
| 10:00 | 10 | MR. WYMAN:  Thank you.  No further questions. |
| 10:00 | 11 | THE COURT:  Mr. Avenatti. |
| 10:00 | 12 | MR. AVENATTI:  Thank you, Your Honor. |
| 10:00 | 13 | CROSS-EXAMINATION |
| 10:01 | 14 | BY MR. AVENATTI: |
| 10:01 | 15 | Q    Mr. Colorado, good morning. |
| 10:01 | 16 | A    Good morning. |
| 10:01 | 17 | Q    You and I worked together for a number of years; did we |
| 10:01 | 18 | not? |
| 10:01 | 19 | A    We did. |
| 10:01 | 20 | Q    And I was the one who made the decision to hire you at |
| 10:02 | 21 | my law firm, right? |
| 10:02 | 22 | A    Yes. |
| 10:02 | 23 | Q    And you and I enjoyed a good working relationship |
| 10:02 | 24 | during those years; did we not? |
| 10:02 | 25 | A    We did. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:03 | 1 | Q    Nothing usual about that, right? |
| 10:04 | 2 | A    Correct. |
| 10:04 | 3 | Q    Now, you are not suggesting to this jury that I wasn't |
| 10:04 | 4 | involved in my cases; are you? |
| 10:04 | 5 | A    Not at all. |
| 10:04 | 6 | Q    Why are you not suggesting to the jury that I was not |
| 10:04 | 7 | involved in my cases? |
| 10:04 | 8 | A    Well, I have testified that you were involved in the |
| 10:04 | 9 | cases. |
| 10:04 | 10 | Q    For the most part I was very involved in my cases; |
| 10:04 | 11 | wasn't I? |
| 10:04 | 12 | A    I think so. |
| 10:04 | 13 | Q    Sir, in your experience isn't it true that almost every |
| 10:04 | 14 | pleading of any significance in any case would be reviewed |
| 10:05 | 15 | by me before it was filed? |
| 10:05 | 16 | A    Yes.  That's true. |
| 10:05 | 17 | Q    No matter where I was in the country, right? |
| 10:05 | 18 | A    Generally true. |
| 10:05 | 19 | Q    No matter where I was in the world? |
| 10:05 | 20 | A    Correct. |
| 10:05 | 21 | Q    At all hours of the day.  You experienced that; did you |
| 10:05 | 22 | not? |
| 10:05 | 23 | A    For the most part, yes. |
| 10:05 | 24 | Q    You would receive e-mails from me sometimes in the |
| 10:05 | 25 | middle of the night and sometimes very early in the morning |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:05 | 1 | relating to my input on matters at the firm that you were |
| 10:05 | 2 | working with me on; isn't that true? |
| 10:05 | 3 | A    That is true. |
| 10:05 | 4 | Q    When it came to the legal filings in our cases, I was |
| 10:06 | 5 | incredibly hands-on; is that fair? |
| 10:06 | 6 | A    That's fair. |
| 10:06 | 7 | Q    Did I appear to you to be devoted to the cases? |
| 10:06 | 8 | A    Also fair. |
| 10:06 | 9 | Q    And it's also fair that I needed help working up the |
| 10:06 | 10 | cases because I wasn't able to do everything on every case |
| 10:06 | 11 | that we had, right? |
| 10:06 | 12 | A    Right. |
| 10:06 | 13 | Q    Because at various points in time we would represent |
| 10:06 | 14 | hundreds if not thousands of plaintiffs, right? |
| 10:06 | 15 | A    Hundreds. |
| 10:06 | 16 | Q    Well, some of our cases had thousands of plaintiffs? |
| 10:06 | 17 | A    Correct. |
| 10:07 | 18 | Q    Okay.  So at any given time we would represent hundreds |
| 10:07 | 19 | and thousands of individuals in cases, right? |
| 10:07 | 20 | A    I think that's fair. |
| 10:07 | 21 | Q    Okay.  And those cases weren't just confined to |
| 10:07 | 22 | California.  Those cases were brought all around the |
| 10:07 | 23 | country, right? |
| 10:07 | 24 | A    Yes. |
| 10:07 | 25 | Q    You worked on cases in California.  You worked on cases |

| | | |
|---|---|---|
| 10:07 | 1 | in Texas.  You worked on cases in other states, right? |
| 10:07 | 2 | A    Correct. |
| 10:07 | 3 | Q    And when it came time to travel in connection with |
| 10:07 | 4 | those cases to make court appearances or take depositions |
| 10:07 | 5 | where people give testimony, was that generally -- was that |
| 10:07 | 6 | what you did? |
| 10:07 | 7 | A    Sometimes. |
| 10:07 | 8 | Q    But not most of the time? |
| 10:08 | 9 | A    I honestly am not sure about that. |
| 10:08 | 10 | Q    Okay.  Who would travel more in connection with those |
| 10:08 | 11 | cases, me or you? |
| 10:08 | 12 | MR. WYMAN:  Calls for speculation. |
| 10:08 | 13 | THE COURT:  Overruled. |
| 10:08 | 14 | THE WITNESS:  I honestly don't know. |
| 10:08 | 15 | BY MR. AVENATTI: |
| 10:08 | 16 | Q    Well, Mr. Colorado, you would be in contact with me |
| 10:08 | 17 | when I would be in other locations making court appearances. |
| 10:08 | 18 | You recall that, right? |
| 10:08 | 19 | A    Sure. |
| 10:08 | 20 | Q    Okay.  And as cases got closer to trial, there would be |
| 10:08 | 21 | a ramp-up of activity in connection with a case, right? |
| 10:08 | 22 | A    Yes. |
| 10:08 | 23 | Q    And was that necessary? |
| 10:08 | 24 | A    Absolutely. |
| 10:08 | 25 | Q    Explain to the jury why that would be necessary. |

53

| | | |
|---|---|---|
| 10:09 | 1 | A    As cases escalated and they become more advanced in |
| 10:09 | 2 | litigation, there is usually more need to make appearances |
| 10:09 | 3 | in court and to make filings in court, and all of those |
| 10:09 | 4 | things require a lot of preparation, research, and the |
| 10:09 | 5 | involvement of more experienced and senior lawyers. |
| 10:09 | 6 | Q    And while you were at the firm, there were cases that |
| 10:09 | 7 | went to trial; am I right? |
| 10:09 | 8 | A    Yes. |
| 10:09 | 9 | Q    Big cases? |
| 10:09 | 10 | A    Yes. |
| 10:09 | 11 | Q    Complicated cases? |
| 10:09 | 12 | MR. WYMAN:  Objection.  Relevance. |
| 10:09 | 13 | THE COURT:  Overruled. |
| 10:09 | 14 | THE WITNESS:  Correct. |
| 10:09 | 15 | BY MR. AVENATTI: |
| 10:09 | 16 | Q    Cases involving in some instances millions of pages of |
| 10:09 | 17 | documents, right? |
| 10:09 | 18 | A    Right. |
| 10:09 | 19 | Q    And the primary person who was responsible for |
| 10:09 | 20 | representing those clients at trial was me, right? |
| 10:10 | 21 | A    Yes. |
| 10:10 | 22 | Q    And you observed, did you not, weeks where I would |
| 10:10 | 23 | spend well over a hundred hours a week working on a case in |
| 10:10 | 24 | the middle of trial? |
| 10:10 | 25 | A    Yes. |

| | | |
|---|---|---|
| 10:53 | 1 | A    Yes. |
| 10:53 | 2 | Q    He's the gentleman seated right to my left; is that |
| 10:53 | 3 | right? |
| 10:53 | 4 | A    I believe so. |
| 10:53 | 5 | Q    Okay.  And Mr. Ryan Roberson; is that right? |
| 10:54 | 6 | A    I don't recall if he was at that meeting.  I do not |
| 10:54 | 7 | dispute it. |
| 10:54 | 8 | Q    Okay.  And you recognize him in the courtroom, right? |
| 10:54 | 9 | He's seated to our left of Mr. Kim? |
| 10:54 | 10 | A    I recognize him. |
| 10:54 | 11 | Q    And then you also met with Julian Andre that day, |
| 10:54 | 12 | Mr. Sagel's colleague at the U.S. Attorney's Office, |
| 10:54 | 13 | correct, that first meeting September 2019? |
| 10:54 | 14 | A    I don't recall. |
| 10:54 | 15 | Q    But you don't dispute it? |
| 10:54 | 16 | A    That is correct. |
| 10:54 | 17 | Q    And that meeting lasted from approximately 10:33 a.m. |
| 10:54 | 18 | to 1:44 p.m.  Am I right about that? |
| 10:54 | 19 | A    I don't recall the duration, but I don't dispute it. |
| 10:54 | 20 | Q    Okay.  So a little over three hours, fair? |
| 10:54 | 21 | A    Possible. |
| 10:55 | 22 | Q    I'm sorry? |
| 10:55 | 23 | A    Possible. |
| 10:55 | 24 | Q    And during that meeting about a year and a half or more |
| 10:55 | 25 | ago, you told the government that you never saw any |

10:55  1    suspicious funds or red flags while working at my law firm;
10:55  2    didn't you?
10:55  3    A    Sounds consistent with what I generally said.  I don't
10:55  4    recall specifically those words, but I'm sure I said
10:55  5    something to that effect.
10:55  6    Q    Would you like to refresh your recollection?
10:55  7    A    Sure.
10:55  8            MR. AVENATTI:  Your Honor, may I approach?
10:55  9            THE COURT:  You may.
10:55  10   BY MR. AVENATTI:
10:56  11   Q    Sir, I would like to direct your attention to paragraph
10:56  12   five of that document.
10:56  13   A    (Witness reviewing document)  Okay.
10:56  14   Q    I think you testified on direct examination that you
10:56  15   worked at my law firm and with me from 2012 until early
10:56  16   2019; is that right?
10:57  17   A    That's right.
10:57  18   Q    We worked closely together, did we not, on a lot of
10:57  19   different cases?
10:57  20   A    Yes.
10:57  21   Q    Isn't it true that you told the government in
10:57  22   September of 2019 that you never saw any suspicious funds or
10:57  23   red flags while working at my law firm?
10:57  24   A    Again I don't specifically recall saying that, but I
10:57  25   don't dispute that that's consistent with what I generally

10:57  1    said.

10:57  2    Q    Well, looking at the document, does that refresh your

10:57  3    recollection?

10:57  4                MR. WYMAN:  Asked and answered.

10:57  5                THE COURT:  Overruled.

10:57  6                THE WITNESS:  It doesn't particularly refresh my

10:57  7    recollection.

10:57  8    BY MR. AVENATTI:

10:57  9    Q    But you don't dispute it?

10:57  10   A    I do not.

10:57  11   Q    When you met with the government in September of 2019,

10:57  12   multiple agents and the Assistant U.S. Attorney, isn't it

10:57  13   true that you told the government that you are not aware of

10:57  14   me ever forging any signature?

10:58  15   A    I don't recall saying that, but that statement is true.

10:58  16   I have no knowledge of that.

10:58  17   Q    Okay.  Well, let me direct your attention to paragraph

10:58  18   64.  My focus is on what you told the government a year and

10:58  19   a half ago.

10:58  20                MR. WYMAN:  Your Honor, this calls for hearsay.

10:58  21   It's also not impeachment on an issue that was presented on

10:58  22   direct.

10:59  23                THE COURT:  Overruled.

10:59  24   BY MR. AVENATTI:

10:59  25   Q    Mr. Colorado, looking at paragraph 64, does that

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

72

10:59  1  refresh your recollection that you informed the government
10:59  2  over 18 months ago that you were not aware of me ever
10:59  3  forging any signatures?
10:59  4  A    It does not refresh my recollection in the sense that I
10:59  5  did remember something and now I remember from seeing this.
10:59  6  But as I said, I don't deny that I said it.  I very well
10:59  7  probably said it because I believe that to still be true.
10:59  8  Q    Isn't it true that when you met with the government
10:59  9  over 18 months ago, you also told them that you weren't
10:59  10 aware of me ever impersonating anyone else?
10:59  11 A    I don't recall that at all.
10:59  12 Q    But do you dispute it?
10:59  13 A    No.
10:59  14 Q    Isn't it true that you also told the government over 18
10:59  15 months ago that you were not aware of me falsifying or
11:00  16 destroying any documents during the entire time period that
11:00  17 you were working with me at my firm?
11:00  18 A    I don't recall saying it, but I don't recall knowing
11:00  19 that you destroyed documents.
11:00  20 Q    Or falsifying any documents?
11:00  21 A    Or falsifying any documents.
11:00  22 Q    Do you have a recollection of telling the government in
11:00  23 September of 2019 that you were not aware of me ever
11:00  24 engaging in any suspicious conduct during the entire time
11:00  25 period that you worked with me closely at Eagan Avenatti?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:00 | 1 | A    I do remember saying that. |
| 11:00 | 2 | Q    Do you stand behind it? |
| 11:00 | 3 | A    That I do not recall seeing you engage in any |
| 11:00 | 4 | suspicious conduct? |
| 11:00 | 5 | Q    Yes. |
| 11:01 | 6 | A    Yes. |
| 11:01 | 7 | Q    Mr. Colorado, thank you for your candor. |
| 11:01 | 8 |         MR. AVENATTI:  Nothing further, Your Honor. |
| 11:01 | 9 |         THE COURT:  Redirect. |
| 11:01 | 10 |         MR. WYMAN:  Briefly, Your Honor.  Thank you. |
| 11:01 | 11 |              REDIRECT EXAMINATION |
| 11:01 | 12 | BY MR. WYMAN: |
| 11:01 | 13 | Q    Good morning again, Mr. Colorado. |
| 11:01 | 14 | A    Good morning. |
| 11:01 | 15 |         MR. WYMAN:  Could you please pull up Exhibit 21, |
| 11:01 | 16 | and if you could blow up the e-mail at the bottom there. |
| 11:01 | 17 | BY MR. WYMAN: |
| 11:01 | 18 | Q    It's on the screen in front of you, if that's easier. |
| 11:01 | 19 | Do you recall the defendant asking you about this e-mail? |
| 11:02 | 20 | A    Yes. |
| 11:02 | 21 | Q    And I believe you discussed how it was on the eve of |
| 11:02 | 22 | trial as well as approaching settlement? |
| 11:02 | 23 | A    Right. |
| 11:02 | 24 | Q    Do you see in his e-mail there how he mentioned the |
| 11:02 | 25 | mediation, settlement, et cetera, and telling you not to |

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                     Plaintiff, )
     vs.                        )
                                )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,          )
                     Defendant.  )TRIAL DAY 21, VOL. 1
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

August 17, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:56 | 1 | MR. AVENATTI:  Thank you, sir. |
| 10:56 | 2 | BY MR. AVENATTI: |
| 10:56 | 3 | Q    Mr. Colorado, the document that I placed in front of |
| 10:56 | 4 | you, now that it has refreshed your recollection, do you |
| 10:56 | 5 | recall other matters that you worked on at the firm while |
| 10:56 | 6 | you were there? |
| 10:56 | 7 | A    Yes.  I recall most of these matters that are on the |
| 10:56 | 8 | document you handed me. |
| 10:56 | 9 | Q    Most of these matters are different than the matters |
| 10:57 | 10 | you testified about earlier, is that right, or at least half |
| 10:57 | 11 | of them? |
| 10:57 | 12 | A    That's correct. |
| 10:57 | 13 | Q    While you were at the firm, did you report to attorneys |
| 10:57 | 14 | that were senior to you other than me from time to time? |
| 10:57 | 15 | A    Yes. |
| 10:57 | 16 | Q    And did you communicate with clients and opposing |
| 10:57 | 17 | parties at their request? |
| 10:57 | 18 | MR. WYMAN:  401, 403. |
| 10:57 | 19 | THE COURT:  Overruled. |
| 10:57 | 20 | THE WITNESS:  Yes. |
| 10:57 | 21 | BY MR. AVENATTI: |
| 10:57 | 22 | Q    Sir, while you were at the firm, in connection with |
| 10:57 | 23 | some matters would you keep track of your time? |
| 10:58 | 24 | A    Yes. |
| 10:58 | 25 | Q    Explain to the jury how you would do that. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:58  1    A    For some of the -- actually for all of the matters, I

10:58  2    tried to keep an Excel spreadsheet that I would log my hours

10:58  3    on for personal reference.  There was no need for billing

10:58  4    purposes on most of the matters to do time entry both in

10:58  5    order to track what I was working on and efficiency and so

10:58  6    forth, I track using those Excel spreadsheets.

10:58  7    Q    For some matters you did track your time for billing

10:58  8    purposes; isn't that true?

10:58  9    A    Correct.

10:58  10   Q    And for the matters that you tracked your time for

10:58  11   billing purposes, how would that work?

10:58  12             MR. WYMAN:  Objection.  Relevance.

10:58  13             THE COURT:  Mr. Avenatti.

10:58  14             MR. AVENATTI:  Your Honor, it goes hand in hand

10:58  15   with Tabs and it goes hand in hand with some of the matters

10:58  16   that were handled that were that were non-contingency, Your

10:59  17   Honor.

10:59  18             THE COURT:  Sustained.

10:59  19   BY MR. AVENATTI:

10:59  20   Q    Mr. Colorado, were you aware of a program called Tabs

10:59  21   while you were at the firm?

10:59  22   A    I was not.

10:59  23   Q    Would you give your time when it was being tracked to

10:59  24   an administrative assistant to be input into a computer

10:59  25   program?

| | | |
|---|---|---|
| 10:59 | 1 | MR. WYMAN:  Relevance, 403. |
| 10:59 | 2 | THE COURT:  Overruled. |
| 10:59 | 3 | THE WITNESS:  Yes. |
| 10:59 | 4 | BY MR. AVENATTI: |
| 10:59 | 5 | Q    So you would keep track of your time and then you would |
| 10:59 | 6 | give it to another individual at the firm who would input it |
| 10:59 | 7 | into a computer program, right? |
| 10:59 | 8 | MR. WYMAN:  Asked and answered. |
| 10:59 | 9 | THE COURT:  Sustained. |
| 10:59 | 10 | BY MR. AVENATTI: |
| 10:59 | 11 | Q    Who did you give your time to in order to be input into |
| 10:59 | 12 | this computer program? |
| 10:59 | 13 | A    I gave my Excel spreadsheets that I used to our |
| 10:59 | 14 | receptionist. |
| 10:59 | 15 | Q    And who was that at the time? |
| 10:59 | 16 | A    It was a woman by the name of Hillary. |
| 10:59 | 17 | Q    Hillary Wolett? |
| 10:59 | 18 | A    Correct. |
| 10:59 | 19 | Q    And you understood that Ms. Wolett would be inputting |
| 11:00 | 20 | that into a computer program, but you did not know the name |
| 11:00 | 21 | of the program; is that right? |
| 11:00 | 22 | A    Correct. |
| 11:00 | 23 | Q    And did you have the understanding that after the time |
| 11:00 | 24 | would be inputted into the computer program, that a bill |
| 11:00 | 25 | would be generated from time to time with a client that |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:00    1    would reflect your time?

11:00    2              MR. WYMAN:  Leading, foundation, and 403.

11:00    3              THE COURT:  Leading, sustained.

11:00    4    BY MR. AVENATTI:

11:00    5    Q    Mr. Colorado, did you understand that your time that

11:00    6    you were tracking that was put into the computer program,

11:00    7    that that time would be used for some purpose ultimately?

11:00    8    A    Yes.

11:00    9    Q    And what purpose did you understand that that time

11:00   10    would be used for?

11:00   11    A    My understanding was that the calculation from the

11:00   12    time, the time that was tracked, would be used at the time

11:01   13    that there was any award or verdict in order to justify the

11:01   14    firm's fees in that case.

11:01   15    Q    Did you also have -- well, strike that.  While you were

11:01   16    at the firm, did you understand that the firm also did

11:01   17    hourly work for clients, meaning billed by the hour?

11:01   18    A    For some of the clients like AT&T, yes.

11:01   19    Q    And did you have the understanding that one of the

11:01   20    purposes for which this time tracking, did you have the

11:01   21    understanding that one of the purposes was so that the hours

11:01   22    could then be billed to the client at an hourly rate?

11:01   23    A    Yes.

11:01   24    Q    Did you have occasion to review draft bills before they

11:01   25    were sent to clients?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER