**Exhibit B**

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JULIAN L. ANDRÉ (Cal. Bar No. 251120)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6683
    Facsimile: (213) 894-6269
    Email:    Julian.L.Andre@usdoj.gov

BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
    Ronald Reagan Federal Building
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone:  (714) 338-3598
    Facsimile:  (714) 338-3708
    Email:    Brett.Sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>MICHAEL JOHN AVENATTI,<br><br>        Defendant. | No. SA CR 19-61-JVS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY AND REQUEST FOR *DAUBERT* HEARING; EXHIBITS<br><br>*EXHIBIT 1 LODGED SEPARATELY UNDER SEAL*<br><br>Hearing Date: October 19, 2020<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>             Hon. James V. Selna |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Julian L. André and

Brett A. Sagel, hereby files its opposition to defendant MICHAEL JOHN AVENATTI's motion in limine to exclude expert testimony and request for Daubert hearing.

    This opposition is based upon the attached memorandum of points and authorities, the attached exhibits and concurrently lodged under seal exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 28, 2020       Respectfully submitted,

                              NICOLA T. HANNA
                              United States Attorney

                              BRANDON D. FOX
                              Assistant United States Attorney
                              Chief, Criminal Division


                                      /s/
                              JULIAN L. ANDRÉ
                              BRETT A. SAGEL
                              Assistant United States Attorneys

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

# TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| TABLE OF AUTHORITIES | ii |
| MEMORANDUM OF POINTS AND AUTHORITIES | 1 |
| I.  INTRODUCTION | 1 |
| II.  BACKGROUND | 1 |
| III.  ARGUMENT | 2 |
| A.  John Drum's Summary Testimony | 2 |
| B.  Professor Kevin Mohr's Expert Testimony | 8 |
| C.  Tracy Kaas's Expert Testimony | 12 |
| D.  A Daubert Hearing Is Unnecessary | 15 |
| IV.  CONCLUSION | 16 |

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**FEDERAL CASES**

Embury v. King,
      361 F.3d 562 (9th Cir. 2004)...................................5

In re Eagan Avenatti, LLP,
      No. 8:18-CV-1644-VAP (KES) (C.D. Cal.)....................11, 14

Kumho Tire Co. v. Carmichael,
      526 U.S. 137 (1999).........................................15

Sells v. Wamser,
      158 F.R.D. 390 (S.D. Ohio 1994).............................13

United States v. Alatorre,
      222 F.3d 1098 (9th Cir. 2000)...............................15

United States v. Ataba,
      805 Fed. App'x 491 (9th Cir. 2020)...........................5

United States v. Audette,
      923 F.3d 1227 (9th Cir. 2019)................................6

United States v. Calderon-Segura,
      512 F.3d 1104 (9th Cir. 2008)...............................15

United States v. Cooper,
      91 F. Supp. 2d 79 (D.D.C. 2000).............................15

United States v. Figueroa-Lopez,
      125 F.3d 1241 (9th Cir. 1997)................................5

United States v. Hill,
      749 F.3d 1250 (10th Cir. 2014)...............................6

United States v. Jawara,
      4747 F.3d 566 (9th Cir. 2007)...............................15

United States v. Nichols,
      169 F.3d 1255 (10th Cir. 1999)..............................15

United States v. Rizk,
      660 F.3d 1125 (9th Cir. 2011).............................4, 5

United States v. Shields,
      844 F.3d 819 (9th Cir. 2016)................................10

United States v. Shirley,
      884 F.2d 1130 (9th Cir. 1989)................................4

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                    PAGE

**FEDERAL STATUTES**

18 U.S.C. § 1028A(a)(1)..............................................1

18 U.S.C. § 1343.....................................................1

18 U.S.C. § 1344(1)..................................................1

18 U.S.C. § 152(2)...................................................1

18 U.S.C. § 152(3)...................................................1

26 U.S.C. § 7202.....................................................1

26 U.S.C. § 7203.....................................................1

26 U.S.C. § 7212(a)..................................................1

**FEDERAL RULES**

Fed. R. Evid. 1006................................................4, 5

Fed. R. Evid. 403....................................................5

Fed. R. Evid. 702.............................................7, 8, 9

Fed. R. Evid. 703....................................................7

Fed. R. Evid. 704....................................................6

**MISCELLANEOUS**

Ninth Cir. Model Crim. Jury Instr. 8.124 (Apr. 2019)...............10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The government intends to call three witnesses whose specialized knowledge will help the jury understand the evidence in this case. John Drum is a certified public accountant and financial analyst; Kevin Mohr is a law professor and legal-ethics teacher; Traci Kaas is an expert in structured settlements and special-needs trusts. These three witnesses will help the jury understand how defendant defrauded his clients and where the money went.

Defendant asks this Court to "exclude the[ir] expert testimony" on a variety of grounds. (Motion in Limine to Exclude Expert Testimony, CR 285 ("Mot.").)  His request should be denied.  He also requests a Daubert hearing, which is unnecessary.

### II.   BACKGROUND

Defendant is charged in a 36-count indictment with: ten counts of wire fraud (18 U.S.C. § 1343); eight counts of willful failure to pay over withheld taxes (26 U.S.C. § 7202); one count of endeavoring to obstruct the administration of the Internal Revenue Code (26 U.S.C. § 7212(a)); ten counts of willful failure to file a tax return (26 U.S.C. § 7203); two counts of bank fraud (18 U.S.C. § 1344(1)); one count of aggravated identity theft (18 U.S.C. § 1028A(a)(1)); three counts of making a false declaration in bankruptcy (18 U.S.C. § 152(3)); and one count of false testimony under oath in bankruptcy (18 U.S.C. § 152(2)).  The relevant facts are described more fully in the government's previously filed motion to admit other-acts evidence (CR 284), and the search warrant affidavits submitted in connection with the government's motion to revoke defendant's bond (CR 78, Exs. 1-3).

**III. ARGUMENT**

Mr. Drum, Professor Mohr, and Ms. Kaas will help the jury understand how defendant defrauded his clients of millions of dollars. Each of them may properly offer opinion testimony based on "specialized knowledge" within the meaning of Fed. R. Evid. 702(a). Defendant's vague and generalized objections to their proposed testimony are meritless.

**A.   John Drum's Summary Testimony**

Defendant appears to challenge only a small portion of Mr. Drum's testimony, since only a small portion of Drum's proposed testimony could reasonably be characterized as expert opinion testimony. (Mot. 3-6.) As defendant is aware, the vast majority (if not all) of Mr. Drum's proposed testimony involves foundation for and explanation of Rule 1006 summary exhibits, which the government produced to defendant along with its Rule 16 notice. (See Def. Ex. A.) Because defendant did not attach these draft summary exhibits to his motion, the government attaches them here as Exhibit 1.[1]

As explained in the government's Rule 16 notice (Def. Ex. A) and in its supplemental notice (Gov't Ex. 2), these summary exhibits primarily summarize and calculate the following information. The exhibits:

- Calculate the amounts EA LLP and defendant owed to each victim-client at the time of the settlements by subtracting the attorneys' fees due to EA LLP under the attorney-client

---

[1] The government produced an initial draft of the summary charts on March 1, 2020, and produced updated drafts of the summary charts on May 26, 2020. The government has not attached the initial drafts to this opposition, but can provide them to the Court if necessary.

2

fee contracts, as well any costs and expenses owed to the firm,[2] from the total settlement amounts. (Def. Ex. A at 1-5.)

- Summarize voluminous financial records reflecting what happened to the settlement funds EA LLP and defendant received on behalf of the victim-clients and whether any portions of the settlement payments were actually paid to the victim-clients. (Id. at 1-5.)

- Summarize voluminous financial records demonstrating that the lulling payments made to the victim-clients were derived from other sources, including from money defendant had embezzled from other clients or taken from his other business. (Id. at 2-5.)

- Calculate how much money defendant's various businesses received during the relevant time periods. (Id. at 5-10.)

- Summarize voluminous financial records showing how defendant moved money among his personal accounts and his various businesses. (Id. at 5-10.)

- Calculate how much money defendant transferred from his various businesses to personal bank accounts and/or used for personal expenses. (Id. at 10-11.)

In other words, these summary exhibits show, in condensed fashion, the numbers underlying defendant's fraud.

---

[2] Mr. Drum relied on EA LLP's QuickBooks accounting records, other internal EA LLP documents (see, e.g., CR 195-1, Exs. 3-7), and bank records to calculate the costs and fees owed to EA LLP for each victim-client. Mr. Drum does not offer any opinion as to whether the costs and fees were appropriate.

1    The government is entitled to use "a summary, chart, or

2    calculation to prove the content of voluminous writings . . . that

3    cannot be conveniently examined in court." Fed. R. Evid. 1006.  The

4    rule "allow[s] the use of summaries when the documents are unmanage-

5    able or when the summaries would be useful to the judge and jury."

6    United States v. Rizk, 660 F.3d 1125, 1130 (9th Cir. 2011).  The

7    Ninth Circuit has emphasized the importance of such summary evidence,

8    as it "can help the jury organize and evaluate evidence which is

9    factually complex and fragmentally revealed in the testimony of the

10   multitude of witnesses." United States v. Shirley, 884 F.2d 1130,

11   1133 (9th Cir. 1989).  The two requirements for summary exhibits are

12   that the underlying documents be admissible and be made available to

13   the opposing party. Rizk, 660 F.3d at 1130.  Both requirements are

14   satisfied here.  (See Gov't Ex. 1 (summary charts produced to

15   defendant, citing underlying documents by Bates number).)  To the

16   extent defendant may later wish to contest the substantive accuracy

17   of the information in the summary exhibits — given that the exhibits

18   document, in summary form, defendant's embezzlement of millions of

19   dollars from his clients — any such objection would "go to the weight

20   and not the admissibility of the evidence." Id. at 1131 & n.2.

21   Defendant does not squarely object to any of these summary

22   exhibits.  His motion addresses only Mr. Drum's proposed opinion

23   testimony.  (And so, even if this Court were to grant defendant's

24   motion to preclude Mr. Drum from testifying as an expert, it would

25   affect very little of his proposed testimony.)  But to the extent

26   defendant offhandedly complains that Mr. Drum's summary exhibits will

27   be "boring to the jury" (Mot. 6), because even they are somewhat

28   voluminous — in light of the breadth and scope of defendant's fraud —

4

his complaint makes up in chutzpah what it lacks in legal merit. <u>See</u>
<u>Embury v. King</u>, 361 F.3d 562, 566 n.22 (9th Cir. 2004) ("<u>Chutzpa</u> is
that quality enshrined in a man who, having killed his mother and
father, throws himself on the mercy of the court because he is
an orphan."). Rule 403 contains no exclusion for juror boredom, only
"wasting time," and in any event hearing direct evidence of fraud in
a financial-fraud case is the reason for being there, not a waste of
time. Presenting these complex financial records in summary form
under Rule 1006 will certainly be less boring to the jurors than
forcing them to review every underlying financial document used in
defendant's fraud and perform all the calculations themselves. <u>See</u>
<u>Rizk</u>, 660 F.3d at 1130.

That leaves in dispute only Mr. Drum's opinions, rather than his
calculations. In his motion, defendant identifies just one such type
of opinion: a conclusion as to the amount of funds defendant diverted
towards his own personal expenses. (Mot. 5.) Even that is not
clearly expert testimony. "An opinion on what expenses are likely
personal requires such a limited amount of expertise to be deemed lay
witness opinion." <u>United States v. Ataba</u>, 805 Fed. App'x 491, 494
(9th Cir. 2020) (unpub.) (citing <u>United States v. Figueroa-Lopez</u>, 125
F.3d 1241, 1245 (9th Cir. 1997)). In any event, the assumptions
behind the conclusion are spelled out in the draft summary charts Mr.
Drum prepared. (<u>See</u> Gov't Ex. 1 at USAO_EX_000193-196 (listing
expenses assumed to be personal for purposes of the expense
calculations, such as funds spent by Global Baristas on Porsche

Motorsport and Victoria's Secret).)[3] Defendant is of course free to question or challenge any of these assumptions on cross-examination; ultimately, it will be the jury's prerogative to decide whether an expense was personal or business-related.

There is no basis for defendant's concerns about ultimate-issue testimony, the Confrontation Clause, or use of hearsay. (Mot. 5-6.) Mr. Drum will not opine on any witness's credibility (<u>contra</u> Mot. 5 (citing <u>United States v. Hill</u>, 749 F.3d 1250, 1258 (10th Cir. 2014)), or "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b); <u>cf.</u> Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). Mr. Drum will not relay to the jury any out-of-court testimonial statements for the truth of what they assert. <u>United States v. Audette</u>, 923 F.3d 1227, 1238 (9th Cir. 2019). And to the extent Mr. Drum's expected testimony relies on hearsay at all, it is entirely foundational; he reviewed a small number of witness-interview summaries in order to confirm basic facts, such as who the witnesses are and their relations to defendant. Specifically, Mr. Drum reviewed interview summaries for some of the victim-clients identified in the Indictment, for defendant's first ex-wife, and for

---

[3] Mr. Drum assumed that the following four categories of payments from defendant's companies constituted personal income: (1) payments to entities or individuals that had already been categorized as personal expenses in EA LLP's QuickBooks accounting records; (2) payments for which there were other documents demonstrating the expenses were of a personal nature (<u>e.g.</u>, payments relating to remodeling defendant's home); (3) payments for which there was unlikely to be any legitimate business purpose (<u>e.g.</u>, defendant's rent and payments to Neiman Marcus or Porsche); and (4) direct transfers to defendant's first ex-wife, his girlfriend at the time, or other family members.

6

defendant's girlfriend.[4]  For the most part, Mr. Drum will not need to relay any of that information to the jury, since the jury will hear the victim-clients' testimony themselves.[5]  Indeed, if he testifies after the victim-clients and is able to watch their testimony, these background facts will not be hearsay at all.  To the extent Mr. Drum's testimony is informed by his review of defendant's ex-wife's and ex-girlfriend's witness statements to obtain basic background information (e.g., a payment by defendant may be more or less likely to be a personal expense based on defendant's relation-ship to the person being paid), that type of foundational background information is "reasonably rel[ied] on" by financial analysts when performing financial analyses.  Fed. R. Evid. 703.

Finally, there is no merit to defendant's complaints that Mr. Drum is unqualified to perform "financial analysis of companies or law firms," or that his "methodology . . . is unclear."  (Mot. 4.) As noted, the vast majority of Mr. Drum's expected testimony is basic arithmetic, primarily adding and subtracting financial data, and summarizing voluminous financial transactions, which under Rule 1004 does not require him to be an expert at all.  Mr. Drum is not going to opine on the fair market value of property, determine profit-ability, or interpolate, extrapolate, or estimate.  See Fed. R. Evid. 702, committee notes (2000 amend.) (noting "property valuation" as an example of "non-scientific" expert opinion testimony).  He will

---

[4] Each of the witness statements Mr. Drum reviewed are referenced by Bates-number in the draft summary charts the government produced.  (See, e.g., Gov't Ex. 1 at USAO_EX_000193-94.)

[5] All of the victim-clients are scheduled to testify at trial, whereas defendant's first ex-wife and ex-girlfriend are unlikely to do so.

testify about his calculations of incoming and outgoing transfers and payments among various people and entities.  Mr. Drum is a certified public accountant,[6] and his résumé makes clear that he is qualified to perform financial arithmetic and analysis.[7]  To the extent there are specific opinions whose bases defendant wishes to probe, defendant will be able to do so at trial.

**B.    Professor Kevin Mohr's Expert Testimony**

The government intends to call Professor Kevin Mohr to testify regarding the legal duties, ethical rules, and professional-responsibility requirements of lawyers admitted to the State Bar of California.  (See Def. Ex. A at 13.)  Defendant's argument that Professor Mohr's testimony is unnecessary and would not be helpful to the jury (Mot. 6) is meritless.

As a threshold matter, defendant does not dispute that Professor Mohr is qualified to provide expert testimony regarding the ethical duties and requirements that applied to attorneys in California, such as defendant.  Nor can he.  Professor Mohr has taught legal ethics for nearly 30 years and, among other things, has served on the State Bar of California's Special Commission on the Revision of the Rules of Professional Conduct since April 2017.

Defendant also does not challenge the substance of Professor Mohr's testimony under Rule 702(b), (c), or (d).  In other words, defendant concedes that Mohr's proposed testimony accurately reflects

---

[6] Mr. Drum is licensed as a certified public accountant in Illinois.

[7] Among other things, Mr. Drum has previously worked as an analyst on a confidential Ponzi-scheme case that required him to analyze and follow the flow of funds and determine when certain transactions took place.

the ethical responsibilities and requirements that applied to defendant during the relevant time period.

Defendant's only actual objection to Professor Mohr's proposed testimony is that such testimony is irrelevant and unnecessary. Defendant is incorrect. Among other things, defendant's own past statements demonstrate that the proposed expert testimony is both relevant and necessary. Professor Mohr's testimony will be critical in helping the jury "understand the evidence" or "determine a fact in issue." Fed. R. Evid. 702(a).

Defendant is charged with engaging in a scheme to defraud his legal clients. (Indictment ¶¶ 6-7.) As part of the fraudulent scheme, defendant would instruct the settling party to transfer or deposit the victim-client's funds to one of defendant's attorney-client trust accounts. (Id. ¶ 7(a)-(e).) Defendant would then misappropriate and embezzle his victim-client's portion of the settlement payment from the attorney-client trust account and use it for defendant's own purposes. (Id.) Defendant would also conceal from his client that the funds had been received and/or lie to them about the disposition of the funds. (Id.)

Professor Mohr's "specialized knowledge will help the trier of fact to understand the evidence" and assist in evaluating defendant's conduct. Fed. R. Evid. 702(a). Although the government agrees that the average juror will understand that a lawyer cannot steal his client's money, the average juror cannot be expected to understand the various California Rules of Professional Conduct or other ethical rules that apply to a lawyers' conduct, particularly with respect to the receipt and disbursement of client settlement funds. For example, the average juror will not know what an attorney-client

trust account is or how they are supposed to be maintained under the California Rules of Professional Conduct.  Similarly, an average juror will not know that a lawyer is required to provide his client with an accounting of any funds received or obtain his client's authorization before distributing or withdrawing any funds he received on behalf of a client from the attorney-client trust account.  Defendant was not operating in a vacuum when he received client funds — he knew he was required to follow very specific rules.  The jury should understand what those rules were and how they are applied.

Professor Mohr's testimony will also assist the jury in determining facts at issue.  Among other things, the government must prove that defendant acted with the intent to defraud.  Ninth Cir. Model Crim. Jury Instr. 8.124 (Apr. 2019).  The government intends to argue that defendant's failure to comply with the applicable California Rules of Professional Conduct and other ethical duties is further evidence that defendant acted with an intent to defraud.[8] However, the government must first explain to the jury what ethical and professional responsibility rules applied at the time.

Additionally, the government has alleged that defendant's fraudulent scheme involved the concealment or omission of material facts.  (Indictment ¶ 6.)  To convict defendant on an "omissions theory of fraud," the jury must find that defendant had a "duty to disclose" the omitted facts arising out of a "relationship of trust." United States v. Shields, 844 F.3d 819, 822-23 (9th Cir. 2016).

---

[8]  Professor Mohr will not be offering any opinions as to defendant's intent or state of mind; he will merely be testifying to facts which the government can then use to argue that defendant acted with the intent to defraud.

Professor Mohr's testimony regarding defendant's ethical duties as a lawyer is directly relevant to this alternative theory of liability.

Moreover, the government expects that defendant will argue at trial, as he has done in other proceedings, that defendant had a good faith belief he was entitled to the money he took from his victim-clients and that defendant complied with all of the relevant ethical rules in doing so. For example, in the State Bar proceedings relating to defendant's embezzlement of Client 3's settlement funds, defendant claimed that he was entitled to the entirety of Client 3's settlement payment and had properly distributed the settlement funds. (Gov't Ex. 3.) Similarly, during the March 22, 2019, judgment-debtor examination in In re Eagan Avenatti, LLP, No. 8:18-CV-1644-VAP (KES) defendant testified that all transfers of Client 3's settlement funds "were legitimate, ethical, and legal under California law at all times." (See CR 283, Ex. 1 at 31-32.) Given the strong likelihood that defendant will claim he was entitled to take his clients' money without their authorization or consent, the government must be allowed to present evidence that such conduct would be a direct violation of the applicable California Rules of Professional Conduct. In other words, defendant should not be allowed to argue that he complied with the applicable ethical rules, while simultaneously preventing the jury from understanding those rules.

Finally, defendant's claim that Professor Mohr's testimony will be a "waste of time" (Mot. 6) rings hollow. Professor Mohr's testimony is expected to be short and straight-forward. The government had offered to enter into an appropriate trial stipulation or agree to a joint proposed jury instruction describing the various legal duties, ethical rules, and professional responsibility

11

1   requirements that applied to defendant.  (Def. Ex. A at 16.)

2   Defendant never responded to the offer.  That is why this testimony

3   is necessary.

4       **C.   Tracy Kaas's Expert Testimony**

5       The government intends to call Traci Kaas to testify regarding

6   special-needs trusts and structured settlements in connection with

7   the wire fraud charges involving Client 1.  (Def. Ex. A at 16-18.)

8   There is no basis to exclude Ms. Kaas's testimony.

9       Defendant does not challenge Ms. Kaas's qualifications as an

10  expert.  (Mot. 7-8.)  Nor does defendant challenge the substance of

11  Ms. Kaas's proposed testimony.  (Id.)  Instead, defendant claims that

12  Ms. Kaas's testimony should be excluded because of a conflict of

13  interest.  (Mot. 7.)  That claim is meritless.

14      No conflict exists.  Ms. Kaas had no prior involvement in this

15  case, never worked on any matters relating to this case, and has

16  never worked for defendant or EA LLP.  Rather, the sole basis for

17  defendant's conflict claim is that Ms. Kaas has previously worked

18  with: (a) P.M. from McNicholas & McNicholas LLP, who served as co-

19  counsel during EA LLP's representation of Client 1; and (b) Callahan

20  & Blaine, which is the law firm currently representing Client 1 in

21  separate civil litigation.  These past relationships do not give rise

22  to any actual or potential conflict.  Indeed, given that Ms. Kaas is

23  one of the leading experts regarding special-needs trusts and

24  structured settlements in this District, it is not surprising that

25  Ms. Kaas would have previously worked with two well-known plaintiffs'

26  law firms.  At most, defendant has basis to briefly cross-examine Ms.

27  Kaas regarding her prior professional relationship with the two law

28  firms and any potential bias.

1   Defendant's citation to <u>Sells v. Wamser</u>, 158 F.R.D. 390, 393

2   (S.D. Ohio 1994), does not support defendant's position.  In <u>Sells</u>,

3   the plaintiff and defendant hired the same engineering firm to

4   conduct an accident reconstruction and provide expert testimony in a

5   civil wrongful-death case.  <u>Id.</u>  The court obviously held that this

6   constituted a direct conflict and that the same firm could not serve

7   as an expert for both parties.  <u>Id.</u>  The court allowed the

8   engineering firm to remain as the plaintiff's expert because the

9   plaintiff had retained the firm first, but held that defendant would

10  need to retain a new expert.[9]  <u>Id.</u>  This factual scenario is not

11  remotely applicable to this case, because Ms. Kaas has never been

12  retained by anyone else to work on this matter or any related matter.

13      Next, defendant claims that the need for Ms. Kaas to provide

14  expert testimony is "minimal due to the subject's lack of materiality

15  in this case." (Mot. 7-8.)  Defendant is wrong.  Defendant's false

16  and fraudulent statements regarding a special-needs trust for

17  Client 1 lie at the core of the wire-fraud charges relating to Client

18  1.  As alleged in the Indictment, for <u>over four years</u>, defendant

19  lulled Client 1 and concealed his theft of Client 1's settlement

20  funds by falsely claiming that Client 1 could not be paid his

21  settlement funds because the County of Los Angeles had not yet

22  approved a special-needs trust for Client 1.  (Indictment ¶¶ 7(g)-

23  (l).)  The evidence at trial will prove that defendant never took any

24  of the necessary steps to setup a special-needs trust for his client,

25  which provides strong circumstantial evidence of defendant's

26

27      [9] In <u>Sells</u>, the court provided defendant with time to obtain a
    new expert.  <u>Id.</u> at 394-95.  To the extent the Court is inclined to
28  disqualify Ms. Kaas, the government requests a reasonable opportunity
    to retain and designate a new expert.

fraudulent intent.  It is therefore critical for the jury to understand what a special-needs trust is and what steps must be taken to establish one.

The specific details and "technical components" of special-needs trusts will likewise be helpful to the jury.  For example, Ms. Kaas is expected to testify that any settlement payments that are to be used to fund a special needs trust should be transferred into the trust <u>immediately after</u> the beneficiary's attorney receives the funds.  (Def. Ex. A at 17.)  These "funding details" further prove that defendant lied about setting up a special-needs trust for Client 1, and will refute defendant's anticipated claim that he merely intended to setup a special-needs trust at a later date.

Moreover, during his March 22, 2019, judgment-debtor examination in <u>In re Eagan Avenatti, LLP</u>, No. 8:18-CV-1644-VAP (KES) (C.D. Cal.), defendant repeatedly referenced "structure documents" and falsely claimed there may have been "structured settlement" in connection with Client 1's case against the County of Los Angeles.  (284-1, Ex. 8 at 238.)  The government has every reason to believe that defendant will continue to make such claims at trial.  As a structured settlement is different than a special-needs trust, it is also necessary for the jury to understand how structured settlements work.

In sum, defendant stole Client 1's money, then spent four years lying to Client 1 about a special-needs trust in order to lull Client 1 and conceal the theft.  Now, defendant wants to prevent the jury from learning the full scope and nature of defendant's lies by preventing the jury from understanding what a special-needs trusts is and how they actually work.

Finally, defendant incorrectly claims that Ms. Kaas's testimony will be a "waste of time." Ms. Kaas's testimony is expected to be short and straight-forward. And, just as with Professor Mohr, defendant has not even responded to the government's offer to enter into an appropriate trial stipulation.[10]

### D.   A **Daubert** Hearing Is Unnecessary

The Ninth Circuit has long held that trial courts are not required to hold separate pretrial Daubert hearings. United States v. Alatorre, 222 F.3d 1098, 1102 (9th Cir. 2000) (interpreting Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)); see also United States v. Jawara, 4747 F.3d 566, 582-83 (9th Cir. 2007) (holding district court is not required to hold a separate Daubert hearing). For example, the Ninth Circuit has held that the district court was not required to hold an evidentiary hearing when, as is the case here, it "was presented with no evidence calling into question the evidentiary reliability" of the proposed expert testimony. United States v. Calderon-Segura, 512 F.3d 1104, 1110 (9th Cir. 2008). Similarly, the district court is not required to "to conduct a pre-trial evidentiary hearing if the expert testimony is based on well-established principles." United States v. Cooper, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (citing United States v. Nichols, 169 F.3d 1255, 1263 (10th Cir. 1999)). Rather, the Court has broad discretion and flexibility in determining how best to assess the relevance and reliability of expert testimony. Alatorre, 222 F.3d at 1103.

---

[10] The government is considering calling a fact witness to testify regarding certain discussions with defendant who may also be able to address some of the topics Ms. Kaas is expected to cover during her testimony. Such testimony could eliminate the need for the government to call Ms. Kaas at trial.

15

As noted above, the primary methodology used by Mr. Drum is arithmetic, which is neither new nor novel. And defendant does not challenge the qualifications, reliability, or methodology used by Professor Mohr and Ms. Kaas. Thus, any concerns regarding the three experts' opinions (which defendant does not identify) or the reliability of their methods (which defendant does not meaningfully challenge) can and should be addressed on the papers and, if necessary, with a limited voir dire at trial. Accordingly, defendant's request for a <u>Daubert</u> hearing should be denied.

**IV.  CONCLUSION**

For the reasons set forth above, defendant's motion <u>in limine</u> to exclude expert and opinion testimony should be denied.

# EXHIBIT 1

**[Filed Separately Under Seal]**

EXHIBIT 2



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*Julian L. André*
*Phone: (213) 894-6683*
*E-mail: Julian.L.Andre@usdoj.gov*

*1100 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California 90012*

May 26, 2020

**<u>VIA EMAIL</u>**

H. Dean Steward, Esq.
107 Avenida Miramar, Suite C
San Clemente, California 92672
deansteward7777@gmail.com

    Re: <u>United States v. Avenatti</u>,
       SA CR No. 19-61-JVS

Dear Counsel:

On March 1, 2020, the government provided your client, defendant MICHAEL JOHN
AVENATTI ("defendant"), with notice of its intent to call a number of witnesses to testify under
Federal Rules of Evidence 702, 703, and 705. Pursuant to Federal Rule of Criminal Procedure
16(a)(1)(G), your May 15, 2019, request for discovery, and the Court's March 26, 2020, Order,
the government writes to supplement its March 2020 expert disclosure notice as it relates to the
anticipated testimony of John Drum.

In addition to the topics previously identified in the government's March 2020 expert disclosure
notice, Mr. Drum is expected to testify regarding the following:

<u>Financial Statements Defendant Provided to The Peoples Bank</u>

- Mr. Drum has reviewed Profit & Loss Statements and Balance Sheets relating to Eagan
  Avenatti LLP ("EA LLP") and Global Baristas US LLC ("GBUS") that EA LLP and
  GBUS employees emailed to defendant in March 2014 and November 2014. <u>See</u>
  USAO_00681947-49; USAO_00681950-54; USAO_00321776-77; USAO_00524732-
  33; USAO_00525262-63.

- Mr. Drum compared the Profit & Loss Statements and Balance Sheets defendant received
  in March 2014 and November 2014 to the Profit & Loss Statements and Balance Sheets
  defendant subsequently provided to The Peoples Bank in connection with various loan
  applications for EA LLP and Global Baristas, LLC ("GB LLC"). <u>See</u> USAO_00091662-
  68; USAO_00091599-607; USAO_00091613-16.

- Based on Mr. Drum's training and experience and analysis of these records, Mr. Drum
  has determined that the original Profit & Loss Statements and Balance Sheets provided to
  defendant were modified prior to being submitted to The Peoples Bank with the effect of

H. Dean Steward, Esq.
RE:  United States v. Avenatti
May 26, 2020
Page 2

making it appear as if EA LLP and GB LLC were in stronger financial positions.  Among other things, the financial statements defendant ultimately provided to The Peoples Bank reflect additional revenues or other assets, and reduced expenses or liabilities.

November 2015 Sale of Defendant's Laguna Beach Residence

- Based on his review and analysis of various financial records and other business records, Mr. Drum is expected to testify regarding defendant's use and disposition of the approximately $4,553,889 in sale proceeds defendant obtained from the November 2015 sale of defendant's home in Laguna Beach.  See USAO_EX_000190.

Defendant's Personal Finances

- Since the March 2020 expert disclosure, Mr. Drum has identified additional payments made from bank accounts associated with EA LLP, Avenatti & Associates, APC ("A&A"), GBUS, and GB LLC that constitute personal spending by defendant. Accordingly, Mr. Drum has updated the income calculations contained in the March 2020 expert disclosure notice to reflect these additional personal expense payments.  Mr. Drum's updated calculations are reflected in the updated summary charts enclosed herewith.  See USAO_EX_000102-196.

As we noted in our March 2020 expert disclosure notice, during Mr. Drum's testimony, the government intends to introduce into evidence charts and summaries of voluminous business and financial records under Federal Rule of Evidence 1006.  As a courtesy and to assist in your preparation for trial, we have enclosed updated working drafts of the summary charts the government intends to use during Mr. Drum's testimony.  USAO_EX_000102-196.  These summary charts have not yet been finalized and are likely to change as the government continues to prepare for trial.  Accordingly, the government would object to you attempting to use any of these summary charts at trial unless and until they are finalized, including during the cross-examination of Mr. Drum.

Additionally, please note that the government anticipates that Mr. Drum will continue to review the relevant financial records and other documents in preparation for trial.  Should Mr. Drum determine prior to trial that it is necessary to adjust any of the calculations referenced above or in the enclosed summary charts, we will advise you of those adjustments and provide updated calculations.  Moreover, please note that Mr. Drum's calculations are based on the information currently known to the government and to Mr. Drum.  Thus, these calculations could also change if the government obtains additional information regarding defendant's finances or any of the specific transactions identified above.

* * *

The government also renews its request, pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), that defendant provide a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705, including the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

H. Dean Steward, Esq.
RE:  <u>United States v. Avenatti</u>
May 26, 2020
Page 3


Please let us know if you have any questions regarding the above information or believe this notice is insufficient.


Very truly yours,


JULIAN L. ANDRÉ
BRETT A. SAGEL
Assistant United States Attorneys


Enclosures

# EXHIBIT 3

1  Ellen A. Pansky (SBN 77688)
   Art Barsegyan (SBN 279064)
2  **PANSKY MARKLE ATTORNEYS AT LAW**
   1010 Sycamore Ave., Suite 308
3  South Pasadena, CA. 91030
   Telephone: (213) 626-7300
4  Facsimile: (213) 626-7330

5

6  Attorneys for Respondent
   Michael Avenatti, Esq.

7

**FILED**

JUN 20 2019

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

8                 BEFORE THE STATE BAR COURT

9                   OF THE STATE OF CALIFORNIA

10               HEARING DEPARTMENT – LOS ANGELES

11

12  In the Matter of                    )   Case Nos. SBC 19-TE-30259
                                        )
13      MICHAEL JOHN AVENATTI.          )   **RESPONDENT'S OPPOSITION TO**
                                        )   **APPLICATION FOR INVOLUNTARY**
14                                      )   **INACTIVE ENROLLMENT;**
                                        )   **DECLARATION OF MICHAEL**
15  Member No. 206929,                  )   **AVENATTI**
                                        )
16  A Member of the State Bar.          )   [Rules of Procedure, rule 5.225 *et seq*; Bus. &
                                        )   Prof. Code § 6007(c)(2)]
17                                      )
                                        )   Status Conf: June 24, 2019 at 10:30 a.m.
18                                      )
                                        )
19  _____ )

20

21

22

23

24

25

26

27

28

1    Respondent Michael Avenatti, by and through his counsel, Pansky Markle Attorneys at Law,

2    opposes the State Bar's Corrected Application for Involuntary Inactive Enrollment ("Application")

3    pursuant to Business and Professions Code, section 6007(c)(2) and Rules of Professional Conduct, rule

4    5.225 *et seq.*, filed June 5, 2019, because the State Bar has failed to demonstrate that Respondent

5    poses a substantial threat of harm to his clients or the public.

6

7    I.    INTRODUCTION

8

9    The Application is based on assertions of misappropriation of client funds, misrepresentation to

10   a client, and failure to account in a single client matter, in addition to the fact that criminal charges are

11   pending against Respondent for matters involving allegations of extortion and embezzlement.

12   *Importantly, **none** of the allegations made by Gregory Barela,[1] the complainant in the State Bar's*

13   *disciplinary proceeding, or the allegations in the pending criminal proceedings, has been proven to be*

14   *true.*

15   Due to the pending criminal proceedings referenced in the State Bar's Application,

16   Respondent's files, records, computers, mobile devices and electronic data were seized by law

17   enforcement. Despite multiple requests for access, Respondent has not been permitted access to his

18   files and records sufficient to presently permit him to respond with particularity to most of the State

19   Bar's factual allegations. Thus, Respondent's herein responses to the allegations in the Application

20   are based on limited current recollection and will be augmented once he is permitted access to his

21   relevant files and records, including text messages, e-mails, client accounting documents, etc.

22   Respondent admits that he represented Barela commencing in July 2014, in an intellectual

23   property case (the "IP Matter"), which settled after years of litigation with Barela's written approval

24   for $1.9 million. Respondent also represented Mr. Barela in other matters, which required significant

25   legal services during the years 2016 to 2019. Respondent further asserts that he properly distributed

26   the settlement proceeds in the IP Matter. Respondent denies that he misappropriated client funds; the

27

28   _____
     [1] The evidence will show that Mr. Barela's credibility is severely lacking, and that he has a lengthy negative history of
     fabrication of false "facts."

RESPONDENT'S OPPOSITION TO APPLICATION FOR INVOLUNTARY INACTIVE ENROLLMENT

amount of funds he received in connection with representing Barela constituted earned fees and costs for legal services provided to Barela for services provided in connection with the IP Matter and other legal services provided to Barela. Respondent further denies that he made material misrepresentations to Barela or that he failed to account to Barela.

The factual allegations on which the State Bar relies in support of its Application are inaccurate and/or woefully incomplete. The evidence is not clear and convincing that Respondent engaged in intentional misappropriation or that he caused or continues to cause substantial harm to clients or the public.

Regardless of Respondent's notoriety, there is nothing significantly unusual about this case that differentiates it from other disciplinary matters in which the State Bar alleges misappropriation of client funds. Respondent does not pose a threat to clients or the public. The Application for Respondent to be involuntarily enrolled inactive is not warranted.

II.   ARGUMENT

The State Bar has failed to demonstrated by clear and convincing evidence that Respondent poses a substantial harm to clients or the public, and should not be placed on involuntary inactive enrollment pursuant to Business and Professions Code § 6007(c)(2).

As the evidence to be presented will show, although the State Bar *may* be able to prove some level of minor misconduct, it is not reasonably likely to prevail on its allegations of substantial dishonest misappropriation of client funds warranting disbarment. In its Application, the State Bar cites to disciplinary authorities of *Palomo v. State Bar* (1984) 36 Cal.3d 785, and *Giovanazzi v. State Bar* (1980) 28 Cal.3d 465, for the proposition that misappropriation may be found merely by the fact that the balance of an attorney's client trust account falls below the requisite amounts to be held. However, for purposes of placing an attorney on involuntary inactive status before a formal disciplinary proceeding has been initiated against the attorney, being able to prove misappropriation alone is not enough. Indeed, the misappropriation cases relied upon by the State Bar for the proposition that a drop in the CTA balance constitutes misappropriation, did not involve

2

1    misappropriation of client funds that justified disbarment. In *Giovanazzi*, the respondent was actually

2    suspended for only 30 days for unintentional misappropriation when the respondent's client trust

3    account balance fell below the requisite amount. And, in *Palomo*, the respondent received a one-year

4    stayed suspension for having endorsed a client's check without consent, deposited the funds in the

5    payroll account, and misappropriated and commingled the funds.

6          Other disciplinary case law shows that an attorney can be culpable for misappropriation

7    involving large sums of money or multiple matters and not be disbarred: See, *In the Matter of Malek-*

8    *Yonan* (Review Dept. 2003) 4 Cal. State Bar. Ct. Rptr. 627, 640 (attorney received eighteen months

9    actual suspension for gross negligent supervision of her office staff, resulting in the misappropriation

10   $1.7 million); *In the Matter of Jones* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 411 (attorney was

11   suspended for two years actual for allowing employee to handle all aspects of his law practice,

12   resulting in misappropriation of $60,000 of withheld client settlements); *In the Matter of Hagen*

13   (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 153 (respondent, with a prior record of discipline,

14   misappropriated client funds in two matters, and failed to pay client funds promptly upon demand,

15   failed to retain a disputed fee in trust, failed to advise a client to retain independent counsel and

16   engaged in an unfair and unreasonable transaction with a client, was actually suspended from the

17   practice for one year); *In the Matter of Robins* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 708

18   (respondent received one-year actual suspension after being found culpable in six counts of

19   misappropriation totaling more than $20,000). While the State Bar is seeking Respondent's

20   involuntary enrollment to inactive status and not his disbarment, if the underlying misconduct will

21   likely not result in disbarment or discipline beyond two years of actual suspension, then Respondent's

22   misconduct is not serious and harmful enough to warrant involuntary inactive enrollment, and his

23   ability to remain on active status pending resolution of the disciplinary proceeding is not a substantial

24   risk to clients or the public.

25         The evidence will show that Respondent was entitled to, or at least believed in good faith that

26   he was entitled to, the funds he received from the Barela settlement proceeds, as attorney's fees for

27   legal services provided to Barela and/or costs. Further, even when a respondent is mistaken in the

28   amount of fees and costs he or she was entitled to receive, an attorney does not engage in moral

turpitude when the attorney disburses client funds due to an honest, but mistaken belief that he or she

was entitled to the funds. See, *Dudugian v. State Bar* (1991) 52 Cal. 3d 1092, 1097 [where attorneys

retained client settlement funds in their own account and refused to pay them to clients, in the

mistaken belief that the clients had given them permission to retain the funds in partial payment of

their fee, the court held that actual suspension was too severe and that public reproval was proper even

though not consistent with the Standards.] In rejecting imposition of actual suspension as excessive,

the court in *Dudugian* stated: "Most significant, petitioners honestly believed that the Collinses had

given them permission to retain the settlement funds." *Id.* at 1100.

See also, *In the Matter of Klein* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 1, 9-11 [an

honestly held belief in the justifiability of one's actions, even if objectively unreasonable, precludes a

finding of moral turpitude and a violation of section 6106]. In *Klein*, an attorney and former client

were in a fee dispute when entrusted funds held by the attorney were awarded to the former client's

ex-husband pursuant to a settlement agreement. The agreement provided that the husband would pay

the wife a sizeable sum. The attorney viewed the agreement as a ploy to frustrate his ability to collect

fees and relied on this belief to justify paying himself from the funds held in trust. Relying on

*Sternlieb v. State Bar* (1990) 52 Cal.3d 317, 321-332, the court found the attorney unreasonably

withdrew fees, but was not culpable of moral turpitude based on the honest belief that the fees were

earned.

The State Bar argues that Barela was significantly harmed because the alleged misappropriation

deprived him of use of the funds. However, even if Respondent's taking of the funds constituted

misappropriation of client funds (which it did not), it would not amount to significant harm where the

funds taken were to compensate Respondent for other legal services provided to Barela. See *Brockway*

*v. State Bar of California* (1991) 53 Cal. 3d 51 ["No harm resulted to his clients, in that the property

misappropriated in both client matters roughly compensated him for his services[.]"]

Moreover, even though criminal charges are pending against Respondent, that alone is not a

considerable factor for the purpose of this matter, because no finding has been made and no evidence

has been offered in the criminal cases, and it is possible that the criminal charges against Respondent

may be dismissed. See *In the Matter of Mesce* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 658,

661-662 [While testimony offered under oath in a criminal proceeding and supported by a judge's findings of fact regarding a respondent's criminal conduct can demonstrate reasonable probability that the State Bar will prevail on the merits of the underlying disciplinary proceeding, **it is inappropriate in involuntary inactive enrollment proceedings for the judge to draw any inference from pending criminal charges in and of themselves**.] (Emphasis added.) Thus, the State Bar cannot rely on the pending criminal charges as circumstantial evidence that Respondent continues to cause significant harm to the public and its invitation for the Court to rely on this alleged "evidence" is patently improper. Indeed, the State Bar must have known this before making the argument in its Application, considering that the *Mesce* case is cited in the Application for evidentiary issues.

III.     REQUEST FOR HEARING AND REQUEST FOR CROSS-EXAMINATION

Respondent requests a hearing in this matter pursuant to rule 5.229 of the Rules of Procedure. Respondent further requests the opportunity to cross-examine complaining witness Gregory Barela, which may be allowed upon showing of good cause (Rule 5.230(A), Rules of Proc.). Good cause to permit cross-examination of Mr. Barela exists because the State Bar's Application is primarily based on the untested allegations made by Mr. Barela, as provided in Mr. Barela's declaration, most of which Respondent vehemently denies. There are significant credibility issues relating to Mr. Barela that can only be resolved through the requested hearing and subjection to cross-examination by Respondent's counsel. Considering that the State Bar's Application seeks to place Respondent on involuntary inactive status and prohibit him from practicing law before formal disciplinary charges are filed, the benefit for Respondent to cross-examine Mr. Barela outweighs any burden or expense on Mr. Barela, who, according to his declaration in support of the State Bar's Application, resides in Irvine, California.[2]

//

//

//

//

---

[2] It is anticipated that Respondent may seek to have two to three other witnesses testify at the hearing in support of his defense. Counsel will be prepared to discuss this issue at the status conference.

5

IV.    CONCLUSION

The State Bar has failed to prove by clear and convincing evidence that sufficient grounds exist to transfer Respondent to involuntarily inactive status in order to safeguard clients and the public from an ongoing or like future harm.  There is no pattern of misconduct; the only arguable basis for the requested order involves only allegations of misconduct in a single client matter, in which Respondent acted in good faith and in which the allegations involve a fee dispute.  For the foregoing reasons, the State Bar's Application for Involuntary Inactive Enrollment should be dismissed and this case should proceed in normal and customary fashion as a regular disciplinary proceeding.

Dated:  June 19, 2019                          PANSKY MARKLE
                                               ATTORNEYS AT LAW


                                        By: _____
                                               Ellen A. Pansky
                                               Attorneys for Respondent
                                               Michael Avenatti

**VERIFICATION**

I, Michael Avenatti., declare:

I am the respondent in this matter. I have read the foregoing Respondent's Opposition to Application for Involuntary Inactive Enrollment and know its contents. The matters stated in the foregoing document are true of my own knowledge except as those matters which are stated on information and belief, and as to those matters I believe to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 19 day of June, at Los Angeles, California.

_____

Michael Avenatti

RESPONDENT'S OPPOSITION TO APPLICATION FOR INVOLUNTARY INACTIVE ENROLLMENT

## PROOF OF SERVICE

*In the Matter of Michael John Avenatti*

I declare that I am over the age of eighteen (18) and not a party to this action. My business address is 1010 Sycamore Ave., Suite 308, South Pasadena, California 91030.

On June 19, 2019, I served the foregoing document(s) described as:

**RESPONDENT'S OPPOSITION TO APPLICATION FOR INVOLUNTARY INACTIVE ENROLLMENT; DECLARATION OF MICHAEL AVENATTI**

on all interested parties in this action by placing a true copy of each document, enclosed in a sealed envelope addressed as follows:

Eli Morgenstern, Senior Trial Counsel
Office of the Chief Trial Counsel
    Enforcement
The State Bar of California
845 Figueroa Street
Los Angeles, CA 90017

( X ) **BY MAIL:** as follows: I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Service. I know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at South Pasadena, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed June 19, 2019 at South Pasadena, California.

_____
Valerie Markle