M11Wave1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          19 Cr. 374 (JMF)

 5   MICHAEL AVENATTI,

 6             Defendant.
                                           Trial
 7   ------------------------------x

 8                                         New York, N.Y.
                                           January 21, 2022
 9                                         11:00 a.m.

10   Before:

11
                        HON. JESSE M. FURMAN,
12
                                           District Judge
13
                            APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  MATTHEW D. PODOLSKY
          ANDREW A. ROHRBACH
17        Assistant United States Attorneys

18   DAVID E. PATTON
          Federal Defenders of New York, Inc.
19        Attorney for Defendant
     BY:  ROBERT M. BAUM
20        ANDREW J. DALACK
          TAMARA L. GIWA
21        Assistant Federal Defenders

22   Also Present:  Special Agent DeLeassa Penland
                    U.S. Attorney's Office
23                  Emily Abrams, Paralegal Specialist
                    Juliet Vicari, Paralegal
24

25
```

M1lWave1

1          THE COURT:  Please be seated.

2          Good morning, everyone.  Welcome back.  We're here on

3   trial in United States v. Avenatti.  Counsel for the

4   government, at least two out of three, are present.  Counsel

5   for defendant and the defendant are present.

6          A few preliminary matters before we get to the

7   peremptory challenges of jury selection.

8          First, the motion to quash filed by Mr. Brewster on

9   his own behalf and on behalf of Ms. Clifford is not yet fully

10  submitted, so I'm not going to rule on it now.  But I don't

11  know if the government wishes to be heard in connection with

12  any piece of it.  In particular, I know the defense, in its

13  opposition to the motion, does request that he be excluded from

14  the courtroom before the defense case in chief.  And my

15  understanding is he did or does intend to be here during

16  Ms. Clifford's testimony, but the defense is seeking to have

17  him excluded.

18          I don't know if you wish to be heard on that or if you

19  want to leave that to him.

20          MR. PODOLSKY:  Thank you, your Honor.

21          I think our current plan is to submit something in

22  writing today.  I will say that I find that request -- we

23  submit that request is entirely meritless, clearly strategic,

24  and possibly a violation of the victim's rights.  The defense

25  has made, as far as I can tell, no plausible explanation for

M11Wave1

1    why Mr. Brewster would actually -- his testimony would actually

2    be relevant at this trial.  And it appears to me to be a naked

3    effort to prejudice a witness in this trial.  But as I said,

4    we're preparing to put something in writing on that issue.

5        THE COURT:  All right.  I think that would be helpful,

6    and I think under the briefing schedule that I had set -- well,

7    I guess it doesn't really matter.

8        I guess the bottom line is, defense counsel, if upon

9    seeing the government's submission, you feel that you need to

10    respond to it, you should alert me promptly, and I will let you

11    know if you will be heard on it.  But if so, you should

12    anticipate that it would have to be submitted, obviously,

13    relatively swiftly.  But I'll take it as it comes.

14        And the other two matters are also not yet fully

15    briefed, and I'm expecting further briefing on them today, and

16    I will decide them in due course.

17        Any other issues of that sort to discuss or raise?

18        MR. PODOLSKY:  Yes, your Honor.

19        I do want to raise one thing with the Court because it

20    impacts trial scheduling and witness lists.  Candidly, I

21    haven't experienced this in my time doing trials here.  Over

22    the last two weeks, we've discussed with the defense

23    stipulations as to purely ministerial matters; business record

24    stipulations, for example, with respect to bank accounts,

25    things of that nature.  It was repeatedly represented to us

M11Wave1

1    that the defense were going to sign those stipulations.  In

2    fact, we exchanged drafts.  They were agreed upon.  We noted

3    that in the time of Covid it would be particularly questionable

4    to ask somebody to come for a five-minute examination as to

5    authenticity, and we repeatedly asked the defense, Are you

6    representing to us that we should tell witnesses no longer to

7    appear who we have been prepared to call?  The answer was yes,

8    and every night the defense said, We are prepared to sign them

9    in the morning.

10            I was informed approximately four minutes ago that

11    they're not prepared to sign the stipulations, which means we

12    need to now add -- we need to figure it out -- probably three

13    or five or more witnesses to the witness list in this case for

14    something that is entirely uncontroversial, a waste of the jury

15    and the Court's time and, frankly, ridiculous.

16            So I want to raise that for the Court now.  Obviously

17    if we have to call these witness, they will appear, but we're

18    going to have to find a way to get them into the schedule.

19            THE COURT:  OK.  Have you looked into the law of

20    whether you can seek an order requiring them to sign the

21    stipulations?

22            MR. PODOLSKY:  I haven't, because it was represented

23    so firmly that we were going to have signatures today, when we

24    met in person, but we will look into whatever the appropriate

25    remedy is.  But I wanted to alert the Court as soon as possible

M1lWave1

1    now that the circumstances have changed.

2             THE COURT:  All right.  I would encourage you to look

3    into it.  I could be wrong, but I think there are cases

4    suggesting that where a party agrees to a stipulation and then

5    has no good faith basis to withdraw from it there may be

6    circumstances in which a court can order them to sign a

7    stipulation.  I don't know that to be the case.  I'm not

8    suggesting that I will grant that relief.  I would need to look

9    into it myself, but I would certainly encourage you to look

10   into it and save the jury and us all some time.

11            Does anyone want to be heard on this from the defense

12   side?

13            MR. DALACK:  Yes.  Judge.

14            The parties have been engaged in good faith

15   discussions about stipulations with respect to authenticity.

16   We've gone back and forth about the language of a particular

17   stipulation and gone back and forth about -- we offered the

18   government a couple of other alternatives to signing a document

19   that would be then put in front of the jury, including waiving

20   any challenge to the authenticity of particular documents and

21   materials and also going as far as waiving any challenge to the

22   admissibility of certain documents and materials.

23            The sticking point, at the end of the day, is whether

24   it's absolutely necessary for a document, signed, to be put in

25   front of the jury as evidence stating that the parties agree to

M11Wave1

something.  And ultimately, where we are at now is that, you
know, we're still willing to agree to stipulate to the
authenticity of certain documents and materials and even,
again, to the admissibility of certain materials.  But
unfortunately, we're not in a position to sign anything that's
going to go back to the jury as evidence.

THE COURT:  OK.

MR. DALACK:  So, if there's an alternative --

THE COURT:  Is the sticking point whether the
stipulation itself is admitted into evidence?

MR. DALACK:  Yes, your Honor.

THE COURT:  And what's the issue there?  Presumably
the stipulation would just say the parties agree that the
following documents are authentic and admissible.  Do you
really think that's going to make a difference in this trial?

MR. DALACK:  I think that the global concern is what
the impression and the optics are of that for the jury.

THE COURT:  Yes, but the optics are that you're not
fighting about stupid things, you're not wasting their time,
you're doing this in an efficient manner and picking your
battles.  I've tried many cases as a lawyer and as a judge.  I
find it very hard to imagine that in any case a jury would put
any weight on a stipulation with respect to some piece of
evidence being admissible or authentic from both sides.  It's
just a technical thing, dotting I's and crossing T's.  I don't

MllWavel

1    think any jury is going to put any weight on that as anything

2    that matters in this case.

3            The bottom line is do what you need to do, both sides.

4    Look into it.  I certainly don't want to waste the jury's time.

5    I don't want to waste our time.  In the age of Covid in

6    particular, dragging somebody down here for five minutes for

7    totally technical testimony seems like unconscionable behavior,

8    to be blunt.  So I would certainly urge you to reconsider it,

9    and if there is room for either compromise or giving in on

10   this, I would urge you to do it.  But both sides know what

11   their rights are and what the law is, or will look into it, and

12   will seek whatever relief is appropriate or, perhaps, reach

13   agreement.  I would certainly urge you to try and reach some

14   sort of agreement.

15           MR. DALACK:  Your point is well-taken, your Honor.  In

16   light of what the Court just said -- look, we've been talking

17   about this, and in good faith, for a while and we have been

18   submitting edits to the proposed stipulations.  I think to the

19   extent that the sticking point seems to be, you know, putting

20   something in front of the jury that shows that the parties have

21   agreed, I would like for an opportunity, without prejudicing

22   the government's efforts to line up any necessary witnesses,

23   especially in light of what the Court just said, to try and put

24   this matter to bed in a timely manner, today.

25           THE COURT:  Great.  I will encourage both sides to do

M11Wave1

1     that.

2              All right.  Any other preliminary matters?

3              MR. DALACK:  Yes.  Actually, your Honor, there is one

4     other addition that we just flagged for the government that I

5     just want an opportunity to discuss with cocounsel briefly

6     before I address it with the Court.

7              THE COURT:  OK.

8              MR. DALACK:  Thank you.

9              THE COURT:  At the moment, 37 of the 41 jurors are

10    present.  I definitely would like to get down as soon as we

11    can, so the quicker you can, the better.

12             MR. DALACK:  Yes, Judge.

13             Thanks, Judge.

14             The first issue, before I return briefly to the

15    stipulations question, is we gave the government a motion that

16    was filed out in the Central District of California by Mr.

17    Avenatti on January 20 that requested that the privilege review

18    team out there make available to him data that is on the

19    servers out there that pertains to his representation of

20    Ms. Clifford.  In particular -- and that application, Mr.

21    Avenatti represented that there was --

22             THE COURT:  Can I interrupt for a second?

23             MR. DALACK:  Sure.

24             THE COURT:  Is this going to take more than two or

25    three minutes?

M11Wave1

1          MR. DALACK:  This will probably take more than two or

2     three minutes.

3          THE COURT:  Let's table it, and we might reconvene

4     after we excuse the jurors this morning.

5          MR. DALACK:  OK.

6          THE COURT:  In that regard, a couple things.

7          First, my intention is to give the jurors preliminary

8     instructions downstairs to make the most of their time today

9     and to enable us to basically start immediately with openings

10    on Monday.  I would assume no objection from either side.

11         MR. PODOLSKY:  No objection, your Honor.

12         MR. BAUM:  No objection.

13         MR. DALACK:  No objection, Judge.

14         THE COURT:  OK.  To be clear, I'm not planning to

15    swear the jurors in until Monday morning, just to leave that to

16    the last possible moment, but I will give them instructions

17    this morning.

18         Second, with respect to openings, who intends to open

19    for the government, and how long do you expect that to be?

20         MR. PODOLSKY:  Mr. Rohrbach will open for the

21    government, and we expect it to be approximately 15 minutes,

22    your Honor.

23         THE COURT:  All right.

24         MR. BAUM:  I'm sorry.  15 or 50?

25         MR. PODOLSKY:  15, one five.

M11Wave1

1          THE COURT:  And for the defense.

2          MR. DALACK:  Your Honor, I'll be opening for the

3    defense, and I also expect it to last around 15 minutes.

4          THE COURT:  OK.

5          Can the government tell me who the first witnesses are

6    on Monday?

7          MR. PODOLSKY:  Yes, your Honor.

8          We currently anticipate that Luke Janklow will

9    testify.  I believe there will be a brief law enforcement

10   witness following Mr. Janklow regarding certain records that we

11   discussed with the defense.  And Ms. Regnier will testify after

12   that.  We've alerted your staff, your Honor, that we will

13   likely need -- unless it falls on a recess, which I don't know

14   if it will, we would likely need a 15-minute break to set up

15   the technology to avoid any complications.

16         THE COURT:  All right.  I assume and understand that

17   you've tested it.

18         MR. PODOLSKY:  I haven't done it personally, but I am

19   told that members of my team have and that it did work.

20         THE COURT:  All right.

21         MR. BAUM:  Judge, in reference to the law enforcement

22   witness, can the government disclose who that witness will be?

23         THE COURT:  Mr. Podolsky said he had, but in any

24   event, go ahead.

25         MR. PODOLSKY:  We were putting together a letter.  I

M11Wave1

1  believe it's Jessica Volchko who will be the law enforcement

2  witness.

3          THE COURT:  All right.

4          Now, turning to the jury, one juror failed screening

5  and is apparently sick, so is no longer going to be with us.

6  That is juror No. 92.  So assuming that the others all arrive,

7  we will be at 40.

8          At the moment, I gather we are missing two; namely,

9  jurors 112 and 132.  So how do you wish to proceed?  We could

10 wait a couple minutes and see.  It might be that one of them is

11 on his or her way in, but we can wait a few minutes and see if

12 they all arrive.  We could do the peremptories with the 40 that

13 we have, taking 92 out, and take our chances if 112 or 132

14 don't show up.  We could reduce the size of the jury *ex ante*,

15 and then you could exercise peremptories.

16         I think those are the three options that I see.

17         Any preferences?

18         MR. PODOLSKY:  My apologies, your Honor.  The two that

19 haven't shown but may show up were --

20         THE COURT:  112 and 132.  And I'm awaiting word if one

21 or both are here or on their way in.

22         MR. PODOLSKY:  Could you indulge us a few minutes just

23 to discuss?

24         THE COURT:  Sure.

25         MR. PODOLSKY:  Thank you.

M1lWave1

1          THE COURT:  I assume thereafter you'll be in a

2     position to swiftly give me your challenges.

3          MR. PODOLSKY:  Depending how we decide to proceed,

4     yes.

5          THE COURT:  OK.

6          Can we go back on the record?

7          MR. DALACK:  Yes, Judge.  We're prepared.

8          THE COURT:  Hang on, because I think I have a material

9     update.  I'm getting confirmation.  We have all 40 other than

10    No. 92.  92, as I said, is sick, so she's no longer with us.

11    So we should have a full complement of 40.  You should have

12    your peremptories.  If you can finish them up now and then show

13    them to the other side, that would be great, and then you can

14    hand them up to my law clerk.

15         MR. DALACK:  We're prepared to do that, Judge.  In the

16    interim, just in advance of the conversation we're going to

17    have about the issue that I had flagged before that we're going

18    to talk about after the peremptories, I was mistaken with

19    respect to the date.  The motion was filed on January 14.

20         THE COURT:  OK.  Mr. Dalack, we're going to take that

21    up after I excuse the jury downstairs.  So we'll come back up

22    here, and then we'll do that.  OK?

23         MR. DALACK:  Can I give you a copy of everything?

24         THE COURT:  Sure.

25         MR. PODOLSKY:  Your Honor, would you like us to hand

M11Wave1

1    up the written paper or read them to you?

2              THE COURT:  I'd like to show you a written list to the

3    other side so they can review it, and then it's up to you to

4    swap; you can then hand me the written list, and I will take it

5    from there.

6              Can I have the defense strikes, please.

7              All right.  The strikes are as follows:

8              The government's strikes are juror Nos. 10, 19, 42,

9    45, 62, 79, 102, 124, and 128.

10             The defense strikes are as follows:

11             Juror No. 6; juror No. 10 as well, so that's a

12   duplicate; juror No. 12; juror No. 18; juror No. 45, also a

13   duplicate; juror No. 50; juror No. 53; juror No. 60; juror No.

14   67; juror No. 79, also a duplicate; juror No. 99; juror No.

15   100; and juror No. 109.

16             All right.  By my calculation, that means that the 12

17   regular jurors are as follows -- well, let me actually first

18   inquire.

19             Any applications from either side?

20             Government.

21             MR. PODOLSKY:  No, your Honor.

22             THE COURT:  Defense.

23             MS. GIWA:  Yes, your Honor.

24             We object to the government's strikes on *Batson*

25   grounds.  The government made nine strikes.  Four of those

M11Wave1

1    strikes were Black jurors; namely, juror No. 45, No. 62, No.

2    102, and No. 124.

3            THE COURT:  And the mere fact that four out of the

4    nine are Black jurors doesn't itself make out a *prima facie*

5    case.  Do you want to make more of a record on why that is

6    discriminatory?  How many jurors in the 40 are African

7    American?  Anything about these in particular that raises an

8    inference of discrimination?  I need more than you've given me.

9            MS. GIWA:  Your Honor, I think the only thing that I

10    would add is that in the qualified pool, there were nine Black

11    jurors, and four of the strikes are of Black jurors.  I think

12    that is sufficient to make out a *prima facie* case.

13            THE COURT:  All right.

14            Any response from the government?  I'm not saying that

15    we've reached stage two of the burden shifting, but any

16    response?

17            MR. PODOLSKY:  Yes, your Honor.

18            I don't think those numbers make out a *prima facie*

19    case.  Of course, the government had a good faith basis for

20    each of these jurors.  I, frankly, think this is complete

21    fishing and a waste of time.  I'm happy to -- if the Court

22    would like to hear a basis for the striking of these jurors, I

23    don't think the defense has made anything other than complete

24    conjecture, and the motion should be denied.

25            THE COURT:  And do you want to briefly provide me with

M11Wave1

1    nondiscriminatory reasons for those jurors, just to make a

2    complete record?  Again, I'm not suggesting that they have met

3    their burden for a *prima facie* case.

4              MR. PODOLSKY:  Yes, your Honor.

5              Candidly, I was trying to keep up for which ones the

6    defense said were African American.

7              THE COURT:  45 they said first.

8              MR. PODOLSKY:  Yes.  45.  First of all, the defense

9    struck 45, so I'm sort of interested in the claim, but

10   nonetheless, I will proffer that this defendant made a comment

11   about how lawyers deserve money when they work for it, and on

12   that basis, we thought that he would -- we struck him.

13             I believe the defense referenced 62.  This is a

14   23-year-old juror who is unemployed, and on the basis of those

15   characteristics, we struck this juror.

16             I believe the next one was 102, who, among other

17   things, I believe this was a gentleman who had a little bit of

18   difficulty remembering some events from earlier in his life,

19   and he also was on a hung jury, both of which we considered in

20   exercising our strikes.

21             And I believe the last one was 124, who expressed, as

22   I recall, fairly vigorously concerns about law enforcement and

23   anti-law enforcement bias.  So those were the bases for the

24   strikes of these four jurors.

25             THE COURT:  All right.

M11Wave1

1          Ms. Giwa, do you wish to be heard?

2          MS. GIWA:  Can I just have one minute, please?

3          THE COURT:  Sure.

4          MS. GIWA:  Your Honor, nothing further.  We're just

5    going to rely on the record.  Thank you.

6          THE COURT:  All right.  The motion is denied.  I don't

7    think that the defense has made out a *prima facie* case.  The

8    mere fact that four of nine are African American does not

9    itself raise an inference of discrimination.  I would note

10   there's no racial valence to this case that I'm aware of, and

11   for that reason, I would assume the government would not

12   exercise its challenges in a discriminatory fashion even if

13   that were not the case, but I particularly see no reason why

14   they would want to do that here.

15          Again, I don't think a *prima facie* case has been made.

16   To the extent that one has been made, I think the government

17   has justified each of its strikes, and the defense has put

18   forward nothing to demonstrate that that is pretextual, so the

19   motion is denied.

20          That leaves a jury of 12.  Juror Nos. 1, 7, 16, 21,

21   24, 26, 28, 35, 40, 52, 61, and 93 are, by my calculation, the

22   12 regular jurors.

23          And then the alternates are as follows:

24          105, 110, 112, 115, 118, and 120.

25          First, does anyone disagree with that list?

M11Wave1

1          MR. PODOLSKY:  No, your Honor.  We believe that's

2     right.

3          THE COURT:  Is the government satisfied with the jury?

4          MR. PODOLSKY:  Yes, your Honor.

5          THE COURT:  Defense, any disagreement with that list?

6          MS. GIWA:  Your Honor, no disagreement.

7          THE COURT:  And putting aside the motion you made, are

8     you satisfied with that jury.

9          MS. GIWA:  Yes, your Honor.

10          THE COURT:  All right.  Let's adjourn.  We'll

11     reconvene downstairs.  I will excuse those who were not

12     selected.  The rest I will give preliminary instructions to,

13     and then they'll be escorted to the jury room, at which point

14     I'll ask you to come back up here and we can take up the issue

15     that the defense wants to discuss.

16          I'll see you downstairs in just one minute.  Please

17     get down there as quickly as you can.

18          Thank you.

19          (Continued on next page)

20

21

22

23

24

25

M1L8AVE2

1              THE COURT:  You may be seated.

2              All right.  Counsel is present.  Mr. Avenatti is

3    present.

4              Mr. Dalack, you wanted to raise an issue.

5              MR. DALACK:  Yes.  Thank you, Judge.

6              The issue pertains to an application that Mr. Avenatti

7    made in the Central District of California to access data that

8    is in the possession of the Privilege Review Team.

9              THE COURT:  I can save you a little time.  I have

10   reviewed the papers that you have handed up.  So cut to the

11   chase.

12             MR. DALACK:  The problem is California is saying to us

13   that we have to seek leave of the court here in the Southern

14   District of New York to obtain information that is in the

15   possession of the Privilege Review Team, the prosecutors out in

16   the Central District of California, that we submit is necessary

17   for us to effectively cross-examine at least one or two of the

18   witnesses in this case with respect to the work that was done

19   on behalf of Ms. Clifford by Mr. Avenatti.  And that data is

20   found in two places.  It's the Tabs data and the program called

21   FileSite.

22             Now, as set forth in the motion, the Privilege Review

23   Team and the defense out in the Central District of California

24   have been working with Software Technology LLC to access the

25   Tabs data, which up until this point, due to a software issue,

M1L8AVE2

1    has not been accessible.  It's my understanding that Software

2    Technology LLC and the Privilege Review Team are going to be

3    able to access the information in the Tabs data by Monday.  But

4    the position that the government has taken in the Central

5    District of California is that they will only disclose to Mr.

6    Avenatti that information contained in the Tabs data that

7    pertains to the five individuals that are at issue in that case

8    out there, and they won't produce materials responsive to his

9    representation of Ms. Clifford.  That's a problem for us.

10         The second part of that is, which is much more

11   straightforward, is that with respect to the FileSite issue, my

12   understanding is that could just be turned over forthwith,

13   immediately, to us, and we can produce it to the government in

14   this case, or it could be produced to the government in this

15   case and they could produce it to us.  And that information

16   contains other documents and materials that are pertinent to

17   Mr. Avenatti's representation of Ms. Clifford and the costs

18   associated with his representation and the work that the firm

19   and that he did on his behalf.

20         Our problem is that in Ms. Regnier's 3500, we

21   understand that she expressly referenced the Tabs data, at

22   least, as containing information that's pertinent to the work

23   that Mr. Avenatti performed on Ms. Clifford's behalf.  So I

24   don't think that there is a persuasive argument to be made that

25   the Tabs data, the expenditure reports that are associated

M1L8AVE2

1    with -- really any documentation that are associated with the

2    firm's representation of Ms. Clifford is not relevant to this

3    case, and certainly it's relevant to the cross-examination of

4    Ms. Regnier and to the credibility of the government's

5    arguments with respect to the firm's financial condition and

6    the work that was done on Ms. Clifford's behalf.

7            So I guess what we are asking the Court here to do is

8    to direct the government to obtain from the Privilege Review

9    Team out in California the Tabs data, that we expect to be

10   accessed on Monday, with respect to the expenses and other

11   data, cost data, with respect to the representation of Ms.

12   Clifford, and also the FileSite information that pertains to

13   Ms. Clifford as well, and then produce that to us in this case.

14           THE COURT:  A couple of follow-up questions before I

15   hear from the government.

16           Number one, explain to me again, maybe you have and I

17   have missed it, but my understanding is you have had these

18   servers -- and by you I mean the defendant -- has had these

19   servers since September of last year, so for four months.  Can

20   you explain to me what the issue is that prevents you from

21   accessing the materials that you're describing on the copy that

22   he has been provided?

23           MR. DALACK:  There's two issues there, your Honor.

24   The first -- and I know your Honor has not found this point to

25   be persuasive, but I must reiterate it for the sake of the

M1L8AVE2

1    record.  The volume of the information at play is substantial.

2    We are talking about 20 terabytes.

3         THE COURT:  The Clifford files are not 20 terabytes.

4    You have identified a discrete set of data that you're seeking,

5    and I get that, and it may or may not be that that is relevant

6    to the issues in this case.  But the fact that it is within 20

7    terabytes of data is immaterial.  You have identified it.  So

8    my question is, why can't you access that data in the server

9    copies that you have?

10        MR. DALACK:  With respect to the Tabs data, it's a

11   software issue that affects both Mr. Avenatti's review of the

12   servers and also the Privilege Review Team's review.  And

13   that's why the representation in the motion, which is accurate,

14   about the software company providing what we understand to be a

15   fix to the glitch to both the Privilege Review Team and Mr.

16   Avenatti, in the context of the Central District of California,

17   is occurring on Monday, and we expect that that will enable

18   both the Privilege Review Team and Mr. Avenatti to access the

19   Tabs data.  However, the issue is that the Privilege Review

20   Team has said they will disclose forthwith the Tabs data that

21   pertains to the five individuals that are at issue in the

22   Central District of California, but they won't relinquish the

23   Tabs data, after having accessed that software, to Mr. Avenatti

24   as it pertains to Ms. Daniels.  And we don't understand that.

25   They said we have to come out here to get a court order to

M1L8AVE2

1    authorize them to disclose that in the first instance.

2              So what I am saying is that the two things can happen

3    in parallel.  Once the software glitch is resolved, we will

4    endeavor to get that information as well, but the Privilege

5    Review Team, who has possession of these materials, is also

6    going to sift through it and they should be in a position --

7    they are in a position to produce it to us, and they should

8    produce it to us.

9              THE COURT:  But if the software glitch is fixed as to

10   both the Privilege Review Team and Mr. Avenatti, won't Mr.

11   Avenatti then be able to access those materials on his own

12   copies of the server?

13             MR. DALACK:  One moment, your Honor.  Thank you.

14             My understanding is that the expert from Mr. Avenatti

15   and also for the government are going to be working with the

16   software provider, all in conjunction, cooperation with one

17   another, to access the Tabs data on one copy of the servers,

18   and that's the copy of the servers that's in the possession of

19   the government.  So that's the issue, your Honor.

20             THE COURT:  I don't get it.  Presumably, whether the

21   Privilege Review Team has authority to look beyond the four,

22   five clients there or not, presumably, those restrictions don't

23   apply to Mr. Avenatti.  Why would he not be able to then

24   conduct whatever searches he wants in the Tabs data once the

25   glitch is fixed?

M1L8AVE2

1              MR. DALACK:  Because the glitch is going to be fixed

2    as to one copy of the servers and the parties have agreed out

3    in the Central District of California to all be present.  So

4    there is going to be an expert for Mr. Avenatti, the Privilege

5    Review Team and the software provider, and they agree that they

6    are going to make the Tabs data available on only one copy of

7    the servers, and that's the copy of the servers that's in the

8    possession of the government.

9              So it's both for that reason, and it would be terribly

10   inefficient for us to then try and obtain -- to try and, I

11   guess, get access to that same data on another copy of the

12   servers when it is already going to be available on the copy of

13   the servers that is in the possession of the government.  And

14   that has been negotiated and agreed on by the parties out in

15   California.  The only problem is that they won't relinquish --

16   the government hasn't agreed out there to relinquish the Tabs

17   data as it pertains to Ms. Clifford.

18             THE COURT:  Question number two is, when did this

19   issue come to your attention, what steps have you taken to deal

20   with it, and when?  And I ask because, unless I am mistaken,

21   the first -- I have heard of the servers, but the first I have

22   heard about any technical problem with respect to accessing

23   anything relating to Ms. Clifford in particular was in your

24   letter on the day of the final pretrial conference when you

25   raised the four issues, one of which was this.  When did this

M1L8AVE2

1    come to your attention, when did you take steps to pursue it,

2    and what steps did you take?

3              MR. DALACK:  The chronology is important, I submit.

4    The Tabs data and the access to the Tabs data and the failure

5    for the government to produce Tabs data in connection with the

6    California case was the basis for the mistrial.

7              THE COURT:  I am not concerned with the mistrial in

8    the California case.  My question is, with respect to this

9    case, when did you have access -- you had access to the Tabs

10   data as of September because you have had the server since

11   September.  So my question is, when between September and now

12   did you learn that there was a technical problem that prevented

13   access to whatever files you're now seeking?

14             MR. DALACK:  We have known that since September.  The

15   Tabs data has not been accessed by anybody.

16             THE COURT:  So what efforts have you made since

17   September to get access to that data?

18             MR. DALACK:  Mr. Avenatti has taken substantial

19   efforts out in the Central District of California to work both

20   with the software company, his expert, and the Privilege Review

21   Team.  So there has been substantial work.

22             THE COURT:  What efforts have been made to either seek

23   relief from Judge Selna or from me?  From me the answer is none

24   until the letter the other day when you raised this, but

25   conspicuously didn't seek relief, just raised it.  So I think

M1L8AVE2

1    to the extent that you're seeking relief from me, the first

2    time is today.  So when did any relief get sought from Judge

3    Selna with respect to the Clifford matter?  Is it this motion,

4    is that the first time?

5            MR. DALACK:  My understanding is that Mr. Avenatti has

6    been seeking relief as to all the Tabs data across all of his

7    clients, including Ms. Clifford, from Judge Selna since the

8    servers were produced to him in September.  It wasn't until he

9    more focused the application, after it became clear on Monday

10   the expert was going to -- his expert, the Privilege Review

11   Team and the software company were going to meet, and then it

12   became clear to him that they would not agree to relinquish the

13   Clifford data, that he put the application in to Judge Selna

14   and Judge Selna said you have got to go to New York.

15           THE COURT:  So the answer is the first time is January

16   14 when this application was made to Judge Selna.

17           MR. DALACK:  It's not the first time, Judge, because

18   the requests up until January 14 have encompassed all of the

19   Tabs data across the firm.  So it necessarily included the data

20   from Ms. Clifford.

21           THE COURT:  So can you marshal for me the chronology

22   of when applications were made to Judge Selna with respect to

23   access to the Tabs data that would encompass Ms. Clifford prior

24   to January 14?  I would like to know that.

25           MR. DALACK:  I appreciate that, your Honor.  I think

M1L8AVE2

1    it would be more effective if I submitted a brief letter

2    explaining that chronology, and I can do that in short order.

3    THE COURT:  Last question before I turn to the

4    government.  Explain to me what the relevance is of whatever

5    the data may be to this case.  Because as far as I can tell,

6    this case basically pertains to whether Mr. Avenatti, whether

7    there was an agreement or not for him to take some of the book

8    advance money, and if not, whether he took it and used it for

9    his own end.  It doesn't seem to me that the billing history of

10   his relationship with Ms. Clifford is going to be particularly

11   relevant to that or has any relevance to that.  So explain to

12   me what the salience is here.

13   MR. DALACK:  The salience, your Honor, is that the

14   Tabs data pertains to bills and costs associated with the work

15   that he did on behalf of Ms. Clifford, not just in connection

16   with the book deal, but over the course of his entire

17   representation of her.  We expect that over the course of the

18   trial there will be significant evidence demonstrating that the

19   financial relationship between Ms. Clifford and Mr. Avenatti

20   was complicated, and that he expended a tremendous amount of

21   his own funds for her benefit, and that that information is

22   properly put before the jury because it goes to Mr. Avenatti's

23   state of mind as it pertains to what moneys he was entitled to,

24   both for purposes of reimbursement and as remuneration for the

25   book deal.

M1L8AVE2

1          THE COURT:  Mr. Podolsky, are you addressing this?

2          MR. PODOLSKY:  Thank you, your Honor.

3          Why don't I pick up where you left off.  This is a

4     total sideshow, your Honor.  The Tabs data, whatever Mr.

5     Avenatti might have done for Ms. Clifford as her lawyer, in

6     terms of costs and copying and whatever else, is not what this

7     trial is about.  The government's theory is not that he

8     overbilled her, not that his billing was inaccurate.  It's

9     exactly as your Honor put it.  Was he entitled to take her

10    money or not?  In fact, I am quite sure that witnesses will say

11    he was her lawyer and he put efforts into being her lawyer.

12    But the issue is, he had an agreement with her that he was only

13    going to take $100, he was not entitled to take her book money,

14    certainly not without telling her, and that is what the issue

15    is going to be at trial.  We don't need the Tabs data.  It's

16    simply not relevant.

17         Now going to the sort of more practical matter.

18    Following up on your Honor's questions, it appears that this

19    is -- I don't know how else to say it -- some manner of

20    sandbagging this trial.  It's Friday, the jury has been

21    selected, the trial has started, and there is an application

22    that somehow the government -- frankly, I am not even sure what

23    the application is.  But the point is this material was in the

24    hands of the defendant since September.  No efforts that we are

25    aware of were made in order to get the material read.  The

M1L8AVE2

1    defense could have taken any number of steps.  They could have

2    issued subpoenas to get some of this material back in

3    September, or, frankly, any time in the last two and a half

4    years that this case has been pending.  Those efforts were not

5    taken and nothing has really happened, as far as we know in

6    this case, until the trial has now begun.

7          The last point I will make is, I am not really sure

8    what relief the defendant is seeking, but I am certainly not

9    sure what the legal basis for that would be.  This material is

10   not in our hands.  As we understand it, based on reading the

11   submission that the defendant has handed to us today, there was

12   a warrant, the Central District of California got a warrant.

13   The warrant gives the government permission to search in

14   particular ways and take particular data.  It doesn't give the

15   government the opportunity to just simply root around in a

16   server, frankly, any arm of the government to root around at

17   the defendant's request.  So I am not quite sure what the

18   defense is asking the Court to tell us or anyone else to do or

19   what the legal basis for such a request would be.

20         MR. DALACK:  May I be heard briefly in reply?

21         THE COURT:  More importantly, I am not sure what

22   relief you're seeking either.  So if you could articulate and

23   specify that, it might be helpful to focus our discussion.

24         MR. DALACK:  With respect to the chronology between

25   September and today, I will put in a brief letter.  But the

M1L8AVE2

1    chronology that we set forth in our request for an adjournment

2    highlights that Mr. Avenatti was actively trying to obtain

3    access to the servers for two and a half years up until the

4    mistrial was granted in California.

5         THE COURT:  I want to be clear, in whatever you submit

6    to me, I am not interested in what happened before September.

7    I understand that that resulted in a mistrial in the California

8    action, and again, that's not my concern.  My concern is this

9    case.  My authority is in this case.  My concern is this case.

10   He has had them since September, and to me, that strikes me as

11   pretty good evidence of the fact that he has had ample time to

12   make use of this and seek whatever relief he needs with respect

13   to anything he can access in it.  So to the extent that you are

14   going to focus on the chronology, I want to know since

15   September what efforts he has made to either obtain authority,

16   if he needs authority, or to address a technical issue, if

17   there is a technical issue, to access what it is you are now

18   concerned with.  I just want to focus you on that.

19        MR. DALACK:  We will focus on that in the letter.

20        The government is taking a particular position with

21   the fee agreement that we disagree with.  And the context and

22   the content and what the fee agreement specifies will be a

23   hotly debated issue at this trial, and it is our position that,

24   per the terms of the fee agreement, Mr. Avenatti was entitled

25   to deduct his costs and expenses of the efforts that he made on

1    Ms. Clifford's behalf, both with respect to the book deal and

2    writ large, and that that information must be properly put

3    before the jury in their assessment of what his mental state

4    was when he kept the third payment of the book deal.

5        So it's directly relevant to issues in this case, and

6    we are talking about the fee agreement, the fee agreement that

7    was signed between Ms. Clifford and Mr. Avenatti.  It could not

8    be more relevant, your Honor.  So I don't understand the

9    government's argument as to how the data that we seek is not

10   material.  It's obviously material.

11            THE COURT:  Anything else?

12            So what is the application?

13            MR. DALACK:  The application is to authorize the

14   Privilege Review Team out in California to disclose on Monday,

15   when this information becomes available, after working with the

16   software analyst, to disclose to the parties, both the

17   government and the defense, the Tabs data and the FileSite

18   information as it pertains to Ms. Clifford.

19            THE COURT:  And how is it within my authority to order

20   the Privilege Review Team in a different U.S. attorney's

21   office, and I recognize you have briefed this issue and I

22   haven't definitively ruled on it, but it may not be within the

23   scope of this prosecution team, what authority do I have to

24   direct them to do anything?

25            MR. DALACK:  I am not entirely sure how to answer that

M1L8AVE2

question, your Honor, because we are put between a rock and a

hard place.  California is telling us the application is denied

without prejudice to seek relief in front of your Honor, and

your Honor is telling us that you might not have the authority

to order that same relief.  So we feel stuck, and that's a

frustrating predicament to be in.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Well, just two comments on that, maybe

three.

First, they may be stuck in a sense but they don't

have a right to relief.  That happens sometimes.

Second, they have many avenues that they chose not to

pursue.  For example, the defendant has mentioned to your Honor

that a trial subpoena was issued recently to the trustee.  Such

a subpoena could have been issued prior to this.  They have had

avenues to access this data.  And it's still not clear to me

why, if it's simply a technical problem, we are dealing with

this on the Friday the trial has started.  It's just not at all

clear to me why -- they might express frustration, but that

doesn't entitle them to relief that the Court isn't empowered

to give.

I will say, the government doesn't particularly care

whether the defendant can access this or not.  We don't have a

position on that.  He is welcome to the data that is in his

possession.  What we do have a problem with is an application

M1L8AVE2

1    on the Friday of trial simply suggesting that the Court should

2    start ordering different arms of the government to take

3    whatever action that the defendant wants without a legal basis.

4            MR. DALACK:  With respect to the subpoena issue, the

5    government subpoenaed the trustee as well.  The returns on that

6    are due on Monday.  I don't understand the argument with

7    respect to the subpoena because they are trying to get that

8    information from the trustee too.

9            THE COURT:  Whether they are or are not doesn't have

10   any bearing on the fact that you could have sought that

11   yourself.  That's Mr. Podolsky's point.  The fact that they

12   have subpoenaed is immaterial to the fact that you had another

13   avenue of relief.  That's the point.

14           MR. DALACK:  We are pursuing multiple avenues of

15   relief.  The problem is that the position that the government

16   is taking is all to Mr. Avenatti's detriment and prejudice.

17   The materials that we are seeking are unquestionably in the

18   possession of the government in California, and we have

19   submitted a letter motion to argue, for a variety of reasons,

20   why the court should not draw a distinction, for the purposes

21   of these materials on the servers, between what is in the

22   possession of the prosecutors in California versus the

23   prosecutors out here.  That notwithstanding, in seeking relief,

24   I submit that had Judge Selna granted the application and

25   permitted the Privilege Review Team on Monday to release the

M1L8AVE2

1    Tabs data, the issue would be mooted, but that's not what he

2    did.  He directed Mr. Avenatti essentially to seek leave to

3    your Honor.

4         And then separate and apart from that is the other

5    argument that we have made that I want to reiterate, which is

6    that the Tabs data, specifying the costs and other information

7    related to Mr. Avenatti's representation of Ms. Daniels, Ms.

8    Clifford, is both *Brady* and *Giglio* materials that, again,

9    concern Ms. Regnier's expected testimony.  Because in her 3500

10   materials in this case, she specifically told the government

11   that the information pertaining to the Clifford representation

12   is located on the Tabs data, and to the extent the government

13   is going to be making an argument and eliciting testimony about

14   Mr. Avenatti's financial condition and his firm's financial

15   condition, all of this information is at play.  Should the

16   government not want to put on a robust presentation about the

17   financial condition of the firm, we can take that up and seek

18   alternative relief, but we don't understand that to be the

19   government's position.  And we expect that there is going to be

20   considerable argument about the financial condition of the

21   firm, and we need to be able to put before the jury all the

22   information bearing on those arguments.

23        THE COURT:  Mr. Podolsky, anything else you wish to

24   say?

25        MR. DALACK:  Your Honor, I'm sorry.  As Ms. Giwa just

M1L8AVE2

1    pointed out to me too, it's not clear that a subpoena issued

2    earlier to the trustee would have had any impact or resolved

3    the technical issues that are only rectified by the software

4    company, which we expect to be cured on Monday when he meets

5    with Mr. Avenatti's expert and the Privilege Review Team.

6             MR. PODOLSKY:  I don't want to belabor this, your

7    Honor.  I just do want to make a point about the notion of

8    possession.  Setting aside the prosecution team issue and the

9    fact that this is not in the government's possession here, it

10   appears based on these papers that the Central District of

11   California got a search warrant.  The government only has

12   possession of what it is entitled to have under the search

13   warrant.  The government isn't allowed to do whatever it wants

14   with a full server unless it is authorized by a court to do so.

15   As we understand it, the trustee or receiver has possession of

16   these, but it may not be accurate to say that the Central

17   District of California actually does have possession of all

18   these materials.  But candidly, your Honor, I don't know,

19   that's not our office.  I am responding to the notion of

20   possession, and we should be precise about it.

21             MR. DALACK:  I think that issue was taken up in the

22   motion, Judge, and our position is that the warrant did cover

23   that Tabs data.

24             THE COURT:  In the motion filed before Judge Selna.

25             MR. DALACK:  Correct.

M1L8AVE2

1          THE COURT:  I don't have the warrant.  I don't know.

2     It hasn't been brought to my attention.  I guess I have various

3     thoughts about this, putting aside the fact that -- I think I

4     am persuaded that it may be relevant, or at least the defense

5     is entitled to see what it is to figure out if there is any use

6     to be made of it.  When I say entitled, I mean I understand why

7     it has relevance.  Whether you are entitled to it is a

8     different story, but at least I understand the relevance and

9     the argument there.  But I am inclined to think that this

10    coming up at the eleventh or close to the twelfth hour is

11    probably an independent reason to say it is what it is, and if

12    you can get it on Monday, so be it; if you can't, you can't,

13    but you have had ample opportunity.  That being said, a couple

14    of thoughts.

15         One is, I guess I am a little bit at a loss, to be

16    completely blunt.  I think, Mr. Dalack, you should put in

17    whatever submission you think there needs to be put in,

18    addressing the chronology and why I should even address this or

19    entertain it at this late hour with respect to our case and why

20    you didn't have an earlier opportunity to address this.  In

21    connection with that, if you want to address the -- I haven't

22    ruled on the prosecution team issue definitively yet.  I have

23    given you my initial inclination.  The defense has briefed that

24    in a motion that the government is going to be responding to

25    today.  I suppose, Mr. Podolsky, you should obviously be aware

M1L8AVE2

1    (A) I may reach a different conclusion on that, (B) even if I

2    agree with you and conclude they are not part of your

3    prosecution team, it could be that an appellate court later

4    disagrees, and in that sense query whether one option would be

5    to call your colleagues and say, although we don't think you're

6    part of our team and we have no authority to order you to, see

7    if you could get it.

8            The second thing is, it may be that it's not within

9    their possession because it's not within the scope of the

10   warrant, and this is just simply a technical issue, that the

11   defendant could access it on Monday as long as the technical

12   issue is resolved.  And I guess I don't see that as a legal

13   issue so much as a technical issue, and I don't know what the

14   issue is there.  I am happy to reach out to Judge Selna, if

15   everybody agrees that that's proper and OK for me to do, and

16   see, if it's merely a technical issue, if we could just get

17   that addressed.  But not being privy to the warrant, not having

18   fully briefed the issue of whether they are part of the same

19   prosecution team, not knowing the chronology here, not knowing

20   what is on this data and what the problem is, not knowing if

21   there are any restrictions on the defendant's use of it or

22   access to it on Monday, I just don't quite know what to say.

23           MR. DALACK:  We will put something in writing, an

24   application speaking to those issues, and in that application I

25   expect we will take a position, with your Honor's offer, to

M1L8AVE2

1    reach out to Judge Selna as well.

2        THE COURT:  Let me say, it is 12:53 Eastern Time on

3    Friday before trial starting at 9:00 on Monday morning.  If you

4    want me to reach Judge Selna, I am reaching him in the next

5    three hours.  Among other things, I am also a sabbath observer

6    and at 4:20 whatever today, I am not going to call Judge Selna.

7    So it's going to happen now or it's not going to happen.

8        MR. DALACK:  We have no objection to you reaching out

9    to Judge Selna, Judge.

10        About the chronology of things and to address the

11    Court's point about the timeliness of our argument, the issue

12    with respect to arguments that the government intends to make

13    about Mr. Avenatti's alleged financial condition and the

14    financial condition of the firm did not become ripe until the

15    government filed its motions in limine.  We responded seeking

16    to preclude --

17        THE COURT:  Mr. Dalack, that is not the argument

18    you're making about the relevance of these things.  So that is

19    just a red herring to justify it coming up in the belated

20    matter.  The argument you're making is that there was a

21    financial arrangement between Mr. Avenatti and Ms. Clifford

22    whereby his costs that he laid out were reimbursable from this

23    money.  That argument, if it is a valid argument, has been

24    clear since day one of this case in 2019.  OK.  So I understand

25    why perhaps the two years in which you didn't have access to

M1L8AVE2

1    the servers are not imputable or blameable to you, but

2    certainly since September you have known that you wanted the

3    data for that purpose, or had reason to know that you would

4    want the data for that purpose.

5        So that's why I want to know what efforts have been

6    made to address the technical issues and/or the legal issues

7    with respect to your access to these materials.  The financial

8    condition issue is not relevant to that.  Not to mention the

9    government filed that motion in December.  I didn't rule on it

10   until last week, but you have known since at least December

11   that the government wanted to introduce that, not to mention

12   the government introduced that evidence in the Nike trial.  So

13   you had reason to think that they might well do the same here.

14   So that's just not compelling.

15       MR. DALACK:  I take your point, Judge.  I am not

16   trying to irritate the Court.  If I recall correctly, and I

17   don't have the response papers in front of me, we did address

18   the pertinence of the servers directly with respect to our

19   opposition to the financial condition arguments made by the

20   government and then also in our December 23 motion for an

21   adjournment.  So I just want to clarify the record on that

22   point that we endeavored to, at least with respect to arguments

23   that the government was going to make, and I submit this Tabs

24   data is relevant to rebutting those arguments, we sought

25   various forms of relief that I understand the Court denied.

1          THE COURT:  I denied because you have had access to

2     this since September.  So I think that's the same point I am

3     making today.

4          MR. DALACK:  Understood.  We will take up the access

5     issue with respect to the efforts that have been made to

6     overcome the technology obstacles in the letter today to

7     provide a fuller record on that point.

8          THE COURT:  With respect to my conversation with Judge

9     Selna, if I can even reach him, and I take it the government

10    has no objection?

11         MR. PODOLSKY:  No, your Honor, we have no objection.

12         THE COURT:  Again, it seems to me there are two

13    different issues here.  One is, to the extent that you're

14    asking me to order the Privilege Review Team in California to

15    do anything, it's my strong intuition that I don't have

16    authority to do that.  They are not before me in this case;

17    they are under Judge Selna's supervision and not mine.  That is

18    a different question to me from -- not to mention I would need

19    to know what is in the warrant, whether the government has

20    possession of it, in that sense, and is allowed to access it.

21    There are all sorts of problems there, and you haven't

22    persuaded me that that is something appropriate for me to do.

23    So to the extent that you want me to order the Privilege Review

24    Team in a different U.S. attorney's office to do something, you

25    should address that in whatever your written submission is and

M1L8AVE2

1    develop a record on why that would be appropriate.  So far you

2    haven't done that.

3            If the issue is just a technical one, that there are

4    steps that have been taken in California to remedy the

5    technical problem and they should be fixed by Monday, and it's

6    just a question of making sure that Mr. Avenatti is given

7    access to things that the Privilege Review Team, by virtue of

8    the terms of the warrant, may not have access to, that's a

9    totally different issue to me, and I am happy to see if a

10   conversation with Judge Selna can clarify and rectify that.

11           I would think that a conversation between counsel,

12   whether it's counsel for the government, counsel for Mr.

13   Avenatti, or both, and your counterparts, or whoever is

14   involved in the technical process, might also succeed in just

15   addressing that.  But there is a difference between a technical

16   issue and a legal issue, and that's an important distinction

17   here.

18           MR. DALACK:  Understood.

19           THE COURT:  Anything else to be discussed on this?

20   It's all a little confusing to me, but I think that's because I

21   only have a small piece of a larger story.

22           Mr. Dalack, anything else from you?

23           MR. DALACK:  On this point, no.  We will address it in

24   writing, Judge.

25           I wanted to also ask the Court what its visceral

M1L8AVE2

1    reaction is to a proposal to have any stipulations with respect

2    to authenticity be filed on the public docket in advance of

3    trial to obviate any authenticity questions and not handled and

4    introduced as evidence to the jury during trial, if that would

5    cure any concerns about admissibility or at least arguments

6    with respect to authenticity of particular materials that are

7    contemplated by the scope of the pending stipulations, if the

8    Court would accept that as an alternative.

9            THE COURT:  I would like to know the government's

10   reaction, visceral or otherwise, before I give you mine.

11           MR. PODOLSKY:  Well, your Honor, this is the first I

12   am hearing of this, so I guess it will have to be visceral.

13           We need to have the basis for the admission of the

14   evidence in the record.  That's what we are looking to do here.

15   This is not magical or unique or odd.  We are not looking to

16   make arguments to the jury about the agreements that records

17   are authentic.  We are looking to have a record that provides

18   the Court a sufficient basis to rule on the evidence, and, if

19   the defendant is convicted and there is an appeal, the record.

20   My visceral reaction is I don't understand the issue here.  We

21   are trying to do what is done in every single trial, which is

22   to have a sufficient basis in the trial record before the jury

23   to understand what the evidence is.  And I am still not

24   understanding what the problem with that is.  If the defendant

25   is now not going to agree to that, I suppose we are going to

M1L8AVE2

1   have to call six, seven different witnesses from different

2   banks in California.

3        THE COURT:  I think my visceral reaction is I am not

4   going to do that if the government isn't OK with it and both

5   sides aren't in agreement.  If the government consents to that

6   and everybody agrees that that's appropriate, then perhaps that

7   would be fine by me.  But if the government, either because it

8   doesn't want to take its chances and doesn't think that's

9   proper or otherwise, decides that they would rather have a more

10  traditional stipulation that's entered into evidence and read

11  to the jury or call the witness, then so be it.  But I will

12  leave it to you guys to decide and you know what your options

13  are.

14        Certainly, I will say -- I mean, I am not sure why the

15  question of whether something is authentic -- that really goes

16  to -- well, let me just state by analogy, in my experience, for

17  example, a certification under Rule 902(11) is not something

18  that would go to the jury.  It has to be presented to a court

19  to satisfy the requirements of the business records rule.  But

20  once those requirements are met, it is admissible, the records

21  themselves come in, but the certification itself is not

22  presented to the jury.  One could argue by analogy that this

23  could be treated similarly, and as long as it's part of the

24  record, then the I's are dotted, the T's are crossed, and it

25  doesn't need to be shared with the jury.  That's definitely not

M1L8AVE2

1    how it's usually done, and I really don't understand what the

2    concerns are with doing it in the usual way, but I throw that

3    out there for your thoughts.  But bottom line, you all know

4    your options and you should discuss it and do whatever you need

5    to do.

6          Yes, Mr. Podolsky.

7          MR. PODOLSKY:  Just to make, I suppose, a fuller

8    record on this.  In the traditional stipulations, including the

9    ones that were agreed to here, they include some testimony that

10   identify what the records are, that otherwise we might call

11   someone, for example, from a bank from California to explain

12   what they are, or, for example, somebody who could explain what

13   an iCloud return is.  This is completely trivial testimony that

14   would just explain what the numbers are and what they match to.

15   I would be pretty reluctant to have somebody in COVID fly

16   across the country for this.  But that is some of the material

17   that may be required to be before the jury, in which in the

18   ordinary case we stipulate to, and we have stipulated to.

19         THE COURT:  Understood.  So I think you know your

20   options.  One, you can figure out whether there is any basis to

21   seek relief from me to order them to sign the stipulations, to

22   which I understand they previously agreed, but that may turn on

23   whether they actually agreed to them or there was an agreement

24   to agree; number two, you can persuade them to sign

25   stipulations; number three, you can agree to a deviation from

M1L8AVE2

the usual way this is done, along the lines of what Mr. Dalack

is posing; or number four, you can just call the witnesses and

moot this issue and waste everybody's time.  By which I mean

you're not wasting it; I think it would be wasting.  I think

those are the options.  You can decide the way you want to

proceed and discuss it with one another, but I don't really

think there is anything for me to do other than lay those

options out.

Anything else?

MR. PODOLSKY:  Not from the government.

MR. DALACK:  Not from the defense.

THE COURT:  First of all, you might be interested in

knowing that my understanding is every member of the jury is

fully vaccinated.  I think not all have received boosters, but

they are all fully vaccinated, just FYI.

Number two, I would like to start promptly at 9 on

Monday.  As I said, usually I will take up any issues with

counsel between 9 and 9:15.  Should I need you before 9, I will

enter an order over the weekend to that effect.  But my hope is

that we can limit whatever we need to discuss to those 15

minutes, and if we need to discuss anything beyond that, we

will take it up either at the lunch break or at the end of the

day.

Obviously, we will start, after swearing the jury,

immediately with openings and then the first witnesses.  I have

M1L8AVE2

1    warned you that you need to have your witnesses here and ready

2    to go.  There was a question, I gather some judges have

3    required some time between witnesses to air out the box.  My

4    understanding is that those requirements are long since phased

5    out.  So I don't think that we need to do that.  It wasn't my

6    intention to do that.  I think that's the point of the HEPA

7    filter in the box.  So I do not intend to take a break between

8    witnesses, and to my knowledge most judges don't, and we

9    haven't had any COVID spread on that account.  So that is the

10   plan.

11            Any other questions?

12            MR. PODOLSKY:  One other item occurred to me.  I don't

13   think we have asked.  Is it your practice to send back the

14   indictment to the jury?

15            THE COURT:  Candidly, it depends on the case, it

16   depends on the indictment.  I would have to look at it and

17   remind myself of what the indictment says.  I don't know.

18            MR. PODOLSKY:  I would say we would be prepared to

19   redact or remove the speaking portion and simply send back, I

20   guess sort of charging version of the indictment, if your Honor

21   was planning or would send it back.  So I just wanted to raise

22   that.

23            THE COURT:  We have plenty of time between now and

24   that point to discuss that issue, but I guess my visceral

25   reaction, to use that phrase, I am not prepared to send the

M1L8AVE2

speaking indictment.  The evidence at trial is what this case

will be decided on, and the fact that you persuaded a grand

jury by probable cause to include an allegation in the

indictment doesn't seem to be relevant to this jury's

consideration.  If all that means is that the bare-bones

charging language would go, I don't entirely understand why

it's necessary.  It seems to me that my instructions probably

are sufficient, but you can consider it and I will take it up.

         MR. BAUM:  For the record, we would be opposed to

that, for the reasons that your Honor just articulated, as well

as the fact that on numerous occasions you have told the jury

that the indictment is merely an accusation.

         THE COURT:  I would do that if I send it back

regardless.  In any event, we have plenty of time to take it up

toward the end of the trial.

         Anything else?

         MR. DALACK:  With respect to openings, I just want to

alert the Court as to demonstratives.  From our perspective, we

are going to use the fee agreement.  That will be introduced

into evidence in this case, and I anticipate reading directly

from it to the jury.  Whether or not that's going to be blown

up or anything like that on some sort of poster board I am not

a hundred percent sure about yet, but the fee agreement will be

used as some sort of demonstrative during the opening.  Then

there may or may not be a children's book that I might make use

M1L8AVE2

1  of, and I will discuss that with the government by the end of

2  today in the event they would have any objections to that.

3          THE COURT:  I will reserve any comment or judgment on

4  the children's book.  But on the fee agreement, I assume you're

5  talking about the fee agreement between Mr. Avenatti and Ms.

6  Clifford?

7          MR. DALACK:  Yes, your Honor.

8          THE COURT:  Mr. Podolsky, I assume that there is no

9  question that it's coming into evidence.  Any objection?

10          MR. PODOLSKY:  I don't think so.  We will confer

11  afterwards, but we expect that will come into evidence.  We

12  will consider whether we need our own children's book once we

13  hear what version they are using.

14          THE COURT:  I will refrain from comment on the

15  children's book.  I will assume that defense can and will use

16  the fee agreement if they wish to.  If the government has any

17  concerns, it's incumbent upon you to raise it.  But unless and

18  until I say otherwise, that's fine.

19          Anything else?

20          MR. PODOLSKY:  No, your Honor.

21          MR. DALACK:  No, your Honor.  Thank you.

22          THE COURT:  You will have some homework to do between

23  now and Monday, as do I.  But promptly no later than 9:00 on

24  Monday be ready to start trial.  In the meantime, have a good

25  weekend.

M1L8AVE2

1           Just a reminder.  My deputy reminds me to remind you

2    that because of the COVID protocols, you should leave the

3    chairs where they are.  You can't move them around or adjust

4    your locations.

5           All right.  Thank you very much.  Have a wonderful

6    weekend.  I will see you on Monday morning.

7           (Adjourned to January 24, 2022, at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25