M1oWaveFrecorrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                           19 Cr. 374 (JMF)

MICHAEL AVENATTI,

            Defendant.
                                         Trial
------------------------------x

                                         New York, N.Y.
                                         January 24, 2022
                                         9:00 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                         District Judge
                                         -and a Jury-

                              APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW D. PODOLSKY
     ROBERT B. SOBELMAN
     ANDREW A. ROHRBACH
     Assistant United States Attorneys

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for Defendant
BY:  ROBERT M. BAUM
     ANDREW J. DALACK
     TAMARA L. GIWA
     Assistant Federal Defenders

Also Present:  Emily Abrams
               Christopher DeGrandpre
               Paralegal Specialists
               Juliet Vicari, Paralegal

M1oWaveFrecorrected

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4          MR. PODOLSKY:  Good morning, your Honor, Andrew

5    Rohrbach, Robert Sobelman, and Matthew Podolsky for the

6    government.  With us at counsel table is Special Agent DeLeassa

7    Penland from our office.

8          THE COURT:  Good morning.

9          MR. BAUM:  Good morning, your Honor.  Robert Baum.  I

10   have also with me my cocounsels, Tamara Giwa and Andrew Dalack.

11   And we are assisted by our paralegal specialist, Juliet Vicari.

12         THE COURT:  Good morning.  I see Mr. Avenatti is

13   present as well.  Good morning.

14         THE DEFENDANT:  Good morning, your Honor.

15         THE COURT:  This case is on trial.  We will be

16   starting with opening statements in a few minutes.  A couple of

17   preliminary matters let me quickly address.

18          First, the defense filed a motion this morning for

19   disclosure of 3500 material and 26.2 material.  I indicated in

20   an order that I would confirm that the government is aware of

21   its obligations and either has complied with them or with will

22   comply with them.  Beyond that, I don't think any further

23   action is required in connection with that motion.

24          Government?

25         MR. ROHRBACH:  Yes, your Honor, the government is

M1oWaveFrecorrected

1    aware of its Jencks Act obligations.  We have complied, and

2    will continue to do so.

3            THE COURT:  Great.

4            So that takes care of that as far as I am concerned.

5            Second, let me give you my ruling with respect to the

6    Brewster motions to quash.

7            By bottom-lime order entered yesterday, I gave you my

8    rulings on the motions those motions for reasons that I would

9    explain today, so let me quickly do that.

10           Together the motion papers -- this is at ECF Nos. 262,

11   266, 282, 286, and 291 -- raise three separate issues.  The

12   first issue is whether the subpoenas are proper to the extent

13   that they seek documents or other materials from Mr. Brewster

14   and Ms. Clifford.

15           The relevant standard is provided by *United States v.*

16   *Nixon*, 418 U.S. 683 (1974).  *See, e.g., United States v.*

17   *Avenatti*, 2020 WL 508682 at *3, (S.D.N.Y. January 31, 2020).

18   Under *Nixon* a Rule 17(c) subpoena must meet the tests of

19   "relevancy, admissibility and specificity."  418 U.S. at 700.

20           More specifically, a party seeking a Rule 17(c)

21   subpoena "must show (1) that the documents are evidentiary and

22   relevant; (2) that they are not otherwise procurable reasonably

23   in advance of trial by exercise of due diligence; (3) that the

24   party cannot properly prepare for trial without such production

25   and inspection and that the failure to obtain such inspection

1    may tend to unreasonably to delay the trial; and (4) that the

2    application is made in good faith and is not intended as a

3    general fishing expedition."  That's from pages 6999 to 700,

4    slightly cleaned up.

5         Applying that starred here, defendant's subpoenas fall

6    short.  First, they are not sufficiently specific, for much the

7    same reasons that Judge Gardephe that Mr. Avenatti nearly

8    identically worded subpoenas were improper in Avenatti, 2020 WL

9    508682 at *5-6.  To borrow from Judge Gardephe, in seeking "any

10   and all communications" covering an almost four-year period,

11   "Defendant sweeps too broadly.  His request has the earmarks of

12   a fishing expeditious premised on a mere hope that something

13   useful will turn up."  That is from page 5, also cleaned up.

14        Here, as there, defendant "has offered only

15   speculation" as to what the subpoena recipients might have

16   said.  Thus, he does not even assert that these communications

17   contain impeachment material.  That is from page 6.  In fact,

18   if anything, the subpoenas here are even more wanting because

19   (1) there is little question that most, if not all, of what

20   they seek would constitute inadmissible hearsay and (2) at

21   least as to the subpoena for Ms. Clifford's communications,

22   there is little question that it would apply to communications

23   that are subject to either or both the attorney-client

24   privilege and the work-product doctrine.  *See, e.g., United*

25   *States v. Pena*, 2016 WL 8735699 at *2 (S.D.N.Y., February 12,

MloWaveFrecorrected

1    2016).

2            Second, as noted in my bottom-line order, I will defer

3    judgment on whether to preclude defendant from calling

4    Mr. Brewster as a witness.  The government's arguments on that

5    score are not without force, but (1) it isn't clear that

6    Mr. Brewster's own motion actually seeks that relief.  It

7    focuses primarily, if not exclusively on, the requests for

8    documents; and (2) the record is not very developed on the

9    issue.

10           At a minimum, I will defer judgment until after

11    Ms. Clifford testifies both because her testimony may moot the

12    issue and because the record will be more well developed at

13    that point.  If, at that point, defendant still wishes to call

14    Mr. Brewster as a witness, he will have to make a detailed

15    proffer of precisely what he seeks to elicit from Mr. Brewster

16    so that I can make an assessment of its admissibility under

17    Rules 401 through 403.

18           Finally, as noted in my order, defendant's request to

19    exclude Mr. Brewster from the courtroom during the testimony of

20    Ms. Clifford is denied.  To be clear, that ruling is limited to

21    the testimony of Ms. Clifford.  There is no suggestion that

22    Mr. Brewster wishes to be in the courtroom during the testimony

23    of any other witness.  Indeed, the government in its opposition

24    is explicit on that score.  Unless and until I rule that

25    Mr. Brewster cannot be called as a witness, therefore, I will

M1oWaveFrecorrected

1    assume that he will not be present for the testimony of anyone

2    other than Ms. Clifford.  If that is an issue, I expect

3    Mr. Brewster or the government to raise it with me promptly.

4        Whether or not Mr. Brewster testifies, I find -- weighing

5    the factors articulated by the Second Circuit in *United States*

6    *v. Jackson*, 60 F.3d 128 at 135 (2d Cir. 1995), his presence

7    during Ms. Clifford's testimony is permissible under Rule

8    615(c).  Among other things, defendant has not made a showing

9    that Mr. Brewster's testimony is "critical" or "will involve

10   controverted and material facts" or that it is "subject to

11   tailoring" that would be affected by his presence during

12   Ms. Clifford's testimony.  Given that, if his testimony happens

13   at all, it would be based at least in part on recordings and

14   e-mail communications.  That is from *Jackson* at page 135.  And

15   given that Mr. Brewster is counsel to the alleged victim of

16   defendant's crimes, Mr. Brewster's presence is "essential

17   rather than simply desirable."  That's from the same page.

18       Indeed, as the government argues, *see* ECF No. 286, at

19   page 3, it may well be that his presence is required to satisfy

20   Ms. Clifford's rights under the Crime Victim's Rights Act 18

21   U.S. Code Section 3771.

22       For these reasons, Mr. Brewster may be in the

23   courtroom during Ms. Clifford's testimony whether defendant is

24   permitted to call him as a witness or not.

25       That's my ruling on that.

M1oWaveFrecorrected

1          Finally, I entered an order shortly ago denying

2   defendant's two outstanding motions.  That is the motion to

3   compel production of *Brady, Giglio*, and 3500 material in the

4   possession of Main Justice and the Central District of

5   California and the motion filed on Saturday seeking access to

6   the TABS data with respect to Ms. Clifford.

7          As I said, I would summarize that in court today, and

8   I will follow with a more thorough opinion.  I think that the

9   prosecution team issue has come up enough that it's clear to me

10  that I should put that to rest and make a record of my ruling

11  on that issue.

12         The bottom line is the motions are denied, and one or

13  both are untimely for reasons that I will spell out in my

14  opinion.  Mr. Avenatti has known that these are live and

15  potential issues for months, if not years, and it wasn't until

16  last week that he sought the relief that he is seeking from me.

17  Again, I will spell out my reasoning on that.

18         Number two, and perhaps more fundamentally,

19  Mr. Avenatti has what he is primarily seeking, namely, the

20  servers and to some extent the Drum analysis.  Indeed, he's had

21  it for months.  By contrast, the prosecution team here does not

22  have it.  The law is clear that where a defendant has

23  information or materials in his possession, there is no *Brady*

24  issue or disclosure obligation on the part of the government.

25  To the extent that he is seeking usable data, he has the same

M1oWaveFrecorrected

1    data that the government has, and the government and he are

2    both at the same disadvantage or in the same situation, namely,

3    not being able to read whatever it is.  But, again, that issue

4    wasn't raised with me until Friday and arguably Saturday.

5        And then, finally, for reasons that I will spell out,

6    I do conclude that, except perhaps with respect to Ms. Regnier

7    and Mr. Macias, that the prosecution team for purposes of this

8    case does not include the Central District of California or

9    Main Justice.  For that reason the materials that are in their

10   possession are not subject to disclosure in this case.

11       Again, I will be issuing an opinion addressing those

12   points in further detail and making a more fulsome record on

13   these issues, but I hope that puts the matter to rest.

14     I am going to advise the jury that they are all vaccinated

15   just so they know that, since you guys know that.  Hopefully

16   that will put them a little bit at ease.  I entered an order

17   last night indicated that seating during trial would be managed

18   by the District Executive's office.  That includes reserve

19   seating for both sides.  I know that they've been handling that

20   this morning, and I should say also for members of the press.

21       One issue I wanted to flag that I don't think will

22   come up this morning, but I want to make sure that you guys

23   think about it and we manage it accordingly, is how we handle

24   privilege issues if or when they arise during the testimony of

25   a witness.  So, for example, if Ms. Clifford is asked a

question that potentially intrudes on privilege and

Mr. Brewster is present in the courtroom, how we plan to handle

that, if that means Mr. Brewster stands up to object, if the

government or defense objects as the case may be.  I would like

to give that thought and have you guys confer about it.

The jury is here, which is wonderful news.  I am going to

have them brought up, but before they come in, anything that

you need to raise?

MR. PODOLSKY:  Yes, your Honor.  I want to raise a few

things because they could potentially impact the flow of trial

today.

The first is that, notwithstanding the Court's Rule 16

order, the defense produced nearly 3200 pages of material

relating solely to Mr. Janklow yesterday evening.  I haven't

had a chance to review all 3200 pages.  What I have had a

chance to look at seems largely coextensive with what the

government has previously produced.  So certainly if the

defense wishes to use the government's production, we are not

going to object.  But we may be forced to object on Rule 16

grounds to the extent we haven't had a chance to take a look at

the discovery, and I think we will continue to object if the

defense intends to continue to produce the evening before a

witness testifies substantial amounts of material past the Rule

16 deadline.

Sort of relatedly, I suppose, the defendant marked as

M1oWaveFrecorrected

1    a potential exhibit, defense exhibit, the entirety of the text

2    message exchanges between Mr. Janklow and Mr. Avenatti spanning

3    a year or two.  I had a prior conversation with defense counsel

4    about potential objections to government exhibits, including

5    defense counsel raising whether they think any of the material

6    that the government had redacted from text messages would be

7    admissible and therefore shouldn't be redacted.

8         Instead, it appears defense has just marked the

9    entirety of Mr. Avenatti's statements and Mr. Janklow's, over

10    90 pages.  We are certainly going to object to the admission of

11    those materials en masse.  So I want to raise these issues in

12    case we can resolve any of them before Mr. Janklow testifies

13    and also simply to bring to the Court's attention the nature of

14    the discovery here.

15         THE COURT:  All right.  Well, it seems like it might

16    be premature for me to address it, but I certainly appreciate

17    your alerting me to it.

18         Yes, Mr. Dalack?

19         MR. DALACK:  Yes, Judge.  Thank you.

20         So the e-mails that were produced last night are, if

21    not entirely coextensive largely coextensive with what the

22    government produced to us.  I submit is that we produced them

23    in a much more user friendly format than the manner in which

24    they produced it to us.  I submitted them in a searchable

25    format and a PDF format.

M1oWaveFrecorrected

1          To the extent we are seeking to affirmatively

2    introduce any of the e-mail exchanges, we can clear any

3    authenticity hurtles with Mr. Janklow and make an argument as

4    to admissibility.  I don't anticipate any issues.

5          Then with respect to the text message exchange, it is

6    a similar situation.  We produced what is exactly coextensive

7    with what the government produced to us from Mr. Janklow's text

8    exchange with Mr. Avenatti.  I don't anticipate admitting at

9    all en masse the text exchange.  I would anticipate admitting

10   particular exchanges, either affirmatively or for impeachment

11   purposes.  Today I think we should take it as it comes, again,

12   given the fact that the exhibit that we produced is simply and

13   unredacted form of what the government originally produced to

14   us.

15         THE COURT:  We will take it as it comes.  I hope I can

16   avoid the need for sidebars, but certainly the government can

17   and should object if it has an objection.

18         Anything else that we must address this morning?

19         The jury is on its way up.

20         MR. DALACK:  Yes, Judge.  I just have one more thing.

21   I need to make a record about this.

22         THE COURT:  Yes.

23         MR. DALACK:  We did not receive the jury selection

24   data.  As a result it is incumbent about the defense to

25   reiterate its request for a modest adjournment to receive the

M1oWaveFrecorrected

1    data.

2         THE COURT:  All right.  That request is denied.

3         You have not asked me for further relief in assisting

4    you in getting it.  I'm certainly happy to provide whatever

5    assistance I can, but the bottom line is it was belatedly

6    requested.  To the extent that you haven't gotten it, you've

7    not, other than alerting me to that, you haven't asked me to

8    assist.  So the bottom line is it's denied.

9         All right.  Anything else from the government?

10        MR. ROHRBACH:  Nothing from the government.

11        THE COURT:  The anything else from the government?

12        MR. DALACK:  No, Judge.  Thank you.

13        THE COURT:  All right.  When the jury is up here we

14   will bring them in and we will get started.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M1oWaveFrecorrected

```
 1              (Jury present)

 2              THE COURT:  You may be seated.

 3              Thank you, Ms. Smallman, for directing traffic.

 4              Ladies and gentlemen please take note of where you're

 5     sitting.  That will be your seat, barring some change, for the

 6     remainder of trial.

 7              I should also note that at this point you new have new

 8     juror numbers.  So this is Juror No. 1 in the seat closest to

 9     me in the first seat, Juror No. 2, 3, 4, 5, 6 through 10 in the

10     second row here, 11 and 12 in the first row back there, and

11     then 13 through 18 up there.

12              So those are now your juror numbers and will be for

13     the remainder of the trial.  Again, the seat that you are

14     currently in is going to be your seat for the remainder of

15     trial, so take note of it.  Hopefully after one or two times

16     doing that with Ms. Smallman's assistance you guys will figure

17     out the right order to be in and where to go when you enter.

18     With the social distancing and COVID protocols that we have in

19     place, it is a little trickier than usual entering.

20              So I thank Ms. Smallman and I thank you.

21              I also want to thank you guys for being here on time

22     today.  You get a gold star for the first day of trial, and I

23     deeply appreciate that.  As I said to you last week, beyond

24     providing for a fair trial, my biggest commitment is just

25     respecting your time and getting you out of here as quickly as
```

1   I can.  I need you to do your part to help me in doing that, so

2   I thank you for doing that this morning.

3        I also just want to share with you all of you

4   information that the parties now know, which is that all of you

5   are fully vaccinated.  I am pleased to hear that.  I just

6   wanted to share that with you so it could potentially put you

7   at ease if that's something that you wanted to know.

8        We will begin with the oath that Ms. Smallman will

9   administer to you just to formally swear you in as jurors in

10   this matter.  With that I would ask you to please rise and

11   raise your right hands.

12        (A jury of 12 and 6 alternates was sworn)

13        THE COURT:  All right.  With that, the case is

14   officially on trial.  All of the instructions that I gave you

15   on Friday continue to apply.

16        We will begin, as I mentioned on Friday, with the

17   opening statements of the lawyers, beginning with the

18   government's opening statement.  Then, if the defendant wishes

19   to make a statement, his lawyer will as well.  I remind you

20   that the government bears the burden at this trial and does so

21   throughout the trial.

22        I also remind you that what the lawyers say is not

23   evidence.  It is merely their prediction of what the evidence

24   will show, just to give you a better sense of the evidence as

25   you hear it, since you will hear it witness by witness and

1    piece of evidence by piece of evidence.

2            So you should definitely listen carefully, but keep in

3    mind that what they say is not evidence.  The testimony and the

4    exhibits that are admitted into evidence are the evidence that

5    you should consider later when you begin your deliberations.

6            With that, we will begin with the government.

7            You may proceed.

8            MR. ROHRBACH:  This is a case about a lawyer who stole

9    from his client, a lawyer who lied to cover up his scheme.

10   That lawyer is the defendant Michael Avenatti.

11           The defendant's client, the victim in this case, had a

12   book deal.  She would write her autobiography, and the

13   publishing company would pay her in four installments.  But the

14   defendant stole two of those payments, almost $300,000.

15           To do it, the defendant sent a letter to the victim's

16   book agent.  The letter looked like it was signed by the

17   victim, and it told the agent to make sure that the money went

18   to a new account.

19           But the victim did not know about that account.  The

20   victim did not sign that letter.  Instead, the defendant copied

21   the victim's signature from another document to make sure the

22   money came to an account that he controlled and then he stole

23   it.

24           To cover it up, the defendant lied.  He lied to the

25   victim.  He lied to the book agent.  He lied to everyone

1    involved over and over and over again.

2              That's why we're here, because the defendant stole

3    almost 300,000 from the person he was supposed to be looking

4    out for.

5              Members of the jury, this opening statement is our

6    opportunity to give you a preview of what we expect will happen

7    at this trial.  I am going to do that in two parts:

8              First, I will describe what we expect the evidence at

9    this trial will show; and

10             Second, I'll tell you how we are going to prove beyond

11   a reasonable doubt that the defendant is guilty.

12             So, first, what will the evidence show?

13             The defendant, Michael Avenatti, was the lawyer for a

14   woman named Stephanie Clifford, who goes by the name Stormy

15   Daniels.  Stormy Daniels is an adult entertainer, an actress,

16   and an author, among other things.

17             In the spring of 2019, Ms. Daniels wanted to publish

18   her book, her life story.  The defendant helped Ms. Daniels

19   find the book agent, and the book agent helped find a

20   publishing company and to get a book deal with the publisher.

21             The publisher agreed to pay Ms. Daniels $800,000 for

22   the book in four installments.

23             The first payment went fine.  The publishing company

24   sent the money to the book agent, the book agent took out his

25   fee and sent the rest of the money to Ms. Daniels, exactly as

1    agreed.

2          But the defendant decided to steal the second payment.

3    You'll learn that the defendant was desperate for money.  His

4    law firm was in debt.  He had trouble making payroll and paying

5    for his office space.  And the defendant had personal financial

6    problems, too.

7          So the defendant asked the book agent to send future

8    payments to a bank account that the defendant controlled rather

9    than the victim's account.  He lied to the book agent,

10   pretending that he was asking for Ms. Daniels.

11         But the book agent wouldn't do it without Ms. Daniels

12   approval, so the defendant put his lie in writing.  He wrote

13   that fake letter from Ms. Daniels to the book agent.  The

14   letter told the book agent to send future payments to the

15   defendant's so-called trust account, a bank account that the

16   defendant controlled.  And then the defendant lied to his

17   office manager so she would copy Ms. Daniels' signature from

18   another document and paste it on the letter.  Ms. Daniels did

19   not know about this letter and did not give anyone permission

20   to sign her name to it.

21         At first, the defendant's scheme worked.  The book

22   agent was fooled.  He followed the payment instructions from

23   the defendant's fake letter and sent almost $150,000 to the

24   defendant's account.

25         And the defendant didn't hold that money in trust for

1    Ms. Daniels.  He spent it on himself.  He spent it on travel,

2    on food, and at Starbucks and on other personal expenses.  None

3    of that money was paid to Ms. Daniels.

4          To be clear, there was no agreement for the defendant

5    to get any piece of Ms. Daniels' book money.  You'll learn that

6    Ms. Daniels hired the defendant to help her with a high-profile

7    legal dispute between her and former President Donald Trump.

8          Ms. Daniels and the defendant had a written contract.

9    Ms. Daniels paid the defendant $100, and the defendant also got

10   permission to raise money from the defendant to pay for

11   Ms. Daniels' legal bills, which he did.  You will learn that he

12   used an online crowd funding site to raise about $600,000 from

13   the public to pay himself for his work.  But under their

14   agreement, that was it.

15         Now, you will see that written contract at this trial,

16   and you will see that they left open the possibility that the

17   defendant would get paid for helping with the book deal.  This

18   is what that agreement said.  It said, "In the event the

19   defendant assists Ms. Daniels in finalizing any book or media

20   opportunity that results in Ms. Daniels' being paid, the

21   defendant and Ms. Daniels agree that the defendant shall be

22   entitled to a reasonable percentage to be agreed upon between

23   Ms. Daniels and the defendant."

24         "To be agreed upon."

25         You will learn that when the time came, the defendant

1    told Ms. Daniels that he wasn't going to take a penny from that

2    book deal.  He told her that she earned the money.  They never

3    agreed that the defendant could take any of the book money.

4    There is no other written contract.

5        Now, as I said a minute ago, the defendant's fake

6    letter worked.  Ms. Daniels didn't get the second book payment.

7    And she noticed.  So she turned to the defendant for help.  He

8    was her lawyer.  He was supposed to be her advocate.  His job

9    was to fight for her.  She was owed $150,000, and she wanted

10   her lawyer to help her get it.  But she didn't know that her

11   lawyer had already stolen her money.

12       So what did the defendant do?

13       He lied.

14       He told her that the publisher was being slow.  He

15   told her that he was working on it.  But the whole time he had

16   her money and he was spending it.

17       Eventually the lies ran out.  Ms. Daniels said that

18   the publisher violated her contract and the defendant knew that

19   if he didn't get her money quickly, she might figure out that

20   he was lying.  After all, that second payment belonged to her,

21   not to him.

22       So he resorted to borrowing from friends.  He told

23   another lie.  He lied to a friend to get a loan and he used

24   that loan to pay Ms. Daniels what she was owed.  And he told

25   Ms. Daniels that that money had come straight from the

1  publisher.  That is how he stole the second payment and lied to
2  pay it back.
3        You are going to hear that the defendant did it again.
4  And this time he didn't pay it back.  The third payment was due
5  when the book was published.  But before that the defendant
6  asked the book agent to make the payment early.  He told the
7  book agent that Ms. Daniels needed the money early.  But that
8  was a lie, an excuse for the defendant to get his hands on the
9  money.
10       And so the publisher paid the third payment early to
11 the book agent, who again sent Ms. Daniels' money to the
12 account that the defendant controlled.  And the defendant again
13 used it on himself, this time on payroll, on airfare, on food.
14 He spent it on himself.
15       Once again, Ms. Daniels noticed that she didn't get
16 the third payment on time.
17       Once again, she asked the defendant about it.
18       The defendant did not say that he already had her
19 money.  He did not say that he was entitled to the money.  He
20 told her he was working on getting her the money.
21       He told her that the publisher was refusing to make
22 the payment.  He even told her that he was threatening to sue.
23 These were all lies.
24       Ms. Daniels reached out to the book agent and to the
25 publisher to try to locate the money herself.  But the

1  defendant told them to ignore Ms. Daniels, making excuses about

2  why she contacted them.  He lied to them too.

3          This went on for months.  For months the defendant

4  lied to Ms. Daniel and told her he was fighting to get the

5  third payment.  And at the same time he was actually fighting

6  against her, making excuses to the book agent for her

7  questions, because the defendant had already spent her money.

8          Then Ms. Daniels finally got around the defendant, and

9  the defendant's scheme unraveled.

10          Ms. Daniels spoke to the publisher and to the book

11  agent, ready to complain about their refusal to pay her.  And

12  she found out that they had already paid.  They showed her

13  records for all three payments, including the second and the

14  third payment that were sent to the defendant's account.  And

15  Ms. Daniels learned then that the defendant had her money all

16  along.

17          I mentioned a fourth payment earlier.  After the

18  defendant was caught stealing from Ms. Daniels and couldn't get

19  away with it any longer, the book agent paid the fourth payment

20  directly to Ms. Daniels.

21          That's what the evidence will show at this trial.

22          For what he did, the defendant is charged with two

23  crimes:

24          First, for stealing Ms. Daniels money through fraud,

25  he is charged with wire fraud.

1          Second, he is charged with a crime called aggravated

2     identity theft for using Ms. Daniels' name and signature

3     without permission when he created that fake letter directing

4     the book agent to send the money to his account.

5          Now that you have a sense of what this case is about,

6     I want to talk briefly about how we will prove beyond a

7     reasonable doubt that the defendant is guilty of these charges.

8          First, you will see the defendant's lies in his own

9     words.  You will see dozens of text messages between the

10    defendant and Ms. Daniels.  You will see Ms. Daniels complain

11    to him about the publisher's failure to pay her, you will see,

12    as he pretends to fight on her behalf, even though the

13    publisher had already paid the money to the defendant.

14         And in the dozens of messages you will see, the

15    defendant will never say he was entitled to Ms. Daniels' book

16    money.  The messages tell the whole story.

17         Second, you are going to follow the money.  You will

18    see bank and wire records showing the first payment go directly

19    to Ms. Daniels, as it was supposed to.

20         You will see the second and third payments go to the

21    defendant's account instead and then be used to pay the

22    defendant's expenses.

23         You will see the loan money and how the defendant used

24    it to pay back the second payment and cover up his scheme.

25         You will see another document, too.  You will see that

1    fake letter that the defendant sent the book agent.  The letter

2    with Ms. Daniels copy-paste signature telling the book agent to

3    send Ms. Daniels' money to the defendant's account.

4            And, of course, you will hear from witnesses.  You

5    will hear from the book agent and from an editor at the

6    publishing company.  They will tell you how they thought the

7    defendant was representing Ms. Daniels' interests.

8            You will hear that the defendant convinced them to pay

9    Ms. Daniels early because the defendant said she needed the

10   money.  And when Ms. Daniels started asking her agent and her

11   publisher about the money, you will hear that her lawyer, the

12   defendant, made sure they never spoke to her and they didn't

13   respond to her calls and texts.

14           You will also hear from Ms. Daniels.  She will take

15   the stand and tell you that the defendant was her lawyer.

16   She'll tell you how the defendant said he would not take any

17   money from the book deal.  She will walk you through the text

18   messages between her and the defendant showing you that she

19   thought he was helping her fight with a publishing company that

20   refused to pay her, until she realized that those texts with

21   defendant were lies and the defendant was the one betraying her

22   trust.

23           Now, Ms. Daniels has a lot of jobs.  She is an

24   entertainer.  She's been in adult films.  She is on a show

25   about paranormal activity.  But adult film actresses and

1  paranormal investigators can be victims of fraud and identity

2  theft too, just like anyone else.

3         This case is not about her jobs, what she does for

4  money.  It is about a fraud that was committed.  When you

5  compare Ms. Daniels' testimony to the text messages and the

6  documents and the other testimony in this case, you will see

7  how they all line up to prove that the defendant stole from

8  her.

9         You will hear it from other witnesses too.  The

10  defendant's office assistant will tell you how she pasted

11  Ms. Daniels' signature on that fake letter because the

12  defendant told her to.  The defendant's friend who arranged the

13  loan will describe the defendant's desperation for money at the

14  very same time he was stealing from Ms. Daniels.

15         That's some of the evidence you will see and hear.

16  That's how we'll prove to you that the defendant is guilty.

17         After you see and hear all the evidence, we will have

18  another chance to talk with you about how it all fits together,

19  how it shows that the defendant betrayed the victim, stole her

20  money, and lied to cover it up.  Between now and then, I ask

21  you to please do three things:

22         First, please pay close attention to the evidence.

23         Second, follow Judge Furman's instructions on the law;

24  and,

25         Third, use your common sense, the same common sense

1    you use to make decisions in your everyday lives.

2            If you do those three things, the defendant will get a

3    fair trial and the government will get a fair trial.  And at

4    the end of this trial you will return the only verdict

5    supported by the evidence, the law, and your common sense:  The

6    defendant is guilty.

7            THE COURT:  Thank you.

8            We will now hear from defense counsel.

9            Mr. Dalack.

10           MR. DALACK:  Now let me tell you what this case is

11   really about.  Mr. Avenatti didn't steal Stormy Daniels' money.

12   He didn't defraud her.  He didn't intend to defraud her.

13   Mr. Avenatti certainly did not act without Ms. Daniels'

14   authorization.

15           Michael Avenatti had a contract known as a fee

16   agreement with Stormy Daniels that Ms. Daniels read,

17   understood, and signed.  That fee agreement entitled

18   Mr. Avenatti to compensation for his work on Ms. Daniels'

19   behalf and reimbursements for costs and expenses associated

20   with his legal representation of her.

21           What we have in this case, members of the jury, is a

22   disagreement, a fee dispute between an attorney and his

23   disgruntled former client, who wanted all the benefits of

24   zealous, fierce, and loyal representation without having to pay

25   for it.

1          This case is about Ms. Daniels not wanting to uphold
2     her end of the contract that she signed and her decision to lie
3     and enlist the power of federal prosecutors to go after
4     Mr. Avenatti so she could avoid paying him what he is owed.
5     This disagreement, members of the jury, has absolutely no
6     business in federal criminal court, and Mr. Avenatti is not
7     guilty.
8          To understand how we got here, we have to travel back
9     in time to the beginning of 2018.  Donald Trump had been
10    President of the United States of America for about a year.
11    Stormy Daniels was an adult entertainer with moderate
12    notoriety, and Michael Avenatti was an accomplished California
13    attorney who had graduated first in his class from George
14    Washington Law School.  It would have been difficult to find
15    three more different people.
16         But by the spring of 2018, the three of them were the
17    focus of the nation in a political scandal that revolved around
18    Mr. Trump's 2006 hush money payment to Ms. Daniels to cover up
19    an affair that he had with her in the waning days of his 2016
20    presidential election.
21         Now, Mr. Avenatti first met Ms. Daniels near the end
22    of February 2018.  Although the story of Ms. Daniels' affair
23    with Mr. Trump had gained some traction and the
24    campaign-related payout had been covered by the press, it did
25    not make much noise.  So Ms. Daniels was looking for someone, a

1   zealous, passionate attorney, an advocate to take up her cause
2   and to take on the President of the United States, the most
3   powerful man in the world.

4        But many of the attorneys that Ms. Daniels met with
5   were very wary about taking on Mr. Trump.  So much so that they
6   insisted on exorbitant, extreme, upfront fees to represent her.
7   She couldn't afford those fees.

8        Enter Michael Avenatti, a seasoned trial attorney who
9   had put himself through college and law school and had 18 years
10  of experience under his belt, having obtained verdicts and
11  settlements for his clients in the hundreds of millions of
12  dollars.  Mr. Avenatti was at the top of his game when he met
13  Ms. Daniels.  Mr. Avenatti was exactly the kind of polished,
14  aggressive, and unafraid litigator that Ms. Daniels needed.

15       Shortly after their first meeting, Mr. Avenatti and
16  Ms. Daniels entered into a fee agreement, a contract in which
17  they agreed to a number of things, but I am going to focus on
18  three of them.

19       First, Ms. Daniels agreed to pay Mr. Avenatti a token
20  $100 to formalize his representation of her, to formalize their
21  attorney-client relationship.

22       Second, Ms. Daniels agreed that she would authorize
23  the creation of a crowd-sourced fund to gather donations from
24  her supporters across the country to help cover Mr. Avenatti's
25  legal fees, including the costs associated with legal filings,

1    travel, and other expenses that Mr. Avenatti would inevitably

2    incur through his representation of Ms. Daniels.

3          Third, and perhaps most importantly to this case, the

4    fee agreement made it perfectly clear in black and white that

5    in the event Mr. Avenatti assists Ms. Daniels in finding any

6    book or media opportunities that results in Ms. Daniels being

7    paid Mr. Avenatti and Ms. Daniels agree that Mr. Avenatti shall

8    be entitled to a reasonable percentage to be agreed upon.

9          Now, Ms. Daniels and Mr. Avenatti reviewed the fee

10   agreement, understood its terms, and they signed the document

11   on February 27, 2018.

12         Immediately thereafter, members of the jury,

13   Mr. Avenatti got to work on Ms. Daniels' behalf.

14         First, he filed a highly publicized lawsuit against

15   Mr. Trump on March 6, 2018, and began zealously representing

16   Ms. Daniels in other courts of law and in the court of public

17   opinion.  Ms. Daniels had also told Mr. Avenatti about her

18   ten-year-long dream of publishing a book, a memoir about her

19   life, something she had been unable to achieve on her own.

20         I want to take a moment here, because we all just

21   listened to the government's opening statement and the

22   government made it sound like that when Ms. Daniels met

23   Mr. Avenatti she had a book in hand.  Members of the jury, that

24   couldn't be farther from the truth, as the evidence will show,

25   and that when Ms. Daniels met Mr. Avenatti, she conveyed to him

M10NAVE1                    Opening – Mr. Dalack

1    that it was her dream to publish a memoir.  And Mr. Avenatti

2    was committed to making that dream come true.

3            So what did Mr. Avenatti do?

4            He quickly used his media contacts to connect with an

5    accomplished book agent who you will hear from today.  And by

6    April 12, 2018, a few short weeks after having inked their fee

7    agreement, Mr. Avenatti helped Ms. Daniels lock down an

8    $800,000 book deal with $250,000 going up front right to

9    Ms. Daniels without a single word being written, no questions

10   asked.  And it was all thanks to Michael Avenatti.

11           As the country's attention focused on Stormy Daniels

12   and Michael Avenatti and their battle against Mr. Trump with

13   countless media interviews and legal filings and day-to-day

14   fires that required immediate attention, Mr. Avenatti continued

15   to work hard on Ms. Daniels' behalf and on her book deal.

16           At every turn the book agent was in touch with

17   Mr. Avenatti about how to deal with Ms. Daniels, who you will

18   hear today was unpredictable and at times uncontrollable.  You

19   will hear that at various points nobody could manage to get

20   Ms. Daniels to uphold her end of the book contract.  See, she

21   was required as a part of the book contract to do certain

22   things, meet deadlines with her writer and also promote the

23   book because the publisher wanted to make money too.

24           But you will hear that they struggled to get

25   Ms. Daniels to focus on her obligations under the book

1    contract.  And when they did, who do you think they turned to?

2    Mr. Avenatti, who was always there to assist, whether it was to

3    edit manuscripts, look at book covers, edit the inserts of the

4    front flap.  Whatever it took, Mr. Avenatti was there to make

5    it happen.  He was loyal to Ms. Daniels and was committed to

6    not letting her dream of publishing a memoir die.

7            At the same time that he was doing what he needed to

8    do with respect to the book deal, Mr. Avenatti was doing a lot

9    of other things for Ms. Daniels.  When Ms. Daniels wanted to

10   sue somebody, she went to Michael.  When she was harassed by

11   the police, she went to Michael.  Whatever her problem was she

12   went to Michael, including money issues.

13           And you will hear that Mr. Avenatti advanced

14   Ms. Daniels hundreds of thousands of dollars, loaned

15   Ms. Daniels, advanced to her hundreds of thousands of dollars

16   of his own money for all sorts of things, to pay for her

17   personal security on end, to help her buy a car, to obtain

18   possible blackmail material.

19           And through his tireless efforts Mr. Avenatti reset

20   the narrative about Ms. Daniels.  Mr. Avenatti brought her

21   enormous credibility in her battle against Mr. Trump.

22   Mr. Avenatti transformed a rather obscure adult entertainer

23   into a household name.

24           This was not by accident, members of the jury.  It was

25   the result of hundreds of hours of work by Mr. Avenatti,

M10NAVE1                    Opening — Mr. Dalack

1    enormous sacrifice in an unrivaled commitment to his client.

2    Mr. Avenatti accomplished for Ms. Daniels what few other

3    attorneys in America could.

4            Now, unfortunately, Ms. Daniels failed to live up to

5    her end of the deal, including with respect to her book.  The

6    evidence will show that, even though her book initially presold

7    around 10,000 copies and was on the New York Times bestseller

8    list for about a week, the book was a disaster in large part

9    because Ms. Daniels did not do what she agreed to do to promote

10   the book.  Ms. Daniels failed to live up to her obligations

11   under her contract with McMillan, the publishing company, so

12   much so that you will hear that the publisher even threatened

13   to withhold payments from her, and that around the same time

14   Ms. Daniels' book was failing.  You will hear how she began to

15   unravel, accusing some of her closest friends and associates,

16   people she has known for years, of all sorts of wrongdoing,

17   including stealing money from her.

18           You are going to hear, members of the jury, that when

19   Ms. Daniels doesn't get her way, when she gets upset about

20   something, she turns on the people closest to her.  She makes

21   false accusations against people that she's known for years.

22           This brings me to why we're here.  The government's

23   case lives and dies on one thing and one thing alone:

24   Ms. Daniels' claim that Mr. Avenatti orally, without

25   documentation and any writing whatsoever, told Ms. Daniels that

1    he would not accept any money from the book deal, only to then

2    later accept those same books payments on her behalf and

3    without authorization and then keep one for himself.

4           But members of the jury, over the course of this

5    trial, you will hear that there are a whole lot of reasons why

6    you can't believe Ms. Daniels.

7           First, Ms. Daniels had a motive to lie against

8    Mr. Avenatti.  You see, Ms. Daniels had lost one of the cases

9    against Mr. Trump, and she was hit with $300,000 in attorneys'

10   fees.

11          It made her mad.  But the evidence will show that she

12   didn't want to pay it and that she blamed Mr. Avenatti for the

13   loss and made up a story about the book deal to get him back

14   and avoid having to pay the judgment herself.

15          Second, the evidence will actually show that

16   Mr. Avenatti was clearly authorized to accept money on

17   Ms. Daniels' behalf, including from the book deal, and that

18   Ms. Daniels herself instructed Mr. Avenatti to help her hide

19   money from her estranged husband, who had cleaned out one of

20   her bank accounts.

21          Specifically, you will hear that near the end of July

22   2019, Ms. Daniels told Mr. Avenatti that she was closing her

23   account with her estranged husband and asked for Mr. Avenatti's

24   help in keeping money from him.

25          And the evidence will show that a little over a week

M10NAVE1                              Opening – Mr. Dalack

1    after that conversation took place, Mr. Avenatti sent a letter

2    to the book agent noting that Ms. Daniels' old account had been

3    closed and instructing the book agent, based on Ms. Daniels'

4    authorization, to transmit the funds to a trust account in

5    Ms. Daniels' name at Mr. Avenatti's firm.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DALACK:  And third, the evidence will show that at

2   around the same time, Ms. Daniels accused Mr. Avenatti of

3   stealing one of her book payments, she began claiming that she

4   could speak with dead people, see inside homes with x-ray

5   vision, that she could interact with a haunted doll named

6   Susan, who walked, talked, plays the piano and calls her mommy.

7          Now, members of the jury, I submit, talking to dolls

8   might not be that unusual.  My kids do it all the time, but

9   when the dolls talk back to you, now that's a problem.  And I

10  submit to you that at times you might find some of the

11  testimony in this case and some of the evidence to be a little

12  bit funny or humorous, but I can assure you that there is

13  nothing funny about Ms. Daniels's decision to transform a

14  disagreement over fees with Mr. Avenatti into a federal

15  criminal case, where Mr. Avenatti has a lot more than money on

16  the line.

17          The government asks you to use your common sense at

18  the end of their opening statement.  Look, I agree with them.

19  Do that.  Does it make sense to you that Mr. Avenatti would

20  sign an agreement entitling him to a fee from a book deal only

21  to later, orally, and without any written documentation,

22  abandon that interest, and then steal what he was previously

23  entitled to in plain sight?  It doesn't make any sense.  In

24  fact, I submit to you, members of the jury, it can only make

25  sense if Michael Avenatti was an idiot, and I can assure you

M1oWave2                    Opening – Mr. Dalack

1  that many people have said and will probably continue to say a

2  lot of things about Michael Avenatti, but one thing you can't

3  say -- that he's stupid.

4        At the end of this trial, after all of the evidence

5  has come in, you will be tasked with making an important

6  decision that will have a lasting impact on Mr. Avenatti's

7  life, and after you consider all the evidence, all of the work

8  that Mr. Avenatti did on Ms. Daniels's behalf, all of his

9  efforts on the book deal, and all of the money that he advanced

10  to her and expended on her through his tireless representation

11  of Ms. Daniels, I am confident that you will all reach the same

12  conclusion, that this case is a disagreement over money, not a

13  federal crime --

14        MR. ROHRBACH:  Objection, your Honor.

15        THE COURT:  Overruled.

16        MR. DALACK:  -- and that the federal government should

17  have never wasted its time and resources pursuing it.

18        Mr. Avenatti is not guilty.

19        Thank you.

20        THE COURT:  Thank you, Mr. Dalack.

21        All right.  That concludes the lawyers' opening

22  statements.  Again, a reminder that what the lawyers say is not

23  evidence.  You're about to hear the beginning of that evidence,

24  and with that, I'll ask the government to call its first

25  witness.

1           MR. PODOLSKY:   The government calls Luke Janklow.

2      LUCAS JANKLOW,

3           called as a witness by the government,

4           having been duly sworn, testified as follows:

5           THE COURT:   The government may proceed.

6   DIRECT EXAMINATION

7   BY MR. PODOLSKY:

8   Q.   Good morning, Mr. Janklow.

9   A.   Good morning.

10  Q.   What do you do for a living?

11  A.   I'm a literary agent.

12  Q.   Where do you work?

13  A.   Janklow & Nesbit Associates.

14  Q.   Where is that based?

15  A.   New York; we have an office in London.

16  Q.   How long have you been a literary agent?

17  A.   In excess of 20 years.

18  Q.   Can you explain briefly what a literary agent does?

19  A.   Sure.   We represent authors.   They write books, and we help

20  them craft the books and sell them to publishers.

21  Q.   Are you familiar with the term "book deal"?

22  A.   Very familiar with a book --

23  Q.   What is a book deal?

24  A.   A book deal's a financial arrangement between a publisher

25  and an author, where a payment is agreed upon and the substance

1   of a book is defined.

2   Q.  And do you assist your clients in obtaining book deals?

3   A.  That is my central purpose.

4   Q.  How do literary agents earn money?

5   A.  We take a percentage of the money that comes in from the --

6   generated from the book.

7   Q.  Now, what is a publisher?

8   A.  A publisher is a large company, usually part of a larger

9   corporation, that purchases the books, manufactures them,

10   markets them, sells them.

11   Q.  Are you familiar with a book called Full Disclosure?

12   A.  I am.

13   Q.  What is that?

14   A.  That was Stormy Daniels's memoir.

15   Q.  How are you familiar with that book?

16   A.  I represented it.

17   Q.  Who published the book?

18   A.  St. Martin's Press.

19   Q.  During the time that you were working on the book, did

20   Ms. Daniels have an attorney?

21   A.  She did.

22   Q.  And who was that?

23   A.  Michael Avenatti.

24   Q.  Do you see him in the courtroom today?

25   A.  I do.

M1oWave2                          Janklow - Direct

1  Q.  Can you please identify him by where he is and an article

2  of clothing he's wearing?

3  A.  He's in the middle of the room, wearing a blue shirt.

4         MR. PODOLSKY:  Your Honor, may the record reflect that

5  the witness has identified the defendant, Michael Avenatti?

6         THE COURT:  So noted.

7  BY MR. PODOLSKY:

8  Q.  Now, how does an author get paid for a book, typically?

9  A.  We agree on an overall price, and that price is paid out

10 during the progression of the creation of and publication of

11 the book.

12 Q.  Are you familiar with the term "advance"?

13 A.  Yes.

14 Q.  What is an advance?

15 A.  An advance is the total agreed-upon price that would be

16 paid to the author, and that is a guaranteed fee, whether they

17 sell zero books or infinite books.

18 Q.  Just so I understand, who pays the advance on the book?

19 A.  The publisher.

20 Q.  And typically, in your business, how is it paid?

21 A.  Usually in four installments across the life of the book.

22 Q.  And who does the publisher pay directly?

23 A.  They pay my company, and we pass it through to the author.

24 Q.  How much was Ms. Daniels's advance on the book Full

25 Disclosure?

M1oWave2                    Janklow – Direct

1    A.   $800,000.

2    Q.   Were there four advance payments, or was the advance

3    divided into four installments, communicated?

4    A.   Yes.

5    Q.   And did you, did your company, Janklow & Nesbit, receive

6    each of those four advance payments from the publisher?

7    A.   Yes, we did.

8    Q.   Did you take your commission out of each of those payments?

9    A.   Yes, we did.

10   Q.   Now, let me focus on the first of those four installments.

11   What did you do with the first advance payment once you

12   received it from St. Martin's Press?

13   A.   We deposited it in our bank account, removed 15 percent,

14   which is our commission, and sent the rest to Stormy.

15   Q.   And when you say Stormy, who are you referring to?

16   A.   Stormy Daniels, the author.

17   Q.   What account did you send it to for Ms. Daniels?

18   A.   It was called Stormy Entertainment.

19   Q.   Now, turning to the second of the four book payments, what

20   did you do once you received that one from St. Martin's Press?

21   A.   We did the same mechanical thing, meaning that we received

22   the money, we removed our commission, we passed on the money to

23   Stormy.  We had been given new instructions for the bank

24   account to receive her portion of the money.

25   Q.   Who provided those instructions to you?

M1oWave2                         Janklow - Direct

1  A.  Mr. Avenatti.

2  Q.  And so, to be clear, did you send the second payment to the

3  same account as the first payment or a different account?

4  A.  A different account.

5  Q.  And what about the third payment; which account did you

6  send that one to?

7  A.  To the same one as the second payment.

8  Q.  And the fourth and final payment, what did you do with that

9  once you received it from St. Martin's Press?

10  A.  That went to another account at Stormy's instructions.

11  Q.  To be clear, the final payment, fourth and final payment,

12  was that sent to the same account as the second and third

13  payments?

14  A.  It was not.

15  Q.  Why not?

16  A.  Because Stormy instructed us to send it to a different one.

17  Q.  And was that instruction from Ms. Daniels herself?

18  A.  Yes.

19  Q.  OK.  We'll return in more detail to that in a moment, but

20  let's back up in the chronology.

21      Approximately when did you first meet Mr. Avenatti?

22  A.  I think it was March 2018, roughly.

23  Q.  And where were you?

24  A.  In the city.

25  Q.  Which city?

1   A.  New York City.  Sorry.  The only city.

2   Q.  Did you know of him?  Did you know who he was before you

3   met him?

4   A.  Yes.

5   Q.  What did you know of him?

6   A.  I knew what I had seen in the papers and on television, and

7   he was very present.

8   Q.  And generally, what was that?

9   A.  He was a folk hero at that point.  He was, you know, during

10  a time of, when the country became very divided, after Trump's

11  election, he was very aggressive and very effective on

12  television, fighting for the 70 million people who didn't vote

13  for him.

14  Q.  And what was your understanding as to how Mr. Avenatti

15  first became known in the public?

16  A.  On that level, it was representing Stormy in her defense

17  against the President.

18  Q.  What did you discuss with Mr. Avenatti when you met him?

19  A.  A book that Stormy might write.

20  Q.  And what did you understand that the book would be about?

21  A.  Well, that was what we were discussing, but it was about

22  her life and her character and her experiences.

23  Q.  Did you begin working as Ms. Daniels's agent after that?

24  A.  I did.

25  Q.  We'll get into some specific instances in a bit, but

1  generally, during the course of your work as Ms. Daniels's

2  literary agent, did you usually speak to her directly?

3  A.  Very seldom.

4  Q.  How did you communicate with her generally?

5  A.  Through Mr. Avenatti.

6  Q.  At whose direction?

7  A.  Mr. Avenatti's.

8  Q.  From the time that you first started working on

9  Ms. Daniels's book until February 2019, approximately how many

10  times would you say you spoke to Ms. Daniels directly?

11  A.  20, 25.

12  Q.  How often would you say that you spoke to Mr. Avenatti

13  during that period?

14  A.  Multiple times a day.

15          MR. PODOLSKY:  Ms. Abrams, if you could pull up for

16  the witness, the attorneys, and the Court what's been marked

17  for identification as Government Exhibit 103.

18  Q.  And Mr. Janklow, that should appear on your screen in front

19  of you.

20  A.  It is.

21  Q.  Do you recognize this document?

22  A.  I do.

23  Q.  What is it?

24  A.  It's a Janklow & Nesbit retainer agreement.

25  Q.  And what's the date at the top?

1   A.  April 13, 2018.

2           MR. PODOLSKY:  Your Honor, the government offers

3   Government Exhibit 103.

4           MR. DALACK:  No objection, Judge.

5           THE COURT:  Admitted.

6           (Government Exhibit 103 received in evidence)

7           MR. PODOLSKY:  May we publish?

8           THE COURT:  You may.

9           MR. PODOLSKY:  Ms. Abrams, if you could pull that out

10  for the jury.

11  Q.  All right.  Now that I think everyone can see it,

12  Mr. Janklow, what are we looking at?

13  A.  You are looking at an agreement between my company and

14  Stormy Daniels that defines our professional relationship and

15  how we are compensated.

16          MR. PODOLSKY:  All right.  Why don't we -- Ms. Abrams,

17  if you could enlarge, maybe, the top half of the document, from

18  the very top, maybe, below the first paragraph.  We'll just

19  take a moment to explain what this is.

20  Q.  So the header at the top, what is that, Mr. Janklow?

21  A.  The addressee, which is Stormy Entertainment, care of

22  Michael Avenatti, Esq.  That's his law firm.

23  Q.  Before we get to that, do you see where it says 285 Madison

24  Avenue?

25  A.  Oh, yes.  That's my address.

M1oWave2                        Janklow - Direct

1    Q.   OK.

2    A.   My office address.

3    Q.   Now, to where you directed us, do you see where it says

4    Stormy Entertainment, Inc.?

5    A.   I do.

6    Q.   What is that?

7    A.   That is Stormy's doing business as, d/b/a.

8    Q.   And do you see that below, at the bottom of that block, it

9    says ATTN?  Does that mean attention?

10   A.   Yes.

11   Q.   Stephanie Clifford?

12   A.   Correct.

13   Q.   Who is that?

14   A.   That's Stormy's nonprofessional name, her given name.

15   Q.   And you see that it's care of Michael J. Avenatti, Esq.?

16   A.   I see.

17   Q.   Why is that?

18   A.   Because that's how all the communications went, through

19   Michael.

20   Q.   All right.  Now, do you see the first paragraph reads:  You

21   have asked us to be your sole and exclusive representative and

22   agent to negotiate for the disposition, throughout the world,

23   of any and all rights, as hereinafter defined, the next

24   literary property you propose to write, a currently untitled

25   work of nonfiction about the story of Stephanie Clifford, a

1   literary work to be written by Ms. Clifford and a professional

2   writer to be approved by Ms. Clifford"?  Do you see that?

3   A.  Yes.

4   Q.  The currently untitled work of nonfiction, what is that a

5   reference to?

6   A.  To the pending book.

7   Q.  Is that the book that later became Full Disclosure?

8   A.  Yes.

9   Q.  And the reference to a professional writer, what is that?

10  A.  Ms. Clifford is not a professional writer, so we needed to

11  hire one to help her create the book.

12          MR. PODOLSKY:  Please zoom out for a moment.  Maybe if

13  we enlarge for the jury the bottom two paragraphs.

14  Q.  Do you see at the bottom a reference to 15 percent?

15  A.  I do.

16  Q.  Can you explain generally what this portion of the

17  agreement means?

18  A.  That's the -- that's how my company gets compensated.  We

19  take 15 percent of every dollar generated from this book.

20          MR. PODOLSKY:  All right.  And if we can go to the

21  third page of the agreement for a moment, Ms. Abrams.

22  Q.  Do you see your signature on this page?

23  A.  I do.

24  Q.  And do you see below your signature a block for Stormy

25  Entertainment, Inc.?

1   A.  Yes.

2   Q.  And a signature for Ms. Clifford?

3   A.  Yes.

4        MR. PODOLSKY:  Now, we can take this down, Ms. Abrams.

5   Q.  You mentioned earlier that one of the main responsibilities

6   of a literary agent is to find a book deal or a publisher for

7   your client.  Do you recall that?

8   A.  Yes.

9   Q.  Did you secure a deal for Ms. Clifford -- excuse me,

10   Ms. Daniels's book?

11   A.  I did.

12   Q.  And can you remind us with whom?

13   A.  St. Martin's Press.

14   Q.  Who were your main points of contact at St. Martin's Press?

15   A.  The editor-in-chief, Sally Richardson, and the responsible

16   editor or the person doing the day to day on the book was

17   called Elizabeth Beier.

18        MR. PODOLSKY:  Ms. Abrams, if we could pull up for the

19   witness and the parties and the Court what's been marked for

20   identification as Government Exhibit 102.

21   Q.  Mr. Janklow, do you recognize this document?

22   A.  Yes.  It's the contract for the book between St. Martin's

23   and Stormy.

24        MR. PODOLSKY:  Your Honor, the government offers

25   Government Exhibit 102.

1              THE COURT:  Any objection?

2              MR. DALACK:  No objection, your Honor.  We stipulate.

3              THE COURT:  Admitted.

4              (Government Exhibit 102 received in evidence)

5              MR. PODOLSKY:  May we publish?

6              THE COURT:  You may.

7              MR. PODOLSKY:  Ms. Abrams, could you put that on the

8    screen for the jury.

9    Q.  All right.  Mr. Janklow, I think everyone can see it now.

10   What is this document?

11   A.  This is a publishing contract between St. Martin's Press

12   and Stephanie Clifford, a/k/a Stormy Daniels.

13   Q.  Now, we won't go through the entire agreement, but let me

14   ask you generally.  Do you see how on this page there are some

15   portions that are bolded and others that have a line through

16   them?

17   A.  Yes.

18   Q.  Why is that?

19   A.  They represent changes in the contract.  We receive a draft

20   from the publisher.  Me and the counsel in my company, go

21   through it to bring it up to the standard of our normal

22   boilerplate, meaning the best we've done with that publisher in

23   the past.  So this is us crafting a contract in the client's

24   best interests.

25   Q.  So where the contract has a strike-through, a line over the

M1oWave2                         Janklow - Direct

1   text, is that portion included in the final contract?

2   A.  No.  It is excluded.

3   Q.  Now, who negotiated this contract on behalf of Ms. Daniels?

4   A.  I negotiated the overall terms, and me and the counsel in

5   my office negotiated the details.

6   Q.  Did you ever discuss the terms of this agreement with

7   Ms. Daniels's lawyer, Mr. Avenatti?

8   A.  Yes.

9   Q.  And did he from -- during the course of the negotiations,

10  provide feedback or commentary on the deal?

11  A.  Yes.

12         MR. PODOLSKY:  Now, if we could just pull up for a

13  moment, Ms. Abrams, the paragraph under the book, grant of

14  rights.

15  Q.  Do you see next to 1(a) the document reads, "This agreement

16  concerns a work provisionally entitled untitled to be written

17  by Stephanie Clifford and a writer hired by the publisher

18  pursuant to paragraph 37"?

19  A.  Yes.

20  Q.  Does this, again, reference Ms. Daniels's forthcoming book

21  Full Disclosure?

22  A.  Yes.

23  Q.  And the writer, what does that refer to?

24  A.  The cowriter, the professional writer, that would help her

25  execute it.

1           MR. PODOLSKY:  Let's go to the second page of the

2     contract, and if we could blow up the portion under advance.

3     Thank you, Ms. Abrams.

4     Q.  All right.  Where it says 2, if you could just read that

5     first sentence opposite the colon?

6     A.  "The publisher will pay the author, or the author's duly

7     authorized representative, as an advance against the author's

8     earnings, from all sources under this agreement, the sum of

9     $800,000 the "author advance," payable as follows:  $250,000

10    upon signing of this agreement."

11    Q.  Why don't you wait just a moment, Mr. Janklow.  We'll go

12    through it.

13    A.  OK.

14    Q.  What does the $800,000 refer to in this portion of the

15    contract?

16    A.  The total advance to be paid to the book.

17    Q.  Do you see THAT below that, as you started to read, THE

18    four paragraphs?

19    A.  Yes.

20    Q.  What do each one of those paragraphs represent?

21    A.  Each paragraph defines the amount and the time at which

22    payments will be made during the course of the development of

23    the book until the full 800,000 is paid.

24          MR. PODOLSKY:  OK.  What I'd like to do is go through

25    each of those, but to help us understand it, if we could pull

1   up, just for Mr. Janklow and the parties, Government Exhibit

2   801.

3   Q.  Mr. Janklow, do you recognize this exhibit?

4   A.  Yes.

5   Q.  What is it?

6   A.  It's an encapsulation of the four payments paid to Stormy

7   during the course of her book.

8   Q.  And did you have a chance to review the accuracy of this

9   exhibit before your testimony?

10  A.  I have.

11  Q.  And is it accurate?

12  A.  Yes.

13          MR. PODOLSKY:  Your Honor, the government offers

14  Government Exhibit 801.

15          MR. DALACK:  Your Honor, we object to this being

16  introduced as evidence as there's not been a foundation laid as

17  to who created this summary chart.  We don't object to its use

18  for demonstrative purposes, however.

19          THE COURT:  All right.  For demonstrative purposes,

20  that is, ladies and gentlemen, you can consider this just as an

21  aid to understanding the testimony of the witness.

22          (Government Exhibit 801 received in evidence)

23          MR. PODOLSKY:  Thank you, your Honor.

24          THE COURT:  Proceed.

25          MR. PODOLSKY:  If we could publish this for the jury,

1  please, Ms. Abrams, and first we'll show it to them, and then

2  perhaps we could bring up side by side Government Exhibit 102,

3  the second page, and this chart.

4  Q.  Now, to help us, Mr. Janklow, on the left side of the

5  screen is Government Exhibit 102.  Is that the contract we were

6  just looking at?

7  A.  Yes.

8  Q.  Can you just explain to the jury, what is the page, the

9  chart on the right side of the screen?

10  A.  It's a summary of the terms in the contract for the

11  payments.

12  Q.  OK.  So let's go through each of the four payments so we

13  understand them, starting with the first payment.  When does

14  the first payment come due under the contract?

15  A.  It is due upon the signing of the contract by both parties.

16  Q.  And what's the total amount of the first payment?

17  A.  $250,000.

18  Q.  And for clarity, what is supposed to happen -- who pays the

19  $250,000?

20  A.  The publisher.

21  Q.  To whom?

22  A.  To my office.

23  Q.  And then what do you do with it?

24  A.  Remove our 15 percent commission and pass the rest on, the

25  balance, to Stormy.

M1oWave2                        Janklow - Direct

1   Q.  All right.  Let's go to the second payment.  When does the
2   second payment come due under the contract?
3   A.  The second payment is due upon the delivery and acceptance
4   of the manuscript, which is the draft of the book, to the
5   publisher.
6   Q.  And what amount is the second payment?
7   A.  175,000.
8   Q.  And the third payment, when does that come due?
9   A.  That is due anywhere from the date of publication to a
10  maximum of six months past the day of publication.
11  Q.  Now, under the contract, does it matter if the publisher
12  decides to publish the book or not?
13  A.  It does not.
14  Q.  So if, hypothetically, the author provided the manuscript,
15  it was accepted, but the book wasn't published, would the
16  author still be entitled to the advance?
17  A.  Yes.
18  Q.  Now, were there any other requirements that had to be met
19  in order for the third payment to become due?
20  A.  Yes.
21  Q.  And what were those?
22  A.  Publicity requirements.
23  Q.  Can you explain what you mean by publicity requirements?
24  A.  Meaning Ms. Daniels was required to publicize her book, and
25  in this contract the outline of that was included as a

M1oWave2                          Janklow - Direct

1  prerequisite for her getting the third payment.

2  Q.  OK.  We'll come back to that, but let's look at the fourth

3  payment.  When does the fourth payment on the advance come due?

4  A.  Six to 12 months from publication, so no later than 12

5  months from the date of publication.

6  Q.  And would the publicity requirement that you just referred

7  to have to be met for the fourth payment to come due?

8  A.  Yes.

9  Q.  How much was the fourth payment for?

10  A.  200,000.

11  Q.  Now, you've mentioned the publicity requirement.  Is there

12  any requirement about the success of the book or the number of

13  sales in order for the advance to come due?

14  A.  No.

15  Q.  If the book sold zero copies, would all four payments still

16  be due?

17  A.  Yes.

18  Q.  Now, specifically with respect to Ms. Daniels's book

19  advance, did St. Martin's Press, in fact, make all four

20  payments on the contract to Janklow & Nesbit?

21  A.  They did.

22  Q.  Now, I want to ask about the way that St. Martin's Press

23  sent the payments to you.  Did St. Martin's Press ever mail a

24  check to you?

25  A.  No.

1    Q.  How did they transmit the four payments to Janklow &

2    Nesbit?

3    A.  By wire.

4    Q.  Did Janklow & Nesbit ever send any money relating to the

5    book deal by mailing a check?

6    A.  No.

7    Q.  How did Janklow & Nesbit transmit the money that was owed

8    to Ms. Daniels to the various bank accounts you referenced

9    earlier?

10   A.  By wire.

11   Q.  All right.  Just a few more questions to understand the

12   book deal.  When we talked about the $800,000 advance, was it

13   possible for Ms. Daniels, as the author, to earn more than

14   $800,000?

15   A.  Yes.

16   Q.  How does that work?

17   A.  The advance can be earned out through sales, so if she sold

18   enough books, to repay the $800,000 that was paid to her, she

19   then, from that point on, would earn 15 percent royalty on

20   every book sold beyond that.  So we call the deal, we refer to

21   them as floors without ceilings, meaning we get a minimum of

22   the advance, and the sky's the limit as to how much, how many

23   books you sell and how much you can make after that.

24          MR. PODOLSKY:  OK.  If we can just briefly turn to

25   page 35 of the contract, Ms. Abrams.

1    Q.  What is this page, Mr. Janklow?

2    A.  This is the signature page of the St. Martin's contract

3    with Ms. Clifford.

4    Q.  And do you see, under author, there appears to be a

5    signature above where it says Stephanie Clifford?

6    A.  Yes.

7    Q.  And what's the date next to that?

8    A.  April 11, '18.

9    Q.  Can you see below that there's a signature, below St.

10   Martin's Press?  Do you see that?

11   A.  Yes.

12   Q.  Now, do you see how this page looks different than the

13   pages we were just looking at?

14   A.  Yes.

15   Q.  Why is that?

16   A.  It's a photograph that was emailed.

17   Q.  By whom?

18   A.  Mr. Avenatti.

19        MR. PODOLSKY:  If we could pull up for Mr. Janklow and

20   the parties what's been marked for identification as Government

21   Exhibit 203.

22   Q.  Mr. Janklow, do you recognize this document?

23   A.  Yes.  It's an email from Mr. Avenatti.

24   Q.  And what's the date at the top?

25   A.  April 11, 2018.

1          MR. PODOLSKY:  Your Honor, the government offers

2   Government Exhibit 203.

3          THE COURT:  Any objection?

4          MR. DALACK:  No objection, Judge.

5          THE COURT:  Admitted.

6          (Government Exhibit 203 received in evidence)

7          MR. PODOLSKY:  Ms. Abrams, if you could please show

8   the exhibit to the jury.

9   Q.  All right.  Mr. Janklow, what are we looking at in

10  Government Exhibit 203?

11  A.  We are looking at an email from Mr. Avenatti to Michael

12  Steger, who is our contracts manager, wherein Mr. Steger says

13  that the photograph of the signature page can be used.

14  Q.  All right.  Let's go through that to explain it.

15         MR. PODOLSKY:  If we can go to the last page,

16  Ms. Abrams.

17  Q.  Is that an attachment to that email?

18  A.  I believe so.

19         MR. PODOLSKY:  Actually, Ms. Abrams, before we look at

20  this, why don't we go to the second-to-the-last page of the

21  email.

22         There we go.  All right.

23  Q.  Do you see at the bottom of this chain is an email from

24  Michael J. Avenatti to Judy K. Regnier?

25  A.  Yes.

1   Q.  Do you know who Judy Regnier is?

2   A.  I think she was an assistant to Mr. Avenatti.

3   Q.  And you see the sent date and time was April 11, 2018, 9:01

4   a.m.?

5   A.  Yes.

6           MR. PODOLSKY:  OK.  Actually, Ms. Abrams, if you can

7   just -- the top, the header there.  Yeah.  Perfect.

8   Q.  OK.  You see it's subject sig page?

9   A.  Yes.

10          MR. PODOLSKY:  Let's now look at that attachment

11  briefly.  OK.

12  Q.  What is this attachment?

13  A.  This is the signature page of the full publishing contract.

14  Q.  OK.  And is this how you received Ms. Daniels's -- here

15  she's using Ms. Clifford -- signature on the contract?

16  A.  Yes.

17          MR. PODOLSKY:  All right.  Let's go back to the email,

18  Ms. Abrams.

19  Q.  And do you see at the bottom Michael Steger writes, "We can

20  work with this.  My goal, I will attach the signed page to the

21  entire agreement and send a scan to St. Martin's"?

22  A.  Yes.

23  Q.  Was there any problem with using a photograph of a

24  signature page to make this contract effective?

25  A.  There was no problem.  We had to make sure it was OK

1  because it was a little unusual.

2  Q.  But is that ultimately how the contract was signed?

3  A.  Yes.

4          MR. PODOLSKY:  All right.  You can take that down,

5  Ms. Abrams.

6  Q.  A few more questions about commissions.

7      Now, in this case, did Janklow & Nesbit keep the whole 15

8  percent of its commission?

9  A.  No.

10  Q.  Why not?

11  A.  Because there was a referral fee involved.

12  Q.  And what was the amount of that referral fee?

13  A.  2.5 percent.

14  Q.  Is that 2.5 percent of the total contract or of the 15

15  percent that you kept?

16  A.  Of the total contract.

17  Q.  And who was the referral fee paid for -- sorry, paid to?

18  A.  Mr. Avenatti.

19  Q.  Who proposed the idea of a referral fee?

20  A.  Mr. Avenatti.

21  Q.  Was that a common -- is that a common practice to you, to

22  pay a portion of your commission as a referral fee?

23  A.  No.

24  Q.  As far as you know, was Ms. Daniels aware of this referral

25  fee?

M1oWave2                          Janklow – Direct

1    A.  No.

2              MR. DALACK:  Objection, your Honor.  Calls for

3    speculation.

4              THE COURT:  Sustained.

5    BY MR. PODOLSKY:

6    Q.  Did you ever tell Ms. Daniels about the referral fee?

7    A.  No.

8    Q.  Was the referral fee ever put in writing?

9    A.  No.

10   Q.  All right.  We're going to come back to the details of the

11   fee in a few minutes, but let's touch on one other thing

12   quickly.

13        Did there come a time when Mr. Avenatti was interested in

14   his own book deal?

15   A.  Yes.

16   Q.  Now, who is his literary agent for that?

17   A.  I was.

18   Q.  About when did you first discuss Mr. Avenatti's book deal

19   with him?

20   A.  Upon meeting him.

21   Q.  Did you secure him a book deal?

22   A.  I did.

23   Q.  With what publisher?

24   A.  Spiegel & Grau.

25   Q.  Was there an advance on that book?

M1oWave2                          Janklow - Direct

1    A.  There was.

2            MR. DALACK:  Objection, your Honor, as to relevance.

3            MR. PODOLSKY:  Your Honor, there's going to be -- may

4    we approach, your Honor?

5            THE COURT:  No.  I'll allow it.  Overruled.

6    BY MR. PODOLSKY:

7    Q.  So let's go back.  Was there an advance on this book?

8    A.  Yes.

9    Q.  Was it set up with the same four-payment structure?

10   A.  I believe so.

11   Q.  And what was the total amount of the advance?

12   A.  $2 million.

13   Q.  How much was actually paid to Mr. -- how much of that

14   advance was actually paid?

15   A.  I believe 500,000, the first payment, 475 or 500.  I can't

16   remember exactly.

17   Q.  In other words, of the four installments, how many were

18   paid?

19   A.  The first.

20   Q.  Why no more than the first?

21           MR. DALACK:  Objection, your Honor.  401, 403.

22           MR. PODOLSKY:  May we approach, your Honor?

23           THE COURT:  Yes.

24           (Continued on next page)

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1          (At sidebar)

2          MR. PODOLSKY:  Your Honor, this is going to come up in

3     several ways.  Mr. Janklow is paying money at certain times to

4     Mr. Avenatti.  We're simply trying to explain a basis for this.

5     It also is relevant to the facts in the case about at what

6     times Mr. Avenatti is seeking money and why.

7          Frankly, this is the end of my questioning on this.

8     I'm just trying to establish the fact that this happened in the

9     course of his relationship with Mr. Janklow, that he was paid

10    one payment on this, that it coincides with the course of

11    events in this case, which was in May of 2018.  That's the

12    extent of my questioning, your Honor.

13         MR. DALACK:  Two concerns, your Honor.  First, this

14    doesn't go to make any material fact or issue in this case more

15    or less likely.  Second, the reason, we submit, why the

16    publisher, Penguin Random House, ultimately balked from the

17    book deal, they pulled out due to Mr. Avenatti's arrest in a DV

18    case, domestic violence case, and so we're concerned that this

19    would open the door to prejudicial testimony that would

20    otherwise be impermissible under 403.

21         THE COURT:  All right.

22         MR. PODOLSKY:  He's not going to say that.

23         THE COURT:  I'm sorry?

24         MR. PODOLSKY:  He's not going to talk about the DV

25    arrest.  He's simply going to say Mr. Avenatti didn't turn in

1   the transcript, the manuscript.  That's how this question is

2   going to be answered.

3           MR. DALACK:  Again, that's not relevant to any

4   material issue of fact in this case.

5           THE COURT:  How about we just leave it as the book was

6   never published?

7           MR. PODOLSKY:  That's all he's going to say.

8           THE COURT:  Not that Mr. Avenatti failed to turn in

9   the manuscript, which might suggest fault on Mr. Avenatti's

10  part, but I think the evidence of some payment is certainly

11  relevant, given that there were payments back and forth.

12  Certainly that alone is not prejudicial, so I'll allow it for

13  that limited purpose, but I don't want to get into Mr.

14  Avenatti's failure to provide the manuscript and suggest that

15  there's any fault there.

16          MR. PODOLSKY:  Fine.

17          MR. DALACK:  If I may submit, the government has

18  already elicited that testimony.

19          MR. PODOLSKY:  He hasn't answered that question.

20          THE COURT:  I'll look back.  I don't think that's the

21  case, but I'll look back.

22          MR. DALACK:  Thank you, Judge.

23          (Continued on next page)

24

25

M1oWave2                         Janklow - Direct

1              (In open court)

2              THE COURT:  All right.  You may proceed, Mr. Podolsky.

3              MR. PODOLSKY:  Thank you, your Honor.

4              OK.  Let's talk about the first payment on

5    Ms. Daniels's book.

6              Ms. Abrams, if you could pull up for the witness and

7    the parties what's been marked for identification as Government

8    Exhibit 202.

9    Q.  Do you recognize this document, Mr. Janklow?

10   A.  It's an email between Mr. Avenatti and me.

11             MR. PODOLSKY:  Your Honor, the government offers

12   Government Exhibit 202.

13             THE COURT:  Any objection?

14             MR. DALACK:  No.

15             THE COURT:  Admitted.

16             (Government Exhibit 202 received in evidence)

17             MR. PODOLSKY:  Thank you, your Honor.

18             Ms. Abrams, if you could display that for everyone,

19   and maybe we could blow up the body of the email.  Perfect.

20   Q.  All right.  Mr. Janklow, do you see who this email's from?

21   A.  Yes.

22   Q.  Who is that?

23   A.  Mr. Avenatti.

24   Q.  And who is it sent to?

25   A.  Me.

M1oWave2                         Janklow - Direct

1    Q.   What is the date that the email is sent?

2    A.   April 11, 2018.

3    Q.   Is that the same date that the contract was signed?

4    A.   Yes.

5    Q.   And to be clear, I'm referring to the book contract.  Did

6    you understand that?

7    A.   Yes.

8    Q.   What's the subject of the email?

9    A.   Wire instructions.

10   Q.   And do you see below it says Bank of America, Stormy

11   Entertainment?

12   A.   Yes, I do.

13   Q.   And do you see it has a bank account number; we can see the

14   last four digits of that?

15   A.   Yup, yes.

16   Q.   OK.  What is this information?

17   A.   It's the routing, bank information for where we should be

18   sending Stormy's payment.

19   Q.   And what did you use this information for?

20   A.   Sending Stormy her money.

21   Q.   How did you know at the time that this was the right place

22   to send the advance?

23   A.   Because it was coming from her lawyer, Mr. Avenatti.

24   Q.   Let me show you what has been marked for identification as

25   Government Exhibit 107.  Do you recognize this document?

M1oWave2                    Janklow - Direct

1    A.  Yes.  It's a report of the wire.  And the bank.

2          MR. PODOLSKY:  Your Honor, the government offers

3    Government Exhibit 107.

4          THE COURT:  Any objection?

5          MR. DALACK:  No objection, sir.

6          THE COURT:  Admitted.

7          (Government Exhibit 107 received in evidence)

8          MR. PODOLSKY:  If we could please display that for the

9    jury, Ms. Abrams.

10   Q.  Mr. Janklow, what is this document?

11   A.  This is a record of the money being sent from our account

12   to Stormy Entertainment.

13   Q.  OK.  So, do you see where it says wire details, sender?  Do

14   you see that?

15   A.  Yes.

16   Q.  OK.  And below it says wire amount.  Do you see that?

17   A.  Yes.

18   Q.  First of all -- well, what is the amount of this wire?

19   A.  $212,500.

20   Q.  Does this reflect the first payment on Ms. Daniels's book

21   deal?

22   A.  Yes.

23   Q.  All right.  Had you, previous to sending this wire,

24   received the first payment from St. Martin's Press?

25   A.  Yes.  I remember them being almost synchronous.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1oWave2                    Janklow - Direct

1    Q.  And can you remind us what was the total amount that St.

2    Martin's Press wired to Janklow & Nesbit for the first payment?

3    A.  250,000.

4    Q.  Just to be clear, what is the difference between the

5    $250,000 you received and the $212,500 that Janklow & Nesbit

6    wired to the Stormy Entertainment account?

7    A.  Our 15 percent commission has been extracted.  And we sent

8    the difference.

9           MR. PODOLSKY:  All right.  Let's pull up one other

10   document to help us keep track of these wire payments.  So if

11   we could pull up for Mr. Janklow Government Exhibit 802.

12   Q.  Do you recognize this document, Mr. Janklow?

13   A.  Yeah.

14   Q.  What is it?

15   A.  It's a, just a summary of the wire.

16   Q.  And --

17   A.  And the date and the destination.

18   Q.  Did you have a chance to review this for accuracy before

19   your testimony today?

20   A.  I did.

21   Q.  Is it accurate?

22   A.  Yes.

23          MR. PODOLSKY:  Your Honor, the government offers at

24   this time Government Exhibit 802 as a demonstrative.

25          MR. DALACK:  No objection as a demonstrative, your

1   Honor.

2           THE COURT:  All right.  I'll allow it as a

3   demonstrative.

4           Again, ladies and gentlemen, this is not being

5   admitted as evidence *per se* but just simply as an aid for you

6   to understand and help you as you listen to the witness's

7   testimony.

8           (Government Exhibit 802 received in evidence)

9           THE COURT:  You may proceed.

10          MR. PODOLSKY:  Thank you, your Honor.

11          Ms. Abrams, if we could pull up Government Exhibit 107

12  on the left and 802 on the right.

13  Q.  All right.  So we'll do this as we go along, but for the

14  first book payment, what was the date on which Janklow & Nesbit

15  wired out the money?

16  A.  April 11, 2018.

17  Q.  What was the total amount?

18  A.  $212,500.

19  Q.  And what bank account did Janklow & Nesbit wire that money

20  to?

21  A.  The Stormy Entertainment bank account.

22  Q.  And what were the last four digits of that account, the

23  Stormy Entertainment account?

24  A.  9205.

25          MR. PODOLSKY:  All right.  Let's pull up for the

M1oWave2                         Janklow - Direct

1    witness and the parties Government Exhibit 204.

2    Q.  Do you recognize this document, Mr. Janklow?

3    A.  Yes.  It's an email.

4            MR. PODOLSKY:  Your Honor, the government offers

5    Government Exhibit 204.

6            THE COURT:  Any objection?

7            MR. DALACK:  No objection, your Honor.

8            THE COURT:  Admitted.

9            (Government Exhibit 204 received in evidence)

10           MR. PODOLSKY:  Ms. Abrams, if you could pull that up

11   for everyone.

12   Q.  OK.  Do you see that this email at the top is an email from

13   Michael Avenatti to you?

14   A.  I do.

15   Q.  And do you see that's a forward of an email below with the

16   subject wire?

17   A.  I do, yes.

18   Q.  OK.  What's the date of this email chain?

19   A.  May 10, 2018.

20   Q.  All right.  And do you see that below there is some bank

21   account information?

22   A.  Yes.

23   Q.  Whose bank account information is that?

24   A.  Mr. Avenatti's.

25   Q.  What did you use this bank account information for?

M1oWave2                        Janklow - Direct

1   A.  This was to be used for the next, for the -- the next

2   payment onward for payments for Stormy.

3   Q.  Let's pause.  I want to make sure you're answering my

4   question.

5       Do you see that this was Mr. Avenatti's bank account

6   information below?

7   A.  Yes.  I'm sorry.  Yes.

8   Q.  And do you see that the date was May 10, 2018?

9   A.  Yes.

10  Q.  All right.  What did you use Mr. Avenatti's City National

11  Bank account information for in May of 2018?

12          MR. DALACK:  Objection, your Honor.  Asked and

13  answered.

14          THE COURT:  I'll allow it.  Overruled.

15  BY MR. PODOLSKY:

16  Q.  What did you use Mr. Avenatti's bank account for in May of

17  2018?

18  A.  I believe for the referral fee.

19  Q.  And did you send a referral fee -- that is, the 2.5 percent

20  you referred to earlier -- to Mr. Avenatti around this time?

21  A.  Yes.

22  Q.  Now, how did it come to happen -- well, before I ask this

23  question, we looked a moment ago at the payment information for

24  the first payment in April of 2018.  Do you recall that?

25  A.  Yes.

M1oWave2                         Janklow - Direct

1    Q.   How did it come to happen that you paid a referral fee to

2    Mr. Avenatti approximately one month later?

3    A.   Because it came up in the interim.

4    Q.   How did it come up?

5    A.   Mr. Avenatti brought it up.

6    Q.   And how did he bring it up?

7    A.   He suggested that I -- a referral fee was appropriate.

8    Q.   What did he say to you?

9    A.   He said:  Look, I could have brought her anywhere.  This is

10   a hot book.  I brought it to you.  I should get a taste of

11   this.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  What, if anything, did he say to you about the timing of

2    you making that referral fee?

3    A.  I am not sure I understand the question.

4    Q.  During that conversation, did he say anything about how

5    quickly the referral fee should be made to him?

6    A.  Right away.

7    Q.  To be clear, that's what he said?

8    A.  Yes.

9    Q.  All right.  Let's go to the -- let's turn to the second

10   payment on Ms. Daniels' book deal.

11          MR. PODOLSKY:  Why don't we pull up Government Exhibit

12   801 again for everyone to help us.

13   BY MR. PODOLSKY:

14   Q.  Can you remind us, how much was the amount of the second

15   payment on Ms. Daniels book deal?

16   A.  $175,000.

17   Q.  And when did that become due?

18   A.  Upon the delivery and acceptance of the manuscript by the

19   publisher.

20          MR. PODOLSKY:  I want to focus us on the end of July

21   2018.  Ms. Abrams, if you could show the witness and the

22   attorneys Government Exhibit 207.

23   BY MR. PODOLSKY:

24   Q.  Do you recognize this document?

25   A.  Yes.  It is an e-mail from Elizabeth Beier at St. Martin's,

M10NAVE3                    Janklow - Direct

1    the publisher.

2                MR. PODOLSKY:  Your Honor, the government offers

3    Government Exhibit 207?

4                MR. DALACK:  Objection, your Honor.  Hearsay.

5                THE COURT:  Mr. Podolsky, can you lay more of a

6    foundation.

7                MR. PODOLSKY:  I can.

8    BY MR. PODOLSKY:

9    Q.  Do you see bottom of this e-mail exchange?

10   A.  I do.

11   Q.  Was this --

12               MR. PODOLSKY:  Ms. Abrams, at the very bottom.

13   Q.  Was this a message that you sent to Ms. Beier?

14   A.  Yes.

15   Q.  Was the message you sent to Ms. Beier after speaking to

16   Mr. Avenatti?

17               MR. DALACK:  Objection, your Honor, as to leading.

18               THE COURT:  Sustained.

19   BY MR. PODOLSKY:

20   Q.  What caused you to send this message to Ms. Beier?

21   A.  I had been urged by Michael Avenatti to get the money as

22   fast as I could.

23               MR. PODOLSKY:  Zooming out for a moment.

24               Your Honor, the government offers Government Exhibit

25   207.  In addition to foundation that has been laid, it is also

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   offered for a nonhearsay purpose.

2           MR. DALACK:  I renew my objection as to hearsay.  I am

3   not aware of the nonhearsay purpose it's being offered for,

4   your Honor.

5           THE COURT:  The objection is overruled.  Admitted.

6           (Government Exhibit 207 received in evidence)

7           MR. PODOLSKY:  Ms. Abrams if you could pull this up

8   for the jury, please.

9   BY MR. PODOLSKY:

10  Q.  And before we zoom in, Mr.Janklow, what is this document?

11  A.  This is an exchange between me and Elizabeth Beier at St.

12  Martin's.

13  Q.  I believe you mentioned her earlier, but can you remind us.

14  Who is Elizabeth Beier?

15  A.  She is an executive editor at St. Martin's Press, and she

16  was Stormy's editor and kind of her connection, her day-to-day

17  connection at the publisher.

18          MR. PODOLSKY:  Ms. Abrams, can you could blow up the

19  very bottom of the e-mail there starting, "On Tuesday."

20  BY MR. PODOLSKY:

21  Q.   Mr.Janklow, when was this message sent?

22  A.  July 31, 2018.

23  Q.  And what did you -- did you write this e-mail?

24  A.  I did.

25  Q.  What did you write?

1    A.  "Hi, we need the money to-do list ASAP.  Okay?"

2    Q.  And what money are you referring to?

3    A.  The next payment, the second payment.

4    Q.  What is the to-do list you are referring to.

5    A.  There were thresholds that Ms. Daniels needed to reach in

6    order to satisfy the contract and the publisher to get paid.

7    Q.  Now, at this moment had the manuscript been finished?

8    A.  I believe so.  Yes.

9    Q.  And what else was left to do in order for the second

10   payment to be made by St. Martin's Press?

11   A.  The publisher needed to read it and determine that it was

12   acceptable.

13   Q.  Were there any other to-dos that the publisher was asking

14   for at the time?

15   A.  There were stipulations in the contract about publicity,

16   and they also needed a title, I think, and cover and just

17   housekeeping items.

18   Q.  Okay.  And do you see you write, "We need the dollar sign

19   to-do list ASAP"?

20   A.  Yes.

21   Q.  Why did you write ASAP?

22   A.  Because I was urged to get the money as fast as I could.

23   Q.  Urged by who?

24   A.  Mr. Avenatti.

25   Q.  What did he say to urge you -- well, what did he say on the

1  topic?

2  A.  On the top?

3  Q.  On the topic.  Excuse me.  What did he say?

4  A.  He said the book's done.  Let's get the money in as soon as

5  possible.

6  Q.  Did he indicate why the money was needed to be sent as soon

7  as possible?

8          MR. DALACK:  Objection, your Honor.  Leading.

9          THE COURT:  Overruled.

10 Q.  Did he indicate -- or what, if anything, did he say about

11 why the money needed to be sent as soon as possible?

12 A.  The money was -- anytime there was money ready to be paid,

13 I was always urged to get it as soon as possible, and in this

14 case it was to get it to Stormy so she felt involved and --

15         MR. DALACK:  Objection, your Honor.  Calls for

16 speculation.

17         THE COURT:  Why don't you just stick to what

18 Mr. Avenatti said to you.  So just tell us as precisely as you

19 can recall what he said to you.

20         THE WITNESS:  He said he needed the money quickly.

21 She needed the money quickly.  She had security worries.  She

22 needed to pay for security and for her daughter and she just

23 needed money.

24 Q.  What, if anything, did Mr. Avenatti say about him -- that

25 is, Mr. Avenatti -- needing the money?

1   A.   He didn't say anything.

2   Q.   So based on your discussions with -- on this discussion

3   with Mr. Avenatti, who did you understand this money would go

4   to?

5   A.   Ms. Daniels.

6   Q.   Did you speak to Ms. Daniels directly about whether she

7   needed the money quickly at this time?

8   A.   No.

9   Q.   Why not?

10  A.   I never spoke to her about money.

11  Q.   Why did you not speak to her about money?

12  A.   Mr. Avenatti told me not to.

13  Q.   What, if anything, did he say to you about why you should

14  never speak to your client about money?

15  A.   That she gets confused, that she's impulsive and that it's

16  much cleaner, more efficient for he and I to deal with all

17  these matters ourselves and he would communicate it to her.

18  Q.   I believe you mentioned earlier that you spoke to

19  Ms. Daniels during the entire year up to February 2019 I think

20  you said 20 to 25 times, did I get that right?

21  A.   Roughly.

22  Q.   Now, at that time, prior to February 2019, did you believe

23  the defendant when he told you things you just said that

24  Ms. Daniels was impulsive and so on?

25  A.   Yes.

1          MR. DALACK:  Objection, your Honor.  Relevance as to

2     what Mr.Janklow believed.

3          THE COURT:  Sustained.

4          MR. PODOLSKY:  Your Honor, may we approach briefly to

5     discuss that?

6          THE COURT:  No.

7     BY MR. PODOLSKY:

8     Q.  Now, during that time period -- and when I say that time

9     period I'm referring to prior for February 2019, do you

10    understand?

11    A.  Yes.

12    Q.  Were there ever times where you said back to Mr. Avenatti

13    in substance that Ms. Daniels was impulsive and the things that

14    you just said?

15    A.  I think on one or two occasions.

16    Q.  Now, in the conversations that you had directly with

17    Ms. Daniels, did she say anything to make you think that she

18    was impulsive such that you couldn't discuss finances with her?

19    A.  No.

20    Q.  So, when you said to Mr. Avenatti in substance that she was

21    impulsive or things along those lines, what was your basis for

22    saying that?

23    A.  Experience, watching her be brittle about the title and the

24    cover image and creative things.

25    Q.  Did those things have anything to do with finances or

M1ONAVE3                              Janklow – Direct

1   contracts or anything like that?

2   A.   No.

3   Q.   Now, let's go back to where we were on the e-mail exchange.

4        Do you see that Ms. Beier says, "Coming this a.m."?

5   A.   Yes.

6   Q.   What was coming that a.m.?

7   A.   The money.

8            MR. PODOLSKY:   Sorry.  I want to reorient us.

9   Ms. Abrams, can you blow up the second -- the bottom of the

10  page, the entire bottom half.

11           Thank you.

12  BY MR. PODOLSKY:

13  Q.   All right.  Do you see where you say, "Hi, we need the

14  money to-do list ASAP"?

15  A.   Yes.

16  Q.   I want you to explain, what is the to-do list?

17  A.   The to-do list was a list of things the publisher needed to

18  be accomplished before they would cut a check, cut a wire in

19  this case.

20           MR. PODOLSKY:   Okay.  Let's pull up for the witness

21  and the parties Government Exhibit 208.

22  BY MR. PODOLSKY:

23  Q.   Do you recognize this document, Mr.Janklow?

24  A.   Yes, it is an e-mail from Elizabeth Beier at St. Martin's

25  to me and Mr. Avenatti.

1            MR. PODOLSKY:  Your Honor, the government offers

2    Government Exhibit 208.

3            MR. DALACK:  We object on hearsay grounds, your Honor.

4            MR. PODOLSKY:  Your Honor, there's no statement of

5    fact in here.  It is not hearsay.

6            THE COURT:  The objection is overruled.

7            The exhibit is admitted.

8            (Government Exhibit 208 received in evidence)

9            MR. PODOLSKY:  Ms. Abrams, if you could pull that up.

10           For the jury maybe blow up down to where it says,

11   "Best Eliz."  Thank you.

12   BY MR. PODOLSKY:

13   Q.  Do you see that this e-mail is from Elizabeth Beier,

14   Mr.Janklow?

15   A.  I do.

16   Q.  Who is it to?

17   A.  Myself and Mr. Avenatti.

18   Q.  You see the subject is book needs?

19   A.  Yes.

20   Q.  Do you see that it was sent on July 31, 2018, at 11 --

21   excuse me, 12:32 p.m.?

22   A.  I do.

23   Q.  Was that approximately a few hours after the e-mail we were

24   just looking at where you asked for the to-do list?

25           MR. DALACK:  Objection, your Honor.  Leading.

1           THE COURT:  All right.  Sustained as to form.

2           MR. PODOLSKY:  Ms. Abrams, if you could just for

3   the -- for everyone pull up Government Exhibit 207 and 208 next

4   to each other.

5   BY MR. PODOLSKY:

6   Q.  Do you see the bottom of 207, the e-mail we were just

7   discussing where you wrote, "Hi, we need the dollar sign to-do

8   list ASAP.  Okay?"

9   A.  I see it.

10  Q.  How long after you sent that message did you receive the

11  e-mail from Ms. Beier in Government Exhibit 208?

12  A.  Roughly three hours.

13          MR. PODOLSKY:  Can you take down 207 and pull up 208,

14  or keep 208 up.

15  BY MR. PODOLSKY:

16  Q.  All right.  Do you see Ms. Beier writes at the top, "Can

17  put through for the $175,000 due on acceptance once we have"

18  colon?

19  A.  Yes.

20  Q.  What was your understanding as to what the 175,000 due on

21  acceptance, what does that refer to?

22  A.  The second payment.

23  Q.  And do you see below a list of items starting with dashes?

24  A.  Yes.

25  Q.  Can you explain generally what these are?

M1ONAVE3                         Janklow - Direct

1   A.  That's the to-do list that she was referring to.

2   Q.  So, for example, do you see where it says, "Dedication,

3   Stormy wants to have one.  Will be on its own first page, front

4   of book"?

5   A.  Yes.

6   Q.  What was to be done there?

7   A.  If Stormy wanted to have a dedication page in her book,

8   they needed it.

9        MR. PODOLSKY:  Why don't we pull up for Mr.Janklow

10  Government Exhibit 211.

11  BY MR. PODOLSKY:

12  Q.  Mr.Janklow, do you recognize this document?

13  A.  I do.

14  Q.  What type of document is it?

15  A.  It's an e-mail.

16       MR. PODOLSKY:  Your Honor, the government offers

17  Government Exhibit 211.

18       THE COURT:  Any objection?

19       MR. DALACK:  Just on hearsay grounds, your Honor.

20       THE COURT:  Overruled.

21       MR. PODOLSKY:  Your Honor, is it admitted?

22       THE COURT:  Yes.

23       (Government Exhibit 211 received in evidence)

24       MR. PODOLSKY:  Thank you, your Honor.

25       Ms. Abrams, if we could pull that up for the jury.

M1ONAVE3                        Janklow – Direct

1    BY MR. PODOLSKY:

2    Q.  If we can just do this briefly, Mr.Janklow, who is this

3    e-mail from?

4    A.  Michael Avenatti.

5    Q.  To whom?

6    A.  Elizabeth Beier and myself.

7    Q.  What is the subject?

8    A.  Book needs, regarding book needs.

9    Q.  Thank you.

10          MR. PODOLSKY:  If we could go to the second page,

11   Ms. Abrams.

12   BY MR. PODOLSKY:

13   Q.  Do you see the e-mail there from Elizabeth Beier to you and

14   Mr. Avenatti?

15   A.  Yes.

16   Q.  What is that e-mail?

17   A.  That is the to-do list.

18   Q.  Okay.  Has anything been added to this to-do list since the

19   last version was sent?

20   A.  Yes.  Mr. Avenatti has responded in brackets to each item.

21   Q.  Okay.  Do you see where in brackets next to, for example,

22   dedication it says "stand by"?

23   A.  I see it.

24   Q.  Who added that, to your understanding?

25   A.  Mr. Avenatti.

1    MR. PODOLSKY:  If we can go to the first page.

2   BY MR. PODOLSKY:

3   Q.  Do you see it says, "Further copy for dedication, 'To my

4   smart brave beautiful daughter.  You remind every day what

5   truly matters'"?

6            Do you see that?

7   A.  I do.

8   Q.  What did you understand that language was?

9   A.  That was the dedication in the front of the book from

10  Stormy to her daughter.

11  Q.  Who sent you that message?

12  A.  Mr. Avenatti.

13  Q.  Let's pull up for the witness and the parties Government

14  Exhibit 210.

15           Mr. Janklow, do you recognize this document?

16  A.  That is an e-mail.

17           MR. PODOLSKY:  Your Honor, the government offers

18  Government Exhibit 210.

19           MR. DALACK:  No objection.

20           THE COURT:  It is admitted.

21           (Government Exhibit 210 received in evidence)

22           MR. PODOLSKY:  If we could publish, Ms. Abrams, to the

23  jury.

24  BY MR. PODOLSKY:

25  Q.  Mr.Janklow, what are we looking at here?

M1ONAVE3                          Janklow - Direct

1    A.  We are looking at an e-mail from Avenatti to myself with

2    banking instructions.

3    Q.  All right.  Do you see the date on both e-mails is July 31,

4    2018?

5    A.  Yes.

6    Q.  Is that the same day or a different day than the e-mail

7    exchange regarding the to-do list we were just looking at?

8    A.  The same day.

9    Q.  Okay.  Let's start with the bottom e-mail.  Do you see this

10   is an e-mail from Judy Regnier to Michael Avenatti?

11   A.  Yes.

12   Q.  Do you see the subject is "Daniels trust account"?

13   A.  I see.

14   Q.  And do you see that below that there is bank info for a

15   California Bank & Trust account with the beneficiary name at

16   the bottom --

17           MR. DALACK:  Objection, your Honor.  Counsel is just

18   testifying for the witness.

19           MR. PODOLSKY:  Your Honor, I am asking him if he sees

20   the e-mail so that the jury can understand it.

21           THE COURT:  I will allow it.  Overruled.

22   BY MR. PODOLSKY:

23   Q.  Do you see at the bottom the beneficiary name is "Avenatti

24   & Associates, Attorney-Client Trust Daniels"?

25   A.  Yes.

1    Q.  And what did Mr. Avenatti do with this e-mail?

2    A.  He sent it to me.

3    Q.  What did you understand -- excuse me.  What did you -- what

4    was your understanding as to what this information was for?

5    A.  This was the new destination.  It was another destination

6    for the next payment due to Stormy.

7    Q.  What did you understand you were supposed to do with this

8    bank account information?

9    A.  It was supposed to be processed by my agency, and the next

10   payments were supposed to go to that account.

11   Q.  When you say next payments, what payments are you referring

12   to specifically?

13   A.  The ones from that point onward.

14   Q.  To be clear --

15   A.  The second --

16   Q.  -- that refers to what?

17   A.  The second, third, and fourth payments of the contract.

18           MR. PODOLSKY:  Let's pull up for the witness and the

19   parties what's been marked for identification as Government

20   Exhibit 212.  Ms. Abrams if you could blow up the text portion.

21   BY MR. PODOLSKY:

22   Q.  Mr.Janklow, do you recognize this document?

23   A.  It's a text exchange.

24   Q.  Between you and who?

25   A.  Mr. Avenatti.

M1ONAVE3                          Janklow - Direct

1              MR. PODOLSKY:  Your Honor, the government offers

2     Government Exhibit 212.

3              THE COURT:  Any objection?

4              MR. DALACK:  No objection, Judge.

5              THE COURT:  Admitted.

6              (Government Exhibit 212 received in evidence)

7              MR. PODOLSKY:  Ms. Abrams, please publish this for the

8     jury?

9              THE COURT:  Ladies and gentlemen, let me just

10    interrupt for a moment.  You could see if the document as a

11    whole were displayed to you that -- thank you -- that the top

12    and the bottom are blacked out.  That's called a redaction.

13    That just simply means that the portion behind the blacked out

14    part is not relevant to your consideration.

15             You shouldn't speculate as to what may or may not be

16    there.  You shouldn't consider it in any way with respect to

17    your deliberations in this case.  The only relevant portion is

18    the portion that is not redacted and is displayed for you.

19             You may proceed.

20             MR. PODOLSKY:  Thank you, your Honor.

21    BY MR. PODOLSKY:

22    Q.  Okay.  Mr.Janklow, I want to make sure we know how to read

23    this.  Do you see the bubbles on the right are in green?

24    A.  Yes.

25    Q.  Who wrote the content in those bubbles?

M1ONAVE3                        Janklow - Direct

1    A.  I did.

2    Q.  And the content on the left in gray, who wrote those?

3    A.  Mr. Avenatti.

4    Q.  And do you see at the top there is a date and time

5    designation 7/31/18, 4:11 p.m.?

6    A.  I see.

7    Q.  What does that reflect?

8    A.  The time I sent the note.

9         MR. PODOLSKY:  Maybe to help us here, Ms. Abrams, if

10   you could pull up alongside this Government Exhibit 210.

11   BY MR. PODOLSKY:

12   Q.  Mr.Janklow, about how long after Mr. Avenatti sent you the

13   bank account information did you send the text message that we

14   are looking at on the left in Government Exhibit 212?

15   A.  Two hours and 15 minutes.

16        MR. PODOLSKY:  Ms. Abrams, if you can take down 210

17   we'll focus on 212 now.

18   BY MR. PODOLSKY:

19   Q.  Can you please read what you wrote at 4:11 p.m. on July 31,

20   2018?

21   A.  "I am in a meeting, but regarding the money, we need

22   something from Stormy saying it's okay that it goes into the

23   trust account, as we only normally pay contracted parties.

24   This is normally not even entertained.  I'm doing my best to

25   take care of you.  Cool?"

1    Q.  All right.  Do you see where you wrote "re the money"?

2    What were you referring to there?

3    A.  Paying the second payment, the second payment.

4    Q.  And after that you write, "We need something from

5    Stormy --"

6            To be clear, who's Stormy in this instance?

7    A.  Stormy Daniels.

8    Q.  -- "saying it's okay that it goes into the trust account."

9            What account are you referring to there, trust

10   account?

11   A.  I'm referring to the account that Michael sent me the

12   information on just prior, the new banking information.

13   Q.  "As we only normally pay contracted parties."

14           What does that part mean, "We only normally pay

15   contracted parties"?

16   A.  Meaning that we had a retainer agreement with Ms. Daniels,

17   and we normally only pay the signatory on our retainer

18   agreement.  And that was her.

19   Q.  Why do you normally only pay contracted parties?

20   A.  Because we're worried about the money getting to them

21   cleanly and without incident.

22   Q.  And above where you say, "We need something from Stormy

23   saying that it's okay," what are you asking for?

24   A.  Something signed by her that she was aware of and approving

25   of this change.

M1ONAVE3                    Janklow - Direct

1   Q.  And then you wrote, "This is normally not even entertained.

2   I'm doing my best to take care of you.  Cool?"

3           What did you mean by that?

4   A.  I meant that this is an unusual thing for us to do, and I

5   was trying to help Michael out.

6   Q.  How did Mr. Avenatti respond?

7   A.  He wrote, "Yes, I will handle."

8           MR. PODOLSKY:  Let's pull up for the witness and the

9   parties Government Exhibit 213.

10  BY MR. PODOLSKY:

11  Q.  Do you recognize this document, Mr.Janklow?

12  A.  It is an e-mail.

13          MR. PODOLSKY:  Your Honor, the government offers

14  Government Exhibit 213.

15          THE COURT:  Any objection?

16          MR. DALACK:  No objection, Judge.

17          THE COURT:  Admitted.

18          (Government Exhibit 213 received in evidence)

19          MR. PODOLSKY:  Ms. Abrams, if you could publish that

20  for the jury, please.

21  Q.  Mr.Janklow, what is this document?

22  A.  It is an e-mail with an attachment from Mr. Avenatti to me.

23  Q.  And what's the date and time of this e-mail?

24  A.  August 1, 2018.  At 12:10 p.m.

25  Q.  So approximately how long after the text message exchange

1  that we just looked at was this e-mail sent by Mr. Avenatti?

2  A.  Soon.  I don't remember exactly what time the text message

3  was.

4  Q.  Why don't we pull up Government Exhibit 212 for the witness

5  and 213 next to it.

6  A.  It's the --

7  Q.  How long after your request on July 31, did Mr. Avenatti

8  send this e-mail reflected in Government Exhibit 213?

9  A.  The next day, lunchtime.

10  Q.  Okay.  And, Mr.Janklow, if you could just -- unfortunately

11  we're in glass cages, so if you could pull it a little bit

12  closer so I can make sure I hear what you are saying in the

13  microphone.  Thank you.

14  A.  Sorry.

15  Q.  I appreciate that.

16       MR. PODOLSKY:  We can take down, 212, Ms. Abrams, and

17  focus on 213, please.

18  BY MR. PODOLSKY:

19  Q.  Okay.  I believe you said this before, but was there an

20  attachment to this letter -- excuse me, e-mail?

21  A.  Yes, it looks like there is.

22       MR. PODOLSKY:  Okay.  Let's look at the attachment,

23  please.  Ms. Abrams, maybe we can blow up the portion with the

24  text.  Thank you.

25  BY MR. PODOLSKY:

M1ONAVE3                        Janklow - Direct

1   Q.  What's the date at the top of this document?

2   A.  August 1, 2018.

3   Q.  And who is it addressed to?

4   A.  My company, Janklow & Nesbit Associates.

5   Q.  Who does the document indicate that it's from?

6   A.  Stormy Daniels.

7   Q.  What does it say beneath the from line?

8   A.  "Until further notice, please ensure all advances

9   associated with my book are routed to the account below, as the

10  prior account has been closed."

11  Q.  I will come back to the signature in a moment, but what

12  information is contained below the signature block on this

13  document?

14  A.  The new banking information for the trust for Mr. Avenatti.

15          MR. PODOLSKY:  Ms. Abrams, let's keep that up and just

16  bring up for a moment Government Exhibit 210.

17          We can put them side by side.

18  BY MR. PODOLSKY:

19  Q.  Is this the same bank account information that Mr. Avenatti

20  sent to you on July 31, 2018?  When I say "is this the same,"

21  I'm referring to what's contained in Government Exhibit 213.

22  A.  Yes.

23          MR. PODOLSKY:  All right.  Ms. Abrams you can take

24  down 210.  Stay with 213 for a moment.  If you could blow that

25  up again, please.

M1ONAVE3                         Janklow – Direct

1    BY MR. PODOLSKY:

2    Q.   Do you see in the middle there's a space that says

3    Stephanie Clifford, aka Stormy Daniels?

4    A.   Yes.

5    Q.   And does that appear to be a signature for Stephanie

6    Clifford below?

7    A.   Yes.

8    Q.   Did you believe at the time that Ms. Daniels had signed

9    this document?

10   A.   Yes.

11   Q.   Why did you think that?

12   A.   Because it came from her attorney.

13   Q.   If you had not received this document with her signature,

14   would you have authorized the payment to go to the Avenatti &

15   Associates trust account as requested by Mr. Avenatti?

16           MR. DALACK:   Your Honor, asked and answered.

17           THE COURT:   Overruled.

18   A.   No.

19   Q.   Do you know sitting here today whether or not Ms. Daniels

20   signed this document?

21   A.   I do not.

22   Q.   Did you ever speak to her directly about it?

23   A.   No.

24   Q.   Why not?

25   A.   I never spoke to her about anything relating to finances.

M10NAVE3                              Janklow - Direct

1    Q.  Why not?

2    A.  Because Mr. Avenatti handled all of that and insisted on

3    it.

4           MR. PODOLSKY:  All right.  Let's pull up to help us

5    here both Government Exhibit 107 and Government Exhibit 802,

6    including for the jury, please.  We can go to the second page

7    of each of these, Ms. Abrams.  Okay.

8    BY MR. PODOLSKY:

9    Q.  So I want to talk now about how the second payment was

10   made.  On the left do you see that this is wire information we

11   were looking at earlier?

12   A.  Yes.

13   Q.  Okay.  The page that we are looking at now, the second page

14   of the document, what payment does that page reflect?

15   A.  The second payment in the contract.

16   Q.  All right.  And we'll come back to that second page.

17          MR. PODOLSKY:  Ms. Abrams, can you just go to the

18   third page of 107 for a moment.

19   BY MR. PODOLSKY:

20   Q.  Do you see that this page reflects a $23,750 payment?

21   A.  I see.  Yes.

22   Q.  Okay.  Which book payment did that payment relate to?

23   A.  The second.

24   Q.  Okay.  So were there two portions of the second book

25   payment wired from Janklow & Nesbit?

M1ONAVE3                          Janklow - Direct

1    A.  Yes.

2    Q.  Okay.  I want to ask you about that in a moment.  Let's

3    just make sure we understand the timeline here, and we can look

4    at Government Exhibit 802.  For the second book payment,

5    when -- how many wires were sent -- well, let me ask.  Where

6    did Janklow & Nesbit send the money for the second book

7    payment, to what account?

8    A.  To the new attorney-client trust account.

9    Q.  What are the last four digits of that bank account?

10   A.  4779.

11   Q.  And in how many payments did Janklow & Nesbit send that

12   money?

13   A.  Two.

14   Q.  What was the date of the first wire transaction?

15   A.  August 1, 2018.

16   Q.  And how much money did Janklow & Nesbit wire to the

17   Avenatti & Associates trust account on that day?

18   A.  $125,000.

19   Q.  Now, do you recall whether, when you made the first of

20   those two payments, Janklow & Nesbit had actually received the

21   second book payment from St. Martin's Press?

22   A.  We had not actually received it.

23   Q.  So did you send the $125,000 on the second book payment

24   before Janklow & Nesbit had received the money from St.

25   Martin's?

1      MR. DALACK:  Asked and answered, your Honor.

2      THE COURT:  Sustained.

3  Q.  Is that something that you typically do, to send out money

4  to a client before you received the money from the publisher?

5      MR. DALACK:  Objection, your Honor.  Relevance.

6      THE COURT:  Overruled.

7  A.  No.  We almost never do that.

8  Q.  Why did you do that in this instance?

9  A.  Because there was -- I was -- urgency of payment was

10  communicated to me from Mr. Avenatti.

11  Q.  And what did Mr. Avenatti communicate to you was the reason

12  for the urgency?

13  A.  I recall it was again about security for Stormy, she needs

14  money, she is in a difficult situation, she needed money fast.

15  And I was trying to help.

16  Q.  Did Mr. Avenatti say anything about him receiving this

17  money?

18  A.  No.

19  Q.  So, based on your conversation with him, who did you

20  understand was going to receive the $125,000?

21      MR. DALACK:  Objection, your Honor.  Asked and

22  answered.

23      THE COURT:  Overruled.

24  A.  Stormy.

25  Q.  Did you ever talk to Ms. Daniels directly about making this

1   payment of $125,000 on August 1?  Did you ever speak to

2   Ms. Daniels directly about that?

3           MR. DALACK:  Again, your Honor, asked and answered.

4           THE COURT:  Overruled.

5   A.  No, I did not.

6   Q.  All right.  By the way, did Mr. Avenatti get his finder's

7   fee on the second payment as well?

8   A.  Yes.

9           THE COURT:  I think earlier you referred to that as a

10  referral fee.

11          Is that the same fee?

12          THE WITNESS:  Yes.

13  BY MR. PODOLSKY:

14  Q.  I'm sorry.  Will you understand me to be referring to the

15  same thing if I say referral fee or finder's fee?

16  A.  Yes.

17          MR. PODOLSKY:  All right.  Let's look at one more

18  document about this payment.

19          Ms. Abrams, could you pull up for the witness and

20  parties Government Exhibit 217.

21  BY MR. PODOLSKY:

22  Q.  Do you recognize this document, Mr.Janklow?

23  A.  That is a transcript of a WhatsApp conversation between

24  Stormy and myself.

25          MR. PODOLSKY:  Your Honor, the government offers

1   Government Exhibit 217.

2            MR. DALACK:  Your Honor, we object on 901 and 1002

3   grounds, and also 401 grounds.

4   Q.  Mr.Janklow --

5            MR. PODOLSKY:  Your Honor, if I may ask a question?

6            THE COURT:  You may.

7   BY MR. PODOLSKY:

8   Q.  Do you recognize these as WhatsApp conversations that you

9   exchanged with Ms. Daniels?

10  A.  I do.

11           MR. PODOLSKY:  Your Honor, the government offers

12  Government Exhibit 217.

13           MR. DALACK:  Again, your Honor.  We are objecting on

14  901, 1002, 401 and 803.

15           THE COURT:  Overruled.  Admitted.

16           (Government Exhibit 217 received in evidence)

17           THE COURT:  I see that I think the paralegal redacted

18  the phone number.  Will that be redacted in the exhibit that is

19  in evidence?

20           MR. PODOLSKY:  Yes, your Honor.  We are endeavoring to

21  redact PII from the admitted exhibit.

22           THE COURT:  If you could just do that in advance of it

23  being displayed, that would be best practice.

24           Ladies and gentlemen, PII is personal identifying

25  information, just private information of people, including

1   phone numbers, that sort of thing.  Unless it's relevant to the

2   case in some way, that will often be redacted from these

3   documents.  And I remind you that things that are redacted from

4   any document in this case you should not consider them or

5   speculate about them in any way.

6              All right.  The document is admitted.

7              MR. PODOLSKY:  Thank you, your Honor.

8              Ms. Abrams, if you could publish this for the jury,

9   please.  And why don't we blow up just the top message.  Okay.

10  BY MR. PODOLSKY:

11  Q.  Before I ask you about the message, now that the jury can

12  see it, what are we looking at?  What type of document is this?

13  A.  It's a WhatsApp conversation between Stormy and myself

14  printed out.

15  Q.  For anyone who doesn't know, what is WhatsApp?

16  A.  WhatsApp is just a messaging app.

17  Q.  All right.  Do you see that enlarged portion of the exhibit

18  starts with Stormy Daniels, 8/9/18?

19              Do you see that?

20  A.  Yes.

21  Q.  So who wrote this message?

22  A.  Stormy did.

23  Q.  And at what date and time?

24  A.  August 9, 2018 at 1:05 p.m.

25  Q.  Do you see that she wrote, "Just heard book is going to

M1ONAVE3                    Janklow - Direct

1   print this weekend.  I never got to see final edit or the

2   cover.  Can I get that please?  And when do we get paid?"

3          Do you see that?

4   A.  Yes.

5          MR. PODOLSKY:  Why don't -- to help us, Ms. Abrams,

6   let's keep this up but add Government Exhibit 802.

7          And, Ms. Abrams, if we can blow that up.

8          And on Government Exhibit 802, go to the second page.

9          All right.

10  BY MR. PODOLSKY:

11  Q.  Approximately how long after Janklow & Nesbit transmitted

12  the payments for the second book payment to the Avenatti &

13  Associates attorney-client trust account did Ms. Daniels send

14  you a WhatsApp message saying when do we get paid?

15  A.  Eight days.

16  Q.  Did you respond to Ms. Daniels' question about getting

17  paid?

18  A.  I did not.

19  Q.  Why not?

20  A.  I was instructed by Mr. Avenatti not to discuss finances

21  with her.

22         MR. PODOLSKY:  All right.  Let's turn to the third

23  payment.  And we can keep up Government Exhibit 802.

24         Actually, why don't we -- sorry, Ms. Abrams.  Why

25  don't we pull up Government Exhibit 801 instead.

1              All right.

2      BY MR. PODOLSKY:

3      Q.  Now, focusing on the third payment, Mr.Janklow, can you

4      remind us how much the amount of the third payment was?

5      A.  175,000.

6      Q.  And when did that become due?

7      A.  That was due from the date of publication or six months

8      from the delivery and acceptance.

9      Q.  Of?  Of what?

10     A.  Of the manuscript to the publisher.

11     Q.  Do you remember approximately when the book "Full

12     Disclosure" was published?

13     A.  I think it's the first -- it's always a Tuesday, so the

14     first Tuesday in October.

15              MR. PODOLSKY:  All right.  Let's pull up for the

16     witness and the parties Government Exhibit 218.

17              If we could blow up that.

18              All right.

19     BY MR. PODOLSKY:

20     Q.  Mr.Janklow, do you recognize this document?

21     A.  That is an e-mail.

22     Q.  What prompted you to write this e-mail?

23     A.  I was trying to make a case to get Stormy paid earlier than

24     she was contractually due.

25     Q.  Did anyone speak to you about that before you wrote this

1    e-mail?

2    A.  Yes, I discussed it with Mr. Avenatti.

3    Q.  Did you understand whether or not you should transmit his

4    views on that to the publisher?

5              MR. DALACK:  Objection, your Honor.  It's vague.

6    Lacks foundation.

7              THE COURT:  Sustained as to form.

8    BY MR. PODOLSKY:

9    Q.  What did you understand Mr. Avenatti want you to do with

10   his views regarding payment of the -- making the third payment?

11   A.  Use them to support a case for her getting paid earlier.

12             MR. PODOLSKY:  Your Honor, the government offers

13   Government Exhibit 218.

14             MR. DALACK:  Objection, your Honor, under 802.

15             THE COURT:  It is overruled.  Admitted.

16             (Government Exhibit 218 received in evidence)

17             MR. PODOLSKY:  If we could publish this to the jury,

18   please, Ms. Abrams, and blow up a portion of the e-mail.

19   BY MR. PODOLSKY:

20   Q.  Mr.Janklow, do you see that this is an e-mail?

21   A.  I do.

22   Q.  Who is it from?

23   A.  It is from me.

24   Q.  To whom?

25   A.  Sally Richardson, Elizabeth Beier, and my assistant Claire

1  Dippel.

2  Q.  I believe you mentioned her at the beginning of your

3  testimony.  Who is Ms. Richardson?

4  A.  She is the editor-in-chief of St. Martin's.

5  Q.  And when did you send this e-mail?

6  A.  September 13, 2018.

7  Q.  At this point had the book been published yet?

8  A.  No.

9  Q.  Was the third payment due yet?

10  A.  No.

11  Q.  Now, do you see you wrote, "Hi, I was speaking to Michael

12  earlier"?

13  A.  Yes.

14  Q.  Who does Michael refer to?

15  A.  Mr. Avenatti.

16  Q.  And do you see, "He asked about the publication"?  You put

17  a dollar sign.  Do you see that?

18  A.  Yes.

19  Q.  What is the publication dollar sign in this instance?

20  A.  The payment due upon the publication of the book.

21  Q.  And when you say he asked about the publication money, what

22  did he say to you?

23  A.  Can we get it faster?  How fast can we get it?

24  Q.  Faster than what?

25  A.  The contract called for.

M1ONAVE3                          Janklow – Direct

1    Q.  Do you see that you wrote, "He was not asking to be greedy.

2    He had a reason"?

3           Do you see that?

4    A.  I do.

5    Q.  Did Mr. Avenatti provide a reason to you?

6    A.  Yes.

7    Q.  What was it?

8    A.  That the way to help control Ms. Daniels to fulfill her

9    publicity requirements and other requirements in the contract

10   was to pay her so she was not distracted by other offers.

11   Q.  Do you see below you wrote, "She has money problems all the

12   time"?

13          Do you see that?

14   A.  Yes.

15   Q.  What was your basis for that statement?

16   A.  Michael told me she had money problems all the time.

17   Q.  Did you speak to her directly about that?

18   A.  I did not.

19   Q.  "It's what begat that stupid Dutch TV interview."

20          Do you see that?

21   A.  Yes.

22   Q.  What are you referring to?

23   A.  Very early in the process, right as we were about to sign

24   the contract which stipulated that she was to do no press prior

25   to the book coming out, she had done this big television

M1ONAVE3                          Janklow - Direct

 1  interview in Holland, and the publisher was very concerned

 2  about that.

 3  Q.  What, if anything, did Mr. Avenatti say about the Dutch TV

 4  interview in this context?

 5  A.  That the reason she did it was that they paid her.

 6  Q.  And you see you write below, "I would like to get her some

 7  of the next payment if possible, as it will be an investment in

 8  keeping her quiet"?

 9         Do you see that?

10  A.  Yes.

11  Q.  What did you mean by that?

12  A.  I meant if we could get her paid now she would be less

13  likely to get enticed by other offers of payment that would

14  essentially be breaches of her contract potentially.

15  Q.  Where did that idea come from?

16  A.  Mr. Avenatti explained the situation to me.

17  Q.  Based on that conversation, who did you understand would

18  receive this third book payment?

19  A.  Ms. Daniels.

20  Q.  Did you speak to Ms. Daniels directly about the request for

21  early payment of the third book payment?

22  A.  No.

23  Q.  Why not?

24  A.  Because Mr. Avenatti did that.

25  Q.  Did St. Martin's Press agree to make the third payment

M1ONAVE3                          Janklow - Direct

1    earlier around this time?

2    A.  Yes.

3         MR. PODOLSKY:  Let's pull up Government Exhibit 107

4    again.

5         THE COURT:  Actually, Mr. Podolsky, it's 11:30, so we

6    are going to break there for our lunch break, ladies and

7    gentlemen.

8         If everything went according to plan, your lunches

9    should be there for you in the jury room when you get down.

10        Now, a couple of reminders that you've already heard

11   from me a couple of times and you will hear from me many more

12   times before there case is over:

13        Number one, continue to keep an open mind.  You have

14   heard the lawyers' opening statements.  What they say is not

15   evidence.  You have heard the testimony, the direct testimony,

16   some of the direct testimony of one witness, but you certainly

17   haven't heard all of the evidence.

18        So continue to keep an open mind until you have heard

19   all of the evidence in this case.

20        Do not discuss the case with each other or with anyone

21   else for that matter.

22        And do not do any research on the case and look up

23   anything about the case, you know, anything of that sort.

24        Given the length of the break and the COVID protocols

25   in effect, you should remain in the jury room for the duration

M10NAVE3                          Janklow – Direct

of the break.  I thank you for your cooperation and patience on

that and also your compliance with the COVID protocols, which

are intended to keep all of you safe.

          Again, don't discuss the case and continue to keep an

open mind.

          It's 11:30.  We will start I hope promptly at 12:15,

so please be ready to go at about 12:10 so that my staff can

arrange for you to come back up here.

          With that, I will ask everybody to remain in the

courtroom for a minute or so after the jury gets out just to

enable them to get on to the elevators and down to the jury

room.

          With that, you are excused.  Thank you very much.

          Please bring your notebooks with you, and we'll see

you after the break.

          (Continued on next page)

M1ONAVE3                        Janklow – Direct

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Again, please remain in the courtroom for a few

4    seconds to let the jury clear out of the atrium area.

5              Mr.Janklow, you may step down.  Before you do, please

6    put your mask on before you exit the box.  Please be back in

7    the courtroom at 12:10 and on the stand by 12:15 ready to

8    continue your testimony.  Enjoy your break.

9              THE WITNESS:  Yes.

10              THE COURT:  Counsel, I want to make sure you get your

11   breaks.

12              Anything we need to discuss before we adjourn?

13              MR. PODOLSKY:  I want to raise one brief thing.  I

14   will wait for the witness to leave.

15              (Witness not present)

16              THE COURT:  I should note I gather a couple of the

17   screens are having some technical difficulty.  The AV

18   department has been alerted, and in fact someone is here

19   working on it as we speak.  Hopefully over the break they'll

20   get those fixed, but the jury screens have been working and

21   everything else seems to be proceeding.  So hopefully that will

22   be fixed.

23              Yes, Mr. Podolsky.

24              MR. PODOLSKY:  Your Honor, there was one sustained

25   objection regarding something that Mr.Janklow believed.  I am

not seeking to revisit it.  I just want to make a record in
case this comes up again.

          In the instances I've asked about his belief, it is
specifically because -- to show two things:  The basis for that
believe, and second because that belief explains an action that
is relevant to the case, for example, sending a payment based
on a particular belief and the source of that belief.

          I just want to make the record on that, not to revisit
the one that was done, but for this afternoon.  The last thing
I'll note about that, of course, is we do need to prove
materiality in this case and the materiality of certain of the
representations that were made to Mr.Janklow I think are at
issue in this case.

          THE COURT:  All right.  Understood.

          Anything the defense needs to raise before our break.

          MR. DALACK:  Just on that point, I wish to note that
there was obviously no issue with having the witness comment on
statements that he made as illustrating a particular action
that he took.  I just wanted to make that point, your Honor.

          THE COURT:  I think, notwithstanding the sustained
objection, the record was developed on the issue.  Certainly,
to the extent any understanding is based on statements and
representations made by Mr. Avenatti, the government is
entitled to elicit that and I'm sure will make that clear.

          Please be back here no later than 12:10 ready to go.

M1ONAVE3                          Janklow – Direct

1    The witness should be on the stand and ready to go at 12:15.

2            Enjoy your breaks.  Thank you.

3            MR. PODOLSKY:  Thank you, your Honor.

4            (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                          12:15 p.m.

3            THE COURT:  Please be seated.

4            Welcome back.  I hope you all enjoyed your break.

5    Sorry we're getting off to a five-minute late start.

6    Everything's a little more complicated these days, so we will

7    get down the timing and logistics of getting you up and down.

8    Thank you for being ready to go on time.  We will continue with

9    the direct testimony of Mr. Janklow.

10           Mr. Janklow, I remind you that you remain under oath.

11           With that, Mr. Podolsky, you may proceed.

12   BY MR. PODOLSKY:

13   Q.  Mr. Janklow, do you recall that before the break we were

14   discussing the third of the four book payments of the payments

15   of the book deal?

16   A.  I do.

17   Q.  Do you recall that you testified before the break that that

18   payment was early, before the book was published?

19   A.  Correct.

20           MR. PODOLSKY:  Let's pull up for everyone Government

21   Exhibit 107 and Government Exhibit 802 side by side.  And this

22   time, Ms. Abrams, if you could go to the fourth page of 107 and

23   the third page of 802.  All right.

24   Q.  Mr. Janklow, when did Janklow & Nesbit -- well, start with

25   this.  Who did Janklow & Nesbit transmit the proceeds from the

M1oWave4                         Janklow - Direct

1   third book payment to; where did you send it?

2   A.  To the attorney-client trust account that Mr. Avenatti sent

3   us information on.

4   Q.  And how much was sent to that account?

5   A.  All together, $148,750.

6   Q.  And again, focusing on the third payment, on what date did

7   Janklow & Nesbit wire that money?

8   A.  It was done in two tranches, one on --

9   Q.  Sorry to interrupt you.  I want to just make sure you heard

10  my question.  I'm focusing on payment 3.

11  A.  Sorry.

12  Q.  If you look at both the page on the left as well as the

13  chart, focusing on the third payment, on what date was the

14  third payment wired?

15  A.  Apologies.

16      September 17.

17  Q.  Of what year?

18  A.  2018.

19      MR. PODOLSKY:  Let's pull up for the witness and the

20  parties Government Exhibit 220.  Ms. Abrams, if you could blow

21  up the portion -- thank you.

22  Q.  Do you recognize this document, Mr. Janklow?

23  A.  Yes, it's a transcript of a text conversation.

24      MR. PODOLSKY:  Your Honor, the government offers

25  Government Exhibit 220.

M1oWave4                    Janklow - Direct

1          THE COURT:  Can you just elicit who it's between,

2    please.

3          MR. PODOLSKY:  Of course, your Honor.

4    Q.  Who is this text message exchanged between, Mr. Janklow?

5    A.  Myself and Mr. Avenatti.

6          MR. PODOLSKY:  Your Honor, the government offers

7    Government Exhibit 220.

8          THE COURT:  Any objection?

9          MR. DALACK:  No objection.

10          THE COURT:  Admitted.

11          (Government Exhibit 220 received in evidence)

12          THE COURT:  Mr. Podolsky, could you keep your voice up

13    a little bit.

14          MR. PODOLSKY:  Yes, your Honor.

15          THE COURT:  Thank you.

16          MR. PODOLSKY:  Ms. Abrams, I believe that's visible to

17    the jury now.

18    Q.  Mr. Janklow, what is the -- well, let's remind ourselves.

19    Who wrote the text that's in the green bubbles on the right?

20    A.  I did.

21    Q.  And who wrote the text that's in the gray bubble on the

22    left?

23    A.  Mr. Avenatti.

24    Q.  At what date and time did you write the first text in this

25    exhibit?

M10Wave4                    Janklow - Direct

1  A.  September 14, 2018, at 4:06 p.m.

2  Q.  What did you write?

3  A.  "The Stormy money is in.  We'll send out first thing

4  Monday.  We missed the bank deadline for today."

5  Q.  What Stormy money were you referring to?

6  A.  The third payment.

7  Q.  And in this exchange, when is the next, when do you write

8  the next message?

9  A.  September 15, 2018, at 9:29 a.m.

10  Q.  And what did you write there?

11  A.  "Hey, how's it going?  Stormy WhatsApped that she wants to

12  talk on the phone this weekend.  Thoughts?"

13  Q.  Why did you ask Mr. Avenatti:  "Stormy WhatsApped that she

14  wants to talk on the phone this weekend.  Thoughts?"

15  A.  Because I always would tell Michael when there was any

16  interaction with Stormy and asked him how he felt about it

17  because he wanted to control all of that.

18          MR. DALACK:  Objection, your Honor, as to what Mr.

19  Avenatti wants.

20          THE COURT:  Sustained.

21          MR. DALACK:  Strike, your Honor?

22          THE WITNESS:  It was habit.  It was habit for me to

23  inform him when I was going to be in touch with her.

24          THE COURT:  All right.  I'm going to instruct the jury

25  to disregard testimony about what Mr. Avenatti may have wanted

M1oWave4                        Janklow - Direct

1    or felt.  The witness is obviously not in a position to opine

2    on what was in Mr. Avenatti's head.  He can tell you his

3    understanding or what Mr. Avenatti said, but that testimony is

4    not in the record and should be disregarded.

5              Go ahead.

6    BY MR. PODOLSKY:

7    Q.  What, if anything, did Mr. Avenatti say to you about your

8    communications with Ms. Daniels?

9    A.  He requested that I have all conversations regarding money

10   in particular through him.

11   Q.  Now, do you see that Mr. Avenatti responds "Pls call me"?

12   A.  Yes.

13   Q.  What did you understand Pls to mean there?

14   A.  Please.

15   Q.  Now, do you see that there's no time stamp in between your

16   message, "hey, how's it going," etc., and Mr. Avenatti's

17   response?

18   A.  I do.

19   Q.  What's your understanding of what that means in this

20   document?

21   A.  That it was less than 60 seconds when he responded.

22   Q.  Do you recall specifically speaking to Mr. Avenatti after

23   this text exchange?

24   A.  I don't recall specifically speaking to him.

25   Q.  After this text exchange, did you -- excuse me, speak to

M1oWave4                        Janklow - Direct

1    Ms. Daniels about the third payment?

2    A.  I did not.

3    Q.  Why not?

4    A.  Mr. Avenatti suggested I didn't.

5    Q.  Now, do you recall earlier that you testified about the

6    reasons that Mr. Avenatti gave for -- that the third payment

7    should be made early?

8    A.  Yes.

9    Q.  Can you remind us generally what those reasons were?

10   A.  It was in an effort to get Stormy to fulfill her

11   obligations to the contract with not doing press that wasn't

12   sanctioned by the publisher.

13   Q.  Now, after the third payment, were there any issues about

14   Ms. Daniels doing or not doing the press that the publisher

15   asked for?

16   A.  Yes.

17   Q.  Did St. Martin's nonetheless make all the payments on the

18   book contract?

19   A.  Yes.

20          MR. PODOLSKY:  All right.  Let's put Government

21   Exhibit 1 on the screen for the witness and the parties,

22   please.

23   Q.  Mr. Janklow, do you recognize this document?

24   A.  I do.

25   Q.  What is it?

1    A.  It's the cover of Stormy's book.

2           MR. PODOLSKY:  Your Honor, the government offers

3    Government Exhibit 1.

4           MR. DALACK:  No objection, Judge.

5           THE COURT:  Admitted.

6           (Government Exhibit 1 received in evidence)

7           MR. PODOLSKY:  If we could display that for the jury,

8    please, Ms. Abrams.

9    Q.  Mr. Janklow, could you just explain to the jury, now that

10   they can see this, what we're looking at?

11   A.  You're looking at what I think is the final mock-up of the

12   cover of Stormy's book.

13   Q.  And approximately when was the book actually published?

14   A.  Early October 2018.

15          MR. PODOLSKY:  Let's pull up for Mr. Janklow and the

16   parties Government Exhibit 242.  And Ms. Abrams, maybe to help

17   the witness, we can put the second page up side by side with

18   that.  The second page of the exhibit.

19          Your Honor, may I just have one moment to address the

20   rest of the exhibit.

21          THE COURT:  You may.

22          MR. PODOLSKY:  Thank you, your Honor.  Just a moment.

23          We'll come back to this document in just a minute.

24          Why don't we pull up Government Exhibit -- why don't

25   we pull up Government Exhibit 242 in that version, please,

M1oWave4                    Janklow - Direct

1    Ms. Abrams.

2    Q.  Do you recognize this exhibit, Mr. Janklow?

3    A.  It's a text.

4    Q.  And who is this text between?

5    A.  It's my -- I'm only seeing my text.  I'm assuming it's with

6    Mr. Avenatti.

7         MR. PODOLSKY:  Can you zoom out to the top of the

8    page, Ms. Abrams.

9    Q.  Who did you send this text --

10   A.  Yes, Mr. Avenatti.

11        MR. PODOLSKY:  Your Honor, the government offers

12   Government Exhibit 242.

13        THE COURT:  Any objection?

14        MR. DALACK:  No objection, your Honor.

15        THE COURT:  Admitted.

16        (Government Exhibit 242 received in evidence)

17        THE COURT:  Just to be clear, this is a one-page

18   document, Mr. Podolsky?

19        MR. PODOLSKY:  We may offer the next page.  For now we

20   offer one page.

21        THE COURT:  OK.

22   BY MR. PODOLSKY:

23   Q.  Mr. Janklow, do you see the date of this text?

24   A.  I do.

25   Q.  What is it?

M1oWave4                          Janklow - Direct

1    A.  October 1, 2018.

2    Q.  Who wrote the text in the blue bubble?

3    A.  I did.

4    Q.  And what did you write?

5    A.  I write, actually, not wrote Stormy, but it should be

6    "write Stormy to congratulate her on the eve of her

7    publication.  I normally would, but..."

8    Q.  Why did you write this text to Mr. Avenatti?

9    A.  Because I wanted to congratulate her, as I do all of my

10   clients on the eve of their publications, but the

11   communications with Stormy had been very limited, and I wanted

12   to make sure it was OK with Mr. Avenatti that I did that.

13   Q.  And following your exchange with Mr. Avenatti, did you

14   congratulate her?

15   A.  I don't think I did, actually.

16        MR. PODOLSKY:  Let's pull up for the witness and the

17   parties Government Exhibit 225.

18   Q.  Mr. Janklow, do you recognize this document?

19   A.  I do.  It's an email.

20   Q.  And focusing at the top of the chain, did you send this

21   email?

22   A.  I did, to Sally Richardson.

23        MR. PODOLSKY:  Your Honor, the government offers

24   Government Exhibit 225.

25        MR. DALACK:  Objection on 802 grounds, your Honor.

1            MR. PODOLSKY:  Your Honor, much of the email's not

2    offered for the truth.  If you'd like, I can ask additional

3    foundation for the top part.

4            THE COURT:  Please do.

5    BY MR. PODOLSKY:

6    Q.  Mr. Janklow, prior to you writing that email, did there

7    come a time when you spoke to the defendant?

8    A.  Yes.

9    Q.  Based on your conversation with the defendant, what was

10   your understanding as to whether or not you should convey what

11   he said to the folks at St. Martin's Press?

12   A.  I felt I should.

13           MR. PODOLSKY:  Your Honor, the government offers

14   Government Exhibit 225.

15           MR. DALACK:  802, your Honor.

16           THE COURT:  Mr. Podolsky, is any of it offered for the

17   truth?

18           MR. PODOLSKY:  No, your Honor.  Actually -- well, I

19   expect the witness will testify as to the communications that

20   informed this email, but no.

21           THE COURT:  All right.  It is admitted.

22           Ladies and gentlemen, just to be clear, you may not

23   consider the text of this exhibit, the emails, for their truth

24   but merely for the fact that they were sent.

25           With that, you may proceed.

1          (Government Exhibit 225 received in evidence)

2          MR. PODOLSKY:  Thank you, your Honor.

3          All right.  Ms. Abrams, if you could pull that up for

4     the jury, please.  And why don't we start with the bottom

5     email, maybe, if you don't mind, and we can include the heading

6     here.

7          Thank you very much.

8     Q.  All right.  Now, Mr. Janklow, do you see that this email is

9     sent at, on November 19, 2018, at 6:00 a.m.?

10    A.  I do.

11    Q.  Do you recall approximately how long after Janklow & Nesbit

12    had transmitted the third payment to the Avenatti & Associates

13    trust account this email was sent?

14    A.  Two months.

15    Q.  And do you see that the email is from Stormy's PR with an

16    email address stormydanielspr@gmail.com?

17    A.  I do.

18    Q.  What was your understanding of who used that address?

19    A.  A gentleman named Denver.

20    Q.  And what relationship did this gentleman Denver have to the

21    book deal, as far as you understood?

22    A.  To the book deal, none.

23    Q.  And what about to Ms. Daniels?

24    A.  I think there might have been a romantic interest, but he

25    was the director of the documentary they were working on.

M1oWave4                      Janklow - Direct

1    Q.  And --

2    A.  That's how he was introduced to me.

3    Q.  Do you see that the Stormy's PR email address writes:  "Hi,

4    folks.  Apologies for mass email.  Just now sure who the right

5    person to contact is with this question"?  Do you see that?

6    A.  Yes.

7    Q.  Who is the group that this email is sent to?  Do you know

8    who those are?

9    A.  Senior executives at St. Martin's in publicity and also her

10   editor.

11   Q.  And do you see below that the email continues, "Stormy gave

12   a magnificent speech to a packed house at the Oxford Union

13   yesterday, which should be posted to YouTube shortly"?  Do you

14   see that?

15   A.  I do.

16   Q.  Do you know what that's a reference to?

17   A.  Yes, a speech that she gave in England.

18   Q.  And at the bottom, do you see the email continues:  "She

19   asked me to follow up about the third payment, which she says

20   was due a few weeks ago upon completion of three weeks of press

21   tour for the book.  When can I tell her to expect the payment"?

22   Do you see that?

23   A.  I do.

24        MR. PODOLSKY:  All right.  If we zoom back out and

25   focus on the middle email for a moment.

M1oWave4                        Janklow - Direct

1    Q.  What does Ms. Richardson do with that email?

2    A.  She forwards it to me.

3    Q.  And you see that she writes:  Luke, the plot thickens.  I

4    need your help here.  Can we talk."  Do you see that?

5            MR. DALACK:  Your Honor, I'll just renew our objection

6    to 802 grounds.  The government is now offering.

7            THE COURT:  You can object to the question, but to the

8    extent you're renewing your objection, I've already given you

9    my ruling.  The objection is overruled.

10           MR. PODOLSKY:  Thank you, your Honor.

11   Q.  Do you see the text here, Mr. Janklow?

12   A.  I do.

13           MR. PODOLSKY:  All right.  Let's zoom out and let's

14   focus on the top email.

15   Q.  Now, do you see that you respond in this portion of the

16   email chain?

17   A.  Yes.

18   Q.  And do you see that you wrote, "spoke to Michael"?  Do you

19   see that?

20   A.  Yes, I do.

21   Q.  Who were you referring to?

22   A.  Mr. Avenatti.

23   Q.  Did you speak to Mr. Avenatti prior to writing this email

24   to Ms. Richardson?

25   A.  Yes.

M1oWave4                        Janklow - Direct

1   Q.  Did you convey the substance of the email below to Mr.

2   Avenatti?

3   A.  Yes.

4   Q.  In substance, what did he say to you?

5   A.  That he'll deal with it, that he's going to talk to Stormy.

6   And that his, you know, neither of us understood why Denver was

7   involved.

8   Q.  Why do you say neither of us -- excuse me.  Why did you not

9   understand?

10  A.  Because he was the documentary filmmaker and had nothing to

11  do with the process of the book and knew nothing about it, to

12  my knowledge.

13  Q.  Did you reach out directly to Ms. Daniels about the email

14  that you had been forwarded from the Stormy PR email address?

15  A.  No.

16  Q.  Why not?

17  A.  Michael said he would handle it.

18          MR. PODOLSKY:  Let's turn and pull up for the witness

19  and the parties Government Exhibit 226.

20  Q.  Mr. Janklow, do you recognize this email?

21  A.  I do.

22  Q.  And did you send the email at the top of the chain?

23  A.  I did.

24          MR. PODOLSKY:  Your Honor, the government offers

25  Government Exhibit 226, and I can say it's not for the truth of

1    the content of the email.

2              THE COURT:  Any objection, with that understanding?

3              MR. DALACK:  With that understanding, your Honor, we

4    object on 401 grounds.

5              THE COURT:  Overruled.

6              (Government Exhibit 226 received in evidence)

7              THE COURT:  Ladies and gentlemen, same instructions

8    with respect to these emails.  You may not consider them for

9    their truth.  You may consider them for other purposes,

10   including, for example, the effect that it had on Mr. Janklow

11   or why he took certain actions that he took.

12             You may proceed.

13             MR. PODOLSKY:  All right.  Ms. Abrams, could you pull

14   up or blow up the bottom half of the email, starting with

15   forwarded message.

16   Q.  Mr. Janklow, do you see the bottom of this email is the

17   same email that we looked at a moment ago in Government Exhibit

18   225?

19   A.  It is.

20   Q.  All right.  And do you see above there's another email from

21   Stormy's PR?

22   A.  I see.

23   Q.  When was that email sent?

24   A.  November 20, 2018, at 4:22 p.m.

25   Q.  And what, can you just read that email to the jury, please?

M1oWave4                    Janklow - Direct

1   A.  "Following up on this, Stormy believes you are several

2   weeks late on a payment, which makes her disinclined to promote

3   a book she feels she isn't getting paid for.  If you can give

4   me an update on that, it would be most appreciated and help me

5   in presenting the opportunities to continue promoting the book

6   to Stormy."

7   Q.  Now, at this time, November 20, from your perspective, had

8   any payments been made late?

9   A.  Yes.

10  Q.  Excuse me.  Had Janklow & Nesbit made any payments -- was

11  Janklow & Nesbit behind on any payments as of November 20?

12  A.  I misheard you.

13      No, we were not.

14      MR. PODOLSKY:  OK.  Zoom out.

15  Q.  Do you see that again Ms. Richardson forwards you this

16  email?

17  A.  Yes.

18  Q.  OK.  And do you see that you responded at the top?

19  A.  I do.

20  Q.  Do you see that you wrote "I don't even know what to say to

21  that nonsense"?

22  A.  Yes.

23  Q.  Did you speak at this time directly to Ms. Daniels about

24  the, these emails that you had been forwarded?

25  A.  No.

M1oWave4                    Janklow - Direct

1    Q.  Why not?

2    A.  Mr. Avenatti was handling it.

3           MR. PODOLSKY:  Let's turn to Government Exhibit 227.

4    Q.  Mr. Janklow, do you recognize this document?

5    A.  I do.  It's an email.

6    Q.  And did you send the email, focusing on the top of the

7    chain?

8    A.  I did.

9           MR. PODOLSKY:  Your Honor, the government offers

10   Government Exhibit 227 with the same proviso.  We are not

11   offering it for the truth of the content.

12          MR. DALACK:  Your Honor, with respect to the bottom

13   part of the email, if this is being offered for the truth of

14   the matter asserted, it is hearsay, and if it's not being

15   offered for the truth, then it's irrelevant under 401 with

16   respect to what the person in the email believes.

17          THE COURT:  Understood.  With the instruction that the

18   jury's not to consider the truth of the exhibit, it is

19   admitted.

20          (Government Exhibit 227 received in evidence)

21          MR. PODOLSKY:  You can pull this up for the jury,

22   please, and blow up the top half.

23          Actually, why don't we, as we read this, Ms. Abrams,

24   could you pull up Government Exhibit 802, the third page -- oh,

25   I'm sorry.

M1oWave4                         Janklow - Direct

1    Q.   Do you see that the bottom of this email is an email from

2    Denver Nicks?

3    A.   I do.

4    Q.   Who is that?

5    A.   The documentary filmmaker and friend of Ms. Daniels.

6    Q.   Is that the same person you understood was using the Stormy

7    PR email address?

8    A.   Yes, it is.

9    Q.   And what was the date that Mr. Nicks sent this email?

10   A.   December 17, 2018.

11   Q.   And you see that it's sent to Sally Richardson, Stormy

12   Daniels, yourself, and Elizabeth Beier?

13   A.   I do.

14   Q.   And what's the subject of this one?

15   A.   Book sales.

16   Q.   What did Mr. Nicks write?

17   A.   "Hi, folks.  Stormy believes St. Martin's owes her the

18   third payment due on her advance and asked if someone on your

19   end -- her agent Luke or someone at St. Martin's -- would

20   please get in touch with me or her directly at

21   stormydaniels@aol.com with an update on the status of the

22   matter.  She also asked if she could see any sales figures that

23   you have, and if you could please send those directly as well

24   or arrange for a phone call with her in the event the

25   information is confidential.  Thanks and happy holidays.

1    Denver."

2    Q.   Approximately how long after Janklow & Nesbit wired the

3    third book payment to the Avenatti & Associates attorney-client

4    trust account did Mr. Nicks write this email?

5    A.   Three months.

6    Q.   And what did you do with this email?

7    A.   I forwarded it to Mr. Avenatti with question marks.

8    Q.   Why did you do that?

9    A.   Because it didn't make sense to me.

10   Q.   Did you speak to Mr. Avenatti after receiving this email?

11   A.   I mean -- I spoke to him all the time, so I assume I did,

12   but I don't know for sure.

13   Q.   Did you speak to Ms. Daniels about this email that you

14   received as well as she did?

15   A.   No.

16   Q.   Why not?

17   A.   Because Michael said he was handling it.

18          MR. PODOLSKY:  All right.  We can take that down,

19   please.

20   Q.   Now I want to turn our attention to February of 2019.  OK?

21   A.   Yes.

22          MR. PODOLSKY:  Let's pull up Government Exhibit 801

23   for everyone.  All right.

24   Q.   Now, as of February 2019, had the first three payments

25   already been made by St. Martin's Press?

M1oWave4                       Janklow - Direct

```
 1    A.  Yes.

 2    Q.  When was the fourth payment due?

 3    A.  Six to 12 months from the publication date.

 4    Q.  And so, if we can do some math here, approximately how long

 5    after publication would this become due?

 6    A.  Between April and October.

 7    Q.  Of what year?

 8    A.  '18, '19 -- no.  '19.  Sorry.  I'm in the book business,

 9    not mathematics, mathematician.

10    Q.  What is the total amount of the fourth payment as made by

11    St. Martin's Press?

12    A.  200,000.

13              MR. PODOLSKY:  Let's pull up for the witness and the

14    parties what's been marked as Government Exhibit 230.  And blow

15    up the text portion, please.

16    Q.  Do you recognize this document, Mr. Janklow?

17    A.  It is a text conversation.

18    Q.  Between who?

19    A.  Myself and Mr. Avenatti.

20              MR. PODOLSKY:  Your Honor, the government offers

21    Government Exhibit 230.

22              THE COURT:  Any objection?

23              MR. DALACK:  No objection, your Honor.

24              THE COURT:  Admitted.

25              (Government Exhibit 230 received in evidence)
```

1          MR. PODOLSKY:  Display that for the jury.  And

2     Ms. Abrams, if we could blow up the text on February 13th

3     through 14th.

4     Q.  All right.  Again, let's make sure we know how to read

5     this.  Whose text messages are in the blue bubbles on the

6     right?

7     A.  Those are mine.

8     Q.  And whose messages are in the blue bubbles -- excuse me,

9     the gray bubbles on the left?

10    A.  Mr. Avenatti's.

11    Q.  And what's the date at the top of this portion of your text

12    exchange?

13    A.  February 13, 2019.

14    Q.  And at what time are those first messages sent?

15    A.  7:36 p.m.

16    Q.  And what did Mr. Avenatti write to you?

17    A.  "Please call me.  I've talked her off the ledge.  You need

18    to call me.  Thanks."

19    Q.  All right.  And now, do you see there's a message that's

20    dated the next morning, at 7:32 a.m.?

21    A.  I do.

22    Q.  And what did Mr. Avenatti write at that time?

23    A.  "Please call me this morning re Stormy."

24          MR. PODOLSKY:  Let's pull up -- we'll come back to

25    this exhibit in a moment, but let's look at Government Exhibit

1      232 for Mr. Janklow and the parties.

2      Q.  Mr. Janklow, do you recognize this document?

3      A.  That's a WhatsApp transcript between Mr. Avenatti and

4      myself.

5                 MR. PODOLSKY:  Your Honor, the government offers

6      Government Exhibit 232.

7                 MR. DALACK:  We object on 1002 grounds, your Honor.

8                 THE COURT:  All right.  Can you just ask a few more

9      foundational questions, Mr. Podolsky.

10                MR. PODOLSKY:  Of course, your Honor.

11     Q.  Do you recognize these messages, Mr. Janklow?

12     A.  Yes.

13     Q.  And do these accurately reflect WhatsApp messages that you

14     exchanged with Mr. Avenatti at the time indicated on the

15     document?

16     A.  Yes.

17                MR. PODOLSKY:  Your Honor, the government offers

18     Government Exhibit 232.

19                THE COURT:  All right.  Admitted.

20                (Government Exhibit 232 received in evidence)

21                MR. PODOLSKY:  If we could display these for the jury.

22     And why don't we do it this way, Ms. Abrams.  If we can put 230

23     up as well at the same time.  And if we could enlarge -- yeah.

24     Thank you.  OK.

25     Q.  Do you see, on the left, on February 14, at 7:32 a.m., Mr.

M1oWave4                    Janklow - Direct

1   Avenatti writes "please call me this morning re Stormy"?

2   A.  Yes.

3   Q.  And do you see on the right, at the bottom, there's also a

4   message on February 14, 2019?  Do you see that?

5   A.  I do.

6   Q.  And what time is that message sent?

7   A.  8:23 a.m.

8   Q.  And who wrote that message?

9   A.  Mr. Avenatti.

10  Q.  And what did he write?

11  A.  "Trying to reach you re Stormy.  Please give me a call."

12  Q.  Did Mr. Avenatti frequently contact you on WhatsApp?

13  A.  No.

14          MR. PODOLSKY:  All right.  Let's continue with 230.

15  Ms. Abrams, we can take down 232 for now.

16          THE COURT:  Mr. Podolsky, was that last question did

17  he frequently contact you?

18          MR. PODOLSKY:  I believe I asked -- I could ask again,

19  your Honor.  I believe I asked did he frequently contact you on

20  WhatsApp?

21          THE COURT:  Is that accurate, he did not frequently

22  contact you on WhatsApp?

23          THE WITNESS:  Correct.

24          THE COURT:  OK.  Thank you.

25          MR. PODOLSKY:  Ms. Abrams, if we can, before we get to

1    this, blow up the message on the 14th, two messages on the

2    14th, or three messages, rather.  Thank you.  OK.

3    Q.  Coming back to the text exchange, what did you write at

4    9:35 a.m. on February 14?

5    A.  "Will call as soon as possible."

6    Q.  And then do you see the next message from you is later in

7    the day, at 3:28 p.m.?

8    A.  Yes.

9    Q.  What did you write?

10   A.  I wrote:  "I got them to pay, so hold your fire.  Sally has

11   issued the full check.  I'll let you know when I have details

12   on when to expect it."

13   Q.  What payment does this refer to?

14   A.  The final payment, the fourth payment.

15   Q.  Now, this is February 14, 2019.  At this time, was the

16   fourth payment due?

17   A.  No.

18   Q.  Did you ask for the fourth payment early?

19   A.  Yes.

20   Q.  Why?

21   A.  Because I was told Stormy needed it.  She was worried about

22   her well-being, her security, and also to help continue to get

23   her to promote the book.

24   Q.  And who told you all of that?

25   A.  Mr. Avenatti.

M1oWave4                        Janklow - Direct

1          MR. PODOLSKY:  All right.  Let's -- I want to go next,

2    the next day, the 15th, but Ms. Abrams, let's pull up 233 for a

3    moment, for the witness and the parties, please.

4    Q.  Do you recognize this document?

5    A.  Yes.  It's a WhatsApp transcript between myself and Stormy.

6    Q.  And are you familiar with these messages?

7    A.  Yes.

8    Q.  Does this document accurately reflect messages that you

9    exchanged on WhatsApp with Ms. Daniels?

10   A.  Yes.

11         MR. PODOLSKY:  Your Honor, the government offers

12   Government Exhibit 233.

13         MR. DALACK:  Objection on 1002 grounds, your Honor.

14         THE COURT:  All right.  Mr. Dalack, I'll treat it as a

15   running objection with respect to this kind of exhibit.  You

16   don't need to renew it.  Overruled.

17         It's admitted.

18         (Government Exhibit 233 received in evidence)

19         MR. PODOLSKY:  Thank you, your Honor.

20         Ms. Abrams, you can show that to the jury.  And maybe

21   to speed this up a little, we'll do this one alongside

22   Government Exhibit 230.

23   Q.  All right.  Now, on the left, Government Exhibit 233, can

24   you explain to the jury what that is?

25   A.  It's a WhatsApp record of Stormy calling me.

M1oWave4                         Janklow - Direct

1    Q.  And can you just explain -- well, let's go through it.  Do

2    you see the date at the top is, on the first message, February

3    15, 2019?

4    A.  Yes.

5    Q.  And it says notification and a missed voice call at 12:19.

6    What does that mean?

7    A.  That she called and I didn't get it.

8    Q.  Did -- is one able to place a voice call through the

9    WhatsApp app instead of via your normal phone app?

10   A.  Yes.

11   Q.  Is that what this reflects?

12   A.  Yes.

13   Q.  And do you see below that there's another message?  Do you

14   see that?

15   A.  Yes.

16   Q.  Who is that from?

17   A.  Stormy.

18   Q.  And what does she write?

19   A.  "Please call me."

20   Q.  And what are the indications below that?

21   A.  Another call from her that I missed.

22   Q.  Now let's look to the right, also on February 19.  Do you

23   see that?

24   A.  February --

25   Q.  Excuse me.  February 15, 2019.

1    A.  Yes.

2    Q.  I'm sorry.

3        And you see it, there's some messages from you at 2:59

4    p.m.?

5    A.  Yes.

6    Q.  What do you write to Mr. Avenatti at that time?

7    A.  "Stormy just called me.  I did not pick up.  She's calling

8    me nonstop, three times since you hung up."

9    Q.  Why didn't you pick up the phone?

10   A.  Because Mr. Avenatti asked me not to, let him handle it.

11   Q.  And do you see, at 4:32 p.m., you write again?

12   A.  "She's calling again, just FYI and Sally will call her

13   either way by 5:30, I assume."

14   Q.  Who did you mean by Sally?

15   A.  Sally Richardson.

16   Q.  Now, during this time period, did you speak to Mr. Avenatti

17   by phone; that is, separate from the text message?

18   A.  I'm not sure.

19   Q.  Do you see where it says "call you in 15"?

20   A.  Yes.

21   Q.  Did you speak to him on that day?

22   A.  I'm not sure.  I assume so.  But I'm not positive.

23            MR. PODOLSKY:  All right.  Give me a moment.  Let's go

24   to Government Exhibit 234 for the witness, please.

25   Q.  Mr. Janklow, do you recognize this document?

M1oWave4                        Janklow - Direct

1   A.  Yes, an email.

2   Q.  And did you send the email, focusing on the top?

3   A.  I did.  It was from me to Mr. Avenatti.

4           MR. PODOLSKY:  Your Honor, the government offers

5   Government Exhibit 234.

6           THE COURT:  Any objection?

7           MR. DALACK:  No objection.

8           THE COURT:  Admitted.

9           (Government Exhibit 234 received in evidence)

10          MR. PODOLSKY:  Please publish that for the jury,

11  Ms. Abrams.  All right.

12  Q.  Mr. Janklow, do you see that Government Exhibit 234 is an

13  email chain?

14  A.  I do.

15  Q.  What's the date of this exchange?

16  A.  February 15, 2019.

17  Q.  All right.  Focusing for a moment on the bottom of the

18  email chain, the first email, do you see it's an email from

19  Dmitri Chitov to Claire Dippel and you?

20  A.  Yes.

21  Q.  Who is Dmitri Chitov?

22  A.  Dmitri Chitov is our chief operating officer.

23  Q.  At Janklow & Nesbit?

24  A.  Yes.

25  Q.  And who is Claire Dippel?

M1oWave4                          Janklow - Direct

1    A.  My assistant.

2    Q.  And what's the subject of this?

3    A.  Information on Full Disclosure payments.

4    Q.  And zooming out for a moment, do you see Mr. Chitov writes:

5    "Here is the information -- hi, Claire.  Here is the

6    information you've requested.  We've made three payments to

7    Stephanie Clifford on Full Disclosure based on the instruction

8    provided"?  Do you see that?

9    A.  Yes.

10   Q.  Do you see below --

11           MR. PODOLSKY:  Maybe zoom out for a moment,

12   Ms. Abrams.

13   Q.  -- there's a numbered list, one, two, three?

14   A.  Yes.

15   Q.  What information is reflected in this email?

16   A.  There's -- where each payment was sent.

17   Q.  OK.  So, for example, for the first payment, No. 1,

18   "signature advance: $250,000 gross."  Do you see that?

19   A.  Yes, that's what was received.

20   Q.  From whom?

21   A.  St. Martin's, at my company.

22   Q.  And which of the four payments was this?

23   A.  First.

24   Q.  All right.  And do you see the first bullet, "$212,500 net

25   payment to Stormy Entertainment, Inc. transferred into Bank of

M1oWave4                     Janklow - Direct

1   America account ending with 9205"?  Do you see that?

2   A.  Yes.

3   Q.  And then below that is "$6,250 referring party commission

4   to Avenatti Esq., transferred into Avenatti Esq.

5   attorney-client account ending with 3512."  See that?

6   A.  I do.

7   Q.  What is that $6,250?

8   A.  That's the 2.5 percent referral fee for that payment.

9   Q.  All right.  We won't go through the whole thing, but let's

10  look at the second payment for a moment.  See it says,

11  "delivery and acceptance of manuscript advance, $175,000

12  gross"?

13  A.  Yes.

14  Q.  And then the first bullet is "$125,000 first part of net

15  payment to Stormy Entertainment, Inc. transferred into

16  California Bank & Trust Avenatti & Associates attorney-client

17  trust Daniels account ending with 4779."  See that?

18  A.  I do.

19  Q.  Do these bullets reflect what Janklow & Nesbit did with the

20  second advance payment?

21  A.  Yes.

22          MR. PODOLSKY:  Can we zoom back out.

23  Q.  And does the third section, without going through it bullet

24  by bullet, reflect what Janklow & Nesbit did with the third

25  advance payment?

M1oWave4                        Janklow - Direct

1    A.  Yes.

2              MR. PODOLSKY:  All right.  Zoom out.

3    Q.  What did you do with that email?

4    A.  I sent it to Michael.

5    Q.  And when did you do that?

6    A.  On February 15, 2019, at 4:40 p.m.

7              MR. PODOLSKY:  OK.  Let's look quickly at Government

8    Exhibit 235 for the witness, please.

9    Q.  Mr. Janklow, do you recognize this document?

10   A.  It's an email.

11   Q.  Did you send this email?

12   A.  I did.

13             MR. PODOLSKY:  Your Honor, the government offers

14   Government Exhibit 235.

15             THE COURT:  Any objection?

16             MR. DALACK:  No objection.

17             THE COURT:  Admitted.

18             (Government Exhibit 235 received in evidence)

19             MR. PODOLSKY:  If we could display this to the jury

20   and maybe zoom out for a moment, Ms. Abrams.

21   Q.  Was this -- when was this email exchange?  When did it

22   occur, Mr. Janklow?

23   A.  February 15, 2019, at 5:25 p.m.

24   Q.  OK.  Do you see it began with a message from Ms. Dippel to

25   you?

1    A.   Yeah.

2    Q.   Does it contain --

3             MR. PODOLSKY:   Go down to the next page.

4    Q.   Is this an attachment to that email?

5    A.   Yes.

6    Q.   Generally, what is this?

7    A.   These are the wire printouts for each of the payments.

8             MR. PODOLSKY:   OK.   If we go up, back to the email.

9    Q.   What did you do with the wire documentation?

10   A.   Sent them to Mr. Avenatti.

11            MR. PODOLSKY:   Let's go back to 230 -- Government

12   Exhibit 233.   OK.   If we could go to the second page of this,

13   and let's blow up the top four messages.   I want to focus us --

14   OK.   I want to focus us now on the next day, February 16.

15   Q.   Do you see there's a message on February 16 at 2:30 p.m.?

16   A.   I do.

17   Q.   What is that?

18   A.   It's another call that I missed from Stormy.

19            MR. PODOLSKY:   Now let's turn to what's been marked as

20   Government Exhibit 236 for the witness and the parties, please.

21   Q.   Do you recognize this document, Mr. Janklow?

22   A.   Yes, a text exchange between me and Mr. Avenatti.

23            (Continued on next page)

24

25

M1onave5                          Janklow - Direct

1          MR. PODOLSKY:  Your Honor, the government offers

2    Government Exhibit 236.

3          THE COURT:  Any objection?

4          MR. DALACK:  No objections.

5          THE COURT:  Admitted.

6          (Government Exhibit 236 received in evidence)

7          MR. PODOLSKY:  I think it would be helpful,

8    Ms. Abrams, if we could pull up 230 and 236 side by side.

9          We can start with the -- yeah, if you could just

10   enlarge the visible portion of 230, Ms. Abrams.  If we could

11   start with the February 15 at 2:59 messages and go down that

12   page.  On the right, blow up the first half of that.  Okay.

13   BY MR. PODOLSKY:

14   Q.  First question for you, Mr. Janklow, Government Exhibit

15   236, on the left, is that a continuation of your exchange with

16   Mr. Avenatti from Government Exhibit 230 on the left?

17   A.  Yes, it looks like it.

18   Q.  Starting with 230 on the left, do you see there's a message

19   from you at 6:31 p.m. on February 15?

20          Do you see that?

21   A.  I do.

22   Q.  What did you write?

23   A.  "I am on a bus to Long Island with little opportunity to

24   talk on the phone, but please let me know when you've resolved

25   this with her.  Thanks.

M1onave5                          Janklow - Direct

                "I understand your desire and ability to smooth this,
    but it still does not make me comfortable about blanking a
    signed client with questions about money -- ill formed as they
    may be.

                "Thanks."
Q.  Who are you referring to when you say "with her" in this
text?
A.  Stormy.
Q.  You write, "I understand your desire and ability to smooth
this."

    What did you mean by that?
A.  The confusion about the payments.
Q.  Why did you write to Mr. Avenatti, what was your basis for
writing to Mr. Avenatti about his desire and ability to smooth
this?
A.  Because that had been his role from the outset.
Q.  You write, "But it still does not make me comfortable with
blanking a signed client with questions about money."

                What did you mean by blanking a signed client with
questions about money?
A.  Being unresponsive, out of communication.
Q.  Did you respond to any of Ms. Daniels' calls or messages on
this day?
A.  Not on this day.
Q.  Why not?

M1onave5                          Janklow - Direct

1   A.  I was asked not to.

2   Q.  By whom?

3   A.  Mr. Avenatti.

4   Q.  What did he say?

5   A.  I'll handle it.

6   Q.  What was his tone when he asked you -- when he said that to

7   you?

8              MR. DALACK:  Objection, your Honor.

9              THE COURT:  Overruled.

10  A.  Urgent.  Forceful.

11             MR. DALACK:  Objection as to speculation, your Honor.

12             THE COURT:  Just to be clear, ladies and gentlemen, I

13  am allowing the witness to testify about Mr. Avenatti's tone,

14  that is, his perception of how Mr. Avenatti sounded, not as to

15  what Mr. Avenatti was thinking.

16             So, with that understanding, the objection is

17  overruled.

18             MR. PODOLSKY:  Thank you, your Honor.

19  BY MR. PODOLSKY:

20  Q.  So what was his tone during the conversation about not

21  responding to Ms. Daniels this day?

22  A.  What was his tone about not responding?

23  Q.  When you spoke to -- excuse me.  Before the objection you

24  were testifying regarding Mr. Avenatti instructing you not to

25  respond to Ms. Daniels?

1    A.   Yes.

2    Q.   During that conversation, what was Mr. Avenatti's tone and

3    demeanor?

4    A.   Insistent, urgent, forceful.

5    Q.   Now, do you see at the end of this text message after you

6    write "blanking a signed client with questions about money,"

7    you wrote, "ill formed as they may be"?

8    A.   Yes.

9    Q.   What did that mean?

10   A.   That is a reference to an extended dialogue Mr. Avenatti

11   and I had about her being confused about money and him needing

12   to explain it to her.  It was an extension of that.

13   Q.   Let's continue to the next day.

14           MR. PODOLSKY:  Sorry, Ms. Abrams.  Stick with the top

15   half of 236, if you don't mind.  Thank you.

16   BY MR. PODOLSKY:

17   Q.   Okay.  Do you see the bottom of 230 breaks at 2/16/19,

18   10:51 a.m. the following morning?

19   A.   Yes.

20   Q.   Do you see at the top of 236 you write, "What's the update?

21   Have you spoken to her?"

22   A.   I see that.

23   Q.   How did Mr. Avenatti respond to that?

24   A.   "I'll call in 30."

25   Q.   Do you see there is another message at 2:36 p.m. on

M1onave5                      Janklow - Direct

1   February 16 from you?

2           Do you see that?

3   A.   I do.

4   Q.   What did you write?

5   A.   "Dude, she just called me again.  I have to be honest.  I

6   am no longer comfortable with not communicating with her at all

7   ever.  She is a client of my firm.  I have legal obligations to

8   her, and I have never behaved this way.  There is clearly

9   something off.  And as impulsive and impetuous as she is, she

10  is not as bad as some of my other clients.

11          "L."

12  Q.   Did you reach out to Ms. Daniels at that time, that is to

13  say right after that message?

14  A.   No.

15  Q.   What is the next message that you wrote in this chain?

16  A.   What did she say?

17  Q.   How did Mr. Avenatti respond?

18  A.   "On the phone with Cook County DA.  Will call as soon as

19  I'm off."

20  Q.   What did you say to that?

21  A.   "Now Denver is texting me.  I need to end this bullshit

22  now."  Excuse me.

23  Q.   When you say Denver is texting you, what was that a

24  reference to?

25  A.   That I was now getting double teamed by Stormy and Denver.

M1onave5                         Janklow - Direct

1    Q.  Regarding what?

2    A.  Money.

3    Q.  How did Mr. Avenatti respond to that text?

4    A.  "I just tried you.  She didn't call.  I thought it was her

5    because it was a blocked number.  This is nonsense."

6            MR. PODOLSKY:  Before we keep going, Ms. Abrams, let's

7    zoom out and then blow up the rest of this page.

8    BY MR. PODOLSKY:

9    Q.  All right.  Now continuing on, what did you write to

10   Mr. Avenatti at the top of the page here?

11   A.  "Left word.  Haven't heard back."

12   Q.  Do you see that he responded, "Anything?"

13   A.  Yes.

14   Q.  What did you say?

15   A.  "Nope, but she read my note.  Denver thanked me for

16   responding to his.  I just said I was tied up but available

17   now."

18   Q.  Do you see Mr. Avenatti writes again, "Anything?  Did you

19   talk to her"?

20   A.  I see.

21   Q.  Was it ordinary for Mr. Avenatti to be checking in you with

22   like that?

23   A.  No, this was more frequent and a little -- and more eager.

24   Q.  And how did you respond February 16, 2019, that evening,

25   7:17?

M1onave5                          Janklow – Direct

1         What did you say to Mr. Avenatti?

2    A.  "Very briefly.  She sounded very calm and together.  But

3    now she's saying that she never received the third payment and

4    has been discussing with it with you.  I'm just going to have

5    my chief operating get her the same stuff I gave you on Tuesday

6    so she can see the money in and out.  I am at a birthday party

7    for a friend so now out of pocket."

8    Q.  Did you speak with Ms. Daniels again before you wrote that

9    text message?

10   A.  Yes.

11   Q.  Did you speak to her about the subjects that are reflected

12   in your message to Mr. Avenatti?

13   A.  Yes.

14   Q.  How does Mr. Avenatti -- let me ask first.  What was her

15   demeanor on that call?

16        MR. DALACK:  Objection, your Honor.

17        THE COURT:  Overruled.

18   A.  Normal.

19   Q.  And how does Mr. Avenatti respond to your text message

20   about your conversation with Ms. Daniels?

21   A.  You want me to read what he said or --

22   Q.  Please.

23   A.  "This is bizarre.  Makes no sense.  She must be confused.

24   Call me when you can.  It's my birthday as well, and I have

25   been dealing with this, this his all day due to everyone else's

M1onave5                         Janklow - Direct

1     demands."  I assume he meant "this shit," but it's "his."

2              MR. PODOLSKY:  Let's go back to Government Exhibit

3     233.  You will have to bear with me just a moment.  All right.

4     Let's go back to Government Exhibit 233.  And we can pull up

5     the second page of this exhibit.  And actually why don't we --

6     Ms. Abrams, if we could blow up starting with the February 18,

7     2019.  All right.

8     BY MR. PODOLSKY:

9     Q.  Mr. Janklow, do you see at the top there is a message on

10    February 18, 2019 at 9:13 p.m.?

11    A.  I do.

12    Q.  Who is that to?

13    A.  Stormy.

14    Q.  Who wrote that?

15    A.  I did.

16    Q.  What did you write?

17    A.  "Hi there.  What e-mail do you want the financials sent to

18    tomorrow?

19              "Thanks.

20              "Luke."

21    Q.  What was that a response to?

22    A.  It was a reference to me sending her what I sent to

23    Mr. Avenatti, which was a summary of the wires and a summary of

24    the financial -- the payments due from the contract.

25    Q.  Why were you sending her that information on February 18?

M1onave5                         Janklow - Direct

1    A.  She had requested it on the phone.

2    Q.  And if we scroll down, do you see that she provides her

3    e-mail address?

4    A.  She does.

5    Q.  And what do you -- how do you respond?

6    A.  "Roger."

7    Q.  Okay.  And then do you see below that she sends you a

8    message and writes, "Michael is no longer my attorney.  Please

9    do not discuss my business with him."

10           Do you see that?

11   A.  I do.

12   Q.  Can you see that you respond, "Oh, brother.  That's very

13   disappointing.  Have you spoken to him?"

14   A.  Yes.

15   Q.  Do you see that?

16           MR. PODOLSKY:  All right.  Let's pull up Government

17   Exhibit 238 for the witness and parties.

18   BY MR. PODOLSKY:

19   Q.  Do you recognize this e-mail?

20   A.  I do.

21   Q.  Were you copied on this e-mail?

22   A.  Yes.

23           MR. PODOLSKY:  The government offers Government

24   Exhibit 238.

25           MR. DALACK:  802, your Honor.

1          MR. PODOLSKY:  Your Honor, this is being offered for

2     the fact of its sending.

3          THE COURT:  With that understanding, the objection is

4     overruled and the document is admitted.

5          Ladies and gentlemen, you may consider this not for

6     the truth of its contents, again, but just for the fact that it

7     was sent.

8          (Government Exhibit 238 received in evidence)

9          THE COURT:  You may proceed.

10         MR. PODOLSKY:  Thank you, your Honor.

11         Ms. Abrams, if you could pull this up for the jury as

12    well.

13    BY MR. PODOLSKY:

14    Q.  Mr. Janklow, what is this e-mail that we're looking at?

15    A.  This is the summary of the transactions for the book sent

16    to Stormy by my assistant.

17    Q.  When was this sent?

18    A.  February 19, 2019, at 9:34 a.m.

19    Q.  Why was -- do you have an understanding of why this was

20    sent?

21    A.  Stormy requested it.

22    Q.  And do you see below, similar to what we looked at before,

23    there's one, two, three marking out information about payments?

24    A.  Yes.

25    Q.  By the way, is the information about Mr. Avenatti's

1    referral fee included in this?

2    A.  No.

3    Q.  Does this otherwise explain the dates and times of the wire

4    communication -- wire transactions relating to the advance on

5    "Full Disclosure"?

6    A.  Yes.

7           MR. PODOLSKY:  And if you can scroll down.  Keep

8    going, Ms. Abrams.

9           Pause.

10   BY MR. PODOLSKY:

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  That's the signed change of bank routing information that

15   occurred just before the second payment.

16   Q.  Was that included as an attachment to this e-mail to

17   Ms. Daniels?

18   A.  Yes, it was.

19          MR. PODOLSKY:  And let's keep going down.

20   Q.  Is this another attachment?

21   A.  Yes.

22   Q.  What is it?

23   A.  Copies of the wire -- the wire receipts from the bank.

24          MR. PODOLSKY:  All right.  If we could take this down

25   and put up for Mr. Janklow and the parties Government Exhibit

M1onave5                         Janklow – Direct

1    240.

2    BY MR. PODOLSKY:

3    Q.  Mr. Janklow, do you recognize this document?

4    A.  I do.

5    Q.  Are you copied on it?

6    A.  I am indeed.

7           MR. PODOLSKY:  Your Honor, the government offers

8    Government Exhibit 240.

9           MR. DALACK:  Objection, your Honor.  802.

10          MR. PODOLSKY:  Your Honor, there's no facts that are

11   represented in here.  It is not for a hearsay purpose.

12          THE COURT:  All right.  I will allow it.  It is

13   admitted for the fact that it was sent, not for the truth of

14   its contents.

15          (Government Exhibit 240 received in evidence)

16          MR. PODOLSKY:  If we could pull it up just for the

17   jury, please, Ms. Abrams.

18   BY MR. PODOLSKY:

19   Q.  Mr. Janklow, do you see that this is an e-mail?

20   A.  I do.

21   Q.  Who wrote it?

22   A.  Claire Dippel.

23   Q.  When did she write it?

24   A.  February 20, 2019 at 12:04 p.m.

25   Q.  Who is it written to?

1   A.  Stormy, copying myself.

2   Q.  Do you see it's subject is "Payment Details"?

3   A.  Yes.

4   Q.  And do you see it has an attachment, banking instructions

5   form?

6   A.  Yes.

7           MR. PODOLSKY:  If we could just go to the attachment

8   for a moment, Ms. Abrams.

9   BY MR. PODOLSKY:

10  Q.  What is this?

11  A.  This is an unfilled sheet for us to receive banking

12  information from a client.

13  Q.  And what was your understanding of the purpose of sending

14  this to Ms. Daniels?

15  A.  That she was going to give us new destination bank

16  instructions for the fourth and final payment.

17          MR. PODOLSKY:  And if we go up to the top -- back to

18  the e-mail.

19  BY MR. PODOLSKY:

20  Q.  Do you see in Ms. Dippel's e-mail it says, "Dear Stormy,

21  when your final payment comments, which may be as soon as

22  tomorrow, can you instruct us as to how you would like to be

23  paid?"

24          Do you see that?

25  A.  I do.

M1onave5                    Janklow – Direct

1    Q.  Why did Janklow & Nesbit have to ask Ms. Daniels for any

2    instructions on how she would like to be paid?

3    A.  Because she had fired Mr. Avenatti, and we were dealing

4    directly with her for the first time.

5    Q.  Was it your understanding at the time that you should send

6    the payments to a new bank account?

7    A.  Yes.

8         MR. PODOLSKY:  I want to turn back very briefly -- I

9    want to pull up just for the witness Government Exhibit 242.

10   BY MR. PODOLSKY:

11   Q.  Do you recall we looked at this before?  There was just one

12   page, Mr. Janklow?

13   A.  It's gone.

14   Q.  Okay.  I am going to pull up for you the second page -- a

15   second page of this exhibit.

16        MR. PODOLSKY:  All right.  If we could blow up the

17   combined text.

18   BY MR. PODOLSKY:

19   Q.  Do you recognize this, Mr. Janklow?

20   A.  Yes.

21   Q.  What is it?

22   A.  It is the text exchange earlier where I asked about

23   congratulating Stormy on the eve of her book's publication.

24   Q.  Does this include a further response from Mr. Avenatti?

25   A.  Yes, it does.

M1onave5                        Janklow - Direct

1          MR. PODOLSKY:  Your Honor, the government would offer

2     government -- this version of Government Exhibit 242 in lieu of

3     the prior one.

4          THE COURT:  Just to be clear, this is a two-page

5     document now.

6          MR. PODOLSKY:  Correct, your Honor.

7          THE COURT:  This would replace 242 that was earlier

8     admitted?

9          MR. PODOLSKY:  It would, your Honor.

10          THE COURT:  Any objection?

11          MR. DALACK:  No objections.

12          THE COURT:  Admitted.

13          MR. PODOLSKY:  Why don't we just display that to the

14     jury briefly.

15     BY MR. PODOLSKY:

16     Q.  Mr. Janklow, do you recall earlier I asked you about the

17     top text message here?

18     A.  Yes.

19     Q.  And what did you write in that text message?

20     A.  "Should I not write Stormy to congratulate her on the eve

21     of publication?  I normally would but --"

22     Q.  Do you see that Mr. Avenatti responds to you, "Let it be"?

23     A.  Yes.

24     Q.  How did you respond?

25     A.  "I figured.  No problemo."

```
 1   Q.  Did you reach out to Ms. Daniel at that time?

 2   A.  I did not.

 3           MR. PODOLSKY:  Your Honor, if I could just have one

 4   moment.

 5           No further questions at this time, your Honor.

 6           THE COURT:  All right.  Thank you very much.

 7           We'll proceed with cross-examination.

 8           Ladies and gentlemen, if you want to get up and stand

 9   where you are, stretch your legs, you're welcome to do that as

10   counsel swap out and we proceed with cross-examination.

11           All right.  Please take your seats.

12   CROSS-EXAMINATION

13   BY MR. DALACK:

14           MR. DALACK:  Ms. Vicari, can you please pull up for me

15   side by side Government Exhibits 233 and 240, please for the

16   witness and the jury, too.

17           Scroll down on 233.

18           All right.  Stop there.

19   BY MR. DALACK:

20   Q.  Mr. Janklow, directing your attention to Government Exhibit

21   233 on the left there, do you see it?

22   A.  Yes.

23   Q.  Okay.  You see where it says that Ms. Daniels told you that

24   "Michael is no longer my attorney, please do not discuss my

25   business with him"?
```

1   A.  Yes.

2   Q.  Do you know the time stamp on that?  Could you read it for

3   us.

4   A.  2:04 p.m.

5   Q.  Okay.  All right.  When she told you that Michael was no

6   longer -- when Stormy Daniels told you that Michael was no

7   longer her attorney, you testified that you assumed that she

8   had fired him, right?

9   A.  Yes.

10  Q.  But she didn't tell that you she fired him, right?

11  A.  I think saying Michael is no longer my attorney to me means

12  that she fired him.

13  Q.  It could have been the case that he fired her, terminated

14  his contract with her, couldn't it have been?

15  A.  Potentially.

16  Q.  You are assuming based off the message here that she was

17  the one who fired him, correct?

18  A.  Yes.

19  Q.  Okay.  Now, in anticipation of your testimony today, you

20  reviewed a lot of e-mails, didn't you?

21  A.  Yes.

22  Q.  And you reviewed a lot of text messages?

23  A.  Yes.

24  Q.  Those were text messages between you and Mr. Avenatti,

25  right?

M1onave5                     Janklow - Cross

1    A.  And Stormy.

2    Q.  And Stormy.  And you also met with the government, did you

3    not?

4    A.  I did.

5    Q.  On numerous occasions, right?

6    A.  I wouldn't say numerous.

7    Q.  Well, wasn't it more than five?

8    A.  It was about five.

9    Q.  You met with them last night, didn't you, or yesterday

10   afternoon, right?

11   A.  Yes.

12   Q.  And in your meetings with them, they asked you a lot of

13   questions, didn't they?

14   A.  Yes.

15   Q.  They asked you to look at e-mails?

16   A.  Yes.  They provided them.

17   Q.  And they asked you to look at text messages?

18   A.  Yes.

19   Q.  Some of these text messages you had provided the

20   government, right?

21   A.  Yes.

22   Q.  Some of these e-mails you had provided the government,

23   right?

24   A.  Yes.

25   Q.  When they were asking you these questions about these

M1onave5                    Janklow - Cross

1    e-mails and these text messages, they were asking you to

2    interpret them for them, right?

3    A.  No.

4    Q.  They weren't asking you to explain the contents of the text

5    messages or the e-mails?

6    A.  They were asking me to confirm and to clarify them.

7    Q.  So to interpret them?

8    A.  If that's the word you want to use.

9    Q.  Okay.  And you told the truth in your meetings with them,

10   right?

11   A.  Yes.

12   Q.  And they told you at the outset of those meetings that it

13   was a lie -- or it was a crime to lie to them, right?

14   A.  Yes.

15   Q.  During yesterday's meeting the government asked you if

16   there were any problems between you and Ms. Daniels, didn't

17   they?

18   A.  No.  Not in those words.

19   Q.  Well, what words did they use, Mr. Janklow?

20   A.  I don't remember exactly.

21   Q.  Okay.  Well, did they essentially ask you whether there

22   were any problems or issues at the moment between you and

23   Stormy Daniels?

24   A.  You mean currently?

25   Q.  Currently, sure, yes.

M1onave5                    Janklow - Cross

1    A.  Yes, and I said no.

2    Q.  Okay.  You said no because you are not aware of there being

3    any issues between you and Stormy Daniels at the moment, right?

4    A.  Correct.

5    Q.  So, to your knowledge, Ms. Daniels hasn't accused you of

6    withholding royalties from her improperly, right?

7    A.  Correct.

8    Q.  And to your knowledge, Ms. Daniels hasn't accused you of

9    improperly withholding from her accounting information about

10   the book sales, right?

11   A.  Correct.

12   Q.  And if she did accuse you of those things, that would be

13   false, wouldn't it?

14   A.  Yes.

15   Q.  Because you haven't withheld royalties from her, correct?

16   A.  I'm sorry.  Say again?

17   Q.  Because you have not withheld royalties from her, correct?

18   A.  Correct.  There are no royalties.

19   Q.  There are no royalties to withhold, right?

20   A.  Correct.

21   Q.  Okay.  You haven't withheld accurate accounting information

22   from her either, right?

23   A.  No, we provided it.

24   Q.  Okay.  Now, during your meeting yesterday and during your

25   direct examination today, you indicated that Stormy Daniels was

M1onave5                    Janklow – Cross

1    easy to work with when you dealt with her directly.

2            Do I have that right?

3            MR. PODOLSKY:  Objection, your Honor.

4            THE COURT:  Overruled.  You may answer if that's what

5    you said; if not, say no.

6    A.  I think I said I didn't have any problems with her when I

7    dealt with her directly.

8    Q.  Okay.  But that isn't entirely accurate, is it,

9    Mr. Janklow?

10   A.  You have to define the type of problems you're referring

11   to.

12   Q.  Okay.  Well, let's talk about the book cover, for example.

13           Do you remember the book cover?

14   A.  Very well.

15   Q.  Why do you remember it so well?

16   A.  Because there was a lot of discussion about it.

17   Q.  What were the discussions about, Mr. Janklow?

18   A.  She had suggested using a mugshot that was taken of her.  I

19   thought it was a great idea.  We mocked up covers.  She then

20   decided she didn't like it at all and supplied different images

21   and different titles of the book that I felt were less

22   effective.

23   Q.  Was it your decision to choose a mugshot for the cover of

24   her book?

25   A.  No.  It was hers.

M1onave5                        Janklow - Cross

1    Q.  It was her decision to choose a mugshot?

2    A.  She suggested it.

3    Q.  She suggested the mugshot?

4    A.  Yes.

5    Q.  But the mugshot didn't end up going on the book, did it?

6    A.  Yes.

7    Q.  Because she ended up changing her mind, right?

8    A.  Correct.

9            MR. DALACK:  Can we please pull up for Mr. Janklow

10   what's been marked as R51.

11   BY MR. DALACK:

12   Q.  Mr. Janklow, do you recognize the document in front of you?

13   A.  I don't, but it looks like a text conversation.

14   Q.  Do you recognize who the text messages are between?

15   A.  I mean it looks like I'm on -- I'm -- it's hard -- I can't

16   tell.  It just has the message Luke on top.

17   Q.  I'm asking you about the contents of the text message.

18           Do you recognize the contents of that text message,

19   Mr. Janklow?

20   A.  It looks like a conversation between -- I don't -- I don't

21   know if it's Stormy or -- I don't know who it was with.  I

22   don't recognize it.

23   Q.  Mr. Janklow, let me just take a step back for a second.

24   You reviewed a bunch of text messages before today, right?

25   A.  Yes.

M1onave5                              Janklow - Cross

1    Q.  These were your text messages with Mr. Avenatti?

2    A.  Yes.

3    Q.  Okay.  So looking again at this particular text message,

4    does this refresh your recollection whether this reflects your

5    exchange with Mr. Avenatti about the book cover?

6    A.  We had several.  It could be.

7    Q.  Okay.  So do you recognize it?

8             MR. PODOLSKY:  Objection, your Honor.

9             THE COURT:  Sustained.  I think he said no, so let's

10   move on, please.

11            MR. DALACK:  Okay.

12   BY MR. DALACK:

13   Q.  Do you remember texting with Mr. Avenatti about the book

14   cover?

15   A.  Yes.

16   Q.  And you telling him -- I can quote -- when he asked you,

17   "You think we are done with the cover?"

18            "I wouldn't say that until we see it and it's given

19   the nod.  I mean, you are -- you and me are done with it and

20   have been done for some time, but not everyone is a stone-cold

21   motherfucking professional."

22            Do you remember writing that to Mr. Avenatti?

23            MR. PODOLSKY:  Objection, your Honor.

24            THE COURT:  Overruled.

25   A.  I don't remember specifically writing that, no, but it

M1onave5                    Janklow - Cross

1    looks like it's my text.

2              MR. DALACK:  Okay.  Okay.

3              Well, let's talk about then, if you could pull up,

4    Ms. Vicari, what's been marked as Defense Exhibit R60, please.

5    BY MR. DALACK:

6    Q.  Do you recognize the document in front of you, Mr. Janklow?

7    A.  Yes.

8    Q.  What is it?

9    A.  It is a quote of a note that Stormy wrote me on WhatsApp.

10   Q.  Okay.

11   A.  But I don't know who it's to or anything, given this

12   document.

13   Q.  Okay.  But you recognize that this is a note that

14   Ms. Daniels had sent you, correct?

15   A.  Yes.

16             MR. DALACK:  Your Honor, I would like to admit R60

17   into evidence, please.

18             MR. PODOLSKY:  Objection.

19             MR. DALACK:  I am not offering it for the truth of the

20   matter asserted, just that the message was sent, your Honor.

21             MR. PODOLSKY:  Foundation and relevance.

22             THE COURT:  Give me one moment, please.

23             All right.  I will allow it not for the truth of its

24   contents, but for the fact that it was sent.

25             You may proceed.

M1onave5                    Janklow - Cross

1          MR. PODOLSKY:  Thank you.  Please publish it to the
2    jury, please.
3          THE COURT:  What was the number of this, please?
4          MR. DALACK:  R60, your Honor.
5          (Defendant's Exhibit R60 received in evidence)
6    BY MR. DALACK:
7    Q.  Mr. Janklow, can you please read the text there for us?
8    A.  "Stormy, WhatsApped me this.  Oh, please God, no.
9          "Hi Elizabeth.  My schedule is crazy and I'm curious
10   if you guys --"
11         THE COURT:  Slow down so the court reporter can keep
12   up with you.
13         This is DX R60?  Is that correct, Mr. Dalack.
14         MR. DALACK:  Yes, your Honor.
15         THE COURT:  OK.  You may proceed a little more slowly.
16   A.  "Hi, Elizabeth.  My schedule is crazy and I'm curious if
17   you guys have scheduled signings, appearances, etc., set up.  I
18   have stuff coming up that would be fantastic cross-promoting
19   opportunities.  Can you give me name and contact of who will be
20   handling that?
21         "I would like to connect with them -- with my tour
22   manager and manager.  Coincidentally, my manager is also a
23   published author so has some experience with book signings,
24   etc.  Just trying to maximize my time and make the book a huge
25   success.  She also wrote this.

M1onave5                      Janklow - Cross

        "I'd like to get you, publisher, and my team on the
same page to knock this out of the park.  Clearly, we need to
take control of this and make sure she's aware of the careful
planning and approach.

        "Let's set up a call for Tuesday or whatever you think
is best.

        "L."
Q.   Now, do you remember who this exchange was with,
Mr. Janklow?
A.   Elizabeth Beier it seems, from St. Martin's.
Q.   Okay.  When you said that "Stormy WhatsApped me this, oh,
please, God, no," what did you mean by that?
A.   I meant that she was proposing very naive things that she
thought would help the book that my feeling was would not.
Q.   Okay.  And at the bottom?
A.   Also, I'm sorry --
Q.   I'm sorry.  Go ahead?
A.   Just from my experience, to hear that a manager is a
published author is like a red siren going off for me.
Q.   Oh, I guess I'm -- we may have misunderstood each other,
Mr. Janklow.  I am not referring to -- when you said, "Stormy
WhatsApped me this, oh, please, God, no," do you remember who
this text exchange is with?  Who did you send this to?
A.   I don't remember.  It was either Elizabeth or it was
Michael.  Probably Michael.  I don't -- I don't really know

M1onave5                    Janklow - Cross

1    because it is not on here, so I don't remember.

2    Q.  Okay.  At the bottom there, when you said "clearly we need

3    to take control of this and make sure she is aware of the

4    careful planning and approach," what did you mean by that?

5    A.  That we need to explain to Stormy how tailored the

6    publication of a book is.

7    Q.  You were worried about her focus, weren't you?

8    A.  I wanted to maximize her efforts.

9    Q.  And you were concerned that she was not focusing her

10   efforts on promoting the book, right?

11   A.  In this instance I was concerned that she was wasting

12   efforts on things that wouldn't help promote the book.

13   Q.  Okay.

14          MR. DALACK:  Can we please pull up what's been marked

15   as Defense Exhibit R62.

16   BY MR. DALACK:

17   Q.  Do you recognize the document in front of you, Mr. Janklow?

18   A.  It's a text exchange.

19   Q.  Sorry.  I didn't hear you.

20   A.  It is a text exchange.  Sorry.

21   Q.  Who is it with?

22   A.  I don't know.  I don't know why this -- these don't say who

23   it's with.  Let me read through it.  One moment.  It seems like

24   it's with Mr. Avenatti.

25   Q.  Okay.

1          MR. DALACK:  Your Honor, I would like to publish

2     Defense Exhibit R62 to the jury.

3          THE COURT:  First you need to offer it.

4          MR. DALACK:  I would like to offer defense Exhibit R62

5     into evidence, your Honor.

6          MR. PODOLSKY:  Objection.  Foundation, hearsay,

7     relevance.

8          MR. DALACK:  I am not offering it for the truth of the

9     matter asserted, just for the present-sense impression of the

10    witness and for his state of mind.  And also I've laid the

11    foundation that he recognizes the document and that it's a text

12    exchange with Mr. Avenatti.

13         THE COURT:  The foundation is laid it will be admitted

14    with the understanding, ladies and gentlemen, that you are not

15    to consider this for the truth of anything in the texts

16    themselves but for the effect that it had on Mr. Janklow, the

17    fact that they were sent and a reflection of his state of mind

18    at the time that he sent his messages.

19         You may proceed.

20         MR. DALACK:  Thank you.  Please publish to the jury.

21         (Defendant's Exhibit R62 received in evidence)

22    BY MR. DALACK:

23    Q.  At the very top of the page, I am going to just read while

24    you follow along, Mr. Janklow.  Okay?

25    A.  Sure.

M1onave5                    Janklow - Cross

1    Q.  "I guess I'm fine with it too.  We're resigned to not being
2    listened to at all.  It's a shame, as she'll sell fewer books
3    and make less money, but, hey, our sanity is important too."
4            That is your message, isn't it?
5    A.  Yes.
6    Q.  And you are writing that to Mr. Avenatti?
7    A.  Yes.
8    Q.  Okay.  What did you mean when you said, "Our sanity is
9    important too"?
10   A.  With a lot of first-time clients, first-time writers, they
11   think they have ideas about how to execute the publication of a
12   book, and there is a point at which you have to kind of leave
13   it alone and let them make some mistakes so then you hopefully
14   can steer them back on course.
15   Q.  Okay.  I am asking you more about what does that have to do
16   with your sanity, Mr. Janklow.
17   A.  I'm implying that it doesn't make sense for us to continue
18   trying to educate her at this point.
19   Q.  And Ms. Daniels was stressing you out, wasn't she?
20   A.  No.  She was being a client.
21   Q.  She was causing you to question your sanity, wasn't she?
22   A.  That's the definition of my job.
23   Q.  Okay.  Now if we can go to the middle of the page to a text
24   dated, I believe that's September 8, 2018 at 5:15 a.m.  You
25   pasted a link there, right?

M1onave5                         Janklow - Cross

1    A.   It looks like it, yes.

2    Q.   Okay.  Do you remember what that link was to?

3    A.   I do not.

4    Q.   Okay.

5    A.   I mean --

6    Q.   If I --

7    A.   It says, "Stormy Daniels Says Bring Trump TV Interview."

8    That's all it says.

9    Q.   Do you recall a point in time in which, in the beginning of

10   September of 2018, Ms. Daniels informed the press that she was

11   going to have an interview on The View?

12   A.   I don't remember the order of operations, whether Michael

13   told me that first or she brought that up.  I can't remember.

14   Q.   Okay.  At the bottom here it says, "I just got a very

15   pissed off note from Sally.  And she's right of course.  I told

16   her you and I were very pissed as well and that she's

17   impossible.  What can we tell them?  Nothing really, right?

18   Perhaps you should write with your frustrations as well."

19           Mr. Janklow, what is that referring to?

20   A.   Much the same thing as I was referring to earlier.  It's,

21   as I said before, Stormy had prerequisites in her contract for

22   how she dealt with the press.  She was supposed to do no press.

23   She was constantly -- not constantly, occasionally doing press

24   that she shouldn't have been doing, and the publisher likes to

25   protect their interest.  They pay a lot of money for the book.

M1onave5                    Janklow - Cross

1    They don't want it exposed prior to the publication of their

2    book.  So her publisher was pissed off because Stormy was out

3    doing press when she was not supposed to.

4    Q.  And Sally here is Sally Richardson from McMillan, right?

5    A.  Correct.

6    Q.  Or St. Martin's I suppose?

7    A.  Both.

8    Q.  You respond, "I told her," meaning Sally, "that you and I

9    were very pissed," meaning you and Mr. Avenatti, right?

10   A.  Yes.

11   Q.  Okay.  And that she's impossible.  The "she" there is

12   Ms. Daniels, isn't it?

13   A.  Correct.

14   Q.  You were referring to her as impossible, right?

15   A.  As I do with, with humor, to a lot of my clients, yes.

16   Q.  Okay.  And then you followed up with, "What can we tell

17   them?  Nothing really, right?"

18           You were dumbfounded; you didn't know what to do?

19   A.  No.  There was just nothing else to tell them at that

20   point.

21   Q.  Because Stormy Daniels was going to do what Stormy Daniels

22   was going to do.  Am I right, Mr. Janklow?

23   A.  No, because she had done what she had done.

24   Q.  She hadn't gone on the interview yet, right?

25   A.  Correct.

M1onave5                        Janklow - Cross

1  Q.  She had just announced it?

2  A.  I am not sure because I don't remember the date of that

3  announcement.

4  Q.  Now, when you met with government yesterday, you told them

5  that you didn't think Mr. Avenatti thought very highly of

6  Stormy Daniels, right?

7  A.  No.

8  Q.  You didn't tell them that?

9  A.  I did not say that.

10  Q.  You didn't tell them that Michael would say, Dude, she's

11  insane, she's a porn actress, doesn't understand the real

12  world?  Those weren't your words?

13  A.  She would -- he would express frustration.

14  Q.  Right.  I am asking you, in your meeting yesterday

15  afternoon with the government, did you tell them that Michael

16  Avenatti would tell you, Dude, Stormy Daniels is insane, she is

17  a porn actress, she doesn't understand the real world?

18  A.  Yeah, he said that.

19  Q.  And you told the government that?

20  A.  Yeah.

21  Q.  Okay.  But, in fact, you feel the same way, don't you,

22  Mr. Janklow?

23  A.  No, I don't.

24           MR. PODOLSKY:  Well, let's pull up R62 again, please.

25  Can we go to the bottom of the page.

M1onave5                    Janklow - Cross

1    BY MR. DALACK:

2    Q.  Please follow along while I read aloud on the left in the

3    gray bubble.  "Lost you.  You are not dependent on Stormy.  She

4    was the foot you kicked down the door with.  She's as much a

5    liability as a reason."

6         That's your words, isn't it?

7    A.  Yes.

8    Q.  And you're referring to Stormy Daniels being a liability,

9    right?

10   A.  To Michael and his ambitions, yes.

11   Q.  And you referred to her as the foot that Michael kicked

12   down the door with, right?

13   A.  Correct.

14   Q.  That's just a tool of Mr. Avenatti's, right?

15   A.  No.  That was his introduction.  That was his first way

16   onto the public stage.

17            MR. DALACK:  Okay.  Let's pull up for the witness only

18   what's been marked as Defense Exhibit R68, please, the witness,

19   and the Court and the parties.

20            One moment, your Honor.

21            THE COURT:  Next question, Mr. Dalack.

22            MR. DALACK:  I'm sorry, please put R68 in front of the

23   witness and the Court.  Thank you.

24   BY MR. DALACK:

25   Q.  Mr. Janklow, do you recognize what's in front of you?

M1onave5                          Janklow - Cross

1    A.   A text conversation.

2    Q.   And who's that between?

3    A.   It looks like it's me and Mr. Avenatti again.

4              MR. DALACK:  Your Honor, I would like to introduce

5    into evidence Defense Exhibit R68, please, again not for the

6    truth of the matter asserted, but that the text exchange

7    occurred and as to the witness's state of mind.

8              THE COURT:  Any objection?

9              MR. PODOLSKY:  Yes, your Honor, hearsay and relevance,

10   including relevance of his state of mind.

11             THE COURT:  Overruled.  Admitted with the same

12   instructions as earlier, ladies and gentlemen.

13             (Defendant's Exhibit R68 received in evidence)

14             MR. DALACK:  Thank you.  Can we zoom in on the top,

15   Ms. Vicari.

16             Hold on one second.  Not the address, just from "sorry

17   on the train."

18             Thank you.

19   BY MR. DALACK:

20   Q.   All right.  Please follow along while I read, Mr. Janklow.

21             "Sorry, on the train.

22             "If she was smart, she'd start planning for her life

23   beyond all this and beyond just higher club fees, but I'm not

24   sure she exactly wants a different life, you know?"

25             Those are your words, aren't they?

M1onave5                    Janklow - Cross

1    A.  Yes.

2    Q.  You are referring to Ms. Daniels, aren't you?

3    A.  Yes.

4    Q.  You are saying that if she wants to be anything more than a

5    stripper who gets paid in tips, she could have it, right?

6    A.  No, that's not what I am saying.

7    Q.  What are you saying there?  What are the club fees?

8    A.  Those are her fees for dancing, yes.

9    Q.  Okay.  What do you mean if she starts planning for her life

10   beyond this and beyond the club fees?  What did you mean by

11   that?

12   A.  It references back to the core story of the book, which is

13   that she's much more than that and she was a feminist icon at

14   the time and that I told her that if this book was done

15   correctly it would change her life and it would vault her into

16   a whole different type of life.  She wanted it, and it turns

17   out that I am not sure that she did want that.

18   Q.  Right.  You followed up with I'm not sure she actually

19   wants a different life, you know?

20   A.  Correct.

21   Q.  You are implying that she doesn't want to be anything more

22   than a stripper?

23   A.  No.  I'm just saying that I don't know if she wants

24   anything different.

25   Q.  Okay.  Those are your words, not Mr. Avenatti's, right?

M1onave5                     Janklow - Cross

1   A.  Yes.  I was sad about that.

2   Q.  Now, let me go to the text that begins with 9/25/2018 at

3   7:44 a.m.

4        Please read while I -- follow along while I read aloud.

5            "Morning.  We have to get Denver to respond to the

6   press.  They're fucking insane to ignore that.  WTF."

7            Those are your words, right?

8   A.  Yes.

9   Q.  Do you remember what this is in reference to?

10  A.  Not specifically.

11  Q.  You don't remember what the issue was that Denver had to

12  respond to in the press?

13  A.  No.

14  Q.  Okay.  When you said, "They're fucking insane to ignore

15  that," the "they" are who?

16  A.  Denver and Stormy.

17           MR. DALACK:  Minimize that, please.

18  BY MR. DALACK:

19  Q.  So you were asking for Mr. Avenatti's help to get in touch

20  with Denver Nicks, right?

21  A.  No.  I was discussing it with Mr. Avenatti.

22           MR. DALACK:  Okay.  Well, let's go to R69, please,

23  just for the witness and for the parties.

24  BY MR. DALACK:

25  Q.  Okay.  Mr. Janklow, do you recognize what I just put in

1    front of you?

2    A.  It looks like a text conversation between me and

3    Mr. Avenatti.

4    Q.  Thank you.  Can you tell what dates it's from?

5    A.  At the top it says September 26 '18.

6            MR. DALACK:  Okay.  Your Honor, I would like to

7    introduce into evidence what's been marked as Defense Exhibit

8    R69, please.

9            THE COURT:  Subject to the same proviso, any

10   objection?

11           MR. PODOLSKY:  No, your Honor.

12           THE COURT:  All right.  Admitted with the same

13   instructions, ladies and gentlemen.

14           (Defendant's Exhibit R69 received in evidence)

15           THE COURT:  You may proceed.

16   BY MR. DALACK:

17   Q.  At the top there in the green bubble it says, "Will call

18   later.  Denver is on it."

19           Who is that from?

20   A.  Michael.

21   Q.  Your response is, "Sweet.  Thanks.  I know you're nuts

22   today.  No rush."

23           Right?

24   A.  Yes.

25   Q.  Michael says, "Let me handle response to Denver.  Tell the

1    publisher."  Right?

2    A.  Yes.

3    Q.  You guys are working together, right?

4    A.  Yes.

5    Q.  You responded, "Dude, I am going to fantasize about

6    responding to him."

7              Who's the "him"?

8    A.  Denver.

9    Q.  "Fucking deluded clowns.  Can't believe you have to deal

10   with this."

11             Who are the deluded clowns you're referring to in

12   this message, Mr. Janklow?

13   A.  Denver and people around Stormy.

14   Q.  Including Stormy?

15   A.  In this case I don't think so, no.

16   Q.  You were parsing out Denver and Stormy from the rest of her

17   crew there?

18   A.  I was parsing out Denver and other people -- it was in

19   response to Denver's note about public publicity.

20   Q.  Let's go to the line right below that.  "She's going to

21   sink this.  It's hard to watch.  Let me know when and if you

22   want to unleash me.  What do we have to lose?"

23             Those are your words, right?

24   A.  Yes.

25   Q.  Okay.  And "she's going to sink this."  Who is the "she"?

1   A.  Stormy.

2   Q.  It's hard to watch.  What was hard to watch, Mr. Janklow?

3   A.  Her emotional collapse at the release of this book.

4   Q.  She was difficult to deal with, wasn't she?

5   A.  She was hurt and she was scared of what the book was

6   exposing.

7   Q.  You didn't say that here, right?

8   A.  No, I am talking to Michael.

9   Q.  I'm saying you didn't say that in this text message, did

10  you?

11  A.  Right.  I was talking to Michael.

12  Q.  You said, "She's going to sink this.  It's hard to watch."

13  A.  Correct.

14  Q.  "Let me know when and if you want to unleash me."

15          Unleash you to do what, Mr. Janklow?

16  A.  Talk to her.

17  Q.  It sounds like you wanted to reprimand her, doesn't it?

18  A.  I wanted to talk to her.

19  Q.  You wanted somebody to unleash you so you could have a

20  talking to?

21  A.  Yes.

22  Q.  Mr. Janklow, you are a book agent, right?

23  A.  Yes, I am.

24  Q.  So you read a lot, right?

25  A.  Yes, I do.

M1onave5                    Janklow - Cross

1    Q.  And words matter, don't they?

2    A.  Very much so.

3    Q.  When you say I want to be unleashed on somebody, what does

4    that imply to you?

5    A.  That's sarcasm with a person who at the time was a friend.

6    Q.  Ah, okay.  Let's go to the bottom one on the page now.

7              "Got my phone back.  Any Storm news?"

8              Mr. Avenatti:  "No."

9         "Ugh, she's blanked you?  What a fucking nightmare.

10   Sorry."

11                  Mr. Avenatti:  "Chill."

12              You were the one who said what a fucking nightmare,

13   weren't you?

14   A.  Yes.

15   Q.  Mr. Avenatti is telling you to relax, isn't he?

16   A.  Right, but I'm sympathizing with him.

17   Q.  Because Stormy is difficult to work with, right?

18   A.  On average so, yes, like most of my clients.

19   Q.  I'm not asking about most of your clients --

20   A.  Yes.

21   Q.  -- Mr. Janklow?

22   A.  She was --

23   Q.  Let me just finish my question, please.

24   A.  All right.

25   Q.  I am not asking about most of your clients.  I am asking

M1onave5                          Janklow – Cross

```
1    here about Ms. Daniels, and you said here "what a fucking

2    nightmare."  Sorry.  Right?

3    A.  Correct.

4    Q.  And you're referring to your interactions and

5    Mr. Avenatti's dealings with Ms. Daniels, right?

6    A.  Over publicity, yes.

7    Q.  Because dealing with Ms. Daniels is a fucking nightmare,

8    isn't it?

9    A.  About publicity, yes.

10            MR. DALACK:  Okay.  All right.  Can we go to what's

11   been marked as Defense Exhibit R70, please, just for the

12   witness and for the parties at this point.

13   BY MR. DALACK:

14   Q.  Mr. Janklow, do you recognize the document in front of you?

15   A.  It is a text exchange.

16   Q.  Who is it with?

17   A.  Mr. Avenatti.

18   Q.  You saw this earlier, right?

19   A.  I don't recall this one specifically.

20   Q.  Well, if you look at the bottom it says, should I --

21            MR. DALACK:  Well, before I quote from it, your Honor,

22   I would like to move Defense Exhibit R70 into evidence with the

23   same proviso.

24            THE COURT:  On this particular one I don't see any 401

25   reason for it.
```

1        MR. DALACK:  It's the full exchange from what the

2   government introduced with respect to the bottom portion.  It's

3   both completing the narrative and it's relevant to the

4   witness's state of mind.

5        THE COURT:  Any objection?

6        MR. PODOLSKY:  Yes, your Honor.  No rule of

7   completeness concern here --

8        THE COURT:  Can you keep your voice up.

9        MR. PODOLSKY:  No rule of completeness concern here.

10  The bottom is cumulative, and the top is irrelevant.

11        THE COURT:  Sustained.

12        MR. DALACK:  Okay.  Can we go back to R69, please.

13        Can we go to the bottom.  Blow that up, Ms. Vicari.

14  BY MR. DALACK:

15  Q.  Mr. Janklow, please read along while -- follow along while

16  I read out loud.

17        "Good morning.  You know I hate writing you these

18  notes, but I've got St. Martin in the redline now, and of

19  course we can't blame them.  Is there anything we can tell

20  them?  Sorry to bug you.  I know you're swamped.  We're doing

21  the 10:45 call?  If so, I'll call you from my office phone and

22  then we'll call them, okay?"

23        That was a message you sent to Mr. Avenatti, right?

24  A.  Yes.

25  Q.  Here you're trying to reassure St. Martin's about the

M1onave5                        Janklow - Cross

1    publicity efforts, right?

2    A.   Correct.

3    Q.   You're trying to assure them that everything is going to be

4    okay with the book deal, right?

5    A.   With the publicity efforts.

6    Q.   You were inviting Mr. Avenatti into this call, weren't you?

7    A.   He was involved -- he was invited always.

8    Q.   But you were inviting him, correct?

9    A.   Yes, because we had to speak to the publisher.

10   Q.   Even though you were the book agent?

11   A.   Correct.

12   Q.   You were soliciting Mr. Avenatti's assistance, right?

13   A.   Yeah.

14   Q.   "Is there anything we can tell them?"

15            Tell them about what, Mr. Janklow?

16   A.   A change in course.

17   Q.   Okay.  And what does in the redline mean, Mr. Janklow?

18   A.   Revved up.

19   Q.   I'm sorry?

20   A.   Revved up, agitated.

21   Q.   That the publisher is agitated?

22   A.   Correct.

23   Q.   Okay.  And they're agitated with Ms. Daniels?

24   A.   They're agitated with her not meeting her legal

25   requirements in the contract for publicity.

M1onave5                    Janklow – Cross

1    Q.  That was your understanding?

2    A.  That was the fact.

3              MR. DALACK:  Okay.  Can we just pull up for the

4    witness and for the parties what's been marked as Defense

5    Exhibit R81.

6    BY MR. DALACK:

7    Q.  Mr. Janklow, directing your attention to the bottom of the

8    page, the date is 11/28/18.  Do you recognize the text there?

9    A.  Yes.

10   Q.  Okay.  What is it?

11   A.  A conversation between me and Mr. Avenatti.

12   Q.  And what is it about?

13   A.  It's about what seems like, to be a video clip on YouTube.

14   Q.  Regarding?

15   A.  Stormy.

16             MR. DALACK:  Your Honor, I would like to introduce

17   Defense Exhibit R81 into evidence.

18             THE COURT:  Subject to the limiting instructions

19   earlier, any objection.

20             MR. PODOLSKY:  Same objection as earlier.  Relevance.

21             THE COURT:  It is admitted subject to the same

22   limiting instruction that is I gave you earlier.

23             (Defendant's Exhibit R81 received in evidence)

24             THE COURT:  You may proceed.

25   BY MR. DALACK:

M1onave5                        Janklow - Cross

1   Q.  In the blue bubble who is that?

2   A.  Mr. Avenatti.

3   Q.  In the gray bubbles is?

4   A.  Myself.

5   Q.  Mr. Avenatti asked you to call him ASAP, right?

6   A.  Yes, he does.

7   Q.  You were at a dinner in London for the Beastie Boys,

8   correct?

9   A.  Correct.

10  Q.  It sounds like a lot of fun.

11  A.  It was.

12  Q.  And he says to you, "Stormy is off the reservation.  Call

13  me ASAP."  Right?

14  A.  Yes.

15  Q.  He sends you a YouTube link, right?

16  A.  Yes.

17  Q.  He tells you to go to 4 minutes and 55 seconds on the

18  counter, right?

19  A.  Yes.

20  Q.  Do you remember what that YouTube video was?

21  A.  I think it was her on Don Lemon.

22  Q.  Okay.  You responded, "I know, she's really tricky and

23  untrustworthy.  That's actually why I wanted to be more honest

24  with her throughout this book process, to take some of it off

25  you and have her have to face her own bullshit, of which there

M1onave5                     Janklow - Cross

1  is plenty.  She is impulsively mercenary."

2           Those are your words, right, Mr. Janklow?

3  A.  They are.

4  Q.  You're describing Ms. Daniels, aren't you?

5  A.  I am just describing a chunk of her behavior, yes.

6  Q.  You are describing an aspect of Ms. Daniels, aren't you,

7  Mr. Janklow?

8  A.  I'm describing some of -- a confined bit of her behavior

9  regarding publicity.

10 Q.  Okay.

11 A.  And regarding this interview.

12 Q.  You've mentioned a few times during your trial testimony

13 today that Mr. Avenatti seemed to express a preference to be

14 the one to communicate with Ms. Daniels, right?

15 A.  Yes.

16 Q.  Now, before we get into the nitty gritty of the chronology

17 of the book deal, which I am looking forward to, I want to ask

18 you a few questions about that dynamic that you had with

19 Ms. Daniels, okay?

20 A.  Sure.

21           THE COURT:  Mr. Dalack, can you pause for one moment.

22 My understanding is that the monitors of the last three jurors

23 are not working.  Our AV staff is here, so just give us one

24 moment while we try and sort that out.

25           In the meantime, if folks want to stand and stretch,

M1onave5                    Janklow – Cross

1   you're welcome to do so.

2           THE COURT:  Mr. Dalack.

3           We're good to go?  All right.  Everybody can take

4   their seat.  Just give us one minute and then we'll get started

5   again.

6           All right.  Proceed.

7           MR. DALACK:  Thank you, judge.

8           THE COURT:  Sorry for the interruption.

9   BY MR. DALACK:

10  Q.  When you met with the government yesterday, Mr. Janklow,

11  you told them that you had wanted to talk directly to Stormy

12  Daniels, right?

13          MR. PODOLSKY:  Objection, your Honor.  Hearsay.

14          THE COURT:  Sustained.

15  BY MR. DALACK:

16  Q.  Okay.  Mr. Janklow, did you want to speak directly with

17  Ms. Daniels over the course of the book deal?

18  A.  Yes.

19  Q.  Did you ask Mr. Avenatti about that?

20  A.  Yes.

21  Q.  Do you recall that on April 20, 2018, you asked

22  Mr. Avenatti for Stormy Daniels' contact information?

23  A.  I don't recall that specifically, but I –– it sounds like I

24  would at the beginning of the process.

25  Q.  Okay.

M1onave5                          Janklow – Cross

1              MR. DALACK:  If we can pull up for the witness,

2     please, what's been marked as Defense Exhibit R15.

3              (Continued on next page)

1    BY MR. DALACK:

2    Q.  And focusing on the bottom portion there, from April 20

3    down, do you recognize this communication, Mr. Janklow?

4    A.  I do.

5    Q.  What is it?

6    A.  It is a note -- it's a text conversation between me and Mr.

7    Avenatti.

8            MR. DALACK:  Your Honor, I'd like to introduce Defense

9    Exhibit R15 into evidence with the same proviso.

10           THE COURT:  Well, I haven't seen the rest of it, so

11   just the bottom message.

12           MR. DALACK:  It's just that bottom message, your

13   Honor, yes.

14           THE COURT:  Why don't you just elicit it; given that

15   there are other messages, you can inquire about that message.

16           MR. DALACK:  OK.

17   Q.  Mr. Janklow, does this refresh your recollection that on

18   April 20, 2018, you asked Mr. Avenatti if there would be a line

19   of communication between you and Stormy Daniels?

20   A.  Yes.

21   Q.  And just to be accurate for a second, this was

22   approximately how many days after Ms. Daniels executed her

23   agreement with you?

24   A.  Nine.

25   Q.  I thought she signed it on the 13th.

M1oWave6                    Janklow – Cross

1    A.  Oh, with me.  Sorry.  Yeah.  I don't remember exactly when

2    our retainer was signed.  Yes.  If you want to show me, I'll

3    tell you exactly.

4    Q.  OK.  But it was close in time when Ms. Daniels signed her

5    retainer with Janklow & Nesbit, right?

6    A.  Yes.

7         MR. DALACK:  And if we can go to R16, please.

8    Q.  Do you recognize this message, the document in front of

9    you, Mr. Janklow?

10   A.  It's a conversation between me and Mr. Avenatti.

11   Q.  And does this refresh your recollection that on April 21,

12   2018, at 9:30 in the morning, according to this time stamp, Mr.

13   Avenatti texted you Stormy Daniels's contact information?

14   Right?

15   A.  Yes.

16   Q.  Can you point me to anywhere on this page where Mr.

17   Avenatti --

18        MR. PODOLSKY:  Objection, your Honor.  This is not in

19   evidence.

20        THE COURT:  Sustained.

21        MR. DALACK:  OK.  Your Honor, to the extent the

22   witness has identified the document as a text exchange between

23   him and Mr. Avenatti, I'd like to offer the top part into

24   evidence.

25        THE COURT:  Can you zoom out, please.

1          All right.  By the top portion, you mean which?

2              MR. DALACK:  From --

3              THE COURT:  The first green message and the message

4     that follows it?

5              MR. DALACK:  Yes, the first green message and the

6     message that follows it, your Honor.  Yes.

7              THE COURT:  Any objection with the understanding it's

8     not for its truth?

9              MR. PODOLSKY:  No, your Honor.  That's fine.

10             THE COURT:  All right.  Admitted, subject to the same

11    instructions, and to be clear, it's just these two messages

12    that are now displayed on the screen, the green message at 9:29

13    a.m. on April 21, 2019, and the response.

14             (Defendant's Exhibit R16 received in evidence)

15    BY MR. DALACK:

16    Q.  Here, this is Mr. Avenatti is sending you Stormy Daniels's

17    contact information, right?

18    A.  Yes.

19    Q.  And there's nothing on this page that suggests he objected

20    to giving you her contact information, right?

21    A.  No.

22    Q.  You asked for it on the 20th, right?

23    A.  Yes.

24    Q.  And he sent it to you on the 21st, right?

25    A.  Yes.

M1oWave6                    Janklow - Cross

1    Q.  And you replied, "thanks, got it," right?

2    A.  Yes.

3    Q.  And then you followed up with "also regarding triple dollar

4    sign, we need to discuss and balance our timing,

5    confidentiality, etc."  What are you talking about here?

6    A.  Michael's book.

7    Q.  You're bringing up Mr. Avenatti's book here, right?

8    A.  In this snippet you're showing me, yes.

9    Q.  OK.  And Mr. Avenatti, after he gave you Ms. Daniels's

10   contact information, you had contact with Stormy Daniels,

11   didn't you?

12   A.  I never said I didn't have any contact with her.

13   Q.  Right.  And Mr. Avenatti didn't interfere with your ability

14   to have contact with her, did he?

15   A.  He discouraged me from contacting her, consistently.

16   Q.  OK.  Mr. Janklow, you had her cell phone number, did you

17   not?

18   A.  I have a lot of cell phone numbers.

19   Q.  OK.  She was a client of Janklow & Nesbit, was she not?

20   A.  She was indeed.

21   Q.  And you had her phone number, right?

22   A.  And her email, yes.

23   Q.  And her WhatsApp handle, right?

24   A.  Correct.

25   Q.  And you were provided this information by Mr. Avenatti,

M1oWave6                     Janklow – Cross

1    weren't you?

2    A.   Her attorney, yes.

3    Q.   Yes.  And so you had a direct line of communication with

4    Stormy Daniels, correct?

5    A.   I had the ability to have a direct line.

6    Q.   And with that ability to have a direct line with Stormy

7    Daniels, you exercised it, didn't you?

8    A.   Very rarely.

9    Q.   Well, let's talk about the times that you did exercise it.

10   The summer of 2018 was a very busy time for the book deal, was

11   it not?

12   A.   Yes.

13   Q.   And that's because that was when Ms. Daniels was going to

14   be working on the book with her ghost writer?

15   A.   Correct.

16   Q.   And she was trying to hit a manuscript deadline?

17   A.   Correct.

18   Q.   So that it could go under editing?

19   A.   Correct.

20   Q.   And redlining?

21   A.   No.  Just editing.

22   Q.   OK.  Maybe I had the terminology down wrong.

23        And then there had to be approval of the book cover, right?

24   A.   Creation of and approval of, yes.

25   Q.   There had to be an epilogue that was written?

M1oWave6                         Janklow - Cross

```
 1   A.  If she so chose.

 2   Q.  Right.  There had to be an acknowledgment section or

 3   dedication section if she so chose?

 4   A.  Correct.

 5   Q.  There was a lot happening in the summer of 2018 with

 6   respect to the book, was there not?

 7   A.  An average amount.

 8   Q.  OK.  And on July 8, 2018, you asked Mr. Avenatti about

 9   speaking with St. Martin's Press the following day about issues

10   relating to the book, did you not?

11   A.  I have to see.  I don't know what you're referring to.

12           MR. DALACK:  OK.  Can we please pull up for the

13   witness what's been marked as Defense Exhibit R44.

14   Q.  Do you recognize the document in front of you, Mr. Janklow?

15   A.  It's a text conversation.

16   Q.  Between whom?

17   A.  I assume Mr. Avenatti and me.

18   Q.  I don't want you to make an assumption, Mr. Janklow.  Do

19   you recognize it?

20   A.  It looks like a conversation between me and Michael, yes.

21           MR. DALACK:  OK.  Your Honor, I'd like to move into

22   evidence what's been marked as Defense Exhibit R44, please.

23           THE COURT:  Any objection?

24           MR. PODOLSKY:  Objection, your Honor.  Relevance.

25           THE COURT:  Sustained.
```

M1oWave6                         Janklow - Cross

1          MR. DALACK:  May I lay a different foundation, your

2     Honor?

3          THE COURT:  I'm sorry?

4          MR. DALACK:  May I lay a different foundation?

5          THE COURT:  You can certainly ask another question.

6     Go ahead.

7     Q.  Mr. Janklow, does this refresh your recollection that on

8     July 8, 2018, you contacted Mr. Avenatti about a phone call

9     with St. Martin's Press?

10         THE COURT:  Let me be clear, Mr. Janklow.  Take a look

11    at this exhibit.  Don't read what's on the exhibit.  The

12    question is, having read the exhibit, does that refresh your

13    recollection about that?

14    A.  No.

15    Q.  Did you not just testify that you recognized this document

16    as a text exchange between you and Mr. Avenatti?

17         MR. PODOLSKY:  Objection, your Honor.

18         THE COURT:  Sustained.

19    BY MR. DALACK:

20    Q.  In the summer of 2018, Mr. Janklow, you were trying to work

21    with the publisher to meet certain deadlines with respect to

22    Stormy Daniels's book, right?

23    A.  I was doing my job.

24    Q.  And in doing your job, you solicited Mr. Avenatti's

25    assistance, did you not?

M1oWave6                    Janklow - Cross

1   A.  Yes, of course.

2   Q.  And on a number of occasions you invited him to participate

3   in phone calls with the publisher, right?

4   A.  Yes.

5   Q.  OK.  And now looking at this document right here, does this

6   refresh your recollection that on a particular date in July,

7   July 8, 2018, you invited him to participate in a specific call

8   with the publisher on July 9, 2018?

9              MR. PODOLSKY:  Objection.

10  A.  I ask him, yes.

11  Q.  OK.  That refreshes your recollection?

12             THE COURT:  I think there was an objection.

13             MR. PODOLSKY:  Objection, your Honor.

14             THE COURT:  I'll allow it.

15             Again, looking at this document, does it refresh your

16  recollection that there was that -- that you invited him to

17  participate in this specific call -- yes or no -- sitting here

18  today?

19             THE WITNESS:  Yes.

20  BY MR. DALACK:

21  Q.  And that call was going to be on July 9, 2018, right?

22  A.  Looks like it.

23             MR. PODOLSKY:  Objection.

24             THE COURT:  Sustained.

25             Mr. Janklow, there are technical rules of evidence

M1oWave6                      Janklow - Cross

1   here, but the question is asking what your recollection is here

2   sitting today, not what it says on the document.  So don't read

3   what's on the document.  Don't assume that what's on the

4   document is correct or incorrect.  The question is sitting here

5   today, having read this document, do you recall what Mr. Dalack

6   is asking about?

7            THE WITNESS:  Then I have to say no.

8            THE COURT:  OK.

9            MR. DALACK:  OK.

10  Q.  This doesn't -- Mr. Janklow, you -- we went over this,

11  right?  You prepared for your testimony today, did you not?

12  A.  Yes.

13  Q.  You reviewed text messages between you and Mr. Avenatti,

14  right?

15  A.  Yes.

16  Q.  And you reviewed emails between you and Mr. Avenatti,

17  right?

18  A.  Yes.

19  Q.  And you reviewed emails between you and folks from St.

20  Martin's Press, did you not?

21  A.  Yes.

22  Q.  And you're testifying under oath today, right?

23  A.  I am.

24  Q.  So looking at this document, again --

25            MR. PODOLSKY:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1oWave6                    Janklow – Cross

1   Q.  -- your testimony is that this does not refresh your

2   recollection that you invited Mr. Avenatti to participate in a

3   phone call with the publisher on July 9, 2018?

4           MR. PODOLSKY:  Objection.

5           THE COURT:  Sustained.

6           Let's move on, Mr. Dalack.

7           MR. DALACK:  OK.

8   Q.  Do you recall a time when Ms. Daniels had signed up to

9   participate in a show called Big Brother?

10  A.  Mr. Avenatti told me that.

11  Q.  OK.  So you recall that?

12  A.  I recall Mr. Avenatti telling me that.

13  Q.  OK.  And do you recall you asking Mr. Avenatti details

14  about Ms. Daniels's anticipated participation in Big Brother?

15  A.  I do.

16          MR. DALACK:  Can we please pull up for the witness and

17  the parties what's been marked as Defense Exhibit R45.

18  Q.  Do you recognize the document in front of you, Mr. Janklow?

19  A.  It's a text conversation.

20  Q.  Who's it with?

21  A.  Me and Mr. Avenatti.

22  Q.  What is it about?

23  A.  Read for a moment.

24      It's about Big Brother and the potential to complicate the

25  schedule that it posed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1oWave6                    Janklow – Cross

1          MR. DALACK:  Your Honor, I'd like to introduce into

2     evidence Defense Exhibit R45, please.

3          THE COURT:  Any objection?

4          MR. PODOLSKY:  Yes, your Honor.  Relevance, scope,

5     hearsay.

6          THE COURT:  Sustained.

7          MR. DALACK:  I'm not offering it for the truth of the

8     matter asserted, your Honor.

9          THE COURT:  All right.  I understand.  Let's move on,

10    Mr. Dalack.

11    BY MR. DALACK:

12    Q.  Why were you concerned about Ms. Daniels participating in

13    Big Brother?

14    A.  Because she was in contract, and one of the terms of the

15    contract was that she not expose herself to the press or

16    public -- or marketing until the book was out.

17    Q.  Were you also concerned that her participation in Big

18    Brother would distract from her ability to comply with the

19    deadlines of the book deal?

20    A.  I was concerned about how to organize it, that it was going

21    to be very complicated.  I was not -- I was not concerned it

22    wasn't going to happen.  It was just complicated.

23          MR. PODOLSKY:  Your Honor, can we take down the

24    document that's not in evidence?

25          THE COURT:  Yes, please.

M1oWave6                         Janklow – Cross

1    Q.  And do you recall whether you would a conversation with

2    Stormy Daniels about this Big Brother appearance?

3    A.  No, I don't recall.

4              MR. DALACK:  OK.  Can we please put back up for the

5    witness what's been marked as Defense Exhibit R45.  Can we blow

6    up that portion right there.

7    Q.  Without reading it aloud, Mr. Janklow, does this refresh

8    your recollection --

9    A.  Which?

10   Q.  -- that you had a conversation with Stormy Daniels about

11   her participation in Big Brother?

12             THE COURT:  Same instructions.  Just read this to

13   yourself.  When you're done, the question is, sitting here

14   today, does that refresh your recollection that you spoke with

15   Ms. Daniels about Big Brother?

16   A.  No, not specifically Big Brother.

17   Q.  Does it refresh your recollection that on July 10, 2018,

18   you had a conversation with Ms. Daniels?

19   A.  I'm not sure when it was exactly.

20   Q.  Looking at the page right here, does it refresh your

21   recollection that it was July 10, 2018?

22             MR. PODOLSKY:  Objection, your Honor.

23             THE COURT:  Sustained.

24   BY MR. DALACK:

25   Q.  And with respect to this conversation, whenever it took

1  place, Mr. Avenatti didn't object to you communicating with

2  Ms. Daniels, did he?

3  A.  No.

4  Q.  OK.  Now, we talked about, a little bit about the book

5  cover, and we'll get into it later, I imagine.  Sometime near

6  the end of July 2018, Mr. Avenatti sent you Ms. Daniels's

7  comments on the book cover, is that correct?

8  A.  I believe so.  I don't remember the exact date.

9        MR. DALACK:  OK.  Can we please pull up for the

10  witness what's been marked as Defense Exhibit R49.

11  Q.  Mr. Janklow, do you recognize this document?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's a text conversation.

15  Q.  Between whom?

16  A.  Me and Mr. Avenatti.

17  Q.  And is it about the book deal?

18  A.  It's about the book.

19  Q.  Right.

20  A.  Not the deal.

21  Q.  Specifically about the book cover, correct?

22  A.  It's partly -- yes.  It's about the book cover and a few

23  other matters, yes.

24        MR. DALACK:  Your Honor, I'd like to move Defense

25  Exhibit R49 into evidence, again not for the truth of the

M1oWave6                    Janklow – Cross

1    matter asserted on the page.  It's for Mr. Avenatti state of

2    mind and Ms. Daniels's state of mind.

3            THE COURT:  Any objection?

4            MR. PODOLSKY:  Relevance.

5            THE COURT:  I'll allow it subject to the same limiting

6    instructions as earlier.

7            MR. DALACK:  Please publish to the jury.

8    Q.  Now, at the top right corner there --

9            THE COURT:  Mr. Dalack, I take it that line -- I think

10   that was put on by --

11           MR. DALACK:  It was put on by my fat fingers, your

12   Honor, and I'm not exactly sure how to delete it from the

13   screen at this moment, unfortunately.

14           THE COURT:  All right.  We'll try to figure out how to

15   do that.

16           MR. DALACK:  There we go.  I think I figured it out

17   I'm sorry.

18           THE COURT:  All right.  Very good.

19   BY MR. DALACK:

20   Q.  OK.  So at the top right corner there, Mr. Janklow, who is

21   that message from?

22   A.  Mr. Avenatti.

23   Q.  And what does it appear to be to you?

24   A.  A quote.

25   Q.  From whom?

M1oWave6                    Janklow - Cross

1    A.  Stormy.

2    Q.  OK.  She said:  "Hate all of them.  Denver's response,

3    seems so aggressive.  You look like a convict, and honestly,

4    they all suck.  P.S. Stormy cannot be the title."  What is she

5    referring to there?

6    A.  Cover proposals.

7    Q.  And specifically she's reacting to the cover proposal of

8    the mug shot, right?

9    A.  Yes.

10   Q.  The one that you testified to she wanted to be the book

11   cover, right?

12   A.  The one that I testified she suggested be the book cover.

13   Q.  And now she's saying that she hates it, right?

14   A.  Yes.

15   Q.  And right under that, you write:  OK.  So she wants to sink

16   the book because of this moronic asshole.  What to do?"  Who is

17   the moronic asshole you're referring to?

18   A.  Denver.

19   Q.  And then after that you forwarded a message that you had

20   sent to Ms. Daniels, right?

21   A.  Yes.

22   Q.  And you were explaining to Mr. Avenatti that you just sent

23   Ms. Daniels a very lengthy message about the title and the book

24   cover?

25   A.  And approach, yes.

M1oWave6                    Janklow – Cross

1    Q.  And approach.

2        This was you communicating directly with Ms. Daniels,

3    wasn't it?

4    A.  Yes, it was.

5    Q.  And you were informing Mr. Avenatti that you were

6    communicating directly with Ms. Daniels, were you not?

7    A.  As I always did.

8    Q.  And Mr. Avenatti did not object to you communicating in

9    this fashion with Ms. Daniels, did he?

10   A.  In this instance.

11   Q.  He didn't tell you to stop, right?

12   A.  Not in this instance.

13   Q.  And he didn't tell you to lay off, right?

14   A.  Not in this instance.

15   Q.  He didn't reprimand you, did he?

16   A.  Not in this instance.

17   Q.  OK.  And you were frustrated, weren't you?

18   A.  I was concerned for Stormy.

19   Q.  You refer to her business manager, documentarian, whatever

20   Mr. Nicks is, as a moronic asshole, right?

21   A.  He's not her business manager.  He was her friend and

22   amateur documentarian.

23   Q.  And you didn't think very highly of him, did you?

24   A.  Not of his professionalism or his professional opinions.

25   Q.  You were pretty frustrated, weren't you?

M1oWave6                      Janklow - Cross

1    A.  It was annoying.

2    Q.  Why was it annoying?

3    A.  Because it was unprofessional and embarrassing.

4    Q.  Were you afraid of losing face with the publisher?

5    A.  No.

6    Q.  Why not?

7    A.  Because I'm professional.  I'm not embarrassing.

8    Q.  Were you afraid that Stormy Daniels would lose face with

9    the publisher?

10   A.  I thought she might lose the confidence of the publisher.

11   Q.  And that could affect the book deal, right?

12   A.  That could affect the publication of the book, not the

13   deal.

14   Q.  I'm sorry?

15   A.  Not the deal.  The publication of the book.

16   Q.  Well, let's just take a step back for a second.  You had

17   mentioned in your testimony that there were certain obligations

18   that Ms. Daniels had to meet in order to adhere to her

19   contractual obligations with St. Martin's Press, right?

20   A.  Correct.

21   Q.  And one of those obligations was to have a manuscript ready

22   on time, right?

23   A.  Correct.

24   Q.  And another one of those obligations was to adhere to

25   certain promotional responsibilities, right?

M1oWave6                      Janklow - Cross

1   A.  Correct.

2   Q.  And if those promotional responsibilities weren't met, it

3   could create a basis for St. Martin's Press to withhold money,

4   right?

5   A.  They had a number of choices, yes.

6   Q.  Yes.  And if Ms. Daniels failed to meet certain deadlines

7   with respect to the actual publication of the book, that could

8   also be grounds for St. Martin's Press to withhold money from

9   Ms. Daniels, right?

10  A.  No.  That could be grounds for canceling the book.

11  Q.  And if the book is canceled, Ms. Daniels doesn't get paid,

12  right?

13  A.  She doesn't get paid any more.

14  Q.  And you don't get paid any more, right?

15  A.  No one does.

16  Q.  Right.  So you were very concerned about her messing up

17  this aspect of the book contract?

18  A.  I wasn't concerned about the deadline because it was

19  already in on time.

20  Q.  OK.

21  A.  And accepted.

22          MR. DALACK:  Can we please go to R50, please.

23  Q.  Do you recognize this document, Mr. Janklow?

24  A.  Yes.

25  Q.  In fact, it appears to be a continuation from the text

M1oWave6                    Janklow – Cross

1    messages on the previous page, right?

2    A.  It appears to be, yes.

3    Q.  OK.  And that's a text exchange between you and Mr.

4    Avenatti?

5    A.  Yes.

6              MR. DALACK:  Your Honor, I'd like to move for Defense

7    Exhibit R50 into evidence on the same proviso.

8              THE COURT:  Any objection?

9              MR. PODOLSKY:  Question, your Honor.  Is it the whole

10   page?

11             MR. DALACK:  Yes, your Honor, the whole page.

12             MR. PODOLSKY:  We do object on relevance grounds,

13   certainly to portions of it.

14             MR. DALACK:  Your Honor, I can explain.  It goes both

15   to Mr. Janklow's state of mind and also to Ms. Daniels's state

16   of mind.

17             THE COURT:  Can you blow up the bottom right, please.

18             MR. DALACK:  Sure.

19             THE COURT:  All right.  I'll allow it subject to the

20   same instructions.

21             (Defendant's Exhibit R50 received in evidence)

22             MR. DALACK:  Please publish to the jury.

23   Q.  Can you read at the top, Mr. Janklow, the message that

24   starts with "this just in"?

25   A.  "This just in.  Wow.  I can't believe you're remotely sane.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1oWave6                          Janklow - Cross

1    My three favorite titles are:  Whore; Director's Cut, and

2    Unbridled.  I really want to call it whore.  Stormy by Stormy

3    Daniels sounds so dumb and pretentious."

4    Q.  Please continue.

5    A.  "You cannot believe the conversation I'm having with her.

6    She's a masochist."

7    Q.  And this is you reporting your conversation in real time

8    with Ms. Daniels to Mr. Avenatti, right?

9    A.  I don't know if it was real time, but yes, it's me

10   reporting my conversation.

11   Q.  OK.  And when you say "This just in, wow, I can't believe

12   you're still remotely sane," what is that in reference to?

13   A.  That's me joking with Michael about her locking on this

14   title and cover issue and just making worse and worse

15   suggestions.

16   Q.  OK.  And when you say your three favorite titles are Whore,

17   Director's Cut, and Unbridled --

18   A.  Those are her favorite, her three favorites.

19   Q.  You're relaying that to Mr. Avenatti?

20   A.  No.  I'm quote -- everything after I say the words, the

21   colon, those are her words.  Those are quotes.

22   Q.  I see.  So I really want to call it Whore is her words and

23   not yours?

24   A.  Yes.

25   Q.  And when you say "you cannot believe the conversation I'm

1    having with her, she's a masochist," what did you mean by that?

2    A.  I meant that I'm trying to steer her towards what I

3    sincerely believe is the best thing for her, and she's

4    resistant.

5    Q.  So now you're conveying your conversation with Stormy to

6    Mr. Avenatti, right?

7    A.  Yes.

8    Q.  You're directly communicating with Ms. Daniels here, are

9    you not?

10   A.  It's the same bout of communications.

11   Q.  And again, Mr. Avenatti is not objecting to your

12   communications with Ms. Daniels, is he?

13   A.  In this instance, he did not.

14   Q.  He's not telling you to stop talking with her, is he?

15   A.  Not in this instance.

16   Q.  And then you follow up with another message, right, "sent

17   this"?

18   A.  Yes.

19   Q.  Who is that to?

20   A.  That was a quote of a note I wrote to Stormy.

21   Q.  And you were conveying that to Mr. Avenatti, right?

22   A.  I was keeping him aware of all my communications with her,

23   always.

24   Q.  His response was?

25   A.  "Great."

1   Q.  He was very pleased that you were having direct

2   communications with Ms. Daniels, wasn't he?

3   A.  About the cover.

4   Q.  Yes.

5           MR. DALACK:  Can we please go to what's been marked

6   for identification purposes only as Defense Exhibit R66.

7           THE COURT:  Mr. Dalack, I'm going to let you do a few

8   more of these, but I think it's time to move on to a different

9   line.

10          MR. DALACK:  Yes, your Honor.  Could we go back to

11  R60, please.  Could we pull up what's been marked -- OK.  R60's

12  in evidence at the moment, right?

13              I believe it is.  Yeah.

14  Q.  Going back to Defense Exhibit R60, Mr. Janklow, this is a

15  message from Stormy; you're forwarding a message here:  "Hi,

16  Elizabeth.  My schedule is crazy, and I'm curious if you guys

17  have scheduled signing appearances set up.  I have stuff coming

18  up that could be fantastic.  Could you give me name and contact

19  of who would be handling that?  I'd like to connect them with

20  my tour manager and manager."  Who did you understand her tour

21  manager and manager to be?

22  A.  I don't remember.

23  Q.  Isn't that Denver Nicks?

24  A.  I don't think he was her tour manager.  I don't know.

25          MR. DALACK:  OK.  Please pull up for the witness and

M1oWave6                        Janklow - Cross

1    the Court and the parties only what's been marked as Defense

2    Exhibit R66.

3    Q.  Mr. Janklow, do you recognize this document?

4    A.  Yes.  It's a text conversation between me and Mr. Avenatti.

5    Q.  And do you recall around what time it occurred?

6    A.  I don't recall, but I can see it on the page.

7    Q.  You recognize the exchange here between you and Mr.

8    Avenatti?

9    A.  Yes.

10         MR. DALACK:  Your Honor, I'd like to move Defense

11   Exhibit R66 into evidence not for the truth of the matter

12   asserted.

13         THE COURT:  Any objection?

14         MR. PODOLSKY:  Your Honor, the portion below the 106

15   is already in evidence.  And the portion above, yes, as to

16   relevance.

17         THE COURT:  All right.  I'll allow it.  It's admitted

18   subject to the same instructions.

19         As you'll see, ladies and gentlemen, the portion at

20   the bottom is actually in evidence already and that has been

21   admitted as evidence, but the portion at the top you may

22   consider only for the limited purposes that I described

23   earlier.

24         You may proceed.

25         (Defendant's Exhibit R66 received in evidence)

M1oWave6                    Janklow - Cross

1    BY MR. DALACK:

2    Q.  The gray bubble at the top, Mr. Janklow -- "I'm talking to

3    her and I'll fill you in and see if they can do three" -- those

4    are your words, right?

5    A.  Yes.

6    Q.  You're writing a message to Mr. Avenatti?

7    A.  Correct.

8    Q.  By "I'm talking to her," you're talking to Stormy Daniels?

9    A.  No.

10   Q.  Who are you talking to?

11   A.  Julie Grau.

12   Q.  Who is Julie Brown?

13   A.  The editor of Michael Avenatti's book.

14   Q.  OK.  And then "I just sent this to Stormy and she asked

15   about the excerpts two days ago and the Sharon Stone thing is

16   100 percent true."  What did you send to Stormy?

17   A.  I don't know.

18   Q.  When you say "I just sent this to Stormy," what are you

19   referring to?

20   A.  Oh.  The quote at the bottom of that box.

21   Q.  And what's that quote?

22   A.  "On another note, I represent Sharon Stone.  I just

23   finished a meeting with her, and she wants you to know that she

24   loves you and she -- and she and an army are true supporters,

25   and she's doing an event next week where she's planning on

M1oWave6                    Janklow - Cross

1   wearing the team Stormy t-shirt.  So there."

2   Q.  And the portion, "sorry I'm taking so long to respond," you

3   also sent that to Ms. Daniels, right?

4   A.  Hold on a second.

5       Yes.

6   Q.  You forwarded this to Mr. Avenatti, didn't you?

7   A.  Yes.

8   Q.  He didn't object to you communicating with Ms. Daniels

9   about this, right?

10  A.  No.

11  Q.  OK.

12  A.  Because I forward him everything.

13  Q.  Now let's just take a step back, Mr. Janklow, and talk

14  about when you first met Mr. Avenatti.  Do you remember when

15  that was?

16  A.  March of '18, I think.

17  Q.  OK.  Do you remember the circumstances?

18  A.  We met at a hotel bar, I believe.

19  Q.  Do you recall who introduced you?

20  A.  I do.

21  Q.  Who introduced you?

22  A.  A client friend and journalist.

23  Q.  Is that Anderson Cooper?

24  A.  That would be Anderson Cooper.

25  Q.  And he introduced the two of you by email, did he not?

M1oWave6                         Janklow – Cross

1    A.  Yes.

2    Q.  Do you remember whether that was on or about March 12,

3    2018?

4    A.  I don't remember.

5              MR. DALACK:  Can we please pull up for the parties and

6    the Court what's been marked for identification purposes only

7    as LJ1.

8              THE COURT:  Mr. Dalack, any sense of how much longer

9    you have on cross?

10             MR. DALACK:  I expect I'll go right until three today,

11   your Honor, and then we'll probably have, maybe, approximately

12   30 to 45 minutes tomorrow.

13             THE COURT:  OK.

14             MR. DALACK:  Thank you.

15   Q.  Mr. Janklow, do you recognize that document?

16   A.  Yes.  It's an email.

17   Q.  What is it?

18   A.  It's an email.

19   Q.  Between whom?

20   A.  Anderson and myself and Mr. Avenatti.

21             MR. DALACK:  Your Honor, I'd like to move into

22   evidence, offer into evidence what's been marked as LJ1.

23             THE COURT:  Any objection?

24             MR. PODOLSKY:  Just a second, your Honor.

25             No objection, your Honor.

1              THE COURT:  Admitted.

2              (Defendant's Exhibit LJ1 received in evidence)

3              MR. DALACK:  Please publish to the jury.

4    Q.  What's the date of this email, Mr. Janklow?

5    A.  March 12, 2018.

6    Q.  And is there anything that's significant to you about that

7    date?

8              MR. PODOLSKY:  Objection.

9              THE COURT:  Overruled.

10   Q.  Mr. Janklow.

11   A.  Oh.  No, there's no special significance to me --

12             THE COURT:  Can you speak up, please, and speak into

13   the microphone.

14             THE WITNESS:  Right.  Sorry.

15   A.  I don't place any special attention to that date.

16   Q.  OK.  In March of 2018, did you know who Mr. Avenatti was?

17   A.  Yes.

18   Q.  And how did you know?

19   A.  He was on TV and the press all the time.

20   Q.  You recall that he had filed a lawsuit against Mr. Trump on

21   March 6, 2018?

22   A.  Yeah, of course.

23   Q.  Right.  And he had gained a significant amount of press?

24   A.  Of course, yeah.

25   Q.  And so you were enthusiastic about being introduced to him,

M1oWave6                    Janklow - Cross

1   were you not?

2   A.  Sure.

3   Q.  And that's because you were looking to make a connection?

4   A.  Because I liked him.  I believed in what he was doing.

5   Q.  And you wanted to publish a book with him, did you not?

6   A.  At that time I wasn't thinking that.  I was just -- I mean

7   Anderson and I have conversations where we introduce each other

8   to interesting people.  So he was an interesting person.

9   Q.  Well, did Mr. Cooper tell you why he was introducing

10  Michael to you?

11  A.  He said he was -- I mean I'm paraphrasing, but he said he

12  was a dynamic, energetic guy and thought I'd like him and

13  thought there might be a book in it.

14  Q.  Thought there might be a what?

15  A.  A book.

16  Q.  A book?

17  A.  And that he was representing Stormy Daniels and there might

18  be a book in that.

19  Q.  Might be a book in that.  So Mr. Cooper introduced you to

20  Mr. Avenatti for the purposes of connecting you about book

21  deals, right?

22  A.  Partially, yes.

23  Q.  This was a professional connection, was it not?

24  A.  Yes.

25  Q.  OK.  And you were very into it?

M1oWave6                    Janklow – Cross

1    A.  Yeah.  I was very curious.

2    Q.  Now, do you recall that the same day Mr. Avenatti emailed

3    you back with his phone number?

4    A.  I do not recall that.

5             MR. DALACK:  OK.  Could we pull up what's been marked

6    as LJ2, please.

7    Q.  Mr. Janklow, do you recognize the document on your screen?

8    A.  I do.

9    Q.  OK.  What is it?

10   A.  It is an email.

11   Q.  Who's it between?

12   A.  It's between Michael Avenatti, myself, and Anderson.

13            MR. DALACK:  Your Honor, I'd like to introduce this

14   into evidence as Defense Exhibit LJ2.

15            MR. PODOLSKY:  Objection.  Relevance.

16            THE COURT:  Sustained.

17   BY MR. DALACK:

18   Q.  Does this refresh your recollection that on March 12, 2018,

19   Mr. Avenatti gave you his cell phone number?

20            MR. PODOLSKY:  Objection.

21            THE COURT:  Overruled.

22   A.  Yes.

23   Q.  And that same day, on March 12, 2018, you began texting

24   with Mr. Avenatti, did you not?

25   A.  I don't know.

1          MR. DALACK:  Can we please pull up for the witness

2     what's been marked as DX R1, please.

3     Q.  Mr. Janklow, do you recognize the document on your screen?

4     A.  It looks like a text exchange with me -- and I don't know

5     who the other person is.  I assume it's Mr. Avenatti.  I don't

6     know.

7     Q.  OK.  Well, does this refresh your recollection that you and

8     Mr. Avenatti exchanged text messages on March 12, 2018?

9     A.  Yes, we did.  Yes.

10    Q.  OK.  And the text messages that you exchanged on March 12,

11    2018, were about a book deal, right?

12         THE COURT:  Can we take this document down, please.

13    A.  I don't -- I didn't get introduced to Michael Avenatti on

14    the 12th and start making a book deal for anybody on the 13th.

15         MR. DALACK:  OK.  Could we please pull up --

16    Q.  When you and Mr. Avenatti began texting on March 12 --

17    A.  Yes.

18    Q.  -- isn't it true that you immediately texted him

19    information for two different publishers, one from Holt and one

20    from Macmillan?

21    A.  I don't recall.

22         MR. DALACK:  OK.  Can we please pull up for the

23    witness what's been marked as Defense Exhibit R1.

24    Q.  Mr. Janklow, I just have to ask you.  When you testified

25    earlier that you reviewed text messages and emails in advance

1    of your testimony today, was that true?

2              MR. PODOLSKY:  Objection, your Honor.

3              THE COURT:  Sustained.

4              Mr. Dalack, move on to your next question, please.

5    BY MR. DALACK:

6    Q.  Looking at the document on your screen, Mr. Janklow, does

7    this refresh your recollection that the very next day, March

8    13, 2018, you sent Mr. Avenatti the contact information and a

9    date and time for a meeting with two different publishers?

10   A.  It looks like I did, yeah.

11   Q.  That's not the question, Mr. Janklow.  I'm sorry.  Does

12   this refresh your recollection that you did or did not share

13   that information with him?

14   A.  It refreshes my -- yeah, it refreshes my recollection.

15   Q.  And in fact, you and Mr. Avenatti, on March 13, 2018, had

16   meetings with two different book publishers, right?

17   A.  It looks that way.  I don't recall being so fast, but it

18   looks that way here, yes.

19   Q.  OK.  Looking at this document, does this refresh your

20   recollection that that meeting occurred?

21   A.  It refreshes it, yes.

22   Q.  OK.  And it refreshes your recollection that the meeting

23   happened?

24   A.  It was booked.

25              THE COURT:  Let's take the document down, please.

M1oWave6                    Janklow - Cross

1              MR. DALACK:  Thank you, your Honor.

2    Q.  Who was Holt publisher?

3    A.  A different publisher from, from St. Martin's.

4    Q.  OK.

5    A.  One of many.

6    Q.  And St. Martin's is a division of Macmillan?

7    A.  Yes, which is owned -- yes.

8    Q.  OK.  And --

9    A.  Holt is another imprint at Macmillan.

10   Q.  So, I don't understand that, actually.  Can you explain

11   that to me?

12   A.  Sure.  There are conglomerates that own multiple

13   publishers.  So you can sometimes sell books to different

14   publishers within the same conglomerate group.

15   Q.  And the purpose of --

16             THE COURT:  Explain that by example.  I take it

17   Macmillan here is the sort of conglomerate --

18             THE WITNESS:  Correct.

19             THE COURT:  -- highest level company.

20             THE WITNESS:  It's the umbrella company that owns

21   multiple publishers, and they act either semiautonomously or

22   autonomously within that umbrella.

23             THE COURT:  And St. Martin's was one of the imprints,

24   one of the publishers within Macmillan?

25             THE WITNESS:  Correct.

M1oWave6                         Janklow – Cross

1           THE COURT:  And Holt was as well?

2           THE WITNESS:  Correct.

3           THE COURT:  OK.  Thank you.

4    BY MR. DALACK:

5    Q.  And the purpose of these meetings with Holt and Macmillan

6    or St. Martin's was to discuss a book deal for Ms. Daniels,

7    correct?

8    A.  Correct.

9    Q.  That's what Mr. Avenatti seemed to be interested in, right?

10   A.  Yes.

11   Q.  And so you were making a pitch both to Holt and to St.

12   Martin's Press, right?

13   A.  Yes.

14   Q.  For Ms. Daniels's memoir?

15   A.  Yes.

16   Q.  And that was the day after Mr. Anderson Cooper introduced

17   you to Mr. Avenatti?

18   A.  Yes.

19   Q.  Then on March 14, 2018, you received a communication from

20   Sally Richardson, right?

21   A.  I have to see it.  It was three years ago, four years ago.

22   I have to see it.

23           MR. DALACK:  OK.  Can we please pull up for the

24   witness what's been marked for identification purposes only as

25   Defense Exhibit R1.

M1oWave6                      Janklow - Cross

1    Q.  Look at the bottom of the page, Mr. Janklow.

2    A.  Yes.

3    Q.  Does this refresh your recollection that Sally Richardson

4    expressed interest --

5    A.  It does, yes.

6    Q.  -- in the book deal?

7        And she did, didn't she?

8    A.  Yes.

9    Q.  OK.  And at that point, because Ms. Richardson had

10   expressed interest, Holt backed out, right?

11   A.  I don't recall, but that would be normal.

12   Q.  And why would that be normal?

13   A.  Because it's a sister company, and often they do that.

14   Q.  As a courtesy, or why?

15   A.  Because they don't want to compete internally.

16   Q.  OK.

17   A.  Sometimes they do, sometimes they don't.

18   Q.  And that wasn't unusual to you?

19   A.  No.

20   Q.  And --

21       THE COURT:  Can you take the document down, please.

22   Q.  -- Ms. Richardson came out pretty strong on March 14, 2018,

23   with a proposed book contract for a million dollars to include

24   the writer's fee of approximately a quarter million, right?

25   A.  At the time it was a thought, yes.

M1oWave6                      Janklow - Cross

1   Q.  Right.  So let's just break that down.  Ms. Richardson's

2   initial position, within a day of meeting you and Mr. Avenatti,

3   was to provide a -- or to seek a contract for a book deal with

4   Ms. Daniels for a million dollars with 250,000 going to the

5   ghost writer, correct?

6   A.  Something like that.

7   Q.  So, I'm no mathematician either, but that would mean that

8   of the million dollars, Ms. Daniels would keep 750, right?

9   A.  If, in fact, the author was paid a quarter of million.

10  Q.  If, in fact, the writer was paid a quarter of a million --

11  A.  Correct.

12  Q.  -- those terms?

13  A.  Correct.

14  Q.  And that's what Ms. Richardson proposed?

15  A.  Correct.

16  Q.  And Ms. Richardson was also interested in a pretty

17  fast-track publication schedule, was she not?

18  A.  It was the biggest story in the country.  It was on TV

19  every night, all day long.  Any publisher would have been

20  interested.

21  Q.  I'm saying she was interested in a fast-track publication

22  schedule, was she not?

23  A.  Yes, to seize the moment.

24  Q.  And she wanted something published by the summer, right?

25  A.  I don't recall if she said the summer, but I know she

M1oWave6                         Janklow – Cross

1   wanted it fast.

2   Q.  OK.  And on March 15, 2018, you had a conversation with Mr.

3   Avenatti about the financial terms, do you remember that?

4   A.  I do not.  I need to --

5              MR. DALACK:  OK.  Can we please pull up for the

6   witness what's been marked as Defense Exhibit R2.

7   Q.  Can you look at the bottom of the page, Mr. Janklow?

8   A.  Yes.

9   Q.  OK.  What are we looking at here?

10  A.  A conversation between me and Mr. Avenatti.

11  Q.  OK.  About what?

12  A.  A potential book deal for Stormy.

13             MR. DALACK:  Your Honor, I'd like to move Defense

14  Exhibit R2 into evidence.

15             THE COURT:  Any objection?

16             MR. PODOLSKY:  Relevance and scope, your Honor.

17             MR. DALACK:  Your Honor, this whole case is about --

18  sorry.

19             THE COURT:  Stop.  Thank you.

20             Sustained.

21  BY MR. DALACK:

22  Q.  Mr. Janklow, looking at the bottom of this page, does this

23  refresh your recollection that after the offer from

24  Ms. Richardson, you and Mr. Avenatti discussed alternative

25  financial terms?

1          MR. PODOLSKY:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.  I would not characterize this as a discussion.  I would

4    characterize it as me listing the terms.

5    Q.  OK.  And does this refresh your recollection that

6    Ms. Richardson was not adverse to discussing different

7    financial terms but that they needed to have a meeting ASAP?

8    Right?

9    A.  She wanted to meet Stormy.  She wanted to have some kind of

10   interaction with the subject.

11   Q.  Right.  And that interaction could have been in person,

12   right?

13   A.  Could have.

14   Q.  Or it could have been over video?

15   A.  Yup.

16   Q.  Ms. Richardson was interested in just meeting with Stormy

17   any way, right?

18   A.  Was -- it was hinging on that.  She was not going to make a

19   deal without meeting her in some way.

20   Q.  Of course.  OK.  And then in the --

21          MR. DALACK:  Please take this down.

22   Q.  When you and Mr. Avenatti were discussing Ms. Richardson's

23   deal, didn't Mr. Avenatti propose to you an alternative

24   financial arrangement?

25   A.  With -- I think with regard to the writer's fee, yes.

1   Q.  Mr. Avenatti was interested in having the writer's fee come

2   from the publisher, not out of Stormy's book advance, right?

3   A.  Yes.

4   Q.  And Mr. Avenatti's proposal was to have the advance to

5   Stormy be $800,000, right?

6   A.  Yes.

7   Q.  With the writer's fee to be covered by the publisher,

8   right?

9   A.  Well, paid by -- paid out by the publisher.

10  Q.  Paid out by the publisher, so I guess what I'm trying to

11  say, Mr. Janklow, is not withheld from the 800,000.  Right?

12  A.  All the money's coming from the publisher.  The publisher's

13  paying for the writer no matter what.  All this was a question

14  of who mechanically paid the writer, either the publisher or

15  the subject.

16  Q.  Let's just back up for a second.  Under the terms

17  Ms. Richardson initially proposed, it was a million dollars

18  with $250,000 to be paid out from that money, the advance to

19  Ms. Daniels, to the ghost writer, right?

20  A.  Potentially.

21  Q.  Potentially.

22  A.  No one knew how much it was going to cost, but the fee for

23  the writer was going to come out of the advance.

24  Q.  And Mr. Avenatti's proposal was for the fees for the writer

25  to be paid separately by the book publisher and for Ms. Daniels

M1oWave6                    Janklow – Cross

1   to get $800,000, right?

2   A.  To be reduced by that amount.  Yes.  Yes.  Yes.

3   Q.  Going back to my question, Mr. Avenatti's proposal was for

4   the book publisher to cover the writer's costs, right?

5   A.  Yes.

6   Q.  And for Ms. Daniels to receive $800,000 without any of that

7   money going to the ghost writer, correct?

8   A.  Correct.

9   Q.  OK.  With a $250,000 advance initial payment up front,

10  right?

11  A.  Upon signing the agreement, yes.

12  Q.  Upon signing the agreement, no questions asked, right?

13  A.  Lots of questions asked.

14  Q.  I'm saying as far as there didn't have to be a single word

15  of the book written, right?

16  A.  No.  Because that's -- writer wouldn't have been hired by

17  then.

18  Q.  Right.  So Mr. Avenatti's proposal was to have Ms. Daniels

19  receive a quarter of a million dollars up front simply by

20  signing the book contract, right?

21  A.  No, it was not Mr. Avenatti.  It was my boilerplate with my

22  company, my lawyers.

23  Q.  OK.  And you took that back to Ms. Richardson, right?

24  A.  I informed her of it.

25  Q.  OK.  And then on March 19, 2018, you actually had a video

M1oWave6                    Janklow - Cross

1    call with Ms. Daniels, Mr. Avenatti, Sally Richardson from St.

2    Martin's Press, and a woman named Tracey Guest, is that

3    correct?

4    A.  Correct.

5    Q.  Who is Tracey Guest?

6    A.  A senior executive in publicity at St. Martin's.

7    Q.  And Mr. Avenatti brought Stormy Daniels to that call,

8    right?

9    A.  He helped arrange the call, yeah.

10   Q.  He wasn't there by himself, was he?

11   A.  No.

12   Q.  OK.

13   A.  Stormy was there.  It was the point of the call.

14   Q.  I'm sorry, sir?

15   A.  The point of the call was to have Stormy there.

16   Q.  Right.

17        During that call, isn't it true that Ms. Richardson

18   expressed concern that unique information that would form the

19   substance of Ms. Daniels's book could be prematurely leaked to

20   the press and, therefore, devalue their investment?

21   A.  I'm not sure that's how she characterized it, but it is

22   standard practice, when a publisher's paying seven figures for

23   a book, that they want to maximize the value and keep as much

24   away from the public so that there's an appetite built for when

25   the book comes out.

M1oWave6                           Janklow – Cross

1    Q.  Thank you.

2         Bringing you back to my question with respect to

3    Ms. Richardson, during that call, she expressed concern that

4    the information that they would be taking a proprietary

5    interest in could be prematurely leaked to the press and,

6    therefore, devalue a book investment, right?

7    A.  She wanted her to have a press blackout.

8    Q.  What does that mean?

9    A.  That she didn't -- that she did not talk to the press until

10   her book, any further until the book came out.

11   Q.  OK.  And on that call, Ms. Richardson was reassured by Mr.

12   Avenatti that he would do everything he could to make sure that

13   whatever investment that was made by St. Martin's Press would

14   be protected, right?

15   A.  I believe so.

16   Q.  That he would work with you and with St. Martin's Press to

17   make sure that any contracting made with Ms. Daniels, she would

18   honor it, right?

19   A.  Yes.

20   Q.  OK.  And Ms. Richardson was reassured by Mr. Avenatti's --

21             MR. PODOLSKY:  Objection.

22   Q.  -- promises, right?

23             MR. PODOLSKY:  Objection, your Honor.

24             THE COURT:  Sustained.

25   BY MR. DALACK:

M1oWave6                        Janklow - Cross

1   Q.  It seemed to you that Ms. Richardson was reassured by Mr.

2   Avenatti?

3            MR. PODOLSKY:  Objection, your Honor.

4            THE COURT:  Sustained.

5   BY MR. DALACK:

6   Q.  You were on that video call, were you not, Mr. Janklow?

7   A.  I was.

8   Q.  And you observed all the other participants on that call?

9   A.  Yes.

10  Q.  And in observing those other participants, did you observe

11  that Ms. Richardson appeared to be reassured by Mr. Avenatti's

12  promises that Ms. Daniels would honor the book contract?

13           MR. PODOLSKY:  Objection, your Honor.

14           THE COURT:  Sustained.

15  BY MR. DALACK:

16  Q.  At the conclusion of that video call, did Ms. Richardson

17  say anything to you about Mr. Avenatti's involvement?

18           MR. PODOLSKY:  Objection, your Honor.

19           MR. DALACK:  Your Honor, I'm not offering it for the

20  truth of the matter asserted, just for Ms. Richardson's state

21  of mind and for the witness's state of mind.

22           THE COURT:  Overruled.

23           You may answer.

24  A.  I don't remember.

25  Q.  Didn't see seem enthusiastic about Mr. Avenatti being

1    involved?

2    A.  Sally's always enthusiastic.

3    Q.  That wasn't my question, Mr. Janklow.

4        On this particular occasion, did she seem to you to be

5    enthusiastic about Mr. Avenatti's participation?

6    A.  She had both the people on the call who were part of this

7    huge presence in the culture.  So yes, she was pleased.

8    Q.  Now, on March 20, 2018, you continued to communicate with

9    Mr. Avenatti about this deal, right?

10   A.  I would assume -- yes, we talked about it until -- we

11   talked about it consistently.

12   Q.  In fact, you had indicated to Mr. Avenatti that you were

13   moving towards the close that we want, right?

14   A.  Yes.

15   Q.  But at some point, Ms. Richardson had sent you a lot of

16   questions, did she not?

17   A.  About publicity, yes.

18   Q.  About publicity, right?

19   A.  Yes.

20   Q.  And Ms. Richardson expressed to you that she was getting a

21   lot of heat from her legal department, right?

22           MR. PODOLSKY:  Objection, your Honor.  Hearsay.

23           THE COURT:  I'll allow it not for the truth.

24           You can answer.

25           THE WITNESS:  I'm sorry?

1          THE COURT:  You can answer.

2     A.  I don't recall.

3          MR. DALACK:  You don't recall?  OK.  Can we please

4     pull up for the witness what's been marked as Defense Exhibit

5     5, R5 for identification purposes.

6          I'm sorry, Mr. Janklow.

7          Can we please pull back up for the witness what has

8     been marked as DX R5.

9     Q.  Do you recognize this document, Mr. Janklow?

10    A.  It looks like a text conversation of mine, yes.

11    Q.  And who is the text conversation with?

12    A.  Looks like Michael.

13         MR. DALACK:  OK.  Your Honor, I'd like to move into

14    evidence, offer into evidence Defense Exhibit R5.

15         THE COURT:  Any objection?

16         MR. PODOLSKY:  Yes, your Honor.  Relevance.

17         THE COURT:  I'll allow it.  Go ahead.  Admitted.

18         (Defendant's Exhibit R5 received in evidence)

19         MR. DALACK:  Thank you.  Please publish to the jury.

20    Q.  Starting at the top, Mr. Janklow, please read while I --

21    follow along silently while I read aloud:  "Yo, call when you

22    can for update."

23         THE COURT:  Mr. Dalack, you're not going to read the

24    whole page, are you?

25         MR. DALACK:  No.  I promise I'm not.

M1oWave6                    Janklow - Cross

1          THE COURT:  OK.

2    BY MR. DALACK:

3    Q.  "We are moving towards the close we want," right?  See

4    that, Mr. Janklow?

5    A.  Yes.  Oh, yes.

6    Q.  What does it mean "we are moving towards the close we

7    want"?

8    A.  Means the negotiation is coming to an end.

9    Q.  OK.  And the next line:  "Sally sent me a note with lots of

10   questions aimed at the narrative."  What is that in reference

11   to?

12   A.  Sally and I discussing what the story's going to be.

13   Q.  OK.  And going to the middle of that highlighted portion:

14   "She is certainly get a lot of heat from her legal department.

15   Pussy squares at the highest order, in essence, I said."  What

16   is that in reference to?

17   A.  The bureaucratic side of the publishing process.  Business

18   affairs, the dreaded business affairs.

19   Q.  What did you mean by "pussy squares of the highest order"?

20   A.  Meaning that they are really belt and suspenders-type

21   characters and often make things very difficult.

22   Q.  And what was -- from your understanding, what was the

23   concern that St. Martin's Press legal department had in

24   entering into a contract with Ms. Daniels?

25   A.  They were clearly concerned about the publicity side.

M1oWave6                    Janklow - Cross

1   Q.  Can you explain that more, please?

2   A.  I'm not sure I can, because I'm not in their head, but that

3   was -- the only point of contention during the whole

4   negotiation was the publicity.

5   Q.  And what about the publicity?

6   A.  Maintaining radio silence to maximize investment.

7   Q.  OK.  And when you say maintaining radio silence to maximize

8   investment, why is that so important?

9   A.  Because they're paying a million dollars for a book, and

10  they don't want the book -- didn't -- fundamentally important

11  parts of the narrative of the book to be exposed on TV or in

12  the newspaper, that they were --

13  Q.  They were --

14  A.  They feel they're buying that story.

15  Q.  Let's just put it in blunt terms.  They were afraid or they

16  seemed to be afraid and concerned that Ms. Daniels would

17  discuss information and aspects of her life that were going to

18  go into the book before the book was published, right?

19  A.  Correct.

20  Q.  And if she did that, it would devalue their investment,

21  right?

22  A.  In their minds, yes.

23  Q.  OK.  Now, can you look where the sentence begins with

24  "lastly."  "Lastly she asked about why you wanted to close so

25  fast and I said because he's smart and wants this done and

M1oWave6                          Janklow - Cross

1    dusted before the Sunday show catapults her deeper and farther

2    into the news cycle"; those are your words, right?

3    A.  Yes.

4    Q.  And "she" is Ms. Richardson, correct?

5    A.  Yes.

6    Q.  And "why you wanted," you're speaking to Mr. Avenatti,

7    right?

8    A.  Yes.

9    Q.  So Sally was inquiring why Mr. Avenatti wanted to close so

10   fast, right?

11   A.  Correct.

12   Q.  You referred to Mr. Avenatti as a brilliant tactician and

13   applauded getting the deal done as soon as possible, did you

14   not?

15   A.  I was referring to his smart assumption -- a smart noticing

16   that when she did 60 Minutes on Sunday, her presence was going

17   to explode in the world.

18   Q.  That's --

19   A.  That's what -- we're saying Sunday show; that refers to 60

20   Minutes.

21   Q.  That's the upcoming 60 Minutes show, right?

22   A.  Correct.

23   Q.  He wanted to get this locked in before that, is that right?

24   A.  Correct.

25   Q.  So there would be some control from the book publisher as

M1oWave6

1    to what was shared on 60 Minutes, correct?

2              MR. PODOLSKY:  Objection.

3              THE COURT:  Sustained.

4              All right.  We're going to stop there for the day, it

5    being 3:00, ladies and gentlemen.

6              A couple reminders.

7              First, continue to keep an open mind.  Again, you've

8    heard only a portion of the testimony of one witness, so you've

9    got to keep an open mind until you've heard all of the

10   evidence.

11             Do not talk about the case with anyone, among

12   yourselves, with your family, friends, employers.  Don't talk

13   about or communicate in any way, shape or form about the case.

14             Don't do any research about the case.  As I told you,

15   if you happen to come across or hear anything on the news that

16   pertains to the case or anyone involved in the case, turn the

17   page, close the browser, turn off the station, whatever you

18   need to do.  It's your obligation to ensure you're not exposed

19   to anything about it while you're sitting as a juror in this

20   case.

21             We will resume tomorrow at the same time, so please be

22   in the jury room by 8:30 or 8:45 at the latest.  We'll stick

23   with the same schedule we did today.  I thank you all again for

24   your punctuality this morning and enabling us to get started

25   promptly.  Hopefully we can do the same tomorrow.

M1oWave6

1          With that, stay safe and healthy.  I wish you a

2    pleasant afternoon and evening.  You are excused.

M1oWave6

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Mr. Janklow, you're excused for the evening, in a

4     moment.  One second.  There was a binder that you were given,

5     so you can leave it on the witness stand, please.

6          You're now on cross-examination, so one of the rules

7     is that you're not permitted to speak with any representatives

8     of the government, prosecutors or their assistants.  You can

9     regarding purely logistical issues, about where you need to be

10    and when, but you probably don't need to do that because you

11    should be in this courtroom tomorrow no later than 9:00, ready

12    to go.

13         Counsel, if we need to discuss anything at nine, the

14    witness can be in the room out there, but otherwise, he should

15    be ready to go when we're ready to proceed with the jury.

16         With that, I wish you a pleasant afternoon and

17    evening, and we'll see you tomorrow.

18         THE WITNESS:  Thank you.

19         MR. BAUM:  Judge, before the witness is excused, may I

20    add a request to what you just told the witness?

21         THE COURT:  You may.

22         MR. BAUM:  Clearly, I agree with you and there's

23    Supreme Court law that he is not supposed to discuss his

24    testimony with the government, but he is also here with his

25    lawyers, and he is not to discuss his testimony with his

M1oWave6

1    personal lawyers.

2          MR. PODOLSKY:  We object to that, your Honor.  I have

3    had this requested at numerous trials, and it's been denied

4    every time.  He has counsel, and he's certainly welcome to

5    speak to his own attorney for his counsel.

6          THE COURT:  I think that is the law.

7          Mr. Baum, do you have any authority that would support

8    it?

9          MR. BAUM:  Yes, Judge, I do.  This is from *Perry v.*

10   *Leeke*, which is 488 U.S. 272.

11         THE COURT:  Can you sit down, Mr. Baum.

12         MR. BAUM:  Yes.

13         THE COURT:  Mr. Janklow, why don't you have a seat as

14   well.

15         MR. DALACK:  *Perry v. Leeke*, 488 U.S. 272, 1989

16   Supreme Court.  I quote --

17         MR. PODOLSKY:  Your Honor, may we just have the

18   witness step out?  I'm sure he won't leave, and we can instruct

19   him.  I don't know why he needs to hear the legal arguments on

20   this issue.

21         THE COURT:  I'm not sure why.  Other than boring him,

22   I'm not sure why it would matter to him.  But sure.

23         Mr. Janklow, why don't you just remain -- I think

24   there's a room right outside these doors.  If you could just

25   sit in there and await further instruction from someone, I'd

M1oWave6

1    appreciate that.  Thank you.

2                THE WITNESS:  OK.

3                THE COURT:  We'll see you tomorrow morning.

4                THE WITNESS:  OK.

5                (Witness not present)

6            MR. BAUM:  Well, Judge, he's not leaving until our

7    argument is complete, is that correct?

8                THE COURT:  Correct.  He's just sitting in the room

9    outside so he's not going to be present for this discussion.

10               MR. BAUM:  Thank you.

11               THE COURT:  All right.  Go ahead.

12               MR. BAUM:  Judge, I'm going to quote from *Perry v.*

13   *Leeke*.

14               THE COURT:  Can you give me the citation again.

15               MR. BAUM:  Yes.  488 U.S. 272 (1989).

16           Judge, I'm not sure it's a direct quote, but I'm going

17   to characterize their decision, if I may.  I don't want to say

18   it's a direct quote.  When I took my notes, I didn't put it in

19   quotations.

20               THE COURT:  All right.  What page are we on?

21               MR. BAUM:  I believe this is 282, 281-282.

22               THE COURT:  OK.  Go ahead.

23               MR. BAUM:  The reason for the rule is one that applies

24   to all witnesses, not just defendants.  It is a common practice

25   for a judge to instruct the witness not to discuss his or her

M1oWave6

testimony with third parties until the trial is completed.

Such nondiscussion orders are a corollary of the broader rule

that witnesses may be sequestered to lessen the danger that

their testimony will be influenced by hearing what other

witnesses have to say and to increase the likelihood that they

will confine themselves to truthful statements based on their

own recollection.

Here's the key part, Judge:  It is entirely

appropriate for a trial judge to decide, after listening to the

direct examination of any witness, whether the defendant or a

nondefendant, that the cross-examination is more likely to

elicit truthful responses if it goes forward without allowing

the witness an opportunity to discuss -- excuse me, an

opportunity to consult with third parties, including his or her

lawyer.

THE COURT:  Mr. Podolsky.

MR. PODOLSKY:  Yes, your Honor.

Defense counsel failed to raise this this morning, so

I wasn't armed with the cases that I've been armed with in the

past when I've argued this, but each and every time a trial

judge has denied this request, in part, based directly on the

language Mr. Baum just referenced.  There is no obligation to

prevent a witness from speaking with his attorney.  There is no

indication that he would not have truthful testimony.  The man

is testifying under oath in a federal trial, and there's simply

M1oWave6

1    no basis to preclude him from speaking to his own attorney

2    overnight.

3         MR. BAUM:  Judge, it would be particularly disturbing

4    if the lawyer were present in the courtroom to hear the

5    testimony of other witnesses, which would allow --

6         THE COURT:  Mr. Baum, there hasn't been any other

7    witness.

8         MR. BAUM:  OK.  I'm just saying that presence in the

9    courtroom and allowing someone to hear the direct and

10   cross-examination and the lawyer then guides his own personal

11   client through what might be the cross tomorrow morning would

12   be in violation of *Perry v. Leeke*.

13        THE COURT:  All right.  I'll tell you what.

14        Mr. Podolsky, since it sounds like you have case

15   citations at the ready in your office.  Why don't you just send

16   me a very short letter with them.  In the meantime, I may look

17   it up myself.

18        For the moment, will I say that Mr. Janklow should not

19   discuss the subject, substance of his testimony with anyone,

20   including his own counsel.  If I change my mind on that, I'll

21   issue an order to that effect and his counsel --

22        Is his counsel present?

23        MR. PODOLSKY:  Yes, your Honor.

24        THE COURT:  All right.  You'll see an order confirming

25   or reversing that, and then you can proceed accordingly, but

M1oWave6

1   for the moment, he should not communicate about the substance

2   of his testimony with anyone, including counsel.

3          And Mr. Podolsky, I'll look for those citations as

4   quickly as you can get them to me.

5          MR. MEISTER:  Your Honor, just in case --

6          THE COURT:  Sorry.  You need to put your mask on, but

7   if you want to step forward and step into the Plexiglas box,

8   then you may remove it and speak into the microphone and

9   identify yourself.

10         MR. MEISTER:  Thanks, Judge.  David Meister from

11  Skadden Arps for Mr. Janklow.

12         Just in case it's necessary, for the record, we would

13  request the opportunity to speak with our own client this

14  evening.

15         THE COURT:  I understand.  And you may get that, but

16  I'd rather make sure that that's proper before I tell you that

17  you may.  So for the moment, you may not, but you may get

18  contrary directions later this afternoon.  All right?

19         MR. MEISTER:  Yes, your Honor.

20         THE COURT:  Please put your mask on before you leave

21  the box.

22         MR. MEISTER:  Thank you.

23         MR. DALACK:  I have a few housekeeping type things,

24  but anything the parties need to raise aside from that?

25         MR. PODOLSKY:  Briefly, a note with respect to the

M1oWave6

1    cross-examination, your Honor.

2         Many of the objections were, in part, based on my

3    inability to understand what the relevance, for example, of the

4    state of mind of St. Martin's Press attorneys, who the witness

5    had never spoken to, is, and I raise this really to say that

6    we've had now an hour, hour and a half, maybe two hours of

7    cross-examination about contract negotiations that have really

8    nothing to do with the issues at stake in this case.  We did

9    not anticipate that length of cross.  If we're going to have

10   cross on these, frankly, irrelevant matters that are lengthy,

11   we are going to go beyond a week and longer than our estimate.

12        THE COURT:  Understood.  You can make objections as

13   you see fit.  I was giving Mr. Dalack some latitude.  I think

14   given the nature of the direct testimony, I think some

15   allowance for testimony regarding Mr. Avenatti's involvement in

16   the negotiations, his role with respect to Ms. Daniels.  This

17   frustration with Ms. Daniels -- at least to publicity issues,

18   etc. -- was fair game.  So that explains it, but as you may

19   have heard, I did tell Mr. Dalack at one point to bring it to a

20   close and move on, since I think he had established the point

21   and we didn't need to continue on it.

22        Anything else from the government?

23        MR. PODOLSKY:  No, your Honor.  Just wanted you to be

24   aware of that.

25        THE COURT:  Mr. Dalack.

M1oWave6

| 1 |  |  | MR. DALACK:  Yes, Judge.  And I just want to bring

2  this to the Court's attention.

3           Shortly before I began my cross-examination of Mr.

4  Janklow, the government provided me with a rather insubstantial

5  but nevertheless impeachment 3500 material concerning the

6  meeting they had with Mr. Janklow today, on January 24, 2022.

7  I'm not prepared to say that this has prejudiced my ability to

8  cross-examine Mr. Janklow.

9           THE COURT:  Mr. Dalack, 3500 requires them to disclose

10 it by conclusion of the direct testimony.  It sounds like

11 they've complied with that.  You have all night to prepare.

12 I'm not concerned.

13          MR. DALACK:  OK.  I just wanted to bring it to the

14 Court's attention.

15          THE COURT:  Very good.

16          A couple things on my end.

17          First of all, I don't think I have a defense exhibit

18 list.  I have an index to the binder, which just has sort of

19 category by category, but I have to say that the defense

20 exhibit numbering is -- I've never seen anything like it.  It's

21 not standard practice, and it seems utterly confusing since

22 we're using as exhibit numbers the page numbers of the

23 documents rather than individually labeled.  Under my rules,

24 they should be individually labeled with exhibit labels so that

25 it's clear what the exhibit is.  I'd like you to fix that.  I'd

M1oWave6

1    like an exhibit list with individually itemized exhibits so

2    that I can keep track of what has been admitted.  So I expect

3    to see that relatively shortly.

4          No. 2, the parties did or the government complied with

5    the new mask policy with respect to the first couple witnesses.

6    I don't know that I had gotten submissions with respect to

7    counsels' compliance.  So for tomorrow, please make sure you

8    submit to my chambers evidence that you're in compliance and

9    will either test negative or have a verifiable case of Covid

10   within the last 90 days in accordance with the order that I

11   entered on Friday.  If we overlooked it, I'll take another

12   look, but please email chambers.

13         I'm not docketing that.  I'm not sharing it with the

14   other side.  I'm just making sure that we're all in compliance,

15   and to the extent that you anticipate doing it over the course

16   of days, a reminder that you can be on an every-other-day

17   schedule.

18         Yes, Mr. Podolsky.

19         MR. PODOLSKY:  And not to belabor it, but the

20   logistics, for example, this morning, I believe all of us took

21   PCR tests here and were receiving the results right before the

22   trial day started.  I'm just trying to figure out the right way

23   to communicate that to your Honor.

24         THE COURT:  You can tell my staff that you're taking

25   tests, you've tested negative.  And as officers of the court, I

M1oWave6

1    trust your representations on that.  I just want to make sure

2    that we're in compliance.  And if you did that this morning,

3    you don't need to do it again tomorrow morning.  Wednesday

4    would suffice.

5            MR. PODOLSKY:  Thank you, your Honor.

6            THE COURT:  Just make sure that you dot those I's and

7    cross those T's by letting us know.

8            A couple of exhibits that were displayed seemed to

9    have emails and phone numbers, including, for example,

10   Ms. Clifford.  Obviously if it's relevant for the trial; that's

11   one thing, but I am concerned, particularly given the

12   high-profile nature of those involved in this case, that that

13   sort of personal information shouldn't necessarily be revealed

14   to the public.  Some of those things were redacted in real

15   time.  Please take tonight to make sure all that stuff is

16   redacted.  And any information of that sort that remains should

17   be relevant to the issues in the case, and otherwise it should

18   be redacted.

19           Witnesses for tomorrow, and let's talk about the

20   two-way video, how we're going to do that.  I was sort of

21   hoping that we would be able to start with her tomorrow morning

22   and thereby deal with, avoid any delay in setting up the video.

23   I also recognize she's on, if not West Coast time, a couple

24   hours behind.

25           What's the government's thought on this?

M1oWave6

1          MR. PODOLSKY:  Your Honor, I think I can tell you what

2     we're expecting to do, but it may be helpful for us to send an

3     email in a couple hours, because due to the length today, we

4     might switch things a little bit.  Our anticipated witness

5     order was Justin Ellard, Jessica Volchko, and Judy Regnier.

6     There's a possibility that we will switch Mr. Macias to

7     tomorrow morning because he had have to travel here, and based

8     on today, we're already anticipating things going a little

9     longer than we had hoped.  But if it would be all right, your

10    Honor, we'll email you by close of business today for the

11    confirmation of the witness order.

12         THE COURT:  All right.  And because I told the

13    gentleman presiding over the due process hearing that involved

14    Mr. Brewster I'll give him an update on scheduling and

15    Mr. Brewster's need to be here, any better sense of when

16    Ms. Daniels or Ms. Clifford is likely to testify?

17         MR. PODOLSKY:  Our best guess would be Wednesday into

18    Thursday.

19         THE COURT:  All right.  If you can let us know by

20    email, talking to counsel obviously, by close of business today

21    your anticipated schedule of witnesses tomorrow and also

22    perhaps how you would propose to handle the two-way video

23    timing, that would be helpful.

24         MR. PODOLSKY:  Yes, your Honor.

25         THE COURT:  Anything else from either side?

M1oWave6

```
 1              From the government.
 2              MR. PODOLSKY:  No, your Honor.
 3              THE COURT:  From the defense.
 4              MR. DALACK:  No, your Honor.
 5              THE COURT:  All right.  In that case, please be in the
 6    courtroom ready to go by nine.  You can let my chambers know or
 7    staff know if you have issues to discuss at nine, and I would
 8    anticipate starting with the jury no later than 9:15 in the
 9    morning.
10              Thank you very much.  See you tomorrow.
11              (Adjourned to January 25, 2022, at 9:00 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

 LUCAS JANKLOW

Direct By Mr. Podolsky . . . . . . . . . . . . 100

Cross By Mr. Dalack  . . . . . . . . . . . . . 221

GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 103  . . . . . . . . . . . . . . . . . . . . 107

 102  . . . . . . . . . . . . . . . . . . . . 111

 801  . . . . . . . . . . . . . . . . . . . . 114

 203  . . . . . . . . . . . . . . . . . . . . 120

 202  . . . . . . . . . . . . . . . . . . . . 127

 107  . . . . . . . . . . . . . . . . . . . . 129

 802  . . . . . . . . . . . . . . . . . . . . 131

 204  . . . . . . . . . . . . . . . . . . . . 132

 207  . . . . . . . . . . . . . . . . . . . . 137

 208  . . . . . . . . . . . . . . . . . . . . 143

 211  . . . . . . . . . . . . . . . . . . . . 145

 210  . . . . . . . . . . . . . . . . . . . . 147

 212  . . . . . . . . . . . . . . . . . . . . 150

 213  . . . . . . . . . . . . . . . . . . . . 153

 217  . . . . . . . . . . . . . . . . . . . . 161

 218  . . . . . . . . . . . . . . . . . . . . 165

 220  . . . . . . . . . . . . . . . . . . . . 176

 1  . . . . . . . . . . . . . . . . . . . . . 180

| | | |
|---|---|---|
| 1 | 242 . . . . . . . . . . . . . . . . . . . | 181 |
| 2 | 225 . . . . . . . . . . . . . . . . . . . | 184 |
| 3 | 226 . . . . . . . . . . . . . . . . . . . | 188 |
| 4 | 227 . . . . . . . . . . . . . . . . . . . | 190 |
| 5 | 230 . . . . . . . . . . . . . . . . . . . | 193 |
| 6 | 232 . . . . . . . . . . . . . . . . . . . | 195 |
| 7 | 233 . . . . . . . . . . . . . . . . . . . | 198 |
| 8 | 234 . . . . . . . . . . . . . . . . . . . | 201 |
| 9 | 235 . . . . . . . . . . . . . . . . . . . | 204 |
| 10 | 236 . . . . . . . . . . . . . . . . . . . | 206 |
| 11 | 238 . . . . . . . . . . . . . . . . . . . | 215 |
| 12 | 240 . . . . . . . . . . . . . . . . . . . | 217 |

13                          DEFENDANT EXHIBITS

14    Exhibit No.                              Received

| | | |
|---|---|---|
| 15 | R60 . . . . . . . . . . . . . . . . . . . | 230 |
| 16 | R62 . . . . . . . . . . . . . . . . . . . | 233 |
| 17 | R68 . . . . . . . . . . . . . . . . . . . | 239 |
| 18 | R69 . . . . . . . . . . . . . . . . . . . | 242 |
| 19 | R81 . . . . . . . . . . . . . . . . . . . | 249 |
| 20 | R16 . . . . . . . . . . . . . . . . . . . | 256 |
| 21 | R50 . . . . . . . . . . . . . . . . . . . | 272 |
| 22 | R66 . . . . . . . . . . . . . . . . . . . | 276 |
| 23 | LJ1 . . . . . . . . . . . . . . . . . . . | 280 |
| 24 | R5 . . . . . . . . . . . . . . . . . . . | 297 |

25