M1pWave1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                          19 Cr. 374 (JMF)

5  MICHAEL AVENATTI,

6              Defendant.
                                          Trial
7  ------------------------------x

8                                         New York, N.Y.
                                          January 25, 2022
9                                         9:00 a.m.

10 Before:

11
                        HON. JESSE M. FURMAN,
12
                                          District Judge
13                                        -and a Jury-

14                          APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  MATTHEW D. PODOLSKY
17      ROBERT B. SOBELMAN
        ANDREW A. ROHRBACH
18      Assistant United States Attorneys

19 DAVID E. PATTON
        Federal Defenders of New York, Inc.
20      Attorney for Defendant
   BY:  ROBERT M. BAUM
21      ANDREW J. DALACK
        TAMARA L. GIWA
22      Assistant Federal Defenders

23 Also Present:  Special Agent DeLeassa Penland
                  U.S. Attorney's Office
24                Christopher de Grandpre, Paralegal Specialist
                  Juliet Vicari, Paralegal

25

M1pWave1

```
1                 (Trial resumed; jury not present)

2                 THE COURT:  Good morning.  Welcome back.

3                 Counsel is present, as is Mr. Avenatti.

4                 Anything to discuss?

5                 From the government.

6                 MR. PODOLSKY:  Not from us, your Honor.

7                 THE COURT:  From the defense.

8                 MS. GIWA:  Your Honor, we have some issues with

9      exhibits that are coming in after lunch.  I don't know whether

10     we should discuss them now or at the lunch break.

11                THE COURT:  Let's start now and go from there.

12                MS. GIWA:  Your Honor, my understanding is the

13     government today plans to introduce, through Ms. Regnier, the

14     witness appearing right after lunch, an extensive list of bank

15     records for Mr. Avenatti's law firm, I think maybe over nine

16     statements from nine different accounts.  So our objection,

17     your Honor, is just to those records coming in in their current

18     form.

19                We understand the Court's ruling about evidence

20     concerning financial conditions and about dispositions of

21     criminal proceeds, but the records that the government is

22     seeking to introduce, I think, go beyond the Court's ruling.

23     They contain transactions that are not relevant to the issue of

24     the disposition of criminal proceeds, and they also contain

25     transactions that are prejudicial.
```

M1pWave1

1          I think your Honor noted that there was a concern

2     about raising the specter of undue prejudice to the jury, and

3     some of those transactions do that.  So our objection is to

4     those records coming in wholesale, certainly in the form of

5     statements.  Your Honor, I think some of the transactions also

6     may implicate some privilege and work product issues because

7     there are transactions involving other clients of the firm.

8          And then, your Honor, my understanding is that the

9     government also intends to introduce summary charts based on

10    those records, and so the objection extends also to the summary

11    charts.

12         THE COURT:  OK.  I'm a tad annoyed that this is coming

13    up now, only because I raised this at the conference a week or

14    two ago.  I don't remember which conference it came up at

15    precisely to sort these things out in advance of trial.  So I'm

16    a little mystified why it's coming up.  I don't know if it's a

17    case of sandbagging or a case of just not doing what you should

18    have done earlier.

19         In any event, government.

20         MR. SOBELMAN:  Yes, your Honor.

21         On Sunday evening, the defense first raised the issue

22    with the bank records.  At that time and on multiple occasions

23    since then, we have told them we'd be glad to agree to

24    reasonable redactions to the extent they think any particular

25    transactions are not relevant or unfairly prejudicial.  We've

M1pWave1

1    invited them to provide us with versions with redactions

2    proposed for us to consider.  They have not done so.

3            I'm not sure how we can deal with the objection in the

4    abstract.  They have not pointed to any -- with respect to the

5    summary charts, they have not pointed to any particular

6    information on the summary charts that might contravene your

7    Honor's order.  We've been faithful to the Court's guidance in

8    not trying to highlight any lavish lifestyle evidence.  We're

9    not going to make reference to the defendant's Ferrari.  We're

10   not going to make reference to the defendant's private jet,

11   etc.  If the defense has a particular concern, we're happy to

12   discuss it with them, but we have not been made aware of any.

13           Your Honor, it's simply the contents of bank accounts,

14   and if there are particular items the defense wants to redact,

15   we're happy to discuss that with them, and if there's a

16   dispute, we can raise it with the Court, but there's no basis

17   to exclude these records en masse simply because the defense is

18   concerned.

19           THE COURT:  Ms. Giwa, is that accurate?  Did they

20   provide these to you on Sunday and invite you to propose

21   redactions, and if so, have you proposed any?

22           MS. GIWA:  Your Honor, we have certainly bank records,

23   but we were informed that the records would be admitted with

24   this specific witness on Friday, and on Sunday I spoke to

25   Mr. Sobelman about it and yesterday I had a very long and, I

M1pWave1

1    think, productive conversation with Mr. Rohrbach about it.

2    Just so that the record is clear, this is not an attempt at

3    sandbagging.  We have been talking about this issue.

4             THE COURT:  Ms. Giwa, answer my question.  Have you

5    proposed any redactions to the exhibits?

6             MS. GIWA:  Your Honor, I have identified --

7             THE COURT:  That's a yes-or-no question.

8             MS. GIWA:  I think the answer is fairly complicated,

9    your Honor.  I have identified types of transactions that I

10   think are problematic.  I want to make clear that our objection

11   is to the records coming in in their entirety.

12            THE COURT:  And that objection is overruled.  I made

13   that clear at the conference.  So I invited you to propose

14   redactions, and it sounds like the government did the same.  My

15   question -- yes or no -- is have you proposed specific

16   redactions to the government for its consideration?  Yes or no.

17            MS. GIWA:  I have proposed areas, types of

18   transactions that I believe should be redacted.

19            THE COURT:  And do you want to tell me what those

20   types are now?  Because I think that's a "no" to my question,

21   and for that reason I'm inclined to deny the application.  But

22   if you want to tell me the specific areas, we can discuss those

23   briefly, but I think it's probably too little, too late.  So

24   what are those areas?  And I would pick your best case first.

25            MS. GIWA:  Your Honor, I guess let me just say that --

M1pWave1

1          THE COURT:  Tell me an exhibit.  Tell me what the

2     specific, identifiable transaction on the exhibit is and an

3     illustration of an area that you think is of concern.

4          MS. GIWA:  One area of concern --

5          THE COURT:  No.  I want an exhibit, and I want an

6     entry on that exhibit that illustrates that area.

7          MS. GIWA:  I think a useful exhibit to look at is

8     Government Exhibit 303C, which is one of the operating

9     accounts.  I'm sorry, your Honor.  302C.

10         THE COURT:  OK.  And then what entry am I supposed to

11    be looking at?

12         MS. GIWA:  Your Honor, there are entries concerning

13    other clients of the firm.

14         THE COURT:  For example.

15         MS. GIWA:  One second, your Honor.

16         Sorry.  I'm just looking at the exhibits.

17         Your Honor, in exhibit 302C, pages 3 through 7.  Let

18    me say all of those are client-related expenses.  I think

19    that's one.

20         THE COURT:  How is that prejudicial?

21         MS. GIWA:  It's just so extensive, your Honor.  This

22    is the entirety of the financial condition of the firm during

23    this period of time.  The government has the burden of showing

24    the transfer of money, the movement of money, from the payment

25    from the publisher to the trust account to the other account.

M1pWave1

1    Introducing this doesn't really do that.

2             THE COURT:  All right.  You can certainly make that

3    argument to the jury.  That's not a 403 issue.

4             The application is presently denied.  If you are able

5    to identify discrete things that you think should be redacted

6    for the government, I would urge you to raise it with them, and

7    if you have enough time to raise it with me and they can

8    implement it, then I will consider it.  But as far as I'm

9    concerned, this is too little, too late, which is why I raised

10   it a week, maybe two weeks ago, and you had an opportunity to

11   confer about it and deal with it before the morning that these

12   things were supposed to come in.

13            You've also known she was supposed to testify

14   yesterday, so I don't even know why this came up today rather

15   than yesterday at a minimum.  So bottom line, too little, too

16   late, as far as I'm concerned, but if you want to identify

17   particular and limited redactions that you think are of

18   particular concern, you're welcome to do, and I'll take it up

19   if we have time.  But if we don't have time and the government

20   can't implement it, then as far as I'm concerned, it's on you.

21   It was incumbent upon you to deal with this sooner.

22            We do have a full jury.  They'll be on their way up.

23   Can we get Mr. Janklow up here, please.

24            (Continued on next page)

25

1              (Jury present)

2              THE COURT:  You may be seated.

3              Good morning.  Welcome back, ladies and gentlemen.

4    I'm very pleased that we're starting promptly at 9:15, and

5    thank you for being here on time.  I very much appreciate it.

6    I hope you all had a good evening and you're ready for another

7    trial day.

8              We will continue with the cross-examination of Mr.

9    Janklow.

10    LUCAS JANKLOW, resumed.

11             THE COURT:  Mr. Janklow, I remind you that you remain

12   under oath.  I also remind you to speak into the microphone and

13   speak loudly and clearly.

14             With that, Mr. Dalack, you may proceed.

15             MR. DALACK:  Thank you, your Honor.

16   CROSS-EXAMINATION CONTINUED

17   BY MR. DALACK:

18   Q.  Good morning, Mr. Janklow.

19   A.  Good morning.

20   Q.  I want to just pick up where we left off yesterday in

21   talking about the work that you and Mr. Avenatti did to secure

22   Ms. Daniels's book contract.  OK?

23   A.  Sure.

24   Q.  So, I think that we left off where Ms. Richardson had sent

25   you quite a few questions.  Do you recall?

M1pWave1                          Janklow - Cross

1   A.   I think I -- I think I remember, yes.

2   Q.   And those were questions that concerned the scope of the

3   book contract after you and her had been discussing the terms

4   of the financial arrangements, right?

5   A.   Yes.

6   Q.   And you had essentially indicated to Ms. Richardson that it

7   was a little too premature to get into those details, right?

8   A.   I believe so, yeah.

9   Q.   And one of the things that Ms. Richardson was curious about

10  was why there was a sense of urgency, right?

11  A.   Uh-huh.

12  Q.   Please answer yes or no.

13  A.   Yes.  Sorry.

14  Q.   Thank you.

15       And one of the reasons is she didn't understand or was

16  curious about why Mr. Avenatti wanted to lock up this deal so

17  quickly?

18            MR. PODOLSKY:  Objection.

19            THE COURT:  Sustained.

20  BY MR. DALACK:

21  Q.   Ms. Richardson asked you why you thought Mr. Avenatti

22  wanted to look up this contract so quickly, correct?

23  A.   She said something about that in the last email, yes.

24  Q.   Yes.  And in response, you had indicated to her that Mr.

25  Avenatti was a brilliant tactician, right?

M1pWave1                      Janklow - Cross

1    A.  I don't have it in front of me, but yes, something like
2    that.
3    Q.  And that one of the things you knew, based on your
4    conversations with Mr. Avenatti, was that he was concerned
5    about locking up the deal before Ms. Daniels's 60 Minutes
6    interview, right?
7    A.  I wouldn't say he was concerned.  I would say he wanted to
8    lock it up.  It was a logical decision because he had a big
9    media hit coming.
10   Q.  So there was this sense of urgency to the contract
11   negotiations, wasn't there?
12   A.  There was a sense of urgency to the whole project because
13   it was at the top of its news arc, and in my business, that's
14   what you want to seize upon.
15   Q.  OK.  You want to seize upon all of the public's interest in
16   Ms. Daniels, correct?
17   A.  Yes, and the subject.
18   Q.  And that 60 Minutes interview was a huge deal, wasn't it?
19   A.  Any 60 Minutes interview is a huge deal.
20   Q.  Did you watch it yourself?
21   A.  Of course I did.
22   Q.  And it was an exciting time to be a part of this process,
23   wasn't it?
24   A.  Yeah, I thought Stormy did a good, really good job.
25   Q.  And if the public were to lose interest in Ms. Daniels

M1pWave1                          Janklow - Cross

1    before the book deal was secured, it could affect her ability
2    to have a book deal altogether, right?
3    A.  No.  She would get a book deal regardless.
4    Q.  You're saying that Ms. Daniels was going to get a book deal
5    regardless of whether or not there was any public interest in
6    her story?
7    A.  No.  You said if she lost public interest.
8    Q.  Right.
9    A.  Public interest had happened.  If it retreated, she still
10   had a story to tell.  She still had a situation with the
11   President.  She would get a book deal.
12   Q.  Is it your testimony that she would have gotten the same
13   kind of book deal, the same quality book deal if public
14   interest in her story had diminished?
15   A.  Quality depends on who was involved.  If I was involved, it
16   would have been the same quality, and it would maybe have not
17   have been --
18   Q.  OK.  Well, let's talk a little bit about you and Mr.
19   Avenatti's negotiations with Ms. Richardson.
20   A.  Sure.
21   Q.  Do you recall that on or about March 21, 2018, you conveyed
22   to Mr. Avenatti that the best St. Martin's Press could do was
23   $200,000 upon signing?  Do you remember that?
24   A.  You mean the first payment?
25   Q.  Yes.

M1pWave1                    Janklow - Cross

1  A.  That -- I don't recall that specifically, but there is

2  always negotiation about the payments.

3          THE COURT:  Mr. Dalack, could I interrupt for one

4  moment.

5          MR. DALACK:  Yes.

6          THE COURT:  We just need to reset these filters for a

7  second.  Give me one moment.  I apologize for the interruption.

8          MR. DALACK:  Oh, sure.

9          Please pull up for the --

10         THE COURT:  Hold on one second.

11         All right.  You may proceed.  Sorry for the

12 interruption.

13         MR. DALACK:  OK.  Can we please pull up for the

14 witness what I believe has been admitted into evidence as

15 Defense Exhibit R5, please.

16 Q.  Do you remember this from yesterday, Mr. Janklow?

17 A.  Let me just take a look.  One second.

18      Yeah.

19 Q.  OK.  Directing your attention to the middle of the page,

20 the text that starts with "from Sally."

21 A.  Yeah.

22 Q.  "From Sally, she's still stuck on the first payment.

23 Before I slam it again, I wanted you to see this."  This is a

24 message you're sending to Mr. Avenatti, right?

25 A.  Yes.

M1pWave1                         Janklow - Cross

1    Q.  And you're conveying to him that Ms. Richardson is still

2    sort of stuck on the amount of the first payment?

3    A.  Yes, but that's a posturing that happens every time you

4    make a deal.

5    Q.  Regardless of whether or not it's posturing or not, in this

6    instance, Ms. Richardson was stuck on the first payment, wasn't

7    she?

8    A.  Yeah, she was -- she was conveying that.  Yes.

9    Q.  And the message below that starts with "Luke."  That's a

10   message that you're forwarding to Ms. Avenatti from

11   Ms. Richardson, right?

12   A.  Yes.

13   Q.  Directing your attention to the sentence that begins with

14   "and for the on-signing payout."

15   A.  Yeah.

16   Q.  "And for the on-signing payout, 200 is the best I can do.

17   But please remember how short a time span we are talking about

18   here so the rest will follow in months."  So Ms. Richardson is

19   saying here that the best that St. Martin's can do for

20   Ms. Daniels for on-signing is $200,000, right?

21   A.  Yes.  At this stage in the negotiation, she said that, yes.

22   Q.  And Mr. Avenatti was pushing for Ms. Daniels to receive

23   $300,000 up front upon signing, wasn't he?

24   A.  I don't remember.

25   Q.  You don't remember what he was asking for?

M1pWave1                         Janklow – Cross

1    A.  When you make a book deal, some people like to get paid up,

2    front-load the deal, meaning that you get paid more at the

3    beginning.  Some people like to get paid more at the end.  It

4    depends on their life, on their finances.  So it's always a

5    negotiation.

6            THE COURT:  Can we zoom out for a second, Ms. Vicari.

7    Q.  Look to the text message right below that, Mr. Janklow,

8    march 21, 2018.  So this is you communicating with Mr.

9    Avenatti, correct?

10   A.  Yup.

11   Q.  "So they'll have a draft tomorrow, and we've gotten all

12   they're going to give.  They are sticking at 200 first

13   payment."  And you're communicating to Mr. Avenatti that

14   Ms. Richardson is not going to budge on the $200,000 for the

15   first payment, right?

16   A.  That's what she said, yeah.

17   Q.  And you referred to it as asinine publishing bullshit,

18   right?

19   A.  Yes, a colloquialism.

20   Q.  Colloquialism, right.  Colloquially.

21   A.  Yeah.

22   Q.  And then you offer to go back and say 300 or no deal,

23   didn't you?

24   A.  Yeah.

25   Q.  And that $300,000 offer, that came from Mr. Avenatti,

1   didn't it?

2   A.  I mean it was a discussion.  It's normal engagement.

3   Q.  Yeah.  You guys are working together on this, right?

4   A.  Yeah.

5   Q.  Trying to make this happen?

6   A.  Yeah.  He's Stormy's lawyer.  I'm her agent.  That's how it

7   works.

8   Q.  And you're trying to get as much money as you possibly can

9   for your mutual client, aren't you?

10  A.  No.  I'm trying -- I'm being asked to move for money at the

11  beginning of the payment structure.  It's the same amount of

12  money total.  It's a question of when it's paid.

13  Q.  I understand that, Mr. Janklow, but you can also -- your

14  interests here, clearly -- both you, your interest, and you

15  understood Mr. Avenatti's interest to be you wanted to maximize

16  the amount of money Ms. Daniels was going to receive on that

17  first payment, right?

18          MR. PODOLSKY:  Objection.

19          THE COURT:  Sustained.

20  BY MR. DALACK:

21  Q.  Mr. Janklow, when you said I can go back and say 300,000 or

22  no deal, that was because Mr. Avenatti was insisting on a

23  $300,000 payment up front, wasn't he?

24  A.  Yes.  He was trying to get that, yes.

25  Q.  And at the end, you refer to "Fire and Fury sold 2.5

M1pWave1                    Janklow - Cross

1   million so far, that's some cake."  What is that in reference

2   to?

3   A.   That is, I believe, the title of one of the Trump books,

4   and I was telling him that, as I said earlier, a book deal's a

5   floor with no ceiling, so if you sell 2.5 million copies, you

6   made $4 million or $5 million.  I was telling him that -- I was

7   trying to show him that the payment structure was not that

8   important ultimately if the book was a success.

9   Q.   But that is predicated on an assumption that the book will

10  sell well, isn't it?

11  A.   I think all my books are going to sell well.

12  Q.   Right.  At the outset you believe all your books are going

13  to sell well, right?

14  A.   Yes.

15  Q.   Including this one?

16  A.   Yes.

17  Q.   So when you were explaining to Mr. Avenatti not to miss the

18  forest for the trees, you were saying, essentially, don't get

19  so hung up on the payouts, right?

20  A.   Yes.

21  Q.   Because the book advance total is just the floor, right?

22  A.   Yes.

23  Q.   And that if the book sells well, we're going to make a lot

24  more money than just the floor, right?

25  A.   Correct.

M1pWave1                          Janklow – Cross

1  Q.  So that was the expectation?

2  A.  Always, yes.

3  Q.  OK.  And then at the end, you said, "Please advise

4  Mr. Darrow," right?

5  A.  Correct.

6  Q.  Who is Mr. Darrow?

7  A.  That was me making a funny comment about Michael being a

8  lawyer.

9  Q.  You're referring to Clarence Darrow?

10  A.  Yes, of course.

11  Q.  The famous defense attorney?

12  A.  Uh-huh.

13  Q.  You had a lot of respect for Mr. Avenatti?

14  A.  Yes.

15  Q.  You trusted his judgment?

16  A.  Yes.

17  Q.  You believed in him?

18  A.  Absolutely.

19  Q.  Now, on the next day, March 22, 2018, when you conveyed the

20  counteroffer to Ms. Richardson, she indicated that her folks at

21  St. Martin's would balk hard at a $250,000 payout, right?

22  A.  Yes.

23  Q.  And she said that because, from the way that she

24  communicated it to you, that they were uncertain about taking

25  that kind of a risk with Ms. Daniels, weren't they?

1    A.  I think it was more to do with how fast everything was

2    moving and that they felt they were making a very handsome

3    offer, and they were trying to mitigate their use of capital.

4              MR. DALACK:  OK.  Can we please pull up for the

5    witness what's been marked as LJ13, please.  LJ, Ms. Vicari.

6    Q.  Do you recognize the document in front of you?

7    A.  Looks like an email from Michael to me and Bennett.

8    Q.  Could you look more closely, please?

9    A.  Yes.

10   Q.  And?

11   A.  Sally writing to me, yes.  I recognize it.

12   Q.  OK.  What is it?

13   A.  Well, it's a couple of notes, but are you referring to the

14   middle?

15   Q.  Just the whole document.  What does the document reflect?

16   What does it look like to you?

17   A.  An email.

18   Q.  All right.  Who is the email between?

19   A.  Well, it's several people.

20   Q.  OK.  Who are those people?

21   A.  Sally Richardson and myself, Clair Ellers at Macmillan, and

22   Michael Avenatti, myself and Bennett Ashley, who is counsel at

23   my office.

24             MR. DALACK:  OK.  So, your Honor, I offer into

25   evidence LJ13.

M1pWave1                          Janklow – Cross

1              THE COURT:  Any objection?

2              MR. PODOLSKY:  No, your Honor.

3              THE COURT:  Admitted.

4              (Defendant's Exhibit LJ13 received in evidence)

5              MR. DALACK:  Thank you.  Please publish to the jury.

6    Q.  Now, according to this email, on March 22, 2018,

7    Ms. Richardson and the folks at St. Martin's Press sent you a

8    proposed contract, right?

9    A.  Yes.

10   Q.  And above there, Sally Richardson noted:  "Luke, here you

11   are.  The on-signing is written as 200,000 but OK to change to

12   250,000 if all else in agreement."  Right?

13   A.  Yes.

14   Q.  So essentially, you had prevailed, you and Mr. Avenatti had

15   prevailed in getting a higher advance for Ms. Daniels up front

16   as a first payment, right?

17   A.  Higher first payment, not a higher advance.

18   Q.  Sorry.  A higher first payment?

19   A.  Yes.

20   Q.  Assuming that the rest of the contract was in agreement?

21   A.  Correct.

22   Q.  And the dates between March 23 and March 25, the contract

23   was sort of in flux, wasn't it?

24   A.  No.  It was being reviewed.

25   Q.  You were reviewing it?

M1pWave1                      Janklow – Cross

1    A.  Yes.

2    Q.  Mr. Avenatti was reviewing it?

3    A.  Yup.

4    Q.  He was also, to your knowledge, preparing for the 60

5    Minutes interview, right?

6    A.  I assume so.

7    Q.  He was working with his client, as far as you were

8    concerned?

9    A.  Yeah.

10   Q.  As far as you were aware, he was taking the contract back

11   to Ms. Daniels?

12   A.  I was not aware of that.

13   Q.  You weren't in touch with Ms. Daniels, were you?

14   A.  No.

15   Q.  And at this point, in fact, you hadn't even executed a

16   signed fee agreement with Ms. Daniels, right?

17   A.  I don't remember the time -- I have to look.  I don't

18   remember the timing on the retainer.  Everything was moving

19   very fast.

20         MR. DALACK:  Well, let's just pull up for a moment

21   what's been marked as Government Exhibit 103, which I believe

22   is already in evidence.

23   Q.  Do you recognize this document?

24   A.  Yes, that's my retainer.

25   Q.  Retainer agreement.  What's the date on that?

M1pWave1                        Janklow – Cross

1    A.  April 13.

2              MR. DALACK:  Can we scroll to the bottom, please.

3    Q.  That's your signature there?

4    A.  Yeah.

5    Q.  That's Ms. Daniels's signature?

6    A.  Yes, it is.

7    Q.  So as of March 22, 2018, you did not have a signed fee

8    agreement with Ms. Daniels, right?

9    A.  Correct.

10   Q.  You and Mr. Avenatti were still negotiating on her behalf

11   with the book publisher, right?

12   A.  Yes.

13   Q.  And you were not in touch with Ms. Daniels directly about

14   the contract at this point?

15   A.  Correct.

16   Q.  Mr. Avenatti was, to your knowledge?

17   A.  I assumed it.

18   Q.  Right.  And you were relying on those representations?

19   A.  Yes.  He was her lawyer.

20   Q.  You were taking it back to the book publisher?

21   A.  Yes.

22   Q.  You had no problems with that, right?

23   A.  No.

24   Q.  You had no problems assuming and you understood that Mr.

25   Avenatti had the authority to act on Ms. Daniels's behalf at

1    that point, right?

2    A.  That's what I believed.

3    Q.  And you understood he had the authority to make financial

4    decisions on her behalf at least with respect to the book

5    contract, right?

6    A.  Yes.

7    Q.  Because at that point you didn't have the authority, right?

8    A.  Not right.  I -- I had the authority to negotiate a deal.

9    Q.  Well, that was through Mr. Avenatti, wasn't it?

10   A.  No, it wasn't.  I had negotiated the deal directly with the

11   publisher.  Mr. Avenatti was next to me in discussing the

12   terms.  I was the voice to the publisher, and Mr. Avenatti was

13   the voice to Stormy to get her approval on the terms.

14   Q.  My question, Mr. Janklow, is the work that you were doing

15   was not anchored by a fee agreement, was it?

16   A.  It was -- there was no signed retainer yet, no.

17   Q.  You were relying on Mr. Avenatti's representation that

18   Ms. Daniels was OK with you negotiating on her behalf alongside

19   him, weren't you?

20   A.  Yes.

21   Q.  There were no problems with that reliance, were there?

22   A.  No.

23   Q.  Now, on March 25, 2018, do you remember whether you and Mr.

24   Avenatti had a conversation about the book contract?

25   A.  I don't remember it specifically, but I assume we did,

1  considering we were talking about it on the 23rd.

2            MR. DALACK:  OK.  Can we please pull up for the

3  witness what's been marked as LJ189, please.

4  Q.  Do you recognize the document in front of you, Mr. Janklow?

5  A.  That's an email.

6  Q.  And who is the email between?

7  A.  Myself, Bennett Ashley, and Michael Avenatti.

8            MR. DALACK:  Your Honor, I offer into evidence LJ189.

9            THE COURT:  Any objection?

10            MR. PODOLSKY:  Is it just this page?  I'm not sure

11  what's being offered into evidence.

12            MR. DALACK:  Just this page.

13            MR. PODOLSKY:  Relevance and hearsay, your Honor.

14            THE COURT:  Sustained.

15            MR. DALACK:  Your Honor, I'm not offering it for the

16  truth of the matter asserted, just for the state of mind of the

17  witness.

18            THE COURT:  I understand.  The objection's sustained,

19  and I'd like you to move on to the next line very shortly.

20            MR. DALACK:  Sure.  Can we please just pull up for the

21  witness only LJ189.

22  Q.  Mr. Janklow, looking at that document, does it refresh your

23  recollection that on or about March 25, 2018, you and Mr.

24  Avenatti were discussing the contract?

25  A.  Yes, it does.

1    Q.  OK.  And that was, again, close in time to the 60 Minutes

2    interview, wasn't it?

3    A.  I -- I guess so, yes.

4    Q.  And does this refresh your recollection that Mr. Avenatti

5    was going to review the contract as soon as possible?

6                MR. PODOLSKY:  Objection.

7                THE COURT:  Sustained.

8                Please take the document down.

9                MR. DALACK:  Yes.

10               THE COURT:  Thank you.

11   BY MR. DALACK:

12   Q.  At this point, again, Mr. Janklow, you had not had any

13   conversations with Ms. Daniels about the contract, right?

14   A.  Correct.

15   Q.  You were relying on Mr. Avenatti to have those

16   conversations with Ms. Daniels?

17   A.  He was her attorney, so yes.

18   Q.  And if Mr. Avenatti told you that Ms. Daniels was OK with

19   the contract, you were ready to proceed, right?

20   A.  Absolutely.

21   Q.  You were waiting on Mr. Avenatti to take that contract to

22   Ms. Daniels and give you the approval?

23   A.  Yes.

24   Q.  OK.  At this time, while this contract was being hashed

25   out, it was a pretty exciting moment for you, wasn't it?

M1pWave1                          Janklow - Cross

1    A.  Yeah.

2    Q.  As you testified yesterday, Mr. Avenatti was a folk hero

3    for you, right?

4    A.  Yeah, I thought the whole thing was really interesting and

5    really exciting and, considering I work in the book business, a

6    fairly exciting moment.  Yes.

7    Q.  And you were excited to be a part of it, weren't you?

8    A.  Yes, happy to be a part of it.

9    Q.  And you remember you reading in the New York Times an

10   article about Stormy Daniels, don't you?

11            MR. PODOLSKY:  Objection.

12            THE COURT:  Sustained.

13   BY MR. DALACK:

14   Q.  Mr. Janklow, while you were negotiating this book deal with

15   Mr. Avenatti, you were aware that he was also doing work with

16   Ms. Daniels with respect to his case against -- her case

17   against President Trump, weren't you?

18            MR. PODOLSKY:  Objection.

19            THE COURT:  Sustained.

20   BY MR. DALACK:

21   Q.  Mr. Janklow, were you aware that Mr. Avenatti and

22   Ms. Daniels had a case against President Trump?

23   A.  Yes.

24   Q.  And at the time that you were negotiating this book deal,

25   were you aware from the news that that case was active?

1          MR. PODOLSKY:  Objection.

2          THE COURT:  Sustained.

3   BY MR. DALACK:

4   Q.  All right.  Mr. Janklow, do you remember when you had a

5   meeting with Steve Cohen from Macmillan?

6   A.  No.

7          MR. DALACK:  All right.  Can we please pull up for the

8   witness what's been marked as Defense Exhibit R9.

9   Q.  Do you recognize this document in front of you?

10  A.  It's a text exchange.

11  Q.  OK.  And what is the text exchange -- who is the text

12  exchange between?

13  A.  Myself and Mr. Avenatti.

14  Q.  OK.  And this text exchange concerns your negotiations with

15  Macmillan, doesn't it?

16  A.  Yes.

17         MR. DALACK:  Your Honor, I offer into evidence Defense

18  Exhibit R9.

19         MR. PODOLSKY:  Objection.  Relevance, among other

20  things.

21         THE COURT:  Sustained.

22         MR. DALACK:  All right.  Just leaving this up for the

23  witness only at the moment, Ms. Vicari.

24  Q.  Mr. Janklow, does this refresh your recollection that on

25  March 27, 2018, you reached out to Mr. Avenatti about the

M1pWave1                        Janklow - Cross

1    status of the contract?

2                MR. PODOLSKY:  Objection.

3                THE COURT:  Sustained.

4    BY MR. DALACK:

5    Q.  Mr. Janklow, do you remember when -- do you recall on March

6    27, 2018, you reached out to Mr. Avenatti and asked him about

7    the status of the contract?

8    A.  I don't remember that.

9    Q.  OK.  Looking at the document in front of you, does this

10   refresh your recollection that on March 27, 2018, you reached

11   out to Mr. Avenatti to ask him about the status of the

12   contract?

13   A.  It's on the page, but it doesn't refresh my memory.

14   Q.  Because you don't recall that?

15   A.  No, not -- not that date.

16   Q.  Well, do you recall having a meeting with Steve Cohen from

17   Macmillan and Mr. Avenatti?

18   A.  Yes.  There were others there as well, but yes.

19   Q.  And you invited Mr. Avenatti to that meeting, right?

20   A.  I believe it was called specifically for him.

21   Q.  And Steve Cohen is the chief operating officer of

22   Macmillan, isn't he?

23   A.  Correct.

24   Q.  And the purpose of that meeting was to discuss the pending

25   contract, wasn't it?

M1pWave1                           Janklow - Cross

1    A.  The purpose of that meeting was to calm the publisher down.

2    Q.  And why did the publisher need any calming down?

3    A.  Because they were operating at a very fast pace for them.

4    They were being pushed by me and Mr. Avenatti to go faster.

5    They had not met the principal in person.  They had had a short

6    video call with her, and everything about this deal was very

7    unusual for the publishing business.

8    Q.  Because it was happening so quickly, wasn't it?

9    A.  Yes.

10           THE COURT:  By principal, you mean Ms. Daniels.

11           THE WITNESS:  Yes.  Sorry.

12           THE COURT:  Can we take the document down, please.

13   BY MR. DALACK:

14   Q.  At that meeting, which you invited Mr. Avenatti to, you

15   were participating in that meeting, right?

16   A.  Yes.

17   Q.  You listened to what Mr. Avenatti had to say?

18   A.  Yes.  We worked together.

19   Q.  He spoke directly to Mr. Cohen?

20   A.  Absolutely.

21   Q.  And it was your impression that Mr. Avenatti assuaged

22   Mr. Cohen's concerns, wasn't it?

23           MR. PODOLSKY:  Objection.

24           THE COURT:  Sustained.

25   BY MR. DALACK:

1    Q.  At the conclusion of that meeting, Mr. Cohen reached out to

2    you, didn't he?

3    A.  Yes.

4    Q.  And he thanked you for coming to the meeting, right?

5    A.  Yes.

6    Q.  He said "please also thank Mr. Avenatti," didn't he?

7    A.  Yes.

8    Q.  And you forwarded that message to Mr. Avenatti, didn't you?

9    A.  Yes.

10   Q.  And in that same message, you told Mr. Avenatti, "well

11   played, sir," isn't that correct?

12   A.  Yes.

13   Q.  And that's because Mr. Avenatti played a pivotal role in

14   that meeting with respect to Mr. Cohen, didn't he?

15   A.  He played a fundamental role in bringing the deal back to a

16   calmer place, given its unusual nature.

17   Q.  He played a pivotal role in reassuring the publisher that

18   they were doing the right thing with respect to the book

19   contract, right?

20   A.  I don't know if I'd say pivotal, but he played a strong

21   role, yes.

22   Q.  OK.  Do you remember -- I'm sorry.

23       After that meeting with Steve Cohen, there was another

24   draft of the contract, wasn't there?

25   A.  I don't remember.  There usually are multiple drafts.

M1pWave1                      Janklow - Cross

1   Q.  OK.  In fact, you received, after that meeting with Steve

2   Cohen, a few days later, an updated draft that had an escrow

3   clause for the $250,000 first payment, isn't that true?

4   A.  It was an escrow -- I think it was for that payment, yeah.

5   Proposed, yes.

6   Q.  Right.  And that was the first time in this context of the

7   contractual negotiations that the book publisher had proposed

8   an escrow clause as to any of the payments associated with the

9   book advance, right?

10  A.  Yes.

11  Q.  And just for clarity for the jury, an escrow clause

12  essentially means that the money would not go directly to

13  Ms. Daniels, right?

14  A.  That's -- it means that there may be paid to an interim

15  account and will be passed on to her once she fulfilled

16  obligations in the contract.

17  Q.  So bringing it back to my question, the escrow clause meant

18  that the payment wouldn't go directly to Ms. Daniels, right?

19  A.  Yes.

20  Q.  And that, instead, it would be held in an account, right?

21  A.  Yes.

22  Q.  For the purposes of making sure that Ms. Daniels adhered to

23  her contractual obligations, right?

24  A.  Yes.

25  Q.  Before she got paid?

1   A.  Yes.

2   Q.  And you were very frustrated about this, weren't you?

3   A.  I rejected it out of hand.  It's absurd.

4   Q.  Well, in fact, you forwarded the contract to Mr. Avenatti,

5   and you told him not to be upset, didn't you?

6   A.  Yes, because it was absurd; it was going to go away.

7   Q.  Well, but you didn't reject it out of hand to the

8   publisher, right?

9   A.  Yes, I did.

10  Q.  But you forwarded it to Mr. Avenatti and asked for his

11  opinion on the escrow clause, isn't that right?

12  A.  No.  I sent it to him because I sent him everything,

13  because he was her lawyer, and I wanted him to see the process

14  of the negotiation and how absurd this gesture on their part

15  was.

16          MR. DALACK:  Can we please pull up for the witness

17  what's been marked as LJ293, please.

18          THE COURT:  Mr. Dalack, I'm going to caution you

19  again.  If you can bring this line to a close, you should.

20          MR. DALACK:  Thank you, your Honor.

21  Q.  Do you recognize this document here, Mr. Janklow?

22  A.  Yes, it's an email.

23  Q.  OK.  It's an email between whom?

24  A.  Mr. Avenatti, Bennett Ashley and myself and Michael Steger,

25  who is another -- who is a contract manager in my office.  And

1    Sally Richardson, from the publisher.

2    Q.  Thank you.  And this email concerns the escrow clause,

3    doesn't it?

4    A.  It doesn't say that in this note.

5    Q.  Well, there's an attachment to this email, isn't there?

6    A.  There's a line that says attachment.  I don't see it.

7            MR. DALACK:  OK.  Can you please pull up for the

8    witness 294 through 326.

9            Scroll down, please, Ms. Vicari.  Scroll down again.

10           Pause there for a second.

11   Q.  Do you recognize this document in front of you, Mr.

12   Janklow?

13   A.  Yes.  This is a draft of the contract.

14   Q.  And this draft of the contract includes the escrow clause,

15   doesn't it?

16   A.  Yes, it does.

17           MR. DALACK:  Your Honor, I'd like to offer into

18   evidence LJ293 through 326.

19           MR. PODOLSKY:  Objection.  Relevance.  Cumulative.

20           THE COURT:  Sustained.

21   BY MR. DALACK:

22   Q.  With respect to the escrow clause in the contract, you

23   forwarded it to Mr. Avenatti, right?

24   A.  I forwarded every draft, and there were more than -- it was

25   more than just this one.

M1pWave1                     Janklow - Cross

1   Q.  And when you forwarded the email or the contract to Mr.

2   Avenatti, you told him "try not to blow your top," right?

3   A.  Yeah.

4   Q.  Because you anticipated that he'd be very upset about the

5   escrow clause, right?

6   A.  Not as upset as I was.

7   Q.  Well, between the two of you, you were trying to get as

8   much money up front for Ms. Daniels as possible, right?

9   A.  We were just moving the payments around to her -- to the

10  best result and what Michael wanted.

11  Q.  And this escrow clause was a huge setback in those

12  negotiations, wasn't it?

13  A.  It was a bluff on the part of the publisher, in my

14  estimation.

15  Q.  Well, when the publisher discussed with you why they wanted

16  an escrow clause, they explained that to you, right?

17  A.  Yes.

18  Q.  The publisher was concerned about Ms. Daniels being able to

19  adhere to the terms of the contract, weren't they?

20           MR. PODOLSKY:  Objection.

21           THE COURT:  Sustained.

22  BY MR. DALACK:

23  Q.  Mr. Janklow, did the publisher explain to you why they

24  included an escrow clause in this revised edition of the

25  contract?

M1pWave1                          Janklow - Cross

1           MR. PODOLSKY:  Objection.

2           THE COURT:  Sustained.

3           Mr. Dalack, next line of questioning, please.

4    BY MR. DALACK:

5    Q.  Well, after they proposed the escrow clause, you took it to

6    Mr. Avenatti, he countered; he said "should we find a new

7    publisher," didn't he?

8    A.  I don't remember, but it sounds like him.

9    Q.  And after you took this escrow clause contract back to Mr.

10   Avenatti, your contracts director -- was that Bennett Ashley?

11   A.  He's our counsel.

12   Q.  OK.  He sent Mr. Avenatti a draft of the agreement without

13   the escrow clause, didn't he?

14           MR. PODOLSKY:  Objection.

15           THE COURT:  Sustained.

16           Mr. Dalack, next line, please.

17           MR. DALACK:  OK.

18   Q.  Ultimately, Mr. Janklow, the contract was approved with

19   Macmillan without an escrow clause, wasn't it?

20   A.  Yes.

21   Q.  And that book contract entitled Ms. Daniels to $250,000 as

22   a first payment, right?

23   A.  Yes.

24   Q.  Directly to her, correct?

25   A.  To Stormy Entertainment.

M1pWave1                     Janklow - Cross

1    Q.  To Stormy Entertainment.  Without any escrow provision,

2    right?

3    A.  Yes.

4    Q.  Now, that payment came through on April 11, 2018, right?

5    A.  I believe so.

6    Q.  You testified on direct examination that --

7    A.  Yes.

8    Q.  -- that's when the wire was sent from Janklow & Nesbit

9    Associates to Stormy Entertainment, right?

10   A.  I think everything happened the same day.  It was signed.

11   It was paid.  It was paid out, yeah.

12   Q.  But it wasn't actually countersigned by the publisher on

13   that date, was it?

14            MR. PODOLSKY:  Objection.

15            THE COURT:  Sustained.

16   BY MR. DALACK:

17   Q.  Mr. Janklow, when you sent the money to Stormy

18   Entertainment on April 11, 2018, you did not have a

19   countersigned version of the contract from the publisher in

20   hand, did you?

21   A.  I don't know.

22            MR. DALACK:  OK.  Could we please pull up for the

23   witness what's been marked as LJ802, please.

24            Sorry.  We'll first do LJ673.

25   Q.  Do you recognize this document, Mr. Janklow?

1    A.  It's an email.

2    Q.  Who is it between?

3    A.  Me and Mr. Avenatti.

4    Q.  And what does it reflect?

5    A.  Wire instructions.

6    Q.  On April 11, 2018, right?

7    A.  Yes.

8              MR. DALACK:  Your Honor, I offer into evidence LJ673.

9              MR. PODOLSKY:  Cumulative.  This is argumentative,

10   your Honor.

11             THE COURT:  Sustained.

12   BY MR. DALACK:

13   Q.  When Mr. Avenatti sent you the wire instructions for Stormy

14   Entertainment on April 11, 2018, you promptly sent the money

15   over to Stormy Entertainment, right?

16   A.  I believe so, yes.

17   Q.  And later on that day, you asked Mr. Avenatti for the

18   signature page to the book contract, right?

19   A.  I'm not sure of the exact timing of all those, those

20   things.  Everything was happening at once.

21             MR. DALACK:  OK.  Could we please pull back up LJ673

22   for the witness.

23   Q.  Does this refresh your recollection that on or about 3:46

24   p.m. on April 11, 2018, the wire information was sent from --

25   to you from Mr. Avenatti regarding Ms. Daniels?

1   A.  Yes.

2          MR. DALACK:  OK.  Please pull up for the witness

3   what's been marked as LJ802.

4   Q.  What is this document, Mr. Janklow?

5   A.  This is an email.

6   Q.  Between whom?

7   A.  Mr. Avenatti and myself.

8   Q.  And in this email, what are you asking for?

9          MR. PODOLSKY:  Objection.  Not in evidence, your

10  Honor.

11         THE COURT:  Sustained.

12  BY MR. DALACK:

13  Q.  Do you recognize this document, Mr. Janklow?

14  A.  I do.

15  Q.  It's an email exchange between you and Mr. Avenatti on

16  April 11, 2018, isn't it?

17  A.  Yes, it is.

18  Q.  About the signature page for the book contract, right?

19  A.  Yes.

20         MR. DALACK:  Your Honor, I offer LJ802 into evidence.

21         THE COURT:  Sustained.

22         Mr. Dalack, why don't you wrap up your

23  cross-examination.  I'll give you a couple more minutes.

24  BY MR. DALACK:

25  Q.  After you got the signature page from Mr. Avenatti for the

M1pWave1                    Janklow - Cross

1  book contract, you forwarded that along to the publisher,

2  correct?

3  A.  We forwarded the whole contract.

4  Q.  Right.  To the publisher, for a countersignature?

5  A.  With -- yeah, with the signature, of course.

6  Q.  OK.  And before Steve Cohen, the chief operating officer,

7  countersigned the book contract, Ms. Daniels announced an

8  appearance on The View, didn't she?

9  A.  I don't remember exact, the exact timing of those things.

10         MR. DALACK:  OK.  Can we please pull up for the

11  witness what's been marked as LJ857.

12  Q.  Mr. Janklow, do you recognize this document?

13  A.  It's an email from me to Mr. Avenatti.

14  Q.  OK.  Was it from April 11, 2018?

15  A.  Yes, it is.

16         MR. DALACK:  Your Honor, I offer into evidence LJ857.

17         MR. PODOLSKY:  Objection.

18         THE COURT:  Sustained.

19  BY MR. DALACK:

20  Q.  On April 11, 2018, Ms. Daniels announced that she was going

21  to appear on The View, didn't she?

22  A.  I don't know if she announced it then.

23  Q.  OK.  But according to the book contract, Ms. Daniels was

24  supposed to preclear all of her media appearances with the

25  publisher, wasn't she?

M1pWave1                    Janklow - Cross

1   A.  Once the signature -- once the contract was signed by both

2   partied and was enacted --

3   Q.  Right.

4   A.  Prior to that, she was not a retained client of the

5   publisher.

6   Q.  Right.  But when you learned that she was going to do

7   publicity before the countersignature had come in, that shocked

8   you, didn't it?

9   A.  No.

10  Q.  In fact, you wrote to Mr. Avenatti:  "Whoa, Nellie.  Let's

11  at least get a countersigned contract before she goes hog wild,

12  huh"?

13          MR. PODOLSKY:  Objection.

14          THE COURT:  Sustained.

15          Take the document down, please.

16  Q.  All right.  Well, before the countersignature came through,

17  you texted Mr. Avenatti and asked him what you were going to

18  tell Steve Cohen, isn't that correct?

19          MR. PODOLSKY:  Objection.

20          THE COURT:  Sustained.

21          Mr. Dalack, I'll give you a couple more questions and

22  then we're done.

23          MR. DALACK:  Thank you, your Honor.  I need to finish

24  up this portion of the chapter, and then I'll wrap up.

25  Q.  Mr. Janklow, before Steve Cohen countersigned, you wanted

1    to consult with Mr. Avenatti, right?

2    A.  I don't remember.

3              MR. DALACK:  OK.  Can we please pull up for the

4    witness what's been marked as Defense Exhibit R12.

5    Q.  OK.  Do you recognize this document, Mr. Janklow?

6    A.  It's a text conversation between Mr. Avenatti and myself.

7    Q.  And this text conversation reflects a communication about

8    the countersignature on the book contract, doesn't it?

9    A.  I need to read it.  One moment.

10   Q.  OK.

11   A.  Yes.

12             MR. DALACK:  Your Honor, I offer into evidence what's

13   been marked as Defense Exhibit R12.

14             MR. PODOLSKY:  Objection.

15             THE COURT:  Sustained.

16             MR. DALACK:  Your Honor, could we have a brief

17   sidebar, please, on this point?

18             THE COURT:  You may not.

19   BY MR. DALACK:

20   Q.  Mr. Janklow, before Steve Cohen countersigned the book

21   contract, he reached out to you, didn't he?

22   A.  Yes.

23   Q.  OK.  In fact, you had the entire Macmillan team on the

24   phone before they countersigned the book contract, right?

25   A.  Yes.

M1pWave1                        Janklow – Cross

1    Q.  And they made it clear to you that they would not

2    countersign the contract unless Ms. Daniels canceled her

3    appearance on The View, didn't they?

4               MR. PODOLSKY:  Objection, your Honor.

5               THE COURT:  Sustained.

6               I'll give you three more questions, Mr. Dalack.

7    BY MR. DALACK:

8    Q.  Before Macmillan countersigned the contract, they indicated

9    to you that they perceived Ms. Daniels as uncontrollable,

10   right?

11              MR. PODOLSKY:  Objection.

12              THE COURT:  Sustained.

13              MR. DALACK:  I'm not offering it for the truth of the

14   matter asserted, your Honor, just as to the witness's state of

15   mind.

16              THE COURT:  I understand.  Sustained.

17   BY MR. DALACK:

18   Q.  Mr. Janklow, before the countersignature on the contract

19   came through, you had a conversation with Macmillan, right?

20              MR. PODOLSKY:  Objection.

21   BY MR. DALACK:

22   Q.  You communicated with Macmillan about the countersignature,

23   right, Mr. Janklow?

24   A.  Yes.

25   Q.  And they expressed some concerns to you about Ms. Daniels

1    before they countersigned the document, right?

2                MR. PODOLSKY:  Objection.

3                THE COURT:  I'll allow it.  Overruled.

4                Go ahead.

5    A.  Yes.

6    Q.  In fact, the folks at Macmillan indicated to you that they

7    perceived Ms. Daniels to be uncontrollable, didn't they?

8                MR. PODOLSKY:  Objection.

9                THE COURT:  Sustained.

10               All right.  Thank you very much.  We'll proceed with

11   redirect.

12               MR. DALACK:  Your Honor, can I have a brief sidebar,

13   your Honor?

14               THE COURT:  You may not.  Please have a seat.

15   REDIRECT EXAMINATION

16   BY MR. PODOLSKY:

17   Q.  Good morning, Mr. Janklow.

18   A.  Good morning, Mr. Podolsky.

19   Q.  Do you recall that yesterday afternoon, defense counsel

20   asked you some questions about the publicity arrangements

21   concerning Ms. Daniels's book deal?

22   A.  Yes, I do.

23   Q.  And do you recall that he asked you a number of questions

24   about the back-and-forth about the cover of Ms. Daniels's book,

25   Full Disclosure, yesterday?

1    A.  I do.

2    Q.  And do you recall that this morning defense counsel asked

3    you a number of questions about the back-and-forth of contract

4    negotiations?

5    A.  I -- yes.

6    Q.  And do you recall that he asked you about an escrow

7    agreement and about the payment -- the amounts of four

8    payments?

9    A.  Yes.

10   Q.  Do you recall him asking you any questions at all about the

11   second or third payments on the book deal?

12   A.  I do not.

13   Q.  Do you recall him asking you any questions at all about the

14   communications that you had with Ms. Daniels or did not have

15   with Ms. Daniels about those payments?

16   A.  I do not remember that.

17          MR. PODOLSKY:  Nothing further, your Honor.

18          THE COURT:  All right.  Thank you, Mr. Janklow.

19   You're excused.

20          MR. DALACK:  Your Honor, just a --

21          THE COURT:  Mr. Dalack, you've got to use the

22   microphone, but I don't want to hear from you on this.  The

23   witness is excused.

24          Thank you, Mr. Janklow.

25          (Witness excused)

1          MR. DALACK:  We may call him, your Honor, on our case

2      in chief.

3          THE COURT:  And we'll take that up at a different

4      time.  Thank you.

5          Government, call your next witness.

6          MR. SOBELMAN:  The government calls Justin Ellard.

7       JUSTIN ELLARD,

8          called as a witness by the government,

9          having been duly sworn, testified as follows:

10         THE COURT:  You may proceed.

11     DIRECT EXAMINATION

12     BY MR. SOBELMAN:

13     Q.  Good morning, Special Agent Ellard.

14     A.  Good morning.

15     Q.  Where do you currently worth?

16     A.  I work for the U.S. Attorney's Office for the Southern

17     District of New York.

18     Q.  What is your position with the U.S. Attorney's Office?

19     A.  My position is special agent.

20     Q.  Before joining the U.S. Attorney's Office, what, if any,

21     other experiences did you have in law enforcement?

22     A.  I worked for the Department of State with the diplomatic

23     security service.

24     Q.  Approximately how long were you with the diplomatic

25     security service?

M1pWave1                          Ellard - Direct

1    A.  Between three and four years.

2    Q.  What was your role there?

3    A.  I was also a special agent.

4    Q.  Turning back to your current position, what are your duties

5    and responsibilities as a special agent with the U.S.

6    Attorney's Office?

7    A.  I conduct investigations into violations of federal law,

8    and I also assist the assistant United States attorneys with

9    their cases in various ways.

10   Q.  Approximately how long have you been a special agent with

11   the U.S. Attorney's Office?

12   A.  Coming up on five years now.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M1PNAVE2                          Ellard - Direct

1   Q.  Approximately how many arrests have you conducted in your

2   career in law enforcement?

3   A.  I would estimate at this point it's about a hundred.

4   Q.  Approximately how many times have you seized electronic

5   devices during your career in law enforcement?

6   A.  I would estimate it's more than that, probably in the order

7   of several hundred.

8   Q.  I would like to direct your attention to March 25, 2019.

9         Were you working that day?

10  A.  I was.

11  Q.  What did you do that day?

12  A.  I participated in a law enforcement operation that

13  ultimately resulted in the arrest of Mr. Avenatti.

14  Q.  Special Agent Ellard, if you could take a moment and look

15  around the courtroom, and if you see Michael Avenatti please

16  tell us where he is and identify by the clothing he's wearing?

17  A.  I see him now.  He's standing and wearing a black mask and

18  what I believe is a blue tie.

19        THE COURT:  Indicating the defendant.

20  Q.  Special Agent Ellard, where did you arrest the defendant on

21  March 25, 2019?

22  A.  I was in a mall in the Hudson Yards development.

23  Q.  Approximately what time did you arrest the defendant?

24  A.  Late morning, I believe between 10 and 11 o'clock.

25  Q.  What is Hudson Yards?

M1PNAVE2                         Ellard - Direct

1    A.  It's a relatively new real estate development in Manhattan

2    in Midtown on the West Side.

3    Q.  What, if any, authority did you have to arrest the

4    defendant that day?

5    A.  There was an arrest warrant issued by a federal judge in

6    this district.

7    Q.  Who, if anyone, assisted you with the arrest of the

8    defendant?

9    A.  Special Agent DeLeassa Penland, also from the U.S.

10   Attorney's Office.

11   Q.  At the time you placed the defendant under arrest, what, if

12   anything, was the defendant holding?

13   A.  The defendant had a briefcase.

14   Q.  What, if anything, did you do with the defendant's

15   briefcase after placing the defendant under arrest?

16   A.  I seized the briefcase incident to arrest and returned with

17   the briefcase to my office.

18   Q.  Where is your office?

19   A.  The U.S. Attorney's Office.

20   Q.  Where is that located?

21   A.  Very close to here at one St. Andrew's Plaza, about a block

22   south from here.

23   Q.  Did you review the contents of that briefcase?

24   A.  Yes, I conducted an inventory search of the briefcase and

25   its contents.

1    Q.   What is an inventory search?

2    A.   I went through the briefcase and made a list of everything

3    in there, filling out forms along the way.

4    Q.   And is an inventory search a standard practice of law

5    enforcement?

6    A.   Yes, it is.

7    Q.   Had you received training on how to conduct an inventory

8    search?

9    A.   Yes, I did.

10   Q.   What were some of the items that you found in the briefcase

11   when you conducted the inventory search of its contents?

12   A.   Various electronics, to include an iPad, a computer,

13   miscellaneous paperwork, a passport, things of that nature.

14   Q.   Special Agent Ellard, if you could now turn to the object

15   that you walked into court with today.  It's been marked as

16   Government Exhibit 404.  Can you please remove that.  Do you

17   recognize this object?

18   A.   I do.

19   Q.   Can you please describe it for the jury.

20   A.   It is a gray colored computer Mac model, MacBook Pro.

21   Q.   What is it inside of?  Or what was it inside of until you

22   just removed it?

23   A.   It was inside an evidence bag.

24   Q.   What, if anything, generally is indicated on that bag?

25   A.   I recognize my handwriting on the bag.  It indicates the

1    date and time that it was seized and placed in the bag and also

2    the location Hudson Yards Mall.

3    Q.  To be clear, is that an evidence bag?

4    A.  Yes, it is.

5    Q.  Is that a standard item that law enforcement uses to store

6    evidence gathered in the course of its investigation?

7    A.  Yes, it is.

8    Q.  And have you filled out bags like this before?

9    A.  Yes, I have.

10   Q.  How many?

11   A.  Oh, many hundreds.  Maybe approaching a thousand at this

12   point in my career.

13   Q.  Where was this particular item seized from?

14   A.  The briefcase that we discussed earlier.

15   Q.  The briefcase that the defendant was holding at the time he

16   was arrested?

17   A.  Yes.

18   Q.  How do you know that sitting here today?

19   A.  I've checked my records.  I generally recognize it.  And,

20   again, I recognize my handwriting on the evidence bag that it

21   was placed in.

22   Q.  In your experience, after a laptop is seized by law

23   enforcement, like in this instance, what generally happens

24   next?

25   A.  It would be secured in some kind of an evidence vault.

M1PNAVE2                         Ellard - Direct

1    Q.  And what, if anything, might occur after that?

2    A.  Well, in order to search it, a search warrant would have to

3    be obtained and then the computer would have to go to a

4    forensic specialist, who essentially would use the authority

5    therein to make what's called a forensic copy, so an exact copy

6    of all the information that's on that electronic device.

7    Q.  Generally who issues a search warrant?

8    A.  The court.  A judge.

9    Q.  What is a forensic specialist?

10   A.  Someone with special training and the appropriate tools to

11   make a copy of the electronic device without altering the

12   original device.

13   Q.  At any point did you review the contents of this particular

14   laptop which is marked for identification as Government Exhibit

15   404?

16   A.  No, I have not.

17   Q.  Aside from working with Special Agent Penland of the U.S.

18   Attorney's Office to arrest the defendant on March 25, 2019,

19   did you have any other role in the investigation of this case?

20   A.  No.  That was the only involvement I have had with this

21   case.

22            MR. SOBELMAN:  Your Honor, may I just consult briefly?

23            THE COURT:  You may.

24            MR. SOBELMAN:  No further questions, your Honor.

25            THE COURT:  Cross-examination.

1              MR. DALACK:  Very briefly, your Honor.

2    CROSS-EXAMINATION

3    BY MR. DALACK:

4    Q.  Good morning, Special Agent.

5    A.  Good morning.

6    Q.  When you arrested Mr. Avenatti, you arrested him without

7    incident, correct?

8    A.  Yes.

9              MR. DALACK:  Thank you.  No further questions.

10              THE COURT:  All right.

11              Agent Ellard, you may step down.

12              THE WITNESS:  Thank you, your Honor.

13              (Witness excused)

14              THE COURT:  Put your mask on.  You have already done

15    that.  When you pass by counsel table, please leave Government

16    Exhibit 404 with them.

17              Government, please call your next witness.

18              MR. SOBELMAN:  Your Honor, we may just have a brief

19    sidebar regarding a logistical issue.

20              THE COURT:  Sure.

21          (Continued on next page)

22

23

24

25

```
 1                    (At sidebar)
 2                    MR. SOBELMAN:  Your Honor, we have another law
 3         enforcement witness who is just who her way up.  We also could
 4         put on the remote witness, although I know your Honor's
 5         preference would be to do that after lunch.  Either we can wait
 6         one or two minutes for her to make her way up here, or we can
 7         switch to the remote witness now.
 8                    THE COURT:  How long is the next witness, the law
 9         enforcement witness?
10                    MR. SOBELMAN:  Brief.
11                    THE COURT:  Ms. Regnier would be next regardless?
12                    MR. SOBELMAN:  Yes.
13                    THE COURT:  And you need 15 minutes, you think, to set
14         that up.
15                    MR. SOBELMAN:  We could try to do it in less, but I
16         don't want to overpromise and underdeliver.
17                    THE DEPUTY CLERK:  We need time for Will to get up
18         here as well.
19                    THE COURT:  Let's do that.  I will excuse the jury.
20         We need to set up for a remote witness.  Stay here I want to
21         make a record on the Janklow cross, and we'll go from there.
22                    MR. SOBELMAN:  Yes, your Honor.
23                    THE COURT:  Let's get the AV folks up here to do that.
24                    MR. SOBELMAN:  Yes, your Honor.
25                    (Continued on next page)
```

M1PNAVE2                          Ellard - Cross

1              (In open court)

2              THE COURT:  Ladies and gentlemen, much as I like to

3       stick to my schedule, we are going to deviate a little bit from

4       it today for the following reason:

5              The next witness that we will be hearing from will

6       actually be testifying pursuant to a live two-way audio and

7       video feed, that is, testifying remotely from a different

8       location.  As a result, we just need a couple minutes to set it

9       up, make sure that it's working.  I will keep my fingers

10      crossed about that.

11             For that reason, I'm going to excuse you.  We are

12      going to take a short break so that we can deal with those

13      technical needs and we can pick it up from there.  As a result

14      of that I think we'll probably take our lunch break a little

15      bit later than yesterday, but I promise you will have an

16      adequate amount of time for lunch and keep my fingers crossed

17      that your lunch will be down there at that time as well.

18             It is now 10:15.  I will have Ms. Smallman take you

19      down to the jury room in just a moment.  Why don't you be ready

20      to go in ten minutes max.

21             Please bear with us.  We want to obviously make sure

22      that this system is working before we bring you back up here.

23             A couple of quick reminders:

24             One, keep an open mind.  You have not heard all the

25      evidence in the case.

M1PNAVE2                              Ellard - Cross

1              Two, do not discuss the case with one another other or

2      with anyone else for that matter.

3              Three, do not do any research on the case.

4              With that, you're excused and we'll pick up in a

5      couple of minutes.

6              Thank you very much.  We'll see you shortly.

7          (Continued on next page)

M1PNAVE2                        Ellard - Cross

1                (Jury not present)

2                THE COURT:  All right.  While hopefully the tech

3        people are up here in a moment, let me just make a record on

4        the cutting off of Mr. Dalack's cross-examination.

5                At the close of trial yesterday, Mr. Dalack indicated

6        that he would have approximately 30 to 45 minutes of additional

7        cross.  I cut him off at minute 43.

8                By my estimation, in the first 43 minutes of this

9        morning I don't think he asked a single question relevant to

10       this case.  Mr. Avenatti's heavy involvement in the negotiation

11       of the contract, the back and forth of the negotiation of the

12       contract as far as I am concerned has virtually no, if any,

13       relevance to this case.

14               I allowed Mr. Dalack plenty of time yesterday and for

15       that matter this morning before cutting him off to make clear

16       Mr. Avenatti's involvement, Mr. Avenatti's representation of

17       Ms. Daniels, his zealous representation.  I don't think it's

18       particularly relevant to the issues in the case, but to the

19       extent that it is I gave you plenty to work with in argument.

20               The bottom line is, after 43 minutes and after plenty

21       of warnings that you have to move on to different lines and

22       wrap up, I had enough and put an end to it.

23               I think Mr. Podolsky's redirect deftly demonstrated

24       that there was virtually no relevance to much of the cross and

25       certainly this morning's cross.

```
1          That is my reason.  Pursuant to my authority under
2     Rule 611, I think was well within bounds to cut off the cross
3     when I did.  Frankly, I would have been on firm ground doing it
4     much sooner than I did.  I gave you plenty of work with, and
5     that's my ruling.
6          If you want to re-call him and you can make a proffer
7     for why you would want to do it, I will take that up, but I
8     think that is not likely to happen.
9          MR. DALACK:  Can I be heard on that?
10          THE COURT:  You may, but I sincerely doubt it will
11    change anything.
12          MR. DALACK:  With that understanding, I just want to
13    make some points.
14          First, as we opened in this case, the amount and the
15    quality of the work that Mr. Avenatti did for Ms. Daniels in
16    the context of the book contract in particular is certainly
17    relevant to his state of mind and to his understanding and to a
18    reasonable understanding of the fee agreement that they entered
19    into.  So we submit that it is very relevant to the issues in
20    this trial.
21          THE COURT:  And you made that clear, and you certainly
22    developed the record on that amply yesterday and this morning.
23    So why did you need to go on?
24          MR. DALACK:  Because the details matter, your Honor.
25    We had a number of -- you know, to the extent the government
```

1    offered a number of e-mail exchanges and correspondences and

2    text messages between Mr. Janklow and Mr. Avenatti

3    demonstrating their respective states of mind as to various

4    aspects of the book contract and the book deal, we were trying

5    to establish the same but from a different perspective.  One,

6    to illustrate to the jury how much work Mr. Avenatti did and,

7    two, to also show Ms. Daniels' failure in adhering to her ends

8    of the book contract.

9           Your Honor, I had a whole other chapter dedicated to

10   discussing with Mr. Janklow how poorly the book did as a result

11   of Ms. Daniels' failures to adhere to various aspects of her

12   promotional obligations under the contract, which is a

13   significant issue in this case.  Because, as we established

14   through Mr. Janklow, the $800,000 book advance was a floor.  It

15   was not a ceiling.

16          So, had the book sold better, both she and Mr. Janklow

17   would have made more money.  And that goes into motive for

18   Ms. Daniels to, as we submit, fabricate that Mr. Avenatti

19   orally abandoned his interest in the book deal.  The motive

20   being because the sales tanked and because she didn't make any

21   royalties, as Mr. Janklow stated yesterday, from the book deal

22   that she was upset about that and perhaps she blamed Avenatti

23   for those failures, even though the failure of the book to sell

24   well was because, as we were going to establish through

25   Mr. Janklow, was through had her own failings in adhering to

1    the promotional obligations.  I think we do have strong grounds

2    for re-calling Mr. Janklow in our direct case to establish that

3    fact and to illustrate that for the jury.

4         And I submit that it would still be appropriate for us

5    to delve into with a little bit more detail the issue that I

6    was trying to flesh out at the end there, despite counsel's

7    objections, as to the chaos that was surrounding the final

8    moments surrounding the signing of the actual book contract.

9         What's also notable that I wasn't able to get to

10   because I was told to sit down is that Mr. Janklow was actually

11   paid and took money from the publisher before he actually had a

12   signed fee agreement with Ms. Daniels, which is also an

13   important concept for the jury to understand how some of these

14   financial transactions take place.

15        THE COURT:  Okay.  I don't see the relevance of that.

16   Be that as it may, that was in the record.  You have the

17   record.  It is in the record the dates on which the contracts,

18   the relevant contracts were signed.  It's in the record the

19   dates on which those payments were made.  You can make that

20   argument.

21        Number two, it is in the record that he expected it to

22   make much more money than it did and that it didn't make enough

23   money to pay her more than the advance.  So you can make that

24   argument.

25        Number three, if you had a whole other line of cross,

1   I gave you I think six or seven warnings that you needed to

2   bring that line to a close and move on, and you failed to take

3   the hint.  So that is on you.

4           Bottom line, 45 minutes I don't think there was a

5   single relevant question.  I was well within my authority under

6   Rule 611 in cutting you off.  I don't see any grounds for you

7   to re-call him.

8           If you have an application on that, I will hear from

9   the government on that later.  But since your defense case is

10  not going to be anytime soon, we don't need to take that up

11  now.

12          MR. DALACK:  May I confer with Mr. Baum, your Honor,

13  on this point.

14          THE COURT:  You can confer all you want because the

15  tech folks are here and they are going to take care of it and I

16  am going to step off the bench.

17          (Recess)

18          MR. BAUM:  Judge, may I be heard?

19          THE COURT:  I think Ms. Regnier is present, is that

20  correct, by video?

21          MR. SOBELMAN:  Yes, your Honor.

22          MR. BAUM:  Judge, is there a way to go sidebar?

23          MR. SOBELMAN:  We could do a sidebar or I can ask the

24  witness to mute her computer and we could text her when the

25  court is done.

1              THE COURT:  Why don't we do that.

2              MR. SOBELMAN:  Ms. Regnier, can you hear me?

3              THE WITNESS:  Yes.

4              MR. SOBELMAN:  Would you please mute the sound on your

5   computer so you cannot hear us, and then Special Agent Penland

6   will text you when you should unmute.  Okay?

7              THE WITNESS:  Yes.

8              MR. SOBELMAN:  Thank you.

9              THE COURT:  Does anyone know if I have a screen on

10  which I can see Ms. Regnier.  I fear that that was -- in any

11  event, we'll cover that in a moment.

12             Yes, Mr. Baum, briefly.

13             MR. BAUM:  Yes, your Honor, very briefly.

14             A serious issue has arisen concerning our continued

15  representation of Mr. Avenatti.  We need a brief recess.  I

16  apologize.  We need a recess to try and iron this out.  It is

17  serious enough to warrant a recess, because Mr. Avenatti may

18  request the Court's permission to represent himself.

19             THE COURT:  Mr. Baum, I don't dispute the seriousness

20  of that issue, but the right to represent one's self in a

21  criminal trial is qualified once the trial begins.  Among other

22  things, I am not going to let it disrupt the rest of the trial.

23             The witness is here ready to go.  The jury was told

24  they would be out for ten or fifteen minutes.  I am not doing

25  it right now.  So you can take it up at the break, the longer

1    break today, and we can address it later, but I am not going to

2    waste the jury's time.  So it is not happening now.

3            Two other --

4            THE DEFENDANT:  Judge --

5            THE COURT:  Mr. Avenatti, please have a seat.

6            THE DEFENDANT:  Judge --

7            THE COURT:  Mr. Avenatti, please have a seat.  Thank

8    you.

9            MR. BAUM:  If Mr. Avenatti desires to represent

10   himself, he has a right to make that request to the Court.

11           THE COURT:  And it is qualified right once the trial

12   begins, which it certainly has.  So I am not taking it up right

13   now.  I am not going to waste the jury's time at this moment

14   when we have two-way feed with a witness who's ready to go.

15           I mean, the fact of the matter is very little of

16   consequence is going to happen before the next break for

17   purposes of counsel's performance.  You can make objections to

18   the direct, but beyond that Mr. Avenatti will have very little

19   prejudice in waiting until the longer break to discuss this

20   with you.

21           I don't dispute the seriousness of it.  I understand

22   it.  But the law is very clear that it is a qualified right

23   once trial begins, and I have ample authority to control the

24   management and conduct of this trial, and I am not going to let

25   it disrupt the trial right now.  So that's my ruling.

1          Two other things:

2          Number one, Mr. Avenatti has been standing when

3    witnesses have been asked to identify him.  I suppose that's

4    fine with me if he wishes to.  I don't think identification is

5    particularly critical in this trial, but he certainly doesn't

6    need to.  I want to make that clear.

7          Second, a quick question.  I got a motion from a

8    nonparty or a lawyer representing a nonparty by the name of

9    Justin I think Loupe, L-o-u-p-e, who apparently received a

10   defense subpoena and is asking me to unseal, I think this is

11   the documents pertaining to the pretrial motions to quash the

12   defense subpoena with respect to Ms. Regnier and the

13   cross-examination of Ms. Clifford, he says because he's just

14   not sure if they're relevant to the potential need for him to

15   file a motion to quash.

16         I think I'm comfortable saying they are not relevant.

17   But that being said, because I don't know who Mr. Loupe is I am

18   not sure I'm in a position to -- well, I am looking for

19   confirmation of that.

20         Does anyone know who Mr. Loupe is, and can I deny it

21   on the ground that those documents are not relevant to him?

22         Ms. Smallman, you can go get the jury.

23         MR. SOBELMAN:  We can explain what we know, but it is

24   a defense subpoena so we defer to them on it if they want to

25   explain the purpose of this.

1            THE COURT:  I don't care about the purpose of the

2    subpoena.  I just want to confirm that the pretrial litigation

3    regarding Ms. Regnier's medical records and Ms. Clifford's

4    cross-examination are not relevant to Mr. Loupe's potential

5    motion to quash.

6            MR. SOBELMAN:  The items with respect to Ms. Regnier's

7    litigation, certainly not.  I suppose there could be an

8    argument that the motion with respect to Ms. Daniels'

9    cross-examination could be relevant.  We have no objection to

10   those materials being provided to Mr. Loupe's lawyer for the

11   purposes of this litigation only.

12           THE COURT:  Okay.

13           Defense counsel?

14           MR. BAUM:  We object to any unsealing.  While we do

15   agree that the Ms. Daniels' cross-examination issues may be

16   relevant, we anticipated Mr. Loupe's testimony to be beyond

17   that.

18           THE COURT:  Beyond?

19           MR. BAUM:  Beyond what's in Ms. Daniels'

20   cross-examination.

21           THE COURT:  All right.  But since you concede that it

22   is may be relevant and he is entitled to make his arguments

23   about quashing, I will unseal those documents for the limited

24   purpose of providing them to Mr. Loupe's lawyer and only in

25   connection with this case.  I also anticipate that those

M1PNAVE2                         Ellard - Cross

1   documents will be unsealed, albeit perhaps with redactions, in

2   the next day or two, so I'll do that.  But thank you very much.

3           All right.  Why don't you get Ms. Regnier unmuted and

4   we can go from there

5           MR. AMBROSIO:  Your Honor, I just want to put on the

6   record, I'm Thomas Ambrosio.  I'm Ms. Regnier's attorney.  I

7   don't know if she can see me.  I wanted to make sure SHE knows

8   I'm here in the event she needs to consult with me.

9           THE COURT:  All right.  Thank you.

10           Ms. Regnier, are you able to hear me?

11           THE WITNESS:  Yes, I am.

12           THE COURT:  All right.  Good afternoon.

13           Can I confirm, my understanding is that you can see

14   the jury box; you can see the podium, which right now looks

15   like a plexiglass box with a reflection in it; and you can see

16   Mr. Avenatti.

17           Is that correct?

18           THE WITNESS:  Yes, I can.

19           THE COURT:  Just to advise you, your counsel,

20   Mr. Ambrosio, is present in the courtroom.  Because of the

21   number of cameras, you are not able to see him, but he is

22   present.

23           Let me also just state my understanding is that,

24   because of our need for cameras, there's no longer a video feed

25   certainly to the press room probably the overflow courtrooms.

M1PNAVE2                          Ellard - Cross

1    It's just audio for purposes of this witness.  It is what it

2    is.  There's some additional room in the courtroom itself, so

3    certainly no public trial issues, but I just wanted to alert

4    folks to that.

5            All right.  We are awaiting the jury, which is on its

6    way up.  When it gets here we will proceed.

7            All right.  The jury is going to come in in a moment.

8        (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  You may be seated.

3          Welcome back, ladies and gentlemen.  Thank you for

4    your patience.  As I said, we needed to just deal with the

5    technical issues involved with this next witness, who will be

6    testifying remotely by two-way video.  To be clear, hopefully

7    all of you can see the witness on the screen.  If not, please

8    signal to me in some way that you can't.

9          Good.  So you should be able to see her.

10          Just so you understand, she is able to see all of you

11    as well as the defense table, me, and the podium where counsel

12    will be inquiring from.

13          So you are to consider her testimony as you would the

14    testimony of any witness testifying in the courtroom itself.

15    You shouldn't concern yourselves with the fact that she's

16    testifying remotely, but obviously what weight, if any, you

17    give her testimony is yours to decide, as it is for any

18    witness.

19          Now, with that, government please call your next

20    witness.

21          MR. SOBELMAN:  The government calls Judy Regnier.

22    JUDY REGNIER,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25          THE COURT:  All right.  Counsel, you may proceed.

1    Let's keep our fingers crossed that this all works.

2            Go ahead.

3    DIRECT EXAMINATION

4    BY MR. SOBELMAN:

5    Q.  Good morning, Ms. Regnier.

6    A.  Good morning.

7    Q.  Where do you currently work?

8    A.  I'm currently unemployed.

9    Q.  When were you last employed?

10   A.  March of 2019.

11   Q.  At that time who did you work for?

12   A.  I worked for the law firm of Eagan Avenatti.

13   Q.  And at that time -- sorry in March -- sorry, in 2018 and

14   early 2019, who managed that law firm?

15   A.  Michael Avenatti.

16   Q.  In 2018 and early 2019, who was your direct supervisor?

17   A.  Michael Avenatti.

18   Q.  Ms. Regnier, if you could please look at the windows on the

19   screen and let us know if you see Michael Avenatti, describe

20   him and identify him by an item of clothing he's wearing.

21   A.  He's wearing glasses and a black mask and I believe a blue

22   suit.

23           THE COURT:  Indicating the defendant.

24   Q.  Ms. Regnier, was the defendant's law firm based in

25   California?

1   A.  Yes, it was.

2   Q.  When did your employment with the law firm end?

3   A.  March 25, 2019.

4   Q.  Approximately how long did you work for the defendant

5   before March 25, 2019?

6   A.  Approximately 11 years.

7   Q.  I am now going to ask you some questions about your work

8   for the defendant.  Focusing on 2018 and early 2019, what were

9   your duties and responsibilities?

10  A.  I was a paralegal and the office manager.

11  Q.  What was your role as a paralegal at the defendant's law

12  firm?

13  A.  As a paralegal, it was to maintain databases, exhibits, to

14  assist with responses to discovery.  We had class action cases

15  where it was the staff's responsibility to contact the various

16  members of the class actions and that type of thing, to assist

17  at trial.

18  Q.  What was your role as the office manager for the

19  defendant's law firm?

20  A.  It was to oversee the staff, not the attorneys but the

21  staff, and to maintain the running of the office, making sure

22  supplies were ordered, paying overhead expenses and kind of

23  overseeing the bank accounts for Mr. Avenatti.  That's pretty

24  much it.

25  Q.  Who, if anyone, directed your actions regarding the law

1   firm's finances?

2   A.  Mr. Avenatti.

3   Q.  What, if any, role did you have in checking the bank

4   accounts' balances?

5   A.  I checked the bank balances for the various accounts by

6   Mr. Avenatti and the firm daily and at times multiple times a

7   day at Mr. Avenatti's request.

8   Q.  Why did you check the bank account balances every day?

9   A.  At that point in time the firm was very, very low on cash,

10  and it was a matter of trying to keep the firm open to pay

11  salaries and to keep the firm going.

12  Q.  Just to be clear, the time period we are speaking about is

13  2018 and early 2019, is that correct?

14  A.  Yes, it is.

15          MS. GIWA:  Objection, your Honor.

16          THE COURT:  Overruled.

17  Q.  Did you ever make financial decisions or payments on behalf

18  of the law firm without defendant's approval?

19  A.  No.  That was one of Michael's cardinal rules, is that all

20  finances were approved by him.  And as he stated many times to

21  everyone, it was his law firm, and he needed to approve them.

22  He's very much a micromanager.

23          MR. SOBELMAN:  Can we please show the witness what's

24  marked for identification as Government Exhibit 3.

25  BY MR. SOBELMAN:

1   Q.  Ms. Regnier, can you see the document marked as Government

2   Exhibit 3 on your other screen?

3   A.  Yes, I can.

4   Q.  And do you recognize this document?

5   A.  Yes, I do.

6   Q.  What is it?

7   A.  It is an attorney-client fee contract between the firm and

8   Ms. Daniels.

9          MR. SOBELMAN:  The government offers Government

10  Exhibit 3.

11         MS. GIWA:  We have no objection.

12         THE COURT:  Admitted.

13         (Government Exhibit 3 received in evidence)

14         MR. SOBELMAN:  Please display it for the jury.

15  BY MR. SOBELMAN:

16  Q.  Ms. Regnier, could you please read the date and title of

17  this document?

18  A.  February 27, 2018, Attorney-Client Fee Contract.

19  Q.  As of February 27, 2018, how were documents like this one

20  created at the defendant's law firm?

21  A.  This type of document was a form that was on the computer,

22  and it basically had blanks for the parties, the scope of

23  services, the legal fees, that type of thing.  So either

24  Mr. Avenatti would provide me the information to insert into

25  the document or I would send him basically the form document

1  and he would insert the information and I would make sure it

2  was in final form.

3  Q.  Let's focus in on the first paragraph that begins, "This

4  attorney-client fee contract."

5      Ms. Regnier, could you please read this document.

6  A.  "This attorney-client fee contract (this 'Agreement') is

7  the written fee contract that California law requires lawyers

8  to have with their client.  It is between Eagan Avenatti LLP;

9  Avenatti & Associates, APC; and Michael J. Avenatti Esq.

10 (collectively the 'Attorney') on the one hand and Stephanie

11 Clifford, aka Stormy Daniels, (collectively the 'Clients' and

12 each a 'Client') on the other."

13 Q.  Ms. Regnier, what is Eagan Avenatti LLP?

14 A.  A law firm.

15 Q.  As of February 27, 2018, who owned that law firm?

16 A.  Michael Avenatti.

17 Q.  At that same time, what was the financial situation of

18 Eagan Avenatti.

19          MS. GIWA:  Objection?  Vague.

20          THE COURT:  Overruled.

21 A.  It was not good.  It was -- as I said, we would check the

22 bank balances every day.  We were trying to pay expenses and we

23 had various things for nonpayment of rent and late payroll,

24 that type of thing.

25 Q.  What is Avenatti & Associates APC?

M1PNAVE2                        Regnier - Direct

1   A.   It is also a law firm.

2   Q.   As of February 27, 2018, who owned that law firm?

3   A.   Michael Avenatti.

4   Q.   At that time, what was the financial situation of Avenatti

5   & Associates APC?

6              MS. GIWA:   Objection.

7              THE COURT:   Overruled.

8   A.   To my knowledge, the accounts I was aware of for Avenatti &

9   Associates did not -- they were running very low on funds also.

10  They didn't have the funds to pay expenses.

11  Q.   Do you see where it says "Stephanie Clifford aka Stormy

12  Daniels"?

13  A.   Yes, I do.

14  Q.   What does "aka" mean?

15  A.   Also known as.

16  Q.   Let's now focus on the paragraph titled:  "4.  Legal Fees,

17  Costs, and Billing Practices."

18       Ms. Regnier, could you please read the first sentence that

19  begins "For legal services rendered."

20  A.   "For legal services rendered, attorney will receive (a) a

21  one-time payment of $100 and (b) attorneys' standard hourly

22  fees and out-of-pocket costs if a legal defense fund is

23  established to benefit clients and has sufficient funds to pay

24  such fees and costs."

25  Q.   As a general matter, what is a legal defense fund?

1  A.  It's an account that is set up for individuals to

2  contribute to, to pay the legal fees of some clients.

3  Q.  Was a legal defense fund set up for Ms. Daniels?

4  A.  Yes, it was.

5  Q.  Who set it up?

6  A.  Mr. Avenatti set up a fund.

7  Q.  Approximately how much was raised?

8          MS. GIWA:  Objection.  Foundation.

9          THE COURT:  Sustained.

10  Q.  Ms. Regnier, are you familiar with how much money that fund

11  raised?

12  A.  Yes, I am.

13  Q.  And how are you familiar with how much money that fund

14  raised?

15  A.  Because the funds that were raised, they were automatically

16  deposited into a trust account for Ms. Daniels and they would

17  send notifications as to the deposits -- I'm sorry.  The

18  GoFundMe.

19  Q.  Who, if anyone, at the defendant's law firm was responsible

20  for managing that account and every other account at the law

21  firm?

22  A.  Mr. Avenatti was responsible for all the financial

23  decisions.

24  Q.  And who, if anyone, did he task with checking the

25  statements, the balances and sending and receiving certain

1   funds?

2   A.   Myself.

3   Q.   Approximately how much was raised for Ms. Daniels' legal

4   defense in the legal defense funds?

5   A.   Approximately $500,000.

6   Q.   Who controlled how that money was spent?

7   A.   Mr. Avenatti.

8   Q.   Are you aware generally of how that money was spent?

9   A.   Yes, I am.

10  Q.   How did you become aware of how that money was spent?

11  A.   Mr. Avenatti would direct me to make payments from that

12  account for various things.

13  Q.   As far as you are aware, was the money raised spent only on

14  expenses for Ms. Daniels?

15          MS. GIWA:   Objection.

16          THE COURT:   Overruled.

17  A.   No, it was not.

18  Q.   Ms. Regnier, please read the last sentence in that

19  paragraph, starting, "In addition."

20  A.   "In addition, in the event attorney assists clients in

21  finalizing any book or media opportunity that results in

22  clients being paid, attorney and client agree that attorney

23  shall be entitled to a reasonable percentage to be agreed upon

24  between clients and attorney."

25  Q.   As far as you are aware, did the defendant ever have any

M1PNAVE2                      Regnier - Direct

1    written agreements with Ms. Daniels aside from this

2    attorney-client fee contract?

3    A.  Not that I am aware.

4    Q.  As far as you are aware, did any other retainer agreement

5    between the defendant, his law firm, and a client include a

6    similar provision like this?

7    A.  No.  This is the only time I was aware of this type of

8    provision in an agreement.

9    Q.  Let's go to the second page of this document and focus in

10   on the signatures at the bottom.

11       Ms. Regnier, are you familiar with the defendant's

12   signature?

13   A.  Yes, I am.

14   Q.  How are you familiar with his signature?

15   A.  I worked with him for many years and I've seen him sign it

16   hundreds of times.

17   Q.  Do you recognize the signature on the line above "Michael

18   J. Avenatti"?

19   A.  Yes.

20   Q.  Whose signature is that?

21   A.  Mr. Avenatti's.

22   Q.  Ms. Regnier, when do you first recall seeing this signed

23   document?

24   A.  It would have probably been 24 to 48 hours of when it was

25   signed.

M1PNAVE2                     Regnier - Direct

```
1    Q.  And how did you come to see this document?
2    A.  It would have been provided to me by Mr. Avenatti.
3    Q.  Around the time that the defendant gave you the signed
4    version of this contract, what, if anything, did you hear the
5    defendant say about his representation of Ms. Daniels?
6    A.  He was talking with various attorneys in the office.  They
7    were outside of my office basically, and they were discussing
8    that they would like to see the client come in --
9              MS. GIWA:  Objection, your Honor.
10             THE WITNESS:  -- because they all wanted to make --
11             THE COURT:  Hold on one second, please.
12             MS. GIWA:  It is a hearsay objection, your Honor.
13             THE COURT:  Overruled.
14   Q.  Ms. Regnier, I will ask you again, because you were
15   interrupted.  Around the time that the defendant gave you the
16   signed version of this contract what, if anything, did you hear
17   the defendant say about his representation of Ms. Daniels?
18   A.  He was outside my office, and he was standing with some of
19   the attorneys.  And the attorneys were stating that they really
20   would like the client to come in, and they wanted to see her.
21   I was out of unaware who Ms. Daniels was at the time.  He was
22   telling them how this was going to be great because they were
23   going to take down Trump and it was going to be great for the
24   firm.
25   Q.  And in that conversation, what, if anything, did you hear
```

1    the defendant say about how, if at all, he and the firm would

2    make money from representing Ms. Daniels?

3            MS. GIWA:  Objection.

4            THE COURT:  Overruled.

5    A.  From -- that they would make money from the lawsuits

6    against Donald Trump.

7    Q.  And at that time what, if anything, did the defendant say

8    about how else he and his law firm might be paid to represent

9    Ms. Daniels?

10   A.  He didn't say anything else about how he might be paid.

11   Q.  Let's display what's in evidence as Government Exhibit 202.

12   Ms. Regnier, what's the date on this e-mail?

13   A.  April 11, 2018.

14   Q.  Who is it sent to?

15   A.  Luke Janklow.

16   Q.  Who is it sent from?

17   A.  Michael Avenatti.

18   Q.  What is the subject line of this e-mail?

19   A.  "Wire instructions."

20   Q.  At the bottom of the e-mail, is that your name?

21   A.  Yes, it is.

22   Q.  Did you send this e-mail?

23   A.  No, I did not.

24   Q.  How do you know that you did not send this e-mail?

25   A.  As you can tell at the top, it's from Michael's e-mail.

M1PNAVE2                        Regnier - Direct

1   Q.  Did you have access to the defendant's e-mail account at
2   this time?
3   A.  No, I never had access to Mr. Avenatti's e-mail account.
4   Q.  Do you know why your signature block is at the bottom of
5   this e-mail?
6   A.  I am assuming that I had sent this information to Michael,
7   and he cut and pasted into another e-mail.
8           MR. SOBELMAN:  Could we please display side by side
9   the second and third pages of what's in evidence as Government
10  Exhibit 203.  On the left, please focus on the second e-mail on
11  the page.
12  BY MR. SOBELMAN:
13  Q.  Ms. Regnier, what is the date on this e-mail?
14  A.  April 11, 2018.
15  Q.  Who sent this e-mail?
16  A.  Michael Avenatti.
17  Q.  Who was this e-mail sent to?
18  A.  To myself.
19  Q.  What is the subject line of this e-mail?
20  A.  "Sig page."
21  Q.  What do you understand "sig page" to mean?
22  A.  The signature page of a document.
23  Q.  Looking at the third page of this exhibit, which is on the
24  other side of the screen, what was the content of this e-mail?
25  A.  It appears to be a photo of a signature page of a document.

1    Q.  During your work for the defendant, was having a client

2    e-mail a signed signature page a common or uncommon occurrence?

3    A.  It was common.

4            MR. SOBELMAN:  Could you please now focus on the top

5    half of the second page and take down the third page.

6    BY MR. SOBELMAN:

7    Q.  Ms. Regnier, what is the date on this e-mail?

8    A.  April 11, 2018.

9    Q.  Who sent this e-mail?

10   A.  Michael Avenatti.

11   Q.  Who was this e-mail sent to?

12   A.  Luke Janklow.

13   Q.  Who was copied on this e-mail?

14   A.  I was.

15   Q.  What did you understand the defendant to mean when he

16   wrote, "Judy from my office is going to see if we can clean

17   this up"?

18   A.  For me to take the photograph of the signature page and get

19   it straightened out and -- so it just filled the square and

20   looked like a normal signature page.

21           MR. SOBELMAN:  Please now display the bottom half of

22   the first page of this exhibit.

23   BY MR. SOBELMAN:

24   Q.  Ms. Regnier, who is this e-mail from?

25   A.  Michael Steger.

1  Q.  Who was this e-mail sent to?

2  A.  Michael Avenatti.

3  Q.  Please read the text of the e-mail.

4  A.  "We can work with this, Michael.  I will attach the signed

5  page to the entire agreement and send a scan to St. Martin's."

6          MR. SOBELMAN:  Please now display the top half of this

7  page.

8  BY MR. SOBELMAN:

9  Q.  Ms. Regnier, who sent this e-mail?

10 A.  Michael Avenatti.

11 Q.  Who was it sent to?

12 A.  Michael Steger.

13 Q.  Who is copied on this e-mail?

14 A.  Luke Janklow, Bennett Ashley, and myself.

15 Q.  What did the defendant write in the text of the e-mail?

16 A.  Thanks.

17 Q.  Around the time of this e-mail what, if anything, did the

18 defendant say to you about the terms of the contract for which

19 the signature page was being sent?

20         MS. GIWA:  Objection.

21         THE COURT:  Overruled.

22 A.  We did not discuss it.

23         MR. SOBELMAN:  Please display what's in evidence as

24 Government Exhibit 204 and focus in on the bottom half of the

25 page.

M1pWave3                    Regnier - Direct

1    BY MR. SOBELMAN:

2    Q.  Ms. Regnier, what is the date on this email?

3    A.  May 10, 2018.

4    Q.  Who sent this email?

5    A.  I did.

6    Q.  Who is this email sent to?

7    A.  Michael Avenatti.

8    Q.  What is the subject line of this email?

9    A.  Wire.

10   Q.  Generally, what is contained in the text of this email?

11   A.  It's wire instructions to an attorney-client trust account

12   at City National Bank.

13   Q.  Who, if anyone, controlled this client trust account?

14   A.  Michael Avenatti.

15          MR. SOBELMAN:  Please now focus on the top half of the

16   page.

17   Q.  What is the date on this email?

18   A.  May 10, 2018.

19   Q.  Who sent it?

20   A.  Michael Avenatti.

21   Q.  Who is it sent to?

22   A.  Luke Janklow.

23   Q.  Aside from forwarding your email below, did the defendant

24   add anything?

25   A.  No.

M1pWave3                          Regnier - Direct

1   Q.  In addition to the bank account in your email below, did

2   the defendant's law firm have any other bank accounts in 2018

3   and 2019?

4   A.  Yes, they did.

5   Q.  Did you review records for some of those accounts in

6   preparation for your testimony today?

7   A.  Yes, I did.

8         MR. SOBELMAN:  Your Honor, the government would offer

9   Government Exhibit S1, which is a stipulation between the

10  parties, and I intend to read from it at this time.

11        THE COURT:  All right.  Any objection?

12        MS. GIWA:  No objection, your Honor.

13        THE COURT:  All right.  Admitted.

14        (Government Exhibit S1 received in evidence)

15        THE COURT:  Ladies and gentlemen, I'll give you

16  further instructions on this at the conclusion of the case, but

17  a stipulation is simply a fancy lawyer word for an agreement.

18  It's an agreement between the parties, and you can consider it

19  as you would any other evidence in this case.  As with all the

20  other evidence, what weight, if any, you give to the

21  stipulation is up to you.

22        With that, please listen to Mr. Sobelman while he

23  reads the stipulation.

24        You may proceed.

25        MR. SOBELMAN:  If you could please display the second

1    page of this stipulation.

2              "If called to testify, a represent of Zion Bank

3    Corporation, N.A., d/b/a California Bank & Trust, would testify

4    as follows:

5              "A.  He or she is familiar with the record-keeping

6    practices of California Bank & Trust;

7              "B.  Government Exhibits 302A and 302B consist of true

8    and correct copies of account records, including account

9    information, statements, records of debit and credit, wire and

10   electronic transfer records, and/or records of deposit for

11   California Bank & Trust accounts held in the name of Eagan

12   Avenatti LLP, account numbers ending in 0313 and 0321, that

13   were made at or near the time of their creation by, or from

14   information transmitted by, a person with knowledge of the

15   matters set forth in the records, that were kept in the

16   ordinary course of California Bank & Trust's regularly

17   conducted business activity, and that it was the regular

18   practice of that business activity to make the records;

19             "C.  Government Exhibit 302C consists of true and

20   accurate copies of account records, including account

21   information, statements, records of debit and credit, wire and

22   electronic transfer records, and/or records of deposit for a

23   California Bank & Trust account held in the name of Avenatti &

24   Associates P.C., account number ending in 0661, that were made

25   at or near the time of their creation by, or from information

1    transmitted by, a person with knowledge of the matters set

2    forth in the records, that were kept in the ordinary course of

3    California Bank & Trust's regularly conducted business

4    activity, and that it was the regular practice of that business

5    activity to make the records."

6          Now reading from page 3 of the stipulation:

7          "D.  Government Exhibit 302D consists of true and

8    correct copies of account record, including account

9    information, statements, records of debit and credit, wire and

10   electronic transfer records, and/or records of deposit for a

11   California Bank & Trust Attorney-Client Trust Account held in

12   the name of Eagan Avenatti LLP, account number ending in 4613,

13   that were made at or near the time of their creation by, or

14   from information transmitted by, a person with knowledge of the

15   matters set forth in the records, that were kept in the

16   ordinary course of California Bank & Trust's regularly

17   conducted business activity, and that it was the regular

18   practice of that business activity to make the records;

19         "E.  Government Exhibits 302E and 302F consist of true

20   and correct copies of account records, including account

21   information, statements, records of debit and credit, wire and

22   electronic transfer records, and/or records of deposit for a

23   California Bank & Trust attorney-client trust accounts held in

24   the name of Avenatti & Associates P.C., account numbers ending

25   in 4779 and 5487, that were made at or near the time of their

M1pWave3                      Regnier – Direct

creation by, or from information transmitted by, a person with

knowledge of the matters set forth in the records, that were

kept in the ordinary course of California Bank & Trust's

regularly conducted business activity, and that it was the

regular practice of that business activity to make the records;

"F.  Government Exhibit 302G consists of true and

correct copies of account records, including account

information, statements, records of debit and credit, wire and

electronic transfer records, and/or records of deposit, for a

California Bank & Trust account held in the name of Passport

420 LLC, account number ending in 9257, that were made at or

near the time of their creation by, or from information

transmitted by, a person with knowledge of the matters set

forth in the records, that were kept in the ordinary course of

California Bank & Trust's regularly conducted business

activity, and that it was the regular practice of that business

activity to make the records."

Now reading from page 4, paragraph 3; this is the last

paragraph I'm going to read at the moment:

"If called to testify, a representative of City

National Bank would testify as follows:

"A.  He or she is familiar with the record-keeping

practices of City National Bank;

"B.  Government Exhibit 303A consists of true and

correct copies of account records, including account

information, statements, records of debit and credit, wire and electronic transfer records, and/or records of deposit for a City National Bank attorney-client trust account held in the name of Michael J. Avenatti, Esq., account number ending in 3512, that were made at or near the time of their creation by, or from information transmitted by, a person with knowledge of the matters set forth in the records, that were kept in the ordinary course of City National Bank's regularly conducted business activity, and that it was the regular practice of that business activity to make the records;

"C. Government Exhibit 303B consists of true and correct copies of account records, including account information, statements, records of debit and credit, wire and electronic transfer records, and/or records of deposit, to a City National Bank account held in the name of Avenatti LLP, account number ending in 8611, that were made at or near the time of their creation by, or from information transmitted by, a person with knowledge of the matters set forth in the records, that were kept in the ordinary course of City National Bank's regularly conducted business activity, and that it was the regular practice of that business activity to make the records."

"It is further stipulated" -- this is on page 5 -- "that no party will raise any objection under Federal Rules of Evidence 802 or 901 with respect to any of the government

M1pWave3                          Regnier - Direct

1    exhibits records referenced above."

2              At this time, your Honor, the government offers

3    Government Exhibits 302A through G and 303A and B.

4              THE COURT:  Subject to our earlier discussion, any

5    objection?

6              MS. GIWA:  Objections only to 401 and 403.  I would

7    ask the Court to consider them running objections.

8              THE COURT:  Duly noted and overruled.  They are

9    admitted.  302A through G and 303A and B admitted.

10             (Government Exhibits 302A through 302G and 303A and

11   303B received in evidence)

12             MR. SOBELMAN:  Could we please show the witness what's

13   been marked for identification as Government Exhibit 803.

14   Q.  Ms. Regnier, do you recognize this?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It's a chart that you prepared showing the various bank

18   accounts or some of the accounts that were related to the law

19   firm.

20   Q.  In preparation for your testimony today, did you review the

21   government exhibits referenced at the bottom of this exhibit?

22   A.  Yes, I did.

23   Q.  Are those exhibits voluminous?

24   A.  Yes, they are.

25   Q.  Based on your review of those exhibits, were you able to

1    confirm the accuracy of the information that's contained in

2    this chart?

3    A.  Yes, I was.

4    Q.  Is it accurate?

5    A.  Yes.

6           MR. SOBELMAN:  Your Honor, the government offers

7    Government Exhibit 803 pursuant to Rule 1006.

8           THE COURT:  Any objection?

9           MS. GIWA:  No objection.

10           THE COURT:  Admitted.

11           (Government Exhibit 803 received in evidence)

12           THE COURT:  Ladies and gentlemen, in contrast to the

13    charts yesterday that I allowed you to see just as aids in

14    understanding the testimony of the witness, this actually is

15    now in evidence so you may consider it as you would any other

16    evidence.

17           You may proceed.

18           MR. SOBELMAN:  Please show this to the jury.

19    Q.  Ms. Regnier, I want to ask you about the headings on this

20    chart.  The first column on the left reads "bank."  Do you see

21    that?

22    A.  Yes, I do.

23    Q.  And what is listed in that column?

24    A.  The various banks at which the accounts were held.

25    Q.  And what are the two banks at which the accounts were held

M1pWave3                        Regnier – Direct

1   that are listed on this chart?

2   A.   California Bank & Trust and City National Bank.

3   Q.   The next column reads account "name."  Do you see that?

4   A.   Yes, I do.

5   Q.   And what is listed in the column titled "account name"?

6   A.   The names that were on the various accounts.

7   Q.   The next column is "account number."  Do you see that?

8   A.   Yes.

9   Q.   And what is listed in the account number column?

10  A.   The last four digits of the account.

11  Q.   The next column is "authorized signers."  Do you see that?

12  A.   Yes, I do.

13  Q.   And what is listed in the authorized signers column?

14  A.   The names of the individuals authorized to sign on the

15  account.

16  Q.   What does it mean to be an authorized signer on a bank

17  account?

18  A.   They all -- I don't -- they have signature cards, and the

19  people listed on the signature cards are the only ones that are

20  authorized to sign to withdraw moneys from the account.

21  Q.   And who, if anyone, appears in that column?

22  A.   Myself and Michael Avenatti.

23  Q.   Are there any accounts listed here that the defendant was

24  not an authorized signer on?

25  A.   No.

1    Q.  The next column is "type."  Do you see that?

2    A.  Yes, I do.

3    Q.  And what is listed in that type column?

4    A.  The type of the, that the account was.

5    Q.  What is an operating account?

6            MS. GIWA:  Objection.  Foundation.

7            THE COURT:  Overruled.

8    A.  It's basically a checking account, which is used to pay

9    expenses and general operating matters.

10   Q.  What is a payroll account?

11   A.  Account used to pay payroll for employees of the firm.

12   Q.  What is payroll?

13   A.  Payroll is your salary, your wages.

14   Q.  What is a client trust account?

15   A.  It's an account with, into which client funds are

16   deposited.

17   Q.  Do you see on the third-to-last line there's a reference to

18   Passport 420 LLC?

19   A.  Yes.

20   Q.  Is that a company the defendant owned?

21   A.  Yes, it is.

22   Q.  And for all the other accounts that are listed here, are

23   they accounts associated with the defendant's law firms?

24   A.  Yes, they are.

25   Q.  And he owned all those law firms?

1   A.  Yes, he did.

2           MR. SOBELMAN:  Now, could we please display what's in

3   evidence as Government Exhibit 210.

4   Q.  Ms. Regnier --

5           MR. SOBELMAN:  Sorry.  Let's focus on the bottom email

6   for the moment.

7   Q.  Ms. Regnier, what is the date on this email?

8   A.  July 31, 2018.

9   Q.  Who sent this email?

10  A.  I did.

11  Q.  Who did you send this email to?

12  A.  Michael Avenatti.

13  Q.  What is the subject line of this email?

14  A.  Daniels trust account.

15  Q.  Generally, what is contained within the text of this email?

16  A.  Wire instructions for Ms. Daniels's client trust account.

17  Q.  Who controlled this account?

18  A.  Michael Avenatti.

19  Q.  Is this one of the accounts that was on the chart in

20  evidence as Government Exhibit 803 that we looked at a moment

21  ago?

22  A.  Yes, it is.

23  Q.  Why did you send this information to the defendant?

24  A.  Because he would have called or texted me or emailed me --

25          MS. GIWA:  Objection.

M1pWave3                        Regnier - Direct

1    A.  -- and requested it.

2              THE COURT:  Sustained.  The jury will disregard that

3    answer.

4              Mr. Sobelman, ask a new question.

5    BY MR. SOBELMAN:

6    Q.  Ms. Regnier, do you have a specific recollection of why you

7    sent this information to the defendant?

8    A.  This is -- Michael Avenatti would have asked for this

9    information.

10             MS. GIWA:  Objection.

11             THE COURT:  Ms. Regnier, the question was just do you

12   have a specific recollection of why you sent this particular

13   email.

14             THE WITNESS:  Michael would have asked for it.  I was

15   being asked to.

16             MS. GIWA:  Same objection, your Honor.

17             THE COURT:  All right.  I'll allow it.  Overruled.

18   BY MR. SOBELMAN:

19   Q.  At various times during 2018 and early 2019, did the

20   defendant ask that you send certain bank account information to

21   him?

22   A.  Yes.

23   Q.  And --

24             MR. SOBELMAN:  OK.  I'll move on.  Let's focus on the

25   top page of the email.

1   Q.  Ms. Regnier, who is this email sent from?

2   A.  Michael Avenatti.

3   Q.  Who is it sent to?

4   A.  Luke Janklow.

5   Q.  What, if anything, did the defendant add to the wire

6   information he was forwarding?

7   A.  He just said "see below."

8           MR. SOBELMAN:  OK.  We can take this down.

9   Q.  Ms. Regnier, how were payments made from the law firm's

10  trust accounts, like the one we just talked about for

11  Ms. Daniels?

12  A.  Generally, they were made by wire transfer.  Most of the

13  client trust accounts we did not maintain checks on, so they

14  required wire transfers out of the account.

15  Q.  And what is a wire transfer?

16  A.  It's an electronic transfer of funds from one bank account

17  to another.

18  Q.  And how did it work in 2018 and early 2019 to send a wire

19  transfer from a client trust account to the defendant's law

20  firm?

21          MS. GIWA:  Objection.  Vague.

22          THE COURT:  Overruled.

23          Just a general description of how that process worked,

24  Ms. Regnier.

25  A.  It's -- basically, it's an online process, and the

M1pWave3                          Regnier - Direct

1    information for where you're sending it to and sending it from

2    is entered online, and then it's a double verification system,

3    usually by key fob inside a code, and those codes have to be

4    entered with a wire mail.

5    Q.  And in that time period, who, if anyone, had the two key

6    fobs at the defendant's law firm?

7    A.  Michael and I.

8    Q.  So to be clear, I believe you said it's called double

9    verification?

10   A.  Yes.

11   Q.  Were you able to send a wire transfer alone from an

12   attorney-client trust account during that time period?

13   A.  No, I was not.

14   Q.  Why not?

15   A.  We always had to have Michael's double verification.

16   Michael was the only one that was authorized to send alone.

17   Q.  Are you generally familiar with how the money in a trust

18   account for Ms. Daniels was spent?

19   A.  Yes.

20   Q.  And generally, what method was used to send that money?

21   A.  It was generally a wire transfer.

22   Q.  And were those wire transfers only for expenses relating to

23   Ms. Daniels?

24   A.  No.

25          MR. SOBELMAN:  Could we please show the witness what's

1   marked for identification as Government Exhibit 608.

2   Q.  Ms. Regnier, do you recognize this document?

3   A.  Yes, I do.

4   Q.  What is it?

5   A.  It's a draft of a letter.

6   Q.  And did the defendant send this to you?

7   A.  Yes.  I believe he sent it to me to finalize.

8           MR. SOBELMAN:  The government offers Government

9   Exhibit 608.

10          THE COURT:  Any objection?

11          MS. GIWA:  No objection.

12          THE COURT:  Admitted.

13          (Government Exhibit 608 received in evidence)

14          MR. SOBELMAN:  Display it for all, please.

15  Q.  How did you come to first see this document?

16  A.  I believe Michael -- Michael sent me, by email, he would

17  have sent me this document or attached this document as a

18  final.

19  Q.  What, if anything, did you do after the defendant sent you

20  this document?

21  A.  He requested that I insert Ms. Daniels's electronic

22  signature on to the document, which I did.

23  Q.  Why did you do that?

24  A.  Michael requested that I put it on there.

25          MR. SOBELMAN:  Let's display the second page of what's

1    in evidence as Government Exhibit 213.

2    Q.  Ms. Regnier, do you recognize this?

3    A.  Yes, I do.

4    Q.  And what is it?

5    A.  It's the completed letter with the signature inserted.

6    Q.  Where did you copy this signature from?

7    A.  The attorney-client retainer agreement.

8    Q.  Is that the one we looked at earlier?

9    A.  Yes, it is.

10            MR. SOBELMAN:  Please put up the last page of

11    Government Exhibit 3 next to what we see now, which is the

12    second page of Government Exhibit 213.

13   Q.  Ms. Regnier, is this document, Government Exhibit 3, the

14   document you copied Ms. Daniels's signature from?

15   A.  Yes, it is.

16            MR. SOBELMAN:  We can take down Government Exhibit 3,

17   but please leave up -- please leave up 213.

18            Thank you.

19   Q.  Ms. Regnier, what, if anything, did you do with this

20   document after you copied Ms. Daniels's signature onto it?

21   A.  I returned it to Mr. Avenatti.

22   Q.  At that time, what, if anything, did the defendant tell you

23   about why he had prepared this document?

24   A.  He said that Ms. Daniels was having problems either with

25   business managers and some personal issues and needed to have

M1pWave3                    Regnier - Direct

1    her funds routed to a different account.

2    Q.  Around the time you helped the defendant make this

3    document, what, if anything, did the defendant say about him

4    being allowed to spend Ms. Daniels's book advance payments on

5    his law firm's expenses?

6    A.  We did not discuss that.

7    Q.  Around the time you helped the defendant make this

8    document, what, if anything, did the defendant say about him

9    being allowed to spend Ms. Daniels's book advance payments on

10   his own personal expenses?

11   A.  We did not discuss that.

12           MR. SOBELMAN:  We can take down this exhibit.

13   Q.  I'm now going to ask you a few more questions about the

14   defendant's law firm situation.  Generally, what was the

15   financial situation at the defendant's law firm between July

16   2018 and February 2019?

17           MS. GIWA:  Objection, your Honor.  401.

18           THE COURT:  Overruled.

19   A.  It was not good.  Payments were running late.  We were

20   having trouble making ends meet.  The firm was eventually

21   evicted from their offices.  Payroll was late.

22   Q.  In the ten years before that time period, when you were

23   also working for the defendant, were there other times that the

24   law firm had financial difficulties?

25   A.  There were other times when it was very lean, but it was

1    never to that point.

2    Q.  So how did the financial difficulties the law firm had in

3    July 2018 through February 2019 compare to the financial

4    difficulties the law firm had at any time in the ten years

5    before that?

6    A.  They were MUCH worse.

7    Q.  Much worse in which time period?

8    A.  The 2018 to 2019.

9    Q.  Approximately how often did you speak to the defendant

10   between July 2018 through February 2019?

11   A.  Almost daily.

12   Q.  Did you speak to the defendant in person or by telephone?

13   A.  The majority of it would have been by telephone.

14   Q.  What, if anything, was the most frequent topic of your

15   conversations from July 2018 through February 2019?

16   A.  Finances.

17   Q.  What do you mean by finances?

18   A.  Basically, checking bank accounts to make sure that there

19   was enough funds to make it through the week, through the day,

20   and that type of thing.

21   Q.  From July 2018 through February 2019, were you discussing

22   the specifics of the law firm's finances with anyone else?

23   A.  No.

24   Q.  Not even other employees of the law firm?

25   A.  No.  That was another of Michael's cardinal rules, the

1   finances --

2           MS. GIWA:  Objection.  Objection.  Nonresponsive.

3           THE COURT:  Hang on.

4           Sustained.  I'll limit the answer to "no" and strike

5   the remainder of that answer.

6   BY MR. SOBELMAN:

7   Q.  Why did you not speak with anyone else, including other

8   employees of the law firm, about the law firm's finances in

9   July 2018 through February 2019?

10  A.  That was Michael's cardinal rule, that no finances were to

11  be discussed --

12          MS. GIWA:  Objection.

13  A.  -- with anyone.

14          THE COURT:  Hold on, Ms. Regnier.

15          MS. GIWA:  Just to the use of "cardinal rule."

16          THE COURT:  I'm sorry.  Overruled.

17          You may continue your answer, Ms. Regnier.

18          MR. SOBELMAN:  Your Honor, may I reask the question?

19          THE COURT:  Sorry?

20          MR. SOBELMAN:  I just want to make sure Ms. Regnier

21  knows the question.

22          THE COURT:  OK.  Go ahead.

23  BY MR. SOBELMAN:

24  Q.  Ms. Regnier, between July 2018 and February 2019, why did

25  you not discuss the law firm's finances with anyone else,

M1pWave3                    Regnier - Direct

1    including other employees of the law firm?

2    A.  That was Mr. Avenatti's cardinal rule, that no finances

3    were to be discussed with anyone but him.  They were not to be

4    discussed among employees at all.

5    Q.  Based on your conversations with the defendant, what is

6    your understanding of whether the defendant ever personally

7    loaned or advanced any money to Ms. Daniels?

8    A.  I'm not aware of him doing so.

9    Q.  Based on your conversations with the defendant and your

10   involvement in the law firm's finances, what is your

11   understanding of whether the defendant's law firm ever loaned

12   or advanced money to Ms. Daniels?

13   A.  I'm not -- I don't believe that the law firm ever loaned

14   money to Ms. Daniels, no.

15   Q.  From July 2018 through February 2019, did you make any

16   payments at the defendant's direction from the defendant's law

17   firm to Geoffrey Johnson?

18          MS. GIWA:  Objection.

19   A.  Yes, I did.

20          MS. GIWA:  Objection.

21          THE COURT:  Overruled.

22   Q.  Who is Geoffrey Johnson?

23   A.  He was a client of the firm.

24   Q.  As far as you are aware, did Mr. Johnson have any

25   connection to Ms. Daniels?

1          MS. GIWA:  Objection.

2          THE COURT:  Overruled.

3    A.  Not that I'm aware.

4    Q.  From July 2018 through February 2019, did you make any

5    payments at the defendant's direction from the defendant's law

6    firm to the DeAnda Law Firm?

7    A.  Yes.

8    Q.  What is DeAnda Law Firm?

9    A.  It's a law firm that assisted with other cases in the

10   office.

11   Q.  As far as you are aware, did DeAnda Law Firm have any

12   connection to Ms. Daniels?

13   A.  Not that I'm aware.

14   Q.  From July 2018 through February 2019, did you make any

15   payments at the defendant's direction from the defendant's law

16   firm to Anthem Blue Cross?

17   A.  Yes, I did.

18   Q.  What is Anthem Blue Cross?

19   A.  It's the health insurance carrier for the employees of the

20   firm.

21        MR. SOBELMAN:  Please show the witness what's been

22   marked for identification as Government Exhibit 610.

23   Q.  Ms. Regnier, do you recognize this?

24   A.  Yes, I do.

25   Q.  What is it?

M1pWave3                    Regnier - Direct

1  A.  It's a letter from Anthem Blue Cross regarding nonpayment

2  of premium.

3          MR. SOBELMAN:  The government offers Government

4  Exhibit 610.

5          MS. GIWA:  Objection.  Hearsay and 401.

6          THE COURT:  Overruled.  Admitted.

7          (Government Exhibit 610 received in evidence)

8          MR. SOBELMAN:  Please display it for the jury.

9          If we could focus on the top half of the letter,

10 please.

11 Q.  Ms. Regnier, what is the date on this letter?

12 A.  September 11, 2018.

13 Q.  Who is it addressed to?

14 A.  Eagan Avenatti LLP.

15 Q.  At the time this letter is dated, who was responsible at

16 the defendant's law firm for handling any correspondence with

17 Anthem Blue Cross?

18 A.  I was.

19 Q.  What is the subject line on this letter?

20 A.  Notice of intent to nonrenew due to nonpayment.

21 Q.  What does nonrenew mean?

22          MS. GIWA:  Objection.

23          THE COURT:  What did you understand that word to mean,

24 Ms. Regnier?

25          THE WITNESS:  That they would cancel our insurance and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    not get renewed for nonpayment.

2    BY MR. SOBELMAN:

3    Q.  What is your understanding of what nonpayment means?

4    A.  Payment -- if the payment was not made.

5    Q.  Can you please read the first two sentences of the first

6    paragraph, starting, "we are writing"?

7    A.  "We are writing to let you know that the premium for your

8    Anthem Blue Cross health plan is due on September 1, 2018.  As

9    of the date of this notice, we have not received your premium

10   payment of $11,997.01, but your plan/policy is active and will

11   remain active as long as premiums are received as described

12   below."

13   Q.  What is your understanding of why the $11,997.01 payment

14   was not made before September 1, 2018?

15   A.  The firm did not have the money to make the payment.

16   Q.  Was the health insurance plan later canceled for

17   nonpayment?

18            MS. GIWA:  Objection, your Honor.

19            THE COURT:  Sustained.

20            MR. SOBELMAN:  I'm sorry.  I didn't hear the

21   objection.

22            THE COURT:  To the form.  Sustained as to form.

23   BY MR. SOBELMAN:

24   Q.  Are you aware of whether the health insurance plan was

25   later canceled for nonpayment?

1    A.  Yes --

2              MS. GIWA:  Objection.  401.

3              THE COURT:  Overruled.

4    A.  Yes, it was.

5    Q.  It was canceled?

6    A.  It was canceled.

7    Q.  When was it canceled?

8    A.  I believe it was sometime around November of 2018.

9    Q.  As far as you are aware, did Anthem Blue Cross have any

10   connection to Ms. Daniels?

11   A.  Not as far as I know.

12             MR. SOBELMAN:  OK.  We can take down this exhibit.

13   Q.  Ms. Regnier, from July 2018 through February 2019, did you

14   make any payments at the defendant's direction from the

15   defendant's law firm to James Cameron?

16   A.  Yes.

17   Q.  Who is James Cameron?

18   A.  He was the driver for the firm.

19   Q.  As far as you are aware, did Mr. Cameron have any

20   connection to Ms. Daniels?

21   A.  Not as far as I know.

22   Q.  From July 2018 through February 2019, what types of

23   expenses, if any, did the defendant instruct you to spend the

24   law firm's money on aside from the law firm's expenses?

25   A.  Some of his personal expenses.

1   Q.  Generally, what types of the defendant's personal expenses

2   did the defendant instruct you to pay using the law firm's

3   money during that time period?

4   A.  His rent and his parties.

5   Q.  Based on your conversations with the defendant, what was

6   your understanding of why the defendant instructed you to pay

7   his personal expenses using the law firm's money?

8   A.  Because he did not have the money.

9   Q.  From July 2018 through February 2019, did you make any

10  payments at the defendant's direction from the defendant's law

11  firm to Christine Carlin?

12  A.  Yes.

13  Q.  Who is Christine Carlin?

14          MS. GIWA:  Objection, your Honor.  Relevance.

15          THE COURT:  Overruled.

16  A.  Michael's ex-wife.

17  Q.  As far as you are aware, did Ms. Carlin have any connection

18  to Ms. Daniels?

19  A.  Not that I'm aware.

20  Q.  From July 2018 through February 2019, did you make any

21  payments at the defendant's direction from the defendant's law

22  firm to Lisa Storie-Avenatti?

23  A.  Yes.

24  Q.  Who is Ms. Storie-Avenatti?

25  A.  Michael's current ex-wife.

M1pWave3                          Regnier - Direct

1   Q.  As far as you are aware, did Ms. Storie-Avenatti have any

2   connection to Ms. Daniels?

3   A.  No.

4   Q.  From July 2018 through February 2019, did you make any

5   payments at the defendant's direction from the defendant's law

6   firm to Mareli --

7               MS. GIWA:  Objection, your Honor.

8               THE COURT:  Please let counsel finish the question.

9               MS. GIWA:  Sorry.

10              MR. SOBELMAN:  I'll ask the question again, your

11  Honor.

12  Q.  From July 2018 through February 2019, did you make any

13  payments at the defendant's direction from the defendant's law

14  firm to Mareli Miniutti?

15              MS. GIWA:  Objection.

16              THE COURT:  Overruled.

17  A.  Yes.

18  Q.  Who is Ms. Miniutti?

19  A.  She was Michael's then girlfriend.

20  Q.  As far as you are aware, did Ms. Miniutti have any

21  connection to Ms. Daniels?

22  A.  No.

23              MR. SOBELMAN:  Now I'm going to shift topics.

24  Q.  Are you familiar with cashier's checks?

25  A.  Yes.

1    Q.  What is a cashier's check?

2    A.  A check that you obtain directly from the bank.  Basically,

3    it's like cash.

4    Q.  And in September 2018, what, if any, responsibilities,

5    through your work for the defendant, did you have for obtaining

6    cashier's checks?

7    A.  Mr. Avenatti would either direct me to go pick up a

8    cashier's check, or I would contact the bank and let them know

9    when he was coming to pick up a cashier's check.

10          MR. SOBELMAN:  If we could please display page 122 of

11   what is in evidence as Government Exhibit 303A, and please

12   focus on the bottom half of the page.

13   Q.  Ms. Regnier, what is this?

14   A.  It is a counter check.

15   Q.  Is a counter check the same thing as a cashier's check?

16   A.  No.  A counter check is a check that you get at the counter

17   at the bank.  They have these checks, and they'll provide it to

18   you if you do not have checks on that account.

19   Q.  Whose handwriting appears on this check?

20   A.  My -- my handwriting is on the majority of the check.  Some

21   I don't recognize but it is generally my handwriting.

22   Q.  What is written next to "name"?

23   A.  Avenatti Trust.

24   Q.  And below that, is that the account number?

25   A.  Yes, that is.

1   Q.  And just to be clear, is that the account number that the

2   money was coming out of or the account number that the money

3   was going to go into?

4   A.  That was the account number that the money was coming out.

5   Q.  And to the right of that, what's the date on this counter

6   check?

7   A.  September 5, 2018.

8   Q.  And underneath that, next to the line "pay to the order

9   of," what is listed there?

10  A.  Stormy Entertainment.

11  Q.  And how much money is listed?

12  A.  $148,750.

13  Q.  Now, in your experience, can you take a counter check and

14  deposit it in a bank account?

15  A.  Yes.

16  Q.  And what was this counter check obtained for the purpose

17  of?

18          MS. GIWA:  Objection.

19          THE COURT:  Sustained.  If you can lay some

20  foundation, Mr. Sobelman.

21          MR. SOBELMAN:  Yes, your Honor.  We'll come back to

22  that in a moment.

23          Let's take a look at the top of the document.  And

24  let's just focus on the very top of the document that says

25  "register copy" at the top.

1    Q.  Ms. Regnier, what is this?

2    A.  It's a copy of the physical cashier's check.  It's in

3    triplicate.

4    Q.  Is this the actual cashier's check, or is this something

5    different?

6    A.  No.  It's a copy.

7    Q.  And what bank was the cashier's check purchased from?

8    A.  City National Bank.

9    Q.  And to be clear, this is a record of the purchase of a

10   different check than a counter check, is that right?

11   A.  Correct.

12   Q.  The counter check was used to buy the cashier's check, is

13   that right?

14   A.  Correct.

15   Q.  And as of September 5, 2018, what, if any, relationship did

16   the defendant's law firm have with City National Bank?

17   A.  They had some bank accounts there.

18   Q.  Did the defendant's law firm always have its bank accounts

19   with City National Bank?

20   A.  No.

21   Q.  Approximately when did the defendant's law firm open bank

22   accounts with City National Bank?

23   A.  I believe it was the summer of 2018.

24   Q.  What bank was the law firm's accounts with before City

25   National Bank?

M1pWave3                        Regnier - Direct

1    A.  California Bank & Trust.

2    Q.  Why did the law firm switch from California Bank & Trust to

3    City National Bank in the summer of 2018?

4            MS. GIWA:  Objection.

5            THE COURT:  Sustained.  Foundation.

6    BY MR. SOBELMAN:

7    Q.  Ms. Regnier, are you aware of why the defendant's law firm

8    switched from California Bank & Trust to City National Bank in

9    the summer of 2018?

10   A.  Yes.

11   Q.  And during that time period, were you the person the

12   defendant had designated to handle his law firm's bank

13   accounts?

14   A.  To handle them?  To -- yeah, I was the one that physically

15   went to the bank most of the time.

16   Q.  Why did the law firm switch from California Bank & Trust to

17   City National Bank in the summer of 2018?

18   A.  Because California Bank & Trust sent notification that they

19   would no longer be handling the law firm's accounts.

20   Q.  What happened shortly before you received that

21   notification?

22   A.  There were overdrafts on the account, and there was one

23   large overdraft on the account that was not repaid.

24   Q.  What is an overdraft?

25   A.  It's when you spend more money than what is in the account.

1          MR. SOBELMAN:  Let's display what's in evidence as

2     Government Exhibit S1.  I'm now going to read another portion

3     of this stipulation.

4          THE COURT:  All right.  Mr. Sobelman, just for my

5     planning purposes, given the jurors' lunches, any sense of how

6     much longer you have on direct?

7          MR. SOBELMAN:  I'm about two-thirds of the way

8     through.

9          THE COURT:  All right.  So we'll probably go for

10    another ten or so minutes, but keep going.  Thanks.

11         MR. SOBELMAN:  Thank you, your Honor.

12         The stipulation, first page of Government Exhibit S1,

13    paragraph 1, reads as follows:

14         "If called to testify, a representative at Bank of

15    America, N.A. ('Bank of America'), would testify as follows:

16         "A.  He or she is familiar with the record-keeping

17    practices of Bank of America;

18         "B.  Government Exhibit 301A consists of true and

19    correct copies of account records, including account

20    information, statements, records of debit and credit, wire and

21    electronic transfer records, and/or records of deposit for a

22    Bank of America account held in the name of Stormy

23    Entertainment, Inc., account number ending in 7417, that were

24    made at or near the time of their creation by, or from

25    information transmitted by, a person with knowledge of the

1    matters set forth in the records, that were kept in the

2    ordinary course of Bank of America's regularly conducted

3    business activity, and that it was the regular practice of that

4    business activity to make the records;

5            "C.  Government Exhibit 301B consists of true and

6    correct copies of account records, including account

7    information, statements, records of debit and credit, wire and

8    electronic transfer records, and/or records of deposit, for a

9    Bank of America account held in the name of Stormy

10   Entertainment, Inc., account number ending in 9205, that were

11   made at or near the time of their creation by, or from

12   information transmitted by, a person with knowledge of the

13   matters set forth in the records, that were kept in the

14   ordinary course of Bank of America's regularly conducted

15   business activity, and that it was the regular practice of that

16   business activity to make the records."

17           Your Honor, the government offers Government Exhibits

18   301A and B.

19           MS. GIWA:  Your Honor, objection as to those exhibits

20   given that they are Stormy Daniels's entertainment bank

21   accounts.

22           THE COURT:  All right.  Overruled.  They're admitted.

23           (Government Exhibits 301A and 301B received in

24   evidence)

25           MR. SOBELMAN:  Could we please display what's in

1    evidence as Government Exhibit 301A.

2    Q.  Ms. Regnier, could you please read the date on this check?

3    A.  September 5, 2018.

4    Q.  Please read to whom the check is made out.

5    A.  Stormy Entertainment.

6    Q.  How much is the check for?

7    A.  $148,750.

8    Q.  What type of check is this?

9    A.  It's a cashier's check.

10   Q.  Based on the information contained on this cashier's check,

11   is the recipient able to tell what specific bank account the

12   money came from?

13   A.  No.

14   Q.  With a wire transfer, is the recipient able to tell what

15   specific bank account the money came from?

16   A.  Yes.

17          MR. SOBELMAN:  Could we please go back to Government

18   Exhibit 303A, page 22.  Let's focus on the counter check, which

19   is the third document on this page.

20   Q.  Ms. Regnier, could you have deposited this counter check

21   directly into the Stormy Entertainment bank account?

22   A.  Yes.

23   Q.  With a counter check, is the recipient able to tell what

24   specific bank account the money came from?

25   A.  Yes.

1    Q.  Why did you not just deposit this counter check into the

2    Stormy Entertainment bank account and instead purchase a

3    cashier's check?

4    A.  Mr. Avenatti instructed me to purchase a cashier's check.

5            MR. SOBELMAN:  Let's go back to Government Exhibit

6    301A.  If we could go to the next page of this exhibit, the

7    back of the check.

8    Q.  Ms. Regnier, what is this?

9    A.  It's the reverse side of the cashier's check.

10   Q.  Do you recognize the handwriting on the right side of this

11   exhibit?

12   A.  "Deposit only," the last four account numbers are my

13   handwriting.  The other I don't recognize.

14   Q.  In the middle of the check, it says Newport Center.  Do you

15   see that?

16   A.  Yes.

17   Q.  What is Newport Center?

18   A.  It's an area in Newport Beach where there's quite a few

19   business offices located.

20   Q.  Does Bank of America have a branch in Newport Center?

21   A.  Yes, they did at that time.

22   Q.  Where was that branch located in relation to where the

23   defendant's law offices were located as of September 5, 2018?

24   A.  There was -- there were about four buildings in the area,

25   and it was downstairs, probably a hundred yards -- yards from

1    the building where law firm is.

2            MR. SOBELMAN:  Ms. Regnier, could slow down and repeat

3    that for the court reporter.

4            THE COURT:  We just had trouble hearing you, Ms.

5    Regnier.  Could you just repeat that answer.

6            THE WITNESS:  I'm sorry.

7            It was located about a hundred yards downstairs from

8    where the building -- downstairs from the building in which the

9    law firm was.  They were all in the same area, approximately

10   four buildings.

11   BY MR. SOBELMAN:

12   Q.  Does City National Bank have a branch in Newport Center?

13   A.  Yes, they do.

14   Q.  Where is that branch in relation to where the defendant's

15   law firm's offices were located as of September 5, 2018?

16   A.  It's in the same building, just across the hallway.

17           MR. SOBELMAN:  Could we please show the witness --

18   Q.  Sorry, Ms. Regnier.  I didn't mean to cut you off.

19   A.  I said --

20           THE COURT:  Sorry.  Can you say that again.

21           THE WITNESS:  It's in the same building as Bank of

22   America.

23           MR. SOBELMAN:  Please show the witness what's been

24   marked for identification as Government Exhibit 601.

25   Q.  Ms. Regnier, do you recognize what's shown in this

1    photograph?

2    A.   Yes.

3    Q.   What is it?

4    A.   It's the location of the law firm and City National Bank.

5           MR. SOBELMAN:  Your Honor, the government offers

6    Government Exhibit 601.

7           THE COURT:  Any objection?

8           MS. GIWA:  No objection.

9           THE COURT:  Admitted.

10          (Government Exhibit 601 received in evidence)

11          MR. SOBELMAN:  Please display it for the jury.

12   Q.   Can you describe what we see in this photograph?

13   A.   Tall building in the back is where the defendant's law firm

14   is located.  The six-story building to the, where City National

15   Bank is, and the bottom floor of the building, the multistory

16   building on the right is where the Bank of America was located.

17          MR. SOBELMAN:  Thank you.  We can take this down.

18   Q.   I'm now going to ask you some questions about a different

19   document.

20          MR. SOBELMAN:  Ms. Abrams, could we please display

21   what is in evidence as Government Exhibit 2.

22          I'm sorry.  I'm not sure it's in evidence.  You can

23   take that down.  Only show it to the witness, please.

24   Q.   Ms. Regnier, do you recognize this?

25   A.   Yes, I do.

M1pWave3                          Regnier - Direct

1   Q.  What is it?

2   A.  It's a letter from Mr. Avenatti to Ms. Daniels.

3            MR. SOBELMAN:  And could we please focus on the -- the

4   government offers Government Exhibit 2.

5            MS. GIWA:  No objection.

6            THE COURT:  Admitted.

7            (Government Exhibit 2 received in evidence)

8            MR. SOBELMAN:  Please show it to the jury and focus on

9   the top half of the document.

10  Q.  What is the date on this letter?

11  A.  November 30, 2018.

12  Q.  And who is the letter addressed to?

13  A.  Ms. Stormy Daniels, paren a/k/a Stephanie Clifford.

14           MR. SOBELMAN:  Let's take a look at the last page of

15  the letter.

16  Q.  Ms. Regnier, who is this letter from?

17  A.  Mr. Avenatti.

18           MR. SOBELMAN:  OK.  Let's go back to the first page.

19  Q.  What is the subject line of this letter?

20  A.  Legal fees/costs update.

21  Q.  What, if any, role did you have in drafting this letter?

22  A.  Michael would have sent me the text of the letter in an

23  email and have me put it into final form.  I also provided him

24  with some of the cost information that's contained within the

25  letter, and he inserted it into that letter.

1           MR. SOBELMAN:  Let's focus on the second paragraph on
2     the first page.
3     Q.  Ms. Regnier, could you please read this paragraph, slowly?
4     A.  "As a preliminary matter, when we were retained, we were
5     paid $100 as an up-front payment by you.  It was further agreed
6     that we would be entitled to receive our standard hourly rates
7     from any legal fund we established relating to the
8     Trump-related litigation.  In particular, paragraph 4 of the
9     attorney-client fee contract that you signed in late February
10    provides that we are entitled to recoup our standard hourly
11    fees and out-of-pocket costs from this fund."
12    Q.  Ms. Regnier, is there any reference to Ms. Daniels's book
13    contract in this paragraph?
14    A.  No, there is not.
15    Q.  Is there any reference to Ms. Daniels's book advance
16    payments in this paragraph?
17    A.  No, there is not.
18    Q.  Is there any reference to a loan provided by the defendant
19    or his law firm in this paragraph?
20    A.  No, there is not.
21          MR. SOBELMAN:  Could we please turn to the second page
22    of the exhibit and focus on the section with the title
23    "out-of-pocket expenses."
24    Q.  Ms. Regnier, generally, what is your understanding of what
25    is listed here?

1    A.  Court reporter fees, courier fees, miscellaneous expenses

2    in a litigation matter.

3    Q.  Sorry.  Let me just pause you.  I'm not sure we need to go

4    through each one.  Just generally, what is listed in this

5    section?

6    A.  Those are just the fees that Mr. Avenatti's paid for

7    through the firm -- or expenses.  Excuse me.

8    Q.  Just to be clear, these are expenses that the letter claims

9    were incurred on behalf of Ms. Daniels's representation, is

10   that right?

11   A.  Correct.

12   Q.  OK.  And do you see where security is listed?

13   A.  Yes.

14   Q.  And next to that is an amount of $352,521.73, is that

15   right?

16   A.  Yes, it is.

17   Q.  And based on your conversations with the defendant, what is

18   your understanding of how Ms. Daniels's security costs were to

19   be paid?

20   A.  The security costs were paid by the firm, and then -- they

21   were originally advanced by the firm, and then they were paid

22   out of the defense fund when it was established.

23   Q.  Was that a loan to Ms. Daniels?

24   A.  No.  It was a cost of her -- the cost.

25   Q.  Anywhere in this part of the letter does it mention

1  anything about a loan?

2  A.  No, it does not.

3  Q.  At any time did the defendant suggest to you that the

4  payments for Ms. Daniels's security costs were some type of

5  loan or advance from the firm that she was going to have to pay

6  back?

7  A.  No.  They were treated as costs to the case.

8  Q.  What, if anything, does this letter say, in any part of it,

9  about whether Ms. Daniels owed the defendant or his law firm

10 any money?

11 A.  It's not a letter requesting payment.  It's just a recap.

12 Q.  What, if anything, did this letter say about Ms. Daniels's

13 book contract?

14 A.  It does not mention the book contract.

15 Q.  What, if anything, does this letter say about Ms. Daniels's

16 book advance payments?

17 A.  It doesn't mention the book at all in this letter.

18         MR. SOBELMAN:  Let's go back to the first page,

19 quickly.

20 Q.  Ms. Regnier, can you remind us, what's the date of this

21 letter?

22 A.  November 30, 2018.

23         MR. SOBELMAN:  OK.  We can take this exhibit down.

24         THE COURT:  All right.  Mr. Sobelman, why don't we

25 stop there, then.

M1pWave3                          Regnier - Direct

1              MR. SOBELMAN:  Yes, your Honor.

2              THE COURT:  Ladies and gentlemen, just so your food

3    doesn't get cold -- I understand some of it is hot -- or

4    colder; it might be a little cold already, for which I

5    apologize -- let's take our break now.  It is 11:56.  Let's be

6    ready to go at 12:30 so that we can keep things going and make

7    the most of our time, since we had a little bit of a break.

8    Hopefully that will give you enough time.

9              My usual reminders apply here too.  Keep an open mind.

10   Don't discuss the case.  Don't do any research about the case.

11             With that, enjoy your lunches, and we'll see you

12   shortly after 12:30.  Thank you.

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Counsel, should I tell Ms. Regnier to log off, or how

4       do you want to do this?  Should she just mute for the break?

5              MR. SOBELMAN:  Ms. Regnier, if you could mute and you

6       can even turn your camera off, and then please be back on a few

7       minutes before 12:30.

8              THE COURT:  Why don't you be on at 12:30, ready to go,

9       and we'll give you further instructions then, but if you can

10      mute yourself now and shut your camera off, that would be

11      great.

12             MR. SOBELMAN:  And mute such that you can't hear the

13      discussion in court as well.

14             THE COURT:  Yes.

15             MR. SOBELMAN:  Thank you.

16             THE WITNESS:  OK.

17             THE COURT:  Thank you.  Enjoy your break.

18             (Witness not present)

19             THE COURT:  All right.  Anything to discuss aside from

20      the request for adjournment earlier?

21             From the government.

22             MR. SOBELMAN:  Nothing from the government, your

23      Honor.

24             THE COURT:  All right.

25             MR. BAUM:  Judge, so you understand, we didn't make a

M1pWave3

1    request for adjournment.

2            THE COURT:  Sorry.  Request for a recess.

3            MR. BAUM:  Yes.

4            THE COURT:  I misused the word.  My apologies.

5        Well, you have the next half an hour to discuss the

6    matter together, and I would urge you to certainly have a very

7    serious discussion.  I'm acutely mindful of the defendant's

8    right to represent himself in a criminal trial, but after the

9    trial has begun, that right is quote/unquote sharply curtailed.

10   *United States v. Pickett*, 387 F.App'x 32, 34 (2d Cir. 2010);

11   quoting *United States v. Stevens*, 83 F.3d 60, 67 (2d Cir.

12   1996).

13           Among other things, I have to weigh the reasons for

14   the request, the status of the proceedings, the effect it would

15   have on the proceedings, and so forth, and ultimately, I have

16   to strike the right balance with respect to those matters.  It

17   is firmly within my discretion.  There's ample authority for

18   the proposition that I do not, in the middle of a trial, need

19   to immediately take up a request to proceed *pro se*.  I would

20   note at this point there hasn't been such a request, merely a

21   request for a recess.  But in any event, I don't need to

22   immediately take it up.  *See, e.g.*, *Jones v. Racette*, 2016 WL

23   7189851, at * 8 (S.D.N.Y. Dec. 2, 2016); citing *Clark v. Perez*,

24   510 F.3d 382, 395 (2d Cir. 2008).

25           (Continued on next page)

M1pnave4                          Regnier - Direct

```
 1                         AFTERNOON SESSION

 2                           (12:25 p.m.)

 3              THE COURT:  You may be seated.

 4              Do you know where the defense team is?

 5              MR. SOBELMAN:  We let them know, your Honor.

 6              THE COURT:  Here is Mr. Dalack.

 7              Mr. Dalack, do you know where your client is and

 8    Mr. Baum?

 9              MR. DALACK:  Yes, he's coming in shortly with

10    Mr. Baum.  I anticipate that he will request an opportunity to

11    address the Court.

12              MR. SOBELMAN:  Your Honor, the witness is back.  If

13    you would like, we can ask her to turn off her sound until we

14    text her.

15              THE COURT:  Yes, please do that.

16              Ms. Regnier, are you able to hear?

17              THE WITNESS:  Yes.

18              THE COURT:  All right.  You can just shut off the

19    sound on your side so you can't hear what's going on in Court.

20    Counsel will text you when it's time to turn your sound back

21    on.

22              THE WITNESS:  Okay.

23              THE COURT:  Thank you.

24              Mr. Avenatti is here.  I said 12:25.  It's 12:29.  I

25    meant 12:25.
```

1              Are we ready to proceed?

2              Does Anyone wish to raise anything.

3              MR. SOBELMAN:  The government has a very quick issue.

4     We noticed a typo in the chart admitted as Government Exhibit

5     803.  We consulted with the defense.  We are going to correct

6     the typo and on consent we would ask that it be substituted.

7              THE COURT:  Any objection from the defense?

8              MS. GIWA:  No objection, your Honor.

9              THE COURT:  All right.  So let's just swap that out.

10    I can't imagine the jury noticed the typo, and we will just

11    treat the corrected exhibit as the exhibit.

12             Anything from the defense?

13             THE DEFENDANT:  Your Honor, I would like to be heard

14    I'm make a formal application to represent myself immediately

15    in this trial.  I am not requesting any delay.  I am prepared

16    to cross-examine Ms. Regnier without any recess or continuance.

17             There has been a breakdown in the relationship between

18    me and my counsel that goes to the heart of my ability to mount

19    a defense.  This breakdown includes disagreements as to the

20    scope and method of cross-examination of Ms. Regnier, who is

21    currently on the stand on direct.  This is a critical witness,

22    and I wish to cross-examine her, especially given her testimony

23    earlier today and my superior knowledge of the issues she

24    testified about.

25             I have also heard your Honor's comments relating to

1    various criticisms of my counsel over the last two days,

2    including the untimeliness of various things that have

3    occurred.  That is also something that I have taken into

4    consideration in making my decision.

5            Again, I am prepared to proceed without any delay.  I

6    am completely competent to proceed in this case as my own

7    counsel.  I was -- I still am technically a member of the bar.

8    I recently represented myself in federal court in the Central

9    District of California in a criminal trial before the Honorable

10   James V. Selna without incident.  Judge Selna found that I was

11   competent to represent myself.

12           That trial lasted six weeks.  I also have significant

13   trial experience in various state and federal courts across the

14   country.  I would be happy to provide the Court with additional

15   information relating to that experience, and I would also be

16   happy to provide additional information to the Court related to

17   the breakdown between me and my counsel in camera.

18           If I could just have one moment, your Honor.

19           This is not the middle of trial.  We have had one

20   witness who's completed -- one government witness who's

21   completed his testimony.  Ms. Regnier is still on direct.

22   She's the second witness in the case.  It's the second day of

23   trial.

24           For each of those reasons, your Honor, pursuant to my

25   Fifth and Sixth Amendment rights under the Constitution, I'm

1    requesting, and under *Faretta*, I am requesting the opportunity

2    to immediately represent myself in the trial of this matter.

3             Thank you.

4             THE COURT:  All right.  Thank you, Mr. Avenatti.

5             So that is certainly a clear and unequivocal request

6    to exercise Mr. Avenatti's Sixth Amendment right to represent

7    himself.  To me the only relevant question is whether we take

8    that up now.  I'm prepared to do so, or if we carry on with the

9    witness and take it up at the end of the day.

10            Does the government have a position on that?

11            MR. SOBELMAN:  Your Honor, we defer to the Court, but

12   our preference would be the end of the day.  There's no reason

13   to interrupt the witness' testimony and take up the jury's

14   time.  We can do this at the end of the day.

15            THE COURT:  Does defense counsel wish to be heard on

16   that?  Not Mr. Avenatti.

17            Does defense counsel wish to be heard?

18            MR. BAUM:  We are ready to proceed, but Mr. Avenatti's

19   point is that he needs to take over the case now, and he seeks

20   to cross-examine Ms. Regnier because of the difference of

21   opinion as to the thrust and scope of the cross-examination we

22   intend to do.

23            THE COURT:  All right.  I'll tell you what.  I'm

24   prepared to deal with it.  Since it is made in specific

25   reference to cross-examining Ms. Regnier, I think it's probably

1    best to just deal with it now and permit him to conduct that

2    cross-examination if that's the way things turn out.  I will

3    explain to the jury that we have a legal matter and that is

4    what has delayed them.  I will have my law clerk communicate

5    that so my deputy is aware of the fact that it will be a little

6    bit more time.

7          Let us proceed.  Mr. Avenatti, I want you to listen

8    carefully.

9          You have the right to counsel; that is, you have the

10    right to have a lawyer representing you in these proceedings

11    and during the remainder of trial.

12          You may waive your right to counsel and represent

13    yourself, but only if you meet certain requirements, as you may

14    know from the proceeding in California.

15          In particular, if you want to represent yourself, you

16    must make a request to do so that is clear and unequivocal and

17    not for purposes of delay or manipulation, knowing,

18    intelligent, and voluntary and timely.  See *Williams v.*

19    *Bartlett* 44 F.3d 95 at 99, (2d Cir. 1994).

20          First, if you want to represent yourself, you must say

21    so clearly and unequivocally.  As I've already indicated, I

22    find that you have done so.  So that requirement is satisfied.

23          Second, your request for self-representation must be

24    knowing, intelligent, and voluntary.  In other words, before

25    you decide what you want to do, you must understand the

M1pnave4                          Regnier - Direct

1    consequences of your decision.

2              I want you to understand what is at stake here.  I

3    know you are a lawyer, as you stated, but my understanding is

4    that, with the exception of the California action in which you

5    represented yourself, you do not have experience handling

6    criminal trials, and regardless you should be aware of the

7    dangers and disadvantages of proceeding without a lawyer.  You

8    must know, in other words, what you are doing and make your

9    choice with your eyes wide open.

10             Let me now try to explain to you some of the

11   difficulties and dangers of self-representation.  If I say

12   something that you do not understand, please let me know, and I

13   will try to explain it to you again.  If at any point you would

14   like to consult with your counsel, please let me know that.

15             It is vitally important that you understand the choice

16   that you are going to be making, and I will do everything I can

17   to ensure that you do understand your choices.

18             You are facing very serious charges in this case, to

19   wit, one count of wire fraud and one count of aggravated

20   identity theft.

21             The first count -- counsel, correct me if I'm wrong --

22   carries a maximum term of imprisonment of 30 years.

23             Count Two requires a term of imprisonment of two years

24   to run consecutive to any imprisonment imposed on Count One.

25             Is that correct?

M1pnave4                        Regnier - Direct

1          MR. SOBELMAN:  Count One is actually a maximum term of

2     imprisonment of 20 years.

3          THE COURT:  Excuse me.  I meant to say 20 years.  My

4     apologies.  All right.

5          These charges are factually complex, and the trial

6     proceedings will be procedurally complex, as you have already

7     seen.  Defending against these charges will require additional

8     legal work and require familiarity with the Federal Rules of

9     Criminal Procedure and the Federal Rules of Evidence.

10          Defending against these charges may require, among

11     other things, filing or making additional legal motions, making

12     objections during the course of the trial, such as an objection

13     to hearsay or other inadmissible types of evidence,

14     cross-examining witnesses called by the government to test

15     their perception or memory of events, their motives or possible

16     bias and the truthfulness of their testimony; calling witnesses

17     for the defense, and eliciting from them evidence that is

18     favorable to your case; moving tangible objects such as

19     documents into evidence, which can be a technical process under

20     the rules of evidence that govern in this Court; and making a

21     closing argument to the jury that summarizes the evidence and

22     argues under the applicable law for an acquittal.

23          All of these things are usually better done by a

24     criminal lawyer because the lawyer is specially trained to do

25     them and has special knowledge of and experience with the

1    substantive and procedural rules of law and of this Court.

2           In that regard, I would note that the three lawyers

3    that you have representing you here today are very familiar

4    with those rules and practices, very familiar with this Court

5    generally and with me specifically, and are among the finest

6    defense lawyers in this district, and as far as I can tell have

7    ably and zealously represented you throughout these

8    proceedings.  The fact that I have found some of their

9    arguments to be wanting is no criticism of them as lawyers.

10   They are exceptionally good lawyers.

11          Obviously, there will be serious consequences if your

12   defense is mishandled here.  In that regard you may well be

13   better off leaving it in the hands of your capable lawyers.

14   For these reasons, among others, it is almost always a good

15   idea for a defendant in a criminal case to proceed with

16   counsel.  I do not however want you to take these warnings or

17   anything else that I am saying, including my praise of your

18   lawyers, as any kind of veiled threat or as a suggestion that I

19   will be disposed against you if you decide to represent

20   yourself.

21          That choice is entirely yours under the Sixth

22   Amendment of the United States Constitution, so long as you

23   make it in a knowing, intelligent, and voluntary fashion with a

24   proper understanding of what is at stake.  I am only trying to

25   ensure that you make an informed decision.

1              Now, finally, let me just caution you that you do not

2    have the right to manipulate these proceedings or cause undue

3    delay.  I am proceeding now for the reasons that I have stated,

4    but certainly I will not permit you to go back and forth on

5    this and delay the proceedings.  You are making a choice to

6    proceed on your own and that is the way the trial will be

7    conducted if you are allowed to do so, and you should be

8    advised and understand that you may not delay the proceedings

9    unduly.

10             This is an important moment in the case.  We are

11   holding this hearing because you have an important decision to

12   make.  You should make a thoughtful and considerate choice that

13   you can live with until the trial is over.

14             Now, if you decide to represent yourself, I will

15   appoint your existing lawyers to serve as what is called

16   standby counsel to assist you.  You will still largely control

17   the presentation of your case, but you will have the lawyers to

18   explain to you the details of courtroom protocol, the rules of

19   evidence, and procedure.  The lawyers will be to help you

20   prior -- I guess during the remainder of trial to help in

21   introducing evidence, objecting to testimony, and will be

22   available to take over if I find for some reason that you have

23   forfeited your right to self-representation.

24             Standby counsel is there to assist, but will not be

25   permitted to interfere with your control of the case with a few

exceptions, and you do not have the right to reject standby
counsel if you decide to proceed pro se.

However, even with standby counsel, you would still
largely control the presentation of your case to the jury.  For
example, you will have a right to control the organization and
content of your own defense, to make motions, to argue points
of law, to question most witnesses, and to address the Court
and the jury at appropriate points in the trial.

Standby counsel may not interfere with your control of
the case or your appearance of control before the jury.  They
may express disagreement with your decisions, but must do so
outside the jury's presence.

You ultimately retain final authority over the case.
Of course, you will have to do all of these things within the
limits set by the rules of courtroom procedure, evidence, and
decorum.  That includes not making any statements to the jury
that would constitute testimony without taking the stand and
testifying as a witness subject to cross-examination.

This is not to say, however, that standby counsel is
prohibited from acting at all in front of the jury.  They may
assist you in overcoming routine procedural or evidentiary
obstacles, such as introducing evidence or objecting to
testimony and may help to ensure your compliance with basic
rules of courtroom procedure and protocol.

In summary, then, you have a right to be represented

M1pnave4                          Regnier – Direct

by a lawyer, and you have a right to represent yourself.  You

do not have, however, have a right to hybrid representation

where you and a lawyer act as cocounsel in the conduct of your

defense.  And, as I stated, you have no right to disrupt these

proceedings by going back and forth on these matters.

        If you do not waive your right to counsel and you are

represented by a lawyer, then the lawyer will continue to

conduct your defense.  You will not be permitted to examine

witnesses, offer evidence, address me or the jury directly,

participate in conferences here at the bench, or perform any of

the attorney's core functions in the courtroom.  You will, of

course, be permitted to remain in the courtroom during your

trial, provided as always that you maintain proper decorum.

And I would encourage you to work behind the scenes with your

lawyers to help them represent you as well as possible.  But if

you are represented by them, you will not function as an

advocate in your trial.  Your only public speaking role would

arise if you decided to testify, in which case you would answer

the specific questions posed by your lawyers and by the lawyers

for the government.

        To repeat, if you continue to be represented by

counsel, then it is counsel and not you who will conduct the

defense.  If you represent yourself, I am not going to treat

you any differently than any other defendant, and the Court of

Appeals is not going to treat your case any differently.  If

M1pnave4                           Regnier - Direct

1    you make the decision to represent yourself and you make

2    mistakes, you are not going to be able to come back and

3    complain about those mistakes.  You will have accepted

4    responsibility for them.

5              There are some other things that you should know.

6              If you do choose to represent yourself, you must

7    understand that it does not give you license to abuse the

8    dignity of the courtroom or license to violate the relevant

9    rules of procedural and substantive law.

10             You must always abide by courtroom protocol and

11   maintain proper decorum.  You may not improperly disrupt the

12   proceedings.  You must, for example, follow the rules of

13   evidence.  You must obey my rulings, even if you disagree with

14   them, knowing that you have preserved any objection for review

15   by the appellate court.  If you deliberately engage in serious

16   and obstructionist misconduct, I will terminate your

17   self-representation.  If I am forced to do so, then standby

18   counsel would take over defense of the case for you.

19             Now, if you would like a moment to consult further

20   with counsel or to think further about your decision, I will

21   pause these proceedings so that you may do so, recognizing that

22   we won't give you too much further time, but would you like an

23   opportunity to confer further with your counsel or to think

24   about this further, Mr. Avenatti.

25             THE DEFENDANT:  In light of your Honor's statements, I

M1pnave4                          Regnier - Direct

1    would.

2              THE COURT:  Okay.  Then do you want to step outside,

3    and I'll give you five minutes and please come back?

4              THE DEFENDANT:  Can I have 15 minutes, your Honor?

5              THE COURT:  No, you can have five.  If you're not

6    prepared to proceed at that time, we will take it up at the end

7    of the day.

8              THE DEFENDANT:  Understood.

9              THE COURT:  Counsel, has Ms. Regnier been told that

10   she should continue to stand by?

11             MR. SOBELMAN:  Yes, your Honor.  She's going to

12   continue to sit there until we tell her otherwise.

13             THE COURT:  Okay.  Thank you.

14             (Pause)

15             THE COURT:  I am going to have my deputy go get

16   Mr. Avenatti and counsel.

17             All right.  Mr. Avenatti is back with counsel.

18             Mr. Avenatti, how do you wish to proceed?

19             THE DEFENDANT:  Your Honor, I am prepared, in light of

20   your Honor's prior statements, to go ahead and proceed to

21   represent myself in the trial.  I am mindful of what your Honor

22   has said.  I have taken those statements into consideration.  I

23   make this decision knowingly and voluntarily.

24             I have one question, which is I am asking that the

25   jury merely be instructed that Mr. Avenatti has decided to

M1pnave4                          Regnier - Direct

1   assist in his defense.

2           THE COURT:  Well, let me address that now.  If I grant

3   your request -- and I will ask you some questions to ensure

4   that you are making the decision knowingly and voluntarily --

5   what I would propose to instruct the jury is slightly

6   different, because I am not permitting a hybrid representation

7   situation.

8           If you are exercising your right to represent

9   yourself, you are representing yourself.  What I will do is

10  tell the jury that, under the Constitution of the United

11  States, a criminal defendant has the right to represent himself

12  if he chooses to do so.  You have made the choice to do that;

13  that your lawyers will or that counsel here will remain to

14  assist you as standby counsel, but you are now representing

15  yourself and will be handling the defense for the remainder of

16  the trial; and that they are not to weigh that in any way in

17  making their determinations or in their deliberations.  In

18  other words, you have that right, and they should not consider

19  it in any respect with respect to whether the government has

20  carried its burden of proving your guilt beyond a reasonable

21  doubt.

22          Let me ask the government if it agrees with that

23  approach or has any suggestions, and then I will turn back to

24  Mr. Avenatti.

25          MR. SOBELMAN:  Your Honor, we have no objection to

M1pnave4                          Regnier - Direct

1    that instruction if your Honor grants the defense request.

2              THE COURT:  All right.

3              THE DEFENDANT:  Your Honor, if I can just hear a

4    preview of the instructions.

5              THE COURT:  Sure.  I think we are putting the cart

6    before the horse a little bit.  That's my inclination at the

7    moment, and you should understand that.  But assuming I grant

8    your request to represent yourself, then you can certainly be

9    heard with respect to what I should tell the jury.

10             With that, let me ask you some questions to learn a

11   little bit more about your background, education, and

12   experience and your familiarity with the American legal system.

13             I also will inquire into any recent or regular use of

14   alcohol, narcotics, or prescription medications to ensure that

15   your judgment today is not clouded.  And then I will hear your

16   decision and make my findings.

17             First, let me ask you, have you ever been hospitalized

18   or treated for any form of mental illness?

19             THE DEFENDANT:  I have been hospitalized, but never

20   treated for any mental illness.

21             THE COURT:  Were you hospitalized for mental illness?

22             THE DEFENDANT:  No, your Honor.  I was hospitalized in

23   connection with a couple of surgeries.

24             THE COURT:  Understood.

25             Are you now or have you recently been under the care a

 1    doctor or a mental health professional?

 2               THE DEFENDANT:  No, your Honor.

 3               THE COURT:  Have you ever been hospitalized or treated

 4    for any addiction, including drug or alcohol addiction?

 5               THE DEFENDANT:  No, your Honor.

 6               THE COURT:  In the last 48 hours, have you taken any

 7    medicine pills drugs or had any alcohol.

 8               THE DEFENDANT:  I have had one drink in the last 48

 9    hours and that was it.

10               THE COURT:  When was that?

11               THE DEFENDANT:  Last night.

12               THE COURT:  Is your mind clear today?

13               THE DEFENDANT:  Yes, your Honor.

14               THE COURT:  Do you feel that your judgment is clouded

15    at all by that one drink you had last night?

16               THE DEFENDANT:  No, your Honor.

17               THE COURT:  Do you understand the nature of these

18    proceedings?

19               THE DEFENDANT:  I do.

20               THE COURT:  And have you discussed -- I don't want to

21    know the particulars, but have you discussed your decision

22    whether to proceed representing yourself with the three lawyers

23    who are currently representing you?

24               Have you discussed that with them?

25               THE DEFENDANT:  Yes.

M1pnave4                          Regnier - Direct

1           THE COURT:  And you have had sufficient opportunity to

2    discuss it with them, recognizing of course that you did ask

3    for more time than I gave you?

4           THE DEFENDANT:  I have.

5           THE COURT:  All right.  Do you understand that, while

6    you have the right to represent yourself, that I must decide

7    for myself whether your waiver of the right to counsel is

8    knowing, intelligent, and voluntary?

9           Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Do you understand the nature and purpose

12   of this trial?

13          THE DEFENDANT:  I do.

14          THE COURT:  Did you study law in the United States?

15          THE DEFENDANT:  I did.

16          THE COURT:  And did you graduate from law school?

17          THE DEFENDANT:  Yes.

18          THE COURT:  How far did you go in your education?

19          THE DEFENDANT:  I graduated from law school.  That was

20   the end of my education, formal education.

21          THE COURT:  All right.  You mentioned that you

22   represented yourself in the proceeding before Judge Selna.

23          Is that correct?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Can you tell me a little bit more about

1    that when that occurred in connection with the trial and how --

2    I know it ended with a mistrial, but tell me a little bit more

3    about that and how Judge Selna handled it.

4              THE DEFENDANT:  I invoked my right to represent myself

5    immediately prior to the jury being sworn in late July of 2021.

6    The trial ended in a mistrial in August after approximately

7    five or six weeks of trial.

8              THE COURT:  Did Judge Selna advise you about the

9    disadvantages of proceeding on your own as well?

10             THE DEFENDANT:  Yes, he did, your Honor, fully.

11             THE COURT:  All right.  Did he advise you about your

12   rights and limitations on those rights, as I have?

13             THE DEFENDANT:  Yes, he did.

14             THE COURT:  All right.  Do you understand that you are

15   charged here with two counts, with one count of wire fraud and

16   one count of aggravated identity theft, the first under 18 U.S

17   Code Sections 1343 and 2 and the second under 18 U.S. Code,

18   1028A(a)(1) and (b) and Section 2?

19             Do you understand that those are the charges?

20             THE DEFENDANT:  I do.

21             THE COURT:  Do you understand the nature and elements

22   of those charges?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Do you understand that the maximum

25   sentence for Count One -- by maximum I mean the most that could

M1pnave4                    Regnier - Direct

possibly be imposed upon you.  It doesn't mean that that is

what you would receive if convicted, but the maximum term of

imprisonment is 20 years, which could be followed by up to five

years of supervised release, and that I could impose a fine of

the greatest of $250,000 or twice the gross pecuniary gain or

twice the gross pecuniary loss to someone other than you as a

result of the offense; that I can also order restitution to any

victims of the offense; and that I may order forfeiture?

            Do you understand that those are the maximum possible

penalties for Count One?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  Do you understand that with respect to

Count Two that that carries a maximum term of imprisonment and

a minimum term of imprisonment of two years, which must be

imposed to run consecutive to any sentence imposed on Count

One.

            Do you understand that?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  Now, do you understand that if you were

convicted and I had to impose sentence that I would have to

consider the applicable guidelines range under the United

States Sentencing Guidelines?

            Do you understand that?

            THE DEFENDANT:  Yes, your Honor.

            THE COURT:  And of course you have been through that

M1pnave4                      Regnier - Direct

1   process I believe before Judge Gardephe in connection with

2   another trial as well, is that correct?

3          THE DEFENDANT:  You are correct, your Honor.

4          THE COURT:  All right.  So you are generally familiar

5   with how the guidelines work and how the sentencing process

6   works?

7          THE DEFENDANT:  Generally, yes.

8          THE COURT:  Have you discussed that process with your

9   lawyers?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you understand that if you represent

12   yourself, you stand by yourself, that is to say that, while

13   counsel can assist you as standby counsel, that you are in

14   charge of your defense, and that I will not advise you about

15   how to try your case?

16          Do you understand that?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Are you familiar with the Federal Rules of

19   Evidence?

20          THE DEFENDANT:  I am.

21          THE COURT:  Are you familiar with the Federal Rules of

22   Criminal Procedure.

23          THE DEFENDANT:  Less than the evidence, but yes.

24          THE COURT:  I take it you had to familiarize yourself

25   somewhat with those rules in connection with the California

M1pnave4                      Regnier - Direct

1    case?

2              THE DEFENDANT:  You are correct.

3              THE COURT:  Do you understand what I said earlier,

4    that most people would say that having an attorney to deal with

5    issues relating to legal matters and the conduct of a trial is

6    generally a sort of sounder decision than representing oneself?

7              Do you understand that?

8              THE DEFENDANT:  I do.

9              THE COURT:  Do you understand that an attorney may

10   well be able to deal better with any plea discussions with the

11   government to the extent that there are any during this trial?

12             Do you understand that?

13             THE DEFENDANT:  I do.

14             THE COURT:  Do you understand that even if you have

15   standby counsel, and I already indicated that I will appoint

16   counsel to remain as standby counsel, that they may not address

17   the jury, make objections, and cannot question witnesses, that

18   those matters will be done by you and by you alone?

19             Do you understand that?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Do you understand that an attorney trained

22   in criminal practice is more qualified to conduct your legal

23   defense likely than you are?

24             Do you understand that?

25             THE DEFENDANT:  Yes.

1          THE COURT:  In light of the penalties that you may

2     suffer if found guilty, in light of all of the challenges of

3     representing oneself, do you still wish to represent yourself

4     and give up your right to be represented by counsel?

5          THE DEFENDANT:  I do, your Honor.

6          THE COURT:  Are you making that waiver knowingly and

7     voluntarily?

8          THE DEFENDANT:  I am.

9          THE COURT:  Have there been any threats to get you to

10    waive your right to counsel?

11         THE DEFENDANT:  No.

12         THE COURT:  In other words, has anyone threatened you

13    or threatened you to waive the right to counsel?

14         THE DEFENDANT:  No.

15         THE COURT:  Has anyone made any promises to you or

16    offered you any inducement to get you to waive the right to

17    counsel?

18         THE DEFENDANT:  No, your Honor.

19         THE COURT:  Mr. Sobelman, any additional questions

20    that you think I should ask of Mr. Avenatti?

21         MR. SOBELMAN:  No, your Honor.

22         THE COURT:  Do you agree that Mr. Avenatti has

23    knowingly and voluntarily waived his right to counsel such that

24    he should be permitted to represent himself?

25         MR. SOBELMAN:  Your Honor, we have no objection that

M1pnave4                    Regnier - Direct

1    the defendant has knowingly and waived voluntarily waived his

2    right.  There are factors your Honor can consider in deciding

3    whether to grant the request.

4              THE COURT:  Do you want to leave me in suspense, or do

5    you want to share what you why referring to?

6              MR. SOBELMAN:  May I just consult briefly, your Honor.

7              THE COURT:  Sure.

8              MR. SOBELMAN:  Your Honor, we do have concerns about

9    the potential disruption of trial as well as it appears to be a

10   strategic move specifically in advance of this witness, who the

11   defendant cross-examined in the California case for something

12   like two full trial days.  So we do have some concerns.  We

13   understand the defendant said he's ready to proceed, but we do

14   have concerns related to that that we think the Court should

15   consider.

16             THE COURT:  All right.  Well, I certainly think there

17   is an argument that there's some strategic gamesmanship going

18   on here.  Obviously the defense has tried repeatedly to adjourn

19   the trial.  But that being said, if I make a finding that he

20   has knowingly and voluntarily waived his right to counsel, I

21   will allow to him to proceed and I think we're done with what

22   we need to do and the disruption has come to an end.  I

23   certainly, as I warned earlier, won't permit Mr. Avenatti to

24   disrupt the proceedings if he does represent himself.

25             As for whether it's strategic, it may well be

1    strategic, but I think he's entitled to decide if strategically

2    he wishes to represent himself for purposes of cross-examining

3    this witness, subject of course to my authority to regulate the

4    conduct and timing of the trial.

5           If you have an objection to any question or the length

6    of his cross, you are certainly welcome to make that, and I

7    will exercise my rights under Rule 611 to control the conduct

8    of the proceedings.

9           With that understanding, defense counsel, do you think

10   that I should ask Mr. Avenatti any additional questions?

11          MR. BAUM:  No, your Honor.

12          THE COURT:  Do you agree that he has knowingly and

13   voluntarily waived his right to counsel under the Sixth

14   Amendment?

15          MR. BAUM:  We do.

16          THE COURT:  Based on my observation of Mr. Avenatti

17   and his statements today, I find that he is competent to waive

18   his Sixth Amendment right to counsel and that he does so

19   knowingly, intelligently, and voluntarily.

20          Therefore, I find that he may and henceforth will be

21   representing himself during this trial.

22          With that, let's talk briefly about what I will tell

23   the jury when they return and then let's get the jury and

24   proceed.

25          Mr. Avenatti, do you wish to be heard on the

1    instructions?

2              MR. AVENATTI:  Yes, your Honor.

3              Would you prefer if I stand, or can I address Court

4    sitting, as I have been doing?

5              THE COURT:  That's fine.  Just because I want to make

6    sure I can hear you, and speaking into the microphone is the

7    most important thing.

8              MR. AVENATTI:  Understood, your Honor.

9              I object to the proposed instruction in that I believe

10   it's prejudicial and informs the jury of a number of things

11   that are unnecessary.

12             Frankly, if the Court is disinclined to give the

13   instruction that I have proposed, then I would ask that no

14   instruction be given at all, that the jury not be informed of

15   my decision, and that I merely be allowed to rise to conduct

16   the cross-examination and we will proceed with the trial.

17             I don't think it's necessary to advise the jury of my

18   decision.  And I will take the risk.  If we do not give an

19   instruction associated with any, you know, intentional decision

20   or potential view of me conducting cross-examinations and

21   participating in the trial, I'll take that risk.  My concern is

22   that the instruction that the Court proposes says too much,

23   your Honor.

24             THE COURT:  Mr. Sobelman?

25             MR. SOBELMAN:  Your Honor, we respectfully disagree.

M1pnave4                          Regnier - Direct

The instruction as proposed is entirely accurate, and we think
the jury could be confused about what's going on here if
they're not informed as to the defendant's decision.

It was his decision to make this decision in the
middle of trial.  He could have done it before trial, and then
this issue wouldn't have arisen, but we are where we are.

MR. AVENATTI:  Your Honor, just one last thing.  My
concern would be that the jury comes to a conclusion that, you
know, either I fired my lawyers or my lawyers fired me or
something of that nature.  And that's my concern.  So --

THE COURT:  Well, Mr. Avenatti that concern arises
whether I give them an instruction or not, since they will
obviously pick up on the fact that you are now representing
yourself.

I think there's no way to proceed without explaining
to the jury that something has happened, and I think it is much
better to explain to the jury that under the Constitution of
the United States that you have the right to do that, and
you're exercising that right.  I think, if anything, that cures
and addresses any potential prejudice.

As I said, I will instruct them that they should not
take that into consideration or the reasons for your decision.
They shouldn't speculate about the reasons for your decision,
and they shouldn't take that decision into their consideration
in any way, shape, or form.

1          I see nothing prejudicial about that.  If anything, it

2     addresses any potential prejudice.  So I will give them that

3     instruction.

4          My deputy has gone to get the jury.  Why don't we get

5     Ms. Regnier back on audio and be ready to proceed.

6          MR. SOBELMAN:  Briefly, your Honor.  Mr. Ambrosio

7     asked me to convey a request to the Court that he be permitted

8     to call his client and alert her that Mr. Avenatti is going to

9     be conducting the cross-examination.  I know she went through a

10    difficult time last summer during that examination.

11         THE COURT:  Why don't we just unmute her and I will

12    advise her.

13         MR. SOBELMAN:  That's fine, your Honor.

14         THE COURT:  All right.

15         MR. SOBELMAN:  Special Agent Penland, can we text

16    Ms. Regnier and ask her to unmute her computer.

17         THE COURT:  Ms. Regnier, can you hear me?

18         THE WITNESS:  Yes, I can.

19         THE COURT:  All right.  I apologize for the delay.

20    Thank you for your patience.  I just wanted to give you a

21    heads-up that Mr. Avenatti has exercised his right to represent

22    himself, so he will be the one conducting the cross-examination

23    when that time arises.  But with that, we will proceed with

24    your direct when the jury returns to the courtroom.

25         MR. SOBELMAN:  Your Honor, sorry.  The defense just

M1pnave4                          Regnier - Direct

1    let us know they intend to use an exhibit they previously told

2    us they were not during Ms. Regnier's cross.  We can just

3    object in real-time, but I just wanted to flag it.  If your

4    Honor wanted to rule on it now, we can raise it now.

5              THE COURT:  You can do it in real-time.  Thank you.

6              MR. SOBELMAN:  Thank you, your Honor.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may be seated.

3           All right.  Ladies and gentlemen, thank you very, very

4   much for your patience.  I sincerely apologize for making you

5   wait.  I think you've picked up that I like to keep to my

6   schedule and in that sense didn't deviate from it lightly.

7           I mentioned to you in the preliminary instructions

8   that from time to time there might be legal issues that arise

9   that I need to discuss with the parties outside of your

10  presence, and that when those can take a while that it is

11  better to leave you in the comfort of the jury room than bring

12  you back here.  So that was what was going on.

13          Let me share with you one development and give you an

14  instruction about it, which is that under the Constitution of

15  the United States, the Sixth Amendment to the Constitution, a

16  defendant in a criminal case has a right to represent himself

17  if he wishes to do so.  Every criminal defendant does have the

18  right to counsel, but if he chooses to waive that right, to

19  give up that right, he is entitled to represent himself.

20          Now, Mr. Avenatti has chosen to exercise the right to

21  do so, that is, to waive his right to counsel and to represent

22  himself for the duration of the trial.  That means that he will

23  be the one making objections if he believes that the government

24  is offering evidence improperly, he will be the one questioning

25  the witnesses, and he will be the one making closing argument

1    to you at the conclusion of trial.

2              Now, his lawyers, his previous counsel -- that is,

3    Mr. Baum, Ms. Giwa and Mr. Dalack -- will remain here serving

4    in the capacity known as standby counsel, that is, basically

5    just here to assist him if he needs assistance and to just help

6    ensure that things run more smoothly.  But the bottom line is

7    Mr. Avenatti is the one now conducting his defense and will

8    control his defense.

9              Now, I want to instruct you, number one, you are not

10   to speculate on the reasons for his making that decision.  As I

11   said, under the Constitution every criminal defendant has the

12   right to make that decision, and he has made that decision.

13   You are not to speculate as to his reasons, nor are you to

14   consider that decision in any way, shape, or form in connection

15   with your deliberations.

16             In other words, you should evaluate the evidence as

17   you would and decide whether the government has proved

18   Mr. Avenatti's guilt beyond a reasonable doubt.  The burden of

19   proof, as I've said, always remains on the government.  So the

20   fact that Mr. Avenatti is now representing himself should not

21   factor into your assessment of the evidence and whether the

22   government has met its burden.

23             With that, we will proceed and continue with the

24   direct testimony of Ms. Regnier.

25             Ms. Regnier, you remain under oath.

1              With that, I will ask counsel to proceed.  Thank you.

2              MR. SOBELMAN:  Please display what's in evidence as

3     Government Exhibit 2.

4     BY MR. SOBELMAN:

5     Q.  Ms. Regnier, is this the document we were taking a look at

6     before the break?

7     A.  Yes.

8     Q.  Can you remind us, what is the date on this document?

9     A.  November 30, 2018.

10             MR. SOBELMAN:  And if we could take a look at the

11    second page of this document, please.

12             Sorry, please go back to the first page.

13             Can you please focus on the last paragraph on the

14    first page.

15    BY MR. SOBELMAN:

16    Q.  Ms. Regnier, can you please read this paragraph.

17    A.  "To date, our fundraising attempts have yielded $587,415,

18    through the first Crowdjustice.org page and approximately

19    $5,000 through the updated page that has since been disabled

20    (please note that the $5,000 has not been received yet from

21    Crowdjustice.org.)  As a result, a total of approximately

22    $592,515 (including your upfront payment) has been raised."

23             MR. SOBELMAN:  We can take this document down.

24    BY MR. SOBELMAN:

25    Q.  As of the date of that letter, November 30, 2018, where

M1pnave4                          Regnier – Direct

1    were you physically working out of?

2    A.  I was working out of my home.

3              MR. AVENATTI:  Objection, your Honor.  Relevance, 401.

4              THE COURT:  Overruled.

5    BY MR. SOBELMAN:

6    Q.  Ms. Regnier, I'll repeat the question.

7              As of November 30, 2018, where were you physically

8    working out of?

9    A.  My home.

10   Q.  Why were you working out of your home?

11             MR. AVENATTI:  Same objection, your Honor.

12             THE COURT:  Same ruling.

13   Q.  Ms. Regnier, why were you working out of your home on

14   November 30, 2018?

15   A.  The firm had been evicted from the law offices.

16   Q.  Approximately when was the defendant's law firm evicted

17   from its law offices?

18             MR. AVENATTI:  Your Honor, can I have a standing

19   objection on this line?

20             THE COURT:  You can.  You may answer.

21   A.  They were evicted shortly before Thanksgiving 2018.

22   Q.  What is your understanding of why the defendant's law firm

23   was evicted from its offices?

24   A.  Nonpayment of rent.

25   Q.  At the time of the eviction in November 2018, for

1    approximately how many months had the law firm not paid its

2    rent?

3    A.   Approximately five months.

4    Q.   At the time of the eviction in November 2018, approximately

5    how much was the rent for the firm's offices?

6    A.   Approximately $50,000 a month.

7    Q.   What is your understanding of why the defendant's law firm

8    did not pay its rent for those months?

9    A.   They did not have the funds to pay the rent.

10   Q.   I am now going to ask you some questions about another

11   document.

12            MR. SOBELMAN:  Could we please show the witness what's

13   been marked for identification as Government Exhibit 4.

14   BY MR. SOBELMAN:

15   Q.   Ms. Regnier, do you recognize this?

16   A.   Yes, I do.

17   Q.   What is it?

18   A.   It's a letter from Mr. Avenatti to Ms. Daniels.

19            MR. SOBELMAN:  The government offers Government

20   Exhibit 4.

21            THE COURT:  Any objection?

22            MR. AVENATTI:  None.

23            THE COURT:  Admitted.

24            (Government Exhibit 4 received in evidence)

25            MR. SOBELMAN:  Please display it for the jury and

1    focus on the top half of the document.

2    BY MR. SOBELMAN:

3    Q.  Ms. Regnier, could you please read the date on this letter.

4    A.  February 19, 2019.

5    Q.  Who is the letter addressed to?

6    A.  Ms. Stormy Daniels.

7    Q.  What, if any, role did you have in drafting this letter?

8    A.  This was -- had been another letter where Michael had

9    forwarded me attached in an e-mail and had me put the letter

10   into final format with the letterhead.

11   Q.  Please focus on the second paragraph.

12            Please read "after much" ending with "financial

13   issues" in this paragraph.

14   A.  "After much contemplation and deliberation, we have decided

15   to terminate our representation of you effective immediately.

16   This decision is not one we make lightly.  Unfortunately,

17   however, we believe that we cannot continue to effectively

18   advocate to your behalf in light of your lack of communication

19   and responsiveness as to time-sensitive matters, including

20   financial issues."

21   Q.  Ms. Regnier, before this letter was sent on February 19,

22   2019, what, if anything, did the defendant say to you about

23   Ms. Daniels not being responsive to him?

24   A.  Mr. Avenatti did not discuss whether or not Ms. Daniels was

25   responsive with me.

Q.  Around the time this letter was sent, what, if anything,
did the defendant say to you about Ms. Daniels' book advance
payments?

A.  He did not discuss the book advance payments with me.

Q.  Around the time this letter was sent what, if any,
questions did the defendant ask you about the status of
Ms. Daniels' book advance payments?

A.  He didn't ask me any questions regarding the book advance
payments.

Q.  At any point in time, did the defendant express any
confusion to you about the status of Ms. Daniels' book advance
payments?

A.  No, he did not.

Q.  Let's now focus on the third paragraph.

    Please read the first sentence of the third paragraph.

A.  "We will, of course, ensure that any property, monies,
documents, and materials that belong to you and that may remain
in our possession will be timely transferred to you or your new
counsel, as you direct.  We will also take all reasonable steps
necessary to transfer the files associated with the multitude
of matters to your new counsel so as to ensure you are not
prejudiced."

Q.  You can stop there.

    Focusing on the first sentence, where it references
returning monies, do you see that?

M1pnave4                    Regnier - Direct

1    A.  Yes, I do.

2    Q.  At any point after this letter was sent on February 19,

3    2019, did the defendant direct you to return any money or

4    anything else to Ms. Daniels?

5    A.  No, he did not.

6    Q.  Around the time this letter was sent, what, if anything,

7    did the defendant tell you about why he was no longer

8    representing Ms. Daniels?

9    A.  He had indicated that he was having difficulty dealing with

10   Ms. Daniels and that's why the letter was sent.

11              MR. SOBELMAN:  Your Honor, can I consult with counsel

12   for one moment.

13              THE COURT:  You may.

14              MR. SOBELMAN:  No further questions, your Honor.

15              THE COURT:  All right.  Cross-examination.

16              Ladies and gentlemen, let me, as Mr. Avenatti gets up

17   to the podium, just mention that now that Mr. Avenatti is

18   representing himself, I want to caution you that anything he

19   says in that capacity is not evidence.

20              So, just as I told you the other day that what the

21   lawyers say, the questions they ask, the objections they make

22   were not evidence, so that is true as to Mr. Avenatti too.  So

23   any question that he asks, any objection that he makes,

24   anything that he says in his closing, that is not evidence.

25              If he chooses to testify when the time comes, then

M1pnave4                          Regnier - Cross

1    that would be evidence, but I remind you that a criminal

2    defendant has no obligation to testify or to put on any case,

3    because the burden is on the government at all times.

4            The key point is I just want to stress that in his

5    capacity as representing himself what he says is not evidence,

6    and you should not take it to be evidence.

7            With that, you may proceed, Mr. Avenatti.

8            MR. AVENATTI:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. AVENATTI:

11   Q.  Ms. Regnier, are you able to hear me and see me?

12   A.  Yes, I am.

13   Q.  Excellent.  Good afternoon.

14           Who is Luke Janklow?

15   A.  I -- other than the documents I've seen here, I really have

16   no independent knowledge of who Mr. Janklow is.

17   Q.  So, other than what the government has shown you during

18   this examination, you have no idea who Mr. Janklow is, true?

19   A.  I have an idea of who he is, but I have no personal

20   knowledge.

21   Q.  You've never had any communications with Mr. Janklow, true?

22   A.  Correct.

23   Q.  Who is Sally Richardson?

24   A.  I do not know that name.

25   Q.  You have no idea who that is, do you?

M1pnave4                        Regnier - Cross

1    A.  No, I do not.

2    Q.  What do you know, if anything, about Ms. Daniels' book

3    deal?

4    A.  I mean, other than that she did have a book deal, I don't

5    know the intricacies of the contract or anything.

6    Q.  Other than the mere fact that she had a book deal, you know

7    nothing of the book deal, true?

8    A.  Correct.

9    Q.  What do you know, if anything, relating to the

10   communications concerning the book, advance payments on the

11   book deal?

12   A.  I'm sorry.  I did not have any communications regarding the

13   book deal, so I have no knowledge of any other communications.

14   Q.  Did you ever speak to or communicate with Ms. Daniels?

15   A.  I -- when her representation first began, I sent a few

16   e-mails to her, but I never communicated with her directly and

17   I don't believe those e-mails were responded to.

18   Q.  So on the couple of occasions that you reached out to

19   Ms. Daniels, you received no response.  True?

20   A.  True.

21   Q.  Who was the attorney at the firm who communicated with

22   Ms. Daniels relating to our representation of her?

23   A.  You were.

24   Q.  Were you a party to any of those communications?

25   A.  To the communications with Ms. Daniels?

M1pnave4                       Regnier - Cross

1   Q.  Yes.

2   A.  No, I was not.  Not that I believe.

3   Q.  You understand that over the firm's and my representation

4   of Ms. Daniels, there were hundreds, if not over a thousand

5   such communications, don't you?

6   A.  I would have no knowledge of how many there were.

7   Q.  Well, you know that the firm represented Ms. Daniels in

8   connection with a number of legal matters between late February

9   of 2018 and February of 2019, do you not?

10  A.  Yes, I do.

11  Q.  The firm and me did quite a lot of work for Ms. Daniels

12  during that one-year time period, didn't we?

13  A.  Yes, they did.

14  Q.  And I wasn't the only one working on Ms. Daniels' matters,

15  was I?

16  A.  No, you were not.

17  Q.  You worked on Ms. Daniels' matters as well, did you not?

18  A.  Yes.

19  Q.  As well as an attorney by the name of Carlos Colorado who

20  worked at the firm?  He too worked on her matters, did he not?

21  A.  I believe he did.

22  Q.  As well as an attorney by the name of Ahmed Ibrahim, he's

23  another attorney who worked on the many matters that we were

24  working on for Ms. Daniels, wasn't he?

25  A.  Yes, he was.

1   Q.  John Arden, another attorney at the firm that's an attorney

2   that also was working on Ms. Daniels' matters, am I correct?

3   A.  Yes.

4   Q.  And then we had other legal assistants or paralegals in the

5   office that also worked on Ms. Daniels' matters, did we not?

6   A.  Yes.

7   Q.  Let's pull up GX 3, the attorney-client agreement that the

8   government asked you about, please.  Ms. Regnier, do you recall

9   being asked a number of questions concerning this document?

10  A.  Yes.

11  Q.  Did you draft this document?

12  A.  As I said previously, I don't know if you provided the

13  information for me to fill in or if you filled it in and had me

14  put it in the correct format, so I'm not sure.

15  Q.  Or if I did it on my own, correct?

16  A.  Correct.

17  Q.  You have no independent recollection of the circumstances

18  around which this document was prepared, true?

19  A.  Sorry.  I don't quite understand.  What circumstances?

20  Q.  Well, you don't have a recollection as we sit here today of

21  who actually prepared this document, do you?

22  A.  No, I don't.

23  Q.  Do you have any knowledge as to the circumstances of the

24  signing of this document?

25  A.  No, I do not.

M1pnave4                    Regnier - Cross

1    Q.  Do you have any knowledge of what was said by either me or

2    Ms. Daniels in connection with the execution of this document?

3    A.  No, I do not.

4    Q.  You do have a recollection of merely receiving the document

5    and putting it in the firm's files, true?

6    A.  Yes, I do.

7    Q.  And you are not aware of any other writing other than this

8    document setting forth the terms and conditions of our

9    representation of Ms. Daniels, true?

10   A.  Correct.

11   Q.  I want to focus -- I'm sorry.

12          THE COURT:  I think it was just you got a little too

13   close to the microphone.

14          MR. AVENATTI:  I apologize, your Honor.

15          THE COURT:  That's okay.  If you're too close I think

16   it messes up a bit.  So maybe an inch or two away.

17          MR. AVENATTI:  All right.

18   BY MR. AVENATTI:

19   Q.  Ms. Regnier, I would like to focus your attention, if I

20   could, on paragraph 4 of the agreement.  Actually, before we

21   get to that, let's go to paragraph 2.

22          Do you have that, Ms. Regnier?

23   A.  Yes, I do.

24   Q.  Based on your experience at the firm, you understand that

25   that paragraph was the paragraph whereby the firm and me would

1    set forth the scope of the work that was going to be done for

2    the client, in this case, Ms. Daniels, true?

3    A.  Correct.

4    Q.  Can you please read that into the record for us.

5    A.  "Scope of Services.  Clients are hiring attorney to

6    represent clients in connection with (a) providing clients with

7    counsel and advice relating to clients' prior negotiation and

8    execution of various alleged agreements concerning clients'

9    prior relationship with Donald Trump; (b) providing clients

10   with counsel and advice concerning various media appearances;

11   and (c) assisting clients with voiding various alleged

12   agreements concerning clients' prior relationship with Donald

13   Trump.  Attorney will provide those legal services reasonably

14   required to represent clients and take reasonable steps to

15   inform clients of progress and to timely respond to clients'

16   inquiries.  In addition, attorney may at any time and at its

17   discretion retain outside and/or local counsel, whose legal

18   fees will be deducted from the fees received by attorney and

19   will be the sole and exclusive responsibility of attorney."

20            MR. AVENATTI:  Then if we could pull up, the same

21   exhibit, I'm sorry, paragraph 3, please.

22   BY MR. AVENATTI:

23   Q.  Now, Ms. Regnier, based on your experience at the firm,

24   what does this paragraph relate to?

25   A.  What we expect -- what the firm expected from the client.

1    Q.   So in this instance this is what the firm expected

2    Ms. Daniels to do, right?

3    A.   Correct.

4    Q.   One of the things that the firm expected pursuant to this

5    written contract was for Ms. Daniels to be truthful with us,

6    right?

7    A.   Correct.

8    Q.   Another thing that the firm expected from Ms. Daniels

9    pursuant to the document that she signed was for her to

10   cooperate with us, right?

11   A.   Yes.

12   Q.   A third thing was to keep us informed of developments,

13   right?

14   A.   Yes.

15   Q.   A fifth thing was to abide by this agreement, meaning this

16   contract, right?

17   A.   Correct.

18   Q.   And the firm also expected Ms. Daniels, pursuant to our

19   written contract, as it says right here, to pay bills for

20   reasonably incurred costs on time.

21        That's what it says, right?

22   A.   Yes.

23        (Continued on next page)

24

25

1  BY MR. AVENATTI:

2  Q.  And that was your understanding when you received this

3  document and put it in the files of the firm, right?

4  A.  Yes.

5  Q.  Are you aware of any amendment to this document relating to

6  paragraph 3?

7  A.  No, I'm not aware of any amendment.

8  Q.  Directing your attention to paragraph 4, you were asked

9  about this on direct.  Do you recall that?

10 A.  Yes.

11 Q.  And the firm was going to be compensated under this

12 agreement in three ways, right?

13 A.  In at least two.

14 Q.  OK.  Well, let's --

15 A.  (inaudible).

16 Q.  -- break it down.  There was going to be a one-time payment

17 of a hundred dollars, right?

18 A.  Correct.

19 Q.  Do you know if that was done?

20 A.  I was -- I have no personal knowledge if that was done.

21 You advised me it hadn't been done.

22 Q.  I told you that?

23 A.  Yes.

24 Q.  OK.  And then our standard hourly fees and out-of-pocket

25 costs were going to come out of a defense fund, right?

1    A.  Yes.

2    Q.  And then in the event that we assisted Ms. Daniels in

3    finalizing any book or media opportunity that resulted in her

4    getting paid, Ms. Daniels had agreed that we would be entitled

5    to a reasonable percentage to be agreed upon, right?

6    A.  Yes.

7    Q.  That's what the contract says?

8    A.  Yes.

9    Q.  And that's what you understood at all times, right?

10   A.  Yes.

11          MR. AVENATTI:  Let's go to the next page of the

12   document, please.

13   Q.  Ms. Regnier, do you have any reason to believe that

14   Ms. Daniels did not sign this document on or about February 27

15   of 2018?

16   A.  No, I do not.

17   Q.  Now, let's talk a moment about hourly fees, which is in the

18   contract; you saw that term?

19   A.  Yes, I did.

20   Q.  OK.  Could you please explain to the jury what an hourly

21   fee is?

22   A.  It's exactly what it states.  It's the hourly rate you

23   would pay someone to perform a service.

24   Q.  And attorneys sometimes bill by the hour for their time,

25   correct?

1    A.   Yes.

2    Q.   And those fees may be hundreds of dollars and sometimes

3    even more than a thousand dollars, in your experience, correct?

4    A.   Yes.

5    Q.   And from time to time over the course of your working at

6    the firm, you were aware that the firm made applications to

7    various courts to be awarded hourly fees in connection with

8    some cases; you're aware of that, are you not?

9    A.   Yes, I am.

10   Q.   And you're aware that in many of those instances, we would

11   make an application for the hourly fee associated with me and

12   other attorneys to be awarded, correct?

13   A.   Yes.

14   Q.   And you're aware, are you not, that in many instances when

15   we sought hourly fees associated with my time, that my time

16   would be billed at $850 an hour or more, right?

17   A.   Probably.  I'm not (inaudible) yes (inaudible) yes.

18           THE COURT:  Mr. Avenatti, can you just take an inch

19   away from the microphone, please.

20           And ms. Regnier, can you just repeat what you said.  I

21   believe we have a little noise distraction here.

22           THE WITNESS:  I don't remember the exact hourly fees,

23   but Michael's fee would be on the higher end, yes.

24   BY MR. AVENATTI:

25   Q.   I think, before we had the static, you said 850 or more, am

1    I correct?

2    A.  Well, I said it was always on the higher end.  I don't know

3    if it was exactly 850, but yes, it was up there.

4    Q.  I was the highest charging attorney at the law firm,

5    correct?

6    A.  Yes.

7    Q.  And that was a result of my experience and my results,

8    isn't that true?

9            MR. SOBELMAN:  Objection.

10            THE COURT:  Sustained.

11    BY MR. AVENATTI:

12    Q.  What was your understanding as to why I was the highest

13    billing attorney at the firm?

14            MR. SOBELMAN:  Objection.

15            THE COURT:  Sustained.

16    BY MR. AVENATTI:

17    Q.  Now, there were other attorneys at the firm that also, in

18    many of those applications, would submit time and hourly fees,

19    correct?

20    A.  Yes.

21    Q.  And those attorneys included Mr. Arden and Mr. Ibrahim and

22    Mr. Colorado, correct?

23    A.  Yes.

24    Q.  And those attorneys also would bill in the hundreds of

25    dollars an hour for their time, correct?

M1pWave5                      Regnier - Cross

```
 1   A.  Yes.

 2   Q.  Now let's talk about costs for a minute.  One of the costs

 3   associated with the representation of Ms. Daniels were the

 4   security costs, right?

 5   A.  Yes, they were.

 6   Q.  And those security costs were exorbitant, weren't they?

 7              MR. SOBELMAN:  Objection.

 8   A.  Yes, they were.

 9              THE COURT:  The witness has answered.

10   BY MR. AVENATTI:

11   Q.  And the reason why those security costs were exorbitant was

12   because Ms. Daniels demanded two full-time security individuals

13   at all times, no matter where she went, isn't that true?

14              MR. SOBELMAN:  Objection.

15              THE COURT:  Sustained.

16   BY MR. AVENATTI:

17   Q.  Are you aware, Ms. Regnier, of why the security costs were

18   so high?

19              MR. SOBELMAN:  Objection.

20              THE COURT:  Overruled.

21   A.  I know that you had instructed me to make sure there were

22   two people and that we were paying for their travel and their

23   room, and that it was basically anytime she stepped out of the

24   house.  I was aware of that.

25   Q.  And those were all costs, right?
```

1    A.  Yes.

2    Q.  Now, counsel for the government asked you about whether any

3    loans had been made by the firm to Ms. Daniels.  Do you recall

4    that?

5    A.  Yes.

6    Q.  And you said no, right?

7    A.  I'm not aware of any.  Yes.

8    Q.  But the firm did advance many hundreds of thousands of

9    dollars in costs in connection with representing Ms. Daniels,

10   isn't that true?

11   A.  We did advance some costs.  Other costs were being paid

12   directly out of the defense fund.

13   Q.  But we advanced some costs, did we not?

14   A.  Yes.

15   Q.  OK.

16   A.  We didn't --

17   Q.  OK.  Thank you.

18          MR. SOBELMAN:  Objection, your Honor.  The witness was

19   trying to answer.

20          THE COURT:  Overruled.

21   BY MR. AVENATTI:

22   Q.  Now, Ms. Regnier, if you wanted to figure out, for the

23   benefit of the jury, how much time had been spent by attorneys

24   at the firm pursuant to the fee contract working on her various

25   matters, what documents or information would you consult?

M1pWave5                    Regnier - Cross

1    A.  For Messrs. Arden, Ibrahim, and Colorado, they would enter

2    their times into -- their time spent on a case into a program.

3    I do not have a record of the time you spent on it.

4    Q.  So they would enter their time into a program called Tabs,

5    T-A-B-S, right?

6    A.  Yes.

7    Q.  And Tabs is a program that the firm used to track how much

8    time and how much costs were advanced and spent in connection

9    with a legal representation, correct?

10              MR. SOBELMAN:  Objection.  Relevance.

11              THE COURT:  Sustained.

12   BY MR. AVENATTI:

13   Q.  Ms. Regnier, if you wanted to figure out how much time and

14   how much costs were spent in connection with the matters that

15   the firm represented Ms. Daniels on pursuant to the contract,

16   how would you go about doing that?

17              MR. SOBELMAN:  Objection.  Relevance.

18              THE COURT:  I'll allow it.

19              You may answer.

20   A.  Like I said, for Messrs. Arden, Colorado, Ibrahim, I would

21   have ran reports, showing the time that they spent, and I would

22   have ran reports showing the costs that we had.  In

23   Ms. Daniels's case, I would have had to obtain time and costs

24   from you as to additional matters that were not -- I believe

25   not ask to be handled within the firm.

M1pWave5                        Regnier - Cross

1    Q.  And when you say that you would generate a report, you

2    would generate that report from what?

3    A.  From Tabs.

4    Q.  And Ms. Regnier, without consulting Tabs and without

5    speaking with me about the cost and time I was aware, you

6    couldn't come to a conclusion as to how much time and how many

7    costs had been expended for Ms. Daniels, could you?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. AVENATTI:

11   Q.  Ms. Regnier, are you aware of any other way to figure out

12   what the cost and hourly fees expended for Ms. Daniels pursuant

13   to the contract, what those were without looking at the data in

14   Tabs?

15             MR. SOBELMAN:  Objection.

16             THE COURT:  Sustained.

17             MR. AVENATTI:  Your Honor, could I have a sidebar?

18             THE COURT:  No.

19   BY MR. AVENATTI:

20   Q.  Now, not all the costs were tracked in Tabs relating to

21   Ms. Daniels, were they?

22   A.  No, they were not.

23   Q.  Some of the costs were tracked in a computer program called

24   QuickBooks, right?

25   A.  Yes.

M1pWave5                          Regnier – Cross

```
 1   Q.  And in order for you to determine what the costs and --
 2   what the costs expended for Ms. Daniels were pursuant to the
 3   contract, you would actually have to look at both QuickBooks
 4   and Tabs; true?
 5              MR. SOBELMAN:  Objection.
 6              THE COURT:  Overruled.
 7   A.  I would need to look at QuickBooks, Tabs, and the various
 8   bank accounts upon which the (inaudible)
 9   Q.  You would have to look at all three of those things; you
10   couldn't just look at one, right?
11   A.  Correct.
12   Q.  Now, I think you testified earlier that this legal defense
13   fund was set up on Go Fund Me, is that correct?
14   A.  I don't know if it was Go Fund Me or something like that.
15   You actually set it up with the, the company.
16   Q.  Right.  It was set up on, with a company called
17   CrowdJustice, not Go Fund Me, isn't that true?
18   A.  That could very well be, yes.
19   Q.  You don't remember?
20   A.  I've seen the name CrowdJustice, so yes, I would say it was
21   CrowdJustice.
22   Q.  So when you said Go Fund Me earlier, you were mistaken,
23   right?
24   A.  Well, I submitted it as an example as to what the type of
25   fund it was.
```

1   Q.  And Ms. Regnier, you understood, when you were dealing with

2   these moneys that would come in from the CrowdJustice, that 100

3   percent of those moneys belonged to the firm, didn't they?

4   A.  I was not aware that 100 percent of the moneys belonged to

5   the firm, no.

6   Q.  As you sit there today, you don't know which percentage of

7   those moneys belonged to the firm and which percentage of the

8   moneys belonged to Ms. Daniels; true?

9   A.  True.

10  Q.  So when counsel for the government asked you whether

11  payments had been made from these moneys for things not related

12  to Ms. Daniels, you recall that -- do you recall that

13  questioning?

14  A.  Yes.

15  Q.  OK.  When the CrowdJustice was set up, money had already

16  been expended for Ms. Daniels by the firm, isn't that true?

17  A.  Some had, yes.

18  Q.  OK.  And time had already been expended for Ms. Daniels,

19  isn't that true?

20  A.  Yes.

21  Q.  Meaning attorney time?

22  A.  Yes.

23          THE COURT:  Mr. Avenatti, just pause for one second.

24  If you could put on your mask, we're just going to put a cover

25  on the microphone and see if that mitigates some of the

1    background noise.  And we'll see if it works.

2              Sorry for the interruption.  You may proceed.

3              MR. AVENATTI:  Thank you, your Honor.

4    Q.  In order to determine which moneys from the CrowdJustice

5    fund belonged to the firm, you would have to know what the

6    hourly fees and the costs were, right?

7              MR. SOBELMAN:  Objection.

8              THE COURT:  Sustained.

9    BY MR. AVENATTI:

10   Q.  Well, Ms. Regnier, on direct, you talked about -- you

11   answered a number of questions by the government about payments

12   for things not relating to Ms. Daniels.  Do you recall that?

13   A.  Yes.

14   Q.  Well, do you know if any of those payments for things not

15   relating to Ms. Daniels were actually reimbursement payments to

16   the firm for the hourly fees and the costs the firm had

17   expended?  Do you know?

18             MR. SOBELMAN:  Objection.

19             THE COURT:  Overruled.

20             Do you know --

21   A.  No, I do not.

22             THE COURT:  Sorry.

23             THE WITNESS:  Sorry.

24             THE COURT:  Just asking if you know whether they were

25   for that purpose or not.

M1pWave5                          Regnier - Cross

1          THE WITNESS:  No, I do not.

2     BY MR. AVENATTI:

3     Q.  It's possible they could have been for that purpose, based

4     on your knowledge, isn't that true?

5     A.  I don't know.

6     Q.  You understood that the firm was entitled to deduct its

7     hourly fees and costs from that, those moneys, isn't that true?

8     A.  Yes.

9     Q.  Now, you've been interviewed by the government in this case

10    a number of times before you testified here today, right?

11    A.  Yes.

12    Q.  And who conducted those interviews?  Was Ms. Penland, to my

13    left -- was she present?

14    A.  Generally, yes.

15    Q.  OK.  Who else from the government was present during these

16    interviews?

17    A.  Mr. Sobelman.  There was an FBI agent.  I can't remember

18    all the people that were actually present.  I'm sorry.

19    Q.  And do you recall how many times you met with the

20    government to prepare for your testimony before taking the

21    stand here today?

22    A.  For this case?

23    Q.  Yes.

24    A.  I don't know the exact number.  It's probably -- it would

25    be less than ten, I believe.

M1pWave5                          Regnier - Cross

1    Q.  More than five and less than ten?

2    A.  That would be probably accurate, yes.

3    Q.  And while -- when you met with the government, they showed

4    you certain documents and they asked you questions about those

5    documents, right?

6    A.  Yes.

7    Q.  So when you took the stand here today, you weren't

8    surprised by any document that the government showed you, were

9    you?

10   A.  No.

11   Q.  You had been shown all of those documents before in

12   connection with the government preparing for you to testify,

13   right?

14   A.  Yes.

15   Q.  In those five to ten interviews with the government before

16   you took the stand here today, did the government ever ask you

17   to calculate or figure out the hourly fees or the costs

18   associated with the Daniels representation?

19   A.  No.

20   Q.  Did they ever ask you any questions about where you could

21   find that information?

22   A.  They did ask me about how time was accounted for.

23   Q.  And did you tell them it was accounted in Tabs?

24           MR. SOBELMAN:  Objection.

25   A.  I told them that --

1           MR. SOBELMAN:  Objection.  Hearsay, your Honor.

2           THE COURT:  Sustained.

3  BY MR. AVENATTI:

4  Q.  Did the government ever ask you to help them get the time

5  and cost data before you testified?

6           MR. SOBELMAN:  Objection.

7           THE COURT:  Sustained.

8  BY MR. AVENATTI:

9  Q.  Ms. Regnier, before testifying here today, why is it that

10  you did not seek to get the cost and time data from Tabs and

11  QuickBooks?  Is one of the reasons because no one asked you to?

12           MR. SOBELMAN:  Objection.

13           THE COURT:  Sustained.

14  BY MR. AVENATTI:

15  Q.  Now, you were asked a number of questions about the

16  financial condition of the firm at various points in time,

17  including in February of 2018.  Do you recall those questions?

18  A.  Yes.

19  Q.  And I believe that the date on the attorney-client fee

20  agreement is February 27, 2018.  Is that right?  Do you want to

21  confirm that?

22  A.  Yes, I believe so.

23  Q.  OK.

24  A.  Yes.

25           THE COURT:  Can we take the document off the screen,

1    please.

2    BY MR. AVENATTI:

3    Q.  Now, about a week prior to that attorney-client fee

4    agreement being signed, the firm had been honored, isn't that

5    right?

6           MR. SOBELMAN:  Objection.

7           THE COURT:  Overruled.

8    A.  I'm not sure what you're referring to.

9    Q.  Let me see if I can refresh your recollection.

10          MR. AVENATTI:  Can we please have Defense Exhibit A to

11   assist Ms. Regnier.

12   Q.  Ms. Regnier, can you see Defense Exhibit A?

13   A.  Yes.

14   Q.  Does that refresh your recollection that less than a week

15   before this attorney-client fee agreement had been or was

16   entered into, the firm had been honored?

17   A.  That does refresh my recollection that there was a write-up

18   in the legal newspaper.

19   Q.  There was a write-up in the legal newspaper called the

20   Daily Journal, which is the legal newspaper in Los Angeles, and

21   the firm had been honored for receiving the single --

22          MR. SOBELMAN:  Objection, your Honor.

23          THE COURT:  Mr. Avenatti, finish the question, please.

24          MR. AVENATTI:  Yes, your Honor.

25   Q.  -- and the firm had been honored for receiving the single

1   largest verdict in the state of California in 2017 of $454

2   million, right?

3              MR. SOBELMAN:  Objection.

4              THE COURT:  Overruled.

5   A.  That's what the article was, yes, because we had

6   obtained -- purpose of the article, yes.

7   Q.  And you recall that the Daily Journal had listed the top

8   results in the entire state of California, and our firm,

9   including due to work by you and me, were No. 1?

10             MR. SOBELMAN:  Objection.

11             THE COURT:  Sustained.

12  BY MR. AVENATTI:

13  Q.  Ms. Regnier, you worked on that case, did you not?

14  A.  Yes.

15  Q.  And the date of that write-up was February 21, 2018,

16  correct?

17  A.  Yes, that's what it says on the document.

18             MR. AVENATTI:  Your Honor, at this time I move Defense

19  Exhibit A into evidence, please.

20             THE COURT:  Denied.

21  BY MR. AVENATTI:

22  Q.  Now, Ms. Regnier, I believe on direct you testified that I

23  owned the law firm.  Is that right?

24  A.  Yes.

25  Q.  Did any other employees or attorneys have an equity or

M1pWave5                        Regnier - Cross

1  financial ownership in the law firm in 2018 and into 2019?

2  A.  No, I don't believe so.  No one did.

3  Q.  And you spoke of this cardinal rule that I have -- I

4  believe you described it as a cardinal rule -- where I did not

5  want you speaking to other employees at the law firm about the

6  finances of the firm.  Is that right?

7  A.  Correct, yes.

8  Q.  And while I had that cardinal rule, did any of those

9  employees, no matter what time it was, did any of those

10  employees have an ownership or management role in the law firm?

11  A.  Since 2018 to 2019?

12  Q.  Yes.

13  A.  No, not that I'm aware of.

14  Q.  And I want to make sure that I wrote this down correctly.

15  You testified that in 2018, when I owned 100 percent of the law

16  firm, I would sometimes have you transfer money out of the law

17  firm accounts and pay some of my personal expenses.  Is that

18  right?

19  A.  Yes.

20  Q.  And when you paid those personal expenses, like my rent or

21  payments to people in my life, or the other expenses that the

22  government asked you about, when you made those payments, I

23  owned 100 percent of the law firm, didn't I?

24  A.  Yes.

25  Q.  As you sit there today, are you aware of a single dollar

1    that was taken in to Ms. Daniels's -- to the trust account that

2    had been established for Ms. Daniels that was then paid to an

3    improper purpose?

4              MR. SOBELMAN:  Objection.

5              THE COURT:  Sustained.

6    BY MR. AVENATTI:

7    Q.  Ms. Regnier, you testified on direct that payments from

8    Ms. Daniels's funds, was the term the government used, that

9    payments from Ms. Daniels's funds went to various personal

10   expenses of mine.  Was that your testimony?

11   A.  Yes.

12   Q.  What payments from Ms. Daniels's personal funds

13   specifically?  Please provide the date, the payee, and the

14   amount.

15   A.  I am not in possession of any of the documentation to allow

16   me to provide that information to you.

17   Q.  So as you sit there today, you are not able to identify for

18   the jury a single dollar that supposedly came from funds

19   belonging to Ms. Daniels and went to some improper purpose, are

20   you?

21             MR. SOBELMAN:  Objection.

22             THE COURT:  Sustained.

23   BY MR. AVENATTI:

24   Q.  Ms. Regnier, I want to go back for just a moment.  You do

25   have a recollection that time and cost data for Ms. Clifford,

1    otherwise known as Ms. Daniels, in particular -- well, strike

2    that.  We'll come back to that, actually.

3            MR. AVENATTI:  Could we have Government Exhibit 2,

4    please?

5    Q.  Do you have Government Exhibit 2, Ms. Regnier?

6    A.  I do.

7    Q.  OK.  And you understood, when you assisted in the

8    preparation of this document, that the purpose of this document

9    was to track the moneys that had been expended from the

10   CrowdJustice funds, right?

11   A.  Yes.

12   Q.  That was the purpose of this letter, right?

13   A.  Yes, it was -- yes.  Like a reconciliation.

14   Q.  A reconciliation of the moneys that had been used from the

15   CrowdJustice funds, right?

16   A.  Yes.

17   Q.  OK.  It had no other purpose, that you were aware of, did

18   it?

19           MR. SOBELMAN:  Objection.

20   A.  No, it did not.

21           THE WITNESS:  Sorry.

22           THE COURT:  All right.  Overruled.

23   BY MR. AVENATTI:

24   Q.  And Ms. Regnier, you were asked by the government whether

25   the document related or made reference to the book, right?

1    A.  Yes.

2    Q.  The book had nothing to do with the CrowdJustice moneys, as

3    far as you knew, did it?

4    A.  As far as I knew, no, it did not.

5    Q.  So would you agree that perhaps that's why the letter

6    doesn't reference the book?

7              MR. SOBELMAN:  Objection.

8              THE COURT:  Sustained.

9              MR. AVENATTI:  Now, why don't we go to the second page

10   of the letter, please.

11   Q.  There's a section entitled "hourly fees."  Do you see that?

12   A.  Yes.

13   Q.  And there's another section entitled "out-of-pocket

14   expenses."

15   A.  Yes.

16   Q.  Do you see that?

17   A.  Yes, I do.

18   Q.  Now, during the course of the preparation of this letter,

19   you pulled certain information from the files of the firm and

20   you sent it to me, right?

21   A.  Yes, I pulled some of that information and forwarded it to

22   you.

23   Q.  And then I drafted this letter and I sent it back to you

24   for finalization and to send it to Ms. Daniels, right?

25   A.  I'm not sure if I actually sent it to Ms. Daniels or not,

 1   but I very well could have, and copied you.

 2   Q.  And some of the information on this page, under the heading

 3   hourly fees and out-of-pocket expenses, some of that

 4   information came from Tabs and QuickBooks, right?

 5   A.  Yes.  The.

 6   Q.  I had asked you to figure out how much time and how much

 7   money had been spent representing Ms. Daniels, right?

 8   A.  Yes.

 9   Q.  And you then consulted Tabs and QuickBooks, and you sent me

10   certain data and information so I could put together the

11   letter?

12              MR. SOBELMAN:  Objection.

13   A.  Yes.

14              THE COURT:  Sustained.

15              MR. SOBELMAN:  Move to strike, your Honor.

16              THE COURT:  Granted.  The jury will disregard the last

17   answer.

18              Ms. Regnier, if you could pause for a moment before

19   you provide an answer just to give counsel an opportunity to

20   object and for me to rule if there is an objection, that would

21   be great.

22              THE WITNESS:  OK.  Sorry.

23              THE COURT:  Not being physically present, it's harder

24   to see.

25   BY MR. AVENATTI:

1    Q.  Ms. Regnier, when you pulled together the information that

2    I asked for in connection with preparing this document, did you

3    consult any other sources, other than Tabs and QuickBooks?

4    A.  Yes.

5    Q.  You also consulted certain bank records, correct?

6    A.  Yes.

7    Q.  What other sources did you consult?

8    A.  That would have been what I had access to, and I would have

9    sent it to you and you added the additional information in.

10   Q.  And why did you consult those three sources when trying to

11   pull this information together?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14   BY MR. AVENATTI:

15   Q.  Now, you worked at the firm -- as of 2018, you had been

16   working at the firm since 2007, is that right?

17   A.  Yes, I believe so.

18   Q.  And you had a number of responsibilities at the firm, is

19   that right?

20   A.  Yes.

21   Q.  But other than class actions, other than class action

22   cases -- well, strike that.

23          Can you tell the jury generally what a class action case

24   is?

25   A.  A class action case is where you have multiple, multiple

M1pWave5                        Regnier - Cross

1    parties who have the exact same claim and basically consolidate

2    it into one action, prosecuted by one attorney, and then the

3    people who have the claims have to step forward to make a

4    claim.

5    Q.  And some of those class action cases have hundreds of

6    thousands of clients, right?

7    A.  Yes.

8    Q.  OK.  Other than in those class action cases, your primary

9    responsibility at the firm was not to communicate directly with

10   clients concerning the financial arrangement between the firm

11   and the client, am I correct?

12   A.  Yes.

13   Q.  That was generally my responsibility?

14   A.  Yes.

15   Q.  And just to clarify, for the benefit of the jury, you never

16   had any communications with Ms. Daniels about the fee contract,

17   the hourly work that was done for her, the costs that she had

18   to reimburse the firm for, did you?

19   A.  No, I did not.

20   Q.  You understood that the person that dealt with those issues

21   was me?

22   A.  Yes.

23   Q.  And while you were at the firm, you were paid well, were

24   you not?

25              MR. SOBELMAN:  Objection.

1    A.  Yes, I was.

2              THE COURT:  Sustained.  The jury will disregard the

3    last answer.

4    BY MR. AVENATTI:

5    Q.  In fact, you were the highest paid nonlawyer at the firm,

6    isn't that true?

7              MR. SOBELMAN:  Objection.

8              THE COURT:  Sustained.

9              MR. AVENATTI:  Your Honor, bias.

10             THE COURT:  All right.  I'll allow it.

11             MR. AVENATTI:  Thank you.

12   Q.  Ms. Regnier, while you were at the firm, you were paid very

13   well, right?

14   A.  Yes:

15   Q.  And you were the highest paid nonattorney at the law firm,

16   is that right?  Yes or no.

17   A.  I -- unless we're including benefits, I was.

18   Q.  And one year, in fact, you received a bonus of over a

19   hundred thousand dollars alone, just for the bonus, right?

20             MR. SOBELMAN:  Objection.

21   BY MR. AVENATTI:

22   Q.  Yes or no.

23             THE COURT:  Overruled.

24   A.  Yes.  I --

25   Q.  Thank you.

1   A.  -- years ago.

2              MR. AVENATTI:  Thank you.  Move to strike everything

3   after "yes," your Honor, as nonresponsive.

4              THE COURT:  I'm not sure anyone heard it, but we'll

5   leave it at "yes."  So the jury will disregard anything it may

6   have heard after "yes."

7   BY MR. AVENATTI:

8   Q.  And from time to time, while you were at the firm, me -- or

9   I or the firm would pay for your vacations, right?

10  A.  Yes.

11  Q.  On one occasion, you and your husband took a trip to Cabo

12  with a number of your friends at my expense as a thank you,

13  right?

14  A.  Yes, we went with another couple.  We did.

15  Q.  And you took a couple trips to Cabo at my expense?

16  A.  Yes.

17             THE COURT:  Was that yes, Ms. Regnier?

18             THE WITNESS:  Yes, it was yes.

19  BY MR. AVENATTI:

20  Q.  Now, a few of the things that you did not do while you were

21  at the firm -- we touched on some of them earlier -- you did

22  not negotiate with our clients; true?

23  A.  Correct.

24  Q.  You did not negotiate fee agreements or contracts that we

25  had with our clients, right?

1    A.  Yes.

2    Q.  You did not discuss what those fee agreements or contracts

3    meant with our clients, right?

4    A.  Correct.

5    Q.  You did not negotiate attorney's fees with our clients,

6    right?

7    A.  Correct.

8    Q.  You certainly didn't give legal advice to our clients,

9    because you were not an attorney, right?

10   A.  Correct.

11   Q.  Those were all things that attorneys at the firm did,

12   including me, is that right?

13   A.  Yes.

14   Q.  But even though you did not negotiate these fee agreements,

15   you were familiar with the fee agreements generally; I think

16   you testified to that on direct?

17   A.  Yes, we had a general form of a fee agreement, and it was

18   personalized for each client.

19   Q.  And when you say it was personalized for each client, it

20   changed depending on the client, the type of engagement, the

21   case, things like that, right?

22   A.  Yes.

23   Q.  And Ms. Daniels's legal representation, would you agree

24   with me that that was very unusual for the firm?

25   A.  Yes, I would.

1   Q.  It wasn't like any other legal representation that we had

2   handled before, right?

3   A.  Correct.

4   Q.  I mean we had represented a client in connection with a

5   lawsuit; we did that hundreds of times, right?

6   A.  Yes.

7   Q.  But everything else that went along with that

8   representation, that was fairly unusual, in your experience,

9   right?

10  A.  Yes, it was.

11  Q.  We did a lot of babysitting for Ms. Daniels, did we not?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14  BY MR. AVENATTI:

15  Q.  Ms. Regnier, we handled a whole host of things for

16  Ms. Daniels that we normally did not handle in connection with

17  our legal representation of clients, isn't that true?

18          MR. SOBELMAN:  Objection.

19          THE COURT:  Overruled.

20  A.  Yes.

21  Q.  Now, some of our fee contracts, when we would have

22  agreements with clients, talking about just generally now, some

23  of those would be what's called a contingency fee agreement,

24  right?

25  A.  Yes.

M1pWave5                    Regnier - Cross

1   Q.  And those agreements provided that if we were successful in

2   a case, the firm would get a percentage -- generally, 25 to 45

3   percent -- of the recovery, right?

4   A.  Yes.

5   Q.  And in some of those agreements, we would agree to advance

6   the costs, meaning we would pay them, and then we would be

7   reimbursed at the end of the case, right?

8   A.  Yes.

9   Q.  And then in other cases or other instances, we would

10  advance the costs and we would ask that the client pay the

11  costs along the way, right?

12  A.  Yes.

13  Q.  And generally, when we would wait to get paid for our

14  time -- well, strike that.

15      Costs are different than fees, right?  Fees were for our

16  time; you understood that?

17  A.  Yes.

18  Q.  Costs were expenses and things like that?

19  A.  Yes.

20  Q.  And generally, when we would wait to get paid for our time,

21  we would take anywhere from -- or we would agree with the

22  client that we would be entitled to 25 to 45 percent, right, if

23  we had to wait to get paid?

24  A.  If it was a contingency fee case, yes.

25  Q.  And if we had to -- which would mean we would have to wait

1    to get paid; it would be 25 to 45 percent, right?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4              Mr. Avenatti, let's move to a different line of

5    questioning, please.

6              MR. AVENATTI:  Your Honor, I just have one question in

7    this line, and I'll move on.

8              THE COURT:  OK.

9              MR. AVENATTI:  Thank you, your Honor.

10   Q.  And then after we were given our percentage and after all

11   of our out-of-pocket expenses were paid, then the client would

12   get the balance of the settlement or judgment or result,

13   generally; that was your understanding, right?

14             MR. SOBELMAN:  Objection.

15             THE COURT:  Sustained.

16             All right.  Now you can move to your next line.  How

17   much time do you have left, would you estimate?

18             MR. AVENATTI:  Your Honor, I think I have somewhere

19   between an hour to an hour and a half.

20             THE COURT:  All right.  You may proceed.

21             MR. AVENATTI:  Thank you.  I will try to be quicker.

22   Q.  Now, in other instances, the firm billed by the hour; true?

23   A.  Yes.

24   Q.  And we touched on that earlier; that would be based on the

25   attorney's hourly fee or rate, right?

M1pWave5                          Regnier – Cross

1    A.  Yes.

2    Q.  And I want to make sure that I got this correctly, but I

3    believe that the government asked you about generally this

4    issue of what costs were as far as what categories.  Do you

5    recall that?

6    A.  Kind of, yes.

7    Q.  OK.  And the costs would vary depending on the case,

8    correct, meaning the types of costs?

9    A.  Yes.

10   Q.  Sometimes there would be expert witnesses, right?

11   A.  Yes.

12   Q.  Consultants?

13   A.  Yes.

14   Q.  With Ms. Daniels, security expenses?

15   A.  Yes.

16   Q.  Travel, right?

17   A.  Yes.

18   Q.  Airfare, hotels, car rentals, Ubers, meals, things like

19   that, right?

20   A.  Yes.

21   Q.  Sometimes photocopies would be an expense because of how

22   voluminous some of the cases were, right?

23   A.  Yes.

24   Q.  Federal Express?

25   A.  Yes.

M1pWave5                         Regnier - Cross

1   Q.  All of these things would add up on cases, depending on how

2   long they went and how complicated they were, right?

3              MR. SOBELMAN:  Objection.

4              THE COURT:  Sustained.

5   BY MR. AVENATTI:

6   Q.  In some of our cases, the firm advanced out-of-pocket costs

7   in excess of $2 million, isn't that true, Ms. Regnier?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Sustained.

10  BY MR. AVENATTI:

11  Q.  Ms. Regnier, are you aware of cases that the firm had while

12  you were overseeing some of the finances where the

13  out-of-pocket costs alone, not including the time spent, were

14  in excess of $2 million?

15             MR. SOBELMAN:  Objection.

16             THE COURT:  Sustained.

17             MR. AVENATTI:  Your Honor, can I get a sip of water?

18             THE COURT:  You may.  Put your mask on before you

19  leave the box, please.

20             MR. AVENATTI:  Thank you.

21  Q.  Now, Ms. Regnier, you were asked about your overseeing of

22  various trust accounts at the firm.  Do you recall generally

23  that testimony?

24  A.  Yes.

25  Q.  And generally speaking, the way that a trust account worked

1    at the firm was the firm would resolve a big case for a client

2    and the money would come in to the trust account, the firm

3    would take its expenses and fees out of that money and then

4    would pay the client whatever amount was left, if anything,

5    correct?

6              MR. SOBELMAN:  Objection.

7              THE COURT:  Sustained.

8    BY MR. AVENATTI:

9    Q.  Ms. Regnier, you were asked about various trust accounts on

10   direct.  Do you remember that?

11   A.  Yes.

12   Q.  OK.  And so I want to ask you some questions about what

13   your understanding was relating to how the trust accounts

14   worked.  Do you have that topic in mind?

15   A.  Yes.

16   Q.  OK.  In your experience at the firm, generally, when a case

17   was settled, the money would be paid by the defendant into the

18   trust account, the firm would take whatever moneys the firm was

19   due, whether it was for fees or costs, and then the balance

20   would be remitted to the client.  Is that a fair description of

21   generally what your understanding of the trust account

22   situation was?

23             MR. SOBELMAN:  Objection.

24             THE COURT:  I'll allow it.

25             You may answer.

1    A.  It is my understanding now that that is how it was supposed

2    to work.

3    Q.  Well, yes.

4    A.  I did not --

5    Q.  Was that your --

6            MR. AVENATTI:  Your Honor, move to strike?

7            THE COURT:  Ms. Regnier, just answer the question,

8    please.  That's your general understanding of how it was to

9    work?

10            THE WITNESS:  That's my general understanding now as

11    to how a trust account --

12            THE COURT:  OK.  Thank you.

13    BY MR. AVENATTI:

14    Q.  Now, sometimes large sums of money would move in and out of

15    the firm, is that right?

16            MR. SOBELMAN:  Objection.

17            THE COURT:  Overruled.

18    A.  Yes.

19    Q.  And isn't it true that while you were at the firm, hundreds

20    of millions of dollars moved in and out of the law firm?

21            MR. SOBELMAN:  Objection.

22            THE COURT:  Mr. Avenatti, could we have a time frame,

23    please, for the question.

24            MR. AVENATTI:  Just during her time at the firm, your

25    Honor, establishing foundation.

1          THE COURT:  All right.

2          You may answer.

3  A.  I don't know if it was hundreds of millions of dollars.

4  Q.  Well, it was certainly over a hundred million dollars

5  during your time at the firm, correct?

6          MR. SOBELMAN:  Objection.

7          THE COURT:  Overruled.

8  A.  I am not sure.

9  Q.  OK.  Well, you're aware of the fact that there were

10 individual cases that were resolved for 10- or 20- or $40

11 million, are you not?

12         MR. SOBELMAN:  Objection.

13         THE COURT:  Overruled.

14 A.  Yes.

15 Q.  OK.  So if you think back about all the cases that the firm

16 handled -- and by the way, the firm handled hundreds of cases

17 while you were there, right?

18 A.  They had been quite of few cases.  I don't know if I would

19 say hundreds, but yes.

20 Q.  OK.  And when you think back on those hundreds of cases and

21 the results that -- that we obtained, there's no doubt in your

22 mind that it was in excess of a hundred million dollars, right,

23 over the entire time period from 2007 forward?

24         THE COURT:  Sustained.  Misstates the testimony.

25 BY MR. AVENATTI:

1    Q.  Ms. Regnier, you were involved with the finances of the

2    firm; we've established that, correct?

3    A.  Yes.

4    Q.  And you were generally aware when these cases settled,

5    right?

6    A.  Yes.

7    Q.  And you're aware that when the cases settled, the money

8    would be sent in to the firm, generally, right?

9    A.  Generally --

10   Q.  And it would --

11   A.  -- yes.

12   Q.  It would hit the firm's accounts, right?

13   A.  Yes.

14   Q.  And some of those cases were in the tens of millions of

15   dollars, right?

16            MR. SOBELMAN:  Objection.

17            THE COURT:  Overruled.

18            (Continued on next page)

19

20

21

22

23

24

25

1    A.  Yes, they were.

2    Q.  Now, generally in your experience, a plaintiffs' law

3    firm -- well, strike that.

4              Do you know what a plaintiffs' law firm is?

5              MR. SOBELMAN:  Objection.

6              THE COURT:  Overruled.

7    A.  Well, I know what they refer to as a plaintiffs' law firm,

8    yes.

9    Q.  Okay.  Can you tell the jury generally what a plaintiffs'

10   law firm is?

11   A.  A law firm that generally only represents plaintiffs and

12   does not represent defendants.

13   Q.  A law firm that the majority of the time represents people

14   on the plaintiffs' side, either the majority or entirely; is

15   that fair?

16   A.  Yes.  I think that's what I said.

17   Q.  Okay.  Now, you are aware, are you not, that generally in

18   your experience plaintiffs' law firms, they ebb and they flow?

19   Do you know what I mean by that?

20             MR. SOBELMAN:  Objection.

21             THE COURT:  Sustained as to form.

22   BY MR. AVENATTI:

23   Q.  Ms. Regnier, you know from your experience that plaintiffs'

24   law firms have periods where they make an enormous amount of

25   money and then they don't make any money, right?

1           MR. SOBELMAN:  Objection.

2           THE COURT:  In your experience and understanding,

3      Ms. Regnier, you may answer.

4      A.  In my experience and understanding a plaintiffs' law firm

5      that works, the majority of their cases are contingency fee

6      cases, yes, that is what happens.

7      BY MR. AVENATTI:

8      Q.  The reason is because you can't always forecast or predict

9      when a particular case might settle or the result might be

10     reached, right, where the firm would get paid?

11          MR. SOBELMAN:  Objection.

12     A.  Yes.

13          THE COURT:  Overruled.

14          THE WITNESS:  Sorry.

15     Q.  So it's not easily predictable?  You would agree with that,

16     right?

17     A.  Yes, I would.

18     Q.  And the nature of our law firm was that we were

19     predominantly a plaintiffs' law firm, correct?

20     A.  Yes, we predominantly handled cases on a contingency fee

21     basis.

22     Q.  Although we had handled some cases on an hourly basis,

23     correct?

24     A.  Yes.

25     Q.  And we handled other cases where we would bill a client a

1    set amount each month, right?

2    A.  Yes.

3    Q.  And because of the nature of our practice, we did not have

4    perfect visibility and predictability as to when fees would get

5    paid on cases, did we?

6            MR. SOBELMAN:  Objection.

7            THE COURT:  Overruled.

8    A.  Correct.

9    Q.  Now, I know I asked you about your communications with

10   Ms. Daniels relating to the fee agreement, but I just want to

11   make sure that we have a clear record.  You never discussed the

12   book deal with Ms. Daniels, correct?

13   A.  Correct.

14   Q.  And you never discussed any of Ms. Daniels' legal matters

15   with her, did you?

16   A.  Correct.

17   Q.  Now, we spoke about security earlier, and I want to ask you

18   just a couple of additional questions about security.

19       At one point in time the firm had to pay for security --

20   yes or no -- as a result of the Daniels' matter?

21   A.  Security for the firm or security for Ms. Daniels?

22   Q.  Security at the offices of the firm.

23   A.  Yes, we did.

24   Q.  And that was as a result of our representation of

25   Ms. Daniels and a lot of people making threats to us at the

M1pnave6                       Regnier - Cross

1   firm as a result of that representation, right?

2   A.  Yes.  Yes.

3   Q.  Now, I want to ask you some specifics about the work that

4   was done for Ms. Daniels by me and the other attorneys and

5   individuals at the firm.

6          Do you have that general topic in mind?

7   A.  Yes.

8   Q.  I think you established on direct that Ms. Daniels was an

9   important client of the firm, correct?

10  A.  She was a very important client of yours, yes.

11  Q.  And she was a very important client to the other

12  individuals at the firm as well, right?

13  A.  I believe she may have been, yes.

14  Q.  Okay.  I mean, the firm had a lot riding on its

15  representation of Ms. Daniels, didn't it?

16          MR. SOBELMAN:  Objection.

17          THE COURT:  Sustained.

18  BY MR. AVENATTI:

19  Q.  You understood in 2018 the importance of us making sure

20  that we adequately and competently represented Ms. Daniels

21  because of how high profile everything was, right?

22  A.  I know that we always attempted to adequately represent our

23  clients.

24  Q.  I would agree with you, but my question is, it was of

25  especially keen importance because of how high profile the

1     representation of Ms. Daniels was, wasn't it?

2              THE COURT:  I am going to direct the jury to disregard

3     the beginning of that question.

4              Mr. Avenatti, just stick to questions please.

5              Thank you.

6              MR. AVENATTI:  I will rephrase, your Honor.

7              THE COURT:  Thank you.

8     BY MR. AVENATTI:

9     Q.  Ms. Regnier, we made efforts to make sure that all the Ts

10    were crossed and all the Is dotted when it came to Ms. Daniels

11    because of how high profile that representation was, didn't we?

12             MR. SOBELMAN:  Objection.

13             THE COURT:  Overruled.

14    A.  We did the same with all of our clients that we did with

15    Ms. Daniels.  That was our standard.

16    Q.  Do you have a recollection of me stating in 2018 to you and

17    others at the firm that we had to be certain that anything that

18    we put out publicly for Ms. Daniels, any filings that were made

19    had to be perfect or near perfect because there were so many

20    eyes watching everything we did?

21             MR. SOBELMAN:  Objection.  Hearsay.

22             THE COURT:  Overruled.  But, ladies and gentlemen --

23    well, let's hear the answer first.

24             Ms. Regnier?

25    A.  I don't know if you made exactly that statement, but it's

M1pnave6                        Regnier - Cross

1    similar to something you probably would have said.

2              THE COURT:  Let me ask you, Ms. Regnier, do you

3    remember Mr. Avenatti saying something along those lines?

4              THE WITNESS:  I don't exactly remember, but I have no

5    doubt that he did.

6              THE COURT:  Ladies and gentlemen, I'm going to

7    instruct you you may not consider Ms. Regnier's testimony

8    regarding whatever statements Mr. Avenatti may have made on

9    that score for their truth, but you may consider them with

10   respect to Mr. Avenatti's state of mind at the time.

11   BY MR. AVENATTI:

12   Q.  Ms. Regnier when you -- strike that.  Over the course of

13   the Daniels representation, you had occasion to observe the

14   legal work that I did along with others at the firm, did you

15   not?

16   A.  Yes.

17   Q.  And was your impression that that legal work was of an

18   extremely high quality?

19             MR. SOBELMAN:  Objection.

20             THE COURT:  Sustained.

21   BY MR. AVENATTI:

22   Q.  Ms. Regnier, did you form an opinion about the quality of

23   the work that our firm did for Ms. Daniels during 2018?

24             MR. SOBELMAN:  Objection.

25             THE COURT:  Sustained.

M1pnave6                        Regnier - Cross

1    BY MR. AVENATTI:

2    Q.  Ms. Regnier, you were predominantly responsible for all of

3    the legal filings that the firm made on behalf of Ms. Daniels,

4    correct?

5    A.  No.

6    Q.  Who was?

7    A.  We had another paralegal who was doing the physical

8    filings, Ms. Garcia.  And the attorneys were involved in it.  I

9    was not the primary person responsible for the filings.

10   Q.  Could you tell the jury the name of the paralegal who was

11   predominantly doing the filing.  I think you mentioned her last

12   name.  Garcia?

13   A.  Yes, Suzie Garcia.

14   Q.  Suzie Garcia was the individual responsible for making sure

15   that the legal work that the firm turned out was actually filed

16   in the various courts around the country that we were working

17   on for Ms. Daniels?

18   A.  Yes.  The physical filing, yes.

19   Q.  Just so the jury understands, she would take the actual

20   documents that had been prepared by the attorneys and make sure

21   they got filed, right?

22   A.  Yes.

23   Q.  Those filings were done in multiple cases around the

24   country because we were handling a lot of legal work for

25   Ms. Daniels, isn't that true?

1   A.  Yes.

2   Q.  There was case here in New York that we had filed for

3   Ms. Daniels, right?

4   A.  Yes.

5   Q.  And there was a bunch of work associated with that case

6   which actually was filed in this very courthouse, right?

7   A.  Yes.

8   Q.  Then there were multiple cases filed in federal district

9   court in Los Angeles, correct?

10  A.  Yes.

11  Q.  And at one point the New York case was actually transferred

12  to Los Angeles, so that was another case that had to be handled

13  in federal court there, correct?

14  A.  Yes.

15  Q.  There was another lawsuit against Keith Davidson,

16  Ms. Daniels' former lawyer, that was filed in California state

17  court.  Do you recall that?

18          MR. SOBELMAN:  Objection.

19  A.  Yes.

20          THE COURT:  Overruled.

21  A.  Yes, I do.

22  Q.  There was a lawsuit against a strip club in Florida that we

23  were involved with.  Do you recall that?

24  A.  Yes, I do.

25  Q.  There was another lawsuit against a horse trainer in Texas.

M1pnave6                          Regnier - Cross

1    Do you recall that?

2    A.  Yes.

3    Q.  There was a lawsuit about a false arrest of Ms. Daniels in

4    Columbus, Ohio, and that case was filed in federal district

5    court in Columbus, Ohio.  Do you recall that?

6    A.  Yes, I recall the case, but I don't believe we did the

7    filing.

8    Q.  Do you recall that we had a local counsel, a lawyer locally

9    in Ohio that did the filing after Mr. Carlos Colorado prepared

10   the complaint?  Do you recall that?

11   A.  I -- yes.  I'm not sure if Carlos prepared the complaint,

12   but I know it was prepared in the office.

13   Q.  So you recall that our law firm prepared the legal filings,

14   but we had a lawyer in Columbus actually file it for us?

15   A.  Yes.

16   Q.  And you are aware, are you not, that that false arrest

17   complaint stemmed from a false arrest of Ms. Daniels in

18   Columbus, Ohio, that I and the firm assisted with in getting

19   the charges dismissed?

20               MR. SOBELMAN:  Objection.

21               THE COURT:  Sustained.

22   BY MR. AVENATTI:

23   Q.  Ms. Regnier, do you recall our involvement in getting

24   charges against Ms. Daniels dismissed in Ohio because she had

25   been falsely arrested?

1          MR. SOBELMAN:  Objection.

2          THE COURT:  Sustained.

3   BY MR. AVENATTI:

4   Q.  There was Ms. Daniels' divorce proceeding in the state of

5   Texas that we were involved in.  Do you recall that?

6   A.  We had very little involvement in that, but, yes, I do

7   recall it.

8   Q.  Well, you don't know the extent of my involvement in that

9   proceeding, do you?

10  A.  No.

11  Q.  So you don't know how much time I spent working on that

12  matter, do you?

13  A.  No.

14  Q.  There was a dispute that Ms. Daniels had with a documentary

15  company by the name of Efran.  Do you recall that?

16  A.  I do not remember that.  No, I do not.

17  Q.  And there was a dispute that we handled for Ms. Daniels

18  where she accused two long-term friends of hers of stealing

19  from her by the name of JD and Keith in late 2018, early 2019

20  that we handled for Ms. Daniels.  Do you recall that?

21          MR. SOBELMAN:  Objection.

22          THE COURT:  Sustained.

23  BY MR. AVENATTI:

24  Q.  Ms. Regnier, do you recall us handling a matter for

25  Ms. Daniels relating to her allegations that someone had taken

1    money from her?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4    BY MR. AVENATTI:

5    Q.  Do you recall a matter that we handled against two friends

6    of Ms. Daniels, and we'll leave it there?

7              MR. SOBELMAN:  Objection.

8              THE COURT:  Overruled.

9    A.  I vaguely recall something, but I don't know the -- any

10   particulars.

11   Q.  And there may have been other matters that we worked on for

12   Ms. Daniels, correct?

13   A.  There may have been other matters that you worked on, yes.

14   Q.  Well, there may have been other matters that I worked on

15   and there may have been other matters that other people at the

16   firm worked on, right?

17   A.  Yes.

18   Q.  All pursuant to that contract that you were shown by the

19   government, right, because that was the only contract there

20   was?

21   A.  That's the only contract I was aware of.

22   Q.  Ms. Regnier, you were also aware that during this year of

23   early 2018 to early 2019 that I spent a lot of time assisting

24   with Ms. Daniels' publicity and media opportunities.  Isn't

25   that true?

M1pnave6                    Regnier - Cross

1   A.  I am aware that you were talking with her quite a bit and

2   working with her.  I don't know exactly what you were doing

3   with her all the time.  But, yes, you were traveling with her

4   quite a bit.

5   Q.  Well, you were aware that I appeared next to her on various

6   media opportunities, right, literally physically with her,

7   correct?

8   A.  Yes.

9   Q.  At one point or maybe more than one point you became

10  concerned that I was actually spending too much time

11  representing Ms. Daniels, isn't that true?  Yes or no.

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14  BY MR. AVENATTI:

15  Q.  Ms. Regnier, isn't it true that at one point you became

16  concerned that I was spending too much time representing

17  Ms. Daniels to the detriment of the firm's ability to earn fees

18  on other cases?

19          MR. SOBELMAN:  Objection.

20          THE COURT:  Overruled.

21  Q.  Yes or no.

22  A.  I was -- that misstates my concern.

23  Q.  Now, at the firm we spent a lot of time dealing with this

24  security issue relating to Ms. Daniels, did we not?

25          MR. SOBELMAN:  Objection.

M1pnave6                          Regnier - Cross

1    A.   Yes.

2              THE COURT:   Sustained.

3    Q.   And in fact, you would often book the travel for the

4    security guards, right?

5              MR. SOBELMAN:   Objection.

6              THE COURT:   I think we have adequately covered this

7    ground.  Let's move on to the next line, please.

8    BY MR. AVENATTI:

9    Q.   Is it fair to say that from what you observed in 2018 the

10   Stormy Daniels case took up a tremendous amount of the

11   resources at the law firm?

12             MR. SOBELMAN:   Objection.

13             THE COURT:   I think we've probably covered this

14   ground, but I'll let her answer the question.

15             Go ahead, Ms. Regnier.

16   A.   It did take up quite a few resources of the firm.

17   Q.   And you observed me and other attorneys at the firm

18   consistently attempt to assist Ms. Daniels in solving her

19   various problem during that time period, right?

20             MR. SOBELMAN:   Objection.  Cumulative.

21             THE COURT:   Sustained.

22   BY MR. AVENATTI:

23   Q.   Now, let's talk about the legal files, the client files

24   relating to Ms. Daniels.  Was there a physical file?

25   A.   Yes.

1    Q.  And the physical file contained what?

2    A.  Hard copies of letters and pleadings.

3    Q.  I'm sorry.  I didn't hear you.

4    A.  Hard copies of letters and pleadings.

5    Q.  And please tell the jury what a pleading is.

6    A.  It's a document filed with the court or it could be a

7    discovery request and response.

8    Q.  Okay.  When you say a pleading is a document filed with a

9    court, it is a document that is filed for the purposes of the

10    case; it could be a motion or it could be an effort to do one

11    thing or another.  Right?

12    A.  Yes.

13    Q.  When you say a discovery request, a discovery request is

14    when one side asks the other side to give them certain

15    information in connection with the case, right?

16    A.  Yes.

17    Q.  And do you recall that the files relating to Ms. Daniels

18    contained all of the things that you just mentioned?

19    A.  Yes.

20    Q.  And over the course of the representation of Ms. Daniels,

21    there were also hearings in court in connection with that that

22    an attorney would have to attend, right?

23    A.  Yes.

24    Q.  And do you recall that I attended a number of those

25    hearings around the country in person?

1    A.  Yes.

2    Q.  And other attorneys --

3    A.  Excuse me.

4    Q.  Do you need some water, Ms. Regnier?

5    A.  I'm okay.  Go ahead.

6    Q.  Okay.  And other attorneys would attend as well, right?

7    A.  Yes.

8    Q.  So there was a physical file and then was there an

9    electronic file relating to the firm's representation of

10   Ms. Daniels?

11   A.  There was -- basically there was an electronic file that

12   would contain the same thing as the physical file, but the

13   electronic file would be more extensive because it included

14   drafts of various documents.

15   Q.  So in connection with the firm's representation of

16   Ms. Clifford on all of these matters that we have been talking

17   about, there was a physical file and electronic file.  True?

18   A.  Yes.

19   Q.  In the five to ten interviews with the government, did the

20   government ever ask you for the physical or the electronic file

21   of the firm's representation of Ms. Daniels?

22           MR. SOBELMAN:  Objection.

23           THE COURT:  Sustained.

24   BY MR. AVENATTI:

25   Q.  In preparing to testify here today, did you at the

M1pnave6                          Regnier - Cross

1    direction of anyone ever make any effort to look at the

2    electronic or physical files relating to the firm's

3    representation of Ms. Daniels?

4                MR. SOBELMAN:  Objection.

5                THE COURT:  Overruled.

6    BY MR. AVENATTI:

7    Q.  Yes or no.

8    A.  I looked -- I looked at the documents that were provided

9    me, but I did not physically look at the hard file or the

10   electronic file.

11   Q.  Nor did you make any effort to look at those at the request

12   of anyone, did you?

13               MR. SOBELMAN:  Objection.

14               THE COURT:  Sustained.

15               Mr. Avenatti, just another check-in.  Any sense of now

16   how much longer you have?

17               MR. AVENATTI:  Your Honor, probably at least 45

18   minutes.  I am assuming you want to break on time.

19               THE COURT:  Yes, I will.  But you can carry on for

20   another four then.  Thanks.

21   BY MR. AVENATTI:

22   Q.  Ms. Regnier, the last time you reviewed any of the files of

23   the firm relating to the firm's representation of Ms. Daniels

24   was back in March of 2019, correct?

25   A.  That would be correct.

1    Q.  So you haven't look at any of that information in almost

2    three years, have you?

3    A.  No, I have not.

4    Q.  And no one has ever asked you to either, have they?

5              MR. SOBELMAN:  Objection.

6              THE COURT:  Sustained.

7    Q.  Now, in preparing to testify, the government showed you a

8    lot of bank records, right?

9    A.  Yes.

10   Q.  But they didn't show you all of the firm's bank records for

11   2018 and 2019, did they?

12   A.  No.

13             MR. AVENATTI:  Your Honor, now is a good breaking

14   point.  You can hold the two minutes against me.  No?

15             THE COURT:  Keep going.  Use the two minutes, please.

16   Thank you.  And it's three for the record.

17             MR. AVENATTI:  Fair enough, your Honor.

18   BY MR. AVENATTI:

19   Q.  You were asked about this signature that I asked you to put

20   on the transmittal letter to Mr. Janklow.  Do you recall that?

21   A.  Yes, I do.

22   Q.  And from time to time you would paste clients' signatures

23   on various documents in connection with our cases, would you

24   not?

25   A.  You would contact me and request that I do it, and, yeah, I

M1pnave6                         Regnier - Cross

1  did it several times.

2  Q.  I mean that was not an uncommon occurrence over the course

3  of our practice, was it?

4  A.  No, it was not.

5  Q.  That was something that in fact was regularly done in

6  connection with our representation of clients, wasn't it?

7  A.  Yes, it was.

8  Q.  And that's why, when I asked you to do it, you didn't find

9  anything unusual about that, because we did that from time to

10  time for clients, right?

11  A.  Correct.  Yes.

12  Q.  Because sometimes the client wouldn't be available to sign

13  something, for instance, right?

14           MR. SOBELMAN:  Objection.

15           THE COURT:  Sustained.

16  BY MR. AVENATTI:

17  Q.  That didn't strike you as unusual, that request, did it?

18           MR. SOBELMAN:  Objection.

19           THE COURT:  Sustained.

20  BY MR. AVENATTI:

21  Q.  That request did not raise any red flags to you, did it?

22           MR. SOBELMAN:  Objection.

23           THE COURT:  Sustained.

24  BY MR. AVENATTI:

25  Q.  Ms. Regnier, when you did that, you didn't think there was

1   anything wrong with it, did you?

2               MR. SOBELMAN:  Objection.

3               THE COURT:  Sustained.

4   BY MR. AVENATTI:

5   Q.  Ms. Regnier, you're not aware of what my communications

6   were with Ms. Daniels at the time that you put that signature

7   on that document, are you?

8   A.  No, I'm not.

9               THE COURT:  All right.  That's where we will leave it

10  for the day.

11              Ladies and gentlemen, as much as I would be tempted to

12  sneak in some extra time today to make up for our time lost,

13  since I told you we will end at 3, we are going to end at 3.

14              My standard instructions apply, but let me repeat

15  them, even if you can probably repeat them with me at this

16  point.

17              Number one, do not discuss the case, with each other,

18  with your friends, family, employers, anyone.  Do not discuss

19  the case.

20              Number two, please don't do any research about the

21  case and investigate anything, so on and so forth.  As I've

22  told you, should you see any reference to the case in anything,

23  social media, media, hear it on the radio, TV, etc., shut it

24  off, turn the page, close your browser, whatever you need to do

25  to avoid hearing anything about the case or anyone involved in

M1pnave6                        Regnier - Cross

1    the case.  Continue to keep an open mind.  You have heard more

2    of the evidence, but there's still more to come.

3              With that, I wish you a very pleasant evening.  So

4    please be here at 8:30 or 8:45 at the latest so we can start

5    promptly.  With that, I wish you a pleasant evening and you are

6    excused.

7              Ms. Regnier, please hang on for one second.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1pnave6                        Regnier - Cross

1          (Jury not present)

2          THE COURT:  You may be seated.

3          All right.  Ms. Regnier, I realize that you're in a

4    different time zone and behind us.  I apologize for the fact

5    that you are going to have to get up early tomorrow to resume

6    your testimony, but such is life, and I thank you in advance

7    for accommodating our schedule.

8          I will instruct you that because you are in the middle

9    of cross-examination you are not to speak with any members of

10   the government except with respect to the logistics of where

11   and when you need to be if you need to have those discussions.

12   You should not discuss the substance of your testimony with

13   anyone from the government.  You may confer with your lawyer --

14   I know you have a lawyer -- but he may not speak to the

15   government on your behalf and transmit communications back and

16   forth.

17         Do you understand that?

18         THE WITNESS:  Yes, I do.

19         THE COURT:  All right.  So please be ready to go at 9

20   o'clock Eastern Time tomorrow.

21         The government or someone will give you instructions

22   as to when you should be on, but I will see you tomorrow

23   morning and wish you a very pleasant afternoon and evening.

24   Thank you.  If you can close out on your end so that you are no

25   longer hearing our feed, that would be great.

1          THE WITNESS:  Thank you.

2          (Witness not present)

3          THE COURT:  All right.

4          One thing, Mr. Avenatti, given the potentially

5    unexpected development of today, I did not enforce the Court's

6    mask rule by requiring you to give me evidence of a negative

7    test.  But if you intend to unmask in the podium tomorrow, I

8    will need a negative test from you this afternoon or tomorrow

9    morning, the same policy that applies to the members of the

10   government team as well.  So please get that to my chambers

11   either this evening, if you do it this evening, or tomorrow

12   morning.  And you should look at the order for what tests are

13   acceptable.

14          All right?

15          MR. AVENATTI:  Understood, your Honor.

16          THE COURT:  Anything to bring up from the government?

17          MR. SOBELMAN:  No, your Honor, other than to flag that

18   we are moving still a little slower than we had initially

19   anticipated.

20          THE COURT:  Understood.  There were some developments

21   today that account for that.

22          First of all, should we discuss the exhibit that you

23   had alerted me to earlier, or is there any need to do that?

24          MR. SOBELMAN:  No, your Honor.  We already dealt with

25   it.

M1pnave6                        Regnier - Cross

 1              THE COURT:  Okay.

 2              MR. SOBELMAN:  Thank you.

 3              THE COURT:  That's what I like to hear.  Can you give

 4    me a sense of what our schedule is tomorrow, who you intend to

 5    call, or do you want to send an e-mail to give us and

 6    Mr. Avenatti a heads-up?

 7              MR. SOBELMAN:  Your Honor, we plan to send an e-mail

 8    by the 5 o'clock deadline in the scheduling order, and we can

 9    do the same with the Court if that's okay.

10              THE COURT:  That is okay.  I would like to know if you

11    think we'll get to Ms. Daniels tomorrow, not only because I am

12    sure many people are interested in that, but also because I

13    want to let that gentleman know who's presiding over the matter

14    with Mr. Brewster.

15              MR. SOBELMAN:  We think it's very unlikely, but

16    possible.

17              THE COURT:  Okay.

18              All right.  So I will look for the e-mail.

19              Mr. Avenatti, anything that you need to raise before

20    we break?

21              MR. AVENATTI:  Yes, your Honor.  Two issues.

22              Number one, as it relates to us moving slow, I am

23    highly confident that this case will be done certainly within

24    three weeks.  Your Honor indicated to the jury three to four

25    weeks.  So there's no question that we will be done by the end

1    of three weeks.  So, you know, any concerns about perhaps the

2    government's case runs over to early next week, you know, so be

3    it.  I think that your Honor showed a lot of foresight in what

4    you told the jury relating to how long this case was going to

5    take.  So I don't anticipate dragging this out any longer than

6    necessary as relates to my defense.  That's the first point.

7             THE COURT:  Okay.

8             MR. AVENATTI:  The second point is, your Honor, I do

9    want to raise for the record an objection to the government not

10   providing all of the 3500 material for Ms. Regnier prior to me

11   beginning my cross-examination.

12            Among other things, I believe that there are e-mails

13   in the possession of the government that have not been provided

14   to the defense as well as the text message that Ms. Regnier

15   sent to Special Agent Penland previously, who is here in the

16   courtroom.

17            There's never been an explanation relating to that

18   text message provided by the government.  They have never

19   stated that the text message was not sent.  If it was sent and

20   they have it, I'm entitled to it under the Jencks Act.  The

21   statute is very clear.

22            If it was sent and then destroyed or spoliated, I am

23   entitled to know that so I can seek appropriate relief.  So,

24   regardless of what happened in the Nike case, regardless of

25   what happened in any other case, I made a specific request

M1pnave6                    Regnier - Cross

1    pursuant to 26.2 and the Jencks Act for all 3500 material for

2    each witness.

3           I am now in the cross-examination of Ms. Regnier.  I

4    was entitled to all e-mails and text messages, and I would like

5    to get a definitive answer as to what happened to this text

6    message between the agent and Ms. Regnier.

7           If the agent no longer has it, then I am entitled to

8    know that.  If the agent does have it, I am entitled to the

9    text message.  It is a statement of a witness.  It's classic

10   3500, and I would like to get to the bottom of it.

11          Thank you.

12          THE COURT:  I think the government has previously made

13   a representation that it has no such text message in its

14   possession, also that it doesn't know if it ever had such a

15   text message in its possession.  I think, in other words, they

16   have given you what information they can.

17          I also know that matter was litigated before Judge

18   Gardephe.  I have read his decision on it.  It is what it is.

19   If it turns out there is a text message, you can certainly seek

20   appropriate relief at that time.  I also find it a little hard

21   to imagine that that's going to be particularly material to the

22   outcome of this case.

23          As for any other e-mails, anything of that sort, the

24   government has represented that it has complied with its

25   obligations, and I assume it has, but I don't know if you have

1    a specific e-mail or thing that you think is in their

2    possession that they have not shared with you.  You are

3    certainly welcome to identify that for me, and I will ask them,

4    but otherwise I will stand on their representation.

5         MR. AVENATTI:  Your Honor, I am happy to confer with

6    the government and perhaps file something with your Honor

7    detailing that for the benefit of the record.

8         I do want to say one thing relating to the text

9    message with Ms. Penland.  In her own hand, your Honor, her own

10   writing in her notes --

11        THE COURT:  Mr. Avenatti, I got it.  I understand

12   that.  It is addressed in Judge Gardephe's opinion.  The

13   government has made a representation that it has no such text

14   in its possession.  That could be because, notwithstanding the

15   notes, which I think were made in anticipation, she never

16   received the text message.

17        It could be that she received the text message and for

18   whatever reason it's no longer in her possession.  I don't know

19   the answer to that.  But I think that that ground has been

20   plowed enough and as much as it's going to be.  I also don't

21   think it's particularly material at the end of the day.  You're

22   certainly welcome to inquire of Ms. Regnier about the fact that

23   she sent that or said she was going to send that text message,

24   which I think is clear from the record.  You are certainly

25   entitled, unless there is another grounds to object, to ask her

M1pnave6                    Regnier - Cross

1    about the text message and about the tweet that I understand

2    she said she was going to send by text message.

3            In other words, I think you have enough to work with.

4    To the extent that there is a text out there that has

5    disappeared for one reason or another, I don't think that fact

6    alone is particularly significant.  So I understand you have

7    made your record, and you have preserved the issue.  I think we

8    move on on that.

9            If you think there's anything else, I would urge you

10   to bring it to the government's attention promptly, and they

11   will either address it or reaffirm tomorrow morning that they

12   have complied with their obligations and given everything to

13   which you are entitled.  I trust that they have.

14           Mr. Sobelman, do you want to do that now?  Or you can

15   reiterate it tomorrow.

16           MR. SOBELMAN:  We have, your Honor.  We stand by all

17   the representations we have made before this Court as well as

18   the representations we made about this issue before Judge

19   Gardephe.  Nothing has changed.

20           THE COURT:  All right.  Very good.

21           One thing I realized too.  I am not suggesting, let

22   alone inviting any filings from either side, but it occurs to

23   me that Mr. Avenatti technically doesn't have ECF privileges

24   and indeed can't technically file things directly with the

25   Court.

1          I am going ask standby counsel to facilitate his

2     filing of anything, that is, to file things on his behalf,

3     given that you do have ECF privileges to ensure that there's no

4     delay in his making any filings and submissions to the Court.

5          All right?

6          MR. AVENATTI:  Thank you, your Honor.

7          THE COURT:  With that I wish you -- hang on one

8     second.

9          Mr. Avenatti, I think we are going to make a test

10    available to you now.  So if you could go with a member of the

11    District Executive's office, who is here, he'll take you and

12    arrange for you to do the test now.

13         MR. SOBELMAN:  Your Honor, I'm sorry.  I just have one

14    quick thing to put on the record.

15         THE COURT:  Can you wait until Mr. Avenatti responds

16    to that?

17         MR. AVENATTI:  Understood, your Honor.

18         THE COURT:  Yes, Mr. Sobelman.

19         MR. SOBELMAN:  Yes, your Honor.

20         In the amended scheduling order, the parties agreed

21    and the Court adopted a procedure by which 26.2 material and

22    other defense disclosures would be triggered by a certain

23    amount of business days from the beginning of the defense case.

24    At this pace we anticipate we likely would rest hopefully late

25    this week, but certainly by Monday or Tuesday of next week,

1    which would put us approximately five business days out and

2    would trigger the first disclosure deadlines.

3          We want to -- we'll of course discuss it with the

4    defense if they have any questions, but we expect that they

5    will make those disclosures as required.

6          THE COURT:  All right.  My order is what it is, and

7    Mr. Avenatti will have to comply with it even if he's handling

8    his own defense.  I will ask standby counsel to facilitate this

9    on that score too.  I imagine it may be easier for them to

10   actually make the disclosures and what have you, but you should

11   confer with one another, and they should certainly honor their

12   obligation and comply with the order.

13         All right.  Thank you very much.  I'll see you

14   tomorrow.  Please be here no later than 9 o'clock.

15         Government, please make sure Ms. Regnier is ready.

16         MR. BAUM:  Your Honor, I apologize.  Just so

17   everything is clear, based on what you have just said, if the

18   government has any new exhibits, new 3500, they should continue

19   to send it to standby counsel as Mr. Avenatti doesn't have a

20   means to receive it.

21         THE COURT:  Understood.  Why don't you guys sort out

22   those sorts of things, but obviously I want standby counsel to

23   play whatever role is necessary to ensure that Mr. Avenatti is

24   able to communicate as he needs to to conduct his defense and

25   file things as needed as well.

M1pnave6                        Regnier - Cross

1              Thank you very much.  Have a good afternoon and

2    evening.  I'll see you in the morning.

3              (Adjourned to January 26, 2022, at 9:00 a.m.)

<pre>
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     LUCAS JANKLOW

 4    Cross By Mr. Dalack  . . . . . . . . . . . . 324

 5    Redirect By Mr. Podolsky . . . . . . . . . . 358

 6     JUSTIN ELLARD

 7    Direct By Mr. Sobelman . . . . . . . . . . . 360

 8    Cross By Mr. Dalack  . . . . . . . . . . . . 367

 9     JUDY REGNIER

10    Direct By Mr. Sobelman . . . . . . . . . . . 383

11    Cross By Mr. Avenatti  . . . . . . . . . . . 476

12                        GOVERNMENT EXHIBITS

13    Exhibit No.                                Received

14    3    . . . . . . . . . . . . . . . . . . . . 386

15    S1   . . . . . . . . . . . . . . . . . . . . 398

16    302A through 302G and 303A and 303B  . . . . 403

17    803  . . . . . . . . . . . . . . . . . . . . 404

18    608  . . . . . . . . . . . . . . . . . . . . 411

19    610  . . . . . . . . . . . . . . . . . . . . 418

20    301A and 301B  . . . . . . . . . . . . . . . 428

21    601  . . . . . . . . . . . . . . . . . . . . 432

22    2    . . . . . . . . . . . . . . . . . . . . 433

23    4    . . . . . . . . . . . . . . . . . . . . 472

24

25
</pre>

                          DEFENDANT EXHIBITS

Exhibit No.                                      Received

  LJ13    . . . . . . . . . . . . . . . . . . 335