M1Q8AVE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 Cr. 374 (JMF)

5    MICHAEL AVENATTI,

6                   Defendant.
                                           Trial
7    ------------------------------x
                                           New York, N.Y.
8                                          January 26, 2022
                                           9:00 a.m.
9    Before:

10                    HON. JESSE M. FURMAN,

11                                         District Judge
                                           –and a Jury–
12
                        APPEARANCES
13
     DAMIAN WILLIAMS
14        United States Attorney for the
          Southern District of New York
15   BY:  MATTHEW D. PODOLSKY
          ROBERT B. SOBELMAN
16        ANDREW A. ROHRBACH
          Assistant United States Attorneys
17
     MICHAEL AVENATTI, Defendant *Pro Se*
18
     DAVID E. PATTON
19        Federal Defenders of New York, Inc.
          Attorney for Defendant
20   BY:  ROBERT M. BAUM
          ANDREW J. DALACK
21        TAMARA L. GIWA
          Standby Assistant Federal Defenders
22
     Also Present:  Special Agent DeLeassa Penland
23                   U.S. Attorney's Office
                     Christopher de Grandpre, Paralegal Specialist
24                   Juliet Vicari, Paralegal

25

M1Q8AVE1

```
1              (Trial resumed; jury not present).
2              THE COURT:  You may be seated.
3              Good morning.  Welcome back, ladies and gentlemen.
4              I don't see Ms. Regnier on the screen.  Can she hear
5   us, do we know?
6              THE WITNESS:  Yes, I can hear you.  I should be on the
7   screen now.
8              THE COURT:  Good morning.  Thank you for being up
9   bright and early.  If you can just mute your end so that we can
10  discuss what we need to discuss.
11             Can the government notify Ms. Regnier when we are
12  ready to put her on unmute.
13             Let me confirm, Ms. Regnier, that you're muted.  I
14  assume you're not hearing me.  Very good.
15             Good morning.  There was a motion filed by the
16  government last night with respect to certain lines of cross as
17  to Ms. Clifford.  I think we can probably deal with that later.
18  It didn't seem from the government's e-mail last night that you
19  anticipate that she will be testifying today, let alone getting
20  to cross, is that correct?
21             MR. SOBELMAN:  That's correct, your Honor.
22             THE COURT:  Let's take that up at the end of the day.
23             Anything else that the government needs to raise?
24             MR. ROHRBACH:  Two things briefly from the government.
25             First, we expect Special Agent Jeremy Rosenman to
```

M1Q8AVE1

1    testify today.  Through him we were planning to offer four

2    exhibits on which one of his summary charts relies.  We had

3    conferred with defense counsel earlier in the trial and they

4    are not planning to object.  But in the event they do object,

5    we would plan to offer them subject to connection and wanted to

6    flag them for the Court in advance.

7            THE COURT:  Can you spell that out a little bit, what

8    they are and what the connection is?

9            MR. ROHRBACH:  They are four check request forms from

10   St. Martin's Press, and they are Government Exhibits 101, 104,

11   105 and 106.

12           We expect the witness from St. Martin's Press later at

13   the trial to provide the testimony that will authenticate them

14   as records of St. Martin's that are what they appear to be.

15           THE COURT:  Mr. Avenatti, you can object in real-time

16   but anything you wish to say to that?

17           MR. AVENATTI:  Yes, your Honor.  I would object at

18   least at a minimum to the documents being shown to the jury

19   before they are admitted into evidence.  I don't think they

20   qualify under the business records exception.  There has been

21   no foundation established in that they are business records.

22   If ultimately the government has a witness who comes in and

23   lays the proper foundation and the Court admits the documents,

24   then I think at such time they can be shown to the jury.  If

25   this is a question of merely the government's witness today

M1Q8AVE1

1    summarizing information that includes the records, I don't

2    object to that, subject, of course, to the underlying records

3    ultimately coming in.  If the underlying records do not come

4    in, I will seek an instruction or other relief relating to the

5    then inaccuracy of the summary.

6            MR. ROHRBACH:  These records are instructions.  They

7    are directions to make payments from St. Martin's Press to

8    Janklow & Nesbit, so I don't think there is a hearsay issue

9    here.  I think what the witness from St. Martin's Press has to

10   testify to later is just the authenticity of these records.

11           THE COURT:  When I see them I will make my ruling, but

12   it certainly sounds like it will be OK, subject to connection,

13   with the understanding that if there is no connection made,

14   then I will instruct the jury to disregard it and strike them

15   from the record.

16           What else?

17           MR. ROHRBACH:  One other matter, your Honor.  The

18   defense produced to us last night about 350 pages of bank

19   records marked as various exhibits.  They could have been

20   produced earlier as defense exhibits, but we received them last

21   night.  They appear to be overlapping with some of the bank

22   records that are already in evidence, but there are other

23   records that don't appear to the government to be relevant

24   right now, but we received them last night and are still

25   reviewing them.  So we aren't asking for relief right now, but

M1Q8AVE1

1    just wanted to flag for the Court that as the defendant shows

2    how they are relevant during his examination, we may object at

3    that time, and the lateness of the production is the reason we

4    haven't raised it with the Court in advance.

5              THE COURT:  Understood.  And we will take that up if

6    and when we need to.

7              I will say, Mr. Avenatti, to the extent that you can

8    avoid, if something is already in evidence, let's just use that

9    rather than admitting a duplicate and causing any confusion

10   about multiple sets of things.  But to the extent that

11   something is not in evidence and it's offered, we will take

12   that up, and if there is an application I will consider it at

13   that time.

14             MR. AVENATTI:  If I could just be heard briefly on

15   that.

16             THE COURT:  You don't need to be.  Since there is no

17   application, you don't need to say anything further.

18             Anything else from the government?

19             MR. ROHRBACH:  Nothing from the government.

20             THE COURT:  Mr. Avenatti, anything from you?

21             MR. AVENATTI:  Yes, your Honor.

22             I want to raise one issue because I anticipate it

23   coming up on redirect.  On cross-examination there was

24   testimony relating to a $454 million jury verdict that had been

25   obtained by me and my firm in the year prior to 2018.  That

M1Q8AVE1

1   jury verdict was ultimately reversed by the Ninth Circuit in

2   2020, well after the alleged completion of the alleged crime in

3   this case.  So, therefore, I am hopeful the government is not

4   going to elicit testimony from Ms. Regnier relating to what

5   happened in 2020 because it's completely irrelevant and it can

6   have no bearing on my state of mind or the financial condition

7   of the firm at the time of the alleged crime.

8           So provided the government is not going to elicit

9   testimony from Ms. Regnier about what happened in 2020, we

10  don't have anything to discuss; otherwise, I think we do have

11  something to discuss.

12          THE COURT:  I have got it.

13          My inclination is that the reversal is irrelevant and

14  it shouldn't be brought up, but I certainly think the

15  government is entitled to elicit from her that when you get a

16  verdict, it doesn't necessarily mean that money will come in,

17  that there can be appeals and delays and cases can get

18  reversed, and in that sense, getting a verdict doesn't

19  guarantee any payment.  I think that's the only relevant thing

20  that I see with respect to the time period at issue here.

21          Government, any disagreement with that?  That is to

22  say, I don't see why the reversal in 2020 should come into the

23  record.  I think the state of mind of Mr. Avenatti in 2018 and

24  2019 is what is relevant here.

25          MR. PODOLSKY:  Your Honor, there are a couple of

1    reasons why we think it is actually fair for us to go into

2    this.  One is we discussed this with then defense counsel in

3    advance of Ms. Regnier's testimony, and they agreed not to go

4    into this on cross.  Obviously, the representation changed

5    mid-testimony and we didn't have this conversation again, but I

6    did not elicit this on direct because of their agreement not to

7    go into it on cross.

8            THE COURT:  I don't see how you could have elicited it

9    on direct, or at least the reversal.  That's frustrating and

10   annoying, but it's neither here nor there for purposes of the

11   rules of evidence.

12           MR. PODOLSKY:  Understood.  But the defendant has now

13   left a misimpression with the jury and has opened the door to

14   this.  He has left the misimpression that his firm was number

15   one, they were doing great, they had all this money coming in.

16   And we agree and we intend to ask about whether they actually

17   ever received any money from this.  But I think as an example

18   of how these plaintiffs' firms work and the outcomes that

19   sometimes can occur, it's completely fair here for Ms. Regnier

20   to testify about her knowledge and understanding about what

21   ultimately happened with that judgment.

22           THE COURT:  I don't agree.  The fact that he never got

23   that money, the fact that it was reversed, I don't think has

24   any relevance and in that sense is not relevant and it's more

25   prejudicial than probative.  I certainly think it is fair game

M1Q8AVE1

1    for you to say that if you get a verdict, it doesn't

2    necessarily lead to payment, let alone payment in any swift

3    way.

4              I think the key to your argument here is that in 2018

5    and '19, Mr. Avenatti was in desperate straits and needed money

6    to make ends meet and make certain payments, and that's fine.

7    I think it was fair game for him to elicit that verdict because

8    it goes to his state of mind that he was expecting payment at

9    some point.  And you can elicit from her that that payment

10   could have been delayed, that it didn't arrive in the relevant

11   time period here, that in some instances, again, payments don't

12   ever come or they are substantially delayed.  I think all of

13   that is fair game.  The fact that a year after his arrest in

14   this case the verdict was reversed I don't think has any

15   relevance.

16             MR. PODOLSKY:  Understood, your Honor.

17             THE COURT:  Next, Mr. Avenatti.

18             MR. AVENATTI:  Thank you, your Honor.

19             In that same vein, the government has elicited

20   testimony and introduced evidence during the trial thus far,

21   your Honor, and your Honor has overruled various objections on

22   401 relating to the financial condition of the firm.  I assert,

23   your Honor, there has to be a temporal cutoff along the lines

24   of what we were just discussing relating to that evidence.

25             The government alleges in this case that the alleged

M1Q8AVE1

1    crime was complete in September of 2018, that the fines

2    allegedly belonging to Ms. Daniels were expended as of the end

3    of 2018, the completion of the crime.  So I fail to see the

4    relevance of any financial-condition evidence relating to the

5    firm in October, November, December of 2018, or January,

6    February or March of 2019.  It's completely irrelevant to any

7    issue in the case, if the government is correct that the crime

8    was complete in September of 2018.

9              THE COURT:  I have got it.

10             Just for my scheduling purposes, do you have more

11   issues than this or is this it?

12             MR. AVENATTI:  I just have a very brief issue.

13             THE COURT:  Great.

14             Government, can you remind me when the third payment

15   occurred and the fourth payment as well?

16             MR. SOBELMAN:  Your Honor, the third payment was

17   middle of September, the fourth payment was middle of February.

18   But there were communications that the government intends to

19   offer, maybe today, between the defendant and the victim, among

20   other people, making statements about the status of those

21   payments, and they are, we contend, lies, and the scheme

22   continues until it is revealed in the middle of February.  The

23   crime is not complete as of that point; the scheme, which is

24   the scheme offense, continues.

25             THE COURT:  I agree.  Whether the crime was completed

M1Q8AVE1

1    or not, that's not the question for purposes of the relevance.

2    I certainly think given the communications that we have already

3    seen involving Mr. Janklow that continued through February in

4    Ms. Clifford's efforts to figure out what is going on with her

5    money, and why she hasn't received it, and so on and so forth,

6    that if the scheme didn't continue, certainly those

7    communications make that evidence relevant.  So I think through

8    February, perhaps through the rest, I agree is relevant.

9            What is the last issue, Mr. Avenatti?

10           MR. AVENATTI:  Your Honor, one housekeeping matter and

11   then one last issue.  The housekeeping matter is --

12           THE COURT:  I am going to ask my clerk to just head

13   down to get the jury.  All the jurors are here so she can begin

14   to get them up while we discuss this last issue.  Ms. Smallman

15   is unfortunately out today so I am going to keep my fingers

16   crossed that things run as smoothly as they do when she is

17   around.

18           Last issue.

19           MR. AVENATTI:  The last issue is, your Honor, I am

20   going to renew my request for a hearing outside the presence of

21   the jury before Mr. Macias testifies.  Mr. Macias and I had an

22   extensive attorney-client relationship, as evidenced by the

23   affirmation or declaration that I have submitted to the Court.

24   I think that hearing needs to occur before Mr. Macias testifies

25   because I believe that the questions that the government

M1Q8AVE1

1    intends to ask will call for answers that invade the

2    attorney-client privilege and the work product doctrine in

3    California, of which I am the owner and have not waived, and I

4    am concerned about being able to object at the moment and not

5    being granted an adequate sidebar to explain the extent of the

6    attorney-client relationship I had with Mr. Macias and why such

7    information is privileged and protected under the

8    attorney-client privilege and the work product doctrine.  And I

9    would like to avoid having Mr. Macias testify to matters that

10   he should not be testifying about as my former counsel, and

11   also, as my ex-wife or estranged wife's current counsel

12   pursuant to the spousal privilege.

13              So I am making that request, your Honor.

14              THE COURT:  That request is denied.  My ruling stands.

15   You're welcome to make objections to specific questions and we

16   will take it up as it comes.

17              MR. AVENATTI:  I had one last question for the Court

18   your Honor.

19              THE COURT:  OK.

20              MR. AVENATTI:  As it relates to the letter brief that

21   was filed this morning relating to Mr. Janklow, I don't know if

22   your Honor saw that.  I am assuming we will take that up at

23   lunch or later in the day.

24              THE COURT:  I did not see it so we definitely are not

25   taking it up now.

M1Q8AVE1

1          Mr. Podolsky.

2          MR. PODOLSKY:  That's exactly what I wanted to bring

3    to your attention, your Honor.  Mr. Janklow apparently received

4    a trial subpoena from the defense overnight.  His attorneys

5    e-mailed a motion to quash to chambers.  They are not able to

6    file on ECF.  So I just wanted to bring it to the Court's

7    attention.  I can hand up a copy if you would like.

8          THE COURT:  No.  I am sure we will get it.  If I don't

9    get it, I will ask for a copy and we will take that up later.

10   It is certainly not going to be relevant to anything today.

11         MR. AVENATTI:  Your Honor, the case that I handed up

12   to the Court relates to that issue, as well as some other

13   issues, *United States v. Rossomando*.

14         THE COURT:  I will take a look, and again, we will get

15   to that when we get to it.

16         Mr. Avenatti, I just wanted to admonish or remind you

17   to be careful with the form of your questions.  There was only

18   I think one question yesterday that clearly crossed the line

19   when you said "I agree."  You're not testifying through your

20   questions.  I am not going to permit you to testify through

21   your questions.  I am going to remind the jury that your

22   questions are not evidence, but I just want to admonish you to

23   be careful and don't run afoul of that.  If you do, I will have

24   to instruct you in front of the jury, and I would rather not do

25   that.  All right?

M1Q8AVE1

1          MR. AVENATTI:  Agreed.

2          THE COURT:  Hopefully, the jury will be up here in a

3    minute and then we will get going.

4          Can you tell Ms. Regnier to unmute herself, please, so

5    she is ready to go when the jury gets in here.

6          MR. PODOLSKY:  Yes, your Honor.

7          THE COURT:  Ms. Regnier, are you able to hear now?

8          THE WITNESS:  Yes, I am.

9          THE COURT:  Stand by.  We will have the jury in in a

10   moment and then we will get started.

11         I don't know who is controlling the cameras, if that's

12   our staff.  When Mr. Avenatti's cross is over, if you could

13   make sure the camera for his place at the counsel table is back

14   on so that the witness is able to see him during redirect, that

15   will be great.

16         For that matter, I don't actually see the podium

17   camera on at the moment.

18         We are working on that, Ms. Regnier.  By the time we

19   start we will have it up and running.

20         Are we all set?  Can we bring the jury in.

21         I am going to have them come in and just explain that

22   we are fixing a technical issue.

23              (Continued on next page)

24

25

M1Q8AVE1                    Regnier – Cross

 1           (Jury present)

 2           THE COURT:  You may be seated.

 3           Good morning, ladies and gentlemen.  Welcome back.

 4           Let me thank you again for being on time.  You guys

 5    are absolutely the best, I appreciate it.  And I'm sorry that

 6    we are starting four minutes than I would like.  We had some

 7    technical issues with the audio two-way system, but we have I

 8    think sorted those out.

 9           We will continue with the cross-examination of Ms.

10    Regnier.  Let me just remind you again that the questions that

11    are posed are not evidence.  So while Mr. Avenatti is now

12    representing himself, when he asks questions, he is acting as a

13    lawyer, he is not testifying.  It's only the witness's answers

14    and any exhibits that are admitted into evidence that are

15    evidence, and the questions that he poses are not evidence.

16           With that, we will continue.

17           Ms. Regnier, you remain under oath.

18           And Mr. Avenatti, you may proceed.

19     JUDY REGNIER, resumed.

20    CROSS-EXAMINATION (Cont'd)

21    BY MR. AVENATTI:

22    Q.  Ms. Regnier, good morning.

23    A.  Good morning.

24    Q.  Can you hear me OK?

25    A.  Yes, I can.

M1Q8AVE1                        Regnier - Cross

1    Q.  Excellent.

2         Since your testimony ended yesterday until this moment,

3    have you spoken with your lawyer?  That's a yes-or-no question.

4    A.  Yes.

5    Q.  Did your lawyer during that time period speak with the

6    government?

7    A.  I do not know.

8    Q.  Now, yesterday you were asked about a payment that was made

9    to a law firm by the name of DeAnda Law Firm.  Do you recall

10   that?

11   A.  Yes.

12   Q.  What was that payment for?

13   A.  The DeAnda Law Firm was assisting in a case that the firm

14   was handling.

15   Q.  What case was that?

16   A.  It had to do with immigration.

17   Q.  The law firm was assisting parents and children that had

18   been separated at the border, and that's what that payment that

19   the government asked you about was for, right?

20              MR. SOBELMAN:  Objection.

21              THE COURT:  Sustained.

22   Q.  Now, let's take a look at GX 3, the fee agreement that Ms.

23   Daniels signed.

24        Can you see that?

25   A.  Yes, I can.

1    Q.  You and I did not speak about this agreement, did we?

2              THE COURT:  Can we get a time period on the question,

3    Mr. Avenatti?

4    Q.  At no point in time did you and I, Ms. Regnier, speak about

5    this agreement other than me giving it to you to put in the

6    files of the firm, did we?

7    A.  No, we did not discuss it.

8    Q.  We didn't discuss any of its terms, correct?

9    A.  We did not discuss the terms of the agreement, no.

10   Q.  And we didn't discuss what any of the terms meant, did we?

11   A.  It's frozen on your end.

12             THE COURT:  We hear you.  It's definitely a little

13   less crisp video today, but we do seem to be hearing you.  I

14   don't know if our A/V person is here.

15             Ms. Regnier, go ahead.

16             MR. AVENATTI:  Let me strike the question and reask

17   the question just so we have a clean record.

18   Q.  Ms. Regnier, and we didn't discuss what any of the terms in

19   the contract meant, did we?

20   A.  No, we did not.

21   Q.  So beyond the words on the page, you're unable to interpret

22   this fee agreement, correct?

23             MR. SOBELMAN:  Objection.

24             THE COURT:  Sustained.

25   Q.  Did you ever have any discussions with Ms. Daniels about

1   this fee agreement?

2   A.  No, I did not.

3   Q.  And you didn't have any discussions with me about it; we

4   just established that, correct?

5        THE COURT:  Sustained.

6   Q.  Did you ever have any discussions with anyone about the fee

7   agreement before you testified yesterday?

8   A.  No, I did not.

9        MR. AVENATTI:  Juliet, if you don't mind, if we can

10  set Government Exhibit 3 to the left, for the benefit of the

11  jury, and blow up paragraphs 3 and 4.

12        Then, if we can pull up Government Exhibit 302E, as in

13  Edward, please, and I would like to go to page 4.

14        THE COURT:  I am turning the jury off.  This is not in

15  evidence, Mr. Avenatti.

16        MR. AVENATTI:  I thought 302E is in evidence.

17        THE COURT:  I'm sorry.  302E.  Forgive me.  Fair

18  enough.

19        MR. AVENATTI:  Thank you.

20  BY MR. AVENATTI:

21  Q.  Now, Ms. Regnier, to the right, this is Exhibit 302.  This

22  is a bank account statement for the period ending March 30,

23  2018.  Do you see that?

24  A.  Yes.

25  Q.  And this was the account that had been set up for the

1  benefit of handling some of the moneys relating to Ms. Daniels,

2  right?

3  A.  Yes.

4  Q.  And this was the first statement from the bank after the

5  account had been established, right?

6  A.  Yes, I believe so.

7  Q.  OK.  During this time period, the deposits into the account

8  were $294,961.14.  Do you see that?

9  A.  Yes, I do.

10  Q.  And then the amount that was deducted was $278,153.12.  Do

11  you see that?

12  A.  Yes.

13  Q.  Then on this bank statement -- strike that.

14      And you're familiar with these bank statements due to your

15  role at the firm, right?

16  A.  Yes.

17  Q.  OK.  And then there is a section deposits/credits.  Do you

18  see that?

19  A.  Yes.

20  Q.  Each line item is a deposit made into this account,

21  correct?

22  A.  Yes.

23  Q.  So here we have a number of deposits beginning on the 19th

24  of March through the 30th of March.  Do you see that?

25  A.  Yes.

1  Q.  And a number of these deposits are from CrowdJustice.  Do

2  you see that?

3  A.  Yes.

4  Q.  And that was the defense fund that we had set up pursuant

5  to our written agreement with Ms. Daniels, right?

6  A.  Yes.

7  Q.  And then under the section charges/debits, those are

8  outflows from the account, correct?

9  A.  Yes.

10  Q.  And the first amount of money that was sent out from this

11  account was $100,000 to Hunter Law.  Do you see that?

12  A.  Yes.

13  Q.  Without looking at other records, you can't tell the jury

14  what that was for, can you?

15  A.  No, I cannot.

16  Q.  What records would you need to look at in order to answer

17  what that was for?

18  A.  I don't recall who Hunter Law is, so I would need to see

19  what it was.  I can't tell you what documents.  I don't know

20  what it's for.

21  Q.  Do you have a recollection that on the eve of the 60

22  Minutes broadcast, that we agreed to pay Hunter Law $100,000

23  for a damaging videotape that they had of Ms. Daniels, that

24  actually their client, a guy by the name of Bubba the Love

25  Sponge, had?

M1Q8AVE1                        Regnier - Cross

 1                 THE COURT:  Sustained as to form.

 2                 Start over, Mr. Avenatti.

 3                 Members of the jury, I remind you that what Mr.

 4    Avenatti asks in his questions is not evidence.

 5    Q.  Ms. Regnier, do you recall that on the eve of the 60

 6    Minutes broadcast, we paid $100,000 for the benefit of Ms.

 7    Daniels?

 8    A.  I do not recall that, no.

 9    Q.  You don't dispute it, though, do you?

10                 MR. SOBELMAN:  Objection.

11                 THE COURT:  Sustained.

12    Q.  As you sit there today, do you know what that $100,000 that

13    is reflected on this bank statement was for?

14                 MR. SOBELMAN:  Objection.

15                 THE COURT:  Sustained.

16    Q.  Let's go to the next payment, 20,000 to Stormy

17    Entertainment.  Do you see that?

18    A.  Yes.

19    Q.  Do you know what that payment was for?

20    A.  I know it was to Ms. Daniels's account.  I do not know

21    exactly what it was for.

22    Q.  Pro Tech Security, $6800.  That was a payment for Ms.

23    Daniels's security, wasn't it?

24    A.  Yes.

25    Q.  Shaffer Security, $1353.  That's another payment for Ms.

1    Daniels's security, wasn't it?

2    A.  I believe so, yes.

3    Q.  Then there was $150,000 transferred to the law firm.  Do

4    you see that, at the bottom?

5    A.  Yes, I see the transfer.

6    Q.  Now, at the time of the transfer, how much did Ms. Daniels

7    owe the law firm in fees and costs pursuant to this fee

8    agreement on the left-hand side?

9            MR. SOBELMAN:  Objection.

10   A.  We had not billed Ms. Daniels.

11           THE COURT:  Ms. Regnier, just a reminder, give a

12   moment so that the government can object and I can rule if

13   there is an objection.

14           I will overrule the objection.  If you know the answer

15   to that, you may answer it.

16   Q.  Ms. Regnier, please answer my question.

17           THE COURT:  The question is, at the time of that

18   $150,000 transfer, how much did Ms. Daniels owe the law firm in

19   fees and costs pursuant to the agreement, if you know the

20   answer.

21   A.  I don't know the answer because we had not billed her.

22           MR. AVENATTI:  Move to strike everything after

23   "answer" as nonresponsive.

24           THE COURT:  Overruled.

25           Next question.

1    Q.  Ms. Regnier, how much in fees and costs had been incurred
2    by the law firm on the Daniels' matter as of March 30, do you
3    know?
4            MR. SOBELMAN:  Objection.  Asked and answered.
5            THE COURT:  Sustained.
6    Q.  Ms. Regnier, did you ever make any effort to figure out how
7    much was due in fees and costs to the law firm on March 30?
8            MR. SOBELMAN:  Objection.
9            THE COURT:  Sustained.
10   Q.  Ms. Regnier, how would you go about figuring out what was
11   due the law firm as of March 30?
12           MR. SOBELMAN:  Objection.
13           THE COURT:  Overruled.
14   A.  I would have had to run several reports and review bank
15   statements and get time from you and from the other attorneys
16   if it had not been entered.
17           MR. SOBELMAN:  Your Honor, we have a brief technical
18   issue that we want to address on the large screens.
19           THE COURT:  Do we need our A/V staff?
20           Can you articulate what the technical issue is?
21           MR. SOBELMAN:  I believe we have adjusted it now.
22           THE COURT:  Can you just make a record of what the
23   issue was?
24           MR. SOBELMAN:  There was a little box appearing over
25   part of Ms. Regnier's face for part of that question, and I

1    believe a member of your staff was able to exit out, and now

2    it's gone.

3            THE COURT:  And was there anything in the box?

4            MR. SOBELMAN:  It just said, do you want to leave, or

5    something like that.

6            THE COURT:  Strange.  We definitely don't want to

7    leave.  Sorry for the interruption.  Thank you for letting me

8    know.  And if anything like that arises, let me know because I

9    can't see those screens from where I am sitting.

10           Go ahead, Mr. Avenatti.

11   BY MR. AVENATTI:

12   Q.  Ms. Regnier, you said you would have to run reports.  Would

13   those be reports in the two programs we were speaking about

14   yesterday, QuickBooks and tabs?

15   A.  That would be part of it, yes.

16   Q.  Together with looking at bank statements and talking to the

17   attorneys billing time on the matter, correct?

18   A.  Yes.

19   Q.  Let's go to page 8 of the same exhibit, 302E.

20           MR. AVENATTI:  In evidence, your Honor.

21   Q.  Ms. Regnier, do you have page 8?

22   A.  I have a page up.  I'm not sure if it's page 8.

23   Q.  The page --

24   A.  Yes.

25   Q.  The page that you are looking at now, and for the benefit

1   of the jury, in the upper right-hand corner, this is the next

2   month's statement on the same account, correct?

3   A.  Yes.

4   Q.  And the deposits on this month were a little more than

5   $20,000 and the amount deducted was a little more or about

6   $36,000, correct?

7   A.  Yes.

8   Q.  And we have a number of deposits here from CrowdJustice, do

9   you see that, just like the preceding month?

10  A.  Yes.

11  Q.  And then there is a number of charges and debits here.  Do

12  you see that?

13  A.  Yes.

14  Q.  And there is a bunch of charges and debits to Pro Tech

15  Security.  Do you see that?

16  A.  Yes.

17  Q.  And that was for Ms. Daniels's security entourage, correct?

18  A.  Yes.

19  Q.  Then there is a $2,000 payment to the firm, a transfer to

20  the firm, on April 9, right?

21  A.  Yes.

22  Q.  And there is a $6500 payment directly to Ms. Daniels at the

23  bottom of that page.  Do you see that?

24  A.  Yes.

25  Q.  Now, at the time of the $2,000 payment to the firm, do you

1    know what Ms. Daniels owed the firm in costs and fees?

2    A.  As I said before, we had not billed her.

3           MR. AVENATTI:  Move to strike, your Honor.

4           THE COURT:  The jury will disregard that answer.

5           Just yes or no, Ms. Regnier, do you know as of that

6    date what, if anything, Ms. Daniels owed the firm?

7           THE WITNESS:  No, I do not.

8    Q.  But as of that date, the firm had incurred costs and hourly

9    time for Ms. Daniels, had it not?

10   A.  I believe so, yes.

11   Q.  Well, you don't believe so, you know so, because the firm

12   was actively working for Ms. Daniels beginning in early March,

13   right?

14          MR. SOBELMAN:  Objection.

15          THE COURT:  Overruled.

16   A.  Yes.

17   Q.  Let's go to the next page because I want to make sure

18   nothing was cut off, please.

19      Now, let's go to page 12, same exhibit.

20      Ms. Regnier, on this page, in the upper right-hand corner,

21   there should be this statement date of May 31, 2018.  Do you

22   see that?

23   A.  Yes.

24   Q.  This is the next month's statement on the same account,

25   right?

1  A.  Yes.

2  Q.  By the way, when you were preparing to testify before

3  yesterday, when you met with the government on five to ten

4  occasions, did the government walk through these bank

5  statements with you like we are doing here today?

6  A.  No.

7  Q.  Going back to this bank statement, the deposits this month

8  were about $190,000 and the amount deducted was about $189,000.

9  Do you see that?

10  A.  Yes.

11  Q.  And the deposits include various deposits from

12  CrowdJustice, right?

13  A.  That's part of them, yes.

14  Q.  And then there is various charges and debits.  Do you see

15  that?

16  A.  Yes.

17  Q.  And there's amounts to Pro Tech Security on various dates.

18  Do you see those?

19  A.  Yes, there's four of them.

20  Q.  And those all were for the benefit of Ms. Daniels's

21  security, right?

22  A.  Yes.

23  Q.  Which you said yesterday was a cost, right?

24  A.  Yes.

25  Q.  Then there's various transfers to the law firm in the month

1    of May.  Do you see that?

2    A.  Yes.

3    Q.  And do you know how much was owed to the firm by Ms.

4    Daniels for costs and fees as of the dates of those transfers,

5    do you know?

6    A.  No.

7    Q.  In order to find out, in order to tell the jury how much

8    was owed, you would have to look at those same records that we

9    were talking about earlier today as well as yesterday, correct?

10   A.  Yes.

11   Q.  Did the government ever ask you to do that?

12           MR. SOBELMAN:  Objection.

13           THE COURT:  Sustained.

14   Q.  Let's go to page 16, please, same exhibit.

15       By the way, I want to make sure I understand something, if

16   I could, please.

17       Ms. Regnier, there were other payments made for the benefit

18   of Ms. Daniels on her cases for costs and the like beyond what

19   is shown on these bank statements, right?

20   A.  I don't quite understand the question.

21   Q.  Let me rephrase the question.

22       Not all of the money that the firm expended as costs for

23   Ms. Daniels came out of this account, did it?

24   A.  No, it did not.  You're correct.

25   Q.  Going back to the page we are on, which is 16 of the

M1Q8AVE1                        Regnier - Cross

1   exhibit.  At the top, this statement is dated June 29, 2018.

2   Do you see that?

3   A.  Yes.

4   Q.  And the deposits were about $74,000 and the amount deducted

5   was about $70,000, right?

6   A.  Yes.

7   Q.  And the deposits were from CrowdJustice, correct?

8   A.  Yes.

9   Q.  And the deductions were to the security company and the

10  firm, right?

11  A.  Yes.

12  Q.  And as you sit here today, you can't tell the jury what was

13  owed to the firm as of the date of those transfers, correct?

14  A.  Correct.  Yes.

15  Q.  Let's go to the next month, page 20 of Exhibit 302E in

16  evidence.

17      At the top, the bank statement is July 31, 2018.  Do you

18  see that?

19  A.  Yes.

20  Q.  And the deposits were only about $3,000 from the

21  CrowdJustice, right?

22  A.  Yes.

23  Q.  And there was about $7,000 expended out of the account.  Do

24  you see that?

25  A.  Yes.

M1Q8AVE1                        Regnier - Cross

1    Q.  And the firm during this time was continuing to work for
2    Ms. Daniels on the various matters that we discussed yesterday,
3    wasn't it?
4    A.  Yes.
5    Q.  And I want to focus your attention on this $5,000 payment
6    to Sabol Mallory LLC.  Do you see that?
7    A.  Yes.
8    Q.  Ms. Regnier, do you recall that that is a payment that the
9    firm advanced for Ms. Daniels in connection with her false
10   arrest in Columbus, Ohio?
11              MR. SOBELMAN:  Objection.
12              THE COURT:  Overruled.
13   A.  I don't recall the name of the firm.  I do recall that
14   there was an advance made.
15   Q.  You just don't recall if the name of the firm was the name
16   reflected on this bank statement, correct?
17   A.  Correct.
18   Q.  Do you recall that that advance was made generally during
19   the month of July?
20   A.  Yes.
21   Q.  Again, as of the date of this bank statement, you're not
22   able to tell the jury how much money was owed to me and the
23   firm for costs and fees, are you?
24   A.  No.
25   Q.  Let's go to page 24, please, the next month.

M1Q8AVE1                         Regnier - Cross

1          MR. AVENATTI:  Your Honor, we are very close.  Juliet
2    has been working till all hours of the night.
3          THE COURT:  I got that.  But let's get it up, please.
4          If we can't get it up in the next couple of seconds,
5    let's move on and you can always circle back Mr. Avenatti.
6          MR. AVENATTI:  Will do, your Honor.
7    Q.  Ms. Regnier, we are going to come back to that momentarily.
8        You were asked some questions about the financial position
9    of the firm yesterday.  Do you recall that?
10   A.  Yes, I do.
11   Q.  What is the Montage in Laguna Beach?
12   A.  It's a hotel in Laguna Beach.
13   Q.  The Montage is a five star resort in Laguna Beach,
14   California, is it not?
15   A.  It's a resort in Laguna Beach.  I don't know its rating,
16   but it's a nice resort in Laguna Beach, yes.
17   Q.  It's right on the beach overlooking the ocean?
18   A.  Yes.
19   Q.  In December of 2017, our law firm, as we have for a number
20   of years before, hosted all of the employees of the firm for a
21   Christmas party and a weekend paid for by the firm at the
22   Montage?
23          THE COURT:  Sustained as to form.
24   Q.  Ms. Regnier, do you recall where we had the firm Christmas
25   party in December of '17 shortly before we started taking on

1    the Daniels representation?

2    A.  I believe it was at the Montage.

3    Q.  We had had the party there for a number of years, had we

4    not?

5              THE COURT:  Ms. Regnier, are you still with us?

6              THE WITNESS:  I'm with you.  You're back.

7              THE COURT:  I am not sure why we are having issues

8    this morning.  But the question was, did you have the party

9    there for a number of years prior to 2017 as well?

10   A.  Yes.

11   Q.  In December of 2017, the firm paid for the party and also

12   paid for employees to be able to stay at the resort, correct?

13   A.  Yes.

14   Q.  Now I want to ask you about some bank statements -- strike

15   that.

16       Yesterday I asked you if you had been shown all of the bank

17   statements of the firm, and you testified that you had not.

18   And when I said "shown," I meant by the government.  Do you

19   recall that?

20   A.  Yes.

21   Q.  I would like to go through some of the other financial

22   statements, bank statements with you, if I could.

23              MR. AVENATTI:  Can we have exhibit -- your Honor, one

24   moment.

25   Q.  Ms. Regnier, we are going to actually revert back to the

1    bank statements relating to the Daniels account because that

2    technology issue has been fixed.  OK?

3        We are going to go back to page 26 of 302E, the next month.

4            THE COURT:  It doesn't look like it's fixed.  So ask

5    another question and we will circle back when we can.

6            I have turned the jury screens off so you're welcome

7    to bring it up, and if it's up, then I will turn them back on

8    and we can circle back.  But please carry on.

9            MR. AVENATTI:  Fair enough, your Honor.  Thank you.

10            Your Honor, if I could just have one moment because we

11    need to pull up another -- my next line of questioning relates

12    to another exhibit that I need Juliet's assistance with.

13    Apologies to the Court and the jury.

14            Could I have Exhibit 213, please.

15    BY MR. AVENATTI:

16    Q.  Ms. Regnier, you were asked some questions regarding

17    Exhibit 213 yesterday, do you recall that, by the government?

18    A.  Yes.

19            MR. AVENATTI:  Could I have the next page, please.

20    Q.  I want to make sure that we have your testimony right.

21        I believe you testified that I told you at the time that

22    this had to be sent because Ms. Daniels was having a personal

23    issue with her estranged husband, is that correct?

24            MR. SOBELMAN:  Objection.

25            THE COURT:  Sustained.

1    Q.  Ms. Regnier, what is your recollection as to what I told
2    you as to why this document had to be sent?
3                MR. SOBELMAN:  Objection.
4                THE COURT:  Sustained.
5    Q.  The third time is the charm.  We are going to go back to
6    those bank statements.
7                Can I please have 302E, page 26, the next month in
8    order.
9        If we go to the top, Ms. Regnier, can you see that, that's
10   the next month from this account?
11   A.  Yes.
12   Q.  And the deposits this month were about $161,000, correct?
13   A.  Yes.
14   Q.  And the charges were about $131,000.  Do you see that?
15   A.  Yes.
16   Q.  Then there's various transfers to the firm, correct, down
17   below?
18   A.  Yes.
19   Q.  And I want to focus your attention, if I could, on these
20   two wires around August 1st and August 3rd, from Janklow &
21   Nesbit Associates.  Do you see that?
22   A.  Yes, I do.
23   Q.  Now, at the time that these wires came into this account,
24   how much money was owed to me and the firm for fees and costs
25   relating to the Daniels representation, do you know?

1    A.  No.

2    Q.  And in order to figure out how much money was owed to the

3    firm on those dates, when that money came in, you would need to

4    look at Tabs, QuickBooks, bank statements, and talk to the

5    lawyers about how much time they had spent, isn't that true?

6    A.  Yes.

7    Q.  When you met with the government on the five to ten times

8    before you testified here yesterday, did the government ever

9    ask you to figure that out as it related to these dates on this

10   page?

11                MR. SOBELMAN:  Objection.

12                THE COURT:  Sustained.

13   Q.  Did you ever look at the Tabs or QuickBooks data, or speak

14   with any attorneys, to try to figure out the answer to that

15   question before testifying here yesterday?

16   A.  No.  I don't have access to that information.

17   Q.  And the government did not give it to you, did they?

18                MR. SOBELMAN:  Objection.

19                THE COURT:  Sustained.

20   Q.  Did the government ever provide any Tabs or QuickBooks data

21   and ask you to help them figure out how much money was owed to

22   me and the firm from Ms. Daniels on those dates?

23                MR. SOBELMAN:  Objection.

24                THE COURT:  Sustained.

25                Please move on, Mr. Avenatti.

1  Q.  Let's go to the next page so we make sure that nothing is

2  cut off for the jury.  OK.

3       Can we please go to page 28.

4       How about 30.  Perfect.

5            In the upper right-hand corner, do you see this

6  statement, September 28, 2018?

7  A.  Yes.

8  Q.  And the deposits were about $171,000 and the charges and

9  debits were about $115,000, right?

10  A.  Yes.

11  Q.  Now, as of this time period, September of 2018, the firm

12  had been representing Ms. Daniels in those matters that we

13  talked about yesterday for about six months, right?

14  A.  Yes.

15  Q.  Multiple attorneys and staff had been working on her cases,

16  right?

17  A.  Yes.

18  Q.  And the firm had incurred costs out of the firm's pocket on

19  her behalf, right?

20  A.  Yes.

21  Q.  I want to focus your attention on the entry on September

22  17, $148,750 from Janklow & Nesbit Associates.  Do you see

23  that?

24  A.  Yes.

25  Q.  What is the date of that deposit?

1    A.  September 17.

2    Q.  As of that date, do you know how much the firm was owed by

3    Ms. Daniels for the fees and costs incurred on her various

4    matters?

5    A.  No.

6    Q.  In order to figure it out, you would have to look at the

7    same sources of information that you had been testifying about

8    thus far, right?

9            THE COURT:  Sustained.

10   Q.  Has anyone ever asked you to do that?

11           MR. SOBELMAN:  Objection.

12           THE COURT:  Sustained.

13   Q.  Let's go to page 34, please.

14       Let's blow it up at the top, please.

15           Ms. Regnier, can you see that, this is the next month

16   in order?

17   A.  Yes.

18       (Continued on next page)

19

20

21

22

23

24

25

1              MR. AVENATTI:  Let's go to 36, please.

2              My mistake.  For the record, this is 36 in 302E in

3    evidence.

4              I stand corrected again.  It's page 34.

5              Let's go to page --

6              OK.  This is 36, for the record.  Thank you.

7              Let's go to page 40.

8    Q.  Now, who is Brandon Parraway, the name on the, this name on

9    the check here?

10   A.  He was one of the security personnel for Ms. Daniels.

11             MR. AVENATTI:  Let's go to page 42, please.

12   Q.  Now, this month, there were no deposits in the account,

13   were there?

14   A.  No.

15   Q.  And what month is this that the jury's looking at now?

16   A.  November of 2018.

17   Q.  And the firm was continuing to represent Ms. Daniels in the

18   various matters that we spoke about yesterday as of November of

19   2018, right?

20   A.  In some matters, yes, I believe so.

21   Q.  And you don't know how much was owed to the firm from

22   Ms. Daniels for hourly fees and costs as of that date, do you?

23   A.  No.

24             THE COURT:  Mr. Avenatti, just pause for one second.

25   One of the jurors is coughing.  Let me let her get a drink of

M1qWave2                          Regnier – Cross

1    water.

2            All right.  Thank you.  Sorry for the interruption.

3    BY MR. AVENATTI:

4    Q.  Ms. Regnier, the firm continued to represent Ms. Daniels in

5    some those matters even after this date of this statement,

6    didn't it?

7    A.  Yes.

8    Q.  The firm represented Ms. Daniels in December of 2018,

9    right?

10   A.  Yes.

11   Q.  January of 2019, right?

12   A.  Yes, I believe so.

13   Q.  Up until the firm terminated Ms. Daniels as a client in

14   February of 2019, correct?

15   A.  Yes.

16   Q.  And during those months, the firm was continuing to advance

17   costs for Ms. Daniels and also spend time working on her

18   behalf, isn't that true?

19   A.  Yes, I believe so.

20           MR. AVENATTI:  Now let's talk about the firm's

21   termination of Ms. Daniels as a client.  Let's go to GX4,

22   please.

23   Q.  Ms. Regnier, this is the letter whereby I and the firm

24   terminated Ms. Daniels as a client, isn't it?

25   A.  Yes.

M1qWave2                    Regnier - Cross

```
1   Q.  The government asked you about some aspects of this letter,

2   and I want to ask you about, perhaps, those and others.  Can

3   you please direct your attention to paragraph 1.

4        Can you see that?

5   A.  Yes, I can.

6   Q.  Can you please read that into the record?

7            THE COURT:  The exhibit speaks for itself.  Let's move

8   on.  Just ask a question, please.

9   BY MR. AVENATTI:

10  Q.  One of the reasons why Ms. Daniels yells was terminated as

11  a client was because she was not responsive, right?

12           MR. SOBELMAN:  Objection.

13           THE COURT:  I'll allow it.

14           But, Ms. Regnier, just to be clear, the question is

15  posed to you and your understanding.  If your understanding --

16  in other words, posed to; it is not a reflection of what's

17  stated in the exhibit.  So do you know the answer to that

18  question?

19           MR. AVENATTI:  Let me strike the question.  I'll ask a

20  better question, your Honor.

21           THE COURT:  All right.

22  BY MR. AVENATTI:

23  Q.  Ms. Regnier, I believe you testified yesterday you had

24  sent, at least on a couple occasions, emails to Ms. Daniels and

25  never received a response.  Is that correct?
```

1   A.  Yes.

2           MR. AVENATTI:  OK.

3           If we can go back to the -- great.

4   Q.  Now, you were asked by the government --

5           MR. AVENATTI:  If we could blow up the first sentence

6   of the third paragraph.  Perfect.

7   Q.  Do you remember when counsel for the government asked you

8   about whether we had any discussions about returning moneys due

9   Ms. Daniels at the time of this letter?

10  A.  Yes.

11  Q.  And you answered that we didn't have any of those

12  discussions, right?

13  A.  No, we did not discuss any money that you'd give her.

14  Q.  As you sit here today -- well, strike that.

15      At the time of this letter, do you know how much money

16  Ms. Daniels owed the firm for costs and fees on all of the work

17  that had been done in the preceding 11 months?  Do you know,

18  Ms. Regnier?

19  A.  No, I do not.

20  Q.  And in order to figure that out, you'd have to look at the

21  same things you'd been talking about earlier, right?

22          THE COURT:  Sustained.

23          MR. AVENATTI:  I want to ask you about some banking

24  statements that the government did not ask you about.  Let's go

25  to exhibit T, as in Tom, please.  Defense Exhibit T, your

1    Honor, only for the benefit of the witness.

2    Q.  Ms. Regnier, in one of the accounts that the firm had that

3    you were not asked about, the deposits in the month of January

4    were $232,000, isn't that true?

5            MR. SOBELMAN:  Objection.

6            THE COURT:  Sustained.

7            Please take the exhibit down if you're not going to

8    ask her what it is.

9            MR. AVENATTI:  OK.  Well, let me ask her what it is,

10   your Honor.  I'm sorry.

11   Q.  Ms. Regnier, do you recognize this document that I've shown

12   you, the first page of exhibit T, as a bank statement from one

13   of the firm's accounts?

14   A.  Yes, I do.

15   Q.  And you regularly received these bank statements in the

16   course of your work at Eagan Avenatti, correct?

17   A.  Yes.

18   Q.  And when you received these bank statements, you would file

19   them in the books and records of the law firm, correct?

20   A.  Yes, I -- yes.

21   Q.  And you're generally familiar with how to read one of these

22   bank statements as a result of your work at the law firm,

23   correct?

24   A.  Yes.

25   Q.  OK.  Isn't it true that in January of 2018, in one of the

1    firm's accounts it received deposits of $232,000?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4              MR. AVENATTI:  What's the objection, your Honor?

5              THE COURT:  Are you offering the exhibit?

6              MR. AVENATTI:  Yes, I'll -- I'd like to offer exhibit

7    T.

8              THE COURT:  Any objection?

9              MR. SOBELMAN:  Yes, your Honor.  Objection.

10   Relevance, based on time period.  Also, this is one of the

11   exhibits we had a belated disclosure issue.

12             MR. AVENATTI:  Impeachment, your Honor, based on the

13   government's --

14             THE COURT:  Counsel and Mr. Avenatti, limit your

15   remarks, please.

16             I'll allow it.  Defense Exhibit T is admitted.

17             (Defendant's Exhibit T received in evidence)

18             MR. AVENATTI:  Can we publish the first page of the

19   exhibit for the benefit of the jury and, maybe, blow up that

20   highlight, please, along with the date.  Perfect.

21   Q.  Ms. Regnier, can you see that?

22   A.  Yes.

23   Q.  $232,000 in January of 2018 into this account, correct?

24   A.  Yes.

25   Q.  This is one of the accounts the government did not ask you

M1qWave2                          Regnier - Cross

 1  about, right?

 2              MR. SOBELMAN:  Objection.

 3              THE COURT:  Sustained.

 4              MR. AVENATTI:  Let's go to the next bank statement in

 5  this series, please.  Same exhibit.

 6              THE COURT:  This is within exhibit T?

 7              MR. AVENATTI:  Yes, sir.

 8              THE COURT:  OK.

 9              MR. AVENATTI:  Can we blow up the top of this.

10  Q.  Deposits $149,000 this month, correct, in February 2018?

11  A.  Yes.

12              MR. AVENATTI:  Can we go to the next month, please.

13              Can we blow up the top half of that page.

14  Q.  Ms. Regnier, what were the deposits into this account in

15  the month of March?

16  A.  $432,226.70.

17  Q.  And this is an account, 0313, right, the account number;

18  you see it there?

19  A.  Yeah.

20  Q.  All right.

21  A.  Yes.

22              MR. AVENATTI:  Can we go to the next month, please.

23              Can we blow up the top half.

24  Q.  This is the bank statement from April 30 of 2018, same

25  account number.  Do you see that?

1    A.  Yes.

2    Q.  What were the deposits this month?

3    A.  310,200.

4              MR. AVENATTI:  Can we go to the next month, please.

5              THE COURT:  Mr. Avenatti, it's in evidence.  You'll be

6    able to argue about it later.  Let's move to the next exhibit

7    or line of questions, please.

8              MR. AVENATTI:  Fair enough, your Honor.

9              I'd like to turn to another account, Defense Exhibit

10   U.

11             THE COURT:  Not for the jury, please.

12             Go ahead.

13   BY MR. AVENATTI:

14   Q.  Ms. Regnier, do you recognize exhibit U?

15   A.  Yes.

16   Q.  This was a bank statement for Avenatti & Associates --

17   strike that.

18       This is a bank statement for Avenatti & Associates from

19   January of 2018, correct?

20   A.  Yes.

21   Q.  And you dealt with these bank statements in much the same

22   way as you dealt with the others that we just discussed;

23   namely, exhibit T, correct?

24   A.  Yes.

25             MR. AVENATTI:  Your Honor, the defense offers exhibit

M1qWave2                          Regnier – Cross

1    U.

2              THE COURT:  Any objection?

3              MR. SOBELMAN:  Objection.  Relevance.

4              THE COURT:  Overruled.

5              Admitted.

6              (Defendant's Exhibit U received in evidence)

7              MR. AVENATTI:  Please publish for the jury.

8    Excellent.

9              Can we blow up the top half, please.

10   Q.  The deposits into this account –– well, strike that.

11       This is a different account than what we were just talking

12   about, right?

13   A.  Yes.  For –– yes, a different law firm.

14   Q.  Well, a different law firm belonging to me, right?

15   A.  Yes.

16   Q.  OK.  And the deposits this month were $78,046, right?

17   A.  Yes.

18             MR. AVENATTI:  OK.  Could we go to the next month.

19             Top half of the page, please.

20   Q.  This is for February of 2018, right?

21   A.  Yes.

22   Q.  What were the deposits?

23   A.  68,354.

24             MR. AVENATTI:  Your Honor, it's in evidence.  I'm not

25   going to go through every month.  I'm going to go to the next

M1qWave2                        Regnier - Cross

1   exhibit.

2               THE COURT:  Thank you.

3               MR. AVENATTI:  Let's pull up exhibit V, as in Victor,

4   another account.

5               Blow up the top half, please.

6   Q.  Look in the right-hand corner.  The date on this is January

7   31, 2018.  Do you see that?

8   A.  Yes.

9   Q.  This is for a different account than the preceding two,

10  right?

11  A.  Yes.

12  Q.  And the deposits into this account during that month --

13              THE COURT:  Sustained.  It's not in evidence, Mr.

14  Avenatti.

15              MR. AVENATTI:  I'm sorry, your Honor.

16  Q.  Ms. Regnier, you handled this bank statement in much the

17  same way as the preceding two accounts, did you not?

18  A.  Yes, I did.

19  Q.  Over the course of your employment, you're familiar with

20  these bank statements, correct?

21  A.  Yes, I am.

22              MR. AVENATTI:  Your Honor, the defense offers V, as in

23  Victor.

24              THE COURT:  Any objection?

25              MR. SOBELMAN:  Same objection, your Honor.

1          THE COURT:  Same ruling.

2          Admitted.

3          (Defendant's Exhibit V received in evidence)

4          THE COURT:  All right.  Now you may proceed.

5          MR. AVENATTI:  Thank you, your Honor.

6   Q.  Ms. Regnier, the deposits into this account during January

7   of 2018 were $328,300, correct?

8   A.  Yes.

9          MR. AVENATTI:  Your Honor, it's in evidence.  I'm

10  going to move to the next exhibit, in the interest of time.

11         How about exhibit W, please, another account.

12         Can we have the top of the page, please.  This is only

13  for the witness.

14  Q.  Ms. Regnier, did you deal with bank statements on this

15  account ending in 4613 in the same way that you dealt with bank

16  statements for the other accounts?

17  A.  Yes.

18         MR. AVENATTI:  Your Honor, the defense offers W.

19         THE COURT:  Any objection?

20         MR. SOBELMAN:  Same objection, your Honor.

21         THE COURT:  All right.  Admitted.

22         (Defendant's Exhibit W received in evidence)

23         MR. AVENATTI:  Please publish.  Excellent.

24  Q.  The deposits into this account were $77,986 for the month

25  of January, correct?

M1qWave2                    Regnier - Cross

1    A.  Yes.

2    Q.  And you're aware that there's additional months of

3    statements relating to this bank account; you're aware of that

4    generally, right, Ms. Regnier?

5    A.  I believe so.  I don't know for sure, but I do believe so,

6    yes.

7              MR. AVENATTI:  OK.  Well, let's go to the next month.

8    I don't want to waste the jury's time and go through every

9    month at this point, but I just want you to be sure.

10             Great.  If we can pull up the top of the next month.

11   Q.  You see this is February 28 --

12   A.  Yes.

13   Q.  -- 2018, Ms. Regnier?

14   A.  Yes, I do.

15   Q.  OK.  And what were the deposits into this bank account just

16   for the month of February and just for this account?

17   A.  276,053.

18             MR. AVENATTI:  All right.  I'm not going to have you

19   go through every month.  It's in evidence.

20             Can I have the next exhibit, please.

21             Could we blow up the top of this, please.  Only for

22   the witness.

23   Q.  Ms. Regnier, did you deal with account statements for this

24   account in the same way that you did the preceding accounts?

25   A.  Yes.

1           MR. AVENATTI:  Your Honor, the defense offers exhibit

2    X.

3           THE COURT:  Same objection?

4           MR. SOBELMAN:  Yes, your Honor.

5           THE COURT:  All right.  Admitted.

6           (Defendant's Exhibit X received in evidence)

7    BY MR. AVENATTI:

8    Q.  Ms. Regnier, what were the deposits for the month of June

9    2018 in this account alone?

10   A.  $107,632.

11   Q.  And do you believe that there are other monthly statements

12   for this account?

13   A.  Yes.

14          MR. AVENATTI:  OK.  I'm not going to go through all of

15   them.  We'll move to the next exhibit, Y, as in Yankee.

16          Can we blow up this at the top, please, for the

17   benefit of the witness.

18   Q.  Ms. Regnier, did you deal with bank statements for this

19   account in the same way as the other accounts?

20   A.  Yes.

21   Q.  And as of January 31, 2018 -- well, strike that.

22          MR. AVENATTI:  Your Honor, the defense offers Y into

23   evidence.

24          MR. SOBELMAN:  Yes, your Honor.  Same objection.

25          THE COURT:  All right.  Same ruling.

1              Admitted.

2              (Defendant's Exhibit Y received in evidence)

3     BY MR. AVENATTI:

4     Q.  I want to focus your attention, Ms. Regnier, on the ending

5     balance in this account.  Do you see that?

6     A.  Yes.

7     Q.  There was a hundred thousand dollars in this account as of

8     the end of January 2018, correct?

9     A.  Yes.

10    Q.  And do you believe that there are other months for this

11    account, other months' statements?

12    A.  Yes.

13    Q.  All right.

14    A.  Yes.

15              MR. AVENATTI:  I'm not going to go through each of

16    them.  They're in evidence.

17              Let's go to Z, as in zebra.

18              Next page, please.  Next page.  Next page.  Next.

19    Keep going, please.

20              If you could back up one.  Great.

21    Q.  Ms. Regnier, do you have Z, as in zebra, in front of you?

22    A.  Yes.

23              MR. AVENATTI:  Actually, if we could go to the first

24    page.  Well, that's fine.

25    Q.  Now, Ms. Regnier, do you have the first page of exhibit Z?

1    A.  Yes.

2    Q.  And do you recognize this as a business account agreement

3    for an operating account relating to me for City National Bank?

4            THE COURT:  Sustained.

5    BY MR. AVENATTI:

6    Q.  Ms. Regnier, you testified earlier that you were familiar

7    with the bank accounts at City National Bank that were opened.

8    Do you recall that?

9    A.  Yes.

10   Q.  And over the course of your employment, did you regularly

11   maintain account statements and banking records from City

12   National Bank among the law firm's files?

13   A.  Yes.

14   Q.  And is exhibit Z an example of that?

15   A.  I don't know if we had this particular document at the

16   firm.

17           THE COURT:  Let me ask you, Ms. Regnier, do you

18   recognize what is on the screen, the first page of exhibit Z?

19   Have you seen that before?

20           THE WITNESS:  Yes, I have seen it before.

21           THE COURT:  And when did you -- where did you see it?

22           THE WITNESS:  At the bank itself, at City National

23   Bank.

24           THE COURT:  So it was not maintained by Avenatti &

25   Associates or Mr. Avenatti's firm?

1          THE WITNESS:  I don't believe we had a copy of this

2    particular document at the firm.  No, I do not.

3          THE COURT:  All right.

4          MR. AVENATTI:  If we could go to the second page, just

5    for the witness.

6          Third page.

7    Q.  Ms. Regnier, do you recognize your signature on the third

8    page of the document?

9    A.  Yes.

10   Q.  That is your signature, correct?

11   A.  Yes.

12   Q.  And you signed as an authorized signer on this document at

13   the time the account was opened, correct?

14         MR. SOBELMAN:  Objection, your Honor.  The document's

15   not in evidence.

16         THE COURT:  Sustained.

17         MR. AVENATTI:  Your Honor, I offer Z into evidence.

18         MR. SOBELMAN:  No objection.

19         THE COURT:  Admitted.

20         (Defendant's Exhibit Z received in evidence)

21         MR. AVENATTI:  Could we go to the next page, please.

22         Actually, can we go to the second page.

23         Does the jury have this?  Great.

24   Q.  This is the document, Ms. Regnier, that both you and I

25   signed to open up one of the accounts at City National Bank,

M1qWave2                      Regnier - Cross

1    correct?

2    A.  Yes.

3    Q.  And my signature appears on this document, does it not?

4    A.  Yes.

5    Q.  And what's the date immediately below my signature?

6    A.  I believe it's May 19, 2019.  Sorry, 20 -- I can't -- I'm

7    sorry.  Can you blow it up?

8        May 17, 2017.

9    Q.  May 17, 2017, is that correct?

10           MR. SOBELMAN:  Objection.

11   A.  Yes.

12           THE COURT:  Sustained.

13   BY MR. AVENATTI:

14   Q.  Now, is May 17, 2017, before or after November of 2019?

15           THE COURT:  I think we don't need the witness to

16   answer that question.  Next question.

17   BY MR. AVENATTI:

18   Q.  Ms. Regnier, you would agree it's before, right?

19           MR. SOBELMAN:  Objection.

20           THE COURT:  Sustained.

21           Next question.

22   BY MR. AVENATTI:

23   Q.  Now, you're aware that there's bank account statements for

24   this account as well, right?

25   A.  Yes.

1          MR. AVENATTI:  All right.  I'm not going to review all

2     of them with you in the interest of time for the jury.  They're

3     in evidence.

4          Let's go to AA, exhibit AA -- I'm sorry.  Exhibit AA,

5     one exhibit, just for the benefit of Ms. Regnier, and if we

6     could go to the third page.

7     Q.  Ms. Regnier, do you recognize your signature on this page?

8     A.  Yes.

9     Q.  And you signed this document in order to open up another

10    account at City National Bank together with me, did you not?

11    A.  Yes.

12         MR. AVENATTI:  Your Honor, the defense offers AA.

13         THE COURT:  Any objection?

14         MR. SOBELMAN:  No, your Honor.

15         THE COURT:  Admitted.

16         (Defendant's Exhibit AA received in evidence)

17         MR. AVENATTI:  Can we go to the preceding page,

18    please.

19    Q.  Now, this is for a different account than what we were just

20    talking about, is that correct, Ms. Regnier?

21    A.  Yes.

22         MR. AVENATTI:  All right.  And if we could blow up the

23    signature block.

24    Q.  Does that have the same date as May 17 of 2017, same date

25    as the preceding exhibit?

1   A.  Yes.

2   Q.  And you're aware that there's other bank account statements

3   for this account, are you not?

4   A.  Yes.

5           MR. AVENATTI:  All right.  I'm not going to review

6   them with you.  They're in evidence.

7   Q.  Now, I want to clear something up, because I want to make

8   sure that we have your testimony.  Now, on some of these

9   accounts that we've been talking about, exhibits T through AA,

10  some of those accounts held moneys that the firm was entitled

11  to, correct?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14  BY MR. AVENATTI:

15  Q.  Well, some of those accounts that we were just reviewing

16  were attorney-client trust accounts, correct?

17  A.  Yes.

18  Q.  And the firm wouldn't necessarily be entitled to all of the

19  money in those accounts, depending on the situation, would it?

20  A.  Correct.

21  Q.  It would depend on the particular case and the

22  circumstances through which the money came into the account,

23  right?

24  A.  Yes.

25  Q.  And in order to determine how much the firm would be

1    entitled to from those moneys in one of those accounts at any

2    particular time, you would have to -- one of those trust

3    accounts, you would have to do an analysis of what the

4    agreement was with the client, what the client owed in fees and

5    costs; fair?

6                MR. SOBELMAN:  Objection.

7                THE COURT:  Overruled.

8    A.  Yes.

9                MR. AVENATTI:  Your Honor, could I have one moment?

10               THE COURT:  You may.

11               Mr. Avenatti, an estimate on how much more cross you

12   have with Ms. Regnier.

13               MR. AVENATTI:  Two minutes.

14               THE COURT:  Great.

15   BY MR. AVENATTI:

16   Q.  Ms. Regnier, I want to ask you about --

17               MR. AVENATTI:  I want to go back to GX3, the agreement

18   that we had with Ms. Daniels, and I want to blow up paragraphs

19   3 and 4.

20   Q.  Do you have that?

21   A.  Yes.

22   Q.  Did Ms. Daniels ever tell you -- well, strike that.

23       Did Ms. Daniels ever tell you, text you, email you, smoke

24   signal you, or otherwise communicate with you in any way,

25   shape, or form that she did not have to adhere to these two

1   paragraphs in the written agreement that she signed?

2            MR. SOBELMAN:  Objection.

3            THE COURT:  Sustained.

4            MR. AVENATTI:  Nothing further at this time.

5            THE COURT:  All right.  Redirect.

6            Ladies and gentlemen, as counsel prepare for redirect,

7   if you want to stand and stretch where you are, you're welcome

8   to do so.

9            And again, whoever's controlling the camera, if you

10  can make sure that the camera at defense table is now on, that

11  would be great.

12           All right.  Looks like all the cameras are operating.

13           THE WITNESS:  I don't have the podium.

14           THE COURT:  I'm sorry?  Ms. Regnier, say that again.

15           THE WITNESS:  I cannot see the podium.

16           THE COURT:  Hang on.

17           Ms. Regnier, I think it's on.  You're not able to see

18  the podium now?

19           THE WITNESS:  All I see is a square with AF in it.

20           THE COURT:  No.  That's not the relevant one.  I don't

21  want this trial to become product placement; I know Zoom better

22  than I do Teams, there should be three dots on the top of your

23  screen, perhaps.

24           THE WITNESS:  OK.

25           THE COURT:  If you click on there, I think there's

1    something that has a gallery view.  Maybe try that.  I don't

2    know if that's on.

3                THE WITNESS:  Gallery view is on.

4                OK.  I have it now.

5                THE COURT:  All right.  Perfect.

6                Mr. Sobelman, you may proceed.

7    REDIRECT EXAMINATION

8    BY MR. SOBELMAN:

9    Q.  Ms. Regnier, do you recall being asked by the defendant

10   yesterday about some kind of honor his law firm received in

11   early 2018?

12   A.  Yes.

13               THE COURT:  Counsel, can you speak up and maybe move

14   the microphone a little closer.

15               MR. SOBELMAN:  Yes, your Honor.

16               THE COURT:  Thank you.

17               MR. SOBELMAN:  Thank you.

18   Q.  Do you recall testifying that this so-called honor was

19   related to a large judgment issued in a case that the

20   defendant's firm had worked on?

21               MR. AVENATTI:  Objection.  Argumentative.

22               THE COURT:  All right.  I think we've oriented the

23   witness.  Just ask your question, Mr. Sobelman.

24               Sustained.

25   BY MR. SOBELMAN:

M1qWave2                        Regnier - Redirect

1    Q.  As of July 2018, how much money had the defendant and his

2    law firm received from that judgment?

3    A.  They had not received any from that judgment.

4    Q.  As of August 2018, how much money had the defendant and his

5    law firm received from that judgment?

6    A.  They hadn't received any.

7    Q.  As of September 2018, how much money had the defendant and

8    his law firm received from that judgment?

9    A.  They hadn't received any.

10   Q.  OK.  Let's skip ahead a little bit.

11       As of February 2019, how much money had the defendant and

12   his law firm received from that judgment?

13   A.  They hadn't received any money from it.

14   Q.  In the time period July 2018 through February 2019, was

15   there any guarantee of that judgment actually being paid to the

16   defendant and his law firm?

17            MR. AVENATTI:  Objection.  Calls for speculation and a

18   legal conclusion, your Honor.

19            THE COURT:  Overruled.  I'll allow the witness to

20   answer.

21            Obviously, Ms. Regnier, by guarantee, not in any legal

22   sense; just your understanding whether that money would be

23   guaranteed to come to the firm, please.

24   A.  No, there was no guarantee that the money would come to the

25   firm.

1   Q.  What is your understanding of why that money might not come

2   to the firm at all?

3   A.  The original judgment had already been reduced by the

4   court.

5           MR. AVENATTI:  Your Honor --

6           THE COURT:  Sustained.

7           MR. AVENATTI:  Move to strike.

8           THE COURT:  Ms. Regnier, just a general answer --

9           THE WITNESS:  OK.

10          THE COURT:  -- why it wasn't a guarantee that that

11  money would come to the firm.

12  A.  Whenever there's a judgment, there's always the chance of

13  an appeal, and the appeal can go either way.  You can either

14  receive the judgment or the judgment can be completely

15  overturned.  So until an appeal is decided, there's no

16  guarantee.

17  BY MR. SOBELMAN:

18  Q.  Ms. Regnier, do you recall being asked on cross-examination

19  about how client trust accounts are supposed to work?

20  A.  Yes.

21  Q.  And I believe you testified as to your current

22  understanding of how they're supposed to work.  Is that right?

23  A.  Yes.

24  Q.  Was your understanding -- is your understanding now

25  different than your understanding at the time you were working

1    for the defendant?

2    A.   Yes.

3    Q.   And how did you learn while you were working at the law

4    firm how to manage the client trust accounts?

5    A.   Michael instructed me on how to manage the funds in the

6    account.

7    Q.   And as of today, what is your understanding of how they're

8    supposed to work?

9    A.   On a client trust account, there should not be any

10   disbursements from the trust account unless there is some

11   client authorization from the client.

12   Q.   And generally, during your work at the law firm, were there

13   signed authorizations sought from the clients?

14   A.   Yes.  On some contingency cases, when the case was

15   resolved, there would be a client accounting prepared, and that

16   would be signed and the funds would be disbursed pursuant to

17   that client accounting.

18   Q.   With respect to the Ms. Daniels trust accounts, are you

19   aware of any such authorizations ever being sought?

20              MR. AVENATTI:  Objection.  Calls for a legal

21   conclusion, your Honor.

22              THE COURT:  Overruled.

23   A.   No, I'm not.

24   Q.   When such an authorization was sought, were you often

25   involved in that process?

1    A.  Yes.

2    Q.  And just to be clear, you never saw one, never were

3    involved in one, never drafted one, never sent or received one

4    with respect to Ms. Daniels, correct?

5    A.  Correct.

6            MR. SOBELMAN:  If we could please put up Government

7    Exhibit 3 for the witness.

8    Q.  Ms. Regnier, do you recall being asked a number of

9    questions about how much money Ms. Daniels might owe

10   defendant's law firm during cross-examination?

11   A.  Yes.

12   Q.  Let's take a look at paragraph 4 of this attorney-client

13   fee agreement.  Here, there's a reference to a one-time payment

14   of $100, is that correct?

15   A.  Yes.

16   Q.  Anywhere in this paragraph is there a reference to

17   Ms. Daniels paying out of her own pocket for any costs or fees

18   per her representation by the defendant and his law firm?

19           MR. AVENATTI:  Best evidence, your Honor.

20           THE COURT:  Sustained.  The exhibit speaks for itself.

21   BY MR. SOBELMAN:

22   Q.  Ms. Regnier, can you just remind us, is this the only

23   agreement between the defendant and Ms. Daniels that you were

24   aware of?

25   A.  Yes.

M1qWave2                        Regnier - Redirect

1   Q.  Ms. Regnier, during your -- let me move on.

2       During your cross-examination, do you recall --

3           MR. SOBELMAN:  We can take this down.

4   Q.  Do you recall being asked some questions about a party at a

5   hotel?

6   A.  Yes.

7   Q.  And that took place in December of 2017, is that right?

8   A.  Yes.

9   Q.  Many months before the defendant's representation of

10  Ms. Daniels began, correct?

11  A.  Correct.

12  Q.  And many months before July 2018?

13  A.  Yes.

14  Q.  Many months before September 2018?

15  A.  Yes.

16  Q.  Was there a party at the Montage in December 2018?

17  A.  Not that I'm aware of, no.

18  Q.  Do you know why?

19          MR. AVENATTI:  Calls for speculation, your Honor.

20          THE COURT:  Well, the question is do you know why.

21  The answer to that is yes or no.

22  A.  Yes.

23  Q.  Why was there no party at the Montage in December of 2018?

24  A.  The firm was not in a position to have a party.  They

25  didn't have the funds.

M1qWave2                          Regnier - Redirect

1    Q.  Where were you working out of in December 2018?

2    A.  My home.

3    Q.  Why were you working out of your home?

4          MR. AVENATTI:  Objection.  Asked and answered, your

5    Honor.

6          THE COURT:  Sustained.

7    BY MR. SOBELMAN:

8    Q.  Do you recall being shown on cross-examination a number of

9    bank records?

10   A.  Yes.

11   Q.  They were marked as Defense Exhibits T through AA.  Do you

12   recall those?

13   A.  Yes.

14   Q.  And the defendant spent most of his time showing you bank

15   records from January and February of 2018, is that right?

16         MR. AVENATTI:  Objection, your Honor.  Misstates

17   the --

18   A.  Yes.

19         THE COURT:  The testimony speaks for itself.

20         Next question, Mr. Sobelman.

21   BY MR. SOBELMAN:

22   Q.  And those records didn't reflect the balances -- that were

23   shown to you during your testimony didn't reflect the balances

24   in those accounts as of July, August, or September 2018,

25   correct?

1          THE COURT:  All right.  I think --

2          MR. AVENATTI:  Objection.

3          THE COURT:  Mr. Avenatti.

4          Ladies and gentlemen, those exhibits are in evidence.

5   When you deliberate, you'll receive all the evidence, all the

6   exhibits that are admitted into evidence and can review them.

7   Obviously, I asked Mr. Avenatti to move things along and not

8   ask about each and every month.  But again, the evidence speaks

9   for itself and you should give it whatever weight, if any, you

10  think it warrants.

11         Mr. Sobelman, next question.

12         MR. SOBELMAN:  Yes, your Honor.

13         Could we put up Defense Exhibit T, please.

14  Q.  Just a couple questions about this document, Ms. Regnier.

15  Do you see at the top where it says Eagan Avenatti LLP debtor

16  in possession?

17  A.  Yes.

18  Q.  What does debtor in possession money?

19         MR. AVENATTI:  Objection, your Honor.  403.

20         THE COURT:  Overruled.

21         MR. AVENATTI:  Can I have a sidebar, please?

22         THE COURT:  No.

23  A.  Eagan Avenatti was in bankruptcy, and when you're in

24  bankruptcy, that's what the bankruptcy trustee has you put on

25  the account.

1          MR. SOBELMAN:  And let's take a look at page 47 of

2     this account.

3     Q.  Now, Mr. Avenatti asked you about several amounts of money

4     that were coming into this account, is that correct?

5     A.  Yes.

6     Q.  He didn't ask you about money going out, right?

7          THE COURT:  Sustained.

8     A.  I don't think so.

9          THE COURT:  Just ask your question, Mr. Sobelman.

10    BY MR. SOBELMAN:

11    Q.  On page 47, Ms. Regnier, could you please read us the

12    starting balance, where it says previous balance on the left

13    side?

14        Sorry.  This is for what time period on the upper right?

15    A.  This is for July 31 to August 31, 2018.

16    Q.  What was the starting balance?

17    A.  Negative $58,177.

18          MR. SOBELMAN:  Could we please go to page 49 of this

19    document, and can you please enlarge the top half.

20    Q.  Ms. Regnier, do you see there are a number of lines where

21    it says insufficient funds fee?

22    A.  Yes.

23    Q.  And overdraft service fee?

24    A.  Yes.

25    Q.  What are those?

M1qWave2                          Regnier - Redirect

1   A.   Those were when checks would hit the bank account and there

2   was insufficient funds to cover the check, there was a fee

3   charged.  Overdraft is related to the same thing.

4            MR. SOBELMAN:  Let's move on to Defense Exhibit U,

5   please, and take a look at page 39.

6   Q.   Ms. Regnier, what time period is this statement for?

7   A.   May 31 to June 29, 2018.

8   Q.   And what was the starting balance here?

9   A.   9,700 -- dollars 45 -- 745 dollars.

10           MR. SOBELMAN:  And let's take a look at page 59 now.

11  Q.   And what's the time period on this statement?

12  A.   July 31 to August 31, 2018.

13  Q.   And what's the starting balance on this statement?

14  A.   Negative 1,143.

15  Q.   Let's take a look at the ending balance on the right.

16           MR. SOBELMAN:  If you could please highlight the

17  ending balance on the right side of the document.

18  A.   Negative $1,236.

19           MR. SOBELMAN:  Let's move on to Defense Exhibit V, as

20  in Victor.

21  Q.   What's the time period on this?

22  A.   December 29, 2017, to January 31, 2018.

23  Q.   And please look at the ending balance on the right.

24  A.   Zero.

25           MR. SOBELMAN:  Move on to Defense Exhibit W.  Take a

M1qWave2                          Regnier - Redirect

1   look at page 41, please.  Page 41, please.

2   Q.  What's the date on this statement?

3   A.  July 31 to August 31, 2018.

4   Q.  And what's the starting balance?

5   A.  $333.

6   Q.  And the ending balance?

7   A.  $181.

8   Q.  And by the way, what type of account is this?

9   A.  This is an attorney-client trust account.

10  Q.  And so could this account be used for the firm's general

11  expenses?

12          MR. AVENATTI:  Objection.  Calls for speculation, your

13  Honor, and an expert opinion.

14          THE COURT:  Overruled.

15          As you understood it.

16  A.  I don't --

17          THE COURT:  As you understood it at the time,

18  Ms. Regnier, could this be used for general firm expenses?

19          THE WITNESS:  Yes.  As I understood it at the time,

20  Mr. Avenatti had the ability to make payments for general firm

21  expenses out of these accounts.

22  BY MR. SOBELMAN:

23  Q.  And as Mr. Avenatti asked you, you have a different

24  understanding of how those accounts are to be used now,

25  correct?

M1qWave2                          Regnier - Redirect

1    A.  Correct.

2    Q.  And can you remind us, as you understand it now, is that

3    how these accounts --

4                MR. AVENATTI:  Objection.

5                THE COURT:  Sustained.

6                MR. SOBELMAN:  Move on to Defense Exhibit X, and take

7    a look at page 11, please.

8    Q.  What's the date on this statement?

9    A.  July 31 to August 31, 2018.

10   Q.  And what is the starting balance on this statement?

11   A.  $1,792.

12   Q.  And what is the ending balance?

13   A.  $491.

14               MR. SOBELMAN:  Go to Defense Exhibit Y.

15   Q.  What's the date on this statement?

16   A.  December 29, 2017, to January 31, 2018.

17   Q.  What are the last four digits on this account?

18   A.  7849.

19   Q.  And what bank is this?

20   A.  California Bank & Trust.

21               MR. SOBELMAN:  Let's take a look, just for the

22   witness, at Government Exhibit 302H.

23   Q.  Ms. Regnier, do you recognize this?

24   A.  Yes.

25               MR. SOBELMAN:  One moment, your Honor.

1            The government offers Government Exhibit 302H.

2            THE COURT:  I think some additional foundation may be

3    required.

4            MR. SOBELMAN:  Yes, your Honor.

5    Q.  Ms. Regnier, is this another statement on the same account

6    we were just looking at in Defense Exhibit Y?

7    A.  Yes.

8            MR. AVENATTI:  Your Honor, I believe it's still --

9    it's already in evidence.  I believe I placed it in evidence.

10            THE COURT:  I don't think you did 302H.

11            MR. AVENATTI:  I have no objection, in any event.

12            THE COURT:  All right.  Let the witness answer the

13    question, please, and when Mr. Sobelman has offered it, you can

14    state that.

15    BY MR. SOBELMAN:

16    Q.  Ms. Regnier, is this the same -- is this different

17    statements for the same account that we just looked at in

18    Defense Exhibit Y?

19    A.  Yes.

20    Q.  Do you recognize these statements?

21    A.  Yes.

22            MR. SOBELMAN:  The government offers Government

23    Exhibit 302H.

24            THE COURT:  Admitted.

25            (Government Exhibit 302H received in evidence)

M1qWave2                    Regnier - Redirect

1           MR. SOBELMAN:  Please display it for the jury.

2    Q.  Ms. Regnier, what time period is this statement for?

3    A.  August 31, 2018, through September 28, 2018.

4    Q.  And what is the ending balance there?

5    A.  $1,544.

6           MR. SOBELMAN:  Let's take a look at page 3.

7           Actually, move on.

8           Take a look at Defense Exhibit Z, and take a look at

9    page 32, please.

10   Q.  What time period is this statement for?

11   A.  July 31 to August 31, 2018.

12   Q.  And let's take a look at the starting balance.

13   A.  $2,541.

14   Q.  And what was the ending balance?

15   A.  $39.

16          MR. SOBELMAN:  And let's take a look at the next page

17   as well.

18   Q.  And what time period is this for?

19   A.  August 31 to September 28, 2018.

20   Q.  And what is the ending balance listed there?

21   A.  Negative $40.

22          MR. SOBELMAN:  Last one.  Let's take a look at --

23   actually, move on.  I just have one or two more questions.

24   Q.  Ms. Regnier, were you asked questions on cross-examination

25   about whether Ms. Daniels paid money to the firm or owed money

M1qWave2                        Regnier - Recross

1    to the firm?

2    A.  Yes.

3    Q.  As far as you are aware, was a bill ever sent to

4    Ms. Daniels for money she might have owed to the firm?

5    A.  Not to my knowledge, no.

6    Q.  Were you involved in the billing and invoicing practices at

7    the firm?

8              MR. AVENATTI:  Asked and answered, your Honor.

9              THE COURT:  Overruled.

10   A.  Yes.

11   Q.  And if such a bill had ever been sent, would you have

12   expected to be involved in that?

13             MR. AVENATTI:  Speculation.

14             THE COURT:  Overruled.

15   A.  Yes.

16   Q.  But none was sent?

17   A.  Not to my knowledge.

18             MR. SOBELMAN:  No further questions, your Honor.

19             MR. AVENATTI:  Your Honor, brief recross, please?

20             THE COURT:  Very brief.

21   RECROSS EXAMINATION

22   BY MR. AVENATTI:

23   Q.  Ms. Regnier, can you hear me?

24   A.  Yes, I can.

25   Q.  Excellent.

1      Ms. Regnier, isn't it true that the involuntary bankruptcy
2  was dismissed in early 2018, and the firm was dismissed by the
3  bankruptcy court in California?  Isn't that true?
4              MR. SOBELMAN:  Objection.
5              THE COURT:  Overruled.
6  A.  Uh --
7  Q.  Isn't that true?
8  A.  I'm trying to remember.  I believe so.  I know it was
9  dismissed at one time, but I'm not sure of the date.
10 Q.  You recall that it was dismissed that at some point in
11 2018, meaning the firm was not in bankruptcy; you recall that,
12 right?
13 A.  Yes.
14 Q.  You were asked some questions about accountings that were
15 provided in contingency cases.  Do you recall that?
16 A.  Yes.
17 Q.  Ms. Daniels's case was not a contingency case, was it?
18 A.  No.
19             MR. AVENATTI:  Nothing further.
20             THE COURT:  All right.
21             Thank you, Ms. Regnier.  I would say you may step
22 down, but you're not actually in the witness box.  You are
23 excused at this time.  You can close out on your end.  We will
24 close out on our end, and have a pleasant day.
25             THE WITNESS:  Thank you.

1              (Witness excused)

2              THE COURT:  All right.  Ladies and gentlemen, while we

3    take care of closing out, and what have you, I'll ask the

4    government to call its next witness.  And in the meantime, you

5    can stretch again, if you'd like.

6              MR. SOBELMAN:  The government calls Jessica Volchko.

7              THE COURT:  All right.

8              JUROR:  Excuse me.  Can I be excused?

9              THE COURT:  Hang on one moment, please.

10             Watch your step, please, and you can follow my law

11   clerk.

12             One of the jurors just needs to use the restroom, and

13   I'll permit her to do that while we're getting everything set

14   up.  So bear with us.

15             (Recess)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We will be ready to go in one minute.

2          All right.  Thank you very much.  Let's get going.

3          Ms. Volchko, if you could just rise and raise your

4     right hand.

5      JESSICA VOLCHKO,

6          called as a witness by the government,

7          having been duly sworn, testified as follows:

8          THE COURT:  If you can just pull the microphone so

9     that you are about an inch or two away from it.  You can remove

10    your mask since you are now in the witness box.  And please

11    just state and then spell your full name, please.

12         THE WITNESS:  Jessica Volchko, J-E-S-S-I-C-A,

13    V-O-L-C-H-K-O.

14         THE COURT:  You may proceed, counsel.

15    DIRECT EXAMINATION

16    BY MR. SOBELMAN:

17    Q.  Good morning, Ms. Volchko.

18    A.  Good morning.

19    Q.  Where do you currently work?

20    A.  I work for the Federal Bureau of Investigation.

21    Q.  Is that also known as the FBI?

22    A.  It is.

23    Q.  What is your position with the FBI?

24    A.  I am an IT specialist forensic examiner.

25    Q.  What is your educational background?

M1Q8AVE3                    Volchko - Direct

```
 1   A.  I have a bachelor of science in digital forensics.
 2             THE COURT:  Can you just speak up a bit or move
 3   closer.
 4   Q.  What are your duties and responsibilities as an IT
 5   specialist forensic examiner with the FBI?
 6   A.  As a forensic examiner, I assist in the proper collection
 7   and preservation of digital evidence, as well as the analysis
 8   of that evidence.
 9   Q.  Approximately how long have you been an IT specialist
10   forensic examiner with the FBI?
11   A.  About five and a half years.
12   Q.  Approximately how many electronic devices have you
13   forensically examined during your time with the FBI?
14   A.  Hundreds.
15   Q.  Ms. Volchko, I believe you have two exhibits next to you in
16   the witness stand.
17   A.  I do.
18   Q.  Could you please remove the object marked as Government
19   Exhibit 404.
20       Do you recognize Government Exhibit 404?
21   A.  I do.
22   Q.  What is it?
23   A.  This is the laptop that I examined.
24   Q.  Can you be a little more specific?
25   A.  It is a silver MacBook that I examined.
```

1    Q.  With respect to what case?

2    A.  For this case.

3    Q.  How do you know that Government Exhibit 404 is a laptop

4    that you forensically examined?

5    A.  When I first received the laptop and started my

6    examination, I placed a sticker on that item that has my

7    initials on it as well as the case number.

8    Q.  Is that sticker still there?

9    A.  It is.

10   Q.  When you forensically examined this laptop, what, if any,

11   authority did you have to do so?

12   A.  It was a search warrant.

13   Q.  Who issued that search warrant?

14   A.  A federal judge.

15   Q.  Please put aside Government Exhibit 404 for a moment.

16       There is another object next to you.  Is that marked

17   Government Exhibit 403?

18   A.  It is.

19   Q.  Do you recognize Government Exhibit 403?

20   A.  I do.

21   Q.  What is it?

22   A.  It's a hard drive containing a forensic image of the laptop

23   as well as forensic software files.

24   Q.  What is a forensic image?

25   A.  A forensic image is an exact copy of an item of digital

1    evidence.  So for this case, it's a copy of everything that's

2    contained on the hard drive in the laptop.

3    Q.  That's the laptop we just looked at, Government Exhibit

4    404?

5    A.  Yes.

6    Q.  You mentioned other files that are on Government Exhibit

7    403.  What are those?

8    A.  Those are the files that are created by the forensic

9    software that I added the image to, and that basically allows

10   an individual to review the files that are on the computer, put

11   into categories, and it makes it easier to review.

12   Q.  How did Government Exhibit 403 come to contain a forensic

13   image and the other files you mentioned related to Government

14   Exhibit 404?

15   A.  I copied those files onto the hard drive as an archive.

16   Q.  How did you make a forensic image of Government Exhibit

17   404?

18   A.  I used a forensic software running on a thumb drive.  So,

19   essentially, I plugged that into the laptop.  I booted the

20   laptop to the forensic software, which allowed me to extract

21   everything from the hard drive in a forensic image to another

22   hard drive.

23   Q.  Is that a standard process you have used before?

24   A.  Yes.

25   Q.  Approximately how many times have you used that process?

1    A.  Probably hundreds.

2    Q.  Please set aside Government Exhibit 403.

3           MR. SOBELMAN:  Can we please display what is in

4    evidence as Government Exhibit 608.

5    Q.  Ms. Volchko, do you recognize this?

6    A.  I do.

7    Q.  What is it?

8    A.  This is a document that was saved on the laptop that I

9    examined.

10   Q.  Ms. Volchko, how do you know that Government Exhibit 608 is

11   contained on the laptop that's marked as Government Exhibit

12   404?

13   A.  I verified prior to my testimony today.

14           MR. SOBELMAN:  Now, can you please show the witness

15   what is marked for identification as Government Exhibit 614.

16   Q.  Ms. Volchko, do you recognize this?

17   A.  I do.

18   Q.  What is it?

19   A.  This is the metadata that's associated with the previous

20   document.

21           MR. SOBELMAN:  The government offers Government

22   Exhibit 614.

23           THE COURT:  Any objection?

24           MR. AVENATTI:  None.

25           THE COURT:  Admitted.

1              (Government's Exhibit 614 received in evidence)

2      Q.   What is metadata?

3      A.   Metadata is information about a file.  So some examples,

4      maybe the date it was created, where it was saved, the name of

5      the document or the file.

6      Q.   Where is this metadata from?

7      A.   This was taken from the hard drive in the laptop; it's

8      saved along with the file.

9      Q.   Let's just look a few of the fields here on this.

10             MR. SOBELMAN:  If we could enlarge the top half,

11     please.

12     Q.   Ms. Volchko, can you please read the name of the document?

13     A.   It was named letter.docx.

14     Q.   What is the file type?

15     A.   It's a Microsoft Word document.

16     Q.   What appears in the path field?

17     A.   The path is where it was saved on the laptop.  So it was in

18     user folder on the desktop.

19     Q.   What was the name of the user whose folder it was in?

20     A.   Michael Avenatti.

21     Q.   What was the date it was created?

22     A.   It was created on July 30, 2018.

23     Q.   What was the date it was accessed?

24     A.   August 1, 2018.

25     Q.   What is date created, date accessed, and date modified

1  mean?

2  A.  So the date created is when that file was created on the

3  system, on the laptop.  Date access could be updated when it's

4  opened, it could be updated when it's printed.  There's a

5  couple of things that would update that date.  And the date

6  modified is when it was last edited.

7          MR. SOBELMAN:  Let's take that large enlargement down.

8          And if you could please enlarge the bottom.

9  Q.  Who is listed as the author?

10  A.  Michael Avenatti.

11  Q.  How is the author field filled in for a document like this?

12  A.  So when you first set up Microsoft Word for the first time,

13  there are a couple of fields that you enter information in and

14  the author, the user is one of them.

15  Q.  What is listed under last saved by?

16  A.  Michael Avenatti.

17  Q.  That's the same user that is the author of the document?

18  A.  Yes.

19  Q.  How much time is listed under total editing time?

20  A.  Eight seconds.

21  Q.  What, if anything, could a user do that might result in the

22  editing time appearing to be short even though it took the user

23  longer to create the file and its contents?

24  A.  The contents in the file could be copied from somewhere

25  else and pasted into the document.  It could also -- document

1  could have been overwritten.  So instead of selecting files

2  saved, the user could say files saved as and overwrite that

3  document.

4  Q.  There is a field that says "MD5 Hash."  Do you see that?

5  A.  Yes.

6  Q.  What is that?

7  A.  It's a digital fingerprint for a file.  So if there is

8  another file on the system with the same content it would have

9  the same hash.

10        MR. SOBELMAN:  You can take down this document.

11  Q.  Just a couple of more questions, Ms. Volchko.

12     Did you review the entire contents of the laptop marked as

13  Government Exhibit 404?

14  A.  I did not.

15  Q.  Why not?

16  A.  That wasn't my role for this.  The investigation was just

17  to process the evidence and put it up for review for the

18  investigative team.

19  Q.  Aside from forensically processing the laptop marked as

20  Government Exhibit 404, did you have any other role in the

21  investigation of this investigation?

22  A.  I did not.

23        MR. SOBELMAN:  No further questions.

24        THE COURT:  Cross-examination.

25  CROSS-EXAMINATION

M1Q8AVE3                         Volchko - Cross

1    BY MR. AVENATTI:

2    Q.  Ms. Volchko, good afternoon.  How are you?

3    A.  Good afternoon.

4    Q.  You were trained at the FBI academy in Quantico, Virginia,

5    correct?

6    A.  I was not.

7    Q.  You were not?

8    A.  No.

9    Q.  What training did you receive as it relates to forensically

10   copying devices before you copied this device?  Did you receive

11   any training?

12   A.  I received training both from the FBI as well as other

13   outside vendors.

14   Q.  What training did you receive?

15   A.  I received courses in both imaging evidence and the

16   analysis of that evidence.

17   Q.  What exact courses did you receive?

18   A.  I received basic imaging from the FBI.  I received also a

19   SANS forensics class.  I received a Macintosh class.

20   Q.  How long did your basic imaging class last?

21   A.  I believe that one might have been a 40-hour course.

22   Q.  When did you receive that?

23   A.  I don't recall the exact date.  It might have been in 2016.

24   Q.  Did you say 2016?

25   A.  Yes.  That sounds right.

1   Q.  So that was about 40 hours.  What other class do you recall
2   taking?
3   A.  I took an introduction to Macintosh.
4   Q.  How long was that?
5   A.  I don't recall the exact amount of time.
6           THE COURT:  Ms. Volchko, just keep your voice up,
7   please.
8   A.  I don't recall.
9   Q.  When did you take that class?
10  A.  That one also might have been in 2016.
11  Q.  So we have the basic class, the introduction to Macintosh.
12  What other classes?
13  A.  I have taken classes for the analysis of cell phones.
14  Q.  What do you mean by that, when you say analysis of cell
15  phones?
16  A.  Extracting data from cell phones, as well as processing
17  that data and making it available for review, and locating
18  artifacts on cell phones.
19  Q.  What do you mean when you say extracting data from cell
20  phones and analyzing artifacts from cell phones?
21  A.  Using a forensic software to extract files that essentially
22  contain the information that's on a cell phone, so it could be
23  contacts, it could be messages, and then analyzing that data.
24  Q.  You were not asked to look at any data from any cell phones
25  in connection with this case, were you?

1    A.  I was not.

2    Q.  Now, you said that you have analyzed hundreds of electronic

3    devices?

4    A.  Yes.

5    Q.  Were they all laptops?

6    A.  It was a combination of laptops, hard drives, cell phones,

7    SD cards, USB drives, various items of digital evidence.

8    Q.  Why is it generally that you were asked to look at these

9    cell phones?

10            MR. SOBELMAN:  Objection.

11            THE COURT:  Sustained.

12   Q.  Why are forensic images taken of electronic devices

13   generally?

14   A.  Generally, it allows the forensic examiner to run it

15   through software without modifying the original evidence.  It

16   also provides us a way to verify that nothing changed over the

17   course of our examination.

18   Q.  What do you mean by that, nothing changed over the course

19   of the examination?

20   A.  That the forensic image and everything that's extracted

21   from it is an accurate copy of what was on the original

22   evidence item.

23   Q.  Over the course of you creating forensic images of laptops

24   and cell phones and the like, you have done so to ensure that

25   the data on the device has not been manipulated, right?

1    A.  Yes.

2    Q.  That's a big reason why you do what you do, correct?

3              MR. SOBELMAN:  Objection.

4              THE COURT:  Overruled.

5    A.  Yes.

6    Q.  Have you understood that that's important?

7    A.  Yes.

8    Q.  Why is that important to make sure that you get a forensic

9    image of a laptop or cell phone to make sure the data has not

10   been manipulated, why is that important?

11   A.  To make sure that what we are looking at is accurate to

12   what was on the device.

13   Q.  That the data actually came from the device and has not

14   been manipulated by the user, right?

15   A.  That the data was on the device, yes.

16   Q.  In a legitimate form?

17   A.  In the similar, like the same form.

18   Q.  Because in your experience, people can manipulate data and

19   evidence from electronic devices, and one of the ways to guard

20   against that is to get a forensic image of the device, correct?

21             MR. SOBELMAN:  Objection.

22             THE COURT:  Sustained.

23   Q.  One of the reasons why you use imaging software like you

24   did on this laptop is to make sure that the data has not been

25   manipulated in some way, correct?

1              THE COURT:  Sustained.

2              Let's move on, Mr. Avenatti.

3   Q.  You said that you used a forensic process that you have

4   used hundreds of times, a standard process.  Do you recall

5   that?

6   A.  Yes.

7   Q.  What have you used that process on, what kinds of devices?

8   A.  Imaging is for any kind of evidence, such as a hard drive,

9   a thumb drive, a laptop, those are just a couple of examples.

10  Q.  Are you familiar with Cellebrite?

11  A.  I am.

12  Q.  What is Cellebrite?

13  A.  Cellebrite is a company that develops software for forensic

14  examiners.

15  Q.  Do you use Cellebrite in the course of your work?

16  A.  Yes.

17  Q.  Did you use Cellebrite in connection with your work on the

18  laptop?

19  A.  I believe at the time I didn't use Cellebrite, but

20  Cellebrite now owns one of the software that I used, but I

21  don't remember if that was before or after.

22  Q.  Did you use FTK?

23  A.  Yes.  I used it for, not for the imaging, but to verify the

24  image.

25  Q.  What did you use for the imaging?

M1Q8AVE3                          Volchko - Cross

1    A.  I used MacQuisition.

2    Q.  Now, I want to show you a couple of exhibits that are in

3    evidence.

4            MR. AVENATTI:  Let's go to GX 232, please.

5            Can we blow up the top half.

6    Q.  Can you see that, Ms. Volchko?

7    A.  I can.

8    Q.  Do you recognize the format of this document?

9    A.  It looks like a text file, based on the text at the top.

10   Q.  Is this consistent with a printout of WhatsApp messages

11   from any of the forensic extraction tools that you are used to

12   seeing?

13           MR. SOBELMAN:  Objection.

14           THE COURT:  Sustained.

15   Q.  This is not a Cellebrite printout, is it?

16           MR. SOBELMAN:  Objection.

17           THE COURT:  Sustained.

18   Q.  It's not a FTK printout, is it?

19           MR. SOBELMAN:  Objection.

20           THE COURT:  Sustained.

21   Q.  Let's take a look at 233.

22           Can you see that, Ms. Volchko?

23   A.  I can.

24           THE COURT:  Ms. Volchko, can I ask you, do you

25   recognize this document?

1                THE WITNESS:  I do not.

2                THE COURT:  Let's take it down and move on, Mr.

3     Avenatti.

4                MR. AVENATTI:  Can we have Exhibit 224, please.

5                THE COURT:  Same question, Ms. Volchko, do you

6     recognize that exhibit?

7                THE WITNESS:  I do not.

8                THE COURT:  Take it down and let's move on.

9     Q.  Now, I believe you testified that you were not asked to

10    review the data on the laptop, all of the data; am I right

11    about that?

12    A.  That's correct.

13    Q.  Who gave you that instruction?

14    A.  Usually I will provide forensic images and digital evidence

15    for the investigative team to review because I don't really

16    have any knowledge of the case.  So that was just the process

17    that I also did for this examination.

18    Q.  Well, the jury is not aware of what you mean by

19    investigative team.  So in this case, who instructed you not to

20    look at the data?  Do you remember their names?

21                MR. SOBELMAN:  Objection.

22                THE COURT:  Overruled.

23    A.  I don't believe it was a specific instruction, but that's

24    usually not my role.

25    Q.  So the reason why you looked at the data is because it's

M1Q8AVE3                    Volchko – Cross

1    usually not your role, but nobody told you not to look at the

2    data?  Do I have that correct?

3              MR. SOBELMAN:   Objection.

4              THE COURT:   Why don't you just explain what you meant

5    by that, Ms. Volchko.

6    A.  Can you rephrase the question?

7    Q.  Sure.

8        You did not look at the data because, was it because it's

9    not your role or because someone told you not to do it?

10   A.  Usually --

11   Q.  I don't want you to speak about usually.  I want to ask you

12   just about this specific instance, if I can focus your

13   attention as it relates to this laptop.

14       Ms. Volchko, you did not review the totality of the

15   information on the laptop, correct?

16   A.  That's correct.

17   Q.  And the reason why you did not review all of the

18   information on the laptop was because someone told you not to

19   or you just assumed you didn't need to?

20   A.  That wasn't a part of the original request.

21   Q.  OK.  Who made the original request?

22   A.  It was the case agent.

23   Q.  Who is the case agent?

24   A.  I believe the person who submitted the request was Special

25   Agent Chris Harper.

M1Q8AVE3                        Volchko - Cross

1    Q.  What did Mr. Harper ask you to do?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Overruled.

4    A.  To extract data from the laptop.

5    Q.  All of the data or some of the data?

6    A.  All of the data.

7    Q.  Then did he instruct you to do anything else?

8    A.  Not in the original request.

9    Q.  Was there a subsequent request?

10   A.  I was asked to export the user generated files.

11   Q.  The user generated files?

12   A.  Yes.

13   Q.  What does that mean?

14   A.  It's really hard to extract every user generated file, so

15   typically I will just do categories that could be potentially

16   user data.  So some of them were documents, graphics, videos,

17   archives.

18   Q.  Who asked you to do that?

19   A.  I don't recall.

20   Q.  Was it Mr. Harper?

21   A.  It may have been.

22   Q.  Was it another agent?

23   A.  It could have been.

24   Q.  Was it Agent Penland, who is seated to my left?

25   A.  It was not.

1  Q.  Was it one of the assistant US attorneys?

2  A.  It was not.

3  Q.  Did you extract the user files from the laptop?

4  A.  I did.

5  Q.  What did you do with them when you extracted them?

6  A.  I copied them to a hard drive and provided them to a case

7  agent.

8  Q.  Which case agent?

9  A.  It might have been Special Agent Melissa Galicia.

10  Q.  That's your best recollection?

11  A.  Yes.

12  Q.  I just want to make sure I understand the chronology.

13     You obtained the laptop, correct?

14  A.  Correct.

15  Q.  You made a forensic image of the laptop, correct?

16  A.  That's correct.

17  Q.  You then extracted certain files, but not all of the files,

18  from that forensic image, correct?

19  A.  That's correct.

20  Q.  And you then took the user files, those certain files, and

21  you gave them to the case agent, who you believe is Ms.

22  Galicia, correct?

23  A.  That's correct.

24  Q.  And during this time period, you knew that the laptop

25  belonged to an attorney, did you not?

1          MR. SOBELMAN:  Objection.

2          THE COURT:  Sustained.

3   Q.  When you did your analysis, did you know who the laptop

4   belonged to?

5          MR. SOBELMAN:  Objection.

6          THE COURT:  Sustained.

7   Q.  Did you ever have any discussions with any of the agents or

8   the assistant US attorneys about the need to not look at the

9   data on the laptop because it might be covered by the

10  attorney-client privilege?

11         MR. SOBELMAN:  Objection.

12         THE COURT:  Sustained.

13         Are you close to wrapping up, Mr. Avenatti?

14         MR. AVENATTI:  I think I have only one or two

15  questions.

16         THE COURT:  Great.

17  Q.  Did anyone specifically ask you to look at the data file

18  relating to the letter document that you were asked about by

19  the government?

20  A.  Yes, I was asked to verify that that document was on the

21  laptop.

22  Q.  Who asked you to verify that?

23  A.  I don't recall the exact person.

24  Q.  Was it one of the agents or one of the assistant US

25  attorneys?

M1Q8AVE3                    Volchko - Cross

1    A.  It was one of the attorneys, I believe.

2    Q.  One of the attorneys who is seated here today?

3    A.  Yes.

4    Q.  Yes?

5    A.  Yes.

6    Q.  You just don't remember which of the three gentlemen,

7    correct?

8    A.  I believe it might have been Rob Sobelman, but I don't

9    remember.  He was on the e-mail.  I don't remember if he was

10   the one that sent it.

11   Q.  So an e-mail was sent to you about your work in connection

12   with this case, right?

13   A.  Yes.

14   Q.  And you communicated by e-mail back to the assistants in

15   connection with your work on this case, correct?

16   A.  I don't remember if it was a phone call or an e-mail.

17   Q.  You recall getting e-mails from them, right?

18   A.  Yes.

19   Q.  And you're not certain if you sent e-mails back, is that

20   your testimony?

21   A.  I sent an e-mail back.  I just don't recall.

22   Q.  You don't recall when?

23   A.  When the e-mail, yeah.

24   Q.  You don't recall how many e-mails beyond at least the one

25   e-mail, correct?

1    A.  That's correct.

2              MR. AVENATTI:  Your Honor, could I have a sidebar,

3    please?

4              THE COURT:  No.

5              MR. AVENATTI:  Your Honor, I am going to reserve the

6    right to ask additional questions.

7              THE COURT:  Mr. Avenatti, do you have any more

8    questions?

9              MR. AVENATTI:  Not at this time, but I am going to

10   reserve my rights.

11             THE COURT:  Have a seat.

12             Any redirect?

13             MR. SOBELMAN:  No, your Honor.

14             THE COURT:  Ms. Volchko, you may step down.  Why don't

15   you just leave the exhibits that you have there on the stand

16   and counsel will retrieve it during our break.

17             Thank you.  You are excused.

18             (Witness excused)

19             THE COURT:  Ladies and gentlemen, sorry for eating

20   into three minutes of your lunch break, but I wanted to get the

21   witness done before our break.  We will take our lunch break at

22   this time.  I am going to give you my standard reminders even

23   though I am sure you could recite them with me at this point.

24             Number one, do not discuss the case with each other or

25   with anyone else; number two, don't do any research about the

M1Q8AVE3

1     case, anything about anyone involved in the case; and three,

2     please keep an open mind.  You have not heard all of the

3     evidence.  You haven't heard the parties' closing arguments.

4     So please keep an open mind.

5            With that, please be ready to go approximately 12:10

6     so that we can get -- let's say 12:15.  I will give you until

7     12:15, and we will get started promptly when you are up here.

8     With that, enjoy your break and we will see you after the

9     break.  Thank you.

10           (Jury exits courtroom)

11           THE COURT:  You may be seated.

12           Two issues I want to flag and then I will hear from

13    you if you have anything, but I want to make sure you get your

14    breaks as well.

15           One, I don't know if there are more defense exhibits

16    coming down the pike, but I don't think I got copies of those

17    that were offered this morning.  I really do need them so that

18    I can look at them when offered.  So if you can just make sure

19    I can get copies as soon as possible I would appreciate that.

20           Number two, I want to raise an issue that the

21    government may or may not have raised on its own, but I want

22    you to think about it because I will certainly be thinking

23    about it.  I think some of the questions this morning of Ms.

24    Regnier regarding the Tabs and QuickBooks raised an issue,

25    which is that, as far as I am concerned, given my ruling that I

M1Q8AVE3

gave on Monday, Mr. Avenatti has long had the Tabs and
QuickBooks records, but the government, namely, the prosecution
team in this case, does not.  And to the extent that the
questions this morning suggested that the government did have
that available to it and is at fault, for instance, for not
asking her to look at it and find certain things, I think it
potentially leaves a misleading impression with the jury.  It
may not warrant any correction.  Maybe it does.  Maybe you all
will find the Tabs data and the QuickBooks before the end of
this trial, I don't know.  I just wanted to raise it as a
potential issue for you to think about, and if there are any
applications we will take it up.  But that's all that needs to
be said on that at this point.

        Anything from the government before we break?

        MR. SOBELMAN:  On that, I just want to note for the
record, and we were planning to raise this today at some point
anyway, we served a trial subpoena on the defendant in advance
of the trial some weeks ago that would cover the Tabs and
QuickBooks data that he has in his possession.  We have never
received any response from that subpoena, either way.  We don't
know whether he intends to comply or fight it or whatnot.

        THE COURT:  Was that the "if, as and when" subpoena
that you served?

        MR. SOBELMAN:  No, your Honor.  It was actually a
subsequent subpoena, just a regular trial subpoena, after he

1    made the representation in the filing to the Court that he had

2    already reviewed that data on the server and other similar

3    documents.  We have received nothing pursuant to that subpoena.

4         THE COURT:  Why don't you discuss that with Mr.

5    Avenatti and standby counsel and we can take it up later,

6    perhaps.  Obviously, to the extent that the data with respect

7    to Ms. Clifford is not in a usable form, which was one of the

8    issues being litigated in California, I am not sure -- it is

9    what it is and giving you something that is not usable by you

10   either doesn't do you much good.

11        Anything else from the government?

12        MR. PODOLSKY:  On Mr. Janklow.  In fairness to

13   Mr. Janklow, my understanding is the issue is he has travel

14   plans for tomorrow and the defense subpoenaed him last night.

15   So I just raise that for the Court's consideration.

16        THE COURT:  I haven't had an opportunity to review his

17   motion.  I do have it.  I will be docketing it shortly if it

18   hasn't been docketed already.  I will be prepared to address it

19   at the close of the day today so that there will be a ruling

20   one way or another.

21        Mr. Avenatti, do you have anything to raise?

22        MR. AVENATTI:  Yes, your Honor, briefly.

23        I will wait for this Tabs issue to ripen before I

24   address it.  The bottom line is I haven't had access to the

25   Tabs data.  In order to update the Court, all the days are

M1Q8AVE3

1    running together, but I believe it was on Monday we were

2    dealing with the privilege review team in California, and I

3    again made a demand for the Daniels data, the Tabs data to be

4    produced to me so that I can turn it over to the government,

5    and the U.S. attorney's office in California declined to do

6    that.  So I wanted to update the Court to that.  I don't have

7    access to the Tabs data.  To be clear, to use your Honor's

8    words, it's not in a usable form to me, the Tabs data relating

9    to Ms. Daniels.  So the suggestion that I have had access to

10    that data I don't believe is accurate, but we can deal with

11    those issues when they arise.

12            As to Mr. Janklow, we oppose quashing the subpoena for

13    a myriad of reasons.

14            THE COURT:  Be prepared to address that at the close

15    of the trial day.

16            Anything else that we need to deal with right now?

17            Mr. Avenatti, anything else right now?

18            MR. AVENATTI:  No, your Honor.

19            THE COURT:  Mr. Podolsky, do you have something else?

20            MR. PODOLSKY:  What time would you like us in the

21    courtroom?

22            THE COURT:  I will certainly tell you that.

23            I should also say I think the defense team did provide

24    copies of the exhibits from this morning to someone on my

25    staff.  It just didn't get to me.  I think one example of Ms.

M1Q8AVE3

1    Smallman's absence causing issues.  So I apologize for that and

2    thank you for it.

3              Please be back in the courtroom by 12:15.  We will

4    then get the jury and start promptly thereafter.  The

5    government should have its next witness here and ready to go.

6    Thank you very much.

7              (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1Q8AVE3

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 12:15 p.m. |
| 3 | (Jury not present) |
| 4 | THE COURT:  My clerk is downstairs getting the jury. |
| 5 | Anything that we need to discuss? |
| 6 | MR. ROHRBACH:  Nothing from the government. |
| 7 | THE COURT:  Mr. Avenatti. |
| 8 | MR. AVENATTI:  Nothing, your Honor.  Thank you. |
| 9 | THE COURT:  Can we get the next witness on the stand |
| 10 | and ready to go. |
| 11 | MR. ROHRBACH:  Yes, your Honor. |
| 12 | THE COURT:  Just step up here, sir.  We will be with |
| 13 | you shortly. |
| 14 | One comment for counsel.  I am going to alert the |
| 15 | relevant person directly as well, but I do plan to take up the |
| 16 | matter that we discussed earlier at 3 p.m.  So I am going to |
| 17 | let counsel who is not present know that, and if he wishes to |
| 18 | appear at that time he can. |
| 19 | MR. AVENATTI:  I wanted to make sure the Court had |
| 20 | received that case I passed up. |
| 21 | THE COURT:  I did. |
| 22 | MR. AVENATTI:  Thank you, your Honor. |
| 23 | THE COURT:  I think they are about to arrive. |
| 24 | (Continued on next page) |
| 25 | |

```
 1              (Jury present)
 2              THE COURT:  You may be seated.
 3              Welcome back, ladies and gentlemen.  I hope you
 4    enjoyed your lunch break.  We will pick up where we left off.
 5              Government, please call your next witness.
 6              MR. ROHRBACH:  The government calls Jeremy Rosenman.
 7    JEREMY ROSENMAN,
 8         called as a witness by the government,
 9         having been duly sworn, testified as follows:
10              THE COURT:  Please have a seat.  Since you're in the
11    witness box with the filter you can remove your mask.
12              If you could just make sure the microphone is close, I
13    would say an inch or two away from your mouth.  Just please
14    begin with your name and spell it for the record.
15              THE WITNESS:  Jeremy, J-E-R-E-M-Y, Rosenman,
16    R-O-S-E-N-M-A-N.
17              THE COURT:  Counsel, you may proceed.
18    DIRECT EXAMINATION
19    BY MR. ROHRBACH:
20    Q.  Good afternoon.
21    A.  Goods afternoon.
22    Q.  Where do you work?
23    A.  U.S. Attorney's Office for the Southern District of New
24    York.
25    Q.  What is your title there?
```

1   A.  Special agent.

2   Q.  What are your duties and responsibilities as a special

3   agent at the U.S. Attorney's Office?

4   A.  I investigate violations of federal law, interview

5   witnesses and review records, primarily e-mails, financial

6   records, and other business records.

7   Q.  How long have you worked at the U.S. Attorney's Office?

8   A.  Since August of 2016.

9   Q.  Let's turn to the case we are here for today.

10      What role have you had in preparing for this trial?

11  A.  I assisted in preparing a visual financial summary of

12  certain financial transactions.

13  Q.  What types of documents did you review to create the visual

14  financial summaries and to prepare for your testimony?

15  A.  Primarily bank records, a few e-mails, and some other

16  business records.

17  Q.  Did you have any role in the investigation that led to the

18  charges in this case?

19  A.  No, I did not.

20  Q.  Did you review all the documents and all the evidence

21  collected during the investigation?

22  A.  No.

23          MR. ROHRBACH:  Mr. de Grandpre, can we display for the

24  witness what has been marked for identification as Government

25  Exhibit 101.

1          Would you please now display Government Exhibit 104.

2          Would you now please display Government Exhibit 105.

3          Would you please now display Government Exhibit 106.

4    Q.  Special Agent Rosenman, do you recognize those four

5    exhibits?

6    A.  Yes.

7    Q.  What is your understanding of what they are?

8    A.  They are check request documents from a book publisher

9    requesting that a check be produced and issued to a payee.

10          MR. ROHRBACH:  Your Honor, the government at this time

11   offers Government Exhibits 101, 104, 105 and 106.

12          MR. AVENATTI:  Objection, your Honor.  Foundation and

13   hearsay.

14          THE COURT:  Subject to connection, counsel?

15          MR. ROHRBACH:  Subject to connection.

16          THE COURT:  Admitted subject to connection.

17          Ladies and gentlemen, what that means is that right

18   now the proper foundation has not been laid for these actually

19   to be admitted into evidence.  But as long as that foundation

20   is later laid, they can come into evidence for all purposes,

21   and if and when that happens, I will advise you.  But this

22   enables this witness to testify about the exhibits even though

23   the connection that would confirm their admissibility has not

24   yet been made.  Since a trial can proceed only witness by

25   witness, that is permitted under some circumstances, and I will

1   allow it here.  So subject to connection, these are admitted,

2   and I will let you know if or when that connection is made, and

3   if it's not, I will instruct you that you should not consider

4   these exhibits.

5          (Government's Exhibits 101, 104, 105, 106 received in

6   evidence)

7          MR. ROHRBACH:  Mr. de Grandpre, would you please

8   display for the jury what is already in evidence as Government

9   Exhibit 234.

10  BY MR. ROHRBACH:

11  Q.  Special Agent Rosenman, have you seen this before?

12  A.  Yes.

13  Q.  What is your understanding of what it is?

14  A.  It's an e-mail from Janklow & Nesbit detailing payments

15  that were made to Stormy Daniels and to Michael Avenatti.

16  Q.  Zooming in on the area numbered 1, 2 and 3, what were you

17  asked to do with regard to these payments?

18  A.  To illustrate the path of the money from St. Martin's Press

19  to Janklow & Nesbit and then to their next destination.

20         MR. ROHRBACH:  Mr. de Grandpre, would you please put

21  up for the witness what has been marked for identification as

22  Government Exhibit 701.

23  Q.  Special Agent Rosenman, what is this?

24  A.  This is one of the visual summaries that I assisted in

25  preparing.

1  Q.  Did you participate in making this summary?

2  A.  Yes, I did.

3  Q.  Do you see the list of exhibits at the bottom of this

4  chart?

5  A.  Yes, I do.

6  Q.  In your preparation for your testimony today, did you

7  review these exhibits?

8  A.  Yes.

9  Q.  Are they voluminous?

10  A.  They are.

11  Q.  Is this chart a fair and accurate summary of those

12  exhibits?

13  A.  Yes, it is.

14         MR. ROHRBACH:  The government offers Government

15  Exhibit 701 pursuant to Rule 1006.

16         THE COURT:  Any objection?

17         MR. AVENATTI:  Foundation; hearsay.

18         THE COURT:  Overruled.  Admitted.

19         (Government's Exhibit 701 received in evidence)

20         MR. ROHRBACH:  Mr. de Grandpre, would you please

21  publish this for the jury.

22  Q.  Let's start at a high level.

23         Special Agent Rosenman, what is this document now that

24  the jury can see it?

25  A.  So this is a visual presentation of the payments that we

1    just described moving from St. Martin's Press, and then showing

2    the flow of funds to Janklow & Nesbit, and then to an account

3    for Stormy Daniels at the top you could see, and then Michael

4    Avenatti, and it details each payment after that.

5    Q.  What records were used to make this chart, what categories

6    of records?

7    A.  So the business records, some e-mails, the e-mail that was

8    just discussed, and bank records.

9    Q.  When there are boxes on this chart, what do they mean?

10   A.  So starting from the left, the initial starting point is

11   St. Martin's Press and then the next box is the next

12   destination of the funds.  So it's just a flow of funds moving

13   from left to right.

14   Q.  Directing your attention to the column of boxes on the

15   right, when they contain an X and a number, what does that

16   mean?

17   A.  Those are the last four digits of the bank account number.

18   Q.  When there are arrows on this chart, what do those arrows

19   represent?

20   A.  They indicate the direction of the flow of funds.

21   Q.  When there is an arrow, does it mean that there was only

22   one transaction or multiple transactions?

23   A.  In several instances there were several transactions that

24   underlie that arrow that's a total amount for several

25   transactions.

1    Q.  Can you explain to the jury what you mean by that?

2    A.  Yes.  So there may be two or three transfers that total one

3    of those numbers above an arrow.

4    Q.  I would like to walk through the top row of this slide.

5            Do you see where it says April 2018?

6    A.  Yes.

7    Q.  Do you see the arrow from St. Martin's Press to Janklow &

8    Nesbit Associates?

9    A.  Yes.

10   Q.  What does that arrow mean?

11   A.  It means that there was a $250,000 payment from St.

12   Martin's Press to Janklow & Nesbit Associates.

13   Q.  How do you know that?

14   A.  The check request document that was mentioned earlier as

15   well as the e-mail, internal Janklow e-mail that described how

16   they received the payment and then broke it up and then

17   transferred additional funds on.

18           MR. ROHRBACH:  Mr. de Grandpre, will you leave this up

19   but put Government Exhibit 101 next to it.

20   Q.  You mentioned a check, I believe a check requisition form.

21   Is that the document we are looking at on the right?

22   A.  That's correct.

23   Q.  Directing your attention to the date on the top right

24   corner, what is the date of that form?

25   A.  April 11, 2018.

1    Q.  Directing your attention to the "check payable to" section

2    on the left, who is this check payable to?

3    A.  Janklow & Nesbit Associates.

4    Q.  Directing your attention to the amount, what is the amount?

5    A.  $250,000.

6             MR. ROHRBACH:  Mr. de Grandpre, you can take down

7    Government Exhibit 101, but if you would leave up Government

8    Exhibit 701.

9    Q.  Turning to the top row of this document, do you see the

10   arrows to the right of the box that says Janklow & Nesbit

11   Associates?

12   A.  Yes.

13   Q.  What do those arrows mean?

14   A.  Those indicate the net amounts that were then transferred.

15   In the top arrow, in that instance, $212,500 was transferred to

16   Stormy Entertainment, and the bottom arrow, $6,250 was

17   transferred to Michael Avenatti.

18   Q.  What is $250,000 minus 15 percent?  A little math problem.

19   A.  Say that again.

20   Q.  $250,000, the number to the left of the Janklow & Nesbit

21   Associates, minus 15 percent?

22   A.  It's $212,500.

23   Q.  The number below that, $6,250, is that 2.5 percent of

24   $250,000?

25   A.  Yes, it is.

1          THE COURT:  Sorry?

2          MR. AVENATTI:  Leading, your Honor.

3          THE COURT:  It's just basic math.  I will overrule it.

4          MR. ROHRBACH:  Mr. de Grandpre, would you please pull

5     up Government Exhibit 107.

6     Q.  Special Agent Rosenman, what is the date -- first of all,

7     Special Agent Rosenman, what is this document?

8     A.  This is a wire request detail from Chase Online.

9     Q.  What is the date of this wire?

10    A.  April 11, 2018.

11    Q.  What is the amount of the wire?

12    A.  $212,500.

13    Q.  Directing your attention to the top row, where is this wire

14    directed?

15    A.  Stormy Entertainment, account ending 9205.

16    Q.  Let's put this side by side with Government Exhibit 301B.

17         Special Agent Rosenman, what account is this for on the

18    right?

19    A.  Stormy Entertainment Inc., account ending 9205.

20    Q.  Is that the same account as the recipient of the wire named

21    in Government Exhibit 107?

22    A.  Yes, it is.

23    Q.  Let's turn to page 3 of Government Exhibit 301B.

24         Special Agent Rosenman, what is the entry at the top?

25    A.  That shows a deposit on April 11, 2018 of the wire from

1   Janklow & Nesbit for $212,500.

2   Q.  Just for clarity, is that the same wire described on

3   Government Exhibit 107?

4   A.  Yes.

5          MR. ROHRBACH:  Mr. de Grandpre, would you go back to

6   Government Exhibit 701 for a moment.

7   Q.  Special Agent Rosenman, where is that wire reflected on

8   this chart?

9   A.  It is the arrow with the number $212,500 above it, pointing

10  towards the box that says Stormy Entertainment, account ending

11  9205.

12  Q.  Are those records how you generated the arrow on this

13  chart?

14  A.  Yes.

15         MR. ROHRBACH:  Mr. de Grandpre, would you leave this

16  up, and also next to it please put up Government Exhibit 303A.

17  Q.  Special Agent Rosenman, directing your attention to the top

18  of Government Exhibit 303A, what is the name of this bank

19  account?

20  A.  Michael J. Avenatti, Esq. Attorney Client Trust Account.

21  Q.  While we are looking at this document, what is it?

22  A.  This is a bank opening agreement -- bank account opening

23  agreement.

24         MR. ROHRBACH:  Mr. de Grandpre, if you would scroll

25  down to the bottom of page 2.

1    Q.  Who is an authorized signer on this page?

2    A.  Michael J. Avenatti.

3            MR. ROHRBACH:  Mr. de Grandpre, would you scroll down

4    to the top of page 3.

5    Q.  Who is another authorized signer of this account?

6    A.  Judy K. Regnier.

7    Q.  What is the last four digits of this account number?

8    A.  3512.

9            MR. ROHRBACH:  Now, Mr. de Grandpre, if you would

10   scroll to page 21 of Government Exhibit 301A.

11           Would you zoom in on the top row, the top two rows of

12   the spreadsheet.

13   Q.  Special Agent Rosenman, what is this we are looking at?

14   A.  This is a summary as part of the bank records that shows

15   the incoming wires into this account.

16   Q.  Directing your attention to the third column from the right

17   where it says "tran date," what does that mean?

18   A.  Transaction date.

19   Q.  What is the date in the first row?

20   A.  May 10, 2018.

21   Q.  Where is that wire from?

22   A.  Janklow & Nesbit Associates.

23   Q.  Who is it to?

24   A.  Michael Avenatti, Esq.

25   Q.  What is the amount of that?

1    A.  $6,250.

2    Q.  Now, looking back at Government Exhibit 701 on the left, is

3    that wire reflected on Government Exhibit 701?

4    A.  Yes.

5    Q.  Can you describe for the jury where?

6    A.  Following line number 1, to the right you will see a $6,250

7    listed above an arrow, and then pointing to the box that says

8    Michael Avenatti X3512.

9            MR. ROHRBACH:  Mr. de Grandpre, you can leave up 701

10   and take down the other exhibit, please.

11   Q.  Let's now talk about the second row here.

12       Do you see where it says August 2018?

13   A.  Yes.

14   Q.  What does the arrow to the right of the box that says "St.

15   Martin's Press" mean?

16   A.  It indicates another payment from St. Martin's Press to

17   Janklow & Nesbit for $175,000.

18   Q.  Do you see the arrows to the right of the Janklow & Nesbit

19   Associates box?

20   A.  Yes.

21   Q.  What do those arrows mean?

22   A.  Those indicate the net payment from that initial payment

23   and how they were directed to two additional accounts.

24   Q.  Can you please describe for the jury what those additional

25   accounts were and how much the net payments were?

M1Q8AVE3                        Rosenman - Direct

1    A.  $148,750 was wired to Avenatti & Associates' trust account,

2    account ending in 4779, and $4,375 was wired to Michael

3    Avenatti's account ending in 3512.

4    Q.  What are those arrows based on?

5    A.  Bank records as well.

6            MR. ROHRBACH:  Mr. de Grandpre, would you leave this

7    up and please pull up next to it Government Exhibit 302E.

8            Would you please turn to page 24 of this exhibit.

9            First, Mr. de Grandpre, if you would magnify the top

10   right of this page.

11       If you would move that over so you can still see.

12           Thank you.

13   Q.  Special Agent Rosenman, what are the last four digits of

14   this account number.

15   A.  4779.

16           MR. ROHRBACH:  Mr. de Grandpre, if you would remove

17   the box.

18   Q.  Special Agent Rosenman, what is the name of this account?

19   A.  State Bar of California, Avenatti & Associates Professional

20   Corporation Attorney Client Trust Account.

21   Q.  I would like to ask you a few questions about this account

22   before we get into the record in particular.

23           What period of financial statements did you review for

24   this account?

25   A.  From the account opening in mid-March to about November 1,

1    when the balance in the account was zero dollars.

2    Q.  What were the sources of funds into this account?

3    A.  Either, generally, transfers from other accounts controlled

4    by Mr. Avenatti, interest payments, and deposits from

5    CrowdJustice.

6    Q.  Over the time period that you reviewed, approximately how

7    much money was deposited by CrowdJustice?

8    A.  Approximately $580,000.

9    Q.  So now focusing again on Government Exhibit 302, page 24.

10            MR. ROHRBACH:  Mr. de Grandpre, would you magnify the

11   area that says "five deposits/credits."

12   Q.  First, Special Agent Rosenman, do you see the first entry

13   there?

14   A.  Yes.

15   Q.  What is that?

16   A.  It's a $671.85 deposit from CrowdJustice.

17   Q.  Is that the site you just mentioned?

18   A.  Yes.

19            MR. ROHRBACH:  Mr. de Grandpre, would you please

20   reduce that box.

21            You can just take the box down.

22            Would you scroll to page 28, I think.

23            It's page 24.

24            Your Honor, just a technical issue.  We are switching

25   to the elmo.

1              THE COURT:  All right.

2              MR. ROHRBACH:  Mr. de Grandpre, you can take down

3   Government Exhibit 302 and just leave up 701 there.

4   Q.  Special Agent Rosenman, looking now at the second row here.

5   A.  Yes.

6   Q.  What is that row?

7   A.  The second row of the deposits you mean?

8   Q.  Yes.

9   A.  It shows a deposit on August 1, 2018 of $125,000 from

10  Janklow & Nesbit Associates.

11  Q.  What is the next row?

12  A.  A deposit on August 3, 2018 for $23,750, also from Janklow

13  & Nesbit.

14             THE COURT:  Counsel, can you just clarify what exhibit

15  we are looking at now.

16             MR. ROHRBACH:  This is the same exhibit, 302E.  It

17  should be page 24.

18             THE COURT:  Thank you.

19  Q.  Special Agent Rosenman, I think I just asked you, but to

20  make sure the jury heard it, would you tell the jury what the

21  third row of this section ask?

22  A.  Yes.  It's a deposit on August 3, 2018 for $23,750 from

23  Janklow & Nesbit.

24  Q.  What is the sum of those two wires from Janklow & Nesbit?

25  A.  $148,750.

M1Q8AVE3                        Rosenman - Direct

1    Q.  I would like to go back now to Government Exhibit 701.

2              Are those two wires reflected on this chart?

3    A.  Yes.

4    Q.  Where?

5    A.  The total above the arrow pointing to the last box on the

6    right that says Avenatti & Associates Trust Account, $148,750.

7    Q.  One more question while we are here.

8              Directing your attention to the Stormy Entertainment

9    account ending in 9205, in the top right corner, what was the

10   last bank record for that account that you reviewed?

11   A.  February of 2019.

12   Q.  Was that account open or closed at the time?

13   A.  It was open.

14   Q.  So based on your review of bank records, was the 9205

15   account opened in August of 2019?

16   A.  Yes.

17             MR. ROHRBACH:  So, Mr. de Grandpre, would you leave up

18   Government Exhibit 701 and please pull up on the other side

19   Government Exhibit 303A, page 1.

20   Q.  Special Agent Rosenman, would you tell the jury the name of

21   this account?

22   A.  Michael J. Avenatti, Esq. Attorney Client Trust Account.

23   Q.  What are the last four digits of this account?

24   A.  3512.

25   Q.  Would you remind the jury where this account appears on

1    your chart?

2    A.  Yes.  If we are looking at the second payment in August

3    2018, and you follow that to the right, you will see a blue box

4    that says Michael Avenatti X3512, that box represents this

5    account.

6    Q.  Let's go to page 21 of this exhibit.

7         MR. ROHRBACH:  Mr. de Grandpre, would you please

8    magnify the box.

9    Q.  Special Agent Rosenman, would you remind the jury what this

10   box is?

11   A.  This is a summary of wires into this account.

12   Q.  I would like to direct your attention to the seventh row,

13   which is dated September 5, 2018.  Is that correct?

14   A.  Yes.

15        MR. ROHRBACH:  Mr. de Grandpre, is there a way you can

16   magnify on that one row.

17   Q.  What does this row reflect?

18   A.  An incoming wire.

19   Q.  Who is the wire from?

20   A.  Geragos & Geragos APC.

21   Q.  For how much money is that wire?

22   A.  $250,000.

23   Q.  Just to be clear, what is the date that this wire was

24   received?

25   A.  September 5, 2018.

M1Q8AVE3                           Rosenman - Direct

1   Q.   Looking over at the Government Exhibit 701, where in the
2   timeline of Government Exhibit 701 does this wire fall?
3   A.   It's between the second and third payments, between August
4   2018 and September 2018.
5        MR. ROHRBACH:   Mr. de Grandpre, if you would please
6   scroll down to the top of page 22 of Government Exhibit 301.
7        Would you magnify the check on the top left-hand
8   corner.
9   Q.   Special Agent Rosenman, what is this?
10  A.   It's a cashier's check.
11  Q.   What is the date of the cashier's check?
12  A.   September 5, 2018.
13  Q.   Is it the same date as the wire we just looked at?
14  A.   Yes, it is.
15  Q.   Who is the recipient of this cashier's check?
16  A.   Stormy Entertainment.
17  Q.   How much money is this check for?
18  A.   $148,750.
19  Q.   Now, looking back at Government Exhibit 701, is that the
20  same amount of money as the net amount of money that went into
21  the Avenatti & Associates trust account in line 2?
22  A.   Yes, it is.
23       MR. ROHRBACH:   On Government Exhibit 303A, Mr. de
24  Grandpre, would you turn to page 19 and magnify the daily
25  balances section.

1    Q.  On this statement, what was the balance of the account at

2    the beginning of the month that this check was purchased?

3    A.  $585.05.

4    Q.  Did you identify any other deposits into the account this

5    month that were at least $148,000?

6    A.  No.

7    Q.  So without that wire, could this account have purchased the

8    check we just saw?

9    A.  No.

10          MR. AVENATTI:  Objection.  Speculation.

11          THE COURT:  Overruled.

12          MR. ROHRBACH:  Thank you, Mr. de Grandpre.  You can

13   take down Government Exhibit 303A, but please leave up

14   Government Exhibit 701.

15          Your Honor, my understanding is the record may not be

16   clear because of the objection.  So if I may repeat the last

17   question to Special Agent Rosenman.

18   Q.  Could the bank account we just looked at have purchased the

19   cashier's check without having received the wire that we looked

20   at?

21   A.  No.

22   Q.  So now, directing your attention to the third row here.

23          The arrow to the right of St. Martin's Press, what

24   does that mean?

25   A.  Again, it's a payment showing from St. Martin's Press to

1    Janklow & Nesbit for $175,000.

2    Q.  Do you see the arrows to the right of the Janklow & Nesbit

3    Associates box?

4    A.  Yes.

5    Q.  What do they mean?

6    A.  That shows the flow of funds from Janklow & Nesbit, the net

7    amounts that were broken up between Avenatti & Associates trust

8    account 4779, and the Michael Avenatti account ending in 3512.

9         MR. ROHRBACH:  I would like to briefly put up one more

10   page from Government Exhibit 302E.

11        Your Honor, this is Government Exhibit 302E, page 30.

12   Q.  First, at the top, Special Agent Rosenman, would you remind

13   the jury of the last four digits of this account?

14   A.  4779.

15   Q.  Then, directing your attention down to the deposit section

16   and to the fourth row, what is the fourth deposit?

17   A.  It shows a deposit on September 17, 2018 of $148,750 from

18   Janklow & Nesbit.

19        MR. ROHRBACH:  You can take down Government Exhibit

20   302 here.

21        We will go back to Government Exhibit 701.

22   Q.  Directing your attention to the fourth row and to the arrow

23   to the right of St. Martin's Press, what does that arrow?

24   A.  That's another payment of $200,000 to Janklow & Nesbit

25   Associates.

M1Q8AVE3                    Rosenman - Direct

1    Q.  Do you see the arrows to the right of the Janklow & Nesbit

2    Associates box?

3    A.  Yes.

4    Q.  What do they mean?

5    A.  Those are the additional -- the further flow of funds, the

6    net amounts that then flowed from Janklow & Nesbit to Stormy

7    Entertainment, account ending in 7417, and Avenatti LLP,

8    account ending 8611.

9    Q.  What were those amounts?

10   A.  To Stormy Entertainment, the amount was $170,000; and to

11   Avenatti LLP, the amount was $5,000.

12   Q.  Just to be clear, for this transaction, no money was sent

13   from Janklow & Nesbit Associates to the 4779 Avenatti

14   Associates account, is that correct?

15   A.  That's correct.

16            MR. ROHRBACH:  At this point, I would like to read a

17   stipulation between the parties into the record, your Honor.

18            THE COURT:  What is the number, please?

19            MR. ROHRBACH:  Government Exhibit S3.

20            THE COURT:  All right.  You may proceed.

21            MR. ROHRBACH:  Would you please put up for counsel and

22   the Court Government Exhibit S3.

23            It is hereby stipulated by the parties that:

24            On April 11, 2018, at approximately 1:06 p.m., a

25   representative of Janklow & Nesbit Associates ("Janklow &

1    Nesbit") sent an interstate wire from Janklow & Nesbit's bank

2    account, with an account number ending in 0570, in the amount

3    of $212,500, from New York, New York, to a bank account

4    entitled Stormy Entertainment, with an account number ending in

5    0570 in California.

6            Your Honor, I will offer Government Exhibit S3 so that

7    the jury may see it while I read it.

8            THE COURT:  Admitted.

9            (Government's Exhibit S3 received in evidence)

10           MR. ROHRBACH:  2.  On August 1, 2018, at approximately

11   12:45 p.m. Eastern Time, a representative of Janklow & Nesbit

12   sent an interstate wire from Janklow & Nesbit's bank account,

13   with an account number ending in 0570, in the amount of

14   $125,000, from New York, New York, to a bank account entitled

15   Avenatti & Associates Attorney Client Trust Account, with an

16   account number ending in 4779, in California.

17           3.  On August 3, 2018, at approximately 1:49 p.m.

18   Eastern Time, a representative of Janklow & Nesbit sent an

19   interstate wire from Janklow & Nesbit's bank account, with an

20   account number ending in 0570, in the amount of $23,750, from

21   New York, New York to a bank account entitled Avenatti &

22   Associates Attorney Client Trust Account, with an account

23   number ending in 4779, in California.

24           4.  On September 17, 2018, at approximately 11:45 a.m.

25   Eastern Time, a representative of Janklow & Nesbit sent an

1    interstate wire from Janklow & Nesbit's bank account, with an

2    account number ending in 0570, in the amount of $148,750, from

3    New York, New York to a bank account entitled Avenatti &

4    Associates Attorney Client Trust Account, with an account

5    number ending in 4779, in California.

6            5.  On February 22, 2019, a representative of Janklow

7    & Nesbit sent an interstate wire from Janklow & Nesbit's bank

8    account in the amount of $170,000, from New York, New York to a

9    bank account entitled Stormy Entertainment Inc., with an

10   account number ending in 7417, in Texas.

11           It's further stipulated that this stipulation marked

12   as Government Exhibit S3 may be received in evidence at trial.

13           THE COURT:  Thank you.

14           MR. ROHRBACH:  So shifting gears, Mr. de Grandpre,

15   would you please put up for the witness what has been marked

16   for identification as Government Exhibit 702.

17   BY MR. ROHRBACH:

18   Q.  Special Agent Rosenman, what is this?

19   A.  This is a continuation of the flow of funds for the second

20   payment in August of 2018.

21   Q.  What kind of document is this?

22   A.  It just summarizes the transactions.

23   Q.  Did you participate in making this summary?

24   A.  Yes, I did.

25   Q.  Do you see the list of exhibits at the bottom of this

1    chart?

2    A.  Yes.

3    Q.  In preparation for your testimony today, did you review the

4    exhibits referenced here?

5    A.  I did.

6    Q.  Are they voluminous?

7    A.  They are.

8    Q.  Is this chart a fair and accurate summary of those

9    exhibits?

10   A.  Yes.

11           MR. ROHRBACH:  The government offers Government

12   Exhibit 702 pursuant to Rule 1006.

13           MR. AVENATTI:  Objection.  Foundation; hearsay.

14           THE COURT:  Overruled.  Admitted.

15           (Government's Exhibit 702 received in evidence)

16           MR. ROHRBACH:  Mr. de Grandpre, would you please

17   display this for the jury.

18   Q.  Directing your attention, Special Agent Rosenman, to the

19   top right, what do the dates there mean?

20   A.  This is the period of time that the summary represents.

21   Q.  When you say that, what do you mean that is the period of

22   time that the summary represents?

23   A.  So the transactions detailed on the summary occurred

24   between this period of August 1, 2018 and September 12, 2018.

25   Q.  Why did you review those dates?

1   A.  That's from when the payment was received, and then

2   September 12 is when the funds from that deposit appear to be

3   exhausted.

4   Q.  When you see boxes or circles on this chart, what does that

5   mean?

6   A.  That's the accounts or the total of amounts that were

7   either transferred or either being deposited or withdrawn from

8   these accounts.

9   Q.  When you see an X with a number inside one of those

10  circles, what does that indicate?

11  A.  That's the last four digits of the account that was

12  receiving funds.

13  Q.  When there are arrows on this chart, how many transactions

14  do they represent?

15  A.  It could be many or it could just be one.

16  Q.  Special Agent Rosenman, first, do you see the arrow to the

17  right of the Janklow & Nesbit Associates circle?

18  A.  Yes.

19  Q.  What does that mean?

20  A.  That shows the direction of funds from Janklow & Nesbit to

21  Avenatti & Associates trust account ending in 4779.

22  Q.  How much money moved into that account?

23  A.  $148,750.

24  Q.  Is that one of the payments we were just discussing on

25  Government Exhibit 701?

M1Q8AVE3                      Rosenman - Direct

1    A.  Yes, it was payment number two.

2    Q.  What does the blue box below the circle that says X4779

3    indicate?

4    A.  That indicates other deposits that were made into that

5    account during this time period.

6    Q.  Approximately how much money was deposited into the 4779

7    account during the time period you looked at?

8    A.  $34,970.

9    Q.  Approximately what was the starting balance of the 4779

10   account at the beginning of the time period we are talking

11   about?

12   A.  Approximately $1200.

13   Q.  Approximately what was the balance at the end of that

14   period we are talking about?

15   A.  About $500.

16   Q.  What does that tell you about what happened to the money in

17   the 4779 account?

18            MR. AVENATTI:  Objection, your Honor.

19            THE COURT:  Overruled.

20   A.  That the funds that were deposited into the account were

21   used or withdrawn from the account.

22   Q.  What do the arrows to the right of the Avenatti &

23   Associates account show?

24   A.  The further flow of the funds from the account ending in

25   4779 and then the next destination.

1   Q.  How did you generate these numbers?

2   A.  By looking at the bank records for all of these accounts.

3   Q.  Do these numbers on the right total up to $148,750, the

4   number on the left?

5   A.  No, they don't.

6   Q.  Why not?

7   A.  Because it has to take into account the starting balance as

8   well as the other amounts in.  All of that money was mixed

9   together and then withdrawn at different times, so it's not an

10  exact total of the 148,750.

11  Q.  Let's first talk about the blue box on the top right.

12      What does that indicate?

13  A.  That is payments to various security vendors.

14  Q.  How much money was paid to various security vendors out of

15  this account in the time period you looked at?

16  A.  $63,719.

17  Q.  Now, directing your attention to the three circles below

18  that, have you reviewed bank statements for each of those

19  entities?

20  A.  Yes.

21  Q.  Who are the authorized signers for those entities?

22  A.  For all three Michael Avenatti was, and in some instances

23  Judy Regnier was as well.

24  Q.  Let's focus on one example.

25          MR. ROHRBACH:  Mr. de Grandpre, would you leave this

M1Q8AVE3                      Rosenman - Direct

1    up and please pull up Government Exhibit 302G.

2              Would you please turn to page 7 of this exhibit.

3    Q.  Special Agent Rosenman, what is this that we are looking

4    at?

5    A.  This is a bank signature card.

6    Q.  What is a signature card?

7    A.  It is a way a bank memorializes an account holder's

8    signature and that gives them access to the account.

9    Q.  What is the name of this account?

10   A.  Passport 420 LLC.

11   Q.  Who are the authorized signers of this account?

12   A.  Michael J. Avenatti and Judy K. Regnier.

13             MR. ROHRBACH:  Mr. de Grandpre, would you please turn

14   to page 1 of Government Exhibit 302G.

15             Would you please zoom in on the section called

16   "deposits."

17   Q.  Special Agent Rosenman, directing your attention -- first

18   of all, what is this section we are looking at here?

19   A.  These are deposits that were made into this account.

20   Q.  Directing your attention to the third line, what is that?

21   A.  It's a deposit of $3,000 on August 20, 2018.

22   Q.  What account is it from?

23   A.  The account ending in 4779.

24             (Continued on next page)

25

1    BY MR. ROHRBACH:

2    Q.   How do you know that?

3    A.   On the statements for the account ending in 4779 it listed

4    this account as the recipient of the wire.

5            MR. ROHRBACH:  All right.  Mr. de Grandpre, you can

6    take this section down.

7    Q.   Is that wire indicated on Government Exhibit 702, to the

8    left?

9    A.   Yes.

10   Q.   Can you please tell the jury where?

11   A.   The third circle down on the right, that shows that $3,000

12   above the arrow and pointing toward Passport 420 LLC.

13           MR. ROHRBACH:  All right.  Mr. de Grandpre, on page 1

14   on Government Exhibit 302G, would you please magnify the

15   section called charges debits.

16   Q.   Special Agent Rosenman, what is this section?

17   A.   These are debits from the account during this month.

18   Q.   Directing your attention -- let's just take a few examples.

19   Directing your attention to the $25 charge on August 10, what

20   is that for?

21   A.   A barber shop, Ferg's Barber Shop.

22           MR. ROHRBACH:  Mr. de Grandpre, would you please

23   scroll to page 2 of this -- I'm sorry.  Page 3.  And can we

24   magnify the expenses section again.

25   Q.   Special Agent Rosenman, on August 23, the first charge,

1   what is that for?

2   A.  $275.18 for Porter House Bar and.

3   Q.  And direction your attention to the last expense on August

4   28 for $99, what is that expense for?

5   A.  For 99.99 to SiriusXM.com.

6           MR. ROHRBACH:  All right.  Let's look at one other

7   account on this chart.  Mr. de Grandpre, if you could leave up

8   Government Exhibit 702 and please put up Government Exhibit

9   302C.

10  Q.  Special Agent Rosenman, what is the name of this account?

11  A.  Avenatti & Associates Professional Corp.

12  Q.  And what are the last four digits of the account number?

13  A.  0661.

14  Q.  Does it appear on -- does this account appear on Government

15  Exhibit 702?

16  A.  Yes, it does.  It's the second circle down from the right.

17  Q.  And what is the starting balance -- sorry.

18      What is the date of this statement, first?  Directing your

19  attention to the top right.

20  A.  The statement date is August 31, 2018.

21  Q.  So what period does it cover?

22  A.  The month of August.

23  Q.  Directing your attention to the previous balance, what's

24  the previous balance?

25  A.  It's a negative $1,143.32.

M1qWave4                        Rosenman - Direct

                   MR. ROHRBACH:  All right.  And let's look at just a
      few of the expenses from this account as well.
Q.    Let's turn to page 3, and looking at the section called
      charges and debits, what is the first expense here?
A.    This is a $4,000 wire out on August 1, 2018, to Mareli
      Miniutti.
                   MR. ROHRBACH:  All right.  And if you would please now
      scroll to the next page, Mr. de Grandpre.  And zooming in on
      the payments -- the charges on August 7.
Q.    What is the expense on August 7 for $1,028?
A.    It says Boardman.  Oh, Best Buy.  I'm sorry.
                   MR. ROHRBACH:  Thank you, Mr. de Grandpre.  You can
      put that down.
                   Turning now to page 6 of this document and zooming in
      on -- actually, you can just scroll to page 7 of the document.
      Zooming in on the expenses on August 28.
Q.    What is the expense for $129.28?
A.    Lego Imagination Center.
                   MR. ROHRBACH:  And now, Mr. de Grandpre, would you
      turn to page 13.
                   THE COURT:  Mr. Rohrbach, these are in evidence.
      You'll have an opportunity to argue later about them.  I'd ask
      you to move on as well.
                   MR. ROHRBACH:  Your Honor, I have only one more
      expense here, and then I'll move on.

1           THE COURT:  All right.  One more.

2           MR. ROHRBACH:  Thank you.

3           On 9/7, would you please highlight the expenses.

4  Q.  And Special Agent Rosenman, the third expense here, what is

5  that?

6  A.  $1,900 to Geoffrey Johnson.

7           MR. ROHRBACH:  Moving on.  Mr. de Grandpre, would you

8  please turn to page 16 of this document.

9  Q.  And directing your attention to the section called daily

10 balances, what does this section mean?

11 A.  This was the ending balance on each day that a transaction

12 occurred in the account.

13 Q.  What was the account ending balance on the last day of the

14 period that you looked at?

15 A.  It's -- it was $6,093.07.

16          MR. ROHRBACH:  You can take down Government Exhibit

17 302C and go back to just Government Exhibit 702.

18 Q.  Special Agent Rosenman, how much money went from the 4779

19 account to the 0661 account during the period that you looked

20 at?

21 A.  $89,400.

22 Q.  What does the account ending balance at the period you

23 looked at tell you about what happened to the $89,400?

24 A.  That it had been spent or withdrawn.

25 Q.  For the three accounts on the right of this line, the 0661

1    account, the 9257 account, and the 5487 account, during the

2    time period you looked at, how many wire transfers did you see

3    from those three accounts to any accounts named Stormy

4    Entertainment?

5    A.    None.

6    Q.    How many wire transfers from those accounts to any

7    individual account named Stephanie Clifford?

8    A.    None.

9    Q.    And how many individual or account names Stormy Daniels?

10   A.    I didn't see any.

11          MR. ROHRBACH:    All right.    Let's now turn to page 2 of

12   Government Exhibit 702.    First, Mr. de Grandpre, if we could

13   scroll up a little bit just so we can see the dates.

14          Thank you.

15   Q.    Special Agent Rosenman, directing your attention to the top

16   right corner, what are those dates?

17   A.    This is, again, the time period that the chart covers, the

18   summary period, September 17, 2018, through October 2, 2018.

19   Q.    And why did you pick those dates?

20   A.    That's when the initial payment is received, and then at --

21   the ending period is when the funds appear to be exhausted.

22   Q.    And how many weeks is that?

23   A.    About two.

24   Q.    All right.    And again, if there are arrows on this chart,

25   does it reflect one payment or multiple payments?

1    A.  It could be multiple payments.

2    Q.  Special Agent Rosenman, do you see the arrow to the right

3    of the Janklow & Nesbit Associates circle?

4    A.  Yes.

5    Q.  What does that mean?

6    A.  That is the payment for $148,750 to Avenatti & Associates

7    Trust account ending in 4779.

8    Q.  Is that one of the payments we discussed earlier?

9    A.  Yes.

10   Q.  Which one?

11   A.  The third payment.

12   Q.  Do you see the arrow to the right of that circle, directed

13   toward the circle that says Eagan Avenatti Trust account 4613?

14   A.  Yes.

15   Q.  What does that arrow mean?

16   A.  That that money was then transferred to that account ending

17   in 4613.

18   Q.  I'd like to focus on the Eagan Avenatti 4613 account.  Who

19   are the authorized signers for that account?

20   A.  Mr. Avenatti and Judy Regnier.

21          MR. ROHRBACH:  All right.  Let's actually look at that

22   record.

23          Mr. de Grandpre, would you mind pulling up next to

24   this Government Exhibit 302D.  And let's turn to the section

25   called deposits.

1   Q.  The second-to-last row of the deposits here, what is that

2   row?

3   A.  On September 28, there's a $50,000 transfer.

4   Q.  What account is that transferred from?

5   A.  The account ending in 4779.

6   Q.  And how can you tell that?

7   A.  If -- in the description, it says transfer from DDA 4779.

8   Q.  And were there other transfers from the 4779 account to

9   this account during the period that you looked at?

10              MR. AVENATTI:  Leading.

11              THE COURT:  Sustained.

12              MR. ROHRBACH:  Sorry, your Honor.  I'll move along.

13   Q.  Did you review the balances of this account at the

14   beginning and end of the time period?

15   A.  Yes.

16   Q.  At the end of the time period you looked at, was the

17   balance -- account balance higher or lower than at the

18   beginning?

19   A.  Lower.

20   Q.  And what does that mean?

21   A.  That the funds that had been deposited during the review

22   period were used or spent.

23              MR. ROHRBACH:  All right.  So let's now look back at

24   Government Exhibit 702.

25   Q.  The arrow going into the 4779 account, how did you generate

1    the number?

2              MR. ROHRBACH:  Sorry.  This is the wrong account.

3              Would you please turn to page 2 of this exhibit, Mr.

4    de Grandpre.

5    Q.  The arrow there going into the 4613 account from the 779

6    account, how did you generate that?

7    A.  By adding together the transfers.

8    Q.  And what is the blue box below the 4613 account?

9    A.  That represents other deposits into the account ending in

10   4613 from sources other than account 4779.

11   Q.  And what was the total of that?

12   A.  $19,678.

13   Q.  Just to be clear, in the time period we're discussing, the

14   4613 account got $19,678 from other locations and $148,750 from

15   the 4779 account?

16   A.  Yes.

17             MR. ROHRBACH:  All right.  Mr. de Grandpre, you can

18   take down the remainder -- sorry.  No.

19   Q.  Directing your attention now to the right of the 4613 box,

20   what do those arrows show?

21   A.  Then how the money moved from account ending 4613 to other

22   accounts or was spent in the case of the box at the bottom.

23   Q.  Do those arrows reflect all of the transfers out of the

24   account during the time period you looked at?

25   A.  Yes.

M1qWave4                              Rosenman - Direct

1    Q.  Let's first talk about the box at the bottom.  What is this

2    box?

3    A.  This box is -- it shows the other disbursements from this

4    account other than the transfers to the three accounts above

5    it.

6         MR. ROHRBACH:  Mr. de Grandpre, if you would magnify

7    that box.

8    Q.  And Special Agent Rosenman, if you could just give a couple

9    examples of that.  For example, how much was wired to the

10   DeAmda Law Firm?

11   A.  $5,000.

12   Q.  And how much to Geoffrey Johnson?

13   A.  $1,900.

14   Q.  Are there any payments here to Stormy Entertainment?

15   A.  No.

16   Q.  Are there any payments to Stephanie Clifford or Stormy

17   Daniels?

18   A.  No.

19        MR. ROHRBACH:  All right.  We can go back to

20   Government Exhibit 702.

21   Q.  For the three circles at the top, who are the authorized

22   signers for those accounts?

23   A.  For all three, it's Michael Avenatti, and in some instances

24   it's Judy Regnier.

25   Q.  Let's start at the top one.  How much money went from the

1    4613 account to the 0661 account?

2    A.  $70,500.

3    Q.  And what does the dotted arrow to the right mean?

4    A.  It's just a little bridge that will connect the next

5    illustration.

6            MR. ROHRBACH:  All right.  Mr. de Grandpre, could you

7    leave this up and put up next to it Government Exhibit 702,

8    page 3.

9    Q.  Sir, would you explain to the jury what you meant by a

10   bridge from that page to the next page?

11   A.  Sure.  If you follow the letter A from the page on the left

12   to the page on the right, that's just showing the continuation

13   of the flow of funds for that particular account.

14   Q.  So the seven -- on the page on the right, the $70,500, is

15   that the same $70,500 from the page on the left?

16   A.  Correct.

17   Q.  OK.  Approximately how much other money was deposited into

18   the 0661 account during the time period we're discussing?

19   A.  I don't recall the other amounts that were deposited.

20   Q.  Would looking at the bank statement refresh your

21   recollection?

22   A.  Yes.

23           MR. ROHRBACH:  All right.  Mr. de Grandpre, would you

24   take these down and display just for the witness Government

25   Exhibit 302C, page 11, I think.

1      THE WITNESS:  Could you repeat the question?

2  Q.  The question was, but I should take this down before you

3  answer it.  The question is how much other money was deposited

4  into this account during the time period we're discussing?

5  A.  $50.

6      MR. ROHRBACH:  Actually, thank you, Special Agent

7  Rosenman.

8      You can take this down, Mr. de Grandpre, and please

9  put up the same two pages from Government Exhibit 702, please,

10  pages 2 and 3.

11  Q.  While Mr. de Grandpre does that, just to make sure the jury

12  heard your answer, Special Agent Rosenman, approximately how

13  much money was put into --

14      MR. AVENATTI:  Objection, your Honor.

15      THE COURT:  Sustained.

16      MR. ROHRBACH:  All right.

17  Q.  So, Special Agent Rosenman, what is the line to the right

18  of the circle that says 0661 on the right page?

19  A.  This shows, this shows the expenses from that account in

20  general categories.

21  Q.  And what is the total of those expenses?

22  A.  $69,336.

23      MR. ROHRBACH:  Mr. de Grandpre, would you please

24  magnify that box.

25  Q.  Let's just take one example -- two examples, the check

1  payment to auto payment, how much money is that?

2  A.  $3,927.52.

3  Q.  And the next line, what does that reflect?

4  A.  A check payment to James Cameron for $5,600.

5  Q.  Are there any payments that you found to Stormy

6  Entertainment from this account during this period?

7  A.  No.

8  Q.  Did you find any payments to Stephanie Clifford or Stormy

9  Daniels?

10  A.  No.

11          MR. ROHRBACH:  Mr. de Grandpre, you can take the

12  magnification down.  Thank you.

13  Q.  All right.  Let's look back at page 2 on the left.  Do you

14  see the circle that says 0321?

15  A.  Yes.

16  Q.  How much money was transferred into that account?

17  A.  $56,000.

18  Q.  And where, if anywhere, is that account reflected on the

19  page on the right?

20  A.  It's next to the letter B.

21  Q.  Did you review the bank records for that account?

22  A.  I did.

23  Q.  How was the money spent from that account?

24  A.  It was spent on payroll.

25  Q.  How could you tell that?

1    A.  The account name itself on the statement says payroll and

2    as well the checks that were issued from it said that they were

3    issued by Paychex, which is a payroll processer.

4            MR. ROHRBACH:  Mr. de Grandpre, would you please take

5    these down and pull up Government Exhibit 302B, and would you

6    please turn to page 9.

7    Q.  Directing your attention first to the deposit -- actually,

8    directing your attention first to the top section, what account

9    is this?

10   A.  This is the account ending in 0321.

11   Q.  And directing your attention to the name of the account,

12   what's the name of this account?

13   A.  Eagan Avenatti LLP debtor in possession payroll account.

14   Q.  Now directing your attention to the deposit section --

15   A.  Yes.

16   Q.  -- do you see -- what are the last two deposits in this

17   section?

18   A.  There's a 6,000 deposit -- $6,000 deposit on September 17,

19   2018, and a $50,000 deposit on September 28, 2018.

20   Q.  And which account did those come from?

21   A.  The 0661 account.

22   Q.  And looking down to the, now to the checks processed

23   section --

24   A.  Yes.

25   Q.  -- you -- I believe earlier you mentioned payroll checks.

1    Are these the checks you were just discussing?

2    A.   Yes.

3    Q.   Do these reflect the checks you were just discussing?

4    A.   That's correct.

5          MR. ROHRBACH:   Mr. de Grandpre, if you would move the

6    box upward.   Thank you.

7    Q.   You just testified that the money was transferred into this

8    account on September 17?

9    A.   Yes.

10   Q.   What, if any, checks were processed on that date?

11   A.   There were several.

12   Q.   And you testified that some money was transferred to this

13   account on September 28.   What, if any, checks were processed

14   on that date?

15   A.   There were six checks processed on that date.

16         MR. ROHRBACH:   All right.   Mr. de Grandpre, if you

17   would remove that box and magnify the charges section.

18   Q.   What is the first charge there?

19   A.   It's an insufficient fee charge.

20   Q.   What does that mean?

21   A.   That there were not enough funds in the account.

22   Q.   And pausing here, was this the only time in your review of

23   the bank records that you found that one of Mr. Avenatti's

24   accounts had been charged for insufficient funds?

25   A.   No.

1          MR. ROHRBACH:  All right.  And now let's, on this

2     account, if you don't mind repeating the magnification, Mr. de

3     Grandpre, and turning to page 19.

4     Q.  I think I'll just ask you, Special Agent Rosenman, rather

5     than, because we're having this technical issue, do you recall

6     what the daily balance of this account was after the period

7     that you looked at, after the period that you were focused on?

8     A.  The -- at the end of the period?

9     Q.  Yes.

10    A.  No, I don't recall the exact daily balance.

11         THE COURT:  Just slow down, Special Agent, to make

12    sure the court reporter can get down what you're saying.

13         MR. ROHRBACH:  I'm sorry.  Let's just go back to

14    Government Exhibit 702, pages 2 and 3.

15    Q.  See the last circle, the Eagan Avenatti 0313 account?

16    A.  Yes.

17    Q.  How much money moved into that account from the 4613

18    account?

19    A.  $13,000.

20    Q.  And does that money appear on the chart on the right?

21    A.  Yes.

22    Q.  Can you direct the jurors' attention to where?

23    A.  Next to the letter C.

24    Q.  Did you review the bank records for this account?

25    A.  Yes, I did.

1   Q.   How much money was in this account at the end of the time

2   period you looked at?

3   A.   $40.

4   Q.   And what happened after the money was transferred into this

5   account?

6   A.   It was withdrawn.

7   Q.   And what was it spent on?

8   A.   On -- as it shows in the chart, it was used for insurance

9   to Anthem Blue.

10  Q.   Approximately how much money was spent on insurance to

11  Anthem Blue?

12  A.   $11,998.

13  Q.   And how else was money spent from this account during the

14  time period that you looked at?

15  A.   It was also spent on bank fees.

16  Q.   All right.  So directing your attention back to slide 2 and

17  to the 4779 account, looking at this chart, all of the arrows

18  to the right of the 4779 account, all of the transactions that

19  were reflected there and on the next slide, did you identify

20  any wires sent to Stormy Entertainment during the time period

21  you looked at?

22  A.   No.

23  Q.   Did you identify any wires sent to Stephanie Clifford

24  during the time period you looked at?

25  A.   No.

1   Q.  Did you identify any wires sent to Stormy Daniels during

2   the time period you looked at?

3   A.  No, I did not.

4           MR. ROHRBACH:  May I have one moment, your Honor?

5           No further questions.

6           THE COURT:  Cross-examination.

7   CROSS-EXAMINATION

8   BY MR. AVENATTI:

9   Q.  Mr. Rosenman, good afternoon.

10  A.  Good afternoon.

11  Q.  Have you ever heard the phrase "a trial is a fight for

12  credibility"?

13          MR. ROHRBACH:  Objection.

14          THE COURT:  Sustained.

15  BY MR. AVENATTI:

16  Q.  Mr. Rosenman, you understand that while you've been here

17  under oath -- while you've been here today, you've been under

18  oath, and you swore to tell the truth, the whole truth, and

19  nothing but the truth, so help you God, correct?

20  A.  Correct.

21  Q.  Now, you started off your testimony and you said, and I

22  think I wrote it down correctly, that you assisted in preparing

23  charts.  Did I get that correctly?

24  A.  I said I assisted in preparing a visual summary.

25  Q.  OK.  A visual summary, not charts?

1    A.  No.

2    Q.  OK.  And who did you assist in preparing the visual

3    summaries?

4    A.  Another financial analyst that works for the U.S.

5    Attorney's Office.

6    Q.  And who is that?

7    A.  David Padilla.

8    Q.  Can I have the last name, spelling, please?

9    A.  It's P-A-D-I-L-L-A.

10   Q.  And which portion of these summaries did you prepare versus

11   your colleague?

12   A.  The initial drafts were, were created by him and then I

13   made changes to them.

14   Q.  So he created the initial drafts, you made changes to them,

15   and then you shared them with your colleagues that are here

16   today on behalf of the government, the assistant U.S.

17   attorneys, correct?

18   A.  Yes.

19   Q.  And how did you share those drafts?

20   A.  There was a shared file on our shared network.

21   Q.  So you would save drafts to the shared network, and then

22   you would let them know that the drafts were updated so they

23   could access them, correct?

24   A.  Correct.

25   Q.  So it was a collaborative effort between you, your

M1qWave4                    Rosenman - Cross

1    colleague, and the assistant U.S. attorneys here today,
2    correct?
3    A.  Collaborative in which way do you mean?
4    Q.  Well, have you ever heard the word "collaborative" before?
5    A.  Yes.
6    Q.  What have you understood the word "collaborative" to mean
7    when you've heard it?
8    A.  That they reviewed it -- well, do you want the definition
9    of collaborative, or do you want me to include what they did
10   with the charts?
11   Q.  Let me be clear with my question.
12   A.  OK.
13   Q.  You said you've heard the word "collaborative" before?
14   A.  Yes.
15   Q.  And I'd like you to tell the jury, when you heard that
16   word, what you understood it to mean.
17            MR. ROHRBACH:  Objection.
18            THE COURT:  Sustained.
19   BY MR. AVENATTI:
20   Q.  Sir, do you know what the word "collaborative" means?
21   A.  Yes.
22            MR. ROHRBACH:  Objection.
23            THE COURT:  Sustained.
24            Mr. Avenatti, ask your next question, please.
25   BY MR. AVENATTI:

1    Q.  Sir, you jointly worked on the summaries with you, the

2    colleague you mentioned, as well as the assistant U.S.

3    Attorneys seated here today, correct?

4    A.  They provided some feedback, yes.

5    Q.  OK.  They provided suggestions as to how those summaries

6    could be changed before they were brought to court here today

7    and presented to this jury, am I correct?

8    A.  For format wise, yes.

9    Q.  But not content?

10   A.  No.

11   Q.  Who determined the content that would go in the summaries?

12   A.  I would create all the -- all the initial drafts were

13   created by Mr. Padilla, the first version of the numbers.  And

14   then I worked on updating numbers, looking at the underlying

15   charts that helped create those numbers.

16   Q.  OK.  What exactly were you asked to do, and who asked you

17   to do it?

18   A.  I was asked to review the bank records, the business

19   records, the emails that we, that I discussed earlier, to

20   ensure that the charts were accurate and that contained correct

21   information, and I was asked to do that by members of the

22   prosecution team.

23   Q.  Who chose the information that you were asked to review?

24   A.  A member of the prosecution team.

25   Q.  OK.  Which member of the prosecution team?

1    A.  I don't know which one specifically.  I don't know what

2    conversations they had when I was not present.

3    Q.  OK.  I'm just interested in what you were asked to do.  Do

4    you recall which attorney on the prosecution team asked you to

5    do what in connection with this project?

6    A.  I spoke most often with Mr. Rohrbach about it.

7    Q.  Mr. Rohrbach, the gentleman that just questioned you on

8    direct, correct?

9    A.  Correct.

10   Q.  OK.  We're going to get into your summaries, but I want to

11   focus on one thing in particular to start off with, please.

12          MR. AVENATTI:  If I could have 702, page 2 and 3 side

13   by side.

14   Q.  Can you see that, sir?

15   A.  Yes.

16   Q.  You were just asked a number of questions by Mr. Rohrbach

17   concerning these two summaries, correct?

18   A.  Correct.

19   Q.  OK.  And included within the questioning -- and we're going

20   to spend a lot of time on these, but I want to focus on one

21   thing in particular.

22          Included in the questioning, you were asked about this

23   $70,500 to Avenatti & Associates, account 0661.  Do you

24   remember that?

25   A.  Yes.

M1qWave4                          Rosenman - Cross

1    Q.  And then you were asked how much additional money during

2    that time period was deposited into account 0661?

3    A.  Yes.

4    Q.  Do you remember that?

5    A.  Yes.

6    Q.  OK.  And then Mr. Rohrbach put exhibit 302C, page 11, up.

7                MR. AVENATTI:  And why don't we, if we could, Juliet,

8    I'm -- sorry to be a pain.  If you could just take page 3 and

9    move it to the left.

10               Excellent.  And then on the right, if we could have

11   302C, page 11.

12               And before we put it up, actually --

13   Q.  Now, sir, you testified that the additional amount in the

14   Avenatti & Associates for this month beyond the 70,500 that was

15   deposited into the account, you testified that it was $50,

16   right?

17   A.  Yes.

18               MR. ROHRBACH:  Objection.  Misstates the testimony.

19               THE COURT:  The jury can make its own evaluation.

20               Your recollection of the testimony governs, and the

21   witness just answered that question in any event.

22               Overruled.

23   BY MR. AVENATTI:

24   Q.  And Mr. Rosenman, you remember that because Mr. Rohrbach

25   tried to get you to answer again that it was $50; do you

M1qWave4                    Rosenman - Cross

```
 1  remember that?
 2              MR. ROHRBACH:  Objection.
 3              THE COURT:  Sustained.
 4              MR. AVENATTI:  OK.  Can we have 302C, page 11, so we
 5  can see if it was $50.
 6              Can we blow up the deposit amount.
 7  Q.  Do you see the amount, sir?
 8  A.  Yes.
 9  Q.  What's the total deposit amount into the account for that
10  month?
11  A.  $89,150.
12  Q.  It's not $70,550, is it?
13  A.  No, but there's --
14  Q.  Sir, yes or no.
15  A.  There's a reason for that.
16  Q.  Sir, yes or no.
17              THE COURT:  Just answer yes or no.
18              THE WITNESS:  OK.
19  A.  No.
20              MR. AVENATTI:   Let's go back to 702 side by side,
21  please.  2 and 3.
22  Q.  Can you see that, sir?
23  A.  Yes.
24  Q.  Now, on 702, page 3, there's this box "other amounts out"?
25  A.  Yes.
```

1  Q.  Do you see that?

2  A.  Yes.

3  Q.  OK.  And Mr. Rohrbach asked you some questions about these

4  amounts and the payees.  Do you see that?

5  A.  Yes.

6  Q.  Do you remember that?

7  A.  Yes.

8  Q.  OK.  Who picked these particular names to put in the box

9  and highlight for the jury?

10  A.  The names come from the -- from the debits that were

11  listed, and the prosecution team picked which ones to

12  highlight.

13  Q.  OK.  So when you say the prosecution team, you're talking

14  about the assistant U.S. attorneys here, right?

15  A.  Correct.

16  Q.  OK.  They're the ones that picked the ones to highlight?

17  A.  Yes.

18  Q.  OK.  And you understood that they picked these to highlight

19  because they had nothing to do with Stormy Daniels, right?

20           MR. ROHRBACH:  Objection.

21           THE COURT:  Sustained.

22  BY MR. AVENATTI:

23  Q.  Well, do you know why they picked these?

24           MR. ROHRBACH:  Objection.

25           THE COURT:  Sustained.

M1qWave4                    Rosenman – Cross

1    BY MR. AVENATTI:
2    Q.  Sir, do any of these payments have anything to do with
3    Stormy Daniels, to the best of knowledge?
4    A.  No.
5    Q.  You say that pretty definitively; you're definitive about
6    that, right?
7                MR. ROHRBACH:  Objection.
8    A.  They don't say her name, but I know what they're for.
9                MR. AVENATTI:  OK.  Let's highlight for the jury this
10   wire out to Brandon Parraway, $4,536.
11   Q.  Do you see that?
12   A.  Yes, sir.
13   Q.  Sir, isn't it true that that was one of Stormy Daniels's
14   security guards?
15               MR. ROHRBACH:  Objection.
16               THE COURT:  If you know.  If you have firsthand
17   knowledge, yes or no, you can answer.  Otherwise, say I don't
18   know.
19   A.  I don't know that.
20   Q.  Did the government ever tell you that?  I'm sorry.  Did the
21   prosecutors ever tell you that?
22               MR. ROHRBACH:  Objection.
23               THE COURT:  Sustained.
24               MR. AVENATTI:  Can we take down the blowup, please.
25   Q.  And then we have this expense box over here to the

1    right-hand side?

2    A.  Yes.

3          MR. AVENATTI:  Can we blow that up.

4    Q.  Sir, are any of these expenses related to my or my firm's

5    representation of Ms. Daniels?

6          MR. ROHRBACH:  Objection.

7          THE COURT:  Sustained.

8    BY MR. AVENATTI:

9    Q.  Sir, do you know if any of these expenses are related to my

10   or my law firm's representation of Ms. Daniels?

11   A.  I do not know that.

12   Q.  Do you know if any of the travel expenses are related to my

13   or my firm's representation of Ms. Daniels?

14   A.  No, I do not know.

15         MR. AVENATTI:  Let's start at the beginning, 701, page

16   1.

17         THE COURT:  701, not 702.  Is that correct?

18         MR. AVENATTI:  No, your Honor -- yes, you are correct.

19   701.

20   Q.  Sir, do you have that?

21   A.  Yes, sir.

22   Q.  OK.  Now, when you were asked to prepare these summaries,

23   you were asked to prepare, first, a summary of where the

24   payments went from St. Martin's Press to Janklow & Nesbit

25   Associates and beyond.  Am I correct about that?

1    A.  Correct.

2    Q.  OK.  And you're not aware of why any of these payments were

3    made on this chart, are you?

4    A.  You mean -- what do you mean by why they were made?

5    Q.  Well, the purpose behind any of these payments.

6    A.  Well, the emails that were provided and that are cited

7    exhibits talk about that they were related to a book for

8    Ms. Daniels.

9    Q.  OK.  But beyond that, you're not aware of the reason why

10   particular amounts were sent to particular accounts.  Am I

11   correct about that?

12   A.  Also in the same email, it described that there were

13   payments sent, I guess, and there were payments withheld for

14   commission.

15   Q.  OK.  Beyond that, are you aware of any evidence relating to

16   why these payments were made or the circumstances surrounding

17   them?

18   A.  No.

19   Q.  OK.  You just determined that these particular amounts went

20   to these particular accounts during the months at issue?

21   A.  Correct.

22   Q.  And you talked about a payment to Stormy Entertainment, the

23   top box, 9205, $212,500, right?

24   A.  Yes.

25   Q.  OK.  And I think you traced that to 301B?

1           MR. AVENATTI:  If I could please have 301B.

2      Q.  Can you see that, sir?

3      A.  Yes.

4      Q.  All right.  And this is the bank statement from the Stormy

5      Entertainment account ending in 9205, 9-2-0-5, that took in the

6      $212,000, right?

7      A.  Yes.

8      Q.  And the beginning balance in this account, before that

9      deposit as well as other deposits, was $10,053.98.  Am I right

10     about that?

11     A.  Yes.

12          MR. AVENATTI:  OK.  Now, can we bring up 303A, please.

13     Q.  And you were asked about this particular account taking in

14     what portion of the payment?

15     A.  The $6,250.

16     Q.  And you understand that that came not from Ms. Daniels's

17     portion but from Mr. Janklow's portion, right?

18     A.  Yes, that's correct.

19     Q.  And then you were asked about 303A, as in apple.

20          MR. AVENATTI:  Can I have that, please.  And can I

21     have the entry on May 10, 2018, please, page 21.

22     Q.  Now, Mr. Rohrbach asked you about the top line item in the

23     amount of $6,250.  Do you recall that?

24     A.  Yes.

25     Q.  Do you recall him asking you any questions about the line

1   item immediately below it?

2   A.   No.

3   Q.   The $6,250 came in on May 10, 2018, right?

4   A.   Yes.

5   Q.   And the next day, another wire came in from Janklow &

6   Nesbit Associates.  Am I correct about that?

7   A.   Yes, that's what it says.

8   Q.   And how much was that wire in comparison to the $6,250?

9   A.   That wire's $475,000.

10  Q.   Over 80 times larger than the 6,250 amount, correct?

11  A.   I didn't do the math, but it is a significant multiplier of

12  that amount, yes.

13  Q.   Do you know what any of these amounts are for, these

14  incoming -- well, strike that.  Let me ask you a better

15  question.

16      Sir, these are all moneys that came into this account,

17  right?

18  A.   Correct.

19  Q.   Do you know what the purpose of any of these payments was

20  for?

21  A.   Other than just the two payments that we described earlier,

22  I don't know what any of the other payments are for.

23  Q.   So you know what the 6,250 and the $250,000 from Geragos &

24  Geragos are from, right?

25  A.   Where they're from, yes.

1    Q.   OK.  But you don't know where the other money -- well,

2    strike that.

3         You don't know why the other money was sent into this

4    account.  Am I correct about that?

5    A.   Right.  From the other wires incoming, I don't know what

6    they're from, no.

7              THE COURT:  Special Agent, can I just clarify; you

8    don't have any personal knowledge about the facts in this case

9    and the reasons for any of these payments, is that correct?

10             THE WITNESS:  That's correct, your Honor.

11             THE COURT:  So the charts you just prepared reflect

12   what you found on the records, is that correct?

13             THE WITNESS:  Yes.

14             THE COURT:  OK.

15             Mr. Avenatti, let's move on a little bit, please.

16   BY MR. AVENATTI:

17   Q.   Now, you were also asked to review the trust account

18   records for the Daniels-related account at California Bank &

19   Trust between mid-March and November 1; I think you testified

20   to that, correct?

21   A.   For the Daniels account?

22   Q.   Sir, do you recall there was an account set up at

23   California Bank & Trust to take in the CrowdJustice money and

24   other moneys?  Do you recall that?

25   A.   I recall that account.  I don't recall it being a Daniels

1   account.

2   Q.  OK.  Were you asked to review all the bank statements for

3   that account from mid-March to November 1?

4   A.  Yes.

5   Q.  And in your review of that account, you saw that there were

6   a number of payments coming in and a number of payments going

7   out, correct?

8   A.  Correct.

9   Q.  And you don't know if the payments that went out had

10  anything to do with fees or costs that Ms. Daniels owed the

11  firm, do you?

12  A.  No, I don't know that.

13          MR. AVENATTI:  And if we could go back to 702 now,

14  please, side by side.

15  Q.  Now, this summary only covers the time period September 17,

16  2018, through October 2, 2018, correct?

17  A.  That's correct.

18  Q.  Those are the dates that the prosecutors chose for you to

19  look at.  Am I right about that?

20  A.  No.  That reflects the time when the money came in.  And

21  then looking at the withdrawals, it was down to only a few

22  hundred dollars, so it didn't seem to be necessary to go

23  further than that.

24  Q.  Well, did you look at any of the transactions relating to

25  Ms. Daniels, the expenses and the costs, before September 17,

1    2018?

2    A.  Well, I had no way to differentiate what costs are for

3    what.  Other than what they are listed as on the bank

4    statements themselves, I don't know who they benefit or don't

5    benefit.

6    Q.  So let me make sure that I understand this.  When you look

7    at an entry on a bank statement, you have no way of telling the

8    jury whether that charge or expense had something to do with

9    Ms. Daniels or not?

10              MR. ROHRBACH:  Objection.

11   Q.  Am I correct?

12              THE COURT:  Sustained.  Asked and answered.

13         I think the point is Agent Rosenman just prepared

14   these based on what he found in the records.  Let's begin to

15   wrap it up, Mr. Avenatti.

16   Q.  Well, you were asked, sir, in detail about 302C.

17              MR. AVENATTI:  Maybe we can put that side by side with

18   page 3 of 702.

19   Q.  Do you have that, sir?

20   A.  Yes, I do.

21   Q.  And do you recall that you were asked about a number of

22   charges on 302C by Mr. Rohrbach?

23   A.  Yes.

24   Q.  OK.  Now, your chart or summary shows that $70,500 came in

25   to Avenatti & Associates during this time period, right?

M1qWave4                          Rosenman - Cross

1   A.   That's correct.

2   Q.   And you were asked about a bunch of these charges on 302C,

3   this statement we're looking at here, right?

4   A.   Yes.

5   Q.   OK.  But the total deposits into this account during that

6   time period is $228,000, right?

7   A.   Not during that time period, no.

8   Q.   Well, you were asked a number of questions by Mr. Rohrbach

9   relating to various charges on here.  I think we started with

10   the barber shop charge.  Maybe we can find that.  I want to ask

11   you about it.

12            MR. AVENATTI:  I believe it was on the next page.

13   Perhaps the next page.

14   Q.   Sir, do you recall which charges you were asked about other

15   than the barber shop?

16            THE COURT:  Sustained.

17            Next question, Mr. Avenatti.

18   BY MR. AVENATTI:

19   Q.   Sir, you have no way of knowing whether any of the charges

20   that Mr. Rohrbach asked you about came from this $70,500, do

21   you?

22            MR. ROHRBACH:  Objection.

23            THE COURT:  I'll allow it.  Overruled.

24   A.   The charges on this statement?

25   Q.   Yes.  The charges that Mr. Rohrbach asked you about, the

1   specific charges, you have no way of knowing whether any of

2   those came from any money related to Stormy Daniels as opposed

3   to other money that was put in the account, do you?

4   A.  I'm sorry.  I'm confused by the question.

5   Q.  Sir, during your direct examination, Mr. Rohrbach asked you

6   about specific charges from this account?

7   A.  Yes.

8   Q.  Do you recall that?

9   A.  I do.

10  Q.  OK.  There was about five or six of them?

11  A.  Uh-huh.

12  Q.  Right?  Yes?

13  A.  Yes.

14  Q.  OK.  You have no way of knowing whether any of those that

15  Mr. Rohrbach pointed to came from money related to Stormy

16  Daniels or other money, do you?

17  A.  Well, I guess, first, the ones that I believe Mr. Rohrbach

18  asked me about were from a different period, but in general,

19  no, I don't know when the -- once the money goes into the

20  account, I don't know exactly what happened to it.  You can't

21  parse out specific dollar for dollar.

22  Q.  You can't trace moneys back to moneys allegedly having to

23  do with Ms. Daniels versus some other source of moneys, right?

24  Isn't that true?

25  A.  It's true if that's the only -- if that's not the only

M1qWave4                              Rosenman - Redirect

1   money going into the account.

2   Q.  And in a number of these instances there were other moneys

3   going into the accounts, right?

4   A.  Yes.

5           MR. AVENATTI:  Nothing further.

6           THE COURT:  Redirect.

7           MR. ROHRBACH:  One moment, your Honor?

8           Very briefly, your Honor.

9           THE COURT:  I would expect so.

10          MR. ROHRBACH:  Mr. de Grandpre, would you please put

11  up Government Exhibit 702 and Government Exhibit 302C.

12          302C, please turn to page 11.  And would you magnify

13  the deposits in the first row.  Just magnify the first row.

14  Sorry, above that dotted line.

15          Thank you.  And on Government Exhibit 702, would you

16  please turn to page 2.

17  REDIRECT EXAMINATION

18  BY MR. ROHRBACH:

19  Q.  Special Agent Rosenman, do you recall being asked on

20  cross-examination about the 0661 account?

21  A.  Yes.

22  Q.  Remember being asked about why you testified that only $50

23  went into the account during the relevant time period in light

24  of Government Exhibit 302C?

25  A.  Yes.

1  Q.  Do you recall starting to say that there's a reason for the

2  difference?

3  A.  Yes.

4  Q.  What's the reason?

5  A.  That the deposits on the bank statement offer specific time

6  periods that is not in line with the time period reflected on

7  the chart.

8           MR. ROHRBACH:  No further questions, your Honor.

9           THE COURT:  All right.  Thank you, Special Agent.  You

10  may step down.  You're excused.

11           (Witness excused)

12           THE COURT:  Government, please call your next witness.

13           MR. PODOLSKY:  The government calls Sean Macias.

14   SEAN ERNESTO MACIAS,

15       called as a witness by the government,

16       having been duly sworn, testified as follows:

17           MR. AVENATTI:  Your Honor --

18           THE COURT:  Not now, Mr. Avenatti.  Please have a

19  seat.

20           You may proceed, Mr. Podolsky.

21           MR. PODOLSKY:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. PODOLSKY:

24  Q.  Good afternoon, Mr. Macias.

25  A.  There you are.  Hold on.  Let me move over so I can see

1    this gentleman.

2    Q.  Better?

3    A.  I've got this seam in the way.  All right.

4           THE COURT:  It's not the best setup, but it is the

5    best we can do.

6           THE WITNESS:  I understand.

7           THE COURT:  Are you good; can you see the podium?

8           THE WITNESS:  I can see him now.

9           THE COURT:  OK.  Go ahead.

10   BY MR. PODOLSKY:

11   Q.  Mr. Macias, what do you do for a living?

12   A.  I'm a licensed attorney in the great state of California,

13   Indiana, and the District of Columbia.

14   Q.  Where do you work out of?

15   A.  My office is in Glendale, California.

16          THE COURT:  Please just speak into the microphone,

17   Mr. Macias.

18          Thanks.

19          THE WITNESS:  Can you hear me?

20          THE COURT:  Yes.

21   BY MR. PODOLSKY:

22   Q.  What kind of law do you practice?

23   A.  I'm a civil litigator.  I do trials.  I do a wide range of

24   civil litigation, ranging from copyright and trademark

25   infringement, trade dress, business-to-business disputes as

1    well as I do catastrophic injuries.

2    Q.  How long have you been a practicing attorney, Mr. Macias?

3    A.  That's a great question.  22 years.

4    Q.  Do you know someone named Michael Avenatti?

5    A.  I do.

6    Q.  Do you see him in the courtroom today?

7    A.  I can't --

8              THE COURT:  You can stand up, if you want, and take a

9    look around.

10             THE WITNESS:  Oh, you want me to stand?

11             THE COURT:  Just take a look around, and if you can

12   see Mr. Avenatti, you can let us know.

13             THE WITNESS:  Can he lower his mask?

14             THE COURT:  I'll tell you what.  I'll ask the three

15   gentlemen at the back table and the two at the front to lower

16   their masks briefly, and look around and if you see Mr.

17   Avenatti -- focus at the back table too.

18             THE WITNESS:  Oh, he's behind -- yeah.  Mr. Avenatti

19   sitting right there.  He's the handsome fellow with the shaved

20   head.

21             THE COURT:  There are two of those at the front.

22             THE WITNESS:  Not Mr. Dalack.

23             THE COURT:  All right.  Indicating the defendant.

24             MR. AVENATTI:  He indicated Mr. Dalack, for the

25   record.

1          THE WITNESS:  No.  I said not Mr. Dalack.

2          THE COURT:  OK.  Let's move on.

3          Mr. Podolsky.

4          MR. PODOLSKY:  May the record reflect that he has

5   indeed identified Mr. Avenatti, the defendant?

6          THE COURT:  So reflected.

7          Thank you.

8   BY MR. PODOLSKY:

9   Q.  Approximately when did you meet Mr. Avenatti?

10  A.  It was either in the end of 2016 or the beginning of 2017.

11  It was a unique meeting.

12  Q.  Why was it unique?

13  A.  Well --

14          THE WITNESS:  Can I go -- can I explain it?

15          THE COURT:  Well, you can answer his question.

16          THE WITNESS:  Sure, your Honor.

17          THE COURT:  Why was it unique?

18          MR. AVENATTI:  Objection, your Honor.  Relevance.

19  401.

20  BY MR. PODOLSKY:

21  Q.  Can you explain the circumstances of your meeting of Mr.

22  Avenatti, please?

23  A.  Sure.

24          MR. AVENATTI:  Same objection.

25          THE COURT:  Overruled.

1   Q.  So, I met Mr. Avenatti at the Stanley Mosk Courthouse on

2   the fourth floor.  He was in front of -- I believe it was Judge

3   White's courtroom.  He was sitting outside, and I looked

4   over -- I've heard about him before.  I recognized him.  I

5   looked over, and I said to him, "What's up soda pop?"  And then

6   he immediately responded, "Nothing much, pony boy."

7       At that moment, I looked at him and said, "Did we just

8   become best friends?"  So that was our meeting.

9   Q.  And did you become friends after that --

10  A.  We did.

11  Q.  Did you become friends with Mr. Avenatti after that?

12  A.  We did.

13  Q.  And was Mr. Avenatti a practicing attorney in California at

14  that time?

15  A.  He was.

16  Q.  And in the years that follow, and particularly focusing on

17  2018, did you socialize with Mr. Avenatti?

18  A.  Can you give me the time period again, counselor?

19  Q.  Yes.  Let's focus on the year of 2018.  Did you socialize

20  with Mr. Avenatti at that time?

21  A.  In 2018, I did.

22  Q.  Now, why are you here today, Mr. Macias?

23  A.  As a witness.

24  Q.  Did you receive any document that called for your testimony

25  today?

1          MR. AVENATTI:  Leading.

2          THE COURT:  Overruled.

3          You can answer it.

4   A.  I did review some documents.

5   Q.  Sorry, Mr. Macias.  Let me be clear.  Did you receive a

6   document that requested your testimony today?

7          MR. AVENATTI:  Your Honor --

8   A.  Yeah, I received a subpoena.

9          THE COURT:  Overruled.

10         Mr. Macias, just give a moment for Mr. Avenatti to

11  make any objections and for me to rule.  You may answer.

12         THE WITNESS:  I apologize, your Honor.  Absolutely.

13         THE COURT:  You received a subpoena, you said?

14         THE WITNESS:  I received a subpoena from the United

15  States government.

16  BY MR. PODOLSKY:

17  Q.  Now, do you know somebody who goes by the name Stormy

18  Daniels?

19  A.  I do.

20  Q.  How did you come to meet her?

21  A.  I've known her for -- I represented a -- I've known her for

22  a couple years.

23  Q.  Let me focus us on the time period that's relevant here,

24  2018.

25  A.  No problem.

M1qWave4                         Macias - Direct

1    Q.  Did you have occasion to speak with her in 2018?

2    A.  In -- I did.

3    Q.  Can you explain how that occasion came to happen?

4    A.  So, Ms. Daniels, also known as Stephanie Clifford, reached

5    out to me several times in February of 2018 to ask me to help

6    her out with a legal matter.

7    Q.  And did you speak to her about her potential legal matter?

8    A.  I did.

9    Q.  And was that in approximately February of 2018?

10   A.  That's correct.

11   Q.  In what manner was that meeting; telephone, in person,

12   something else?

13   A.  So, I received several calls from Ms. Daniels, and we

14   finally connected via cell phone.

15   Q.  And in substance, what did you discuss?

16   A.  So, she was asking me regarding a release that she signed

17   regarding a sexual inter -- interaction that she had with

18   Donald Trump and that she wanted to --

19              MR. AVENATTI:  Objection.  Hearsay, your Honor.

20              MR. PODOLSKY:  Not for the truth, your Honor.

21              THE COURT:  All right.  I'll allow it.

22              MR. AVENATTI:  Well, if it's not for the truth --

23              THE COURT:  Mr. Avenatti.

24              MR. AVENATTI:  Understood.

25              THE COURT:  Thank you.

1          The objection's overruled.

2          Ladies and gentlemen, you may not consider the

3     statement for the truth of any matter asserted but merely for

4     the fact that it was said.

5          Somebody, I think, had a cell phone which was

6     vibrating.  That cell phone had better be off.  Otherwise, it's

7     going to be in my possession.

8          Thank you.

9     BY MR. PODOLSKY:

10    Q.  Mr. Macias, please continue.  What, in substance, did you

11    discuss on that phone call in February -- first phone call in

12    February 2018 with Ms. Daniels?

13    A.  She had a -- signed a -- an agreement, and she wanted to

14    broaden out the release of that agreement in order that she

15    could speak to the press and talk -- maybe write a book to talk

16    about her interaction with Donald Trump.

17    Q.  What, if anything, did Ms. Daniels say to you about her

18    ability to pay for representation at that time?

19          MR. AVENATTI:  Hearsay.

20          MR. PODOLSKY:  Again, your Honor, not for the truth.

21          THE COURT:  Same ruling.  Same instructions.

22          You may answer.

23          THE WITNESS:  Thank you, your Honor.

24    A.  She didn't say that she had -- I mean she informed me that

25    she didn't have -- she had limited funds to pay -- actually, no

M1qWave4                         Macias - Direct

1    funds, pretty much, to pay.

2    Q.  Did you take on that representation at that time?

3    A.  I did not.

4    Q.  Now, did there come a time where Mr. Avenatti became

5    involved with your discussions with Ms. Daniels?

6    A.  Right.  So, you know, we were --

7             THE WITNESS:  Can I refer to him as Michael or Mr.

8    Avenatti?

9             THE COURT:  Either way.  Whatever you'd like.

10   A.  So Michael and I were -- you know, we were palling around,

11   and I said, I have Stormy Daniels blowing up my phone.  And he

12   wanted to know what was going on about that, and I told him

13   that she wanted to expand her release and I wasn't really

14   interested in the case.

15       He said, Hey, I might be interested in this.

16       So when I called her, we had another call and I said, Hey,

17   I might have a great lawyer for you.

18             (Continued on next page)

19

20

21

22

23

24

25

M1Q8AVE5                          Macias - Direct

1    Q.  And did there come a time where you and Ms. Daniels and Mr.

2    Avenatti discussed potential representation.

3    A.  We did.

4    Q.  Where were you?

5    A.  We were at her manager's house, I believe it was Gina

6    Hernandez.

7    Q.  Where was Mr. Avenatti?

8    A.  He was sitting next to me on the couch.

9    Q.  Where was Ms. Daniels?

10   A.  She was on the phone.

11   Q.  What was discussed at that meeting?

12   A.  It was discussed regarding how they wanted to expand --

13            MR. AVENATTI:  Work product, your Honor.  Hearsay.

14            MR. PODOLSKY:  Your Honor, there is no attorney-client

15   privilege issue with this conversation.

16            THE COURT:  Overruled.

17            You may answer.

18            THE WITNESS:  Thank you, your Honor.

19   A.  Could you give me the question again?

20   Q.  What was discussed on the phone during that meeting where

21   Ms. Daniels was on the phone and you were on the couch near Mr.

22   Avenatti?

23   A.  So Ms. Daniels was represented by a gentleman named Keith

24   Davidson.  I knew about him.  He was an OK guy -- I mean, OK

25   lawyer, nice guy.  She wanted to obviously expand her ability

1    to speak about her interactions with Donald Trump.  I suggested

2    we make a phone call, we get to Mr. Trump's attorney at that

3    time, which would be Cohen, to expand the release, maybe throw

4    her some extra bucks, and call it a day.

5        Mr. Avenatti had a whole different game plan.  What he

6    wanted to do was to go big, go on 60 Minutes, and he

7    wanted -- and then he told her, I'll charge you a dollar.  And

8    at that moment, Macias was out.

9    Q.  So following that meeting, did you represent Ms. Daniels?

10   A.  Repeat.

11   Q.  Following that meeting, did you, Mr. Macias, represent Ms.

12   Daniels?

13   A.  I kind of represented her more in a -- not in a formal

14   sense, in the sense that I did go to a meeting or two regarding

15   some sort of documentary.  I came out here when Michael was

16   doing a lot of press with CNN and whatnot.  And then I went

17   with both of them to The View.

18   Q.  Was it your understanding that Mr. Avenatti did represent

19   Ms. Daniels after that meeting?

20   A.  Mr. Avenatti, after that meeting, met Ms. Daniels at the

21   Waldorf in Beverly Hills and their engagement began.

22   Q.  Did Mr. Avenatti ever explain to you the terms of the

23   financial terms of the representation?

24            MR. AVENATTI:  Objection.  Work product.

25            THE COURT:  Overruled.

1          You may answer.

2   A.  Over the time of 2018 it became clear what was the

3   understanding.

4          MR. AVENATTI:  Move to strike, your Honor.

5          THE COURT:  Granted.

6          Can you just answer the question, did Mr. Avenatti

7   ever explain to you the financial terms of his representation?

8   Just yes or no.

9   A.  Yes.

10  Q.  What did Mr. Avenatti tell you?

11  A.  That he was going to charge a dollar for his

12  representation.  That's what he said.

13  Q.  Did he say anything else?

14  A.  I found out that there was a GoFundMe page --

15         THE COURT:  Just answer the question.  Did he say

16  anything else, yes or no?

17  A.  Yes.

18  Q.  What else did Mr. Avenatti tell you?

19  A.  About a GoFundMe page.

20  Q.  About the financial arrangements -- let me ask this.

21         Did it come to your understanding that there was a

22  GoFundMe page related to Ms. Daniels?

23  A.  I did.  I had that understanding.

24  Q.  What, if anything, did Mr. Avenatti tell you about that

25  GoFundMe page?

1   A.   That was supposed to assist Ms. Daniels with her fees and

2   costs, and allegedly for security, which I was shocked that she

3   needed security.

4   Q.   Now, did Mr. Avenatti ever thank you for making the

5   connection between him and Ms. Daniels?

6   A.   He did.

7   Q.   Did he thank you in any particular way?

8   A.   He did.

9   Q.   How was that?

10  A.   He gave me a Cartier watch.

11  Q.   Approximately when did that happen?

12  A.   I think it was in the summer of 2018.

13  Q.   I want to focus our attention on September of 2018 and

14  specifically Labor Day weekend.

15  A.   I've got that time period in my head.

16  Q.   Where were you that weekend?

17  A.   I was in Las Vegas.

18  Q.   Why were you in Las Vegas?

19  A.   During that time period or every Labor Day is the CAALA,

20  which is the consumer attorneys kind of convention.  So it's

21  the California plaintiffs' attorneys bar that goes out to

22  Vegas.  There's MCLE classes, vendors that try to sell their

23  goods, parties.

24          THE COURT:  CLE is continuing legal education, is that

25  correct?

 1              THE WITNESS:  That's correct, your Honor.
 2   Q.  Can you give us a sense of generally how people spend their
 3   time during the course of that weekend?
 4              MR. AVENATTI:  Objection.  Relevance.
 5              THE COURT:  Sustained.
 6   Q.  Was Mr. Avenatti with you that weekend?
 7   A.  Most of the weekend he was.
 8   Q.  Can you generally give us a sense of what types of events
 9   you went to together?
10              MR. AVENATTI:  Relevance, your Honor.
11              THE COURT:  Overruled.
12   A.  We went to -- we actually went to what's called Walk the
13   Floor, which would be the convention center.  Mr. Avenatti and
14   I and a couple of my colleagues, we had meals together.  And
15   then on Friday night we went to a big blow-out party.
16   Q.  Did you notice anything in particular that stood out to you
17   about Mr. Avenatti's demeanor that weekend?
18              MR. AVENATTI:  Objection, your Honor.
19              THE COURT:  Overruled.
20   A.  I am not understanding your question.
21   Q.  Was there anything about Mr. Avenatti's demeanor that stood
22   out to you as different from the way he normally acted?
23              MR. AVENATTI:  Same objection.
24              THE COURT:  Same ruling.
25              You may answer it.

1          THE WITNESS:  Thank you.

2   A.  He seemed a little -- he seemed a little more agitated than

3   he normally was, and he seemed a little bit needy.

4   Q.  Did there come a time during that weekend where you had a

5   discussion with Mr. Avenatti about Ms. Daniels's book deal?

6   A.  I did.

7   Q.  Where were you when that conversation took place?

8   A.  I was at the Girardi & Keese party at Lakeside on Friday

9   evening.

10  Q.  To give us a sense, what were you and he doing at the time

11  that this conversation took place, you and he being you and Mr.

12  Avenatti?

13  A.  What we were doing?

14  Q.  Yes.  Were you walking, having dinner, what were you doing?

15  A.  Well, there was an event that happened before.  So I

16  remember, the way I recall it, he came back to the table and he

17  was kind of like in a melancholy type of attitude.  So I don't

18  know how much else you want me to get into detail.

19         THE COURT:  What was going on when you had the

20  conversation?  Were you eating?  Were you drinking?

21         THE WITNESS:  I was sitting at the table laughing.  He

22  came to the table, sat down, kind of slumped over, and was kind

23  of like someone stole his ball or something; he was in a bad

24  mood.

25  Q.  Was this in the evening?

1    A.   It was in the evening.

2    Q.   Were you or Mr. Avenatti drinking any alcohol at the time?

3    A.   Of course.

4    Q.   Nonetheless, you recall the substance of your conversation

5    with him?

6    A.   Absolutely.

7    Q.   What did he say to you about Ms. Daniels and her book deal?

8    A.   So he came to the table, he sat down all melancholy, and I

9    said, What happened to you, what's going on now?  And he said,

10   She's going crazy.  And I said, Who are you talking about?

11   He's, like, Stormy.  I said, Why is she going nuts?  He said,

12   Well, she's not getting -- the book publisher hasn't paid and

13   she's going to blow this deal up, but I might need you to

14   represent her.  And I was really taken aback by that.

15            MR. PODOLSKY:  Before we continue, it appears one

16   juror is raising his hand.

17            THE COURT:  Sir, I will send my clerk to just check in

18   with you.  One second, please.

19            Thank you, Mr. Podolsky.

20            We have a request to use the restroom.  Obviously, I

21   would like to avoid doing this very often.  If we need to

22   adjust the schedule, we will adjust the schedule.  But I

23   certainly don't want anybody to be uncomfortable.  Let's take a

24   break.  You can stand up and stretch and we will resume when

25   Juror No. 6 comes back.

1                The jury should remain where you are.  Just stand and

2       stretch in place, please.

3                We have Juror No. 6 back.  If we could ask everybody

4       to have your seats.  When Juror No. 15 comes back, we will

5       proceed from where we left off.  Thank you.

6                All right.  Watch your step as you get back to your

7       seat.

8                Sorry for the interruption.  We will pick up where we

9       left off.

10               Mr. Macias, you remain under oath.

11               Mr. Podolsky, would you please take a step back and

12      ask the last question again.

13      BY MR. PODOLSKY:

14      Q.  Do you recall before the break we were discussing a

15      discussion that you had with Mr. Avenatti at a CAALA event?

16      A.  I do.

17      Q.  When in time was this event?

18      A.  This was a Friday evening.  So it would be whatever Labor

19      Day weekend 2018.

20      Q.  I believe just before the break you started to explain what

21      Mr. Avenatti said to you at that event about Ms. Daniels's book

22      deal.  So if you could start again.  When he came and spoke to

23      you about it, what did he say?

24               MR. AVENATTI:  Objection, your Honor.  Work product;

25      attorney-client privilege.

1            THE COURT:  Overruled.

2            You may answer.

3            THE WITNESS:  I couldn't hear what anybody said.  This

4    thing is loud.

5            THE COURT:  You may answer.

6            Did you not hear the question?

7            THE WITNESS:  This fan is really blowing hard.

8            THE COURT:  Keep your voice up, please.

9            MR. PODOLSKY:  I will.

10   BY MR. PODOLSKY:

11   Q.  When Mr. Avenatti came -- at the CAALA event, what did Mr.

12   Avenatti say to you about Ms. Daniels's book deal?

13       Did you hear me?

14           THE WITNESS:  This thing is really loud.

15           THE COURT:  Try again.  Mr. Podolsky, I'm not sure why

16   we are having issues all of a sudden, but keep your voice up.

17           THE WITNESS:  Can I turn this off?

18           THE COURT:  No.  That's, unfortunately, why you are

19   able to be in there without a mask.  Hopefully, Mr. Podolsky

20   can just keep his voice up.

21   Q.  Mr. Macias, what did Mr. Avenatti --

22           THE WITNESS:  Can I turn this speaker towards me?

23           THE COURT:  Sure.

24   A.  Go ahead, counsel.

25   Q.  Mr. Macias, what did Mr. Avenatti say to you at that event

1    about Ms. Daniels's book deal?

2    A.  So he came back to the table.  He was really melancholy.

3    And I said, What's going on?  And he said that she's going

4    nuts.  I said, Who's she?  He said, Stormy.  I said, What's she

5    going nuts about?  And, apparently, she was upset that she

6    wasn't getting paid, and she was going to go either to the

7    press or she was going to blow the press deal.

8    Q.  When you say "apparently," was that based on what Mr.

9    Avenatti told you?

10           MR. AVENATTI:  Leading.

11   A.  Everything is what he told me.

12           THE COURT:  Hang on, Mr. Macias.

13           Overruled.

14           Go ahead.

15   Q.  Was that based on what Mr. Avenatti told you at that time?

16   A.  Yes.

17   Q.  What, if anything, did he say about why Ms. Daniels wasn't

18   getting paid?

19           MR. AVENATTI:  Objection.  Work product; privilege.

20           Can I have a standing objection, your Honor?

21           THE COURT:  You can.  Overruled.

22           MR. AVENATTI:  Thank you.

23   A.  He didn't say anything about why she wasn't getting paid,

24   but he wanted me to represent her to sue the book publishing

25   company.

1    Q.  Who did you understand, based on that conversation, wasn't
2    paying at the beginning of September of 2018?
3    A.  The book publishing company.
4    Q.  What, if anything, did Mr. Avenatti say about him not
5    getting paid from the book publishing company?
6    A.  He never said anything to me about that.
7    Q.  Based on that conversation, who did you understand was to
8    get the money from the publisher at that time?
9            MR. AVENATTI:  Objection.  Calls for speculation, your
10   Honor.  Foundation.
11           THE COURT:  Overruled.
12           You may answer.
13   A.  What Mr. Avenatti told me was that Stormy wasn't getting
14   paid from the publishers and she was going nuts.
15           MR. AVENATTI:  Move to strike, your Honor.
16   Nonresponsive to the question.
17           THE COURT:  Denied.
18   Q.  Do you know, separate from that conversation, whether or
19   not the publisher had made a payment to Ms. Daniels at that
20   time?
21   A.  I do not.
22   Q.  Now, when was the next time that you saw Mr. Avenatti after
23   the CAALA event?
24   A.  The Tuesday, that Tuesday right after Labor Day.
25   Q.  Where did you see him?

1    A.  He was in my conference room at my office.

2    Q.  Did you have an appointment to meet with him at that time?

3    A.  No.  I was shocked -- apparently, when I was at lunch, he

4    came and he sat in my conference room, and I found out when I

5    got back from lunch about 20 minutes he was sitting there, that

6    he was in my conference room.

7    Q.  Did you go to speak to him?

8    A.  Yes.

9    Q.  Before we get into the substance, what was his demeanor at

10   that time?

11   A.  Agitated.

12   Q.  What did he say to you when you spoke to him in your

13   conference room?

14   A.  I was just kind of shocked at why he was there, and he said

15   that he was jammed up and he needed help.

16   Q.  What did you understand him to mean by "jammed up"?

17   A.  He told me what he meant.

18   Q.  And what was that?

19   A.  He said that he was about to be evicted from his office

20   space and that he needed money for his payroll.  And I

21   questioned it.  I said, How is this happening right now?  He

22   was running around all over, doing all this press, why wasn't

23   his office organized?  He said, Not now, I'm just jammed up.

24   Q.  And you referenced that he said he needed help.  Did he

25   explain what kind of help he was asking for?

1    A.  He needed financial help.

2    Q.  Did he explain what help he was asking for from you at that

3    time?

4    A.  He asked me to loan him $250,000 for a bridge loan.

5    Q.  What does a bridge loan mean?

6    A.  A loan for, money is due, but you need the money at this

7    point in time, and then you could -- it would be just bridging

8    the gap between the time the money came and your shortfall.

9    Q.  Now, aside from the payroll and rent, which I believe you

10   referenced, did he explain whether he needed money for anything

11   else at that time?

12   A.  No.  That was the only two things.  I was kind of taken

13   aback because he was the top lawyer all around TV and

14   everything.  So I was shocked that he needed money for rent and

15   for payroll.

16   Q.  What, if anything, did he say about needing to pay any

17   money to Ms. Daniels at that time?

18   A.  There was no discussion about Ms. Daniels.  All the

19   discussion about Ms. Daniels happened on that Friday evening at

20   the Girardi party.

21   Q.  What, if anything, did he say at that time about how

22   quickly he needed the money from the loan?

23   A.  Well, that's when you asked me why he was -- what his

24   demeanor was.  He was just agitated.  He said he needed the

25   money now.  I kind of looked at him and said, Are you serious?

1    Q.  How did respond to the request for a loan from you?

2    A.  I used the "F" word with a no at the end.

3    Q.  What, if anything, did you say after that?

4    A.  He's like, Can you help me out, do you have anybody that

5    can give me a bridge loan?

6    Q.  How did you respond?

7    A.  I said, I do, I have some people that have some cash that

8    could probably get you a loan, but I don't know if they could

9    do it within the time period.

10   Q.  What was your understanding of the time period that was

11   required?

12   A.  As I said earlier, it was like now, at that time.

13   Q.  Did you and he discuss any particular person who might be

14   able to provide such a loan?

15   A.  No.  He just said, Come on, player, you've got to help me

16   out, you've got to help me out.  I said, I know some serious

17   guys, and I don't think you want to borrow money from them, but

18   I might have another guy that you could borrow money, let me

19   make a call.

20   Q.  Who is that guy?

21   A.  His name is Jack Guiragosian.

22   Q.  Who is that?  How do you know him?

23   A.  Jack is a client of mine.  I was a general counsel for a

24   company of his called Tri-Tech Internet Services, Inc. and

25   Cyber New World Business.  He's an online tech guy.  He also

1    owns -- he owned a handful of nightclubs in Los Angeles, very

2    successful.

3    Q.  Did you reach out to him at that time?

4    A.  I did.

5    Q.  Was Mr. Avenatti there for your call with Mr. Guiragosian?

6    A.  He went back into the conference room because I think he

7    did some sort of interview.

8    Q.  Who is "he" in that sentence?

9    A.  Avenatti.

10   Q.  In substance, what did you communicate to Mr. Guiragosian?

11   A.  I said, I have a colleague, you might have heard of him,

12   Michael Avenatti.  He needs a quick bridge loan to handle some

13   sort of --

14           MR. AVENATTI:  Objection.  Hearsay.

15           MR. PODOLSKY:  Your Honor, first of all, it's an agent

16   statement in this context.  Second of all, it's simply offered

17   to advance the story.

18           THE COURT:  The jury may not consider the statement

19   for its truth but to explain what comes next.

20           With that, you may answer.

21   A.  So I talked to Jack.  I gave him who -- basically, kind of

22   like a Reader's Digest of why Avenatti needed the bridge loan.

23   My understanding was it was going to be for a couple of weeks,

24   maximum a month or so.  Would he be interested in assisting me

25   in that request.  And he said yes.

1    Q.  Did you then communicate that to Mr. Avenatti?

2    A.  Yeah.

3    Q.  How did he respond?

4    A.  He said he was going to draft up a promissory note.

5    Q.  Let me show you --

6          MR. PODOLSKY:  Mr. de Grandpre, if you could pull this

7    up for the witness and the parties and the Court what has been

8    marked for identification as Government Exhibit 604.

9    Q.  Mr. Macias, do you recognize this document?

10   A.  You want me to go through the notebook or on the computer?

11   Q.  Whatever is easier for you.

12   A.  I'm a paper guy.

13         THE COURT:  Just find Government Exhibit 604, your

14   Honor.

15   A.  I recognize this.

16   Q.  What type of document is it?

17   A.  It's an e-mail attached to a promissory note.

18   Q.  Did you receive this e-mail from Mr. Avenatti?

19   A.  Yeah.  He sent it to me.

20         THE COURT:  Into the microphone, please.

21         THE WITNESS:  I apologize, your Honor.

22   A.  Yes.

23         MR. PODOLSKY:  The government offers Government

24   Exhibit 604.

25         THE COURT:  Any objection?

1          MR. AVENATTI:  None.

2          THE COURT:  Admitted.

3          (Government's Exhibit 604 received in evidence)

4          MR. PODOLSKY:  Mr. de Grandpre, if you could pull it

5     up for the jury, please.

6          Why don't we do it this way.  If we could pull up the

7     e-mail on the left side and on the right side the first page of

8     the attachment.

9     Q.  Do you see on the left side of the screen, or the first

10    page of Government Exhibit 604, an e-mail from Michael

11    Avenatti?

12    A.  Yeah, directed to me, Sean.

13    Q.  That was my first question.  Is Sean in the "to" line you?

14    A.  Yes.

15    Q.  You see that it was sent September 4, 2018, at 5:16 p.m.?

16    A.  I do.

17    Q.  In relation to the events that we were just discussing,

18    your conversation in your office with Mr. Avenatti, when was

19    this e-mail sent to you?

20    A.  On or about September 4, 2018, at 5:16 p.m.

21    Q.  Was this during, before or after, close in time to, what

22    was the relationship to the discussion you were just describing

23    that you had with Mr. Avenatti about the loan?

24    A.  So it was after I talked to Jack, after I told Avenatti

25    Jack is interested, Mr. Avenatti sent me this note.  We had a

1    meeting with Jack that evening.

2              THE COURT:  So this is all on the same day, later the

3    same day after your meeting in your conference room?

4              THE WITNESS:  Yes, your Honor.

5    Q.  Now, just looking on the right side of the screen, or in

6    the binder the second page, the beginning of the attachment,

7    what is the title of this document?

8    A.  Nonnegotiable promissory note due November 5, 2018.

9    Q.  What is a nonnegotiable promissory note?

10   A.  Well, nonnegotiable is the terms are going to be set forth

11   in the document; promissory note is a promise basically to pay;

12   and that Mr. Guiragosian would be the noteholder for this.

13   Q.  In substance, does this reflect a proposed loan from Mr.

14   Guiragosian to Mr. Avenatti?

15   A.  It does.

16   Q.  Who do you understand drafted this document?

17   A.  I know that Michael drafted it.

18   Q.  How do you know that?

19   A.  Because he said I'm going to draft a note and can you print

20   it out.

21   Q.  You see the amount is $300,000 in the upper left-hand

22   corner?

23   A.  I do.

24   Q.  Now, did you go to meet Mr. Guiragosian about this

25   potential loan?

 1    A.  Yes.

 2    Q.  Where did you meet Mr. Guiragosian?

 3    A.  At his home in La Canada, California.

 4    Q.  How did you get there?

 5    A.  I drove.

 6    Q.  Did Mr. Avenatti come with you?

 7    A.  Yeah, he was in my passenger seat.

 8    Q.  What happened when you got to Mr. Guiragosian's house?

 9    A.  Jack, Mr. Guiragosian was outside playing basketball with

10    his son.  I stepped out of the car.  Mr. Avenatti stepped out.

11    I introduced Jack, or Mr. Guiragosian, to Michael.  He told us

12    to come inside.  We walked inside his home.

13    Q.  What did you do at that point?

14    A.  We sat pretty much in the living room area, and I excused

15    myself because I didn't want to make Michael feel awkward if

16    someone is asking for money.  So I said, let me go grab a beer,

17    because I am very familiar with Jack, and I went into the

18    kitchen to get a beer.

19    Q.  After you left to go get the beer, at any point, while Mr.

20    Avenatti was still there, did you go back and forth to the room

21    where Mr. Avenatti and Mr. Guiragosian were?

22            MR. AVENATTI:  Leading.

23            THE COURT:  Overruled.

24    A.  I couldn't find a bottle opener in his kitchen so I had to

25    go back and I asked him, and I basically sat down and listened

1   to what was being spoke.

2   Q.  In substance, can you describe the discussion between Mr.

3   Guiragosian and Mr. Avenatti?

4           MR. AVENATTI:  Objection.  Hearsay.

5           THE COURT:  Overruled.

6           Let me just say, you can consider whatever testimony

7   the witness gives about statements that Mr. Avenatti made, you

8   may consider those for their truth.  Whatever statements the

9   witness describes Mr. Guiragosian making you may consider only

10  for context, that is, for purposes of understanding Mr.

11  Avenatti's statements.

12          With that, you may proceed.

13  A.  So Michael told Mr. Guiragosian that he needed the money

14  for a bridge loan to pay some costs that -- the Irvine Company

15  were Republicans and they were trying to throw him out, and it

16  was terrible, and he's fighting the good fight.  And then he

17  said that he needed it for a bridge loan for two months and

18  that he'll pay him back; he had some big hit that was coming

19  in, in September or October, and so he would be sorted out or

20  paid up.  And then we were about to leave and Jack said, OK,

21  that sounds good.  He wanted to talk to a friend who is a

22  lawyer.  No one had an issue with that.  But I think then

23  Michael turned and said, I need the money by tomorrow morning.

24  Q.  For clarity, you mentioned the Irvine Company.  Did you

25  have an understanding, based on your discussions with Mr.

1    Avenatti, of what the Irvine Company was?

2    A.   Irvine Company is a property owner of buildings in Orange

3    County.  Mr. Avenatti has -- I guess had an office in Newport

4    Coast near Fashion Island, very nice part of Orange County.

5    Q.   Was Irvine Company the landlord for that, as you understood

6    it?

7    A.   My understanding is, but I don't have any other

8    understanding, from Mr. Avenatti saying the Irvine Company is

9    trying to throw him out.

10   Q.   Following your meeting with Mr. Guiragosian, when is the

11   next time you heard from Mr. Avenatti?

12   A.   The next morning, so that would be the 5th.

13   Q.   How did you hear from Mr. Avenatti?

14   A.   He was like blowing up my phone all morning.

15   Q.   How early, as you recall it?

16   A.   Like super early.

17   Q.   Did you speak with him?

18   A.   I did.

19   Q.   What did he say?

20   A.   Apparently, he didn't hear from Jack and he was just

21   basically on me to go call.  It was like a beautiful September

22   morning, and I was just shaking my head thinking, no good deed

23   gets unpunished here.  I said, let me get to the office and

24   then I will make some phone calls.

25        MR. PODOLSKY:  Let's show for Mr. Macias and the

1    parties and the Court what has been marked for identification

2    as Government Exhibit 605.

3    Q.   You can look in your binder, Mr. Macias, for 605.

4    A.   I have got it.

5    Q.   Do you recognize this e-mail -- this document, Mr. Macias?

6    A.   I do.

7    Q.   What is it?

8    A.   This is an e-mail from Jack Guiragosian to me.

9              THE COURT:  Let's leave it there.  Thank you.

10             MR. PODOLSKY:  The government offers Government

11   Exhibit 605.

12             MR. AVENATTI:  Objection.  Hearsay.

13             MR. PODOLSKY:  It's not offered for any truth, and I

14   don't think there is any hearsay in the document.

15             THE COURT:  I will allow it.  The objection is

16   overruled.

17             Ladies and gentlemen, to the extent that there are any

18   statements in this e-mail, you may not consider them for their

19   truth, but you can certainly consider it for the fact that it

20   was sent and received.

21             (Government's Exhibit 605 received in evidence)

22             THE COURT:  You may proceed.

23             MR. PODOLSKY:  Mr. de Grandpre, if we can pull it up

24   for the jury, please.

25   BY MR. PODOLSKY:

1    Q.  Do you see that Government Exhibit 605 is an e-mail to you,

2    Mr. Macias?

3    A.  That's correct.

4    Q.  You see at the top it's from Jack G?

5    A.  Jack G, Jack Guiragosian, yes.

6    Q.  When was this e-mail sent?

7    A.  September 5, 2018, on or about 9:01 a.m.

8    Q.  What was the subject?

9    A.  Avenatti; loan no go.

10   Q.  You see that Mr. Guiragosian wrote, "Sorry, Sean, as much

11   as I wanna help and be involved, this transaction can't happen

12   in such a short time period.  Don't wanna hold you guys up with

13   back and forth."

14           Do you see that?

15   A.  I do.

16   Q.  Where were you when you received this e-mail?

17   A.  I was at my office.

18   Q.  What did you do after receiving this e-mail?

19   A.  I called Avenatti.

20   Q.  What did you tell him?

21   A.  I told him, I said, Sorry, kid, Jack says no on the loan.

22   Q.  How did he respond?

23   A.  He was really upset, like really upset.

24   Q.  Did he say anything at that time?

25           THE COURT:  You can answer the question, whatever it

1    may have been.

2    A.  I just don't want to, you know -- he was just really upset.

3          THE COURT:  The question was, did he say anything?

4    Please answer regardless of what the words were.

5    Q.  Mr. Macias, setting aside his emotions and demeanor, what

6    did he say?

7    A.  It was a lot.

8          THE COURT:  Can you recall the precise words?  I

9    understand you seem uncomfortable about saying them, but put

10   that aside and please share the exact words.

11         THE WITNESS:  It's not about me being uncomfortable

12   about saying words in court.  I'm am OK with that, your Honor.

13   It's just that -- he was upset.

14   Q.  What, if anything, did he say about the loan at that time?

15   A.  I couldn't even understand him.  It was almost like he was

16   teared up crying.

17   Q.  Did you come to speak to him further about the possibility

18   of a loan?

19   A.  Yeah.  After he calmed down.

20   Q.  Did you speak to him on the phone, in person?

21   A.  On the phone.

22   Q.  What, if anything, did he say about the possibility of

23   getting a loan at that point?

24   A.  I mean, and I still feel bad for him, in a weird --

25         THE COURT:  Mr. Macias, just answer the question.

1          THE WITNESS:  I'm trying, your Honor.  I kind of go

2     through my own process here.

3     A.  So he was upset, calmed down, and then he asked me to reach

4     out to somebody else.

5     Q.  Did he ask about a specific person or just anyone else?

6     A.  He asked me -- he's, like, can you call Geragos?

7     Q.  Who is Geragos?

8     A.  Mark Geragos.

9     Q.  How do you know that person?

10    A.  Mark Geragos is a mentor, friend, marquis attorney from the

11    United States.

12    Q.  What did you say in response to the request to reach out to

13    Mr. Geragos?

14    A.  I did not want to call Geragos on a beautiful September

15    morning and ask him for money.  I said, you're killing me.

16    Q.  Did you come to call Geragos?

17    A.  I did.

18    Q.  Where was Mr. Avenatti when you called Mr. Geragos?

19    A.  I don't know where he was.  He wasn't near me so I don't

20    know where he was.

21    Q.  In substance, what did you convey to Mr. Geragos?

22          MR. AVENATTI:  Objection, your Honor.  Hearsay.

23          MR. PODOLSKY:  Again, not for the truth.

24          THE COURT:  Same ruling.  Same instructions.

25          You may answer.

1    A.  So I called up Mark Geragos and I said, Hey, Avenatti's

2    jammed up.  I said, Don't yell at me, but he needs a bridge

3    loan.

4    Q.  Again, in substance --

5    A.  You want me to continue?  OK.

6         So Mark said, how much?  And I said, 250 to 300.  And he

7    kind of like laughed.  And then he said, What's going on?  I

8    said, He's getting squeezed by his company that manages or owns

9    the building, and he has some payroll problems.  And that's

10   what I told him.

11   Q.  Did Mr. Geragos agree to extend the loan?

12   A.  Shockingly, he said -- he referred to him as El

13   Presidente -- he's like, Why not.

14   Q.  Did you convey that back to Mr. Avenatti?

15   A.  I called Avenatti out there and I said, you know what, I

16   just did it again.  I'm just a lifesaver for you, kid.  Geragos

17   is a go.

18            MR. PODOLSKY:  Let's pull up for the witness and the

19   parties what is marked for identification as Government Exhibit

20   606.

21   Q.  Mr. Macias, do you recognize this document?

22   A.  It looks like a text conversation between me and Geragos.

23            MR. PODOLSKY:  The government offers Government

24   Exhibit 606.

25            MR. AVENATTI:  Objection, your Honor.  Hearsay.

1          MR. PODOLSKY:  There are no statements of facts in

2     here, your Honor.

3          THE COURT:  Overruled.  Admitted.

4          (Government's Exhibit 606 received in evidence)

5          MR. PODOLSKY:  If we could please pull this up for the

6     jury, Mr. de Grandpre.

7     Q.  Mr. Macias, what are we looking at, what is this exhibit?

8     A.  So, you know, I talked to Mark a lot.  So this looks like a

9     chain of text messages that I had with Mark over the weekend of

10    Labor Day 2018.

11    Q.  You see in the middle there is a timestamp Wednesday,

12    September 5, 11:35 a.m.?

13    A.  I do.

14    Q.  You see below that, there is blue bubble that says, "Thanks

15    for sorting out Avenatti."

16          Do you see that?

17    A.  Yes.

18    Q.  Who wrote the text in the blue bubble?

19    A.  That's definitely my language, so that's me.

20    Q.  Why did you write on September 5, at 11:35 a.m. "thanks for

21    sorting out Avenatti"?

22    A.  Because at that time my understanding was that the wire was

23    green-lighted to Avenatti for the loan.

24    Q.  How much did you understand that loan was for?

25    A.  300,000.

1              Let me correct myself.  My understanding, for Geragos

2      it was 250, 250.

3      Q.  $250,000?

4      A.  Yeah.  It was Jack that he asked for 300.

5      Q.  Now, you mentioned before discussions about rent and so on.

6              Do you know how Mr. Avenatti spent the proceeds of that

7      loan?

8      A.  I do not.

9              MR. PODOLSKY:  Just one moment, your Honor.

10             Nothing further at this time, your Honor.

11             THE COURT:  Cross-examination.

12     CROSS-EXAMINATION

13     BY MR. AVENATTI:

14     Q.  Mr. Macias, good afternoon.

15     A.  Hello.

16     Q.  Have you consumed any alcohol or drugs in the last 24

17     hours, sir?

18     A.  Yeah.

19     Q.  What have you consumed?

20     A.  I had a glass of champagne yesterday.

21     Q.  Anything else, any cocaine or marijuana?

22     A.  No.

23     Q.  Now, how many times have you met with the government in

24     connection with this case?

25     A.  Four or five times.

1    Q.  And each time that you have met with the government, you
2    have had a criminal defense attorney present, isn't that true?
3    A.  I had my attorney present.
4    Q.  He is a criminal defense lawyer.  He is here today.  He is
5    seated in the second row there on the end, right, Mr. Gameel?
6    A.  I don't know who Gameel is.  It's David Gammill, and he is
7    my attorney.
8    Q.  He is a criminal defense attorney and he is seated here
9    today, correct?
10              MR. PODOLSKY:  Objection, your Honor.
11              THE COURT:  Sustained.
12              Ladies and gentlemen, let me explain.  Anyone is
13   entitled to hire a lawyer, and it's certainly not uncommon when
14   a witness is asked to meet with the government, with
15   prosecutors, that they may choose to bring a lawyer with them.
16   That is their right.
17              And with that, you may proceed, Mr. Avenatti.
18              MR. AVENATTI:  Thank you, your Honor.
19   Q.  Mr. Macias, before you agreed to meet with the government
20   in this case, you requested a proffer agreement?
21   A.  Absolutely.
22   Q.  And you requested a proffer agreement in order to allow you
23   to speak to the government and in order to prevent them from
24   using anything you might tell them against you in a criminal
25   case, isn't that true?

1   A.  Absolutely.  That's criminal law 101.

2           MR. AVENATTI:  Move to strike everything after

3   "absolutely" as nonresponsive.

4           MR. PODOLSKY:  He is responding to the question, your

5   Honor.

6           THE COURT:  We will leave it as is.

7           Mr. Avenatti, go ahead.

8   Q.  You did that because you wanted to make sure that you were

9   provided protection from the government pursuing criminal

10  charges against you.  Isn't that true, sir, yes or no?

11  A.  No.

12  Q.  And you asked for the proffer agreement so that you could

13  say things to the government and they could not use them

14  against you, yes or no?

15          MR. PODOLSKY:  Objection, your Honor.

16          THE COURT:  Overruled.

17  A.  No.

18  Q.  Now, you understood that you had the ability to meet with

19  the government without a proffer agreement, yes or no?

20  A.  I would never have done that.

21  Q.  You understood, though, that witnesses meet with the

22  government all the time without a proffer agreement, don't you,

23  sir, yes or no?

24  A.  No.  That would be speculating.

25  Q.  So you think every time a witness meets with the

1    government, based on your knowledge and experience, they always

2    have a proffer agreement, am I right about that?

3              MR. PODOLSKY:  Objection, your Honor.

4    A.  Every smart witness would.

5              THE COURT:  Wait for an objection and a ruling.

6              The objection is sustained.  You don't need to answer

7    the question.

8    Q.  Mr. Macias, please just answer my question.  Here is my

9    next question.

10       You have represented various individuals in connection with

11   criminal defense cases, correct?

12   A.  Can you ask your question again?

13             MR. AVENATTI:  Could I have it read back, your Honor?

14             THE COURT:  The question was, you have represented

15   various individuals in connection with criminal defense cases,

16   correct?

17   A.  I would say no.

18   Q.  So you have never represented any witness in connection

19   with any criminal matter; is that your testimony, sir?

20   A.  No.  Criminal matters, but not defending them as a defense

21   counsel at trial.

22   Q.  OK.  So you have represented witnesses in connection with

23   criminal investigations, correct?

24   A.  Absolutely.

25   Q.  And you're familiar then, are you not, with generally what

1    a proffer agreement is, yes or no?

2    A.  I am.

3    Q.  And a proffer agreement is a written agreement that a

4    witness signs and the government signs that generally provides

5    that the witness will speak with the government and the

6    government will not use what they learned from the witness

7    during the meeting against the witness; is that your

8    understanding, sir?

9    A.  That's a great restatement of what a proffer is,

10   absolutely.

11   Q.  And that's what you demanded that these prosecutors enter

12   into before you would speak with them, right, yes or no?

13   A.  I did because I had no idea what you were doing.

14          MR. AVENATTI:  Move to strike after "I did" as

15   nonresponsive.

16          THE COURT:  We will leave it at just "I did."

17   Q.  And the reason why you asked for the proffer agreement was

18   because you were concerned about what the government might have

19   on you as it related to criminal exposure, isn't that true, yes

20   or no?

21   A.  No.  I would have gotten an immunity claim if I was

22   concerned.

23          THE COURT:  Mr. Macias, just answer the question, and

24   we will leave it at "no."

25          THE WITNESS:  OK.

1          MR. AVENATTI:  Move to strike the balance.

2          THE COURT:  Granted.

3          Just answer the question.  If counsel for the

4    government wishes to follow up, they will have an opportunity.

5          THE WITNESS:  I appreciate that.  Thank you, your

6    Honor.

7    Q.  You were concerned -- strike that.

8          Another reason why you asked for the proffer agreement was

9    because you were concerned that you might be setting yourself

10   up to be criminally charged, isn't that true, sir?

11   A.  No.

12   Q.  Have you ever seen the fee agreement that I or one of my

13   law firms has with Stormy Daniels?

14   A.  I believe I did see it.

15   Q.  It's your testimony that your best recollection is that

16   that agreement provides that I will represent her for one

17   dollar; is that your testimony, sir?

18   A.  No.  You said that you would represent her for one dollar.

19         MR. AVENATTI:  Move to strike, your Honor, after "no."

20         THE COURT:  Again, just answer the question.  The

21   answer was "no," and we will strike the rest.

22   Q.  Mr. Macias, before you met with the government, had you

23   ever seen the fee agreement between me and my firms and Ms.

24   Daniels?

25   A.  I believe I did in March of 2018.

1           MR. AVENATTI:  Can we pull up the fee agreement,

2    please.

3    Q.  Before we pull it up, Mr. Macias, what do you recall about

4    the fee agreement?

5    A.  That you were going to charge her one dollar to represent

6    her.

7    Q.  That's what you recall seeing in March of 2018, correct?

8    A.  No.  That's what you told her --

9           MR. AVENATTI:  Move to strike after "no" as

10   nonresponsive to the question.

11          THE COURT:  Granted.  We will leave it at "no."

12   Q.  Mr. Macias, do you recall seeing the written fee agreement

13   in March of 2018, yes or no?

14   A.  I just said -- I have said now twice I have.

15   Q.  What do you recall the written fee agreement between Ms.

16   Daniels and me and my firms stating?

17   A.  I don't recall as I sit here today.

18   Q.  Do you know if there is a signed written fee agreement

19   between me and Ms. Daniels?

20   A.  I do not know that.

21   Q.  Did you ever discuss with Ms. Daniels a written fee

22   agreement?

23   A.  No.

24   Q.  Sir, isn't it true when we met with Mr. Guiragosian, that

25   he voiced an interest in investing in a website that would

1    allow him to market my legal services in exchange for a

2    financial interest?

3              MR. PODOLSKY:  Objection.

4    Q.  Isn't that true?

5              MR. PODOLSKY:  Objection.

6              THE COURT:  Sustained.

7    Q.  Mr. Macias, the meeting that you testified on direct about,

8    I want to take you back to that meeting.  Do you have the

9    meeting in mind?

10   A.  Which meeting is that, the meeting in my office or with

11   Jack?

12   Q.  The meeting at Jack's home that you testified about.

13   A.  I got it.

14   Q.  Isn't it true that during that meeting, it was discussed

15   that Mr. Guiragosian had an interest in investing in a web

16   business involving me?

17   A.  I don't recall that part.

18   Q.  Are you saying that didn't happen?

19   A.  Remember, I was outside getting a beer, so it could have

20   happened but I wasn't present.

21   Q.  Well, let's take a look at Exhibit 605, the e-mail.

22        Maybe we can blow up the second sentence.

23        "I would still be interested in investing and doing

24   something in the near future."

25        Did I read that correctly, sir?

1    A.  You did.

2    Q.  Now, the fact of the matter was, Mr. Macias, that in the

3    fall of 2018, you were incredibly enthusiastic that I might run

4    for higher office, isn't that true?

5            MR. PODOLSKY:  Objection, your Honor.

6            THE COURT:  Overruled.

7    A.  Absolutely.  I told you I wanted to be ambassador.

8    Q.  What do you mean ambassador.

9    A.  You told me you wanted me to be chief of staff.  I said

10   make me ambassador of France, that would be awesome.

11   Q.  Isn't it true, sir, that in late August of 2019, you

12   attempted to raise money for my campaign?

13   A.  2019?

14           MR. PODOLSKY:  Objection.

15   Q.  2018.

16           THE COURT:  Sorry.  Can you ask the question again?

17   And if there is an objection, I will rule on it.

18   Q.  Isn't it true, sir, that in late August of 2018, around the

19   same time that the government was asking you about, you

20   actually sent me a text message that said you were going to

21   raise money for me so that I could run like a banshee?

22   A.  Did I say banshee?  If you could show me the text to

23   refresh my recollection.

24   Q.  Do you deny that you sent the text?

25           MR. PODOLSKY:  Objection, your Honor.

1              THE COURT:  Sustained.

2              MR. AVENATTI:  Can I please have the text for the

3      benefit of the witness?

4              THE COURT:  No.  Ask your next question, please.

5              MR. AVENATTI:  I was going to refresh your

6      recollection.

7              THE COURT:  I understand what you were going to do,

8      but ask your next question, please.

9      Q.  Mr. Macias, the money that you were attempting to raise for

10     me in August and September of 2018 related to my potential

11     campaign, didn't it?

12             MR. PODOLSKY:  Objection.

13     A.  I am completely confused.

14             THE COURT:  Hold on.  There is an objection so you

15     have to wait for a ruling.

16             Sustained as to form.

17     Q.  Mr. Macias, in August and September of 2018 -- strike that.

18         On direct you told a story about efforts to find money for

19     me.  Do you recall that testimony on direct?

20             MR. PODOLSKY:  Objection as to characterization.

21             THE COURT:  The jury's recollection of the testimony

22     will control.  I reminded you before that questions that

23     lawyers ask and that Mr. Avenatti asks are not evidence; only

24     the answers of the witness are evidence.

25             With that, Mr. Avenatti, why don't you ask your next

1   question since I think the framing has occurred.

2           Go ahead.

3   Q.  Mr. Macias, on direct examination, you were asked a number

4   of questions about your efforts to raise money for me in August

5   and September of 2018.  Do you recall that?

6   A.  I don't recall the word raising money for you.  You asked

7   me to help you out for a loan.

8           MR. AVENATTI:  After the first "you" move to strike as

9   nonresponsive.

10          THE COURT:  Denied.

11  Q.  Mr. Macias, you testified on direct about your efforts to

12  find money for me.  Do you recall that?

13  A.  I don't accept your wording so I can't answer as worded.

14  So I would request that you reword your question.

15          MR. AVENATTI:  Your Honor, I would like an answer to

16  the question.

17          THE COURT:  Ask another question and he will answer

18  it.

19  Q.  Mr. Macias, on direct examination, you answered various

20  questions about efforts to assist me in getting money.  Do you

21  recall that?

22  A.  I was --

23  Q.  Do you recall the questions and the answers, sir?

24  A.  Yes.

25  Q.  OK.  Isn't it true that those efforts to find money for me

M1qWave6

1    related to my campaign?

2    A.   Absolutely not.

3            THE COURT:  We are going to stop there for the day.

4            Ladies and gentlemen, a couple of reminders, my usual

5    ones.  Number one, please keep an open mind.  You have not

6    heard all of the evidence in the case.  Number two, do not

7    discuss or communicate about the case to anyone involved in it

8    or to anyone, in any way, shape or form.  Number three, don't

9    do any research about the case, investigate anyone involved in

10   the case, or anything of that sort.  Number four, as you know,

11   if you hear anything, see anything on the news, in the

12   newspaper, on the internet about the case, close it, shut it

13   down, change the channel, whatever the case may be.  It's your

14   obligation to avoid being exposed to anything about the case.

15           With that, I wish you a very pleasant evening.  If you

16   can make it four days in a row that you are here on time and

17   ready to go, that will be awesome, and we will see you in the

18   morning.  Thank you very much.

19           (Continued on next page)

20

21

22

23

24

25

M1qWave6

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Mr. Macias, in a moment, I'll excuse you.  Just before

4    I do, let me give you a couple instructions first.  Please be

5    here by 9 a.m. tomorrow, ready to go to resume your testimony.

6    Looks to me you're not thrilled about that, and I apologize,

7    but it is what it is.

8          No. 2, you may not communicate with the

9    representatives of the government about the substance of your

10   testimony because you're on cross-examination.  You certainly

11   may with respect to logistical matters, but limited to that.

12   You may speak to your own lawyer, but your lawyer may not be a

13   conduit for communications with the government.

14         With that, you may step down, and we'll see you

15   tomorrow morning.  And thank you very much.

16         THE WITNESS:  Your Honor, can I have an understanding

17   of how long I'll be here tomorrow?

18         THE COURT:  Sure.  That's reasonable enough.

19         Mr. Avenatti, do you know how much longer you have on

20   cross-examination here?

21         MR. AVENATTI:  Less than 30 minutes.

22         THE COURT:  OK.

23         MR. AVENATTI:  And I'd like to renew the objection.

24         THE COURT:  Mr. Avenatti, not now.  Thank you.

25         You may step down, Mr. Macias, and you're excused from

M1qWave6

1    the courtroom.

2            MR. AVENATTI:  Your Honor, the objection --

3            THE COURT:  Mr. Avenatti, not now.

4            MR. AVENATTI:  Understood.

5            THE COURT:  Thank you.  Then hold your tongue, please.

6            (Witness not present)

7            THE COURT:  The witness is out of the room.

8            Mr. Avenatti, what do you wish to say?

9            MR. AVENATTI:  I was going to ask for an instruction

10   of the witness not to converse with his counsel, which was the

11   same request we made previously.  I understood the Court denied

12   it previously.

13           THE COURT:  And I --

14           MR. AVENATTI:  In fact, I wanted to make the record

15   before the witness left the room, your Honor.

16           THE COURT:  Well, it's harmless, because the same

17   request gets the same ruling, and it is denied.

18           We have to take up the motion to quash.  I would

19   propose that we take a couple minutes' break just so folks can

20   stretch and take care of whatever business they need to take

21   care of.

22           I think in future trials, I may have to ask in my jury

23   selection things about bladder control.  I've never had this

24   problem before, but be that as it may, I'll give you an

25   opportunity to take care of that yourselves.

M1qWave6

```
 1              It's 3:05.  Why don't you be ready in just about five
 2     minutes so we can deal with that promptly, and at that time,
 3     you can tell me if there's anything else we need to deal with
 4     as well.  I suppose we should also address the government's
 5     motion, filed last night, to preclude cross with respect to
 6     Ms. Clifford.
 7              Be back in a few minutes.
 8              (Recess)
 9              THE COURT:  You may be seated.
10              I think Mr. Meister is here.
11              MR. MEISTER:  Yes, your Honor.
12              THE COURT:  Mr. Meister, are you admitted in the
13     Southern District?
14              MR. MEISTER:  I am.
15              THE COURT:  All right.  Let's take up the motion to
16     quash first.  I guess why don't I hear from Mr. Avenatti, and
17     then we'll go from there.
18              I assume, let me confirm the government and Mr.
19     Avenatti have both received a copy of Mr. Meister's submission?
20              MR. PODOLSKY:  Yes, your Honor.
21              THE COURT:  Mr. Avenatti.
22              MR. AVENATTI:  Thank you, your Honor.
23              THE COURT:  Have you received a copy of the
24     submission?
25              MR. AVENATTI:  Yes, sir.
```

M1qWave6

1          THE COURT:  OK.  I don't know if it's yet on the

2     docket, but certainly --

3          MR. PODOLSKY:  I think I saw an ECF bounce, your

4     Honor.

5          THE COURT:  OK.  Great.

6          Mr. Avenatti.

7          MR. AVENATTI:  Yes, your Honor.

8          Your Honor, I want to start with the events of

9     yesterday, because I think they're relevant to the issue of

10    whether the subpoena should be quashed.

11         During the cross-examination of Mr. Janklow, or at the

12    end of the examination, I should say, your Honor ended the

13    cross-examination of Mr. Janklow early and told my counsel at

14    the time, Mr. Dalack, to sit down, that he was effectively

15    done, in the presence of the jury.

16         Your Honor, at the end of the cross-examination of Mr.

17    Janklow, while Mr. Dalack was exploring a number of relevant

18    areas -- and I understand the Court may disagree, but had spent

19    considerable time in the morning session cross-examining Mr.

20    Janklow relating to -- or related to relevant topics, highly

21    relevant to this case, and I'll get to that in a minute.  That

22    was highly prejudicial, your Honor, in that it precluded the

23    defense from examining a superior witness on issues that are at

24    the center of the defense theory of this case, and I lodged my

25    objection on the record to the Court doing so, especially

M1qWave6

1    before the jury, and at a minimum, I believe we should be able

2    to re-call Mr. Janklow and finish the cross-examination.

3            THE COURT:  Well, the objection is overruled,

4    obviously, and you've made your record.  As I said yesterday, I

5    think my cutting Mr. Dalack off, after repeated warnings to

6    move on and given the nature and extent of his questions in the

7    morning, was on firm ground under Rule 611.

8            The focus at this point is why you should be permitted

9    to re-call Mr. Janklow, particularly given that he has a

10   nonrefundable vacation with his family upon which he is due to

11   leave tomorrow.  So focus on that, please.

12           MR. AVENATTI:  We are presently, as the Court is well

13   aware, on the government's case in chief and then I will have

14   an opportunity to put on my case in chief.  During my case in

15   chief, I want to explore with Mr. Janklow all of the work I did

16   for Ms. Daniels on the book deal and ensuring that the book got

17   published, the pivotal role that I played and the quantity and

18   quality of my work.  All of that testimony and evidence, your

19   Honor, goes directly to a central defense in this case, which

20   is that I was entitled to a fee from Ms. Daniels for that work,

21   both under the contract and under the law of *quantum meruit*,

22   both in California and New York.  And I have two citations.

23           THE COURT:  I don't need citations on that.  Thank

24   you.

25           MR. AVENATTI:  OK.

M1qWave6

1          It goes directly, this evidence and testimony, your

2    Honor, goes directly to my state of mind and my intent.  You

3    cannot be convicted of stealing your own money.  You cannot be

4    convicted of stealing money you legitimately believe you're

5    entitled to under a contract and black letter law because of

6    work that you did.  We previously handed up, or I previously

7    handed up the *Rossomando* case to your Honor.

8          THE COURT:  And I've read the portion that you

9    highlighted.  Mr. Avenatti, I understand the argument that

10   you're trying to make, and I understand that you will make it

11   to the jury.

12          My question is what did you not get from Mr. Janklow

13   that you need to re-call him?  Because the arguments that you

14   are making are based on evidence that's already in the record.

15   The jury knows that the book didn't do well.  The jury knows

16   that you did a ton of work for Ms. Daniels, certainly at the

17   start in negotiating the contract.  But thereafter, the jury

18   knows you had extensive conversations and communications with

19   Mr. Janklow on Ms. Daniels's behalf.  I think all of the

20   arguments you're trying to make are makeable based on the

21   evidence that's already in the record, not to mention your

22   counsel, at the time, had ample opportunity to elicit whatever

23   he needed from Mr. Janklow in the time that he was on the

24   stand.  So I just don't see it.

25          MR. AVENATTI:  Your Honor, let me see if I can assist

M1qWave6

1    the Court in seeing it.

2            THE COURT:  Mr. Avenatti, don't condescend to me.  All

3    right?  Make your argument.  If you can make your argument and

4    you can persuade me, that's one thing.  If you don't, then

5    that's another thing.  But make your argument, do it

6    straightforwardly, and then tell me what your argument is.

7            MR. AVENATTI:  Your Honor, to be clear, I meant no

8    disrespect.

9            THE COURT:  OK.

10           MR. AVENATTI:  I'm sorry.

11           THE COURT:  Make your argument.

12           MR. AVENATTI:  OK.

13           The amount and quality of the work I did on the book,

14   your Honor, during the duration, from the negotiation with the

15   publisher all the way up through the publishing of the book,

16   including the publicity, your Honor, goes directly to whether

17   my belief was reasonable and whether I had any intent to

18   defraud Ms. Daniels.

19           THE COURT:  I'm not disagreeing with that as a valid

20   argument that you may make to the jury.  But my question is,

21   based on the record as it stands today, between the testimony

22   of Mr. Janklow, which made very clear how extensively involved

23   you were on behalf of Ms. Daniels, not to mention the testimony

24   of Ms. Regnier, from whom you elicited that you did a ton of

25   work and expended a ton of resources on behalf of Ms. Daniels,

M1qWave6

1    what do you need Mr. Janklow for again in order to develop the

2    record on that point to make that argument?

3          MR. AVENATTI:  Because the cross-examination of Mr.

4    Janklow was confined to the front end of the time period, your

5    Honor, and we were not permitted to develop the record relating

6    to the work that I did after signing the -- well, actually,

7    just prior to signing the book contract as well as during the

8    process of getting the book published, including the time

9    period thereafter relating to the publicity and all of the

10   other work and the quality and quantity of the work that I did

11   on Ms. Daniels's behalf.  We were not permitted to develop that

12   because the cross-examination was curtailed by your Honor, and

13   that is the area, or areas, that I intend, if permitted, to

14   explore with Mr. Janklow on direct examination during my case

15   in chief.

16         That's the first area, and then I have a second area.

17         THE COURT:  Great.  So let's move to the second area.

18         MR. AVENATTI:  The second area is that I expect

19   Ms. Daniels to testify about her financial dealings with

20   Mr. Janklow and the book publisher relating to the book deal,

21   and I expect much of that testimony to be false based on what

22   she has said publicly.  I must have the ability to call Mr.

23   Janklow to testify relating to Ms. Daniels's false testimony

24   before the jury.

25         I'm happy to share with the Court -- in camera, ex

M1qWave6

*parte* -- documentary evidence of what I am referring to; in particular, statements previously made by Ms. Daniels, attacking Mr. Janklow and the publisher for allegedly defrauding her in the exact same way that she has made these allegations against me.  I should be permitted to re-call Mr. Janklow in the event that Ms. Daniels provides such testimony to demonstrate to the jury that Ms. Daniels is not being honest when it comes to the book deal in her allegations against me and others in connection with the book deal; that she's not being honest in connection with her allegations relating to all three parties -- me, the publisher, and the agent -- relating to how the book moneys were provided.

        And again, I'm also prepared to provide an *in camera, ex parte* oral proffer as to the additional areas of inquiry that I wish to explore with Mr. Janklow in my case in chief following the expected testimony not only of Ms. Daniels on the government's case but also Ms. Beier, Elizabeth Beier, who is on the government's witness list and I understand is going to be called.

        I have no desire to inconvenience Mr. Janklow or his family.  I am respectful of his travel plans, but at the same time, I certainly do have a due process right and a right under the Fifth and Sixth Amendments to mount a defense in this case, and a significant portion of the defense is, was I entitled to a fee; did I have a reasonable belief in that fee; how much was

M1qWave6

1    a reasonable amount for that fee, etc.

2           This is the core of the defense, your Honor, in this

3    case, and I need to be able to explore those areas adequately

4    with the jury.  And so for each of those reasons, I would ask

5    that I be permitted to either re-call Mr. Janklow out of turn

6    in order to present that testimony and evidence to the jury, or

7    that alternative arrangements be made so that I can re-call Mr.

8    Janklow in my case in chief, which I'm permitted to obviously

9    put on a case in chief in defense.  And for each of those

10   reasons, your Honor, I think the motion to quash should be

11   denied, and I would request an opportunity to examine Mr.

12   Janklow along the lines of what I've mentioned.  And again, I'm

13   willing to provide additional information *ex parte*, *in camera*

14   relating to the defense.

15           THE COURT:  All right.  Let me hear from the

16   government.  I think you're certainly welcome to develop the

17   record on the first point if you think there's anything further

18   that needs to be said, but I find that argument utterly without

19   merit.  I think the record is perfectly well developed for Mr.

20   Avenatti to make the arguments that he wishes to make between

21   Mr. Janklow's testimony and Ms. Regnier's.  I think if he had

22   questions to ask of Mr. Janklow, he had ample opportunity, and

23   that is not a justifiable basis to re-call him.  So if that

24   were the only argument, I would grant the motion to quash.

25           I guess the question I have is -- again, you can make

M1qWave6

1    whatever record you want to supplement that, but with respect

2    to the second issue, how I should address that.  I obviously

3    don't know what Ms. Clifford is going to testify to.  I don't

4    know what Mr. Avenatti is alluding to.  He's offered to make a

5    proffer *in camera*, and perhaps I should take him up on that,

6    but that one is hard to assess at this juncture.

7            MR. PODOLSKY:  Well, on the first point, I think you

8    quit while you're ahead, so I'm not going to make a further

9    record on that.  But on the second point --

10           THE COURT:  Keep your voice up, please.

11           MR. PODOLSKY:  Yes, your Honor.

12           Look, this is utterly speculative.  The defendant, if

13   he wished, your Honor, can make whatever proffer he wants to

14   you, but we don't expect testimony to be elicited about false

15   accusations to Mr. Janklow, No. 1.

16           No. 2, we don't think that would be a basis to re-call

17   him on a collateral matter about, I suppose, what Mr. Avenatti

18   is saying is that she might have falsely accused someone else.

19   I don't expect that to be the testimony, but I don't see why we

20   would re-call Mr. Janklow on that.  And I particularly don't

21   see why we'd re-call him on that for the third reason, which is

22   Mr. Avenatti was already permitted to ask him about that.

23           There were questions on cross-examination about

24   whether he was aware of any accusations by Ms. Daniels against

25   Mr. Janklow, and Mr. Janklow's answer was no.  So I really

M1qWave6

don't see the purpose here of testimony that is going to be
irrelevant, cumulative, and a waste of everyone's time on this
issue or any other.

        THE COURT:  All right.

        Mr. Meister, do you want to just make your way to the
podium here so you can find a microphone.

        Anything you wish to say?

        MR. MEISTER:  Just briefly, your Honor.

        First of all, we will rely on the argument that's in
the letter.

        Just with respect to this new point, I guess the other
thing I would just add to Mr. Podolsky's argument --

        THE COURT:  Loudly and into the microphone, please.

        MR. MEISTER:  Sorry.

        I think what Mr. Avenatti is proffering is that at
some point in the past, Ms. Daniels accused Mr. Janklow of some
sort of impropriety.  But I don't think that there's any
proffer that that's what she's going to say on the stand here.
And so what is the relevance if, at some point in the past, she
made an accusation against him, which he already denied, you
know, in his testimony?  I sort of fail to see how this can
possibly bear on the issues in this case.

        I also agree that -- I also agree, your Honor, that
the defense counsel had a lot of opportunity to talk to -- to
question Mr. Janklow about his conversations with Ms. Daniels,

M1qWave6

1  a lot about Ms. Daniels that went on for a couple of hours.

2  They could have asked more questions on that score.

3       That's all I have, Judge.

4       THE COURT:  All right.  And can you tell me -- I know

5  from your letter, I think you said that Mr. Janklow is due to

6  leave tomorrow.  Is that correct?

7       MR. MEISTER:  Tomorrow morning, Judge.

8       THE COURT:  And when is he scheduled to return?

9       MR. MEISTER:  He's returning to the country on

10 February the 3rd.

11      THE COURT:  Which is next Thursday, is that correct?

12      MR. MEISTER:  I don't have a calendar in front of me,

13 your Honor.

14      THE COURT:  All right.  I'll take judicial notice that

15 it is next Thursday.

16      All right.  Very good.  Thank you.  I appreciate it.

17      Mr. Avenatti, anything you wish to say?

18      MR. AVENATTI:  Yes, your Honor.  One, maybe two

19 things.

20      First of all, we would not be opposed to doing it by

21 way of two-way video from wherever Mr. Janklow is located in

22 order to accommodate him and his schedule.  In light of the

23 fact that he's leaving town, I'd be more than willing to do it

24 that way if that would be more acceptable to your Honor and to

25 Mr. Janklow and his counsel and the government.

M1qWave6

1          So that is No. 1.  And I'm not going to repeat myself

2     relating to what I've already said, your Honor.

3          THE COURT:  All right.

4          Here's my ruling.  I am, at least tentatively,

5     preliminarily granting the motion to quash and allow Mr.

6     Janklow to go on his vacation.

7          I certainly see no basis to deny it based on the first

8     argument that Mr. Avenatti made.  As I said, he had ample

9     opportunity to develop the record on that when Mr. Janklow was

10    on the stand.  I was well within the bounds of Rule 611 in

11    cutting Mr. Dalack off when I did, but regardless, he had ample

12    opportunity and, more importantly, actually availed himself of

13    that opportunity, which is to say that the record is well

14    developed on those issues, and Mr. Avenatti will be able to

15    make that argument to the jury, and I see no reason to

16    inconvenience Mr. Janklow and require him to appear to develop

17    it further.  Indeed, any such testimony would be cumulative.

18         I'm pretty skeptical that there will be a basis to

19    re-call him for purposes of impeaching or anything with respect

20    to Ms. Clifford, but obviously that is speculative at this

21    point in the sense that I don't know what she's going to say

22    and whether and what the record will be on that.  So I'm

23    denying it but subject to reconsideration.  If, after

24    Ms. Clifford testifies, you think there is a basis to renew the

25    subpoena or renew the request for him to appear, I will take

M1qWave6

1    that up at that time and make a decision.  And if I agree that

2    it's appropriate to re-call Mr. Janklow, then we'll discuss the

3    means of doing that.

4         If we are still going as of next Thursday, it may be a

5    moot point and he may be back and able to testify in person.

6    If not, maybe we can make arrangements to have him testify by

7    two-way video, just as we did for Ms. Regnier.  So I think

8    bottom line is I'm not going to stand in the way of his

9    vacation; to the extent that there is a subpoena demanding his

10   presence here in court later this week or early next week the

11   motion to quash that subpoena is granted.  If there is a basis

12   to call him after Ms. Clifford testifies, Mr. Avenatti can take

13   that up at that time, and I will consider it at that time.

14        Mr. Meister, anything else you need on that?

15        MR. MEISTER:  No, your Honor.

16        Just one clarification on the date.  He arrives back

17   in the country on February the 3rd.  I don't know what time.

18        THE COURT:  Understood.  And we'll deal with whatever

19   we need to deal with, and I assume you'll be available if we do

20   need to make arrangements for him to either appear remotely or

21   in person; that you'll make yourself available in assisting on

22   that.  Correct?

23        MR. MEISTER:  Of course.

24        THE COURT:  Thank you very much.  You're welcome to

25   stick around if you like, but you're also welcome to go.

M1qWave6

1          All right.  Can I get a sense from the government

2     about scheduling tomorrow?  I take it Mr. Macias has, I'm going

3     to estimate about an hour to go, maybe less.  What happens

4     thereafter?

5          MR. PODOLSKY:  Yes, your Honor.

6          After Mr. Macias, we will call Enrique Santos, who

7     is -- investigative analyst is the right title, in our office,

8     followed, we anticipate, by Ms. Daniels.

9          THE COURT:  All right.  And I think that you have

10    provided information on testing of Mr. Santos.  I trust that

11    you'll get me that information as to Ms. Daniels.

12         MR. PODOLSKY:  Consistent with the rules, we expect

13    her to take her test in the morning, and we will provide the

14    results to the Court.

15         THE COURT:  All right.  Very good.

16         And how long do you expect the Santos testimony to be?

17         MR. PODOLSKY:  30 minutes, your Honor.

18         THE COURT:  All right.  And do you have an estimate of

19    how long your direct of Ms. Daniels is likely to be?

20         MR. PODOLSKY:  Sounds like the estimate is

21    approximately three hours, give or take.

22         THE COURT:  All right.  Sounds pretty likely that her

23    testimony will be continuing into Friday.

24         MR. PODOLSKY:  I think for what we anticipate

25    cross-examination to be, I think that's a safe bet.

M1qWave6

1              THE COURT:  All right.  Very good.  Thank you for

2     that.

3              Let's talk about the motion to limit the scope of

4     cross.

5              Mr. Avenatti, do you wish to be heard on that?

6              MR. AVENATTI:  I do, your Honor, please.

7              THE COURT:  Go ahead.

8              MR. AVENATTI:  All right.  Your Honor, I'll start with

9     what I think is the most obvious issue, which is certainly I

10    should be able to cross-examine Ms. Daniels relating to the

11    work that me and my firm did on her numerous matters and issues

12    between February of 2018 and February of 2019.  All of that

13    work and the quality of the work and what was done goes

14    directly to the issue of whether we were entitled to be paid

15    both under the contract and under *quantum meruit*.  The quantity

16    of the work, all of the work that was done, the costs that were

17    expended, how many matters we worked for her on, the range of

18    those matters, the work involved, all of that is fruitful

19    ground for developing the defense in this case, which is

20    consistent with what I just mentioned moments ago relating to

21    Mr. Janklow.

22             THE COURT:  All right.  Let me interrupt you.  I want

23    to parse this out in a few different ways.

24             First of all, there's a quantity question and there's

25    a quality question.  You've made reference on a couple

M1qWave6

1    occasions to being allowed to introduce evidence of the quality

2    of your representation.  As I said, I'm pretty sure, I'm

3    confident that this case is not about whether you're a good

4    lawyer or a bad lawyer.  It's about whether you defrauded

5    Ms. Daniels.

6         What relevance does the quality of your representation

7    of her, or anyone else for that matter, have to do with that

8    question?

9         MR. AVENATTI:  It goes to the reasonableness of the

10   money that was kept and whether that would be a reasonable fee

11   under both the contract and the law in California and New York

12   on *quantum meruit*.

13        THE COURT:  And point me to the provision in the

14   contract that makes the quality of your work relevant to the

15   fees that you would be entitled to take.

16        MR. AVENATTI:  The contract has the word

17   "reasonableness" or "reasonable" fee as it relates to the book

18   in particular, your Honor, and I think that in determining what

19   a reasonable fee is, part of the analysis is the quality of the

20   work, both the quantity and the quality of the work.  The span

21   of time, the amount of work, how many matters were involved,

22   the efforts that had to be undertaken, all of that goes to the

23   determination as to whether it was reasonable for me to expect

24   a fee, whether I was entitled to a fee, the amount of that fee.

25   And it all goes to my state of mind and intent, as I previously

M1qWave6

1    stated.  I'm not going to repeat those same arguments now.

2           And I would again direct the Court to the *Rossomando*

3    case that I handed up earlier today.

4           THE COURT:  And I cut you off earlier, but do you have

5    authority for the proposition that the quality of the work is

6    relevant in the *quantum meruit* analysis?

7           MR. AVENATTI:  Yes, your Honor.  Could I provide some

8    cases to your Honor?

9           THE COURT:  Yes, please.

10           MR. AVENATTI:  California Supreme Court*, Fracasse v.*

11   *Brent*, 494 P.2d 9 (1972) and its progeny.  It's a fairly

12   well-known case in California, your Honor.

13           In New York, I would direct the Court's attention to

14   the --

15           THE COURT:  What relevance does New York law have in

16   this case on this issue?

17           MR. AVENATTI:  I merely wanted to provide it to your

18   Honor, by way of background and seeing that the --

19           THE COURT:  I don't need the background.  I just need

20   what's relevant.  California I get.  New York I don't get.

21           MR. AVENATTI:  And I'm happy, your Honor, to -- I

22   don't have them directly in front of me right now, but I'd be

23   happy to provide two or three other seminal decisions in

24   California relating to the measure of *quantum meruit* in an

25   attorney-client-type relationship that terminates.

M1qWave6

1          THE COURT:  OK.

2          MR. AVENATTI:  But in my experience, my understanding

3     is it's about a 12-factor test in California: the expertise

4     that the lawyer shows; the experience of the lawyer; the

5     quality of the work; the quantity of the work; the timeliness

6     of the work.  I mean these are five factors off the top of my

7     head, but there are a number of factors that go into that

8     determination in determining what a reasonable fee is under the

9     circumstances, your Honor.  And I think I need to be able to

10    develop the evidence to support that argument before the jury.

11         THE COURT:  OK.  No. 1, I'll certainly hear from the

12    government in a moment on that.

13         No. 2, I think I'm inclined to agree with you that

14    you're entitled, within reasonable limits, to elicit the

15    quantity of the work that you did on her behalf, because it

16    certainly is relevant to your argument that you were entitled

17    to fees because of the time and expenses you made on her

18    behalf.  That, to me, is different from the nature of the

19    particular cases.

20         You asked a question earlier today about a case

21    involving the family separation policies, I think, of the Trump

22    administration.  I don't want to get into cases that are on

23    hot-button issues, that are politically charged.  That is not

24    relevant for the jury.  It is more prejudicial than probative,

25    and I don't want to get into that.  So I sustained the

M1qWave6

1    objection with respect to that question.  It also had no

2    relevance, that particular question.  But I definitely don't

3    want you going there with Ms. Daniels, so it's one thing to

4    elicit the facts -- that you were involved in various cases and

5    in general terms what the cases were so that we can

6    differentiate among them.  But I don't want to get into the

7    particulars of what the claims were in those cases, among other

8    things, also because they're just allegations in most

9    instances.

10              Anything you wish to say on that?

11              MR. AVENATTI:  I understand your Honor's position.  I

12   intend on respecting it, adhering to it, and I do not intend,

13   your Honor, on getting into a detailed factual recitation of

14   each of these cases.  I will provide a little bit of

15   information or seek to provide some, get some testimony from

16   Ms. Daniels relating to some of these cases just merely so we

17   can keep them all straight.  There's a lot of them, as you

18   know.

19              THE COURT:  I don't disagree, but do it at a level of

20   generality and without anything salacious or politically

21   charged, and then I think it will probably be OK.

22              All right.  Let me hear from the government on that.

23   Again, maybe divide it into quantity, quality, and the

24   specifics of potentially politically charged cases.

25              MR. SOBELMAN:  We agree with the Court with respect to

M1qWave6

quantity and quality generally.  However, I do just want to
point out the defendant's argument seems to be that the
reasonable fee clause, which only related to a book or media
opportunity, somehow would import the entirety of his work for
Ms. Daniels and that deciding what a reasonable fee for
representing her in the book deal would be would somehow
encapsulate a study of the litigations that she was involved
in.

    We don't see how that could possibly be relevant,
whether the quality, quantity, etc.  I understand your Honor's
ruling, and we don't feel strongly about him eliciting
generally he was involved in other litigations, although he's
firmly established that through Ms. Regnier.  We think it's
cumulative at this point.  It's unclear how it could possibly
be relevant in the way that he suggests.

    THE COURT:  What about his point on *quantum meruit*?  I
have to say, having not heard these words until this
proceeding, I haven't given that any thought, but your response
on that.  Also, I guess, one thing I would say on that, unless
Mr. Avenatti testifies and says that his intent, he believed
that he was entitled to these funds based on *quantum meruit*,
I'm not sure how he could make that argument to the jury.  But
your thoughts on that.

    MR. SOBELMAN:  Agreed, your Honor, and I've also not
heard *quantum meruit* since law school.

M1qWave6

1          That being said, my recollection -- and I could be

2    wrong and will look into this tonight -- is that's a cause of

3    action.  You bring a cause of action against a client, and the

4    court considers the various factors that the defendant is

5    listing.  It's not the case that you can just take it and not

6    tell the person and that you unilaterally decide what all

7    these, all these factors.  So it is unclear how the defendant

8    could possibly put that before the jury, either mechanically,

9    as your Honor suggested, or substantively, in the sense that

10   it's -- assuming my recollection of the law is correct, which

11   maybe it is not, it's unclear how it could possibly be more

12   probative than prejudicial.

13          THE COURT:  All right.  I have heard of those terms

14   more recently than law school, perhaps an advantage or

15   disadvantage of my current job, but be that as it may, I think

16   there's another question whether there is a claim for *quantum*

17   *meruit* when there's a fee contract between counsel and the

18   client.  My understanding, I think, is that *quantum meruit* is a

19   cause of action where, in essence, an attorney performs

20   services that are not covered by an agreement and seeks to

21   recover essentially for the value of those services in equity,

22   but I'm sure you'll be looking into that and also considering

23   whether an instruction on that is appropriate.

24          Mr. Avenatti, you should do the same.

25          MR. AVENATTI:  Your Honor, could I make one comment in

M1qWave6

1  response to the point of the government?

2          THE COURT:  Sure.

3          MR. AVENATTI:  And as well as what your Honor just

4  said.

5          The government is going to argue in this case that the

6  fee agreement was an agreement to agree and that we never

7  agreed on a percentage and that, according to Ms. Daniels, I

8  then orally told her I didn't want any part of the book deal.

9  That's the government's case.  We, I vehemently disagree with

10 that, but that's the government's position.

11         They have made rumblings about the fact that, under

12 California law, you have to have a written agreement with the

13 client in order to recover fees.  That's only half the story.

14 Under California law, if you don't have a written agreement

15 with the client but you do work in connection with the matter,

16 you're entitled to *quantum meruit* in that context as well.

17         THE COURT:  And do you have authority for the

18 proposition that in those circumstances you can simply keep

19 money without advising the client?

20         MR. AVENATTI:  Your Honor, I'm happy to get you

21 authority for what I said.  I understand your Honor's point.  I

22 think it's somewhat of a rhetorical question.

23         THE COURT:  It's not at all a rhetorical question.

24         MR. AVENATTI:  Well, if you look at the case that I

25 handed up earlier, if I had a belief, a legitimate belief that

M1qWave6

1   I had a legitimate right to the money, I do not believe that I
2   could be convicted of what I've been charged with under the
3   authority of that case.

4          THE COURT:  And I think that may well be right, but
5   I'm not sure how getting into the quality of your
6   representation with Ms. Daniels allows you to make that
7   argument.  If you testified and you testify regarding your
8   belief that you were entitled to that money for that reason,
9   that's a different story.

10         But in any event, I think this is sufficient for me to
11  have a sense of the landscape here.  I just in general terms
12  agree that within reasonable limits, noncumulative limits, Mr.
13  Avenatti should be entitled to inquire about other matters, the
14  quantity of matters that he was involved in on Ms. Daniels's
15  behalf.  Subject to the remarks I made earlier, he can get into
16  the nature of them just to keep things straight and avoid
17  confusion, but I will sustain any objection if he asks -- or I
18  will sustain even if there is no objection if he asks anything
19  that delves into hot button, politically charged things and
20  there's not a good reason to do so.

21         With respect to quality, I'm not sure Ms. Daniels is
22  in a position to opine on the quality of the legal work.  I
23  sincerely doubt she is, but I'll take that as it comes.  And
24  again, if she's competent to testify on that and you ask a
25  nonobjectionable question and I conclude, after looking at the

M1qWave6

1    cases you've given me, that they're appropriate, then so be it.

2    Otherwise, I'll sustain an objection.

3                MR. AVENATTI:  Your Honor, I would expect -- and I

4    hope I'm wrong, but I would expect Ms. Daniels to volunteer

5    information on direct or potentially on cross-examination

6    relating to the quality of my work.  She's been very outspoken

7    about that publicly in many podcasts and social media posts,

8    and things of that nature.

9                THE COURT:  Whatever she -- this courtroom is not a

10   podcast or a social media post.

11               MR. AVENATTI:  I agree.

12               THE COURT:  And the government, I'm sure, is going to

13   restrict itself to eliciting only relevant testimony, and I

14   doubt that they're going to get very far, if at all, into the

15   quality of your representation for the reasons I said.

16   Subject, perhaps, to the argument you're raising now, I don't

17   think this case is about whether you're a good lawyer or a bad

18   lawyer or represented her well or not.  It's about whether you

19   stole her money.

20               Anything else you wish to say on this?  I think we've

21   covered this ground enough.

22               MR. AVENATTI:  On this particular issue within the

23   motion, no, your Honor.

24               THE COURT:  All right.  That's, I think, issue No. 3.

25               We'll take up issue No. 1, regarding Mr. Davidson.

M1qWave6

1          MR. AVENATTI:  Your Honor, the government has opened

2     the door in this case by introducing the fee agreement with

3     Ms. Daniels as it relates to the reasonableness of that

4     agreement as well as Ms. Daniels's understanding of the

5     agreement.

6          THE COURT:  The agreement with Mr. Davidson or with

7     you?

8          MR. AVENATTI:  No.  With me.  And I'm going to tie it

9     to Mr. Davidson's agreement in a moment, your Honor.

10          The government introduced the fee agreement that I had

11     with Ms. Daniels.  That puts Ms. Daniels's understanding of

12     attorney-client fee agreements directly at issue.  The

13     understanding that she had at the time she entered into the

14     agreement with me, her knowledge and experience relating to

15     contracts she's had with her attorneys, what she understood

16     those contracts to require, and she has placed her

17     understanding of the attorney-client relationship generally and

18     the contractual relationships in particular -- the government

19     has put that directly at issue.  And so I should be

20     permitted -- first of all, the attorney-client fee contract

21     between her and Mr. Davidson is no longer privileged because

22     there's a waiver in this case, and there was previously a

23     waiver relating to Mr. Davidson.  So there's no privilege

24     issues associated with the agreement.

25          THE COURT:  I don't think they've made a privilege

M1qWave6

1    argument here.  It's a relevance argument.

2              MR. AVENATTI:  So, the relevance, your Honor, is that

3    I should be permitted to get into with Ms. Daniels on

4    cross-examination her prior experience in contracting with

5    lawyers and her understanding of what those agreements

6    generally require and --

7              THE COURT:  And what relevance does her understanding

8    of your agreement with her have here?  In other words, I get

9    the argument you want to make -- that if you in good faith

10   generally believe that you're entitled to the money, that may

11   not be sufficient to convict you of defrauding her.  But what

12   relevance does her belief of whether you were entitled to it or

13   not have?

14             MR. AVENATTI:  Because I anticipate, your Honor, that

15   the government is going to elicit testimony from Ms. Daniels as

16   to her understanding of the fee agreement with me and what that

17   fee agreement provided for and did not provide for and what it

18   allowed in the way of costs and fees and what it did not allow

19   in the way of cost and fees.  And if the government seeks to

20   elicit testimony from Ms. Daniels as to those areas, then I

21   have to be able to probe her knowledge and experience generally

22   relating to attorney-client fee contracts and what her

23   experience has been in that regard and what her understanding

24   has been at the time that she came to the table, if you will,

25   in February of 2018 and entered into this agreement with me.

M1qWave6

```
 1          THE COURT:  All right.  I'm skeptical, but I guess my
 2   inclination is to see what the government's direct is, whether
 3   it opens the door to that, and then rule on any objections as
 4   they come.
 5          Mr. Sobelman, do you wish to say anything?
 6          MR. SOBELMAN:  Your Honor, we just don't understand
 7   hew a separate agreement with a separate attorney at a separate
 8   time with different terms could possibly be relevant to this
 9   case.  If your Honor wants to reserve on it, you certainly have
10   the discretion to do that.
11          THE COURT:  I think giving you my inclination that I
12   agree with you is sufficient at this point, and we'll take it
13   as it comes, if it comes up.
14          The second issue is Ms. Daniels's payment of back
15   taxes and spousal and child support payments to her ex-husband
16   or estranged husband.
17          Mr. Avenatti, any intention to go there?
18          MR. AVENATTI:  Yes, your Honor, because it is a motive
19   to fabricate these accusations against me.  It's a motive to
20   lie about me owing her this money.  It's a motive to lie, it's
21   a motive for Ms. Daniels to lie about this alleged oral
22   agreement that we had, that there's no documentation for
23   whatsoever, after the written agreement was signed.  Her
24   financial condition and the fact that she was in dire straits
25   in many ways is an absolute motive for her to fabricate what
```

M1qWave6

1    she has told the government and what I anticipate she's going

2    to tell this jury.  And I'm allowed to get into it because it

3    goes directly to bias and motive to lie.

4            THE COURT:  Mr. Sobelman, given the defense arguments

5    before trial about Mr. Avenatti's motive and financial

6    condition, but put that aside.

7            MR. SOBELMAN:  I think it's nonsensical and it's

8    certainly precludable under 403 even if it were relevant under

9    401.  It is an entire sideshow.  Ms. Daniels is paying back

10   taxes pursuant to an agreement with the IRS that her accountant

11   brokered.  She's making the payments regularly during this time

12   period.  It has nothing to do with this case.  How she spent

13   her lawfully earned money and the money that she did actually

14   receive from the book advance payments, unlike the ones that

15   were stolen, have nothing to do with this case.

16           THE COURT:  And can I clarify; she ultimately received

17   the book payments, is that correct?

18           MR. AVENATTI:  No.  No, your Honor.  She received book

19   payment 1 directly.  Book payment 2 the defendant stole and

20   them, months later, repaid her through the Geragos loan.  And

21   then book payment 3, he stole, never paid back.  Book payment 4

22   she received directly after the termination of her relationship

23   with Mr. Avenatti.

24           THE COURT:  All right.  I thank you for clarifying

25   that.

M1qWave6

1          Mr. Avenatti.

2          MR. AVENATTI:  Well, your Honor, we obviously moved

3     before trial to exclude certain financial information relating

4     to my position.  The government opposed that, and the

5     government won, prevailed on the issue.  The Court found that

6     my financial condition was relevant to my state of mind,

7     intent, and motive.  And frankly, under the circumstances, in

8     light of this seminal witness --

9          THE COURT:  Wait.  Can I ask you a question?  How does

10    the payment of back taxes and payment of spousal and child

11    support even support the argument of dire financial conditions?

12    If she's making the payments, it can be the opposite; it could

13    suggest the opposite, that she has money to make payments.

14         MR. AVENATTI:  Because she was in substantial debt and

15    was desperate for money and --

16         THE COURT:  You're not answering my question.  If

17    she's making payments to the IRS and to her estranged husband

18    that she's obligated to make, how does that prove that she's in

19    financial straits?

20         MR. AVENATTI:  Because the amount of debt goes into,

21    your Honor, an analysis as to what her financial condition is

22    and whether she's desperate enough where she wants to make

23    accusations against me in connection with this case in an

24    effort to get money in order to pay her debts.

25         THE COURT:  All right.

M1qWave6

1          The motion is granted as to the payment of back taxes,

2    both spousal and child support, on 401 and 403 grounds.  I'm

3    not saying that Mr. Avenatti won't be entitled to inquire about

4    her financial circumstances to the extent that it may or it

5    would support an argument that it gives her a motive to

6    fabricate her allegations, but within limits, and you are not

7    going to get into the particulars of the back taxes, spousal or

8    child support.  You can develop a record without getting into

9    those.  I find that they're more prejudicial than probative, so

10   the motion is granted as to that.

11          All right.  I think that resolves the government's

12   motion.

13          Anything else to address on that?

14          MR. SOBELMAN:  Not from the government, your Honor.

15          THE COURT:  All right.  Anything else beyond that?

16          MR. SOBELMAN:  No, your Honor.

17          THE COURT:  Mr. Avenatti, anything else on your end?

18          MR. AVENATTI:  Three issues, briefly, your Honor.

19          First, is it acceptable to the Court if I submit a few

20   cases for your Honor to review along the lines of what we were

21   discussing earlier?

22          THE COURT:  You can submit anything you want, Mr.

23   Avenatti.  I will read it, so if you think it would be helpful

24   to me, you're welcome to.  And if it wouldn't be helpful,

25   don't.

M1qWave6

1           MR. AVENATTI:  OK.

2           The second issue, your Honor, is I want to avoid a

3      situation during the testimony of Ms. Daniels tomorrow where

4      Ms. Daniels does not answer my question and instead gives

5      answers well beyond my question or is combative.  I don't have

6      any intent on being combative with Ms. Daniels.  I'm not

7      predicting a problem, your Honor.  I am just raising it now and

8      that it is my sincere belief that we can have a question,

9      answer to the question, question, answer to the question.  That

10     is what I'm hoping for, and that is what I'm going to strive to

11     do tomorrow especially.

12          THE COURT:  Good.  I hope for the same, and I assure

13     you that if you do anything otherwise and act in any way that

14     is other than professional, then you will be cut off and you

15     will be told to sit down.  So I expect you to behave as you

16     would if you were a trial lawyer trying his case and put aside

17     the fact that you have a history with Ms. Daniels and you're a

18     defendant in this case, and you are to act professionally and

19     in good faith and if you do that I will certainly enforce the

20     rules as to her as I do every other witness.

21          MR. AVENATTI:  That's all I ask for, your Honor.

22          THE COURT:  Good.

23          Third.

24          MR. AVENATTI:  The third issue is, your Honor, I'd

25     like to ask that the Court allow Mr. Baum to address the Court

M1qWave6

```
 1    as to the particular instruction that the Court gave during the

 2    testimony of Mr. Macias.

 3              THE COURT:  Who is Mr. Bond?

 4              MR. AVENATTI:  Mr. Baum.

 5              THE COURT:  Oh, Baum.  OK.

 6              That request is denied.

 7              MR. AVENATTI:  OK.  No problem.

 8              THE COURT:  You requested to represent yourself, and

 9    you're representing yourself.

10              MR. AVENATTI:  All right.

11              THE COURT:  They're here to assist you, but they're

12    not going to address me.  And if you have something to say, you

13    can say it.

14              MR. AVENATTI:  Thank you, your Honor.

15              I would object to the instruction that the Court gave

16    to the jury relating to the fact that it is usual or

17    customary -- I forget the exact word that was used -- for

18    witnesses to bring lawyers to interviews with the government or

19    to enter into proffer agreements with the government.

20              THE COURT:  I don't think I said anything about a

21    proffer agreement here.  I think, and I'll look back at the

22    transcript, that all I said was that anyone is entitled to have

23    a lawyer and it's not unusual when being interviewed by the

24    government to bring a lawyer with you.  I don't think that's a

25    controversial proposition or statement.  And to the extent that
```

M1qWave6

1    you are insinuating that by bringing a lawyer to the meeting

2    with the government that reveals that Mr. Macias was somehow

3    worried about his own exposure, I think it was totally proper

4    to explain that to the jury.  Tell me what I just said that is

5    inaccurate.

6            MR. AVENATTI:  Your Honor, the government interviews

7    witnesses all the time, probably more often than not, without

8    lawyers present.  And so to suggest to the jury that somehow it

9    is usual or more often than not customary to have a lawyer

10   present or demand a lawyer present during an interview, I don't

11   think is accurate, and I would request a curative instruction

12   to the jury.

13           THE COURT:  All right.  That request is denied.

14           I said, just so the record is clear, that anyone is

15   entitled to hire a lawyer and it's certainly not uncommon when

16   a witness is asked to meet with the government, with

17   prosecutors, that they may choose to bring a lawyer with them.

18   That is their right, and with that, you may proceed.

19           That is a totally accurate statement of the law and

20   facts.  And again, I think it was relevant to correct any

21   misleading impression the jury may have had.  Not uncommon does

22   not mean it is common, doesn't mean that it's more often than

23   not.  It doesn't mean most.  It doesn't mean anything along the

24   lines of what you just suggested.  I don't think there's any

25   prejudice, and you made the record you made with Mr. Macias.

M1qWave6

1    So the request is denied.

2              I'll see you guys here by 9:00.  Mr. Macias should be

3    ready to go so that we can start promptly when we get the jury.

4              With that, I wish you all a pleasant evening.  Thank

5    you.

6              MR. PODOLSKY:  Thank you, your Honor.

7              (Adjourned to January 27, 2022, at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2   Examination of:                              Page

3    JUDY REGNIER

4   Cross By Mr. Avenatti . . . . . . . . . . 563

5   Redirect By Mr. Sobelman . . . . . . . . . .607.

6   Recross By Mr. Avenatti . . . . . . . . . 621

7    JESSICA VOLCHKO

8   Direct By Mr. Sobelman . . . . . . . . . . 624

9   Cross By Mr. Avenatti . . . . . . . . . . 632

10   JEREMY ROSENMAN

11  Direct By Mr. Rohrbach . . . . . . . . . . 651

12  Cross By Mr. Avenatti . . . . . . . . . . 695

13  Redirect By Mr. Rohrbach . . . . . . . . . 713

14   SEAN ERNESTO MACIAS

15  Direct By Mr. Podolsky . . . . . . . . . . 714

16  Cross By Mr. Avenatti . . . . . . . . . . 750

17                        GOVERNMENT EXHIBITS

18  Exhibit No.                              Received

19   302H   . . . . . . . . . . . . . . . . . 619

20   614   . . . . . . . . . . . . . . . . . 629

21   101, 104, 105, 106 . . . . . . . . . . . 654

22   701   . . . . . . . . . . . . . . . . . 655

23   S3   . . . . . . . . . . . . . . . . . . 672

24   702   . . . . . . . . . . . . . . . . . 674

25   604   . . . . . . . . . . . . . . . . . 739

1   605   . . . . . . . . . . . . . . . . . . 744

2   606   . . . . . . . . . . . . . . . . . . 749

3                       DEFENDANT EXHIBITS

4   Exhibit No.                              Received

5   T   . . . . . . . . . . . . . . . . . . 591

6   U   . . . . . . . . . . . . . . . . . . 594

7   V   . . . . . . . . . . . . . . . . . . 596

8   W   . . . . . . . . . . . . . . . . . . 596

9   X   . . . . . . . . . . . . . . . . . . 598

10  Y   . . . . . . . . . . . . . . . . . . 599

11  Z   . . . . . . . . . . . . . . . . . . 601

12  AA  . . . . . . . . . . . . . . . . . . 603

13

14

15

16

17

18

19

20

21

22

23

24

25