M1S8AVE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          19 Cr. 374 (JMF)

 5   MICHAEL AVENATTI,

 6              Defendant.
                                           Trial
 7   ------------------------------x

 8                                         New York, N.Y.
                                           January 28, 2022
 9                                         9:00 a.m.

10   Before:

11
                      HON. JESSE M. FURMAN,
12
                                           District Judge
13                                         –and a Jury–

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
17        ROBERT B. SOBELMAN
          ANDREW A. ROHRBACH
18        Assistant United States Attorneys

19   MICHAEL AVENATTI, Defendant Pro Se

20   DAVID E. PATTON
          Federal Defenders of New York, Inc.
21        Attorney for Defendant
     BY:  ROBERT M. BAUM
22        ANDREW J. DALACK
          TAMARA L. GIWA
23        Standby Assistant Federal Defenders

24   Also Present:  Special Agent DeLeassa Penland
                    U.S. Attorney's Office
25                  Christopher de Grandpre, Paralegal Specialist
                    Juliet Vicari, Paralegal
```

M1S8AVE1

1          (Trial resumed; jury not present)

2          THE COURT:  You may be seated.

3          Good morning.  Welcome back.  I see counsel is

4     present.  Mr. Avenatti is present.

5          There was a flurry of filings last night and even this

6     morning.  Before I turn to those, let me just make sure there

7     is nothing that we need to take up with respect to Ms. Daniels

8     since that's more timely.

9          MR. SOBELMAN:  Not from the government, your Honor.

10          THE COURT:  Mr. Avenatti.

11          MR. AVENATTI:  Nothing from the defense, your Honor.

12          THE COURT:  Given that, let me turn to the motions

13     that were filed in the time we have, and the jury is all here

14     so in a few minutes I will have my clerks go down and get them.

15          First, Mr. Avenatti's motion to preclude the

16     government's summary chart, Government Exhibit 804, is denied.

17     The Second Circuit decisions in *United States v. Ho* and *United

18     States v. Blackwood*, both of which are cited by the government,

19     are directly on point, as is *United States v. Miller*, 954 F.3d

20     551, at 556-66 (2d Cir. 2020).

21          First, the chart contains details of well over 100

22     texts, WhatsApp messages, e-mails, and wire transfers, among

23     five or six different people, over a period stretching more

24     than seven months.  See for comparison *Blackwood*, 366 F.App'x,

25     at 212, approving admission of a chart that sets forth

M1S8AVE1

information concerning "well over 100 telephone calls spanning three days between four individuals," and *Miller*, 954 F.3d, at 565, approving admission of a chart summarizing eight pages of telephone bills. Thus, the chart summarizes information that "otherwise would have been difficult for the jury to synthesize and evaluate, thus falling well within the purview of Rule 1006." That's *Blackwood*.

Second, I find the summary would be helpful to the jury in its evaluation of the evidence because it shows the pattern and timing of relevant communications over the life of the alleged scheme; and, third, it is based upon, and fairly represents, competent evidence already before the jury. See *Blackwood* for both those points. Notably, Mr. Avenatti does not contend that the chart contains any inaccurate information that could potentially mislead the jury, which is to say there is no indication that the chart is prejudicial.

Accordingly, assuming that a proper foundation is laid, the chart may come in. I will, however, instruct the jury, as the government invites me to do, that the chart is not evidence, that it is merely a graphic demonstration of the underlying evidence, and that the jury should determine for itself whether the chart fairly and accurately summarizes the underlying evidence and ultimately what weight, if any, to give the chart. Moreover, I am not going to let the government march the witness through what would amount to a pre-summation

M1S8AVE1

1    or second summation, which to say you can lay a foundation, I

2    will allow some brief testimony to explain what's what so the

3    jury understands the chart, but you're not going to march

4    through the entirety of it as if you were doing a summation.

5    So you should be mindful of that.

6              Number two, just one housekeeping matter.  In light of

7    the fact that it seems like this trial will end sometime next

8    week, I am going to tell the jury that and also tell them we

9    are going to take a slightly different approach today and have

10   a ten-minute break in the morning, around 11 or so, where I am

11   going to have them go into the jury room here to stretch their

12   legs and use the facilities, and then we will break for lunch

13   at about 12:30.  So everybody should be aware of that.

14             Other issues.  The government filed a letter with

15   respect to the willfulness instruction.  We will take that up

16   at the charge conference so we don't need to speak to that now.

17             There was a motion to compel compliance with the

18   subpoena that was served on Mr. Avenatti.  Let's talk about

19   that.

20             Mr. Avenatti.

21             MR. SOBELMAN:  Your Honor, we have one update, which

22   is very early this morning, the defendant produced a single PDF

23   containing what appears to be more than 5,000 pages of

24   documents in response to the subpoena.  We obviously haven't

25   had a chance to review those yet.  We don't know whether there

M1S8AVE1

1    is more coming, but we just wanted to update the Court as to

2    that development.

3            THE COURT:  Do you know what they are even if you

4    haven't had a chance to review them?

5            MR. SOBELMAN:  It's difficult for us to tell.  Some of

6    them appeared to relate to Ms. Daniels.  It appears to be files

7    from the server, but again, it's 5,000 pages and it was

8    produced this morning.

9            THE COURT:  Mr. Avenatti.

10           MR. AVENATTI:  Your Honor, this isn't really of

11   consequence, it was produced late last night.  As your Honor is

12   aware, we are continuing to attempt to review the data on the

13   servers.  The information produced to the government is

14   responsive to the subpoena.  It came from the servers.  I

15   believe it's over 5,000 pages of e-mails and attachments from

16   the servers that are responsive to the subpoena.  And we are

17   continuing to review the information and produce it as we have

18   a chance to review it, your Honor.

19           THE COURT:  How much remains to be reviewed?

20           MR. AVENATTI:  Your Honor, I can't answer that

21   question because the servers are 20 terabytes, as we have noted

22   previously.  It's not as simple as just plugging them into a

23   computer and doing a search.

24           THE COURT:  Mr. Avenatti, in mid-December you

25   identified, you said that your expert had identified relevant

M1S8AVE1

1    information to this case and identified very discrete

2    categories of information that were on the server.  I presume

3    that you didn't make that representation to the Court on

4    speculation.  I presume that was because you had reason to

5    believe that that information was on the servers, which means

6    that you found it, which means that you should be able to

7    access it, which means that because you have been under

8    subpoena for three weeks now, you had an obligation to turn it

9    over to the government, whether it is usable or not.

10            Am I wrong about any piece of that?

11            MR. AVENATTI:  Well, your Honor, if I could clarify,

12    if possible, please.

13            I believe the statement to the Court was that we

14    believe this information was on the servers based on our review

15    thus far.  We then made efforts to get that information off the

16    servers and produce it to the government.  It's a very

17    complicated process, your Honor.  It's not as easy as just

18    searching a name and then producing the data.  So we have gone

19    to a lot of effort to get this information.  We are continuing

20    to get the information.  Some of the data is not accessible to

21    us.  For instance, the Tabs data contains all of the client

22    financial information for the entire law firm.  We are not able

23    to segregate out the data only relating to Ms. Daniels, which

24    is why we sought the relief we did in California and then

25    before this Court.  We would like to segregate out the Tabs

M1S8AVE1

1    data and provide it to the prosecution team here.  We have been

2    striving to do that.  We too want the data.  We don't have

3    access to that data, your Honor, and that's the problem.

4         So we have made good faith efforts to get this data

5    and produce it to the government, consistently over the last

6    few weeks, and even prior to receiving the subpoena, your

7    Honor.

8         THE COURT:  Well, I am going to grant the motion to

9    compel and you must comply with the subpoena.  Turn over

10   everything in your possession that is responsive to the

11   subpoena, whether it is in usable format or not, no later than

12   3 p.m. tomorrow.  If you fail to do that, and the government

13   demonstrates that you failed to do that, then we will talk

14   about what relief the government is entitled to.  But the

15   bottom line is it's been three weeks.  I understand that it's

16   potentially complicated.  You have had the servers in your

17   possession since September, you have had an expert even before

18   September to assist you in that; and, frankly, I just don't

19   understand why you haven't been able to comply with the

20   subpoena by this point.

21        So I am going to grant the motion to compel.  Again,

22   by 3 p.m. tomorrow, you are to turn over whatever remains to be

23   turned over that is subject to the subpoena, and if you fail to

24   do that, we will discuss what the consequences are.

25        Mr. Avenatti filed a motion this morning at about 8:15

M1S8AVE1

raising again the Tabs issue as a potential *Brady* issue.  The

upshot of the letter is that the government served a subpoena

on the bankruptcy trustee in November 2020, but I gather

withdrew the subpoena when told how much it would cost the

government to get the data, and then obviously renewed it I

think earlier this month.

        Is that basically accurate, Mr. Sobelman?

        MR. SOBELMAN:  It's close, your Honor.  We have served

a total of three subpoenas.  One a while back when we thought

the trial was going to go much earlier.  The bankruptcy trustee

told us they could not comply without getting the bankruptcy

court's permission and us funding the harvesting of that data,

and they said it would take so long that it would have been not

ready by the time that the trial at that time was set.  As this

trial date came closer, we served a second subpoena.  We were

told basically the same thing, except they said there was a

possibility they could have the data ready for us, but that the

cost was, in our view, exorbitant.  We then served a third

subpoena with a much narrower request and agreed to pay the

cost, but we just learned yesterday that even though that data

had been extracted, the bankruptcy trustee was denied

permission by the bankruptcy court to comply with our subpoena.

        So the long and short of it is, we have made efforts

to get these materials, which, ironically, we did try to moot

the issue that has been repeatedly raised by the defendant,

M1S8AVE1

1    essentially at his request.  We have not been able to get any

2    materials, and therefore there is nothing for us to share with

3    the defendant.

4              THE COURT:  Thank you.

5              The motion is denied as frivolous.  The law is very

6    clear the government has no obligation to obtain information

7    that is not in its possession even if it could be helpful to

8    the defense.  That's number one.  And the letter that Mr.

9    Avenatti filed simply demonstrates that the government made

10   some efforts to obtain information.  The fact that it didn't

11   obtain it is the key point.  It has no obligation to turn over

12   something that it doesn't have in its possession.  It has no

13   obligation to go out and do the defendant's work and obtain

14   information on his behalf.  And, most importantly, as I have

15   now said repeatedly, Mr. Avenatti has had this in his

16   possession since September of last year.

17             So the irony of this, I understand Mr. Avenatti

18   succeeded in getting a mistrial on this basis in the California

19   action.  This action is just totally different.  Number one, it

20   involves different charges.  Even more importantly, Mr.

21   Avenatti has had the data since September.  By contrast, the

22   prosecution team does not have the data, which is why they

23   served a subpoena on Mr. Avenatti for the data and why I

24   granted the motion to compel that I did a few minutes ago.

25             So this is a red herring, a distraction, smoke and

M1S8AVE1

1    mirrors.  I don't know what metaphor you want to use, but the

2    bottom line is it's just a nonissue in this court.  Mr.

3    Avenatti has had the data.  The law is clear.  The government

4    doesn't need to do his work for him.  The law is also clear

5    there is no *Brady* violation if information is in the possession

6    of the defendant.  As I said, I am writing an opinion that

7    addresses some of these issues at greater length, and I will

8    spell it out even more in that context, but the bottom line is

9    it's frivolous and denied.

10           Anything else?  My clerks are on their way to get the

11   jury.

12           MR. SOBELMAN:  Nothing from the jury.

13           THE COURT:  Mr. Avenatti.

14           MR. AVENATTI:  Nothing.

15           THE COURT:  Let's get Ms. Daniels on the stand,

16   please.

17           Mr. Avenatti, do you have any authority that would

18   support your being able to recall a witness in your

19   case-in-chief if you have an opportunity to ask questions on

20   cross?

21           MR. AVENATTI:  I hope I will be able to submit that to

22   the Court on the break.

23           THE COURT:  Well, until I give you a different ruling,

24   you should plan accordingly and understand that you may not be

25   allowed to recall a witness.

M1S8AVE1

1          MR. AVENATTI:  I understand, your Honor.

2          Good morning, Ms. Daniels.  You can have a seat and

3    take off your mask.  The jury will be with us in a moment.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1S8AVE1

1                (Jury present)

2          STEPHANIE CLIFFORD, resumed.

3                THE COURT:  You may be seated.

4                Good morning.  Welcome back, ladies and gentlemen.

5     Let me thank you again for being here on time and enabling us

6     to start promptly.  I very much appreciate it.

7                A couple of things before we resume Ms. Daniels's

8     testimony.  Number one, as I told you yesterday, I am

9     monitoring the weather at the moment.  It doesn't look like it

10    will get here at a time that should impact anybody's ability to

11    get home.  So I think we will end at the normal time.  But if

12    that changes, I will obviously let you know and we will do what

13    we need to do.

14                Number two, I am pleased to say that, although it may

15    or may not always feel like it, we are actually making

16    excellent progress in the case.  Things could change.

17    Obviously, something could happen, COVID or otherwise.  But

18    barring an unexpected disruption, I am expecting that you will

19    begin your deliberations at sometime next week.  Given that,

20    and given that I think the schedule has been a little

21    challenging, we are going to change it a little bit today.  So

22    mid-morning, sort of 11:00 or so, I am going to have a brief

23    recess and just take you into the jury room here, as we did

24    yesterday, give you an opportunity to stretch and use the

25    facilities if you need to, keep it to about five or ten

1  minutes, and then we will go and break for lunch at about

2  12:30, and see how that works.  Again, since we are making good

3  progress, I think we can alter things up a little bit.

4          Then, finally, we will pick up where we left off

5  yesterday on cross-examination of Ms. Daniels.

6          Ms. Daniels, I remind you that you remain under oath.

7          And let me remind you, ladies and gentlemen, that Mr.

8  Avenatti is obviously not testifying when he is asking her

9  questions.  So, naturally, because he is involved in some of

10  the events that are being discussed, he makes reference to

11  himself, but his questions are not evidence.  I have told you a

12  few times that it's only the answers that the witness gives and

13  any exhibits that are admitted into evidence that is evidence

14  that you may consider.  I just want to remind you of that as we

15  proceed.

16          With that, Mr. Avenatti, you may proceed.

17  CROSS-EXAMINATION (Cont'd)

18  BY MR. AVENATTI:

19  Q.  Good morning, Ms. Daniels.

20  A.  Good morning.

21  Q.  How long have you been an actress?

22  A.  Since 2002.

23  Q.  So about 20 years?

24  A.  Yes.

25  Q.  And is it safe to say that in the course of being an

1    actress you have grown used to reading scripts?

2    A.  Of course.

3    Q.  And delivering lines, correct?

4    A.  Correct.

5    Q.  Before you testified yesterday, how many times did you

6    communicate with the government about this case?

7    A.  In person?

8    Q.  In person or by phone or by Webex or Zoom.

9    A.  Roughly six or seven.

10   Q.  How many times did you communicate with the government in

11   the last month about this case?

12   A.  Minus one of those.

13   Q.  So five or six?

14   A.  Yes.

15   Q.  In the last 30 days?

16   A.  Yes.

17   Q.  And collectively those totaled hours, correct?

18   A.  Correct.

19   Q.  And then you have also met with Mr. Brewster, your

20   attorney, in preparation for your testimony in this case, have

21   you not?

22   A.  Correct.

23   Q.  How many times have you communicated with Mr. Brewster as

24   it relates to this case and your testimony?

25   A.  Two or three.

 1    Q.  Is it your testimony that in the last three years you have

 2    only communicated with Mr. Brewster two or three times relating

 3    to your testimony in this case?

 4    A.  For trial prep, yes.  He wasn't present.

 5    Q.  When did you meet with Mr. Brewster as it related to

 6    preparing to testify in this case?

 7    A.  Two days ago.

 8    Q.  How long did you meet for?

 9    A.  30 minutes.

10    Q.  Now, you are aware -- strike that.

11         The government yesterday asked you some questions

12    about one of the instances in which you had said that you hoped

13    that I was raped in prison.  Do you recall those questions?

14    A.  I do.

15    Q.  And you know that millions of people follow your comments,

16    do you not?

17    A.  I do.

18    Q.  And in September -- strike that.

19         On September 27, 2019, you published a podcast, did

20    you not?

21    A.  Perhaps.  I don't know exact dates.

22    Q.  And you had a podcast back in 2019 with a gentleman by the

23    name of Dwayne Crawford, your tour manager, did you not?

24    A.  Probably, yes.

25    Q.  And during that podcast, you have stated that I was, quote,

M1S8AVE1                    Clifford - Cross

1  fucking myself pretty nice and hard, and that when I go to

2  prison, there will be a long line of people to ass rape me, did

3  you not?

4  A.  I don't know.

5  Q.  Do you deny that you made those statements?

6         MR. SOBELMAN:  Objection.

7         THE COURT:  Overruled.

8  Q.  You can answer.

9  A.  I don't deny it.  I don't remember.

10  Q.  Do you recall back in September of '19, you stated that it

11  was pretty handy that you had your own line of lube now because

12  you could just bring me a gift basket in prison?

13  A.  Yes.

14  Q.  You said that, right?

15  A.  I believe it was on Twitter.

16  Q.  When your cohost stated that he wanted me to fucking

17  suffer, you suggested that you could put Tabasco sauce in the

18  lube, didn't you?

19  A.  He probably said that.

20  Q.  And you suggested that you could put Tobasco sauce in the

21  lube that you would bring to me in prison so that I could be

22  anally raped, right?

23  A.  Yes.

24  Q.  But that's not the only time that you have suggested

25  publicly that you were looking forward to me being raped in

M1S8AVE1                    Clifford - Cross

1   prison, is it?

2   A.  We talked about Twitter, yes.

3   Q.  So you have said it on your podcast and you have said it on

4   Twitter, right?

5   A.  Yes.

6   Q.  And then in July of this year -- strike that.

7           In July of last year, only about six months ago, you

8   went on a podcast with a woman by the name of Garcelle

9   Beauvais, didn't you?

10  A.  Yes.

11  Q.  What does it mean to drop the soap?

12  A.  That is a common reference to prison.

13  Q.  In what way?

14  A.  To drop the soap?

15  Q.  Yes.

16  A.  It's a gay term.

17  Q.  What does it mean?

18  A.  To have sex in prison.

19  Q.  To have anal sex in prison, right?

20  A.  I don't know.

21  Q.  Well, you have understood the term "drop the soap" to mean

22  when someone is in prison, if they drop the soap, another

23  inmate may anally rape them, right?

24  A.  Yes.

25  Q.  And on this podcast Ms. Beauvais said, I hope he doesn't

M1S8AVE1                    Clifford - Cross

1    drop anything, to which you responded, I do, over and over and

2    over, didn't you?

3    A.  I did.

4    Q.  Have you ever falsely accused anyone of a crime?

5    A.  Not to my knowledge.

6    Q.  Now, you first made allegations relating to me, criminal

7    allegations, in approximately February and March of 2019, is

8    that correct?

9    A.  Yes.

10          MR. AVENATTI:  Your Honor, one moment.

11   Q.  And, Ms. Daniels, around that same time, in February and

12   March of 2019, according to you, you started experiencing

13   unexplainable and frightening experiences in your home in New

14   Orleans, isn't that true?

15   A.  That was in March of 2019, correct.

16   Q.  And this included, according to you, visible -- strike

17   that -- physical attacks from invisible assailants, right?

18   A.  Not to me.

19   Q.  To other people in the home?

20   A.  That was what they told me.

21   Q.  Well, that's what you have written?

22   A.  Yes.

23   Q.  And you stand behind it?

24   A.  Absolutely.

25   Q.  And at that same time, you claim that you started

M1S8AVE1                    Clifford - Cross

1  experiencing poltergeist phenomenon, right?

2  A.  Yes.

3  Q.  And shadow figures?

4  A.  Yes.

5  Q.  And unexplainable sounds and voices that prowled your home,

6  right?

7  A.  Yes.

8  Q.  And these assailants, phenomenon, shadow figures, and

9  sounds and voices invaded your life, and your relationship at

10  the time, like a predatory animal.  Those are your words,

11  right?

12  A.  Those are on the Spooky Babes show website.

13          MR. AVENATTI:  Move to strike, your Honor.

14          THE COURT:  Overruled.

15  Q.  You didn't fabricate those words, did you?

16  A.  I did not write them; they are press for our television

17  show.  But I stand behind them.

18  Q.  Is it true?

19          THE COURT:  Sustained as to form.

20  Q.  Ms. Daniels, you have made these claims publicly, correct?

21  A.  Of course.  It's a television show.

22  Q.  No, Ms. Daniels, that's not my question.

23          MR. SOBELMAN:  Objection.

24          THE COURT:  Just ask your question.

25  Q.  Ms. Daniels, have you fabricated anything as it relates to

1    what I have just read for the purposes of your television show?

2    A.  Absolutely not.

3    Q.  So it's all true, what I just read happened, right?

4    A.  Yes.

5    Q.  And these experiences that you claim that you had started

6    in March of 2019, and they escalated rapidly until they made

7    life for you an impossibility, isn't that true?

8    A.  Correct.

9    Q.  And your then partner at the time questioned your sanity,

10   did he not?

11   A.  Yes.  This is all documented.

12   Q.  And your partner at the time was named what?

13   A.  Denver Nicks.

14   Q.  And Denver Nicks, back in 2018, served as your manager for

15   a period of time, did he not?

16   A.  Publicist.

17   Q.  Is it your testimony that you never stated that Mr. Nicks

18   was your manager?

19   A.  He did not serve that job.  I never had a manager.

20   Q.  Did you ever tell anyone that Mr. Nicks was your manager?

21   A.  I don't remember.

22   Q.  So you may have?

23   A.  Perhaps.  He was my publicist.

24   Q.  Mr. Nicks was never the director of your documentary, was

25   he?

M1S8AVE1                         Clifford - Cross

1   A.  I don't have a documentary.

2   Q.  So if someone were to say that he was the director of your

3   documentary, would that be accurate, according to you?

4            MR. SOBELMAN:  Objection.

5            THE COURT:  Sustained.

6   Q.  Now, I want to ask you some questions about this time

7   period in the spring of March 2019, the spring in the month of

8   March.

9            Now, during that time period, according to you, there

10  was a portal in your house and a dark entity came through it,

11  right?

12  A.  That's what I was told by a medium.

13  Q.  And according to you, this dark entity held down Mr. Nicks

14  twice, right?

15  A.  That is on the television show, yes.

16  Q.  Ms. Daniels, I am asking you, have you ever made that

17  claim?

18  A.  Yes.

19  Q.  Now, let's talk about this alleged television show.  Has

20  this show ever aired --

21            MR. SOBELMAN:  Objection.

22            THE COURT:  Sustained as to form.

23  Q.  Ms. Daniels, has this show ever actually aired on

24  television?

25  A.  No.  It is an editing with EQ Media.

M1S8AVE1                          Clifford - Cross

1            MR. AVENATTI:  Move to strike everything after "no" as

2    nonresponsive, your Honor.

3            THE COURT:  Denied.

4    Q.  There has never been a single episode that has actually

5    aired on television, am I correct about that?

6    A.  Correct.

7    Q.  According to you, because of this dark entity, Mr. Nicks

8    attacked you, you saw him, his eyes turned black, and he put

9    his hands on you, and he has not been the same since, right?

10   A.  I don't know.  I haven't seen him in two years.

11   Q.  Well, isn't it true that you have previously stated that he

12   attacked you due to this entity, that you saw him, his eyes

13   turned black, and he put his hands on you?

14   A.  Yes.

15   Q.  And you have also claimed that he broke your collarbone

16   because of this entity, right?

17   A.  Correct.

18   Q.  And you also claimed that you saw it happen, right?

19   A.  What?

20   Q.  You saw him break your collarbone.

21   A.  I didn't see it.  I felt it.

22   Q.  According to you, Mr. Nicks was held under water in the

23   bathtub, he came running upstairs, unprovoked, screamed at you,

24   choked you so hard that he broke your collarbone, that he

25   looked at you and there was no color or white in his eyes.

1    That's what you have claimed, right?

2    A.  He told me about the bathtub.  I was not present.

3    Q.  But according to you, he came running upstairs, unprovoked,

4    screamed at you, choked you so hard that he broke your

5    collarbone, you looked at him and there was no color or white

6    in his eyes, right?

7    A.  Correct.

8    Q.  Around the same time, according to you, Ms. Daniels, you

9    started getting images in the house, right?

10   A.  On film, yes.

11   Q.  No.  But you started getting visual images in your head of

12   dead people in the home, right?

13   A.  No.

14   Q.  Have you ever said that?

15   A.  Different time frame.

16   Q.  On one occasion, according to you, you were standing in

17   your kitchen and you remember feeling a woman's presence, but

18   more strongly than normal, correct?

19   A.  Correct.

20   Q.  And you could actually see her and she was crying over a

21   child that had passed away, right?

22   A.  Correct.

23            THE COURT:  Mr. Avenatti, can we get a time frame for

24   this.

25   Q.  In the spring of 2019, right?

M1S8AVE1                    Clifford - Cross

1   A.  Yes.

2           No.  Sorry.  That was fall, I believe.

3   Q.  When did that happen?

4   A.  I'm not sure.

5   Q.  It's within the last three years, correct?

6   A.  Between April 2019 and November 2019.

7   Q.  According to you, when you saw this woman, she was standing

8   there and she was sobbing and cutting her wrists, attempting to

9   kill herself, right?

10  A.  Yes.

11  Q.  And all of a sudden the room morphed and you saw belongings

12  and furniture that you didn't recognize as yours, correct?

13  A.  I don't remember.

14  Q.  And then you looked down and your whole arm was covered in

15  blood, is that true?

16  A.  Yes.

17  Q.  And you don't remember opening the drawer, taking the knife

18  out, or cutting yourself?

19  A.  Correct.

20  Q.  And at the time, you began to think that you were crazy?

21  A.  Correct.

22  Q.  And Mr. Nicks called you nuts and moved out?

23          MR. SOBELMAN:  Objection.

24          THE COURT:  I will allow it.

25          But ladies and gentlemen, not for the truth of

M1S8AVE1                     Clifford - Cross

1    anything Mr. Nicks may or may not have said, just for Ms.

2    Daniels's state of mind and her reactions.

3            Go ahead.  You can answer.

4    A.  He was not there.

5    Q.  Have you ever said, My partner at the time was, like,

6    you're nuts, and he moved out; he was, like, wouldn't hear it.

7    Have you ever said that?

8    A.  He moved out in April, I believe, before this incident.

9            MR. AVENATTI:  Move to strike, your Honor.

10           THE COURT:  Denied.

11   Q.  Ms. Daniels, my question is this:  Have you ever said, "My

12   partner at the time was, like, you're nuts, and he moved out;

13   he was, like, wouldn't hear it"?

14           MR. SOBELMAN:  Objection.

15           THE COURT:  I am going to sustain it.

16           Next question.

17   Q.  And Ms. Daniels, you developed almost a weird obsession for

18   the house, one that you still have, right?

19   A.  Yes.

20           THE COURT:  Can we clarify?  Does she still have the

21   house or the obsession?  Can you clarify with a new question,

22   please.

23           MR. AVENATTI:  Sure.

24   Q.  I am talking about the obsession.  You have since moved out

25   of the home, right?

M1S8AVE1                    Clifford - Cross

```
 1   A.  Made a whole TV show about it, yes.
 2              MR. AVENATTI:  Move to strike as nonresponsive.
 3              THE COURT:  Denied.
 4              Ms. Daniels, listen to the question and just answer
 5   the question.
 6              THE WITNESS:  All right.
 7              THE COURT:  The question was, you have since moved out
 8   of that house, is that correct?
 9   A.  Correct.
10   Q.  But you still have a fascination with the house, correct?
11   A.  I want answers, yes.
12   Q.  And you have previously referred to the fact that the
13   house, you have called the house a "she," and you have claimed
14   that she has a name, right?
15   A.  Yes.
16   Q.  And from time to time, you pull up in an Uber and you look
17   at the house and you talk to the house, right?
18   A.  For filming.
19   Q.  So it's make-believe?
20   A.  It's documentation.
21   Q.  You're not suggesting that it's make-believe or fabricated,
22   are you?
23   A.  No.  I do go to the house, and we do film it.
24   Q.  And you talk to the house?
25   A.  Me with the whole team.
```

M1S8AVE1                    Clifford - Cross

1   Q.  And you talk to the house, right?

2   A.  Yes.

3   Q.  And according to you, these issues with the house led you

4   to have severe health problems, right?

5   A.  That's what I thought.  Three other people have left in an

6   ambulance since moving into the house.

7           MR. AVENATTI:  Move to strike everything after "I

8   thought" as nonresponsive.

9           THE COURT:  Granted.

10           Ms. Daniels, answer the question and only the

11   question, please.

12   Q.  And at one point over the last three years, you have

13   claimed that the experiences in the house led you to have a

14   mass in your head?

15   A.  An energy worker told me that, yes.

16   Q.  Isn't it true that, in fact, you had scans?

17   A.  Yes.  Reiki scans.

18   Q.  And the reiki scans showed a mass in your head?

19   A.  Yes.  A blockage was the term.

20           THE COURT:  What kind of scan was that?

21           THE WITNESS:  Reiki.

22           THE COURT:  Do you know how to spell it?

23           THE WITNESS:  R-E-I-K-I.

24   Q.  And at one point within the last three years you were

25   having memory loss and headaches, right?

M1S8AVE1                          Clifford – Cross

1    A.  Correct.

2    Q.  And you were also bleeding from the eyes and the ears and

3    the nose, according to you?

4    A.  Documented, yes.

5    Q.  Your hair was falling out and you had a tumor, according to

6    you, right?

7    A.  That's what they thought.  Luckily I was wrong.

8    Q.  Well, isn't it true that in April 2021, you stated, My hair

9    was falling out, I was bleeding at one point, I had a tumor,

10   they had, like, a mass, as soon as I moved out, it went away,

11   isn't that true?

12   A.  Yes.

13            MR. SOBELMAN:  Objection.

14            THE COURT:  Sustained.  The jury will disregard that

15   answer.

16   Q.  Ms. Daniels, isn't it true that in April of 2021 you

17   claimed --

18            THE COURT:  Mr. Avenatti.

19            MR. AVENATTI:  Yes.

20            THE COURT:  I sustained the objection.

21            MR. AVENATTI:  I thought it was to form.

22            THE COURT:  It was, but you have to come up with a

23   different form.

24            MR. AVENATTI:  I am going to try.

25            THE COURT:  Thank you.

M1S8AVE1                      Clifford - Cross

1   Q.  Ms. Daniels, you have previously claimed that you had a

2   tumor, and as soon as you moved out, it went away, true?

3   A.  Luckily it was stress, yes.

4   Q.  As you previously stated, I'm pretty sure coming forward

5   and saying that I talk to dead people are ruining my court

6   cases, because there is your insanity like dismissal, you know.

7   A.  What was the question?

8            MR. AVENATTI:  Could I have it read back, your Honor?

9            THE COURT:  As you previously stated, I'm pretty sure

10  coming forward and saying that I talk to dead people are

11  ruining my court cases, because there is your insanity like

12  dismissal, you know.

13  A.  Is the question that I said that?

14  Q.  Yes.

15  A.  Yes.

16  Q.  Have you previously stated, I should keep my mouth shut

17  because me going around saying I see dead people and I hear

18  voices can have a pretty terrible effect on these open court

19  cases?

20           MR. SOBELMAN:  Objection.

21           THE COURT:  Overruled.

22  A.  Yes, I said that.

23  Q.  Now, you started experiencing these -- strike that.

24           You started having these experiences, according to

25  you, in March of 2019, but you didn't form the Spooky Babes

1    show until 2020, did you?

2    A.  It took a long time to shop it, yes.

3    Q.  I am not talking about shopping it.

4            Isn't it true, Ms. Daniels, that according to your

5    website, you founded Spooky Babes in 2020, a year after?

6    A.  Correct.

7    Q.  A year after you started experiencing all of these things

8    you have been talking about, right?

9    A.  Correct.  That's when we get our trademark and all that

10   stuff.

11   Q.  How do you speak with the dead?

12   A.  I don't know.  It just happens sometimes.

13   Q.  What do you mean it just happens sometimes?

14   A.  Cards, meditation.

15   Q.  Do the dead speak back to you; they communicate to you?

16   A.  Yes.

17   Q.  Are you able to have conversations with them?

18   A.  Sometimes.  We record them.

19   Q.  How do you see into people's homes from the outside?

20   A.  It's called remote viewing.  We record that as well.

21   Q.  What do you mean remote viewing?

22   A.  That's what it's called.

23   Q.  How does it work?

24   A.  I have no idea.  That's why I have the show.  I want to

25   learn about these things.

M1S8AVE1                        Clifford - Cross

1    Q.  Well, you're not suggesting that you can actually stand

2    outside someone's home and see what's going on inside, are you?

3    A.  I don't know how it works.  That's the premise of the show.

4    Q.  But, Ms. Daniels, are you able to stand outside of a

5    residence and actually see what's going on inside?

6    A.  Sometimes.  But what happened.

7    Q.  What is Scooby-Dooing?

8    A.  That's a cartoon about people who solve crimes.  It means

9    take off running after clues.

10   Q.  But you refer to yourself having the ability to be put in a

11   trance and then run around and solve crimes, right?

12   A.  All in the show, yes.

13   Q.  Are you actually able to do that?

14   A.  Yes.

15            MR. SOBELMAN:  Objection.

16            THE COURT:  Overruled.

17   Q.  I'm sorry.  The answer was yes?

18   A.  Yes.

19   Q.  I want to talk to you for a moment about Susan, who you

20   claim is a haunted doll, right?

21   A.  Correct.

22   Q.  According to you, Susan walks, right?

23   A.  I have never seen her walk.

24   Q.  According to you -- have you claimed that she walks?

25   A.  No.  I have seen her be in a different spot.  I don't know

M1S8AVE1                    Clifford - Cross

1    how she got there.

2    Q.  You have claimed that she has the ability to talk, right?

3    A.  Yes.

4    Q.  She has the ability to call you mommy, right?

5    A.  Anyone who has seen the YouTube video knows this, yes.

6            THE COURT:  Ms. Daniels, just answer the question and

7    only the question.  All right?

8    Q.  She has the ability, according to you, to play the piano,

9    right?

10   A.  Someone else saw that, not me.

11   Q.  But you believe it?

12   A.  I believe they were telling the truth, yes.

13   Q.  According to you, on one occasion you were in a home and

14   Susan the doll was buckled into the backseat of a car in the

15   driveway, you heard her call out mommy, mommy, you ran out of

16   the home, opened the backseat, Susan was unbuckled face-down on

17   the floor, right?

18   A.  That is what happened.  I don't know how it happened.

19   There were ten people there.

20   Q.  But you remember her calling you mommy, mommy?

21   A.  We heard her voice outside, yes.

22   Q.  You heard her call you mommy, mommy?

23   A.  I don't know if it was her.  We assume.

24   Q.  Well, you have previously stated that you heard Susan call

25   you mommy, mommy during this incident?

```
 1   A.  Yes.
 2   Q.  Now, you mentioned that you read tarot cards for
 3   entertainment.  Do you remember that yesterday?
 4   A.  Yes.
 5   Q.  In fact, you charge people for reading tarot cards, right?
 6   A.  Technically, oracle cards, but yes.
 7   Q.  And you advertise your services on the internet so that
 8   people will come to you from all of the country to have you
 9   read their cards?
10   A.  All over the world, yes.
11   Q.  And you make money from that?
12   A.  I do.
13   Q.  You claim, in connection with that, that you can
14   communicate with these people's dead relatives, right?
15   A.  Sometimes.
16   Q.  And that you can also see into the future as to what is
17   going to happen to them, right?
18   A.  No.
19   Q.  What do you claim that you can see by reading these people
20   from all over the world who pay you money for reading their
21   tarot cards?
22   A.  That's their private information.
23   Q.  I am not asking for any specifics.  Generally speaking,
24   what is your talent and skill set as it relates to being able
25   to tell someone who comes to you anything about them by reading
```

M1S8AVE1                              Clifford - Cross

1    their cards?

2    A.  I have learned the meaning of all of the cards.  I shuffle

3    and they ask a question, the card hits the table, and I tell

4    them the definition of each card.  It all depends on what their

5    questions are.

6    Q.  You believe you are a medium, correct?

7    A.  Correct.

8           THE COURT:  Can you just tell us what your

9    understanding of that term is, what is a medium?

10          THE WITNESS:  A medium is considered someone who

11   communicates with spirits.  Nonliving, sorry, to be specific.

12   Q.  Who David Karbley?

13   A.  David Karbley is my bus driver.

14   Q.  Your former bus driver?

15   A.  Correct.  Sorry.  Yes.

16   Q.  You previously told the government that you spoke to him

17   about the book deal, correct?

18          MR. SOBELMAN:  Objection.  Hearsay.

19          THE COURT:  Sustained.

20   A.  I don't remember.

21          THE COURT:  Ms. Daniels, if I sustain an objection,

22   please don't answer.

23          So the jury will disregard the answer.

24   Q.  Who are the dragons?

25   A.  Brandon and Travis.  They are security office officers.

M1S8AVE1                      Clifford - Cross

1    Q.  What are their full names, for the benefit of the jury?

2    A.  Brandon Parraway and Travis Miller.

3            MR. AVENATTI:  Could I please have Government Exhibit

4    702.

5            Next page, please.

6            Can we blow up the box in the right-hand corner,

7    please.

8    Q.  Ms. Daniels, can you see that?

9    A.  Yes.

10   Q.  You see where it says Brandon, and I think it's misspelled,

11   but P-A-R-R-A-W-A-Y?

12   A.  Yes.

13   Q.  Is that the gentleman you were just referring to who is one

14   of your security officers?

15   A.  Yes.

16           MR. AVENATTI:  We can take that down.

17   Q.  Why do you call them your dragons?

18   A.  Because we use code names when checking into hotels and

19   things like that for security reasons.  And somehow they ended

20   up calling me Danny, which was short, as an inside joke, for

21   Daenerys Stormborn from Game of Thrones.  And anyone familiar

22   with the show knows that her protectors were her dragons.

23   Q.  You really liked that nickname, right?

24   A.  Yeah, of course.

25   Q.  And so you nicknamed them the dragons from Game of Thrones?

M1S8AVE1                    Clifford - Cross

1   A.  Yes.

2   Q.  Now, you have previously gone on various podcasts and

3   interviews and you have discussed your book payments, haven't

4   you?

5   A.  I'm not sure.  Likely.

6   Q.  You know who Michael Cohen is, correct?

7   A.  Of course.

8   Q.  And Michael Cohen is here today, right?

9   A.  I saw him when I walked in.

10          MR. SOBELMAN:  Objection.

11          THE COURT:  Sustained.

12  Q.  Now, Ms. Daniels, you have gone on Mr. Cohen's podcast on

13  two occasions and you have discussed your book payments,

14  correct?

15  A.  Correct.

16  Q.  Have you been honest when you have made statements on

17  Mr. Cohen's podcast about your book payments?

18  A.  Absolutely.

19  Q.  100 percent?

20  A.  To the best of my memory, yes.

21  Q.  Well, you just said absolutely.

22  A.  Yes.

23  Q.  Isn't it true that on -- strike that.

24          Isn't it true that in February of 2021, you went on

25  Mr. Cohen's podcast and you stated, I did get my first couple

M1S8AVE1                     Clifford – Cross

1    of checks?

2    A.  Yeah.

3    Q.  Now, there were four payments under the book deal, correct?

4    A.  Correct.

5    Q.  And what was the last big check?

6    A.  Are you asking amount?  I don't understand.

7    Q.  Well, the fourth payment was the last big check, right?

8    A.  Correct.

9    Q.  OK.  Isn't it true that on this podcast in February 2021,

10   you said, But my last big check he intercepted by forging my

11   signature, and I have yet to see an accurate royalty statement?

12   Isn't it true that's what you said?

13   A.  I'm not sure.

14   Q.  Do you deny it?

15   A.  No.

16   Q.  Is that true?

17              MR. SOBELMAN:  Objection.

18              THE COURT:  Sustained as to form.

19   Q.  Ms. Daniels, you don't dispute that statement, do you?

20              MR. SOBELMAN:  Objection.

21              THE COURT:  Sustained as to form.

22   Q.  Then in September 2021, you went back on Mr. Cohen's

23   podcast, didn't you?

24   A.  I believe that was the date.

25   Q.  During that podcast, you said that you got your first two

1    payments, quote, no issue, close quote, right?

2    A.  I don't remember.

3    Q.  Do you deny it?

4    A.  No.

5            MR. SOBELMAN:  Objection.

6            THE COURT:  Overruled.

7            The witness said no.

8    Q.  You then said on the podcast that you didn't get your other

9    two payments, didn't you?

10   A.  I don't remember.

11   Q.  Do you deny saying that?

12   A.  This was before I knew --

13           MR. AVENATTI:  Move to strike.

14           THE COURT:  Just answer the question.

15   A.  I don't remember.

16   Q.  Well, this was in September of 2021?

17   A.  Correct.

18   Q.  All right.  And we established yesterday that you have,

19   according to you, a, quote, perfect, close quote, memory, do

20   you remember that?

21   A.  Photographic memory.

22   Q.  So my question to you is, isn't it true that you said on

23   Mr. Cohen's podcast, only four months ago, that you didn't get

24   your other two payments, the last two payments?

25           MR. SOBELMAN:  Objection.  Asked and answered.

M1S8AVE1                        Clifford - Cross

1              THE COURT:  Sustained.

2    Q.  Ms. Daniels, have you ever claimed that in fact you did not

3    get the last two payments?

4    A.  I don't remember.

5    Q.  So you may have?

6    A.  Maybe.

7              MR. AVENATTI:  Your Honor, one moment, please.

8    Q.  Now, Ms. Daniels, within the last year, you have also

9    claimed that the federal government planted 16 false criminal

10   charges on your criminal record, have you not?

11   A.  I did not say that.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

M1sWave2                    Clifford - Cross

1    BY MR. AVENATTI:

2    Q.  Is it your testimony that you never gave an interview to

3    CNN where you said that there were false criminal charges on

4    your record?

5    A.  I said there were false charges placed on my FBI record.  I

6    never accused the FBI.  As a matter of fact, they helped me

7    resolve it.

8              MR. AVENATTI:  Your Honor, move to strike everything

9    after "accused" as nonresponsive.

10             THE COURT:  All right.  Let's leave it as it is.

11             Next question.

12   BY MR. AVENATTI:

13   Q.  Ms. Daniels, isn't it true that when you met with the

14   government in connection with this case, you claimed that there

15   were these false charges on your record, and you had been

16   detained at the Canadian border because of the false charges?

17   A.  I was --

18             MR. SOBELMAN:  Objection.  Hearsay.

19             THE COURT:  Sustained.

20   BY MR. AVENATTI:

21   Q.  Ms. Daniels, did you previously -- strike that.

22        According to you, within the last couple years, you were

23   detained at the Canadian border because of 16 false criminal

24   charges on your FBI record, right?

25             MR. SOBELMAN:  Objection.

M1sWave2                        Clifford – Cross

1           THE COURT:  Overruled.

2     Q.  Yes or no.

3     A.  I was detained at the Canadian border with false charges on

4     my record.  That is correct.

5     Q.  Now, yesterday, you were shown a text message by the

6     government from February of 2019 where you forwarded

7     Mr. Brewster's contact information to me and told me that he

8     was your new attorney.  Do you recall that?

9     A.  Yes.

10    Q.  And you sent that text message after you received my letter

11    of termination, didn't you?

12    A.  I don't remember.

13    Q.  Do you deny that?

14    A.  It was the same day.

15          MR. SOBELMAN:  Objection.

16          THE COURT:  Hold on.

17          Overruled.

18    BY MR. AVENATTI:

19    Q.  Do you deny that you only sent me that text message with

20    the contact information for Mr. Brewster after I terminated you

21    as a client?

22    A.  I don't remember.  Same day.

23    Q.  Do you deny it?

24    A.  No.

25          MR. SOBELMAN:  Objection.

M1sWave2                          Clifford - Cross

1          THE COURT:  Overruled.

2          Ladies and gentlemen, let me just remind you again, as

3   I did this morning, that Mr. Avenatti's questions are not

4   evidence.  It is only the witness's testimony that is evidence.

5   BY MR. AVENATTI:

6   Q.  Ms. Daniels, during the course of our relationship, we

7   communicated via WhatsApp, correct?

8   A.  Correct.

9   Q.  We communicated by iMessage, correct?

10  A.  No.

11  Q.  And we communicated via email, correct?

12  A.  Correct.

13  Q.  So WhatsApp and email but not iMessage?

14  A.  I didn't have an iPhone.

15  Q.  WhatsApp, email, and text message?

16  A.  Text message.

17  Q.  Yes?

18  A.  Yes.

19  Q.  On the five to seven occasions that you met with the

20  government, did the government ever ask you to examine your

21  phone?

22          MR. SOBELMAN:  Objection.

23          THE COURT:  Overruled.

24  A.  I gave them my phone.

25  Q.  Because they asked for it?

M1sWave2                              Clifford - Cross

1    A.  Yeah.

2    Q.  Did they ever ask you to image your phone?

3            MR. SOBELMAN:  Objection.

4            THE COURT:  Overruled.

5            You can answer.

6            THE WITNESS:  I don't really understand.

7            MR. AVENATTI:  Let me ask a better question.

8    Q.  Did they ever ask you for your phone so they could plug it

9    into a computer and take a forensic image of your phone?

10   A.  I believe so.  They took my phone.

11   Q.  For how long?

12   A.  Seems like forever.  I don't remember.

13   Q.  I mean was it more than a day?

14   A.  No.

15   Q.  Did they leave the room with the phone?

16   A.  No.

17   Q.  Did you observe them plug your phone into any computer to

18   image it?

19   A.  They plugged it in.  I don't know what the equipment is.

20   They copied my WhatsApp messages.

21   Q.  Off your phone?

22   A.  Correct.

23   Q.  Do you know if they copied anything else?

24   A.  I don't know.

25   Q.  Who was there when they plugged it in and copied this data

M1sWave2                        Clifford - Cross

1    off your phone?

2              MR. SOBELMAN:  Objection, your Honor.

3              THE COURT:  Sustained.

4    BY MR. AVENATTI:

5    Q.  Now, Ms. Daniels, no one can tell you what to do, correct?

6    A.  Correct.

7              MR. SOBELMAN:  Objection.

8              THE COURT:  The witness answered.

9              Next question.

10   BY MR. AVENATTI:

11   Q.  And in February of 2018, you sought out an attorney, and

12   then you chose and hired one, right?

13   A.  Correct.

14   Q.  And that attorney was me, right?

15   A.  Say the date again, please.

16   Q.  February 2018.

17   A.  Correct.

18   Q.  Have you ever claimed that you did not pick me and that you

19   had no choice but to hire me?

20   A.  Yes.

21   Q.  Was that true?

22   A.  Yes.

23   Q.  So it's your testimony that, actually, you did not pick me

24   and you had no choice but to hire me?

25             MR. SOBELMAN:  Objection.  Asked and answered.

M1sWave2                          Clifford – Cross

1              THE COURT:  Sustained.

2    BY MR. AVENATTI:

3    Q.  Ms. Daniels, did you pick me or not?

4              MR. SOBELMAN:  Objection.

5              THE COURT:  Sustained.

6    BY MR. AVENATTI:

7    Q.  Ms. Daniels, is it your testimony that you did not have a

8    choice and had to hire me?

9              MR. SOBELMAN:  Same objection.

10              THE COURT:  Same ruling.

11    BY MR. AVENATTI:

12    Q.  Ms. Daniels, you voluntarily picked me to be your attorney,

13    right?

14              MR. SOBELMAN:  Objection.

15              THE COURT:  I'll allow that.  Overruled.

16    A.  Can you repeat the question, please?

17    Q.  Sure.  You voluntarily chose me to be your attorney,

18    correct?

19    A.  I was out of options.

20    Q.  And the reason why, according to you, you were out of

21    options was because no one would take your case without a lot

22    of money paid up front, right?

23    A.  That was one of the reasons.

24    Q.  What was the other reason or reasons?

25    A.  Some were just afraid.  I didn't know who else to call, and

M1sWave2                        Clifford - Cross

1    I was out of time, because I thought I had hired an attorney --

2    or was going to hire an attorney.  Sorry.

3    Q.  Now, I never sought you out initially for representation,

4    correct?

5    A.  Not to my knowledge.

6    Q.  And you didn't have a huge amount of money to put down for

7    a retainer at that time, did you?

8    A.  No, I did not.

9    Q.  Now, before we met at the Waldorf Astoria, we had never

10   spoken before on the phone, right?

11   A.  We had not.

12   Q.  And do you recall any instance in 2018 where you and me and

13   a guy by the name of Sean Macias ever spoke together on a phone

14   call?

15   A.  Not that I recall.

16   Q.  Now, yesterday, you testified that at the time the

17   attorney-client fee agreement was signed --

18           MR. AVENATTI:  And why don't we get that, if we could.

19   Thank you, Juliet.  GX3.

20   Q.  Can you see that?

21   A.  Yes.

22   Q.  All right.  I want to make sure that I understand your

23   testimony.  Yesterday, you testified that we met on the 26th of

24   February, we met again on February 27 at the restaurant, right?

25   A.  Correct.

1   Q.  You paid me a hundred dollars, right?

2   A.  Correct.

3   Q.  I had this fee agreement with me, exhibit 3, you read it,

4   and signed it, correct?

5   A.  Correct.

6   Q.  And you're sure about that?

7   A.  Yes.  I was there.

8   Q.  And you're as sure about that as you are about the rest of

9   your testimony that you gave to the jury yesterday, correct?

10              MR. SOBELMAN:  Objection.

11              THE COURT:  Sustained.

12  BY MR. AVENATTI:

13  Q.  Ms. Daniels, are you any less sure that that actually

14  happened the way that you've testified to; are you unclear

15  about that in any way?

16              MR. SOBELMAN:  Objection.

17              THE COURT:  Sustained.

18  BY MR. AVENATTI:

19  Q.  Ms. Daniels, isn't it true that, in fact, this agreement

20  was not signed on February 27 in Los Angeles, California; it

21  was signed in your kitchen in Pawnee, Texas, about a week to

22  ten days later?

23  A.  No.

24  Q.  You're sure about that?

25  A.  I believe that's when you gave me your signed copy.

M1sWave2                     Clifford - Cross

1    Q.  You're sure about that?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Overruled.

4    BY MR. AVENATTI:

5    Q.  I'm sorry.  The answer is yes?

6    A.  You gave me your signed copy, I believe, yes.

7    Q.  You're sure that you signed this agreement in late

8    February, not in early March at your home?

9              MR. SOBELMAN:  Objection.

10              THE COURT:  Sustained.

11   BY MR. AVENATTI:

12   Q.  Now, you have described this contract as a "terrible deal"

13   from me, right?

14   A.  I said that.

15   Q.  And you've also claimed that I was supposed to get a

16   percentage of any cases that I won for you, right?

17   A.  Correct.

18   Q.  Can you please show me where in Government Exhibit 3 that

19   it says that?

20   A.  It doesn't.

21   Q.  You have also said that if I wanted money from the book

22   deal, I should have asked for it and put it in our contract,

23   right?

24   A.  You should have made a separate contract, as this one

25   states, yes.

M1sWave2                        Clifford - Cross

1      MR. AVENATTI:  Move to strike, your Honor.

2      THE COURT:  Denied.

3   BY MR. AVENATTI:

4   Q.  Ms. Daniels, isn't it true that you had said that if I

5   "wanted money from the book deal" that I should have, quote,

6   asked for it and put it in our contract?

7      MR. SOBELMAN:  Objection.  Same question, your Honor.

8      THE COURT:  Sustained.

9      MR. AVENATTI:  Let's blow up paragraph 4, please.

10  Q.  I want to focus your attention on the last sentence of the

11  paragraph.

12  A.  OK.

13  Q.  "In addition, in the event attorney assists clients in

14  finalizing any book or media opportunity" -- we'll stop right

15  there.

16      Ms. Daniels, did I assist you over the course of late

17  February 2018 to February 2019 in finalizing any book or media

18  opportunity?  Yes or no.

19  A.  Yes.

20  Q.  The contract continues:  "that results in clients being

21  paid."  Do you see that?

22  A.  I do.

23  Q.  Were you paid from those book or media opportunities?

24  A.  Some of them, yes.

25  Q.  "Attorney and client agree that attorney shall be

M1sWave2                     Clifford - Cross

1    entitled" -- you understood that that meant that I would be
2    entitled if those things occurred, right?
3    A.  You're very entitled, yes.
4    Q.  "To a reasonable percentage" -- did I read that correctly?
5    A.  You did.
6    Q.  "To be agreed upon between clients and attorney."  Did I
7    read that correctly?
8    A.  You did.
9    Q.  And you read that and understood it, that clause, when this
10   agreement was signed, correct?
11   A.  Correct.
12   Q.  Now let's talk about this word "reasonable."  When you
13   work, do you expect to be paid?
14   A.  Of course.
15   Q.  Why do you say of course?
16   A.  That's how we survive.
17   Q.  And you knew prior to February of 2018 that attorneys
18   generally don't work for free, didn't you?
19            MR. SOBELMAN:  Objection.
20            THE COURT:  Sustained -- sorry.  Overruled.
21   BY MR. AVENATTI:
22   Q.  Do you want me to ask --
23   A.  Please.  I'm sorry.
24   Q.  No problem.
25        Ms. Daniels, you knew when you signed this contract that

1   attorneys don't generally work for free, correct?

2   A.   That's why I was shocked when you would.

3   Q.   So you understood that I was working for free?  Yes or no.

4   A.   For a hundred dollars.

5   Q.   Now, you generally understood that attorneys take fees for

6   their work, right?

7   A.   Often.

8   Q.   Well, almost always, correct?

9          MR. SOBELMAN:  Objection.

10  Q.   Based on your experience?

11         MR. SOBELMAN:  Objection.

12         THE COURT:  Sustained.

13  BY MR. AVENATTI:

14  Q.   Ms. Daniels, at the time that you signed the contract, did

15  you have the understanding that attorneys often take fees for

16  their legal work?

17         MR. SOBELMAN:  Objection.

18         THE COURT:  Sustained.

19  BY MR. AVENATTI:

20  Q.   Now, Ms. Daniels, this was not the first fee agreement that

21  you had signed with a lawyer, was it?

22         MR. SOBELMAN:  Objection.  Prior ruling.

23         THE COURT:  Sustained.

24  BY MR. AVENATTI:

25  Q.   Ms. Daniels, you had experience hiring attorneys and

1    arranging for them to get paid on a percentage basis, did you

2    not?

3            MR. SOBELMAN:  Objection.  Prior ruling.

4            THE COURT:  Sustained.

5    BY MR. AVENATTI:

6    Q.  Ms. Daniels, my office prepared a legal complaint for you

7    to file in connection -- strike that.

8            My office prepared a legal complaint and arranged for

9    a lawsuit to be filed on your behalf in Columbus, Ohio,

10   relating to your false arrest, didn't we?

11   A.  I don't know.

12   Q.  Ms. Daniels, isn't it true that my office prepared a legal

13   complaint, which is the first document that is filed in a

14   lawsuit, and that we provided it to you in 2018 for your

15   review?

16           MR. SOBELMAN:  Objection.  Form.

17           THE COURT:  Sustained as to form.

18   BY MR. AVENATTI:

19   Q.  Ms. Daniels, isn't it true that my office prepared what's

20   called a complaint and provided it to you for your review in

21   2018?

22           THE COURT:  Sustained as to form.

23   BY MR. AVENATTI:

24   Q.  Ms. Daniels, do you recall my office preparing any

25   documents and providing them to you for your review relating to

M1sWave2                         Clifford - Cross

1    a potential lawsuit in Ohio?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained as to form.

4              It's a compound question, Mr. Avenatti.  Break it up,

5    please.

6    BY MR. AVENATTI:

7    Q.  Ms. Daniels, do you recall receiving any documents from my

8    office relating to a potential lawsuit in Ohio?

9    A.  Yes.

10   Q.  And do you recall that one of those documents is what is

11   called a complaint?

12   A.  I don't know.

13             MR. AVENATTI:  Your Honor, one moment, please?

14             THE COURT:  Mr. Avenatti.

15             MR. AVENATTI:  Yes, your Honor.  I'm just trying to

16   locate one document.  I'm sorry.

17             Let's go to the top of ST29, for the witness only,

18   please.

19   Q.  Ms. Daniels, directing your attention to the top of ST29,

20   does that refresh your recollection that in November 2018 you

21   were asked to review the complaint for the Columbus case that

22   my office had prepared?

23             THE COURT:  All right.  Ms. Daniels, let me explain

24   the nature of the question.  Just look at the exhibit that's

25   depicted on the screen.  Take a moment to read it.  When you

M1sWave2                         Clifford - Cross

1    have read it, I want you to look up and indicate that you have

2    read it.  OK?

3              THE WITNESS:  All right.

4              THE COURT:  And don't answer yet.  Just look at the

5    document.

6              THE WITNESS:  OK.

7              THE COURT:  You've read it?

8              THE WITNESS:  Yes.

9              THE COURT:  So the question is not what the document

10   says or doesn't say or what the document is.  That's not

11   relevant.  The question is looking at that document, does it

12   refresh your recollection that you were asked in November 2018

13   to review the complaint for the Columbus case that Mr.

14   Avenatti's office prepared.

15             So sitting here today, does this refresh your

16   recollection?

17             THE WITNESS:  Yeah.  OK.  I understand.

18             THE COURT:  OK.  So what's the answer to that

19   question?

20             THE WITNESS:  Yes.

21   BY MR. AVENATTI:

22   Q.  Now, that case was ultimately settled, correct?

23             THE COURT:  Let's take the exhibit off the screen,

24   please.

25             You can answer.

M1sWave2                          Clifford - Cross

1   A.  Yes.  Clark Brewster handled that case for me.

2   Q.  Clark Brewster?

3   A.  And Chase Mallory.

4   Q.  They handled the case after it was filed, correct?

5   A.  They refiled it differently.  Yes.

6   Q.  And that case was settled for $450,000, correct?

7   A.  Correct.

8   Q.  And you paid a percentage to your attorneys for their work

9   on that case, did you not?

10          MR. SOBELMAN:  Objection.

11          THE COURT:  Overruled.

12  A.  They got a percentage of the winnings, yes.

13  Q.  And that percentage was 40 percent, wasn't it?

14          MR. SOBELMAN:  Objection.

15          THE COURT:  Sustained.

16  BY MR. AVENATTI:

17  Q.  What was the percentage that you paid to your attorneys for

18  handling that case?

19          MR. SOBELMAN:  Objection.

20          THE COURT:  Sustained.

21  BY MR. AVENATTI:

22  Q.  Was the percentage you paid to your attorneys reasonable?

23          MR. SOBELMAN:  Objection.

24          THE COURT:  Sustained.

25  BY MR. AVENATTI:

M1sWave2                          Clifford - Cross

1    Q.  How much of the $450,000 did you receive?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4              MR. AVENATTI:  Now, let's go back to GX3, if we could,

5    please.

6    Q.  This was not the first fee agreement that you had ever

7    signed, am I right about that?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. AVENATTI:

11   Q.  You previously had a fee agreement with an attorney by the

12   name of Keith Davidson, am I right about that?

13             MR. SOBELMAN:  Objection.

14             THE COURT:  Sustained.

15             Mr. Avenatti, we've been here before.  New line,

16   please.

17   BY MR. AVENATTI:

18   Q.  Have you ever paid Mr. Davidson legal fees for the work

19   he's done?

20             MR. SOBELMAN:  Objection.  Prior ruling.

21             THE COURT:  Sustained.

22   BY MR. AVENATTI:

23   Q.  Would you agree that me and my law firm, during the year

24   2018, did a lot of work for you?  Yes or no.

25   A.  You did --

M1sWave2                    Clifford – Cross

 1   Q.  Yes or no, Ms. Daniels.

 2   A.  Yes.

 3   Q.  Now, Ms. Daniels, this is the book that we've been

 4   discussing, right?

 5            MR. SOBELMAN:  Objection.

 6            THE COURT:  Sustained.

 7            If it's not in evidence, please do not display it to

 8   the jury.

 9   BY MR. AVENATTI:

10   Q.  Ms. Daniels, I believe you testified late yesterday that

11   everything in the book is true.  Am I right about that?

12            MR. SOBELMAN:  Objection.  Asked and answered.

13            THE COURT:  Sustained.

14            MR. AVENATTI:  I'm just trying to orient everyone.

15            THE COURT:  I think we're oriented.  Next question,

16   please.

17            MR. AVENATTI:  Fair enough, your Honor.

18   Q.  The words in the book are your words, is that right?

19

20            MR. SOBELMAN:  Objection.  Asked and answered.

21            THE COURT:  Sustained.

22   BY MR. AVENATTI:

23   Q.  Ms. Daniels, you dedicated the book:  "To my smart, brave,

24   beautiful daughter.  You remind me every day what truly

25   matters."

1          MR. SOBELMAN:  Objection.  Relevance.

2          THE COURT:  Sustained.

3    BY MR. AVENATTI:

4    Q.  Ms. Daniels, isn't it true that I wrote the dedication to

5    your book?

6          MR. SOBELMAN:  Objection.  Relevance.

7          THE COURT:  Overruled.

8    A.  Yes, you wrote that, and I approved it.

9    Q.  And I wrote it because you asked me who you should dedicate

10   your book to and what it should say, true?

11   A.  True.

12   Q.  And I suggested that you dedicate it to your daughter, and

13   you asked me to write something, and that's what I wrote and

14   you used, true?

15         THE COURT:  Sustained.

16   BY MR. AVENATTI:

17   Q.  Now, Ms. Daniels, you have understood since you signed the

18   book contract that the total amount of money you were to

19   receive under the contract would be dependent on book sales,

20   right?

21   A.  Past the advance, yes.

22         THE COURT:  Can you just explain what you mean by past

23   the advance.

24         THE WITNESS:  Additional fees over 800,000.

25         THE COURT:  Just tell me your understanding, what you

1    meant by that phrase "past the advance."

2              THE WITNESS:  That I was guaranteed 800,000 and a

3    percentage once the advance was earned back.

4    BY MR. AVENATTI:

5    Q.  And when you say earned back, you mean once enough books

6    sold beyond a certain level where the publisher earned back the

7    $800,000 they had paid you, right?

8    A.  That's how that worked, yes.

9    Q.  And that has not happened as it relates to your book?

10   A.  I haven't received any additional payments.  No.

11   Q.  How many copies of your book have been sold?

12             MR. SOBELMAN:  Objection.  Relevance.

13             THE COURT:  Sustained.

14   BY MR. AVENATTI:

15   Q.  Ms. Daniels, you previously claimed that 390,000 copies of

16   your book were sold in the first three weeks, and you knew that

17   to be untrue, didn't you?

18   A.  No.  That's what's on the statement I received.

19   Q.  From who?

20   A.  Janklow.

21   Q.  And you've also claimed that the book was on the New York

22   Times best seller list for 360 days, and you knew that wasn't

23   untrue -- or that was true.  Strike that.

24             You also had stated that the book was on the New York

25   Times best seller list for 360 days even though you knew that

M1sWave2                          Clifford - Cross

1    was false, didn't you?

2    A.  I didn't say that.  I never gave a number of days.

3    Q.  Did you ever agree with that statement?

4              MR. SOBELMAN:  Objection.

5    Q.  Even though you knew it was untrue?

6              THE COURT:  Sustained as to form.

7              Let's break it up, Mr. Avenatti.

8              MR. AVENATTI:  Sure.

9    Q.  Did you ever agree with the statement that your book had

10   been on the New York Times best seller list for 360 days?

11   A.  I don't remember that.  No.

12   Q.  Because your book was not on the New York Times best seller

13   list for 360 days, was it?

14   A.  No, it wasn't.

15             MR. SOBELMAN:  Objection.

16             THE COURT:  Sustained.

17   BY MR. AVENATTI:

18   Q.  Now, since the book has come out, St. Martin's Press has

19   flat-out refused to give you an updated accounting, and so as

20   you sit here today, you don't know how much is owed to you,

21   right?

22             MR. SOBELMAN:  Objection.

23             THE COURT:  Sustained, certainly as to form.

24   BY MR. AVENATTI:

25   Q.  Ms. Daniels, since the book came out, St. Martin's Press

1  has flat-out refused to give you an updated accounting, right?

2          MR. SOBELMAN:  Objection.

3          THE COURT:  Overruled.

4  A.  I have not received any accounting.

5  Q.  And they have flat-out refused to give you an updated

6  accounting, right?

7          MR. SOBELMAN:  Objection.

8          THE COURT:  Overruled.

9  A.  I don't know.

10 Q.  Well, isn't it true that you previously claimed that St.

11 Martin's Press has, quote, flat-out -- that they, quote,

12 flat-out refused to give me an updated accounting?

13 A.  I don't know who's not giving it to me.  I've had no

14 communication with St. Martin Press.

15 Q.  Have you ever claimed that St. Martin's Press has refused

16 to give you this accounting?

17 A.  Yes, I have, because I believed it to be so.

18 Q.  So as far as you know, St. Martin's Press is withholding

19 information from you relating to the book deal, right?

20         MR. SOBELMAN:  Objection.

21         THE COURT:  Sustained.

22 BY MR. AVENATTI:

23 Q.  According to you, Ms. Daniels, St. Martin's Press has not

24 given you the accounting that you're entitled to under the book

25 contract.  Am I right about that?

1          MR. SOBELMAN:  Objection.

2          THE COURT:  Sustained.

3          Next question, please.

4    BY MR. AVENATTI:

5    Q.  And you have also claimed that Mr. Janklow, Luke Janklow,

6    has refused to give you information about your book deal, am I

7    correct?

8          MR. SOBELMAN:  Objection.

9          THE COURT:  Overruled.

10   A.  He was not answering any of my messages.

11   Q.  Well, let me ask you this.  Isn't it true that you have

12   claimed, within the last two years -- so this does not include

13   February of 2019.

14       Isn't it true that you have claimed within the last two

15   years that Mr. Janklow has withheld information from you about

16   your book deal?

17   A.  Yes.

18   Q.  What information has he withheld from you?

19         MR. SOBELMAN:  Objection.

20         THE COURT:  Sustained.

21   BY MR. AVENATTI:

22   Q.  Ms. Daniels, what information do you claim you're entitled

23   to from Mr. Janklow relating to the book deal and your receipt

24   of payments that you have not received?

25         MR. SOBELMAN:  Objection.

1          THE COURT:  Sustained.

2     BY MR. AVENATTI:

3     Q.  Did you fire Mr. Janklow?

4     A.  I tried to.

5     Q.  Well, have you sent him a letter terminating him?

6     A.  No.

7     Q.  So as you sit there today, he's still your book agent,

8     true?

9     A.  I don't know.

10    Q.  Well, why is it that you don't know?

11         MR. SOBELMAN:  Objection.

12         THE COURT:  Sustained.

13    BY MR. AVENATTI:

14    Q.  Ms. Daniels, can you explain what you mean when you say I

15    don't know?

16         MR. SOBELMAN:  Objection.

17         THE COURT:  Overruled.

18    A.  I mean that I've had no communication, so I don't know who

19    is telling the truth or lying anymore.

20    Q.  And that includes the book publisher and Mr. Janklow?

21    A.  Correct.

22    Q.  Have you attempted to communicate with the book publisher

23    and Mr. Janklow relating to your book deal since March of 2019?

24         MR. SOBELMAN:  Objection.

25         THE COURT:  Overruled.

M1sWave2                        Clifford – Cross

1    A.  No.

2    Q.  Have you asked anyone to do so on your behalf?

3    A.  I left that to the discretion of my current counsel.

4    Q.  Well, don't you want to know how much money is owed to you

5    from the book?

6              MR. SOBELMAN:  Objection.

7              THE COURT:  Overruled.

8    A.  Absolutely.

9    Q.  Well, have you received any answers from the book publisher

10   and Mr. Janklow in the last two years?

11             MR. SOBELMAN:  Objection.  Asked and answered.

12             THE COURT:  Sustained.

13   BY MR. AVENATTI:

14   Q.  Have you gone to the federal government and accused the

15   book publisher and Mr. Janklow of any federal crimes because

16   they haven't given you information in the last two years?

17             MR. SOBELMAN:  Objection.

18             THE COURT:  Overruled.

19   A.  No.

20   Q.  Have you told the prosecutors that are here today that they

21   should charge anyone from St. Martin's Press and Mr. Janklow

22   for what they've done to you?

23             MR. SOBELMAN:  Objection.

24             THE COURT:  Overruled.

25   A.  No.  I don't know what they've done.  It's why we're here.

M1sWave2                     Clifford - Cross

1    Q.  You understand that part of this proceeding is for us to

2    figure out what St. Martin's Press and Mr. Janklow have done --

3              MR. SOBELMAN:  Objection.

4    Q.  -- true?

5              THE COURT:  Sustained.

6    BY MR. AVENATTI:

7    Q.  How many copies of your book have been sold?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Sustained.

10   BY MR. AVENATTI:

11   Q.  Ms. Daniels, do you have any knowledge as to the number of

12   copies that your book -- of your book, how many copies were

13   sold before February of 2019?

14             MR. SOBELMAN:  Objection.

15             THE COURT:  Sustained.

16   BY MR. AVENATTI:

17   Q.  Ms. Daniels, when was the first time that you advanced

18   money in connection with our legal representation of you?  And

19   by our, I mean my and my firm's.

20   A.  I don't understand.

21   Q.  You said that -- strike that.

22             Yesterday, you said that you had advanced money --

23   strike that.

24             Yesterday, you said that you had paid money for

25   security at some point in 2018.  Do you recall that?

M1sWave2                    Clifford - Cross

1   A.  Yes.

2   Q.  And what was that -- what was the amount, and when was it?

3   A.  It was November -- I don't know the exact date -- 2018, and

4   it was $26,000 to the security team you had hired.

5   Q.  $26,000 to the dragons?

6   A.  Correct.

7   Q.  Before November of 2018, had you paid any of the security

8   costs directly?

9   A.  Yes.

10  Q.  How much, and when?

11  A.  I don't recall.

12  Q.  When was the first time that you paid a security cost

13  directly?

14  A.  15 years ago.

15  Q.  I'm sorry.  Maybe my question wasn't clear.  I'm talking

16  about in connection with the events of 2018 and early 2019.  Do

17  you have that in mind?

18  A.  I don't remember exact dates.

19  Q.  OK.  Well, can you estimate for me, have you paid -- before

20  November 2018, had you paid directly any security costs

21  associated with this case?

22  A.  Yes.

23  Q.  Who had you paid and when?

24  A.  Security named -- do you want their names?

25  Q.  Yes, and the date of the payments, please.

M1sWave2                    Clifford - Cross

1    A.  Sometime in January to a man named Brad who worked for me.

2              THE COURT:  What year are we talking about?

3              THE WITNESS:  2018.

4              THE COURT:  2018?

5              THE WITNESS:  Yes.

6              THE COURT:  OK.

7              THE WITNESS:  That's the year he's speaking about,

8    correct?

9              THE COURT:  Let's actually limit it from the beginning

10   of March 2018 to February of 2019.

11             MR. AVENATTI:  Actually, your Honor, if I could ask a

12   different question, please?

13             THE COURT:  Sure.  Even better.

14   BY MR. AVENATTI:

15   Q.  Ms. Daniels, between February 27 of 2018 until the end of

16   2018, what payments did you make directly for security other

17   than the $26,000 payment you've already mentioned?

18   A.  None that I remember, other than tips to local club

19   security, obviously.

20   Q.  A couple hundred bucks here and there?

21   A.  Yes.

22   Q.  You don't recall any others, right?

23   A.  I don't believe so, no.

24   Q.  Now, you publicly stated that none of the CrowdJustice

25   money was going to go to you, didn't you?

M1sWave2                    Clifford - Cross

1    A.  Yes.

2    Q.  And was that true?

3    A.  Was it supposed to go to me?  No.  You did give me some.

4         MR. AVENATTI:  Move to strike, your Honor.

5         THE COURT:  All right.  Strike the answer.  Let's ask

6    the question again.  The jury will disregard the answer.

7         Ms. Daniels, just listen to the question and answer

8    only the question, please.

9    BY MR. AVENATTI:

10   Q.  None of the CrowdJustice money was supposed to go to you

11   personally, was it?  Yes or no.

12   A.  No.

13   Q.  And in fact, you told the public that none of the money

14   would go to you, didn't you?

15   A.  I don't remember.  Probably.

16   Q.  Well, do you recall tweeting that out and making public

17   statements that none of the money raised from the American

18   public would go to you?

19   A.  Yes.

20   Q.  But in reality, you demanded that I pay you $26,000 from

21   the CrowdJustice fund so that you could, among other things,

22   buy a personal truck, isn't that true?

23   A.  No.

24   Q.  Ms. Daniels, isn't it true that in late March or early

25   April 2018, you received an initial $20,000 wire transfer from

M1sWave2                         Clifford - Cross

1   the trust account directly into your Bank of America account,

2   which you promptly then used to buy a truck?

3           MR. SOBELMAN:  Objection.  Compound.

4           THE COURT:  Sustained as to form.

5   BY MR. AVENATTI:

6   Q.  Ms. Daniels, isn't it true that in late March or early

7   April -- well, strike that.  Let me ask a different question.

8           Ms. Daniels, yesterday, under examination by one of

9   the prosecutors, you said repeatedly that you had no knowledge

10  of the trust account.  Do you remember that?

11  A.  Yes.

12  Q.  Now, isn't it true that in late March or early April, you

13  received a $20,000 wire transfer directly from the trust

14  account into your personal Bank of America account, actually,

15  your account under Stormy Entertainment?  Isn't that true?

16  A.  I don't know where the wire came from except that it came

17  from you.

18  Q.  But you do recall receiving $20,000, don't you?

19  A.  Yes.  Not for a truck.

20  Q.  And you took the $20,000 and you purchased a vehicle, did

21  you not?

22  A.  No, I did not.

23  Q.  And you later received another $6,000 payment from the same

24  trust account, did you not?

25  A.  I don't remember.

M1sWave2                    Clifford - Cross

1    Q.  And after you received the $20,000 payment and the $6,000

2    payment, you continued to --

3                THE COURT:  Sustained.

4    BY MR. AVENATTI:

5    Q.  After you received the $20,000 payment, you continued to

6    represent to the American public that you were not receiving

7    any of the moneys personally, didn't you?

8    A.  Yes.

9                MR. AVENATTI:  Your Honor, can I get another water,

10   briefly?

11               THE COURT:  You may.

12               MR. AVENATTI:  Could we please have exhibit 302E,

13   already in evidence, for the jury.

14               Next page, please.  Next page.

15   Q.  Ms. Daniels, do you have 302E, page 4, in front of you?

16   A.  Yes.

17   Q.  Do you see at the top where it says Avenatti & Associates

18   attorney-client trust account?

19   A.  Yes.

20   Q.  And in fact, you made public statements in the spring of

21   2018 in which you said that these CrowdJustice moneys would go

22   into a trust account, did you not?

23   A.  I don't remember.  I definitely didn't know my name was on

24   it.

25               MR. AVENATTI:  Move to strike after "I don't remember"

1    as nonresponsive, your Honor.

2              THE COURT:  All right.  Granted.

3              Again, Ms. Daniels, listen carefully to the question

4    and just answer the question, please.

5    BY MR. AVENATTI:

6    Q.  Ms. Daniels, your name isn't on this trust account, is it?

7    A.  No.

8    Q.  But isn't it true that in 2018, you publicly stated and

9    acknowledged that you knew there was a trust account relating

10   to our representation of you?

11   A.  I don't remember.

12   Q.  Now, if we look at the charges and debits section of

13   this --

14   A.  Uh-huh.

15   Q.  By the way, before we get to that, you understood that,

16   during the representation, I had authority over the moneys in

17   the trust account, correct?

18   A.  Correct.

19   Q.  So I could decide what payments got made or not made,

20   right?

21   A.  Yes.

22   Q.  And that would be true for any moneys that were received

23   into the trust account, right?

24   A.  Yes.

25   Q.  That never changed?

M1sWave2                    Clifford - Cross

1    A.  We never had a conversation, no.

2    Q.  Well, it never changed, to the best of knowledge?

3    A.  Correct.

4    Q.  During the entire representation?

5    A.  Correct.

6    Q.  Now, if we look at the charges and debits, there's a

7    $20,000 payment to Stormy Entertainment on March 28 of 2018.

8    Do you see that?

9    A.  Yes.

10   Q.  Did you receive that money?

11   A.  I did.

12           MR. AVENATTI:  And if we could then pull back out.

13           If we could look at all of the deposits.

14   Q.  The only money that was deposited into this trust account

15   were moneys from CrowdJustice that month, right?

16   A.  That's what it says, yes.

17           MR. AVENATTI:  Let's go to the next month, please.

18   Q.  This is for the month of April, same trust account.  Do you

19   see that?

20   A.  Yes.

21   Q.  And the only moneys that are deposited into this trust

22   account are from CrowdJustice, right?

23   A.  Correct.

24   Q.  And there was another payment to you on April 30 for

25   $6,554.63, right?

M1sWave2                      Clifford - Cross

1   A.  Yes.

2   Q.  And Ms. Daniels, I got to decide how the money in this

3   account was spent, right?

4   A.  Yes.

5          THE COURT:  Sustained.

6   BY MR. AVENATTI:

7   Q.  Now, there's a number of charges or debits on this

8   statement relating to Pro Tech Security.  Do you see that?

9   A.  I do.

10  Q.  And do you recognize the name Pro Tech Security?

11  A.  That's Brandon's company.

12  Q.  Brandon Parraway, one of the dragons?

13  A.  Yes.

14  Q.  So you understand those payments to be for your security,

15  right?

16  A.  Yes.

17         MR. AVENATTI:  And if we go to the preceding

18  statement, we'll just back up one moment.

19  Q.  There's a payment to Hunter Law P.A.  Do you see that?

20  A.  Yes.

21  Q.  Do you recall that immediately around -- immediately prior

22  to the airing of the 60 Minutes interview, there was a video

23  purchased?

24  A.  Yes.

25  Q.  And do you recall that, actually, there were two videos

M1sWave2                         Clifford - Cross

1    purchased: one from a gentleman by the name of Bubba the Love

2    Sponge and the other from a polygraph examiner in Las Vegas?

3    A.  Correct.

4    Q.  And do you recall that the charges -- strike that.

5              Do you recall that the amount that had to be paid for

6    those two videos was in excess of a hundred thousand dollars?

7    A.  No.  This is the first time I've seen this accounting.

8              MR. AVENATTI:  Move to strike after "no" as

9    nonresponsive, your Honor.

10             THE COURT:  Granted.

11             Ms. Daniels, again, just listen to the question and

12   answer the question.

13             So the answer is no, you don't recall that the amount

14   paid for those two videos was in excess of a hundred thousand

15   dollars?

16             THE WITNESS:  No.

17   BY MR. AVENATTI:

18   Q.  Have you ever been informed as to how much those two videos

19   cost?

20             MR. SOBELMAN:  Objection.

21             THE COURT:  Sustained.

22   BY MR. AVENATTI:

23   Q.  Did I ever tell you how much those two videos cost?

24             MR. SOBELMAN:  Objection.

25             THE COURT:  Overruled.

M1sWave2                        Clifford - Cross

1    A.  I don't remember.

2    Q.  Ms. Daniels, I've placed on the screen Government Exhibit

3    4.  This is one of the documents that you were asked about

4    yesterday, correct?

5    A.  Yes.

6    Q.  Dated -- this is the termination letter, correct?

7    A.  Correct.

8    Q.  All right.  Do you recall yesterday being asked about a

9    November 2018 accounting that you had received?

10   A.  Yes.

11          MR. AVENATTI:  We're going to try to pull that up

12   quickly.

13          We're going to come back to that in the interest of

14   time.

15          Could we go back, please, to 302.

16          OK.  Thanks to Juliet, we were able to find it.

17   Q.  I'm going to direct your attention to Government Exhibit 2.

18   Do you have that in front of you?

19   A.  I do.

20   Q.  Dated November 30, 2018, do you see that?

21   A.  Yes.

22   Q.  And the government asked you a number of questions

23   yesterday about this document.  Do you remember that?

24   A.  Yes.

25          MR. AVENATTI:  All right.  Let's go to the next page.

M1sWave2                          Clifford - Cross

1  Q.  There's a line "rights to video/files pre-60 Minutes"?

2  A.  Correct.

3  Q.  $125,000.  Do you see that?

4  A.  Yes.

5  Q.  And when you read this accounting, that line item was in it

6  back in November of 2018, am I right about that?

7  A.  Yes.

8         MR. AVENATTI:  All right.  Let's go back to 302E,

9  please.  I think we were about ready to get into the third

10  month of the trust account, the month of May.  Preceding

11  statement, please.

12         THE COURT:  I'll tell you what, while you're looking

13  for that, or instead of looking for it, let's break there for

14  our morning break.

15         Ladies and gentlemen, my usual reminders apply, but

16  first I'm going to have you go again here just to the jury room

17  to stretch your legs and use the facilities just for a few

18  minutes.  So please be ready to go in, let's say, eight minutes

19  so we can start promptly in about ten.

20         No. 1, keep an open mind.  You haven't heard all the

21  evidence at this point, let alone the parties' arguments.  No.

22  2, don't discuss the case with each other.  No. 3, not that you

23  could do it in there, but don't do any research about the case.

24         With that, you're excused, and please be ready to go

25  in about eight minutes.

M1sWave2                        Clifford - Cross

 1             (Jury not present)

 2             THE COURT:  You may be seated.

 3             Ms. Daniels, you may step down, and please be ready to

 4     go in eight minutes as well back on the stand.  Again, you

 5     can't speak with the government during the break, but you can

 6     step out.

 7             And we'll take up one or two things and then give you

 8     a break as well, counsel and Mr. Avenatti.

 9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The witness is out of the room.  A couple
2     of quick things.
3          First of all, much as I am sure we all want to know
4     what is on those two videotapes, am I correct in assuming that
5     that is not going to be inquired about, Mr. Avenatti?
6          MR. AVENATTI:  I have no intention of asking about the
7     contents.
8          THE COURT:  Can you use the microphone.
9          MR. AVENATTI:  Can I sit down?
10         THE COURT:  Yes.
11         MR. AVENATTI:  Your Honor, I have no intention of
12    asking about the contents of either of those two videotapes.
13         THE COURT:  So the answer is no.
14         Number two, I hope you heeded my advice last night to
15    pare down your cross since six hours certainly seems excessive
16    in the abstract.  I will assure you you are not going to get
17    six hours if you insist on asking questions two, three, four,
18    or five times, let alone if you continue to do what you have
19    repeatedly been doing, which is, when I sustain an objection,
20    asking the very same question with like three words changed.
21    So I just want to caution you not to do that, to stick to one
22    question, and if I sustain the objection to move on.  If I
23    sustain as to form, you can certainly reformulate.
24         Do you understand all that?
25         MR. AVENATTI:  Yes, your Honor.  Often I have not

M1S8AVE3                          Clifford - Cross

1    understood whether the objection was to form or was sustained.

2             THE COURT:  If it's to form, I will say it's as to

3    form.

4             MR. AVENATTI:  I now understand that.

5             THE COURT:  Anything else that we need to take up?

6    Otherwise I want to give you your breaks.

7             MR. SOBELMAN:  Your Honor, could we get a sense of how

8    much longer this is going to go so that we can let our other

9    witnesses know?

10            THE COURT:  Sure.

11            Mr. Avenatti, any sense of how much more you have?

12            MR. AVENATTI:  Your Honor, I would estimate that I

13   probably have about another two to two and a half hours.

14            THE COURT:  I am glad to hear you have pared things

15   down.

16            So you should have your next witnesses ready to go.

17            And with that, it's 11:02.  Be ready at 11:06 so we

18   can start at 11:08.  Thank you.

19            (Recess)

20            THE COURT:  You may be seated.

21            Let's get Ms. Daniels back on the stand, please.

22            MR. AVENATTI:  Your Honor, a point of clarification.

23   Are you planning on breaking at noon or 12:15?

24            THE COURT:  12:30.

25            Is Ms. Daniels on her way to the stand?

 1              (Jury present)

 2              THE COURT:  Everybody may be seated.

 3              Welcome back.  I hope you enjoyed your break.  Thank

 4    you for keeping it short.  And we will continue with

 5    cross-examination of Ms. Daniels.

 6              Ms. Daniels, again, I remind you that you remain under

 7    oath.

 8              With that, Mr. Avenatti, you may proceed.

 9              MR. AVENATTI:  Thank you, your Honor.

10    BY MR. AVENATTI:

11    Q.  Ms. Daniels, earlier today you mentioned a reiki scan?

12    A.  Yes.

13    Q.  Did you receive that scan by a medical professional?

14    A.  Not a doctor, no.  Holistic medicine.

15    Q.  Where did you receive that scan and who did it?

16    A.  In Louisiana, in Texas, and her name is Lisa.

17    Q.  What was Lisa's profession?

18    A.  I guess an energy worker and yoga instructor.

19    Q.  So the energy worker and the yoga instructor Lisa did the

20    scan, and that's how you discovered the mass in your head?

21    A.  Yes.

22              MR. AVENATTI:  Can we go back to the trust account

23    statements, please?

24    Q.  Can you see that, Ms. Daniels?

25    A.  Yes.

1  Q.  You see at the top it's for the month of May 2018?

2  A.  I see that.

3  Q.  You see the deposits from CrowdJustice?

4  A.  Yes.

5  Q.  Do you see the payments to Pro Tech Security?

6  A.  Yes.

7  Q.  And then you see some transfers to, it says Egan and then

8  A-V-E-N-A-T.  Do you see that?

9  A.  Yes.

10 Q.  Do you understand those to be transfers to one of my other

11 law firm accounts?

12 A.  That's what it appears.

13 Q.  Those were permitted, correct?

14 A.  Yes.

15          MR. SOBELMAN:  Objection.

16          THE COURT:  Sustained.  The jury will disregard that

17 answer.

18 Q.  Ms. Daniels, you understood that those were permitted,

19 right?

20          MR. SOBELMAN:  Objection.

21          THE COURT:  Sustained.

22 Q.  Ms. Daniels, you understood that me and my firm could

23 withdraw money from the trust account in order to cover our

24 fees and costs, correct?

25          THE COURT:  Sustained.

M1S8AVE3                     Clifford - Cross

1    Q.  Ms. Daniels, did you have the understanding over the course

2    of our relationship in 2018 and early 2019 that me and my firm

3    were permitted to withdraw money from this trust account in

4    order to cover costs and fees pursuant to our agreement?

5              MR. SOBELMAN:  Objection.

6              THE COURT:  Sustained.

7    Q.  Ms. Daniels, is it your position that me and my firm were

8    not entitled to withdraw money from the trust account to cover

9    costs and fees?

10             MR. SOBELMAN:  Objection.

11             THE COURT:  Sustained.

12             Mr. Avenatti, next line of questions, please.

13             MR. AVENATTI:  Can we go to the next statement,

14   please.

15   Q.  Do you see at the top this is the statement for June 29,

16   2018?

17   A.  I do.

18   Q.  You see the payment to Pro Tech Security?

19   A.  Yes.

20   Q.  Then there's transfers to my firm.  Do you see that there?

21   A.  Yes.

22   Q.  Now, you understood in March, April, May and June that me

23   and my firm were providing legal services to you, right?

24   A.  Yes.

25   Q.  And you understood that we were expending time and effort

M1S8AVE3                    Clifford - Cross

1   to provide those services, right?

2   A.  Yes.

3   Q.  And you understood that we were expending money out of our

4   own pockets to advance costs, right?

5   A.  I wouldn't know that.

6   Q.  So you don't know one way or the other?

7   A.  No.

8   Q.  OK.  But you did know that we were spending attorney time

9   on your cases, right?

10  A.  Yes.

11  Q.  And you understood that we had an entitlement to be paid

12  for that work, right?

13              MR. SOBELMAN:  Objection.

14              THE COURT:  Sustained.

15  Q.  I want to switch topics, if we could, and I want to talk

16  about the subject of you and your estranged husband's

17  relationship, your estranged husband Glen, his relationship

18  with you.  I believe the government asked you about that

19  yesterday.

20              MR. SOBELMAN:  Objection, your Honor.

21  Q.  Ms. Daniels, do you recall yesterday --

22              THE COURT:  Sustained with respect to the commentary.

23  Just ask your question.

24  Q.  Ms. Daniels, do you recall yesterday that the government

25  asked you some questions about the status of your relationship

M1S8AVE3                        Clifford - Cross

1    with your husband Glen in 2018?

2    A.  Yes.

3    Q.  Now, in April of 2018, namely, on April 9, 2018, you

4    informed me that you wanted me to retract the suit, the lawsuit

5    against Donald Trump, and stop giving interviews, and that you

6    were done, isn't that true?

7    A.  Yes.

8    Q.  And you also informed me that that was because your husband

9    was leaving you and taking your daughter?

10            MR. SOBELMAN:  Objection.

11            THE COURT:  Overruled.

12   A.  That was one of the reasons, yes.

13   Q.  And this was on April 9, 2018 --

14            MR. SOBELMAN:  Objection.  Asked and answered.

15            Sorry.  I thought that was the question.

16            THE COURT:  Why don't you start over, Mr. Avenatti.

17            MR. AVENATTI:  Thank you.

18   Q.  And, Ms. Daniels, that was on April 9, 2018, only two days

19   before you signed the book contract, right?

20   A.  Yes.

21   Q.  And you also informed me that you expected Glen to be

22   giving a statement, quote, any minute about divorcing me

23   because I am a whore and danger to our child, close quote?

24            MR. SOBELMAN:  Objection.

25            THE COURT:  Sustained.

M1S8AVE3                        Clifford - Cross

1   Q.  Ms. Daniels, do you recall using those words?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4   Q.  Ms. Daniels, on April 9, 2018, you wanted to walk away from

5   the lawsuit and have it dismissed and no longer be a part of

6   going after Donald Trump, true?

7   A.  I wanted you to stop giving interviews and walk away from a

8   legal battle so that I could tell my story, instead of you

9   telling it for me.

10  Q.  Ms. Daniels, isn't it true that, in fact, what you wrote me

11  via a text was, retract the suit, stop giving interviews, I am

12  done?

13  A.  Yes.

14  Q.  Isn't it true that the reason why you sent that was because

15  your husband Glen was leaving you and taking your daughter

16  because of what had happened and how much exposure there was

17  relating to the lawsuit?

18             MR. SOBELMAN:  Objection.

19             THE COURT:  Sustained.

20  Q.  Do you recall that in response to that, I informed you that

21  we needed to make sure there was a soft landing, if that's what

22  you wanted to do?

23             MR. SOBELMAN:  Objection.

24             THE COURT:  Overruled.

25  A.  I don't remember the exact words.

```
 1              MR. AVENATTI:  Can we have ST 9, please, only for the
 2    benefit of the witness.
 3              THE WITNESS:  Thank you.
 4              MR. AVENATTI:  Can we start at ST 8, for the benefit
 5    of the witness, and then we will go to ST 9.
 6    Q.  Ms. Daniels, just take a moment and read the top of ST 8
 7    and then on to ST 9.
 8              THE COURT:  To yourself, though.  The same thing we
 9    did earlier.  Just read it to yourself and when you're done you
10    can look up.
11    A.  I have got it.
12    Q.  Does that refresh your recollection that in response to
13    your request, I said, we need to make sure there is a soft
14    landing, if that's what you want to do, that's all?
15    A.  Yes, that's part of what you said.
16    Q.  Then later that day you changed your mind, correct?
17    A.  Yes.
18    Q.  And that was in the middle of our negotiations with the
19    book publisher relating to you getting paid to do a book,
20    right?
21    A.  Yes.
22    Q.  Later that same day, isn't it true that I informed you as
23    to the status of the book deal?
24    A.  I'm sure you did, yes.
25    Q.  Why are you sure that I did?
```

M1S8AVE3                        Clifford - Cross

1   A.  Because you said you needed to talk to me.

2           MR. SOBELMAN:  Can we take the exhibit down?

3           THE COURT:  Take the exhibit down.

4           Ask your question again, please.

5   Q.  Ms. Daniels, you were aware, were you not, in March

6   of -- in April of 2018, that I was working hard to secure a

7   book deal for you?

8   A.  Yes.

9   Q.  Do you recall that I informed you on or about April 9, in

10  the evening, that we needed to discuss whether you actually

11  wanted to do the book or not?

12  A.  Yes.

13  Q.  And I also informed you at that time that we needed to

14  discuss what you wanted to do relating to other interviews and

15  the risks involved with certain of those interviews, right?

16  A.  Yes.

17  Q.  Do you recall the very next day, on April 10, 2018, I sent

18  you the book contract and informed you that I wanted to review

19  it with you later that same morning?

20  A.  Yes.

21  Q.  Then from that point forward, until the book came out in

22  October, I continued to work on your behalf in connection with

23  the book, did I not?

24  A.  Yes.

25  Q.  You understood that I was in regular communication with

1   Mr. Janklow and the publisher on your behalf during that time
2   period, right?
3   A.   That's what you told me.
4   Q.   And that's what you saw firsthand because you were a party
5   to some of those communications, right?
6   A.   In April, yes.
7   Q.   Well, you were a party to some of those communications
8   after April, including around the time the book came out, were
9   you not?
10  A.   Some.
11  Q.   You're not suggesting that I didn't work to secure your
12  book deal, are you?
13          MR. SOBELMAN:  Objection.
14          THE COURT:  Sustained.
15  Q.   You're not suggesting that I did no work to ensure that the
16  book was actually published, are you?
17          MR. SOBELMAN:  Objection.  It was asked and answered.
18          THE COURT:  I will allow it.
19          Go ahead.  You can answer.
20  A.   Of course not.
21  Q.   When you signed the book deal and you got your payment of
22  approximately $212,000, you knew that Mr. Janklow had taken a
23  percentage of the first payment, right?
24  A.   Yes.
25  Q.   And you didn't sign your agreement with Mr. Janklow

M1S8AVE3                          Clifford - Cross

1    entitling him to a portion of the money until days later, did

2    you?

3    A.  No.

4    Q.  Am I correct in what I said?

5    A.  Yes.

6    Q.  So Mr. Janklow took his money before you had a written deal

7    with Mr. Janklow?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Sustained.

10             MR. AVENATTI:  I am just cleaning up the record.

11             THE COURT:  Let me just clarify.

12             Is that correct, that he took a portion of the first

13   payment before you signed an agreement with Mr. Janklow?

14             THE WITNESS:  Before I signed it, yes.

15   Q.  And you didn't have a problem with that, did you?

16             MR. SOBELMAN:  Objection.

17             THE COURT:  Sustained.

18   Q.  Ms. Daniels, did you object to that at the time, yes or no?

19             MR. SOBELMAN:  Objection.

20             THE COURT:  Overruled.  I will allow it.

21             Did you object to that?

22   A.  No.  We had a verbal agreement, and I had seen the

23   contract.

24             MR. AVENATTI:  I am going to move to strike everything

25   after "no" as nonresponsive.

M1S8AVE3                          Clifford - Cross

1           THE COURT:  Denied.

2           Next question.

3           MR. AVENATTI:  Can I have the answer read back?

4           THE COURT:  No.  Next question.

5    Q.  Ms. Daniels, what work did I perform relating to your book?

6    A.  I know what you told me.  You set up some interviews for

7    me; you reviewed the contract; you advised me to move forward

8    to hire Luke, that you had reviewed his contract; you

9    accompanied me to meet with the publisher; and you told me that

10   you sent letters to try to fight for my payments that you said

11   that they had not sent, which was untrue.

12   Q.  Ms. Daniels, is it your testimony I did nothing else other

13   than what you have just testified to in connection with your

14   book deal?

15          MR. SOBELMAN:  Objection.

16          THE COURT:  Sustained.

17   Q.  Ms. Daniels, isn't it true that, in fact, I was involved in

18   ensuring that your book got published consistently throughout

19   the summer and fall of 2018, including on a number of e-mails

20   and conference calls on which you were present?

21          MR. SOBELMAN:  Objection.

22          THE COURT:  Sustained as to form.

23   Q.  Ms. Daniels, isn't it true that during the summer and fall

24   of 2018, I was heavily involved in making sure your book got

25   published and was a success?

M1S8AVE3                         Clifford - Cross

1    A.  That's what you told me.

2    Q.  Well, Ms. Daniels, you observed some of my work on your

3    book deal during that time period, did you not?

4    A.  Which I just stated, yes.

5    Q.  You were also on conference calls and e-mails during that

6    time period where I was involved, as well as the publisher and

7    the book agent, right?

8    A.  I recall phone calls about the cover and you writing the

9    forward of the book, and if I approve that.  I recall, as I

10   have testified, who was going to read the audiobook.  Things

11   like that, yes.

12   Q.  Let's talk a moment about who was going to read the

13   audiobook.

14         You were asked about that yesterday by the government,

15   some text messages.  Do you recall that?

16   A.  Yes.

17   Q.  And the publisher wanted you to read the book for the audio

18   recording, right?

19   A.  Correct.

20   Q.  And you had me inform the publisher that you were too busy

21   to record the book in your own voice, right?

22   A.  Correct.  I was doing press.

23   Q.  Thank you.

24         MR. AVENATTI:  Correct, move to strike anything after

25   that as nonresponsive.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1S8AVE3                     Clifford - Cross

1           THE COURT:  Just move on, Mr. Avenatti.

2    Q.  As a result of that, Ms. Daniels, your refusal to record

3    the portion of the book that you wrote, the publisher had to go

4    out and hire somebody else to record them reading your book, is

5    that correct?

6           MR. SOBELMAN:  Objection.  Misstates testimony.

7           THE COURT:  Overruled.

8           Is that correct or incorrect?

9    A.  Yes.

10   Q.  Do you know what the publisher's reaction was when they

11   were informed that you were too busy to record your own book?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Sustained.

14   Q.  Do you know what the publisher's reaction was when they

15   were informed of that?

16          MR. SOBELMAN:  Objection.

17          THE COURT:  Sustained.

18          MR. AVENATTI:  Let's go back to 302E, please.

19          Your Honor, one minute.

20   Q.  Ms. Daniels, you remember earlier we were talking about a

21   transfer from the trust account into your Bank of America

22   account, do you recall that?

23   A.  Yes.

24   Q.  I want to show you -- only for the benefit of the

25   witness -- a document that we have marked as SB 2.

M1S8AVE3                          Clifford - Cross

1              Ms. Daniels, do you recognize this document?

2   A.  Of course, yes.

3   Q.  What is it?

4   A.  A bank statement.

5   Q.  From what account?

6   A.  For my Bank of America Stormy Entertainment account.

7              MR. AVENATTI:  Your Honor, at this point we move SB 2

8   into evidence.

9              MR. SOBELMAN:  How many pages is this document?

10             THE COURT:  Do I have a copy, Mr. Avenatti?

11             MR. AVENATTI:  It's ten pages.

12             MR. SOBELMAN:  I don't think we have a copy either,

13  your Honor.

14             THE COURT:  We will take it up at the break.  So not

15  right now.  If you can get me and the government a copy, we

16  will discuss it.

17             MR. AVENATTI:  Perhaps I can handle some of the

18  questions and we can handle the admission on the back end.  We

19  won't publish it to the jury, if that's all right, your Honor.

20             THE COURT:  Can you scroll through how many pages are

21  on the screen.

22             MR. AVENATTI:  Sure.

23             I am only interested in the first and the third page.

24             THE COURT:  I wanted to see what, if anything, was

25  redacted and the like.

1       Any objection to the admission at this time?

2              MR. SOBELMAN:  No, your Honor.

3              THE COURT:  It's admitted.

4              (Defendant's Exhibit SB 2 received in evidence)

5              MR. AVENATTI:  Can we publish that for the jury?

6    Q.  Ms. Daniels, this is the account statement from March 1,

7    2018 to March 31, 2018 for your Bank of America account Stormy

8    Entertainment, right?

9    A.  Yes.

10   Q.  By the way, did you ever inform me that this account had

11   been closed?

12   A.  No.  At this time?

13   Q.  No.  Ever.  Did you ever inform me that this bank account

14   had been closed?

15   A.  This account is open.

16   Q.  So the answer is no, you never informed me of that?

17   A.  No.

18   Q.  I asked a bad question.  It's my fault.

19          Am I correct that you never informed me that this

20   account was closed?  Am I correct?

21             MR. SOBELMAN:  Objection.  Asked and answered.

22             THE COURT:  Sustained.

23             Let me make sure the record on this is clear.

24          Is it correct that you never said to Mr. Avenatti that

25   this account was closed?

M1S8AVE3                        Clifford - Cross

1           THE WITNESS:  No.

2           THE COURT:  No.

3           THE WITNESS:  I didn't tell him it was closed.

4           THE COURT:  Thank you.

5           MR. AVENATTI:  Your Honor, thank you.

6           Can we go to the next page, please.

7    Q.  Do you see on March 28, 2018, there is a $20,000 deposit

8    into this account?  Do you see that?

9    A.  Yes.

10          MR. AVENATTI:  Can we please put this side by side

11   with 302E, the statement from March of 2018.

12          Can we blow up the two payments.

13   Q.  Ms. Daniels, can you see that?

14   A.  Yes.

15   Q.  You see there is an outgoing wire transfer from the trust

16   account, in the amount of $20,000, from the CrowdJustice money

17   into your personal account, or your business account, I should

18   say, at Bank of America on the same date.  Do you see that?

19          MR. SOBELMAN:  Objection.

20          THE COURT:  Sustained.  Somewhat as to form.

21          MR. AVENATTI:  Let me clean it up, or try to.

22   Q.  Ms. Daniels, do you see the $20,000 wire out from the trust

23   account?

24   A.  Yes.

25   Q.  You see there is a deposit into your business account,

M1S8AVE3                          Clifford - Cross

1    Stormy Entertainment, at Bank of America in the same amount on

2    the same day?

3    A.   From State Bar of California, though.

4    Q.   Yes.  $20,000.  Do you see that?

5    A.   Yes.  The amount is the same, but I don't have any way of

6    knowing if it's the same account.

7            MR. AVENATTI:  Move to strike anything after "amount"

8    as nonresponsive.

9            THE COURT:  There wasn't a question so we will strike

10   the witness's statement.

11           Ms. Daniels, just wait for a question and then answer

12   the question, please.

13           MR. AVENATTI:  Let's go back to 302E only, please.

14           June, please.

15   Q.   Do you have that in front of you, Ms. Daniels?

16   A.   I do.

17   Q.   You see under deposits the money from CrowdJustice?

18   A.   Yes.

19   Q.   Then under charges and debits, you see Pro Tech Security?

20   A.   Yes.

21   Q.   Then there's various transfers to my law firm.  Do you see

22   that?

23   A.   I do.

24   Q.   Now, you don't take issue with any of those transfers, do

25   you, to my law firm?

1          THE COURT:  Sustained.

2     Q.  You don't believe that we did anything improper in

3     connection with these transfers that are on the screen, do you?

4          MR. SOBELMAN:  Objection.

5          THE COURT:  Sustained.

6          Mr. Avenatti, these statements are in evidence.  They

7     will go to the jury during its deliberations.  So to the extent

8     that you want to elicit information from the witness, you may,

9     but let's move on then.

10    Q.  Now, moments ago we were speaking about your relationship

11    with Glen.

12         By the way, I should have asked you, is it OK if I

13    call him Glen?

14    A.  Of course.

15    Q.  In July of 2018, namely, on July 19, 2018, you informed me

16    that Glen had cleaned out your Stormy Entertainment bank

17    account and left with your daughter, right?

18    A.  I believe that was the date, on or about July 19.

19    Q.  And we discussed the need to possibly issue a public

20    statement in order to get out in front of the news that was

21    going to come from that, didn't we?

22    A.  Yes.

23    Q.  And you asked me -- strike that.

24         You asked me if it was safe to put money in that same

25    account after he had cleaned it out, right?

M1S8AVE3                    Clifford - Cross

1  A.  I believe so, yes.

2  Q.  And you asked if he could freeze the money if it was in the

3  account, right?

4  A.  Yes.

5  Q.  And you asked me if you should file fraud charges against

6  Glen for cleaning out your account, right?

7  A.  Yes.

8  Q.  And I told you, no, absolutely not, you should not do that,

9  right?

10 A.  Yes.

11 Q.  You then went to the bank, Bank of America, right?

12 A.  Yes.

13 Q.  And, in fact, we talked about that, correct?

14 A.  Yes.

15 Q.  And I told you that the bank should be able to just remove

16 him from the account.  Do you remember that?

17 A.  Yes.

18         MR. AVENATTI:  Your Honor, at this time I would

19 offer -- strike that.

20 Q.  And you expressed concern about putting additional money in

21 that account because Glen was on the account, right?

22 A.  That's why I opened a second account, yes.

23         MR. AVENATTI:  Your Honor, at this time I offer ST 12

24 as impeachment on the witness's prior testimony in response to

25 the question from your Honor.

1    ST 12, July 19.

2            THE COURT:  Mr. Avenatti, hold on.

3            You can certainly try to lay a foundation and -- to

4    the extent it's being offered at this time, denied.

5    Q.  Ms. Daniels, moments ago, in response to a question from

6    his Honor, you stated you had never informed me that the

7    account had been closed, didn't you?

8    A.  Yes.

9    Q.  Was that truthful when you said it?

10   A.  I was unable to close the account.

11   Q.  That wasn't --

12           MR. AVENATTI:  Move to strike, your Honor.

13           THE COURT:  I will grant that.  The jury will

14   disregard that answer.

15           Can you just answer the question that Mr. Avenatti

16   asked?

17           MR. AVENATTI:  Let me reask it.

18   Q.  When his Honor turned to you and looked at you and asked

19   you whether you had ever informed me that you had closed the

20   account, you said no.  Do you remember that?

21   A.  Yes.  There is nothing to inform.

22           THE COURT:  Please listen to the question and answer

23   the question.

24           MR. AVENATTI:  Move to strike everything after "yes."

25           THE COURT:  I don't think anything was audible.  So

1    next question.

2    Q.  Ms. Daniels, that was a lie, wasn't it?

3    A.  No.

4           MR. AVENATTI:  Your Honor, I offer ST 12, just the one

5    blue bubble.

6           THE COURT:  Can you ask her a question about the

7    statement first, please.

8           MR. AVENATTI:  Sure.

9    Q.  Ms. Daniels, isn't it true you sent me a text message on

10   that same day; in response to me saying they should be able to

11   just remove him, you sent me a text message that read, "they

12   couldn't so closed it"?

13          THE COURT:  Just yes or no, did you send that text to

14   him on that date?

15          THE WITNESS:  I don't see it.

16          THE COURT:  That's not the question.

17          THE WITNESS:  I don't know.

18          THE COURT:  Take down what is on the screen, please.

19          Next question.

20          MR. AVENATTI:  Can we please have for the benefit of

21   the witness ST 12.

22   Q.  Have you had a chance to read that?

23   A.  Yes.

24   Q.  Isn't it true, Ms. Daniels, in response to me texting you

25   that they should be able to, meaning the bank, to just remove

M1S8AVE3                    Clifford - Cross

1  him, that you responded, that they couldn't so you closed it?

2  A.  And they were unable to close it.

3        THE COURT:  Just yes or no.

4  Q.  Yes or no?

5  A.  Yes.

6  Q.  So, in fact, you did inform me on that date that the

7  account had been closed via text message?

8  A.  Yes.

9        MR. AVENATTI:  Your Honor, at this point in time, we

10  move ST 12, only that portion, into evidence.

11        THE COURT:  The first two bubbles?

12        MR. AVENATTI:  Yes, sir.

13        THE COURT:  Any objection?

14        MR. SOBELMAN:  Yes, your Honor.  The witness confirmed

15  the statement.

16        THE COURT:  Sustained.  Move on.

17        MR. AVENATTI:  Can I have exhibit -- before we get to

18  that.

19  Q.  That was on July 19, 2018, correct?

20  A.  Yes.

21        MR. AVENATTI:  Can I have Exhibit 213, please.

22        Next page.

23  Q.  What is the date of this document?

24  A.  August 1, 2018.

25  Q.  "Until further notice, please ensure all advances

1    associated with my book are routed to the account below as the

2    prior account has been closed."

3              Did I read that correctly?

4    A.  Yes.

5              MR. AVENATTI:  You can take that down.

6    Q.  Now, Ms. Daniels, between February 27, 2018 and February

7    2019, we will say February 1, 2019, do you have that time

8    period in mind?

9    A.  Yes.

10   Q.  During that time period, did my authority, as far as you

11   understood, to act on your behalf on the book deal, did it ever

12   change?

13             MR. SOBELMAN:  Objection.

14             THE COURT:  Overruled.

15   A.  No.

16   Q.  On or about April 11, 2018, you provided wire instructions

17   to me with the understanding that I had the authority to pass

18   those along to Mr. Janklow for your first payment, correct?

19   A.  That's what I requested, yes.

20   Q.  And that was your understanding at the time, right?

21   A.  Yes.

22   Q.  You were relying on me to do whatever I needed to do to

23   make sure Mr. Janklow had the correct wire instructions, right?

24   A.  No.

25   Q.  Did you take any -- strike that.

1       Did you make any effort in 2018 to hide any assets or

2   moneys from Glen?

3   A.  Yes.

4           MR. AVENATTI:  Your Honor, the Court's indulgence.

5   One moment, please.

6           Your Honor, thank you.

7   Q.  Now, around the same time on July 18, Glen filed a petition

8   for divorce and for sole custody of your daughter in Texas, am

9   I right about that?

10          MR. SOBELMAN:  Objection.

11          THE COURT:  Overruled.

12  A.  Yes.

13  Q.  And you were not able to locate your daughter for some

14  time, is that true?

15          MR. SOBELMAN:  Objection.

16          THE COURT:  Sustained.

17  Q.  Ms. Daniels, you asked me to assist you in locating your

18  daughter, isn't that true?

19          MR. SOBELMAN:  Objection.

20          THE COURT:  Overruled.

21  A.  Yes.

22  Q.  In fact, you had me send someone out to Glen's brother's

23  home in St. Louis in an effort to locate Glen and your daughter

24  because you were deeply concerned about her, right?

25  A.  Yes.

1   Q.  Did I undertake efforts on your behalf to try to locate

2   your daughter for you?

3   A.  You told me you did.

4   Q.  Are you suggesting that I didn't take the efforts or make

5   the efforts?

6   A.  I am saying I don't know.

7          THE COURT:  Hold on.  Sustained.

8          The jury will disregard the answer.

9   Q.  Ms. Daniels, after the petition for divorce was filed, you

10  and I communicated about issues in your divorce case in Texas,

11  correct?

12  A.  Yes.  You referred me to a lawyer.

13         MR. AVENATTI:  Move to strike everything after "yes"

14  as nonresponsive.

15         THE COURT:  Granted.

16         Ms. Daniels, again, just listen to the question and

17  answer only the question.  If there is more to be added, I am

18  sure counsel for the government will have an opportunity.

19         Go ahead.

20  Q.  After the petition was filed, Ms. Daniels, I communicated

21  with you by e-mail concerning various issues in your divorce

22  proceeding, right?

23  A.  Yes.

24  Q.  And I also communicated with Glen's divorce attorney in

25  connection with your divorce proceeding, right?

1  A.  I believe so, yes.

2  Q.  And I also assisted you in compiling an asset list in an

3  effort to resolve your divorce proceeding amicably, didn't I?

4  A.  I don't remember.

5  Q.  Do you recall that you and I had a number of discussions

6  about attempting to resolve your divorce proceeding amicably?

7  A.  Yes.

8  Q.  And do you recall at one point Glen's attorney wanted

9  information about your assets before they would agree to a

10  resolution?

11  A.  Yes.

12  Q.  And do you recall you and I working together to compile

13  that list?

14  A.  I don't remember.

15  Q.  Now, after Glen cleaned out the bank account, you also gave

16  money to two gentlemen by the name of JD and Keith to hold for

17  you, correct?

18          MR. SOBELMAN:  Objection.

19          THE COURT:  Overruled.

20  A.  No.  Wrong date.

21          THE COURT:  Just answer the question.

22          MR. AVENATTI:  Move to strike everything after "no."

23          THE COURT:  The answer is no, and we will leave it at

24  no.  The rest is stricken.

25          Ms. Daniels, if it's a yes-or-no question, just answer

1    yes or no.  If yes or no would be misleading, you can tell me

2    that, but just strictly limit yourself to yes or no if that is

3    what it calls for.

4    Q.  Ms. Daniels, you gave money and assets to Mr. Nicks to hold

5    for you so Glen would not know about it, right?

6    A.  Yes.

7    Q.  And you did that to hide those assets from Glen, right?

8              MR. SOBELMAN:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   Q.  Where did you ask Mr. Nicks to hold these assets?

11             MR. SOBELMAN:  Objection.  Relevance.

12             THE COURT:  Sustained.

13   Q.  In fact, you asked Mr. Nicks to hide these items in his

14   parents' safe in Oklahoma, didn't you?

15             MR. SOBELMAN:  Objection.  Relevance.

16             THE COURT:  Sustained.

17   Q.  When is the last time you communicated with Mr. Nicks?

18             MR. SOBELMAN:  Objection.  Relevance.  And asked and

19   answered.

20             THE COURT:  Sustained.

21   Q.  Yesterday, Ms. Daniels, you testified that when you found

22   out the book deal was complete, you were in a house in Sun

23   Valley California.  Do you recall that?

24   A.  Yes.

25   Q.  And the government asked you a number of questions about

1  your reaction to that, correct?

2  A.  Yes.

3  Q.  Whose house were you in in Sun Valley?

4  A.  It was owned by Keith Munyan, and I rented a portion of

5  that house for a few years.

6  Q.  Who is Keith Munyan?

7          MR. SOBELMAN:  Objection.  Relevance.

8          THE COURT:  Overruled.

9  A.  He is a photographer in LA that was a close family friend

10 of mine.  He is also my daughter's godfather.

11 Q.  He lived with a gentleman named JD, right?

12 A.  Yes.

13         MR. SOBELMAN:  Objection.  Relevance.

14         THE COURT:  I will allow it.

15 Q.  You were very close to JD and Keith at the time, right?

16         MR. SOBELMAN:  Objection.

17         THE COURT:  I will allow it.

18         Go ahead.  You can answer it.

19 A.  Yes.  Mostly Keith.

20 Q.  And you said yesterday that at the time that you found out

21 that the book contract was done, you were, quote, with my team.

22 Do you recall that?

23 A.  Yes.

24 Q.  Who was there?

25 A.  Myself, Travis, Brandon, Keith.  I don't remember if JD was

1    home.

2    Q.  Did you speak with JD and Keith about your book deal?

3    A.  Yes.

4    Q.  Did you speak with them about your book deal on that day

5    and thereafter, or at certain times thereafter?

6    A.  Many days.

7            MR. AVENATTI:  Let's go to Government Exhibit 28 and

8    28A, please.

9    Q.  You remember you were asked about forwarding your account

10   details to me on September 4th of 2018, do you recall that?

11   A.  Yes.

12   Q.  You were paid the next day, weren't you?  Yes or no?

13   A.  Yes.

14           MR. AVENATTI:  Can we please go back to 302E, as in

15   Edward.

16           Can we go to the month of July, please.

17   Q.  Can you see that, Ms. Daniels?

18   A.  Yes.

19   Q.  Now, around July 12th you were arrested in Columbus, Ohio,

20   correct?

21   A.  Yes.

22   Q.  And was I in communication with you or anyone on your team

23   that night and into the morning relating to your arrest?

24   A.  Yes.

25   Q.  Who was I in communication with, to the best of your

M1S8AVE3                    Clifford – Cross

1    knowledge?

2    A.   Denver.

3              (Continued on next page)

M1sWave4                        Clifford - Cross

1  BY MR. AVENATTI:

2  Q.  Mr. Nicks, according -- strike that.

3          To the best of your knowledge, Mr. Nicks had contacted

4  me immediately upon your arrest, is that right?

5  A.  I was in a police car.

6  Q.  OK.  You later found out that Mr. Nicks had been in contact

7  with me throughout the night, right?

8  A.  That's what I was told.

9  Q.  Mr. Nicks informed you of that?

10  A.  Yes.  And you.

11  Q.  And you're aware of the fact, are you not, that I

12  immediately retained a law firm in Columbus to assist you in

13  getting those charges dismissed?  Do you remember that?

14  A.  A law firm was hired, yes.

15  Q.  OK.  Do you remember who paid the initial retainer for that

16  law firm?

17  A.  No.  I was never told.

18  Q.  Well, you didn't think they were working for free, did you?

19  A.  No.

20          MR. SOBELMAN:  Objection.

21          THE COURT:  Next question.

22  BY MR. AVENATTI:

23  Q.  OK.  So you knew someone had paid them?

24  A.  I didn't know.

25  Q.  Well, again, you knew they weren't working for free, and

M1sWave4                        Clifford - Cross

1   therefore, somebody must have paid them, right?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained.

4   BY MR. AVENATTI:

5   Q.  Let's take a look at the entry on July 12, at the bottom.

6   There's a wire out for $5,000.  Do you see that?

7   A.  Yes.

8   Q.  Do you recognize the name Sabol Mallory, LLC?

9   A.  I'm guessing that's Chase Mallory.

10             THE COURT:  I don't want you to guess.

11             Do you recognize that name?

12             THE WITNESS:  No.

13  BY MR. AVENATTI:

14  Q.  The attorney that was retained to assist you in Ohio was a

15  gentleman by the name of Chase Mallory, M-A-L-L-O-R-Y, correct?

16  A.  Yes.

17  Q.  And within 24 hours of your arrest, me and Mr. Mallory were

18  able to get your charges dismissed, right?

19  A.  I don't know who got them dismissed.

20  Q.  Well, you knew I was working on it, right?

21  A.  I knew that Chase had been hired.

22  Q.  Is it your testimony that I had nothing to do with getting

23  your charges dismissed?

24  A.  It's my testimony --

25             MR. SOBELMAN:  Objection.

M1sWave4                              Clifford - Cross

1            THE COURT:  Hold on.

2            You can answer.  What is your testimony?  Go ahead.

3    What's your testimony?

4            THE WITNESS:  That I don't know.

5            THE COURT:  Within 24 hours, were the charges

6    dismissed?

7            THE WITNESS:  That I don't know who was responsible

8    for getting them dismissed.  They were dismissed, however.

9            THE COURT:  Thank you.

10           MR. AVENATTI:  Could we have this side by side with

11   the fee agreement, please.

12   Q.  Can you see that, Ms. Daniels?

13   A.  Uh-huh, yes.

14   Q.  OK.  Can you point the jury to the portion of the contract

15   where it says that Michael Avenatti or one of his law firms

16   will advance moneys in connection with any criminal case in

17   which you are a party?

18   A.  There's no spot -- spot.  Sorry.

19   Q.  It's not in there, is it?

20   A.  No.

21   Q.  Ms. Daniels, I want to return to Mr. Nicks briefly.

22           Now, in 2018 and early 2019, what did Mr. Nicks do for

23   you?

24   A.  He was my publicist.

25   Q.  OK.  And what are the things that he did in connection with

M1sWave4                    Clifford - Cross

1   his role for you?

2   A.  Set up and handled press interviews; coordinated travel for

3   those events; book signings; appearances, press releases;

4   helped me write statements sometimes.  And occasionally he

5   traveled with me and acted as an assistant when my other

6   assistant had things to do.

7   Q.  And you also had a romantic relationship with Mr. Nicks,

8   correct?

9   A.  Yes.

10  Q.  And that ended in March of '19?

11  A.  April -- no.  I'm sorry.  May of 2019.

12  Q.  After the events in the house?

13  A.  Yes.

14  Q.  And Mr. Nicks also communicated on your behalf with Mr.

15  Janklow and the book publisher, correct?

16  A.  Yes.

17  Q.  And from time to time he communicated with me, right?

18  A.  Yes.

19  Q.  Where is Mr. Nicks?

20          MR. SOBELMAN:  Objection.

21          THE COURT:  Sustained.

22  BY MR. AVENATTI:

23  Q.  Ms. Daniels, we've been trying to find Mr. Nicks.  Do you

24  know where he is?

25          THE COURT:  Sustained.

M1sWave4                    Clifford - Cross

1        Mr. Avenatti, do not do that.

2   BY MR. AVENATTI:

3   Q.  Ms. Daniels, do you know where Mr. Nicks is?

4        MR. SOBELMAN:  Objection.

5        THE COURT:  Sustained.

6        Ladies and gentlemen, I'm going to remind you again

7   that what Mr. Avenatti says in his capacity as his own lawyer

8   is not evidence.  Only the answers of the witness are in

9   evidence.

10  BY MR. AVENATTI:

11  Q.  Ms. Daniels, when is the last time you communicated with

12  Mr. Nicks about the book deal?

13       MR. SOBELMAN:  Objection.  Asked and answered.

14       THE COURT:  I'm not sure that precise question has

15  been asked, let alone answered.  So I'll allow it.

16       When is the last time you spoke with Mr. Nicks about

17  the book deal?

18  A.  I don't remember.

19  Q.  Was it in 2018 or 2019?

20  A.  '19.

21  Q.  Was that an oral discussion, in person, a telephone

22  discussion, a text, or some other means of communication?

23  A.  Probably all of the above.

24  Q.  Did you ever inform the government that you had

25  communicated with Mr. Nicks about the book deal?

 1              MR. SOBELMAN:  Objection.

 2              THE COURT:  Sustained.

 3    BY MR. AVENATTI:

 4    Q.  Ms. Daniels, you also communicated with Mr. Nicks about the

 5    book payments, am I right?

 6    A.  Yes.

 7    Q.  Did you ever do that in writing, including via text?

 8    A.  I don't know.  We lived together.

 9    Q.  In October of 2018, do you recall that you gave a

10    television interview to Don Lemon on CNN in connection with the

11    release of your book?

12    A.  You were with me.  Yes.

13    Q.  And isn't it true that you said:  "People send me messages

14    and they think that Michael has abandoned me or I'm not

15    important to him anymore, or this or that"?  Did you say that?

16    A.  Yes.

17    Q.  Did you also say, And we are in contact every single day?

18    A.  Yes.

19    Q.  Did you also say, Almost, you know, three or four times a

20    day sometimes?

21    A.  Yes.

22    Q.  Did you also say, And I will message him about other things

23    that are going on, other problems, this or that, and, oh, this

24    person did this or that?

25    A.  We were friends, so yes.

M1sWave4                         Clifford - Cross

1   Q.  And then did you tell Don Lemon on CNN, "and he always puts
2   me first"?  Did you say that?
3   A.  I believed it to be true.
4           MR. AVENATTI:  Move to strike.
5           THE COURT:  Yes or no, Ms. Daniels.  Did you say that?
6           THE WITNESS:  Yes.
7   BY MR. AVENATTI:
8   Q.  Did you inform the government during the course of this
9   case when you met with them that during the approximate 11
10  months that I represented you, you were generally satisfied
11  with my representation and that I was typically nice and
12  respectful to you?
13          MR. SOBELMAN:  Objection.
14          THE COURT:  Sustained.
15  BY MR. AVENATTI:
16  Q.  Ms. Daniels, did you inform the government in one of the
17  meetings that you had with them that during the 11 months that
18  I --
19          THE COURT:  Sustained.
20  BY MR. AVENATTI:
21  Q.  Ms. Daniels, isn't it true that during the 11 months that I
22  represented you, that you were generally satisfied with my
23  representation?
24  A.  No.
25  Q.  Isn't it true that I was typically nice and respectful to

M1sWave4                    Clifford - Cross

1    you?

2    A.  You lied to me.  That's not respectful.

3            MR. AVENATTI:  Move to strike, your Honor.

4            THE COURT:  Denied.

5            Next question.

6    BY MR. AVENATTI:

7    Q.  Ms. Daniels, isn't it true you told the government that I

8    was typically nice and respectful to you?

9            MR. SOBELMAN:  Objection.

10           THE COURT:  Overruled.

11   A.  Yes.  You were cordial, always.

12   Q.  Well, I wasn't just cordial; I was nice and respectful to

13   you.  That's what you told the government, isn't it?

14           MR. SOBELMAN:  Objection.

15           THE COURT:  Overruled.

16   A.  I was wrong.

17           MR. AVENATTI:  Move to strike, your Honor.

18           THE COURT:  Ms. Daniels, the question is did you tell

19   the government that Mr. Avenatti was nice and respectful to

20   you?  Yes or no.

21           THE WITNESS:  Yes.

22   BY MR. AVENATTI:

23   Q.  And did you also inform the government that I became very

24   controlling, to the point where I finagled my way into your

25   Vogue photo shoot?

1    MR. SOBELMAN:  Objection.

2    THE COURT:  Sustained.

3  BY MR. AVENATTI:

4  Q.  Ms. Daniels, did I finagle my way into your Vogue photo

5  shoot during my representation of you?

6  A.  You appeared at my Vogue photo shoot and were in the photos

7  with me.  I don't know how it came to pass.

8  Q.  You knew nothing about it until I showed up?

9  A.  You told me you were coming by.

10 Q.  And that's all you knew?

11 A.  Yes.  I don't know how you were invited.

12    THE COURT:  Hold on.  Wait for a question, please.

13 BY MR. AVENATTI:

14 Q.  And in fact, Ms. Daniels, you said the same thing publicly

15 on one of Mr. Cohen's podcasts, correct?

16 A.  Yes.

17 Q.  And it was true then and it's true now, right?

18 A.  That I said that, yes.

19 Q.  Well, and what you said was true then and it's true now, to

20 the best -- right?

21    MR. SOBELMAN:  Objection.

22    THE COURT:  Sustained.

23    I don't even know now what statement we're now talking

24 about.  You're welcome to clarify what you're asking, and then

25 if there's an objection, I'll rule on it, but I don't know what

M1sWave4                          Clifford - Cross

1    statement you're referring to.

2            MR. AVENATTI:  Fair enough, your Honor.  Let me see if

3    I can clean it up.

4    Q.  Ms. Daniels, this notion that I just showed up at your

5    Vogue photo shoot and somehow ended up in the magazine, which

6    is what you told the government and on the podcast --

7            THE COURT:  Sustained.

8    BY MR. AVENATTI:

9    Q.  Ms. Daniels, what you've previously stated relating to my

10   role in the Vogue photo shoot is true, is it not?

11           MR. SOBELMAN:  Objection.

12           THE COURT:  Sustained.

13           Let's move on.

14   BY MR. AVENATTI:

15   Q.  Ms. Daniels, did you tell The New York Times, in 2018,

16   every time I watch him work I think this is what it must have

17   been like to see the Sistine Chapel being painted?

18           MR. SOBELMAN:  Objection.

19           THE COURT:  Overruled.

20   A.  Yes.  That's what you told me to say.

21           MR. AVENATTI:  Your Honor, move to strike everything

22   after "yes" as nonresponsive.

23           THE COURT:  All right.  I will grant that.  The jury

24   will disregard everything after "yes."

25           Again, Ms. Daniels, just yes or no if that's all it

1    calls for.

2    BY MR. AVENATTI:

3    Q.  Ms. Daniels, have you ever stated that you never liked me

4    and that you fired me three times?

5    A.  Yes.

6    Q.  Did you ever write anything in your book that contradicted

7    your statement that you never liked me and had fired me three

8    times?

9              MR. SOBELMAN:  Objection.

10             THE COURT:  Overruled.

11             Did you write anything in your book that contradicts

12   that statement?

13             THE WITNESS:  I'm not clear how to answer that.

14             THE COURT:  OK.  Let's try a new question then.

15             MR. AVENATTI:  Well, let me see if I can break it

16   down.

17   Q.  Did you write -- you understand that, right?

18   A.  Yes.

19             MR. SOBELMAN:  Objection.

20             THE COURT:  Mr. Avenatti, sustained.  Just ask

21   questions, please.

22   Q.  Ms. Daniels, we established yesterday that everything in

23   your book is correct, right?

24             MR. SOBELMAN:  Objection.

25             THE COURT:  Just ask your question, Mr. Avenatti.

M1sWave4                    Clifford - Cross

1    BY MR. AVENATTI:

2    Q.  Ms. Daniels, did you put anything in your book, that you

3    can recall, contradicting your statement to the jury moments

4    ago that you had previously said you did not like me and had

5    fired me three times?

6    A.  The book was done in June.

7            MR. AVENATTI:  Move to strike, your Honor.

8            THE COURT:  All right.  Let's move on.

9            Next question, please.

10           MR. AVENATTI:  Your Honor, could I get an answer to

11   that question?

12           THE COURT:  No.  Next question, please.

13   BY MR. AVENATTI:

14   Q.  Ms. Daniels, before you hired me, you did some research

15   into me, did you not?

16           MR. SOBELMAN:  Objection.

17           THE COURT:  Overruled.

18   A.  I don't remember.  I googled the night before.

19   Q.  Well, isn't it true that after the evening that we met at

20   the Waldorf Astoria, in fact, you looked me up on Wikipedia?

21   A.  Yes.

22   Q.  And isn't it true that at that time you told your friend

23   Kayla about a bunch of my cases?

24   A.  I googled you and read her what came up, yes.

25   Q.  And you told her about a bunch of my cases, right?

```
 1   A.  Yes.
 2   Q.  OK.  What do you recall telling her about -- well, strike
 3   that.
 4           What do you recall reading about my cases before you
 5   signed the fee agreement?
 6           MR. SOBELMAN:  Objection.
 7           THE COURT:  Sustained.
 8   BY MR. AVENATTI:
 9   Q.  Ms. Daniels, what you read when you looked me up influenced
10   your decision of whether to hire me, did it not?
11   A.  Yes.
12   Q.  What do you recall reading?
13           MR. SOBELMAN:  Objection.
14           THE COURT:  Sustained.
15   BY MR. AVENATTI:
16   Q.  Ms. Daniels, in connection with the CrowdJustice, the
17   raising of the money with CrowdJustice, there were updates that
18   would be posted to the CrowdJustice page which you approved,
19   right?
20   A.  Which part of the question?
21   Q.  Well, let me break it down.
22           Do you recall that we were previously speaking about
23   CrowdJustice?
24   A.  Yes.
25   Q.  All right.  On the CrowdJustice website, there was a page
```

1    that was dedicated to the efforts to raise money for the cause,

2    right?

3    A.   Yes.

4    Q.   All right.  And do you recall that there were periodic

5    updates that were posted from you on that page?

6    A.   I never posted to that page.

7    Q.   Well, do you recall approving certain posts made to the

8    page?

9    A.   Some.

10   Q.   OK.  Do you recall approving an update that was posted on

11   April 24, 2018, that said, "This money is not going to me

12   personally, ever"?

13   A.   I don't remember.

14   Q.   Do you recall approving an update that was posted on March

15   15, 2018, that said:  I want to be clear as to what this money

16   is not being raised for.  The money is not going to me

17   personally, ever.  It is only being used to cover the legal

18   expenses and potential damages I describe on the home page.  If

19   the money is not needed, it will be used pursuant to the

20   CrowdJustice guidelines on unused funds, as with all other

21   cases on their site.  In other words, I am not going to pocket

22   any money?

23        Do you recall that?

24   A.   Yes.  You wrote that.

25   Q.   I'm sorry?

1    A.  Yes.

2    Q.  You approved that, right?

3    A.  I don't remember.

4    Q.  Are you denying you approved it?

5           MR. SOBELMAN:  Objection.

6           THE COURT:  Sustained.

7    BY MR. AVENATTI:

8    Q.  Do you recall on March 15, 2018, in response to someone

9    making a statement on Twitter you wrote, quote:  You are a

10   fucking moron.  I can't touch that money.  It goes straight to

11   legal fees.  Try again, dipshit?

12   A.  I don't know what I said on what day.  Probably.

13   Q.  Do you recall the day before that, on March 14, 2018, also

14   writing on Twitter, quote:  It will be used to cover legal

15   fees/court costs/etc.  Anything after that will be returned or

16   donated to charity (depending on the rules).  I will not be

17   pocketing a single penny from the legal funding.

18       Do you recall writing that on Twitter?

19   A.  No, but I'm sure I did.

20   Q.  By the way, from early 2018 until the present, nobody

21   writes your tweets, do they?

22          THE COURT:  Can you clarify that question?

23          MR. AVENATTI:  Sure.

24          THE COURT:  Somebody writes the tweets.

25          MR. AVENATTI:  Fair enough, your Honor.  Terrible

M1sWave4                    Clifford - Cross

1   question.

2   Q.  Ms. Daniels, from early 2018 to the present, you're

3   responsible for the content that is sent out from your Twitter

4   feed, right?

5   A.  I'm responsible for it, yes.

6   Q.  And you review everything before it gets posted, right?

7   A.  Yes.

8   Q.  And do you post it, or does somebody post it for you?

9   A.  I post.

10  Q.  And isn't it true that in 2018, Glen became more and more

11  critical of you, saying that you were being dramatic about

12  needing two security guards?

13          MR. SOBELMAN:  Objection.

14          THE COURT:  Sustained.

15  BY MR. AVENATTI:

16  Q.  Do you recall, as it relates to your security detail, that

17  you went through a number of security guards before finally

18  settling on Brandon and Travis?

19          MR. SOBELMAN:  Objection.  Relevance.

20          THE COURT:  Sustained.

21  BY MR. AVENATTI:

22  Q.  Well, Ms. Daniels, you recall that in March and April of

23  2018, I was making payments to various security firms on your

24  behalf, right?

25  A.  Yes.

M1sWave4

1          THE COURT:  All right.  We're going to take our break
2     there.
3          Ladies and gentlemen, it's 12:30.  I'm going to steal
4     five minutes of your lunch since we had a break this morning.
5     So let's be ready at 1:05 and hopefully get started a couple
6     minutes thereafter.
7          During the break, keep an open mind.  You haven't
8     heard all the evidence.  Do not communicate about the case with
9     anyone involved in it, with each other, or anyone else, and
10    don't do any research about the case.
11         With that, enjoy your lunch, and we'll see you
12    approximately 1:10.  Thank you.
13         MR. AVENATTI:  Your Honor, I believe Mr. --
14         THE COURT:  Please.
15         Nobody speak to the jurors, please.
16         Have a seat.
17         MR. AVENATTI:  Your Honor, I believe Mr. --
18         THE COURT:  Hold on, please.
19
20         (Continued on next page)
21
22
23
24
25

M1sWave4

```
 1              (Jury not present)
 2              THE COURT:  Yes.  Mr. Avenatti, can we excuse the
 3     witness?
 4              MR. AVENATTI:  Yes.
 5              THE COURT:  OK.
 6              Ms. Daniels, you can step down.  Please be back in
 7     here at 1:05, ready to go with the rest of your cross.
 8              Mr. Avenatti, I assume you have about an hour left.
 9     Is that right?
10              MR. AVENATTI:  I think that's a fair estimate, your
11     Honor.
12              THE COURT:  OK.  Thank you.
13              MR. AVENATTI:  Plus or minus 15 minutes.  I may be
14     done sooner than that.
15              THE COURT:  All the better.
16              You can step out, Ms. Daniels.
17              Thank you.
18              (Witness not present)
19              THE COURT:  The witness is out of the room.
20              Yes, Mr. Avenatti.
21              MR. AVENATTI:  I understand that Mr. Brewster would
22     like to address the Court.
23              THE COURT:  OK.  Mr. Avenatti, before you leave the
24     box, please put your mask back on.
25              MR. AVENATTI:  I forgot.  I'm sorry.
```

M1sWave4

1          THE COURT:  It's OK.  I'm just reminding you.

2          Before Mr. Brewster addresses me, or as he approaches,

3    two things.

4          First, upon reflection, Mr. Avenatti, I don't need

5    your authority about re-calling the witness over lunch.  Bottom

6    line is I'll give you latitude, as I said yesterday, to go

7    beyond the scope and ask any relevant lines of questioning that

8    you might want to elicit as part of your case in chief.  In the

9    event that, after being given that opportunity, you think that

10   there's a basis to re-call her, you'll have to persuade me that

11   there's a basis to re-call her.  So I think the bottom line is

12   it's not actually ripe at the moment, so I'll relieve you of

13   having to bring that to my attention right now.

14         Second, assuming that Mr. Avenatti has less than an

15   hour to go, I assume there's a chance -- it will be close --

16   that the government would finish with all the witnesses it

17   currently plans to call today.  Is that accurate?  I recognize

18   it will be tight.

19         Here's why I ask.  Given my ruling this morning that

20   Mr. Avenatti needs to comply with the subpoena by tomorrow, my

21   inclination would be, if you do get through the remainder of

22   your witnesses, to not have you rest until Monday morning so

23   that you have an opportunity to review the subpoena production

24   and use it as part of your case in chief in the event that you

25   wish to do so.

M1sWave4

1       MR. SOBELMAN:  We were going to request as much and
2   would appreciate that.
3       THE COURT:  OK.  Very good.  We'll do that.  If you do
4   get through your witnesses, we'll call it quits there.  And if
5   you don't, then obviously we'll pick up on Monday.
6       Yes, Mr. Brewster.
7       MR. BREWSTER:  Your Honor, if it please the Court, my
8   name is Clark Brewster.
9       I was subpoenaed by Mr. Avenatti, and I believe the
10  motion to quash was sustained pending another special showing
11  of some type as to whether --
12      THE COURT:  Can you just put the microphone down a
13  little bit.
14      MR. BREWSTER:  Sure.  I apologize, your Honor.
15      THE COURT:  That's OK.  I just want to be sure I can
16  hear you.
17      MR. BREWSTER:  Yes.
18      So I've been subpoenaed as a witness.  As you recall,
19  motion to quash was sustained --
20      THE COURT:  Right.
21      MR. BREWSTER:  -- subject to a special showing.
22      I'm also here on behalf of Ms. Clifford, advising her
23  especially.
24      I've had a family medical emergency I just found out
25  about that is significant and urgent, and I don't know what the

M1sWave4

1    status is, if he's going to make a show for me to stay later or

2    next week.  I just want to get some clarification, if I could.

3            THE COURT:  All right.  First of all, I'm sorry to

4    hear about your family emergency, and I hope all is OK.

5            MR. BREWSTER:  Thank you.

6            THE COURT:  I guess you're welcome to talk to Mr.

7    Avenatti.  The bottom line is no application has been made to

8    me.  Unless and until it is made and I rule on it, I can't

9    really tell you whether you'll be required in next week or not.

10   So it may depend on what your situation is, your availability,

11   and other such things.  We'll obviously try to respect

12   whatever's going on with your family, but I'm not sure that we

13   can definitively answer your fate at this moment.

14           MR. BREWSTER:  Your Honor, I would ask if I am asked

15   to testify that I be able to, maybe, appear via video rather

16   than come back to New York.

17           THE COURT:  Again, all of this is premature.  I don't

18   know whether you'll have to testify at all.  If you do, perhaps

19   both sides would agree to do it by video.  I just can't say for

20   sure, but certainly everybody hears you loud and clear and

21   understands.  I don't know what you're dealing with -- I'm not

22   going to ask certainly in open court -- but we'll obviously try

23   to accommodate you as a nonparty in whatever ways we can.

24           MR. BREWSTER:  Thank you, your Honor.  Appreciate it.

25           THE COURT:  All right.  While you're here, let me

M1sWave4

1     raise one other issue.  I think I'm prepared at this time to

2     unseal the pretrial letters regarding Ms. Clifford's

3     cross-examination and the defense request for a 17(c) subpoena.

4     It seems to me that that ground has been pretty well trod, and

5     at this point there's no interest, the public access

6     outweighing any interest in privacy.

7                Any objection from the government?

8                MR. SOBELMAN:  No, your Honor.

9                THE COURT:  Mr. Brewster, do you wish to be heard on

10    that?

11               MR. BREWSTER:  No.

12               THE COURT:  Mr. Avenatti, I assume since you had moved

13    to unseal those, you have no objection as well.

14               MR. AVENATTI:  Correct.

15               THE COURT:  I will unseal those five letters and

16    docket them in due course.

17               Anything else from the government?

18               MR. SOBELMAN:  Your Honor, you want us back at 1:05?

19               THE COURT:  1:05.

20               MR. SOBELMAN:  Thank you, your Honor.

21               THE COURT:  Anything else from you, Mr. Avenatti?

22               MR. AVENATTI:  Yes, your Honor.  Two issues, and I'll

23    try to make them as brief as possible.

24               First, I offer the text message that Ms. Daniels told

25    me that the Stormy Entertainment account was closed.

M1sWave4

1            THE COURT:  Yes.  ST12.

2            MR. AVENATTI:  ST12.

3            The Court sustained the government's objection.  This

4    text message was offered as a prior inconsistent statement, and

5    I ask the Court to reconsider my application for admission of

6    that text message into evidence.  It's a critical piece of

7    evidence in the case.

8            THE COURT:  But she admitted on the stand that she

9    sent you a text message stating that, so why do you need this

10   to impeach her or to prove the inconsistent statement?  She

11   admitted it.

12           MR. AVENATTI:  Because I would like the jury to have

13   the benefit of the text message when they deliberate on the

14   case, and I would like the text message itself into evidence,

15   as the government has been able to admit many, many, many text

16   messages.

17           THE COURT:  What-about-ism isn't a legal argument.

18           Mr. Sobelman.

19           MR. SOBELMAN:  We object, your Honor.  It's

20   cumulative.

21           THE COURT:  We'll leave it where it is.

22           Next issue.

23           MR. AVENATTI:  Yes, your Honor.

24           The next issue is I also would like to address, your

25   Honor, the issue of the sustaining of objections as to many

M1sWave4

questions relating to the questions I posed to Ms. Daniels

concerning her experience with fee contracts, knowledge of fee

contracts, etc.

        The government, your Honor, placed the fee contract in

evidence.  The government examined witnesses extensively about

the contract.  The government's opening statement made

reference to the contract.  The government asked Ms. Daniels

numerous times whether I had ever said that I was entitled to

the proceeds from the book.  The government asked Ms. Daniels

about her understanding of the terms of the fee contract.

        I should not be precluded from questioning her about

her understanding of what constitutes a "reasonable fee," as

set forth in the contract, and what would be a reasonable fee

based on her experiences with other attorneys.  The door to

this line of questioning was opened by the government, and my

questions go to the heart of my defense that the contract

entitled me to a reasonable percentage of her $800,000 book

deal.

        THE COURT:  No. 1, I have allowed you to inquire about

her understanding of your contract with her.  So in that sense,

you've already done that.

        I don't think that her prior contracts or her general

understanding prior to entering into that contract, about

contract law generally, or fee agreements with other attorneys

has any relevance.

M1sWave4

No. 3, to the extent that you want to make the argument, it pertains to your state of mind, not to Ms. Daniels's state of mind.  Whether she thought you were entitled to that money or not, frankly, doesn't matter.  If the question is whether you did or that you sought to defraud her of that money through false and fraudulent means; it's your state of mind that matters, not Ms. Daniels's state of mind, not Ms. Daniels's understanding of the contract.

No. 4, the contract speaks for itself.  It is in evidence.  I did allow limited questions from both sides regarding her understanding of it because I thought, to some limited extent, that was relevant.  But at the end of the day, the contract is in evidence.  Both sides can make arguments about it, and we'll go from there.

Finally, No. 5, I'd like to add to the *quantum meruit* question the following:

Now, I could be wrong.  I don't know California contract law as much as I know New York law, but I'm pretty confident that that last provision -- that a reasonable fee to be agreed upon -- is an unenforceable agreement to agree; that is to say, that that is not actually an enforceable contract.

So again, the landscape may change if Mr. Avenatti testifies and testifies to his understanding of that provision, because that's a different question than the objective question of whether it's enforceable, but it again raises the question

M1sWave4

of whether and to what extent and what I should instruct the
jury about with respect to contract law, with respect to
*quantum meruit*, with respect to all of these matters. So I
just wanted to flag that and put a marker there as something
I'll probably want to hear from both sides over the weekend
about.

The bottom line is, no, you're not going into her
prior fee agreements with other lawyers. It's not relevant to
this case. Her state of mind is not relevant to this case.

Next.

MR. AVENATTI: The last issue, before lunch, your
Honor, is I asked a number of questions relating to payments
from the trust account to my law firm and whether the firm was
entitled to deduct payments for costs and fees, whether she
disagreed with that assertion, whether she was asserting that
there was something improper about the deduction of costs and
fees or other payments from the trust account, and the
government objected repeatedly and the Court sustained those
objections.

THE COURT: Right, because it's not relevant. Her
state of mind, her understanding, her belief of whether you
were entitled to deduct those fees or not is not relevant.
Same exact issue. It's your state of mind that matters, not
her state of mind. Full stop.

Anything else?

M1sWave4

1    　　　　MR. AVENATTI:  Not at this time.

2    　　　　THE COURT:  Mr. Sobelman, do you wish to add anything

3    to what I've said?

4    　　　　MR. SOBELMAN:  No, your Honor.  I wish to go eat

5    lunch.

6    　　　　THE COURT:  Very well.  Permission granted.

7    　　　　I'll see you all at 1:05.

8    　　　　MR. SOBELMAN:  Thank you, your Honor.

9    　　　　(Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              1:05 p.m.

3          THE COURT:  Let's get the witness back.

4          When Mr. Avenatti is here, we will get the jury.

5          Let's go get the jury and let me know when they are

6     ready to come in.

7          MR. AVENATTI:  Your Honor, apologies, I was in the

8     bathroom.

9          THE COURT:  Are you ready to go?

10          MR. AVENATTI:  Yes, sir.

11          THE COURT:  Welcome back, Ms. Daniels.

12          If you could step up, please.

13          You can remove your mask and we will get started when

14     the jury is back.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  You may be seated.

 3              Welcome back, ladies and gentlemen.  I understand your

 4    food was a minute or two after you arrived.  I apologize for

 5    that, but I hope you had enough time to enjoy it.

 6              With that, we will continue with the cross-examination

 7    of Ms. Daniels.

 8              Ms. Daniels, I remind you that you remain under oath.

 9              Mr. Avenatti, you may proceed.

10              MR. AVENATTI:  Thank you, your Honor.

11    BY MR. AVENATTI:

12    Q.  Good afternoon, Ms. Daniels.

13    A.  Good afternoon.

14    Q.  Ms. Daniels, in March of 2018, you understood that Donald

15    Trump was pursuing you for $20 million in damages, did you not?

16    A.  Yes.

17    Q.  Who was defending you in connection with that?

18    A.  You were.

19    Q.  And when you first found out about that, you were very

20    concerned about it, were you not?

21              MR. SOBELMAN:  Objection.

22              THE COURT:  Sustained.

23    Q.  Ms. Daniels, it was important that you have legal

24    representation to defend yourself against Donald Trump, was it

25    not?

M1S8AVE5                          Clifford - Cross

1        MR. SOBELMAN:  Objection.

2        THE COURT:  Sustained.

3   Q.  Ms. Daniels, one of the reasons why you asked me to

4   represent you in defending you against Donald Trump was because

5   you were concerned about ultimately owing money, am I correct?

6   A.  I didn't ask you to represent me.

7   Q.  Who did you understand was representing you, Ms. Daniels?

8        MR. SOBELMAN:  Objection.

9        THE COURT:  Sustained.

10  Q.  Ms. Daniels, who did you ask to represent you?

11       MR. SOBELMAN:  Objection.

12       THE COURT:  You may answer.

13  A.  A man named Sean.

14  Q.  Before you entered into the fee agreement that has been

15  before the jury, right?

16  A.  Yes.

17  Q.  Did you ever have a fee agreement with Sean?

18  A.  No.

19  Q.  Did you ever try to hire Sean after February 27th of 2018?

20  A.  No.

21  Q.  Now, we started off -- strike that.

22       We started off yesterday afternoon, I asked you if you

23  always told the truth.  Do you recall that?

24       MR. SOBELMAN:  Objection.

25       THE COURT:  Next question, please.

1  Q.  Ms. Daniels, you testified yesterday that you always tell

2  the truth.

3         Now, that's not true, is it?

4         MR. SOBELMAN:  Objection.

5         THE COURT:  Overruled.

6         You may answer.

7  A.  I try my best, yes.

8  Q.  Let me show you what has been marked as DX K, as in kite.

9         MR. AVENATTI:  For the witness only, please.

10 Q.  Do you see that, Ms. Daniels?

11 A.  Yes.

12 Q.  Is that your signature on the page?

13 A.  Yes.

14 Q.  Do you recognize this document?

15 A.  Yes.

16 Q.  Is this a letter you signed on or about January 10, 2018?

17 A.  Yes.

18        MR. AVENATTI:  Your Honor, the defense offers Exhibit

19 K.

20        MR. SOBELMAN:  Objection.

21        THE COURT:  I will reserve judgment on that.

22        MR. AVENATTI:  Can I offer it?

23        THE COURT:  I am going to reserve judgment on it so we

24 can discuss it.  Do you need it in evidence to ask any further

25 questions?

1    MR. AVENATTI:  Yes, your Honor.  I am happy to ask one

2    more foundational question.

3          THE COURT:  Why don't you do that.

4    BY MR. AVENATTI:

5    Q.  Ms. Daniels, the statement in this document -- strike that.

6          This document is not entirely true, is it?

7    A.  No, it's not.

8          MR. AVENATTI:  The defense offers Exhibit K.

9          MR. SOBELMAN:  Objection, your Honor.  Extrinsic.

10          THE COURT:  Sustained.

11   Q.  Ms. Daniels, you have in the past signed documents that you

12   knew to be completely false, have you not?

13   A.  No.

14          MR. AVENATTI:  Your Honor, the defense offers K.

15          MR. SOBELMAN:  Objection.

16          THE COURT:  Same ruling.

17   Q.  Ms. Daniels, isn't it true that on January 10, 2018, you

18   signed a letter that you knew was false?

19   A.  Portions of it, yes.

20          MR. AVENATTI:  Your Honor, I offer K.

21          THE COURT:  Denied.

22   Q.  And you understood that this letter that you signed was

23   going to be disseminated to the public, correct?

24   A.  Yes.

25   Q.  You knew that that letter that you signed on that date was

M1S8AVE5                        Clifford - Cross

1    going to be disseminated to more people than are presently in

2    this courtroom right now, didn't you?

3              MR. SOBELMAN:  Objection.

4              THE COURT:  Sustained.

5    Q.  Ms. Daniels, you knew that that letter was going to be

6    disseminated to the public at large, right?

7              MR. SOBELMAN:  Objection.

8              THE COURT:  Sustained.  Asked and answered.

9    Q.  Ms. Daniels, you knew that that letter was going to be sent

10   out to millions of people?

11             MR. SOBELMAN:  Objection.

12             THE COURT:  Overruled.

13             You can answer it.

14   A.  Yes.  My attorney told me to.

15             MR. AVENATTI:  Move to strike everything after "yes"

16   as nonresponsive.

17             THE COURT:  Granted.

18             The jury will disregard everything after "yes."

19   Q.  And in the letter, you stated that you had become aware

20   that certain news outlets were alleging that you had had a

21   romantic affair with Mr. Trump, Donald Trump, and that that was

22   absolutely false; right, that's what you said?

23   A.  Because it was not romantic.

24             THE COURT:  Just yes or no, is that what you said?

25             THE WITNESS:  Yes.

1  Q.  You also said that your involvement with Donald Trump was

2  limited to a few public appearances and nothing more, didn't

3  you?

4  A.  Yes.

5  Q.  And that was not true when you signed the letter, was it?

6  A.  No.

7  Q.  You also stated, When I met Donald Trump, he was gracious,

8  professional, and a complete gentleman to me and everyone in my

9  presence.  That's what you signed, right?

10 A.  Yes.

11 Q.  And that too was completely false, wasn't it?

12 A.  No.

13 Q.  You then said, Rumors that I have received hush money from

14 Donald Trump are completely false, didn't you?

15 A.  Yes.

16 Q.  And what was completely false was your statement about the

17 rumors, wasn't it?

18             MR. SOBELMAN:  Objection.  Argumentative.

19             THE COURT:  Overruled.

20 A.  No.

21 Q.  Even though you signed a document that said, rumors that I

22 have received hush money from Donald Trump are completely

23 false, even though you signed that document, you had, in fact,

24 received hush money from Donald Trump, true?

25 A.  Cohen paid me.

1  Q.  So you were relying on the fact that the letter said that

2  it came from Donald Trump, but really the money came from

3  Michael Cohen on behalf of Donald Trump, is that your

4  testimony?

5  A.  Yes.

6            MR. SOBELMAN:  Objection.

7            THE COURT:  Overruled.

8            What was your answer?

9            THE WITNESS:  Yes.

10 Q.  You also said that if indeed you did have a relationship

11 with Donald Trump, that trust you, people wouldn't be reading

12 about it in the news, you would be reading about it in your

13 book, right?

14 A.  Yes.

15 Q.  Then you said, But the fact of the matter is these stories

16 are not true.  That's what you said, correct?

17 A.  Correct.

18 Q.  But the fact of the matter, Ms. Daniels, was, in fact, some

19 of those stories were true, were they not?

20 A.  I did not have a relationship with Donald Trump.

21 Q.  Ms. Daniels, you signed a letter that suggested that you

22 never had a relationship with him, you never received hush

23 money, a hush money payment, and that the news stories are not

24 true, and you knew your statements to be false, did you not?

25            MR. SOBELMAN:  Objection.

M1S8AVE5                        Clifford - Cross

1           THE COURT:  Sustained.

2           MR. AVENATTI:  The defense again offers K.

3           THE COURT:  Same ruling again.  Denied.

4           MR. AVENATTI:  Can we have Exhibit L, as in Larry, DX

5    L, just for the witness.

6    Q.  Before we get to L, at the time that you signed that letter

7    that we were just discussing, on or about January 10, 2018, you

8    had received a $130,000 payment in the final days of the 2016

9    election from Michael Cohen on behalf of Mr. Trump, did you

10   not?

11          MR. SOBELMAN:  Objection.

12          THE COURT:  Overruled.

13   A.  Yes.

14   Q.  Now, three weeks after that -- strike that.

15          Ms. Daniels, you signed the letter we were just

16   talking about because you didn't want to lose any portion of

17   your $130,000 payment, isn't that true?

18   A.  No.

19   Q.  Let's go to DX L.  Do you have it?

20   A.  Yes.

21          THE COURT:  Just the witness.

22   Q.  Ms. Daniels, on January 30, 2018, you signed this document,

23   did you not?

24   A.  Yes.

25   Q.  And it's a letter, right?

1    A.  It's a statement.

2    Q.  OK.  It's a statement you signed?

3    A.  Yes.

4    Q.  At the time you signed the statement, you knew it to be

5    false, correct?

6    A.  Yes.

7              MR. AVENATTI:  Your Honor, the defense offers DX L.

8              MR. SOBELMAN:  Objection.  Extrinsic.

9              THE COURT:  Sustained.

10   Q.  In the letter, Ms. Daniels, you stated that over the past

11   few weeks, I have been asked countless times to comment on

12   reports of an alleged sexual relationship I had with Donald

13   Trump many, many, many years ago, right?

14   A.  Yes.

15   Q.  What is a fact?

16             MR. SOBELMAN:  Objection.

17             THE COURT:  Sustained.

18   Q.  What do you understand a fact to be, Ms. Daniels?

19             MR. SOBELMAN:  Objection.

20             THE COURT:  Sustained.

21   Q.  Ms. Daniels, you then stated, the fact of the matter is

22   that each party to this alleged affair denied its existence in

23   2005, 2011, 2016, 2017, and now again in 2018.  Do you recall

24   that?

25   A.  Yes.

M1S8AVE5                          Clifford - Cross

Q.  You then stated, I am not denying this affair because I was

paid, quote, hush money, close quote, as has been reported in

overseas owned tabloids.  I am denying this affair because it

never happened.  That's what you signed, correct?

A.  Yes.

Q.  And that was a complete lie, wasn't it?

A.  No.

Q.  Ms. Daniels, do you recall that in March of 2018 --

         THE COURT:  Let's take this down, please.

Q.  Do you recall in March of 2018 you sat for an interview

with Anderson Cooper on the show 60 Minutes?

A.  Yes.

Q.  Were you truthful in that interview?

A.  Absolutely.

Q.  100 percent, right?

A.  Yes.

Q.  Isn't it true that during that interview, Mr. Cooper asked

you about that very statement that I just read and asked you,

that's a lie, and you responded, contrary to what you just told

this jury, you responded, yes?

         MR. SOBELMAN:  Objection.

         THE COURT:  Overruled.

A.  I don't consider getting cornered coming out of a bathroom

to be an affair.

         MR. AVENATTI:  Move to strike as nonresponsive.

1            THE COURT:  Granted.

2            Just answer the question.  Did you say that in the

3    interview with Mr. Cooper?

4            THE WITNESS:  Yes.

5    Q.  So you told Mr. Cooper on 60 Minutes that it was a lie, but

6    you just testified to this jury under oath that it was not a

7    lie.  Do I have that correct?

8            MR. SOBELMAN:  Objection.  It misstates the testimony.

9            THE COURT:  Sustained.

10   Q.  Ms. Daniels, what is more important to you, being honest to

11   this jury or being honest to Anderson Cooper?

12           MR. SOBELMAN:  Objection.

13           THE COURT:  Sustained.

14           Mr. Avenatti, let's move to a new line of questioning,

15   please.

16   Q.  In fact, you wrote about this very same statement in your

17   book, the one that you told the jury is 100 percent true, did

18   you not?

19   A.  Yes.

20           MR. AVENATTI:  Let's have S14 just for the witness.

21           THE COURT:  Mr. Avenatti, I am going to ask you to

22   move on to a new line of questioning, new topic.

23           MR. AVENATTI:  Your Honor, I would like to offer S14

24   and S15.

25           THE COURT:  I don't know what they are, but if it's

1    what I just saw on the screen, that's denied.  And let's move

2    on to a new topic, please.

3    Q.  Ms. Daniels, have you ever stated that the statement was,

4    quote, complete bullshit?

5            MR. SOBELMAN:  Objection.

6            THE COURT:  Ask that question again.  I missed one of

7    the words.

8            MR. AVENATTI:  Can I have S15, please, for the benefit

9    of his Honor.

10   Q.  Ms. Daniels, isn't it true that you stated in your book

11   that the January 30, 2018 statement was, quote, complete

12   bullshit?

13   A.  It is complete bullshit.

14   Q.  Ms. Daniels, the fact of the matter is that consistently in

15   your adult life, when it has mattered the most, you have lied?

16           MR. SOBELMAN:  Objection.

17   Q.  Isn't that true?

18           THE COURT:  Sustained.

19   Q.  In fact, Ms. Daniels, isn't it true that in your book, you

20   admit to many, many lies that you told to Glen?

21           MR. SOBELMAN:  Objection.

22           THE COURT:  Overruled.

23           THE WITNESS:  I don't know what he is referring to,

24   exactly.

25           MR. AVENATTI:  Let's have S6, please, for the benefit

M1S8AVE5                    Clifford - Cross

1    of the witness.

2    Q.  Do you see that, Ms. Daniels?

3    A.  Yes.

4    Q.  Does that refresh your recollection that in the book you

5    discuss the various lies that you told Glen over the course of

6    your relationship?

7    A.  No.  That's one sentence and I don't know the context.

8    Q.  Ms. Daniels, isn't it true that you wrote in your book that

9    you had told your husband that you felt like too much time had

10   passed and that you just couldn't tell him, so you lied to him?

11   A.  I never told him what happened, it was before him.  It's

12   not a lie, it's a secret.

13   Q.  So in your mind there is a difference between keeping a

14   secret and a lie?

15            MR. SOBELMAN:  Objection.

16            THE COURT:  Sustained.

17   Q.  Isn't it true that in your book you admit to repeatedly

18   lying to your husband because you thought he wasn't well?

19            MR. SOBELMAN:  Objection.  Hearsay.

20            THE COURT:  Sustained.

21            Let's move on, Mr. Avenatti.

22   Q.  Ms. Daniels, isn't it true that on page 214 of your book

23   you admit to being dishonest?

24            MR. SOBELMAN:  Objection.  Hearsay.

25            THE COURT:  Sustained.

M1S8AVE5                          Clifford - Cross

1    Q.  Now, in November of 2018, at the same time that there were

2    these text messages that the government asked you about --

3              THE COURT:  Sustained.

4              Start your question over, please.

5    Q.  Yesterday you were asked about some text messages during

6    the time period of November 2018.  Do you recall that?

7    A.  Yes.

8    Q.  Now, in November 2018, you had asked me to assist you in a

9    dispute that you were having with Keith Munyan and JD Barrale,

10   correct?

11   A.  Yes.

12   Q.  And the dispute was that you were accusing them of stealing

13   your money, correct?

14   A.  Yes.

15             MR. SOBELMAN:  Objection.

16             THE COURT:  Overruled.

17             Is that correct?

18   A.  I had given them money --

19             THE COURT:  Just, is that correct?

20             THE WITNESS:  I didn't know if they had stole it.  So

21   no.

22             MR. AVENATTI:  Move to strike.

23             THE COURT:  Denied.  Next question.

24   Q.  Ms. Daniels, didn't you accuse Mr. Munyan and Mr. Barrale

25   of stealing your money in November of 2018 and asked me to

M1S8AVE5                         Clifford - Cross

1    assist you with it?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Overruled.

4    A.  I asked you to speak to them about the whereabouts of

5    money.

6    Q.  So you did not accuse them of stealing your money, is that

7    your testimony?

8              MR. SOBELMAN:  Objection.

9              THE COURT:  Overruled.

10   A.  And then later, yes.

11   Q.  So you did accuse them of stealing your money?

12   A.  Yes.

13   Q.  In connection with those accusations, you accused -- strike

14   that.

15             At the time, how long had you known both of them?

16             MR. SOBELMAN:  Objection.  Relevance.

17             THE COURT:  Overruled.

18   A.  Keith, 18 years; JD, three.

19   Q.  And the amount of money that you claim they had stolen from

20   you was approximately how much?

21   A.  Between 26 and $30,000.

22   Q.  And in connection with that dispute, you told your two

23   friends, JD and Keith, that if they didn't pay the money, that

24   you would expose them and immediately go to the police and

25   claim they committed a crime, didn't you?

1          MR. SOBELMAN:  Objection.

2          THE COURT:  Overruled.

3     A.  I can't remember if I said that exactly, but yes, I

4     threatened to go to the authorities.

5     Q.  And you had your husband send them an e-mail calling them

6     both faggots, didn't you?

7     A.  No, I did not.

8          THE COURT:  Sustained.

9          The jury will disregard that question and the answer.

10    Q.  Ms. Daniels, your allegations relating to Mr. Munyan and

11    Mr. Barrale -- well, you had a number of allegations against

12    them, did you not?

13         MR. SOBELMAN:  Objection.

14         THE COURT:  Sustained.

15    Q.  Ms. Daniels, you claimed that these two individuals, who

16    you had known for some time, had stolen your money and failed

17    to give you a proper accounting, am I correct?

18         MR. SOBELMAN:  Objection.

19         THE COURT:  Sustained.

20         Let's keep this moving, Mr. Avenatti.

21    Q.  And your allegations against your two long-time friends,

22    those were made only weeks before you publicly accused me of

23    not giving you an accounting, isn't that true?

24    A.  Yes.

25    Q.  And approximately one or two months later you also fired

M1S8AVE5                        Clifford - Cross

1   your dragons, correct?

2   A.  Yes.

3   Q.  And when you fired your dragons, you also accused them of

4   stealing from you, did you not?

5   A.  I could not afford them.

6           MR. AVENATTI:  Move to strike, your Honor.

7           THE COURT:  Denied.

8           Next question.

9   Q.  Ms. Daniels, do you deny that within a couple of months of

10  November 2018, when you fired your dragons, do you deny that

11  you accused them of stealing from you, yes or no?

12          MR. SOBELMAN:  Objection.

13          THE COURT:  Overruled.

14  A.  I asked you to fire them, and I don't remember.

15          THE COURT:  Next question, Mr. Avenatti.

16  Q.  Ms. Daniels, isn't it true that you sent me a text message

17  when you fired your dragons and informed me that you had done

18  so because you were accusing them also of stealing from you?

19          MR. SOBELMAN:  Objection.  Hearsay.

20          THE COURT:  Sustained.

21  Q.  Ms. Daniels, did you ever tell me that the dragons had

22  stolen from you?

23          MR. SOBELMAN:  Objection.  Same.

24          THE COURT:  Not for the truth, but you can answer yes

25  or no.  Did you ever tell Mr. Avenatti that the dragons were

M1S8AVE5                          Clifford - Cross

1    stealing from you?

2    A.  I definitely don't remember that.

3              MR. AVENATTI:  Your Honor, one moment, please.

4              Juliet, if I could please have Exhibit 5 for the

5    benefit of the witness only, page 445 at the bottom.

6              THE COURT:  Is this Government Exhibit 5, Mr.

7    Avenatti?

8              MR. AVENATTI:  Yes, sir.

9              445 at the bottom.

10   Q.  Now, let's start with this text message from February 14th

11   of 2019, the text message that reads "word," exclamation mark.

12             And I think, if I recall correctly, the government

13   asked you how many exclamation marks were on this text message

14   yesterday.  Do you remember that?

15   A.  Yes.

16   Q.  So they asked you about this one, right?

17   A.  Yes.

18   Q.  I am going to show you a message immediately below that and

19   ask if it refreshes your recollection.

20             Ms. Daniels, that very same day you texted me and

21   said, just fired the dragons, did you not?

22   A.  Yes.

23   Q.  And I then asked you what happened, right?

24             MR. SOBELMAN:  Objection.  This portion of the

25   document is not evidence.

1    THE COURT:  Sustained.

2  Q.  Ms. Daniels, do you recall that upon you telling me that,

3  or informing me of that, I asked you what happened?

4    MR. SOBELMAN:  Objection.

5    THE COURT:  Overruled.

6    Do you recall if he said that?

7  A.  That's what it says.

8    THE COURT:  That's not the question.  Do you recall

9  him saying that?

10    THE WITNESS:  No, I didn't recall.

11  Q.  Ms. Daniels, do you deny that that's what I asked?

12  A.  No.

13    MR. SOBELMAN:  Objection.

14    THE COURT:  Let's get to the point, Mr. Avenatti.

15    When you step out of the box, can you put your mask

16  on.

17    MR. AVENATTI:  Oh, certainly, your Honor.  Sorry about

18  that.

19  Q.  Ms. Daniels, can you see that?

20  A.  Kind of.

21  Q.  It's a text message that you sent to me with a screenshot,

22  correct?

23  A.  Yes.  It's blurry.

24  Q.  Can you see that?

25  A.  Yes.  I can't read the screenshot.

1   Q.  Can you see that, Ms. Daniels?

2   A.  Yes.

3   Q.  Do these text messages refresh your recollection that, in

4   fact, you fired the dragons and you then sent me screenshots of

5   your communications with the dragons accusing them also of

6   stealing from you?

7           THE COURT:  Hold on one second.

8           First of all, for the record, pages 445, 446 and 447

9   have been shown to the witness.

10          Having said that, having seen what you have seen on

11  the screen, does that refresh your recollection sitting here

12  today that you told Mr. Avenatti that that's why you fired the

13  dragons?  Just yes or no.

14          THE WITNESS:  No.

15  Q.  Ms. Daniels, is it your testimony under oath that in

16  February, mid-February of 2019, that you did not tell me you

17  had fired the dragons because they had taken money from you?

18          MR. SOBELMAN:  Objection.  Asked and answered.

19          THE COURT:  Sustained.

20          Move on to the next line, Mr. Avenatti.

21  Q.  Ms. Daniels, as of February 14, 2019, you were of the

22  belief that, quote, everyone, close quote, was fucking you

23  over, isn't that true?

24          MR. SOBELMAN:  Objection.

25          THE COURT:  Let's not quote from something that may or

M1S8AVE5                    Clifford - Cross

1    may not be in evidence.  So sustained to the extent that it

2    included any quotation marks.  But why don't you ask the

3    question again.

4    Q.  Ms. Daniels, isn't it true that as of February 14, 2019,

5    you believed that everyone was fucking you over?

6    A.  Not everyone.  Lots of people, yes.

7    Q.  Did you ever state to me on or about that date that

8    everyone was fucking you over?

9    A.  Yes.

10           MR. AVENATTI:  Your Honor, one moment, please.

11           THE COURT:  Ladies and gentlemen, while we wait, if

12   you want to stand up and just stretch in your place, you are

13   welcome to.

14           Please have a seat.

15   Q.  Ms. Daniels, as of February 2019, you had been ordered to

16   pay Donald Trump approximately $300,000 in attorneys' fees,

17   correct?

18           MR. SOBELMAN:  Objection.

19           THE COURT:  Overruled.

20   A.  I don't remember the date, but yes.

21   Q.  Well, as of that date, you had been ordered to pay those

22   fees, correct?

23   A.  Yes.

24   Q.  And you blamed me for that, did you not?

25   A.  Yes.

M1S8AVE5                          Clifford - Cross

1    Q.  Have you paid any of those fees?

2           MR. SOBELMAN:  Objection.

3           THE COURT:  Sustained.

4    Q.  Ms. Daniels, have you been required to pay any of those

5    fees before taking the stand to testify yesterday?

6           MR. SOBELMAN:  Objection.

7           THE COURT:  Sustained.

8    Q.  Ms. Daniels, have you attempted to have JD or Keith charged

9    with any crimes?

10          MR. SOBELMAN:  Objection.

11          THE COURT:  Sustained.

12   Q.  Ms. Daniels, do you stand behind your testimony thus far in

13   this proceeding?

14          MR. SOBELMAN:  Objection.

15          THE COURT:  Sustained.

16   Q.  Ms. Daniels, what percentage do you believe is a reasonable

17   percentage for all of the work that me and my firm did for you?

18          MR. SOBELMAN:  Objection.

19          THE COURT:  Sustained.

20   Q.  Ms. Daniels, as far as you're concerned, you don't owe a

21   dollar more for the work that we did on your behalf, is that

22   true?

23          MR. SOBELMAN:  Objection.

24          THE COURT:  Sustained.

25   Q.  Ms. Daniels, do you wish to change any of your answers in

1    your testimony in this matter?

2             MR. SOBELMAN:  Objection.

3             THE COURT:  Sustained.

4    Q.  Ms. Daniels, when you do work, do you get paid?

5             MR. SOBELMAN:  Objection.

6             THE COURT:  Sustained.

7             Are we coming to a close soon, Mr. Avenatti?

8             MR. AVENATTI:  Yes, your Honor.

9    Q.  Ms. Daniels, how many matters did me and my law firm assist

10   you with?

11   A.  I don't know.

12   Q.  You know there were multiple federal cases, right?

13   A.  I don't know.

14   Q.  You have no idea?

15   A.  No.

16            MR. SOBELMAN:  Objection.

17            THE COURT:  Move on.

18   Q.  Ms. Daniels, I filed the NDA case on your behalf, correct,

19   the case relating to the nondisclosure agreement, do you recall

20   that?

21   A.  Yes.

22   Q.  That case was filed in federal court in Los Angeles, was it

23   not?

24   A.  I believe so, yes.

25   Q.  Did you win that case?

1        MR. SOBELMAN:  Objection.

2        THE COURT:  Overruled.

3  A.  It was dismissed.

4  Q.  Did you win the case?

5  A.  I don't know.

6  Q.  Ms. Daniels, did you ever tell people that you won the

7  case?

8        MR. SOBELMAN:  Objection.

9        THE COURT:  Sustained.

10 Q.  Ms. Daniels, isn't it true that you repeatedly have

11 correctly informed people that you won that case?

12       MR. SOBELMAN:  Objection.

13       THE COURT:  Sustained.

14 Q.  Ms. Daniels, after reviewing the fee contract and its

15 language, do you have any documentary evidence that I ever

16 agreed to give up my right to a fee?

17       MR. SOBELMAN:  Objection.

18       THE COURT:  Sustained.

19 Q.  Ms. Daniels, after you left here yesterday, were you able

20 to locate a text message, an e-mail, a voice mail, a recording,

21 or anything else that proves that I agreed to never take a

22 portion of your book deal?

23       MR. SOBELMAN:  Objection.

24       THE COURT:  Sustained.

25       Your mask before you leave the box.

1             MR. AVENATTI:  No further questions at this time.

2             Ms. Daniels, thank you.

3             THE COURT:  Mask before you leave, please.

4             Redirect.

5             MR. SOBELMAN:  Yes, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. SOBELMAN:

8   Q.  Ms. Daniels, do you recall questions about telling the

9   defendant you thought people might be fucking you over on

10  February 14, 2019?

11  A.  Yes.

12  Q.  That week did you learn who was fucking you over?

13  A.  Yes.

14            MR. AVENATTI:  Objection.  Argumentative.

15            THE COURT:  Sustained.

16  Q.  That week did you learn anything about your relationship

17  with the defendant?

18  A.  Yes.

19  Q.  What, if anything, did you learn that week about your

20  relationship with the defendant?

21  A.  That he had been lying to me, that he had forged my

22  signature, and that he had stolen my book money.

23  Q.  When you told him that you thought that people were fucking

24  you over, did he tell you that he had been lying to you and

25  stealing from you?

 1    A.  No.

 2    Q.  Ms. Daniels, do you recall being asked a number of

 3    questions about statements you signed with respect to Mr.

 4    Trump?

 5    A.  Yes.

 6    Q.  Were those statements signed before or after you met the

 7    defendant?

 8    A.  Before.

 9    Q.  Did those have anything to do with your book contract?

10            MR. AVENATTI:  Objection.  Speculation, your Honor.

11            THE COURT:  Sustained.

12    Q.  What, if anything, did the statements have to do with your

13    book contract?

14            MR. AVENATTI:  Same objection.

15            THE COURT:  Sustained.

16    Q.  Who wrote those two statements the defendant asked you

17    about?

18    A.  Michael Cohen.

19    Q.  Did you edit them before you signed them?

20    A.  No.

21    Q.  Why did you sign them?

22    A.  Because my attorney told me I had to.

23    Q.  Was that attorney the defendant or someone else?

24    A.  Someone else.  I'm sorry.

25    Q.  Ms. Daniels, I want to show you an exhibit, but it's an

1  audiovisual clip that is very brief.  In order to show it to

2  you, I have to hand you a laptop and a set of headphones, if

3  the Court will permit.

4          THE COURT:  You may.

5  Q.  It's a clip that's marked as Government Exhibit 617.

6          THE WITNESS:  Your Honor.

7          THE COURT:  Put your mask on.  I appreciate it.

8          MR. AVENATTI:  I would like a moment to view the clip.

9  I haven't seen the clip.

10          MR. SOBELMAN:  Your Honor, we have produced this

11  previously.

12          THE COURT:  I'll tell you what.  Let's get Ms. Daniels

13  set up so she can watch it with the headphones, and then I will

14  talk to Mr. Avenatti and counsel at the sidebar.

15          MR. SOBELMAN:  Thank you, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  OK.  What is the clip?

3          MR. SOBELMAN:  The clip is a brief clip of Mr.

4    Avenatti on 60 Minutes saying that he would have done exactly

5    what Ms. Daniels did with respect to the statements and would

6    have signed it.

7          MR. AVENATTI:  Your Honor, it's completely irrelevant

8    to this witness's testimony and what she did.  This was a

9    hearsay statement.  It's offered for the truth of the matter

10   asserted.

11         THE COURT:  Hold on.  Mr. Avenatti, once again, it's

12   not hearsay.

13         MR. AVENATTI:  Your Honor, it is irrelevant in this

14   context to offer the statement to Ms. Daniels.  There's no

15   foundation for the statement with this witness whatsoever.

16   It's highly prejudicial under 403, and I object, your Honor, on

17   multiple grounds.  It's also irrelevant under 401.  It's going

18   to open up an entire line of recross relating to the --

19         THE COURT:  Keep your voice down.

20         MR. AVENATTI:  Counsel, please don't laugh at me.

21         It's going to open up an additional line of

22   questioning relating to the context of the statement, when it

23   was made, what the relationship was between us at the time it

24   was made.  I mean we're going to go down a rabbit hole on this

25   because I'm going to have to, if your Honor permits this, I'm

M1sWave6                        Clifford - Redirect

1    going to have to get into what she had told me during the

2    course of the relationship about this.  Again, this is going to

3    open up a Pandora's box, your Honor.  I'm going to have to be

4    granted an opportunity to recross.

5              THE COURT:  I got it.

6              There's certainly a strong argument that Mr. Avenatti

7    opened the door to this with his cross.  I guess it does seem

8    to me that the more we dwell on her hush-money payments and

9    statements about it and so forth, the more we are just going on

10   a tangent from what this case is actually about.  So tell me

11   why I should permit this.

12             MR. SOBELMAN:  Your Honor, we marked this clip in

13   advance assuming that once the defendant saw that this existed

14   and remembered what he had said he would not open the door to

15   this.  I'm shocked he did, but he's now left a misimpression

16   that Ms. Daniels did something wrong.  She was acting at the

17   advice of her counsel at the time, and then the defendant went

18   on television and said that he thought she was acting properly.

19             It is unconscionable that the defendant is going to be

20   permitted, through the misimpression of the jury that she had

21   done something wrong, when he had said exactly the opposite

22   publicly, the exact statements we're talking about.

23             MR. AVENATTI:  Your Honor, the issue is this.  The

24   witness testified at the beginning of cross that she always

25   tells the truth and she's 100 percent honest.  I offered the

1    statements to impeach those statements on the record under

2    oath.  Your Honor denied me the ability to put in the actual

3    statements, presumably under 403.  And to now allow the

4    government to play this out of context, again, it's highly

5    prejudicial, your Honor, and on the 403 balancing, the Court

6    should exclude the statement.  And I don't want to have to

7    recross on this at length about the 60 Minutes interview and

8    the hush-money payment scheme, etc., your Honor.  I offered the

9    two statements.

10            THE COURT:  Mr. Avenatti, I'm not going to allow it.

11   I certainly think there's a strong argument that you opened the

12   door, but honestly, this whole area with the former President

13   just strikes me as distracting from the real issues in this

14   case.  I think she adequately handled those questions on her

15   own, and I think you can both argue from it.  What Mr. Avenatti

16   thought about the propriety of her signing those statements is

17   really sort of not an issue of relevance directly to this case.

18   So we'll move on.

19            MR. SOBELMAN:  Thank you, your Honor.

20            (Continued on next page)

21

22

23

24

25

 1                (In open court)

 2                THE COURT:  All right.  Can you retrieve the laptop

 3     from Ms. Daniels, please, unless there's any other need for it.

 4                MR. SOBELMAN:  No, your Honor.

 5                THE COURT:  OK.

 6                MR. SOBELMAN:  Thank you.

 7                THE WITNESS:  I didn't watch it.

 8                THE COURT:  That's OK, actually.

 9                THE WITNESS:  Oh.

10                THE COURT:  Thank you.

11     BY MR. SOBELMAN:

12     Q.  I just have a few more questions, Ms. Daniels.  Do you

13     recall being asked about a $300,000 fee award to Mr. Trump?

14     A.  Yes.

15     Q.  And the defendant asked you who you blamed for that, and

16     you said you blamed him, is that correct?

17     A.  Yes.

18     Q.  Why did you blame the defendant for that fee award?

19     A.  Because he filed -- that was for a defamation case that I

20     didn't -- I learned that he filed on Twitter.  I wasn't

21     interested in pursuing a defamation case.

22     Q.  So to be clear, this was a lawsuit, correct?

23     A.  Yes.

24     Q.  And who filed that lawsuit?

25     A.  Michael did.

M1sWave6                        Clifford - Redirect

1    Q.  And before he filed it, do you recall him asking you if you

2    wanted him to file it on your behalf?

3    A.  Yes.

4    Q.  And did you have that conversation with him?

5    A.  Yes.

6    Q.  How did that conversation end?

7    A.  With me saying I don't think it's a good idea, let's not.

8    Q.  And what happened next --

9    A.  Uh --

10   Q.  -- with regard to that lawsuit?

11   A.  I guess he filed it, because I read about it online.

12   Q.  Had you authorized him to file it?

13   A.  No.

14   Q.  Is that why you blamed him for losing it?

15   A.  Among other reasons.

16   Q.  What are the other reasons?

17   A.  I've been told that the paperwork wasn't done correctly.

18            MR. AVENATTI:  Objection.  Hearsay.  Move to strike,

19   your Honor.

20            MR. SOBELMAN:  No objection to that.

21            THE COURT:  Sustained.

22            The jury will disregard the last answer.

23            MR. SOBELMAN:  Just a few more questions.

24            Can we pull up Government Exhibit 238.  Let's go to

25   page 3.

M1sWave6                    Clifford - Redirect

1    Q.  Ms. Daniels, the defendant showed you this briefly on

2    cross-examination, right?

3    A.  Yes.

4    Q.  Just remind us, before Mr. Janklow sent it to you in the

5    email we just saw on February 19, 2019, had you ever seen this

6    before?

7    A.  No.

8    Q.  Did you know about it?

9    A.  No.

10   Q.  Did you sign it?

11   A.  Absolutely not.

12   Q.  Did the defendant tell you about it?

13   A.  No.

14   Q.  Did he ask you about it?

15   A.  No.

16   Q.  Did you authorize it?

17           MR. AVENATTI:  Objection.  Leading.

18           THE COURT:  Overruled.

19   Q.  Did you authorize it?

20   A.  No.

21   Q.  Did you write the words on this page?

22   A.  No.

23   Q.  And after you received this document and the other

24   attachments to this email from Mr. Janklow, you sent them to

25   the defendant, right?

1    A.  Yes.

2            MR. SOBELMAN:  Let's take a look at Government Exhibit

3    60.

4            Let's go to the second page, and if we can put up 60B

5    next to this.

6    Q.  Just remind us -- it's the last set of messages I'm going

7    to show you -- who are these messages between?

8    A.  Myself and Michael.

9    Q.  And what date were these messages sent?

10           MR. AVENATTI:  Objection, your Honor.  Outside the

11   scope.

12           THE COURT:  Overruled.

13   BY MR. SOBELMAN:

14   Q.  What date were these messages sent?

15   A.  February 19.  2019.  Sorry.

16           MR. SOBELMAN:  Ms. Abrams, if you could please,

17   actually, enlarge the second message, which is what's in 60B.

18   Thank you.

19   Q.  What did you send the defendant on February 19, 2019, in

20   this screenshot?

21   A.  I sent him a screenshot of the amount and the dates of my

22   payments that had been sent to him instead of to me.

23   Q.  And do you know if he actually received the exact same

24   documentation from Mr. Janklow a few days earlier?

25           MR. AVENATTI:  Objection.  Leading.

1          THE COURT:  That objection is overruled, but sustained

2     for other reasons.

3     BY MR. SOBELMAN:

4     Q.  Let's take a look at how the defendant responded to this.

5     A.  Uh-huh.

6          MR. AVENATTI:  Your Honor, outside the scope.

7          THE COURT:  Overruled.

8     BY MR. SOBELMAN:

9     Q.  Ms. Daniels, as of February 19, 2019, how long had it been

10    since you'd been asking the defendant about your third book

11    payment?

12         MR. AVENATTI:  Same objection, your Honor.

13         THE COURT:  Same ruling.

14    Q.  How long?

15    A.  About five months.

16    Q.  And the during that time period, approximately how often

17    were you speaking with him?

18    A.  Several, several times a week.

19    Q.  And in how many of those conversations would you bring up

20    the status of your third book payment?

21    A.  Almost every one of them.

22    Q.  And in any of those conversations, did he tell you he'd

23    received it and he'd spent it?

24    A.  No.

25    Q.  And after you received this documentation from Mr. Janklow,

1    the defendant wrote to you, "Let me find out if we even

2    received this payment."  Is that right?

3    A.  Yes.

4    Q.  OK.  Where in this message does he explain what happened?

5            MR. AVENATTI:  Objection.  Argumentative.  Best

6    evidence, your Honor.

7            THE COURT:  All right.  I'll sustain it.

8            Let's move on, Mr. Sobelman.

9            MR. SOBELMAN:  Yes, your Honor.  Let's take a look at

10    the next page, then we'll be done.  And let's get 60C up next

11    to 60, page 3.

12    Q.  Ms. Daniels, what was this document that you sent the

13    defendant?

14            MR. AVENATTI:  Objection.  Outside the scope, your

15    Honor.

16            THE COURT:  Overruled.

17    BY MR. SOBELMAN:

18    Q.  What's here in 60C you sent the defendant on February 19,

19    2019?

20    A.  It is a screenshot of the wire transfer receipts from the

21    bank.

22    Q.  And what was the date of that wire transfer?

23    A.  September 17, 2018.

24            MR. SOBELMAN:  Let's take a look at the last message.

25    Q.  Can you read what the defendant said when you sent this to

1    him?

2    A.  He said, "Let me find out what is going on."

3    Q.  Did he ever tell you?

4    A.  No.

5            MR. SOBELMAN:  No further questions.

6            MR. AVENATTI:  Brief recross, your Honor?

7            THE COURT:  Very, very briefly.

8    RECROSS EXAMINATION

9    BY MR. AVENATTI:

10   Q.  Ms. Daniels, you just informed the jury -- you told the

11   jury that, quote --

12           THE COURT:  Mr. Avenatti, just ask the question.  It

13   was a very short redirect.  You don't need to reorient

14   everyone.  Just ask the questions, please.

15   BY MR. AVENATTI:

16   Q.  Ms. Daniels, isn't it true that you were interested in

17   pursuing the defamation case?

18   A.  No.

19   Q.  Isn't it true that after I terminated you as a client, you

20   had Mr. Brewster handle an appeal of the decision in that case

21   before the Ninth Circuit court of appeal?

22   A.  Yes.

23   Q.  And isn't it true that after the decision by the Ninth

24   Circuit court of appeal, you actually asked the U.S. Supreme

25   Court to take or review the decision in the defamation case?

M1sWave6                    Clifford - Recross

1                     MR. SOBELMAN:  Objection.

2                     THE COURT:  Sustained.

3    BY MR. AVENATTI:

4    Q.  Ms. Daniels, after I terminated you as a client, you

5    pursued the defamation case for approximately two years, isn't

6    that true?

7                     MR. SOBELMAN:  Objection.

8                     THE COURT:  Sustained.

9    BY MR. AVENATTI:

10   Q.  Ms. Daniels, isn't it true that after I terminated you as a

11   client -- strike that.

12            Isn't it true that within the last two years, you took

13   your defamation case all the way to the Supreme Court?

14                    MR. SOBELMAN:  Objection.

15                    THE COURT:  Sustained.

16   BY MR. AVENATTI:

17   Q.  Ms. Daniels, isn't it true that after we parted ways, you

18   hired Mr. Brewster to handle the defamation case?

19                    MR. SOBELMAN:  Objection.

20                    THE COURT:  Sustained.

21            Mr. Avenatti, I'll give you one more line and then

22   we'll be done.

23                    MR. AVENATTI:  Could I have SA13, please.

24   Q.  Ms. Daniels, isn't it true that --

25   A.  I don't have anything.

1   Q.  I understand.

2   A.  Oh.

3   Q.  Ms. Daniels, isn't it true that after the court decided

4   that you had to pay $300,000 in fees relating to the defamation

5   case, that you never sent me a text message or any other

6   communication stating that you didn't want me to file it?

7               MR. SOBELMAN:  Objection.

8               THE COURT:  Sustained.

9   BY MR. AVENATTI:

10  Q.  Final question, Ms. Daniels.  If you never wanted to pursue

11  the defamation case, why did you pursue it for approximately

12  three years?

13              MR. SOBELMAN:  Objection.

14              THE COURT:  Sustained.

15              Thank you, Mr. Avenatti.  You can have a seat.  Mask

16  on, please.

17              Ms. Daniels, you're excused at this time.  Please put

18  your mask on before you leave the box.

19              Thank you very much.  Have a good afternoon.

20              (Witness excused)

21              THE COURT:  Government, please call your next witness.

22              MR. ROHRBACH:  The government calls Elizabeth Beier.

23   ELIZABETH BEIER,

24       called as a witness by the government,

25       having been duly sworn, testified as follows:

1              THE COURT:  Mr. Rohrbach, you may proceed.

2       DIRECT EXAMINATION

3       BY MR. ROHRBACH:

4       Q.  Good afternoon, Ms. Beier.  Can you hear me all right?

5       A.  I can.

6       Q.  What do you do for a living?

7       A.  I'm an editor at St. Martin's Press.

8       Q.  What is St. Martin's Press?

9       A.  St. Martin's Press is a large trade book publisher, which

10      means books there are designed to sell to people who buy them

11      at Barnes & Noble, Amazon, real people who like to read as

12      opposed to, perhaps, students or other kinds of professionals.

13      Q.  What are your responsibilities as an editor at St. Martin's

14      Press?

15      A.  Most people think that an editor reads books and fixes them

16      or improves them or, maybe, helps people with their grammar,

17      spelling, or something like that, and that's part of the job,

18      but the job of an editor at my company is also to find books --

19      to find books that we want to sell; to contract and negotiate

20      with the representatives for those books; to help the author

21      figure out what their story should be; and really just sort of

22      stay with the book all the way through the process.

23           After the words are fixed, that might include having

24      something to do with what the cover looks like; what the

25      promotion for the book is like, which would be the publicity;

M1sWave6                         Beier - Direct

1   to talk to the salespeople about the book.  I sort of think of

2   it as more a project manager for a book than just word fixing.

3   Q.  You just talked a little bit about the process, but at a

4   high level --

5            THE COURT:  Mr. Rohrbach, first of all, just a little

6   closer to the microphone, and second of all, just slow down a

7   little bit, please.

8   BY MR. ROHRBACH:

9   Q.  You just spoke about it a little bit, but at a high level,

10  would you describe for the jury what the publication process is

11  like?

12  A.  I guess the publication process is sort of like a train

13  moving through the station.  There's a lot to do sometimes, and

14  then there's some pauses in a normal publication process: first

15  of all, is getting to know the author and working with them to,

16  you know, tell their story, if it's nonfiction; and also

17  figuring out why the public would want a book, presenting it to

18  the public.  Some of that involves writing, for example, the

19  copy that goes on the flaps when you see a hard cover book.

20  Part of it is actually figuring out what we call our key

21  selling points, why would somebody in the outside world want to

22  buy that book; talking to retailers -- Amazon, Wal-Mart, Barnes

23  & Noble, Target -- about the book, seeing if they would like to

24  take it in the stores; and also being a cheerleader in-house

25  for the book, telling other people in the company what the

1    book's about and why they want to devote some of their energy

2    to it as well.

3    Q.  How long have you worked at St. Martin's Press?

4    A.  More than 23 years.

5    Q.  Did there come a time when you worked on a book called Full

6    Disclosure?

7    A.  Yes.

8    Q.  Who was the author of that book?

9    A.  Stormy Daniels, who is also known as Stephanie Clifford.

10   Q.  Did Ms. Daniels have an attorney?

11   A.  She did.

12   Q.  Who was that?

13   A.  Michael Avenatti.

14   Q.  Looking around the courtroom today, do you see Michael

15   Avenatti?

16   A.  I do.

17   Q.  Can you identify him by describing where he's sitting and

18   an article of clothing he's wearing?

19   A.  Yes.  He's got a pen in his right hand and wearing a black

20   mask.

21          MR. ROHRBACH:  Let the record reflect that the witness

22   has identified the defendant.

23   Q.  Ms. Beier, when did you first become involved with

24   Ms. Daniels's book?

25   A.  Late spring of 2018, after Easter.

M1sWave6                          Beier - Direct

1    Q.   How did that come to happen?

2    A.   A literary agent called Luke Janklow called our

3    copublisher, who is now our chairman, a woman called Sally

4    Richardson, and said that he had a book that he wanted to

5    present or pitch to -- just to our company, only to our

6    company.

7    Q.   And what was your role in deciding whether or not St.

8    Martin's Press would publish the book?

9    A.   Sally Richardson, the copublisher, thought I would be the

10   right editor, project manager for the book and came to talk

11   with me about it and asked whether she thought it would be a

12   good idea for us to publish.

13   Q.   Why did St. Martin's Press decide to pursue publishing this

14   book?

15   A.   It was an incredibly interesting story from a person who

16   was in the news and who I was convinced, having edited books

17   for a long time, had more to her story than we had probably

18   read in the headlines as the public.

19   Q.   You mentioned a minute ago Luke Janklow.  Who is that?

20   A.   He's a literary agent at Janklow & Nesbit.

21   Q.   What was your role in negotiating the acquisition of the

22   book?

23   A.   I did not negotiate directly with Luke Janklow, but we

24   discussed internally how we wanted to organize the publication

25   in terms of finances, payments, what we thought the price for

M1sWave6                          Beier - Direct

1    the book would -- should be.

2    Q.  At what point did you learn that Ms. Daniels had an

3    attorney?

4    A.   Immediately.

5    Q.  How did you come to learn that?

6    A.   Luke Janklow let us know.

7           MR. ROHRBACH:  If we could pull up for the witness,

8    please, what's in evidence as Government Exhibit 102.

9    Q.  Ms. Beier, do you recognize this document?

10   A.   I do.

11   Q.   What is it?

12   A.   This is one of or author contracts.  This one is with

13   Stephanie Clifford for an, at that time, untitled book.

14          THE COURT:  Ms. Beier, if I could just ask you to keep

15   your voice up a little bit as well.  Thank you.

16          THE WITNESS:  OK.

17   BY MR. ROHRBACH:

18   Q.  I'd like to -- Ms. Beier, if you wouldn't mind speaking a

19   little bit more closely to the microphone too so we can hear

20   you.  Thank you.

21   A.   OK.

22   Q.  I'd like to ask you a few questions about this contract.

23          MR. ROHRBACH:  If we could turn to page 2.

24   Q.  Directing your attention to the top section, called

25   advance, what is an advance?

M1sWave6                        Beier - Direct

1    A.   An advance is the amount of money that we, the publisher,

2    give the author to write the book, and the reason it's called

3    an advance instead of a payment is these are payments that are

4    actually advanced against money that we hope the book will

5    eventually earn from royalties.

6    Q.   Could you explain to the jury what you mean by that?

7    A.   Well, when a book is published, the publisher gets a

8    certain amount of money.  The retailers who are selling it get

9    another amount of money.  And out of the money that we get, we

10   pay all of the expenses for the book.  We pay for author.  We

11   pay for the printing.  We pay for the promotion.  We pay for

12   the shipping, all sorts of things.  But the author receives a

13   royalty based on not what we all pay in the stores or on Amazon

14   but based on the suggested retail price that you see sometimes

15   slashed through when you're buying a book on an online

16   retailer.  They get a royalty on that.  You know, not having

17   the numbers in front of me, but it's often around $4 a book,

18   sometimes a little bit more.

19       So we advance money that we hope will be equivalent to what

20   the author ends up earning in the end.  And we advance them the

21   money so that they can actually write the book and also to show

22   that we're enthusiastic about the book, that we think it's

23   going to earn a lot of money by the time it's published.

24   Q.   What was the amount of the advance for Ms. Daniels's book?

25   A.   $800,000.

M1sWave6                         Beier - Direct

1   Q.  How many payments were due to Ms. Daniels?

2   A.  Four separate payments.

3   Q.  I'd like to walk through those briefly.  First, at what

4   point under the contract is the first payment due?

5              MR. AVENATTI:  Objection, your Honor.  Cumulative.

6              THE COURT:  Sustained.

7              MR. ROHRBACH:  Your Honor --

8   Q.  Moving to the second payment, do you see where it says --

9              MR. AVENATTI:  Objection.  Cumulative.

10             THE COURT:  Let him ask his question, please.

11  BY MR. ROHRBACH:

12  Q.  Ms. Beier, do you see where it says that the second payment

13  is due at the publisher's acceptance of the complete and final

14  manuscript; what is acceptance?

15  A.  Acceptance means the author will have turned in the

16  manuscript and any other materials relating to the book that we

17  need in order to publish the book -- for example, if there are

18  photographs in a book -- and that we've deemed the book

19  something we can publish.  And that's both our thinking that it

20  turned out well, that it's a good story, that we're accepting

21  it and also, perhaps, passed a legal read as well just to make

22  sure everything in it is OK to publish.

23  Q.  And directing your attention to the third paragraph, do you

24  see on the third-to-last line where it says the author has

25  satisfactorily completed the three weeks publicity requirement

1    and complied with all media restrictions; what is the publicity

2    requirement, in general?

3    A.  Yes.  In this contract, the publicity requirement was we

4    contracted for three weeks of Stormy Daniels's attention and

5    time in order to publicize the book.

6    Q.  And what sorts of publicity are part of the contract?

7    A.  A wide variety.  For a book this big, that we had such big

8    expectations about and that had some news value, it would be

9    everything from major national broadcast television publicity

10   to smaller television shows and interview shows, to radio

11   interviews, to satellite radio interviews, to author

12   appearances and signings, and social media also, tweets and

13   Instagrams and any -- anything in the arsenal.

14   Q.  Under the contract, are poor sales a reason for nonpayment?

15   A.  No, they are not.

16   Q.  When the time comes for St. Martin's Press to make a

17   payment, what, if any, internal process is used to send out the

18   payment?

19   A.  We have a, what's called a check requisition, a check req,

20   and my office would fill out the check req on most, most

21   payments, not all of them.  The payments on publication kind of

22   go out automatically from our accounts payable department.  But

23   everything else would be triggered by a check requisition,

24   which my office would fill out and would be signed by several

25   people before the money would be paid.

M1sWave6                          Beier - Direct

1        MR. ROHRBACH:  I'd like to pull up for the witness

2   what's been, but not for the jury what's been marked for

3   identification as Government Exhibit 101.

4   Q.  Ms. Beier, do you recognize this document?

5   A.  I do.

6   Q.  What is it?

7   A.  That's a check requisition.

8   Q.  Is this a form that you have reviewed or approved?

9   A.  Yes.

10       MR. ROHRBACH:  Your Honor, the government offers

11  Government Exhibit 101, which was previously offered subject to

12  connection.

13       THE COURT:  Any objection?

14       MR. AVENATTI:  No objection.

15       THE COURT:  All right.  Admitted.

16       (Government Exhibit 101 received in evidence)

17       THE COURT:  Ladies and gentlemen, I told you I would

18  remind you if and when this happened, so I am reminding you,

19  earlier this was admitted subject to connection -- that is,

20  because there was another necessary piece of the foundation to

21  be laid.  That having now been laid, it is now in evidence as

22  an exhibit.

23       Thank you.

24       MR. ROHRBACH:  If we could please publish that for the

25  jury.

1    Q.  Ms. Beier, directing your attention to the top of page 2,

2    where it says Holtzbrinck Publishers, what is that?

3            MR. ROHRBACH:  On the first page, Mr. de Grandpre.

4    Thank you.

5    A.  Holtzbrinck Publishers is the larger publishing,

6    international publishing company that owns St. Martin's Press,

7    where I work, and where Full Disclosure was published.  The

8    company is the same company, but it is now called Macmillan.

9    Q.  And directing your attention to the top right, what is the

10   date of this form?

11   A.  That is April 11, 2018.

12   Q.  And directing your attention to the top left, who is this

13   form from?

14   A.  This is from Jennifer Donovan/Elizabeth Beier.

15   Q.  Who is Jennifer Donovan?

16   A.  At that time she was the editorial assistant in my office.

17   Q.  Do you see the section that says title?

18   A.  Yes.

19   Q.  What is the title?

20   A.  Untitled.

21   Q.  Why is this listed as untitled here?

22   A.  Well, first of all, the book didn't have a title yet, and

23   second of all, we were keeping the fact of this book very

24   quiet, even within our own company.  We wanted to be able to

25   have the maximum amount of attention on the book when it came

1   out, and we didn't want anybody to know about it before, so

2   there would be some interest and surprise when it -- when it

3   finally was published.

4   Q.  Do you see the section that says check payable to?

5   A.  Yes.

6   Q.  Who was the payment to be sent to?

7   A.  Janklow & Nesbit Associates.

8   Q.  Why was St. Martin's Press sending the payment to Janklow &

9   Nesbit Associates?

10  A.  Luke Janklow, who is the literary agent for the book, is

11  part of Janklow & Nesbit Associates.

12  Q.  Do you see the section called where it says explanations

13  and special instructions?

14  A.  I do.

15  Q.  What does it say there?

16  A.  On signing for untitled.

17  Q.  And what does that mean?

18  A.  That means it was for the first payment in the contract

19  that we looked at, that first payment which was due on both

20  parties signing the contract, which would be Stormy Daniels and

21  our chief financial officer in my publishing company.

22  Q.  And briefly, if we could turn to page 2 of this document --

23          MR. ROHRBACH:  And scroll up to the top.  Thank you.

24  Q.  -- what is this page?

25  A.  This is the first page of the author contract for the book.

M1sWave6                         Beier - Direct

1    Q.  And why is this connected to the document we were just

2    looking at?

3    A.  We sort of do that for ease so that the two or three people

4    whose hands that request has to pass through don't have to go

5    digging for the details if this page would show that the money

6    was actually owed to the person we were cutting the check to.

7                MR. ROHRBACH:  Mr. de Grandpre, you can take that

8    down.

9    Q.  Let's turn to how the book was written.  Who wrote this

10   book?

11   A.  Stormy Daniels, who is Stephanie Clifford, wrote the book

12   together with a professional writer.

13   Q.  And why was that process used?

14   A.  That process is fairly commonly used when someone is a

15   first-time nonfiction writer and telling their own story

16   particularly.  There are various reasons for that.  Sometimes

17   the person who's the author, which would be Stormy Daniels,

18   might not see something about their own life that would be of

19   interest.  It's good to have another person in to help tell the

20   story.

21       Also, in this case, we were publishing -- the whole process

22   was very collapsed.  We were publishing very quickly, and we

23   would not have had time to work through all of the sort of

24   newcomer aspects.  It's not so easy to write a book, actually,

25   and it would have been hard to work through that process at

1    speed with someone who hadn't done it before.

2    Q.   And what was your role in the writing process?

3    A.   As the editor, I would suggest certain things for

4    inclusion.  I found the professional writer to work with Stormy

5    and to read what they were working on, to keep abreast of the

6    schedule as well and to suggest places where they might add a

7    little more or cover topics that they might not have thought

8    of.

9    Q.   What was your experience in working with Ms. Daniels on the

10   content of the book?

11   A.   It was very good.  It was -- it was very concentrated, as I

12   say, time wise, and it was very strong.  I was really pleased

13   with what came back.  She and the professional writer had some

14   sessions together in person.  I wasn't there, but when they

15   turned in the work product after those sessions, I -- I just

16   thought it was really good, and I encouraged them to keep

17   going.  That was true all the way through to the finished first

18   draft of the manuscript.

19   Q.   How difficult did you find working with Ms. Daniels?

20   A.   I found that remarkably easy.  She was really engaged.  She

21   was communicative.  She and the writer clicked, which is always

22   something you worry about when you put, in my position, a

23   professional writer together with someone in the public eye.

24   If they aren't comfortable with each other and aren't able to

25   speak to each other, you're not going to get an interesting

1    book.  And I could see right away, I was communicating with

2    both of them and sometimes them together in various

3    combinations, and I could see that they were being very

4    productive.

5    Q.  Did you have any notable creative disagreements with

6    Ms. Daniels?

7    A.  I did.

8    Q.  About what?

9    A.  It was about the book cover.

10   Q.  Can you tell the jury a little bit about that?

11   A.  Yes.  The book cover is very important for a number of

12   reasons, and I mean even more so now, when so many people are

13   just looking at little -- little pictures of the cover on the

14   screen to see if they're interested enough to keep going and

15   find out more, on their phones or on their computers.  It's

16   always been important, and how you present the book, so much of

17   what people first think about the book is going to be that

18   cover image of the author.

19       So we at St. Martin's had ideas about what that might look

20   like when it came to Stormy Daniels.  I remember quite a few of

21   the discussions about what we thought would make a terrific

22   cover.  We had -- we had trouble -- normally we would have

23   hired a photographer to do a photo session with her and would

24   have collaborated with her on what she was going to wear or

25   what kinds of looks that we were going for for that.  We could

1   not get that scheduled in time, and we had to look for photos

2   that already existed.

3   Q.  Ms. Beier, is it unusual to have a creative disagreement

4   with an author about a book cover?

5   A.  No, it's not unusual.

6   Q.  I've asked you a few questions about the creative side of

7   working with Ms. Daniels.  When it came to Ms. Daniels's

8   contract, who did you typically talk to?

9   A.  Ms. Daniels's contract?

10  Q.  Yes.

11  A.  Luke Janklow.

12  Q.  And why is that?

13  A.  As the literary agent for the book, sort of the financial

14  aspects of the book are really mostly his responsibility to

15  deal with his client.

16          MR. ROHRBACH:  Let's change gears and now pull up for

17  the witness what's in evidence as Government Exhibit 207.

18  Q.  Do you recognize this document?

19  A.  I do.

20  Q.  What is it?

21  A.  It's an email from me to Luke Janklow.

22  Q.  I'd like to direct your attention --

23          MR. ROHRBACH:  And if we could zoom in on the bottom

24  of this document, the very last email in the chain.

25  Q.  Do you see where it says, where Mr. Janklow write:  "Hi.

1  We need the dollar sign to-do list ASAP.  OK?"  Do you see

2  where the email says that?

3  A.  I do.

4  Q.  What did you understand Mr. Janklow to mean by the dollar

5  sign to-do list?

6  A.  At this, at this point in the publication process, we were,

7  at St. Martin's Press, really in a crunch.  There were many

8  things that we really needed in order for the book to be ready

9  to go to the printer, and we had talked about them in pieces

10  and I had just put them together in a list.  And I had been

11  told that if we could get some of the acceptance money, you

12  know, to Stormy Daniels more quickly, this list would be able

13  to be accomplished.

14  Q.  And how did you come to believe that if you could get money

15  to Ms. Daniels more quickly the list could be accomplished?

16  A.  Luke Janklow told us that.

17  Q.  And what's your understanding of how Mr. Janklow knew that?

18          MR. AVENATTI:  Objection.  Calls for speculation.

19          THE COURT:  Sustained.

20  BY MR. ROHRBACH:

21  Q.  So did Mr. Janklow tell you how he knew that getting the

22  money to Ms. Daniels would get her to complete the list more

23  quickly?

24          MR. AVENATTI:  Objection.  Hearsay.

25          THE COURT:  Without stating what he said, did he tell

1   you how he understood that?

2            THE WITNESS:  He did.

3   BY MR. ROHRBACH:

4   Q.  And how did he -- what did he say to you?

5            MR. AVENATTI:  Objection.  Hearsay.

6            THE COURT:  Sustained.

7   BY MR. ROHRBACH:

8   Q.  What did he say about who told him, who, if anyone, told

9   him about that?

10            MR. AVENATTI:  Objection.  Hearsay.

11            THE COURT:  Sustained.

12            MR. ROHRBACH:  Not offered for its truth, your Honor.

13            THE COURT:  What is it offered for?

14            MR. ROHRBACH:  The fact that -- to explain Ms. Beier's

15   decision.

16            MR. AVENATTI:  Then it's irrelevant.  401, your Honor.

17   Hearsay.

18            THE COURT:  Understood.

19            All right.  I'll allow it along with the instruction,

20   ladies and gentlemen, that you may not consider Ms. Beier's

21   testimony regarding what Mr. Janklow said for its truth, but

22   you may consider it for the effect it had on her and what she

23   did in response.  You may proceed.

24            You may answer the question.

25   BY MR. ROHRBACH:

M1sWave6                          Beier - Direct

1   Q.  What --

2   A.  I'm sorry.  Can you repeat the question?

3          THE COURT:  Why don't you ask the question again.

4   BY MR. ROHRBACH:

5   Q.  What did Mr. Janklow say to you about how he knew that --

6   or why he thought that getting Ms. Daniels the money sooner

7   would get the list completed?

8          MR. AVENATTI:  Same objection.

9          THE COURT:  Same ruling.

10         You may answer.

11  A.  He said Michael had told him.

12         MR. ROHRBACH:  All right.  Let's now pull up for the

13  witness what's in evidence as Government Exhibit 208.

14  Q.  Do you recognize this document?

15  A.  I do.

16  Q.  What is it?

17  A.  It's an email from me to Luke Janklow and Michael Avenatti.

18  Q.  And what is the content of this email, at a high level?

19  A.  The subject is called book needs, and it is that list that

20  I just referred to.  In this email, I'm saying we can put

21  through that money due on acceptance once we have -- list of

22  things and I think, just on a quick scan, it looks about 11 or

23  12 things that we needed.

24  Q.  To be clear, what do you mean by put through?

25  A.  It means that my office would do that check requisition the

1    same that we did for the signing money in order to get money

2    transferred to the literary agent.

3    Q.  Directing your attention to the bottom of this page, the

4    final paragraph, do you see where it says "will make sure we

5    get the funds released quickly"?

6    A.  Yes.

7    Q.  Why did you write that?

8    A.  Because we had been told in order to keep the author

9    interested --

10            MR. AVENATTI:  Objection.  Hearsay, your Honor.

11            THE COURT:  All right.  Overruled.  Same instruction,

12   though.

13            This is not offered for the truth or you may not

14   consider it for the truth, but you may consider it as context

15   for Ms. Beier's statement in this email and also for her

16   understanding and the effect it had on her.

17            You may proceed, Ms. Beier.

18            THE WITNESS:  Thank you.

19   A.  I was told that in order to keep the author interested and

20   for her to devote her attention and time to these -- this list

21   of things that we needed, she would have to have more -- she

22   would have to have money more quickly, as soon as we could do

23   it.

24   Q.  And so who did you --

25            MR. ROHRBACH:  Minute?

1          THE COURT:  Mr. Rohrbach, into the microphone, please.

2          MR. ROHRBACH:  Sure.

3          THE COURT:  And slowly, please.

4    BY MR. ROHRBACH:

5    Q.  What is the date of this email?

6    A.  This is July 31, 2018.

7          MR. ROHRBACH:  Let's please pull up what is in

8    evidence as Government Exhibit 211.

9    Q.  Do you recognize this document?

10   A.  I do.

11   Q.  What is it?

12   A.  It's an email from Michael Avenatti to me and to Luke

13   Janklow.

14   Q.  And what's the date of this email?

15   A.  That's July 31, 2018.

16   Q.  Directing your attention to the top email, what does that

17   email say?

18   A.  The top of the email was the answer to one of the questions

19   of what I was calling book needs, and this was the copy, just

20   the words, of the dedication that Stormy wanted to use on her

21   book.

22         MR. ROHRBACH:  If we could scroll down on the email to

23   the next email, where it begins "further."  One email up from

24   that, Mr. de Grandpre.

25   A.  And this email from Michael Avenatti to me and to Luke

1   Janklow goes through a few more of those items that was on that

2   list.  There was a picture that I wanted to use at the very

3   front of the book; it's called a frontispiece photo.  It was a

4   picture of Stormy, when she was a young girl, on a horse, and I

5   needed approval to use that.  I had a question about whether

6   she wanted to have acknowledgements in the book.  That's

7   basically thank yous.  And I got the answer here that she did

8   not.  And then whether she wanted a dedication, and yes, she

9   did.

10  Q.  Did there come a time when Ms. Daniels satisfied the

11  requirements on that list?

12  A.  Yes.

13          MR. ROHRBACH:  Let's please pull up for the witness

14  only what's been marked for identification as Government

15  Exhibit 104.

16  Q.  Do you recognize this document?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a check request.

20  Q.  And is this a form that you reviewed and approved?

21  A.  Yes.

22          MR. ROHRBACH:  Your Honor, the government offers

23  Government Exhibit 104, which was previously offered subject to

24  connection.

25          THE COURT:  Any objection?

1           MR. AVENATTI:  No objection, your Honor.

2           THE COURT:  All right.  Admitted.

3           (Government Exhibit 104 received in evidence)

4           THE COURT:  Same instruction.  This is now fully in

5    evidence.

6           MR. ROHRBACH:  If you could please publish that for

7    the jury.

8    Q.  Ms. Beier, directing your attention to the top right, what

9    is the date of this document?

10   A.  That's July 31, 2018.

11   Q.  And what is the author's name on the left-hand side?

12   A.  Stephanie Clifford.

13   Q.  What's the title of the book?

14   A.  It says untitled typed in, but somebody's written in by

15   hand the October project, which was our -- remember I said we

16   were trying to keep it quiet even within our own company to the

17   people who didn't need to be working on it, and so we had a

18   code name.  And we were publishing in October, so we called it

19   the October project.

20   Q.  And who is this check payable to?

21   A.  Janklow & Nesbit Associates.

22   Q.  And directing your attention to the explanation section, do

23   you see where it says "D&A for untitled by Stephanie Clifford"?

24   A.  Yes, I do.

25   Q.  What does mean?

1    A.  That means the book was delivered, the manuscript and

2    associated items were turned in and that we had accepted it for

3    publication.

4    Q.  Do you know how long after this check request the payment

5    was made?

6    A.  I believe it was in two or three days.

7    Q.  And why is that?

8    A.  Because we'd been told we needed to accelerate the money --

9            MR. AVENATTI:  Objection.  Hearsay, your Honor.

10           MR. ROHRBACH:  Offered not for its truth.

11           THE COURT:  All right.  Overruled.  And same

12   instruction.

13           What Ms. Beier was told and what she's about to say in

14   that regard is not to be considered by you for its truth but

15   merely for the effect it had on her as the listener.

16           Go ahead, Ms. Beier.

17   A.  I was asked to accelerate the payment on acceptance in

18   order to keep the author engaged and interested in the project.

19   Q.  And who did you expect to receive the payment?

20   A.  Luke Janklow would get it to Stephanie Clifford, Stormy

21   Daniels, as she was his client.

22   Q.  And how long after one of these check request forms is

23   filled out does a payment typically leave St. Martin's Press?

24   A.  It's about two to three weeks, usually.

25           MR. ROHRBACH:  You can take that down, Mr. de

1  Grandpre.

2  Q.  After the manuscript was approved -- did there come a time

3  when the manuscript was approved as discussed in the contract?

4  A.  Yes.

5  Q.  What happened in the process after that?

6  A.  In the process after that was really quite a rush.

7  Normally a manuscript would be approved before we set it in

8  type, but because of the concentration and speed of this

9  process, it wasn't -- it was already set in type, but we still

10  had to race and rush.  So we had proofreading to do.  We had

11  one more pass to do to check for typos and mistakes.  We had to

12  get the book to the printer.  We had to begin telling retailers

13  that we were shipping them a book that they didn't have the

14  full details of, and we started to plan the actual publication

15  in earnest.

16  Q.  And would you remind the jury when under the contract the

17  third payment was due?

18  A.  The third payment was due on the publication of the book.

19  Q.  We talked earlier about the contract's publicity

20  requirements.  What, if any, publicity was Ms. Daniels allowed

21  to do between when the contract was signed and when the book

22  was published?

23  A.  Contractually, she was allowed to do no publicity at all.

24  Q.  And why is that?

25  A.  You know, it's hard to get most of the world to pay

1    attention to a new book in the marketplace, and the publicity

2    part of publishing a nonfiction book is incredibly important.

3    Also, what happens early, right when the book is published, is

4    extremely important.  Particularly with someone in the news,

5    anything that gets out, any other publicity that's done before

6    takes away from our ability to bring attention to the actual

7    book as opposed to just the person and the rest of that

8    person's life.

9    Q.  What, if any, publicity did Ms. Daniels do between the

10   contract signing and the publication of the book?

11   A.  She did some publicity.  She did some local publicity for

12   some club appearances that she had.  And more to our dismay,

13   she did an interview, she did a Dutch television interview that

14   got out internationally and got back to this country.

15            MR. ROHRBACH:  If we could pull up what's in evidence

16   as Government Exhibit 218.

17   Q.  Do you recognize this document?

18   A.  I do.

19   Q.  What is it?

20   A.  It's an email from Luke Janklow to our copublisher, Sally

21   Richardson, with a copy to me.

22   Q.  If you could direct your attention to the second paragraph,

23   do you see --

24            MR. ROHRBACH:  Mr. de Grandpre, if we can magnify

25   that.

1   Q.  Do you see where it says, "It's what begat that stupid

2   Dutch TV interview"?

3   A.  I do.

4   Q.  And what does that mean?

5   A.  Well, this email was about our paying the third payment,

6   due on publication, paying it early.  It says she has money

7   problems all the time.  "It's what begat that stupid Dutch TV

8   interview" means -- I took it to mean that they paid her to do

9   the interview.

10  Q.  And now directing your attention to the first paragraph, do

11  you see where it says:  "I was speaking to Michael earlier and

12  he asked about the publication money.  He was not asking to be

13  greedy.  He had a reason"?  What is your understanding of what

14  that meant?

15  A.  I do see it.

16      Yes, I thought it was the same thing that we had been told

17  before, that money was an incentive, and getting the money

18  sooner than we might have contracted to on paper was important

19  to keeping this author interested and enthusiastic and on board

20  for all the many things we needed to publish the book.

21  Q.  And just to be clear, what is your understanding of why you

22  needed to -- why you were being asked to pay the third

23  publication payment early?

24          MR. AVENATTI:  Objection.  Asked and answered, your

25  Honor.  Cumulative.

1          THE COURT:  Sustained.

2     BY MR. ROHRBACH:

3     Q.  What did St. Martin's Press decide to do in response to the

4     request?

5     A.  We decided to pay the publication money early.

6     Q.  Why?

7     A.  It was -- we now had a lot invested in this project, and we

8     were really down to the wire.  Also, from a business point of

9     view, at this point we knew we had something that we could

10    produce and publish, and so we were accelerating the payment

11    by -- that we would normally make several weeks later.

12    Q.  And who did you expect to receive that payment?

13    A.  We were sending -- we would send that check to Janklow &

14    Nesbit.

15         MR. ROHRBACH:  Let's please pull up for the witness

16    what's been marked for identification as Government Exhibit

17    105.

18    Q.  Do you recognize this document?

19    A.  I do.

20    Q.  What is it?

21    A.  That's a check request.

22    Q.  Is this a form you reviewed and approved?

23    A.  I did.

24         MR. ROHRBACH:  The government offers Government

25    Exhibit 105, which was previously offered subject to

M1sWave6                    Beier - Direct

1  connection.

2          THE COURT:  Any objection?

3          MR. AVENATTI:  No objection, your Honor.

4          THE COURT:  It will be admitted.

5          (Government Exhibit 105 received in evidence)

6          THE COURT:  Same instruction.

7          MR. ROHRBACH:  If we could please publish this for the

8  jury.

9  Q.  And Ms. Beier, directing your attention to the top

10 right-hand corner, what is the date?

11 A.  The date is September 8, 2018.

12 Q.  And directing your attention to the title, what is the

13 title of the book?

14 A.  It's now the real title of the book, Full Disclosure.

15 Q.  And to whom was this payment made?

16 A.  This payment was made to Janklow & Nesbit Associates.

17 Q.  Directing your attention to the area on the left where it

18 says "for," do you see the word "publication" and then a box?

19         MR. ROHRBACH:  If we could magnify that, Mr. de

20 Grandpre.  It's a little bit above where you are.

21 A.  I do.

22 Q.  Do you see -- what is to the right of the word

23 "publication"?

24 A.  To the right --

25 Q.  Is there a check box?

1    A.   There is a check box, yeah.

2    Q.   And what does that indicate?

3    A.   That indicates that this was the third payment on the

4    contract with Stormy Daniels due upon our publication of the

5    book.

6    Q.   And which number -- and what was the date when the book was

7    actually published?

8    A.   The book was published October 3, 2018.

9           MR. ROHRBACH:  All right.  You can take this down, Mr.

10   de Grandpre.

11   Q.   Ms. Beier, would you remind the jury whether Ms. Daniels

12   had to publicize the book in order to obtain the final payment

13   under the contract?

14   A.   Contractually, she did.

15   Q.   Why?

16   A.   That publicity relating to the publication of the book, the

17   three weeks of publicity was incredibly important to us,

18   particularly with someone so much in the news.

19   Q.   What were St. Martin's Press's expectations about how the

20   book would be publicized?

21   A.   We thought we would use almost all of that three weeks.  We

22   thought it would be a big, splashy, national campaign, which

23   would begin with broadcast media that would be something that

24   would go out nationwide, probably follow up with several more

25   television shows like that and then go on from there to smaller

1  television shows, interviews, newspaper interviews, radio

2  interviews, and appearances.

3  Q.  How were you expecting those appearances to be arranged?

4  A.  Through Michael Avenatti.

5  Q.  Why?

6  A.  From the very beginning of our meeting him, he had said

7  that was something he was very conversant with and that he

8  would be handling for the project.

9  Q.  Did St. Martin's Press set up press appearances for

10  Ms. Daniels?

11  A.  We eventually did.

12  Q.  What actually happened in terms of publicity for this book?

13  A.  Much, much less than we expected.  There was some.  There

14  was an anchor interview on Jimmy Kimmel's television show to

15  start, and then there were some other shows in New York and a

16  book signing here in New York as well, and some social media.

17  Sounds like a lot, but it's much less than we expected.

18  Q.  How satisfied were you with Mr. Avenatti's arrangements for

19  the publicity of the book?

20  A.  We were not satisfied.

21  Q.  In your experience, when Ms. Daniels did do publicity for

22  the book, was she effective?

23  A.  She was terrific when she did her appearances, absolutely

24  terrific.

25  Q.  At the time, what, if anything, did you consider to get

1   Ms. Daniels to do more publicity?

2   A.   We talked about everything.  We were really worried and

3   panicking.  It's very unusual -- I remember one afternoon fewer

4   than -- maybe less than ten days before we were publishing, all

5   huddling.  Normally these things, even for a big, newsworthy

6   book, even when we were trying to keep quiet, would be set up

7   months in advance, and it wouldn't just be people who said that

8   they would have the author on their television show.  It would

9   be what we label as confirmed publicity, which means not only

10  have they said they want the person on the show but they've

11  gotten back to us with a specific date and specific

12  requirements for the interview so that we can schedule other

13  things around it.  So we were very, very worried.  We were

14  sitting ten days out without even that first anchor television

15  show set up and ready to go.

16  Q.   Did there come a time when you considered withholding the

17  fourth payment for the book?

18  A.   We did.

19  Q.   And why was that?

20  A.   That fourth payment also would be tied to the successful

21  completion of three weeks of publicity, and we just hadn't

22  gotten it despite really trying and having an awful lot of

23  conversations about it.

24       Because the fourth payment wasn't due until six months

25  after publication, we had that conversation on and off for a

1  few weeks without actually making a decision.

2  Q.  While we're on the subject of withholding payments, did Mr.

3  Avenatti ever threaten any kind of legal action against St.

4  Martin's Press related to the nonpayment of the book advance?

5           MR. AVENATTI:  Objection.  Calls for speculation.

6  BY MR. ROHRBACH:

7  Q.  To your knowledge.

8           THE COURT:  You may answer.

9  A.  He did not.

10          THE COURT:  All right.  We'll call it a day.

11          Ladies and gentlemen, that concludes the first week of

12  trial.  As I told you earlier, I do expect that you may get to

13  your deliberations next week.  Typically, when we get to the

14  parties' closing arguments, which follow the close of evidence

15  and then deliberations, I often ask the jury to stay for a

16  longer day, until 5:00.  It just makes things a little bit more

17  manageable.  So I just want to give you a heads-up about that

18  so you can make arrangements for next week.  I do not know what

19  day, if at all, we will get there, but I just wanted to give

20  you that heads-up so that we have some flexibility when the

21  time comes.

22          More importantly, a few things.  First of all, get

23  home safely, and I hope no one is adversely affected by the

24  weather.

25          No. 2, I assume that we will not be adversely affected

by the weather come Monday and that it will be clear by the
time you need to get here.  Obviously if there's some issue on
that score, please let us know if you have trouble.  We will
let you know if there's any change to the usual schedule or
court plans.  But you should plan to be here at your usual
time.  I know we got you some coffee and tea this morning, and
I'm sorry I didn't realize that we could do that earlier, but
I'll make sure it's there again on Monday for you.

Most importantly, my usual instructions apply.

No. 1, keep an open mind.  You have not heard all of
the evidence.  You haven't heard the parties' closing
arguments.  You haven't heard my instructions about the law.
You have not begun your deliberations.  So it is critical that
you continue to keep an open mind.

No. 2, do not discuss the case with each other, with
your families, with your employers, with anyone.  Do not
communicate about the case in any way, shape, or form.  Do not
do any research about the case, investigate the case, anyone
involved in it.  And as I said, please, please, please make
sure you avoid any coverage of the case.  I don't know how
much, if any, there will be, but should you see anything on the
news, on the internet, anywhere, you know the instructions.
Disregard it and do not expose yourself to it.

(Continued on next page)

1    THE COURT:  I am tempted to ask you if I have left

2    anything out.  Keep an open mind, don't discuss the case, don't

3    do any research about the case.  I think that covers it.

4        With that, I wish you a very pleasant afternoon and

5    weekend.  Stay safe, stay healthy, and hopefully we will see

6    you the same time on Monday morning.

7        Thank you very much.  You are excused.

8        (Jury exits courtroom)

9        THE COURT:  You may be seated.

10        Ms. Beier, you are welcome to step down.  Please be

11   back in the courtroom or in the witness room outside by 9:00

12   Monday morning.  Have a pleasant weekend.  Thank you.

13        (Witness exits courtroom)

14        THE COURT:  All right.  I have a couple of things on

15   my agenda, but anything from the government?

16        MR. SOBELMAN:  Yes, your Honor.  We have two quick

17   items.

18        THE COURT:  Yes.  I assume you have a little bit left

19   with Ms. Beier and then the summary witness, who will be

20   relatively brief.  And what else?

21        MR. SOBELMAN:  At this time we intend that's it, but

22   that brings us to our first issue.

23        THE COURT:  OK.

24        MR. SOBELMAN:  For weeks we have been trying to

25   negotiate a stipulation regarding the defendant's membership in

1    the California bar and some related circumstances to lay the

2    foundation for what we expect the instructions your Honor will

3    give regarding his various duties and responsibilities as an

4    attorney.  Defendants have declined to sign the stipulation,

5    which is fine.  We have a stipulation with the exact same

6    matters that was signed in the case before Judge Gardephe.  We

7    have produced it to the defendant.  Obviously he had it.  But

8    we have redacted the references to the other case, and we

9    intend to offer that on Monday morning.  It's a statement by

10   the defendant.  We don't know if he objects, but we just wanted

11   to let your Honor know that we intend to do that.

12          THE COURT:  Mr. Avenatti.

13          MR. AVENATTI:  Your Honor, I object to the use of the

14   stipulation from the *Nike* case.  I don't believe that

15   stipulation was signed by me.  It may have been.  I am not

16   certain.

17          THE COURT:  Mr. Avenatti, if it was signed by your

18   lawyers, they were acting as your agents, and therefore it was

19   effectively signed by you.  So that argument doesn't work.

20          MR. AVENATTI:  I don't think it's appropriate to admit

21   the stipulation from another case in this matter, but let me

22   see if I can shortcut this.

23          No one here is claiming that I was not a member of the

24   State Bar of California at the time period at issue.  So I

25   stipulate to that.  I waive any claim that I was not a member

M1S8AVE7

1    of the State Bar of California in 2018 or 2019.  So I am

2    perplexed by what the issue here is.

3        THE COURT:  I think the issue is that you're not

4    willing to sign an actual stipulation to that effect in this

5    case.  So they need to prove it in order to lay a foundation

6    for the instructions regarding your professional duties as a

7    member of the bar.

8        MR. AVENATTI:  Your Honor, I will sign the stipulation

9    that says that I was a member of the bar during the years 2018

10   and 2019.  I am willing to sign that stipulation.  What I am

11   not willing to do is sign a stipulation that has a number of

12   other attendant statements that go along with it, and, frankly,

13   I shouldn't be asked to.

14       THE COURT:  Does the proposed stipulation have

15   attendant other stipulations?

16       MR. SOBELMAN:  It has a few other facts in it that the

17   defendant agreed to a couple of years ago.  They are still as

18   true now as they were then.

19       THE COURT:  Slow down.

20       MR. SOBELMAN:  It avoided us having to call a witness

21   from the California State Bar in the other case.  We would like

22   to avoid having to call a witness from the California State Bar

23   in this case.  If your Honor wants to review the stipulation,

24   it's Government Exhibit S4.  I think we produced it last night

25   in redacted form.

M1S8AVE7

1          THE COURT:  All right.

2          Mr. Avenatti, tell me, if you are not willing to

3    stipulate in any form that the government is satisfied with,

4    why should I not admit this document as a prior statement of

5    your own?

6          MR. AVENATTI:  Your Honor, I would like an opportunity

7    to at least do a little bit of research this evening on it.

8    Initially, my objections would be under 401, 402 and 403.  I

9    don't think it's proper for the government to take a

10   stipulation signed by my criminal defense counsel in another

11   case, involving different facts, different circumstances.  I

12   was advised by my counsel as to certain matters in that case

13   that may not be present here.  There's a whole host of reasons

14   why it's highly prejudicial and improper to just transform that

15   stipulation, which I did not sign, into this case, and,

16   frankly, it's unnecessary.

17         So again, I am willing to stipulate along the lines of

18   what I said earlier.  There is no dispute about that.  But what

19   I am not willing to do is agree to what the government has

20   asked me to agree to and further their effort to transform this

21   case into a bar disciplinary proceeding.  So I have vehement

22   objections about this criminal proceeding being turned into a

23   bar disciplinary proceeding and for me to be tried criminally

24   for alleged violations of the California bar rules.

25         THE COURT:  You are not being tried criminally for

1    your violations of the California bar rules.  I have indicated

2    earlier that, if appropriate, I am prepared to give

3    instructions to the jury on those rules because they are

4    matters of law.  That's why I granted your motion to preclude

5    an expert from testifying on that.  I certainly think they are

6    relevant, but I think in order to warrant an instruction,

7    although Mr. Dalack did stand up on your behalf and say that

8    you were an attorney in his opening statement, there needs to

9    be an evidentiary foundation for it.  So it is certainly

10   relevant.

11          Number two, I am pretty sure you will find that the

12   law is very clear that statements of counsel in a prior case

13   can be, and usually are, treated as statements of the

14   defendant, that they are adopted by the defendant.  For

15   instance, you can admit against a defendant a statement of

16   counsel in a prior opening or closing because it's a statement

17   on behalf of the defendant.  So I would think that the same

18   principle would suggest that a stipulation signed on your

19   behalf is a prior statement of yours.

20          Now, having said that, I think 403 is the only really

21   relevant issue here.  You can certainly, if you find authority

22   that suggests otherwise, you're welcome to bring it to my

23   attention.  But if you don't agree on a stipulation in this

24   case, I think the only relevant question is whether it would

25   violate Rule 403 to admit this.  I think given the redactions,

1     I might also propose redacting paragraphs F and G because they

2     reference exhibits, and I assume that they are not exhibits

3     here; they reference exhibit numbers in a different case.  But

4     assuming that the redactions cure any potential reference or

5     progress arising from a different case, then I am prepared to

6     admit this.

7          I personally think, Mr. Avenatti, you would be well

8     served to just do it in a cleaner fashion and stipulate to it

9     in this case so that there is no suggestion that there was some

10     other proceeding in which you were a participant.  I will

11     instruct the jury in my closing instructions, as I have several

12     times before, that they are not to speculate about anything

13     that is behind a redaction or about the reasons for a

14     redaction.  But I do think that the cleanest and simplest way

15     to do this would just be to stipulate in a new stipulation.

16          MR. AVENATTI:  Your Honor, I would like an opportunity

17     to take what your Honor has said under advisement and speak

18     with my advisory counsel, and perhaps we can work something out

19     in the next 24 hours with the government.

20          Just so I have an adequate record, I just want my

21     position to be clear, which is that the California Rules of

22     Professional Conduct are irrelevant to this proceeding and have

23     nothing to do with whether I violated any federal criminal

24     statute.  I understand the Court's prior ruling.  I respect it.

25          THE COURT:  I haven't ruled on what the jury

M1S8AVE7

1    instructions are going to be, but I am telling you now that

2    sitting here now I am inclined to think it is appropriate to

3    explain those rules to the jury; not because this is a bar

4    disciplinary proceeding, but because they are highly relevant

5    to the jury's determination of whether you engaged in fraud.

6         MR. AVENATTI:  I understand the Court's position.  I

7    understand we are going to have a charge conference and I will

8    lodge additional objections at that time along the lines of

9    what I have already said as well as further objections related

10   to the inclusion of the bar rules, but I understand your

11   Honor's position.

12        THE COURT:  Let me throw out another suggestion and

13   you can both think about it and discuss it as well.

14        If Mr. Avenatti is not willing to just do this in the

15   cleanest possible way and enter a new stipulation, and I would

16   urge the government to be -- don't be greedy.  If you can get

17   him to agree, the most important thing here is that he was a

18   member of the state bar at that time.  I think some of the

19   information in here regarding the obligations of a lawyer to

20   take the CLE and to be up-to-date on ethics training are

21   arguably relevant as well, but my point is, if you get your

22   cake don't try to eat it too.  If you can't negotiate a new

23   stipulation, which would certainly be my suggestion and

24   preference here, I think another option would be not to redact

25   this document in a way that suggests it came from a different

M1S8AVE7

1    case, but basically to recreate it as if it didn't include the

2    redacted portions.  If Mr. Avenatti won't sign it, which is

3    sort of the premise of this conversation, I am prepared to

4    admit it with an S/S in the place for his counsel, and we can

5    do it that way.  I think that's probably an easier and better

6    way of doing it.

7             So you all have some things to think about and to

8    discuss.  I am hoping you can sort that out.

9             What else, Mr. Sobelman?

10            MR. SOBELMAN:  Your Honor, we appear very likely to

11   rest on Monday morning.  We wanted to know the Court's

12   intentions with respect to when the defense case will begin and

13   whether the defense is going to provide us with a list of

14   witnesses and tell us who is going to be on on Monday pursuant

15   to the Court's scheduling order.

16            THE COURT:  I think pursuant to the scheduling order,

17   Mr. Avenatti has until 5:00 of the business day before to show

18   that.

19            Mr. Avenatti, your defense case, if you put one on,

20   will start on Monday after the government rests.  So can you

21   tell us your plans at this point?

22            MR. AVENATTI:  I was expecting to begin the defense

23   case on Monday, your Honor, and I am expecting to give a list

24   to the government by 5:00 today by e-mail just as they have

25   been doing with me.

M1S8AVE7

1        THE COURT:  All right.  There is your answer, Mr.

2   Sobelman.

3        Anything else, Mr. Sobelman?

4        MR. SOBELMAN:  Your Honor, just to flag an issue in

5   advance of the 5:00 e-mail.  We have some sense I think of who

6   some of the potential witnesses could be.  As far as we

7   understand, none of them have testimony relevant to this case,

8   and we may be filing a motion to preclude at some point tonight

9   or tomorrow.  Obviously, we will do that as quickly as we can

10  to put the issue before your Honor, but I just wanted to

11  forecast that that may occur.

12       THE COURT:  I think I could have intuited that without

13  the forecasting, but thank you.

14       Mr. Avenatti, anything you wish to raise?

15       MR. AVENATTI:  Yes, your Honor, there are a few

16  issues.

17       First of all, I can state unequivocally to the Court

18  that in light of the testimony just elicited on direct from Ms.

19  Beier, that I will seek to recall Mr. Janklow.  I am happy to

20  provide an in camera, ex parte offer of proof related to Mr.

21  Janklow's testimony.  But suffice it to say, Mr. Janklow has

22  knowledge and evidence that is directly contrary to what Ms.

23  Beier testified on direct on a few of the issues.

24       THE COURT:  So file something by 5:00 tomorrow.  If

25  you think it's appropriate for me to consider it on an ex parte

M1S8AVE7

1    basis, I will certainly entertain it and I will take it under

2    advisement.

3              MR. AVENATTI:  Obviously, that will be without

4    prejudice to my ability to supplement because I don't know what

5    else Ms. Beier is going to testify to on Monday, your Honor.

6              THE COURT:  I am not requiring you to foretell the

7    future.  So only based on to the record to date.

8              MR. AVENATTI:  Thank you, your Honor.

9              Then, secondly, prior to the trial, the Court had

10   ruled that Mr. Vilfer would not be permitted to testify, and

11   the basis for the Court's ruling was that the government was

12   only going to introduce text messages from my iCloud account.

13             THE COURT:  That was only part of the basis, actually,

14   if I recall correctly.

15             MR. AVENATTI:  Correct, your Honor.  That was the

16   first question that you had asked during the hearing on the

17   issue.  And I can get the Court the exhibit numbers.  I don't

18   have them handy.  The government during the case actually

19   introduced a number of text messages not from my iCloud account

20   but from, I believe it's 232 and 233, Exhibits 232 and 233.

21   Those are not extractions from an iCloud account.  In fact,

22   it's unclear to us exactly where they came from, because the

23   totality of the text messages were not produced in that form,

24   i.e., on a forensic copy or something of that nature.

25             So for that reason, your Honor, we intend on calling

M1S8AVE7

1    Mr. Vilfer relating to the government's use of those text

2    messages that they put into evidence over our objection.

3         THE COURT:  I think you should rephrase, if you were

4    to ask to call Mr. Vilfer, and that request is denied.  My

5    prior ruling stands.  It didn't rest only on the fact that the

6    government was going to introduce them through the iCloud

7    account.  It rested on additional grounds as well, and those

8    grounds remain as valid today as they did before.  I don't

9    think it's relevant.  I don't think it fits the facts of this

10   case.  And to the extent it is relevant, it fails the 403

11   balancing test by a mile.  So not happening.

12        MR. AVENATTI:  And, your Honor, just for the record, I

13   will also note that Ms. Daniels testified today that the

14   government in fact did take her phone.

15        THE COURT:  Mr. Avenatti, Mr. Vilfer is not

16   testifying, full stop.  You have preserved the issue for

17   appeal.  I am pretty confident on that issue, but he is not

18   going to testify in this case.

19        What is next?

20        Anything else on your list?

21        MR. AVENATTI:  I think that covers it for now, your

22   Honor.

23        THE COURT:  All right.  Two things I wanted to raise.

24        One is, I do think some briefing would be appropriate

25   on the quantum meruit and contracts law principle questions

M1S8AVE7

1    that I flagged earlier.  I don't quite know what to say because

2    the landscape would change dramatically if Mr. Avenatti

3    testifies.

4            Mr. Avenatti, I assume from your remarks yesterday

5    that you haven't yet made that decision and you will think

6    about it over the weekend?

7            MR. AVENATTI:  I have not made the decision, but I am

8    strongly leaning in favor of testifying, your Honor.

9            THE COURT:  Do we need to litigate the admissibility

10   of the *Nike* conviction if Mr. Avenatti testifies?  I assume it

11   comes in under Rule 609.

12           MR. SOBELMAN:  It does, your Honor.

13           THE COURT:  Mr. Avenatti, do you have any dispute

14   about that that we would need to litigate in advance?

15           MR. AVENATTI:  Your Honor, we may need to litigate it.

16   I believe that the government had to provide adequate notice

17   under 609 of their intention to use the actual conviction prior

18   to trial.  I am not certain if that happened or not because

19   obviously I was represented at the time by the federal

20   defenders.  I don't believe that under 609 they can just

21   announce that at the trial and then use the prior conviction.

22   I believe I was required to be given prior notice.  I may be

23   wrong about that.  I would like an opportunity to research it

24   briefly.  But I would object to any use of the prior *Nike*

25   conviction for the reasons I have already stated, as well as

M1S8AVE7

1    those under 403.

2            I will also note that there is a pending appeal in the

3    Second Circuit, and were the government to cross-examine me on

4    that conviction, and were that conviction to be overturned

5    before the Second Circuit -- hopes springs eternal, your

6    Honor -- I don't know how that might impact the record in this

7    case and any potential result in this case.  So I will just put

8    that on the record.  If the government wants to take the risk

9    and cross-examine me on that conviction, over my objection,

10   then I would think that they would do so at their own risk.  I

11   have not, again, researched the 609 issue, but I believe they

12   had to give me prior written notice prior to trial, but I may

13   be wrong about that.

14           THE COURT:  First of all, I think you are wrong.

15   Second of all, to the extent that notice was required, I would

16   think the jury instructions provided adequate notice because

17   they include an instruction on that conviction in the event

18   that you testified.  Third, it's Friday.  You have the weekend

19   to think about whether you are going to testify.  You have a

20   full weekend of notice.  So even if they did not give you prior

21   notice till today, I think there is no argument that you don't

22   have ample opportunity to raise the issue.

23           As for the appeal, as you know, you probably know,

24   under subsection (e) of Rule 609, it doesn't matter in terms of

25   admissibility.  The pendency of the appeal is also admissible.

M1S8AVE7

1    So in that regard you may well get that in.  You're certainly

2    right that there are risks on both sides, but it does seem to

3    me that it comes in under Rule 609.

4              MR. AVENATTI:  The other thing I would add, your

5    Honor, is I do think we would need to litigate how much or how

6    many details of that case actually come in and what happened,

7    whether it's the mere fact that I was convicted or the facts

8    and circumstances around that case.  Obviously, depending on

9    the scope of the questioning on that issue, I may seek to call

10   witnesses.  I would assume that the Court would not want to

11   turn this into a retrial of the *Nike* matter or a minitrial on

12   the facts of the *Nike* matter.

13             THE COURT:  You're certainly right about that.  I

14   don't know how to address that.

15             Well, Mr. Podolsky.

16             MR. PODOLSKY:  Just a few comments.

17             First of all, we did provide a letter well before

18   trial, for what it's worth, in which we informed the defendant

19   that should he testify, we intend to inquire not only about his

20   fraud conviction in the *Nike* case but, as well, his fraudulent

21   conduct with respect to the victims in California.  We don't

22   intend to ask any questions about that trial, but should he

23   testify, we certainly intend to ask questions about defrauding

24   other clients, which go directly to his character for

25   truthfulness.  I will say we are not writing on a blank slate

M1S8AVE7

1    here.  These issues were litigated in front of Judge Gardephe.

2    Judge Gardephe decided very clearly that all of those matters

3    would come in in the *Nike* case.  Obviously, that's not to

4    preclude your Honor from making your own decision, but I am

5    just noting that we are not writing on a blank slate here.

6            Certainly, the defendant is welcome to, as the rule

7    makes clear under 609, state that he has an appeal pending.

8    What we would object to is the defendant trying to relitigate

9    that case or explain the grounds of the appeal, all of which I

10   think the case law makes clear does not come in.  And with

11   respect to the California conduct, it would be an inquiry into

12   the conduct, not the trial; and certainly whatever may have

13   happened in the California trial -- mistrial, etc. -- would be

14   irrelevant.  But we certainly intend to inquire into those

15   matters, as they go directly to the defendant's character for

16   truthfulness, and candidly would be admissible under 404(b) in

17   any case, which we, again, provided notice of well before

18   trial.

19           MR. AVENATTI:  Your Honor, for the record, were the

20   government to get into the allegations relating to California,

21   then I intend on calling a number of the clients from the

22   California case to testify in an effort to bolster my defense.

23   So if they want to open the door as to what happened in

24   California, and the circumstances around those settlements, and

25   the cost and the expenses, and all of that, this trial is going

1    to be potentially a lot longer than we anticipated.  But what

2    will not happen -- well, unless I am told it's going to happen

3    by your Honor -- is that they get to cross-examine me about the

4    allegations in California and then, other than my testimony, I

5    don't have an opportunity to refute those allegations here in

6    this court.  That would not be appropriate, and I think it

7    would be highly prejudicial, your Honor.

8          THE COURT:  Here is my suggestion.  It sounds like

9    each side recognizes that the other side has a different view

10   about the admissibility of some of this stuff.  I am happy to

11   take it as it comes, but I will certainly urge you to consider

12   submitting something over the weekend that addresses your views

13   with respect to the admissibility or non-admissibility of

14   issues relating to the California conduct and the *Nike*

15   conviction, just so I have whatever law you think I should have

16   in order to make rulings on those issues.  So I am not going to

17   set a deadline, but the earlier you can file something that

18   speaks to that the better.

19          With respect to the form of that testimony, that's an

20   issue I raised yesterday.  I have researched the law and

21   confirmed my suspicion, which is that I have pretty wide

22   discretion with respect to how to handle any defense testimony

23   where a defendant is representing himself.  My very strong

24   inclination, though I am certainly happy to hear from both

25   sides, would be to adopt one of the approaches I proposed

1    yesterday, namely, that Mr. Avenatti draft questions for

2    himself to answer and then have somebody, whether it is standby

3    counsel or somebody else -- it could be a paralegal, it could

4    be standby counsel; if it's someone else, subject to my saying

5    no, I am open to that -- but have that person read it, give the

6    government an opportunity to object to the question, and then

7    have Mr. Avenatti answer from the stand.

8         MR. AVENATTI:  Your Honor, that is my preference as

9    well.

10        THE COURT:  Terrific.  Who would you like to read the

11   questions should you decide to testify?

12        MR. AVENATTI:  I haven't decided yet.  It's going to

13   be between the handsome bald gentleman at the table -- it's a

14   reference to Mr. Macias's testimony -- or probably Ms. Giwa.

15   But neither one of them has signed up for that yet, and I don't

16   even know if they will take the job.

17        THE COURT:  I am guessing that I can order them to do

18   it, but perhaps you can persuade them without the need for

19   that.

20        MR. AVENATTI:  Actually, I think you have a better

21   shot.

22        THE COURT:  All right.  Very good.

23        Any objections from the government to proceeding in

24   that fashion?

25        MR. PODOLSKY:  No, your Honor.  I think that would be

M1S8AVE7

1    the optimal fashion.

2             THE COURT:  I think that gets us back to the point

3    that I raised that formed this conversation, which was the

4    quantum meruit contract point.  I began by saying that the

5    landscape on that might shift dramatically if Mr. Avenatti

6    testifies and testifies as to his beliefs with respect to those

7    areas of the law.  So in that sense, it may be hard to know

8    precisely what, if any, instructions should be given, but I

9    wonder if you could submit things covering both those

10   scenarios, i.e., if the record is as it is versus if Mr.

11   Avenatti testifies and testifies that it was his belief that

12   under the contract and/or principles of quantum meruit that he

13   was entitled to the money.

14             Your thoughts on that and do you have an alternative

15   approach and any thoughts on the timing of when you would

16   submit that.

17             MR. AVENATTI:  Your Honor, from the defense

18   perspective, I would like to have until prior to court on

19   Monday to submit that in light of the deadline relating to the

20   production of the information tomorrow and the whole host of

21   other things that we have going on.  So I would like the Court

22   to set a deadline of 8 a.m. on Monday.

23             MR. PODOLSKY:  Whenever the Court will like it we will

24   endeavor to get it to you, perhaps Sunday.  We will try to get

25   you something useful as soon as we can.

M1S8AVE7

1    THE COURT:  What about the form, or you want to take

2    my remarks and think about it?

3    MR. PODOLSKY:  I think we are, perhaps like the Court,

4    trying to parse through the right way to approach the issue and

5    frame it, but we understand the issue could change depending on

6    whether Mr. Avenatti testifies or not.  So we will do our best

7    to in a rational way address both possibilities.

8    THE COURT:  I will give you until 8 a.m. on Monday

9    morning.  My hope and request would be if you could get it to

10   me by Sunday night.  Even if it's late Sunday night, it would

11   give me an opportunity to review it before we come to court

12   because that may have some bearing on our schedule and other

13   such things.  But if Mr. Avenatti has a two- to three-day case,

14   and particularly if he testifies, then we probably have a

15   little bit more time to address these things in due course.

16   Mr. Avenatti, as you sit here, putting aside your

17   testimony, has your estimate for the length of a defense case

18   changed?  What is your thought on that?

19   MR. AVENATTI:  It's about the same, your Honor.

20   Obviously, if you start excluding defense witnesses, it's going

21   to shorten it dramatically.  And I am hopeful that is not going

22   to be the case.  My estimate remains the same, but I am going

23   to sharpen my pencil, as they say, over the weekend.

24   THE COURT:  I appreciate and commend you on sharpening

25   your pencil and curbing the six-hour cross which became a more

M1S8AVE7

1    economical cross today.

2              MR. AVENATTI:  I listened to your Honor.

3              THE COURT:  So I think the admonition is as applicable

4    to a defense case, less is sometimes more there too.  But,

5    obviously, you should seek to call whomever you think you need

6    to put on a defense in this case, and if there is an

7    application to preclude, I will consider that in due course.

8              MR. AVENATTI:  I will just raise another issue.  I

9    haven't reached this point yet, but there are a number of

10   individuals that are actively dodging defense subpoenas.

11   Secondly, there's a number of individuals who have just

12   completely disregarded their subpoenas.  So we may have to

13   engage in some motion practice in order to compel those

14   individuals to appear to testify in the defense case.  I am not

15   there yet, but we are going to try to figure that out as

16   quickly as possible, and I may seek to have the Court determine

17   that one or more of those individuals are material witnesses.

18   So I am trying to avoid doing that, but obviously I have a lot

19   at stake, and I need to be able to mount my defense, and I need

20   witnesses to comply with subpoenas to testify.

21             THE COURT:  I understand that, and you should take

22   whatever action you think is appropriate to mount your defense.

23   I think you have picked up that I am very much not a fan of

24   wasting the jury's time and want to keep the case moving and

25   get them back to their civilian lives as soon as I can.  So in

M1S8AVE7

1   that regard, I would underscore the need to seek whatever

2   relief you need to seek in a timely fashion.  And with that, I

3   will leave it to you.

4          On that score, though, I almost forgot, I got an

5   e-mail, not copied to both sides -- by "I" I mean chambers got

6   an e-mail from counsel to Mr. Loupe, Richard Palma.  You will

7   recall that he had sought the unsealing of those pretrial

8   documents with respect to whether to proceed with a motion to

9   quash.  Frankly, it's a puzzling e-mail, and I don't really

10  understand what to make of it or do with it, so I am open to

11  your suggestions.

12         It says, "Attached is a motion to quash a subpoena,

13  which I was intending to ask the Court to file as a nonparty on

14  behalf of my client, Mr. Justine Loupe -- I assume it's

15  Justin -- but was advised by him this morning not to file it.

16  I respectfully request that it be made part of the court file."

17         So I don't understand what that means.

18         MR. AVENATTI:  Your Honor, if the document is not

19  going to be filed, it has no business in the court file, in my

20  view, or it should be sealed.  That's the defense position.

21         THE COURT:  I think if he has been instructed not to

22  file it, and he is not filing it, there is no such thing as a

23  court file other than the docket.

24         MR. AVENATTI:  I meant to say the docket, your Honor.

25         THE COURT:  My inclination is to respond saying that

M1S8AVE7

1    he can decide whether to file it or not.  If he files it, it

2    will be docketed; if he doesn't file it, it will be

3    disregarded.  I certainly agree if he doesn't file it, it's not

4    part of the record, it's not a judicial document, it's not

5    public, and it's irrelevant.

6              MR. AVENATTI:  Can we be provided a copy of what the

7    Court received?

8              THE COURT:  I don't particularly have an objection.

9    It's an odd thing that he even sent it to me.  I have not

10   looked at it.

11             Does the government have a view on that?

12             MR. SOBELMAN:  Either it's going to be part of the

13   record or it's not.  We certainly haven't received a copy of

14   it.

15             THE COURT:  If I give anyone a copy of it, I will give

16   it to both sides.

17             MR. SOBELMAN:  Right now it sounds like -- if it gets

18   filed, it certainly should be shared with the parties.  I think

19   we defer to the Court whether something that was not filed

20   should be shared with the parties.  It seems a little unusual.

21             THE COURT:  This whole thing seems a little unusual.

22             I think I am not going to share it.  I will tell

23   Mr. Palma that if he wishes to file something, that he may, and

24   if he doesn't, that this will be disregarded.  Since I have not

25   looked at it, there is certainly no prejudice to either side

M1S8AVE7

1   from the fact that I am not sharing it or I will not consider

2   it unless it is filed.  I will not look at it unless it is

3   filed.  I will have my staff respond to the e-mail.  And for

4   that matter, I will have them copy both sides on the response,

5   just so you can see the e-mail that he submitted and you can

6   see our response.

7          Anything else from the government?

8          MR. SOBELMAN:  No, your Honor.

9          THE COURT:  Mr. Avenatti.

10          MR. AVENATTI:  No, your Honor.

11          THE COURT:  All right.

12          With that, I wish you all a pleasant, I would say

13   restful weekend, but I think everybody is going to have some

14   work to do, and I will see you same time on Monday morning.

15   Stay safe and healthy.

16          (Adjourned to January 31, 2022, at 9:00 a.m.)

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    STEPHANIE CLIFFORD

 4   Cross By Mr. Avenatti . . . . . . . . . . .1039

 5   Redirect By Mr. Sobelman . . . . . . . . . .1188

 6   Recross By Mr. Avenatti . . . . . . . . . .1200

 7    ELIZABETH BEIER

 8   Direct By Mr. Rohrbach . . . . . . . . . . .1203

 9                        GOVERNMENT EXHIBITS

10   Exhibit No.                              Received

11    101   . . . . . . . . . . . . . . . . . . .1211

12    104   . . . . . . . . . . . . . . . . . . .1224

13    105   . . . . . . . . . . . . . . . . . . .1230

14                        DEFENDANT EXHIBITS

15   Exhibit No.                              Received

16    SB 2  . . . . . . . . . . . . . . . . . .1120

17

18

19

20

21

22

23

24

25
```