M1VNAVE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 Cr. 374 (JMF)

5    MICHAEL AVENATTI,

6              Defendant.
                                          Trial
7    ------------------------------x

8                                         New York, N.Y.
                                          January 31, 2022
9                                         9:00 a.m.

10   Before:

11
                         HON. JESSE M. FURMAN,
12
                                          District Judge
13                                        -and a Jury-

14                            APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
17        ROBERT B. SOBELMAN
          ANDREW A. ROHRBACH
18        Assistant United States Attorneys

19   MICHAEL AVENATTI, Defendant *Pro Se*

20   DAVID E. PATTON
          Federal Defenders of New York, Inc.
21        Attorney for Defendant
     BY:  ROBERT M. BAUM
22        ANDREW J. DALACK
          TAMARA L. GIWA
23        Standby Assistant Federal Defenders

24   Also Present:  Special Agent DeLeassa Penland
                     U.S. Attorney's Office
25                   Christopher de Grandpre, Paralegal Specialist
                     Juliet Vicari, Paralegal

M1VNAVE1

1              (Trial resumed; jury not present)

2              THE COURT:  You may be seated.

3              Welcome back.  I hope you had a nice weekend.

4              All right.  I'm please that Ms. Smallman is back with

5    us.  She is going to check on the jury, and we'll see where

6    they stand.  A couple of jurors were running a bit late because

7    of transportation delays that are arising from the weather, but

8    they seemed to think they would only be a few minutes late, so

9    it may not actually affect our start time.

10             There are a lot of issues going on here.  Honestly, I

11   have never seen a case where there were as many open issues

12   regarding the defense case at the state that we are at.  It's

13   the kind of thing that I would have hoped and expect to be

14   litigated in advance of trial, even if it wasn't clear that the

15   defense was going to put on a case.  But, in any event, it is

16   what it is.  We are where we are.

17             I will certainly gave careful consideration to all of

18   the pending motions, and if that requires us to let the jury go

19   early today so we can deal with it, then so be it.  It's not my

20   preference.  I would like to make the most of the jury's time,

21   but we'll take it one step at a time.

22             I guess to that end, Mr. Avenatti, can you tell me

23   which, if any, of your witnesses are present and prepared to

24   testify today so I can prioritize those issues if there are

25   open issues on there?

M1VNAVE1

1          MR. AVENATTI:  Yes, your Honor.  Good morning.

2          Obviously the Court issued its ruling over the weekend

3     informing --

4          THE COURT:  I didn't really issue any ruling.  I was

5     just trying to schedule this and organize it in a way that made

6     sense.  It seemed to me as of Saturday there was a dispute

7     regarding six of your ten witnesses.  There's now a dispute

8     regarding eight of your ten witnesses.

9          It seems to me that it made sense to say, great, like

10    have the four who are not subject to dispute ready to go on

11    Monday, so I gave you the day and a half notice about that.  So

12    it wasn't a ruling.  It was just trying to organize this in a

13    way that made the most sense and used time most effectively,

14    but go ahead.

15         MR. AVENATTI:  I understand, your Honor, unfortunately

16    I believe five of those witnesses -- or four of the witnesses,

17    I've lost track were the witnesses we were planning on calling

18    today.  So when your Honor issued his order over the weekend,

19    that obviously put me at a significant disadvantage relating to

20    trying to get witnesses here for this afternoon.

21         I learned this morning that Mr. Loupe, Justin Loupe,

22    who was here in New York and has been under subpoena for a few

23    weeks now, he left New York without notifying me or my advisory

24    counsel and went back to New Orleans.  I just learned of that

25    this morning.

M1VNAVE1

1          I was planning to call Mr. Loupe this afternoon.  So

2   we are in the process of trying to get Mr. Loupe to come back

3   here to New York.  My preference would be for him to get on a

4   flight first thing this morning in order to get here so I can

5   call him this afternoon.  I believe Mr. Fischer will be

6   available this afternoon to testify.  We have issues

7   outstanding, as your Honor noted, relating to Mr. Marshack and

8   Mr. Drum.  Perhaps the filing with the Court on Saturday that

9   we made -- well, not perhaps.  Obviously it was not clear.

10  After we sent our initial witness list we added one additional

11  witness which is Tracey Guest.  She is with St. Martin's.  We

12  expect to serve her this morning with a subpoena.

13          Her testimony became relevant and important upon the

14  first portion of Ms. Beier's testimony late Friday.  Mr. Denver

15  Nicks we have trying to serve for some time.  We had hoped we

16  were going to be able to serve him on Saturday.  Unfortunately,

17  he's dodging service, so we are trying to get him served.  He

18  is an integral player in then.

19          Then Mr. Glendon Crain, Ms. Daniels' former husband,

20  we have been trying to serve.  We understood that he was at her

21  current home in New Orleans, but I am told that he too is

22  dodging service.

23      So we have the six witnesses that are dealt with by motion.

24  We have the two witnesses we moved to compel last night on.  We

25  had the situation with Mr. Loupe.

M1VNAVE1

 1             I have informed you of Tracey Guest.

 2             Then we have the issue with Mr. Crain.  I cannot

 3    represent to the Court that we are going be to be able to get

 4    Mr. Nicks and Mr. Crain served.  We have been, you know,

 5    actively trying to do that in multiple states, your Honor.

 6             THE COURT:  Okay.  So, in other words, every witness

 7    that has been subpoenaed is now the subject of a motion, and

 8    the only ones who aren't subject to a motion have not actually

 9    even been served with a subpoena, that is what you are telling

10    me?

11             MR. AVENATTI:  I believe that --

12             THE COURT:  That is a yes-or-no question.

13             MR. AVENATTI:  Yes.

14             THE COURT:  Okay.  I will tell you what.  The jury is

15    here.  Let's deal with the two things that we can deal with

16    immediately.  One is the motion for reconsideration with

17    respect to the DX ST12.  And the other I would like to deal

18    with, if we have time, is Mr. Fischer, since he is the one

19    witness who could conceivably testify today it sounds like.

20    Otherwise, it may be that we need to let the jury go and hash

21    all of this out and make as much progress as we can.

22             First, on the motion for reconsideration, I will say

23    that upon further reflection I'm actually inclined to grant it

24    and let the exhibit in.

25             Any objection from the government?  I think the only

1    objection had been cumulativeness.  I recognize it is arguably

2    cumulative, but I certainly let you put in a bunch of texts

3    notwithstanding related testimony from the witness.

4              what is your view?

5              MR. ROHRBACH:  Yes, your Honor.  Our objection is

6    cumulativeness.  Also, it is in light of the fact that the

7    witness acknowledged the content of that statement on the

8    stand.  Moving it in now is no longer inconsistent with the

9    witness's testimony.  So the rule is not applicable.

10             THE COURT:  I am going to grant the motion for

11   reconsideration.  I will admit it this morning.  I'll tell the

12   jury that it is now in evidence.  You can use it during

13   closing, but we are not going to show it to the jury this

14   morning.

15             Mr. Fischer.  I guess let me start by asking you,

16   Mr. Avenatti, your response to the motion to preclude cites

17   Defense Exhibit AB, and I will discuss that in one moment, but

18   it also intimates an intent to introduce an unspecified number

19   and nature of other text messages, WhatsApp messages, and

20   e-mails.

21             Can you tell me what they are.

22             MR. AVENATTI:  Your Honor, I have not finally

23   concluded what they are.  I was waiting for the end of the

24   government's case.  But just to be clear, we are certainly

25   talking less than 10 and probably less than 5 e-mails, WhatsApp

messages, and text messages.  So I was going to wait until the

end of the government's case, wait to hear the examination and

what evidence was elicited or testimony was elicited by the

government to the two remaining witnesses in their case,

including the summary witness, who is going to utilize a

timeline.  Then I was going to determine which exhibits I

wanted to potentially use with Mr. Fischer.

THE COURT:  Okay.  So in that case, let's take that up

after the government rests.  I am going to excuse the jury to

take up any motions with respect to the government's case

anyway.  So we'll discuss that, probably discuss the Luke

Janklow issues.  And, as I said, depending on -- well, it seems

like Mr. Fischer is going to be the only witness who is in a

position to testify today.  Whatever the consequences of that

are, they are, and we'll deal with it.  But my guess is we will

end up sending the jury home early if there's nothing else to

do.

I should have checked in the first instance if the

government's case, if there's any change in the scope or extent

of your case this morning or if you anticipate resting after

Ms. Beier finishes her testimony and then the summary witness

and then whatever stipulation.  I don't know where that stands.

MR. ROHRBACH:  That's right, your Honor.  There's been

no change in the government's expected schedule this morning.

THE COURT:  What's the status of the stipulation?

M1VNAVE1

```
1              MR. PODOLSKY:  We were not able to reach an agreement
2     with the defendant over the weekend, so we do intend to offer a
3     redacted version of the prior stipulation that the defendant
4     entered into.  I believe we produced a further redacted version
5     to the Court and the defense yesterday, and we would plan to
6     simply read that to the jury at the conclusion of Mr. Medrano's
7     testimony.  I hoped -- I am assuming the defendant is going to
8     object but perhaps we can simply resolve that now and his
9     objection can be reserved if the Court will let it in so that
10    we don't have to take up the jury's time with that.
11             THE COURT:  Mr. Avenatti, do you have any objection
12    and anything you need to say beyond what you have already said?
13             MR. AVENATTI:  Well, let me just say this for the
14    record, your Honor.  I am going to object to the stipulation
15    being read to the jury and to the stipulation being placed
16    before the jury or in evidence under 401, 402, 403.  I do not
17    believe it's proper to take a stipulation entered into in
18    another case that was not signed by me and put it before this
19    jury.
20             Over the weekend I offered to stipulate to the fact
21    that during the relevant time period I was a licensed attorney
22    in the state of California.  That stipulation offer was
23    declined by the government.  So I object on multiple grounds,
24    all available grounds frankly, to the admission of that
25    exhibit.
```

M1VNAVE1

1          THE COURT:  All right.  I admire your objection on all

2     available grounds without specifying what they all may be, but

3     I am not sure that preserves it for appellate review.

4          MR. AVENATTI:  Fair enough.  Let me rattle some off.

5          THE COURT:  Can we get Ms. Beier on the stand because

6     the jury is going to come up in a moment.

7          I invited you to bring authority to my attention.  As

8     I said on Friday, I think I said that my understanding was

9     that, for instance, counsel's statements during an opening or

10    closing in a prior proceeding were admissible against the

11    defendant as an adopted admission or adopted statement of the

12    defendant, and I would think that the same applies to a

13    stipulation in a different proceeding, subject to a 403

14    balancing test.  I did invite to you cite authority to the

15    contrary.

16         Do you have any authority to the contrary?

17         MR. AVENATTI:  Your Honor, not as of this morning.  It

18    was a rather tough weekend, needless to say, with all of the

19    filings, so I have not had a chance to do the research on this,

20    but obviously I would object on hearsay grounds.  I don't

21    believe it's proper.

22         THE COURT:  Okay.  Well, that's overruled since, as I

23    said, it is a statement of the defendant as far as I understand

24    the law.

25         So the objection is overruled, preserved for the

1    record.  You don't need to make it in front of the jury.  I

2    will allow the government to read the stipulation.

3         I am not going to let you show this one to the jury

4    just yet.  I think we can discuss what form, if any, it takes

5    if it goes to the jury during its deliberations.  Perhaps, as I

6    suggested on Friday, a form that doesn't have obvious

7    redactions making it clear -- or not clear, but suggesting that

8    it may come from a different proceeding might be better than

9    the version that you have here.  But I will certainly let you

10   read it aloud to the jury.

11        Yes, Mr. Avenatti.

12        MR. AVENATTI:  Thank you, your Honor.

13        Just briefly commenting on what your Honor said

14   previously, and obviously we are going to do whatever your

15   Honor directs us to do, but my preference would be for the

16   government, after the government closes its case today, that we

17   have an opportunity to work through some of these issues.  I

18   expect a robust Rule 29 argument in connection with the

19   government's case, and I would ask for the Court's indulgence

20   to allow me to begin my case in chief tomorrow morning.

21        THE COURT:  I understand.  We will take that up after

22   the government rests.  I certainly expect a Rule 29 motion.  I

23   am not expecting a robust argument, but I will just give you a

24   heads-up with that.

25        MR. AVENATTI:  Fair enough, your Honor.

M1VNAVE1

1          I had one other issue I wanted to bring to the

2     attention of the Court.

3          THE COURT:  With Ms. Beier present, or --

4          MR. DALACK:  It makes no difference to me.

5          THE COURT:  The jury is on its way up but you have

6     your couple of moments.

7          MR. AVENATTI:  Yes, your Honor.  I think it's

8     incumbent on the government, and I would ask that the Court

9     also join in this, in that there is a misimpression that's now

10    been placed before the jury by the government, namely relating

11    to this issue of when Ms. Clifford, Ms. Daniels sent the text

12    message.

13         THE COURT:  I think this is best taken up not with the

14    witness on the stand.  So --

15         MR. AVENATTI:  It has no bearing on the witness's

16    testimony, but I'm happy to do it outside the presence of the

17    witness.  Thank you.

18         THE COURT:  Great.  So we will take it up after the

19    government rests as well.

20         MR. AVENATTI:  Thank you, your Honor.

21         THE COURT:  Good morning, Ms. Beier.  You may remove

22    your mask now that you are in the witness box.

23         THE WITNESS:  Thanks.

24     Elizabeth Beier, resumed.

25          (Continued on next page)

M1VNAVE1                    Beier - Direct

1           (Jury present)

2           THE COURT:  You may be seated.

3           All right.  Good morning.  Welcome back, everyone.  I

4    hope you had a wonderful, safe and warm weekend,

5    notwithstanding the weather.

6           I want to thank a couple of you who called this

7    morning to say that you were running a bit late because of

8    transportation delays arising from the weather.  I thank you

9    for giving us a heads-up about that.  And thank you for being

10   here and enabling us to start pretty much on time

11   notwithstanding that.

12          I hope you all are well.  We are going to pick up

13   where we left off on Friday with the continuing direct

14   examination of Ms. Beier.

15          Ms. Beier, I remind you that you remain under oath.  I

16   also wanted to just alert you that I have Defense Exhibit ST

17   12, which was offered I think on Friday, I had not allowed its

18   admission on Friday, but I am going to admit that into

19   evidence.  So Defense Exhibit ST 12 is now in evidence.

20          (Defendant's Exhibit ST 12 received in evidence)

21          THE COURT:  You will see it along with the other

22   exhibits when you deliberate at the end of the case.

23          With that, counsel, you may proceed.

24   DIRECT EXAMINATION

25   BY MR. ROHRBACH:

M1VNAVE1                        Beier - Direct

1    Q.  Good morning, Ms. Beier.

2    A.  Good morning.

3              THE COURT:  Just a reminder, Mr. Rohrbach, loud and

4    slow.

5              MR. ROHRBACH:  Yes, your Honor.

6              I would like to begin today with what's in evidence as

7    Government Exhibit 224.  Mr. de Grandpre, would you please pull

8    that up.

9    BY MR. ROHRBACH:

10   Q.  Ms. Beier, do you recognize this?

11   A.  I do.

12   Q.  What is it?

13   A.  It's a text -- series of text messages from Stormy Daniels

14   to me.

15   Q.  What's the date at the top of the text message?

16   A.  November 12, 2018.

17   Q.  Would you please read this top message for the jury.

18   A.  "Hi, Elizabeth.  Hope you are doing well.  I am flying to

19   the UK tomorrow and wanted to touch base about my next payment.

20   It was due a bit ago, but I was unable."

21   Q.  If you would read the next message?

22   A.  "To reach Luke.  Do you need my wire info?"

23   Q.  At the time what was your understanding of this message?

24   A.  I saw that and thought she was talking about the payment

25   due on publication.  She said it was due a bit ago, and that

1     was the one that we had already paid in September.

2     Q.  Did you respond to this message?

3     A.  I did not.

4     Q.  Why not?

5     A.  The literary agent is the one who deals with the client,

6     the author, about all the financial arrangements.

7     Q.  Would you remind the jury who the literary agent is.

8     A.  Luke Janklow.

9            MR. ROHRBACH:  Let's now pull up what is in evidence

10    as Government Exhibit 226.  If we could zoom in on the bottom

11    two e-mails, please.

12    BY MR. ROHRBACH:

13    Q.  Ms. Beier, do you recognize these e-mails?

14    A.  I do.

15    Q.  What are they?

16    A.  These are e-mails from Stormy Daniels' public relations man

17    at the time to our copublisher, Sally Richardson; to a couple

18    of people in our publicity department; and to me.

19    Q.  You just mentioned Stormy Daniels' publicity agent at the

20    time.  Who is that?

21    A.  Someone called Denver Nicks.

22    Q.  Let's start at the bottom e-mail.  What is the date of that

23    e-mail?

24    A.  November 19, 2018.

25    Q.  Directing your attention to the last paragraph of this

1    e-mail, which is on page 2.

2             MR. ROHRBACH:  Mr. de Grandpre, if you don't mind.

3    Q.  Would you read the first sentence to the jury.

4    A.  "She asked me to follow up about the third payment, which

5    she says was due a few weeks ago upon completion of three weeks

6    of press tour for the book."

7    Q.  And if you would read the next sentence.

8    A.  "When can I tell her to expect that payment?"

9    Q.  When you received this e-mail, what did you think you were

10   being asked about?

11   A.  I thought I was being asked about the payment that wasn't

12   due until April, for six months after publication.

13   Q.  Is that the third payment or the fourth payment?

14   A.  That's the fourth payment.

15   Q.  What did you think about the reference to the third

16   payment?

17   A.  I thought this was a new employee of Stormy's and that he

18   was not privy to the details of the contract or had gotten it

19   wrong.

20   Q.  Why did you think that was a reference to the fourth

21   payment?

22   A.  Because it still hadn't been paid at that point.

23            MR. ROHRBACH:  And let's now go back to the e-mail

24   above this in the chain on page 1.  Mr. de Grandpre, the e-mail

25   above that.  Yes.  Thank you.

M1VNAVE1                         Beier - Direct

1    BY MR. ROHRBACH:

2    Q.   What is the date of this e-mail?

3    A.   This is November 20, 2018.

4    Q.   Would you please read the first two sentences for the jury.

5    A.   "Following up on this.  Stormy believes you are several

6    weeks late on a payment, which makes her disinclined to promote

7    a book she feels she isn't getting paid for."

8    Q.   At the time what did you understand those sentences to

9    mean?

10   A.   I thought they were still referring to the payment that we

11   hadn't paid yet, which we were not late on, or I thought they

12   referred to publication payment, which we had paid, of course,

13   early in September.

14   Q.   And why did you think it might refer to one or both of

15   those payments?

16   A.   We weren't late with any of the payments.

17   Q.   Why did you think that Ms. Daniels' representative sent

18   this e-mail?

19   A.   I thought that he wasn't privy to the details of the

20   contract and had gotten confused about what was still owed.

21   Q.   And what, if anything, did you do after you received this

22   e-mail?

23   A.   I mentioned it to our copublisher and mentioned it to Luke

24   Janklow.

25         MR. ROHRBACH:  If we could now pull up just for the

1    witness what's been marked for identification as Government

2    Exhibit 228.

3    BY MR. ROHRBACH:

4    Q.  Ms. Beier, do you recognize this document?

5    A.  I do.

6    Q.  What is it?

7    A.  It's an e-mail from me to Luke Janklow.

8                MR. ROHRBACH:  Your Honor, the government offers

9    Government Exhibit 228.

10               MR. AVENATTI:  Objection.  Hearsay.

11               MR. ROHRBACH:  This is not offered for its truth.

12               THE COURT:  The objection is overruled.  It is

13   admitted with the instruction that you may not consider it for

14   the truth of anything asserted in the e-mail, but merely for

15   the fact that it e-mail was sent and the effect it may have had

16   on the recipient.

17               (Government Exhibit 228 received in evidence)

18               MR. ROHRBACH:  Mr. de Grandpre, if you would publish

19   this for the jury, please.  If we could zoom in on the e-mail

20   at the bottom.

21   BY MR. ROHRBACH:

22   Q.  Ms. Beier, who is this e-mail from?

23   A.  This e-mail is from Denver Nicks.

24   Q.  And would you remind the jury who that is.

25   A.  He was acting as Stormy's PR representative, public

1  relations representative.

2  Q.  Who is this e-mail to?

3  A.  It's to our copublisher, Sally Richardson; to Stormy

4  Daniels; to Luke Janklow; and to me.

5  Q.  What's the date of this e-mail?

6  A.  December 17, 2018.

7  Q.  If you could please read the first two sentences of the

8  e-mail to the jury.

9  A.  "Hi folks.  Stormy believes St. Martin's owes her the third

10  payment due on her advance and asked if someone on your end,

11  (her agent Luke or someone at St. Martin's) will please get in

12  touch with me or her directly with an update on the status of

13  that."

14  Q.  What did you think that this e-mail was asking you about?

15  A.  I thought that it was asking about the payment due six

16  months after publication, not due until April.

17  Q.  And, again, is that the third payment or the fourth

18  payment?

19  A.  That would have been the fourth payment.

20  Q.  What did you think about the reference to the third payment

21  in this e-mail?

22  A.  I thought that the PR agent, who would normally not be part

23  of a contract negotiation, didn't know which payment was still

24  due.

25          MR. ROHRBACH:  If we could now move up to the next

1    e-mail in the chain, Mr. de Grandpre.

2    BY MR. ROHRBACH:

3    Q.  Ms. Beier, who is this, the lower e-mail here, from?

4    A.  This is from Luke Janklow.

5    Q.  Would you please read that e-mail to the jury.

6    A.  "Hello, all.  Please sit tight on this -- Michael spoke

7    about this with Stormy yesterday and will have a formal

8    response shortly."

9    Q.  What did you understand Mr. Janklow to mean by the phrase

10   "please sit tight"?

11   A.  That we should do nothing about it, and we would get some

12   more information about what they were referring to at some

13   point.

14   Q.  What did you understand him to mean by a "formal response"?

15   A.  I expected we would probably get another e-mail explaining

16   what they meant.

17   Q.  How did you respond to this e-mail when you received it?

18   A.  I didn't do anything with this e-mail.

19        MR. ROHRBACH:  All right.  Mr. de Grandpre, if you

20   would take that down, and if you would please pull up for the

21   witness only what's been marked for identification as

22   Government Exhibit 229.

23   BY MR. ROHRBACH:

24   Q.  Ms. Beier, do you recognize this document?

25   A.  I do.

1   Q.  What is it?

2   A.  These are e-mails from me to our cochairman, Sally

3   Richardson; and from John Karle in our publicity department to

4   me.

5           MR. ROHRBACH:  Your Honor, the government offers

6   Government Exhibit 229 and not for its truth.

7           MR. AVENATTI:  Your Honor, objection.  Double hearsay.

8           THE COURT:  All right.  If it's not for its truth, it

9   is admissible for that purpose.  Admitted subject to the same

10  instructions.

11          (Government Exhibit 229 received in evidence)

12          MR. ROHRBACH:  Mr. de Grandpre, would you publish that

13  for the jury, please.

14          If we could begin again with the bottom e-mail, which

15  is on the next page, I believe.

16          Thank you.

17  BY MR. ROHRBACH:

18  Q.  Ms. Beier, who is this e-mail from?

19  A.  This e-mail is from Denver Nicks.

20  Q.  And who is it to?

21  A.  It's to John Karle, who is the publicist at St. Martin's

22  who was handling Stormy's book.

23  Q.  I direct your attention to the second paragraph.  Do you

24  mind reading that paragraph to the jury?

25  A.  "Wondering, do you know if Stormy's check was sent out for

 1    her third payment?  She's very in the dark about where things

 2    stand with that and asked me to check with you, since she

 3    hasn't been able to communicate with anyone else at St.

 4    Martin's."

 5    Q.  When you read this e-mail at the time, what did you think

 6    this e-mail was referring to?

 7    A.  I thought it was referring to the payment that wasn't due

 8    until April, the fourth payment.

 9          MR. ROHRBACH:  All right.  And then Mr. de Grandpre

10    you can take that down and if you would go up two messages.

11    BY MR. ROHRBACH:

12    Q.  Ms. Beier, what is the date of that e-mail?

13    A.  February 11, 2019.

14    Q.  Would you please read this e-mail to the jury.

15    A.  "Hi EB.  Just making sure you saw this -- is this something

16    you can respond to?  Or maybe you did already?"

17    Q.  Who is EB?

18    A.  That's me, Elizabeth Beier.

19          MR. ROHRBACH:  All right.  Mr. de Grandpre, if you

20    would take that down and please go up one e-mail in this chain.

21    BY MR. ROHRBACH:

22    Q.  And if you would please read this e-mail to the jury.

23    A.  "JK.  Thanks for forwarding it on.  It's a little more

24    complicated than the usual author request so am not able to

25    respond to them directly.  She can talk to her agent, and I

1    imagine already has."

2    Q.  Who is JK?

3    A.  John Karle.

4    Q.  Why did you say that this was more complicated than usual?

5    A.  There were new people who were coming in and asking about

6    these payments, Denver Nicks, for example.  It's not typical

7    for us to talk the financial arrangements with a book with a

8    public relations person.

9    Q.  Who is it typical for you to talk to?

10   A.  The literary agent.

11           MR. ROHRBACH:  Mr. de Grandpre, if you would please go

12   up one more e-mail.

13   BY MR. ROHRBACH:

14   Q.  Ms. Beier, if you would please read this e-mail to the

15   jury.

16   A.  This is an e-mail from John Karle that said:  "Thanks,

17   that's what I thought and why I haven't replied to Denver

18   either.  If he follows up with me, is it okay to say that's a

19   question she should discuss with her agent?  Or better not to

20   reply at all?"

21   Q.  And directing your attention up one e-mail from there.  How

22   did you respond to Mr. Karle?

23   A.  I said, "Sally and I have basically not been replying

24   directly to that question -- I've been sending them some books

25   for events, but that's about it.  You can always suggest that

1    they get in touch with me and I can maintain my not-answering

2    drill, if easier and seems better for you not to ghost them.

3    Thanks."

4    Q.  What did you mean -- what is the not-answering drill that

5    you mentioned?

6    A.  That I was not going to answer Denver Nicks about the

7    financial arrangements --

8    Q.  Why not?

9    A.  -- with Stormy's book.

10         He was not the literary agent.  He was a new public

11   relations person for her, and she -- the lines were for her to

12   talk to her literary agent about the money portion of the deal.

13   Q.  And what did you mean in that first sentence when you said

14   you have basically not been replying directly to that question?

15   A.  I was referring to the fact that Denver Nicks had gotten in

16   touch with us also and that we had not answered him.

17        MR. ROHRBACH:  Now, Mr. de Grandpre, if you would take

18   that down and now go up into the top e-mail in this chain.

19   BY MR. ROHRBACH:

20   Q.  Did you sent this e-mail, Ms. Beier?

21   A.  I did.

22   Q.  Who did you send that to?

23   A.  This is to Sally Richardson, our copublisher at St.

24   Martin's.

25   Q.  Would you please read it for the jury.

1    A.  "FYI she/he/they are trying to get at that payment anyway

2    they can (I sort of don't blame them, but still)."

3    Q.  What did you mean by this e-mail?

4    A.  I thought they were trying to get paid early for the fourth

5    payment due in April, the payment due six months after

6    publication.  By saying I didn't blame them, I meant we had

7    basically trained them to ask for money early by having paid a

8    couple of the other payments early, and I didn't blame them in

9    some way for trying again, but did not intend to pay it early.

10   Q.  Do you recall on Friday when I asked you whether

11   Mr. Avenatti ever threatened any kind of legal action relating

12   to nonpayment of the advance?

13   A.  I do.

14   Q.  To your knowledge, did Mr. Avenatti ever threaten to sue

15   St. Martin's Press for any reason?

16             MR. AVENATTI:  Objection.  Asked and answered.

17             THE COURT:  Given the intervening weekend, I will

18   allow it.  You can answer.

19   A.  Can you repeat the question?

20   Q.  To your knowledge, did Mr. Avenatti ever threaten to sue

21   St. Martin's Press for any reason?

22   A.  He did not.

23   Q.  To your knowledge, did he ever send any kind of demand

24   letter?

25   A.  No.

1    Q.  At any point did Mr. Avenatti claim to you that St.

2    Martin's Press had not made a payment as required by the book

3    contract?

4    A.  He did not.

5    Q.  At any point did the defendant claim to you that St.

6    Martin's Press was late in making a payment as required by the

7    contract?

8    A.  No.

9            MR. ROHRBACH:  Mr. de Grandpre, if you could take this

10   down and pull back up Government Exhibit 224 again.

11   BY MR. ROHRBACH:

12   Q.  Directing your attention now, Ms. Beier, to the bottom

13   message.  What's the date of this message?

14   A.  February 13, 2019.

15   Q.  Would you please read the bottom message for the jury?

16   A.  "Hi Elizabeth, this is Stormy Daniels.  I am very confused

17   why I have not been paid per my contract with your company.

18   I've been lied to repeatedly about this and want to hear

19   directly from you when I will be receiving my check."

20   Q.  What, if anything, did you do after you received this

21   message?

22   A.  I called Stormy.

23   Q.  What happened during that call?

24   A.  I determined --

25           MR. AVENATTI:  Objection.  Hearsay, your Honor.  It

M1VNAVE1                          Beier - Direct

1    calls for hearsay.

2                THE COURT:  Overruled.  You may answer.

3    A.  I'm sorry.  Can you ask the question again?

4    Q.  What happened during that call?

5    A.  Something in this text sparked me in a way that the

6    previous communications had not.  I think it was her saying

7    I've been lied to.  I called her, and in that conversation she

8    revealed it was the third payment, the payment on publication

9    that she had not received.

10               Now, enough time had passed.  I said to her, I'm 97

11   percent sure we paid that, but let me just confirm it and I

12   will call you no later than Monday and find out whether we had.

13   Then I called our accounts payable department and I determined

14   that we had paid that, as my memory had led me to believe.

15   Q.  What was your reaction when you came to understand that

16   Ms. Daniels was asking you about the third payment?

17   A.  I was surprised because we had paid it in September.

18   Q.  You mentioned that you confirmed that the third payment had

19   been made.  What did you do after that?

20   A.  I filled in Sally Richardson and my company and called Luke

21   Janklow as well.

22   Q.  And when you called Mr. Janklow, what did you tell him?

23   A.  I described this text and said I was confused, because we

24   had in fact paid the payment due on publication back in

25   September, and that was about all.

M1VNAVE1                          Beier - Direct

1   Q.  What, if any, expectations did you have about how that

2   information would be communicated to Ms. Daniels?

3   A.  I thought Luke would be in touch with her to figure out

4   what had happened with the payment.

5   Q.  Do you know whether the fourth payment was ever made to

6   Ms. Daniels?

7   A.  Yes.

8   Q.  Was it?

9   A.  Yes.

10          MR. ROHRBACH:  Let's now pull up for the witness

11  what's been marked for identification as Government Exhibit

12  106, just for the witness, please.

13  BY MR. ROHRBACH:

14  Q.  Do you recognize this document?

15  A.  I do.

16  Q.  What is it?

17  A.  It's a check request.

18  Q.  Is this a form you reviewed and approved?

19  A.  Yes.

20          MR. ROHRBACH:  Your Honor, the government offers

21  Government Exhibit 106, which was previously offered subject to

22  connection.

23          THE COURT:  Any objection?

24          MR. AVENATTI:  No.

25          THE COURT:  It is admitted.  As you know from the

1    other exhibits similar to this one, this is now fully in

2    evidence.

3               (Government Exhibit 106 received in evidence)

4               MR. ROHRBACH:  Mr. de Grandpre, if you would please

5    publish this for the jury.

6    BY MR. ROHRBACH:

7    Q.  Ms. Beier, what is this document?

8    A.  This is a check request for the last advance payment for

9    Full Disclosure.

10   Q.  You have used the word "check request."  How does St.

11   Martin's Press pay authors?

12   A.  We pay them through electronic bank transfers.

13   Q.  So is a check actually sent to authors, at least in this

14   case?

15   A.  No.  Not typically.  We still have old-fashioned forms, and

16   that's a leftover from the old days.

17   Q.  Directing your attention to the top right corner, what's

18   the date of the form?

19   A.  February 14, 2019.

20   Q.  And what's the title of the book?

21   A.  Full Disclosure.

22   Q.  Who is that payee name on the left?

23   A.  Janklow & Nesbit associates.

24   Q.  And do you see where it says "payment for"?

25               What does it say payment for?

M1VNAVE1                    Beier - Cross

1    A.  "Advance on other" -- and then handwritten next to it is

2    "six months."

3    Q.  And what does "six months" mean?

4    A.  That it -- this was the fourth payment on our contract with

5    Stormy Daniels due six months after publication of the book.

6    Q.  At the time this payment was paid, was St. Martin's Press

7    required to make this payment?

8    A.  We were not.

9    Q.  Why did you make it?

10   A.  Now, at this point we had published the book, and we were

11   basically paying a few weeks early.  At that point we knew we

12   were able to recoup some of this money through sales, and we

13   were willing to pay it a few weeks early.

14           MR. ROHRBACH:  If I may have a moment, your Honor.

15           No further questions.

16           THE COURT:  Cross-examination.

17   CROSS-EXAMINATION

18   BY MR. AVENATTI:

19   Q.  Ms. Beier, good morning.

20   A.  Good morning.

21   Q.  Did you -- strike that.  Did St. Martin's ever consider

22   withholding the fourth payment because Ms. Daniels had not done

23   adequate publicity?

24   A.  We did consider it.

25   Q.  When was it considered?

1    A.  It was considered often on -- from the end of October to

2    around Christmastime.

3    Q.  So for about two and a half months, correct?

4    A.  A little bit less.

5    Q.  The book was published on October 6, and by the end of

6    October St. Martin's was already considering not paying

7    Ms. Daniels the last payment because she had not done what she

8    was required to do.  True?

9    A.  Yes.

10   Q.  And do you recall having communications with Mr. Janklow

11   during that time period relating to the fact that St. Martin's

12   was considering not paying the fourth payment because

13   Ms. Daniels had not done what she was obligated to do?

14   A.  We may have mentioned it to him.  It was mostly internal

15   conversations.

16   Q.  Did St. Martin's ever send me or any of my law firms any

17   money, to the best of your knowledge?

18   A.  That's a tough one to answer.  Do you mean directly?

19   Q.  Ms. Beier, was there ever a wire transfer or an ACH or

20   anything of that nature from St. Martin's to an account

21   controlled by me or one of my entities?

22   A.  Not that I am aware of.

23   Q.  Did I ever ask St. Martin's to send me directly any money?

24   A.  No.

25   Q.  After the signing of the contract in April 2018, do you

M1VNAVE1                          Beier - Cross

1  recall any communications between me and St. Martin's relating

2  to money?

3  A.  No.

4  Q.  To the best of your knowledge, did I ever tell you or

5  anyone else at St. Martin's not to communicate with Ms. Daniels

6  or Mr. Nicks about money?

7  A.  You did not.

8  Q.  You were asked some questions about whether I, to your

9  knowledge, had ever threatened to sue St. Martin's.  Do you

10  recall that?

11  A.  I do.

12  Q.  You are not aware of the content of any communications that

13  I may have had with Mr. Janklow between late October of 2018

14  and February of 2019 relating to potentially taking action

15  against St. Martin's, are you?

16  A.  I am not.

17  Q.  So it is possible that those conversations may have

18  occurred, but you were not a party to them, true?

19           MR. ROHRBACH:  Objection.

20           THE COURT:  Sustained.

21  BY MR. AVENATTI:

22  Q.  Ms. Beier, one of the reasons why you and others at St.

23  Martin were considering for two and a half months not making

24  the last payment was because of what Ms. Daniels had failed to

25  do resulted in a disaster in the form of book sales, true?

1      MR. ROHRBACH:  Objection.

2      THE COURT:  Overruled.

3  A.  Can you repeat the question, please.

4  Q.  For two and a half months, there were internal

5  communications at St. Martin's about not making the last

6  payment because Ms. Daniels had not fulfilled her obligations,

7  which resulted in terrible book sales.  True?

8  A.  I would not use the word "terrible."  We did not think

9  there was enough publicity for the book.

10  Q.  Ms. Beier, as of the end of 2018, approximately how many

11  copies of the book had been sold?

12  A.  In all formats --

13      MR. ROHRBACH:  Objection.

14  A.  -- which is hardcover books, electronic books, and audio

15  books, around 40,000 copies of the book were sold.

16  Q.  How many copies had St. Martin's expected to sell of those

17  versions of the book during that time period immediately prior

18  to the book being released?

19      That's a terrible question.  Let me strike it and ask

20  a better one.

21      At the time the book was published in early October of

22  2018, how many copies of the book did St. Martin's expect to

23  sell?

24      MR. ROHRBACH:  Objection.

25      THE COURT:  Overruled.

M1VNAVE1                    Beier - Cross

A.   We expected to sell about four times as many as we did.

Q.   Which is how much?

A.   About 150,000 or so.

Q.   Is it your testimony that the expectation that St. Martin's

had for the total sales of the book in all forms -- hard copy,

audio, paperback, all forms -- was 150,000 copies?

A.   Expectations and true sales in publishing often diverge.

          MR. AVENATTI:  Move to strike, your Honor.

          THE COURT:  Denied.  Ask your next question.

BY MR. AVENATTI:

Q.   Ms. Beier, I am not asking you what often happens or -- let

me ask this question:  Oftentimes you have expectations for

sales of a book, and it far surpasses expectations, doesn't it?

A.   Yes.

Q.   And sometimes it falls short, correct?

A.   Yes.

Q.   And sometimes it falls woefully short, because it's a

disaster.  Right?  Sometimes that happens?

A.   It does sometimes happen.

Q.   Okay.  So is it your testimony that St. Martin's expects or

expected to sell a total of only 150,000 or 160,000 copies of

this book in all forms?

A.   160,000 isn't "only."  That's quite a lot.

Q.   Ms. Beier, did you ever have any communications with

Ms. Richardson about how terrible the book sales were?

1        MR. ROHRBACH:  Objection.

2        THE COURT:  Sustained.

3  BY MR. DALACK:

4  Q.  Ms. Beier, are you aware of any communications that

5  occurred within St. Martin's addressing how bad the book sales

6  were?

7        MR. ROHRBACH:  Objection.

8        THE COURT:  Sustained.

9  Q.  Ms. Beier, did you ever have any communications with

10 Mr. Janklow relating to the book sales?

11       MR. ROHRBACH:  Objection.

12       THE COURT:  Overruled.

13 A.  Yes.

14 Q.  What did you inform Mr. Janklow about the book sales and

15 when?

16 A.  We kept up a constant stream of information to Luke Janklow

17 about how the book was doing, both before publication in terms

18 of how many copies were going out to stores and week by week at

19 and after publication and discussed with him how we needed more

20 publicity to move the copies that were out in the marketplace.

21 Q.  Did you ever have any communications with Mr. Janklow

22 during which you voiced concerns about the book sales?

23 A.  Yes.

24 Q.  When did those communications take place?

25 A.  Those communications would have taken place about a week

1  after the book was published and for a few weeks afterwards.

2  Q.  The reason why the communications took place at that point

3  is because the month after a book is released is usually the

4  most important time for book sales, true?

5  A.  It depends on the book.

6  Q.  Generally that is true, is it not?

7  A.  Generally.

8  Q.  Okay.  And how many books sold during that time period of

9  Ms. Daniels' book?

10  A.  During that first month?

11  Q.  Yes.

12  A.  A large portion of that 40,000 copies sold.  I don't have

13  the figure sitting here today.

14  Q.  More or less than 20,000?

15  A.  More.

16  Q.  How many books -- well, strike that.  When St. Martin's

17  does an initial printing of a book, does it usually attempt to

18  gauge the demand for the book in deciding how many books to

19  print?

20           MR. ROHRBACH:  Objection.

21           THE COURT:  Overruled.

22  A.  There's a complicated answer to that question involving

23  what our retailers would like to sell, what we would like to

24  put out into the world, and what we perceive to be the demand

25  for the topic.

M1VNAVE1                    Beier - Cross

1  Q.  But for every book you print in advance of publication,

2  that is a cost to St. Martin.  True?

3  A.  Yes.

4  Q.  So St. Martin's strives not to overprint books because that

5  can cost St. Martin money generally.  Right?

6  A.  It's an industry issue that books are still returnable.  It

7  is a very unusual and not great thing in the publishing

8  business in general.  We as an industry do actually have to

9  overprint because the retailers can return books, often really

10  with no time limit, to get credit on their accounts.  And

11  though that's gotten somewhat better as sales have moved from

12  brick-and-mortar stores to online stores, it's still -- we

13  still assume that at least 35 to 40 percent of copies will be

14  returned.

15  Q.  My question is a little different, Ms. Beier.  Generally

16  speaking, St. Martin's attempts to only print in the first

17  printing the number of books it estimates it will sell.

18  Correct?

19  A.  No.

20  Q.  Okay.  How many books did St. Martin's print for the first

21  printing for Ms. Daniels' book?

22  A.  It was about 120,000 copies.

23  Q.  It wasn't 200,000 or 250,000?

24  A.  It was not.

25  Q.  How many copies of the book had to sell in order for

M1VNAVE1                         Beier - Cross

1    Ms. Daniels to get any money beyond the $800,000?

2    A.  I would have to do a back-of-the-envelope calculation, but

3    she would have had to sell over 100,000 copies.

4    Q.  Tell me what the calculation is.

5    A.  Actually it's somewhat more than that.  She would receive

6    roughly $4 a book in royalties.

7    Q.  Correct.  So --

8            THE COURT:  Sustained.  Ladies and gentlemen, let me

9    remind you that what Mr. Avenatti says when he is asking

10   questions of a witness is not evidence.  Only the witness'

11   testimony is evidence.

12           Please restrict yourself to questions, Mr. Avenatti.

13   BY MR. AVENATTI:

14   Q.  Ms. Beier, just to clarify for the jury, Ms. Daniels would

15   get credit at a rate of $4 per book, correct?

16   A.  That's per hardcover book.

17   Q.  Right.  So if Ms. Daniels sold or if the book sold 150,000

18   copies in hardcover, that amounts to $600,000, correct?

19   A.  Roughly, yes.

20   Q.  Okay.  So in order for her to get -- even with the $800,000

21   advance, she has to sell 200,000 copies in hardcover of the

22   book, correct?

23   A.  There are other sources of revenue for the book, including

24   foreign sales, which we controlled as the publisher, audio and

25   some other ancillary income.  So somewhat less than 200,000

M1VNAVE1                        Beier - Cross

1    hardcover books.

2    Q.  Can you approximate for me.  Is it between 150,000 and

3    200,000 hardcover books?

4    A.  With the income from the other sources of revenue, the

5    foreign publishers, etc., it would probably be closer to

6    150,000 copies.

7    Q.  As you sit here today, how many hardcover books have been

8    sold?

9    A.  I know it's 40,000 combined formats.  I can't remember what

10   the breakdown is for the hardcover.

11   Q.  So of the $800,000, Ms. Daniels has earned back about

12   $160,000, 40 times $4.  Is that correct?

13   A.  We call it recouping advance.  It's not really earning.

14   She's already earned the advance money.

15   Q.  So she's recouped about $160,000?

16   A.  I would have to look at royalty statements to be sure.

17   Q.  But that's a fair estimate?

18   A.  It's roughly accurate.

19   Q.  St. Martin's generally does not pay advances on a book that

20   they expect to be far greater than ultimately what the author

21   would be entitled to by way of royalties, true?

22              MR. ROHRBACH:  Objection.

23              THE COURT:  Sustained.  Let's move on to a new line of

24   questions, Mr. Avenatti.

25   BY MR. AVENATTI:

```
 1  Q.  Ms. Beier, the fact of the matter is, is it not, that St.

 2  Martin's lost a ton of money on this book?

 3          MR. ROHRBACH:  Objection.

 4          THE COURT:  Overruled.

 5  A.  We were very glad to do the book.  It happens quite a bit

 6  that we overpay.  It happens quite a bit that we spend money

 7  that we are not able to recoup.

 8          MR. AVENATTI:  Move to strike as nonresponsive.

 9          THE COURT:  Ms. Beier, just answer the question.  Is

10  it a fact that St. Martin's lost a ton of money on this book?

11          THE WITNESS:  We lost money on the book.

12  BY MR. AVENATTI:

13  Q.  You lost well over $600,000 on the book, didn't you?

14  A.  I would have to go back and look at a lot more data to see

15  what we actually lost.

16  Q.  Hundreds of thousands of dollars, right?

17  A.  I expect that is correct.

18  Q.  And the main reason why St. Martin's lost hundreds of

19  thousands of dollars was because Ms. Daniels did not do what

20  she was obligated to do.  Isn't that true?

21          MR. ROHRBACH:  Objection.

22          THE COURT:  Sustained.  Let's move on, please.

23  BY MR. AVENATTI:

24  Q.  Has St. Martin's ever withheld information relating to the

25  book sales from Ms. Daniels?
```

M1VNAVE1                         Beier – Cross

1                    MR. ROHRBACH:   Objection.

2                    THE COURT:   Overruled.

3    A.   No.

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. AVENATTI:

2    Q.  You're certain about that?

3          MR. ROHRBACH:  Objection.

4          THE COURT:  Sustained.

5    BY MR. AVENATTI:

6    Q.  Ms. Beier, if Ms. Daniels were to testify before this jury

7    that St. Martin's has withheld information from her relating to

8    the book sales, would that be true or untrue, to the best of

9    your knowledge?

10          MR. ROHRBACH:  Objection.

11          THE COURT:  Sustained.

12          MR. AVENATTI:  Your Honor, one moment, please?

13    Q.  Ms. Beier, in 2018 and 2019, what was your title at St.

14    Martin's?

15    A.  Executive editor.

16    Q.  And who did you report to?

17    A.  Our editor-in-chief.

18    Q.  And who was that?

19    A.  George Witte.

20    Q.  And who did George report to?

21    A.  At that time George reported to Jennifer Enderlin and Sally

22    Richardson as copublishers.

23    Q.  Sally Richardson, in 2018, 2019, what was her title?

24    A.  Copublisher.

25    Q.  She was senior to you by at least two levels, correct, in

M1vWave2                        Beier - Cross

1  seniority?

2  A.  Yes.

3  Q.  She was the head of St. Martin's, or cohead, is that fair

4  to say?

5  A.  Yes.

6  Q.  And who was John Karle?  I saw his name on one of the

7  exhibits, and we're going to -- I'm going to ask you some

8  questions about him, but for the benefit of the jury, who was

9  John Karle?

10  A.  John Karle is one of our publicists.  He's an associate

11  director of publicity at St. Martin's.

12  Q.  And is he junior to you or senior to you?

13  A.  He's in a different department, so it's not necessarily

14  relevant.

15  Q.  And who is Tracey Guest?

16  A.  Tracey Guest is our director of the publicity department.

17  Q.  Is Tracey senior or junior to John Karle?

18  A.  She is senior to John Karle.

19  Q.  Who dealt primarily with the publicity issues surrounding

20  the book; was that you, Ms. Richardson, Mr. Karle, or

21  Ms. Guest?

22  A.  It depends what kind of publicity issue it was.

23  Q.  Well, the issue of what Ms. Daniels was doing or not doing

24  in the area of publicity.

25  A.  We all had discussions about that.

M1vWave2                        Beier - Cross

1    Q.  In the fall of 2018, that was a fairly common topic of

2    discussion at St. Martin's, wasn't it?

3                MR. ROHRBACH:  Objection.

4                THE COURT:  Sustained.

5    BY MR. AVENATTI:

6    Q.  Ms. Beier, isn't it true that Mr. Karle and Ms. Guest were

7    primarily on point, as they say, as it related to dealing with

8    Ms. Daniels and Mr. Nicks about the publicity for the book?

9    A.  John Karle would be what I would describe as the

10   on-the-ground publicity person, making the bookings and dealing

11   with the author and her PR.

12   Q.  And what was Ms. Guest's role as it related to the

13   publicity for the book?

14   A.  She's the head of the publicity department, and we were all

15   very involved with this campaign.

16   Q.  Do you recall receiving an email from John Karle on October

17   9, 2018, informing you and Ms. Guest and Ms. Richardson as well

18   as Mr. Janklow that Ms. Daniels was refusing to do any more

19   press in connection with the book?

20               MR. ROHRBACH:  Objection.

21               THE COURT:  Overruled.

22   A.  I don't remember such an email.

23               MR. AVENATTI:  Can I have LJ2911 only for the witness.

24   Q.  Ms. Beier, please take a look at what we've showed you as

25   LJ2911, and my question is does this refresh your recollection

M1vWave2                    Beier - Cross

1    that, in fact, that is exactly what happened?

2    A.  I see the email.

3           THE COURT:  Ms. Beier, the question is looking at

4    what's on the screen, putting aside whatever it may be or

5    whatever it may say, does that refresh your recollection that

6    on October 9 you received an email from Mr. Karle stating that

7    Ms. Daniels was refusing to do any further press?

8           THE WITNESS:  Yes.

9    BY MR. AVENATTI:

10   Q.  And do you recall on that day Mr. Karle informed you that

11   he had received a text message from Mr. Nicks stating that

12   Ms. Daniels was not going to do any more press, the Don Lemon

13   interview had --

14          MR. ROHRBACH:  Objection, your Honor.

15          THE COURT:  Sustained.

16          Can you take this down, please.

17   BY MR. AVENATTI:

18   Q.  Ms. Beier, do you recall learning in early October of 2018

19   that Mr. Nicks had been fired by Ms. Daniels and that she was

20   refusing to do any more press to promote the book?

21          MR. ROHRBACH:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23   BY MR. AVENATTI:

24   Q.  Ms. Beier, isn't it true that in October of 2018,

25   Ms. Daniels, through Mr. Nicks, informed St. Martin's she would

M1vWave2                         Beier - Cross

1    not do any more press to promote the book, which had only come

2    out days earlier?

3              MR. ROHRBACH:  Objection.  Hearsay.

4              THE COURT:  Sustained.

5    BY MR. AVENATTI:

6    Q.  Ms. Beier, did you learn in October of 2018 --

7              THE COURT:  Sustained.

8              Move on, Mr. Avenatti.

9    BY MR. AVENATTI:

10   Q.  In 2018 -- strike that.

11        I believe you stated in 2018, you had no direct role in the

12   negotiation of the book deal.  Am I right about that?

13   A.  I was not the primary negotiator for the book.

14   Q.  The primary negotiator was Ms. Richardson, correct?

15   A.  Yes.

16   Q.  And you understood that I dealt predominantly, at least as

17   it related to St. Martin's, with Ms. Richardson, right?

18   A.  There were a number of people working in different

19   configurations.

20   Q.  I'm talking about the book negotiation.  You and I did not

21   deal with one another at that time, did we?

22   A.  No.

23   Q.  I dealt, to the best of your knowledge, with Ms. Richardson

24   as it related to the book deal, the head of St. Martin's, true?

25             MR. ROHRBACH:  Objection.

M1vWave2                         Beier - Cross

1          THE COURT:  I don't want you to testify as to what

2     someone else told you, so only if you know firsthand that Mr.

3     Avenatti dealt directly with Ms. Richardson, you should say yes

4     or no.  But if you don't know or you know only based on what

5     someone else told you, just say you don't know.

6          With that instruction, you may answer the question.

7     A.  I don't know.

8     Q.  Do you recall that at one point during the negotiations,

9     St. Martin's had proposed that the first payment, instead of

10    going directly to Ms. Daniels, would be placed in an escrow

11    account and held until she had done certain things in

12    connection with the book?

13         MR. ROHRBACH:  Same objection, your Honor.

14         THE COURT:  Sustained.

15    BY MR. AVENATTI:

16    Q.  Ms. Beier, I believe you testified on direct that while you

17    did not have any direct involvement in the negotiation, you

18    were involved behind the scenes as it related to advising

19    Ms. Richardson and others.  Am I correct about that?

20    A.  It was a group conversation more than an advising role.

21    Q.  And you were part of this group, correct?

22    A.  Yes.

23    Q.  Did you ever propose that the first payment be put into

24    escrow?

25    A.  I did not.

M1vWave2                        Beier - Cross

1    Q.  Did St. Martin's ever propose that?

2              MR. ROHRBACH:  Objection.

3              THE COURT:  Again, if you know firsthand, not based on

4    what someone may or may not have told you.

5              MR. AVENATTI:  It's not offered for the truth, your

6    Honor.

7              THE COURT:  I understand.

8              Ms. Beier, if you know firsthand, you may answer.

9    Otherwise, say you don't know.

10             THE WITNESS:  I don't.

11   BY MR. AVENATTI:

12   Q.  One other question about this publicity issue.  Do you

13   recall in 2018 Ms. Daniels canceling various publicity events

14   for the book because on one day she wanted to get her nails

15   done?

16   A.  I recall an interview having to be moved.

17   Q.  Because she wanted to get her nails done, correct?  Yes or

18   no.

19   A.  You told me that.

20   Q.  So that would be yes?

21   A.  Yes.

22             THE COURT:  Ladies and gentlemen, I'm going to

23   instruct you that you may not consider the fact that Mr.

24   Avenatti told Ms. Beier that for its truth, merely for the fact

25   that Mr. Avenatti said it and for her state of mind, but not

M1vWave2                           Beier - Cross

1   for the truth of whether that's what happened or not.

2   BY MR. AVENATTI:

3   Q.  Ms. Beier, is it fair to say that in 2018 and 2019 you had

4   very little visibility, if any visibility, into what was going

5   on between me and Mr. Janklow and Ms. Daniels?

6           MR. ROHRBACH:  Objection.

7           THE COURT:  Overruled.

8   A.  Can you be more specific?

9   Q.  Let me see if I can rephrase the question.

10      Ms. Beier, you don't know what communications I had with

11  Ms. Daniels during that time period, do you?

12  A.  Some of them I was a part of, so those, yes.

13  Q.  OK.  The ones that you were not a part of, you don't know

14  what was being communicated between me and Ms. Daniels, do you?

15  A.  No.

16  Q.  And you don't know what was being communicated between Mr.

17  Janklow and I unless you were a party to them, do you?

18  A.  Not unless I was in the conversation.

19  Q.  And you don't know what communications were taking place

20  between Mr. Janklow and Ms. Daniels, do you?

21  A.  No.

22  Q.  Ms. Beier, during 2018, was I an active participant in

23  getting the book published?

24  A.  Yes.

25  Q.  What do you recall me doing in connection with ensuring

1  that this book got published?

2  A.  You wrote a foreword to the book.  You were involved in

3  looking at the manuscript and giving feedback.

4  Q.  I conducted a legal review of the book, correct?

5  A.  Yes.

6  Q.  I communicated with you consistently in 2018 about the

7  book, did I not?

8  A.  We communicated.

9  Q.  We communicated often, did we not?

10  A.  Not as often as I would have liked.

11  Q.  Well, did you ever send me an email or any request to have

12  further communication with me that you did not get?

13  A.  Yes.

14  Q.  Did you ever call me and Mr. Janklow in August of 2018,

15  quote, great partners?

16          MR. ROHRBACH:  Objection.

17          THE COURT:  Overruled.

18  A.  I don't remember that.

19  Q.  We'll come to that in a minute.  Here's my next question.

20      On July 24, 2018, isn't it true that you thanked me and Mr.

21  Janklow for, quote, all the time and attention today and in

22  general on the book?

23          MR. ROHRBACH:  Objection.

24          THE COURT:  Sustained.

25          MR. AVENATTI:  Not offered for the truth, your Honor.

M1vWave2                      Beier - Cross

1    State of mind.

2              THE COURT:  Sustained.

3    BY MR. AVENATTI:

4    Q.  Ms. Beier, isn't it true that on July 24, 2018, you sent an

5    email to me and you thanked me for all the time and

6    attention --

7              THE COURT:  Sustained.

8              Next line of questioning, please.

9    BY MR. AVENATTI:

10   Q.  Ms. Beier, do you recall that in late July, 2018, St.

11   Martin's was attempting to finalize the book for publication?

12   A.  Yes.

13   Q.  And do you recall sending a draft of the book to me for

14   review?

15   A.  I do.

16   Q.  And did I conduct that review of the book and provide

17   changes to the book?

18   A.  You did.

19   Q.  Around that same time period, St. Martin's requested that I

20   have a call with St. Martin's legal counsel concerning the book

21   and some potential legal issues, isn't that true?

22   A.  Yes.

23   Q.  Now, Ms. Beier, at the time that this book was being

24   prepared, you were aware that there was sensitivity or

25   sensitivities concerning the book and when it would be

1   published because Ms. Daniels was in the middle of a lawsuit

2   against the President, isn't that true?

3   A.  Yes.

4   Q.  And in fact, that was something that you learned even

5   before the contract was signed, isn't that right?

6   A.  Yes.

7   Q.  St. Martin's was on notice that the release of this book

8   had to be second to the lawsuit that had been filed, is that

9   accurate?

10          MR. ROHRBACH:  Objection.

11          THE COURT:  Sustained.

12  BY MR. AVENATTI:

13  Q.  What was your understanding, Ms. Beier, as to what the

14  lawsuit had to do with the content and release of the book?

15          MR. ROHRBACH:  Objection.

16          THE COURT:  Sustained.

17          Next line.

18  BY MR. AVENATTI:

19  Q.  You were asked some questions about the book cover on

20  direct.  Do you recall that?

21  A.  I do.

22  Q.  And in late July of 2018, there was quite a lot of drama

23  surrounding this cover, wasn't there?

24  A.  We had disagreements about the cover.

25  Q.  When you say we had disagreements, what do you mean?

M1vWave2                              Beier - Cross

1   A.  There were a lot of discussions about the cover internally

2   and also with you and with Luke and with the author.

3   Q.  And Ms. Beier, St. Martin's, and Mr. Janklow and me at the

4   time all agreed on the cover, true?

5            MR. ROHRBACH:  Objection.

6            THE COURT:  Overruled.

7   A.  Can you be more specific about what you mean?

8   Q.  Well, Ms. Beier, do you recall that in the end of July of

9   2018, St. Martin's, Mr. Janklow, and myself were all in

10  agreement relating to what the cover should look like?

11  A.  It was a complicated process.  We had one we thought would

12  be a good cover.

13  Q.  When you say we had one, you mean St. Martin's?

14  A.  St. Martin's, yes.

15  Q.  And do you recall that Mr. Janklow and I agreed with St.

16  Martin's?

17  A.  I do.

18  Q.  And St. Martin's was enthusiastic about that cover, weren't

19  they?

20  A.  We thought it would work.

21  Q.  And the cover that was proposed was a mug shot picture of

22  Ms. Daniels, right?

23  A.  Yes.

24  Q.  And in fact, at one point, you described that idea as,

25  quote, a genius idea?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              MR. ROHRBACH:  Objection.

 2   Q.  Did you not?

 3              THE COURT:  Sustained.

 4   BY MR. AVENATTI:

 5   Q.  Ms. Beier, did you believe, in late July of 2018, that

 6   using the mug shot was a genius idea?

 7              MR. ROHRBACH:  Objection.

 8              THE COURT:  Sustained.

 9   BY MR. AVENATTI:

10   Q.  Why was St. Martin's proposing to use the mug shot?

11              MR. ROHRBACH:  Objection.

12              THE COURT:  Sustained.

13   BY MR. AVENATTI:

14   Q.  Ms. Beier, do you know who came up with the idea to use the

15   mug shot?

16              MR. ROHRBACH:  Objection.

17              THE COURT:  Sustained.

18   BY MR. AVENATTI:

19   Q.  Now, ultimately, Ms. Daniels refused to allow St. Martin's

20   to use that cover, true?

21              MR. ROHRBACH:  Objection.

22              THE COURT:  Overruled.

23   A.  True.

24   Q.  And that resulted in a scramble in an attempt to figure out

25   what the cover was going to look like, didn't it?
```

M1vWave2                       Beier - Cross

1    A.  We were already scrambling.

2    Q.  Well, it resulted in an additional scramble, didn't it?

3    A.  Yes.

4    Q.  And one of the reasons why it resulted in an additional

5    scramble was because Ms. Daniels was insisting on using a

6    particular photographer as it related to the book cover, do you

7    recall that?

8    A.  I recall that she preferred a photographer.  The main

9    reason we were scrambling was just the schedule, just the

10   schedule of how long it takes to print these books and the fact

11   that the covers are printed before the insides of the books.

12   Q.  Now, ultimately, a cover was agreed upon, right?

13   A.  Yes.

14   Q.  And then do you recall in August of 2018 Ms. Daniels

15   refused to record the audio for the book, the audio version,

16   citing a scheduling difficulty?

17   A.  I remember we had trouble scheduling.  I do not recall her

18   refusing to record the audio.

19   Q.  Well, did she ever record any audio for her own book?

20   A.  No.

21   Q.  Instead, St. Martin's had to go out and pay somebody to

22   record what St. Martin's wanted Ms. Daniels to record, right?

23   A.  We would have preferred to have Ms. Daniels record the

24   book, but we often do turn to professional readers.

25           MR. AVENATTI:  Move to strike, your Honor, as

1   nonresponsive.

2              THE COURT:  Denied.

3   BY MR. AVENATTI:

4   Q.  Ms. Beier, St. Martin's, because Ms. Daniels would not

5   record the book, had to go out and pay somebody else to record

6   the book, is that true?

7              MR. ROHRBACH:  Objection.

8              THE COURT:  Just yes or no.

9              THE WITNESS:  I'm sorry.  I didn't hear you.

10             THE COURT:  You can answer.  Just yes or no.

11  A.  We did pay someone.

12  Q.  So yes?

13  A.  Yes.

14  Q.  But the foreword to the book was not recorded by that same

15  person, was it?

16  A.  No.

17  Q.  Who wrote the foreword to the book?

18  A.  You did.

19  Q.  Who took the time to record the foreword of the book?

20             MR. ROHRBACH:  Objection.

21             THE COURT:  Overruled.

22  A.  You recorded the audio of the foreword.

23             THE COURT:  Mr. Avenatti, how much longer do you think

24  you have?

25             MR. AVENATTI:  Probably about 30 or 45 minutes, your

M1vWave2                          Beier - Cross

 1 | Honor.

 2 |         THE COURT:  OK.  Carry on.

 3 | BY MR. AVENATTI:

 4 | Q.  Now, Ms. Beier, in October of 2018, do you recall that

 5 | there was an epilogue that was drafted to be included in the

 6 | book?

 7 | A.  I do.

 8 | Q.  Please tell the jury what an epilogue is, generally.

 9 | A.  An epilogue is usually a very short piece of a book that

10 | comes after the main body of the book.

11 | Q.  And do you recall that this epilogue had to be reviewed --

12 | had to undergo a legal review?

13 | A.  Yes.

14 | Q.  And do you recall that I was involved in that process?

15 | A.  I do.

16 | Q.  Do you recall that in August of 2018, St. Martin's thanked

17 | me and Mr. Janklow for all of our continuing hard work at this

18 | stage of the game?

19 |         MR. ROHRBACH:  Objection.

20 |         THE COURT:  Sustained.

21 | BY MR. AVENATTI:

22 | Q.  Ms. Beier, did you thank me in August of 2018 for all of my

23 | continuing hard work?

24 |         MR. ROHRBACH:  Objection.

25 |         THE COURT:  Sustained.

M1vWave2                        Beier - Cross

1    BY MR. AVENATTI:

2    Q.  Did you state -- strike that.

3        In August of 2018, were you of the belief that St. Martin's

4    had genuine partners in Mr. Janklow and I in every way on the

5    book and its publication?

6             MR. ROHRBACH:  Objection.

7             THE COURT:  Sustained.

8    BY MR. AVENATTI:

9    Q.  Ms. Beier, did you communicate that to me --

10            THE COURT:  Sustained.  Move on, please.

11   BY MR. AVENATTI:

12   Q.  Let me show you what is marked as LJ1678.

13            MR. AVENATTI:  Only for the witness.

14   Q.  Ms. Beier, do you see that?

15   A.  I do.

16   Q.  What is this?

17   A.  It's an email from me to you and to Luke Janklow.

18   Q.  And what is the date?

19   A.  August 10, 2018.

20   Q.  And does this email relate to the book, including the work

21   I was doing on the book?

22   A.  I would have to read the email, quickly.

23   Q.  Well, take a moment.

24   A.  Yes.

25   Q.  And you sent this email on or about that date, correct?

M1vWave2                    Beier - Cross

1    A.  On August 10, 2018.

2    Q.  Yes?

3    A.  Yes.

4           MR. AVENATTI:  Your Honor, the defense offers LJ1678

5    into evidence.

6           MR. ROHRBACH:  Objection.

7           THE COURT:  Sustained.

8    BY MR. AVENATTI:

9    Q.  Now, Ms. Beier, in this email --

10          THE COURT:  Sustained.

11          MR. ROHRBACH:  Objection.

12          THE COURT:  Sustained.

13          Move on, please.

14          Take the email down off the screen.

15          Thank you.

16   BY MR. AVENATTI:

17   Q.  Let me show you what has been marked as LJ1970.

18       Can you see that, Ms. Beier?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's an email from me to you and to Luke Janklow.

22   Q.  And did you send this email on or about August 13, 2018?

23   A.  I did.

24   Q.  And does the email relate to the book and the work that I

25   did on the book?

M1vWave2                        Beier - Cross

1    A.  The email relates to the book.

2    Q.  And it also relates to some of the work that I did, does it

3    not?

4    A.  I would have to read through it.

5    Q.  Please take a moment.

6    A.  OK.

7    Q.  The email relates to the book and some of the work I did on

8    the book, does it not?

9    A.  It relates to the book, and I was making sure you and Luke

10   were OK with our going to press.

11   Q.  And you thanked me for getting us --

12              MR. ROHRBACH:  Objection.

13              THE COURT:  Sustained.

14   Q.  -- to goal here, correct?

15              THE COURT:  Move on, Mr. Avenatti.

16   BY MR. AVENATTI:

17   Q.  Ms. Beier, did you thank me in August of --

18              MR. ROHRBACH:  Objection.

19              THE COURT:  Mr. Avenatti, sustained.  Move on.

20              Can I see counsel and Mr. Avenatti at sidebar, please.

21              (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At sidebar)

2          THE COURT:  No. 1, if you continue to do what I warned

3     you about last week -- namely, ask questions again after I

4     sustain objections to them, changing two or three words -- I'm

5     going to tell you to sit down and I'm going to admonish you in

6     front of the jury, so do not do that.

7          No. 2, I have allowed you an excess of time to develop

8     that you did a lot of work on the book, that you were a partner

9     on the book.  This witness's subjective belief that you were a

10    good partner or bad partner is not relevant to any issues in

11    this case.  I'm not convinced at this point that the amount of

12    work you did on the book is relevant to any issues in the case,

13    but I certainly allowed you to develop the record on it.  I

14    think we are going well over any --

15         I just don't understand what you're doing at this

16    point, so you're going to have to explain why you have another

17    half an hour with this witness when I think you've developed

18    the record on the points that you need to make or are entitled

19    to make through her.  Frankly, it's more than you really should

20    be allowed.

21         MR. AVENATTI:  Your Honor, a few points.

22         No. 1, on direct, the government elicited testimony

23    from the witness that I was to blame for the lack of publicity

24    about this book --

25         THE COURT:  And you have --

M1vWave2                    Beier - Cross

 1              MR. AVENATTI:  -- suggesting --

 2              THE COURT:  And you have discussed that with her and

 3    certainly made your record that Ms. Daniels didn't do what she

 4    was expected to do.  Whether that's because of you or

 5    Ms. Daniels, I'm not sure is clear.

 6              MR. AVENATTI:  Well, we're going to get to that

 7    because there's actually an email that clarifies that point,

 8    and I think that's important.

 9              So that's No. 1.  I'm responding to the testimony the

10    government elicited.

11              No. 2, the amount, quality, and quantity of the work

12    that I did on this book and in general, in my view, as I've

13    stated, is highly relevant to this case.  It's not enough to

14    just simply say, oh, he did a lot of work.  I believe I'm

15    entitled to develop, through this witness, exactly what I did,

16    when I did it, whether the publisher was satisfied with it or

17    not, and what my role was in connection with this book, because

18    I think it goes directly to whether I had a reasonable belief

19    that I was entitled to a fee and whether I was entitled to a

20    fee by law, under the law of California.

21              So that is why I'm getting into this area, your Honor.

22    That is why I'm marching through what transpired in 2018.

23              THE COURT:  OK.  We'll discuss the broader issues

24    later.  I'm inclined to think the government is probably

25    correct that unless you take the stand and testify to your

1    subjective belief, that all of this evidence is irrelevant and

2    I'll probably tell the jury that it should disregard it, but

3    we'll see about that and we'll see if you testify.

4        In any event, I think you have had an adequate

5    opportunity to develop the record that you did a substantial

6    amount of work on it.  Perhaps I'll let you ask some additional

7    questions about your role in trying to get her to do publicity,

8    because the government did go there on direct; I'll concede

9    that point.  But I think that you are simply not entitled to

10   lard the record in this case with irrelevant issues and the

11   particulars of every single email you sent and every single

12   thing you did on the book.  The record is very well developed

13   that you did a lot of work on this book.  All right?

14       I think you have plenty of materials to work with on

15   that score, and if the jury believes you that you had a

16   reasonable belief in that, then I think you have enough to

17   argue on that basis.  But I just don't -- there are 403 issues,

18   there are 401 issues.  It's not --

19       Anything the government wants to say or add?

20       MR. ROHRBACH:  Nothing else, your Honor.

21       MR. AVENATTI:  Your Honor, the only, last thing I will

22   add is there are hundreds of communications about this book

23   with --

24       THE COURT:  And they're not coming in at this trial.

25       MR. AVENATTI:  -- Mr. Janklow.

M1vWave2                              Beier – Cross

1           I understand, but I want the record to be clear that

2   we have culled down hundreds of communications to a couple

3   hand, maybe four handfuls of communications out of hundreds,

4   because there was an enormous amount of work done.

5           THE COURT:  And I think the record is pretty clear and

6   well developed on that.  I'll let you ask her some questions

7   about your role in the publicity in an effort to impeach the

8   government's evidence that you were at fault for that.  I think

9   that's the last line, and then we'll bring this to a close.

10  All right?

11          MR. AVENATTI:  Thank you.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  All right.  Sorry for the interruption,

3    ladies and gentlemen.

4    BY MR. AVENATTI:

5    Q.  Ms. Beier, do you recall in September of 2018 that there

6    was a leak of the book before it was published?

7    A.  I do.

8    Q.  And what happened in connection with the leak?

9    A.  Can you be more specific?

10   Q.  Well, can you inform the jury generally what happened as it

11   related to this leak?

12          MR. ROHRBACH:  Objection.  Vague, your Honor.

13          THE COURT:  Overruled.

14   A.  As I talked about on Friday, we were just trying to keep

15   the contents of the book and even the fact of the book for a

16   while very quiet, and some -- somebody had gotten an early copy

17   of the book and there had been a little bit of press that came

18   out before we published.  That was the leak.

19   Q.  A copy had made its way into the press and was reported on,

20   fair?

21   A.  Fair.

22   Q.  And how did Ms. Daniels react to that?

23          MR. ROHRBACH:  Objection, your Honor.

24          THE COURT:  Overruled.

25   A.  I don't remember.

1   Q.  Do you recall Ms. Daniels being extremely upset and not

2   understanding how a leak had occurred?

3   A.  I don't remember that.

4   Q.  Do you have a recollection of an event, a book signing that

5   had been established at the Museum of Sex here in New York?

6   A.  I do.

7   Q.  And Ms. Daniels was to appear at the Museum of Sex -- well,

8   strike that.

9       An appearance at the Museum of Sex to sign the books was

10  Mr. Janklow's idea.  Do you recall that?

11  A.  I don't remember whose idea it was.

12  Q.  Was it St. Martin's idea, to the best of your knowledge?

13              MR. ROHRBACH:  Objection.

14              THE COURT:  If you know firsthand.

15              THE WITNESS:  I'm sorry.  Were you speaking to me?

16              THE COURT:  If you know firsthand whose idea it was,

17  you may --

18  A.  I don't remember whose idea that was.

19  Q.  Were you involved in monitoring this appearance at the

20  Museum of Sex?

21  A.  I attended the signing.

22  Q.  Was Ms. Daniels on time for the signing?

23  A.  I don't remember.

24  Q.  Isn't it true that Ms. Daniels was about two hours late for

25  that signing?

M1vWave2                        Beier – Cross

```
 1               MR. ROHRBACH:  Objection, your Honor.

 2               THE COURT:  Sustained.

 3    BY MR. AVENATTI:

 4    Q.  Did you ever have any communications with Mr. Janklow or

 5    anyone else relating to Ms. Daniels not fulfilling her

 6    obligation as it related to signing or showing up on time for

 7    the Museum of Sex event?

 8               MR. ROHRBACH:  Objection.

 9               THE COURT:  Sustained.

10    BY MR. AVENATTI:

11    Q.  Ms. Beier, you testified on direct, on Friday, that the

12    lack of publicity was my fault.  Do you recall that?  Yes or

13    no.

14    A.  That's not the way I would put it.

15    Q.  OK.  Do you recall that in September of 2018 there was a

16    belief within St. Martin's that Ms. Daniels was blowing it with

17    her publicity attitude?

18               MR. ROHRBACH:  Objection.

19               THE COURT:  If you know.

20               THE WITNESS:  I'm sorry.  I didn't hear you.

21               THE COURT:  If you know, you can answer.

22    A.  We would never have described it that way, no.

23               MR. AVENATTI:  Can I please have jsdny_001000144 for

24    the witness.

25    Q.  Ms. Beier, can you see that document?
```

1   A.  I do.

2              MR. AVENATTI:  Your Honor, we offer this under 613.

3              MR. ROHRBACH:  Objection.

4              THE COURT:  Sustained.

5   BY MR. AVENATTI:

6   Q.  Ms. Beier, do you recall having communications with

7   Ms. Richardson in September 2018 relating to the fact that

8   Ms. Daniels was blowing the book sales -- strike that.

9       Do you recall having communications with Ms. Richardson in

10  had September of 2018 relating to the fact that Ms. Daniels was

11  responsible for the lack of publicity?

12             MR. ROHRBACH:  Objection.

13             THE COURT:  Sustained.

14  BY MR. AVENATTI:

15  Q.  Did you understand, in September and October of 2018, that

16  Ms. Richardson, the head of St. Martin's, believed that

17  Ms. Daniels was blowing the book sales as a result of her

18  attitude?

19             MR. ROHRBACH:  Objection.

20             THE COURT:  Sustained.

21  BY MR. AVENATTI:

22  Q.  Do you recall St. Martin's, in September of 2018, being

23  concerned about Ms. Daniels's approach to the publicity?

24  A.  We were concerned we didn't have enough publicity lined up.

25  She had not started to do anything yet, so we had not seen her

1    do publicity for the book except for, maybe, one -- sitting for

2    one interview.

3    Q.  Do you recall that Mr. Nicks was the individual that St.

4    Martin's was interfacing with relating to the day-to-day

5    publicity for the book?

6    A.  Yes.

7    Q.  How was the book announced?

8    A.  The book was announced on the television show The View.

9    Q.  Who set that up?

10   A.  You did.

11          MR. AVENATTI:  Nothing further at this time.

12          THE COURT:  Redirect.

13          MR. ROHRBACH:  Very briefly.

14   REDIRECT EXAMINATION

15   BY MR. ROHRBACH:

16   Q.  Ms. Beier, do you recall being asked questions on

17   cross-examination about the book sales?

18   A.  Yes.

19   Q.  Are poor book sales a reason for St. Martin's Press to

20   withhold payment of the advance?

21   A.  They are not.

22   Q.  Did St. Martin's Press actually withhold any payments of

23   the advance?

24   A.  We did not.

25   Q.  Did St. Martin's Press pay any of the payments early?

M1vWave2                        Beier - Redirect

1    A.  Yes, we did.

2    Q.  Which payments?

3    A.  We paid the --

4              MR. AVENATTI:  Outside the cross, your Honor.

5              THE COURT:  Sustained.

6    BY MR. ROHRBACH:

7    Q.  Did St. Martin's Press pay any payments early in order to

8    encourage Ms. Daniels to participate in more publicity?

9              MR. AVENATTI:  Leading.

10             THE COURT:  All right.  Sustained, but I will actually

11   allow the last question that I had sustained, so go back and

12   ask that one again.

13   BY MR. ROHRBACH:

14   Q.  Which, if any, payments did St. Martin's Press pay early?

15   A.  We paid the second, third, and fourth payments early.

16   Q.  Why did St. Martin's Press pay the third payment early?

17             MR. AVENATTI:  Objection.  Outside the scope, your

18   Honor.

19             THE COURT:  Overruled.

20   A.  We wanted to keep the author engaged with the process of

21   publishing.

22   Q.  And what specifically do you mean by keep the author

23   engaged with the process of publishing?

24   A.  We wanted her time and attention on the publicity relating

25   to the book.

M1vWave2                        Beier - Redirect

1  Q.  What was St. Martin's Press's understanding of who would

2  receive the third payment?

3  A.  Ultimately, the author would receive the third payment.

4  Q.  Did St. Martin's Press expect that payment to go to the

5  defendant?

6           MR. AVENATTI:  Objection, your Honor.  Speculation.

7  401.

8           THE COURT:  Overruled.

9  BY MR. ROHRBACH:

10 Q.  Did St. Martin's Press expect the third payment to go to

11 the defendant?

12 A.  No.

13          MR. ROHRBACH:  No further questions.

14          THE COURT:  All right.  Ms. Beier, you may step down,

15 and you're excused at this time.

16          THE WITNESS:  Thank you.

17          THE COURT:  Please put your mask on before you leave

18 the box.

19          (Witness excused)

20          THE COURT:  Government, please call your next witness.

21          MR. PODOLSKY:  Thank you, your Honor.

22          The government calls Shamel Medrano.

23 SHAMEL MEDRANO,

24      called as a witness by the government,

25      having been duly sworn, testified as follows:

M1vWave2                          Medrano - Direct

```
 1              THE COURT:  You may proceed.

 2    DIRECT EXAMINATION

 3    BY MR. PODOLSKY:

 4    Q.  Good morning, Mr. Medrano?

 5    A.  Good morning.

 6    Q.  Where do you work?

 7    A.  At the U.S. Attorney's Office in the Southern District of

 8    New York.

 9    Q.  What is your title?

10    A.  I'm an investigative analyst.

11    Q.  How long have you been an investigative analyst with the

12    U.S. Attorney's Office?

13    A.  Approximately two years and a half.

14    Q.  What did you do prior to joining the United States

15    Attorney's Office?

16    A.  I worked at the Bronx District Attorney's Office.

17    Q.  And what did you do there?

18    A.  I was an intelligence analyst and a trial prep assistant.

19    Q.  Let's focus on your current position.  What are your duties

20    as an investigative analyst at the United States Attorney's

21    Office?

22    A.  I assist special agents and assistant United States

23    attorneys in the course of their investigation.

24    Q.  And what types of crime do you assist in investigation of?

25    A.  White collar crimes, financial crimes, violent crimes.
```

1    They vary.

2    Q.  Why don't we focus on the white collar, financial crime.

3    Can you explain generally what techniques you use in the course

4    of your participation in those kinds of investigations?

5    A.  We typically -- well, I typically review records, including

6    emails, bank records, text messages, social media.

7    Q.  And generally, how do you obtain the documents that you

8    review and analyze in the course of your investigation?

9    A.  Through search warrants and subpoenas, court orders.

10   Q.  Let's focus on your work on this case.  What role, if any,

11   have you had in the preparation for this trial?

12   A.  I assisted in preparing a timeline of an event -- of

13   events.

14   Q.  And generally, what is contained in that timeline of

15   events?

16   A.  That timeline of events has a various number of events that

17   took place throughout a time period.  Within that time are text

18   messages, emails, financial transactions.

19   Q.  Were you involved in the investigation leading to charges

20   in this case?

21   A.  No.

22   Q.  Did you review all of the emails and other evidence

23   collected during this investigation?

24   A.  No.

25   Q.  Who provided you with the documents that you did review in

1    preparing the timeline?

2    A.  The assigned investigator.

3    Q.  Now, do you have in front of you a binder of government

4    exhibits?

5    A.  Yes, I do.

6    Q.  And what is contained in that binder?

7    A.  These are the exhibits I reviewed in order to confirm the

8    accuracy of the events on the timeline.

9    Q.  Were the records you reviewed voluminous?

10   A.  Yes, they were.

11   Q.  To your understanding, do they constitute only a portion of

12   the documents and records uncovered during the investigation

13   leading to this case?

14   A.  Yes.

15              MR. PODOLSKY:  If we could put up for the witness and

16   the parties what has been marked for identification as

17   Government Exhibit 804.

18   Q.  Mr. Medrano, do you recognize this document?

19   A.  Yes.

20   Q.  What is it?

21   A.  This is the timeline of the events I assisted in creating.

22              MR. PODOLSKY:  Your Honor, at this time the government

23   offers into evidence Government Exhibit 804.

24              THE COURT:  Subject to our previous discussion, any

25   further objections?

1              MR. AVENATTI:  I believe it's subsumed, but hearsay,

2      your Honor.

3              THE COURT:  All right.  Overruled.  Admitted.

4              (Government Exhibit 804 received in evidence)

5              THE COURT:  Ladies and gentlemen, this chart is not

6      technically in evidence.  It's merely a graphic demonstration

7      of the underlying evidence that Mr. Medrano has referenced and

8      may expand upon.  The jury should determine for yourselves

9      whether the chart fairly and accurately summarizes the

10     underlying evidence and ultimately what weight, if any, to give

11     to the chart.

12             With that, Government Exhibit 804 is admitted.

13             MR. PODOLSKY:  Thank you.

14             If we could pull that up for the jury as well now.

15     Great.

16     Q.  Now that we're all looking at it, Mr. Medrano, can you

17     describe what's contained in this exhibit?

18     A.  Correct.  In this exhibit are text messages and some

19     financial transactions.  There's also -- in the middle there's

20     also a sort of indicator that indicates the date and time of

21     these events.

22     Q.  All right.  Let me ask you some questions about how to read

23     the chart, and then maybe we'll take just a couple of examples

24     to help us learn how to use it.

25             The first question is what time period does this chart

M1vWave2                          Medrano - Direct

1    cover?

2    A.  This is in Eastern Standard Time -- oh, I'm sorry.  The

3    time period is from July 2018 to February 2019.

4    Q.  OK.  I think you've -- why don't I go there, to the point I

5    think you were going to make.

6        Do you see in the middle of the chart there's a bar that

7    contains dates and times?

8    A.  Yes.

9    Q.  Can you explain what that portion of the chart is?

10   A.  That portion of the chart indicates the dates that the

11   events you see above or below are taking place on.  There's

12   also a time to indicate the first time of day -- well, the

13   earliest time of day that the first event took place.  So you

14   might see two word bubbles below one of those times or dates.

15   However, it might -- that specific time might only be

16   indicating to only word bubble, which would be the highest one

17   or the -- yeah, the highest one.

18   Q.  All right.  I'm going to ask you about the bubbles in a

19   moment, but you referenced this a second ago.  What time zone

20   are the time stamps portrayed in?

21   A.  In Eastern Standard Time.

22   Q.  Now, were all the records in this case in Eastern Time when

23   you reviewed them?

24   A.  No.

25   Q.  Were some records in West Coast time?

1  A.  Yes.

2  Q.  What did you do when you got a record in West Coast time?

3  A.  What I did is I went ahead and I converted it to Eastern

4  Standard Time, which would have been three hours ahead.

5  Q.  And were some records in what's known as Coordinated

6  Universal Time, or UTC?

7  A.  Yes.

8  Q.  What is the difference between UTC and Eastern Time?

9  A.  We are five hours -- Eastern Standard Time is five hours

10  behind.

11  Q.  Is that true at all times of the year?

12  A.  No.  During Daylight Savings it's four hours.

13  Q.  And what did you do with any records you observed were UTC?

14  A.  I also went ahead and corrected it and set it to Eastern

15  Standard Time.

16  Q.  All right.  First of all, we're just looking at the first

17  page.  Is this a multipage document?

18  A.  Yes, it is.

19  Q.  OK.  Let's start with the first page.  Do you see that

20  above the line there are bubbles in red?  Do you see that?

21  A.  Yes, I do.

22  Q.  Before I ask you what that means, let me just ask,

23  generally, what is contained in each bubble?

24  A.  In each bubble is a small blurb of the larger government

25  exhibit, so it's going to have just a small portion of what the

1    entire message might contain or entire email or entire

2    financial document might have had.

3    Q.  So what would one do if you wanted to view the entire

4    contents of the summary or blurb that is contained?

5    A.  You would have to open the government exhibit, which is

6    displayed beneath the small word bubble.  So, for example, in

7    the first, top left one, it says GX20.  So you would have to go

8    to Government Exhibit 20 to view the full summary of it.

9    Q.  Now, returning to the placement and color, what is the

10   significance, if any, of the fact that certain bubbles are red

11   and above the timeline in the middle?

12   A.  So, the bubbles that are red and above the timeline

13   indicate events that took place with Ms. Daniels and email

14   account that was coming from a Stormy PR or with a Mr. Denver

15   Nicks email account.

16   Q.  I just want to make sure I heard you.  Does that mean every

17   communication in red had one of those three parties included in

18   it?

19   A.  Correct.

20   Q.  And then below the line on this page you see that there's a

21   number of blue bubbles?

22   A.  Yes.

23   Q.  What does it mean when a summary is below the line in blue?

24   A.  It's all other parties.

25   Q.  In other words, is Ms. Daniels included in any of the

M1vWave2                    Medrano - Direct

1  communications below the line?

2  A.  No.

3  Q.  All right.  If we could go to the second page, do you see

4  on this page there are bubbles in purple?

5  A.  Yes.

6  Q.  What does a purple bubble represent?

7  A.  Those represent financial transactions.

8  Q.  OK.  So we're not going to go through this whole chart now.

9  I want to take maybe two or three instances and walk through

10 them to see how to use the chart.  OK?

11 A.  Sounds good.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  We can start with page 2.  So what date is the first item

2    summarized on page 2?

3    A.  August 1, 2018.

4    Q.  All right.  Right below that, what is the government

5    exhibit that is summarized?

6    A.  Government Exhibit 213.

7         MR. PODOLSKY:  So, just to explain how we can use

8    this, if we can put the chart page 2 on the left and government

9    Exhibit 213 on the right.

10   BY MR. PODOLSKY:

11   Q.  Do you see that on the right Government Exhibit 213 is an

12   e-mail from Michael Avenatti to Luke Janklow?

13   A.  Correct.

14   Q.  Do you see it was sent August 1, 2018, at approximately

15   12:10 p.m.?

16   A.  Correct.

17   Q.  Does that time match the time that's indicated at the

18   bottom of the bubble on the chart?

19   A.  Yes, it does.

20        MR. PODOLSKY:  All right.  Just so we can see what the

21   document is, Mr. De Grandpre, if you could go to the second

22   page.  Thank you.

23   BY MR. PODOLSKY:

24   Q.  Do you see that this is a page containing certain financial

25   instructions?

M1VNAVE3                          Medrano - Direct

1    A.  Yes.

2    Q.  Okay.  Now, focusing on the chart on the left, do you see

3    that that same day there is a financial transaction?

4    A.  Yes.

5    Q.  What financial transaction is summarized on August 1, 2018?

6    A.  Janklow & Nesbit wire, $125,000 to Avenatti & Associates,

7    account ending in 47679.

8    Q.  Is that the same account that is described or listed on

9    Government Exhibit 213 on the right?

10   A.  Yes.

11   Q.  And then do you see that the chart on this page continues

12   through August 3, August 9, and August 27?

13   A.  Correct.

14   Q.  And then do you see that, for example, there is a summary

15   of a communication on August 27, 2018 at 10:03 a.m.?

16   A.  Yes.

17   Q.  And what -- if you can just read the bubble, what's

18   summarized there?

19   A.  Daniels messages Avenatti, pretty annoying how they are all

20   over us for something they need have not paid me despite --

21   sorry.

22            THE COURT:  Slow down.

23   A.  -- have not paid me despite final version being submitted a

24   while ago.  I am going e-mail Elizabeth about it now, at 10:03

25   a.m., Government Exhibit 26.

1      MR. PODOLSKY:  Okay.  Let's go to the third page of

2  the chart.  We can take down 213.  All right.

3  BY MR. PODOLSKY:

4  Q.  Let's focus on some of the transactions on September 5.  Do

5  you see that?

6  A.  Yes.

7      MR. PODOLSKY:  So just so we can understand again how

8  to use the chart, let's put up Government Exhibit 303A on the

9  right, page 21.

10      MR. AVENATTI:  Your Honor, objection.  Cumulative.

11      THE COURT:  How much longer do you have, Mr. Podolsky?

12      MR. PODOLSKY:  I was hoping to do maybe two of these.

13  So maybe 20 minutes.

14      THE COURT:  Can you speak into the microphone?

15      MR. PODOLSKY:  Sorry, your Honor.  I was hoping to do

16  maybe two examples.  So maybe 20 minutes.

17      THE COURT:  Hold on one second.  All right.  I will

18  give you very briefly one more, and I think at that point the

19  jury is likely to understand how to read the chart for

20  themselves.  Since they will have it during their

21  deliberations, I think we will leave it there.

22      Ladies and gentlemen, let me just tell you, in case

23  you were wondering, I know we had modified the schedule toward

24  the end of last week.  Under the new schedule this would be

25  around the time we would take a short break.  I'm juggling a

1    bunch of things, but bottom line is I am, I think it is

2    possible that we will get to a point in the case in the

3    relatively near future, *i.e.*, the next 15 or 20 minutes, where

4    I will need to excuse you for a longer period of time.  So I

5    think what I am inclined to do today is, notwithstanding our

6    new schedule, is just to push forward and get to that point

7    rather than take a short break and then shortly thereafter give

8    you a longer break.

9           I just want to explain that to you so you are not

10   sitting there under wondering and you can focus on the

11   evidence.

12          But, Mr. Podolsky, let's wrap this up.

13          MR. PODOLSKY:  Thank you, your Honor.  Why don't we

14   quickly put -- we can take this down and instead put page 17

15   and page 20 of 804 on the left and right.

16          Okay.  Let's do 17 on the left, please, and 20 on the

17   right.  Okay.

18   BY MR. PODOLSKY:

19   Q.  Mr. Medrano, do you see that we've taken two pages out of

20   the timeline, and you can see that it extends from February 15,

21   to February 19, 2019?

22   A.  Yes.

23   Q.  So, for example, do you see that on the bottom left-hand

24   corner, there's a summary of Mr. -- of Luke Janklow sending

25   Michael Avenatti an e-mail?  Do you see that?

1   A.  Yes.

2   Q.  What government exhibit does that summarize?

3   A.  Government Exhibit 234.

4   Q.  Does that exhibit contain written detail of advance

5   payments made and payments to Ms. Daniels?

6   A.  Yes.

7   Q.  And then, if you look on the right, do you see above the

8   line there are a number of portions of Government Exhibit 60

9   summarized?  Do you see that?

10  A.  Yes.

11  Q.  Do you see that, for example, at the very end, at 207, it

12  summarizes a message from Ms. Daniels to Mr. Avenatti:  Here is

13  the wire proof.  We also waited over 30 days to give me payment

14  number two.  And Mr. Avenatti responds, let me find out what is

15  going on?

16  A.  Yes.

17  Q.  For example, how long after the e-mail from Mr. Janklow on

18  February 15, did that exchange occur?

19          MR. AVENATTI:  Objection.

20          Best evidence, your Honor.

21          THE COURT:  Sustained.

22          MR. PODOLSKY:  Okay.  We can take this down.

23          And at this time I am going to offer and read into the

24  record a stipulation, your Honor.

25          THE COURT:  All right.  Is this S4?

M1VNAVE3                        Medrano - Direct

1              MR. PODOLSKY:  It is, your Honor.

2              THE COURT:  Subject to our earlier discussion you may

3    proceed.  S4 is admitted.

4              (Government Exhibit S4 received in evidence)

5              MR. PODOLSKY:  Thank you, your Honor.

6              Mr. De Grandpre, why don't we put this up for the

7    parties and the Court at this time.

8              THE COURT:  Just keep your voice up, Mr. Podolsky.

9              MR. PODOLSKY:  I will, your Honor.

10             This document reads:

11             Stipulation regarding state bar records and

12   information.

13             And it reads as follows:

14             It is hereby stipulated and agreed by and between the

15   United States of America and Michael Avenatti, the defendant

16   that:

17             1.  If called as a witness, a representative of the

18   state bar of California, the State Bar, would testify that:

19             A.  The State Bar maintains records regarding the

20   admission, registration, and status of attorneys licensed to

21   practice in the state of California.  An individual can --

22             B.  An individual cannot practice law without being

23   licensed to do so.

24             To be licensed to practice law in California, referred

25   to as becoming a member of the bar, an individual must pass an

1   exam referred to as the bar exam.  In California that exam

2   includes questions on ethics and professional responsibility

3   and has included such questions since at least 2000.

4          To be admitted to the bar in California, an individual

5   must also take and pass the multistate professional

6   responsibility examination, NPRE, which measures knowledge and

7   understanding of standards related to the professional conduct

8   of lawyers.

9          Page 2.  Thank you.

10         D.  With few exceptions, such as for elected officials

11  of California, all attorneys who are actively practicing law in

12  California must complete ongoing legal training, called minimum

13  continuing legal education, MCLE.  25 hours of MCLE are

14  required every three years.  These hours must include at least

15  four hours of training on legal ethics.  Attorneys are required

16  to report their training to the State Bar every three years.

17         Michael Avenatti, the defendant, took and passed the

18  NPRE in November 1999, took and passed the California bar exam

19  in February 2000, and was admitted to the California bar in

20  June 2000.

21         Continuing below:

22         Michael Avenatti, the defendant, certified to the

23  State Bar his compliance with applicable MCLE requirements for,

24  among other periods, February 1, 2013, to January 31, 2016, and

25  February 1, 2016, to January 31, 2019.

1    Take that down.

2    If I could just have one moment, your Honor.

3    Nothing further at this time, your Honor.

4    THE COURT:  Thank you.  Cross-examination.

5   CROSS-EXAMINATION

6   BY MR. AVENATTI:

7   Q.  Sir, good morning.

8   A.  Good morning.

9   Q.  Your title is investigator analyst, correct?

10  A.  Investigative analyst.

11  Q.  Investigative analyst?

12  A.  Yes, sir.

13  Q.  And in connection with that job, do you analyze?

14  A.  Yes.

15  Q.  You analyze evidence, right?

16  A.  Yes.

17  Q.  And in this case, you assisted the prosecution team in

18  compiling this chart, am I right?  804?

19  A.  Correct, yes.

20  Q.  Who picked the information to go on the chart?

21  A.  The prosecution team.

22  Q.  Who did you deal predominantly with from the prosecution

23  team?

24  A.  The assigned investigator.

25  Q.  And who's that?

M1VNAVE3                          Medrano - Cross

1    A.  DeLeassa Penland.

2    Q.  Do you see Ms. Penland here to my left seated?

3    A.  Yes.

4    Q.  Okay.  So Ms. Penland selected the items for you to include

5    on the timeline, am I right about that?

6    A.  Yes.

7    Q.  And then who selected the blurbs?  I think it was described

8    as a small blurb?

9    A.  Correct.

10   Q.  Right.  Who selected the blurbs?

11   A.  Ms. Penland.

12   Q.  I'm sorry.

13   A.  The prosecuting team also?

14           THE COURT:  Just keep your voice up.

15           THE WITNESS:  I'm sorry.

16   A.  The prosecution team.

17   Q.  Was that Ms. Penland?

18   A.  Correct.

19   Q.  So she give you the quoted statements to include in the

20   blurbs?

21   A.  Yes.

22   Q.  So what did you do in connection with creating 804?  I mean

23   Ms. Penland selected the items to be put on the timeline, and

24   she gave you the quotes.  Right?

25   A.  Correct.

M1VNAVE3                          Medrano - Cross

1    Q.  All right.  So what did you do?

2    A.  I went back and confirmed that they were accurate, it was

3    correctly depicted -- well -- and also the times were correct,

4    the dates, if there were any punctuations, I corrected them,

5    stuff of that matter.

6    Q.  Did you actually plug it into the chart?

7    A.  Sorry.  What do you mean?

8    Q.  Well, did you actually type the words on the page?

9    A.  If they had to be corrected, did I myself correct them on

10   the chart?  No.

11   Q.  So were you given a draft chart and then you confirmed it?

12   A.  No, I was given a draft chart.  I went through it.  I found

13   a couple of corrections to do.  I then corrected them on a

14   printout that I had gotten and I gave it back, and they went

15   back and corrected it.

16   Q.  Who gave you the draft chart?

17   A.  I received it from Ms. Penland.

18   Q.  Who created the draft chart?

19   A.  I believe Ms. Penland.

20   Q.  Just to be clear, you did not create the draft chart?

21   A.  The draft chart, no.

22   Q.  Meaning 804?

23   A.  Correct.

24   Q.  Did you ever suggest that any other text messages, e-mails,

25   or financial transactions be included within 804?

M1VNAVE3                         Medrano - Cross

1    A.  No.

2    Q.  Who decided that the timeline would start --

3              MR. AVENATTI:  Maybe we can have 804, the first page,

4    please.  Thank you, Juliet.

5    BY MR. AVENATTI:

6    Q.  Sir, do you see the first page of 804?

7    A.  Yes, I do.

8    Q.  Who decided that this timeline would start on July 29,

9    2018, at 2:29 p.m.?

10   A.  The prosecution team.

11   Q.  You didn't make that decision?

12   A.  No, I did not.

13   Q.  Who decided that the timeline, if we could go to the last

14   page, would end on February 19, 2019, at 2:07 p.m.?

15   A.  I believe it ends at 2:09 p.m.  I'm sorry.

16   Q.  2:09 p.m.  You are correct.  Who decided that?

17   A.  The prosecution team.

18   Q.  Ms. Penland?

19   A.  I am not sure if it was specifically Ms. Penland, but I do

20   believe it was the prosecution team.

21   Q.  Do you read books?

22   A.  Yes, I do, sir.

23   Q.  All right.  When you read books, do you read them from

24   beginning to end, or do you just take out a chapter in the

25   middle of the book and just read the middle chapter?

1        MR. PODOLSKY:  Objection.

2        THE COURT:  Sustained.

3   BY MR. AVENATTI:

4   Q.  Now, you were asked about communications that you included

5   in the timeline.  Do you recall that?

6   A.  Yes.

7   Q.  And one of the individuals you communicated -- strike that.

8        One of the individuals you included communications

9   with was Mr. Denver Nicks, am I correct?

10  A.  Correct.

11  Q.  And why was it that you included communications with

12  Mr. Denver Nicks?

13  A.  I didn't -- the communications were already part of the

14  timeline, so I personally did not include it.

15  Q.  So the communications with Mr. Nicks were already in the

16  draft timeline that Ms. Penland provided to you?

17  A.  Correct.

18  Q.  You didn't make that decision?

19  A.  No, I did not.  I had a small -- I had a very -- task,

20  which was to create this -- which was to assess in creating

21  this timeline.  The government exhibits were already given to

22  me.  I didn't add anything else.

23  Q.  How many edits did you make to the timeline that you were

24  given by Ms. Penland?

25  A.  On each page?  Or do you mean how many times did I go back

M1VNAVE3                    Medrano - Cross

1    and correct them.

2    Q.  What I'm getting at is, after you got the draft timeline

3    from Ms. Penland, you went to verify certain information, how

4    many edits did you make to the draft that Ms. Penland gave you?

5    A.  I believe I went back twice.  I made a couple of edits on

6    several pages.

7    Q.  So less than 10 in total?

8    A.  I mean, I have given you a rough estimate approximately

9    around that that number, yeah.  I -- sorry, I can't confirm.

10   Q.  That's okay.  That is a fair estimate, though, right?

11   A.  Well, 10 to 15 prob -- yes.

12   Q.  You are aware -- well, strike that.  I think you were asked

13   this on direct.  This timeline does not include all of the

14   communications, all of the texts or e-mails relating to this

15   case, does it?

16   A.  Correct.

17   Q.  Now, I want to ask you, you were shown -- strike that.

18           MR. AVENATTI:  Let's go to page 2 of the timeline.  If

19   we can have that side by side with 213, page 2.

20   BY MR. AVENATTI:

21   Q.  Can you see that, sir?

22   A.  Yes.

23   Q.  Now, you were just asked by counsel for the government

24   about this entry on August 1:  "Avenatti e-mails Janklow with

25   attachment.  Until further notice, please ensure all advances

1    associated with my book are routed to the account below, as the
2    prior account has been closed."
3         Do you recall being asked about that?
4    A.  Yes, I do.
5    Q.  And then counsel for the government put 213 right here next
6    to it just like we have, right?
7    A.  Yes.
8    Q.  And 213 is the document that's reflected in this entry on
9    the timeline, correct?
10   A.  Yes.
11            MR. AVENATTI:  Why don't we leave 213 up and to the
12   left of 213.  Can I please have ST 12, which is in evidence.
13   Can we blow up the top, please.
14   BY MR. AVENATTI:
15   Q.  Can you see that, sir?
16   A.  Yes, I can.
17   Q.  Do you see the text that reads, "They couldn't so closed
18   it"?
19   A.  Yes.
20   Q.  What's the date of that text?
21   A.  I believe July 19, 2018.
22   Q.  What's the date of 213, 12 -- or 213, page 2?
23   A.  August 1, 2018.
24   Q.  About two weeks later, right?
25   A.  Correct.

M1VNAVE3                         Medrano – Cross

1          MR. AVENATTI:  Okay.  So why don't we keep ST 12 up

2    and move it to the right, if we could, please, Juliet.  Blow it

3    up for the benefit of the jury.

4    BY MR. AVENATTI:

5    Q.  Now let's go back to the timeline that the prosecution team

6    prepared and that you're testifying about here today, Exhibit

7    804.  Do you see that?

8    A.  Yes.

9    Q.  Okay.  Can you direct the jury's attention to where on the

10   timeline this text message dated July 19, 2018, is located?

11   A.  It is not on the timeline.

12   Q.  You don't know why, do you?

13   A.  Nope.

14          MR. AVENATTI:  Nothing further.

15          THE COURT:  Any redirect?

16          MR. PODOLSKY:  No, your Honor.

17          THE COURT:  All right.

18          Mr. Medrano, you may step down.

19          (Witness excused)

20          THE COURT:  Government, please call your next witness.

21          MR. PODOLSKY:  Your Honor, at this time the government

22   rests.

23          THE COURT:  All right.

24          Thank you very much.

25          So, ladies and gentlemen, you just heard Mr. Podolsky

1    say that the government rests at this time.  That means that

2    the government has completed its case in chief.

3           That is a significant moment in the trial.  As I said

4    earlier, I need to discuss some things with the parties, and

5    I'm going to excuse you while I do that.

6           Let me say the defendant has no obligation to put on

7    any case at all.  As I've said to you several times and will

8    say to you again in the final instructions, the government

9    bears the burden of proof in this trial at all times, and the

10   defendant is presumed innocent unless and until you find that

11   the government has proved its case beyond a reasonable doubt.

12   What that means is that the defendant doesn't have to call any

13   witnesses.  He doesn't need to testify.  He doesn't need to do

14   anything.

15          That being said, he does have an opportunity to put on

16   a case if he wishes to do so, and one of the things that I will

17   be discussing with the parties is whether Mr. Avenatti plans to

18   do so, so that I will have a better sense of our schedule and

19   how we are going to handle things.

20          But as I said, there are some things that I need to

21   discuss with them, including that.  Given that it will take us

22   a little bit of time to do that, rather than take a short

23   break, I am going to excuse you to go downstairs to the jury

24   room and wait until we are ready for you.

25          It's 11:25.  I have communicated with the cafeteria to

M1VNAVE3                      Medrano - Cross

1    see if we could get your lunch a little bit earlier, just in

2    case our discussions take a little bit of time.  I don't quite

3    know how long that will take.  If I knew that, I would tell

4    you.  As I think you have seen I try to keep things moving, so

5    I will do my best.

6              But the bottom liable is if can you bear with me, if

7    you can bear with us, I would appreciate it.  And I assure you

8    that I am trying to make the most efficient and effective use

9    of all of our time.

10             My standard instructions apply.  While you have heard

11   the government's case, you have not necessarily heard all of

12   the evidence.  You will find that out in due course.  And you

13   certainly haven't heard the parties' closing arguments and my

14   instructions as to the law.

15             So, for that reason you should continue to keep an

16   open mind.  For the same reason you should not discuss the case

17   with each other or with anyone else.  Your deliberations have

18   not begun.

19      So don't discuss the case, don't do any research about the

20   case, continue to keep an open mind.

21             And with that, we will excuse you, and you may proceed

22   with Ms. Smallman down to the jury room.

23      Thank you.

24             (Jury not present)

25             THE COURT:  You may be seated.

M1VNAVE3                          Medrano - Cross

1           All right.

2           So, let's take things in order.  First, is there a

3    motion under Rule 29?

4           MR. AVENATTI:  Yes, your Honor.

5           THE COURT:  Why don't you have a seat and just use the

6    microphone, please.

7           MR. AVENATTI:  Your Honor, there's actually a couple

8    of evidentiary issues I would like to address before I make my

9    Rule 29 motion.

10          THE COURT:  All right.

11          MR. AVENATTI:  First, your Honor -- and I will submit

12   something this evening on this -- I am going to move for the

13   exclusion of Exhibit 804.  I understood the witness that was

14   going to be taking the stand today prepared 804.  That's what

15   was represented to me or what I understood.  He did not prepare

16   804.

17          THE COURT:  Mr. Avenatti, the law doesn't require the

18   witness to be the one who prepared the exhibit, as long as the

19   witness can lay a proper foundation that the exhibit is

20   accurate and it is admissible.  He did so.

21          I also instructed the jury that they should give it

22   whatever weight they think it is due and whatever weight they

23   think it is due in light of whether it fairly and accurately

24   characterizes the underlying evidence.  I don't see any basis

25   to revisit the matter.

1          MR. AVENATTI:  My understanding is under 1006 I am

2     entitled to have the individual who actually prepared the chart

3     testify.

4          THE COURT:  That is not my understanding of the law.

5     In any event, you can certainly submit something to me in

6     writing.  I think it is highly unlikely it will alter anything.

7     You had an opportunity to raise your objections prior to the

8     exhibit's admission.  If you can demonstrate that you didn't

9     have an opportunity to raise that objection then and that it is

10    a proper objection, I will certainly consider it.  But I think

11    you are fighting an uphill battle.

12         Next?

13         MR. AVENATTI:  The next issue I have, your Honor, is,

14    is that the government has left the jury with a misimpression

15    relating to the timeline of events on February 19.

16         By way of the government's questioning of Ms. Daniels

17    at page 999 of the trial transcript, the government has

18    suggested to the jury that in fact Ms. Daniels sent me the text

19    message informing me of her retention of Mr. Brewster before

20    receiving my letter of termination on the same day, which is in

21    evidence.

22         We located the e-mail and provided it to the

23    government over the weekend.  When I say the e-mail, I'm

24    speaking of the e-mail by which the termination letter was

25    e-mailed to Ms. Daniels on that same day.

1      That e-mail shows that hours before she sent the text

2  message, she received the e-mail of termination.  So I think it

3  is incumbent upon the government to correct that misimpression

4  to the jury.  There is no dispute as to the timing of this and

5  the sequence of events.  The e-mail terminating Ms. Daniels as

6  a client was first, and hours later she sent me that text

7  message alerting me to the fact that she had retained

8  Mr. Brewster.

9      A fair inference is the reason why she retained

10  Mr. Brewster on that day was because the letter asked her to

11  have her new counsel contact me or to give me his or her

12  contact information as I recall.  I don't have it in front of

13  me.

14      But I do not think it is appropriate, and I think it's

15  highly prejudicial for the jury to be left with the impression

16  that Ms. Daniels sent the text message before I sent the

17  termination letter.

18      THE COURT:  Mr. Avenatti, I am at a loss.  A trial in

19  the American system is an adversary process.  There's

20  cross-examination.  There's the opportunity to put on your own

21  case.

22      The government may or may not be correct.  I don't

23  know.  But you certainly had an opportunity to make the point

24  through cross-examination of Ms. Daniels to refresh her

25  recollection if you had an e-mail to do that, if she wasn't

1   able to recall the timing.

2          You may be able to admit that as part of your own

3   case.  I don't understand it.  I don't know.  That seems to me

4   the way this works in the American system.  So I don't

5   understand what the application is or what basis you would have

6   for the government to correct some misimpression.

7          Mr. Podolsky.

8          MR. PODOLSKY:  Thank you, your Honor.  Certainly no

9   disagreement with what you said.

10         THE COURT:  Why don't you stay seated.  It will allow

11  you to get the mic closer as well.

12         MR. PODOLSKY:  Absolutely.

13         Certainly no disagreement with anything the Court just

14  said.  But because the defendant in court likes to suggest that

15  misleading was happening, I will just make a couple of

16  comments.

17         One is, first of all, there's nothing misleading on

18  the record.

19         But second is, in fact what happened was the defendant

20  dumped I think 5,000 pages of these records on us.  We actually

21  ourselves found that e-mail, e-mailed standby counsel over the

22  weekend.  He didn't e-mail us.  We e-mailed him, asking him to

23  clarify the time zone in which that e-mail was written, because

24  it appeared to be UTC.  That was confirmed to us, which

25  corroborated that the e-mail was sent at 11 a.m.  We then asked

1    would Mr. Avenatti stipulate that we don't have to call you, an

2    attorney, to the fact that this e-mail was sent at 11 a.m., in

3    other words, that it was in UTC, at which point that we would

4    actually offer the e-mail.

5          No response was given to us on that.  We are more than

6    happy to put this e-mail into the record or permit the

7    defendant to do so with the stipulation explaining that the

8    e-mail was sent at 11 a.m. Eastern or that the e-mail's time

9    stamp is at 4 p.m.

10          We actually -- although there was no misleading any of

11    kind, we actually asked the defendant if we could put this

12    e-mail into the record.

13          MR. AVENATTI:  Your Honor, that was the first I have

14    learned of that.  Mr. Dalack just confirmed it.  I was not

15    informed that the government had made that offer, so perhaps we

16    can figure out a stipulation and solve this.  It was news to

17    me, your Honor.

18          THE COURT:  Great.  So talk to each other about it and

19    see if you can solve it.

20          Anything else before we move to Rule 29?

21          MR. AVENATTI:  Not at this time, your Honor.

22          THE COURT:  Okay.

23          Do you want to make your Rule 29 motion?

24          MR. AVENATTI:  Yes, your Honor.

25          THE COURT:  Okay.

1              MR. AVENATTI:  I move for a judgment of acquittal

2    pursuant to Rule 29 on both counts based on the following, your

3    Honor:

4              The government has not submitted adequate evidence

5    necessary to satisfy each element of each of the two offenses,

6    both Count One and Count Two.

7              I want to focus the Court's attention on a few, not

8    all of the salient points.  At least the Court has already

9    indicated it doesn't expect robust arguments, so I am going to

10   try to curtail my statements on the record.

11             First of all, your Honor, at all times I was acting as

12   the attorney or agent of Ms. Daniels.  There is a question

13   relating to -- well, strike that.  There's no evidence elicited

14   by the government related to the scope of that authority and

15   how that scope of authority changed over any period of time, if

16   at all.

17             In fact, on cross-examination Ms. Daniels testified

18   that my authority relating to the book deal and the

19   communications with Mr. Janklow never changed over the course

20   of the time period that I was representing Ms. Daniels.

21             THE COURT:  All right.  Mr. Avenatti I am going to cut

22   you off so you so we can make efficient use of our time.

23   Ms. Daniels clearly testified that you did not have authority

24   to accept the second and third payments on her behalf, and she

25   never authorized you to redirect it to an account belonging to

1  you.  The jury may or may not believe her testimony on that

2  score but I think that certainly makes clear, to the extent you

3  had authority, it did not extend to that, and that argument is

4  meritless.

5          Next argument.

6          MR. AVENATTI:  Your Honor, Ms. Daniels testified that

7  she provided the wire instructions as related to the first

8  payment to me because she understood that I had the authority

9  to provide wire instructions to Mr. Janklow.  That's number

10  one.

11          Number two, she then testified that my authority never

12  changed.  So if I had authority to send the first set of wire

13  instructions, how was it that I no longer had authority to send

14  subsequent wire instructions?

15          THE COURT:  Mr. Avenatti, I am not in a debate here

16  with you.  There's ample evidence in the record for the jury to

17  find that you acted contrary to your authority as counsel.

18          I am not aware of any principle of agency law or

19  attorney-client law that permits an attorney to redirect money

20  that is owed to the client to himself for his own purposes

21  without the permission of the client, without the knowledge of

22  the client.  It's just a frivolous argument.

23          You can maybe make the argument to the jury, we will

24  cross that bridge when we get to it, but it is certainly not a

25  basis for judgment as a matter of law, judgment of acquittal.

1    What's your next argument?

2    MR. AVENATTI:  The next argument, your Honor, is

3    Ms. Daniels was impeached on the stand related to the fact that

4    she had told me the account was closed.  She denied telling me

5    that the account was closed.  Actually, denied it to your

6    Honor.  Your Honor asked the cleaner question.  She denied it.

7    She was impeached by ST 12, the text message showing

8    that in fact she had informed me that the account was closed.

9    Approximately two weeks later the letter was sent to

10   Mr. Janklow.  That letter said exactly that, that the account

11   was closed.

12   The money then was transferred from Mr. Janklow to the

13   trust account.  Under identity theft, the crime would have been

14   completed at that time.  There's no evidence that in fact --

15   well, let me rephrase.

16   When the money was transferred to the trust account,

17   your Honor, the evidence is clear that I had been told the

18   account was closed.  The evidence is also clear that

19   Ms. Daniels was undertaking efforts to hide money from her

20   husband at the time because of their ongoing divorce.  So for

21   each of those reasons, I don't know how the elements relating

22   to identity theft have been met by the government in the case.

23   THE COURT:  Okay.  That argument is rejected as well.

24   Next?

25   MR. AVENATTI:  Furthermore, your Honor, under the

1    contract and California law, I had an entitlement at all times

2    to a reasonable fee for my legal services, all of the legal

3    services that were done for Mr. Daniels, either under the

4    contract or under the clear law of California.

5         So if the contract is voided, then I rely on, I think

6    it's 6147 and 6148 of the Business and Professions Code in

7    California.  That's the law that I was entitled to a reasonable

8    amount for the legal work that I had done.  She was not

9    entitled to a windfall.

10        If the contract is not voided as a matter of law, then

11   the clear language of the contract would control.  I asked

12   Ms. Daniels if the contract was ever modified.  She admitted

13   that it was not.  The government appears to be relying on

14   Ms. Daniels' statements that on -- I believe she said on two or

15   three or three or three or four occasions I informed her that I would

16   not accept any money from the book deal.

17        As a matter of law, your Honor, that's irrelevant for

18   the following reason:

19        The fee agreement is a written contract.  Under

20   California law, it may be amended orally with one requirement:

21   There has to be consideration on both sides for the amendment.

22   The government has placed no evidence before the Court that

23   there was any consideration provided by Ms. Daniels to me in

24   connection with any amendment of the contract during these

25   alleged oral conversations.

1          Therefore, as a matter of law, there was no amendment

2    to the contract.  If there was no amendment to the contract,

3    and the contract is not void on other grounds, I was entitled

4    at all times to a reasonable fee.  I cannot be convicted of a

5    crime for stealing money I was entitled to or money that

6    belonged to me.

7          The government's position is further weakened by the

8    following, your Honor:  There's no evidence in the record

9    relating to the fact that the amount of money kept from the

10   book deal was "unreasonable," an unreasonable fee.  The

11   government has offered no evidence relating to the

12   reasonableness or lack thereof of the money that was kept.

13   There's been no legal expert to talk about a percentage under

14   such circumstances.  There's been no effort to have any witness

15   come in and testify that approximately 18 and a half percent,

16   which is $149,000 divided by $800,000, is somehow improper or

17   unreasonable or outside the custom and practice.  The

18   government has elicited no testimony relating to the

19   reasonableness of the fee.  The government ignores the plain

20   language of the contract and ignores California law.

21          For that reason, your Honor, I am entitled to a

22   judgment of acquittal on both counts.

23          THE COURT:  All right.  Any other arguments?

24          MR. AVENATTI:  One moment, your Honor.

25          Your Honor, one other point I would like to make on

 1    the record.

 2                On the agg. ID count, whether the money left the trust

 3    account after being transferred or not is irrelevant to the

 4    analysis on the agg. ID count.

 5                It cannot be said that if the money was simply

 6    deposited into the trust account and never left there would be

 7    no crime, but because the money left there's a crime under agg.

 8    ID.

 9                THE COURT:  I'm not even -- forgive me.  I don't even

10    understand the point.

11                What does that have to do with the sufficiency of the

12    evidence on Count Two?  It's the use of a means of

13    identification in furtherance of wire fraud.  So if there is

14    scheme to defraud, if you committed wire fraud and you used

15    Ms. Daniels' name and signature in furtherance of that without

16    lawful authority, it has nothing to do with whether money was

17    or wasn't transferred.  That's it.  No?

18                MR. AVENATTI:  Your Honor, my argument is, is that the

19    use of the authority to transfer the money into the trust

20    account was not in furtherance of any scheme to defraud, and

21    there's insufficient evidence that it was in furtherance of any

22    scheme to defraud.

23                THE COURT:  All right.  Anything else?

24                MR. AVENATTI:  Nothing further, your Honor.

25                THE COURT:  All right.  The motion is denied.  I am

M1VNAVE3                        Medrano - Cross

not saying that you don't have some arguments that you can make

to the jury with respect to the credibility and the like, but

credibility is obviously for the jury to determine and the

bottom line is if the jury credits the government's evidence

and the testimony that has been offered, there is certainly

ample evidence in my judgment to support a conviction on Counts

One and Two.  So the motion is denied.

         Let's take up quickly the Mr. Fischer question since I

think, if I am not mistaken -- actually, we are going to do two

things.  First I am going to have my law clerk hand copies of

the two letters regarding Mr. Janklow to the government so that

they can now have them and we can have a more informed

discussion on that point.

         I am also going to have her e-mail them to

Mr. Meister, Mr. Janklow's counsel, and they will be docketed

in short order.  And I am going to ask my law clerk to advise

Mr. Meister to advise us immediately in the event that he

wishes to be heard on the issue, in which case we will figure

out an appropriate manner and time to do that.

         In addition, though, I want to address Mr. Fischer,

since as I understand it, he's the only witness who could

conceivably testify today.

         So, Mr. Avenatti, can you tell me now which other

e-mails, texts, WhatsApp messages, etc. that you would propose

to offer through Mr. Fischer or if it's just Defense Exhibit

1    AB.

2              MR. AVENATTI:  No, your Honor.  It's beyond Defense

3    Exhibit AB.  I have not identified the text messages and

4    e-mails yet.  I was hoping to do that over the break now that

5    the government has rested.  So I am not prepared to answer the

6    question quite yet.

7              THE COURT:  Mr. Avenatti, I don't understand.  I mean,

8    honestly, I really -- I am losing my patience.  That's because

9    it is ordinarily the practice when the government rests that

10   the defendant has a case to put on if the defendant has any

11   case to put on.

12             The degree of complete uncertainty over whether you

13   have a case, what your case looks like, where your witnesses

14   are, is just astonishing to me.  The fact of the matter is the

15   exhibits I presume do not pertain to Ms. Beier's very brief

16   testimony this morning.  Mr. Medrano is irrelevant because he

17   simply laid the foundation for the admission of the chart, and

18   you knew what was on the chart.  I simply don't understand why

19   you couldn't be prepared over the weekend to tell me what

20   exhibits other than defense Exhibit AB you propose to offer

21   through Mr. Fischer.

22             MR. AVENATTI:  Your Honor, let me address that.

23             First of all, some of them actually do relate to

24   Ms. Beier's testimony here today.  That's number one.

25             Number two, we had five witnesses prepared to testify

1    here today in the defense case, to begin our defense case.

2    Your Honor, upon receiving notices of various motions, issued

3    an order over the weekend telling those witnesses not to show

4    up effectively.

5        THE COURT:  No.  I told only one witness that he did

6    not need to travel from California to New York only to find out

7    that he might not have to testify at all.  Because there was a

8    motion to quash and, based on my initial review of that motion,

9    it was colorable enough that I did not think it was justified

10   to burden hem with the need to travel cross country.  That was

11   the only witness that I directed not to travel.  Everyone else

12   you had the ability, and the obligation quite frankly, to

13   arrange for them to be here prepared to testify in the event

14   that I ruled in your favor on these issues.

15       MR. AVENATTI:  Your Honor, the problem is, is that

16   when your Honor issued the ruling relating to the defense

17   should have other witnesses beyond the five or six ready to

18   testify, those five or six witnesses took that order from your

19   Honor to mean they didn't have to testify on Monday.  So we

20   didn't have the ability to have them testify on Monday, your

21   Honor.

22       THE COURT:  What is your basis for saying that?

23       MR. AVENATTI:  Advisory counsel had communications,

24   for instance, with Mr. Loupe's counsel.  So I mean, we --

25       THE COURT:  And advisory counsel, standby counsel told

1    Mr. Loupe's counsel that he was free to go and not be present

2    on Monday?

3            MR. AVENATTI:  No, absolutely not.

4            THE COURT:  Did they tell him to be in Court on Monday

5    prepared to testify in the event that I denied the motion to

6    quash or the motion to preclude?

7            MR. AVENATTI:  He was --

8            THE COURT:  I mean, the fact of the matter is,

9    Mr. Avenatti, you have some obligations to ensure that you are

10   prepared to put on your case.

11           MR. AVENATTI:  Your Honor --

12           THE COURT:  That means serving subpoenas in a timely

13   fashion.  That means if you can't negotiate a resolution to a

14   dispute over a subpoena, it means bringing that to my attention

15   in a timely fashion.  It means being prepared to call a witness

16   in a timely fashion.

17           MR. AVENATTI:  Your Honor, as it relates to Mr. Loupe,

18   we informed Mr. Loupe's counsel we expected him to be here at 1

19   o'clock today to testify.  Okay.  Mr. Loupe's counsel advised

20   his client to fly back to New Orleans based on your Honor's

21   rulings.  Now, we were prepared --

22           THE COURT:  I didn't make any rulings, Mr. Avenatti.

23           MR. AVENATTI:  Okay.

24           THE COURT:  I didn't make any rulings.  I said

25   Mr. Colorado did not need to travel to New York yesterday.  To

M1VNAVE3                         Medrano - Cross

1    the extent that I made any rulings, that is the full extent of

2    the rulings.  There were motions filed.  The motions were under

3    advisement.

4           MR. AVENATTI:  Your Honor, I understand.  I wanted the

5    witnesses here.  We did everything we could to have the

6    witnesses here.  The fact of the matter is, is that once your

7    Honor issued his order, once your Honor issued his order,

8    witnesses interpreted your order at docket 325 to mean that

9    they didn't need to be here.  So, I mean, your order --

10          THE COURT:  Mr. Avenatti, it seems to me that you are

11   trying to blame your own lack of preparation to put on a

12   defense case on me.  That is absolutely unpersuasive and

13   unacceptable.

14          We will take a recess.  In 15 minutes I will take the

15   bench.  I expect you at that time to specify the exact exhibits

16   that you propose to offer through Mr. Fischer and we'll discuss

17   them one at a time and whether you are permitted to do so.

18          If I permit him to testify, then he is going to

19   testify today, and then we will take up the remainder of the

20   witnesses.  They will testify tomorrow or they are not

21   testifying at all, if I let them testify at all.

22          All right.  I will see you in 15 minutes.

23          (Recess)

24

25

M1vWave4

1          (Jury not present)

2          THE COURT:  Mr. Avenatti, what other exhibits would

3     you propose to offer through Mr. Fischer?

4          MR. AVENATTI:  All right, your Honor.  We're proposing

5     to offer AD, which has already been discussed or we've already

6     submitted on that before the Court.

7          The February 19, 2019, termination email, which was

8     referenced immediately below the break -- or prior to the

9     break, I should say.

10          And then during the examination of Ms. Daniels, there

11     were some text messages that were used where she could not view

12     the thumb, the small picture of the screenshot.  It's part of

13     exhibit 5, Government Exhibit 5.

14          Maybe we could pull that up; I'm looking for Juliet.

15          This related, your Honor, to the termination of the

16     security detail.

17          THE COURT:  OK.  While Juliet is doing that, what

18     else?

19          MR. AVENATTI:  That's it, your Honor.  I eliminated a

20     number of others in the interest of time.

21          THE COURT:  OK.  Let's discuss the two that you've put

22     on the table, and then when -- I would prefer to call her by

23     her last name, but I don't remember it.

24          My apologies, Ms. Vicari.

25          No. 1, the termination email, I had told my law clerk

M1vWave4

1  to tell you that you should discuss a stipulation issue during

2  the break.  I don't know if counsel was in here and able to do

3  that.

4         Mr. Podolsky.

5         MR. PODOLSKY:  Unfortunately, the defendant was busy.

6  We didn't have the time to discuss.  As I represented before,

7  we'd be happy to draft of stipulation that simply explains that

8  it's admissible -- you know, that it's authentic and translate

9  the time zone so the jury can understand the correct timing of

10  it.  We'd be happy to do that today over the lunch break, or

11  whatever the timing is, and the defendant can offer it, or

12  however he wants to proceed.  But we have no objection to it

13  going into evidence.

14         THE COURT:  Mr. Avenatti.

15         MR. AVENATTI:  I'm encouraged by that.  I would like

16  to offer the stipulation in my case.

17         THE COURT:  OK.  Great.  So you'll negotiate with the

18  government on that in short order.

19         Defendant's Exhibit AD, this is the text from

20  Mr. Macias in August, stating that he has some do-re-mi so you

21  can run like a banshee, or something to that effect.

22         Mr. Podolsky.

23         MR. PODOLSKY:  Sure, your Honor.  I'll make several

24  points.

25         One, I'm not sure the defendant can even lay a

M1vWave4

1    foundation that this was Mr. Macias's text, but even assuming

2    he can, I don't believe there is any possible foundation to

3    overcome a relevance objection or hearsay objection.  It's not

4    at all obvious -- well, let me start --

5            THE COURT:  Let me try to make this more efficient.

6            MR. PODOLSKY:  Sure.

7            THE COURT:  I don't see the hearsay objection because

8    I think it's a statement of future intent, not a statement of

9    fact.  So I don't think it's being offered for the proof of the

10   matter asserted or the truth of the matter asserted.  It's

11   being offered as a statement of future intention to argue in

12   conjunction with the getting of the money that the money was

13   for a political run.  I don't think that's a valid argument in

14   light of the testimony, but the question is whether Mr.

15   Avenatti can make that argument to the jury.

16           MR. PODOLSKY:  I suppose I have a slightly different

17   view on the hearsay, but I'll skip that in light of your

18   Honor's comment.

19           I don't think there is any foundation laid by which we

20   could demonstrate relevance of this.  The defendant's assertion

21   that he interprets this text message as relating to getting

22   money somehow relates to the loan that he got is simply not

23   supported by the record.  Mr. Macias did not explain what this

24   means.  I certainly can't understand what it means on its face.

25   The do-re-mi so you can run like a banshee neither explains

M1vWave4

what the intention is, what do-re-mi is, what run like a
banshee is, nor does it in any way connect it to the loan that
Mr. Avenatti sought the following week.  So I just don't see
how the defendant can simply put in somebody else's words and,
without any explanation of what it means, claim relevance and
start to argue things that have no basis in the record.

THE COURT:  All right.  And didn't you have an
opportunity to ask him?  He did testify that he uses the phrase
"do-re-mi," and to the extent that you thought that it was
important to clarify what he meant by it -- it seems to me he
meant money, and certainly there's a valid argument that
do-re-mi is a reference to dough, which is a reference to
money.

I'm inclined to think that this has nothing to do with
the loan that he helped Mr. Avenatti secure, but that's not --
the question is whether my view of that prevents Mr. Avenatti
from arguing the point to the jury.  I guess I'm inclined to
think that he can argue the point to the jury, and you can
stand up and say this is a distraction and irrelevant and you
heard him testify and you know that that money had nothing to
do with Mr. Avenatti's political ambitions.

MR. PODOLSKY:  Again, certainly, if the text messages
go in, we will argue that and argue it with some force, I
believe.

I will just point out, as I recall the testimony,

M1vWave4

1    Mr. Macias said no, this has nothing to do with it.  So I'm not

2    sure what foundation could be laid to draw some reference

3    between a text message that was sent the prior week that says

4    I'm getting you some do-re-mi so you can run like a banshee to

5    any fact at issue in this case.

6              THE COURT:  Mr. Avenatti, do you wish to be heard on

7    that?

8              MR. AVENATTI:  Yes, your Honor, I do.

9              First of all, on the foundation, we asked Mr. Macias

10    about the text message.  He did not --

11             THE COURT:  Can I cut to the chase with you.  How do

12    you plan to lay a foundation to authenticate that this was a

13    text message from Mr. Macias through Mr. Fischer?

14             MR. AVENATTI:  Because it comes off the iCloud returns

15    that the government provided the defense, your Honor.

16             THE COURT:  That doesn't prove that it came from

17    Mr. Macias.

18             MR. AVENATTI:  When the returns are analyzed off the

19    forensic report by Mr. Fischer, he can see that the text

20    message came from Mr. Macias.  It's consistent with his other

21    text messages that the government used as coming from

22    Mr. Macias.  It's all under the account of coming from

23    Mr. Macias.  So that's how the foundation is laid, your Honor.

24             Mr. Fischer will testify he examined the iCloud

25    returns provided by the government, pulled off the WhatsApp,

M1vWave4

1    the communications from Mr. Macias.  This text message was

2    included within the communications from Mr. Macias.  I mean I

3    don't think there's really any debate about whether this text

4    message came from Mr. Macias or not.  It's in the iCloud

5    returns.  It's consistent with the other text messages.

6            The government, their forensic copy is the same

7    forensic copy that we have.  So if necessary, we'll call

8    Mr. Fischer to lay that foundation, although I would hope that

9    we could just get a stipulation as to that issue.  But that is

10   how Mr. Fischer confirmed that, in fact, this text message did

11   come from Mr. Macias on that date and time to me.  So that

12   would be the foundation, your Honor, at which point it would be

13   complete or my ability to put the text message into evidence

14   would be complete under 613.  So I think that the arguments of

15   the government go to weight, and they're free to argue to the

16   jury that it has nothing to do with my desire for money at that

17   time and that they should disregard it, but the timing of it

18   is -- I mean it's within days, within a week of the same time

19   period that the government elicited testimony concerning it.

20           THE COURT:  All right.  I will allow Mr. Avenatti to

21   put it into evidence.  My inclination is that, at the end of

22   this, it may be that the best course here is just to have a

23   stipulation with respect to this exhibit.  And the termination

24   letter, rather than calling a witness who has to -- that seems

25   like it might be a more efficient course, but obviously we'll

 1   see where things stand.

 2           Mr. Podolsky.

 3           MR. PODOLSKY:  I'm happy to say that given your

 4   Honor's ruling, we can simply not object to the admission of

 5   this exhibit or if a stipulation is necessary, that's fine too.

 6   But given your Honor's ruling as the admissibility on relevance

 7   hearsay grounds, we're not going to object to it.

 8           THE COURT:  OK.  Does Ms. Vicari have pieces of

 9   Government Exhibit 5 that you are making reference to?

10           MR. AVENATTI:  Yes, your Honor, Government Exhibit 5,

11   page 445, February 14, 2019, and the text message from

12   Ms. Daniels, "just fired the dragons," and then I ask what

13   happened.

14           THE COURT:  Yes, I remember.

15           MR. AVENATTI:  OK.

16           THE COURT:  Get to the piece that you want to admit.

17           MR. AVENATTI:  I understand, your Honor.

18           Immediately after that, please.

19           THE COURT:  It's the thumbnail.  So what's in the

20   thumbnail?

21           MR. AVENATTI:  Yes, these thumbnails here, your Honor.

22           THE COURT:  But what is in the thumbnails?

23           MR. AVENATTI:  The thumbnails, your Honor, are

24   screenshots of her communications with the dragons relating to

25   why she fired them -- namely, disputes over money and her

M1vWave4

1    claims that they owed her money.

2            THE COURT:  Do we have a copy of them?  In other

3    words, this is unintelligible and illegible, and I'm not

4    admitting it into evidence because no one could possibly read

5    it.

6            MR. AVENATTI:  Agreed, your Honor, which is why we

7    want Mr. Fischer to use the actual images, and he's in the

8    process of pulling the actual images for use during his

9    testimony.

10            THE COURT:  OK.  Well, that was what I wanted you to

11    do, if not before today altogether, certainly during the break,

12    was be able to identify and share with me precisely what you

13    want to offer through Mr. Fischer.  Without knowing what's in

14    here, tell me your theory of admissibility.

15            MR. AVENATTI:  The theory of admissibility, your

16    Honor, is I think it's relevant in light of Ms. Daniels's prior

17    testimony.  It also goes to my state of mind as of February 14,

18    2019.  It's also offered to show --

19            THE COURT:  I need something more specific than it's

20    relevant in light of her testimony and it goes to your state of

21    mind.  What testimony and how does it prove your state of mind

22    in a way that is relevant to this trial?

23            MR. AVENATTI:  I believe, your Honor, it's an

24    inconsistent statement to Ms. Daniels's statements on the

25    record relating to why she had terminated the dragons, No. 1.

M1vWave4

1          THE COURT:  And what statement are you pointing to

2    that you think it is inconsistent with?  What page in the

3    transcript?

4          MR. AVENATTI:  Can I have one moment, your Honor,

5    please.

6          THE COURT:  Yes.

7          MR. AVENATTI:  Thank you.

8          Your Honor, I'd like to, and I appreciate the Court's

9    patience.  Thank you.  Page 1180.

10         THE COURT:  I'm there.

11         MR. AVENATTI:  Actually, bottom of 1179 and the top of

12   1180.  "And when you fired the dragons, you also accused" --

13         THE COURT:  Slow down.  Slow down.  I'm reading it.

14   You don't need to read it to me.  Tell me the theory of

15   admissibility based on that.

16         MR. AVENATTI:  All right.  Your Honor, the screenshots

17   that Ms. Daniels provided me shows me that, in fact, the reason

18   that she provided for firing the dragons, that she could not

19   afford them is not accurate, is not true.  The screenshots show

20   that the reason why she fired the dragons was because she was

21   in a dispute over money and believed that they had withheld

22   money from her that she was due.

23         THE COURT:  But her answer was that she asked you to

24   fire them because she couldn't afford them and she didn't

25   remember whether she had accused them of stealing from her.

M1vWave4

```
1          MR. AVENATTI:  I'm at lines 3 through 5.

2          THE COURT:  I understand.  And then the colloquy

3    continues, and the answer she gives to the question of whether,

4    do you deny that you accused them of stealing from you, yes or

5    no, she said I asked you to fire them and I don't remember.

6          MR. AVENATTI:  And then I had a follow-up question,

7    "Isn't it true that you sent me a text message?"  There was an

8    objection sustained.

9          THE COURT:  I understand.

10         MR. AVENATTI:  And then, "did you ever tell me that

11   the dragons had stolen from you?"  She says, "I definitely

12   don't remember that."

13         THE COURT:  OK.  I don't see any inconsistency that

14   this would be admissible with respect to.

15         MR. AVENATTI:  Well, let me try another ground.

16         Your Honor, it goes to establish the -- and this is

17   touched on in the briefing before your Honor as it relates to

18   the other witnesses -- the personality trait of Ms. Daniels

19   that when she gets into financial disputes with people, she

20   falsely accuses them of stealing from her.

21         THE COURT:  But in order to make that argument, you

22   would need to prove that it was a false accusation.  I don't

23   know if it's a false accusation, and it would require a mini

24   trial on whether the dragons were actually stealing from her or

25   not.  For all I know, they were.
```

M1vWave4

1          MR. AVENATTI:  Your Honor, in addition, it's a prior

2     recollection recorded.

3          THE COURT:  But the recollection has to be -- I mean I

4     understand those words and the legal, but I don't get the

5     applicability here.

6          What's your next argument?

7          MR. AVENATTI:  One moment, your Honor, please?

8          Your Honor, there's no question as to the authenticity

9     of these messages.  There's no question they came from

10    Ms. Daniels.  There's no question that they were

11    contemporaneous.  It goes directly to our defense, your Honor,

12    and again, a part of our defense is that when Ms. Daniels has

13    disagreements with people, she accuses them of taking money

14    from her.

15         THE COURT:  Mr. Podolsky.

16         MR. PODOLSKY:  That's not a pertinent character trait.

17    They're trying to get into some kind of 404(b) aspect here,

18    which your Honor said would require a mini trial.  We think

19    that this is improper under the rules and also excludable under

20    403.

21         THE COURT:  All right.  I'm not going to permit this.

22    I don't think there's any valid theory of admissibility that's

23    been offered to me.  So denied on that.

24         I will either allow Mr. Fischer to testify to offer

25    defense exhibit A -- I think it's been referred to as AB, but

M1vWave4

1    there's also AD, which is the extraction report.  So I'm not

2    quite sure which it is, but in any event, the text message from

3    Mr. Macias, he can also testify -- well, I'll expect the

4    parties to reach a stipulation with respect to the termination

5    letter.  I would urge you to discuss a stipulation with respect

6    to the Macias email -- text as well and avoid the need to call

7    Mr. Fischer at all.  In either case, we'll take a half hour

8    recess.  I'll bring the jury back at that point and either you

9    should have Mr. Fischer here and ready to go in the event that

10   there is no stipulation covering those two exhibits.  If there

11   is a stipulation, then I'll allow you to introduce the

12   stipulation and then I'm going to let the jury go home, and

13   we'll take up the remaining witnesses and figure out what the

14   rest of the defense case is going to look like, if at all.  All

15   right?

16              Any questions.

17              MR. PODOLSKY:  30 minutes, your Honor?

18              THE COURT:  Yes.  It's 12:25.  We'll reconvene at

19   12:55, and I'll expect the jury to be in the box at 1:00 either

20   with Mr. Fischer in the witness box or with a stipulation to be

21   read.

22              Mr. Avenatti, any questions?

23              MR. AVENATTI:  None.

24              THE COURT:  See you in half an hour.

25              (Luncheon recess)

M1vWave4

<pre>
 1                        AFTERNOON SESSION

 2                           12:55 p.m.

 3              (Jury not present)

 4              THE COURT:  All right.  Let's plan.  Are we getting a

 5      stipulation with respect to both exhibits, calling Mr. Fischer?

 6      What's the plan?

 7              MR. AVENATTI:  Your Honor, we have agreement on a

 8      stipulation.  I plan on -- the stipulation addresses three

 9      defense exhibits.  I plan on reading the sentence relating to

10      each exhibit and then offering the exhibit.  So I'm going to

11      read a sentence, I'm going to offer that exhibit; I'm going to

12      read a sentence, I'm going to offer the next exhibit; I'm going

13      to read a sentence, I'm going to offer the third exhibit, which

14      will alleviate the need for Mr. Fischer to testify.

15              THE COURT:  All right.

16              Mr. Sobelman.

17              MR. SOBELMAN:  My understanding is that's correct, and

18      my colleagues, I believe, are finalizing it and printing it.

19      They're on their way up now.

20              THE COURT:  All right.  Can I go get the jury?  Will

21      your colleagues be here in time, or do we need to wait?

22              MR. SOBELMAN:  May I send a quick text message, your

23      Honor?

24              THE COURT:  Yes.

25              And then my plan is to tell the jury that that's all
</pre>

M1vWave4

1    we have for today, that I'll be in a position to tell them in

2    the morning whether there will be any other witnesses called on

3    the defense case.

4            Is that OK with you, Mr. Avenatti?

5            MR. AVENATTI:  I think my preference would be just to

6    inform the jury that we're adjourning for the day and they

7    should return tomorrow morning.

8            THE COURT:  All right.  That's fine.

9            MR. AVENATTI:  Your Honor, I'm assuming that you're

10   going to inform the jury that we're now beginning the defense

11   case and that I'm going to offer these pieces of evidence.

12           THE COURT:  Yes.

13           MR. AVENATTI:  Thank you.

14           THE COURT:  I'll remind them that you have no

15   obligation to put on a case at all but that we will be

16   beginning the defense case, and then you can do it.  And then

17   think instead of asking for your next witness, I will tell them

18   at that point that that's all we're going to do for the day and

19   I'm letting them go early.

20           MR. AVENATTI:  Thank you.

21           MR. SOBELMAN:  Your Honor, my colleagues are on their

22   way up right now.

23           THE COURT:  Great.

24           MR. SOBELMAN:  I think getting the jury will be fine.

25   Thank you.

M1vWave4

1            THE COURT:  Let's get the jury, and we will proceed.

2            MR. AVENATTI:  Your Honor, I'm going to go to the

3    podium, if that's OK with your Honor.

4            THE COURT:  You can stay there, and you may proceed to

5    the podium when it's time to present your case.

6            MR. AVENATTI:  Thank you.

7            MR. PODOLSKY:  Apologies for keeping the Court waiting

8    on our printer, but we have a copy of the stipulation we've

9    agreed to.

10            THE COURT:  All right.  Does Mr. Avenatti have a copy?

11            MR. PODOLSKY:  I'm going to give him this one.  And

12    he's seen an electronic copy too.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M1vWave4

1          (Jury present)

2          THE COURT:  All right.  Welcome back, ladies and

3    gentlemen.  Thank you for your patience.  I hope you had a good

4    lunch.  And again, thank you.

5          As I said before, the defense in a criminal trial in

6    this country is under no obligation to present any evidence,

7    call any witnesses, do anything, because the burden is on the

8    government and always on the government.  That being said, my

9    understanding is that Mr. Avenatti does intend to present a

10   defense case, and with that, we'll begin.

11          Mr. Avenatti.

12          MR. AVENATTI:  Thank you, your Honor.

13          Your Honor, the defense offers Defense Exhibit S1, a

14   stipulation regarding certain documents.

15          THE COURT:  All right.  Subject to our discussion

16   earlier, admitted.

17          (Defendant's Exhibit S1 received in evidence)

18          THE COURT:  You may proceed.

19          MR. AVENATTI:  Thank you, your Honor.

20          "It is hereby stipulated by the parties that Defense

21   Exhibit AD is a true and accurate extraction of text messages

22   exchanged between Michael Avenatti, the defendant, and Sean

23   Macias at or around the dates and times indicated on the

24   exhibit."

25          Could I please have exhibit AD for the jury.

M1vWave4

1          Your Honor, I move exhibit AD into evidence.

2          THE COURT:  Admitted.

3          (Defendant's Exhibit AD received in evidence)

4          MR. AVENATTI:  "Defense exhibit AB is a graphical

5     version of the contents of Defense Exhibit AB."

6          Your Honor, the defense moves exhibit AB into

7     evidence.

8          THE COURT:  Admitted.

9          (Defendant's Exhibit AB received in evidence)

10          MR. AVENATTI:  "Defense Exhibit AE is a true and

11     accurate copy of an email sent from Michael Avenatti, the

12     defendant, on February 19, 2019.  The time zone reflected on

13     the cover of the email is in UTC.  The email was sent at

14     approximately 11:10 a.m. Eastern Time."

15          Your Honor, at this time the defense offers AE.

16          THE COURT:  Admitted.

17          (Defendant's Exhibit AE received in evidence)

18          MR. AVENATTI:  Next page, please.

19          Next page, please.

20          Thank you.

21          "It is further stipulated that no party will raise any

22     objection under Federal Rule of Evidence 901 with respect to

23     any of the defense exhibits referenced above.

24          "It is further stipulated that this stipulation,

25     marked as Defense Exhibit S1, may be received in evidence at

M1vWave4

1  trial, dated January 31, 2022."

2          THE COURT:  All right.  Thank you.

3          MR. AVENATTI:  Thank you, your Honor.

4          THE COURT:  All right.

5          Ladies and gentlemen, we're actually going to stop

6  there for today and pick up tomorrow morning, in part, because

7  there are some additional matters that I need to discuss with

8  the lawyers.  And rather than take the rest of the time with

9  you waiting in the jury room, and waiting in the jury room for

10  an excessive amount of time, I'd rather let you use your time

11  more productively with respect to whatever you have to do with

12  your lives.

13          So it's a little like a school day where I'm

14  announcing early dismissal.  We're going to leave it there for

15  the day.  We'll pick up tomorrow same time and place, so please

16  be here by 8:45, the latest, and ready to go.  And then we will

17  see what comes next.

18          A couple things.  First of all, I mentioned to you

19  that when it comes time for the lawyers' closing arguments and

20  your deliberations, that I might ask you to stay past 3:00 just

21  because it gives us more flexibility.  I just want to remind

22  you of that.  I do not expect that we will do that tomorrow.  I

23  want to be clear about that.  But perhaps Wednesday, perhaps

24  Thursday.  We'll have to see what comes.  I just wanted to give

25  you a heads-up so you can make whatever arrangements you may

M1vWave4

1    need to make given the schedule we've been keeping to date.

2              Aside from that, my usual instructions apply.  No. 1,

3    keep an open mind.  No. 2, don't discuss the case with anyone.

4    No. 3, don't do any research about the case, and make sure

5    you're not exposed to any information or discussion about the

6    case.

7              With that, I wish you a very pleasant afternoon and

8    evening, and we will see you at the usual time and place

9    tomorrow morning.  Thank you very much.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M1vWave4

1           (Jury not present)

2           THE COURT:  You may be seated.

3           All right.  There are a lot of things to discuss and

4    ground to cover.  I think we should probably take up the

5    witness-related issues first, although to some extent it may

6    require some discussion of the *quantum meruit* issues, I want to

7    discuss those as well and the issues pertaining to the nature

8    and scope of the defendant's testimony, if there is any, and

9    any cross-examination.

10          That's on my agenda.  Anyone have anything else to

11   raise or anything you want to raise before we start discussing

12   those items?

13          MR. PODOLSKY:  No, your Honor.

14          MR. AVENATTI:  Your Honor, the defense did have one

15   item, and that was that Mr. Dalack wanted to be heard relating

16   to the submission by Ms. Marino and the representations

17   submitted in the submission concerning Mr. Dalack's

18   communications with Ms. Marino, to which I was not a party.

19          THE COURT:  All right.  Mr. Avenatti, that is in the

20   subject of the witnesses, so that's not a separate matter, but

21   certainly to the extent that Mr. Dalack can speak to those

22   issues, I would obviously be happy to hear from him.

23          MR. AVENATTI:  Thank you.

24          THE COURT:  Let's turn to the witnesses then and, yes,

25   take them one at a time.

M1vWave4

1        I want to say at the outset, because Mr. Avenatti,

2   this may have bearing on what you want to communicate or have

3   your people communicate through these witnesses, to the extent

4   that any of these witnesses is permitted to testify, they'd

5   better be here tomorrow morning ready to go.  If they are not,

6   they are not going to testify.  So I just want that to be loud

7   and clear and unambiguous.

8        Do you hear me?

9        MR. AVENATTI:  I understand, your Honor.  We're going

10  to do everything in our power to get them here.

11       THE COURT:  Good.

12       All right.  Let's take them one at a time.  We've

13  already dealt with Mr. Fischer.  Let's talk about Mr. Loupe.

14  I'll ask the government to speak to these items first, since

15  the last word came from Mr. Avenatti.

16       Hang on one second.  Let me get my documents up here.

17       I'll hear from the government.  I guess the question I

18  have, it seems to me that hearing from Mr. Loupe about

19  Ms. Daniels's involvement with the paranormal and her belief in

20  spirits and the like, particularly since as I understand it,

21  his relationship with her postdates the events at issue in this

22  case, that I'm inclined to exclude it on both 401 and 403

23  grounds.  I think we've developed the record on that quite

24  extensively, and it doesn't seem to me that calling a witness

25  to speak to her interest in those matters from 2019 or 2020

M1vWave4

1    will add anything.

2            That being said, Mr. Avenatti proffers that Mr. Loupe

3    has witnessed Ms. Daniels's consistent memory loss and

4    inability to remember facts and details during the last three

5    years; some reference to diminished mental capacity -- I don't

6    know what that means exactly; and that she operates in a

7    trance, he has seen her operate in a trance after which her

8    memory is wiped and she can't remember anything.  I guess the

9    question I have, certainly my initial question, is why his

10   testimony wouldn't be admissible with respect to those items to

11   the extent that it's impeachment of Ms. Daniels's credibility

12   and memory as a witness.

13           MR. PODOLSKY:  For starters, your Honor, I read that

14   as another way to describe the paranormal activity.  I'm not

15   aware of any basis for the proffer that he be able to testify

16   as to any of those items.  I'm not sure there's a good faith

17   basis for those questions.  If the defendant is able to proffer

18   that he's spoken to Mr. Loupe or has some reason to ask these

19   questions, maybe we could consider it.  But I will also say

20   that I think this testimony should be excluded under 403.

21           For one thing, he didn't meet Ms. Daniels until after

22   the events at question here.  Ms. Daniels was subjected to

23   cross-examination as to her memory of the events, and she was

24   impeached with or attempted to be impeached with

25   contemporaneous communications.  Mr. Loupe is not a doctor.  He

M1vWave4

1    has no useful evidence to give on her mental capacity.  I'll

2    start with I have no idea where these allegations are coming

3    from.  We're certainly not aware of any, and frankly, they're

4    inconsistent with what we observed on the stand.

5              THE COURT:  All right.

6              Mr. Avenatti, do you want to make a more detailed

7    proffer with respect to your basis to believe that he would and

8    could testify to the effect that I just described?  Or do you

9    wish to be heard on the admissibility of further testimony

10   regarding her interest in the paranormal and the like?

11             MR. AVENATTI:  Your Honor, I'm sorry.  I didn't catch

12   the last phrase.

13             THE COURT:  Do you wish to be heard with respect to

14   Mr. --

15             MR. AVENATTI:  Yes.

16             THE COURT:  -- perhaps a more detailed proffer with

17   respect to particularly the items that I flagged would be

18   helpful.

19             MR. AVENATTI:  Yes, your Honor.

20             Each of the items identified in the letter, your

21   Honor, go to Ms. Daniels's competency as a witness, her

22   competency to adequately recall events, facts and the like.

23   The fact that Mr. Loupe met Ms. Daniels after the conduct at

24   issue is really of no relevance and is largely a red herring.

25   The question is does Mr. Loupe have knowledge relating to

M1vWave4

1    Ms. Daniels's conduct, behavior, what he has witnessed

2    firsthand in the time period immediately prior to her taking

3    the stand in this case, which he does.

4            According to the proffer that we've offered, and I

5    don't think that there's much dispute about this, he spends an

6    inordinate amount of time around Ms. Daniels, has observed

7    Ms. Daniels, and in fact --

8            THE COURT:  Does he live with her now?

9            MR. AVENATTI:  Yes.

10           THE COURT:  OK.  I think my specific question was what

11   is your good faith basis to say that he would be prepared to

12   testify that she has consistent memory loss, an inability to

13   remember facts and details?  I think "at this time" is the

14   relevant question.

15           MR. AVENATTI:  Mr. Loupe has given a series of

16   interviews with Ms. Daniels and also separate from Ms. Daniels,

17   where he describes her inability to remember things, how she

18   appears in this trance-like state, his involvement in placing

19   her into a trance-like state, taking her out of a trance-like

20   state.  There is a litany of interviews that Mr. Loupe has

21   provided where he has --

22           THE COURT:  Let me ask you about the trance-like

23   state.  Is the testimony that after she comes out of it she

24   doesn't remember anything that predated the trance at all?

25   Because she wasn't in a trance, as far as I could tell, on the

M1vWave4

1    stand.  So in that regard, I don't know what relevance it would

2    have that he's able to put her in a trance and that in that

3    time she doesn't recall things accurately.  That seems like a

4    total sideshow and cumulative of the testimony that you

5    elicited regarding her interest in the paranormal.

6         MR. AVENATTI:  Your Honor, Mr. Loupe, based on the

7    interviews, has discussed Ms. Daniels's memory loss both in the

8    trance and outside of the trance over the last two and a half

9    years and how she has been unable to recall entire events based

10   on her -- well, based on her cognitive condition, your Honor.

11   So I would expect the testimony to be developed of what he's

12   observed firsthand, what he has observed relating to her

13   inability to recall, what he's observed relating to her

14   delusional beliefs and her detachment from reality and the

15   facts.  And that's what I would expect him to testify to based

16   on the interviews that I've heard, the social media posts that

17   have been made, and the like, all of which goes to her

18   competency to testify and adequately recall facts and events

19   years prior.

20        THE COURT:  Mr. Podolsky.

21        MR. PODOLSKY:  Your Honor, I think we need something

22   more specific than what the defendant's just said, because what

23   I hear is on interviews on Spooky Babes, she talks about

24   trances and paranormal activity, which we've already heard a

25   lot of, and what is absolutely, palpably clear is that the

M1vWave4

1    defendant simply wants to provoke an emotional reaction in a

2    juror to the fact that Mr. Loupe or Ms. Daniels might be

3    strange or weird and they should take that into account in

4    their deliberations.

5         I hear Mr. Avenatti saying in Spooky Babes interviews

6    she talks about trances.  I don't think that goes at all to her

7    diminished capacity, and if it did, it's certainly cumulative

8    of what Ms. Daniels was asked about on the stand.

9         MR. AVENATTI:  Your Honor --

10        THE COURT:  Hold on.

11        I completely agree, and if he asks those questions,

12   I'm prepared to sustain them.  But I guess the question is he

13   seems to think he has a good faith basis, based on interviews

14   and social media posts, and he does cite some in footnote 7 of

15   his submission that don't appear to be Spooky Babes

16   specifically.  Maybe he does, maybe he doesn't, but I guess the

17   question for my purposes is should he be allowed to call him as

18   a witness to attempt to elicit from him testimony that in this

19   day, at this time, given that she testified last week, is there

20   a reason to doubt her recollection of events?  Does she have

21   difficulty remembering things, etc.?

22        MR. PODOLSKY:  Your Honor, I'm happy to spend more

23   time looking at Midnight Paranormal Society on YouTube and

24   paranormal activity on Facebook --

25        THE COURT:  Mr. Podolsky, let's be clear, you are not

M1vWave4

1    happy to do that.  You may do that, but you don't actually want

2    to.

3           MR. PODOLSKY:  I don't know.  After this trial, maybe

4    I'll spend more time in the paranormal.

5           Look, the bottom line is I can tell just from the URLs

6    that this is just more trying to besmirch her with the Spooky

7    Babes.  We're happy to take a look, and if there's something in

8    there, if he has some ability to provide some form of testimony

9    that actually bears on her ability to recall facts and details

10   on the stand, then maybe he would have a good faith basis.  But

11   merely based on what he has said and what I observe in his

12   letter, it appears that is not the case.

13           THE COURT:  All right.

14           Mr. Avenatti, do you want to be heard with respect to

15   the Karbley matter and Mr. Loupe's testimony there?  Because it

16   seems to me that, No. 1, any testimony he may offer on that

17   would be hearsay, I presume.  And No. 2, for reasons that we'll

18   get to, I'm disinclined to think that the Karbley accusations

19   or incident should be admitted at all.

20           Do you wish to speak to that as to Mr. Loupe?

21           MR. AVENATTI:  Not as to Mr. Loupe.

22           THE COURT:  OK.  My ruling is, as to Mr. Loupe, I will

23   not preclude him from being called as a defense witness.  If he

24   is here tomorrow and prepared to testify, he may, but I will

25   certainly cabin his testimony.  I'm not going to permit further

M1vWave4

1    inquiry regarding Ms. Daniels's interest in the paranormal, the

2    occult, Susan the doll, anything of that nature.  We've, I

3    think, plowed that ground perhaps exhaustively, but I think it

4    would be entirely cumulative if that's the testimony that's

5    elicited.

6            To the extent that he has testimony to offer with

7    respect to Ms. Daniels's ability to recall things today that

8    will speak to her credibility as a witness today, then I'll

9    permit him to testify on those issues.  But he won't be allowed

10   to testify with respect to the stuff that was elicited from

11   Ms. Daniels on cross, nor would he be allowed to testify

12   regarding the Karbley incident.  Subject to that ruling, if

13   he's here tomorrow and prepared to take the stand, he may

14   testify.

15           MR. AVENATTI:  Your Honor, one point of clarification.

16           I just want the record to be clear, your Honor's not

17   suggesting that it's optional for him to appear here tomorrow.

18   He's under subpoena, so we're going to inform his lawyer that

19   we want him here tomorrow.  If he does not appear tomorrow,

20   then we may have him deemed or attempt to have him deemed a

21   material witness or otherwise, but what I want to avoid is a

22   similar situation to what happened over the weekend, where the

23   witnesses somehow think that the subpoenas are optional when

24   they're not optional.

25           THE COURT:  Subpoenas, in general, are certainly not

M1vWave4

1    optional, and I agree with you on that score.  Mr. Loupe's

2    lawyer, you'll recall, did submit something to the Court saying

3    that he had prepared a motion to quash, but he didn't actually

4    file it, and for that reason, I did not even look at it.  So I

5    don't know what, if any, representations have been made to

6    Mr. Loupe through his counsel.  I don't know if he has a valid

7    argument to make to quash the subpoena, but certainly unless

8    and until the subpoena is quashed, he is subject to the

9    subpoena, and he'd better be in this courtroom.  And if he is

10   not, he is subject to the penalties that flow from that.

11             MR. AVENATTI:  Thank you.

12             THE COURT:  But if he's not here tomorrow, I don't

13   anticipate that he will testify.

14             As I said, we've discussed Mr. Fischer, so let's turn

15   to Mr. Karbley then.  And let me hear first from the government

16   on Mr. Karbley.

17             MR. PODOLSKY:  Your Honor, this is much like the issue

18   we took up before.  It's clear that what Mr. Avenatti wants to

19   do is try to get in some other prior instance where Ms. Daniels

20   has a disagreement with someone, and then I suppose we'll be in

21   a mini trial about the reasons for which she fired Mr. Karbley.

22             I would say this one is particularly excludable under

23   403.  Just based on the 26.2 materials we received, it's

24   absolutely clear that this will be a sideshow and unfairly

25   prejudicial.  Ms. Daniels fired Mr. Karbley based on what she,

M1vWave4

1    as I understand it, her understanding that he had, I believe,

2    engaged in a form of sexual harassment and other misconduct.

3    Now they wish to call Mr. Karbley, I guess, because he's angry

4    at her for him being fired.  I think this is a complete

5    sideshow.  It's collateral and doesn't go to any issue in the

6    trial and should be excluded.

7              THE COURT:  I'm inclined to agree.  Mr. Avenatti, tell

8    me why that is wrong and if there is any other basis to call

9    him.

10             MR. AVENATTI:  Yes, your Honor.

11             Well, first of all, in her first interview with the

12   government, Ms. Daniels identified Mr. Karbley as an individual

13   with knowledge concerning the issues in this case.

14             THE COURT:  I think, as you proffer, she identified

15   him as someone that she had spoken to about the book payments.

16   Now, No. 1, I don't know what she said to him.  And No. 2,

17   presumably anything she said to him would be hearsay.

18             MR. AVENATTI:  Well, your Honor, I believe that his

19   testimony will be favorable and potentially exculpatory

20   relating to what Ms. Daniels told him relating to the book

21   payments.

22             THE COURT:  And what is your proffer on that?

23             MR. AVENATTI:  Well, I'd be happy to make that *in*

24   *camera*, your Honor.

25             THE COURT:  No.  Tell me now what your proffer is.

M1vWave4

1          MR. AVENATTI:  Well, my understanding is --

2          THE COURT:  The government has rested its case.  We're

3     on your case.  At this point, there's nothing that the

4     government can do to deal with whatever is coming down the

5     pike, so there's no basis for an *ex parte* proffer at this

6     point.  What's your proffer?

7          MR. AVENATTI:  I believe, your Honor, that Mr. Karbley

8     will testify concerning communications that he had with

9     Ms. Daniels where she said she was not owed any money under the

10    book deal.

11         THE COURT:  And can you tell me the timing and nature

12    of these communications?

13         MR. AVENATTI:  2018 to early 2019.

14         THE COURT:  She was saying that to him even while

15    sending you repeated messages saying where's my money, where's

16    my money, where's my money?

17         MR. AVENATTI:  Your Honor, I'm not here to debate with

18    the Court.  I'm giving you a good faith basis as to what I

19    think his testimony is going to be, and then there's other

20    reasons why I think I should be able to call him.

21         THE COURT:  OK.  Tell me the other reasons, and then

22    we'll discuss them one at a time.

23         MR. AVENATTI:  Mr. Karbley witnessed the extent of

24    Ms. Daniels's security that was around her in 2018, 2019.  That

25    goes directly to the amount of costs for that security, and of

M1vWave4

1    course, the defense submits, I submit, your Honor, that I was

2    entitled to be reimbursed for all of those costs associated

3    with security.

4         THE COURT:  Can you speak into the microphone, please.

5         MR. AVENATTI:  And I submit that I was entitled to be

6    reimbursed for all of the costs associated with that security.

7    Those were not costs that I had to incur.  So the amount of

8    those costs and the extent of those costs is directly relevant

9    to my good faith belief and state of mind as to whether I was

10   entitled to keep part of the money from the book deal as

11   reimbursement for those costs.

12        THE COURT:  And isn't there plenty of record on that

13   both through her testimony and the bank records?

14        MR. AVENATTI:  Well, your Honor, it's a critical issue

15   in the case.  I don't think it's cumulative.

16        THE COURT:  OK.  Next?

17        MR. AVENATTI:  Next, I believe that Mr. Karbley also

18   has witnessed Ms. Daniels's delusional and bizarre behavior,

19   including her inability to separate reality from fantasy as

20   well as her inability to remember facts and things

21   appropriately.

22        THE COURT:  When is the last time that he had anything

23   to do with her?

24        MR. AVENATTI:  September of 2021, I believe.

25        THE COURT:  OK.  So he can't actually speak to her

M1vWave4

1     current state of mind, is that correct?

2              MR. AVENATTI:  Well, I wouldn't necessarily agree with

3     that, your Honor.  It's close in time.  I mean it's only five

4     or six months later.  I mean this isn't something where he's

5     going to talk about how she couldn't remember things five years

6     ago.  I mean this is someone who's spent an inordinate amount

7     of time with her over about a three year, two and a half year

8     time period.  In the last, call it 36 months, he's been with

9     her probably about 30 of those months.  So it's not so remote

10     in time as to call into question the veracity or relevancy of

11     the testimony.  If she was unable to accurately recall things

12     for a significant period of time, as late as six months ago, I

13     think that's certainly relevant to her ability to now, all of a

14     sudden, allegedly accurately recall specific facts and events.

15              THE COURT:  OK.  Next?

16              MR. AVENATTI:  And then we have the issue relating to

17     the 404(a)(2)(A) issue that we raised in the letter.  I mean I

18     think I adequately set forward, or set forth, I should say,

19     that issue in the letter.  I'd be happy to address it further

20     if your Honor would like to hear from me.

21              THE COURT:  And that issue is her accusation against

22     him?

23              MR. AVENATTI:  That's correct, your Honor.

24              Again, this personality trait that when Ms. Daniels

25     gets into a disagreement with someone, especially over money,

M1vWave4

1   she then begins making financial allegations against them

2   relating to crimes -- extortion, theft, and the like.  I mean

3   this is a pattern.  It is a constant pattern.  It's happened

4   repeatedly over the last few years, and it has happened during

5   the time period relevant to the conduct in this case as well as

6   since this case was filed.

7        THE COURT:  All right.  Anything else?

8        MR. AVENATTI:  Yes.

9        Under 608(a), we would offer Mr. Karbley's statements

10  that Ms. Daniels has a reputation for untruthfulness and

11  dishonesty and that he is of the opinion that she is untruthful

12  and dishonest, which we're able to offer under 608(a).

13        THE COURT:  All right.  Is that it?

14        MR. AVENATTI:  Yes.

15        THE COURT:  All right.

16        MR. AVENATTI:  Well, separate and apart from what's

17  already in the letter, your Honor.

18        THE COURT:  I'm asking you to walk through all of your

19  arguments, so I expect you to incorporate what is in your

20  letter.  But I think that covers it.

21        Mr. Podolsky, do you want to take those one at a time?

22        First, if she told Mr. Karbley that she wasn't owed

23  any money on the book deal in the fall of 2018, early 2019,

24  what's your response to that?

25        MR. PODOLSKY:  Well, first, I think a more detailed

M1vWave4

1    proffer would be in order because there's nothing in the 26.2

2    materials we received on that.  And in fact, Mr. Karbley

3    informed our agent that he has no knowledge and has never heard

4    anything like that.  So I'm a little bit skeptical here.  And

5    frankly, it brings up the 403 issues because of it.  If Mr.

6    Avenatti wants to simply put these questions to him, despite

7    having previously said he has no knowledge of it, in order to

8    impeach him we're going to be forced to talk about all of these

9    same sideshows that, frankly, is what I think Mr. Avenatti

10   wants to call him for to begin with.  So I don't think there's

11   a sufficient basis to claim he is going to come here and,

12   notwithstanding what he told our special agent, claim that in a

13   prior period Ms. Daniels slipped to a bus driver directly

14   contradicting what she was telling to everybody else in her

15   life.

16            THE COURT:  OK.  And his testimony regarding security.

17            MR. PODOLSKY:  Yes.  There's an inordinate amount of

18   evidence on this issue in the record.  I don't think the bus

19   driver's view of the security guards' work is relevant at all.

20   To the extent Mr. Avenatti wants to argue, contrary to the

21   contract and all the evidence in the case, that he was supposed

22   to be paid back for the security, there is actually documentary

23   evidence already in the record about how much the security

24   guards were paid.  So I'm not sure I understand why the bus

25   driver's opinion about the security guards is relevant to any

M1vWave4

1    matter in this case.

2           THE COURT:  All right.  Inability to recall things.

3           MR. PODOLSKY:  Again, your Honor, what Mr. Avenatti

4    wants to do is try to find everybody who dislikes Ms. Daniels

5    and have them, again, describe her belief in the paranormal and

6    that makes her difficult to trust.  I don't think the bus

7    driver's simply biased view, again, of her paranormal

8    activities should be admitted in this case.

9           THE COURT:  And 608(a)(1).

10          MR. PODOLSKY:  Same, your Honor.  I think this is

11   easily excludable under 403.

12          THE COURT:  Here's my problem, Mr. Podolsky.  I do

13   fear that this is all an effort to just kick up dust and cause

14   confusion, but the problem is that the proffer is being made

15   that there's a witness who would testify that she told him that

16   she wasn't owed any money under the book contract.  That does

17   seem like it is something that the defendant is entitled to

18   elicit.  You may have a contrary prior inconsistent statement,

19   and you can impeach him on that.  You may have valid arguments

20   that he's biased, but that strikes me as fodder for

21   cross-examination and not a basis to exclude the witness

22   altogether.

23          Relatedly, if he can lay a proper foundation and

24   testify that she has a reputation for dishonesty and

25   untruthfulness, I'm inclined to think he can do that under Rule

M1vWave4

608(a), again, subject to your right to cross-examine on points
you have raised.  I recognize that the accusations she has made
against him may, if we go that route, the accusations may
ultimately come into the picture because it goes to his bias,
but I'm certainly inclined to exclude those, at least in the
direct, because it's extrinsic proof of a particular episode of
alleged un truthfulness and, therefore, I think not admissible
under 608(b).  And for the reasons I stated earlier, its
probative value -- I think its probative value is relatively
minimal and depends entirely on the accusations being false and
to determine the truth or falsity of the accusations would
require a mini trial on an issue that is marginally, if at all,
relevant.  So I don't think he can be called to testify as to
that.  Whether the door is opened to it or not is a different
question.

          I guess all that is to say my inclination is that he
should be permitted to testify as to any statements that
Ms. Daniels made with respect to whether she was owed any book
money, with respect to her character for truthfulness, and with
respect to, if he has anything to say, with respect to her
current ability to recall things.  Those are appropriate
subjects for inquiry.  I'm not going to permit him to testify
as to security costs, and anything that he could say on that
score would be cumulative of the evidence already in the
record, and for the reasons I stated, any probative value as to

1      the accusations of stealing is far outweighed by the dangers of

2      unfair prejudice, waste of time, and confusion of the issues.

3      So that's sort of where I land.

4                  Anything you wish to say?

5                  MR. PODOLSKY:  No, other than I think a more specific

6      proffer, the basis for the statement would be in order given

7      the issues here.

8                  THE COURT:  Well, I'm assuming --

9                  Well, Mr. Avenatti, can you tell me what the basis for

10     your proffer is that Ms. Daniels told Mr. Karbley in the fall

11     of 2018 and early 2019 that she wasn't owed any book money?

12                 MR. AVENATTI:  Communications with Mr. Karbley.

13                 THE COURT:  All right.  Well, I sure hope that's --

14                 MR. PODOLSKY:  Sorry, your Honor.

15                 THE COURT:  He said communications with Mr. Karbley.

16                 MR. PODOLSKY:  Between the defendant and Mr. Karbley?

17                 THE COURT:  I would assume, or defense people

18     associated with the defendant and Mr. Karbley.  I mean it's not

19     my job to exclude a witness because their testimony may be

20     lacking in credibility.  That's what cross-examination is for,

21     so --

22                 MR. PODOLSKY:  Understood, your Honor.  I just think

23     in the context and given the 403 issues, I'm just trying to

24     make sure there really is a basis for it.  That's all.

25                 THE COURT:  Well, if he doesn't testify to it, then

M1vWave4

1    there's nothing to impeach.  So I guess in that regard one

2    thing follows from the other.  I will circle back whether

3    there's any cumulativeness issue with respect to these

4    witnesses to the extent that Mr. Avenatti is proposing to call

5    multiple witnesses to speak to Ms. Daniels's either character

6    for truthfulness or ability to recall events, because there may

7    be issues on that score.  But subject to that, I'll allow

8    Mr. Karbley to testify to the limited issues that I've

9    discussed and described.  So again, if he's here tomorrow, I'm

10   prepared to let him testify subject to objections to specific

11   questions.

12            Let's talk about Mr. Barrale.

13            MR. AVENATTI:  Yes, your Honor.

14            I provided the Court in detail with the history of

15   Mr. Baralle, his role in Ms. Daniels's life, his knowledge

16   relating to the book deal.  In fact, the government elicited

17   testimony relating to Ms. Daniels's reaction upon learning of

18   the book deal.  She was actually standing in Mr. Barrale's home

19   at the time.  She also testified she had a number of --

20            THE COURT:  That doesn't actually make calling him

21   relevant.  I mean I understand that they elicited that, but

22   this case pertains to really what happened between July of 2018

23   and February of 2019.  So what's his relevance to those issues?

24            MR. AVENATTI:  Mr. Barrale, as I detailed in the

25   letter, your Honor, observed a lot of the work that was done

M1vWave4

1    for Ms. Daniels, had communicated with me during that time

2    period, was familiar with the quality and quantity of that

3    work, is also specifically familiar with the quality and

4    quantity of the work that was done in connection with the

5    dispute that Ms. Daniels had with him and his partner.  There's

6    been no testimony in the case thus far concerning what work was

7    done in connection with that matter, so it would not be

8    cumulative.  He is perhaps the best witness to testify on that

9    topic because he was on the other side of it and can testify as

10   to how much work was done, what that involved, etc.

11          He also has knowledge as to certain costs that were

12   advanced from Ms. Daniels beyond security costs.  He was a

13   witness to this time period, your Honor, that you've just

14   focused on of July of 2018 to January, February 20 -- really

15   I'd say December of 2018, July 2018 to December 2018.

16          He and his partner are perhaps the two closest people

17   at that time to Ms. Daniels and, again, observed firsthand the

18   issues that are outlined in my letter.  And then again, as with

19   Mr. Karbley, we would seek to have him testify pursuant to

20   608(a) concerning Ms. Daniels's reputation for untruthfulness

21   and dishonesty and that he is of the opinion that she is

22   untruthful and dishonest.

23          THE COURT:  Mr. Podolsky.

24          MR. PODOLSKY:  First of all, your Honor, I believe

25   that Mr. Barrale's attorney, maybe in the last 30 minutes, has

M1vWave4

1    filed a reply, which may bear on some of these issues and speak

2    directly to his ability to testify as to any of these matters.

3    I haven't had a chance to look at it, but I believe his

4    attorney may have addressed specifically what facts he could

5    provide in a reply brief.

6           THE COURT:  OK.  I haven't seen that myself, but we're

7    looking for it now.  Do you want to table our discussion of

8    Mr. Barrale until we have all had an opportunity to see it?

9           MR. PODOLSKY:  I think that would be more useful.  I

10   don't want to speak without the benefit of the record.

11          THE COURT:  All right.  We'll table it for the moment

12   while we look for that, and if we locate it, we'll hopefully be

13   able to make copies for everybody and docket it as well.

14          MR. PODOLSKY:  Thank you.

15          THE COURT:  Let's talk about Mr. Colorado.  I guess

16   this requires, I think, a little bit of a detour into the

17   *quantum meruit* type issue, because -- let me lay out sort of my

18   quandary.  I'm inclined, as I said at sidebar, to agree with

19   the government's view of the *quantum meruit* issue, which is

20   that there's absolutely no objective basis for an argument that

21   Mr. Avenatti was entitled to this money on a *quantum meruit*

22   theory and no *quantum meruit* theory will justify the false

23   representations that he made to secure it.  But be that as it

24   may -- well, I think based on the existing record, unless Mr.

25   Avenatti introduces testimony or evidence, and I think the only

M1vWave4

1    conceivable way he could is if he testifies as to his own

2    subjective belief that, however mistaken it may have been, that

3    he was entitled to take this money, I don't think that there's

4    a basis in the record to instruct the jury with respect to

5    *quantum meruit*.  I think all of the evidence and testimony

6    regarding Mr. Avenatti's work on behalf of Ms. Daniels -- the

7    quantity and quality of it is the recurring trope -- I think

8    all of that is only relevant to the extent that *quantum meruit*

9    comes into this case, and again, my inclination is that the

10   government is correct and the only way *quantum meruit* comes

11   into this case is if Mr. Avenatti testifies that he

12   subjectively, even if wrongly, subjectively believed that he

13   was entitled to this money on some theory of *quantum meruit*.

14          The problem that I have is Mr. Avenatti is likely to

15   testify, if at all, last, and in that regard, I think he's

16   entitled to, if he testifies, then I think to make that

17   argument, he is entitled to build a record with respect, to

18   some extent, to the quantity and quality of work that he did on

19   Ms. Daniels's behalf and, I think, to some extent should be

20   entitled to introduce evidence, testimony regarding his firm's

21   billing practices and the contingency fee arrangements that

22   they typically have and reasonableness -- well, the contingency

23   fee agreements that they typically have and arrangements with

24   clients and so forth.

25          So I guess the quandary I have is it seems to me is

M1vWave4

1    that we don't know sitting here whether *quantum meruit* will end

2    up being in this case or not or if I'll tell the jury it is

3    irrelevant and they should disregard it.  And again, we haven't

4    yet even discussed that issue, so this is all tentative and me

5    speaking or thinking out loud.  But I guess the problem I have

6    is I need to make a determination regarding the admissibility

7    of Mr. Colorado without knowing whether *quantum meruit* comes

8    in, and it seems to me that allowing it in conditionally is

9    probably appropriate or necessary given, again, the possibility

10   that the defendant testifies and does manage to introduce it

11   into the case.  So that's sort of the quandary that I have.

12            Mr. Podolsky.

13            MR. PODOLSKY:  I suppose two points to make are -- I

14   understand the Court's analysis.  I suppose the first question

15   is whether --

16            THE COURT:  I'm thinking out loud.

17            MR. PODOLSKY:  Yes.

18            THE COURT:  I'm not making any rulings.  Let's be

19   clear about that.

20            MR. PODOLSKY:  Understood, your Honor.

21            I think even assuming that there were a basis to build

22   a record as to the quantity of the work, and so on, I think

23   there's a question as to whether it's cumulative from

24   Ms. Regnier's testimony.  She was crossed on this matters, as

25   was Ms. Daniels.

M1vWave4

1          I think there's a second question, which is, as I

2   understood the theory articulated by the defendant at the end

3   of the day in court Thursday or Friday of last week –– they're

4   running together a little for me –– it was really the work done

5   on the book deal that he would be entitled to recoup through

6   some *quantum meruit* idea.  So if that's the case, I'm not sure

7   I completely see the relevance of walking through all of the

8   various legal filings he might have done for Ms. Daniels, which

9   is what I understand the Carlos Colorado testimony to be,

10  although maybe I'm misunderstanding that.

11          THE COURT:  Mr. Avenatti.

12          MR. AVENATTI:  Your Honor, if I was unclear

13  previously, let me be clear now.  It's not limited to just the

14  book deal.  It was a global fee agreement addressing a number

15  of different issues, and whether the work was done in

16  connection with the book deal or some other legal

17  representation, we were still entitled –– I was still entitled

18  to a reasonable fee.

19          Now, I was entitled to that reasonable fee under

20  either of the two scenarios: either pursuant to the contract,

21  which specifically provides for it, and we've already

22  established or at least I've already claimed and I think

23  there's a good argument that that contract was never amended by

24  law, because there was no consideration for it, for the

25  amendment, alleged amendment.  So if I'm entitled to a

M1vWave4

1    reasonable fee under the contract, what Mr. Colorado would

2    testify about, would go to the reasonableness of that and

3    whether the amount that was kept was reasonable or

4    unreasonable.  So that's No. 1.

5         THE COURT:  And spell that out for me, because you're

6    not calling Mr. Colorado as an expert.  You didn't notice him

7    as an expert.  I don't think he would be admissible to testify

8    as an expert.  So as I understand it, all he could testify to

9    is the amount of work you'd done.  As I further understand it

10   and from the attachments that you submitted in connection with

11   your opposition, he drafted the complaint in the Ohio false

12   arrest case, but that's already in the record through the

13   testimony of Ms. Regnier and the testimony of Ms. Daniels

14   herself.  So there's no real dispute.

15        You also attached, I think, a single email or

16   certainly a single email chain referencing some Texas case, but

17   unless there's more to that, that single email suggests that

18   his involvement in that was pretty tenuous to nonexistent, and

19   his lawyer's representation in the letter is that his

20   involvement with respect to Ms. Daniels was limited to the one

21   Ohio matter.  So it seems like there's not much added on that

22   through Mr. Colorado.

23        MR. AVENATTI:  Well, your Honor, just to be clear, I

24   wasn't running Skadden Arps.  All right?  This was a relatively

25   small firm.  Mr. Colorado witnessed, spoke to, observed a lot

M1vWave4

1    of the work that was being done.  I mean this is a single-floor

2    office, where attorneys regularly communicate with one another,

3    and this was a big client.  This was a big deal in the firm.

4    So I doubt Mr. Colorado's going to testify that he had no idea

5    what was going on in connection with these other matters.  In

6    fact, I know that he won't testify to that.  So that's No. 1.

7            No. 2, Mr. Colorado's testimony relating to the custom

8    and practice of the firm and the percentage fees that the firm

9    charged clients on a regular basis, including in connection

10   with fee agreements that Mr. Colorado was responsible for

11   securing and explaining to clients of the firm, goes to the

12   reasonableness of the percentage in this case, which is about

13   18-1/2 percent.  It's not out of the ordinary.  In fact, it's

14   incredibly low compared to what the firm generally charged its

15   clients.

16           THE COURT:  But you're mixing fee agreements with

17   respect to other clients, and you're trying to use that as a

18   basis for arguing some *quantum meruit* principle that I think

19   probably doesn't apply unless you testify, in which case you

20   can testify as to your belief that it was reasonable based on

21   the fact that it's lower than the contingency fee agreements

22   that you had with other clients.

23           MR. AVENATTI:  What I'm struggling to understand, your

24   Honor, is how it is we're read the word "reasonable" out of the

25   contract.  The contract specifically contains the same word,

M1vWave4

1   "reasonable," as the concept of *quantum meruit* under 6147 and

2   6148 of the Business and Professions Code of California.

3         There's only two possibilities.  Either the contract

4   is valid and I was responsible for a reasonable fee or the

5   contract's invalid and responsible -- in which case I'm

6   entitled to a reasonable fee.  Those are the only two

7   possibilities.

8         THE COURT:  OK.  Well, except, let's talk about this.

9   The contract, paragraph 4, you have a one-time payment of $100,

10  no concept of reasonableness there.  Item B is attorney's

11  standard hourly fees and out-of-pocket costs.  There's no

12  reasonableness issue there.  The only place in which

13  reasonableness comes up is in the event that attorney assists

14  client in finalizing any book or media opportunity that results

15  in client being paid --

16        MR. AVENATTI:  Which happened.

17        THE COURT:  -- that the two agree that attorney shall

18  be entitled to a reasonable percentage to be agreed upon.

19        Now, No. 1, I'm quite sure under California law that's

20  an unenforceable agreement to agree.  So in that regard, I

21  don't think that there's a valid contractual argument.  But be

22  that as it may, if you take the stand and testify that you

23  believed that you were entitled to it because you thought it

24  was a reasonable fee, that would be one thing.  I just think

25  using Mr. Colorado to either be a surreptitious expert witness

M1vWave4

with respect to the reasonableness of the fee or a back-door

way of trying to introduce your own state of mind when you may

or may not testify to that doesn't work.  In that regard, it

adds nothing if you testify, and if you don't testify, I don't

think it's admissible.

MR. AVENATTI:  Let me address that, if I could, your

Honor.

THE COURT:  Please.

MR. AVENATTI:  For the sake of argument, we will

assume that you are right --

THE COURT:  Thank you.

MR. AVENATTI:  -- that the last cause --

That won't be the last time.  I'm positive, your

Honor.

That clause relating to the reasonable fee on the

book, let's assume that you're correct and that's void because

it is an agreement to agree.  The result is not that I don't

get a percentage of the book.  The result of the clear

California law is I get *quantum meruit*; I get a reasonable fee.

That's what 6147 and 6148 and the Supreme Court of California

decisions that I've cited provide.  It's not that Ms. Daniels

gets a windfall and she doesn't have to pay any portion of the

book deal.  That is clearly not the law in California.  So if

that clause is found to be defective, it's not as if I don't

get paid for my work on the book deal.  I get paid for my work

M1vWave4

1    on the book deal under California law then, which is a

2    reasonable fee determined with a whole host of factors.

3         THE COURT:  I understand the argument, and perhaps you

4    would have had a valid legal claim, which I think pursuant to

5    the contract you would have to bring in arbitration, but I

6    don't see how that's a basis to say that you were entitled to

7    take this money without advising Ms. Daniels.

8         MR. AVENATTI:  Your Honor, it goes directly to state

9    of mind.  This is the --

10        THE COURT:  Which is why if you testify you're

11   certainly welcome to testify that you, however wrongly,

12   believed that you were entitled to this money.  But I think if

13   you do that, then Mr. Colorado's testimony regarding the

14   contingency fee arrangements that are in other fee agreements

15   with other clients who had nothing to do with Ms. Daniels

16   doesn't add anything.

17        MR. AVENATTI:  Your Honor, I don't believe I have to

18   testify in order to have a defense relating to a reasonable

19   belief and/or a good faith belief, especially when this is the

20   law.  I mean it's the law in California.

21        THE COURT:  All right.  I'll tell you what.  Let's

22   table Mr. Colorado until we discuss the *quantum meruit* issue,

23   because I think if the government is right, and I've indicated

24   that I"m inclined to think it is and that *quantum meruit* comes

25   into this case only in the event that you testify, and in the

M1vWave4

1    event that you testify it would be with an instruction to the

2    jury that there's no actual *quantum meruit* entitlement here,

3    but this is a matter of your intent and good faith, then I

4    think that's one thing.  But I think if the government is

5    wrong, then maybe there's a basis for Mr. Colorado to testify.

6    But it strikes me that if the government's right, then Mr.

7    Colorado's testimony isn't relevant if you don't testify, and

8    if you do testify, his testimony is presumably cumulative and

9    far less probative than your own testimony and, therefore, not

10   necessary.  So let's table it until we discuss the *quantum*

11   *meruit* issue.

12            I think we have Mr. Barrale's counsel's submission.

13            Have we printed those?  Let's print them, and I'll

14   read them while that's being done, and then we can turn to him

15   and then to Mr. Janklow.  Also, I don't know if anyone knows if

16   Mr. Meister wishes to be heard as to Mr. Janklow.  We sent him

17   an email indicating that he should let us know.  I don't know

18   that we've heard back from him.

19            MR. PODOLSKY:  I don't know the answer, your Honor.  I

20   suspect he opposes, but I don't know anything more than that.

21            THE COURT:  OK.  Well, let's print the Barrale

22   submission.  And I'll ask my staff to also just send it to

23   docketing so it gets docketed as well.

24            (Continued on next page)

25

1        THE COURT:  All right.  I will turn to Mr. Barrale.

2        Mr. Podolsky?

3        MR. PODOLSKY:  Yes, your Honor.  I think this to a

4   significant degree makes the point that I have made with

5   respect to other witnesses and intended to make to Mr. Barrale.

6   Really all that there is to offer here is evidence about a

7   specific dispute, which frankly it sounds like was not even

8   directly with Ms. Daniels but through her ex-husband.

9        This is clearly a sideshow and extrinsic evidence that

10  I don't think should come in under 403.  It does not appear he

11  has proper evidence to offer as far as reputation.

12       THE COURT:  Mr. Avenatti.

13       MR. AVENATTI:  Your Honor, as someone that was

14  involved in the dispute, I can assure the Court this dispute

15  was directly between Ms. Daniels and Mr. Barrale.  Now at one

16  point in time Ms. Daniels' husband got involved for a very

17  brief period of time and sent one or more unfortunate

18  communications to Mr. Barrale.  But this dispute was directly

19  between Ms. Daniels and Mr. Barrale.

20       The government has the iCloud returns.  There are

21  messages relating to the dispute.  I Believe there are screen

22  shot communications or other communications directly between

23  Ms. Daniels and Mr. Barrale.  So perhaps Mr. Barrale's counsel

24  is ill informed, but I can unequivocally state to the Court

25  that this was a dispute between Ms. Daniels and Mr. Barrale.

M1VNAVE5

```
 1              While Mr. Barrale may not be able to speak to her
 2      community-wide untruthfulness reputation, he can certainly
 3      provide a personal opinion under 608(a) relating to her
 4      dishonesty and untruthfulness, which I am permitted to elicit
 5      under the circumstances, your Honor.  And I would be happy to
 6      submit to the Court copies of the relevant text messages
 7      supporting the representation I made, your Honor.
 8              THE COURT:  Mr. Podolsky, your response to the
 9      reputation opinion --
10              MR. PODOLSKY:  Yes, your Honor.
11              THE COURT:  -- argument.
12              MR. PODOLSKY:  Yes, your Honor.
13              I think it's clear from the letter this isn't general
14      opinion.  This is about a specific dispute.  And, frankly, if
15      he generally wants opinion testimony, it would be cumulative.
16              THE COURT:  I am going to grant the motion to quash
17      under Rule 401, 402, and 403 grounds.  I am not sure what the
18      relevance of this is.  To the extent it has any relevance, it
19      is a complete sideshow.  Again, it turns on the accuracy of the
20      allegations being made, getting into a messy allegations
21      between Ms. Daniels and her earlier friend, her prior
22      ex-friend, whatever he may be, some of which is clearly based
23      on hearsay and independent or indirect communications or
24      understandings.  It is just a sideshow that I am not going to
25      permit this case to go into.
```

M1VNAVE5

1      To the extent he has anything to offer with respect to

2  his opinion, as I said, I'm permitting the testimony of

3  Mr. Loupe and Mr. Karbley, so I think ut would be cumulative.

4      The motion to quash is granted as to Mr. Barrale.

5      Let's talk about Mr. Janklow.

6      MR. AVENATTI:  Your Honor, I had one question.  I'm

7  sorry.  I apologize for interrupting.

8      THE COURT:  Go ahead.

9      MR. AVENATTI:  In the event Mr. Karbley would not

10  testify as to 608(a), would you allow us to offer Mr. Barrale

11  on 608(a)?  Since you are excluding Mr. Barrale on cumulative

12  grounds, and because you are allowing Mr. Karbley.

13      THE COURT:  I don't understand.  You're proposing to

14  call Mr. Karbley and not elicit that from him and elicit that

15  from Mr. Barrale instead?

16      MR. AVENATTI:  Not at all, your Honor.

17      What I am suggesting is, in the event Mr. Karbley

18  doesn't testify, would we be permitted to call Mr. Barrale

19  under 608(a).

20      THE COURT:  Here's my problem.  It seems like his

21  opinions of her truthfulness are based entirely on this one

22  episode.  And this one episode, as I have said, I think is

23  classic 403 ground.  It is a total sideshow, and we are not

24  going to have a mini trial on the veracity of the allegations

25  that she may have had against Mr. Barrale and his partner.

M1VNAVE5

1                 So no I guess is the short answer.  It is not just

2       cumulative.  I think he's also unduly prejudicial and a waste

3       of time.

4                 MR. AVENATTI:  I don't believe it would be tied only

5       to that one episode, for the record.

6                 THE COURT:  Understood.  My ruling stands.

7                 Let's talk about Mr. Janklow.  I have given the

8       government and I think docketed at this point letters

9       pertaining to Mr. Janklow.  So let's talk about whether he

10      should be permitted to be re-called.

11                my view is that there's no basis to re-call him to

12      elicit testimony regarding the nature or extent of

13      Mr. Avenatti's work on the book.  I think there is an ample

14      record developed on that through Ms. Beier, through Ms. Daniels

15      herself, through Ms. Regnier and Mr. Janklow.

16                To the extent the questions were not asked of

17      Mr. Janklow regarding that while he was on the stand, that is

18      on Mr. Avenatti and not a basis to re-call him.  He had ample

19      opportunity to do so.  Even assuming he didn't, there is ample

20      record on that.

21                With respect to the impeachment of Ms. Daniels there

22      are a few things that Mr. Avenatti mentions.  Let me run

23      through them.  The first is that he would impeach her testimony

24      regarding the book sales.  First of all, I think that misstates

25      her testimony.  I think her testimony is that she received a

M1VNAVE5

1    statement indicating that 390,000 books had been sold, but

2    there was nothing further elicited on that.  She didn't state

3    that that's how many books were sold.

4        In any event, the testimony from Ms. Beier, including

5    testimony this morning, made amply clear that many, many fewer

6    books than that were sold.  So I think that it's not relevant

7    and cumulative and therefore not a basis to re-call.

8        With respect to her allegations against Luke Janklow

9    and the Janklow agency, I will inquire of the government, but I

10   think that Mr. Avenatti through Mr. Dalack did ask Mr. Janklow

11   about it and he denied any knowledge of such accusations.  In

12   that regard the record has already been made on that, and I am

13   not sure what, if anything, Mr. Janklow could add to it.  I

14   also believe that Ms. Daniels was asked about that, and in that

15   regard I think the record is probably complete on it.

16       And then there's, Mr. Avenatti states that he wishes

17   to call Mr. Janklow to impeach.  Honestly, I am not sure I even

18   follow this, but it has to do with some testimony regarding the

19   reasons for withholding or the same arguments, was balking at

20   paying.  Maybe I will have Mr. Avenatti explain what that

21   argument is, because I am not sure I got it.

22       Why don't we pause there.

23       Mr. Avenatti, do you have anything you wish to say

24   with respect to any of the matters I just mentioned, and can

25   you elaborate on what that last point is on before we get to

M1VNAVE5

1    the impeachment of Ms. Beier issues.

2              MR. AVENATTI:  Before we get to the Ms. Beier

3    impeachment issues?

4              Yes, your Honor.  At the time that Mr. Dalack asked

5    Mr. Janklow the question relating to the allegations by

6    Ms. Daniels, Ms. Daniels had not made the allegations on the

7    record before the jury relating to the fact that she had not

8    been provided adequate information, etc.

9              So what Mr. Janklow said was that he wasn't aware of

10   any such allegations.  Ms. Daniels then, when she testified,

11   made various allegations relating to not receiving information

12   and being kept in the dark relating to her book sales, royalty

13   statements, and the like.

14             I assert, your Honor, that is completely 100 percent

15   false.  It is absolute perjury in front of the jury, because

16   there's no evidence of that whatsoever.  Ms. Daniels again --

17   and this is our argument -- in keeping with her custom and

18   practice fabricates financial allegations against people.

19             THE COURT:  Okay.  But let me interrupt, Mr. Avenatti,

20   because on page 225 of the transcript you asked, or Mr. Dalack

21   asked:  "You haven't withheld accurate accounting information

22   from her either, right?"

23             He says, "No, we provided it."

24             You have already inquired about that.  I understand it

25   predated her testimony regarding that, but a record has been

made on it.  I just don't understand the need to call him back

to testify to something that he's already testified to, that,

by the way, I think has marginal relevance to this case.

MR. AVENATTI:  Your Honor, I think her testimony when

she testified was a little more specific relating to, you know,

her assertions and allegations.  Namely, that she's claiming,

your Honor -- to be clear she has claimed that everyone in this

book deal, everyone in the book deal -- me, Mr. Janklow and St.

Martin's -- we've all hidden information from her.  We've all

operated to keep information from the book deal from

Ms. Daniels.

THE COURT:  And you have developed that in the record.

In other words, I believe she testified to that effect, and

again on page 225 it is not just the question and answer that I

referenced a moment ago, but Mr. Dalack also asked:

"To your knowledge, Ms. Daniels hasn't accused you of

improperly withholding from her accounting information?

"A.  Correct.

"Q.  And if she did accuse you of those things, that would be

false, wouldn't it?

"A.  Yes.

"Q.  Because you have not withheld royalties from her, correct?

"A.  Correct.

"Q.  You haven't withheld accurate accounting information from

her either, right?

1    "A.  No, we provided it."

2              So what's your next argument?

3              MR. AVENATTI:  I would like to move, if possible, your

4    Honor, to the impeachment of Ms. Beier.

5              THE COURT:  Meaning you're conceding the other points

6    don't get you to re-call Mr. Janklow?

7              You are preserving them for the record I understand.

8              MR. AVENATTI:  I am not conceding anything.  I have

9    nothing to add those other points.

10             THE COURT:  Do you want to clarify what the last

11   argument is that I didn't even understand having to do with

12   balking and not paying her?

13             MR. AVENATTI:  One moment, your Honor.

14             Your Honor, with the Court's indulgence, one moment.

15   I appreciate it.  Thank you.

16             Yes, your Honor.  I am prepared to address the balking

17   issue.

18             Your Honor, the government has elicited testimony and

19   suggested in the case that when I conveyed to Ms. Daniels that

20   the publisher was delaying payment due to issues relating to

21   her not fulfilling her publicity requirement that those

22   statements were false.  The government has done that in this

23   case.

24             Mr. Janklow will testify to the exact opposite; that

25   in fact, the publisher had extensive communications with him

M1VNAVE5

1    and he had extensive communications with me about that very

2    fact for months; that the publisher was not going to make the

3    last payment to Ms. Daniels because she had violated the

4    contract and not done her part.

5            During those discussions, I informed Mr. Janklow that

6    we were going to file suit if necessary in order to get the

7    publisher to make good on the contract.  So those --

8            THE COURT:  Mr. Avenatti, I think most of those

9    communications were made after the evidence suggests that you

10   already received the payment.

11           So the falsity is not that they were upset with her

12   publicity.  The falsity was that that was a basis for

13   withholding the third payment because in actual fact you had

14   received the third payment.

15           MR. AVENATTI:  I am talking about the fourth payment,

16   your Honor.

17           THE COURT:  The fourth payment is not an issue here

18   because she received the fourth payment.

19           MR. AVENATTI:  Your Honor, it is an issue because

20   there was confusion over which payments were being discussed by

21   whom at what time.  That's the issue.  The government has

22   suggested to the jury that I just fabricated this litigation

23   threat out of thin air just to keep Ms. Daniels at bay, that

24   there was no intention -- in fact, you heard testimony elicited

25   with Ms. Beier about this, that it was all out of whole cloth,

M1VNAVE5

1  it was all nonsense.  It wasn't nonsense, your Honor, and the

2  communications between me and Mr. Janklow demonstrate that it

3  is not nonsense.

4         So that's the issue relating to the balking.

5         Then, hand in hand with this, your Honor, is -- we saw

6  some of the e-mails, although your Honor would not let me put

7  them into evidence with Ms. Beier.  We attached an e-mail from

8  November from Mr. Janklow to me in our filing.  Your Honor,

9  this entire idea that I was to blame for the lack of book sales

10  is completely fabricated.  It's completely fabricated.

11         There is no way to reconcile Ms. Beier's testimony on

12  the stand with the documentary evidence and the e-mails

13  relating to what happened here.  There is no way to reconcile

14  Ms. Beier's testimony with the e-mails and communications from

15  Mr. Janklow.

16         Mr. Janklow in November of 2018 -- your Honor has it

17  there -- states effectively that Ms. Daniels had sabotaged the

18  book project.  How can you possibly reconcile that with

19  Ms. Beier's testimony that somehow I was responsible for the

20  book publicity.

21         And I'll tell you another reason why this is so

22  important, your Honor.  Let me get this straight.  Everybody

23  associated with the book deal, everyone was supposed to get

24  paid except Michael Avenatti.  Mr. Janklow was supposed to get

25  paid, Ms. Daniels was supposed to get paid, the book publisher

M1VNAVE5

1    was supposed to get paid, but Michael Avenatti, he was supposed

2    to do everything and get nothing.  That is argument, and I

3    recognize that.

4           THE COURT:  That is argument.

5           There's also I think evidence that you got a two and a

6    half percent referral fee without disclosing that to

7    Ms. Daniels.  There is also evidence, testimony at least that

8    you agreed not to take anything beyond that.  But that is

9    argument and an issue for the jury.

10          MR. AVENATTI:  There's three discussions of unknown

11   date, duration, time, etc.

12          THE COURT:  I understand.  You can argue that to the

13   jury.

14          MR. AVENATTI:  Your Honor, the point is, Mr. Janklow

15   and the contemporaneous communications from Mr. Janklow, they

16   don't slightly impeach.  They completely impeach the testimony

17   that the government elicited from Ms. Beier on the stand

18   relating to a number of issues.

19          That alone is reason, sufficient reason for me to be

20   able to call Mr. Janklow.  The government was aware of those

21   communications with Mr. Janklow at the time they elicited that

22   testimony.  I was shocked that they called this woman to blame

23   me for the lack of book sales and the lack of publicity.  I

24   wasn't running the publicity, your Honor.

25          THE COURT:  Let me say this trial is not about why the

M1VNAVE5

1    book failed.

2             Having said that, the government did elicit testimony

3    from Ms. Beier that Mr. Avenatti was responsible for the

4    publicity and suggested, if not testified, that he fell short

5    on that front.

6             So I guess there is an argument at least to be made

7    that the door was opened to him at least, you know, presenting

8    evidence that he did his part and it was Ms. Daniels' failure

9    to cooperate that was responsible for the lack of publicity and

10   perhaps by extension the lack of book sales.  But at the end of

11   the day, this case is not about whether and who is responsible

12   for the book's lack of success.

13            So, Mr. Podolsky, we seem to be bleeding into the

14   Beier impeachment issue, so maybe we should just focus on that

15   since that seems to be the heart of Mr. Avenatti's argument

16   here.

17            I think if there is valid impeachment of Ms. Beier,

18   there is a reasonable argument for letting him re-call

19   Mr. Janklow, because he obviously didn't know what Ms. Beier

20   would testify to when he was doing cross, when Mr. Dalack did

21   his cross.

22            MR. PODOLSKY:  Yes, your Honor.  So let me focus on

23   this publicity issue such as it is.

24            Ms. Beier testified that, from her perspective,

25   Mr. Avenatti was responsible for arranging the publicity.  Now,

1    that was elicited in part in response to the fact that the

2    defendant has spent much of this trial trying to talk about who

3    was at fault with the publicity.

4         This is an issue of marginal relevance at best.  The

5    defendant has spent a lot of this trial actually asking

6    questions about it.  He cross-examined Ms. Beier.  I believe

7    there were questions, although I should check the transcript,

8    to Mr. Janklow about it.  There were questions to Ms. Daniels

9    about it at length.

10        Ultimately the relevance of this I would say is

11   approaching zero, because every book payment was made.  I can't

12   candidly articulate in my own mind the relevance of whether

13   Ms. Daniels did a great job of publicity or not.  Every single

14   book payment Mr. Rohrbach illustrated in his redirect was made.

15        I have yet to understand or hear from the defendant

16   any theory of why whether Ms. Daniels did a good or bad job at

17   publicity has anything do with whether he is entitled to the

18   money, whether the money went to him, whether the money was

19   spent or anything at issue in this case.

20        MR. AVENATTI:  Your Honor, on direct examination the

21   government elicited testimony from Ms. Beier relating to the

22   fact that I had supposedly fallen short on my obligations on

23   publicity.

24        And also, to make matters worse, your Honor, they

25   painted Ms. Daniels as spectacular as it relates to publicity,

M1VNAVE5

1    that it was great, that she did everything that they asked of

2    her.  I mean, that was the testimony by Ms. Beier.

3              If you look at the first page of Exhibit A attached to

4    our filing, November 19, 2018, from Mr. Janklow to me:

5              "I know you have other fish frying, but we need to

6    deal with this.  Her camp continues to exhibit a lack of the

7    fundamental movements here, *i.e.*, St. Martin's doesn't care one

8    whit about press overseas.  I thought about this and here is

9    where I land.  She sabotaged the book, there is no question.  I

10   am actually stunned at how effectively she did.  I think we

11   should offer to split the difference and give the publisher the

12   acknowledgment of the elephant in the room.  I think we should

13   say 100,000 and we're done.  That is my opinion obviously, and

14   I want to hear yours."

15             Your Honor, this communication alone touches on a

16   myriad of issues relating to what Ms. Beier testified to,

17   including you remember all of the questions that were asked

18   about whether I ever threatened litigation, whether I'd ever

19   made any claim against St. Martin's, all of that.

20             Your Honor, Mr. Janklow's statements about splitting

21   the difference, getting a hundred thousand and calling it a

22   day, that is exactly what that relates to.  Because St.

23   Martin's wasn't going to make the last payment.  I was telling

24   Mr. Janklow if I have to I am going to sue St. Martin's.

25             The other reason why this is important, your Honor, is

M1VNAVE5

they also elicited tam from Mr. Macias about this discussion

where I told Mr. Macias that I need him to sue the publisher,

and they suggested to the jury that that was fabricated, they

did; that that was just a smokescreen when I had that

discussion with Mr. Macias in September of 2018, your Honor.

It wasn't a smokescreen.  There was a huge issue

relating to whether this last payment was going to be made and

this issue of litigation.  Again, I didn't elicit this

testimony.  The government did.

And they also, your Honor, brought out this allegation

of the -- or this issue of the reduced fee --

THE COURT:  Hold on.

Mr. Avenatti, you have a tendency to just lump like 20

things together in an effort to throw spaghetti at a wall and

hope that some of it sticks.

Let's try to parse this a little bit more finely so

that we can actually see if there is any there there.  I am

looking at the Janklow cross, the transcript of it.

You elicited -- Mr. Dalack elicited from him his view

that Ms. Daniels was an F'ing nightmare when it came to

publicity; that she is quote-unquote impulsively mercenary;

that he was frustrated with her behavior regarding publicity.

I think you've developed a record on that.  Not to

mention I think you elicited on your cross of Ms. Beier this

morning that she wasn't happy with the extent and nature of

M1VNAVE5

1    Ms. Daniels' publicity efforts.

2            So, this seems like, for the reasons that Mr. Podolsky

3    mentioned, probably irrelevant altogether because the payments

4    were made.  And in fact the evidence suggests that, if

5    anything, the payments were made early, earlier than she was

6    entitled to under the contract.  I think it is just a

7    distraction.

8            MR. AVENATTI:  Well, your Honor, two things.

9            Number one, we haven't been permitted to establish the

10    record that there was a potential for litigation because the

11    publisher was balking, and I had communications --

12            THE COURT:  What do you mean?  You did cross of both

13    Ms. Beier and Mr. Janklow.  If you wanted to make that record,

14    you had an opportunity to make that record.

15            MR. AVENATTI:  Your Honor, we didn't know that

16    Ms. Beier was going to testify that she knew of no threat of

17    litigation, etc., so we didn't have an opportunity to develop

18    that line of questioning with Mr. Janklow.  The government knew

19    that there was a threat of litigation, and yet they proceeded

20    to elicit that testimony from Ms. Beier, your Honor.  So that

21    issue has not been touched upon.  And then let me --

22            THE COURT:  Let's just say that you said to

23    Mr. Janklow maybe we should sue St. Martin's.  What's the

24    probative value of that?

25            MR. AVENATTI:  The probative value is, is that the

M1VNAVE5

1    government has elicited testimony to suggest to the jury that

2    that was just a smokescreen to keep Ms. Daniels at bay, that it

3    never really happened.

4          THE COURT:  It didn't happen.

5          MR. AVENATTI:  No --

6          THE COURT:  There's no evidence of a demand letter.

7    There's no evidence that you had any communications certainly

8    with this representative of St. Martin's about it.

9          MR. AVENATTI:  But I did have communications with

10   Mr. Janklow.  I had communications with the book agent and

11   told --

12         THE COURT:  Surely you knew that the

13   representations -- I mean, the government disclosed its

14   evidence to you, including the text messages back and forth

15   with Ms. Daniels in which you are saying that you are going to

16   reach out to St. Martin's and maybe you will need to sue and so

17   on and so forth.

18         I don't understand the argument that you didn't

19   understand -- you know, that you would want to develop the

20   record on that with Mr. Janklow when he was here.

21         MR. AVENATTI:  Because, your Honor, we did not expect

22   Ms. --

23         THE COURT:  In other words, I don't understand how you

24   could possibly maintain with a straight face that you didn't

25   understand the relevance of that until Ms. Beier's testimony.

1           MR. AVENATTI:  Your Honor, furthermore the Court shut
2   us down halfway through the direct examination.
3           THE COURT:  Because Mr. Dalack wasn't making effective
4   use of his time.  He was wasting the jury's time by asking --
5   dwelling ad nauseam on your role in the negotiation and, like,
6   drafting of the contract in March 2018.
7           That's not what this case is about.  I warned him
8   seven times.  I don't mean to dwell on it.  I don't mean to
9   take it out on Mr. Dalack.  I like Mr. Dalack a lot.  He is an
10  excellent attorney.
11          MR. AVENATTI:  But had the Court not shut us down, we
12  would have gotten to that area with Mr. Janklow, which is why
13  we reacted so strongly when the Court shut down the
14  cross-examination of Mr. Janklow, the very first witness in the
15  case and the critical witness.
16          So had the Court not curtailed the cross, we would
17  have gotten to that issue.  Had the Court not curtailed the
18  cross, we would have gotten --
19          THE COURT:  In other words, you admit that you
20  anticipated the relevance of the issue?
21          MR. AVENATTI:  No.
22          THE COURT:  That seems to be contradicting the
23  argument that you made 30 second ago.
24          MR. AVENATTI:  No, your Honor, not at all.
25          THE COURT:  30 seconds ago, you said you didn't

anticipate this until Ms. Bayer testified.  And then you were

shocked.  You didn't understand how the government could

elicited that.  And had you been able to anticipate that, you

would have developed the record on Mr. Janklow.

        I said, okay, how is that possible?  And now suddenly

your argument is that you -- sorry I'm getting a little heated

here.  I will slow down.

        Suddenly your argument is, well, actually we did

anticipate it and that was a line of cross that I didn't

permit.  It seems to me you are being a little wiggly here.

        MR. AVENATTI:  Your Honor, I don't certainly want to

be wiggly.  Let me be clear.  We were going to touch on the

issue that a dispute arose relating to the fourth payment and

that we were going to potentially pursue litigation, and I had

communications with Mr. Janklow along those lines.

        What surprised me about Ms. Beier's testimony was her

testimony that they had no idea about that.  Because from the

e-mail communication and my communications with Mr. Janklow,

Mr. Janklow passed along those threats to St. Martin's.

        So what surprised me was Ms. Beier's testimony that

she never heard anything about this and that -- like it just

came out of thin air.

        It clearly did not come out of thin air, your Honor,

because if you look at the e-mail I was just referencing,

Mr.Janklow is proposing that we go back to St. Martin's and

1    basically say we'll take $100,000 on the last payment.  That's

2    because there is a dispute over the last payment.

3           THE COURT:  Mr. Podolsky.

4           MR. PODOLSKY:  A few observations.  One is I am

5    looking at what's been marked as 3519, page 4.  This is

6    Elizabeth Beier -- excuse me, page 2.  It's 3519-04, page 2.

7           This is 3500 produced relating to Ms. Beier.  At the

8    top it reads, "MA," I think understood to be Michael Avenatti,

9    "never threatened litigation or legal action on behalf of

10   Stormy Daniels related to the book contract."

11          That was produced -- I think ten days before trial was

12   our 3500 date.

13          So that's, I think, point number one as to the

14   surprise.

15          Point number two is I think Mr. Avenatti is just

16   confusing the timeline here.  As your Honor pointed out, there

17   is no litigation over the third payment.  It was paid early.

18          So Mr. Avenatti is saying, oh, my God, Mr. Macias

19   testified that I threatened litigation in September and that

20   was false.  Well, that was false.  Mr. Janklow is not going to

21   say there was litigation, possibility of litigation in

22   September.  September 5 was prior to when the second payment --

23   excuse me -- the third payment was even made and a month before

24   the book came out.

25          I mean, this is just a complete misdirection.

M1VNAVE5

1    Frankly, the defendant has had an opportunity to expand the

2    record in all of these areas.  I don't think there's any basis

3    to re-call Mr. Janklow on any of these topics other than to

4    attempt to confuse them.

5         MR. AVENATTI:  Your Honor, just one last point I would

6    like to make for the record.

7         It is not appropriate for the government to raise in

8    direct a number of issues, get testimony that they want placed

9    before the jury to tar the defendant -- namely, me -- as to

10   issues, some of which comes in over my objection.

11        THE COURT:  Can you be less abstract and more

12   specific?

13        MR. AVENATTI:  For instance, the publicity issue, the

14   government interjected this into the case.  So the government

15   interjects it into the case and gets Ms. Beier to make the

16   statement, this extraordinarily false statement.

17        Then, when I want to present evidence and testimony to

18   counter that statement, the government says, you know, I don't

19   understand what we're doing here because it doesn't, it only

20   relates to the second and third payment and this is so far

21   afield.

22        THE COURT:  We are going in circles.  On publicity

23   we're done.  403, cumulative.  You elicited it from

24   Mr. Janklow.  There's nothing to be gained by calling him and

25   trodding through that ground again.  You elicited from it

1    Ms. Beier.  You elicited it from the Mr. Janklow.  Ample

2    opportunity.  In fact, you managed to develop the record on

3    that.

4         So, straight up 403, not happening.

5         If you want to focus on the threat of litigation,

6    let's focus on the threat of litigation.  But each time I try

7    to pin you on one thing by pointing out the flaw in that

8    argument, you switch to another in an effort to deflect and

9    create more confusion.

10        My point is I want to prevent you from being able to

11   cause confusion to this jury.  I want you to make your

12   arguments to the jury, but causing them to be confused about

13   what's going on here is not a valid way to defend the case.

14        Throughout this case you have tried to inject

15   irrelevant issues into it, which is why I sustained more

16   objections in this trial than perhaps in any trial I have

17   participated in as counsel or as a judge.

18        It is why I've prevented you from injecting hearsay

19   into this trial.  That is why I have policed it vigorously --

20   to keep the focus on what this case is about.

21        I am doing that here too.  I want to understand.  What

22   is the threat of litigation?  When did you threaten the

23   litigation to Mr. Janklow, and how is that relevant to the

24   issue in this case?

25        MR. AVENATTI:  Your Honor, I may be able to pull up an

M1VNAVE5

1    exhibit briefly, if I could.

2              THE COURT:  Go ahead.

3              MR. AVENATTI:  Thank you.

4              Your Honor, unfortunately I can't seem to locate the

5    exhibit presently.  I believe there is an e-mail that the

6    government either asked a witness to refresh recollection on or

7    perhaps it is in evidence, but it relates to Mr. Janklow

8    telling me to keep my powder dry in the fall of 2018.  I

9    believe it was in October or thereabouts, somewhere between

10   September and November.

11             That is referring to this threat of litigation.

12   Because very early on in this process, your Honor, St. Martin's

13   was disenchanted and extremely upset about the lack of

14   responsiveness from Ms. Daniels, and they were threatening to

15   withhold the last payment.

16             So this issue of threat of litigation, your Honor, is

17   important as it relates to Mr. Janklow to be able to show that

18   in fact there was a threat of litigation.

19             THE COURT:  But the last payment was made, and it was

20   made early.  So the fact that there may have been a threat

21   months later --

22             MR. AVENATTI:  Your Honor, it wasn't months later.

23             THE COURT:  So I would like you to point me to the

24   exhibit that focuses on us the timing and the nature of what

25   the discussion was.

M1VNAVE5

1          MR. AVENATTI:  Well, I'm trying to locate it.  I

2     wasn't able to locate it, but if I can provide the Court

3     some --

4          THE COURT:  Let's circle back to that when you've

5     located it and let's talk about the other witnesses while we

6     can.

7          Guest and Crain.  My understanding is that you have

8     not yet subpoenaed them.  I don't know if there's going to be a

9     motion to quash or a motion to preclude if you do manage to,

10     but --

11          MR. AVENATTI:  Your Honor, I have an update.

12          THE COURT:  Okay.

13          MR. AVENATTI:  I believe that Ms. Guess was served via

14     her counsel earlier today.

15          THE COURT:  Okay.

16          Mr. Podolsky.

17          MR. PODOLSKY:  Honestly I am not sure what the

18     defendant's intention is here.  But given Ms. Guest's role, it

19     sound like he wants to continue to litigate people's

20     perceptions of who's responsible for the publicity.

21          I just raise that, given the discussion we have been

22     having for the last 20, 30 minutes, that if she comes and

23     that's the entirety of her testimony, there may be a number of

24     objections as to relevance and cumulativeness, etc.

25          THE COURT:  Would you ask me to preclude her on that

M1VNAVE5

1   basis?

2          MR. PODOLSKY:  We would move to preclude if that's the

3   entire basis of her testimony.  We are just not exactly sure

4   what Mr. Avenatti --

5          THE COURT:  Mr. Avenatti, what is proffer with respect

6   to the relevance of her testimony?

7          MR. AVENATTI:  She will impeach Elizabeth Beier's

8   testimony about Ms. Daniels being cooperative and responsive in

9   connection with the book deal.

10          THE COURT:  I think Ms. Beier testified that she was

11  cooperative with respect to the writing of the book.

12          MR. AVENATTI:  I actually think it was a little

13  broader than that, your Honor.

14          THE COURT:  What else?

15          MR. AVENATTI:  Well, the other reason was going to be

16  the publicity, which you have told me now is off limits.

17          THE COURT:  It is not off limits.  It is just amply

18  developed already.  This trial is not going to be about the

19  publicity of the book and whether the book failed.  It is about

20  whether you committed fraud.

21          You have enough to make the argument you want to make

22  regarding the publicity.  To the extent it speaks to the truth

23  or falsity of your communications with Ms. Daniels calling the

24  head of publicity at St. Martin's to have a mini trial on

25  whether Ms. Daniels is responsible for the failure of her own

M1VNAVE5

1    book is not what this trial is about.

2              MR. AVENATTI:  Your Honor, I understand what your

3    Honor is saying.  Just to be clear, the issue that I have is

4    the testimony that I was to blame for the publicity, that it

5    was my fault, it's my fault the book didn't sell, it's my fault

6    there wasn't adequate publicity.

7              That's the issue that I have, your Honor.  That's what

8    I am trying to refute.  If it's irrelevant, then it shouldn't

9    have been put before the jury to begin with.

10             THE COURT:  Mr. Podolsky?

11             MR. PODOLSKY:  Yes, your Honor.

12             First of all, I just want to be clear.  Mr. Avenatti

13   raised this from the beginning of the trial.  We didn't inject

14   this into the trial.

15             We would be more than pleased with an instruction that

16   tells the jury who is responsible for the publicity failures is

17   irrelevant.  We don't intend to argue in closing that

18   Mr. Avenatti is guilty because he did a bad job with publicity.

19   We don't care.

20             What we do care about is the defendant has spent most

21   of the trial trying to find different ways to blame Ms. Daniels

22   for things that have nothing to do with anything, including

23   apparently the failure of her own book.

24             THE COURT:  I am going to grant the motion to preclude

25   with respect to Ms. Guest.  I don't see the relevance of the

M1VNAVE5

1    publicity issue.  To the extent that it was injected into this

2    trial, I actually think it was injected by Mr. Avenatti through

3    the initial cross-examination of Mr. Janklow.

4           I think we are going down a rabbit hole of

5    irrelevancy, and I am certainly open to instructing the jury

6    that who's responsible for the lack of sales of the book is not

7    relevant in this trial if both sides want me to make that

8    instruction.  Otherwise, it seems that there's ample material

9    for both sides to work with in whatever argument they want to

10   make to the jury.  I don't think we need to waste further time

11   debating who is responsible for what failure with respect to

12   the sales and publicity of the book.

13          So Ms. Guest will not be testifying.

14          Next is Nicks and Crain.  While we turn to them, I got

15   a motion to quash e-mails on behalf of Mr. Marshack.  My staff

16   hopefully be able to print out two copies and provide it to

17   both sides and we will also proceed to docket it as we speak.

18          Mr. Nicks, Mr. Crain.

19          Hang on one second.

20          The full document is 97 pages, but the letter itself

21   is only four.  I am going to have my staff provide printed

22   copies of the first four pages to both sides.  We'll docket the

23   whole thing, and you will be able to get it electronically that

24   way.  I'm guessing that the attachments are not the heart of

25   the matter anyway.

M1VNAVE5

1          MR. AVENATTI:  Your Honor, I had a question.

2          THE COURT:  Okay.  Can you hold the wire one second?

3          MR. AVENATTI:  Yes, your Honor.

4          THE COURT:  Yes, your question?

5          MR. AVENATTI:  Yes, your Honor.

6          Pursuant to your order, I believe it was first thing

7    this morning, I understood that Mr. Marshack and Mr. Drum had

8    until 3:00 to file motions to quash and then we would be

9    permitted to file something on the record by 6 p.m.

10          THE COURT:  That is true.

11          MR. AVENATTI:  Is that still your Honor's intention?

12          THE COURT:  If you would like an opportunity to

13    respond in writing, certainly I will give you that opportunity.

14    But to the extent that you are able to respond orally and we

15    can deal with this this afternoon, then we will do it this

16    afternoon.

17          MR. AVENATTI:  I would prefer to make a record in

18    writing, your Honor, if possible.

19          THE COURT:  All right.  Let's table those two.

20          And, again, I said to go to Nicks and Crain.

21          So what's the status on the two of them.

22          MR. AVENATTI:  I don't have an update beyond this

23    morning, your Honor.  We're still trying to serve them.

24          THE COURT:  Okay.  So I'm guessing that they may not

25    be here.

M1VNAVE5

1          Mr. Podolsky, anything you need to say with respect to
2     them at the moment?
3          MR. PODOLSKY:  No, I mean, I -- Mr. Crain I think
4     almost certainly would --
5          THE COURT:  Mic.
6          MR. PODOLSKY:  Sorry, your Honor.
7          Mr. Crain, should he be served and appear, I think his
8     testimony should almost certainly be precluded, but I don't
9     know that we need to deal with it at the moment.
10          THE COURT:  And Mr. Nicks?
11          MR. PODOLSKY:  Your Honor, I think it's possible that
12     Mr. Nicks has some firsthand knowledge that may be relevant.  I
13     wouldn't be surprised if it's cumulative, but I don't know what
14     Mr. Avenatti's intentions are.  So I think that one is a little
15     bit harder for us to move at this point to preclude.
16          THE COURT:  We will table both of those.  If they're
17     here tomorrow and prepared to testify, perhaps we will take it
18     up.  Otherwise we may never have to.
19          Can we resume discussion of Mr. Janklow?
20          Do you have the exhibit that you were looking for,
21     Mr. Avenatti?
22          MR. PODOLSKY:  Your Honor, I would note that
23     Mr. Janklow's counsel I think just moments ago sent an e-mail
24     to the Court, and I just wanted to bring that to the Court's
25     attention.

M1VNAVE5

1          THE COURT:  I am aware.

2          MR. PODOLSKY:  Thank you.

3          THE COURT:  Saying that he largely rests on his

4     papers, but if I wish to hear from him, he's available.  So I

5     think that may depend.

6          I thought you were ready to proceed.

7          MR. AVENATTI:  Your Honor, I'm waiting on Mr. Dalack,

8     who's pulling out the e-mail.  I apologize to the Court.

9          Your Honor, I am not able to locate the exhibit.

10          THE COURT:  All right.  Well, then you are resting on

11     the arguments that you have made as to Mr. Janklow.

12          MR. AVENATTI:  Thus far, your Honor.  Unfortunately, I

13     can't put my fingers on the exhibit right now.

14          THE COURT:  Mr. Podolsky, I take it that you are

15     comfortable with understanding the first issue on appeal is

16     likely to be the propriety of my cutting off of the

17     cross-examination of Mr. Janklow and denial of his requests to

18     call him as a witness in his own case?

19          You are comfortable with the record?

20          MR. PODOLSKY:  Your Honor, we are absolutely

21     comfortable with defending your Honor's decision should there

22     be an appeal in this case.  Frankly, to the extent that

23     defendant wants to argue that there was an actual dispute over

24     the fourth payment and that's what his text messages were

25     about, that matter is already in the record, and he can make

M1VNAVE5

1    that argument.

2           MR. AVENATTI:  Your Honor, let me add one last thing

3    for the benefit of the record.  When your Honor cut off the

4    cross-examination of Mr. Dalack, we had not spent even as much

5    time as the government had spent on direct.  Mr. Janklow was a

6    cooperating witness with the government, so obviously they had

7    the ability to meet with him and prepare him to testify.

8           THE COURT:  Mr. Avenatti, I am not even sure that is

9    accurate with respect to the amount of time, but it is also

10   irrelevant to the 611 issue.

11          MR. AVENATTI:  I just want to make one last point for

12   the record, your Honor.

13          The prejudice to the government in re-calling

14   Mr. Janklow is zero; absolutely no prejudice to the government

15   in allowing me to re-call Mr. Janklow and examine him in my

16   case in chief.  And so I just want to state that for the

17   record, whereby, at least in my view, the prejudice to me is

18   substantial for the reasons that I have already outlined on the

19   record and in my papers.

20          So I would urge the Court to allow me to re-call

21   Mr. Janklow and examine him as to the issues as outlined in my

22   letter so that I can mount an appropriate defense and utilize

23   my right to compulsory process under the Constitution.

24          THE COURT:  All right.  Understood.  You have made

25   your record.  I am not going to permit to you do so.  I remind

1    you that Mr. Janklow moved to quash the subpoena, so in that

2    regard it is not only the government's prejudice at issue here

3    but the burden and oppressiveness to Mr. Janklow.

4             In essence what you are asking me to do is reconsider

5    my ruling in granting that motion to quash.  I am not going to

6    do so.  I do not think that there are any grounds that would be

7    appropriate to re-call Mr. Janklow as a witness in your case in

8    chief, given the record that has been developed already and

9    given your opportunity to ask questions when he was on the

10   stand with respect to matters that were entirely foreseeable,

11   including the issue that Mr. Podolsky flagged in the 3500

12   material.

13            So that's my ruling with respect to Mr. Janklow.  You

14   have preserved it for appeal, if there is an appeal.

15            With that, we'll move on.

16            All right.  I guess that resolves I think all of the

17   witnesses other than Mr. Colorado, which I said we would table

18   until we discussed the quantum meruit issue.  Are there other

19   witness issues that I have overlooked or we need to discuss?

20   There's the open question with respect to Mr. Drum and

21   Mr. Marshack, but as Mr. Avenatti points out there is a

22   briefing schedule in place for them and I don't know yet

23   whether we will receive any additional submissions on behalf of

24   Mr. Drum.

25            Mr. Podolsky?

1          MR. PODOLSKY:  Two items.

2          One, just for the sake of a record if the defendant

3     does seek an appeal, our notes show that the cross-examination

4     of Mr. Janklow was two and a half hours as opposed to a direct

5     of I think two hours or less.

6          The second thing I will just note, just so we don't

7     lose track of it, if the defendant does intend to testify we

8     have the outstanding though unresponded-to motion regarding the

9     scope of that testimony and cross-examination.

10         THE COURT:  We will get to that.

11         MR. AVENATTI:  Your Honor, I was informed that the

12    cross was less than the direct.  If I'm wrong about that, I

13    apologize.

14         THE COURT:  I do believe you're wrong about that.  My

15    time is in accord with what Mr. Podolsky just said.  So we'll

16    leave it there.

17         Here's what I propose.  Since we have been going at

18    this a little while, let's take a five- to eight-minute break.

19    Let's call it is just an eight-minute break so there's no

20    ambiguity.

21         And then we will pick up with a discussion of the

22    quantum meruit business and we will go back to Mr. Colorado and

23    discuss the defendant's testimony and arguments on the

24    government's motions at 326 and 334.

25         I think that's the rest of what we need to cover this

M1VNAVE5

1    afternoon.  If I forgot something or left something out, I am

2    sure you will remind me.

3              It's 2:52.  Let's pick up at 3 o'clock.

4              I'll see you then.

5              (Recess)

M1vWave6

1          THE COURT:  Mr. Avenatti, I would expect at this point
2     in the trial you would understand when I say eight minutes and
3     be here at three, i mean three on the dot and that I would be
4     on the bench at three.  It's now 3:02, so let's get going.
5          Let's talk about *quantum meruit*.  I said a couple of
6     times that I'm inclined to agree with the government that
7     unless Mr. Avenatti testifies *quantum meruit* is not relevant to
8     this case.  Objectively, there is no basis for the argument
9     that Mr. Avenatti is making and no factual basis to make the
10     argument to the jury in the absence of testimony suggesting
11     that that was Mr. Avenatti's subjective belief.  As I
12     articulated earlier in the trial and as the government appears
13     to agree, if Mr. Avenatti takes the stand and is willing to
14     testify that notwithstanding his having graduate waited No. 1
15     from GW law school, or wherever it is, and his legal practice
16     that he genuinely believed he was entitled to take this money
17     for his own without discussing it with Ms. Daniels, etc.,
18     pursuant to this doctrine called *quantum meruit*, then I think
19     he's probably entitled to testify to that effect, and if the
20     jury believes him that may well be a valid defense to the
21     charge of wire fraud.  But I think unless Mr. Avenatti
22     testifies to that effect and the jury believes it, I don't see
23     how the issues are relevant to the issues in this case.
24          Mr. Avenatti, your submissions —— let me say, before I
25     give you the floor —— have not been helpful.  I'm aware of what

M1vWave6

1    the doctrine of *quantum meruit* is and I'm aware of the factors

2    that a court considers in evaluating a *quantum meruit* claim.

3    The question that I had posed and expected submissions on is

4    what role that plays in this case and whether and to what

5    extent you're entitled to an instruction to the jury on the

6    issues and whether and to what extent you're entitled to argue

7    the issues to the jury.  The government did respond to that

8    question, but your submission simply told me what *quantum*

9    *meruit* is, which I made clear I already knew.  So I'd like you

10   to speak to the issues that the government has briefed; namely,

11   if you testify -- well, maybe we should start with the question

12   of whether you intend to testify since that might help clarify

13   the stream of discussion.

14           MR. AVENATTI:  I haven't decided yet, your Honor.

15           THE COURT:  OK.  Then it won't.

16           We'll talk about either of the two hypotheticals: the

17   hypothetical world where you do testify and the hypothetical

18   world where you don't.

19           Let me say if you do testify, I think the issue

20   becomes relevant, and if you testify that you subjectively

21   believed that you were entitled to this money pursuant to the

22   doctrine of *quantum meruit*, you may do that; I agree with the

23   government that it should be curtailed.  You shouldn't be

24   permitted to talk about particular cases, and you should only

25   be allowed to describe them in general terms and that a

M1vWave6

1    curative instruction advising the jury what the doctrine

2    actually says would be appropriate.  But I disagree with the

3    government in one particular respect, which is that you should

4    be permitted to testify only as to the book deal that you

5    thought you were entitled to -- *quantum meruit*

6    matters-specific -- and therefore, the only thing that mattered

7    would be the work that you did on the book deal.  I think if

8    you were to take the stand and say that you didn't understand

9    that either and that you subjectively believed that *quantum*

10   *meruit* applied to all the work that you did on Ms. Daniels's

11   behalf, I think that is an extension of a good faith defense

12   and you should be permitted to testify to that effect.  But

13   with that one slight disagreement with the government, I'm

14   inclined to think that the government is correct in its

15   approach to this.  So why is it not?

16          MR. AVENATTI:  Your Honor, two points.

17          No. 1, the government's submission was completely

18   silent as to Sections 6147 and 6148 of the Business and

19   Professions Code of California.

20          THE COURT:  Slow down.  Slow down.

21          MR. AVENATTI:  OK.  I'll start over.

22          THE COURT:  You don't need to start over.  I heard

23   you.

24          MR. AVENATTI:  All right.  Thank you.

25          Those two sections are, perhaps, the most relevant

M1vWave6

1    legal sections to this analysis, because those are the two code

2    sections that all attorneys in California are presumed to have

3    knowledge of and must follow.  That's the law in California.

4          Now, my position is this, your Honor.  I was entitled

5    to a reasonable fee under either the contract or California

6    law -- or I should say under the contract and California law.

7    But in the event the contract is found to be void or deficient

8    under the law for any reason, then I would be entitled to

9    *quantum meruit* under 6147 and 6148 and the law cited in my

10   submission to the Court.  I do not believe it is contingent on

11   me testifying.  And whether I testify or not, the law is the

12   law.  I am presumed to have knowledge of those two sections of

13   the California Business and Professions Code.  And therefore, I

14   believe under the law, the jury should be instructed that I was

15   entitled to a reasonable fee for my services and that of my law

16   firm.

17         Now, I know we're not up to the charge conference yet,

18   but I believe I'm entitled to an instruction along those lines

19   regardless of whether I testify or not.  I also do not believe

20   that it is appropriate to negate my ability to raise that

21   defense if I do not testify.  I do not believe -- I believe

22   under either scenario, whether I testify or not, I'm entitled

23   to a good faith defense, and I think this goes hand in hand

24   with that issue.  I don't think it's contingent upon me

25   testifying.  I don't think I'm required to testify in order to

M1vWave6

give a good faith defense, and I don't believe I'm required to

testify in order to get an instruction relating to *quantum*

*meruit* or the fact that I was, under the law, entitled to a

reasonable -- a reasonable fee for the services that I

provided.

       Now, my arguments might be better tailored if I had

some insight from the Court as to whether the Court intends to

instruct the jury as to whether the last clause in paragraph 4

is void as a matter of law, because I think that impacts

certainly the discussion and the analysis.

       THE COURT:  And do you want to respond to the three

arguments that the government made in its letter with respect

to why any *quantum meruit* claim here fails as a matter of law

and, therefore, is objectively unreasonable?

       MR. AVENATTI:  Well, first of all, your Honor, I don't

believe that the arbitration issue or the statute of

limitations issue has any bearing whatsoever on this question.

All of this goes to the question of my state of mind, my good

faith belief --

       THE COURT:  Which is why if you testify I agree that

these issues come into the case.  But my question is if you

don't testify, how do they come into the case?  Do you have

authority for the proposition, separate and apart from whether

a lawyer who works on a case is entitled to a reasonable fee

for the work that he or she did, do you have law for the

M1vWave6

proposition that the lawyer is entitled to simply take it from

the client without advising the client of the basis to take it?

Because I think there's plenty of law that says otherwise.

MR. AVENATTI:  Your Honor, Ms. Daniels may have a

complaint against me with the bar for doing that, but I can't

be convicted criminally, in my view, because I lack the

requisite intent in light of the law of the law of *quantum*

*meruit*.

THE COURT:  But it does go to whether you're entitled

to -- again, let's try to do this in a clear way.

Let's assume for the moment that you don't testify.  I

think in order to be entitled to any sort of instruction with

respect to what *quantum meruit* may be, you would have to

demonstrate that there's an objective basis to your *quantum*

*meruit* claim.  I think the government makes three points.  One,

it's an equitable remedy that accrues upon the completion of

the attorney's representation, and it's not an entitlement to

self-help; two, that whether or not you were owed money, that

you're responsible for maintaining Ms. Daniels's money as a

fiduciary and, in the absence of permission, you can't simply

take her money and use it for your own purposes; and three, to

the extent that you thought you had -- sorry, let me put it

differently.  To the extent that there is a valid *quantum*

*meruit* claim that you were required under the contract to bring

it in arbitration and an extension on the argument that it's

M1vWave6

```
1    not an entitlement to self-help, but -- in other words, no
2    understanding of *quantum meruit* in any objective, reality-based
3    world entitled you to simply take Ms. Daniels's money to be
4    your own.  Full stop.  Can you cite me authority that suggests
5    otherwise?
6              MR. AVENATTI:  Your Honor, I can't cite authority that
7    suggests otherwise in a criminal context, and the government
8    can't cite authority to support their position in a criminal
9    context, your Honor.
10             THE COURT:  That's not my question.  My question is to
11   the extent that you think that there is a valid theory of
12   defense here that you were entitled to take this money as your
13   own without telling Ms. Daniels -- in fact, with lying to
14   Ms. Daniels about the fact that you took it -- is there a valid
15   theory of *quantum meruit* that would support your doing that as
16   opposed to you bringing a lawsuit, whether in arbitration or
17   any court of law, bringing a *quantum meruit* claim seeking a
18   reasonable fee for the work that you did on her behalf?  Can
19   you cite me any authority that would support that argument?
20             MR. AVENATTI:  Can I have one moment, your Honor?
21             THE COURT:  You may.
22             MR. AVENATTI:  Your Honor, my belief that I was
23   entitled to money because of my understanding of 6147 and 6148,
24   which I'm presumed to have knowledge of, under California law,
25   then under United States, I believe it's *Rossomando*, which I
```

M1vWave6

1    handed up last week.

2              THE COURT:  I've read it.

3              MR. AVENATTI:  I believe that I could not be convicted

4    of the crimes that I am charged with.

5              THE COURT:  My question is -- what you just said may

6    well be an accurate statement, but how is there a record to

7    argue that if you don't testify as to your subjective belief?

8    And you're actually not answering my question.  You're doing

9    what I said before.  It's a classic case of misdirection, where

10   I pose a question and instead of answering my question you

11   answer a different question.  I want you to listen carefully to

12   my question and answer it.

13             Do you have any authority for the proposition, putting

14   aside your subjective belief, and I mean legal authority, to

15   support the proposition that the doctrine of *quantum meruit*

16   permits a lawyer to take his client's money without telling the

17   client and indeed with affirmatively misrepresenting to the

18   client that he's taking the money?  Do you have any support for

19   your proposition that the doctrine of *quantum meruit* allows a

20   lawyer to engage in that kind of self-help as opposed to the

21   proposition that, with respect, whether under 6147 or 6148, the

22   lawyer is entitled to bring an action, whether in a court of

23   law or in arbitration, seeking a reasonable fee?  Do you have

24   any authority for the former?

25             MR. AVENATTI:  Not as I sit here right now beyond that

M1vWave6

```
 1    which I have previously brought to the Court, which I
 2    understand your Honor does not believe applies.  But not as I
 3    sit here right now.  But I would like to also state that were
 4    the Court's view on quantum meruit to be true, a party would
 5    never be able to get a good faith instruction unless he or she
 6    testified.
 7              THE COURT:  Unless there's evidence in the record to
 8    support that that was their subjective belief, yes, I believe
 9    that's correct, and I think that the law supports that.
10              MR. AVENATTI:  Your Honor, again, we have the fee
11    agreement in evidence.
12              THE COURT:  If there's a new argument, you can make a
13    new argument.  If it's an argument that you've made, you've
14    preserved it for appeal and you've made your record.  But I
15    think I've heard and considered those arguments.  Any new
16    argument?
17              MR. AVENATTI:  Not beyond what I've already filed with
18    the Court and made on the record, your Honor.
19              THE COURT:  All right.
20              Mr. Podolsky, anything you want to add here?
21              MR. ROHRBACH:  Your Honor, I'm actually handling this
22    one.
23              THE COURT:  All right.  Mr. Rohrbach, I didn't mean to
24    be presumptuous.
25              MR. ROHRBACH:  The only thing we'd add is we agree --
```

M1vWave6

 1          THE COURT:  Slow down.

 2          MR. ROHRBACH:  We agree that the defendant is entitled

 3    to the good faith instruction and to make any arguments of good

 4    faith he wants that are supported by the record.  The problem

 5    is that with regard to *quantum meruit*, he has no objective

 6    basis in the law that this otherwise irrelevant doctrine comes

 7    into the case absent testimony from the defendant or something

 8    else showing that he, in fact, held this incorrect belief.

 9          MR. AVENATTI:  Your Honor, I just want to make one

10    point.

11          THE COURT:  Yes.

12          MR. AVENATTI:  Over my objection, the government

13    submitted the stipulation from the prior case relating to my

14    license as a California attorney and knowledge of the bar

15    rules, etc.  That in and of itself establishes my knowledge of

16    6147 and 6148 during the relevant time period.

17          THE COURT:  Mr. Avenatti, stop.  It doesn't.  OK?

18          First of all, I've been in enough courtrooms with

19    enough lawyers who don't know the law.  The fact that

20    somebody's a member of the bar and up to date on their CLEs

21    does not mean that they know the law.

22          No. 2, what we're talking about is not your belief of

23    what the law says.  It's actually your misunderstanding of the

24    law and your belief that these provisions justify your taking

25    money from your client without permission.  So you've made your

M1vWave6

1    argument.  You've preserved your argument.  I don't buy it.

2    It's wrong.  All right?

3            Now, if you testify and there is evidence in the

4    record to support the proposition that you had a subjective

5    belief, albeit mistaken, that you were entitled to take this

6    money pursuant to a doctrine of *quantum meruit*, then we're in a

7    different land.  I think both sides should think very hard

8    about whether the colloquy that I just had with Mr. Avenatti

9    would be admissible in the event that he testifies, because his

10   failure, sitting here today, to cite any authority for the

11   proposition that *quantum meruit* would justify him taking the

12   money in the manner that he did certainly speaks to the

13   credibility of his subjective belief to that effect in 2018,

14   and you should think hard about whether and to what that comes

15   in.  It certainly underscores the pitfalls of representing

16   oneself if it does come in.

17           MR. AVENATTI:  Your Honor --

18           THE COURT:  Yes.

19           MR. AVENATTI:  -- I'm sorry, but I have to object.

20           THE COURT:  To what?

21           MR. AVENATTI:  Because I believe that that statement,

22   your Honor, frankly, is -- the government is more than capable,

23   as demonstrated over the last eight days, of prosecuting me in

24   this case.

25           THE COURT:  Mr. Avenatti, my job is to flag issues.  I

M1vWave6

1    think one issue that we might need to address if you testify is

2    whether the colloquy that we just had is admissible against

3    you.  If it is, there are issues that we need to address,

4    including your right to object to its admissibility and our

5    discussion of it, if it does come in, what form it comes in.

6    I'm just flagging the issue.  That's all.  I know that the

7    government is entirely competent to prosecute the case as it

8    sees fit, and it may or may not choose to do that.  I just

9    wanted to flag that as a potentially relevant issue that we may

10   need to think about, so there's no basis to object to that.

11           All right.  In any event, we are now at the charge

12   conference, so in that regard, I don't need to make a final

13   determination with respect to these issues, but maybe it speaks

14   to the admissibility of the Colorado testimony, which is why I

15   wanted to address it today.  Based on that colloquy, I see no

16   basis for Mr. Colorado to be called as a witness.  For the

17   reasons I discussed, I don't think *quantum meruit* will be

18   relevant or presented to the jury unless Mr. Avenatti

19   testifies, and if Mr. Avenatti testifies, Mr. Colorado's

20   testimony would be cumulative and unnecessary.  So it's either

21   irrelevant or it's cumulative, and in either case, it's

22   inadmissible.

23           MR. AVENATTI:  Your Honor, why would Mr. Colorado's

24   testimony not be admissible in light of the plain language of

25   the contract?

M1vWave6

1          THE COURT:  Mr. Avenatti, that's not the way this

2    process works.  I've given you my ruling.  For the reasons I

3    stated, unless you testify, I don't think *quantum meruit* is a

4    valid argument that will be made to the jury, and given that,

5    the nature and extent, quality of the work that you did is not

6    going to be relevant, and I don't need to build a record on

7    that.  And to the extent that it is, the record has been built

8    on it.  His testimony regarding how much you charge other

9    clients in other fee agreements is far afield from this case

10   and simply going to confuse the issue, and for those reasons,

11   it's irrelevant and also inadmissible under 403.

12          If you testify as to your subjective belief, his

13   testimony has minimal probative value with respect to your

14   subjective belief, and to the extent that it has any value with

15   respect to objective facts, like how much you charge other

16   clients, it will be duplicative and cumulative of what's in the

17   record.  So again, either you don't testify, in which case I

18   think it's irrelevant and confusing, or you do testify, in

19   which case I think it's cumulative and potentially confusing.

20   In either case, I think it's inadmissible.

21          Mr. Podolsky, do you have anything to add here?

22          MR. PODOLSKY:  I guess just because I want to make --

23   based on something the defendant said, I want to make sure

24   there's no confusion.  We've requested -- we will have to prove

25   his intent to defraud beyond a reasonable doubt.  There will be

M1vWave6

1   an explanation of good faith.  It's not that there's no good

2   faith instruction at all, and I just wanted to make sure the

3   defendant understands that based on the colloquy he just had

4   with you.

5           THE COURT:  All right.  I certainly agree and intend

6   to include an instruction with respect to good faith, but we're

7   not yet at the charge conference, and in that sense, we don't

8   have to debate the particulars of the instruction, but

9   certainly it is my intention to include an instruction on good

10  faith and it is the government's burden to prove Mr. Avenatti's

11  fraudulent intent.

12          All right.  So that addresses Colorado and, to the

13  extent that we need to for today's purposes, *quantum meruit*.

14          I think that brings us to Mr. Avenatti's testimony

15  should he testify.  There are a few issues to discuss there.

16  One is *quantum meruit*.  For the reasons I've discussed, I agree

17  with the government, except in that one narrow respect, that

18  Mr. Avenatti can speak to his subjective beliefs with respect

19  to *quantum meruit*.  The government certainly can impeach him,

20  but he's entitled to testify if that was his belief.

21          I am inclined to give a curative instruction to the

22  jury.  The government has proposed one.  I may tweak it a

23  little bit but would be inclined to use it.  If Mr. Avenatti

24  has any objection to that instruction or an alternative

25  instruction that he would propose, I'm happy to consider it and

M1vWave6

1    he can file it by 10:00 tonight.

2            With respect to the other matters that the government

3    has raised, let me turn to those.

4            First, there is -- we've discussed *quantum meruit*.

5    There is the issue of the Nike conviction.

6            Mr. Avenatti, do you wish to be heard on that?

7            MR. AVENATTI:  Your Honor, just for the benefit of the

8    Court, at this point in time, I'm not intending on testifying.

9            THE COURT:  OK.  I understand that, but I think it's

10   incumbent upon us to work through these issues now, because if

11   you do testify, based on the number of witnesses that may show

12   up, you're likely to begin testifying tomorrow.  So I think it

13   is necessary to work through these issues so we're ready to go,

14   because I'm not going to do what we did today, which is waste

15   half a day of trial time by letting the jury go early.

16           So given that, what's your view on the Nike case's

17   admissibility on cross?

18           MR. AVENATTI:  Your Honor, I don't believe the

19   conviction should be admissible on cross.  There's a pending

20   motion for a new trial that's under consideration as well as

21   the pending Second Circuit appeal, and I think that in the

22   event I am cross-examined, if I do testify I am cross-examined

23   on that conviction, and were that conviction to be overturned,

24   I think it would potentially put a conviction, if it was

25   obtained in this case, at risk.  And therefore, I would argue

M1vWave6

1    that, under 403, it should be excluded.

2          THE COURT:  OK.  That argument is meritless.  Under

3    609(e), as I stated last week, the pendency of an appeal -- and

4    certainly that subsumes any I posttrial motion in the district

5    court -- does not negate the admissibility of a prior

6    conviction, that's not a basis to exclude it.  So the Nike

7    conviction can come in on cross.

8          California conduct I'd like to spend a little bit more

9    time on.  My concerns here are that this does potentially

10   devolve into a mini trial with respect to the California

11   allegations, and it may be that I don't fully understand the

12   nature of what all those allegations in the indictment pertain

13   to.  I know it pertains to fraud charges as to five other

14   clients, some tax charges, maybe bank fraud.  But I guess,

15   Mr. Podolsky or Mr. Rohrbach or Mr. Sobelman -- I don't mean to

16   leave you out -- perhaps a proffer with respect to what you

17   would anticipate asking on cross with respect to the California

18   conduct might be helpful here.

19         MR. PODOLSKY:  Yes, your Honor.

20         These would be offered on the 608(b).  I would intend

21   to ask about certainly, first, certain clients that Mr.

22   Avenatti defrauded largely by lying to them about the status of

23   their settlement agreements, that he had received the money but

24   essentially hid it from them and declined to give the proceeds

25   to them.  This would be in the mode of questioning.  I

M1vWave6

1    certainly would seek to refresh his recollection if he denies

2    allegations untruthfully, but I don't see it as devolving into

3    a mini trial as much as this is a collateral matter.  I think

4    we'd only be entitled to actually offer any evidence if it

5    directly contradicts or shows that he lied on the stand.

6         Similarly, I would ask questions about Mr. Avenatti's

7    bank fraud.  He applied for, I think, two loans in 2014 -- I

8    should check the year -- but he submitted in support of those

9    loans multiple false and fraudulent tax documents, essentially

10    Form 1040s and, I think, 1065s that he did not actually submit

11    to the IRS and relatedly did not file taxes at that time.

12         So I think for the reasons we've put forth in our

13    letter, and I'm happy to speak on it further, we're entitled to

14    probe the defendant's character for truthfulness.  We have more

15    than a good faith basis to ask these questions.  We don't

16    intend to put in extrinsic evidence save for the possibility

17    that the defendant denies something on the stand that would

18    render a particular document admissible.

19         THE COURT:  Mr. Avenatti.

20         MR. AVENATTI:  Your Honor, a few points.

21         No. 1, if I'm cross-examined on these issues relating

22    to these clients, then I should be permitted to call clients or

23    other individuals to substantiate my defense to those charges

24    and those allegations.

25         THE COURT:  Doesn't that depend on what you're asked

M1vWave6

1    and what you say?

2            MR. AVENATTI:  Yes, it does, your Honor, but I don't

3    think that the cross-examination on these issues is going to be

4    so confined.  I think in almost any circumstance, I would have

5    to then be permitted to call individuals and witnesses in

6    connection with those allegations, and basically, then it would

7    transform this case into a case not only about the allegations

8    relating to Ms. Daniels but also the allegations in California.

9            I would also be hampered in my ability to respond

10   because of the current status of the data in California, which

11   resulted in a mistrial and goes directly to whether I am

12   guilty.

13           THE COURT:  Which you have had since September of last

14   year, Mr. Avenatti.

15           MR. AVENATTI:  But I have not had access.

16           THE COURT:  Right.  I don't want to hear about that.

17           MR. AVENATTI:  Your Honor, but I haven't had access to

18   the requisite cost data.

19           THE COURT:  Mr. Avenatti, that has nothing to do with

20   the admissibility of this under 608(b) on cross.

21           MR. AVENATTI:  But it has everything to do with my

22   ability --

23           THE COURT:  It doesn't.

24           MR. AVENATTI:  OK.

25           Your Honor, if I'm cross-examined on those

M1vWave6

1    allegations, then I should be -- I should have the opportunity

2    to show why those allegations are not accurate.  In order for

3    me to be able to show that, I have to have access to this data,

4    which is not in a useable state and has not been in a useable

5    state since I received it in September.  That's been the topic

6    of litigation in California.

7            So it will turn this trial, it will transform this

8    trial into basically a joint trial between this case and

9    California.  It will require calling multiple additional

10   witnesses from out of state, from California, to testify as to

11   these allegations, and it should be excluded under 403 grounds,

12   in addition, your Honor.

13           THE COURT:  Mr. Podolsky.

14           MR. PODOLSKY:  The argument is not supported by the

15   rules of evidence, your Honor.  Just because he's asked about

16   matters under 608(b) does not entitle him to offer extrinsic

17   evidence.  Often this comes up in the opposite way.  A

18   cooperator is on the stand.  They're asked about prior

19   instances of lack of truthfulness, and we can't simply put in a

20   rebuttal case to deny every other instance through extrinsic

21   evidence.  Mr. Avenatti will have to answer the questions.

22   That's what Rule 608(b) permits.  It does not permit the

23   parties to then offer extrinsic evidence to prove up the other

24   instances of lack of truthfulness.

25           THE COURT:  All right.

M1vWave6

1        So I agree with the government on this one too.  I
2    think the rules of evidence clearly support the government's
3    argument that it's entitled to inquire into this other alleged
4    misconduct.  Whether and to what extent the government can
5    offer any extrinsic evidence or Mr. Avenatti can is a separate
6    question, and it's not ripe unless and until that happens.  But
7    I think the question for me at this moment is whether the
8    government can inquire about it, and I agree wholeheartedly
9    with Judge Gardephe.  I've read his ruling.  If a defendant
10    testifies and puts forward an innocent reason for his conduct
11    here, I think the government is clearly entitled under the law
12    to impeach his credibility through the conduct at issue in
13    California because it speaks directly to his character for
14    truthfulness and would be permissible under 608.

15        That is a very different question from the
16    admissibility of extrinsic evidence, and I don't anticipate we
17    will ever need to get to that, but if we do, it's a different
18    question.  I would caution the government not to go overboard
19    on the California conduct.  Not to go overboard on it, that is
20    to say, I will allow you some limited room to inquire about it.
21    I would perhaps limit yourself to what you think is your best
22    material there, and I'm not going to permit this case to become
23    about the truth or falsity of the California allegations, but I
24    do think you're on firm ground inquiring on cross-examination
25    under 608(b).

M1vWave6

1        Understood?

2        MR. PODOLSKY:  Yes, your Honor.  We intend to make

3   this case about this case, but also, if the defendant testifies

4   his credibility will be at issue.  So we certainly understand

5   your Honor's ruling and commentary on it.  Thank you.

6        THE COURT:  All right.

7        Next, in 326, the government moves to preclude any

8   testimony attacking this prosecution, his prior prosecution or

9   his prosecution in the Central District of California, and I

10  will underscore that the government certainly should not intend

11  to elicit the fact of that prosecution separate and apart from

12  the conduct.

13        Mr. Avenatti, do you wish to be heard?  It certainly

14  seems like they're on firm ground in saying that the decision

15  to prosecute you and their conduct is not relevant to the

16  issues in this case.  Am I wrong about that?

17        MR. AVENATTI:  Your Honor, I have nothing more to add

18  on that point other than what's already on the record.

19        THE COURT:  How's it on the record?

20        MR. AVENATTI:  Well, the government has made a

21  submission on the record.

22        THE COURT:  Right.  So I'm giving you an opportunity

23  to respond to it.

24        MR. AVENATTI:  And I'm declining the opportunity.

25        THE COURT:  Great.  That makes the government's motion

M1vWave6

1    granted as unopposed.

2            I think that extends to the government's motion at 334

3    to preclude any argument or evidence regarding the government's

4    motives.  It's really the same issue.  So in that sense, that

5    motion is granted as well.  I think that covers the issues with

6    respect to the defendant's testimony, if there is going to be

7    any.

8            Did I miss anything, Mr. Podolsky or Mr. Rohrbach?

9            MR. PODOLSKY:  I don't believe so, your Honor.

10           THE COURT:  All right.  I should note that Mr. Drum

11   filed a motion to quash a few minutes ago, so we do now have

12   motions from Mr. Drum and Mr. Marshack.  Mr. Avenatti has until

13   6 p.m. to file his reply -- a single reply to both motions,

14   please -- on those motions and then we'll decide if they

15   testify -- I will decide.  Excuse me.

16           All right.  Let me sum up where that leaves us.  If

17   Mr. Loupe and Mr. Karbley are present in court tomorrow

18   morning, they will be permitted to testify on the limited

19   subject areas that I have identified earlier.  If Mr. Nicks and

20   Mr. Crain are in court and prepared to testify, then we will

21   take up the question of whether they should be permitted to

22   invoke.  And I will resolve the motions to quash with respect

23   to Mr. Marshack and Mr. Drum tonight.  If they are permitted to

24   testify, I would urge you to figure out how that might happen.

25   I think one of them may not be available to be in New York for

M1vWave6

1    any number of reasons, and I'm not sure that any of them can be

2    in New York tomorrow.  So you should make adequate

3    preparations, recognizing, Mr. Avenatti, that I warned you

4    pretrial that if it came time for you to call a witness, you'd

5    better have that witness ready, and if you didn't have the

6    witness ready, you're deemed to rest.  As of now, their motions

7    have not been granted.  If they are not granted and they're

8    permitted to testify, then they will testify tomorrow in

9    whatever form that may take.  If they're not permitted to

10   testify tomorrow, then we will proceed to the next phase of the

11   case.  And then the final question is whether Mr. Avenatti will

12   testify.  I'll obviously give him overnight to think about it,

13   particularly in light of the discussion that we've had here

14   today, and inquire at that time and we'll go from there.

15             Yes.

16             MR. AVENATTI:  Your Honor, just briefly, just so the

17   record's clear.

18             If a subpoena is not quashed and the witness has an

19   obligation to appear and does not appear to testify, then I

20   have any number of means that I can use to compel that

21   witness's testimony immediately so that I am not prejudiced in

22   a criminal defense.

23             THE COURT:  I understand, and you need to take steps

24   to arrange for that.  One of the two witnesses -- maybe both;

25   I'm not sure -- could not enter the courthouse right now.  So

M1vWave6

1    you'll need to make adequate provisions to take that witness's

2    testimony in the event that the motion to quash is not granted.

3    That's all I'm saying.

4              MR. AVENATTI:  I understand.  I just wanted the record

5    to be clear that if witnesses don't comply with our subpoenas,

6    that the answer is not we just move to the next stage of the

7    case and I don't get to call them.

8              THE COURT:  It might be.  It will turn, at that point,

9    on what efforts, if any, you made to ensure their compliance

10   with the subpoena.  It's my understanding -- and maybe

11   Mr. Dalack should be heard now or he can, I guess, be heard in

12   the reply tonight.  At least according to Ms. Marino, the

13   subpoena as to Mr. Drum was served several weeks ago.  There

14   were discussions between your team and her with respect to

15   negotiating an agreed-upon way of handling it.  The last I

16   heard from you was on January 16, and the subpoena called for

17   compliance on January 24.  If they didn't hear from you until

18   this weekend that you expected them to be in New York on

19   Monday, that strikes me as unreasonable and entirely reasonable

20   for them to assume that you had withdrawn the subpoena.

21             MR. AVENATTI:  Your Honor, Mr. Dalack, if permitted,

22   will address that to your Honor, but I just wanted my position

23   to be clear, which is the default position is when someone is

24   served with a subpoena, they show up.

25             THE COURT:  I understand.

M1vWave6

```
1              MR. AVENATTI:  They're obligated to show up.  Once
2      they are served, I don't have to do anything.  I have to do
3      nothing.  They have an obligation to appear to testify once
4      they are served with a subpoena.
5              The idea that you serve somebody with a subpoena and
6      then if you don't follow up with them they can just blow off
7      the subpoena and then you suffer the consequences, I don't
8      think that has any basis that I know of certainly.  Each of
9      these witnesses were served with a valid subpoena.  There's no
10     issue as to service.  They have an affirmative obligation to
11     come here to testify in my defense case.
12             THE COURT:  I think the subpoena called for them to
13     testify on January 24, which has come and gone.  That's all the
14     point I was trying to make, but in any event, you'll have a
15     reply, and I haven't even read their motions to quash.
16             Mr. Dalack, do you want to just make a record on
17     whatever it is you want to make a record on so that that's at
18     least in the record, and I'll consider it later?
19             MR. DALACK:  Sure.  Thank you, Judge.
20             The back-and-forth that Ms. Marino represented in her
21     letter suggested that we had conversations the weekend of
22     January 16, which seems like light years ago at the moment.
23     During those conversations, we were trying to reach an
24     agreement as to what documents and what testimony we would be
25     seeking from Mr. Drum in lieu of sort of a full-scale
```

M1vWave6

1      compliance with the subpoena.  In particular, Ms. Marino had

2      taken issue with our request for communications between

3      Mr. Drum and certain others about the scope of his prospective

4      testimony.  I have indicated to Ms. Marino, both on, I believe,

5      the 15th and then on the 16th, that I was confident we could

6      reach an agreement; that this wasn't my call to make, that

7      ultimately I was going to defer to my client, at the time, Mr.

8      Avenatti, and the way that I left the conversation was that if

9      she didn't hear back from me, she was going to -- my

10     understanding was that she would be filing a motion to quash.

11              So there was no agreement that could be reached.  I

12     never reached back out to her, and I expected for them to file

13     a motion to quash on or before January 24.  And there has been

14     no contact between me and Ms. Marino since January 16.

15              THE COURT:  All right.  Thank you.  I appreciate that.

16     I'll look for your rely at 6:00.  I'll give you my ruling on

17     that in as timely a fashion as I can, and then we'll see where

18     that leaves us tomorrow.

19              Let's talk about the schedule.

20              We'll have somewhere between two and six defense

21     witnesses other than Mr. Avenatti.  That will depend in part on

22     my rulings, in part on who is here, in part on whether or not

23     Mr. Avenatti is prepared to call them.  It seems to me that if

24     Mr. Avenatti doesn't testify, that the defense case is likely

25     to rest tomorrow, in which case I think -- I have no idea

M1vWave6

1    sitting here today what time that would be, but my inclination

2    would be to dismiss the jury at that time, finalize my draft

3    charge, get it to you and then have the charge conference

4    sometime tomorrow afternoon, with the intention of closing on

5    Wednesday.  If Mr. Avenatti testifies, I'm guessing that that

6    might takes through tomorrow, and then we'll see where things

7    stand.

8            Anyone disagree with that?

9            MR. PODOLSKY:  No disagreement at all with that

10   schedule.

11           I suppose the one thing I'll note is we certainly

12   haven't made any decisions about a rebuttal case, and if Mr.

13   Avenatti is calling witnesses as to reputation for truthfulness

14   of the victim, I think we have several options that we could

15   pursue as to a rebuttal witness on that.  I don't know that we

16   will, but just to flag that.

17           THE COURT:  OK.  And would you be prepared to put on a

18   rebuttal case tomorrow if you were going to put on a rebuttal

19   case?

20           MR. PODOLSKY:  We're going to discuss tonight, your

21   Honor.  I think that would be our hope, if he rests tomorrow,

22   to go directly into it.  But since, frankly, we learned today a

23   little bit more about Mr. Avenatti's intentions, we'll have to

24   discuss after court today and see what we can arrange.

25           THE COURT:  Let me put it differently.  If you have a

M1vWave6

1    rebuttal case and he doesn't testify and rests tomorrow, we're

2    going to proceed to the rebuttal case.  If you do not have a

3    witness here to testify, I will deem you not to have a rebuttal

4    case and we will proceed in the manner that I described.

5           Do you understand?

6           MR. PODOLSKY:  Understood.

7           THE COURT:  Mr. Avenatti, anything you want to say

8    with respect to that schedule?

9           MR. AVENATTI:  Only one question.  Nothing as relates

10   to the schedule, your Honor.

11          THE COURT:  OK.

12          MR. AVENATTI:  I just had one question, which is are

13   we required then to bring -- well, Mr. Marshack we anticipate

14   offering by video, I would guess.  If that motion is denied.

15          Mr. Drum -- is your Honor informing me that we need to

16   bring Mr. Drum here, or would your Honor entertain us offering

17   Mr. Drum by video in the interest of time?

18          THE COURT:  Mr. Podolsky.

19          MR. PODOLSKY:  Your Honor, I don't think we're able to

20   agree under the rules that he's unavailable just for the sake

21   of convenience.  So I guess that's our position on it.

22          THE COURT:  I think I'll take it under advisement, and

23   we'll see, first, if the motion to quash is granted in which

24   case it moots the issue, and if not, you can make an

25   application in your reply for your basis to call him remotely

M1vWave6

1    and why I should permit that.  All right?

2                    MR. AVENATTI:  OK.

3                    THE COURT:  Anything else from either side?

4                    Government.

5                    MR. PODOLSKY:  No, your Honor.  Thank you.

6                    THE COURT:  Mr. Avenatti.

7                    MR. AVENATTI:  Your Honor, the only point I'll make,

8    finally, relating to Mr. Drum is we'll do our best to get him

9    here if the motion is denied.  If we're not able to get him

10   here, then I'm going to ask that he be permitted to testify by

11   video.  Again, he's been under a valid subpoena.

12                   THE COURT:  I understand, and you should certainly

13   make that known to Ms. Marino and she can take whatever chances

14   she wants, either join in your application to have him testify

15   remotely, if I permit him to testify at all, or get him on a

16   plane or take her chances that I deny -- sorry, grant the

17   motion to quash.  But I agree with you.  He is under a valid

18   subpoena.  She didn't file a motion to quash until today.  At

19   the same time, you've known since at least Saturday that I

20   expected him to be here today to testify, and I don't quite

21   understand why he's not here.

22                   MR. AVENATTI:  Actually, your Honor, I expect had the

23   motions to quash not happened and had what happened this

24   weekend not happened, Mr. Drum would have testified late in the

25   day Tuesday or Wednesday.

M1vWave6

1          THE COURT:  OK.  Well, be that as it may, you have had

2     ample time to try and get him here.  To the extent that I don't

3     permit him to testify remotely but do permit him to testify,

4     we'll discuss what efforts, if any, you made, whether and to

5     what extent that's your fault as opposed to Mr. Drum's

6     noncompliance with the subpoena, and I'll deal with whatever we

7     need to deal with.  In the meantime, you may want to take steps

8     to figure out how to arrange for him to testify remotely in the

9     event that I permit that.  So bottom line is see what happens.

10    You should be prepared for any of those possibilities.

11          I'll see you tomorrow morning at 9:00 and see what the

12    day brings.

13          (Adjourned to February 1, 2022, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      Elizabeth Beier

 4     Direct By Mr. Rohrbach . . . . . . . . . . .1271

 5     Cross By Mr. Avenatti  . . . . . . . . . . .1288

 6     Redirect By Mr. Rohrbach . . . . . . . . . .1327

 7     SHAMEL MEDRANO

 8     Direct By Mr. Podolsky . . . . . . . . . . .1330

 9     Cross By Mr. Avenatti  . . . . . . . . . . .1345

10                         GOVERNMENT EXHIBITS

11     Exhibit No.                              Received

12      228   . . . . . . . . . . . . . . . . . . .1276

13      229   . . . . . . . . . . . . . . . . . . .1279

14      106   . . . . . . . . . . . . . . . . . . .1287

15      804   . . . . . . . . . . . . . . . . . . .1333

16      S4    . . . . . . . . . . . . . . . . . . .1343

17                         DEFENDANT EXHIBITS

18     Exhibit No.                              Received

19      ST 12   . . . . . . . . . . . . . . . . . .1271

20      S1    . . . . . . . . . . . . . . . . . . .1386

21      AD    . . . . . . . . . . . . . . . . . . .1387

22      AB    . . . . . . . . . . . . . . . . . . .1387

23      AE    . . . . . . . . . . . . . . . . . . .1387

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300