M22nave1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                      19 Cr. 374 (JMF)

5   MICHAEL AVENATTI,

6                    Defendant.
                                        Trial
7   ------------------------------x

8                                       New York, N.Y.
                                        February 2, 2022
9                                       9:00 a.m.

10  Before:

11
                        HON. JESSE M. FURMAN,
12
                                        District Judge
13                                      —and a Jury—

14                          APPEARANCES

15  DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
    BY:   MATTHEW D. PODOLSKY
17        ROBERT B. SOBELMAN
          ANDREW A. ROHRBACH
18        Assistant United States Attorneys

19  MICHAEL AVENATTI, Defendant *Pro Se*

20  DAVID E. PATTON
          Federal Defenders of New York, Inc.
21        Attorney for Defendant
    BY:   ROBERT M. BAUM
22        ANDREW J. DALACK
          TAMARA L. GIWA
23        Standby Assistant Federal Defenders

24  Also Present:  Special Agent DeLeassa Penland
                   U.S. Attorney's Office
25                 Christopher de Grandpre, Paralegal Specialist
                   Juliet Vicari, Paralegal

M22nave1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  You may be seated.
 3              Good morning.  Welcome back.
 4              The government is here, Mr. Avenatti is here, standby
 5    counsel, at least two out of three, are here.
 6              Is the government ready to proceed?
 7              MR. SOBELMAN:  Yes, your Honor.
 8              THE COURT:  Mr. Avenatti, are you ready to proceed?
 9              MR. AVENATTI:  Good morning.  Yes, your Honor.
10              THE COURT:  I think there was one juror who called and
11    said that she would be here around 9:05 -- he or she.
12    Actually, I don't know which.  So they may not all be here, but
13    my deputy is going down to check.  If they are here at 9:05, we
14    will bring them promptly up and get started.
15              I didn't ask explicitly, but am I correct in believing
16    that Mr. Podolsky is doing the rebuttal?
17              MR. PODOLSKY:  That's right, your Honor.
18              THE COURT:  All right.  Based on your estimates of
19    length -- and I hope everybody heeded my admonition and tried
20    to pare things down last night -- my anticipation is that we
21    will take a very short break after the government's summation.
22    I will have the jury just go to the jury room here to use the
23    facilities and stretch their legs and then we will proceed
24    after that short break with Mr. Avenatti's closing, at which
25    point I think we will be at the lunch hour, so we will break
```

M22nave1

```
 1   for lunch.  Then the rebuttal and my instructions will come
 2   after lunch.
 3           Mr. Avenatti, that underscores the need for me to
 4   police the length, so again I hope you heeded my admonition and
 5   may not even go two hours, but I definitely don't want to
 6   interrupt you to take the lunch, nor do I want the jurors
 7   sitting there at 1:30 wondering what's going on with their
 8   lunch.
 9           Good?
10           MR. AVENATTI:  Understood, your Honor.  So it is your
11   intention to take a lunch break at the end of my close,
12   whenever that is?
13           THE COURT:  Correct.
14           MR. AVENATTI:  Okay.
15           THE COURT:  All right.  Anything anyone needs to raise
16   with me before we get started in a minute or two?
17           MR. SOBELMAN:  Nothing from the government, your
18   Honor.
19           MR. AVENATTI:  Your Honor, only one housekeeping
20   question that I have, which is, is it your Honor's intention to
21   take a sidebar following the government's rebuttal close?  I
22   just want to have an opportunity to object to the jury
23   instructions and preserve the record.
24           THE COURT:  No.  You have, I think, preserved whatever
25   objections you have made I think now multiple times.
```

M22nave1

1          MR. AVENATTI:  That's fine.  As long as the record is

2     clear on that.  No problem.

3          THE COURT:  Well, let me tell you what I do -- the

4     jury is all here so we are going to bring them up.

5          I will go directly by my instructions after the

6     government's summation.  Then after that I will bring you up to

7     sidebar, at which point you can -- well, any objection you've

8     already made is preserved as far as I am concerned.  I will

9     just inquire and confirm that there are no objections to the

10    instructions as read.

11         So I will give you an opportunity to make any new

12    objections, but you don't need to renew any objections you've

13    already made.

14         MR. AVENATTI:  Thank you, your Honor.

15         THE COURT:  All right.

16         I had entered an order last night directing you to

17    make sure that we had an electronic set of the exhibits.

18         Where does that stand?

19         MR. SOBELMAN:  The parties have agreed on a set of

20    exhibits.  If they have not been shared with the Court's

21    deputy, they will shortly.

22         THE COURT:  You are absolutely certain that it

23    includes only what has been admitted into evidence and nothing

24    omitted or included that shouldn't be omitted or included as

25    the case may be?

1          MR. SOBELMAN:  We double checked last night and also

2     shared with the defense and they had an opportunity to check as

3     well.

4          THE COURT:  Mr. Avenatti?

5          MR. AVENATTI:  Your Honor, the only thing I would add

6     to that is, just so the record is clear, I am objecting to I

7     believe it's 804 going back to the jury.  That is the document

8     that I previously submitted the letter brief on.  We have had

9     considerable discussion on the record.

10         THE COURT:  Stop.  I understand you have preserved

11    that, but any objections -- sorry.  You've confirmed that they

12    are accurate, subject to that objection?

13         MR. AVENATTI:  Yes, sir.

14         THE COURT:  Okay.  Good.  If you can make sure that my

15    deputy gets them at some point this morning, if she hasn't

16    already -- I will certainly check with her as well -- that will

17    be great.  We will load them for the jury to have in the jury

18    room.  All right.

19         We will let you know when the jury is about to arrive

20    and we'll get going.

21         MR. AVENATTI:  Your Honor, before the jury comes in, I

22    just want to state for the record that I am renewing my Rule 29

23    that was made at the end of the government's case now that I

24    have rested my case.

25         THE COURT:  Fair enough.  I'm renewing my ruling.

M22nave1

1    It's denied.

2          All right.  The jury is going to be entering in a

3    moment.

4          (Jury present)

5          THE COURT:  Watch your step.  You may be seated.

6          All right.  Good morning, ladies and gentlemen.

7    Welcome back.  Thank you again for being here on time.

8    Hopefully you all had a good unexpected day off yesterday.

9    Sorry that we only kept you for a brief amount of time,

10   particularly those of you who had to travel far distances to

11   get here.  Today, as I told you the other day, we will be

12   proceeding with the parties' closing arguments, their

13   summations, and after they conclude I will give you my

14   instructions as to the law.

15         Hang on one second, please.

16         All right.  My apologies.

17         After the summation I will give you my instructions as

18   to the law, and when I conclude you will begin your

19   deliberations.  For the moment, I want you to please listen

20   carefully, give your undivided attention first to the

21   government and then to Mr. Avenatti for their closing

22   arguments.

23         Let me remind you that what they say in their closing

24   arguments is not evidence.  All right.  Obviously you know that

25   Mr. Avenatti was involved in many of the events relevant to

this trial, so inevitably I imagine he will refer to himself,
but he is not testifying.  What he says is not evidence.  It is
simply, the government's argument, Mr. Avenatti's argument are
simply their arguments about the conclusions that you should
draw from the evidence.  The evidence is the testimony of the
witnesses, the exhibits that were admitted into evidence and
the stipulations between the parties.

          This is their opportunity to make arguments to you
about what conclusion you should draw from that evidence, what
inferences you should draw from that evidence, but what they
say is not evidence.  I want you to remember that as you listen
to them.  But I also want you to listen carefully, because
their arguments are an important part of the process and help
you in understanding the evidence and how it fits together.

          So, with that, we will begin with the government's
summation.

          Mr. Sobelman, you may proceed.

          MR. SOBELMAN:  The defendant was a lawyer who stole
from his own client.  She thought he was her advocate, but he
betrayed her.  He told lies to cover it all up, lies he told to
try to get away with it.

          But he failed.  His lies caught up with him.  At this
trial, the truth came out.  The defendant's lies and betrayal
were exposed, and you learned how the defendant committed fraud
and identity theft when he stole from his own client.

M22nave1                    Summation – Mr. Sobelman

1          This is the government's closing statement.  It is our

2     opportunity to summarize the evidence for you.

3          I'm going do that in four parts:

4          First, I am going to quickly go over some of the basic

5     facts of the case.

6          Second, I'm going to go through the ten reasons you

7     know the defendant is guilty.

8          Third, I'm going to briefly discuss the charges in

9     case.

10         Last, I'm going to talk about some of the ways the

11    defendant has tried to distract you from what matters in this

12    case.

13         First, what did the evidence show?

14         On February 27, 2018, the defendant and Ms. Daniels

15    signed an agreement.  As you know, that agreement did not give

16    the defendant permission to take Ms. Daniels' book advance

17    payments and to lie to her about it.  All it said was that the

18    defendant and Ms. Daniels could agree later.

19         But that never happened.  The defendant told

20    Ms. Daniels he would not take one penny of her book payments

21    because she earned that money herself.  On April 11, 2018,

22    Ms. Daniels signed a book contract with St. Martin's Press.

23    The publisher agreed to pay Ms. Daniels $800,000 for the book

24    in four installments.

25         The first payment went fine.  The publisher sent the

1    money to Mr. Janklow, and Mr. Janklow took his fee and sent the

2    rest to Ms. Daniels exactly as agreed.

3        But when the second payment was almost due, the

4    defendant decided to steal it.  As you know, the defendant's

5    scheme was actually quite simple.  The defendant created a fake

6    letter with Ms. Daniels' signature copied on to it.  On August

7    1, 2018, he sent that fake letter to Mr. Janklow.  He tricked

8    Mr. Janklow into sending Ms. Daniels' second book payment to

9    the defendant.  Then he spent Ms. Daniels' money on whatever he

10   wanted to.  And he lied to Ms. Daniels to cover it up.

11       But when she kept asking and asking "Where's my

12   money?" he got worried.  He didn't want to get caught.  So he

13   called up Mr. Macias and begged him to get a loan.

14       On September 5, 2018, the defendant got that loan.

15   The same day the defendant transferred the loan money to

16   Ms. Daniels and told her the publisher had paid it late.  That

17   was a lie.

18       Then the defendant stole from Ms. Daniels again.  On

19   September 17, 2018, Mr. Janklow followed the instructions on

20   the fake letter and sent the third book payment to the

21   defendant.  Again, the defendant spent it right away on things

22   for himself, on his car payment, his ex-wife, his girlfriend.

23   Then he lied to Ms. Daniels for months to cover it up.

24       But in February 2019, the defendant got tangled in his

25   own web of lies.  He got caught.  That is what happened and

1    that is why we are here.

2            Now, how do you know that the defendant is guilty?

3            You have a mountain of evidence before you.  You have

4    seen dozens of documents and text messages.  You have heard

5    more than a week of witness testimony.  Right now, I'm going to

6    focus on the ten reasons you know the defendant is guilty.

7            First, you know the defendant is guilty because of his

8    lies to Ms. Daniels about the book advance payments, lies he

9    told to his own client.

10           You saw a lot of text messages between the defendant

11   and Ms. Daniels.  And you learned then that those messages from

12   the defendant's own iCloud account are devastating evidence of

13   the defendant's guilt.  Because these messages alone show you

14   that the defendant lied to Ms. Daniels for months, how he

15   strung her along with lie after lie after lie about what

16   happened to her money when he had it all along.

17           As you know, the defendant used his fake letter to

18   steal Ms. Daniels' second book payment on August 1, 2018.

19   Almost a month later, on August 27, 2018, Ms. Daniels told the

20   defendant she was frustrated the publisher had not paid her.

21   That's what she believed, because the defendant had lied to her

22   after he stole her second book payment.

23           This is Government Exhibit 26.

24           After being asked about recording an audio version of

25   her book, Ms. Daniels complained to the defendant that the

1    publisher still had not paid me despite final version being

2    submitted a while ago.

3            Let's be very clear.  By August 27, 2018, the

4    publisher had already made the second payment.

5            So why did she say this?

6            Because she didn't know the publisher had sent the

7    money, because it went to the defendant's bank account, because

8    the defendant had lied to her, and that's what she believed at

9    the time.

10           She didn't know that the defendant was the reason she

11   hadn't received her payment, not the publisher.  A week after

12   that, on September 5, 2018, Ms. Daniels again complained to the

13   defendant.

14           This is Government Exhibit 29.

15           "I did not get paid today.  They're in breach of

16   contract by about four weeks."

17           Why did Ms. Daniels think that?

18           Because the defendant lied to her about her second

19   book payment over and over and over again, even though by

20   September 5 he had stolen her second book payment a month

21   earlier and had spent it.

22           How do you know that?

23           This is part of the timeline that was admitted during

24   Shamel Medrano's testimony, which is Government Exhibit 804.

25   We did not go through the whole timeline during the trial

1    because you had already seen all the exhibits that are

2    mentioned in it, but I want to pause for a moment on this

3    timeline because it's very important.  It shows how the

4    defendant was telling Ms. Daniels one thing, but telling other

5    people something else.

6          He was keeping Ms. Daniels in the dark the whole time.

7    On this timeline the communications with Ms. Daniels are above

8    the line.  On the bottom it shows the defendant's

9    communications with other people and the money transfers that

10   happened without Ms. Daniels' knowledge.  This timeline puts in

11   context all of the key evidence in this case.

12         This part of the timeline shows how the defendant

13   stole Ms. Daniels' second book payment in early 2018, a month

14   before the text message we just looked at.

15         He used the fake letter in Government Exhibit 213 to

16   trick Mr. Janklow into transferring money into the account only

17   he controlled, which is shown in Government Exhibit 107.  The

18   other purple bubble shows the secret referral fee the defendant

19   got from Mr. Janklow.  The defendant kept Ms. Daniels in the

20   dark about that, too.  That transfer is in Government Exhibit

21   303A.

22         But, as you know, the defendant's scheme and his lies

23   did not stop with Ms. Daniels' second book payment.  He stole

24   her third book payment too.  These messages are from a month

25   later, October 1, 2018.  Ms. Daniels wrote to the defendant to

1    double check that she would get her third book payment on time

2    when her book was published the very next day.  This is when

3    the defendant first told his everything-will-be-okay lie.

4          This is Government Exhibit 33.

5          Ms. Daniels wrote, "That means I get paid tomorrow,

6    right?"

7          And she attached a part of her book contract with the

8    third payment circled.

9          How did the defendant respond?

10         He lied.  He wrote, "yes, yes," as in you get paid

11   tomorrow.

12         How do you know that's not true?  The payment had

13   already been made -- to him.

14         This is another part of the timeline, Government

15   Exhibit 804.  This tells you that Government Exhibit 107 shows

16   how the defendant stole Ms. Daniels' third book payment on

17   September 17, 2018, more than two weeks before the messages we

18   just looked at.

19         Why did the defendant lie in those messages?

20         Because he knew that was not his money.  It did not

21   belong to him.  He stole it.  He lied to avoid getting caught.

22         Later that day, Ms. Daniels wanted to make sure that

23   the defendant knew her third book payment was important to her.

24   And the defendant again told his everything-will-be-okay lie.

25         This is Government Exhibit 34.

1        Ms. Daniels wrote, "Re book payment, make sure they

2    don't take five weeks like last time.  They were way late."

3        Of course you know that the second book payment was

4    actually paid on time, but the defendant had kept her in the

5    dark.  Here, Ms. Daniels was asking about the third payment

6    which the defendant had already stolen and spent.

7        But how did he respond?  Did he tell her what really

8    happened with the second and third book payments?

9        No, he lied.

10        He wrote, "Got it on the book."

11        The next day, October 2, 2018, was the day

12    Ms. Daniels' book was published.

13        How did the defendant celebrate?

14        By inventing a new lie to hide his scheme.

15        This is Government Exhibit 35.

16        Ms. Daniels wrote to the defendant, "Which reminds me,

17    publisher owes me a payment today."

18        The defendant responded,  "On it.  We need to make

19    sure we have the publicity requirement met."

20        You know from Ms. Beier's testimony that is not true.

21    The publisher wasn't waiting on some requirement to be met.  It

22    had already made the third payment, and the defendant had

23    already stolen that payment and spent it.  This was false.  It

24    was a coverup.

25        The next day, October 3, 2018, Ms. Daniels asked the

1   defendant again about her third book payment.  And, again, the

2   defendant lied.

3           This is Government Exhibit 36.

4           Ms. Daniels wrote, "And are publishers trying not to

5   pay me?"

6           The defendant responded, "No on the publishers.  We

7   are not going to have any issues."

8           What is he talking about?  The defendant had already

9   stolen and spent the third book payment.

10          The defendant kept the scheme going for months, lie

11  after lie after lie.

12          This is Government Exhibit 37.

13          On October 26, 2018, Ms. Daniels wrote, "The publisher

14  owes me a payment."

15          The defendant had spent the third book payment more

16  than a month before, but he just wrote back, "Agreed."

17          That was false.  The publisher did not owe Ms. Daniels

18  anything.  It was the defendant who took her money.

19          A few days later another lie.

20          This is Government Exhibit 38.

21          On October 29, 2018, Ms. Daniels wrote, "Did you ask

22  publisher about my payment?"

23          The defendant told a clear lie, "Yes, they are on it."

24          The publisher is on what?  It had made the third book

25  payment six weeks before.  The defendant knew that because he

M22nave1                    Summation - Mr. Sobelman

1    had spent the money himself.

2              You know what the defendant didn't say in response?

3              He didn't say, I have the money because we agreed I

4    could have it.  He didn't say, I took the money because I

5    earned it.  Because that's not what happened.  The defendant

6    stole that money.

7              A few weeks later, the defendant started using his

8    let-me-check lie.

9              This is Government Exhibit 39.

10             November 13, 2018, Ms. Daniels wrote, "Where is my

11   book payment?"

12             The defendant responded, "Let me check."

13             What was he going to check?  The empty bank account

14   that he spent her money from?

15             This is the bank statement for the so-called trust

16   account that the defendant put the stolen money into.  It's

17   Government Exhibit 302E.

18             During the month when they exchanged these messages

19   the balance was literally zero dollars.  He already spent all

20   of Ms. Daniels' money.

21             But Ms. Daniels was persistent.  This is Government

22   Exhibit 39 again.

23             A few hours later, she wrote, "What did they say?"

24             The defendant lied again:  "Waiting for call back."

25             But he wasn't waiting on anything.  He knew exactly

M22nave1                    Summation – Mr. Sobelman

1    what he did, and he was lying to try to cover it up.

2           A couple of weeks after that the defendant switched

3    from his let-me-check lie back to his publicity-requirement

4    lie.

5           This is Government Exhibit 42.

6           On November 28, 2018, Ms. Daniels asked, "Any news?"

7           The defendant responded, "I should also have the

8    publisher letter finalized and out."

9           What letter?  One he completely made up.  Ms. Beier

10   told you the third book payment was actually paid early, and it

11   certainly wasn't held up waiting for a letter from the

12   defendant about publicity.  The payment was made almost two

13   months before these messages, and the defendant spent it all

14   long ago.

15          A couple of days later, more of the defendant's lies.

16          This is Government Exhibit 45.

17          Ms. Daniels wrote, "And let's not forget the

18   publisher."

19          The defendant pretended to be on her side:  "I have

20   it.  That's complete bullshit," he wrote.

21          The publisher had already paid.  What the defendant

22   said was false.  He was pretending to fight for Ms. Daniels

23   when he was the one scamming her.

24          As time went on, Ms. Daniels grew impatient and the

25   defendant started to worry about getting caught.  So he came up

M22nave1                    Summation - Mr. Sobelman

1    with a new lie.  He was going to have to threaten to sue the
2    publisher.

3            This is Government Exhibit 48.

4            On December 5, 2018, Ms. Daniels asked the defendant,
5    "When is the publisher going to cough up my money?"

6            The defendant responded, "As for publisher -- working
7    them and threatening litigation.  They need to pay you the
8    money, as you did your part and then some."

9            This was not true.  This was December 5, 2018.  The
10    defendant already took and spent the money almost three months
11    before this.  And you know from Ms. Beier's testimony that
12    there was never any talk of a lawsuit between the defendant and
13    St. Martin's Press.

14            A month later the defendant was still trying to cover
15    up his scheme.  The latest lie was the we're-resolving-it lie.

16            This is Government Exhibit 52.

17            On January 15, 2019, Ms. Daniels asked, "Any word from
18    publisher?"

19            The defendant wrote, "Not yet, but I expect this
20    resolved this week."

21            Another lie.  He stole her money and lied about it,
22    even when he knew that she couldn't afford to buy a home
23    without that money.

24            A month later, the defendant was still telling the
25    same lie.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    This is Government Exhibit 58.

2    On February 12, 2019, Ms. Daniels wrote, "Did you

3    speak to publisher?"

4    The defendant responded, "Yes.  Will call shortly.  We

5    are resolving."

6    This is obviously false and he knew it.  There was

7    nothing to resolve with the publisher.  The third payment had

8    been made five months ago.  The defendant had spent it all

9    right away, and then he spent five months lying about it.

10   The lies the defendant told to Ms. Daniels are the

11   first reason you know he is guilty.

12   But Stormy Daniels was not the only person that the

13   defendant lied to.  He also lied to Luke Janklow.  That is the

14   second reason you know that the defendant is guilty.  I am

15   going to show you just a few examples of those lies.

16   This is Government Exhibit 218.  This e-mail shows

17   that the defendant lied to Mr. Janklow.  The defendant told

18   Mr. Janklow that the publisher should pay Ms. Daniels' third

19   book payment early because she had money problems.  "He was not

20   asking to be greedy.  He had a reason."

21   Early payment was supposed to be an investment in

22   Ms. Daniels.  That was a lie.  The defendant planned to steal

23   that payment all along.  That's why he asked for the money to

24   be transferred to his account.

25   Here's another lie that the defendant told

1    Mr. Janklow.  This is part of Mr. Janklow's testimony on page

2    159 of the transcript.

3            The defendant told Mr. Janklow that Ms. Daniels' book

4    payments should be paid early because she needs money.  She

5    needed money fast.  As Ms. Daniels told you, she actually did

6    need the money.  That much is true.  But the defendant wasn't

7    asking for her.  He was asking for himself.  The money went to

8    his bank account and he spent it.

9            If the defendant thought he was entitled to this

10   money, why would he have told Mr. Janklow that Ms. Daniels

11   needed it?  The defendant lied to Mr. Janklow, and then he

12   stole that money for himself.

13           That's the second reason you know the defendant is

14   guilty.

15           How did the defendant get away with lying to

16   Ms. Daniels and Mr. Janklow for months and months?

17           He kept them from talking to each other.  That is the

18   third reason you know the defendant is guilty.

19           This is part of Mr. Janklow's testimony from page 178

20   of the transcript:

21   "Q.  What, if anything, did Mr. Avenatti say to you about your

22   communications with Ms. Daniels?

23   "A.  He requested that I have all conversations regarding money

24   in particular through him."

25           Why did the defendant not want Mr. Janklow to talk

1    about money with Ms. Daniels?

2           To keep Ms. Daniels and Mr. Janklow from uncovering

3    the defendant's scheme.

4           This part of the timeline, which is government Exhibit

5    804, shows one example of when the defendant told Mr. Janklow

6    not to speak to Ms. Daniels.

7           On October 1, 2018, the night before Ms. Daniels' book

8    was released, Mr. Janklow asked the defendant whether he could

9    congratulate her on being published.

10          The defendant's answer:  "Let it be."

11          That meant no.

12          Remember, this was a dangerous moment for the

13   defendant.  He had just stolen Ms. Daniels' third book payment

14   a few weeks before, and she was asking where it was.  If

15   Mr. Janklow reached out to her, she would have asked him,

16   where's my money?  And the defendant's scheme would have fallen

17   apart right then.

18          The defendant tried to keep Ms. Daniels and

19   Mr. Janklow apart as much as possible so the defendant could

20   avoid getting caught.  You also saw how Mr. Janklow told the

21   defendant he was uncomfortable with this unusual separation

22   from his client, Ms. Daniels.

23          This is Government Exhibit 238, a text message from

24   Mr. Janklow to the defendant on February 16, 2019.

25          "Dude, she just called me again.  I have to be honest;

M22nave1                    Summation - Mr. Sobelman

1    I am no longer comfortable with not communicating with her at

2    all ever.  She is a client of my firm.  I have legal

3    obligations to her, and I have never behaved this way.  There

4    is clearly something off and, as impulsive and impetuous as she

5    is, she's not as bad as some of my other clients."

6            Why would the defendant not let Mr. Janklow speak with

7    his own client?

8            The defendant kept them separate because he didn't

9    want to get caught.  You saw the effect that this had on

10   Ms. Daniels.  She thought Mr. Janklow and Ms. Beier did not

11   want to speak with her because she did not know the defendant

12   was trying to keep them separate from her.

13           This is Government Exhibit 31.  Ms. Daniels wrote to

14   the defendant, "FYI, Luke still has not called me."

15           The defendant also kept Ms. Daniels separate from

16   Ms. Beier.

17           Government Exhibit 39, Ms. Daniels wrote to the

18   defendant, "I've texted Elizabeth, but no response."

19           Ms. Daniels told you that she still doesn't know why

20   Mr. Janklow and Ms. Beier wouldn't respond to her.  The

21   defendant kept Ms. Daniels separate from Mr. Janklow and

22   Ms. Beier to cover up his lies.

23           That is the third reason you know the defendant is

24   guilty.

25           The fourth reason you know the defendant is guilty is

M22nave1                    Summation - Mr. Sobelman

1    because he lied to his friend Sean Macias to get a loan and pay

2    back Ms. Daniels before he got caught.  I'm going to spend a

3    few minutes on this lie, because it is really important

4    evidence of the defendant's guilt.

5            You learned that on September 5, 2018, Mr. Macias

6    helped the defendant get a quick loan when he was desperate for

7    money.  As you learned, the defendant wanted the money to pay

8    back the second book payment he stole from Ms. Daniels a month

9    earlier.  He wasn't trying to do her a favor.  He was trying to

10   avoid getting caught stealing.

11           To get that loan, the defendant lied to Mr. Macias.

12           This is page 735 of the transcript:

13   "Q.  Now, aside from the payroll and rent, which I believe you

14   referenced, did he explain whether he needed money for anything

15   else at that time?

16   "A.  No, that was the only two things."

17           The defendant never mentioned paying back the money

18   from Ms. Daniels.  Why?  Because he didn't want Mr. Macias to

19   know what he had done.

20           After the defendant lied to him, Mr. Macias helped the

21   defendant get a loan from Mark Geragos, a friend of Mr. Macias.

22           This is another part of the timeline, Government

23   Exhibit 804.

24           This shows when the defendant got the loan for

25   $250,000 from Mr. Geragos, which is shown in Government Exhibit

1   303A.  The same day the defendant got that money, he used it to

2   pretend like he had just gotten the second book payment from

3   the publisher.  This kept Ms. Daniels from uncovering the

4   defendant's scheme for many more months.

5         But the defendant had a problem.  He could not just

6   write a check or send a wire transfer from his account to

7   Ms. Daniels, because she would see that the money hadn't come

8   directly from Mr. Janklow.

9         So what did the defendant do?

10        He took steps to hide the fact that the payment was

11  coming from his account.  This is the fifth reason you know the

12  defendant is guilty.

13        He used a cashier's check that hid the source of the

14  money.  Government Exhibit 303A includes the counter check that

15  Ms. Regnier used to buy the cashier's check.  Ms. Regnier told

16  you exactly what happened.

17        This is from page 430 of the transcript:

18  "Q.  Why did you not just deposit this counter check into the

19  Stormy Entertainment bank account and instead purchase a

20  cashier's check?

21  "A.  Mr. Avenatti instructed me to purchase a cashier's check."

22        This is what Ms. Daniels saw when she received the

23  money.  Government Exhibit 301A includes the cashier's check

24  and Ms. Daniels' bank statement, which just shows counter

25  credit.

1          Ms. Regnier explained how the cashier's check hid the

2   source of the payment from Ms. Daniels.  This is from page 429

3   of the transcript:

4   "Q.  Based on the information contained on this cashier's

5   check, is the recipient able to tell what specific bank account

6   the money came from?

7   "A.  No."

8          Just think about this for a minute.  The defendant

9   told Ms. Regnier to go through all that trouble of having a

10  counter check written out, buying a cashier's check, walking to

11  another bank and depositing the cashier's check, and then he

12  lied to Ms. Daniels about it.  He could have just sent a wire

13  transfer from his desk or had Ms. Regnier do it from her

14  computer.

15         You know why he didn't do that.  It's because he was

16  concealing this from Ms. Daniels.

17         This is page 928 of the transcript:

18  "Q.  What, if anything, did the defendant tell you about this

19  cashier's check?

20  "A.  He said that the publisher had mailed him my second book

21  payment to his office."

22         You know that what the defendant told Ms. Daniels was

23  false.  The publisher was paid on time by wire transfer, not

24  check, weeks before.

25         The defendant then took out a loan a month later to

M22nave1                    Summation - Mr. Sobelman

1    pay Ms. Daniels, to hide his crime.  If this was some innocent

2    transaction, the defendant would have just sent a wire transfer

3    to Ms. Daniels or deposited the counter check.  But he didn't

4    do that.  He used a cashier's check to keep her in the dark.

5    The steps he took to conceal the loan from Ms. Daniels is the

6    fifth reason you know the defendant is guilty.

7            The sixth reason you know the defendant is guilty is

8    the fake letter he created and used to trick Mr. Janklow and

9    steal Ms. Daniels' book payments.

10           Just before Ms. Daniels' second book payment was due,

11   the defendant decided to steal it.  So he sent the e-mail in

12   Government Exhibit 210 telling Mr. Janklow to send Ms. Daniels

13   money to a bank account that the defendant controlled.

14           But Mr. Janklow said no.  It wasn't the defendant's

15   money.  It was Ms. Daniels' money.  So any instructions had to

16   come from her.

17           Mr. Janklow texted the defendant on July 31, 2018, in

18   Government Exhibit 212:

19           "I'm in a meeting, but re the money, we need something

20   from Stormy saying it's okay that it goes into the trust

21   account, as we only normally pay contracted parties.  This is

22   normally not even entertained.  I'm doing my best to take care

23   of you.  Cool?"

24           The defendant responded, "Yes, I will handle."

25           He didn't say, I'll have Stormy sign something.  He

1    didn't say, I'll ask Stormy to send you something.  He didn't

2    say I'll give her a call.  He said, "I will handle."

3            What did the defendant do next?

4            He created the fake letter and sent it to Mr. Janklow.

5            This is Government Exhibit 213, the fake letter that

6    the defendant pretended was from Ms. Daniels.

7            You learned from Ms. Volchko that the defendant typed

8    this up on his own laptop.  You learned from Ms. Regnier that

9    the defendant directed her to copy Ms. Daniels' signature on to

10   it from the retainer agreement.  You learned from Mr. Janklow

11   that the defendant then sent the fake letter with the copy and

12   paste signature to him.

13           The defendant didn't ask for Ms. Daniels' permission.

14   He didn't tell her about it.  He didn't send her a copy.

15           Why?

16           Because he did not want her to know that he was

17   stealing her money.

18           Let me pause here for a moment.  There is another

19   reason you know this letter is fake.  Ms. Daniels told you she

20   never had anyone sign her contracts, and it was easy for her to

21   sign them no matter where she was.  You actually saw how easy

22   it was for Ms. Daniels to sign the book contract when she was

23   on the road filming a commercial in California.

24           These are Government Exhibits 16 and 16A.

25           You learned from Ms. Daniels that she signed the book

contract, took a photo with her phone, and sent it back to the
defendant right away.  If the defendant thought he was actually
changing the payment instructions for Ms. Daniels rather than
for himself, he could have done the same thing; sent it to
Ms. Daniels for her to sign.  But that thought never crossed
his mind.  He did everything he could to hide that fake letter
from her.

That is the sixth reason you know the defendant is
guilty.  He created and used the fake letter to trick
Mr. Janklow and steal Ms. Daniels' money.

The next reason is focused on certain attorney rules
the defendant broke when he stole Ms. Daniels' money.  These
rules did not come up much during the trial, but I expect Judge
Furman will instruct you on the rules attorneys have to follow.

I also expect Judge Furman will instruct you that
proof that the defendant violated one or more of these rules
does not, without more, mean he committed wire fraud, but you
may consider whether he broke these rules in determining
whether the defendant engaged in a scheme to defraud and
whether he did so with the knowledge and intent to defraud.
I'm going to briefly discuss a few of these rules, but Judge
Furman's instructions on the law are what controls.

I expect Judge Furman will instruct you that lawyers
owe a duty of loyalty to their clients.  This means that a
lawyer always has to put the client's best interest first.

1          I expect Judge Furman will also instruct you that a

2     lawyer owes a duty of reasonable communication to their client.

3     That means keeping the client reasonably informed of

4     significant developments and promptly complying with reasonable

5     requests for information.

6          The defendant violated those rules.  The defendant

7     stole his client's money.  The defendant lied to his client

8     about it.  He didn't tell her when he sent the fake letter to

9     Mr. Janklow.  He didn't tell her that the payments had been

10    made.  He didn't tell her when he spent the money.  He didn't

11    tell her about the referral fee he was being paid.  And the

12    defendant did everything he could to keep Ms. Daniels from

13    speaking with Mr. Janklow about the payments all to hide his

14    scheme.

15         I expect Judge Furman will further instruct you that

16    when a lawyer receives money for a client, the lawyer has to

17    promptly notify the client of the receipt of those funds.  That

18    means the defendant was required to tell Ms. Daniels when he

19    received money for her into that trust account, including the

20    second and third book payments.  You know he violated this

21    rule, because he never did that.  It is clear from the text

22    messages between the defendant and Ms. Daniels.

23         If he told her you the book payments were made, she

24    would not have to keep asking where the money was.  And it was

25    no mistake.  The defendant didn't just say nothing.  He

M22nave1                Summation - Mr. Sobelman

1    actively lied to her over and over again.

2         I expect Judge Furman will also instruct you that when

3    a client asks for information regarding how much money the

4    lawyer is holding for the client or what the lawyer has done

5    with money held for the client, the lawyer must promptly

6    provide the information.

7         You know from the dozens and dozens of text messages

8    between defendant and Ms. Daniels that the defendant never did

9    that.  He violated this rule by not telling her what was going

10   on with her own money.

11        The defendant violated another rule, too.  I expect

12   Judge Furman will instruct you that when a client asks for

13   their money, the lawyer must promptly provide it.

14        Why did the defendant break all these rules?

15        If he had followed the rules, he would have gotten

16   caught right away.  So he broke them.  He didn't act honestly

17   and in his client's best interest.  He lied to his client.

18        The defendant's many violations of these rules, the

19   rules that lawyers are supposed to follow, are strong proof

20   that the defendant knew what he was doing was wrong.  That is

21   the seventh reason.

22        The eighth reason you know the defendant is guilty,

23   that he was desperate for money when he stole Ms. Daniels' book

24   payments.

25        Think back to Ms. Regnier's testimony.  This is

1   Government Exhibit 6.  In these text messages the defendant

2   described Ms. Regnier as:  "My trusted assistant who I trust

3   with my life.  Number one on my list of trusted people close to

4   me.  She can be trusted with anything.  Knows more about my

5   life than I do."

6              What did you learn from Ms. Regnier?

7              You learned that from July 2018 through February 2019,

8   the defendant and his law firm were broke.  Ms. Regnier

9   explained how the defendant's law firm was evicted from its

10  offices because it didn't have enough money to pay rent.

11             This is page 471 of the transcript:

12  "Q.  Approximately when was defendant's law firm evicted from

13  its law offices?

14  "A.  They were evicted shortly before Thanksgiving 2018.

15  "Q.  What is your understanding of why the defendant's law firm

16  was evicted from its offices?

17  "A.  Nonpayment of rent."

18             The defendant's law firm was out of money.

19             Ms. Regnier also explained the defendant's law firm

20  couldn't afford the basics, like its health insurance payments

21  to Anthem Blue Cross.  And you read the letter in Government

22  Exhibit 610.

23             Ms. Regnier also testified as follows from page 413 of

24  the transcript:

25  "Q.  I'm now going to ask you a few more questions about the

1    defendant's law firm situation.  Generally, what was the

2    financial situation at the defendant's law firm between July

3    2018 and February 2019?

4    "A.  It was not good.  Payments were running late.  We were

5    having trouble making ends meet.  The firm was eventually

6    evicted from their offices.  Payroll was late."

7            What Ms. Regnier told you even matches up with what

8    the defendant actually did with Ms. Daniels' book payments.

9            This is Government Exhibit 702, which shows how more

10   than $50,000 of Ms. Daniels' money was spent on payroll and

11   more than $10,000 of her money was spent on health insurance.

12           The defendant's law firm was broke.  That's one of the

13   reasons he stole Ms. Daniels' money.  Remember when the

14   defendant asked Ms. Regnier about the party his law firm threw

15   at a fancy resort in December of 2017, before the defendant

16   even met Ms. Daniels?

17           This is from page 612 of the transcript:

18   "Q.  Why was there no party at the Montage in December of 2018?

19   "A.  The firm was not in a position to have a party.  They

20   didn't have the funds."

21           But the defendant's law firm wasn't the only one with

22   money troubles.  The defendant also had no money.

23           This is from Ms. Regnier's testimony at page 421 of

24   the transcript:

25   "Q.  Based on your conversations with the defendant, what was

1    your understanding of why the defendant instructed you to pay

2    his personal expenses using the law firm's money?

3    "A.  Because he did not have the money."

4         That is why the defendant stole Ms. Daniels' money.

5    He and his law firm were broke.  That explains why the

6    defendant stole her money, but it doesn't excuse his crimes.

7         Now, let's take a look at how the defendant spent

8    Ms. Daniels' money.

9         During the trial, Special Agent Rosenman helped you

10   follow the money.  You followed it from the publisher to the

11   book agent to the defendant's own pockets.

12        This chart is Government Exhibit 701.

13        It shows how the defendant diverted Ms. Daniels'

14   second and third book payments to accounts he controlled,

15   almost $300,000 in total.

16        This chart is Government Exhibit 702.

17        It shows where Ms. Daniels' second book payment ended

18   up.

19        So where did that money go?

20        Most of it went to other accounts the defendant

21   controlled in the names of his law firms and another company he

22   owned.  Some of it was also spent on security costs that he was

23   required to pay.  Not a dollar of it went to Ms. Daniels.

24        This is another page of Government Exhibit 702.

25        This chart shows where Ms. Daniels' third payment

M22nave1                    Summation - Mr. Sobelman

1    went.  This part of the chart shows that the defendant first

2    sent some of the money to a few other accounts that he

3    controlled, and sent it to another client of his, Geoffrey

4    Johnson, who had absolutely nothing to do with Ms. Daniels.

5            Let's follow the money further.

6            This is another page of Government Exhibit 702.

7            This shows where most of the third payment ended up.

8    Paying for the defendant's own expenses, like airfare, food,

9    hotels, his bill at the cleaners.

10           He also paid his law firm's driver, James Cameron.  He

11   sent money to his ex-wife, Christine Carlin, and his girlfriend

12   Mareli Miniutti.

13           This is the ninth reason you know why the defendant is

14   guilty, because he spent the stolen money on himself, his law

15   firm, and others close to him.

16           The tenth reason you know the defendant is guilty is

17   that he played dumb when he got caught.  It's another kind of

18   lie he told.  Of course, as the defendant's lawyer told you in

19   his opening statement, the defendant is not stupid.  The

20   defendant knew exactly what he did from the moment he stole

21   Ms. Daniels' second and third book payments back in August and

22   September of 2018.  He then spent months and months lying about

23   it, trying to hide his scheme.

24           If that wasn't enough, Mr. Janklow sent the defendant

25   proof of the defendant's crimes when the scheme started to

M22nave1                    Summation - Mr. Sobelman

1    unravel.

2         This is Government Exhibit 234.

3         Mr. Janklow spelled out the defendant's scheme in

4    black and white.  This e-mail shows when Ms. Daniels' second

5    and third book payments were made and to which account, the

6    defendant's account.

7         Ms. Daniels didn't know any of this.  Mr. Janklow sent

8    this e-mail to the defendant for the defendant to provide to

9    Ms. Daniels.  Of course, the defendant never sent it to

10   Ms. Daniels.  He was still trying to find a way to hide his

11   scheme.

12        Four days later, on February 19, 2019, Mr. Janklow

13   sent the same information directly to Ms. Daniels, because she

14   still couldn't get any answers from the defendant.

15        As Ms. Daniels told you, she was shocked, she was

16   upset.  When she got this information, she realized the

17   defendant had been lying to her all along.  She could not

18   believe that her trusted lawyer could have lied to her every

19   day for months, but he did.

20             (Continued on next page)

21

22

23

24

25

1           MR. SOBELMAN:  Ms. Daniels confronted him with the

2    facts and the evidence.

3           This is Government Exhibit 60 and 60B.

4           Ms. Daniels wrote:  "I never received this payment

5    that was sent to you.  Last payment you gave me was No. 2 via a

6    check you deposited on September 5.  I didn't even know that

7    you had a trust account with my name on it."

8           Ms. Daniels sent a screenshot of the information from

9    Mr. Janklow showing how the payment had been made.

10          How did the defendant respond?

11          "Let me find out if we even received this payment."

12          Let me find out.  The defendant was trying to make

13   Ms. Daniels believe that he didn't know where the money was,

14   just like the "let me check on it" lies from months before.  He

15   had received and spent this payment.  He knew exactly what he

16   had done when he wrote this.  For the first time, Ms. Daniels

17   saw right through the defendant's lie.  She kept messaging him,

18   providing more proof that he had stolen her money.  She told

19   you this was her mike-drop moment.  She had caught the

20   defendant redhanded, and she wanted him to know that she knew

21   what he had done to her.

22          This is Government Exhibit 60 and 60C.

23          Ms. Daniels wrote:  "Here is the wire proof.  You also

24   waited over 30 days to give me payment No. 2.  You've had

25   payment No. 3 for over five months.  Last payment, which is No.

 1    4, is not due quite yet."

 2            Ms. Daniels also sent a screenshot of the wire

 3    transfer receipt showing how the money went from Mr. Janklow to

 4    the defendant's account.

 5            How did the defendant respond?

 6            "Let me find out what is going on."

 7            Let me find out.  Again, the defendant was trying to

 8    make Ms. Daniels believe that he didn't know where the money

 9    was.  What was there to find out?  Nothing.  He had stolen and

10    spent the money months ago.  Mr. Janklow had just sent him the

11    same evidence of the scheme four days before these messages.

12            Why did the defendant play dumb?  It was the only lie

13    he had left to tell.  If there was some innocent explanation,

14    he would have given it right away.  If he thought the money was

15    actually his, he would have just said so.  This time, the

16    defendant's lie didn't work.  He had finally gotten caught.

17            Those are the ten reasons you know the defendant is

18    guilty.  Each provides powerful evidence of the defendant's

19    guilt, and taken together, they are overwhelming proof that the

20    defendant is guilty beyond a reasonable doubt.

21            I'm now going to say a few words about the charges in

22    this case.

23            As I mentioned before, Judge Furman will instruct you

24    on the law, and his instructions control.

25            There are two charges here: wire fraud and aggravated

1    identity theft.  I expect Judge Furman will instruct you that

2    wire fraud has three elements:  The defendant created a scheme;

3    he had an intent to defraud; and he used an interstate wire.

4           The ten reasons the defendant is guilty, which I

5    talked about earlier, provide overwhelming proof that the

6    defendant created a scheme and had an intent to defraud, a

7    scheme to trick Mr. Janklow into sending Ms. Daniels's second

8    and third book payments to the defendant, who then spent

9    Ms. Daniels's money on himself.

10          And the use of an interstate wire, the third element,

11   is not disputed.

12          This is Government Exhibit S3, a stipulation.  This

13   stipulation tells you that the wire transfers of the second and

14   third payments from Mr. Janklow to the defendant's account,

15   based on the instructions in the defendant's fake letter, were

16   interstate wires.  This says that the wire transfers from Mr.

17   Janklow's bank account to defendant's bank account went from

18   Manhattan to California.  This is proof beyond a reasonable

19   doubt on this element, and it is not in dispute.  You can check

20   this one right off your list.

21          This stipulation also takes care of something called

22   venue, which is another part of the wire fraud crime.  I expect

23   Judge Furman will instruct you that venue just means that part

24   of the crime must have occurred in the Southern District of New

25   York.  The wire transfer from a bank account in Manhattan, like

1    those listed here in this stipulation, satisfies the venue

2    requirement.  There's no dispute about that either.  You can

3    check venue right off your list also.

4              The defendant is guilty of wire fraud.

5              The second charge is aggravated identity theft.  I

6    expect Judge Furman will instruct you that using someone else's

7    name or signature during and in relation to wire fraud, without

8    lawful authority, is enough to find the defendant guilty of

9    this crime.

10             This is Government Exhibit 213, the fake letter that

11   the defendant sent to Mr. Janklow.  You know that the defendant

12   used Ms. Daniels's name and signature, without her permission,

13   in order to carry out his fraud scheme and steal her money.

14   You know from Ms. Daniels's testimony that she did not give him

15   permission.  You know from Ms. Regnier that the defendant told

16   her to copy and paste Ms. Daniels's signature onto it.  You

17   know from the defendant's email to Mr. Janklow that he used

18   this fake letter.  And you know from Ms. Daniels's text

19   messages and testimony how shocked she was to learn about this

20   fake letter.

21             The defendant is guilty of aggravated identity theft.

22             Now that we've gone through the devastating evidence

23   of the defendant's guilt, let's spend a few minutes now talking

24   about some of the main defense arguments you heard in this

25   case.

M22Wave2                    Summation - Mr. Sobelman

1              Before I do, I want to remind you it is the

2    government's burden to prove the defendant guilty beyond a

3    reasonable doubt, but when a defendant makes arguments, you

4    have an obligation to scrutinize them.  You have an obligation

5    to hold them up to the evidence, and you have an obligation to

6    ask, do they make any sense?  I'm going to go through these

7    pretty quickly, because they're not actually defenses.  They're

8    just distractions.

9              So, what have you heard from the defense so far?

10             First, the "I deserved it" defense; second, the "blame

11   the victim" defense; third, the "everyone is lying or crazy"

12   defense -- again, distractions.

13             The first defense distraction is the "I deserved it"

14   defense.

15             What is this one about?  Basically, the defendant has

16   suggested he was somehow entitled to Ms. Daniels's money.  He

17   wants a free pass on his crimes because he did a lot of work

18   for Ms. Daniels and helped her get a book deal.  None of that

19   matters.  You don't have to decide how many lawsuits the

20   defendant filed for her.  You don't have to decide how many

21   revisions he made to her book.  You don't have to decide how

22   good he was or bad he was at publicity.  None of that provides

23   any excuse for his fraud, his deceit, his theft.  None of that

24   gave him the right to take his own client's money and lie to

25   her about it.

1          Another version of this distraction is the language in

2     defendant's agreement with Ms. Daniels, which is Government

3     Exhibit 3.  This agreement wasn't an agreement on a fee.  It

4     was just an agreement to discuss it later.  There's no evidence

5     that the defendant and Ms. Daniels later agreed for the

6     defendant to take Ms. Daniels's second or third book payments.

7     And Ms. Daniels told you the defendant told her he would not

8     take one penny of her book payments, because that's money she

9     earned.

10         You don't have to just take Ms. Daniels's word for it

11    either.  You have her real time text messages with the

12    defendant.  In those messages, she asked again and again and

13    again for the money.  And the defendant told the "let me check"

14    line, told her "we're resolving it" line, and he came up with

15    excuse after excuse.  If there had been some agreement, he

16    would have just responded:  Stormy, I'm confused.  Why are you

17    asking about this?  I received your book payment under our

18    agreement.  You told me I could take that money.  We agreed to

19    that.

20         But of course, there's no message like that, because

21    that never happened.  He stole that money from her.  You cannot

22    just decide you deserve something and take it from someone.

23    That is stealing.

24         The second defense distraction is the "blame the

25    victim" defense.  The defendant is on trial, not Ms. Daniels,

M22Wave2                    Summation - Mr. Sobelman

1    and she is not to blame for the defendant's crime.

2           Remember when the defendant's lawyer suggested in his

3    opening statement that Ms. Daniels did not do what she was

4    supposed to do under the book contract with the publisher?  And

5    the defendant had tried to suggest that Ms. Daniels didn't

6    respond to his emails fast enough.  But that doesn't matter at

7    all.  The question is whether the defendant stole the payments

8    that were made by the publisher.  That's the issue.  You don't

9    need to spend one second thinking about whether Ms. Daniels met

10   the publicity requirements or did anything else under her book

11   contract.  The fact is this -- the publisher made the payments,

12   which were supposed to go to Ms. Daniels.  The defendant stole

13   them from her.  That's what matters.

14          The third defense distraction is the suggestion that

15   everyone is lying or crazy.  The defendant has suggested that

16   almost every witness who testified in this trial was lying to

17   you in some way.

18          Why has he done that?  Because the truth shows he's

19   guilty.  You saw each of these witnesses testify.  You know

20   they were telling the truth.  How?  They took the oath.  Their

21   testimony matched up with all the documents you saw, and their

22   testimony matched up with each other's.  Why?  Because they

23   told you what actually happened.

24          The defendant also wants to distract you by suggesting

25   that Ms. Daniels, his victim, is crazy.  Now, has she had some

1    unusual experiences?  Yes.  Does she have some unusual beliefs?
2    Sure.  But she's the victim in this case.  You saw her
3    testify -- confidently and directly.  You saw how everything
4    she told you is backed up by the documents, including the text
5    messages in the defendant's own iCloud between her and the
6    defendant.  Her testimony is backed up by the dozens and dozens
7    of messages, and it matches up with the testimony of every
8    other witness in this case.  This is another defense
9    distraction, and you should ignore it.
10            In a moment, I'm going to sit down.  Before I do, I
11   want to remind you what this case is about.  At the end of the
12   day, once you strip away all the distractions, what is it
13   about?  It's about a betrayal of trust.  Stormy Daniels went to
14   the defendant for help.  She trusted him as her lawyer.  They
15   talked and texted every day.  They traveled and appeared on
16   television together.  He was supposed to be her advocate.  But
17   the defendant betrayed her trust.  He stole from her.  He lied
18   to her over and over and over again, all to steal and spend
19   money that was not his.
20            The defendant is guilty.
21            THE COURT:  Thank you, Mr. Sobelman.
22            All right.  Ladies and gentlemen, just to break up the
23   morning a bit and make sure that you can give your undivided
24   attention to Mr. Avenatti when he begins his closing, we're
25   going to take a brief break now, one of those where I'm going

M22Wave2

1    to have you just go into the jury room here, please, to stretch

2    your legs and use the restroom or whatever you need to do.

3    We'll keep it to just about five or eight minutes, so when

4    you're ready, we will be ready and we'll see you in a few

5    minutes.

6            A couple reminders:  One, do not discuss the case.

7    Your deliberations have not begun, so you should not be

8    discussing the case with each other at all.

9            No. 2, keep an open mind.  You've heard all the

10   evidence, but you've heard only the government's closing.  You

11   haven't heard Mr. Avenatti's closing, the government's

12   rebuttal, or my instructions.

13           And I don't think you could do any research on the

14   case in there, but certainly don't do any.

15           With that, enjoy your brief break, and we'll see you

16   in a couple minutes.

17           (Jury not present)

18           THE COURT:  You may be seated.

19           All right.  Anything to discuss?

20           From the government.

21           MR. SOBELMAN:  No, your Honor.

22           THE COURT:  Mr. Avenatti.

23           MR. AVENATTI:  Yes, your Honor.  One thing.

24           I'm going to request a curative instruction relating

25   to counsel for the government's emphasis on the bar rules.

M22Wave2                    Summation - Mr. Avenatti

1    This was a significant area of objection by me yesterday.

2            THE COURT:  I understand.  The request is denied.

3    Thank you.

4            I'm going to just sit here and wait for the jury.  You

5    can go about your business, and when they're ready to go, I'll

6    let you know and you can have a seat.

7            MR. AVENATTI:  How long do you think we have, your

8    Honor?

9            THE COURT:  Five minutes.

10           (Recess)

11           THE COURT:  Mr. Avenatti, can you put your mask back

12   on and just sit back at defense table until the jury's out,

13   please.

14           MR. AVENATTI:  Yes, your Honor.

15           (Jury present)

16           THE COURT:  You may be seated.

17           Welcome back.  Thank you for keeping the break short.

18           We'll continue with Mr. Avenatti's closing at this

19   time.  Please give him your undivided attention.

20           With that, you may proceed.

21           MR. AVENATTI:  Thank you, your Honor.

22           Ladies and gentlemen, good morning.

23           When my father was a teenager, he sold hot dogs at a

24   ballpark.

25           THE COURT:  Sustained.

1            MR. SOBELMAN:  Objection.

2            THE COURT:  Sustained.

3            Mr. Avenatti, stick to this case, please.

4            MR. AVENATTI:  Ladies and gentlemen of the jury, the

5    government is only telling you part of the story.  They're not

6    telling you the complete story.  They're not telling you half

7    the story.  They haven't even told you one-half or one-twelfth

8    of the story.

9            It is said that every trial is a fight for credibility

10   in the eyes of the jury, and this trial, ladies and gentlemen,

11   is no different.

12           The government just told you a lot of things.  They

13   just represented to you a lot of things.  So let's deal with

14   one of the things that they just represented to you moments

15   ago.

16           The government just stood here at this very podium,

17   and they told you that I kept Mr. Janklow and Ms. Daniels

18   apart, that I prevented them from communicating.  Let's see if

19   the evidence shows that is true.

20           Can I please have R16.

21           Ladies and gentlemen of the jury, this is a text

22   message, in evidence, dated April 21, 2018, between me and Mr.

23   Janklow.  This document shows that back in April of 2018, I

24   sent Mr. Janklow Ms. Daniels's contact information.  That is

25   not evidence of me keeping Ms. Daniels and Mr. Janklow apart.

1              Let's go to R49, in evidence, more text messages
2      between me and Mr. Janklow.  This is dated July 26, 2018.
3              Mr. Janklow:  "OK.  So she wants to sink the book
4      because of this moronic asshole.  What to do?  Just send her
5      this."
6              Ladies and gentlemen of the jury, Mr. Janklow was
7      communicating directly with Ms. Daniels during this entire
8      process.  They were communicating outside of my presence, as
9      reflected in the evidence, and there is no evidence that I kept
10     them from communicating, as the government just stood before
11     you and told you.  That was completely untrue.
12             R50, Mr. Janklow, at the top:  "Just in.  Wow.  I
13     can't believe you're still remotely sane."
14             Mr. Janklow was telling me about a communication that
15     he had just received directly from Ms. Daniels.  Why?  Because
16     it had not been sent to me.  They were communicating directly
17     with one another.
18             Mr. Janklow continued, down below, July 26:  "Sent
19     this" -- again, Mr. Janklow, directly to Ms. Daniels, no
20     involvement by me.
21             But the communications directly between Ms. Daniels
22     and Mr. Janklow didn't end there.  Perhaps you could overlook
23     one or two text messages that the government just forgot, but
24     there's more.
25             R60.  Mr. Janklow sent me this text message on

1    September 2, 2018:  "Stormy WhatsApped me this.  Oh, please,

2    God, no."

3          He continued:  "She also wrote this."

4          Why was Mr. Janklow sending me these text messages,

5    alerting me to what was going on with Ms. Daniels?  Because Mr.

6    Janklow was communicating directly to Ms. Daniels and vice

7    versa.

8          It gets worse for the government.

9          Exhibit R66, at the top, more communications directly

10   between Mr. Janklow and Ms. Daniels.  He even says:  "I just

11   sent this to Stormy."  He then quotes what he sent to Stormy.

12         There's no question that Ms. Daniels was freely able

13   to communicate with Mr. Janklow and vice versa during this

14   entire process, and any representation to you, ladies and

15   gentlemen, is completely false.  And you should ask yourself

16   when you deliberate why would the government try to mislead us?

17         The government also did not discuss with you in their

18   summation R81, a text message from Mr. Janklow to me on

19   November 29, 2018.  These are Mr. Janklow's words, not mine,

20   describing Ms. Daniels:

21         "I know.  She's really tricky and untrustworthy.

22   That's actually why I wanted to be more honest with her

23   throughout the book process, to take some of it off you and

24   have her have to face her own bullshit, of which there is

25   plenty.  She is impulsively mercenary" -- Mr. Janklow's words

1    in November 2018.

2           Now, let's talk a moment about Ms. Daniels.

3           Some of you may admire Ms. Daniels.  I understand

4    that.  The evidence shows that I did too for a long time.  The

5    evidence shows that I was her advocate, that I was her

6    champion.  The evidence shows that I put it all on the line for

7    Ms. Daniels, because I believed in her and I wanted to help

8    her.  That is what the evidence shows, ladies and gentlemen.

9           I, too, admired her, perhaps more than anyone else in

10   her life.  But ladies and gentlemen, when a person walks into

11   this courtroom, this hallowed ground, and they take the witness

12   stand to the left of his Honor and they raise their hand to

13   tell the truth, the whole truth, and nothing but the truth, so

14   help them God, and then they are less than honest with all 18

15   of you, that, ladies and gentlemen, is not admirable.

16          Let's talk a moment about attorneys.

17          A lot of people don't like attorneys.  The thing about

18   attorneys, though, is when you really need one, you usually

19   really need one.  And the evidence shows that Ms. Daniels, in

20   February of 2018, really needed an attorney, and the evidence

21   shows that she was having a very difficult time finding an

22   attorney, because many attorneys wouldn't take her case and the

23   few that would wanted huge sums of money up front as only a

24   deposit against how much money they would bill her.  And the

25   reason why a lot of attorneys, according to the evidence, would

1    not take her case was because Ms. Daniels was about to embark

2    on a fight against the President of the United States, the most

3    powerful person on the planet.  And the evidence shows that I

4    agreed to take on that fight for Ms. Daniels.  But I didn't

5    agree to do it for free.

6           Attorneys, like most professionals, cost money.  They

7    don't work for free.  They expect to be paid.

8           Now, the government's theory of the case really boils

9    down to you, ladies and gentlemen, asking yourself two

10   questions.

11          Here's the first question:  Why would I tell

12   Ms. Daniels I was giving up my right to the book money under

13   our contract only to then steal the same money?

14          The government's theory makes no sense.  No one would

15   do that.

16          Second question, if I was so desperate for money, as

17   the government claims, why would I have ever given up my right

18   to the book money under the contract?

19          That makes no sense.  Someone as desperate for money,

20   as the government wants you to believe, would have asserted

21   their right to every dollar under the contract.  Ladies and

22   gentlemen, it makes no sense, and it results -- or should

23   result -- in me being found not guilty.  You need not go any

24   further unless you can answer those two questions with any

25   logical answer, and I submit there is no logical answer,

1     because it doesn't make sense.

2              Let me be clear.  Michael Avenatti never committed the

3     crime of wire fraud.  Michael Avenatti never committed the

4     crime of aggravated identity theft.  There is insufficient

5     evidence, ladies and gentlemen, to show that Michael Avenatti

6     ever intended to defraud Ms. Daniels or had a scheme to defraud

7     Ms. Daniels.  There is insufficient evidence, ladies and

8     gentlemen, to show that Michael Avenatti ever intended to harm

9     Stormy Daniels.  There is insufficient evidence, ladies and

10    gentlemen, to show that Michael Avenatti ever sent an

11    unauthorized and false letter to Luke Janklow in order to get

12    the money for himself.

13             Now, a little later, his Honor will instruct you on

14    the law, and one of the instructions that his Honor is going to

15    give you is this instruction on your screen.  And ladies and

16    gentlemen, it is critical that you listen to this instruction,

17    which I know you will; that you understand the instruction,

18    which I know you will; and that you apply this instruction

19    during your consideration of the evidence and your

20    deliberations.

21             And this instruction is as follows:

22             "Because an essential element of wire fraud is the

23    intent to defraud, it follows that good faith on the part of a

24    defendant is a complete defense to the charge of wire fraud.

25    That is, if the defendant in good faith believed that he was

1  entitled to take the money or property from the victim, even if

2  that belief was mistaken, then you must find him not guilty."

3       It continues:

4       "The defendant has no burden to establish good faith."

5       What does that mean?  That means that under the law I

6  don't have to prove anything.  I don't have to prove that I had

7  a good faith belief, although I believe the evidence

8  overwhelmingly shows that I did.  It is the government's

9  burden.  It is their obligation to show you that I possessed

10 fraudulent intent and lacked good faith, and they must prove

11 that beyond a reasonable doubt.  And ladies and gentlemen of

12 the jury, they have not done that.

13      What is some of the evidence that shows that they have

14 not proven that and cannot prove that?

15      First of all, ladies and gentlemen, people expect to

16 be paid for their work, no matter what you do.  There is

17 nothing controversial, or there should be nothing

18 controversial, about that basic concept.

19      In this case, I had a contract with Ms. Daniels.

20 That's what the evidence shows, Government Exhibit 3.

21      What did Ms. Daniels testify to about the contract?

22 "Q.  Do you have exhibit 3, Ms. Daniels?

23 "A.  Is that the attorney-client fee contract?

24 "Q.  Yes.

25 "A.  I see it.

1    "Q.  Before you signed this document, you read it, right?

2    "A.  Of course.

3    "Q.  And you say of course because you always read contracts

4    very carefully before you sign them?

5    "A.  I try my best.

6    "Q.  Well, that's what you do, right?

7    "A.  Yes."

8            I then asked Ms. Daniels, before you signed it, you

9    understood the contract?  She said that she did.

10           She then signed it.  She said that she did.

11           She received a copy on multiple occasions -- not one,

12   multiple occasions.  She said that she did.

13           And then I asked this question:

14   "Q.  And you generally know what a contract means because you

15   have signed hundreds of contracts?

16   "A.  Absolutely."

17   "Q.  Ms. Daniels, you knew when you signed this contract that

18   attorneys don't generally work for free, correct?

19   "A.  That's why I was shocked when you would.

20   "Q.  So you understood that I was working for free?  Yes or no.

21   "A.  For a hundred dollars."

22           Now, ladies and gentlemen, when you go back into that

23   deliberation room and you take a look at this fee agreement, I

24   want you to try to find the place in the fee agreement where it

25   says I was working for free.  You won't find it.

1          I want you to then try to find the part where it says
2    I was working for a total of a hundred dollars.  You won't find
3    it.
4          This is the testimony Ms. Daniels gave to you, to this
5    Court, to his Honor when she testified.  These aren't my words.
6    These are hers, and they are false.
7          I then asked Ms. Daniels whether the contract was ever
8    modified.  Was Ms. Daniels claiming that there was another
9    contract or an amendment to the contract or something else that
10   changed that contract?
11   "A.  No."
12         That is the only contract.
13         What does this contract say?
14         Paragraph 3:  "Client duties.  Clients," which is
15   defined as Ms. Daniels, "agree to be truthful with attorney, to
16   cooperate, to keep attorney informed of developments, to abide
17   by this agreement, and to pay bills for reasonably incurred
18   costs on time."
19         No. 1, I wasn't working for free, and No. 2, I was not
20   agreeing to give hundreds of thousands of dollars of money,
21   millions of dollars of money, to Ms. Daniels for costs --
22   security costs, travel, etc.  I wasn't adopting Ms. Daniels.
23   It's clear as day.  The costs, and all the costs, were
24   Ms. Daniels's responsibility to pay.
25         Then we get to legal fees, costs and billing

M22Wave2                    Summation - Mr. Avenatti

1    practices.  Now, remember, Ms. Daniels told you on the stand

2    that I had agreed to work for free.  This paragraph shows

3    that's not true.  She also told you that I had agreed to work

4    only for a hundred dollars.  This paragraph also shows that's

5    not true.  Under the contract I was to get, my firms were to

6    get three things:  $100, our hourly and out-of-pocket costs,

7    and if I assisted Ms. Daniels in finalizing a book deal or

8    other media opportunities, I was to get a reasonable percentage

9    of them.

10            Now, the government presented no evidence of what a

11   reasonable percentage would be.  They haven't even argued to

12   you what a reasonable percentage would be.  They want you to

13   determine that a reasonable percentage is zero.  For all the

14   work done on the book, for all the work done across the country

15   for over a year, for all of the attorney time, for all of the

16   blood, sweat, and tears, the government proposes that me and my

17   firm were to receive zero, and therefore, we could not have a

18   good faith belief that we were entitled to some of the money.

19            Ladies and gentlemen, that makes no sense.  It is not

20   equitable.  It is not fair.

21            I asked Ms. Daniels about this provision:

22   "Q.  Ms. Daniels, did I assist you over the course of late

23   February 2018 to February 2019 in finalizing any book or media

24   opportunity?  Yes or no.

25   "A.  Yes.

M22Wave2                    Summation - Mr. Avenatti

1   "Q.  The contract continues:  'that results in clients being

2   paid.'  Do you see that?

3   "A.  I do.

4   "Q.  Were you paid for those book or media opportunities?

5   "A.  Some of them, yes.

6   "Q.  'attorney and client agree that attorney shall be

7   entitled,' you understood that that meant that I would be

8   entitled if those things occurred, right?"

9          And then Ms. Daniels made this remark:  "You're very

10  entitled."  But more importantly, she then said this word:

11  "Yes."

12         She understood that I was entitled to be paid from the

13  book deal.

14  "Q.  'to a reasonable percentage.'  Did I read that correctly?

15  "A.  You did.

16  "Q.  'to be agreed upon between clients and attorney.'  Did I

17  read that correctly?

18  "A.  You did.

19  "Q.  And you read that and understood it, that clause, when

20  this agreement was signed, correct?

21  "A.  Correct."

22         And then we have this exchange on that very witness

23  box:

24  "Q.  Now let's talk about this word 'reasonable.'  When you

25  work, do you expect to be paid?

M22Wave2                   Summation - Mr. Avenatti

1    "A.  Of course.

2    "Q.  Why do you say of course?

3    "A.  That's how we survive."

4              I asked Ms. Daniels another question about the

5    contract:

6    "Q.  And you've also claimed that I was supposed to get a

7    percentage of any cases that I won for you, right?

8    "A.  Correct."

9              Ladies and gentlemen, when you go back to the jury

10   room and you look at GX3 -- and look, I can understand why some

11   of you may not want to look at the contract.  Reading contracts

12   is boring, often.  But this contract is at the center of this

13   case.  It is a critical piece of evidence.  In fact, the

14   government introduced the contract, as I recall, on the first

15   day of testimony.

16             When you go back and you look at this contract, find

17   the part in the contract where it says I would get a

18   reasonable -- or that I would get a percentage of any cases

19   that I won for Ms. Daniels.  It doesn't exist.  That's not what

20   the contract says.  Even to this day, even knowing that she was

21   going to come and testify in this serious criminal case,

22   Ms. Daniels still doesn't know what the contract says.

23             So what happened after this contract was signed,

24   according to the evidence?

25             A huge amount of work was done under this contract.

1    No one disputes that.  The government did not call a single

2    witness in this case who said Avenatti didn't do any work under

3    the contract, or Avenatti and his firms, they kind of blew

4    everything off and really didn't help Ms. Daniels.  Nobody said

5    anything remotely close to that, not even Ms. Daniels.

6            Testimony of Ms. Regnier on cross-examination:

7    "Q.  Those filings were done in multiple cases around the

8    country because we were handling a lot of legal work for

9    Ms. Daniels, isn't that true?

10   "A.  Yes."

11           I asked her about a case in New York.

12   "A.  Yes."

13           I asked her about a bunch of work associated with that

14   case that was filed in this very courthouse.

15   "A.  Yes."

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          I asked her about multiple cases that were filed in

2    Los Angeles for Ms. Daniels.

3          Yes.

4          "The case here in New York was then transferred to Los

5    Angeles, which resulted in more work?

6          "Yes.

7          "There was another lawsuit against Keith Davidson, a

8    former lawyer that Ms. Daniels had?

9          "Yes.

10          "There was a lawsuit against a strip club in Florida?

11          "Yes.

12          "There was another lawsuit against a horse trainer in

13    Texas?

14          "Yes."

15          I am not going to go through all of them.  We would be

16    here forever.  There was enormous amount of work done for

17    Ms. Daniels.  The evidence shows that it wasn't done for free.

18          "The firm and me did quite a lot of work for

19    Ms. Daniels during that one-year time period, didn't we?

20          "Yes, they did.

21          "And I wasn't the only one working on the matters?

22          "No, you were not."

23          Ms. Regnier worked on the matters.

24          An attorney by the name Carlos Colorado worked on the

25    matters.

1          Another attorney by the name of Ahmed Ibrahim with my

2     firm worked on the matters.

3          A lot of people worked on the matters.

4          And the evidence shows that the work was extensive,

5     that it was high quality, that we got results for Ms. Daniels,

6     and we reset the narrative around Ms. Daniels in her legal

7     fight against the most powerful man on the planet.

8          The evidence shows we took the fight to Donald Trump,

9     and the evidence shows that we had tremendous success in doing

10    so.  And the evidence shows that that's one of the reasons why

11    there was even the possibility of a book deal.

12         Because the evidence shows that for ten years before

13    Ms. Daniels met me, she had gotten nowhere in an effort to have

14    a book published.

15         And the evidence shows that, shortly after she met me,

16    I immediately went to work to secure a book deal for

17    Ms. Daniels.

18         There's testimony in the record from Mr. Janklow

19    discussing the extensive involvement of me and others at my

20    firm in connection with the book deal.

21         Ladies and gentlemen of the jury, this was not a

22    situation where I just took an hour and looked at a contract on

23    a computer and then expected to get paid a bunch of money.

24    That's not what the evidence shows.  The evidence shows that I

25    was instrumental in securing the book deal, finalizing the book

M22nave3                        Summation – Mr. Avenatti

1  deal, working with Mr. Janklow and the publisher during the

2  process that the book was being completed, and also

3  instrumental in the public relations surrounding the book in an

4  effort to make sure the book sold.

5          The government wants you to conclude that everyone

6  else was entitled to be paid; that everyone else had a

7  good-faith belief in their right to be paid other than Michael

8  Avenatti.  According to the government, Michael Avenatti could

9  never have believed he actually had a right to be paid.  That

10 is ludicrous.  And it is not supported by the evidence.

11         I am not going to go through all of Mr. Janklow's

12 testimony.  You have the ability to ask for it if you so

13 desire.

14         I am not going to go through all of Mr. Janklow's text

15 messages.  They show an extensive amount of involvement by me

16 on behalf of Ms. Daniels.

17         Why is that important?

18         Because, like all the other work that was done for

19 Ms. Daniels, it establishes a good-faith belief in my mind that

20 I was entitled to be paid.

21         Why does that matter?

22         Because a good-faith belief, ladies and gentlemen, is

23 a complete defense to all of these charges.  Complete.  That is

24 what his Honor will instruct you.  It's game over for the

25 government.

1          Ms. Beier.  Ms. Beier testified relating to my

2     involvement in the book deal.

3          What else establishes my complete defense of good

4     faith?

5          The huge amount of costs and fees owed by Ms. Daniels

6     to me and my firm at all times.  In fact, ladies and

7     gentlemen -- and this is in evidence, and I encourage you to go

8     through the bank statements on the trust account at Exhibit

9     302E.  Those bank statements show many hundreds of thousands of

10    dollars that were expended for the benefit of Ms. Daniels.

11    Some of the money was demanded by Ms. Daniels and actually paid

12    to Ms. Daniels, like this entry on March 28 for $20,000.

13         Ladies and gentlemen, this was my money.  This was the

14    firm's money.  This wasn't Ms. Daniels' money.  We weren't

15    obligated to give Ms. Daniels money.  We weren't obligated to

16    pay security costs and all the other costs.  Ms. Daniels was

17    obligated to pay those monies.

18         And to the extent that those monies were paid by us

19    initially, the evidence shows that we had an expectation to be

20    repaid, to be paid back.

21         Why?

22         Because that's what the contract says.  That evidence

23    establishes a good-faith belief that we were entitled to some

24    of the book money.

25         Ms. Daniels admitted -- and this is only one example,

1    and there are many, many, many examples in the bank statements.

2    There's hundreds of pages of bank statements in the record,

3    showing monies expended to and for Ms. Daniels.  Ms. Daniels

4    admitted that she received the $20,000 payment into her Bank of

5    America account.  That payment came directly from the trust

6    account.

7        I asked her using her own bank statement, this is

8    Ms. Daniels' bank statement, I asked her if she saw the $20,000

9    deposit.

10       She admitted that she did and that it said state bar

11   of California.

12       When you go back and you look at the bank statements

13   for the trust account, you are going to see at the top it says

14   State Bar of California.  Ms. Daniels not only knew about the

15   trust account, she demanded money from it and she got it.  And

16   we expected to be repaid.

17       Here's another transfer from the trust account.  There

18   wasn't just one.  This one is for $6500 on April 30.  And you

19   see all these entries on this page for Protech Security.  When

20   you look at that contract, try to find where in the contract it

21   says what the government just told you, that Michael Avenatti

22   was supposed to pay for all of the security costs without any

23   reimbursement.

24       You are not going to find it, because it doesn't

25   exist.  The security costs were Ms. Daniels' responsibility.

1    She was the one that was ultimately responsible for paying the

2    money or reimbursing me and my firm.

3            You have Exhibit 2.  Exhibit 2 discusses some of the

4    costs, but not all, some but not all.  It also discusses the

5    thousands of hours that were spent working on Ms. Daniels'

6    behalf.

7            I asked Ms. Regnier about the security costs and

8    whether that was a cost in connection with the matter.  She

9    said yes.  She said they were exorbitant, and they were

10   exorbitant.  And the evidence shows that the reason why they

11   were exorbitant was not because I demanded that Ms. Daniels

12   have two 24-hour security guards for almost a year.  The

13   evidence shows that that's what Ms. Daniels wanted, because she

14   wanted an entourage.

15           Now, if she wanted an entourage, I guess there's

16   nothing wrong with that.  But there is something wrong when she

17   expects someone else to pay for it who never agreed to pay for

18   it.

19           I asked Ms. Regnier about the hundreds of thousands of

20   dollars in costs, hundreds of thousands of dollars that we

21   advanced for Ms. Daniels.  She testified to that.

22           And then I asked Ms. Regnier this question:  If you

23   wanted to figure out how much time and how much costs were

24   spent in connection with the matters that the firm remitted

25   Ms. Daniels pursuant to the contract, how would you go about

1    doing that?

2           Ms. Regnier said she would have to run reports in the

3    accounting systems of the firm.

4           She also said that she would consult two software

5    programs, QuickBooks and Tabs, as well as bank accounts.  You

6    couldn't look at just one.  If you wanted to figure out how

7    much money at any given time Ms. Daniels owed the firm, you

8    would have to look at Tabs, QuickBooks, and bank statements.

9    That's what Ms. Regnier testified to.

10          Ladies and gentlemen of the jury, why didn't the

11   government show you all of the time and accounting records that

12   Ms. Regnier testified about?

13          MR. SOBELMAN:  Objection.

14          THE COURT:  Sustained.

15          Move on, please.

16          MR. AVENATTI:  Ladies and gentlemen, the evidence

17   shows that there were millions of dollars' worth of time and

18   costs advanced for the benefit of Ms. Daniels, and some of it

19   is shown in 302E and the bank statements at DX T, U, V, W, Y, Z

20   and AA.

21          MR. SOBELMAN:  Objection.  Testifying.

22          THE COURT:  All right.  Ladies and gentlemen, I will

23   just remind you that what Mr. Avenatti is saying during his

24   closing is not evidence.  Your recollection of the evidence is

25   what controls.  The witnesses' testimony is evidence; the

M22nave3                    Summation - Mr. Avenatti

1    exhibits in evidence are evidence.

2           You may proceed, Mr. Avenatti.

3           MR. AVENATTI:  Thank you, your Honor.

4           Instead of giving you the complete picture, the

5    government called a witness to only give you a small portion of

6    the story.  You will recall this exhibit, 702, Government

7    Exhibit 702.  And you'll recall that when the agent testified

8    under examination by his colleagues, he testified that the

9    costs in this little box in the lower right-hand corner had

10   nothing to do with Ms. Daniels.

11          MR. SOBELMAN:  Objection.  Misstates.

12          THE COURT:  Once again, ladies and gentlemen, your

13   recollection of the witnesses' testimony is what governs.

14          MR. AVENATTI:  And then we have this name, Brandon

15   Parraway.  Who is that?

16          According to Ms. Daniels, that was one of her security

17   guards.

18          Once again, a trial is a fight for credibility.

19          Ladies and gentlemen, the government is attempting to

20   convince you that me and my firm were not entitled to be paid

21   what we were due.

22          That is directly contrary to the instruction that we

23   talked about.  If the defendant in good faith believed he was

24   entitled to take the money or property from the victim, even if

25   that belief was mistaken, then you must find him not guilty.

1          Now let's take a moment and talk about some of

2     Ms. Daniels' testimony in this case that destroys the

3     government's case.

4          Ladies and gentlemen, there's a lot of discussion in

5     this case about first payment, second payment, third payment,

6     fourth payment.  Ms. Daniels even to this day, as shown by the

7     testimony, can't testify to what payments she received or did

8     not receive.

9          She testified:

10         "Now, Ms. Daniels, you have gone on Mr. Cohen's

11    podcast on two occasions and you have discussed your book

12    payments, correct?

13    "A.  Correct.

14         "Have you been honest about your book payments on that

15    podcast?

16         "Absolutely.  A hundred percent.

17         "Isn't it true that in February of 2021, you went on

18    Mr. Cohen's podcast, and you stated, I did get my first couple

19    of checks?

20         "Yeah.

21         "Now, there were four payments under the book deal,

22    correct?

23         "Correct.

24         "Well, the fourth payment was the last big check,

25    right?

1          "Right.

2          "Okay.  Isn't it true that on this podcast in February

3    of 2021, you said, but my last big check" -- she's talking

4    about the fourth payment -- "he intercepted by forging my

5    signature, and I have yet to see an accurate royalty statement?

6          "Isn't that true that's what you said?

7    "A.  I'm not sure.

8    "Q.  Do you deny it?

9    "A.  No."

10         Ms. Daniels did not deny that she previously said that

11   it was the fourth payment that I took from her.

12         Then she went back on another podcast of Mr. Cohen's

13   in September of 2021.

14         "During that podcast, you said that you got your first

15   two payments, quote, no issue, close quote, right?

16         "I don't remember."

17         Ms. Daniels testified she had a perfect memory a

18   photographic memory.  All of a sudden she didn't remember

19   saying something four months ago about the book payments.

20         "Do you deny it?

21         "No.

22         "You then said on the podcast that you didn't get your

23   other two payments, didn't you?

24         "I don't remember.

25         "Ms. Daniels, have you ever claimed that in fact you

M22nave3                    Summation - Mr. Avenatti

1     did not get the last two payments?

2                    "I don't remember.

3                    "So you may have?

4     "A.  Maybe."

5                    Ladies and gentlemen, the testimony of Ms. Daniels as

6     to which payments she received or did not receive has been a

7     moving target.  It has been entirely inconsistent.  It is not

8     nearly as straightforward and clean as the government would

9     like you to believe.

10                    And then Ms. Daniels testified to this, which I submit

11    also destroys the government's case:

12                    "You understood that during the representation, I had

13    authority over the monies in the trust account, correct?

14                    "Correct.

15                    "So I could decide what payments got made or not made,

16    right?

17                    "Yes.

18                    "And that would be true for any moneys that were

19    received into the trust account, right?

20                    "Yes.

21                    "That never changed?

22                    "We never had a conversation, no.

23                    "Well, it never changed to the best of your knowledge?

24                    "Correct.

25                    "During the entire representation?

1           "Correct."

2           Ms. Daniels testified that whatever monies were

3    deposited into the trust account, I could decide where they

4    went.  And that was true during the entire representation.

5           THE COURT:  Ladies and gentlemen, let me just

6    interrupt and remind you I will give you the instructions about

7    the law.  The lawyers, Mr. Avenatti can't tell you what the law

8    is nor can any witness.  I will give you the instructions about

9    what the law is.

10          With that, you may proceed.

11          MR. AVENATTI:  Thank you, your Honor.

12          When you look at 302E, three of the payments that were

13   deposited into the trust account came from Janklow &

14   Associates.

15          Those are the same payments that Ms. Daniels testified

16   I had complete control and authority during the entire

17   representation over.  That was her testimony.

18          Here are two of the payments.

19          Here is the third payment.

20          What else did Ms. Daniels testify to?

21          I asked her if during the approximate year I

22   represented her whether my authority to act on her behalf ever

23   changed, meaning did we have an agreement that I had certain

24   authority and then it changed where I no longer had that

25   authority.

M22nave3                    Summation – Mr. Avenatti

1          She said no.

2          According to Ms. Daniels, my authority in connection

3  with the book deal and communicating with Mr. Janklow was the

4  same at all times.  It was the same in April 2018, July 2018,

5  October 2018.  It was the same.

6          Ms. Daniels then said, in response to my question, "On

7  or about April 22, 2018, you provided wire instructions to me

8  with the understanding that I had the authority to pass those

9  along to Mr. Janklow for your first payment?

10          "That's what I requested, yes.

11          "And that was your understanding at the time, right?

12          "Yes."

13          Ladies and gentlemen, at all times in 2018 I had the

14  same authority.  That authority allowed me to communicate with

15  Mr. Janklow as to where the money would go.

16          MR. SOBELMAN:  Objection.

17          THE COURT:  Sustained.

18          Ladies and gentlemen, let me just, number one, repeat

19  what I just said, which is a witness can't tell you what the

20  law is, nor can the lawyers.  I will tell you what the law is.

21          Number two, as Mr. Avenatti has previewed, I will

22  certainly tell you about what the good faith defense is and the

23  government's burden to prove that Mr. Avenatti acted with

24  fraudulent intent, that he lacked good faith.

25          His state of mind is relevant to your consideration of

1    whether he committed the crime with which he is charged,

2    Ms. Daniels' state of mind is not relevant to that question.

3              Mr. Avenatti, you may proceed.

4              MR. AVENATTI:  What else did Ms. Daniels testify to?

5              You may recall that the government asked Ms. Daniels

6    some questions about the end of our relationship.  The

7    government in particular asked you about this text message that

8    Ms. Daniels sent on February 19 at 4:25 p.m., in the afternoon.

9    And Ms. Daniels suggested to you that she sent this text

10   message before she got the letter from me terminating our

11   relationship.

12             This letter.

13             Ms. Daniels claimed that this text message was sent --

14   strike that.  Ms. Daniels suggested that this text message was

15   sent and then this letter.

16             MR. SOBELMAN:  Objection.  Misstates.

17             THE COURT:  Ladies and gentlemen, again, your

18   recollection of the testimony of the witnesses and the exhibits

19   admitted into evidence governs.  If you would like any of it

20   during your deliberations, you can always request it.

21             Mr. Avenatti, you may proceed.

22             MR. AVENATTI:  But this stipulation shows the exact

23   opposite.  This stipulation says that this letter was sent at

24   11:10 a.m. Eastern Time, which is hours before this text

25   message.  The evidence shows that Ms. Daniels did not hire a

M22nave3                    Summation – Mr. Avenatti

1    new attorney until after we terminated her as a client.

2                And then we get to the big lie.

3                Ms. Daniels was on the stand, and there were a number

4    of questions that I asked about whether she had ever told me

5    her bank account was closed and in particular whether she had

6    told me that before I sent the letter to Mr. Janklow.  And his

7    Honor stepped in to clarify things.

8                And his Honor turned to Ms. Daniels and asked her this

9    question:  "Let me make sure the record on this is clear.

10                "Is it correct that you never said to Mr. Avenatti

11   that this account was closed?

12                "THE WITNESS:  No.

13                "THE COURT:  No?

14                "THE WITNESS:  I didn't tell him it was closed.

15                "THE COURT:  Thank you."

16                His Honor's questions, Ms. Daniels under oath,

17   critical point in the case.

18                Was that true?

19                It was completely false.

20                ST12, July 19, 2018, I was discussing with Ms. Daniels

21   the fact that Mr. Crain, her husband, had just cleaned out

22   their bank account and fled with their daughter.

23                He was divorcing Ms. Daniels.

24                MR. SOBELMAN:  Objection, your Honor.

25                MR. AVENATTI:  According to the evidence.

1          MR. SOBELMAN:  Testifying.

2          THE COURT:  Overruled.

3          MR. AVENATTI:  How did Ms. Daniels respond when I said

4     they should be able to just remove him?

5          "They couldn't, so closed it".

6          This is clear as day.  Ms. Daniels lied on the stand.

7          Why is that a big deal?

8          Because of this letter that was sent about two weeks

9     later, Government Exhibit 213.

10         The government told you I sent the letter so that I

11    could steal Ms. Daniels' money.  The evidence shows I sent the

12    letter because Ms. Daniels had told me the other account was

13    closed.

14         Why was the money sent to me?

15         Because the evidence shows, ladies and gentlemen,

16    there was nowhere else to send the money, and she was trying to

17    hide the money from her soon-to-be ex-husband.

18         How do we know that?

19         Because Ms. Daniels testified to other efforts she was

20    making at the same time to keep money hidden from her husband.

21         "Did you make any effort in 2018 to hide any assets or

22    moneys from Glen?

23    "A.  Yes."

24         "Now, around the same time, on July 18" -- that's the

25    day before Ms. Daniels telling me the account is closed, on

1  July 19 -- "around the same time, on July 18, Glen filed a
2  petition for divorce and for sole custody of your daughter in
3  Texas, am I right about that?
4  "A.  Yes."
5        "Ms. Daniels, you gave money and assets to Mr. Nicks
6  to hold for you so Glen would not know about it, right?
7  "A.  Yes."
8        "And you expressed concern about putting additional
9  money in that account because Glen was on the account, right?
10        "That's why I opened a second account, yes."
11       You can infer that the letter was sent in response to
12  a request by Ms. Daniels because she didn't want the money
13  taken by Glen.  She told me the account was closed because she
14  wanted to make sure the money wasn't sent there.  That is not
15  aggravated identity theft.
16       The government cannot prove that I had the intent to
17  do any harm to Ms. Daniels in connection with that payment in
18  light of this evidence.  They certainly can't prove it beyond a
19  reasonable doubt.
20       Ms. Daniels' false testimony on the stand, the text
21  message, and her testimony about hiding monies all results in
22  one thing and one thing only:  A not-guilty verdict relating to
23  the claim that I stole her identity or tried to harm her in
24  having the money rerouted.
25       By the way, when you look at Exhibit 804, this

1    timeline that the government keeps talking about, you won't

2    find any of these items on the timeline.  You will find the

3    letter to Mr. Janklow, but that's it.

4              Why?

5              Because the government doesn't want you to focus on

6    the whole story.

7              What happened next?

8              According to Ms. Daniels, she sent me her new account

9    details on September 4th of 2018.

10             She was paid the very next day.

11             Now, ladies and gentlemen, the government mentioned

12   that Ms. Daniels may have some -- I think the words that they

13   used were unusual beliefs.  Ladies and gentlemen, her testimony

14   shows she is not credible.  It is unfortunate.  It is very

15   unfortunate, but it is true.

16             She claims to have the ability to talk to the dead.

17             She claims to have a doll who talks, plays the piano,

18   and calls her mommy.

19             She claims that she can see inside people's houses.

20             She claims that her business manager was possessed by

21   a demon, his eyes turned black and he attacked her.

22             She made up having a mass in her head.

23             She's not credible.

24             I ask you to use your common sense.  Does this sound

25   like someone the government should be using as their star

1    witness in a criminal case?

2              MR. SOBELMAN:  Objection.  Government not on trial.

3              THE COURT:  Sustained.

4              Ladies and gentlemen, as I will instruct you later,

5    Mr. Avenatti is the only person on trial in this case.  The

6    government is not on trial, and whether you approve or

7    disapprove of its methods or the way it has presented its case

8    is not relevant.

9              What is relevant is whether through the evidence that

10   has been presented to you or what hasn't been presented to you,

11   whether the government has proved beyond a reasonable doubt

12   that Mr. Avenatti is guilty of the crimes charged.

13             You may proceed.

14             MR. AVENATTI:  Is that someone that you can rely on

15   100 percent when determining whether someone committed a crime

16   beyond a reasonable doubt?

17             I would submit that the answer is no.

18             I want to go back to something I touched on moments

19   ago.  This exchange about the payment, when Ms. Daniels sent me

20   the account information, why did she send me the account

21   information?

22             Because she knew I had the money.

23             She sent me the account information because she knew I

24   had the money, and she knew she was going to be paid the next

25   day, which she was.

1          Now, I want to focus your attention, if I could, on

2    some very large holes in the government's case, beyond what I

3    have already said.

4          Ladies and gentlemen, where is the proof that I agreed

5    that I would not take a portion of the book deal?

6          Where is that text message?

7          Where is that e-mail?

8          Where is that voice mail?

9          Where is that proof?

10         It doesn't exist.

11         I asked Ms. Daniels:

12         "Ms. Daniels, do you have a single text message,

13   e-mail, voice mail, or recording that says I would not take any

14   money from your book deal?  Yes or no?

15   "A.  No.

16         Where is it stated in the book contract that I was

17   responsible for all the work I did on the book, but was not to

18   be paid?

19         It is not in there.

20         Where is it stated in the fee contract with

21   Ms. Daniels that I am not entitled to a reasonable fee?

22         It is not in there.

23         Where is the text message from Ms. Regnier telling me

24   the book money is in the account?

25         It is not in there.  It is not in the evidence.

M22nave3                    Summation - Mr. Avenatti

1    There's no e-mail, there's no text message.  In fact, when the

2    government called Ms. Regnier, they didn't ask her when did you

3    tell Mr. Avenatti the book payments had been deposited into the

4    account?  They didn't ask that question.  They didn't ask her

5    whether she ever informed me of that.  They didn't ask any

6    questions.

7           I submit it is because they didn't want the answers.

8           And I submit that the evidence suggests that she never

9    told me the money was in the accounts.  The evidence shows that

10   at this time I was running around the country representing

11   Ms. Daniels in all of these cases, many, many, many hours a

12   week.

13          I wasn't monitoring every entry and withdrawal --

14   strike that.  According to the evidence, I was not monitoring

15   every inflow and outflow of every bank account.

16          MR. SOBELMAN:  Objection.  Misstates.

17          THE COURT:  Sustained.

18          The jury will disregard that argument.

19          MR. AVENATTI:  Where is the evidence from all of the

20   other text messages?

21          Ms. Daniels admitted that we communicated via

22   WhatsApp, via e-mail, and via text message.

23          And then the government called Enrique Santos, an

24   investigative analyst.  Mr. Santos testified that there were 12

25   different groups of chats between me and Ms. Daniels, between

1    messages and WhatsApp messages.  Twelve.

2              The government only asked him to look at one.  One.

3              They didn't ask him to look at all 12.  They didn't

4    tell him we want to make sure that we have all the

5    communications and we know the whole story.

6              MR. SOBELMAN:  Objection.  Government not on trial.

7              THE COURT:  I will repeat, ladies and gentlemen.  The

8    government is not on trial in this case, and your decision

9    should be based on the evidence or the lack of evidence.  But

10   there is no obligation to present all evidence.  Your decision,

11   again, is just based on what evidence was presented or the lack

12   of evidence.

13             You may proceed, Mr. Avenatti.

14             MR. AVENATTI:  Mr. Santos didn't tell you anything

15   about what was in the other 11 groups of text messages.

16             MR. SOBELMAN:  Objection.

17             THE COURT:  I will allow it.  Go ahead.

18             MR. AVENATTI:  Thank you, your Honor.

19             The government elicited a lot of testimony in this

20   case about a gentleman by the name of Denver Nicks.  According

21   to the testimony, Mr. Nicks was at the center of these issues

22   relating to the book and the book payments.

23             Where is Denver Nicks?

24             MR. SOBELMAN:  Objection.

25             THE COURT:  Ladies and gentlemen, again, I repeat my

1    instruction from before, and you will hear more later.

2            You may proceed, Mr. Avenatti.

3            MR. AVENATTI:  Now, ladies and gentlemen, the text

4    messages show that I certainly at times could have communicated

5    better with Ms. Daniels.  There is no question about that.  And

6    I accept responsibility for that.

7            MR. SOBELMAN:  Objection.

8            THE COURT:  Sustained.  The jury will disregard that

9    statement.

10           MR. AVENATTI:  The evidence shows that in 2018 and

11   early 2019 it was like drinking out of a firehose for me and

12   the other attorneys who were working on the myriad of matters

13   for Ms. Daniels.  You heard from Ms. Regnier that me and others

14   were working constantly for her.  We were drowning in work.

15   And we were overwhelmed at times according to the evidence.

16           MR. SOBELMAN:  Objection.  Misstates.  Testifying.

17           THE COURT:  Ladies and gentlemen, a reminder that this

18   is argument, not testimony or evidence.

19           Mr. Avenatti, you may proceed.

20           MR. AVENATTI:  But, ladies and gentlemen, failing to

21   effectively communicate is not a crime, and the evidence has

22   not established that I intended to defraud or harm Ms. Daniels.

23           Shortly his Honor is going to instruct you as to

24   various jury instructions.  We've already talked about one of

25   the jury instructions that I submit is most critical, the good

1    faith instruction.  I want to direct your attention to a few

2    others.

3             His Honor will instruct you that I am always presumed

4    innocent until you reach a final conclusion.  This is a bedrock

5    of our society.  It has been true for hundreds of years.  It is

6    one of the core principles upon which this nation was founded,

7    that when someone is accused of a crime they start off

8    innocent.

9             His Honor will also instruct you that I was never

10   under any obligation to prove anything, nothing at all.

11            I didn't have to cross-examine a single witness.

12            I didn't have to put a single document in front of

13   you.

14            I didn't have to give an opening statement.

15            And I don't even have to be up here speaking to you

16   now.

17            The entire burden rests with the government.  It is

18   their obligation.  And it is their obligation to prove this

19   case and every element of the case beyond a reasonable doubt.

20   And his Honor will instruct you as to what that means.  But it

21   is a significant hurdle and one that is not to be taken

22   lightly, which I know you will not.

23            One of the things that the government is going to have

24   to prove beyond a reasonable doubt is the fact that, according

25   to the government, they have to prove that I did not believe

1  that I was entitled to any money from the book deal.  They

2  can't just say that.  They have to prove it.  They don't have

3  to prove it a little bit.  They have to prove it beyond a

4  reasonable doubt.

5          They cannot meet that burden in light of the evidence.

6  They have not met that burden in light of the evidence.

7          To conclude, I will leave you with this:  I am

8  Italian.  I like Italian food.

9          MR. SOBELMAN:  Objection.

10          THE COURT:  Sustained.  Mr. Avenatti, please stick to

11  the evidence in the case.

12          MR. AVENATTI:  Ladies and gentlemen, the case that the

13  government is attempting to feed you has a giant cockroach in

14  the middle of the plate.

15          Would you eat that dish, or would you send it back?

16          I submit that you would send it back.

17          When you deliberate, I ask that you do exactly that as

18  it relates to this case, that you send it back and find me not

19  guilty because, ladies and gentlemen, that is exactly what I

20  am.

21          Thank you.

22          THE COURT:  Thank you, Mr. Avenatti.

23          All right.  Ladies and gentlemen, it's a couple of

24  minutes before noon, so we are going to take our lunch break

25  now to let you fill your stomachs and be ready to listen to the

M22nave3

1    remainder of what you have to hear, namely, the government's

2    rebuttal.  The government bears the burden, so it gets the

3    final word.  Well, really, I get the final word, because after

4    the government's rebuttal I will give you my instructions as to

5    the law.

6            We are going to check on your lunch.  If it is not

7    there when you get down, it will be there very soon.  I promise

8    you.  I obviously need to sort of guess what time we would

9    break.  We are a few minutes off, but I think it should be

10   there very soon if it is not there now.

11           It's let's say a couple of minutes before 12.  Why

12   don't you be ready to go at 12:45, and we will pick up where we

13   left off, with the government's rebuttal and my instructions

14   and you will begin your liberation.

15           For now, do not discuss the case.  You have heard the

16   government's principal summation.  You have heard

17   Mr. Avenatti's summation.  You have not heard the other two

18   things that I have mentioned.

19           Do not discuss the case.  Continue to keep an open

20   mind.  Don't do any research about the case.

21           Enjoy your lunches.

22           You are excused.

23           (Luncheon recess)

24           THE COURT:  You may be seated.

25           Well, obviously I gave a couple curative instructions

M22nave3

1    during Mr. Avenatti's summation, particularly where I thought

2    he did cross the line from proper summation to something akin

3    to testimony.  I thought we had made that line clear yesterday,

4    but be that as it may, that's come and gone.  Certainly, the

5    jury has been told repeatedly that what Mr. Avenatti says is

6    not evidence.

7         The one thing I am concerned about -- and frankly I am

8    a little stunned that Mr. Avenatti went there given my

9    reference to it earlier in the trial -- is the Tabs statement.

10   I know he's hung up on it, but for the reasons I've explained,

11   it is just not a meritorious argument in this case.

12        As I have already explained, it is in his possession.

13   It has been in his possession since September, and this

14   prosecution team does not have it.

15        So suggesting to the jury, which you certainly did

16   through the questions you posed to Ms. Regnier, that the

17   government had access to it and could have used it to prove

18   their case was bad enough.  I raised the question at that time

19   whether a curative instruction might be necessary and for that

20   reason did not fathom that Mr. Avenatti would have brought it

21   up in his summation and, perhaps inadvisedly, therefore didn't

22   raise it yesterday to preempt it, but he did.

23        I don't know if the government wishes to be heard on

24   that or if you want to think about it, but it does raise the

25   question in my mind of whether a curative instruction on that

M22nave3

1    front is appropriate.

2          MR. PODOLSKY:  Yes, your Honor.

3          A couple of items on the instructions.  We were going

4    to raise that as well.  There were actually a few instances

5    where the defendant I believe improperly commented on evidence

6    that was available to both parties or, in the Tabs instance,

7    more available to the defendant, and suggested that the

8    government hadn't presented or hadn't looked at it, text

9    messages, Tabs, etc.

10         We think there may be -- we agree we need to figure

11   out what it would be, but I think a curative instruction is in

12   order.  I think we also need to make sure that we have a

13   sufficient uncalled witness instruction as well, given an

14   entire portion that appeared to be intended to imply that the

15   government had an obligation to call Denver Nicks.

16         The third instruction issue I just want to raise to

17   the Court, obviously we had litigation about the defense theory

18   of the case instruction.  I think we just need to look to see

19   if that instruction actually still matches what the defendant

20   argued today.

21         I don't believe the argument came out in the way that

22   perhaps we had anticipated, and we just want to make sure that

23   the instruction doesn't suggest arguments that actually the

24   defendants has not advanced to the jury and that the jury would

25   somehow believe they should consider on the Court's suggestion.

M22nave3

1          THE COURT:  All right.

2          Number one, there is an uncalled witnesses

3     instruction.  I think that probably does address the concern

4     you flagged on that score, but if you look at it and you think

5     otherwise, I will certainly hear from you.

6          Number two, I am looking at the defense theory of the

7     case, and I think it does correspond to Mr. Avenatti's

8     argument, but if you look at it and you think otherwise you can

9     certainly let me know.

10          MR. PODOLSKY:  Thank you.

11          THE COURT:  Why don't you think about the Tabs issue.

12     There's one argument for just letting it be.  I can't really

13     imagine that the jury's verdict will turn on that, and if I

14     give a curative instruction it certainly doubles down on the

15     prosecution team issue that I have ruled in your favor on.  But

16     you should make a decision whether you want to in the event of

17     a conviction have to defend that issue on appeal as well.

18          I think if you are interested in doing that, I am open

19     to the idea of a curative instruction.  If you want to leave

20     it, leave well enough alone, then I will not.

21          It is 12:01.  Why don't you come back at 12:35 so that

22     we can discuss these issues before the jury comes back, and

23     then at 12:45 we will get them and continue with the case.

24          MR. AVENATTI:  Your Honor, could I be heard briefly?

25          THE COURT:  Sure.

M22nave3

1          MR. AVENATTI:  Okay.  Thank you, your Honor.

2          First of all, to update the Court, in response to the

3    subpoena, I made a production before the government's case

4    rested of the Tabs data, as directed to do so by the Court.

5          So that's number one, your Honor.

6          Number two, I am not here to debate with the Court as

7    to the access to that particular data and whether it was

8    accessible and when.  I think the record is sufficiently

9    established in that regard, but I did want to provide that bit

10   of information to the Court relating to the production of the

11   data, number one.

12         And then, number two, I will also note that the

13   government did not object to each question posed to Ms. Regnier

14   relating to the Tabs and the QuickBooks data.

15         THE COURT:  All right.  Understood.  Thank you for

16   making the record on that.  It certainly underscores and

17   confirms that you have had the Tabs data and had it prior to

18   this trial.  Be that as it may, it does complexify, if you

19   will, the record at the time that those questions were posed to

20   Ms. Regnier.

21         I don't believe there was any basis to say that the

22   prosecution team had that evidence, but to the extent that it

23   was produced to the prosecution team before the close of its

24   case in chief, perhaps there is more to that point.  So that

25   may counsel in favor of leaving well enough alone, but

M22nave3

1    certainly I wanted to raise the issue.

2              Anything else, Mr. Avenatti?

3              MR. AVENATTI:  No, sir.

4              THE COURT:  All right.  See you at 12:35.

5              (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M22Wave4

AFTERNOON SESSION

12:35 p.m.

1    THE COURT:  You may be seated.

2    Good afternoon.

3    Mr. Sobelman, government, someone, your thoughts.

4    MR. SOBELMAN:  Your Honor, after reflection, we don't
think anything additional instructions are needed at this time.

5    THE COURT:  All right.

6    Mr. Avenatti, anything you need to discuss or raise?

7    MR. AVENATTI:  No, sir.

8    THE COURT:  All right.

9    We'll go and check on the jury.  I suspect it will
take a few minutes for them to get up here.

10    Mr. Podolsky, what's good for the goose is good for
the gander.  I'd ask you to put your mask back on and have a
seat.  And then you can stand up when they get here.

11    MR. PODOLSKY:  Thank you.

12    MR. AVENATTI:  Your Honor, is there a time estimate on
the rebuttal?

13    THE COURT:  Not from me.

14    Mr. Podolsky, do you have an estimate on the time?

15    MR. PODOLSKY:  I don't, your Honor.  I had about,
maybe, 30 minutes of material, but I've tried to strip it down
in response to the defendant's summation.  So I expect it will
be less than that; I'm not sure how much less.

M22Wave4                          Rebuttal - Mr. Podolsky

1            THE COURT:  All right.  Thank you.

2            Just to give you an update, we are waiting on a couple

3    of jurors, so they are not even on their way up.  I will give

4    you a heads-up when they are.

5            MR. AVENATTI:  Your Honor, may I run to the restroom

6    real quick?

7            THE COURT:  You may.

8            MR. AVENATTI:  Thank you.

9            THE COURT:  All right.  The jury is about to be here,

10   so please take your seats.

11           (Jury present)

12           THE COURT:  You may be seated.

13           All right.  Ladies and gentlemen, I hope you enjoyed

14   your lunch break.  Welcome back.

15           We will continue, as I said earlier, with the

16   government's rebuttal summation given by Mr. Podolsky, and I'd

17   ask you to give your undivided attention to him.

18           With that, Mr. Podolsky, you're welcome to proceed.

19           MR. PODOLSKY:  Thank you, your Honor.

20           Good afternoon, everyone.  I'm glad to finally be able

21   to speak to you.  This will actually be the last time we get to

22   speak to you, so let me start by saying thank you.  We can tell

23   you've really paid a great deal of attention to the witnesses,

24   to the evidence in this case, to the arguments, and we thank

25   you for that.  It allows everyone to get a fair trial and also

1    gives you a chance to review the evidence that demonstrates the

2    defendant's guilt.

3            Now, before the lunch break, Mr. Avenatti had a chance

4    to, and elected to, give a closing argument.  This is our

5    chance to respond to the defendant's arguments.  I'm not going

6    to respond to all of them.  Many of them don't cry out for

7    response, but I will respond to some to help you evaluate what

8    he said.  And as the judge told you multiple times in this

9    trial, as the defendant said, he had no obligation to make an

10   opening statement.  He had no obligation to make a closing

11   argument, but he did do that.  And when he does that, it's

12   incumbent on you to consider what he said, evaluate it, ask if

13   it makes sense with what you heard in this trial.  And if not,

14   ask why he is making these arguments.

15           I'm just going to say right off the bat the

16   defendant's arguments in this case do not make sense.  They do

17   not match with the evidence, with the testimony and documents

18   that you've seen through this trial.

19           Actually, I would suggest you think about what he

20   spent an hour and a half talking to you about.  A lot of it was

21   about security guards and entourages and reasonable fees and

22   complaints and legal costs and things that actually aren't at

23   issue in this case.  These things don't matter in this case.

24           The reason that he wants to talk to you about those

25   things is that they sound complicated.  But this case is not

M22Wave4                        Rebuttal - Mr. Podolsky

1    complicated.  You don't need to know about reasonable fees.

2    You don't need to know about lawyers' work.  You don't need to

3    be a contract attorney to know the answer to this case.  You

4    only need to know about the truth, and the truth is something

5    that you know about.  It's something simple.  So let me suggest

6    as we talk about the defendant's arguments that you keep this

7    in mind.

8         The truth is simple.  It makes sense.  The closer you

9    get to the truth, the clearer things become.  Things come

10    together when you understand the truth about what happened.

11    Lies are complicated.  When something isn't true, it's

12    confusing, because there's always some evidence -- a witness,

13    an email; in this case, a text message -- that doesn't quite

14    fit.  So keep that in mind, because in this case, the truth is

15    very, very simple.

16         That man took someone else's money.  That's what the

17    case is about.  And when you consider that simple fact, every

18    single piece of evidence in this case -- every witness's

19    testimony, every text message, email, bank statement,

20    everything you've heard over the past week or week and a

21    half -- makes sense.

22         Now, let's talk about what the defendant is arguing in

23    this case, because unlike the truth about what happened, it's

24    very complicated.  And let's brush aside the business about

25    security guards and publicity and reasonable fees, and let's go

M22Wave4                    Rebuttal - Mr. Podolsky

1    to the core of what he is trying to tell you happened in this

2    case.  And here's what it is:

3            According to the defendant, what he just told you is

4    that in July of 2018, Stormy Daniels wanted her money to go to

5    a different bank account.  So the defendant, without telling

6    her, apparently, without getting her consent, what the book

7    agent asked for, himself changed the bank account.  And then he

8    didn't tell Ms. Daniels for some reason.  Even though,

9    according to him, he was keeping the money safe for her, he

10   went ahead and spent it.  Then he found a way to get a loan and

11   pay her back.  And his claim to you is he was doing that all

12   for Ms. Daniels.

13           OK.  That's the second payment, the first one that he

14   took.  But then, to try to make sense of all the bad facts for

15   him in the case, he's got a different theory about the third

16   payment.

17           The theory about the third payment is that even though

18   it went into the same bank account and notwithstanding all the

19   text messages, his theory is I was entitled to just keep that;

20   I could just have it.  Even though, remember, he hasn't argued

21   to you, because the facts don't show it, that he ever had a

22   conversation with Ms. Daniels where she said he could have it.

23   He never discussed what money could be his.  What he is arguing

24   to you today is that he could just take Ms. Daniels's money

25   because he was entitled to it.

M22Wave4                    Rebuttal - Mr. Podolsky

1              MR. AVENATTI:  Objection, your Honor.

2              THE COURT:  Overruled.

3              MR. PODOLSKY:  Now, look, these arguments don't make

4    sense on their face.  You know the evidence.  You can apply

5    your common sense, but let's actually try to take them

6    seriously.  Let's talk about each one.

7              MR. AVENATTI:  Objection, your Honor.

8              THE COURT:  Overruled.

9              MR. PODOLSKY:  Let's talk about the second payment.

10             Now, the defendant, in his summation, referred to this

11   as the big lie, and he argued to you that he was authorized to

12   do this.  Apparently, his claim is that as Ms. Daniels's

13   lawyer, he was authorized to just take her money, spend it,

14   and -- I don't know -- hopefully he could get it back for her

15   before she noticed.

16             Well, let's see what he actually did.  Let's see what

17   the evidence shows.

18             First, we know -- I'm not going to put it up; you've

19   seen it many times, Government Exhibit 213.  That's the false

20   wire instructions that he sent to Mr. Janklow.  Now, if the

21   defendant were right, if the defendant were telling the truth

22   about this, that he was doing this for Ms. Daniels, when Mr.

23   Janklow said to him, I need Ms. Clifford, Ms. Daniels's

24   authorization to do this, why didn't he just go to Ms. Daniels?

25   Send her a WhatsApp message, call her, say, Hey, do you want to

1    do this?  Luke needs your information.  Can you call him?

2    Email him?  Or maybe just sign this.  I'll send it to him for

3    you.  None of that.

4            What he actually did, and he didn't dispute this, is

5    he had his assistant take this piece of paper, a blank piece of

6    paper, copy -- you know how to do this on a computer.  She cut

7    out from the fee agreement, took Stephanie, Ms. Clifford's

8    signature and then pasted it -- pasted it -- onto the document

9    that the defendant wrote.  Why do that?

10           Now, the defendant also made a big deal on his

11   summation about this idea that the -- let's see, the fake wire

12   instructions said that Ms. Daniels's account was closed, and he

13   wants to say, apparently, that that was true.  But there's

14   something interesting about this, and it's Government Exhibit

15   301A, which is the bank account that Ms. Daniels opened that

16   very same day.  The defendant argued to you, argued to you

17   before lunch, that there was no other way to get Ms. Daniels

18   her money, no other way.  Actually, Government Exhibit 301A was

19   her other bank account.  But what he absolutely cannot explain,

20   what he cannot explain is why he didn't just tell Ms. Daniels

21   I've got your money.

22           Why don't we pull up the timeline, Government Exhibit

23   804, and look at page 2.  Can we do that, Ms. Abrams?

24           All right.  Here we go.  August 1, the defendant sends

25   Mr. Janklow the false wire instructions.  Mr. Janklow sends the

first portion of the second payment.  August 3, Mr. Janklow
sends the remainder.  August 9, Ms. Daniels messages Mr.
Janklow, asking him when do we get paid?

Now, if, as the defendant suggested to you,
Ms. Daniels knew the defendant had her money, why in the world,
a week later, is she asking Mr. Janklow where it is?

And then three weeks later, August 27, Ms. Daniels
messages Michael Avenatti:  "Pretty annoying how they are all
over us for something they need"; that's the book publisher
asking for her to follow up on some of the publicity or other
work.  "Pretty annoying how they are all over us for something
they need but still have not paid me despite final version
being submitted a while ago."  That was the final version of
the manuscript that she submitted for that August 1 payment.
Now, why is she telling the defendant -- the defendant -- I
haven't been paid if she knows that he has her money?

And what's really incredible about this argument is,
as Special Agent Rosenman showed you and as you can see in
Government Exhibit 702, by this time the defendant had spent
all of the book money.  He's arguing to you -- to you -- that
this was safekeeping for Ms. Daniels.  He was holding her money
for her so that her husband wouldn't get it, and yet he had
spent all of it.  In fact, I wrote this down.  He told you that
Ms. Daniels knew he had the money at this time.  Well, that's
an incredible thing to say because not only did she not know

1    that, he didn't have the money.  He had spent it.  It was gone.

2            Let's just pay attention to the timeline.  It's

3    interesting.  If we go to the next page of 804, so you see

4    August 27 on the prior page, Ms. Daniels was asking about the

5    money.  August 30, Avenatti responds, saying, "I have an

6    update."

7            And what was happening this weekend?  You'll remember

8    that Mr. Macias told you about it.  This was when Mr. Avenatti

9    started talking to him about his money issues.  And if we focus

10   on September 4, Ms. Daniels messages Mr. Avenatti saying, "My

11   new account info for publisher."  She thinks the publisher

12   hasn't paid her.  Why else would she say that?  And she gives

13   the account info to pass along to the publisher, and Avenatti

14   responds, "Got it."  He doesn't say:  Oh, don't worry.  I've

15   got your money.  I was authorized to hold on to it and spend

16   it.  He doesn't say:  You're confused.  I have it.

17           He says, "Got it."  But what he didn't have was the

18   money, because you'll remember that right around this very same

19   time -- Mr. Macias told you about this; you saw it in the

20   exhibits -- he was in Mr. Macias's office begging for a loan so

21   that he could pay Ms. Daniels back before she knew what

22   happened.

23           And you know, there are actually rules that apply to

24   trust accounts.  I expect that Judge Furman is going to

25   instruct you about them.  And what I think you're going to hear

M22Wave4                    Rebuttal - Mr. Podolsky

1    is that when a lawyer receives any money on behalf of a client,

2    the lawyer must --

3             MR. AVENATTI:  Objection, your Honor.

4             THE COURT:  Overruled.

5             Ladies and gentlemen, the lawyers and Mr. Avenatti are

6    permitted to tell you what they expect my instructions will be,

7    but it is my instructions that you must listen to.  I, and I

8    alone, can give you instructions about the law that applies

9    here.

10            You may proceed.

11            MR. PODOLSKY:  Thank you, your Honor.

12            What I expect you will learn is that lawyers have to

13   promptly notify a client when they receive money into a trust

14   account.  But that's not what Mr. Avenatti did.  And by the

15   way, you don't need a legal instruction on this.  Use your

16   common sense.  If you ask someone to hold your money, do you

17   expect them to go out and spend it and then hope maybe they'll

18   find a loan or maybe they'll pick up some money on the ground

19   and be able to pay you back before you notice it's gone?

20            Michael Avenatti knew that too.  He knew this wasn't

21   his money.  That's why when Ms. Daniels asked where her money

22   was, he didn't say:  Oh, I've had it for weeks.  You knew that.

23            He lied.  He lied again.  He got the cashier's check

24   that Mr. Sobelman told you about so that she didn't know that

25   he had the money.  Mr. Avenatti didn't mention that.

M22Wave4                    Rebuttal - Mr. Podolsky

1          That's the second payment.  Now let's talk about the
2   entitlement defense.  This is the third payment.
3          On this one, pay attention to what Mr. Avenatti told
4   you.  He didn't suggest to you, because there is no evidence
5   that would support this, that he had an agreement with
6   Ms. Daniels where he could just take the money, that she knew
7   about it.  What he tried to tell you was I worked real hard.  I
8   did a lot of work.  I thought I deserved her money, so I took
9   it.  That's the defense.
10          You know that's wrong based on your own common sense.
11   You'll hear it in the instructions, I expect.  You know that
12   based on your own common sense.  This isn't a lawyer thing.
13   This is just not how the world works.  Think about your own
14   job.  Imagine you get hired.  You get hired to work at a store,
15   and the manager says to you:  You know what?  I'm going to hire
16   you.  Here's your salary.  And if you do a great job, if you
17   do --
18          MR. AVENATTI:  Objection, your Honor.
19          MR. PODOLSKY:  -- great job.
20          MR. AVENATTI:  Objection, your Honor.
21          THE COURT:  Overruled.
22          MR. PODOLSKY:  You work hard, you stay late, you clean
23   up the store, you will be entitled to a raise.  And so a week
24   later you come in and you're like, Man, I did a great job this
25   week.  I stayed late every day.  I organized the merchandise.

M22Wave4                    Rebuttal - Mr. Podolsky

1    I'm a great employee.  I'm entitled.  I'm going to take a

2    thousand bucks out of the cash register.

3              What do you think is going to happen when the boss

4    comes back --

5              MR. AVENATTI:  Objection, your Honor.

6              MR. PODOLSKY:   -- And notices a thousand dollars

7    missing?

8              THE COURT:  Overruled.

9              MR. PODOLSKY:  Do you think you could just say, Well,

10   I was entitled; I worked hard?  No.  You're going to get fired,

11   and you're going to get reported just like anyone else who

12   steals.

13             You know, we've gone through this.  I'm not going to

14   belabor the point.  One thing you definitely would not do if

15   you believed that was your money is lie, is say:  I don't know

16   what you're talking about, never seen it; customer must not

17   have paid.  But that's exactly what Mr. Avenatti did.

18             I mean look at -- we won't go through them all, but

19   let's look at Government Exhibit 804, page 4.  Here it is, in

20   the middle.  September 17, Janklow & Nesbit wire $148,750 to

21   Avenatti & Associates.  This is the third book payment, the one

22   that was due on publication.  It's actually sent -- received

23   early because of what Mr. Avenatti claimed to Mr. Janklow.  And

24   there it is, paid on September 17.

25             October 1, the night before Ms. Daniels's book is

1  published, I'd bet she's pretty excited, she says to Avenatti:

2  "Re book payment, make sure they don't take five weeks like

3  last time" -- five weeks like last time because she thought

4  they were five weeks late because Mr. Avenatti didn't tell her

5  he took the money last time -- "They were way late."  Mr.

6  Avenatti responds not I'm entitled, this is my money.  He says,

7  "Got it on the book."

8         Go to the next page.  October 2, this is the very day

9  that Ms. Daniels's book is published, and she says, not

10 surprisingly, to her lawyer:  "Publisher owes me a payment

11 today."  Avenatti responds.  I'm sure he responds I'm entitled

12 to it; it's my money.  Right?

13        No.  He responds: "On it.  We need to make sure we

14 have the publicity requirement met."  You can take Government

15 Exhibit 804 back.  You can look at it.  You can look at all the

16 emails yourself, the text messages.  I won't go through them

17 all.  What I will say is this.  Mr. Avenatti told you before

18 the break this was a failure of communication.  A failure of

19 communication.  Was this an accident?  No.  Maybe one.  Maybe a

20 failure of one, he could say I misunderstood.  You can count

21 how many there are.  On this page alone, four times he lies to

22 her.  She asks for her money, and he lies to her.

23        All right.  Let's go through a few other things.

24        Mr. Avenatti talked to you about good faith.  He even

25 put what he expects Judge Furman's instructions on this case to

M22Wave4                    Rebuttal – Mr. Podolsky

1    be up on the screen.  I think he probably said this half a

2    dozen times.  He said this a number of times.  What was it?

3    There's no magic to good faith.  You're going to hear the

4    instructions.  Judge Furman will explain to you the

5    requirements of wire fraud and the government's burden to prove

6    the defendant's intent to defraud.  You're going to hear about

7    that.

8           But when you think about the facts of this case, when

9    you think about good faith, the phrase "good faith," you can

10   ask yourself, was it good faith when the defendant lied to

11   Ms. Daniels, almost daily, for months?  Was it good faith when

12   the defendant spent the book money, spent the money she earned

13   without telling her?  Was it good faith to spend her money and

14   then scramble for a personal loan to try to pay it back so she

15   didn't discover what he did?  Was it good faith?  Was it good

16   faith to keep Ms. Daniels's own book agent from responding to

17   her asking where the money is?

18          The defendant tried to dispute this.  Let's put up

19   Government Exhibit 236, and we can zoom in on the top.

20          This is Mr. Janklow, February 16.  This is when

21   Ms. Daniels is frantically trying to figure out why, where her

22   money is.  Mr. Janklow says:  "Dude, she just called me again.

23   I have to be honest.  I am no longer comfortable with not

24   communicating with her at all," communicating with her at all.

25   He testified Mr. Avenatti told him not to talk to her about

1    money, and here it is, contemporaneous, on the page:  "I'm no

2    longer comfortable with not communicating with her at all."

3            By the way, when you look up the text, if you want to

4    look at this document, he keeps telling Mr. Avenatti:  She's

5    calling me.  She's calling me.  I want to call her back.

6            He says:  "She is a client of my firm.  We have legal

7    obligations to her, and I've never behaved this way."  Was that

8    good faith?

9            Actually, let's do one other good faith.  Let's look

10   at Government Exhibit 60.  And let's go to the third page.  And

11   maybe we can try to blow up the whole thing just a little bit

12   bigger.

13           All right.  Mr. Sobelman showed you this.  You know

14   about this.  This is where Ms. Daniels sends Mr. Avenatti the

15   receipts.  She's got the wire information, and she says to him:

16   Look.  Here it is:  Here's the proof you took my money.  I

17   didn't have it.

18           And Mr. Avenatti responds.  First is, "Let me figure

19   out if we even received this payment."  Well, not only did he

20   know he spent it, Mr. Janklow had sent the same information to

21   Mr. Avenatti three days before.

22           If we zoom out for a minute, then Ms. Daniels sends

23   the actual documentation of the wires, and then we get the

24   final response:  "Let me find out what is going on."  That's

25   what he says, let me find out what's going on.  This is like

your spouse, your boyfriend or girlfriend is cheating on you.

MR. AVENATTI:  Objection.

MR. PODOLSKY:  And you see it.

THE COURT:  Overruled.

MR. PODOLSKY:  And you see it, and you find the
messages on your phone.  You see the messages between your
spouse and someone else, and you go to your spouse and you say
to them:  Look, I caught you.  What is going on?  And your
spouse says, Let me find out what is going on.  It's
ridiculous.  This is a lie.  He knows what he did.  He took her
money.  Where is the response, Oh, I was entitled to it; you
knew I had it?  So keep that in mind when you consider good
faith.

All right.  Let's talk about the contract briefly.  I
don't want to spend a lot of time on this.  As I'll show you in
a moment, it's really not very relevant, but the defendant
showed it to you, so why don't we talk about it.  Let's pull up
Government Exhibit 3 and look at a couple points here.

First, defendant brought up paragraph 3, talked about
clients' duties, and he quickly quoted to you this language
about clients' duties to pay bills for reasonably incurred
costs on time.  You heard in this case there were no bills to
Ms. Daniels.  She wasn't billed.  Ms. Regnier told you that.
There were no bills.

MR. AVENATTI:  Objection, your Honor.  Misstates the

1    testimony.

2              THE COURT:  Overruled.

3              MR. PODOLSKY:  And the reason for that is in paragraph

4    4.

5              Let's pull that one up.  I want you to look at this

6    and remember the way the defendant read it to you just before

7    lunch.  He noted that there was a one-time payment of a hundred

8    dollars.  That was the one that he proudly paid for lunch with.

9    And then the defendant kind of quickly said to you, And then

10   the attorney's standard hourly fees and out-of-pocket costs get

11   paid for.  That's what he said.  But actually, that is not what

12   the provision says.  Let's read it:  "Attorney's standard

13   hourly fees and out-of-pocket costs if a legal defense fund is

14   established to benefit clients and has sufficient funds to pay

15   such reasonable costs."

16             Apparently, he thought he might just ignore that.

17   What this says and what you heard testimony about is the

18   defendant's agreement was he could set up a legal defense fund

19   and he could get paid out of it.  That's how the contract

20   works.  He wasn't getting paid from Ms. Daniels.  She didn't

21   have money to pay him.  That was the beginning and end of their

22   agreement.  And the incredible thing about what the defendant

23   argued to you about this is he did get paid.  He went on and on

24   about all the work he did.  He got paid for it.

25             Pull up Government Exhibit 2.

1      MR. AVENATTI:  Objection, your Honor.

2      THE COURT:  Overruled.

3      MR. AVENATTI:  Misstates the testimony.

4      THE COURT:  Overruled.

5      Ladies and gentlemen, as I said to you earlier, the

6  testimony and the exhibits admitted into evidence, that is the

7  evidence.  What the lawyers argue and what Mr. Avenatti argues,

8  that is not evidence, but you may consider it in your

9  evaluation of the evidence.

10      MR. PODOLSKY:  Thank you, your Honor.

11      This is the legal fees/costs update that Mr. Avenatti

12  sent to Ms. Daniels November 30, 2018.  He wrote this.  These

13  are his words, and he noted at the bottom:  "Our fund-raising

14  attempts have yielded $587,415" to that point.

15      Let's go to the second page.  If we can blow up the

16  bottom half -- well, actually, you're right.  Let's go to the

17  top half quickly.  Thank you.

18      Here, he talks about the hourly amounts, the billable

19  hours, how much that was worth.  Then it goes to the bottom

20  half, if we can just zoom back out, go to the bottom half of

21  that page.

22      Here are the costs.  Here are the costs, and one cost

23  I just have to point out, because in here is $352,521.73 for

24  security.  The defendant -- frankly, this has nothing to do

25  with anything, but the defendant devoted part of his summation

M22Wave4                        Rebuttal - Mr. Podolsky

1   to claiming to you that Ms. Daniels owed him for her entourage.

2   But actually, it was part of the legal costs.  It says it right

3   here, right here.  It's paid for out of the CrowdJustice fund.

4   This doesn't say that CrowdJustice owes him any money.  It

5   doesn't say that Ms. Daniels owes him any money.  It says that

6   he actually was able to cover $637,000 of his costs from the

7   CrowdJustice fund, and that's how the deal worked.

8           All right.  Let's go back to the contract for a

9   minute, Government Exhibit 3, and go back to paragraph 4.  And

10  when the defendant skipped over the way subsection (b) works,

11  he went right to the last sentence.  He said:  "In addition, in

12  the event attorney assists clients in finalizing any book or

13  media opportunity that results in clients getting paid,

14  attorney and clients agree that attorney shall be entitled to a

15  reasonable percentage to be agreed upon between clients and

16  attorney."

17          OK.  The defendant suggested to you that this entitled

18  him to money.  Apparently, according to him, it entitled him to

19  take Ms. Daniels's money, not tell her, just keep it.  But you

20  know what?  It didn't entitle him to anything.  You're going to

21  hear the judge instruct you on what provisions in contracts

22  like this mean.  And I expect that he will tell you that this

23  is an agreement to agree.  It means nothing.  You can't take

24  this and just say I'll take whatever I want.  It is completely

25  irrelevant.

M22Wave4                      Rebuttal - Mr. Podolsky

1          I also expect the judge will instruct you that if you

2    think you're owed fees, if a lawyer thinks that he or she is

3    owed fees that were not covered by the contract, they could

4    bring a lawsuit or an arbitration to ask the client for money.

5    So I ask you this.  Where is the evidence that the defendant

6    did that?  Where is the evidence that the defendant, thinking

7    he was owed money by Ms. Daniels --

8          MR. AVENATTI:  Objection, your Honor.

9          MR. PODOLSKY:  -- not --

10          MR. AVENATTI:  Objection.

11          THE COURT:  Ladies and gentlemen, I remind you that

12    the government bears the burden of proof at all times in this

13    trial.  Mr. Avenatti has the burden to do nothing.  He does not

14    need to put on a defense.  He does not need to present any

15    evidence whatsoever.

16          You may proceed.

17          MR. PODOLSKY:  Thank you, your Honor.

18          Let's be clear about this.  The evidence in this case

19    is that Mr. Avenatti never did anything like that.  He didn't

20    bring an arbitration.  He didn't --

21          MR. AVENATTI:  Objection, your Honor, again.  Same

22    objection.

23          MR. PODOLSKY:  Your Honor, this is what the evidence

24    showed.

25          THE COURT:  All right.  You may proceed.  That

M22Wave4                        Rebuttal - Mr. Podolsky

1    objection is overruled.

2              You may proceed.

3              MR. PODOLSKY:  The evidence shows that the defendant,

4    rather than bringing a lawsuit if he truly believed he was owed

5    money, notwithstanding what the contract says, could have

6    brought a lawsuit.  What the evidence shows he did is he took

7    the money and lied about it.  I'll just say this again.  You

8    don't need the legal instructions.  This is common sense.  You

9    don't just take someone's money because you think you worked

10   hard.  It's their money.

11             All right.  Getting towards the end here.  Let me just

12   maybe cover one or two more items.

13             I want to talk briefly about Ms. Daniels.  Mr.

14   Avenatti sort of sprinkled throughout his summation various

15   comments about Ms. Daniels.  Candidly, it's not really clear if

16   he wants you to believe her or disbelieve her.  He likes some

17   of her testimony, doesn't like others.  I suppose you're

18   supposed what he wants you to believe and not believe others.

19   I'll say a few things about this.

20             No. 1, her testimony really -- you can put it aside if

21   you'd like.  The text messages are very, very clear.  You don't

22   have to focus on her testimony.  You can just focus on the

23   documents.  The documents tell the story.  Mr. Avenatti's own

24   words -- own words -- convict him.

25             But I do want to talk about the fact that in

1    approximately five hours of cross-examination and then in much

2    of his summation today, the defendant heaped insults on her,

3    talking about her belief in the paranormal, her lifestyle --

4          MR. AVENATTI:  Objection, your Honor.

5          MR. PODOLSKY:  -- and so on.

6          THE COURT:  Overruled.

7          MR. PODOLSKY:  And ask yourselves, what does any of

8    that have to do with anything?  With anything?  I don't know

9    what you all believe, whether you think it's kooky to believe

10   in the paranormal, whether you believe it's weird, whether you

11   have beliefs in the paranormal.  No idea.  What matters here

12   has nothing to do with that.  It has nothing to do with that at

13   all.  She can believe whatever she wants and still be stolen

14   from, from the defendant, and still deserves not to be.

15         The defendant, in his summation, multiple times, said

16   that she was lying, that she didn't deserve belief.  But what

17   was she lying about?  Everything she said was in the WhatsApp

18   message with the defendant.  And candidly, I don't really even

19   understand what the theory is.  What is she lying about?  What

20   did she do that would undermine the facts in this case?

21         Is the theory that because -- I don't know why -- for

22   some unspecified reason, she wanted to frame him so she started

23   messaging Mr. Janklow and Ms. Beier and saying where's my

24   money, and then she somehow, like, inserted text messages that

25   Mr. Avenatti wrote onto his iCloud and that she did all this to

frame him so she could come up here and testify for hours while

Mr. Avenatti heaped insults on her?  It makes no sense, makes

no sense.  She's not lying about anything.  The defendant can't

even articulate what she might be lying about.

        The fact of the matter is Ms. Daniels, stolen from, by

her own attorney who said he was working for her, came into

this courtroom, sat there, answered every question that was put

to her.  You saw her.  You could evaluate her.  You could

compare her testimony to the text messages.  And she was

truthful.  She told you what happened.

        All right.  I am going to wrap up.

        Look, you paid close attention to the evidence in this

case.  When you go back, I'm sure you'll take a look at the

exhibits and you'll understand exactly what happened.  But I

will make one suggestion.

        The defendant has basically said I'm entitled to take

the money, and so what I would suggest to you is, after you

leave the courtroom, after Judge Furman instructs you on the

law, when you go back to the room and you sit down to

deliberate, you can ask one simple question, one question:  If

Michael Avenatti thought that money was his, if he thought that

money was his, if he thought that somehow, in his head, a thing

he could do as a lawyer was just take someone's money, keep his

client's money because he felt he deserved it, then why did he

lie about it?

M22Wave4                    Rebuttal – Mr. Podolsky

1     He didn't say anything about the text messages in his

2   summation.  Those texts, it's clear, they're lies.  They're

3   lies, and so the question is why.  Why did he lie?  All he had

4   to do in response to one question from Ms. Daniels about the

5   money is just say:  Oh, Stormy, what do you mean?  I have the

6   money.  I've got your money.  It's in my bank account.  We

7   agreed on this.  It's mine.

8     But he didn't.  He lied, and so ask yourself one

9   simple question:  Why did he lie?

10     I think you know the answer to that question.  There

11   is only one answer to that question.  The answer is because he

12   is guilty.

13     Thank you.

14     THE COURT:  Thank you, Mr. Podolsky.

15     MR. AVENATTI:  Your Honor, I request a sidebar.

16     THE COURT:  Not now, Mr. Avenatti.

17     Ladies and gentlemen, at this time I'm going to have

18   my staff distribute to you copies of my jury instructions.

19   Please don't look at them until I direct you to do so, and in a

20   moment we will proceed.

21     For those who are in the audience, I don't want people

22   coming in and out during the jury instructions, so if you don't

23   want to be here for this portion, I'd ask you to leave at this

24   time.  If you remain, I'd ask you to remain until I conclude

25   and the jury is excused to begin its deliberation.

M22Wave4                     Charge

1          All right.  Have you given a copy to the parties as

2    well?  Excellent.

3          With that, ladies and gentlemen, you may turn to page

4    1 of the instructions.

5          Members of the jury, you have now heard all of the

6    evidence in the case.  It is my duty at this point to instruct

7    you as to the law.  My instructions to you will be in three

8    parts.

9          First, I will give you general instructions -- for

10   example, about your role as the jury, what you can and cannot

11   consider in your deliberations, and the burden of proof.

12         Second, I will describe the law that you must apply to

13   the facts as you find them to be established by the evidence.

14         Finally, I will give you some instructions for your

15   deliberations.

16         I am going to read my instructions to you.  It is not

17   my favorite way to communicate -- and not the most

18   scintillating thing to listen to -- but there is a need for

19   precision, and it is important that I get the words just right

20   and so that is why I will be reading.

21         Because my instructions cover many points, I have

22   given you a copy of my instructions to follow along.  Please

23   limit yourself to following along; that is, do not read ahead

24   in the instructions.  If you find it easier to listen and

25   understand while you are following along with me, please do so.

M22Wave4                              Charge

1    If you would prefer, you can just listen and not follow along.

2    Either way, you may take your copy of the instructions with you

3    into the jury room so you can consult it if you want to reread

4    any portion of the charge to facilitate your deliberations.

5         For now, listen carefully and try to concentrate on

6    the substance of what I am saying.  You should not single out

7    any instruction as alone stating the law; rather, you should

8    consider my instructions as a whole when you retire to

9    deliberate in the jury room.

10        You, the members of the jury, are the sole and

11   exclusive judges of the facts.  You must weigh and consider the

12   evidence without regard to sympathy, prejudice, or passion for

13   or against any party.  It is your duty to accept my

14   instructions as to the law and to apply them to the facts as

15   you determine them.  If either party has stated a legal

16   principle different from any that I state to you in my

17   instructions, it is my instructions that you must follow.

18        In reaching your verdict, you must remember that all

19   parties stand equal before a jury in the courts of the United

20   States.  The fact that the government is a party and the

21   prosecution is brought in the name of the United States does

22   not entitle the government or its witnesses to any greater

23   consideration than that accorded to any other party.  By the

24   same token, you must give it no less deference.  The government

25   and the defendant, Michael Avenatti, stand on equal footing

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

before you.

It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the defendant's race, national origin, religious beliefs, sex, or age. All persons are entitled to the same presumption of innocence and the government has the same burden of proof with respect to all persons.

A criminal defendant has a constitutional right under the Sixth Amendment to the United States Constitution to represent himself. The defendant's decision to exercise that right and represent himself has no bearing on whether he is guilty or not guilty, and it must not affect your consideration of the case. You are not to draw any inferences from the defendant's decision to exercise his right to represent himself.

The personalities and the conduct during trial of both counsel and Mr. Avenatti are not in any way at issue. If you formed opinions of any kind about the personalities or conduct during trial of any of the lawyers in the case or of Mr. Avenatti, favorable or unfavorable, whether you approved or disapproved of their behavior, those should not enter into your deliberations.

In addition, remember that it is the duty of each side to object when the other side offers testimony or other

M22Wave4                        Charge

1    evidence that the objector believes is not properly admissible.

2    Therefore, you should draw no inference from the fact that

3    there was an objection to any testimony or evidence.  Nor

4    should you draw any inference from the fact that there was --

5    sorry.  Nor should you draw any inference related to the weight

6    or importance of any testimony or evidence from the fact that I

7    sustained or overruled an objection.  Simply because I have

8    permitted certain testimony or evidence to be introduced does

9    not mean that I have decided on its importance or significance.

10   That is for you to decide.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M22nave5                         Charge

 1          The defendant has pleaded not guilty to the charges

 2     against him.  As a result of that plea of not guilty, the

 3     burden is on the government to prove guilt beyond a reasonable

 4     doubt.  This burden never shifts to a defendant for the simple

 5     reason that the law never imposes upon a defendant in a

 6     criminal case the burden or duty of testifying or calling any

 7     witness or locating or producing any evidence.

 8          Furthermore, the law presumes the defendant to be

 9     innocent of the charges against him.  The presumption of

10     innocence was in his favor when the trial began, continued in

11     his favor throughout the entire trial, remains with him even as

12     I speak to you now, and persists in his favor during the course

13     of your deliberations in the jury room unless and until the

14     government proves beyond a reasonable doubt that he committed

15     one of the charged crimes.

16          The question that naturally arises is what is a

17     reasonable doubt?

18          A reasonable doubt is a doubt based on your reason,

19     your judgment, your experience, and your common sense.  It is a

20     doubt that a reasonable person has after carefully weighing all

21     of the evidence.  It is a doubt founded in reason and arising

22     out of evidence in the case or the lack of evidence.

23          Proof beyond a reasonable doubt does not mean proof

24     beyond all possible doubt.  It is practically impossible for a

25     person to be absolutely and completely convinced of any

M22nave5                    Charge

disputed fact that by its very nature cannot be proved with

mathematical certainty.  The government's burden is to

establish guilt beyond a reasonable doubt, not all possible

doubt.

          If, after a fair and impartial consideration of all

the evidence, you can candidly and honestly say that you are

not satisfied with the guilt of the defendant, that you do not

have an abiding belief of the defendant's guilt, in other

words, if you have such a doubt as would reasonably cause a

prudent person to hesitate in acting in matters of importance

in his or her own affairs, then you have a reasonable doubt,

and in that circumstance it is your duty to acquit.

          On the other hand, if after a care and impartial

consideration of all the evidence, you can candidly and

honestly say that you do have an abiding belief of the

defendant's guilt, such a belief as a prudent person would be

willing to act upon in important matters in the personal

affairs of his or her own life, then you have no reasonable

doubt, and in that circumstance it is your duty to convict.

          There are two types of evidence that you may properly

use in deciding whether the defendant is guilty or not guilty

of the crimes with which he is charged.

          One type of evidence is called direct evidence.

Direct evidence of a fact in issue is presented when a witness

testifies to that fact based on what he or she personally saw,

M22nave5                        Charge

1   heard, or otherwise observed through the five senses.

2           The second type of evidence is circumstantial

3   evidence.  Circumstantial evidence is evidence that tends to

4   prove a disputed fact indirectly by proof of other facts.

5           There is a simple example of circumstantial evidence

6   that is often used in this courthouse.  Assume that when you

7   came into the courthouse this morning, the sun was shining and

8   it was a nice day outside.  Also assume that the courtroom

9   shades were drawn, and you could not look outside.  Assume

10  further that as I were sitting here someone walked in with an

11  umbrella that was dripping wet, and then a few moments later

12  someone else walked with with a raincoat that was also dripping

13  wet.

14          Because you could not look outside the courtroom and

15  cannot see whether it was raining but of would no direct

16  evidence of that fact.  But on the combination of facts that I

17  have asked you to assume, it would be reasonable and logical

18  for you to conclude that it was raining.  That is all there is

19  to circumstantial evidence.  You infer on the basis of your

20  reason, experience, and common sense from one established fact

21  the existence or the nonexistence of some other fact.

22          The matter of drawing inferences from facts in

23  evidence is not a matter of guesswork or speculation.  An

24  inference is a logical factual conclusion that you might

25  reasonably draw from other facts that have been proved.

M22nave5                    Charge

1          Many material facts, such as a person's state of mind,

2     are not easily proved by direct evidence.  Usually such facts

3     are established by circumstantial evidence and the reasonable

4     inferences you draw.  Circumstantial evidence may be given as

5     much weight as direct evidence.  The law makes no distinction

6     between direct and circumstantial evidence.  The law simply

7     requires that, before convicting a defendant, you must be

8     satisfied of the defendant's guilt beyond a reasonable doubt

9     based on all of the evidence in the case.

10         During the trial, you have heard the attorneys use the

11    term "inference," and in their arguments they have asked you to

12    infer on the basis of your reason, experience and common sense

13    from one or more established facts the existence of some other

14    fact.

15         An inference is not a suspicion or a guess.  It is a

16    reasoned, logical decision to conclude that a disputed fact

17    exists on the basis of another fact that you know exists.

18         There are times when different inferences may be drawn

19    from facts whether proved by direct or circumstantial evidence.

20    The government asks to you draw one set of inferences, while

21    the defendant asks you to draw another.  It is for you, and you

22    alone, to decide what inferences you will draw.

23         The process of drawing inferences from facts and

24    evidence is not a matter of guesswork or speculation.  An

25    inference is a deduction or a conclusion that you, the jury,

1    are permitted to draw, but not required to draw from the facts

2    that have been established by either direct or circumstantial

3    evidence.  In drawing inferences, you should exercise your

4    common sense.

5           So, while you are considering the evidence presented

6    to you, you are permitted to draw from the facts that you find

7    to be proven such reasonable inferences as would be justified

8    in light of your experience.

9           Here again let me remind you that, whether based on

10   direct or circumstantial evidence, or on the logical,

11   reasonable inferences drawn from such evidence, you must be

12   satisfied of the guilt of the defendant beyond a reasonable

13   doubt before you may convict.

14          What, then, is the evidence in the case?

15          The evidence in this case is (1) the sworn testimony

16   of the witnesses, (2) the exhibits received into evidence, and

17   (3) any stipulations made by the parties.  Anything else is not

18   evidence, and you are to be guided solely by the evidence in

19   this case.

20          For example, the questions posed to a witness are not

21   evidence.  It is the witness's answers that are evidence, not

22   the questions.  In addition, exhibits marked for identification

23   but not admitted by me are not evidence.  Nor are materials

24   brought forth only to refresh a witness's recollection.

25   Moreover, testimony that has been stricken or excluded by me is

1    not evidence and may not be considered by you in rendering your

2    verdict.

3           Along these lines, we have among the exhibits received

4    in evidence some documents that are redacted.  "Redacted" means

5    that part of the document was taken or blacked out.  You are to

6    concern yourself only with the part of the document that has

7    been admitted into evidence.  You should not consider any

8    possible reason why the other part of it has been deleted or

9    blacked out.

10           Arguments by the advocates are also not evidence.

11   What you heard during the opening statements and summations is

12   merely intended to help you understand the evidence and reach

13   your verdict.  If your recollection of the facts differs from

14   the parties' statements, you should rely on your recollection.

15   If a party made a statement during his or her opening or

16   summation, and you find that there is no evidence to support

17   the statement, you should disregard the statement.

18           In that regard, let me remind you, because the

19   defendant decided to act as his own lawyer, you heard him speak

20   at various times during the trial, including in closing

21   argument.  I want to remind you that when the defendant spoke

22   during those parts of the trial, he was acting as a lawyer in

23   the case, not as a witness, and thus his words are not

24   evidence.  The only evidence in this case is the testimony of

25   the witnesses under oath and exhibits admitted into evidence.

M22nave5                    Charge

Finally, any statements that I may have made during the trial or during these instructions do not constitute evidence. At times I may have admonished a witness or directed a witness to be responsive to questions or to keep his or her voice up. At times I may have asked a question myself. Any questions that I asked or instructions that I gave were intended only to clarify the presentation of evidence and to bring out something that I thought might be unclear. You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case by reason of any comment, question or instruction of mine.

The rulings I have made during the trial and these instructions are no indication of my views of what your decision should be, nor should you infer that I have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you. That is entirely your role.

How do you evaluate the credibility, or believability, of the witnesses? The answer is that you use your common sense. There is no magic formula by which you can evaluate testimony. You may use the same tests here that you use in your everyday life when evaluating statements made by others to you. You may ask yourselves: Did the witness impress you as open, honest, and candid? How responsive was the witness to the questions asked on direct examination and on

1  cross-examination?

2          If you find that a witness intentionally told a

3  falsehood, that is always a matter of importance you should

4  weigh carefully.  On the other hand, a witness may be

5  inaccurate, contradictory, or even untruthful in some respects

6  and entirely believable and truthful in other respects.  It is

7  for you to determine whether such inconsistencies are

8  significant or inconsequential and whether to accept or reject

9  all the testimony of any witness or to accept or reject only

10  portions.

11          You are not required to accept testimony even though

12  the testimony is uncontradicted and the witness's testimony is

13  not challenged.  You may reject it because of the witness's

14  bearing or demeanor or because of the apparent improbability of

15  the testimony or for other reasons sufficient for you to

16  conclude that the testimony is not worthy of belief.

17          In evaluating the credibility of the witnesses, you

18  should take into account any evidence that a witness may

19  benefit in some way from the outcome of the case.  Such an

20  interest in the outcome creates a motive to testify falsely and

21  may sway a witness to testify in a way that advances his or her

22  own interest.  Therefore, if you find that any witness whose

23  testimony you are considering may have an interest in the

24  outcome of this trial, you should bear that factor in mind when

25  evaluating the credibility of his or her testimony and decide

1    whether to accept it with great care.

2              Keep in mind, though, that it does not automatically

3    follow that testimony given by an interested witness is to be

4    disbelieved.  There are many people who, no matter what their

5    interest in the outcome of the case may be, would not testify

6    falsely.  It is for you to decide based on your own perceptions

7    and common sense to what extent, if at all, the witness's

8    interest has affected his or her testimony.

9              You have heard testimony from law enforcement or other

10   government witnesses.  The fact that a witness may be employed

11   as a law enforcement official or a government employee does not

12   mean that his or her testimony is necessarily deserving of more

13   or less consideration or greater or lesser weight than that of

14   an ordinary witness.  It is your decision after reviewing all

15   of the evidence whether to accept the testimony of any law

16   enforcement witness or government witnesses, as it is with

17   every other type of witness, and to give that testimony the

18   weight you find it deserves.

19             You have heard evidence during the trial that

20   witnesses have discussed the facts of the case and their

21   testimony with the lawyers before the witnesses appeared in

22   court.  You have also heard evidence that some of the witnesses

23   had lawyers of their own.  Although you may consider these

24   facts when you are evaluating a witness's credibility, it is

25   common for a witness to meet with lawyers before testifying so

1    that the witness can be aware of the subjects he or she will be

2    questioned about, focus on the subjects, and have the

3    opportunity to review relevant exhibits before being questioned

4    about them.  In fact, it would be unusual for a lawyer to call

5    a witness without such consultation.

6            Additionally, as I told you during trial, it is not

7    unusual for a witness in a criminal investigation to have a

8    lawyer of his or her own and for that lawyer to be with the

9    witness for a pretrial interview.  As always, the weight you

10   give to the fact or the nature of these issues and what

11   inferences you draw from them are matters completely within

12   your discretion.

13           There are people whose names you have heard during the

14   course of the trial but who did not appear here to testify.  I

15   instruct you that each party had an equal opportunity, or lack

16   of opportunity, to call any of these witnesses.  Therefore, you

17   should not draw any inferences or reach any conclusions as to

18   what they would have testified to had they been called.  Their

19   absence should not affect your judgment in any way.

20           You should, however, remember my instruction that the

21   law does not impose on a defendant in a criminal case the

22   burden or duty of calling any witness or producing any

23   evidence.  The burden of proof remains at all times with the

24   government.

25           The fact that one party called more witnesses or

1   introduced more evidence does not mean that you should

2   necessarily find the facts in favor of the side offering the

3   most witnesses and the most evidence.  By the same token, you

4   do not have to accept the testimony of any witness who has not

5   been contradicted or impeached if you find the witness to be

6   not credible.  You must decide which witnesses to believe and

7   determine which facts are true.  To do this you must look at

8   all the evidence, or lack of evidence, drawing upon your own

9   common sense and personal experience.

10          After examining all the evidence, you may decide that

11  the party calling the most witnesses has not persuaded you

12  because you do not believe its witnesses or because you do

13  believe the fewer witnesses called by the other side.  In this

14  case, Mr. Avenatti presented a stipulation as you will recall.

15  Again, you should also keep in mind that the burden of proof is

16  always on the government.  The defendant is not required to

17  call any witnesses or offer any evidence since he is presumed

18  to be innocent.

19          On the other hand, the government is not required to

20  prove each element of the offense by any particular number of

21  witnesses.  The testimony of a single witness may be enough to

22  convince you beyond a reasonable doubt of the existence of the

23  elements of the charged offenses if you believe that the

24  witness has truthfully and accurately related what he or she

25  has told you.  The testimony of a single witness may also be

1    enough to convince you that reasonable doubt exists, in which

2    case you must find the defendant not guilty.

3         Stipulations were entered into relating to various

4    facts in this case.  A stipulation is an agreement between

5    parties as to what certain facts were or what the testimony

6    would be if certain people testified before you.  The

7    stipulations are the same for your purposes as the presentation

8    of live testimony.  You should consider the weight to be given

9    such evidence just as you would any other evidence.

10         If certain testimony or evidence was received for a

11   limited purpose, you must follow the limiting instructions I

12   have given.

13         The government has presented exhibits in form of

14   charts and summaries.  As you will recall, some of the charts

15   and summaries were not admitted into evidence, but were shown

16   to you as aids to make the other evidence more meaningful and

17   to help you in considering the evidence.  Others were admitted

18   into evidence as exhibits.  I admitted these charts and

19   summaries in place of or in addition to the underlying

20   documents that they represent in order to save time and avoid

21   unnecessary inconvenience.  They are no better than the

22   testimony or the documents upon which they are based.

23   Therefore, you are to give no greater consideration to these

24   charts or summaries than you would give to the evidence upon

25   which they are based.  It is for you to decide whether they

1    correctly present the information contained in the testimony

2    and in the exhibits to which they were based.

3              You have heard reference to certain investigative

4    techniques that were used or not used by the government in this

5    case.  There is no legal requirement that the government prove

6    its case through any particular means.  While you are to

7    carefully consider the evidence adduced by the government, you

8    are not to speculate as to why the government used the

9    techniques it did or why it did not use other techniques.

10             You may not draw any inference, favorable or

11   unfavorable, toward the government or the defendant from the

12   fact that any person was not named as a defendant in this case,

13   and you may not speculate as to the reasons why other people

14   are not on trial before you now.  Those matters are wholly

15   outside your concern and have no bearing on your function as

16   jurors in deciding the case before you.

17             You've heard testimony about evidence that was seized

18   and about various searches, including searches of electronic

19   devices.  Evidence obtained from those searches was properly

20   admitted in this case and may be properly considered by you.

21   Indeed, such searches are entirely appropriate law enforcement

22   actions.  Whether you approve or disapprove of how the evidence

23   was obtained should not enter into your deliberations, because

24   I instruct you that the government's use of the evidence is

25   lawful.  You must, therefore, regardless of your personal

1   opinions, give this evidence full consideration along with all

2   the other evidence in the case in determining whether the

3   government has proved the defendant's guilt beyond a reasonable

4   doubt.  Once again, however, it is for you to decide what

5   weight, if any, to give to this evidence.

6       The defendant did not testify.  Under our

7   Constitution, a defendant is presumed innocent and has no

8   obligation to testify or to present any other evidence because,

9   as I have told you, it is the government's burden to prove the

10  defendant guilty beyond a reasonable doubt.  That burden

11  remains on the government throughout the entire trial and never

12  shifts to the defendant.  A defendant is never required to

13  prove that he is innocent.

14      You may not attach any significance to the fact that

15  the defendant did not testify.  No adverse inference against

16  the defendant may be drawn by you because the defendant did not

17  take the witness stand.  You may not consider this in any way

18  in your deliberations in the jury room.

19      That concludes my introductory instructions.  Let me

20  now turn to the charges, but before I do I am just going to

21  take a sip of water.  Hang on.

22      The defendant is formally charged in an indictment.

23  As I instructed you at the outset of this case, the indictment

24  is a charge or accusation.  It is not evidence.

25      The indictment contains two charges, or counts,

M22nave5                    Charge

against Michael Avenatti.  Each count accuses the defendant of committing a different crime.  You must as a matter of law consider each count, and you must return a separate verdict for each count in which the defendant is charged.  Except in one respect that I will explain to you in a few minutes, your verdict on one count should not control your decision as to any other count.

Count One charges the defendant with wire fraud. Specifically, it charges that, from in or about July 2018 through in or about 2019, the defendant devised a scheme to obtain payments owed to Ms. Stephanie Clifford, also known as Stormy Daniels, under Ms. Clifford's book contract by falsely representing to Ms. Clifford's literary agent, in interstate communications and otherwise, that Ms. Clifford had given authority for payments to be sent by wire to an account controlled by the defendant, by converting these payments to his own use, and by falsely representing to Ms. Clifford, in interstate communications and otherwise, that the payments had not been made.

Count Two charges the defendant with aggravated identity theft.  Specifically it charges that from in or about August 2018 through in or about February 2019, the defendant, without lawful authority, used Ms. Clifford's name and signature on a document during and in relation to the wire fraud scheme charged in Count One.

1    I will explain each count in turn.  I remind you that
2    you must consider each count separately and return a separate
3    verdict on each counts.

4    In order to find the defendant guilty of Count One,
5    which charges wire fraud, the government must prove the
6    following three elements beyond a reasonable doubt:

7    First, that there was a scheme or artifice to defraud
8    or to obtain money or property by materially false and
9    fraudulent pretenses, representations or promises, as alleged
10    in Count One of the indictment;

11    Second, that the defendant knowingly, willfully, and
12    with the intent to defraud, devised or participated in the
13    scheme or artifice; and

14    Third, that an interstate or international wire
15    communication was used in furtherance of the scheme or
16    artifice.

17    The first element that the government must prove
18    beyond a reasonable doubt for purpose of Count One is that
19    there was a scheme or artifice to defraud a victim of money or
20    property by means of false or fraudulent pretenses,
21    representations, or promises.

22    A scheme or artifice is merely a plan to accomplish an
23    object.  A scheme or artifice to defraud is any plan, device,
24    or course of action to obtain money or property by means of
25    false or fraudulent pretenses, representations, or promises.

M22nave5                          Charge

1              A pretense, representation, or promise is false if it

2       is untrue when made and was then known to be untrue by the

3       person making it.  A pretense, representation, or promise is

4       fraudulent if it was falsely made with the intent to deceive.

5              Deceitful statements of half truths, the concealment

6       of material facts, and the expression of an opinion not

7       honestly entertained may also constitute false or fraudulent

8       statements under the statute.  The deception need not be

9       premised upon spoken or written words alone.  The arrangement

10      of the words or the circumstances in which they are used may

11      convey the false and deceptive appearance.  If there is

12      deception, the manner in which it is accomplished is

13      immaterial, that is, unimportant.

14             The false or fraudulent pretense, representation, or

15      promise must relate to a material fact or matter.  A material

16      fact is one that reasonably would be expected to be of certain

17      to a reasonable and prudent person in relying upon the

18      pretense, representation, or promise in making a decision.

19      This means that if you find a particular statement of fact to

20      have been false, you must also determine whether that statement

21      was one that a reasonable person would have considered

22      important in making his decision.  The government is not

23      required to prove that the scheme or artifice actually

24      succeeded -- that is, that an intended victim relied upon any

25      false statement or suffered any loss or that a defendant

1    realized any gain.

2            The failure to disclose information may also

3    constitute a fraudulent representation if the defendant was

4    under a legal, professional, or contractual duty to make such a

5    disclosure; the defendant actually knew such disclosure was

6    required to be made; and the defendant failed to make such

7    disclosure with the intent to defraud.  In a few moments, I

8    will explain certain professional duties that the defendant had

9    as a licensed attorney.

10            In addition to proving that a statement was false or

11    fraudulent and related to a material fact, in order to

12    establish a scheme to defraud, the government must prove that

13    the alleged scheme contemplated wrongly depriving another of

14    money or property.  The government is not, however, required to

15    prove that the defendant personally originated the scheme to

16    defraud.  Furthermore, it is not necessary that the government

17    prove that the defendant actually realized any gain from the

18    scheme or that the intended victim actually suffered any loss.

19            It is enough that a false statement, or a statement

20    omitting material facts that made what was said deliberately

21    misleading, was made as part of a fraudulent scheme in the

22    expectation that it would be relied on.  You must concentrate

23    on whether there was such a scheme, not on the consequences of

24    the scheme.  Of course, proof concerning the accomplishment of

25    the goals of the scheme may be the most persuasive evidence of

1    the existence of the scheme itself.

2            A scheme to defraud need not be shown by direct

3    evidence, but may be established by all of the circumstances

4    and facts in the case.

5            If you find that the government has sustained its

6    burden of proof that a scheme to defraud, as charged did exist,

7    you next should consider the second he will event.

8            The second element that the government must establish

9    beyond a reasonable doubt for purposes of Count One is that the

10   defendant devised or participated in the fraudulent scheme

11   knowingly, willfully, and with specific intent to defraud.

12           To devise a scheme to defraud is to concoct or plan

13   it.  To participate in a scheme to defraud means to associate

14   oneself with it with the intent to make it succeed.

15           As I've already instructed you, knowingly means to act

16   voluntarily and deliberately, rather than mistakenly or

17   inadvertently.

18           willfully means to act voluntarily and with a wrongful

19   purpose.

20           Intent to defraud means to act knowingly and with the

21   specific intent to deceive, for the purpose of causing some

22   financial or property loss to another.  Thus, the defendant

23   acted with intent to defraud in the context of wire fraud, if

24   he engaged or participated in the fraudulent scheme with

25   awareness of its fraudulent or deceptive character, with an

1    intention to be involved in the scheme to defraud and to help

2    it succeed, and with a purpose of causing some financial or

3    property loss to another.  That is, the government must prove

4    beyond a reasonable doubt that the defendant contemplated some

5    actual harm or injury to a victim with respect to the victim's

6    money or property.

7              As I instructed before, the government need not prove

8    that any intended victim was actually harmed, only that such

9    harm was intended by the defendant.  Actual financial harm

10   includes depriving someone of the real and immediate control

11   over the use of assets.  Thus, even if the defendant believed

12   the money obtained by fraudulent means would one day be repaid

13   and therefore believed that ultimately no harm would come to

14   the owner of the funds, his intention eventually to repay is no

15   defense.

16             Because an essential element of wire fraud is the

17   intent to defraud, it follows that good faith on the part of a

18   defendant is a complete defense to the charge of wire fraud.

19   That is, if the defendant in good faith believed that he was

20   entitled to take the money or property from the victim, even if

21   that belief was mistaken, then you must find him not guilty

22   even if others were injured by the defendant's conduct.  The

23   defendant has no burden to establish good faith.  The burden is

24   on the government to prove fraudulent intent and the consequent

25   lack of good faith beyond a reasonable doubt.

1          Under the wire fraud statute, false representations or

2     statements, or omission of material facts, do not amount to a

3     fraud unless done with fraudulent intent.  Thus, however

4     misleading or deceptive a plan may be, it is not fraudulent if

5     was devised or carried out in good faith.  Additionally, it is

6     not enough for government to prove that the defendant made

7     false representations or statements or that he omitted material

8     facts.  It must prove beyond a reasonable doubt that he did so

9     with the intent to deprive someone of money or property to

10    which he knew he was not entitled.

11         Direct proof of knowledge and fraudulent intent is

12    almost never available.  It would be a rare case where it could

13    be shown that a person wrote or stated that as of a given time

14    in the past he committed an act with fraudulent intent.  Such

15    direct proof is not required.  Instead, the ultimate facts of

16    knowledge and criminal intent, though subjective, may be

17    established by circumstantial evidence, based upon a person's

18    words, his conduct, his acts, and all the surrounding

19    circumstances disclosed by the evidence and the rational or

20    logical inferences that may be drawn from them.

21         To conclude on this element, if you find that the

22    defendant was not a knowing or willful participant in the

23    scheme or that he lacked the specific intent to defraud, you

24    should find the defendant not guilty.  On the other hand, if

25    you find that the defendant has established beyond a reasonable

M22nave5                        Charge

1    doubt not only the first element, namely, the existence of

2    scheme to defraud, but also the second element, you next should

3    consider the third and final element of wire fraud.

4            Before we turn to the third and final element of wire

5    fraud -- excuse me, my law clerk thinks that I may have

6    misspoken and said the defendant instead of the government.

7    Let me just underscore that if you find that the government has

8    established beyond a reasonable doubt not only the first

9    element, namely, the existence of scheme to defraud, but also

10   the second element, you next should consider the third and

11   final element of wire fraud.  That is, as you know, the burden

12   rests on government and the government alone and the defendant

13   bears no burden at this trial whatsoever.

14           Before we turn to the third and final element of wire

15   fraud, I want to explain certain professional duties of lawyers

16   that you may consider in connection with the first two elements

17   of Count One.

18           As you know, during most of the events relevant to

19   this case, Mr. Avenatti served as Ms. Clifford's lawyer.

20   During that time, the defendant was a member of the California

21   Bar and therefore, under California law owed certain duties to

22   Ms. Clifford as his client.  In considering the first two

23   elements of Count One, you may consider whether the defendant

24   breached any of these professional obligations to Ms. Clifford.

25           You should keep in mind that proof that the defendant

M22nave5                    Charge

violated one or more of his professional duties under

California law does not, without more, mean that he committed

wire fraud.  Nevertheless, such proof may be considered by you

in determining whether the defendant engaged in a scheme to

defraud and whether he did so with knowledge and an intent to

defraud.

Lawyers owe a duty of light to their clients.  This

means that, when acting on behalf of a client, a lawyer must

put his client's interests first.  The misappropriation of

clients funds is a particularly serious violation of a lawyer's

ethical duty of loyalty.

Under California law, it is the client who defines the

objectives of the representation and not the lawyer.  A lawyer

cannot act without the client's authorization, and a lawyer may

not take over decision making for a client, unless the client

has authorized the lawyer to do so.  A lawyer must abide by a

client's decisions concerning the objectives of the

representation and shall reasonably consult with the client as

to the means by which the objectives are to be pursued.

Subject to requirements of client confidentiality, a

lawyer may take such action on behalf of the client as is

impliedly authorized to carry out the representation.  The

client has the ultimate authority to determine the purposes to

be served by the legal representation, however, within the

limits imposed by law and the lawyer's professional

M22nave5                    Charge

1    obligations.

2              A lawyer retained to represent a client is authorized

3    to act independently on behalf of the client in making routine

4    or tactical decisions.  By contrast a lawyer is not authorized

5    merely by virtue of the retention to impair the client's

6    substantial rights (such as the right to settle a case or to

7    stipulate to something that would eliminate a claim or defense)

8    or impair the claim itself.

9              Lawyers are required to keep clients reasonably

10   informed of significant developments in matters with regard to

11   which the attorney has agreed to provide legal services, and to

12   respond promptly to reasonable status inquiries of clients.  A

13   lawyer must also reasonably consult with the client about the

14   means by which the lawyer will try to achieve the client's

15   goals and objectives; keep the client reasonably informed about

16   significant developments relating to the representation,

17   including promptly complying with reasonable requests for

18   information and for copies of significant documents when

19   necessary to keep the client so informed; and explain a matter

20   to a client to the extent reasonably necessary to permit the

21   client to make informed decisions during the representation.

22   "Reasonably" refers to the conduct of a reasonably prudent and

23   competent lawyer.

24              Under California law, a lawyer is generally required

25   to put fee agreements with clients in writing.  In particular,

whenever it is reasonably foreseeable that the total expense to a client, including attorney's fees, will exceed $1,000, the contract for the attorney's services must be in writing and must contain the basis for the fees to be charged by the attorney, such as hourly rates, flat fees, or other arrangements.

Additionally, all bills for services rendered by an attorney must include the amount of fees and the method by which the fees are calculated and must clearly identify costs and expenses incurred on behalf of a client and the amount of the costs and expenses.

Lawyers in California are also required to adhere to rules regarding the safekeeping of their clients' funds. When a lawyer receives any money on behalf of a client, the lawyer must deposit the money into a bank account labeled as a client trust bank account and must promptly notify the client of the receipt of the funds. Furthermore, when a client asks for money that a lawyer holds for the client in a trust account, the lawyer must promptly provide all undisputed funds that the client is entitled to receive.

Similarly, when a client asks for information regarding how much money the lawyer is holding for the client or what the lawyer has done with money held for the client, the lawyer must promptly provide the information.

Lawyers may not deposit or otherwise commingle funds

belonging to the lawyer or their law firm in the client trust

account.  If the lawyer becomes entitled to funds in the client

trust account, the lawyer must withdraw the funds at the

earliest reasonable time.  If a client disputes the lawyer or

law firm's right to receive a portion of the funds in the

client trust account, the disputed portion of the funds may not

be withdrawn until the dispute is resolved.

Let me stress again:  Proof that the defendant

violated one or more of his professional duties under

California law does not, without more, mean that he is guilty

of any crime.  That is, a lawyer can violate his ethical duties

under California law without having the intent required to

commit a crime.  The question you must decide with respect to

the first two elements of the Count One is whether the

defendant knowingly, willfully, and with the intent to defraud,

devised or participated in a scheme or artifice to defraud or

obtain money or property by materially false and fraudulent

pretenses, representations or promises as alleged in Count One

of the indictment -- not whether he violated his ethical

obligations.

In connection with the first two elements of Count

One, let me also give you some brief instructions with respect

to lawyer's claims for attorney's fees and costs.

As I noted a moment ago, California law generally

requires a written fee agreement or contract between a lawyer

1    and his or her client.  Under California law, a contract is an

2    agreement to do (or not to do) a certain thing.  A contract

3    requires, among other things, mutual consent to the essential

4    terms of the agreement.  where an essential term of a contract

5    is reserved for future agreement of the parties -- that is,

6    where an essential term of the contract states that the parties

7    will agree as to the specifics of that term in the future --

8    there is no mutual consent as to that term, and the contract is

9    not enforceable; it is an unenforceable agreement to agree.  The

10   cost of services is generally an essential term in a contract.

11        In certain circumstances, a lawyer may be able to

12   recover the reasonable value of his or her legal services

13   rendered to a client in the absence of an agreement or if a fee

14   agreement is found to be invalid or unenforceable.  The lawyers

15   can do so by bringing a claim in court, or, if the contract

16   provides, in an arbitration proceeding.  An arbitration is a

17   type of dispute resolution that happens outside of court.  In

18   determining what constitutes a reasonable fee, a Court or

19   arbitrator may consider the number of hours reasonably expended

20   on the litigation and the reasonable hourly rate, as well as

21   the nature of the work performed, its difficulty, the amount of

22   work involved, the skill required in its handling, the skill

23   employed, the attention given, the success or failure of the

24   attorney's efforts, and the attorney's skill and learning,

25   including his age and experience in the particular type of work

1    demanded.  If the Court or arbitrator finds that an attorney

2    engaged in a serious violation of his or her ethical duties to

3    the client, however, the Court or arbitrator may reduce or even

4    eliminate the attorney's ability to recover any such fee.  Of

5    course, your task here is not to decide what, if any, fees

6    might have been reasonable for any work the defendant did on

7    behalf of Ms. Clifford.  I merely provide these instructions to

8    help understand how a lawyer's fee might be determined if the

9    lawyer were to bring a claim for fees in court or arbitration.

10          An attorney's ethical obligations to a client, which I

11   discussed with you a few moments ago, are not changed in the

12   attorney could file a claim of this sort or under a contract.

13   The fact that a lawyer could bring such a claim does not permit

14   an attorney to take a client's money without permission before

15   the resolution of any dispute over legal fees.  It also does

16   not allow an attorney to take and spend any client money,

17   including money held in a client trust account, and an attorney

18   may not take client money from a client trust account unless

19   the attorney's entitlement to that money is undisputed.

20          I want to remind you, however, that whether or not you

21   find that the defendant was entitled, under California law, to

22   fees or costs in connection with his representation of

23   Ms. Clifford, it is the government that bears the burden of

24   proving all of the elements of wire fraud, including an intent

25   to defraud, beyond a reasonable doubt.  In other words, merely

M22nave5                    Charge

1    finding that the defendant was not entitled to a fee under

2    California law is not sufficient to meet the government's

3    burden on Count One.

4            With that, let me turn to the third element of Count

5    One.

6            The third and final element that the government must

7    establish beyond a reasonable doubt for purposes of Count One

8    is that interstate wires (for example, telephone calls, e-mail

9    communications, WhatsApp messages, text messages, or bank wire

10   transfers) were used in furtherance of the scheme to defraud.

11   A wire communication need not itself be fraudulent.  Indeed, it

12   may be completely innocent, as long as it was made in

13   furtherance of the fraudulent scheme.  To be in furtherance of

14   the scheme, the wire communication must be incident to an

15   essential part of the scheme to defraud and must have been

16   caused, directly or indirectly, by the defendant.  The wire

17   communication requirement can be satisfied, however, even if

18   the wire communication was done by the person being defrauded

19   or some other innocent party.  When a person does an act with

20   knowledge that the use of the wires will follow in the ordinary

21   course or where such use can reasonably be foreseen by that

22   person, even though he does not actually intend such use, then

23   nonetheless causes the wires to used.  Thus, there is no

24   requirement that the defendant specifically authorize others to

25   make a communication by wire.

1          The government must prove beyond a reasonable doubt
2     that the wire communication occurred within the period of the
3     scheme listed in Count One.  The government must prove beyond a
4     reasonable doubt that the wire communication was interstate or
5     international.  To do so, the government may prove that a wire
6     communication whose origin and destination were within one
7     state was routed through another state, or that the wire
8     communication passed between two or more states or between the
9     United States and a foreign country.  The government is not
10    required to prove that the defendant knew or could foresee the
11    interstate or international nature of the wire communication.
12          Let me turn then, to Count Two, which charges the
13    defendant with aggravated identity theft.  In order to find the
14    defendant guilty of aggravated identity theft, the government
15    must prove the following three elements beyond a reasonable
16    doubt:
17          First, that the defendant knowingly used, transferred,
18    or possessed a means of identification of another person;
19          Second, that the defendant used the means of
20    identification during and in relation to the offense charged in
21    Count One of this indictment; and
22          Third, that the defendant acted without lawful
23    authority.
24          Now let me elaborate on each of these three elements.
25          The first element that the government must prove

M22nave5                    Charge

1    beyond a reasonable doubt is that the defendant used,

2    transferred or possessed a means of identification of another

3    person.

4         The terms "use," "transfer," and "possess," have their

5    common sense meaning.  The government need only one of these.

6         The terms "means of identification" means any name or

7    number that may be used, alone or in conjunction with any other

8    information, to identify a specific individual, including any

9    name, signature, social security number, date of birth,

10   official state or government issued driver's license or

11   identification number, alien registration number, government

12   passport number or employer or taxpayer identification number.

13        In addition, the government must prove both that the

14   means of identification was that of an actual person and that

15   the defendant knew that the means of identification was that of

16   an actual person.

17        To act knowingly, as I said earlier, means to act

18   voluntarily and intentionally and not by mistake or accident.

19        The second element the government must prove beyond a

20   reasonable doubt is that the defendant used, transferred, or

21   processed, the means of identification of another person during

22   and in relation to the offense charged in Count One of the

23   indictment, namely, wire fraud.

24        A person uses, transfers, or possesses a means of

25   identification in relation to a crime if the means of

M22nave5                    Charge

1    identification had a purpose, role, or effect with respect to

2    the crime.  If you find the defendant not guilty on Count One,

3    it means that the government has not proved this second element

4    of Count Two, and you must find also find him not guilty on

5    Count Two.  In other words, if you find that the government did

6    not prove beyond a reasonable doubt that the defendant

7    committed wire fraud as charged in Count One, you must also

8    find him not guilty on Count Two.

9         The third element which the government must prove

10   beyond a reasonable doubt is that the defendant acted without

11   lawful authority.  The term "without lawful authority"

12   prohibits the use of another person's means of identification

13   absent the right or permission to act on that person's behalf

14   in a way that is not contrary to law.

15        To prove this element, the government need not prove

16   that the means of identification were stolen -- although proof

17   that means of identification were stolen would satisfy the

18   "without lawful authority" element.  "Without lawful authority"

19   includes situations in which a defendant comes into lawful

20   possession of identifying information and had the lawful

21   authority to use that information for a lawful purpose, but

22   then used the information for an unlawful purpose.

23        In addition to charging the defendant with wire fraud

24   and aggravated identity theft, Counts One and Two also charge

25   that the defendant willfully caused another person to commit

M22nave5                    Charge

1       each of those crimes.

2               Title 18, United States Code, Section 2, provides

3       that:  "Whoever willfully causes an act to be done which, if

4       directly performed by him, would be an offense against the

5       United States, is punishable as a principal."

6               What does the "term willfully" caused mean?  It does

7       not mean that the defendant himself must have physically

8       committed the crime or supervised or participated in the actual

9       criminal conduct charged in the indictment.

10              The meaning of the term "willfully caused" can be

11      found in the answers to the following questions:

12              Did the defendant have the mental state necessary to

13      commit the offenses in Counts One and Two?

14              Did the defendant intentionally cause another person

15      or persons to engage in the conduct constituting the crime?

16              If you are persuaded beyond a reasonable doubt that

17      the answer to both of these questions is yes, then the

18      defendant is guilty of the crime charged just as if he himself

19      had actually committed it.

20              To prove the defendant guilty in this case, the

21      government need not prove that he acted through a guilty

22      person.  Instead, the defendant can be found guilty even if he

23      acted through someone who has no knowledge of the illicit acts

24      charged in the indictment or otherwise is not guilty of any

25      crime.

1           The defense contends that Mr. Avenatti had a

2     good-faith belief that he was legally entitled to take the

3     money at issue this case (1) as a reasonable fee for his work

4     in obtaining the book deal; (2) as compensation for his and his

5     law firm's work as Ms. Clifford's attorney and (3) as

6     reimbursement for costs he advanced for her or incurred for her

7     benefit.  If you agree that Mr. Avenatti had such a good-faith

8     belief, then you must find the defendant not guilty on both

9     counts.

10          With respect to Count Two, which charges the defendant

11    with aggravated identity theft, the defense also contends that

12    Mr. Avenatti acted with lawful authority when he used

13    Ms. Clifford's name and signature on the document in evidence

14    as Government Exhibit 213.  More specifically, the defense

15    contends, first, that Ms. Clifford told Mr. Avenatti that her

16    original bank account had been closed because she was concerned

17    about her husband withdrawing money from the account and,

18    second, Mr. Avenatti was authorized, as Ms. Clifford's

19    attorney, to sign Ms. Clifford's name on the document to direct

20    future book payments to the trust account and to sent the

21    document to Mr. Janklow.  If you agree, you must find the

22    defendant not guilty on Count Two.

23          In addition to all of the elements that I have

24    described for you, in order to convict the defendant of each

25    count in the indictment, you must also decide whether any act

M22nave5                    Charge

in furtherance of the count occurred within the Southern

District of New York.  I instruct you that the Southern

District of New York includes all of Manhattan (also known as

New York County.)

          The government need not prove that the entirety of the

charged crime was committed in the Southern District of New

York or that the defendant was present here.  It is sufficient

to satisfy the venue requirement if any fact in furtherance of

the crime charged occurred within the Southern District of New

York and it was reasonably foreseeable to the defendant that

the act would take place in the Southern District of New York.

          In the case of Count One, the government satisfies its

burden on this issue if it proves that any of the wire

communications -- such as a telephone call, e-mail or text

message -- you find to satisfy the third element of the offense

was committed from or to the Southern District of New York, so

long as the defendant reasonably anticipated that the

communication would be transmitted from or to the Southern

District of New York.

          If you find that venue has been satisfied for Count

One, then venue for Count Two is automatically satisfied.  To

be clear, for venue with respect to Count Two, it does not

matter whether the means of identification was transferred,

possessed, or used in the Southern District of New York.  If

you find that venue in the Southern District of New York is

proper for Count One, and you find that the aggravated identity theft charged in Count Two was committed in furtherance of the wire fraud scheme charged in Count One, then venue is satisfied for Count Two, even if the means of identification was transferred, possessed, or used outside of the Southern District of New York.

I should note that on this issue -- and this issue alone -- the government need not prove venue beyond a reasonable doubt, but only by a mere preponderance of the evidence. Thus, the government has satisfied its venue obligations as to a count if you conclude that it is more likely than not that any act in furtherance of the crime charged in that count occurred in the Southern District of New York and that it was reasonably foreseeable to the defendant that the act would take place in the Southern District of New York. By contrast, if you find that the government failed to prove venue by a preponderance of the evidence with regard to any count, then you must acquit the defendant of that count.

Proof of motive is not a necessary element of the crimes with which the defendant is charged. Proof of motive does not establish guilt. Nor does the lack of proof of motive establish that a defendant is not guilty.

If the government has proved the defendant's guilt beyond a reasonable doubt, it is immaterial what the motive for the crime or crimes may be, or whether any motive has been

1    shown at all.  The presence or absence of motive is, however, a

2    circumstance that you may consider as bearing on the

3    defendant's intent.

4         It does not matter if the evidence you heard at trial

5    indicates that a particular act occurred on a different date or

6    that the amount of money involved was different.  The law

7    requires only a substantial similarity between the dates

8    alleged in the indictment and the dates established by the

9    evidence are the amounts alleged in the indictment and the

10   amounts alleged by the evidence.

11        In a few minutes, you are going to go into the jury

12   room and begin your deliberations.  During your deliberations,

13   please continue to adhere to the safety protocols that we have

14   used throughout the trial, including social distancing and

15   masking.  We have taken those precautions on the advice of our

16   medical experts, to ensure that everyone remains safe and

17   healthy during trials.  In addition, people have different

18   levels of anxiety and risk tolerance when it comes COVID-19.

19   By adhering to the protocols you not only ensure that everyone

20   remains safe and healthy, but also respect the fact that your

21   fellow jurors may or may not have the same level of comfort

22   with the current situation that you have.

23        After you retire to begin your deliberations, your

24   first task will be to select a foreperson.  The foreperson has

25   no greater voice or authority than any other juror, but is the

1    person who will communicate with me when questions arise and

2    when you have reached a verdict and who will be asked in open

3    court to pass your completed verdict form to me.  Notes should

4    be signed by the foreperson and should include the date and

5    time that they were sent.  They should also be as clear and

6    precise as possible.  Any notes from the jury will become part

7    of the record in this case, so please be as clear and specific

8    as you can be in any notes that you send.  Do not tell me or

9    anyone else how the jury stands on any issue until after a

10   unanimous verdict is reached.

11        All of the exhibits will be given to you near the

12   start of deliberations.  Most of it will be provided to you on

13   a preloaded on a laptop.  When you retire to deliberate, my

14   staff will provide you with information on how to use the

15   laptop to display any evidence you wish on see in the jury

16   room.

17        If you prefer to view any evidence here in the

18   courtroom -- forgive me.  I am advised it is not actually on a

19   laptop.  The bottom line is you will have access to them, and

20   my staff will advise you how to look at.  If you prefer to view

21   any evidence here in the courtroom or if you want any of the

22   testimony read back to you, you may also request that.  Keep in

23   mind that if you ask for testimony, however, the court reporter

24   must search through his or her notes, the parties must agree on

25   what portions of testimony may be called for and, if they

disagree, I must resolve those disagreements.  That can be a
time-consuming process.  So please try to be as specific as you
possibly can in requesting portions of the testimony, if you
do.

Again, your requests for testimony -- in fact, any
communication with the Court -- should be made to me in
writing, signed by your foreperson with the date and time and
given to one of the court security officers.

If any of you took notes during the course of the
trial, you should not show your notes to, or discuss your notes
with, any other jurors during your liberation.  Any notes
you've taken are to be used solely to assist you.  The fact
that a particular juror has taken notes entitles that juror's
views to no greater weight than those of any other juror.
Finally, your notes are not to substitute or your recollection
of the evidence in the case.  If, during your deliberations,
you have any doubt as to the any of the testimony, you may --
as I just told you -- request that the official trial
transcript that has been made of these proceedings be read back
to you.

All of us, no matter how hard we try, tend to look at
others and weigh what they have to say through the lens of our
own experience and background.  We each have a tendency to
stereotype others and make assumptions about them.  Often, we
see life and evaluate evidence through a clouded filter that

M22nave5                        Charge

 1    tends to favor those like ourselves.  You must do the best you

 2    can to put aside such stereotypes, for all litigants and

 3    witness are entitled to a level playing field.

 4          Indeed, your under oath as jurors, you are not to be

 5    swayed by bias or sympathy I.  You are to be guided solely by

 6    the evidence in this case, and as you sift through the

 7    evidence, the crucial question that you must ask yourselves for

 8    each count is, has the government proved each element beyond a

 9    reasonable doubt?

10          It is for you and you alone to decide whether the

11    government has proved that the defendant is guilty of the

12    crimes charged solely on the basis of the evidence and subject

13    to the law as I have instructed you.

14          It must be clear to you that once you let prejudice,

15    bias, or sympathy interfere with your thinking, there is a risk

16    that you will not arrive at a true and just verdict.

17          If you have a reasonable doubt as to the defendant's

18    guilt with respect to a particular count, then you must render

19    a verdict of acquittal on that particular count.  On the other

20    hand, if you should find that the government has met its burden

21    of proving the guilt of a defendant beyond a reasonable doubt

22    with respect to a particular count, then you should not

23    hesitate because of sympathy or any other reason to render a

24    verdict of guilty on that count.

25          I also caution that you, under your oath as jurors,

M22nave5                    Charge

1    you cannot allow to enter you into your deliberations any

2    consideration of the punishment that may be imposed upon the

3    defendant if he is convicted.  The duty of imposing a sentence

4    in the event of conviction rests exclusively with the Court,

5    and the issue of punishment may not affect your deliberations

6    as to whether the government has proved the defendant's guilt

7    beyond a reasonable doubt.

8              The most important part of this case, members of the

9    jury, is the part that you as jurors are now about to play as

10   you deliberate on the issues of fact.  I know you will try the

11   issues that have been presented to you according to the oath

12   that you have taken as jurors.  In that oath, you promised that

13   you would well and truly try the issues joined in this case and

14   a true verdict render.

15             As you deliberate, please listen to the opinions of

16   your fellow jurors and ask for an opportunity to express your

17   own views.  Every juror should be heard.  No one juror should

18   hold the center stage in the jury room, and no one juror should

19   control or monopolize the deliberations.  If, after listening

20   to your fellow jurors and if, after stating your own view, you

21   become convinced that your view is wrong, do not hesitate

22   because of stubbornness or pride to change your view.  On the

23   other hand, do not surrender your honest convictions and

24   beliefs solely because of the opinions of your fellow jurors or

25   because you are outnumbered.

1          Your verdict must be unanimous.  If at any time you

2     are not in agreement, you are instructed that you are not to

3     reveal the standing of the jurors, that is, the split of the

4     vote, to anyone, including me, at any time during your

5     deliberations.

6          We have prepared a verdict form for to you use in

7     recording your decision, a copy of which is attached to these

8     instructions.  Do not write on your individual copies of the

9     verdict form.  My staff will give the official verdict form to

10    Juror No. 1.  When you are excused you should give it to the

11    foreperson after the foreperson has been selected.

12         You should draw no inference from the questions on the

13    verdict form as to what your verdict should be.  The questions

14    are not to be taken as any indication that I have any opinion

15    as to how they should be answered.

16         After you have reached a verdict, the foreperson

17    should fill in the verdict form and note the date and time and

18    you should all sign the verdict form.  The foreperson should

19    then give a note, not the verdict form itself, to the court

20    security officer outside your door stating that you have

21    reached a verdict.  Do not specify what the verdict is in your

22    note.  Instead, the foreperson should retain the verdict form

23    and hand it to me in open court when I ask for it.

24         I will stress again that each of you must be in

25    agreement with the verdict that is announced in court.  Once

M22nave5                    Charge

1    your verdict is announced by your foreperson in open court and

2    officially recorded, it cannot ordinarily be revoked.

3          Finally, I say this, not because I think it is

4    necessary, but because it is the custom in this courthouse to

5    say it:  You should treat each other with courtesy and respect

6    during your deliberations.  All litigants stand equal in this

7    room.  All litigants stand equal before the bar of justice.

8    All litigants stand equal before you.  Your duty is to decide

9    between these parties fairly and impartially and to see that

10   justice is done.

11         Under your oath as jurors, you are not to be swayed by

12   sympathy.  You should be guided solely by the evidence

13   presented during the trial and the law as I gave it to you,

14   without regard for the consequences of your decision.  You have

15   been chosen to try the issues of fact and reach a verdict on

16   the basis of the evidence or the lack of evidence.  If you let

17   sympathy interfere with your clear thinking, there is a risk

18   that you will not arrive at a just verdict.  You must make a

19   fair and impartial decision so that you will arrive at the just

20   verdict.

21         Members of the jury, I ask your patience for a few

22   moments longer.  It is necessary for me to spend a few moments

23   with the parties and the court reporter here at the sidebar.  I

24   will ask you to remain patiently where you are in the jury box

25   without speaking to one another, and we will return in just a

1    verdict to submit the case to you.  Thank you.

2              (At sidebar)

3              THE COURT:  First any objections to the charge as

4    read.  All prior objections are preserved.  No need to renew

5    them.

6              Mr. Avenatti?

7              MR. AVENATTI:  Yes.  I have a few additional

8    objections, your Honor.

9              First of all, the defense requests that the court

10   advise the jurors that they may conclude their deliberations

11   for the day at any time they desire and that they should so

12   advise the Court by note.

13             THE COURT:  We will discuss that in a moment.  I am

14   not going to give them that particular instruction.

15             Next?

16             MR. AVENATTI:  Secondly, I request that the Court

17   charge the jury regarding the harm issue, namely, on page 18 --

18             THE COURT:  Mr. Avenatti I want to be clear.  To the

19   extent that you could have raised an objection to the charge as

20   written, it has either been made or it's been forfeited.  My

21   question is do you have any objections to the charge as it was

22   read in court today.  I don't want to hear an objection that

23   you could have raised before the charge conference.

24             MR. AVENATTI:  In light of that statement, your Honor,

25   I have nothing further.

M22nave5                    Charge

1          THE COURT:  All right.

2          The government?

3          MR. PODOLSKY:  No.

4          THE COURT:  Did you want to raise an issue?  You

5    requested a sidebar earlier.  Is there anything you wished to

6    discuss?

7          MR. AVENATTI:  Yes, your Honor.  I move for a mistrial

8    on the following grounds.  Provided that the Court agrees that

9    it's preserved, I'm happy to take it up outside the presence of

10   the jury after the jury is dismissed.  Unless you would like me

11   to make it now.  I just want to make sure that I am not

12   forfeiting anything by not making it now, but it may take a

13   little bit of time as it relates to the colloquy, and I want to

14   be are respectful of your Honor and the jurors' time.

15         THE COURT:  Thank you.

16         Any objection to doing that?

17         MR. PODOLSKY:  No.

18         THE COURT:  All right.  We will take it up after the

19   jury is excused.

20         MR. AVENATTI:  Your Honor, in addition, as it relates

21   to your Honor's position that the objections are not timely as

22   it relates to two other instructions, I feel like I need to

23   make a record now at this point in time to preserve it.  I

24   think I can do it rather quickly.

25         THE COURT:  Is there a reason you need to do that now,

M22nave5                    Charge

1    or do you want to do that when you make your mistrial

2    application?

3            MR. AVENATTI:  Provided that the government will agree

4    that if I wait for when I make my mistrial application, it's

5    not waived, we can do it then.

6            THE COURT:  Or do you want to succinctly state your

7    objection and we can elaborate later if need be?

8            MR. AVENATTI:  Yes, I would like to succinctly state

9    my objection.

10           THE COURT:  Go ahead, as long as it's succinctly.

11           MR. AVENATTI:  Page 18, after line 7, I believe that

12   the Court must charge the jury regarding the harm, that if the

13   defendant believed that Ms. Daniels would suffer no financial

14   harm because he was entitled to the money, the jury must find

15   him not guilty.

16           And then, secondly, page 20, line 7 and 8, the

17   misappropriation of client funds is a particularly serious

18   violation of a lawyer's ethical duty of loyalty.  I object to

19   this as an expression of an opinion and highly prejudicial.

20           THE COURT:  You have preserved that one.

21           On the first one I think you forfeited it.

22           Anything the government wishes to say?

23           MR. PODOLSKY:  No, the instruction is accurate.  The

24   instruction as proposed by Mr. Avenatti is not.

25           THE COURT:  All right.  Very good.  I am going to tell

the jury that -- first of all, I am going to excuse the

alternates.  It turns out we didn't need six after all, but

better safe than sorry.

          And also pleased to say that we didn't lose anyone to

COVID or otherwise.  So that is good news.

          My plan is to tell them that they may continue to

deliberations until 5 o'clock today.  I am not inclined to

think that they need to come back here to be excused if they

have not completed their deliberations.  So if there's no

objection, I will tell them that at 5 o'clock they can go,

returning tomorrow by 9, and emphasize that of course they

can't begin their deliberations until all 12 of them are

present.

          Any objections from the government?

          MR. PODOLSKY:  No objections.  But just so I

understand, are you going to give them the option to say even

past that if they wish to?

          THE COURT:  They are excused at 5.

          So there is a no ambiguity, you are also excused at 5.

          MR. AVENATTI:  Your Honor, no objection.  But I also

think I it's important to advise the jury that it is up to them

how long they stay.  If they don't want to stay until 5, that's

their option.

          THE COURT:  I am not going to tell them that because I

would like them to stay until they reach a verdict or until 5,

M22nave5                    Charge

1    whichever is first.  Thank you.

2            Hang on one second.  Thank you.

3            (In open court)

4            THE COURT:  All right.  Thank you for your patience,

5    ladies and gentlemen.

6            So, at this moment, it's something that I don't love

7    to do, which is to advise some of you that you are alternates

8    and not part of the main jury that will at least begin

9    deliberation.  That is Juror Nos. 13 through 18.  You are

10   alternates and at this time I am going to -- in a moment I am

11   going ask you to leave and go with Ms. Smallman to retrieve

12   your belongings from the jury room before I excuse the Juror

13   Nos. 1 through 12 to begin their deliberations.

14           Let me say I don't usually select six alternates.

15   That is the maximum am loud by law.  I did that in this

16   particular instance given what is going on around us and my

17   concern that I might lose some members of the jury during this

18   trial and to omicron or otherwise.

19           So in that regard I'm very pleased that all of you

20   remain and that everyone has remained healthy throughout the

21   trial.  Let me say to Juror Nos. 13 through 18 before I let you

22   go a couple of things.

23           First of all, you are not excused from your jury

24   service until you receive word from us that a verdict has been

25   reached.  You remain in active jury services.  For that reason

1    the instructions of that I have given you to date continue to

2    apply.  That means that you should not discuss the case.  You

3    should not discuss the case one another, you should not discuss

4    the case with your family, friends, employers, or the like.

5         You should not do any research about the case.  You

6    shouldn't Google the case.  You shouldn't Google anyone

7    involved in the case.  You shouldn't read any news about the

8    case.  It is your duty to remain vigilant and ensure that you

9    are not exposed to any information about the case.

10        The reason for that is that it is possible that during

11   deliberations something will happen and one or more of you will

12   be called upon to substitute for one of Juror Nos. 1 through

13   12.  So for that reason it is absolutely critical that you

14   continue to adhere to those instruction and rules, and I thank

15   you in advance for your cooperation.

16        We have your contact information.  I promise if or

17   when the jury reforms a verdict and you are excused from jury

18   service that we will contact you and advise you that you too

19   are excused and thus those restrictions are lifted.

20        Last thing.  Let me just say is thank you.  There is a

21   very famous judge in this courthouse or in this court by the

22   name of Edward Weinfeld.  He's sort of a legend of the bench,

23   and many of us seek to emulate him in many respects.  But

24   there's one respect in which I do not, which is he never

25   thanked a jury.  It was his view that it is one of the few ways

1  in which American citizens are called upon to perform service

2  in this country.  While that is certainly true, it is

3  nonetheless my view that you deserve thanks because you do take

4  time out of your busy lives to devote to the justice system to

5  the parties in this case.

6       I am not going to comment on the facts because those

7  are within the exclusive province of the jury, but certainly I

8  appreciate the fact that you have been here on time each and

9  every day.  And to my judgment all of you have appeared to be

10  paying careful attention, and I thank you for that.

11       So, on behalf of the parties, on behalf of the justice

12  system and this Court, I do sincerely thank you for your time

13  and attention and your service.

14       I want to emphasis again that you are not yet done

15  with your service, so again please adhere to the rules and

16  restrictions that I set.

17       With that, juror Nos. 13 through 18, please take

18  whatever you have here and follow Ms. Smallman to the jury

19  room.  She will also take your notebooks and ensure that they

20  are secured in case you need them, but please follow her.  Once

21  you have your stuff and you are gone I will then excuse the

22  jurors to begin their deliberations.  You may proceed.

23       (Alternates excused)

24       THE COURT:  You may be seated.  All right.

25       Juror Nos. 1 through 12, I am not going to excuse you

1    to begin your deliberations for a minute because unfortunately,

2    given that the jury room is located on a different floor, we

3    need to give them a little more time than usual to just

4    retrieve their belongings and make sure that they are well and

5    gone.

6            Let me take the opportunity to talk to you about some

7    logistical type issues.  When you begin your deliberations,

8    I've already given you instructions on those and what you

9    should do.

10           But let me say that you should plan to stay until 5

11   o'clock today, unless of course you reach a verdict before that

12   time.  But if you have not reached a verdict at 5 o'clock, you

13   should cease your deliberations at that time, and you may leave

14   and go about your lives.

15           I am not going to drag you back here to excuse you at

16   5 o'clock.  So if 5 o'clock comes and you have not yet reached

17   a verdict, then you are free to go.  Leave your jury notebooks

18   in the jury room, as you have done throughout the trial.  Then

19   you will resume your deliberations when you are all back

20   together.

21           That brings me to the next important point, which is

22   you may not deliberate until all 12 of you are present or

23   unless all 12 of you present.  So if you do not reach a verdict

24   before the close of today, then please be back in the jury room

25   no later than 9 o'clock tomorrow, even before if you can.  You

M22nave5                    Charge

1    have certainly been great at that all through trial.

2              When all 12 of you are present, you may resume your

3    deliberations, but as long as somebody is missing, please do

4    not discuss the case.  It is very important that your

5    deliberations are collective, that all of you are present for

6    any discussion of the case.

7              So in the morning if someone has not yet arrived or is

8    late, please wait for that person to begin your deliberations.

9    You should deliberate only when all 12 of you are present.

10             Again, tomorrow morning, no need to come to the

11   courtroom.  You should go straight to the jury room, and as

12   long as all 12 of you are present, you may begin your

13   deliberations.

14             Should you -- I think at some point tomorrow if you

15   have not reached a verdict at the end of the day, I will bring

16   you to the courtroom just to check in and excuse you at that

17   time.  But you also know from what I told you earlier that you

18   may communicate with me by note.  A note should be signed by

19   the foreman with the date and time of the note.

20             That concludes what I need to say.

21             I guess while we're awaiting Ms. Smallman, I will ask

22   the court security officer who will secure the jury's

23   deliberations to step forward to take the oath.

24             (Marshal sworn)

25             THE COURT:  All right.  Thank you very much.

M22nave5                    Charge

1          And with that, please bear with me and hopefully we

2     will have you on your way in one moment.  All right.

3          Thank you, Ms. Smallman.

4          Thank you for your patience, ladies and gentlemen.

5          Ms. Smallman, will hand the official verdict form in

6     an envelope, and I think some forms with which you can use to

7     communicate with us.  Those may be in the jury room already.

8     She will give those to Juror No. 1 to give to the foreperson

9     when the foreperson is selected.

10          With that, you are excused at this time to begin your

11     deliberations.  Thank you.

12          (The jury retired to deliberate upon a verdict at 2:48

13     p.m.)

14          THE COURT:  You may be seated.

15          All right.  Mr. Avenatti, you wish to be heard?

16          MR. AVENATTI:  Yes, your Honor.  Thank you.

17          Your Honor, at this point in time, I move for a

18     mistrial on multiple grounds.

19          First of all, the government's commentary on the lack

20     of evidence that I proffered or, you know, the lack of evidence

21     that I pursued legal recourse against the publisher and lack of

22     evidence that I communicated with Ms. Daniels about book

23     payments was improper and drew attention to my Fifth Amendment

24     right to remain silent and was an improper commentary on that

25     right.  I cite the court to Griffin v. California 380 U.S. 609

1    (1965).

2            The government's remarks on rebuttal were riddled with

3    personal opinions about my arguments and whether they were

4    truthful and/or made sense and amounted to prosecutorial

5    misconduct that deprived me of a fair trial.  I direct the

6    Court to U.S. v. *Young*, 470 U.S. 1.  In that case, the Court

7    found that prosecutorial remarks on rebuttal giving personal

8    opinions were improper.  In *Young*, the Supreme Court said the

9    prosecutor's remarks on rebuttal giving those personal opinions

10   is error, but not plain error.  However, in that case there was

11   no objection.  Here, there was and is a timely objection, and

12   I'm arguing that the personal remarks deprived me of a fair

13   trial and improperly injected the prosecutor's credibility into

14   this trial unfairly.

15           In addition, your Honor, during my summation, the

16   Court on two separate occasions, both at the beginning and at

17   the end of my summation, sustained objections and precluded me

18   from using analogies.

19           When the prosecutor rose and gave his rebuttal, on at

20   least two and perhaps three different occasions, the government

21   used analogies that had nothing to do with the facts of this

22   case, and they were designed to ridicule my arguments, at which

23   point I objected and the Court overruled my objections.

24           Those analogies were highly inflammatory.  One

25   discussed stealing money out of a cash register.  The other

1   described cheating on my spouse.

2        The Court overruled those objections.  Those rulings

3   were especially prejudicial because the Court had prevented me

4   from utilizing analogies in my closing summation.

5        So, for each of these reasons, your Honor, I move for

6   a mistrial.

7        THE COURT:  All right.  The motion is denied as

8   frivolous.

9        First, let me take them in order.

10       I will grant you one thing, which is that I think at

11  one point Mr. Podolsky did come a tad too close to the line and

12  suggest that there was a lack of evidence, and that could have

13  been interpreted to mean that you didn't present evidence, and

14  of course you have no burden.

15       There was an objection and I think I sustained it.  I

16  certainly gave a curative instruction at that time and reminded

17  the jury, as I have dozens of times, that the government bears

18  the burden at all times.

19       So, to the extent that there was any improper

20  argument, it was amply cured by that curative instruction.

21       Number two, I don't think that Mr. Podolsky improperly

22  injected himself into the rebuttal or into the arguments.  I

23  will confess there was one point where I thought he used the

24  first person pronoun perhaps inadvisedly, but I'm pretty

25  confident that there was no objection at that point.  And

1    regardless, I told the jury multiple times that what the

2    lawyers say is not evidence, it's merely their argument, and so

3    on and so forth.

4            So, again, to the extent that he crossed any line, it

5    was certainly cured by my repeated curative instructions.

6            With respect to the analogies point, first of all I

7    don't think he suggested that you were cheating on your spouse.

8    He said it in general.  I may or may not think it was a good

9    analogy, but I don't think it was an accusation about you, and

10   in that sense, nothing inflammatory about it.

11           The problem wasn't that he was allowed to make

12   analogies and you weren't.  The problem is you got up, and the

13   first thing you said is something about your father being a hot

14   dog vendor, and the last thing you tried to say is that you are

15   Italian and you like Italian food.  There was no evidence about

16   either of those things.  And I made pretty darn clear yesterday

17   that what I was not going to allow to you do is let you take

18   the podium in your closing and testify without subjecting

19   yourself to cross-examination.

20           So putting aside the fact that no one cares that you

21   like Italian food and no one cares that your father was a hot

22   dog vendor, it is not relevant to the issues in this case.

23   It's testimony.  It was a factual statement about your father

24   and a factual statement about yourself for which there was no

25   support in the record.

1          What Mr. Podolsky did was nothing like that.  He made

2     an argument by analogy.  That is a proper thing for a lawyer to

3     do.  Quite frankly, I felt the first one was quite effective

4     and clever.  It removed this case from the abstractions of the

5     lawyer-client relationship and professional duties owed by a

6     lawyer and conveyed an analogy to the jury, think about this as

7     if it was just an employee, if you were told you had earned a

8     bonus, you can't just take it for yourself.  I think that was

9     well within the bounds of proper argument and certainly not

10    grounds for a mistrial.

11         The bottom line is the application is denied as

12    frivolous.

13         I will ask that at least one representative, which I

14    guess means Mr. Avenatti in the defense case, remain in the

15    courtroom.  It's 3 o'clock.  Since it's only two hours until

16    the jury will be gone for the day at the latest and because in

17    my experience we often do get notes relatively quickly asking

18    for this or that, even if it is just for pens or things of that

19    nature, I would ask that at least one representative from each

20    side remain in the courtroom and so that we can deal with those

21    sort of things promptly.

22         If they are not back by 5 or don't send a note by 5,

23    you are free to go at 5.  If that is the case, then you should

24    be here in the courthouse or within the very close vicinity of

25    the courtroom by 9 o'clock tomorrow.  You should make sure

M22nave5                          Charge

1    that we have a cell phone where we can reach you immediately so

2    that you can be here within literally just minutes, because I

3    don't want to make the jury wait while we consider how to

4    respond to a note.  Any questions or anything else that we need

5    to discuss?

6              MR. PODOLSKY:  No, your Honor.

7              THE COURT:  Mr. Avenatti?

8              MR. AVENATTI:  No, sir.  Thank you.

9              THE COURT:  All right.  I may see you this afternoon.

10   I may see you tomorrow.  In either case, enjoy whatever time

11   you have between now and whenever I see you.

12             Thank you.

13             (Recess pending verdict)

14             (Adjourned to February 3, 2022, at 9:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25