UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                         :

UNITED STATES OF AMERICA              :

                                         :

        -v-                     :           19-CR-374 (JMF)

                                         :

MICHAEL AVENATTI,                  :       <u>OPINION AND ORDER</u>

                                       :

                     Defendant.         :

                                       :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      On February 4, 2022, after an eight-day trial, a jury found Defendant Michael Avenatti

guilty of wire fraud and aggravated identify theft in connection with a scheme to defraud his

former client, Stephanie Clifford (also known as Stormy Daniels), of money that she was

supposed to receive in connection with a book contract. In advance of and during the trial,

Avenatti made at least three motions to compel the Government to acquire or disclose

information on servers containing data and files from his former law firm (the "Servers"), servers

that had been seized by prosecutors in the United States Attorney's Office for the Central District

of California in connection with a different case. During trial, the Court denied Avenatti's

motions to compel, providing a brief summary of its reasoning and promising that a more

detailed opinion would follow. *See* Tr. 71, 1035-36.[1] This is that opinion.

      As the Court will explain, Avenatti's motions were and are without merit for several

reasons. First, at least one, if not all, of the motions were patently untimely, as Avenatti knew or

---

[1]        "Tr." refers to the trial transcript; "GX ___" refers to a Government exhibit admitted at
trial (except for GXs in the 35 series, which are Jencks Act materials merely marked for
identification); and ECF docket number references are to documents filed in this case, unless
otherwise noted.

should have known the facts underlying his motions for months, if not years, and yet he waited until the eve of trial (or during trial) to raise them.  Second, there was and is no basis to compel the Government to disclose the Servers because Avenatti himself has had them since September 2021 — more than four months before trial — when he obtained a complete forensic copy of the Servers from the prosecutors in California.  Third, the Government's disclosure obligations extend only to evidence or information in the possession of the "prosecution team" — those involved in the prosecution at issue — and the Servers are not, and have never been, in the possession of the prosecution team for purposes of *this* case.  And finally, Avenatti has not shown, and almost certainly cannot show, that anything on the Servers was favorable to his defense and would have altered the outcome of the trial.  That is because the evidence that he engaged in a scheme to defraud was overwhelming and largely undisputed; his sole "defense" was no valid defense at all.  In short, Avenatti's motions to compel were and are without merit.

## BACKGROUND

These motions arise from the fact that Avenatti has, for almost three years, been facing three (or arguably four) sets of charges in two different districts: an indictment for extortion and other crimes in 19-CR-373 (PGG) (S.D.N.Y.) (the "Nike Extortion Case"); an indictment for tax offenses and other crimes (since severed into two sets of charges to be tried separately) in 8:19-CR-061 (JVS) (C.D. Cal.) (the "California Case"); and the indictment in this case for wire fraud and aggravated identity theft.  More specifically, the motions arise primarily from the seizure by prosecutors and agents in the California Case of servers containing data from Eagan Avenatti, LLP, Avenatti's former law firm.

**A.  The Relationship Between the USAO-CDC and USAO-SDNY**

Avenatti's motions are premised in part on the relationship between the two U.S. Attorney's Offices involved in his three cases, so a detailed summary of that relationship is warranted.  On March 25, 2019, Avenatti was arrested pursuant to a criminal complaint filed in the Central District of California and a criminal complaint filed in this District in connection with the Nike Extortion Case.  *See* ECF No. 190 ("Def.'s Mot. for Adjournment"), at 2.  The United States Attorney's Office in this District ("USAO-SDNY") learned of the nature and scope of the investigation being conducted by the United States Attorney's Office for the Central District of California ("USAO-CDC") "only a few days before" Avenatti was arrested "in the context of deconfliction discussions concerning the place and timing of [his] arrest."  ECF No. 287 ("Gov't Opp'n"), at 1.  Beyond deconfliction efforts, the interactions between the two offices were limited to "discrete requests for certain materials" and a small number of joint witness interviews discussed in more detail below.  *Id.* at 1-2, 7.

Aside from these interactions, the USAO-SDNY and USAO-CDC investigated and prosecuted their respective cases largely independently.  The two offices conducted their investigations with different agency partners — the USAO-SDNY partnering with the Federal Bureau of Investigation's New York Field Office ("FBI-NY") in this case and the Nike Extortion Case, and the USAO-CDC partnering with the Internal Revenue Service-Criminal Investigations ("IRS-CI") in the California Case.  *Id.* at 1, 6; No. 19-CR-373, ECF No. 360, at 3.  Additionally, the USAO-CDC was not involved in the USAO-SDNY's grand jury presentation for this case (or the Nike Extortion Case).  Gov't Opp'n 7.  Nor did it accompany the USAO-SDNY to any court

proceedings in this case (or the Nike Extortion Case).  *Id.*[2]  Likewise, the USAO-CDC played no

role in the development of the USAO-SDNY's prosecutorial strategy or trial plans.  *Id.*  For

instance, when the USAO-CDC moved to remand Avenatti just days before the trial in the Nike

Extortion Case, it gave no prior notice to the USAO-SDNY team.  *Id.*

With respect to witness interviews, the USAO-SDNY conducted more than 120

interviews with approximately 45 witnesses over the course of its investigation both for this case

and the Nike Extortion Case without "any involvement whatsoever" on the part of the USAO-

CDC.  *Id.*  The USAO-SDNY and USAO-CDC met jointly, "for mutual convenience," with only

two witnesses of mutual interest on five total occasions — four times with Avenatti's former

assistant, Judy Regnier,[3] and one time with Sean Macias.[4]  *Id.* at 2, 6-7.  But the two USAOs met

with Regnier and Macias more times alone than they did together.  The USAO-SDNY met with

Regnier approximately nine times without a representative of the USAO-CDC present,[5] and the

USAO-CDC met with Regnier approximately twelve times without a representative of the

---

[2]     Members of the USAO-CDC team did observe parts of the Nike Extortion Case trial from
the public gallery.  *See* No. 19-CR-373, ECF No. 360, at 8; No. 19-CR-373, ECF No. 363, at 7.

[3]     *See* GX 3514-003 & GX 3514-004 (Nov. 20, 2019); GX 3514-005 (Jan. 9, 2020); GX
3514-024 (Feb. 4, 2020); GX 3514-025 (Feb. 5, 2020).  GX 3514-003 (an interview
memorandum) states that it memorializes an interview conducted on November 26, 2019, but
this appears to be a scrivener's error, as the interview memorandum contains nearly identical
information to handwritten notes from the November 20, 2019 interview in GX 3514-004.

[4]     *See* GX 3565-005 (Nov. 20, 2019).  This interview memorandum also appears to contain
a scrivener's error: The body of the memorandum indicates the interview took place on
November 26, 2019, but the header of the memorandum states that the interview took place on
November 20, 2019.  The USAO-SDNY also indicated that this took place on November 20,
2019.  *See* Gov't Opp'n 2 n.2.

[5]     *See* GX 3514-010 (Jan. 16, 2020); GX 3514-011 (Jan. 17, 2020); GX 3514-034 (Dec. 10,
2021); GX 3514-038 (Jan. 4, 2022); GX 3514-041 (Jan. 12, 2022); GX 3514-042 (Jan. 13,
2022); GX 3514-043 (Jan. 16, 2022); GX 3514-044 (Jan. 17, 2022); GX 3514-065 (Jan. 19,
2022).

USAO-SDNY present.[6]  *Id.*  Likewise, the USAO-SDNY met with Macias approximately three

times without a representative of the USAO-CDC present,[7] and the USAO-CDC met with

Macias approximately once without a representative of the USAO-SDNY present.[8]  *Id.*  The

USAO-SDNY produced to Avenatti documentation of the USAO-CDC's meetings with Regnier

and Macias that were not attended by the USAO-SDNY, in addition to documentation of the

USAO-SDNY's meetings with both witnesses.  *Id.*[9]

**B.  Seizure of, and Avenatti's Initial Requests for, the Servers**

As noted, Avenatti was arrested on March 25, 2019, pursuant to warrants issued in

connection with both the Nike Extortion Case and the California Case.  *See* Def.'s Mot. for

Adjournment 2.  A few weeks later, pursuant to a search warrant obtained in the Central District

of California, agents involved in the California Case obtained the Servers — containing

---

[6]      *See* GX 3514-001 (Mar. 25, 2019); GX 3514-014 (Mar. 26, 2019); GX 3514-017 (June 14, 2019); GX 3514-019 (July 25, 2019); GX 3514-020 (Oct. 24, 2019); GX 3514-012 (Nov. 19, 2019); GX 3514-021 (Dec. 5, 2019); GX 3514-056 (June 14, 2021); GX 3514-057 (July 6, 2021); GX 3514-058 (July 8, 2021); GX 3514-059 (July 19, 2021); GX 3514-060 (July 22, 2021).

[7]      *See* GX 3565-004 (June 5, 2019); GX 3565-009 (Dec. 17, 2021); GX 3565-010 (Jan. 12, 2022).

[8]      *See* GX 3565-008 (July 24, 2019).

[9]      Avenatti also contends that Joseph Varani — a Senior Digital Investigative Analyst with "Main Justice," who assisted USAO-CDC in the California Case — "engage[d] in joint fact-gathering with the prosecutors in this case" related to forensic processing of Avenatti's laptop. ECF No. 279 ("Def. First Mot."), at 5-6.  But the Government's opposition makes plain that there was no collaboration between the USAO-SDNY and Varani (or any member of the USAO-CDC prosecution team) regarding forensic processing of Avenatti's laptop.  *See* Gov't Opp'n 2-3.  The USAO-SDNY and USAO-CDC teams obtained separate court-authorized warrants to search Avenatti's laptop, and the laptop was processed by a separate analyst in a separate agency — Jessica Volchko, an FBI-NY IT Specialist/Forensic Examiner — for the USAO-SDNY prosecution team.  *Id.* at 3.  The USAO-SDNY team never communicated with, nor utilized the services of, Varani in relation to its investigations and prosecutions of Avenatti.  *Id.*  As such, any argument based on the alleged collaboration between the USAO-SDNY and the Main Justice forensic analyst identified by Avenatti is meritless.

approximately twenty terabytes of client and other firm data — from a receiver (the "Receiver")
who had been appointed to manage Eagan Avenatti and made a complete forensic copy of the
Servers. *See id.*; ECF No. 196 ("Gov't Adjournment Ltr."), at 1-2.  In May 2019, the agents in
the California Case obtained another search warrant authorizing a search of the Servers. *See*
Def.'s Mot. for Adjournment 4.

Beginning as early as April 2019, Avenatti repeatedly sought access to data on the
Servers in the California Case. *See id.* at 2-4.  By contrast, until shortly before trial in this case,
Avenatti appears to have raised the issue only once in this District — and not at all in this case.
*See* Gov't Adjournment Ltr. 2.  Specifically, in a June 18, 2019 status conference before Judge
Gardephe — the District Judge in the Nike Extortion Case — Avenatti's counsel noted that he
had "made a request of the government in" the Nike Extortion Case "for a copy and image of the
server" and that "their response is they don't have it in their possession.  I believe it … is in the
possession of the U.S. Attorney in the Central District of California."  19-CR-373, ECF No. 25,
at 7.  The Assistant United States Attorney (who represents the Government in this case as well)
responded: "We don't have possession of the server.  We haven't reviewed the contents."  *Id.* at
9.  At that time, Avenatti did not seek relief from Judge Gardephe, and he did not raise the issue
at all in this case.

Fast forward to 2020 and 2021.  In February 2020, a jury convicted Avenatti of all
charges in the Nike Extortion Case; later, Judge Gardephe sentenced him principally to thirty
months' imprisonment.  *See United States v. Avenatti*, No. 19-CR-374-1 (JMF), 2021 WL
4120539, at *2 (S.D.N.Y. Sept. 9, 2021).  The California case, meanwhile, was severed into two
sets of charges, and trial on the first set began in July 2021.  *See id.*  A few weeks into trial,
Judge Selna — the District Judge in the California Case — granted a mistrial after finding that

the Government had failed to produce certain *Brady* information contained on the Servers. *See*
Def.'s Mot. for Adjournment 5-6. Even then, Avenatti made no mention of the Servers in this
case.

On September 16, 2021, more than four months before trial in this case was scheduled to
begin, Avenatti was provided (apparently by the USAO-CDC) a complete forensic copy of the
Servers. *See id.* at 7. By contrast, when trial started in this case, the USAO-SDNY did not have
a copy of the Servers, although it had issued three subpoenas to the person appointed by the
Bankruptcy Court for the Central District of California to serve as the trustee for Eagan Avenatti
(the "Bankruptcy Trustee") seeking to obtain any data on the Servers relating to Ms. Clifford,
and, on January 10, 2022, a similar subpoena to Avenatti himself. *See* Gov't Adjournment Ltr. 3
& n.5; ECF No. 313, at 1; Tr. 1034-35. For reasons that are unclear, Avenatti served a subpoena
of his own on the Bankruptcy Trustee on January 10, 2022. *See* ECF No. 344, at 4.

**C. Avenatti's First Mentions of the Servers in This Case**

Avenatti did not mention the Servers in the context of *this* case until December 23, 2021
— less than one month before trial — but he has since made up for lost time, raising them on no
fewer than six occasions in writing (and at least twice orally). The first mention came in
Avenatti's opposition to the Government's motion *in limine* seeking an order admitting evidence
of Avenatti's and his law firm's financial condition. *See* ECF No. 187 ("Def. Opp'n to Motion
*in Limine*") at 18-20. That was swiftly followed by a letter motion seeking an adjournment of
trial based in part on the need to review the data on the Servers, in which Avenatti noted that he
had "retained a highly qualified computer expert to assist with" his review of the Servers and that
"a preliminary review" revealed that they contained "information highly relevant to" this case,
including communications with and about Ms. Clifford and financial information relating to

Avenatti's representation of Ms. Clifford. *See* Def.'s Mot. for Adjournment 1-7. Just under two weeks later, on January 6, 2022, Avenatti raised the issue again, opposing the Government's motion for reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure on the ground that the Government had failed to comply with its Rule 16(a) obligations by not producing the Servers (and other information in the possession of the USAO-CDC less relevant here). *See* ECF No. 211. In its responses to these submissions, the Government stressed that Avenatti had had the Servers since September 16, 2021; that the Servers had "never been in the possession of or reviewed by the Government" in this case; and that Avenatti had never sought the Servers from the Government in this case. Gov't Adjournment Ltr. 1-4.

In each of these first instances, the Court sided with the Government. *See* ECF Nos. 203, 213, 239; *see also* ECF No. 288 ("Jan. 11, 2022 Tr."), at 47-48. The Court indicated that it was "inclined to agree" that the Government had no obligation to disclose materials in the exclusive possession of the USAO-CDC, but rested on the fact that the Servers had been in Avenatti's possession since September 16, 2021. *Id.* As the Court put it in granting the Government's letter motion for reciprocal discovery, Avenatti's "arguments about the Government's compliance with Rule 16(a) are a red herring. Putting aside the question of whether the servers at issue were subject to disclosure under Rule 16(a), the fact of the matter is that Defendant has had the servers since September 2021." ECF No. 213 (citation omitted). The Court acknowledged that "the volume of materials on the servers may be large," but noted that "four months is ample time to prepare for trial and comply with Rule 16(b) given, among other things, Defendant's own knowledge of what is on the servers and the tools available to search and review electronic data." *Id.*

**D.  The First and Second Motions to Compel**

Alas, that did not put the issue to rest.  First, on January 18, 2022 — the morning of the final pretrial conference and five days after jury selection had commenced — Avenatti filed another letter with respect to the Servers.  *See* ECF No. 272 ("Def. Pretrial Ltr.").  In this letter, Avenatti raised for the first time that he had "been unable to access critical information on the servers relating to [the] representation of Ms. Clifford, including financial information and cost data."  *Id.* at 2.  Avenatti noted that this unspecified technical problem had "trigger[ed] a pending motion before Judge James V. Selna in California."  *Id.*  The letter did not explain the nature of the motion filed with Judge Selna.  Nor did it seek any related relief from this Court.

Two days later, on the first day of oral *voir dire*, Avenatti filed his First Motion to Compel — one of the three motions at issue here — seeking "all *Brady*, *Giglio*, and 3500 materials in the possession of" Main Justice and the USAO-CDC, including any data stored on the Servers.  ECF No. 279 ("Def. First Mot."), at 1.  The next day, immediately following selection of the jury, Avenatti's counsel renewed the issue orally, prompted by the fact that Judge Selna had denied his motion in the California Case without prejudice to seeking relief in this case.  Tr. 41.  Counsel indicated that, on Monday, January 24, 2022, some third party was supposed to assist Avenatti and a privilege review team from the USAO-CDC in retrieving certain files from the Servers, but that — consistent with orders entered by Judge Selna — the relevant files were limited to the clients at issue in the California Case.  *Id.* at 37.  For the first time, Avenatti asked this Court for relief, namely an order directing the USAO-CDC privilege review team to also retrieve files relevant to Ms. Clifford.  *Id.* at 38.  In response to the Court's inquiries about the nature of the technical issue and the relevant chronology, defense counsel indicated that he would elaborate and seek appropriate relief in writing.  *Id.* at 41-42.

The next day — namely, Saturday, two days before the parties' opening statements were to take place — Avenatti filed his Second Motion to Compel.  *See* ECF No. 290 ("Def. Second Mot.").  In it, Avenatti recounts the following chronology:

- September 16, 2021: Avenatti receives a forensic copy of the Servers;

- September 16, 2021, through the date of filing: Avenatti, aided by his retained computer expert, has "worked diligently" to "extract the data from the servers in a form where at least some of it is searchable" and to "access the data relevant to Mr. Avenatti's representation of Ms. [Clifford]";

- October 13, 2021: the USAO-CDC filed "an emergent application" for an order "Requiring Software Technology, LLC," the maker of software called "Tabs" that Eagan Avenatti used to maintain financial information, "to facilitate the Government's Restoration of Tabs Software Files" on the Servers.  The USAO-CDC filed the motion "after Government agents . . . , like Mr. Avenatti and his expert[,] were unable to access the Tabs data on their own";

- October 15, 2021: a status conference was held before Judge Selna after Software Technology indicated that, due to confidentiality concerns, it would not comply with the Government's request absent a stipulation;

- October 27, 2021: the USAO-CDC filed "an emergent application" after the parties failed to reach agreement on the language of a stipulation;

- November 1, 2021: Judge Selna granted the USAO-CDC's application, ruling that Software Technology "was permitted to provide technical assistance to both parties";

- November 24, 2021: after several weeks of negotiations involving Avenatti, the privilege review team, and Software Technology, the parties memorialized the terms of a stipulation regarding a protocol that would allow for the production of data to both Avenatti and the privilege review team "relating to the five clients" at issue in the California Case;

- December 6, 2021: the privilege review team proposed at least one date for the search on which Software Technology was available (December 8, 2021), but Avenatti's expert was not available on that date;

- January 11, 2022: a conference call with Avenatti, the privilege review team, and Software Technology occurred during which the parties discussed "the logistics of segregating the data and scheduled the in-person segregation to take place on January 18, 2022, which was ultimately rescheduled" — for unspecified reasons — "to January 24, 2022";

- January 12, 2022: the Government in this case produced notes that it had taken from an

interview earlier the same day with Regnier, Avenatti's former business manager who had been responsible for inputting entries in QuickBooks and Tabs, in which Regnier stated "that information relating to . . . Mr. Avenatti's firm's representation of Ms. Clifford was kept in QuickBooks and Tabs";

- On an unspecified date, but clearly between January 12 and 14, 2022: Avenatti "raised with the [privilege review team] the need to also acquire the Tabs data related to Ms. Clifford"; the privilege review team responded that, "in order to facilitate the segregation of the Tabs data related to Ms. Clifford, it would need to be directed to do so by the court and took no other position on the matter";

- January 14, 2022: Avenatti filed his "emergent application" with Judge Selna seeking an order "permitting the Privilege Review Team to assist in segregating the data relating to Ms. Clifford";

- January 20, 2022: Judge Selna denied the request "without prejudice to any relief which defendant may be entitled to in the Southern District of New York."

Def. Second Mot. 2-5; No. 8:19-CR-061 (JVS), ECF Nos. 903, 909.  At the conclusion of the Second Motion to Compel, Avenatti tacitly acknowledged that he could have sought access to the data relating to Ms. Clifford earlier, but argued that the delay was immaterial because, "[t]hrough no fault of his own, the data has been inaccessible for months and the company responsible for the Tabs program has required multiple court orders to even assist the parties in obtaining the data.  Thus, even if Mr. Avenatti had specifically requested the Tabs data for Ms. Clifford on September 16, 2021, the day the servers were first produced, he would still be in the exact same position he is in now."  Def. Second Mot. 5.  Reiterating his position that the USAO-CDC is "part of the . . . prosecution team" for purposes of this case, and noting that "the data segregation will occur on the copy of the servers in the possession" of the USAO-CDC, Avenatti argued that the Court "should compel the Government's production of the Tabs data for Ms. Clifford."  *Id.*

## E.  The Third Motion to Compel and Other Developments During Trial

On Monday, January 24, 2022, shortly before opening statements, the Court denied Avenatti's First and Second Motions to Compel "[f]or reasons to be summarized in Court . . .

11

and to be spelled out in a forthcoming opinion." ECF No. 300. Shortly thereafter, the Court

explained from the bench that one or both motions were untimely; that both motions failed

because Avenatti already had the data he was seeking; and that both motions also failed because

the USAO-CDC was not part of the prosecution team for purposes of this case. Tr. 71-72. The

Court reiterated that it would, in due course, "issu[e] an opinion addressing these points in

further detail and making a more fulsome record on these issues." *Id.* at 72.

Several other developments during trial warrant brief discussion. First, as noted, both

Avenatti and the USAO-SDNY had served subpoenas on the Bankruptcy Trustee for Eagan

Avenatti. On January 26, 2022 — in the middle of trial here — the Bankruptcy Court for the

Central District of California held a hearing to decide whether the Bankruptcy Trustee could

comply with the subpoenas. *See* ECF No. 315 ("Def. Third Mot."), at 1; No. 8:19-BK-13560

(SC), ECF No. 360. As recounted by the Government during trial, the Bankruptcy Court denied

the Bankruptcy Trustee permission to comply with the Government's and Avenatti's subpoenas.

*See* Tr. 1034; *see also* 8:19-BK-13560 (SC), ECF No. 360. On the morning of January 28, 2022,

Avenatti filed his Third Motion to Compel, alerting the Court to the Government's efforts to

obtain data from the Servers in the possession of the Bankruptcy Trustee via multiple subpoenas.

*See* Def. Third Mot. The Government's "deliberate failure to acquire information favorable to

the defendant," Avenatti contended, raised "a host of issues . . . relating to *Brady*." *Id.* at 2. On

the record at trial the same day, the Government confirmed that the Bankruptcy Court had denied

the Bankruptcy Trustee's application for permission to comply with the Government's

subpoenas and that it still did not have possession of the Servers. Tr. 1034-35. The Court then

denied Avenatti's Third Motion to Compel, noting, among other things, that the Government had

no obligation to produce that which it did not possess and, once again, that Avenatti in fact had

had possession of the data since September 2021. *Id.* at 1035-36.

Second, on January 28, 2022, the last full day of the Government's case-in-chief, the

Court granted the Government's motion to compel Avenatti to comply with the trial subpoena

that it had issued on January 10, 2022, which sought certain materials — including Tabs data —

from the forensic copy of the Servers in Avenatti's possession. *See* ECF No. 313; Tr. 646, 1031-

33. The Court directed Avenatti to produce materials responsive to the subpoena no later than

3:00 p.m. on Saturday, January 29, 2022. Tr. 1033. Five days later, on February 2, 2022,

Avenatti represented to the Court that he had complied with the Court's ruling by producing the

"the Tabs data . . . before the [G]overnment's case rested." Tr. 1690.

As noted, on February 4, 2022, the jury found Avenatti guilty of both counts, wire fraud

and aggravated identity theft. *See* Tr. 1842-43.

## DISCUSSION

Three motions are at issue here: Avenatti's First Motion to Compel, which sought an

order requiring the Government to produce "all *Brady*, *Giglio*, and 3500 materials in the

possession of individuals at Main Justice and the [USAO-CDC]," Def. First Mot. 1; his Second

Motion to Compel, which sought an order requiring "the Department of Justice" to disclose

certain "data in their possession relating to Ms. Stephanie Clifford in a usable, readily accessible

format," Def. Second Mot. 1; and his Third Motion to Compel, which sought an unspecified

"inquir[y]" into the Government's unsuccessful efforts to obtain a copy of the Servers from the

Bankruptcy Trustee, Def. Third Motion 2. All three motions fail for multiple reasons, some of

which are unique to a particular motion, some of which are shared by two or even all three. The

Court will address these reasons in turn.

**A. Avenatti's Second Motion to Compel Was Untimely**

For starters, at least one of Avenatti's Motions to Compel — his Second — was patently untimely when filed. As noted, Avenatti had a copy of the Servers as of September 2021. Thus, he should have known (and probably did know) if there was a technical problem that prevented access to the data he needed for this case long before January 14, 2022, the date on which he sought relief from Judge Selna — let alone January 21, 2022, the first date on which he sought relief from *this* Court.[10] Yet, inexplicably, he waited until after the jury had been selected in this case to raise the issue. Even then, his (later dismissed) counsel was unable to explain the history or precise nature of the issue. It was not until the following day — Saturday, only two days before the parties were to open in this case and, with Software Technology's assistance, the data extraction was to take place in California — that counsel provided the relevant procedural and technological background. That was too late for the Court to address the issue, particularly since, as Avenatti's own submission and the litigation history leading to Judge Selna's order made plain, *see* Def. Second Mot. 2-5, the Court would have had to give Software Technology an opportunity to be heard before issuing any order granting Avenatti's request.

Avenatti's attempts to justify his delay in raising the issue fall flat. First, he suggests that it was not until January 12, 2022 — when the Government produced notes of an interview with Regnier mentioning Tabs — that he realized his need for the data. *See id.* at 1. But that suggestion is disingenuous, if not false. Avenatti has known for years that the Government was likely to offer evidence of his and his firm's financial condition, as it did in the Nike Extortion

---

[10]     Whether there even was a technical problem is open to question. As noted above, Avenatti produced the Tabs data to the Government on January 29, 2022. *See* Tr. 1690. Given that he did so despite the Court's denial of his Second Motion to Compel suggests that Avenatti could have accessed the relevant data all along. In any event, the Court did not need to delve into that issue as there are several other reasons that Avenatti's motions fail.

Trial in February 2020.  *See* ECF No. 176 ("Gov't Motion *in Limine*"), at 7 nn.1-2.  If there was

any doubt on that score, it was resolved by the Government's motion *in limine* — filed on

December 9, 2021 — seeking leave to present evidence of Avenatti's and his firm's financial

condition.  *See id.* at 7-9.  Nor is there any doubt that Avenatti knew that information relating to

his and his firm's financial condition, and information relating to his representation of Ms.

Clifford, would be found in the Tabs data.  He was the principal of the "relatively small firm,"

Tr. 1415, and, as testimony at trial revealed, a "micromanager" with respect to its finances, Tr.

385.  Moreover, his response to the Government's motion *in limine* and his first request for an

adjournment of trial confirm that he knew full well what was on the Servers.  *See* Def. Opp'n to

Motion *in Limine* 18-20 (noting that the Servers contained "the financial data for the firm and

each of its clients, including Ms. Clifford"); Def.'s Mot. for Adjournment 7 ("[A] preliminary

review [of the Servers] shows that information highly relevant [to this case] . . . are [sic] included

on the servers, including . . . financial data relating to Mr. Avenatti's representation of Ms.

Clifford, including costs and expenses incurred . . . .").  In short, Avenatti could have, and should

have, moved for relief long before January 12, 2022.

Avenatti's effort to minimize the impact of his delay is similarly unavailing.  Citing the

lengthy procedural history leading to Judge Selna's order resulting in Software Technology's

assistance, Avenatti asserts that "even if [he] had specifically requested the Tabs data for Ms.

Clifford on September 16, 2021, the day the servers were first produced, he would still be in the

exact same position . . . : waiting for Software Technology, LLC to conduct the Tabs data

segregation with agreement of the Government."  Def. Second Mot. 5.  But that is entirely

speculative and likely wrong.  Without an imminent trial date in the California Case, there was

little time sensitivity involved in the effort to access the data relevant to the California Case.  By

contrast, Avenatti has known for over a year that the trial in this case was to start in January 2022. ECF No. 103; *see also* ECF No. 104 (confirming that "Avenatti is aware of the [January 2022] trial date" and "understands that this is a firm date"). Given the looming trial date, if Avenatti had a genuine need for relief (a premise that is dubious to say the least, both because it appears he had long had access to the relevant information and because, as discussed below, it would not have aided his defense), it was incumbent upon him to seek it earlier than the weekend before trial.

In short, Avenatti's Second Motion to Compel was patently untimely and fails for that reason alone. His other two Motions to Compel were arguably untimely as well because he knew or should have known of the facts underlying those motions months, if not years earlier, and yet he waited until the eve of trial to raise them. But the Court need not, and does not, rest its decisions with respect to those two motions on that ground because the motions fail for several other, more fundamental reasons that also doom his Second Motion to Compel. It is to those other reasons that the Court now turns.

**B. Avenatti Himself Had the Tabs Data for Months Before Trial**

First, Avenatti's motions with respect to any data contained on the Servers fail because the record is clear: He himself had the Servers for months before trial. It is well established that the Government need not disclose materials or information that a defendant has in his own possession long before trial. *See, e.g.*, *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016) ("'[A]s long as a defendant possesses *Brady* evidence in time for its effective use,' there can be no *Brady* violation." (quoting *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001)); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take

advantage of any exculpatory evidence." (citations and quotation marks omitted)); *United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 WL 10673620, at \*3 (E.D.N.Y. July 10, 2009) ("[T]he Court finds that the Government did not violate its obligations under *Brady* because [the defendant] was already in possession of the [exculpatory evidence].").  As noted, Avenatti received a complete forensic copy of the Servers, including all the Tabs data, on September 16, 2021.  *See* Def. Second Mot. 2; Gov't Adjournment Ltr. 3.  Given Avenatti's own familiarity with what was on the Servers, his retention of a technology expert to assist him in conducting a review even before he obtained the Servers, *see* Def. Second Mot. 3, and the tools available to search electronically stored information, that was ample time to make effective use of the Servers at trial.  Any suggestions to the contrary are belied by Avenatti's ability to produce the Tabs Data within a single day of being ordered by the Court to comply with the Government's subpoena, as Avenatti conceded he did.  *See* Tr. 1690 ("MR. AVENATTI: . . . [I]n response to the subpoena, I made a production . . . of the Tabs data, as directed to do so by the Court. . . . THE COURT: All right.  Understood.  Thank you for making the record on that.  It certainly underscores and confirms that you have had the Tabs data and had it prior to this trial.").  In short, there was no need or basis to compel the Government to disclose to Avenatti what he already had.

The fact that Avenatti received the Servers from the USAO-CDC, not the USAO-SDNY, is of no moment.  *See, e.g.*, *United States v. Tuzman*, No. 15-CR-536 (PGG), 2021 WL 1738530, at \*57 (S.D.N.Y. May 3, 2021) (finding no *Brady* violation where the relevant information had been produced to the defendant prior to trial by the Securities and Exchange Commission).[11]

---

[11]     Moreover, Avenatti has long maintained (albeit wrongly, as discussed below) that the USAO-CDC and USAO-SDNY are part of a single prosecution team.  From his perspective,

Avenatti's suggestion that *Brady* was somehow implicated because the "data segregation" to be done with Software Technology's assistance was to "occur on the copy of the servers in the possession" of the USAO-CDC is even more baseless. Def. Second Mot. 5. The data segregation could just as easily have been conducted on his copy of the Servers. The key point is that Avenatti had an exact copy of whatever was in the Government's possession; to the extent that some of the data was unusable, it was unusable to *both* the Government and to Avenatti. *Brady* and its progeny did not require that the Government do more.

## C.  The USAO-CDC Is Not Part of the Prosecution Team in This Case

Second, Avenatti's First and Second Motions to Compel failed because the USAO-CDC is not part of the prosecution team in this case for the purposes of *Brady* disclosures.[12] The Government's obligations under *Brady* and *Giglio* "extend[] only to material evidence . . . that is known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (noting that *Giglio* materials are a species of *Brady* materials). "An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and . . . has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Avellino*, 136 F.3d at 255-56 (internal quotation marks omitted). Notably, however, "knowledge on the part of persons employed by a *different office* of the government does not in

---

therefore, it surely did not matter from which office he received the Servers. And regardless, the source of a defendant's possession or knowledge is irrelevant to the analysis. All that matters is whether the defendant already possessed the information or knowledge at issue, which Avenatti indisputably did.

[12]    The fact that the USAO-CDC was not part of the prosecution team for this case does not bear on Avenatti's Third Motion to Compel, which is based solely on the conduct of the USAO-SDNY (namely, its efforts to obtain the Servers from the Bankruptcy Trustee).

all instances warrant the imputation of knowledge to the prosecutor." *Id.* (emphasis added).

That is for good reason.  As the Second Circuit explained in *Avellino*, "the imposition of an

unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's

office on the case in question would inappropriately require [courts] to adopt a monolithic view

of government that would condemn the prosecution of criminal cases to a state of paralysis."  *Id.*

(internal quotation marks omitted).

Instead, "[i]n the Second Circuit, a prosecutor's constructive knowledge only extends to

those individuals who [or entities that] are 'an arm of the prosecutor' or part of the 'prosecution

team.'"  *United States v. Meregildo*, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2013) (quoting

*United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002); *United States v. Morell*, 524 F.2d 550, 555

(2d Cir. 1975)), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015); *see also*

*United States v. Locascio*, 6 F.3d 924, 949-50 (2d Cir. 1993); *United States v. Middendorf*, No.

18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) ("The prosecution's

obligation to disclose *Brady* material extends to any material in the possession of any entity that

has acted as an 'arm of the prosecutor' in a given case." (quoting *Morell*, 524 F.2d at 555)).[13]

This rule applies not only to other federal agencies, but also to other offices within the

---

[13]    The same "prosecution team" (or "joint investigation") analysis applies to the
determination of what qualifies as "in the possession of the United States" for purposes of the
Jencks Act.  *United States v. Bin Laden*, 397 F. Supp. 2d 465, 490-91 (S.D.N.Y. 2005), *aff'd sub
nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008); *see also
United States v. Merlino*, 349 F.3d 144, 155 (3d Cir. 2003) ("In speaking of statements 'in the
possession of the United States,' we understand the [Jencks Act] to require production only of
statements possessed by the prosecutorial arm of the federal government." (cleaned up)); *United
States v. Paternina-Vergara*, 749 F.2d 993, 997 (2d Cir. 1984) ("We have ruled that documents
of local police are not subject to the Jencks Act . . . in the absence of a joint federal-state
investigation." (citing *United States v. Bermudez*, 526 F.2d 89, 100 & 100 n. 9 (2d Cir.1975));
*United States v. Ferguson*, 478 F. Supp. 2d 220, 240 (D. Conn. 2007) (denying motion for
Jencks Act materials in the possession of state entities where those entities had not engaged in a
"joint investigation" with the federal prosecutors).

Department of Justice, including other United States Attorney's Offices.  *See, e.g.*, *Avellino*, 136

F.3d at 256 (describing how in *United States v. Quinn*, 445 F.2d 940 (2d Cir. 1971), the Second

Circuit "refused to impute the knowledge of a [federal] Florida prosecutor to an AUSA in New

York, rejecting as completely untenable the position that knowledge of any part of the

government is equivalent to knowledge on the part of this prosecutor" (cleaned up)); *Gist v.

United States*, No. 16-CR-656-6 (GHW), 2021 WL 3774289, at *16 (S.D.N.Y. Aug. 24, 2021)

(concluding "the Government did not violate its *Brady* obligations" where it had not disclosed a

report from another Department of Justice agency because it "was not in the possession of an

arm of the prosecution"); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y.

2018) (same for materials in possession of the Securities and Exchange Commission); *cf. United

States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) (holding that Rule 16 of the Federal

Rules of Criminal Procedure did not require disclosure of material in the possession of a

different prosecution team within the *same* United States Attorney's Office where the two teams

were "not involved in a joint investigation, and where the prosecution d[id] not have access to

the material requested").[14]

---

[14]     To the extent that Avenatti relies on Ninth Circuit case law to support his motion to
compel, *see* Def. First Mot. 4-5, that reliance is misplaced.  Ninth Circuit case law appears to
diverge from Second Circuit case law on the scope of a prosecutor's constructive knowledge
with respect to *Brady* obligations.  *Compare Avellino*, 136 F.3d at 256, *Middendorf*, 2018 WL
3956494, at *4 (quoting *Morell*, 524 F.2d at 555), *and Meregildo*, 920 F. Supp. 2d at 440-41
(quoting *Gil*, 297 F.3d at 106), *with United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019)
("Knowledge and access are presumed if the agency participates in the investigation of the
defendant."), *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) ("The prosecutor will
be deemed to have knowledge of and access to anything in the possession, custody or control of
any federal agency participating in the same investigation of the defendant."), *and United States
v. Grace*, 401 F. Supp. 2d 1069, 1075 (D. Mont. 2005) (interpreting Ninth Circuit precedent to
foreclose the "prosecution team" concept of the scope of disclosure obligations).

Importantly, although "[a]n investigation may be joint for some purposes[,] it may be independent for others." *United States v. Gupta*, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012). Thus, where two prosecution teams jointly conduct a limited number of investigative activities, those activities, without more, do not necessarily create an obligation under *Brady* for either team to search the entirety of the other team's file.  Instead, each prosecution team will have "an obligation to review the documents *arising from* [*the*] *joint efforts* to determine whether there is *Brady* material that must be disclosed." *Id.* (emphasis added); *see also, e.g.*, *United States v. Carroll*, No. 19-CR-545 (CM), 2020 WL 1862446, at *9 (S.D.N.Y. Apr. 14, 2020) (noting that "joint fact gathering" does not necessarily "give rise to an obligation by the Government to review the [other agency's] entire investigative file"); *United States v. Martoma*, 990 F. Supp. 2d 458, 461-62 (S.D.N.Y. 2014) (ordering the Government to review a subset of another agency's files relating to cooperating witnesses).  In determining whether another government entity acted as part of the prosecution team for all or part of a given case, courts in this Circuit consider five primary factors: "whether the other [entity] (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Middendorf*, 2018 WL 3956494, at *4 (citing *Blaszczak*, 308 F. Supp. 3d at 741-42); *see also, e.g.*, *Gist*, 2021 WL 3774289, at *17 (same factors); *Carroll*, 2020 WL 1862446, at *9-10 (same); *United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) (same).

Applying these factors here, the Court concludes the USAO-CDC was not a part of the prosecution team in this case.  Three of the five factors weigh heavily in favor of that conclusion.  The USAO-CDC was not involved in the USAO-SDNY's grand jury presentations, played no

role in the development of the USAO-SDNY's prosecutorial strategy, and did not accompany the USAO-SDNY to court proceedings in this case. Gov't Opp'n 7.[15] It also bears emphasis that the two offices conducted their respective investigations with separate agency partners — the FBI-NY for the USAO-SDNY and the IRS-CI for the USAO-CDC. Gov't Opp'n 1; *see also* No. 19-CR-373 (PGG), ECF No. 318, at 9. And there was limited or no consultation between the two offices on significant developments, including, for instance, the USAO-CDC's decision to move to remand Avenatti just days before trial in the Nike Extortion Case, which was made without any prior notice to the USAO-SDNY team and (presumably to the chagrin of the USAO-SDNY) delayed the start of trial in the Nike Extortion Case. *See* Gov't Opp'n 7.

To be sure, for sake of "mutual convenience," Gov't Opp'n 6-7, the two offices conducted a total of five joint interviews with two witnesses of mutual interest — four with Regnier and one with Macias. *Id.* at 2. But the two offices conducted more solo interviews with Regnier and Macias than they did joint interviews, and the small number of joint interviews with them was a mere fraction of the 120 interviews with 45 witnesses that the USAO-SDNY conducted in the Nike Extortion Case and this case. *Id.* at 2. Viewed in context, therefore, the five joint interviews of two witnesses do not render the USAO-CDC part of the USAO-SDNY's prosecution team for the entire case. *See, e.g.*, *Collins*, 409 F. Supp. 3d at 241 (holding there was no "joint investigation" between the prosecutors and the another government agency where, among other things, the two teams "both participated in only 16 of 60 interviews of 37 distinct witnesses"); *Ferguson*, 478 F. Supp. 2d at 239 (same where "[o]nly eleven witnesses were

---

[15]     As noted above, members of the USAO-CDC team did attend portions of the Nike Extortion Case trial, but they did so as mere spectators, observing the proceedings from the public gallery. *See* No. 19-CR-373, ECF No. 360, at 8. That does not qualify as "accompan[ying]." And the Court has no reason to believe that anyone from the USAO-CDC attended trial in this case.

interviewed jointly" and the government stated the "purpose of the joint interviews was to spare the witnesses from the burden of multiple sessions with . . . different agencies"); *cf. Gupta*, 848 F. Supp. 2d 491 (concluding the prosecutors and the agency at issue were engaged in a joint investigation where, among other things, the two teams "jointly interviewed no fewer than 44 witnesses"); *Martoma*, 990 F. Supp. 2d at 461-62 (same where the prosecutors and the agency "jointly conducted twenty interviews of twelve witnesses").

The same goes for the limited document sharing between the two offices. Accommodating "a small number of specific, discrete requests for certain materials," Gov't Opp'n 7, without engaging in any joint "review[] [of the] documents," *Middendorf*, 2018 WL 3956494, at *4, does not, without more, render a separate United States Attorney's Office part of the same prosecution team for *Brady* purposes, *see, e.g.*, *Collins*, 409 F. Supp. 3d at 240-42 (concluding the SEC was not part of the prosecution team even where, among other things, there was some "sharing of information between the SEC and the Government," including sharing of "information gathered from search warrants"); *United States v. Chow*, No. 17-CR-667 (GHW), ECF No. 69, at 89 (S.D.N.Y. Feb. 9, 2018) (same where the agency in question "provided documents that it collected" to the prosecutors but "there [was] no assertion that [those documents] were collected at the direction of or in coordination with" the prosecutors).

At most, the USAO-CDC could arguably qualify as part of the USAO-SDNY prosecution team for the purposes of fact-gathering related to Regnier and Macias based on the offices' joint interviews of those witnesses. But that is debatable and, in any event, little help to Avenatti here. Assuming for the sake of argument that the USAO-SDNY's *Brady* obligations extended to "documents arising from [its] joint efforts" related to Regnier and Macias, *Gupta*, 848 F. Supp. 2d at 495, the issue is immaterial because, before trial, the Government turned over all

documentation from the USAO-CDC's meetings with Regnier and Macias that the USAO-SDNY did not attend, *see* Gov't Opp'n 2.

Notably, the Court's conclusion is consistent with Judge Gardephe's recent ruling in the Nike Extortion Case. *See United States v. Avenatti*, No. 19-CR-373 (PGG), 2022 WL 394494, at *10-11 (S.D.N.Y. Feb. 9, 2022) ("Nike Extortion Op.").[16]  There, Judge Gardephe held, on a nearly identical record, that, except perhaps as to Regnier, "the New York and California prosecutors were not engaged in a joint investigation or prosecution" for *Brady* purposes. *Id.* at *11.[17]  The two offices' "collaborat[ion] with respect to Regnier" and sharing of "certain documents regarding [Avenatti's] finances," Judge Gardephe concluded, did not "demonstrate that the two offices were engaged in a joint investigation and prosecution." *Id.*  With respect to the documents shared between the two offices, Judge Gardephe explained, Avenatti "d[id] not contend that the New York and California prosecutors jointly analyzed those documents or pursued a joint strategy to introduce them at the two trials." *Id.*  "[T]he absence of a joint investigation or prosecution," Judge Gardephe concluded, "is fatal to [Avenatti's] *Brady* claim" based on documents and information in the possession of the USAO-CDC alone. *Id.*  That absence is similarly fatal to Avenatti's First and Second Motions to Compel here.

In short, the limited collaboration between the USAO-CDC and the USAO-SDNY is insufficient to conclude that the two offices were part of the same prosecution team for all purposes in this case.  As such, the knowledge and possession of materials by the USAO-CDC

---

[16]    Prior to Judge Gardephe's February 9, 2022 decision, Avenatti attempted to rely on an earlier ruling by Judge Gardephe to suggest that the USAO-SDNY and USAO-CDC were part of the same prosecution team for *Brady* purposes.  *See* ECF No. 291-1, at 2 (citing *United States v. Avenatti*, No. 19-CR-373 (PGG), ECF No. 336, 2021 WL 2809919, at *45 (S.D.N.Y. July 6, 2021)).  Avenatti's misreading of that earlier ruling — whether ingenuous or not — is confirmed by Judge Gardephe's recent decision.  *See* Nike Extortion Op., at *10-11.

[17]    Macias does not appear to have testified in, or been relevant to, the Nike Extortion Case.

cannot be imputed to the USAO-SDNY in this case for *Brady*, *Giglio*, or Jencks Act purposes. For that reason alone, Avenatti's First and Second Motions to Compel fail.

## D.  In Any Event, Avenatti Has Not Demonstrated Any *Brady* Violation

Finally, even if Avenatti had not had the relevant data himself *and* the USAO-CDC was part of the prosecution team for purposes of this case, his *Brady* arguments (which are the primary basis of his motions) fail for an even more basic reason: He has not established that the Government violated its obligations.  Under *Brady* and its progeny, the Government is required "to disclose evidence favorable to the accused when it is material to guilt or punishment." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  To demonstrate a *Brady* violation, therefore, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 140 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The Government "suppresses" evidence within the meaning of the first element only when it has evidence in its "possession."  *United States v. Brennerman*, 818 F. App'x 25, 29-30 (2d Cir. 2020) (summary order).  Put differently, *Brady* does not obligate the Government "to seek out . . . information like a 'private investigator and valet . . . gathering evidence and delivering it to opposing counsel.'"  *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002)). Evidence is "favorable" to the defendant if it undermines the Government's proof or supports a valid defense, a universe that includes both "exculpatory information" and "information that could be used to impeach government witnesses, so-called *Giglio* material."  *Madori*, 419 F.3d at 169 (2d Cir. 2005) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  Finally,

"prejudice" (sometimes called "materiality") is established when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *Turner v. United States*, 137 S. Ct. 1885, 1887 (2017) (internal quotation marks omitted). "To make that determination," courts "evaluate the withheld evidence in the context of the entire record." *Id.* (cleaned up). "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Gil*, 297 F.3d at 103.

These well-established principles doom all of Avenatti's arguments with respect to *Brady*. First, the gravamen of Avenatti's Third Motion to Compel was that the Government had made insufficient efforts to acquire data from the Servers from the Bankruptcy Trustee. *See* Def. Third Mot. 2 (arguing that the Government had long "known of the importance of the data . . . and yet purposely disregarded it and avoided acquiring it" and that "the Government's deliberate failure to acquire information favorable to the defendant" raises "issues relating to *Brady*"). But *Brady* does not require the Government to "acquire" evidence or information from others (let alone evidence or information that is already in the defendant's possession). *See, e.g.*, *Thomas*, 981 F. Supp. 2d at 239; *see also, e.g.*, *United States v. Raniere*, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019) ("*Brady* does not require the government to search for exculpatory material not within its possession or control."); *Meregildo*, 920 F. Supp. 2d at 445 ("Because the Government never possessed [defendant's] Facebook account, it had no obligation to acquire it."). At most, it requires disclosure of evidence or information in the Government's possession. *See, e.g.*,

*Brennerman*, 818 F. App'x at 29-30.  So *Brady* did not require the Government to make efforts to "acquire" the Servers from the Bankruptcy Trustee or anyone else.[18]

More significantly, Avenatti has not shown that any of the information or data on the Servers are favorable or would have been material to the outcome of the trial.  According to Avenatti, the information on the Servers would have been relevant for two purposes: first, to prove the quantity (and perhaps the quality) of the work that he and his firm did, and the costs they incurred, on behalf of Ms. Clifford; and second, to prove that his firm's financial condition was not as dire as the Government suggested.  ECF No. 344, at 4.  But Avenatti did not need the Server data to establish the former.  There was ample evidence at trial that Avenatti and his firm did a lot of work and incurred substantial costs on Ms. Clifford's behalf.  Indeed, those facts were basically undisputed.  *See, e.g.*, GX 2; Tr. 341-51, 524-30, 1082-83.  As for the latter, most of the evidence from the Server — including all of the evidence from the California Case to which Avenatti has pointed, *see* ECF Nos. 336-1 (under seal), 342, 345 — would have been inadmissible because it related to periods that were irrelevant to this case.  *See* Tr. 1508-10 (granting on these grounds a motion to quash a subpoena Avenatti had served on an expert hired by the USAO-CDC to analyze the financial condition of Avenatti's firm for purposes of the California Case).

Moreover, the Government's proof that Avenatti and his firm were in financial straits at the time relevant to this case — July 2018 through February 2019 — was simply overwhelming. It included evidence that the firm's bank accounts incurred charges throughout the Summer and

---

[18]     Relatedly, it is worth noting that if Avenatti had needed to obtain the Servers from the Bankruptcy Trustee — which he did not, as he had them himself as of September 2021 — he could have sought them himself.  In fact, for reasons that are unclear, Avenatti *did* in fact subpoena the Bankruptcy Trustee for the Servers.  *See* ECF No. 344, at 4.  The record is unclear with respect to what efforts, if any, Avenatti made to enforce the subpoena.

Fall of 2018 because the accounts lacked sufficient funds, *see, e.g.*, GX 302A, at 1, 7; GX 302B, at 1, 9, 17; GX 302C, at 3, 6-7, 13, 15, 21-23; GX 803; Tr. 426, 615-16, 692-93; that from July 2018 to February 2019 the firm was unable to make payments, including payroll, on time, *see* Tr. 413 ("MS. REGNIER: [The financial situation at the defendant's law firm between July 2018 and February 2019] was not good.  Payments were running late.  We were having trouble making ends meet. . . . Payroll was late."); that the firm was unable to pay an $11,997.01 healthcare premium for its employees in September 2018, *see* GX 610; Tr. 418-20, resulting in cancellation of its health insurance plan in November 2018, Tr. 420; and that the firm was ultimately evicted from its offices in late November 2018 due to nonpayment of rent, *see* Tr. 413, 471-72. Additionally, Macias — a friend of Avenatti's —testified that Avenatti came to him in September 2018 seeking a $250,000 "bridge loan" in order to cover payroll and rent for his firm. Tr. 733-36 ("[MR. MACIAS]: He said that he was about to be evicted from his office space and that he needed money for his payroll."); *see also id.* 736-750 (describing efforts to secure a loan for Avenatti from other sources in September 2018); GX 604-06 (text and email communications regarding the loan).

On top of that, Avenatti has not shown, and almost certainly could not show, that more granular evidence of the work he and his firm did and the expenses they incurred on behalf of Ms. Clifford, or evidence that his firm's financial condition was stronger than the evidence suggested, would have affected the outcome of the trial.  That is because evidence of Avenatti's guilt was overwhelming and largely undisputed.  It showed that Avenatti forged Ms. Clifford's signature on a document diverting book proceeds to an account controlled by him, *see* GX 213; Tr. 411-13; Tr. 995-97; *see also* GX 107; GX 701; that, after the funds were wired to that account, Avenatti converted most, if not all, of the proceeds to his own personal use or his firm's

use, *see* GX 302A-G; GX 702; and that he repeatedly lied to Ms. Clifford, orally *and* in writing,

claiming that the money — money he had received and already spent — had not yet been paid,

*see* GX 26-29, 34-42, 44-45, 48-50; *see also, e.g.*, Tr. 927-29, 940-41, 956-58.  To highlight just

a few of the *many* examples of Avenatti's written lies:

- On October 2, 2018, more than two weeks after the third payment had already been sent to the account controlled by Avenatti and largely spent, Ms. Clifford wrote to Avenatti over WhatsApp, "Which reminds me . . . publisher owes me a payment today."  GX 35. Avenatti responded "On it.  We need to make sure we have the publicity requirement met."  *Id.*

- On November 13, 2018, Ms. Clifford asked over WhatsApp, "Where is my book payment?  I've texted [my editor at St. Martin's Press] but no response."  GX 39. Avenatti replied, "Let me check."  *Id.*

- On November 30, 2018, nearly two-and-a-half months after the publisher had sent the third payment to the account controlled by Avenatti, and nearly two months after Avenatti had spent that money, Ms. Clifford said over WhatsApp, "And let's not forget the publisher."  GX 45.  Avenatti responded, "I haven't.  That's complete bullshit."  *Id.*

In short, the Government's evidence of Avenatti's and his firm's dire financial condition

certainly provided important context — it helped to explain what might otherwise have seemed

to be inexplicable misconduct.  *See* Tr. 1632-35.  But it was not the main event.  The main event

was the extensive documentary evidence demonstrating beyond doubt Avenatti's lies and deceit.

Notably, Avenatti did not really dispute these facts at trial.  Instead, his primary, if not

sole, defense was that he believed in good faith that he was entitled to take Ms. Clifford's book

advance payments, either pursuant to their fee agreement, GX 3, or under the equitable doctrine

of *quantum meruit*.  *See, e.g.*, Tr. 1753 (instructing the jury that the defense theory was "that Mr.

Avenatti had a good-faith belief that he was legally entitled to take the money at issue [in] this

case (1) as a reasonable fee for his work in obtaining the book deal; (2) as compensation for his

and his law firm's work as Ms. Clifford's attorney and (3) as reimbursement for costs he

advanced for her or incurred for her benefit").[19]  In his closing, for example, Avenatti argued

that, "[u]nder the contract," he and his firm were entitled to "our hourly and out-of-pocket costs"

and "a reasonable percentage" of any "book deal or other media opportunities" in the event that

Avenatti assisted Ms. Clifford in finalizing any such opportunities.  Tr. 1657.  He asserted that

the Government's position was that "a reasonable percentage is zero," which "makes no sense."

*Id.*  To support his theory, Avenatti also emphasized that "people expect to be paid for their

work," *id.* at 1654, and repeatedly stressed the "huge amount of work [that] was done under th[e]

contract," *id.* at 1659; *see also id.* at 1664 (claiming the evidence showed the "huge amount of

costs and fees owed by Ms. [Clifford] to [him] and [his firm]").  According to Avenatti, this

evidence "establishe[d] a good-faith belief that [he] was entitled to some of the book money."

*Id.* at 1664; *see also id.* at 1663 ("[I]t establishes a good-faith belief in my mind that I was

entitled to be paid" and "a good-faith belief . . . is a complete defense to all of these charges.").

But that is not even a valid defense.  Indeed, the Second Circuit has squarely held that "a

claim of right to funds obtained through a false statement is not a defense negating fraudulent

intent."  *United States v. Blake*, 558 F. App'x 129, 130 (2d Cir. 2014) (summary order); *accord

United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) ("[C]ourts have uniformly held that a

claim-of-right is not a defense to mail fraud." (citing cases)).  That is, the wire fraud law

prohibits obtaining money through false and misleading statements even if the perpetrator holds

an honest belief that he is legally entitled to the money.  *See Blake*, 558 F. App'x at 130 (holding

that the evidence was sufficient to support conviction of a defendant who believed himself

---

[19]     With respect to Count Two, the aggravated identity theft charge, Avenatti also argued
that he "acted with lawful authority when he used Ms. Clifford's name and signature" on the
document directing the publisher to wire the book payments to an account he controlled.  Tr.
1753.  Avenatti has never suggested that the Server data had any relevance to that theory, so the
Court focuses here on the wire fraud charge and Avenatti's good faith defense.

entitled to his former wife's life insurance and made false statements on insurance form); *Gole*, 158 F.3d at 168 (affirming a conviction where the defendant "intentionally misrepresented his income in order to retain pension overpayments" and rejecting as a matter of law the defendant's argument that "he lacked fraudulent intent because he believed . . . he would be entitled to the overpayments"); *United States v. Lauersen*, No. 98-CR-1134 (WHP), 1999 WL 637237, at *2-4 (S.D.N.Y. Aug. 20, 1999) ("Where an insurance claimant submits false and misleading invoices and thereby deprives the carrier from determining for itself the merit of the claim based on truthful representations, the carrier has been defrauded.").[20]

The Second Circuit's holding was compelled by the language of the wire fraud statute, which "does not mention [a claim-of-right] as a defense." *Gole*, 158 F.3d at 168.  It was also "command[ed]" by "common sense." *Id.*  As the Second Circuit explained in *Gole*:

> If Gole's theory of self-help were the law, anyone who believed that he was legally entitled to benefits from a pension plan, or an insurance policy, or a government program, but who was concerned that he or she might nevertheless be denied such benefits, would be given carte blanche simply to lie to obtain those benefits.  Such a course of action would often be much easier than pursuing legal remedies through civil actions in court, and would guarantee success as long as the misrepresentation remained undiscovered.  We will not encourage people to lie to obtain benefits rather than pursue their rights in civil actions.  Such controversies may be resolved by civil suit or settlement, but cannot be won by using lies and deception.

---

[20]    Throughout trial, Avenatti placed heavy reliance on *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998), in which the Second Circuit stated that, in order to show fraudulent intent, "the government [had] to prove that [the defendant had] lied with the intent to deprive [the victim] of monies he *knew* he was not entitled to," *id.* at 203; *see* Tr. 767, 779-80, 1461, 1793, 1801-02.  In *Gole*, however, the Circuit explained that *Rossomando*'s holding applies only where the defendant "kn[ew] of the immateriality of the false statements he made," 158 F.3d at 168, thus effectively limiting *Rossomando* to its facts.  Indeed, Judge Jacobs, concurring, wrote that "*Rossomando* is thus limited to the quite peculiar facts that compelled the *Rossomando* result under the only holding that *Rossomando* will support: a defendant's belief that information is immaterial to a disbursement decision amounts to a defense to mail fraud only if the disbursement is mechanical as opposed to discretionary . . . and a jury finds that such a belief is reasonable." *Id.* at 169 (Jacobs, J., concurring).

*Id.*; *see also, e.g.*, *United States v. Catapano*, No. 05-CR-229 (SJ) (SMG), 2008 WL 3992303, at

*8 (E.D.N.Y. Aug. 28, 2008) ("Defendants cannot prevail by engaging in 'self-help.'  If

Defendants believed that the program had expired and that further enforcement would therefore

be unconstitutional, they had the option of going through the appropriate legal channels . . . .").

In other words, whether or not Avenatti genuinely believed that he was ultimately entitled to the

money he took, pursuant to either the contract or *quantum meruit*, was irrelevant.  To qualify as

"good faith," Avenatti would have had to hold an honest belief that his false and misleading

statements to Ms. Clifford were, in fact, true, or an honest belief that the law entitled him to

engage in self-help — to take and spend his client's money, without her knowledge and consent

and despite his false and misleading statements to her, rather than going through "appropriate

legal channels."  *Catapano*, 2008 WL 3992303, at *8; *see also Blake*, 558 F. App'x at 130

("[An] honest misstatement is insufficient to prove fraudulent intent.").[21]

   But there was zero evidence in the record to support such a finding of good faith.  One

need look no further than Avenatti's summation for confirmation of that fact.  As noted above,

he argued at length that the jury should find that he held a good faith belief that he was entitled to

---

[21]    Strictly speaking, the Court's instructions to the jury on good faith — that "if the
defendant in good faith believed that he was entitled to take the money or property from the
victim, even if that belief was mistaken, then you must find him not guilty," Tr. 1739 — were
not inconsistent with the foregoing.  That said, as the Court acknowledged during the jury's
deliberations (after the jury sent a note seeking further instructions on the meaning of "good
faith" and the Government — belatedly — brought *Gole* and *Blake* to the Court's attention), the
phrase "entitled to take the money or property" may not have drawn sharply enough the
distinction "between a good faith belief that Defendant was ultimately entitled to Ms. Clifford's
money, which is not a valid defense, and a good faith belief that the defendant was entitled to
engage in self help by taking Ms. Clifford's money when and in the manner he did, which is a
valid defense."  ECF No. 367.

the money he took as a reasonable fee and reimbursement of expenses.[22]  But nowhere did he argue, or even suggest, that there was evidence in the record from which the jury could infer that he had a good faith belief that he was entitled to take Ms. Clifford's money at the time or in the manner that he did — by resorting to self-help and lying or misleading her rather than going through appropriate legal channels.  That is perhaps not surprising, as Avenatti conceded in a colloquy with the Court that he could not cite any authority for the proposition that he was "entitled to take this money as [his] own without telling Ms. [Clifford] — in fact, with lying to Ms. [Clifford] about the fact that [he] took it — . . . as opposed to [his] bringing a lawsuit, whether in arbitration or any court of law, bringing a *quantum meruit* claim seeking a reasonable fee for the work that [he] did on her behalf."  Tr. 1461-65.

　　　　In short, the evidence that Avenatti engaged in wire fraud was overwhelming and largely undisputed; his sole "defense" was no valid defense at all.  In the face of that evidence, Avenatti has failed to show that any information on the Servers was favorable or material within the meaning of *Brady*.  Not to beat a dead horse, but this failing is all the more notable given that Avenatti had the Servers for over four months before trial in this case began.  It stands to reason that, if there were information on the Servers favorable to Avenatti's defense or material to the outcome of the trial, he would have sought to use it at trial or at least referenced it in one of his three Motions to Compel (not to mention one of his many other submissions, before and during

---

[22]　　　　In advance of closings, the Court had expressed the view that Avenatti could not argue good faith because there was no evidence in the record to support such a finding, but reversed course because the Government took the view that Avenatti "may be able to point to circumstantial evidence that he could then argue to the jury they can infer good faith from."  Tr. 1518-24.  Upon reflection, the Court is of the view that the Government was wrong and that Avenatti should not have been able to make the arguments he did in closing.  That is, the Court arguably erred in giving Avenatti too much latitude in his closing argument (which may well be why the jury sought clarification of the "good faith" defense).  In any event, Avenatti certainly has no basis to complain that he was allowed to make an argument that was unsupported by law.

trial, discussing the Servers).  The fact that he did not is additional proof that there was and is no merit to Avenatti's Motions to Compel.

## CONCLUSION

In sum, there was no merit whatsoever to Avenatti's Motions to Compel — or to his general complaints about access to the Server and the Tabs data.  That may explain why, in contrast to his repeated requests in the California Case, Avenatti did not even bother to raise the issue in this case until the eve of trial.  But he certainly made up for lost time and pressed the point with frequency and vigor from December 23, 2021, through trial.  It is hard to avoid the conclusion that he did so based on the hope or belief that, having used Tabs to secure a mistrial in the California Case, he could accomplish the same here (or plant a seed for eventual appeal).  But this case is not the California Case.  The Servers were not, and have never been, in the possession of the USAO-SDNY.  There is no reason to believe that anything on the Servers is favorable or would have altered the outcome of *this* case.  And perhaps most significant: Avenatti himself had the Servers for over four months before trial in this case began.  In short, for purposes of *this* case, Avenatti's arguments with respect to the Servers are nothing more than a smoke screen; there is no there there.

In fact, if anything, the party with a legitimate grievance regarding the Servers is the Government, not Avenatti.  In the lead up to trial, Avenatti was privy to what was on the Servers and could have made use of their contents (if admissible); the Government here was not.  In light of Avenatti's December 24, 2021 representation that he had identified relevant information on the Servers, *see* Def.'s Mot. for Adjournment 7, the Government served a subpoena on Avenatti on January 10, 2022.  Yet it was not until January 29, 2022, with only about two hours remaining in the Government's case-in-chief, that Avenatti — faced with a Court order and the threat of

"consequences" if he failed to comply, Tr. 1033 — finally complied with the subpoena and turned over materials from the Server to the Government.  Given the history recounted above, it is hard not to think that that was a pure act of gamesmanship on Avenatti's part: It effectively deprived the Government of a meaningful opportunity to use the Server data as part of its case-in-chief — yet enabled him to oppose a curative instruction with respect to his arguments about the Tabs data in summation on the ground that the data had technically been disclosed to the Government.  *See* Tr. 1690.  But whether the timing of Avenatti's compliance was or was not an act of gamesmanship is beside the point here.  The point is that, for purposes of this case, Avenatti had, and has, no legitimate grievance with respect to the Servers.

In short, Avenatti's Motions to Compel were without merit and remain DENIED.


        SO ORDERED.

Dated: February 15, 2022
       New York, New York                    _____
                                             JESSE M. FURMAN
                                             United States District Judge

35