# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
*Executive Director*
*and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

May 19, 2022

**BY EMAIL (UNREDACTED)**
**BY ECF (REDACTED)**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**RE:   United States v. Michael Avenatti,**
**        19 Cr. 374 (JMF)**

Dear Judge Furman:

Consistent with United States Probation's recommendation for a downward variance and a partially concurrent sentence with that imposed by the Honorable Paul G. Gardephe in <u>United States v. Avenatti</u>, 19 Cr. 373 (PGG) (S.D.N.Y.) ("Avenatti I"), the Court should sentence Michael Avenatti to a year and a day on Count 1 and to the statutorily-consecutive term of two years' imprisonment on Count 2, with the sentence on Count 1 to run concurrently with Avenatti I.

## I.    Overview

From a very young age, Mr. Avenatti was determined to escape the difficult financial and social circumstances that he was born into. He started working at 15 years old and did not stop until the day he was arrested. Mr. Avenatti put himself through college and law school, started a family, and built a successful law practice primarily on the strength of his will and ingenuity. For much of his career, Mr. Avenatti championed the voiceless and powerless. No fight was too big. No opponent too mighty. Now, Mr. Avenatti knows that he will never practice law again—a devastating consequence of his actions. He will never again have the opportunity to do the thing he loved most, second to caring for his family: advocate on behalf of his clients. The certainty of that fact serves as a powerful punishment and deterrent, and militates against a term of imprisonment significantly greater than the statutory-minimum two-year term on Count 2.

The Government's case against Mr. Avenatti implicated his precipitous rise and fall in 2018 and 2019 as a result of his representation of Stephanie Clifford, an adult entertainer who had an affair with Donald J. Trump before he was president

and who received hush money from Mr. Trump's former lawyer and fixer on the eve of the 2016 presidential election. While there were many disputes at trial about the scope and nature of their relationship, certain things are incontestable.

At the time Ms. Clifford met Mr. Avenatti in the winter of 2018, her story and its significance to the integrity of Mr. Trump's election was obscured in the press. Ms. Clifford desired and sought out an aggressive and fearless advocate who would provide her with representation that was tailored to the unique pressures one faces when squaring off against a sitting United States president. Unlike other attorneys who had demanded significant money up front, Mr. Avenatti agreed to take Ms. Clifford on as a client with $100 down and a fee agreement—a document that included a provision for crowd-sourced reimbursement of Mr. Avenatti's costs and expenses, and an "agreement to agree" on a reasonable compensation for any book deal Mr. Avenatti helped broker on Ms. Clifford's behalf.

Within a few weeks of becoming Ms. Clifford's attorney, Mr. Avenatti catapulted her to the center of the country's attention and transformed Ms. Clifford into a formidable threat to Mr. Trump's presidency. In the midst of the frenzy, Mr. Avenatti also helped Ms. Clifford achieve an elusive and longtime dream: to publish a memoir. A few days after meeting Ms. Clifford, Mr. Avenatti secured the assistance of a prominent and successful New York City-based literary agent, and worked with him to secure for Ms. Clifford a book deal worth at least $800,000. At the time, nobody could have anticipated that this book deal would eventually become the focus of Mr. Avenatti's own criminal case.

Despite his early successes as Ms. Clifford's lawyer, Mr. Avenatti was overwhelmed by an all-consuming relationship with Ms. Clifford. For example, the full WhatsApp chat between Ms. Clifford and Mr. Avenatti, which was one of their primary and consistent avenues of communication, reveals that he was available to her virtually 24/7, and that Ms. Clifford relied on Mr. Avenatti on a multitude of personal and professional fronts. Ms. Clifford treated Mr. Avenatti less like a lawyer with a discrete purview and more like a jack-of-all-trades legal fixer—and Mr. Avenatti never objected. Unfortunately, this was neither wise nor sustainable, and it placed a significant burden on the rest of Mr. Avenatti's practice, which was dealing with its own financial woes.

Against this backdrop, Mr. Avenatti exercised very poor judgment at multiple stages of his representation of Ms. Clifford. He failed to communicate with her effectively and he did not adhere to the rightfully stringent ethical standards that govern the practice of law in California. And while Mr. Avenatti went to trial and intends to appeal his conviction, he is very sorry for the hurt and damage he caused Ms. Clifford, as set forth in his letter to her dated May 13, 2022 (attached as Exhibit

2

H). Mr. Avenatti understands that some may view his remorse as too little too late, and that the Court may look skeptically on his contrition given the way in which Mr. Avenatti's trial transpired. Nevertheless, Mr. Avenatti is genuinely remorseful, especially for the pain his actions have caused his family and close friends. Given Mr. Avenatti's personal background and circumstances; the 30-month sentence imposed by Judge Gardephe; the significant term of imprisonment Mr. Avenatti likely faces in the Central District of California; and the permanent professional consequences of his conviction, it would be greater than necessary to sentence Mr. Avenatti within the Guidelines range calculated by United States Probation, which the defense submits is otherwise inaccurate and inflated. Instead, the Court should sentence Mr. Avenatti to a year and a day on Count 1, and two years on Count 2, with Count 1 to run concurrent with Avenatti I, for a total of 36 months and one day of imprisonment.

## II.   Procedural History

On February 4, 2022, a jury found Mr. Avenatti guilty of wire fraud in violation of 18 U.S.C. § 1343 (Count 1) and aggravated identity theft in violation of 18 U.S.C. § 1028A (Count 2). Following the verdict, and with the Government's consent, the Court permitted Mr. Avenatti to self-surrender in the Central District of California. Initially, Mr. Avenatti was detained at MDC Los Angeles, but he was eventually transferred to FCI Terminal Island to begin serving the 30-month sentence imposed by Judge Gardephe.

On May 3, 2022, United States Probation issued its final Pre-Sentence Report (dkt. no. 429).[1] As discussed in more detail below, U.S. Probation arrived at an advisory Guidelines range of 65 to 75 months' imprisonment, based on an adjusted offense level of 21, a Criminal History Category of II, and the mandatory two-year consecutive penalty associated with Count 1. Nevertheless, Probation recommended a combined sentence of 48 months' imprisonment, with the 24 months on Count 1 to run concurrently with the sentence imposed by Judge Gardephe.

---

[1] The final PSR was filed with the Court before the defense submitted to the authoring probation officer various corrections, edits, and/or objections to the PSR, which are addressed in detail below.

### III.   Michael Avenatti's Personal Background, Record, and Circumstances

#### A. Mr. Avenatti's difficult childhood circumstances motivated him to work hard and achieve.

"Michael…had high expectations for himself and could see potential where others didn't…He certainly wasn't born with a silver spoon in his mouth, just the determination to succeed."

Letter from friend Jay Manheimer, attached as Exhibit F.

Born in 1971 in Sacramento, Mr. Avenatti was an only child in a difficult home environment. ███████████████████████████████████████ ████████████████████████████████████████████████████ His work took the family around the country: over the course of his childhood Mr. Avenatti lived in four different states. Young Michael had trouble fitting in and found himself isolated at school and at home. The family's circumstances changed dramatically when, shortly before Mr. Avenatti's high school graduation, ███████ ████████

Even at a young age, Mr. Avenatti understood that he could not depend on his parents for financial or social stability. At 15, he began working at a McDonalds in St. Louis, Missouri. From that point on, Mr. Avenatti never stopped working. As a teenager, he worked various service, retail, and clerk positions. As a high school senior he managed an athletic complex where he umpired over 500 baseball games. Mr. Avenatti was committed to attending college, though he knew that his parents would be unable to assist him financially. Mr. Avenatti completed the first two years of college at St. Louis University and used his high academic achievement there to transfer to the University of Pennsylvania, where he obtained a degree in political science. Mr. Avenatti worked full-time throughout his college years, until his graduation in 1996. He is the first member of his family to graduate from college.

Following college, Mr. Avenatti was accepted to George Washington University Law School, where he attended evening classes as he continued to work full-time. Mr. Avenatti was a member of GWU's Law Review, participated in extensive extra-curricular and pro bono activities, and worked as a law clerk at international law firms. In 1999, Mr. Avenatti graduated first in his class. Mr. Avenatti's parents did not attend his law school graduation.

**B. Mr. Avenatti was a passionate, aggressive, and successful litigator who stook up for the proverbial little guy.**

After law school, Mr. Avenatti and his wife Christine moved to Newport Beach, California, where Mr. Avenatti joined O'Melveny & Myers, LLP, as an associate. After three years at O'Melveny he joined the litigation boutique Greene Broillet Panish & Wheeler, LLP, in Santa Monica. There, he developed an expertise representing plaintiffs against large corporations. In one notable victory at the firm, Mr. Avenatti obtained a $22.5 million settlement on behalf of a client who had been defrauded by a corrupt Chief Financial Officer. The settlement was reached after years of litigation, during which Mr. Avenatti took over 100 days of depositions on three continents and obtained significant discovery sanctions against Gibson Dunn & Crutcher, the defendant's counsel.

Mr. Avenatti loved being a litigator and was committed to representing plaintiffs that society overlooked. In 2006, he formed Avenatti & Associates, where he remained until 2019.[2] Over the course of a 20-year legal career, Mr. Avenatti achieved excellent results for thousands of clients across the country. He obtained over $1 billion in verdicts and settlements for victims who were often vulnerable, elderly, and disabled. In 2011, Mr. Avenatti secured one of the largest settlements in U.S. history at the time on behalf of a victim of malicious prosecution. For several years, Mr. Avenatti also served as lead counsel to victims of a sprawling Ponzi scheme. In 2014, Mr. Avenatti settled a class action on behalf of families whose loved ones' remains had been removed from plots in a Los Angeles cemetery and cast aside in a mass grave.[3] The case was featured on 60 Minutes in 2012 in a story titled "Final Resting Place."[4] Mr. Avenatti worked tirelessly, often to the detriment of his personal life, to fight zealously for his clients.

Mr. Avenatti's work ethic did not go unrecognized. George Washington University Law School celebrated Mr. Avenatti's success and tenacity by establishing the Michael J. Avenatti Award for Excellence in Pre-Trial and Trial Advocacy shortly after his graduation, and an endowed scholarship years later. PSR at ¶ 94. In 2007, Mr. Avenatti was recognized as one of the top 20 attorneys under 40 in California. In 2009 his, peers in Orange County voted him Trial Lawyer of the

---

[2] The name of the firm changed a few times between 2006 and 2019, but was at all times owned and operated by Mr. Avenatti.

[3] See L.A. cemetery settles lawsuit alleging body dumping, USA Today (Feb. 27, 2014 at 9:39 p.m. ET), available at:
https://www.usatoday.com/story/news/nation/2014/02/27/los-angeles-cemetery-settlement/5883681/.

[4] Available at: https://www.cbsnews.com/news/final-resting-place-cemeteries-lack-oversight/.

Year. In 2018, after obtaining a (later-vacated) $454 million jury verdict on behalf of medical staff using defective personal protective equipment during the Ebola crisis, Mr. Avenatti was awarded the national Public Justice Trial Lawyer of the Year Award.[5] As Judge Gardephe noted at Mr. Avenatti's sentencing last year: "Mr. Avenatti's early years were marked by hard work, determination, and ambition…." *Avenatti I*, dkt. no. 341 at 38.

### C. Mr. Avenatti is a proud and loving father and family man.

> "To us, our Dad is the father who tells us he loves us just because, gives us a hug, kiss…when saying goodbye, took us to plays and concerts, and always has encouraging words for us and coaches us through life's challenges."

Letter from Mr. Avenatti's daughters, attached as Exhibit D.

In 1994 Mr. Avenatti married Christine Avenatti-Carlin, his college sweetheart.[6] Mr. Avenatti was readily welcomed by his wife's siblings and parents.[7] As his brother-in-law Stephen Rodier writes, "Michael…would become an integral part of our family. Michael shared an office with my dad and a computer with my sister Michelle, competed in our fantasy football league, served as a groomsman in my wedding and as a Godparent to my son…" Exhibit G.

In the Rodier family, Mr. Avenatti found the security and affection that he had yearned for as a child. When his mother-in-law became ill, he moved into her home to help provide lay palliative care in the final months of her life. Although Mr. Avenatti and Ms. Avenatti-Carlin have been divorced since 2007, "Michael is still considered an important part of our family." Exhibit G.

Mr. Avenatti is most proud of his children. Mr. Avenatti and Ms. Avenatti-Carlin have two daughters—Lauren, age 19, and N███ age 16.[8] Mr. Avenatti also has a seven-year-old son A██████ from his second marriage. Mr. Avenatti is a loving and devoted father. In their letter to the Court, his daughters describe joyful childhood experiences at the zoo, beach, and hours playing in the park. They

---

[5] See Public Justice Trial Lawyer of the Year Award Winners, 2018, available at: https://www.publicjustice.net/trial-lawyer-year-award/trial-lawyer-of-the-year-award-winners/.

[6] A of support letter from Ms. Avenatti-Carlin is attached to this submission as Exhibit C.

[7] A letter from Ms. Michelle Rodier Greene, Ms. Avenatti-Carlin's sister, is attached as Exhibit E. A letter from Stephen Rodier, Ms. Avenatti-Carlin's brother, is attached as Exhibit G.

[8] A joint letter from Lauren and N███ is attached as Exhibit D.

recount watching their father model kindness, self-reliance, and hard work. They credit him with their resilience and ability to overcome adversity. Exhibit D.







Perhaps most importantly, Mr. Avenatti tried to give his children the love and tenderness that he often yearned for as a child. This relationship has been put to the test these past few years, and his daughters are forthcoming about the





impact of Mr. Avenatti's case on them: "The last few years have been extremely trying as he has been unable to participate in our lives the way he used to due to his restrictions…. We have adjusted to these restrictions and learned during our visits and phone calls how to stay connected and share our stories through more vivid story telling." Ex. D. Indeed, the letters of support appended to this submission chronicle the love and support surrounding Mr. Avenatti, and the collective suffering incurred as a result of Mr. Avenatti's predicament, aspects of Mr. Avenatti's character and record that the Court must take into account.

### D. Mr. Avenatti's all-consuming attorney-client relationship with Ms. Clifford.

In February 2018, after almost two decades of practice, Mr. Avenatti met Stephanie Clifford and agreed to take her on as a client in her fight against then-President Donald J. Trump. Despite having taken on highly-publicized cases previously, it is evident that Mr. Avenatti's representation of Ms. Clifford was the most significant and demanding experience of his career. Given Ms. Clifford's unique needs and circumstances, Mr. Avenatti strived to give her as much of his undivided attention as possible, working tirelessly on her various legal matters and on negotiating, obtaining, and seeing through a book deal with St. Martin's Press.

Of course, as the Court acknowledged at trial, "[t]he record is very well developed that [Mr. Avenatti] did a lot of work on [Ms. Clifford's] book." Trial Tr. at 1321:12-13. For example, Mr. Avenatti played a pivotal role in negotiating a

contract with MacMillan and was the driving force behind the generous $800,000 advance MacMillan offered Ms. Clifford (without the escrow provision MacMillan desired), which included a $250,000 initial payment without Ms. Clifford writing a single word. See Tr. at 349-350. And Mr. Avenatti's involvement in the book deal extended well beyond the contractual negotiations. As set forth in emails and text messages between Mr. Avenatti and Luke Janklow (Ms. Clifford's book agent), Mr. Avenatti made himself available to help put out various fires related to Mr. Janklow and MacMillan's concerns about Ms. Clifford's publicity efforts, her preferred title and book cover, and the meeting of various publication deadlines. In fact, Mr. Avenatti not only reviewed and edited Ms. Clifford's entire book (Trial Tr. at 1308-09), but he also assisted the publisher's legal counsel in its liability-related review of the manuscript (id.). It is indisputable that Mr. Avenatti was involved in the minutiae of Ms. Clifford's book and its publication to a degree well beyond that required as her attorney.

But Mr. Avenatti's representation of Ms. Clifford was obviously not limited to the book deal at issue in this trial. In addition to representing Ms. Clifford zealously in the court of public opinion as she battled Mr. Trump, Mr. Avenatti represented Ms. Clifford in a number of other legal matters from February 2018 to February 2019. Trial Tr. at 478:7-13. This included a lawsuit brought on Ms. Clifford's behalf in the Southern District of New York; multiple cases in federal district court in Los Angeles; a lawsuit against Ms. Clifford's former counsel filed in California state court; a lawsuit against a strip club in Florida; another lawsuit against a horse trainer in Texas; and a false-arrest claim filed against the police in Columbus, Ohio, which was filed in federal court. Trial Tr. 524:23 through 529:8. The scattered and diverse nature of Mr. Avenatti's representation of Ms. Clifford stretched his firm thin (id. at 530:9-16), as Mr. Avenatti relied primarily on his firm's resources to make court appearances in various locations, prepare filings, and meet discovery demands (id. at 531:8 through 532:1).

Mr. Avenatti also handled an array of personal matters for Ms. Clifford. For example, after Ms. Clifford petitioned for divorce in Texas, she relied on Mr. Avenatti to advise her on how to best resolve her divorce proceeding amicably and on how to compile an accurate asset list. Trial Tr. 1130:9 through 1131:11. In another instance, Ms. Clifford sought Mr. Avenatti's help in a nasty dispute over money with two of her closest associates. Id. at 1177:8 through 1178:12. By her own admission, Ms. Clifford was in touch with Mr. Avenatti every single day, sometimes "three or four times a day." Id. at 1141:9 through 1142:6. And unsurprisingly, Ms. Clifford is unable to recall with specificity the number of or types of matters Mr. Avenatti handled for her over the course of their year together. Id. at 1186:9 through 1187:3.

Mr. Avenatti also expended a lot of money representing Ms. Clifford and promoting her interests. He paid nearly $353,000 for her security (Trial Tr. at 435:12 through 436:7), $100,000 to obtain potential blackmail material (id. at 566:21 through 575:22), and $20,000 directly to Stormy entertainment (id.).

## IV.   A Cumulative Sentence Of 36 months And One Day, Concurrent with Avenatti I, Is Sufficient But Not Greater Than Necessary To Satisfy The Statutory Goals Of Sentencing Under 18 U.S.C. § 3553(a)

In recommending a downward variance to 48 months (concurrent with Avenatti I) from a Guidelines range of 65 to 75 months' imprisonment, United States Probation acknowledges many of the mitigating factors cited by the defense herein. But the Court should vary even further below Probation's recommendation given Mr. Avenatti's mitigation and because Probation's position is based on an inflated and inaccurate Guidelines calculation that is an otherwise inappropriate lodestar for a sufficient sentence in fraud or fraud-related cases. A cumulative sentence of 36 months and one day is also sufficient in light of the horrific confinement conditions Mr. Avenatti endured while at MCC New York and the extra punitive nature of federal imprisonment in a post-COVID era.

### A.   Probation's proposed Guidelines range is based on an inflated criminal history category and an erroneous loss amount.

The defense objects to Probation's offense level calculation and its application of the specific offense characteristics under U.S.S.G. §2B1.1(b)(1)(G) in Paragraphs 32 through 39 and 119. The defense also objects to a Criminal History Category of II based exclusively on his conviction in Avenatti I.

It is inappropriate to hold Mr. Avenatti accountable for a total loss of $297,500, as Probation seeks to do, because it is undisputed that Mr. Avenatti gave Ms. Clifford a sum of money equivalent to the second book-advance installment, and the facts at trial do not establish by a preponderance of the evidence that he did so after "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim." U.S.S.G. § 2B1.1 Cmt. 3(E)(i)(II). As a result, Ms. Clifford plainly did not "lose" this money. Indeed, the Government acknowledged as much at trial when it stated that the loss amount at issue was $148,750—the total amount of the third installment of the book advance. Trial Tr. at 1525. Accordingly, the loss amount to Ms. Clifford is no greater than $148,750, and Mr. Avenatti's adjusted offense level is no greater than 17 under §2B1.1(a)(1) and (b)(1)(E), and §3B1.3. With a criminal history category of II, Mr. Avenatti's Guidelines range is therefore no greater than 27 to 33 months on Count

1, or 51 to 57 months with the consecutive two-year term on Count II.

But Mr. Avenatti respectfully submits that the Court should calculate his Guidelines differently. First, the Court should downwardly depart from a Criminal History Category of II to I under U.S.S.G. §4A1.3(b)(1) because the three criminal history points he received for Avenatti I "substantially over-represent" his record. Indeed, the Government did not have to proceed against Mr. Avenatti in this district under two different indictments. Had it consolidated all of its charges into one indictment, then Mr. Avenatti would have had a single sentencing date for all of the charges in this case and Avenatti I, and (with no other prior convictions) would have had a Criminal History Category of I. With an adjusted offense level of 17, his Guidelines range would have been 24 to 30 months on Count 1, or 48 to 54 months when combined with Count 2.

Second, there is an argument that the loss amount in this case does not warrant any offense-level increase under §2B1.1(b)(1) given the totality of the circumstances between Mr. Avenatti and Ms. Clifford. As detailed above, Mr. Avenatti expended considerable time, energy, and resources on Ms. Clifford, including hundreds of thousands of dollars, for which he was never fully reimbursed or compensated (not by Ms. Clifford and not by any crowd-sourced fund). Accordingly, the defense respectfully submits that any loss amount ($148,750 or $297,500) is offset by the myriad other ways in which Mr. Avenatti added value to Ms. Clifford's life and career in 2018 and 2019, such that there is really no cognizable loss amount. Thus, the adjusted offense level would be 9, and the Guidelines range (including Count 2) would be 28 to 34 months (Category I) or 30 to 36 months (Category II).

## B. Mr. Avenatti's factual objections to the Pre-Sentence Report.

Mr. Avenatti offers the following objections and/or corrections to the final Pre-Sentence Report for the Court's consideration:

i.   Regarding the cover page, Mr. Avenatti's sentencing date is June 2, 2022, and he is no longer pro se. Similarly, and beyond the cover page, paragraph 5 includes the wrong date for Mr. Avenatti's sentencing and should be changed to June 2, 2022. Paragraph 47 also misstates that Tamara Giwa is standby counsel, when she is in fact Mr. Avenatti's appointed counsel.

ii.  Paragraph 10 does not include all of the details related to Mr. Avenatti's pre-trial release in the Central District of California. Mr. Avenatti was first granted a 60-day extension of his release on July 6, 2020. Subsequent

extensions were granted throughout 2020 and 2021, and Mr. Avenatti's release was ultimately extended to March 15, 2022.

iii. Paragraph 12 should state that on February 4, 2022, Mr. Avenatti was ordered to self-surrender on February 7, 2022, to the U.S. Marshals Service following the jury's verdict in this case. Paragraph 14 should state that since February 7, 2022, the defendant has been incarcerated at MDC Los Angeles and FCI Terminal Island.

iv. Regarding Paragraph 17, we respectfully ask that the Court add the following language: "Mr. Avenatti also filed a number of legal actions on Ms. Clifford's behalf and represented her in various other legal matters."

v. Regarding Paragraph 18, Ms. Clifford did not provide the literary agent with her bank account information for the first payment on her book-deal advance. Mr. Avenatti provided her account information to the literary agent.

vi. Regarding Paragraph 45, the Ninth Circuit Court of Appeals denied Mr. Avenatti's appeal from the Central District of California's decision denying his double-jeopardy motion, and a motion for rehearing and rehearing en banc was denied.

vii. In Paragraph 54, N███ Avenatti's age should be 17, and in Paragraph 61, Ms. Storie and her son reside in Irvine, California.

viii. The defense respectfully requests that the Court add the following language to the end of Paragraph 160: "To date, he has not provided these documents at the direction of his counsel and due to his pending case in California." Similar language should be added to Paragraph 112: "[Mr. Avenatti] was directed to complete the financial statement for this report but has not done so to date at the direction of his counsel and due to his pending case in California."

### C. The fraud guideline lacks any empirical or historical basis and does not warrant substantial deference at sentencing.

In considering the weight to be afforded to the Sentencing Guidelines in a particular case, in Kimbrough v. United States, 128 S. Ct. 558, (2007), the Supreme Court effectively recognized that not all guidelines are equal: while some "exemplify the Commission's exercise of its characteristic institutional role," others do not. Id. at 575. In cases involving application of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional

role," it is "not [] an abuse of discretion for a district court to conclude when sentencing a particular defendant" that the application of the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." Id.; see also, e.g., United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010). In Dorvee, the Second Circuit endorsed the authority of the district court to disagree with the Guidelines in child pornography cases based solely on policy considerations where the Guidelines are not based on empirical research and appear to be 'irrational."

Indeed, in Rita v. United States, 551 U.S. 338 (2007), the Court reasoned that if a particular Guideline was originally based on past sentencing practices and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of §3553(a). Id. at 349. Conversely, when a Guideline is not developed according to this practice, there is less reason to believe that it embodies the statutory objectives and deserves deference, even in a mine-run case. Kimbrough, 552 U.S. at 109. Against this backdrop, district courts have routinely engaged in the process of scrutinizing presumptive Guidelines provisions, finding that many of them are not in fact the product of empirical research or national surveys of sentencing practices. See, e.g., United States v. Shipley, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (child pornography guideline); United States v. Galvez-Barrios, 355 F. Supp. 2d958, 962 (E.D. Wis. 2005) (illegal reentry guideline).

U.S.S.G. §2B1.l, the fraud guideline, is an example of one that is not based on historical sentencing practices or research. The history of §2B1.l shows the Guideline to lack any sound policy rationale. It was not based on empirical research concerning deterrent efficacy or any other variable relevant to the purposes of sentencing. It was not even originally intended as a codification of past sentencing practices. To the contrary, it was written with the goal of increasing the severity of sentences over their historic levels. See United States v. Corsey, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("The loss guideline … was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.").

The history of bracket inflation and the extraordinary emphasis on loss (which can be either actual or intended) renders the loss Guideline fundamentally flawed. Corsey, 723 F.3d at380. In imposing a below-guidelines sentence, Judge Rakoff noted in United States v. Adelson, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006), that the loss Guideline in fraud cases (as well as the drug Guideline), in an effort to appear "objective," places great weight on putatively

13

measurable quantities without explaining why it is appropriate to accord such weight to such factors. Indeed, and as the Sentencing Commission has detailed, so-called white collar offenders were historically more likely to receive probationary sentences. The Guidelines tried to modify this practice by making a greater number of white collar offenders subject to heightened prison terms. See U.S.S.C., Fifteen Years of Guidelines Sentencing vi-vii, 15, 44 (Nov. 2004). This deviation from past practices was a conscious but largely unjustified and inexplicable decision by the Commission, which opined that lengthier sentences were necessary to correct for past under-punishment of theft and fraud, to make white-collar sentences "proportionate" to sentences for drug and violent crimes, and to effectuate greater deterrence. See id. at 55-56.

The Commission's stated reasons for amending the fraud Guideline simply do not justify imposing harsher sentences and more prison time on convicted fraudsters. Rather, the Commission's apparent rationale seems to directly contradict the statutory prescription that an individual be sentenced based on his own personal characteristics and his own offense, and that prison terms be the least amount necessary to punish the individual, promote respect for the law, and adequately account for the individual's specific physical and mental health needs.

With this in mind, there is no clear evidence that more severe sentences, or the more frequent imposition of prison terms, actually provides for greater deterrence of crime. To the contrary, the weight of the evidence indicates that increasing the severity of sentences has little deterrent effect. See, e.g., Francis T. Cullen, et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 The Prison Journal 48S (2011); Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995).

Former Attorney General Eric Holder, in a speech given on September 23, 2014, announced that the federal prison population decreased for the first time since 1980, and is projected to continue that decrease. He noted that "high incarceration rates and longer-than-necessary prison terms have **not** played a significant role in materially improving public safety, reducing crime, or strengthening communities." See Exhibit A. This observation belies the common, but misguided, perception that incarceration is necessary to promote "general deterrence."

In addition to its shaky theoretical foundation, over time the fraud Guideline has only moved further from historical sentencing practices and the

14

stated original intent of the Commission. Since 1987, the Guidelines have
strayed far from the initial goal of "short but definite" prison terms for white
collar defendants: recommended sentences have been steadily increased, often
with little justification. Looking at this case alone, if Mr. Avenatti had been
convicted of this same offense in 2000, more than 20 years ago, the Guidelines[9]
would have recommended a sentence of almost half (at the low end of the
Guidelines) what they recommend today. (Guidelines for a loss of more than
$200,000 earned a base-offense level of 6, plus an 8-level loss-amount
enhancement, yielding a Guidelines Range of 18 to 24 months, whereas
Probation's calculations under the current Guidelines call for a base offense
level of 7 with a 12-level loss-amount enhancement.) That the same crime can
supposedly warrant such different penalties over time undercuts any claim that
the Guidelines yield rational sentencing recommendations.

   In sum, the harsh sentences recommended under §2B1.1, based primarily
on loss, are not historically or empirically based, and actually provide little
verifiable benefit while imposing significant costs on the individual defendant
and the community. See, e.g., United States v. Chavez, 230 F.3d 1089, 1092 (8th
Cir. 2000) (Bright, J., concurring).

### 1. Section 2B1.1 overemphasizes loss amount.

   Core to the criticism of relying on §2B1.1 as a lodestar in fraud cases is the
Guideline's overemphasis on loss amount and a failure to recognize other factors
that might more accurately capture an individual's culpability and/or the harm
from his offense. See, e.g., United States v. Gupta, 904 F. Supp. 2d 349
(S.D.N.Y. 2012) (Rakoff, J.) (describing how fraud guidelines effectively ignore
everything but the loss amount and that many of the resulting Guidelines -
recommended sentences are "irrational on their face"); United States v. Ovid, 09
Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (criticizing§ 2B1.1
for failing to account for "many of the myriad factors that are properly
considered in fashioning just sentences"); United States v. Musgrave, 647 F.
App'x 529, 538-39 (6th Cir. 2016) (explaining that "there is reason to believe
that, because the loss Guidelines were not developed using an empirical
approach based on data about past sentencing practices, it is particularly
appropriate for variances").

   A study by The American Bar Association Task Force On The Reform Of
Federal Sentencing for Economic Crimes, recommended vast changes to the
fraud Guideline. The Task Force included Second Circuit Judge Gerard Lynch,

---

[9] Available at: ussc.gov/guidelines/archive/2000-federal-sentencing-guidelines-
manual.

Southern District Judge Jed S. Rakoff, and former Eastern District Judge John Gleeson. See Defense Exhibit B. As a preface to the Report, Task Force members reached a consensus that the current structural framework for the fraud Guideline "can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are lesseasily quantified." Exhibit B at Principles of Consensus." The recommendations included a dramatic decrease in the emphasis on loss (instead of the 12-level enhancement for a $300k loss amount, as recommended by Probation, Mr. Avenatti would face a 6-level enhancement for the same loss amount), and a greater emphasis on other 3553(a) factors. Id.

### 2. A sentence below Probation's Guidelines range is also necessary to avoid an unwarranted sentencing disparity with comparable cases.

The Court must consider a number of factors in imposing a sentence that is "sufficient, but not greater than necessary" to meet the goals of the Sentencing Reform Act. 18 U.S.C. §3553(a). One consideration is "the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). The Second Circuit has found that this section requires a District Court to consider nationwide sentence disparities. United States v. Ghaliani, 733 F.3d 29, 55 (2d Cir. 2013). Accordingly, we request that the Court consider the following sentences imposed within the Southern District of New York and other District Courts, in cases involving fraud and aggravated identity theft. Many of these cases also involved defendants who were attorneys:

a. United States v. Dory Slater, 19 Cr. 113 (ROM) (M.D. Pa.). The defendant was an attorney, convicted of bank fraud and aggravated ID theft. She forged documents and signatures and lied to the FBI. Her Guidelines Range for the Bank fraud was 21 -27, and she was sentenced to12 months for the bank fraud and 24 months consecutive for the aggravated ID theft. The 36-month sentence imposed is identical to the sentence requested on behalf of Mr. Avenatti.

b. United States v. Richard Gaffey, 18 Cr. 693 (RMB) (S.D.N.Y.). The defendant was an accountant, convicted of wire fraud, conspiracy to commit tax evasion and aggravated ID theft. He received a sentence of 39 months, 15 months for thefraud and 24 months consecutive for ID theft. For more than 10 years he assisted taxpayers to defraud the United States. The Government claimed that the loss to the U.S. Treasury was 3.4 Million dollars. His sentence, despite the length and scope of the

16

crime, as well as a loss more than 20 times greater than caused by Mr.
Avenatti, resulted in a term of incarceration 3 months greater than
requested here.

c. <u>United States v. Andrea Dumitru</u>, 18 Cr. 243 (LAK) (S.D.N.Y.). The
defendant was an attorney convicted of fraud, false statements and
aggravated ID theft. Her Guidelines were 63 to78 months for the fraud
and 24 months consecutive for the ID theft. She was sentenced to 36
months for the fraud and 24 months consecutive for a total sentence of 60
months. She had forged her client's signatures and falsely notarized
affidavits in approximately 105 false applications for asylum to the INS.
Despite the significant breadth and scope of her false representations, and
forged signatures, over a significant period of time, her sentence is just 24
months greater than requested here, involving one forged document and
signature. Although the government alleges that Mr. Avenatti lied to his
client on several occasions, the defendant here lied to clients, and a
government agency over 100 times.

d. <u>United States v. Alice Belmonte</u>, 16 Cr. 260 (DRH) (E.D.N.Y.). The
defendant was a disbarred attorney convicted in a wire fraud scheme of
stealing $2 million from victims who believed that they were giving her
money to invest in real estate. She had held herself out as an attorney.
The funds were supposed to be held in escrow. The defendant contacted
the escrow agent using false email addresses in the names of her "clients"
and sent fraudulent instructions to authorize transfer of the money to an
account she controlled. She then diverted the funds to additional accounts
she controlled by forging fraudulent disbursement instructions ostensibly
from a victim. She was sentenced to 24 months of incarceration, one year
less than the sentence requested here.

e. <u>United States v. Evan Greebel</u>, 15 Cr. 637(KAM) (E.D.N.Y.). The
defendant was an attorney who wasconvicted after trial. The Government
calculated the Guidelines at 108 to 135. Because of a dispute as to the loss
amount, the Defense calculations were 24 to 30 months. At the time of the
crime, the defendant was highly compensated by his firm earning almost
$1 million yearly. Restitution was awarded at over $10 million. The
Government argued that the defendant used his legal training and skills
to defraud the victims, violating his ethical duties to his clients. He was
sentenced to 18 months of incarceration.

f. <u>United States v. Harvey Newkirk</u>, 14 Cr. 534 (JSR) (S.D.N.Y.). Defendant
was an attorney, convicted of wire fraud after a jury trial. He was

acquitted of conspiracy and aggravated ID theft. He defrauded lenders of millions of dollars (restitution was $3.1 million). His skills as an attorney were critical to the fraud and the Government claimed that his crime was marked by lies to his law firm and victims. The defense claimed that he was guilty of conscious avoidance, and he was convicted after testifying at trial. Judge Rakoff imposed a sentence of 6 months.

g. United States v. Martin Weisberg, 8 Cr. 347 (NGG) (E.D.N.Y.). The defendant was an attorney employed by Baker & McKenzie LLP. He was convicted of money laundering and conspiracy to commit securities fraud. In a multi-year scheme he defrauded stockholders and according to the Government, lied and stole from his clients. His Guidelines were 78-97 months. He consistently made false statements personally and in writing. His restitution was $297,5000. He was sentenced to 24 months' incarceration.

h. United States v. Joseph Farkas, 18 Cr. 340 (LGS) (S.D.N.Y.) The defendant pled guilty to wire fraud and conspiracy to commit securities fraud. He induced investors to invest more than $25 million based on false claims. He personally benefitted to receive approximately $350,000. Judge Lorna G. Schofield imposed a sentence of one year and one day.

**D. The conditions of Mr. Avenatti's pretrial confinement and the realities of incarceration post-Covid militate against a lengthy term of imprisonment.**

As Judge Gardephe explained in varying downward from the presumptive Guidelines range in Avenatti I:

A variance is also necessary because Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it; first, because a loaded handgun had been smuggled by someone into the facility, and later because of the Covid-19 pandemic. Conditions were terrible. It's hard to believe they could occur in the United States of America. Mr. Avenatti himself was at risk from the Covid-19 virus as the result of a preexisting medical condition.

Avenatti I Sentencing Tr. at 43:2-10. This immutable aspect of Mr. Avenatti's experience in pretrial detention compels a variance in this case, particularly since the harsh conditions of Mr. Avenatti's solitary confinement at MCC New York were

exacerbated by his placement on 10 South.[10]  When MCC New York was operational, the unit, colloquially-dubbed "Guantánamo North," was reserved for detainees under Special Administrative Measures (28 C.F.R. § 501.3), which are designed to all but eliminate the third-party communications of a detainee the Government considers extremely dangerous. Why Mr. Avenatti was placed in a unit reserved for alleged drug lords and terrorists remains a mystery, but it undoubtedly worsened his experience. The abhorrent and brutal conditions of 10 South have been widely reported and routinely described by experts as being "diabolical," a form of torture, worse than those at Guantánamo Bay, and causing severe psychological trauma.[11]

### E. A cumulative sentence of 36 months and one-day imprisonment is sufficient to punish Mr. Avenatti and promote respect for the law.

Mr. Avenatti is currently 51 years old. If the Court were to adopt the defense recommendation and impose a term of one year and one day on the wire fraud count and 24 months consecutive for identity theft, to run concurrent with the sentence imposed by Judge Gardephe of 30 months, and followed by a three-year term of supervised release, Mr. Avenatti would be incarcerated for 54 months and under supervision of the Court to age 57. At his current age and beyond, recidivism and deterrence are less of a factor. As a general matter, older offenders—especially those with no prior criminal history—have much lower recidivism rates than younger defendants. See e.g., U.S. Sentencing Comm., Measuring Recidivism: The Criminal History Computation of the

---

[10]  The extreme isolation and brutal conditions of 10 South have been described as "a punitive measure that is unworthy of the United States as a civilized democracy," according to a former special monitor on torture and punishment for the United Nations who investigated the case of one prisoner held in the unit. See Evidence from US experts to the House of Lords Select Committee on the Extradition Law, Center for Constitutional Rights (Sept. 12, 2014), https://ccrjustice.org/ sites/default/files/assets/files/US%20experts%20submission%20to%20House%20of% 20Lords%20extradition%20committee.pdf (accessed June 8, 2021), Sally Eberhardt and Jeanne Theoharis, Five Years Ago, Obama Pledged to End Torture. He Still Hasn't, The Nation (Jan. 22, 2014), https://www.thenation.com/article/archive/five-years-ago-obama-pledged-end-torture-he-still-hasnt.

[11]  See, e.g., Jeanne Theoharis, I Tried to Tell the World About Epstein's Jail. No One Wanted to Listen, The Atlantic (Aug. 16, 2019), https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257; Arun Kundnani, The Guantánamo in New York You're Not Allowed to Know About, The Intercept (Feb. 5, 2016), https://theintercept.com/2016/02/05/mahdi-hashi-metropolitan-correctional-center-manhattan-guantanamo-pretrial-solitary-confinement.

<u>Federal Sentencing Guidelines</u> 12, 28 (2004) (noting that recidivism rates decline relatively consistently as age increases; finding, for example, that Criminal History Category I defendants over age 50 demonstrate a 6.2 percent recidivism rate, as compared to the 15.2 percent recidivism rate for all males in Category I).

Mr. Avenatti knows that he will never practice law again. His convictions have destroyed the life and identity that he spent decades carefully cultivating. This sobering reality is as sufficient and powerful a punishment and deterrence as any. Worse, Mr. Avenatti's extreme rise and fall played out on the most public of platforms, an experience he is unlikely to ever recover from reputationally. Mr. Avenatti has experienced substantial humiliation and shame since his arrest and (after enduring a hellish pretrial confinement at MCC New York) has been on home incarceration, relegated to living on a close friend's couch. Given his mitigating personal record and background, and the unique and overwhelming nature of his relationship with Ms. Clifford, a lengthy, additional term of imprisonment is gratuitous, and certainly more than necessary to achieve the goals of 18 U.S.C. § 3553(a).

Despite the certainty that he will spend substantial time in prison, Mr. Avenatti is focused on what lies ahead. He would like to receive treatment for alcohol abuse and engage in therapeutic counseling services. His three children await him at home, and he is eager to be at their side as they grow up. Mr. Avenatti knows that he must prioritize the next chapter of his life and learn from his mistakes. He is committed to a future that is productive and law-abiding, and he is eager to return to his family.

## V.    Conclusion

For the reasons stated herein and for any that are apparent at Mr. Avenatti's June 2, 2022, sentencing proceeding, the Court should sentence Mr. Avenatti to a cumulative term of 36 months and one day on Counts 1 and 2, with the sentence on Count 1 to run concurrent with that imposed in Avenatti I.

Respectfully Submitted,

_____/s/_____
Robert M. Baum
Tamara L. Giwa
Andrew J. Dalack

Cc:    Government Counsel                    Counsel for Michael Avenatti