# EXHIBIT A

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                      Tuesday, September 23, 2014

**One Year After Launching Key Sentencing Reforms, Attorney General Holder Announces First Drop in Federal Prison Population in More Than Three Decades**

In a speech at the Brennan Center for Justice, Attorney General Eric Holder announced today that the federal prison population has dropped by roughly 4,800 inmates since September 2013. This represents the first time the federal inmate population has fallen, rather than risen, over the course of a fiscal year since 1980.

Moreover, Attorney General Holder announced that current Bureau of Prisons estimates project this downward trend to continue in each of the next two fiscal years. In FY15, the inmate population is projected to drop by another 2,200 inmates. In FY16, the population is projected to drop by 10,000 inmates - or the equivalent of six federal prisons.

"This is nothing less than historic," said Attorney General Holder. "Clearly, criminal justice reform is an idea whose time has come. And thanks to a robust and growing national consensus – a consensus driven not by political ideology, but by the promising work that's underway – we are bringing about a paradigm shift, and witnessing a historic sea change, in the way our nation approaches these issues."

While these statistics show progress at the federal level, there is similar progress at the state level. Overall, incarceration rates have fallen by roughly 10 percent since President Obama took office, and that has occurred simultaneously with a similarly-sized reduction in crime rates.

The Attorney General's full remarks to the law enforcement conference, as prepared for delivery appear below:

Thank you, Jim [Johnson], for those kind words; for your friendship over the many years we've known one another – since we served together in the Clinton Administration; and for your leadership, along with Doug Jones, as co-chair of the Brennan Center's Blue Ribbon Panel.

I'd also like to thank the Brennan Center's distinguished president, my friend Michael Waldman, and your entire staff – particularly the Justice Program – for bringing us together today. It's an honor to take part in this important conference. It's a privilege to be at NYU Law School for the second time in as many weeks. And it's a great pleasure, as always, to be back home in New York City.

For nearly two decades, the Brennan Center has provided indispensable leadership on issues ranging from campaign finance and voting rights to national security and equal justice. You've offered rigorous research and expert guidance to policymakers at every level of government. And with this conference – and the report you're unveiling today – you're taking yet another step to advance our efforts to address some of our nation's most critical challenges – few of which are more complex, or more urgent, than the need to strengthen America's criminal justice system and reduce our overreliance on incarceration.

Case 1:19-cr-00374-JMF Document 433-1 Filed 05/19/22 Page 3 of 4

As you know, we gather this afternoon just over a year after the launch of the Justice Department's Smart on Crime initiative – a series of important changes and commonsense reforms I set in motion last August. Already, these changes are fundamentally shifting our response to certain crime challenges – particularly low-level, nonviolent drug offenses. And this initiative is predicated on the notion that our work as prosecutors must be informed, and our criminal justice system continually improved, by the most effective and efficient strategies available.

After all – as I've often said – the United States will never be able to prosecute or incarcerate its way to becoming a safer nation. We must never, and we will never, stop being vigilant against crime – and the conditions and choices that breed it. But, for far too long – under well-intentioned policies designed to be "tough" on criminals – our system has perpetuated a destructive cycle of poverty, criminality, and incarceration that has trapped countless people and weakened entire communities – particularly communities of color.

In recent decades, the effects of these policies – and the impact of the "truth-in-sentencing" mindset – have been dramatic. Although the United States comprises just five percent of the world's population, we incarcerate almost a quarter of its prisoners. The entire United States population has increased by about a third since 1980. But the federal prison population has grown by almost 800 percent over the same period. Spending on corrections, incarceration, and law enforcement has exploded, consuming $260 billion per year nationwide. And the Bureau of Prisons currently commands about a third of the Justice Department's overall budget.

Perhaps most troubling is the fact that this astonishing rise in incarceration – and the escalating costs it has imposed on our country, in terms both economic and human – have not measurably benefited our society. We can *all* be proud of the progress that's been made at reducing the crime rate over the past two decades – thanks to the tireless work of prosecutors and the bravery of law enforcement officials across America. But statistics have shown -- and all of us have seen – that high incarceration rates and longer-than-necessary prison terms *have not* played a significant role in materially improving public safety, reducing crime, or strengthening communities.

In fact, the opposite is often true. Two weeks ago, the *Washington Post* reported that new analysis of crime data and incarceration rates – performed by the Pew Charitable Trusts, and covering the period of 1994 to 2012 – shows that states with the most significant drops in crime *also* saw reductions in their prison populations. States that took drastic steps to reduce their prison populations – in many cases by percentages well into the double digits – saw crime go down as well. And the one state – West Virginia – with the greatest increase in its incarceration rate actually experienced an *uptick* in crime.

As the *Post* makes clear: "To the extent that there is any trend here, it's actually that states incarcerating people have seen *smaller* decreases in crime." And this has been borne out at the national level, as well.

Since President Obama took office, both overall crime *and* overall incarceration have decreased by approximately 10 percent. This is the first time these two critical markers have declined together *in more than 40 years*. And although we have a great deal of work to do – and although, last year, some states continued to record growth in their prison populations – this is a signal achievement.

We know that over-incarceration crushes opportunity. We know it prevents people, and entire communities, from getting on the right track. And we've seen that – as more and more government leaders have gradually come to recognize – at a fundamental level, it challenges our commitment to the cause of justice.

Fortunately, I can report today that we are *finally* moving in the right direction, at least at the federal level. Over the past year, the federal prison population declined by roughly 4,800 inmates – the first decrease we've seen in many decades.

Even more promising are new internal projections from the Bureau of Prisons. In a dramatic reversal of prior reports – which showed that the prison population would continue to grow, becoming more and more costly, overcrowded, and unsafe – taking into account our new policies and trends, our new projections anticipate that the number of federal inmates will fall by just over 2,000 in the next 12 months – and by *almost 10,000* in the year after.

This is nothing less than historic. To put these numbers in perspective, 10,000 inmates is the rough equivalent of the combined populations of *six* federal prisons, each filled to capacity. Now, these projected decreases won't result in any prison closures, because our system is operating at about 30 percent above capacity. But my hope is that we're witnessing the start of a trend that will only accelerate as our Smart on Crime changes take full effect.

Clearly, criminal justice reform is an idea whose time has come. And thanks to a robust and growing national consensus – a consensus driven not by political ideology, but by the promising work that's underway, and the efforts of leaders like Senators Patrick Leahy, Dick Durbin, Mike Lee, and Rand Paul – we are bringing about a paradigm shift, and witnessing a historic sea change, in the way our nation approaches these issues.

Of course, for these changes to become permanent, we'll need to rely on the dedication – and the leadership – of federal prosecutors in Washington and in all 94 of our United States Attorney's Offices. As a career prosecutor myself – and as former U.S. Attorney for the District of Columbia – I have always had the utmost confidence in, and respect for, these hardworking men and women. And that's why, as Attorney General, I've consistently advocated policies that push discretion out into the field.

The Smart on Crime initiative is in many ways the ultimate expression of my trust in the abilities – and the judgment – of our attorneys on the front lines. And although some have suggested that recent changes in charging and sentencing policies might somehow undermine their ability to induce cooperation from defendants in certain cases, today, I want to make it abundantly clear that nothing could be further from the truth.

As I know from experience – and as *all* veteran prosecutors and defense attorneys surely recognize – defendant cooperation depends on the certainty of swift and fair punishment, *not* on the length of a mandatory minimum sentence. Like anyone old enough to remember the era before sentencing guidelines existed and mandatory minimums took full effect, I can testify to the fact that federal guidelines attempted to systematize the kinds of negotiations that were naturally taking place anyway. As our U.S. Attorney for the Western District of Wisconsin, John Vaudreuil, often reminds his colleagues, even without the threat of mandatory minimums, it remains in the interests of *all* attorneys to serve as sound advocates for their clients – and for defendants to cooperate with the government in exchange for reduced sentences.

Far from impeding the work of our prosecutors, the sentencing reforms I've mandated have strengthened their discretion. The contention that cooperation is somehow dependent on mandatory minimums is tied to a past at tension with the empirical present, and is plainly inconsistent with history, and with now known facts. After all, as the Heritage Foundation observed earlier this year: "[t]he rate of cooperation in cases involving mandatory minimums is comparable to the average rate in *all* federal cases."

Of course, as we refine our approach and reject the ineffective practice of calling for stringent sentences against those convicted of low-level, nonviolent crimes, we *also* need to refine the metrics we use to measure success; to evaluate the steps we're taking; and to assess the effectiveness of new criminal justice priorities. In the Smart on Crime era, it's no longer adequate – or appropriate – to rely on outdated models that prize only enforcement, as quantified by numbers of prosecutions, convictions, and lengthy sentences, rather than taking a holistic view.