# EXHIBIT B

# A Report on Behalf of The American Bar Association Task Force on The Reform of Federal Sentencing for Economic Crimes

## Task Force Members

- Stephen Saltzburg (Chair)
  Professor of Law, George Washington
  University School of Law

- James E. Felman, Esquire (Reporter)
  Kynes, Markman & Felman, P.A.

- Sara Sun Beale
  Professor of Law
  Duke University School of Law

- Barry Boss, Esquire
  Cozen O'Connor

- David Debold, Esquire
  Gibson Dunn & Crutcher

- The Honorable Nancy Gertner
  Professor of Law
  Harvard Law School

- The Honorable John Gleeson
  United States District Court
  Eastern District of New York

- Gary Lincenberg, Esquire
  Bird, Marella, Boxor, Wolpert,
  Nessim, Brooks & Lincenberg

- The Honorable Gerard Lynch
  United States Court of Appeals
  for the Second Circuit

- Jane Anne Murray
  Professor of Law
  University of Minnesota Law School

- Kyle O'Dowd, Esquire
  Legislative Director, National
  Association of Criminal Defense Lawyers

- Marjorie J. Peerce, Esquire
  Stillman & Friedman, P.C.

- Mary Price, Esquire
  Vice President and General Counsel
  Families Against Mandatory Minimums

- The Honorable Jed Rakoff
  United States District Court
  Southern District of New York

- Neal Sonnett, Esquire
  Neal R. Sonnett, P.A.

- Kate Stith
  Professor of Law
  Yale Law School

- The Honorable Jonathan Wroblewski
  (Observer)
  Director, Office of Policy and Legislation
  United States Department of Justice

## Principles of consensus

The present working draft of a proposed guideline for the sentencing of federal economic crimes is submitted by the Task Force as a consensus proposal with the following understandings:

1. It is assumed that, for the foreseeable future, the current structural framework dictated by statute will remain in place, including the 25% rule (28 U.S.C. § 994(b)(2)), and that the Commission therefore will still find it necessary to assign fairly specific numeric values to sentencing considerations. The draft proposal is written to comply with that assumed structural framework.

2. This structural framework is not ideal because it can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

3. A better structural framework would allocate greater sentencing authority to the judiciary.

4. The Task Force is not necessarily of one mind regarding the ideal allocation of sentencing authority between the Congress, the Sentencing Commission, the Judiciary, and the Executive Branch, but it was not deemed necessary to achieve consensus on this point in light of the assumption that the current structural framework will remain in place.

## Economic Offenses

(a) **Base Offense Level:** [6-8]

(b) **Specific Offense Characteristics**

    (1) **Loss**. If the loss exceeded $20,000, increase the offense level as follows:

        (A) More than $20,000     add [4]
        (B) More than $100,000     add [6]
        (C) More than $1,000,000     add [8]
        (D) More than $5,000,000     add [10]
        (E) More than $10,000,000     add [12]
        (F) More than $50,000,000     add [14]

    (2) **Culpability**

        (A) Lowest culpability     subtract [6-10]
        (B) Low culpability     subtract [3-5]
        (C) Moderate culpability     no change
        (D) High culpability     add [3-5]
        (E) Highest culpability     add [6-10]

    (3) **Victim Impact**

        (A) Minimal or none     no increase
        (B) Low     add [2]
        (C) Moderate     add [4]
        (D) High     add [6]

(c) **Special Offense Considerations**

For offenses of a kind specified in Section 2B1.1(b)(3) through (9), (11) through (14), or (16) through (18), the court should consider those offense characteristics to the extent they are appropriate in determining culpability or victim impact. Where the offense presents a special concern of the kind intended to be addressed by these subsections, and where the concern has not been addressed in determining the offense level, increase by 2 offense levels. [additional specific Congressional directives].

(d) **Offense level cap of 10 for non-serious offenses by first offenders**

If the defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.

*Application Notes*:

1. *Loss*:

   [To be incorporated from current 2B1.1 with the modification that loss means actual loss].

2. *Culpability*:

   The Guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others, and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive. Other factors may also bear on the culpability level.

   The Guideline does not assign a numeric score to each individual culpability factor. Instead, the court arrives at one of five culpability levels after considering the combined effect of all culpability factors. The weight that each particular culpability factor plays in a given case defies a simple numeric formula. Culpability factors (such as a defendant's motive, for example) are not easily quantified and often operate on a continuum with many potential degrees. Furthermore, the many potential combinations of multiple culpability factors make it impractical to assign values to the individual factors. In assigning a culpability level, the court should consider where the defendant ranks in culpability compared to the universe of defendants to whom Section 2B1.1 applies.

   In assigning a culpability level, the court should consider the following factors, as well as others that may be relevant to a defendant's culpability. In doing so, the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate specific offense characteristic. There is also some overlap between the considerations that inform the defendant's level of culpability and those that bear on the defendant's role in the offense as determined under Chapter Three. The court should take this potential "double counting" into consideration in fashioning an appropriate sentence, which may in some instances warrant a downward departure from the applicable sentencing range.

(A) *Motive/Nature of Offense*

One factor in the culpability level is the defendant's motive or the nature of the offense. The following examples occur frequently in cases sentenced under this Guideline.

(1) *Predatory* – These offenses are intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking. These offenses – accompanied by no legitimate purpose – are among the most culpable types of offenses sentenced under this Guideline.

(2) *Legitimate ab initio* – These offenses often arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties. Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.

(3) *Risk shifting* – These offenses are not specifically intended to cause loss. Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense. Examples include false statements for the purpose of obtaining a bank loan that is intended to be repaid. Such offenses are generally less culpable than those where loss is specifically intended.

(4) *Gatekeeping* – These offenses are not specifically intended to cause loss or even to shift the risk of loss. Instead, they violate so-called "gatekeeping" requirements intended generally to prevent practices that create potential loss or a risk of loss. Examples include the sale of medical products by a company that lacks the appropriate government certification. Such offenses are generally at the lower level of culpability under this factor.

There may be cases where the nature of the offense fits more than one of these descriptions. And there may be cases for which none of these categories is appropriate. Whether or not these descriptions fit a particular case, the court should take them into account when considering how the defendant's motive (including the nature of the offense) compare, for culpability purposes, to that of other defendants sentenced under this Guideline.

(B)   *Gain*

Another culpability factor is the gain to the defendant or to others involved in the criminal undertaking.

>   (1)   *Commensurate with loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is roughly commensurate with the loss, this ordinarily indicates a higher degree of culpability.

>   (2)   *Less than loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability than (1).

>   (3)   *Minimal or Zero* – Where the defendant and others involved in the criminal undertaking derive little or no gain from the offense, this ordinarily indicates a lesser degree of culpability than (2).

The extent to which the defendant *personally* gained may also be relevant to the culpability level. For example, an accountant convicted for participation in a securities fraud scheme would be less culpable (on the factor of gain) than an officer of the company who personally gained more than the accountant. Also, a small amount of gain in relation to the loss may not always mean a lower level of culpability. For example, a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss. The degree of culpability in this example varies depending on the extent to which the loss was foreseeable to the defendant.

(C)   *Degree of sophistication/organization*

Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability. The reverse is also true – where the offense is executed in a simple manner without the involvement of large numbers of participants, this generally reflects a lesser threat of harm and a lower level of culpability. The court should also consider the extent of the defendant's contribution to the offense's sophistication or organization. A defendant with less responsibility for the offense's sophistication or organization would be less culpable, all other things being equal, than one with greater responsibility for these characteristics.

(D)  *Duration*

As with sophistication and organization, the duration of the offense also frequently reflects differences in culpability. Criminal undertakings that extend over several months or longer suggest a greater degree of culpability, while those that occur in a single event or over a shorter period of time in many circumstances reflect a lower level of culpability.

(E)  *Extenuating circumstances*

Some defendants will commit an offense in response to various circumstances, such as coercion or duress. There are many extenuating circumstances that could contribute to the commission of an offense, and the extent of their contribution will also vary from case to case. A defendant's culpability will be affected by the nature of these extenuating circumstances and the extent to which they played a part in the commission of the offense.

(F)  *Efforts to mitigate harm, including voluntary cessation, self-reporting, or restitution*

A defendant will sometimes take steps that help mitigate the harm or otherwise reflect a lower level of culpability. Where the defendant voluntarily ceases the offense conduct prior to its detection, this generally indicates a decreased level of culpability. Self-reporting of the offense is also a sign of lower culpability, as is voluntary restitution. In considering the significance of restitution, care must be taken not to punish a defendant more severely as a result of a lack of financial resources.

The court may consider a defendant's cessation of criminal conduct even if it does not qualify as a legal defense to conviction for conduct that occurred after the defendant's involvement ceased. For example, the court may consider the fact that a defendant ceased taking part in a conspiracy even though the legal standard for withdrawing from the conspiracy was not met.

*Consideration of the various culpability factors*

Because of the nature and number of these culpability factors, as well as the almost limitless variety of possible combinations, there is no workable formula for assigning values to each individual factor. In some cases, the defendant's motive will be the factor most indicative of the defendant's culpability. In other cases, extenuating circumstances will play the most prominent role. Also, these various factors will often overlap. A less culpable motive, or a less culpable nature of the offense, will sometimes be evident in the extenuating circumstances that prompted the defendant to commit the offense. The end result of the court's analysis should be a culpability level that "ranks" the defendant in the hierarchy of five levels of culpability for all defendants sentenced under this Guideline. The court should therefore ask, at the end of the process, whether the level assigned is appropriate in comparison to that for defendants in other cases to which this Guideline applies.

As a way of assisting the court in making that assessment, it is anticipated that, over time, approximately [5%] of all defendants sentenced under this Guideline will be assigned the "highest culpability" level, while approximately [5%] will be assigned the "lowest culpability" level. The middle – "moderate culpability" – is intended to be the largest category, accounting for approximately [40%] of all defendants. These are rough guides that the Commission will re-evaluate based on experience and judicial feedback.

3. *Victim Impact*:

The Guideline has four levels of victim impact: (1) minimal or none; (2) low; (3) moderate; and (4) high. As with the culpability levels, there are many factors to consider in arriving at the appropriate level of victim impact. The court should consider how the combination of these factors places the defendant's offense in comparison to victim impact in other cases under this Guideline.

(A)   *Vulnerability of victims*

Where victims are identified and targeted because some particular vulnerability they suffer makes the offense easier to commit or more difficult to detect, this generally indicates a higher degree of victim impact.

(B)   *Significance of loss*

Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact. This may be more common where the victims are individual as opposed to institutional.

(C)   *Other non-economic harm*

Where the victim has suffered a significant non-economic harm, this may not be captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense under some circumstances in the absence of an upward adjustment reflecting victim impact.

(D)   *Victim inducement of offense*

In some circumstances the victim has contributed to the offense in some manner. This may include inducing the commission of the offense or some lesser degree of conduct. Under such circumstances it may be appropriate to partially discount the impact on the victim as a measure of offense severity.

4. *Offense level cap for offenses that are not "otherwise serious"*:

    The Sentencing Reform Act provides as follows: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense...." 28 U.S.C. § 994(j). Many of the offenses falling within this guideline are not "otherwise serious." Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense. Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.