

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 26, 2022

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Michael Avenatti*, 19 Cr. 374 (JMF)

Dear Judge Furman:

      The Government respectfully writes in advance of the sentencing of defendant Michael Avenatti, and in response to the defendant's sentencing letter dated June 9, 2021 (Dkt. No. 433) ("Def. Letter").

      Avenatti was convicted, following a jury trial, of wire fraud (Count One), in violation of 18 U.S.C. § 1343, and aggravated identity theft (Count Two), in violation of 18 U.S.C. § 1028A. These charges arose from the defendant's scheme to defraud his former client, Stephanie Clifford (also known as Stormy Daniels), of money that she was supposed to receive in connection with a book contract. Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the sentencing range applicable to the defendant's conduct is 65 to 75 months' imprisonment, as set forth in the Presentence Investigation Report ("PSR") of the United States Probation Office ("Probation Office").

      The Probation Office recommends a sentence including a term of 48 months' imprisonment, with 24 months imposed on Count One to run concurrently with the sentence imposed by the Honorable Paul G. Gardephe in *United States v. Avenatti*, No. 19 Cr. 373 (PGG), and 24 months imposed on Count Two to be served consecutively. Avenatti has requested that the Court impose a sentence of imprisonment of 36 months and 1 day, with 12 months and 1 day imposed on Count One to run concurrently with the sentence imposed by Judge Gardephe and 24 months imposed on Count Two to run consecutively. For the reasons set forth below, the Government submits that a substantial but below-Guidelines sentence on Count One and a Guidelines sentence of two years' imprisonment on Count Two, both to be served consecutively to the sentence imposed by Judge Gardephe, would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

I.      **Background**

    A.      **Offense Conduct**

As described in the PSR and proven at trial, Avenatti stole from his client.[1] He did so to support his own business and fund his own lifestyle. He did so despite presenting himself to the world as his client's champion and defender and despite using that feigned credibility to secure fame and pursue political influence. And he did so by exploiting his position of trust and authority as an attorney, by forging his client's signature, and by lying to his client and others repeatedly and callously for months.

Avenatti met Stormy Daniels in February 2018, when Daniels was seeking an attorney to assist her with respect to a non-disclosure agreement that she had earlier signed with President Donald Trump. (PSR ¶ 17; Trial Tr. 886-89.) Daniels spoke to another attorney, Sean Macias, who declined to represent Daniels after she explained that she could not afford to pay for representation. (*See* Trial Tr. 720-22.) Macias, however, introduced Daniels to Avenatti, a colleague and friend. (Trial Tr. 722.) Avenatti saw opportunity in representing Daniels, and offered to serve as her lawyer for $100, with fees and costs to be paid from proceeds of a crowdfunding campaign. (*See, e.g.*, Trial Tr. 722-26, 889-95; GX 3.) Avenatti and Daniels also agreed that Avenatti might be able to earn a fee from helping Daniels obtain a publishing contract for her memoir, subject to Avenatti and Daniels later agreeing on such a fee. (Trial Tr. 895; GX 3.) In fact, although Daniels did, with assistance from Avenatti, ultimately secure a book contract with a guaranteed $800,000 advance, Avenatti and Daniels never agreed to any fee from Daniels' book contract and Avenatti disclaimed any interest in obtaining such a fee. (PSR ¶ 18; Trial Tr. 895, 910-14.)

Avenatti's representation of Daniels paid off handsomely—both in exposure and financially. As a result of the representation and of presenting in public as Daniels' advocate against President Trump, Avenatti appeared frequently on national media and became a widely recognized public figure. (PSR ¶ 17.) Indeed, Avenatti managed to secure his own book contract with a $2 million advance, payable if he met certain contractual prerequisites, which he ultimately did not.[2] (Trial Tr. 124.) Moreover, by his own accounting, Avenatti received at least approximately $592,515 from the crowdfunding platform to cover costs and fees. (GX 2.) Avenatti also directly benefited from Daniels' book deal, as, unbeknownst to Daniels, he sought and received a 2.5% referral fee—$20,000—from Daniels' book agent. (Trial Tr. 122; GX 701.)

Nonetheless, by at least February 2018, Avenatti and his law firm were both facing significant financial difficulties. (Trial Tr. 387-88, 413-14.) Indeed, Avenatti's law firm was

---

[1]     Because the Court presided over the trial, this letter does not describe all aspects of the scheme or cite all relevant evidence.

[2]     Avenatti did receive approximately $475,000 or $500,000 from this advance. (Trial Tr. 124.)

behind on rent and payroll. (Trial Tr. 387-88.) These circumstances continued to worsen between July 2018 and February 2019, and Avenatti's firm was evicted from its offices. (Trial Tr. 413-14.)

Beginning in July 2018, Avenatti intercepted and stole two of the four payments intended for Stormy Daniels and made by the publisher of her memoir. Avenatti, purporting to be acting in the interests of his client, instructed Daniels' literary agent, Luke Janklow, to wire Daniels' payment to a new bank account. (PSR ¶ 19; Trial Tr. 148-49; GX 210.) Janklow told Avenatti that it was not possible to change the destination for Daniels' payments without authorization from Daniels. (PSR ¶ 19; GX 212.) In response, Avenatti created a false authorization apparently from Daniels, and instructed his paralegal to insert a copy of Daniels' signature. (PSR ¶ 19; GX 213.) After receiving this forged authorization, Janklow, believing that Daniels had approved it, directed the payment to the new account, controlled by Avenatti, who promptly took and spent the money. (PSR ¶ 19; GX 701, 702.)

Soon thereafter, Daniels began asking Avenatti why she had not yet been paid. (PSR ¶ 20; GX 804 at 2-3.) Avenatti lied to Daniels and blamed the publisher, claiming that the publisher had never made the payment that Avenatti had in fact stolen. (PSR ¶ 20.) Avenatti then sought money to replace the stolen funds before Daniels discovered Avenatti's subterfuge. (PSR ¶ 20.) Avenatti showed up at Macias's office, admitted that he was in a desperate financial condition, and pressed Macias for a loan. (Trial Tr. 733-36.) Macias ultimately did help Avenatti secure a personal loan from a friend of Macias. (Trial Tr. 736-50; GX 804 at 3.) Avenatti then used the proceeds from that loan to have a check deposited in Daniels' account—instructing his paralegal to use a cashier's check to obscure the provenance of the money. (PSR ¶ 20; GX 804 at 3.)

Avenatti's attention soon turned to Daniels' next book payment, and he began to press her publisher to make the payment earlier. (PSR ¶ 21; GX 804 at 4.) The publisher agreed, and made the payment to Janklow in September 2018. (PSR ¶ 21.) Janklow remitted the money to Avenatti's account, and Avenatti again took and spent the money. (PSR ¶ 21; GX 701, 702.) Over the next several months, Avenatti frequently lied to Daniels, claiming that the publisher never made the payment and continuing to suggest that he (Avenatti) was fighting for her; he also lied to the publisher and Janklow, claiming that Daniels was confused and instructing and imploring them not to respond to Daniels' requests for information. (PSR ¶ 22; GX 804 at 4-18.) Daniels intended to use this payment for a down payment on a house that would allow her to live separately from her ex-husband. (Trial Tr. 965.) Only after repeated efforts to speak directly to the publisher and to Janklow did Daniels finally discover that the publisher had made the payments months earlier and that it was her own attorney who had taken her money and lied to her for the better part of a year. (PSR ¶ 22; GX 804 at 18-20.)

### B. The Advisory Guidelines Range

The Probation Office calculates the defendant's advisory Guidelines range as follows:

- **Count One**
    - The Guideline applicable to Count One is U.S.S.G. § 2B1.1. (PSR ¶ 31.)

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 4

- o Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7 because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more. (PSR ¶ 31.)

- o Pursuant to U.S.S.G. § 2B1.1(b)(1)(G), because the loss from the offense exceeded $250,000 but was less than $550,000, the offense level is increased by 12 levels. (PSR ¶ 32.)

- o Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of private trust and/or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, the offense level is increased by 2 levels. (PSR ¶ 34.)

- o Accordingly, the applicable Guidelines offense level for Count One is 21. (PSR ¶ 39.)

- **Count Two**

  - o The Guideline that applies to Count Two is U.S.S.G. § 2B1.6. (PSR ¶ 30.)

  - o Pursuant to U.S.S.G. § 2B1.6(a) and 18 U.S.C. § 1028A, the Guidelines sentence is the minimum term of imprisonment required by statute, which is two years, and must be imposed consecutively to any other term of imprisonment. (PSR ¶ 30.)

- **Criminal History Category**

  - o On or about February 14, 2020, the defendant was convicted, in the United States District Court for the Southern District of New York, of (1) transmission of interstate communications with intent to extort, in violation of Title 18, United States Code, Sections 875(d) and 2; (2) attempted extortion, in violation of Title 18, United States Code, Sections 1951 and 2; and (3) honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346. On July 8, 2021, the defendant was sentenced to 30 months' imprisonment. (PSR ¶ 41.)

  - o Pursuant to U.S.S.G. § 4A1.1(a), this conviction results in three criminal history points. (PSR ¶ 42.)

  - o Accordingly, the defendant's Criminal History Category is II. (PSR ¶ 43.)

Based upon the calculations set forth above, the defendant's sentencing range on Count One is 41 to 51 months' imprisonment, to be followed by a mandatory two-year consecutive term of imprisonment on Count Two, yielding an effective range of 65 to 75 months' imprisonment. (PSR ¶ 119.)

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 5

## II. Discussion

### A. The Probation Office's Guidelines Calculation Is Correct

The defendant contends that the Probation Office's calculation of the advisory Guidelines range is incorrect. (Def. Letter 10-11.) First, the defendant argues that the loss amount applied by the Probation Office under U.S.S.G. § 2B1.1(b)(1) is wrong, and, indeed, that he should not be held to account for any loss under the Guidelines, notwithstanding his theft from his client. (Def. Letter 10-11.) Second, the defendant argues that he is entitled to a downward departure because the Criminal History Category of II "substantially over-represents" his criminal record. (Def. Letter 11.) Neither argument has merit.[3]

#### 1. The Correct Loss Amount Is $297,500

As observed above, the defendant diverted and stole two payments intended for Daniels, each in the amount of $148,750, for a total loss of $297,500. (*See, e.g.*, GX 701.) The defendant now argues that he should not be held accountable for the first payment stolen because he "gave Ms. [Daniels] a sum of money equivalent to" the amount taken. (Def. Letter 10.) The Sentencing Guidelines explain, however, that a defendant may receive a credit against loss only for "money returned" before "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim." U.S.S.G. § 2B1.1 cmt. 3(E)(i)(II).

The defendant asserts that "the facts at trial do not establish by a preponderance of the evidence that he [returned the money] after 'the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim.'" (Def. Letter 10 (quoting U.S.S.G. § 2B1.1 cmt. 3(E)(i)(II)).) As an initial matter, Avenatti did not return the money stolen; he sought out new funds to place in Daniels' account after depriving her of her money for weeks, and on this basis alone is not entitled to a credit against loss. *See* U.S.S.G. § 2B1.1 cmt. 3(E)(i) (credit against loss only permitted for "[t]he money *returned*" (emphasis supplied)); *United States v. Fumo*, 655 F.3d 288, 312-13 (3d Cir. 2011) ("The use of the word 'returned' signifies that for a credit to apply, the defendant must have either *returned* the very same money or property,

---

[3] The defendant seeks a number of factual corrections to the PSR (Def. Letter 11-12), to which the Government does not object.

The defendant also argues generally, based substantially on a concurring opinion by the Honorable Stefan R. Underhill in *United States v. Corsey*, 723 F.3d 366, 377-82 (2d Cir. 2013), that the Guidelines range under U.S.S.G. § 2B1.1 is unreliable due to the reliance on that provision's loss table. Judge Underhill's views of the loss table are wholly irrelevant here. Judge Underhill's concerns were focused on the impact of the loss table in "high-loss cases," such as in *Corsey*, where the loss amount produced an advisory Guidelines sentence of the statutory maximum of 20 years, but the "conspiracy to defraud involved no actual loss, no probable loss, and no victim." *Id.* at 378-79. By contrast, the present case is not a "high-loss case," and the defendant's conduct involved both actual loss and an actual victim—his own client.

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 6

or have provided services that were applied to the very same money, value, or property that was lost or taken during the fraud." (emphasis in original)).

In any case, contrary to the defendant's bald assertion, the evidence admitted at trial was conclusive that the defendant specifically sought out money to put in Daniels' account to forestall her imminent discovery of his crime. Specifically, and as described further above, text message evidence demonstrates that on August 27, 2018, which was approximately one month after Avenatti had stolen the first installment of $148,750, Daniels—believing that it was the publisher who failed to make the payment—told Avenatti that she (Daniels) intended to email the publisher to inquire as to the whereabouts of the missing payment. (GX 26, GX 804.) On Friday of that week, Avenatti told Macias that Daniels was "going crazy" over the missing money, which, Avenatti lied, had not been paid by the publisher. (Trial Tr. 729, 732.) On Tuesday of the following week, Avenatti appeared at Macias's office and begged for a personal loan, going to desperate lengths to secure one. (Trial Tr. 733-50.)

The purpose of the loan was clear: Avenatti used the proceeds to deposit a check into Daniels' bank account, taking steps to obscure the source of the money, including using a cashier's check and lying to Daniels about how he had received the check. (PSR ¶ 20; Trial Tr. 928-29; GX 804 at 3.) And if the defendant's intent in paying that money to Daniels were not obvious enough, he stole another payment from Daniels just weeks later—hardly suggesting that he returned the money to make her whole. In short, Avenatti did not "return" the money he had stolen from Daniels and to the extent he repaid her the amount of the first stolen payment, he did so only after it became clear to him that Daniels would soon detect his offense if he did not repay her. Accordingly, any money arguably returned to Daniels was done so only after "the time the defendant knew or reasonably should have known that the offense was . . . about to be detected by a victim," and the defendant is not entitled to a credit against loss. U.S.S.G. § 2B1.1 cmt. 3(E)(i)(II).

The defendant's second argument carries, if anything, less weight. He contends that because he "expended considerable time, energy, and resources" for Daniels, for which he feels "he was never fully reimbursed or compensated," no loss should be attributed to his fraud. (Def. Letter 11.) In fact, as discussed above, the defendant was compensated for his effort in precisely the manner to which he agreed: he was paid a $100 retainer, approximately $600,000 derived from crowdsourced funds, and an estimable amount in publicity and exposure. He was even paid an additional $20,000 to which Daniels did not agree and of which she was not aware, due to his extraction of a referral fee from Daniels' agent. Perhaps more importantly, however, the defendant points to no authority that would permit the Court simply to ignore the loss caused to a victim on the basis that the defendant felt that he expended time or energy for the victim over the course of their relationship.

In short, the applicable loss amount under the Guidelines is $297,500.[4]

---

[4] The defendant also strangely claims that the Government "stated that the loss amount at issue was $148,750." (Def. Letter 10 (citing Trial Tr. 1525).) In support of this assertion, the

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 7

## 2. A Downward Departure Is Not Warranted

The defendant's Criminal History Category of II is based on the 30-month sentence of imprisonment imposed by Judge Gardephe following the defendant's convictions for transmission of interstate communications with intent to extort, attempted extortion, and honest services wire fraud. (PSR ¶ 41.) Those convictions arose from the defendant's wrongful use of confidential information obtained from a client in a failed effort to extort NIKE, Inc., into paying at least $15 million, not to the client, but directly to the defendant. (*See id.*) The defendant now contends that the criminal history points resulting from this prior sentence "'substantially over-represent' his record," and that he should therefore receive a downward departure such that he be sentenced as if he had no criminal record. (Def. Letter 11.) The Sentencing Guidelines do not provide for a downward departure in these circumstances.

In the introductory commentary to the criminal history analysis, the Sentencing Guidelines explain that "[a] defendant's record of past criminal conduct is directly relevant to" the purposes of sentencing because, among other things, "[t]o protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered" and "[r]epeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." U.S.S.G. ch. 4, pt. A, introductory cmt. Accordingly, the Sentencing Guidelines use "[t]he specific factors included in § 4A1.1 and § 4A1.3," which "are consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior." U.S.S.G. ch. 4, pt. A, introductory cmt.

Section 4A1.3 of the Sentencing Guidelines sets out criteria for upward and downward departures based on "inadequacy of criminal history category." A downward departure "may be warranted" "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). As illustration for this concept, the Sentencing Guidelines provides the example that a downward departure may be warranted if "the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3 cmt. n.3.

The defendant's recent 30-month sentence based on three felony convictions for extortion and honest services fraud bears no reasonable relation to the illustrative example of a downward departure provided by the Sentencing Guidelines, and there is no reliable information indicating

---

defendant cites to transcript pages reflecting a discussion, during the charge conference, regarding a potential good faith instruction. The Government noted the concern that certain proposed language might suggest to the jury "that part of their job is to be the arbitrator, is to determine what a reasonable fee was," and that "[i]f it was reasonable for him to take $148,750, then that is a defense." (Trial Tr. 1525.) This passage, in which the Government remarked upon a potential, improper defense argument and made reference to one of the payments as an illustration, had nothing whatsoever to do with the loss amount under the United States Sentencing Guidelines in this case.

that the defendant's Criminal History Category of II substantially over-represents the seriousness of his criminal history or likelihood of recidivism. The defendant's criminal history demonstrates the outrageous extent of criminal conduct that the defendant is willing to engage in to support his own lifestyle and confirms a pattern of defrauding his own clients for self-gain. Simply put, the three criminal history points resulting from the defendant's prior sentence serve—and perhaps only minimally—the Sentencing Guidelines' goals of accounting for the likelihood of recidivism.

The defendant's only argument to the contrary is that "the Government did not have to proceed against Mr. Avenatti in this district under two different indictments" and, had the cases been consolidated, the defendant "would have had a single sentencing date for" the charges in both this case and his case before Judge Gardephe. (Def. Letter 11.) But this point—even if it were correct—is entirely irrelevant to the question posed by the Sentencing Guidelines in assessing whether a departure is warranted, which is whether "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). And the defendant is not correct. He offers no support or argument for his claim that the Government could have proceeded in a single charging instrument, at no time did the defendant seek to consolidate the two cases, and had the Government done so, the defendant likely would have moved to sever the unrelated offenses, and his sentencing exposure for the consolidated cases would have required an entirely different Guidelines analysis. That the defendant committed two unrelated offenses is precisely why his criminal history in this second sentencing reflects a prior conviction.

Indeed, had the two cases proceeded together, and had the defendant been sentenced on all convictions at once, there would be a substantial argument for an upward departure under Section 4A1.3 on the basis that a Criminal History Category of I "substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," given the breadth of the defendant's various criminal schemes. U.S.S.G. § 4A1.3(a)(1). Although the Government does not seek an upward departure now, one might wonder if a Criminal History Category of II is actually sufficient here to serve the purposes of the criminal history computation, given that the defendant has been separately charged in the Central District of California with stealing from numerous other clients and engaging in tax and bankruptcy fraud. *See* U.S.S.G. § 4A1.3(a)(2)(E) (an upward departure for inadequacy of criminal history category may be supported by "[p]rior similar adult criminal conduct not resulting in a criminal conviction").

The Probation Office correctly calculated the defendant's Criminal History Category as II, and no downward departure is warranted.

      **B.    A Substantial Consecutive Sentence Should Be Imposed**

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of general deterrence, a substantial but below-Guidelines sentence on Count One and a Guidelines sentence of two years' imprisonment

on Count Two, both to be served consecutively to the sentence imposed by Judge Gardephe, would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

*First*, the nature and seriousness of the offenses and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant committed a serious crime. He stole from a client—someone who put her trust in him and relied on him, and his commitment to his own professional and ethical duties, to represent her interests. Rather than honor these duties and commitments, the defendant stole from Daniels, forged an authorization letter with her signature, and—perhaps most galling of all—lied to her repeatedly for months, and described her as crazy to her literary agent and publisher to prevent them from speaking to her and discovering the truth. In fact, not only did the defendant lie to and steal from someone in breach of his solemn duties, but at the very same time he was doing so, he was appearing on television and other media, falsely presenting himself as Daniels' champion and defender.

The defendant has only now, less than a month before his sentencing, sought to express some form of remorse. (*See* Def. Letter 2-3 & Ex. A.) In support of this claimed contrition, the defendant sent a letter to Daniels, which is notable for what it includes and what it does not. Although the defendant does in the letter "apologize . . . for [his] actions and conduct," he goes on to recount how he made himself "available to [Daniels] 24/7 and felt that [he] was always there for [Daniels.]" (Def. Letter Ex. H.) The defendant further explains that he "made personal sacrifices" for Daniels, "[b]ut along the way . . . failed." (*Id.*) Despite being held up as evidence of contrition, the defendant's letter to Daniels (as well as his sentencing letter to the Court) never specifically acknowledges or expresses remorse for acting with intent to defraud Daniels, the core conduct with which he was convicted. Instead, it apologizes generally for failure, while committing approximately equal focus to the defendant's own purported "sacrifices."

The content of this letter is consistent with many of the arguments advanced by the defendant during his trial and again in his sentencing submission. As at trial, the defendant devotes much of his sentencing submission to arguing about the extensive work done and sacrifices made for Daniels. (*See* Def. Letter 8-11 & Ex. H.) The defendant may well have been, at certain times, a zealous advocate for his client. But he was not, as he seems to suggest, a victim of her demands. The defendant was under no obligation to represent Daniels, but did so on the terms that he presented to her and he received exactly what he sought: fame and a platform. The defendant could at any time have focused on his law practice to pay his bills. And, if he was dissatisfied with his arrangement with Daniels in light of the effort he spent on her representation, he could have raised the issue with her and negotiated a new fee agreement or withdrawn from the representation. Instead, he chose to steal his client's money.

Further, as the defendant himself acknowledges, "some may view his remorse as too little too late, and that the Court may look skeptically on his contrition given the way in which Mr. Avenatti's trial transpired." (Def. Letter 3.) It is difficult to ignore, on this count, an extremely lengthy cross-examination in which the defendant—without apparent benefit to the arguments he actually sought to make to the jury—berated his victim for lewd language and being a difficult client, questioned her invasively about marital and familial difficulties, and sought to cast her as crazy, much as he did during the course of his fraud to prevent her own agent and publisher from

responding to her pleas for help. (*See* Trial Tr. 1010-11, 1042-60, 1109-13, 1117-18, 1129-30.) The defendant certainly had every right to defend himself at trial. But he is not entitled to a benefit for showing remorse, having done so only when convenient and only after seeking to humiliate his victim at a public trial, and denigrating and insulting her for months to her agent and publisher while holding himself out as taking up her cause against the powerful who might have taken advantage of her.

The seriousness of this crime and of this conduct is not consistent with a sentence for the wire fraud conviction fully concurrent with the defendant's prior sentence. Rather, the nature and seriousness of the offenses and the need to provide just punishment warrant a consecutive sentence both for the defendant's scheme to defraud and for his identity theft.

*Second*, the needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(A), (2)(B). As is clear from the facts of this case, given the authority that attorneys wield over clients and their finances, attorney theft is not always easily detectible. A substantial sentence is therefore necessary to send a message to attorneys and other fiduciaries who might take advantage of their positions to benefit and enrich themselves at client expense.

A substantial sentence is similarly necessary for specific deterrence. The defendant contends that his likely expulsion from the bar and public humiliation are sufficient to satisfy this purpose of sentencing. (Def. Letter 20.) Certainly, these are circumstances that can and should be taken into account when fashioning a sentence. But it is also clear that a substantial sentence is necessary to deter this defendant from further criminal conduct. The trials in this case and before Judge Gardephe have laid bare the defendant's enormous capacity for and willingness to engage in fraud, deception, and other forms of criminality, and a sentence must be imposed that will deter the defendant from further abuses.[5]

---

[5] The defendant's tenuous relationship with the truth was apparent during trial, including in circumstances that seem gratuitous or even trivial. For example, the defendant began his summation by stating, "When my father was a teenager, he sold hot dogs at a ballpark." (Trial Tr. 1647.) The Court sustained the Government's objection, and the defendant did not complete the story. But walking back from the courthouse that day, the defendant proceeded to relate the full story to the media, explaining how his father, "Bill," worked at a ballpark selling hotdogs, how his father's boss instructed his father to sell broken hotdogs rather than throw them out, how "[his] dad said, well how do we do that if the hot dog are in pieces," how his father's boss responded that his father should cover them in mustard, and how the Government in this case was giving the jury the mustard. *See* https://twitter.com/innercitypress/status/1489375868715732997.

In fact, the defendant's father, William John Avenatti, was an executive for Anheuser-Busch. (PSR ¶ 48.) The tale instead is one that the defendant's standby counsel, who was to deliver the summation before the defendant determined to proceed *pro se*, has told at trials in this District about his own experience selling hotdogs at Shea Stadium. *See, e.g.*, *United States v. Calix*, No.

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 11

Finally, the defendant refers to a number of cases that he contends support his request for a fully concurrent sentence on Count One. (Def. Letter 16-18.) These cases are not instructive here. Although the cases do concern attorneys convicted of fraud or other misconduct, they do not involve outright client theft or the other aggravating factors discussed above. Most importantly, however, they do not address the central issue here, which is the extent to which the defendant's sentence should be served concurrently with or consecutive to the sentence imposed for entirely separate, egregious conduct. On that question, these cases, if anything, support a consecutive sentence for wire fraud (as well as aggravated identity theft), inasmuch as each of these cases involved a substantial sentence for the defendant.

### C. The Court Should Order Restitution and Forfeiture

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including fraud. *See* 18 U.S.C. § 3663A(c). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks and citation omitted). Accordingly, restitution to Daniels should be ordered in the amount of $148,750 to reflect the direct harm to her of the defendant's crimes.

Forfeiture should be ordered in the amount of $297,500, which reflects the property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense. 18 U.S.C. § 981(a)(1)(C); *see also id.* § 981(a)(2)(A) (in cases involving "illegal activities," forfeiture "not limited to the net gain or profit"); 21 U.S.C. § 853(c) ("All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section.").

---

13 Cr. 582 (LAP), Trial Tr. 61 (Sept. 11, 2017). That is, the defendant appropriated the story from his attorney, but, not content to use the device generically, claimed falsely to the press—and, until the sustained objection, to the jury as well—that the events had happened to his own father.

Honorable Jesse M. Furman
United States District Judge
May 26, 2022
Page 12

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial but below-Guidelines sentence on Count One and a Guidelines sentence on Count Two, both to be served consecutively to the sentence imposed by Judge Gardephe, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing, and also order restitution and forfeiture.

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

By:    s/ _____
        Matthew D. Podolsky
        Andrew A. Rohrbach
        Robert B. Sobelman
        Assistant United States Attorneys
        (212) 637-1947/2345/2616

cc:    Counsel of Record (by ECF)